IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF BUSINESS; and TEXAS BANKERS ASSOCIATION.<br><br>                                     *Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>                                     *Defendants*. | Case No. 6:22cv381 |

## COMPLAINT

Plaintiffs—Chamber of Commerce of the United States of America, Longview Chamber of Commerce, American Bankers Association, Consumer Bankers Association, Independent Bankers Association of Texas, Texas Association of Business, and Texas Bankers Association—bring this action for equitable relief against Defendants, Consumer Financial Protection Bureau (CFPB) and Rohit Chopra in his official capacity as Director of the CFPB. Plaintiffs primarily challenge the CFPB's recent update to the Unfair, Deceptive, or Abusive Acts or Practices (UDAAP) section of its examination manual.

## INTRODUCTION

1.      The CFPB is an agency with "vast authority." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2210 (2020). That vast authority makes the legal constraints that do exist all the more

important. Yet the CFPB's recent update is violating its statutory authority and the Administrative Procedure Act in three main ways:

2.      ***First***, the CFPB is exceeding its statutory authority outlined in the Dodd-Frank Act. The recent update to its examination manual adopts the novel position that the CFPB can examine entities for alleged discriminatory conduct under its UDAAP authority. *See* CFPB Supervision and Examination Manual, Unfair, Deceptive, or Abusive Acts or Practices Section at 11, 13, 14, 17 (revised Mar. 16, 2022) (Exhibit A). But the CFPB cannot regulate discrimination under its UDAAP authority at all because Congress declined to give the CFPB authority to enforce anti-discrimination principles except in specific circumstances. The CFPB's statutory authorities consistently treat "unfairness" and "discrimination" as distinct concepts. *E.g.*, 12 U.S.C. §5511(b); §5481(13); §5493(c)(2)(A); §5531(c); §5536(a)(1).

3.      ***Second***, the updated manual is "arbitrary" and "capricious." 5 U.S.C. §706(2)(A). Despite admitting that its UDAAP authority is modeled on the FTC's similar authority, Ex. A at 1 n.2, 2 n.4, the CFPB did not grapple with Congress's decision to narrowly define the FTC's unfairness authority to screen out the same kind of power that the CFPB is now claiming for itself.

4.      Worse, the CFPB reads Dodd-Frank as giving it the broadest possible authority to regulate both disparate treatment and disparate *impacts*. In touting the update, the CFPB stated that "[c]onsumers can be harmed by discrimination regardless of whether it is intentional," so examiners will consider "discriminatory outcomes." *See* Halperin & Salas, *Cracking Down on Discrimination in the Financial Sector*, CFPB (Mar. 16, 2022) (Exhibit B). While Plaintiffs support the enforcement of existing nondiscrimination statutes, Dodd-Frank is not such a statute and does not come close to authorizing the CFPB's action.

5.      ***Third***, the CFPB's updated manual violates the APA's procedural requirements because it constitutes a legislative rule that failed to go through notice and comment. 5 U.S.C. §553.

6.      To be clear, the Chamber of Commerce of the United States of America, Longview Chamber of Commerce, American Bankers Association, Consumer Bankers Association, Independent Bankers Association of Texas, Texas Association of Business, Texas Bankers Association, and their respective members fully support the fair enforcement of nondiscrimination laws. Yet they cannot stand by while a federal agency exceeds its statutory authority, creates regulatory uncertainty, and imposes costly burdens on the business community. Especially when the CFPB did not even give the public an opportunity to raise concerns through the APA's notice-and-comment process.

7.      This Court's intervention is needed to ensure that the CFPB is accountable to legal constraints, the rule of law, and the public as it pursues an aggressive agenda with far-reaching implications for the American economy, Plaintiffs, and their members.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction because this case arises under the Constitution and laws of the United States. *See* U.S. Const. art III, §2; 28 U.S.C. §§1331, 2201; 5 U.S.C. §§701-706.

9.      This Court is authorized to award the requested relief under 5 U.S.C. §706; 28 U.S.C. §1361; and 28 U.S.C. §§2201-02.

10.      Venue is proper in this district because Defendants include United States agencies and officers sued in their official capacities and because one of Plaintiffs resides here. *See* 28 U.S.C. §1391(e)(1).

## PARTIES

11.      Plaintiff Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every

industry sector, and from every region of the country. An important function of the U.S. Chamber is to represent the interests of its members before Congress, the executive branch, and the courts.

12.   Plaintiff Longview Chamber of Commerce is a voluntary representative organization of business and professionals who have joined together for the betterment of business, development of tourism, development of downtown Longview potential, and the overall quality of life in Longview.

13.   Plaintiff American Bankers Association (ABA) is the voice of the nation's $23.7 trillion banking industry, which is composed of small, regional and large banks that together employ more than 2 million people, safeguard $19.6 trillion in deposits and extend $11.8 trillion in loans. ABA advocates for banks before Congress, regulatory agencies and the courts to drive pro-growth policies that help customers, clients and communities thrive.

14.   Plaintiff Consumer Bankers Association (CBA) is the only national trade association focused exclusively on retail banking. Established in 1919, the association is a leading voice in the banking industry and Washington, representing members who employ nearly two million Americans, extend roughly $3 trillion in consumer loans, and provide $270 billion in small business loans. Part of its mission includes representing its members interests in various government settings.

15.   Plaintiff Independent Bankers Association of Texas (IBAT) is the largest state community banking organization in the nation, with membership comprised of more than 2,000 banks and branches in 700 Texas communities. Providing safe and responsible financial services to all Texans, IBAT member bank assets range in size from $27 million to $39 billion with combined assets statewide of nearly $256 billion. IBAT member banks are committed to supporting and investing in their local communities. IBAT advocates for and represents the interests of its members in various settings.

16.   Plaintiff Texas Association of Business (TAB) is the largest general business association in the state as well as the Texas State Chamber of Commerce.  TAB represents member

companies, large and small, to create a policy, legal, and regulatory environment that allows them to thrive in business.

17.     Plaintiff Texas Bankers Association (TBA) is America's oldest and largest state banking organization.  TBA advocates for 400 member banks in Austin and Washington and invests in Texas communities through financial literacy, scholarship, and charitable activities.  TBA has a member median asset size of approximately $357 million and our banks employ over 150,000 Texans.  TBA is dedicated to representing Texas community banks as well as institutions of all sizes and charter types before the Texas Legislature, U.S. Congress, state and federal regulatory agencies, and, when necessary, the courts.

18.     Defendant CFPB is an agency of the United States. 12 U.S.C. §5491(a).

19.     Defendant Rohit Chopra is the Director of the CFPB. Director Chopra is sued in his official capacity.

## I.     Federal rulemaking must comply with the Administrative Procedure Act.

20.     The APA broadly waives the sovereign immunity of the United States and its federal agencies. It lets parties who are adversely affected or aggrieved by agency action seek judicial review. 5 U.S.C. §§702, 704.

21.     Under the APA, agency action must be vacated if it is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C).

22.     The APA further dictates that a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.' This necessarily means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical

and rational.'" *Texas v. United States*, 524 F. Supp. 3d 598, 652 (S.D. Tex. 2021) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

23.     The APA also requires that an agency action be set aside if it is promulgated "without observance of procedure required by law." 5 U.S.C. §706(2)(D). Unless covered by an exception, all agency rules must go through the APA's notice-and-comment process. *Texas*, 524 F. Supp. 3d at 657. A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," including "the approval or prescription . . . of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. §551(4). This definition includes "virtually every statement an agency can make." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983).

24.     To that end, the APA distinguishes between "legislative rules" and "interpretive rules." The former are subject to the Act's notice-and-comment requirements. 5 U.S.C. §553(b)(3)(A). In determining whether a rule is legislative or interpretive, the agency's label is not dispositive. Rather, any rules that operate as "substantive agency regulations" are deemed legislative. *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 313-15 (1979). "Legislative or substantive rules are those which 'affect individual rights and obligations.'" *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001).

25.     Notice and comment provides a crucial and necessary safeguard against the consequences of an unchecked federal administrative state. *See Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010) ("The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the people.").

II.    **The CFPB attempts to regulate discriminatory conduct under UDAAP violates the APA.**

      A.  **The CFPB has broad jurisdiction.**

26.    In Dodd-Frank, Congress established the CFPB as an independent agency to "implement and … enforce Federal consumer financial law." 12 U.S.C. §5511(a). The CFPB's discrete purpose is to "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. §5511(a).

27.    "Congress transferred the administration of 18 existing federal statutes to the CFPB, including the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and the Truth in Lending Act." *Seila Law*, 140 S. Ct. at 2193. Congress also made it unlawful for entities, like Plaintiffs' members, "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. §5536(a)(1)(B).

28.    Among other things, Congress gave the CFPB authority to "conduct investigations, issue subpoenas and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court." *Seila Law*, 140 S. Ct. at 2193 (citing 12 U.S.C. §§5562, 5564(a), (f)). Through those processes, the CFPB can seek penalties including restitution, rescission of contracts, disgorgement, and injunctive relief. 12 U.S.C. §5565.

29.    The CFPB was also granted the authority to "require reports and conduct examinations on a periodic basis" of certain entities, including members of each Plaintiff, in order to "assess[] compliance with the requirements of Federal consumer financial law," and "obtain[] information about the activities and compliance systems or procedures" of the examined entity. 12 U.S.C. §§5514-15.

30.    Plaintiffs each have members regulated by the CFPB under these statutes and enforcement processes.

### B. The CFPB uses examinations and enforcement actions to exercise its UDAAP authority.

31.     Dodd-Frank gave the CFPB authority to prohibit "unfair" acts or practices by covered entities, among other laws that the CFPB enforces. *See* 12 U.S.C. §5536(a)(1)(B) (giving the CFPB the authority to enforce a statute that makes it unlawful for a covered entity "to engage in any unfair, deceptive, or abusive act or practice"). But in enacting Dodd-Frank, Congress chose not to provide the CFPB with authority over alleged discrimination, except in specific circumstances.

32.     Dodd-Frank authorized the CFPB to "prescribe rules applicable to a covered person or service provider identifying as unlawful, unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service," including "requirements for the purpose of preventing such acts or practices." 12 U.S.C. §5531(b). In some cases, the CFPB has done so. *See, e.g.*, 12 C.F.R. §1041.7 & Supp. I.

33.     But here, the CFPB has elected simply to announce its exercise of UDAAP authority, without notice or an opportunity for public comment, through its nearly 2,000-page Supervision and Examination Manual. *See* CFPB, *Supervision and Examination Manual* (Mar. 2022), bit.ly/2HYQXLW. The Supervision and Examination Manual explains that Dodd-Frank "authorizes it to supervise certain financial companies and large depository institutions and their affiliates for consumer protection purposes." CFPB Supervision and Examination Manual, Overview Section at 1 (revised Oct. 12, 2012) (Exhibit C). As a result, the CFPB "has the responsibility to implement, examine for compliance with, and enforce 'Federal consumer financial law.'" *Id.* This law includes the requirement that CFPB monitor compliance with Dodd-Frank's prohibitions on "unfair, deceptive, or abusive acts and practices in connection with consumer products and services." *Id.*

34.     CFPB's examination of regulated entities is far-reaching. After going "onsite to observe, conduct interviews, and review ... documents and information," the CFPB decides whether the

examination "indicates potential unfair, deceptive, or abusive acts or practices"; evaluates "the regulated entity's compliance management and its statutory and regulatory compliance"; and decides whether there should be any "corrective actions that the institution should take, whether through informal agreement or a formal enforcement action." *Id.* at 5-6.

35.     In other words, the CFPB examiners extensively review the regulated entity's compliance with UDAAP and the other federal laws that the CFPB enforces. But CFPB examiners do more than just decide whether a regulated entity has violated federal law. They also review whether the entity has adequate policies and procedures in place to *prevent* violations.

36.     For UDAAP in particular, compliance requires substantial resources. To start with, examiners "assess the quality of the regulated entity's compliance risk management systems, including internal controls and policies and procedures, for avoiding unfair, deceptive, or abusive acts or practices." Ex. A at 11. They also "identify acts or practices" that examiners believe "materially increase the risk of consumers being treated in an unfair, deceptive, or abusive manner." *Id.*

37.     To conduct that review and assess the entity's compliance, examiners have carte blanche to obtain and review copies of the entity's internal documents, including: "Training materials," "Procedure manuals and written policies"; "Internal control monitoring and auditing materials"; and "Minutes of the meetings of the Board of Directors and of management committees, including those related to compliance." *Id.* Examiners' evaluations also include "reviewing all relevant written policies and procedures" and "internal and external audit reports." *Id.* at 12.

38.     The examiners then make determinations on dozens of vaguely worded factors, including whether the entity's own compliance audits "include[] a review of potential unfair, deceptive, or abusive acts or practices"; "Management and the Board of Directors are made aware of and review significant deficiencies and their causes"; "Management has taken corrective actions to follow up on any identified deficiencies"; and "[t]he entity's compliance program includes an established process

for periodic analysis and monitoring of all decision-making processes used in connection with consumer financial products and services, and a process to take corrective action to address any potential UDAAP concerns." *Id.* at 12-13.

39.      The examiners also "determine whether the entity's internal controls are adequate to prevent unfair, deceptive or abusive acts or practices." *Id.* at 13. That determination is based on whether the "compliance management program includes measures aimed at avoiding unfair, deceptive, or abusive practices"; "The entity conducts prior UDAAP reviews on advertising and promotional materials"; "The entity reviews new products and changes in terms and conditions of existing products for potential UDAAP concerns"; "The entity has established policies and procedures to review, test, and monitor any decision-making processes it uses for potential UDAAP concerns"; and "[t]he entity has established policies and procedures to mitigate potential UDAAP concerns arising from the use of its decision-making processes." *Id.* at 13-14.

40.      If the CFPB concludes that a regulated entity has violated UDAAP or that its compliance program is inadequate, it may issue a "Matter Requiring Attention." Supervision and Examination Manual, Examinations and Targeted Reviews Section at 17 (revised Feb. 2019) (Exhibit D). A "Matter Requiring Attention" will identify "specific goals to be accomplished" including "timeframes for periodic reporting of efforts taken to address these matters, as well as expected timeframes for implementation." *Id.*

41.      Until recently, the CFPB would also issue "Supervisory Recommendations." A "Supervisory Recommendation" did not "include provisions for periodic reporting or expected timelines for implementation," but the CFPB "[would] review through monitoring the steps institutions have taken to address" a Supervisory Recommendation. *Id.* In March 2021, the CFPB eliminated the use of Supervisory Recommendations, noting that "MRAs will more effectively convey our supervisory expectations." CFPB Bulletin 2021-01 at 2 (Mar. 31, 2021), https://bit.ly/3LEJy4D.

42.     In some cases, the CFPB will refer a matter to its "Action Review Committee," which determines "whether matters that originate from examinations will be resolved through confidential supervisory action, such as a board resolution or memorandum of understanding, or through a public enforcement action." CFPB, *Supervisory Highlights* at 27 (Summer 2015), bit.ly/3SuNhnL; *see also* CFPB, *Supervisory Highlights* at 37-38 (Sept. 2017), bit.ly/3Srdgwk ("about one-third" of matters referred to the Action Review Committee result in public enforcement proceedings).

43.     The CFPB treats the entire process as producing confidential information that belongs to the agency. Regulated entities are largely prohibited from disclosing information about the process "without the prior written permission of the Director" of the CFPB. 12 C.F.R. §1070.47(a)(2). By any name, this is regulation without any opportunity for public scrutiny and typifies the CFPB's transparency and accountability problems.

44.     Although a Matter Requiring Attention is not itself legally enforceable, the CFPB considers a regulated entity's "response ... when assessing an institution's Compliance rating, or otherwise considering the risks that an institution poses to consumers and to markets," which "may be used by the Bureau when prioritizing future supervisory work or assessing the need for potential enforcement action." Ex. D at 17. Draft examination reports are also shared with the entity's prudential regulator, which can take any number of actions against the entity based on the CFPB's conclusions, including adjustment to ratings, penalties, and enforcement actions. As a result, the CFPB's examination findings are not-so-confidential communications that can have significant public consequences.

45.     If the CFPB chooses to bring an enforcement action based on findings it made during the examination process, it may issue expansive penalties, including "civil monetary penalties," "disgorgement" of profits, "restitution," and "[p]ublic notification regarding the violation." Ex. A at 7.

## C.  The CFPB misinterprets its UDAAP authority to include discrimination.

46.    Before this year, the CFPB had never interpreted its UDAAP authority to include the power to regulate discriminatory conduct. Since its first iteration in October 2012, the manual made no mention of discrimination in the UDAAP section. *See* CFPB, *Unfair, Deceptive, or Abusive Acts or Practices Examination Manual* (revised Oct. 2012) (Exhibit E). To the contrary, the manual repeatedly treated UDAAP and discrimination separately.

47.    That changed earlier this year. *See CFPB Targets Unfair Discrimination in Consumer Finance*, CFPB (Mar. 16, 2022) (Exhibit F). On March 16, the CFPB updated several portions of its examina-tion manual to claim authority to regulate discrimination under its UDAAP authority.

48.    First, the updated manual claims that its examination objectives include identifying "acts or practices that materially increase the risk of consumers being treated in an unfair, deceptive, or abusive manner, *including discriminatory* acts or practices." Ex. A at 11 (emphasis added).

49.    Second, the manual now dictates requirements that a regulated "entity's compliance program includes an established process for periodic analysis and monitoring of all decision-making processes used in connection with consumer financial products or services, and a process to take corrective action to address any potential UDAAP concerns related to their use, *including discrimination*." *Id.* at 13 (emphasis added)

50.    Third, the manual now requires that a regulated "entity has established policies and procedures to review, test, and monitor any decision-making processes it uses for potential UDAAP concerns, *including discrimination*." *Id.* at 14 (emphasis added). It also requires that a regulated "entity has established policies and procedures to mitigate potential UDAAP concerns arising from the use of its decision-making processes, *including discrimination*." *Id.* (emphasis added). It instructs examiners specifically to evaluate if an "entity has a process to take prompt corrective action if the decision-making processes it uses produce deficiencies or discriminatory results." *Id.* at 18.

- 12 -

51.     Fourth, the manual now requires that a regulated "entity ensures that employees and third parties who market or promote products or services are adequately trained so that they do not engage in unfair, deceptive, or abusive acts or practices, *including discrimination*." *Id.* at 17 (emphasis added). Regulated entities must also ensure "that employees and third party contractors refrain from engaging in servicing or collection practices that lead to differential treatment or disproportionately adverse impacts on a discriminatory basis." *Id.* at 18.

52.     Fifth, the manual instructs its examiners to obtain documentation from regulated entities "regarding the use of models, algorithms, and decision-making processes used in connection with consumer financial products and services"; "[i]nformation collected, retained or used regarding customer demographics, including the demographics of customers using various products or services"; and "any demographic research or analysis relating to marketing or advertising of consumer financial products or services." *Id.* at 12.

53.     The CFPB did not hide its decision; it proclaimed that, after the update, "[d]iscrimination or improper exclusion can trigger liability under [the] ban on unfair acts or practices." Ex. F. As the CFPB explained things: "We will be *expanding* our anti-discrimination efforts to combat discriminatory practices *across the board* in consumer finance." *Id.* (emphases added). The CFPB also "will examine for discrimination in all consumer finance markets, including credit, servicing, collections, consumer reporting, payments, remittances, and deposits." *Id.*

### D.  The CFPB's "update" is causing significant compliance costs.

54.     In its blog post published after the update, the CFPB stated that this update would impose new obligations on regulated entities. CFPB examiners now "will require supervised companies to show their processes for assessing risks *and discriminatory outcomes [i.e., "disparate impact"]*, including documentation of customer demographics and the impact of products and fees on different demographic groups." *Id.* (emphasis added). And the CFPB "will look at how companies test and

monitor their decision-making processes for unfair discrimination, *as well as discrimination* under [the ECOA]." *Id.* (emphasis added).

55.     The CFPB has redefined the unfairness prong of UDAAP. This redefinition means that the CFPB can now examine for and enforce its novel interpretation. As a matter of course, the CFPB shares violations it finds in examinations with the Enforcement Division, which results in Enforcement opening investigations and lawsuits. The update is thus not a change that attempts to explain how the CFPB will examine an institution. Rather, it is a dictate that institutions *must* comply with or face legal action.

56.     All financial services companies are affected by the CFPB's exercise of enforcement authority in this new area. In fact, CFPB has already said that it will use the updated manual to do just that. *See* Ex. B ("Under the updated examination guidelines, we will continue to scrutinize any conduct of covered institutions that violates the federal prohibition against unfair practices, including determining if an entity has unfairly discriminated against certain people.").

57.     The CFPB's addition of discrimination-related compliance issues adds to the already burdensome UDAAP compliance regime. Yet the CFPB provided no instruction for the regulated communities on what might constitute unfair discrimination or actionable disparate impacts. Several points illustrate the confusion:

      a.  The CFPB did not identify any protected classes or characteristics, as essentially all nondiscrimination statutes must do. For example, ECOA prohibits discrimination on the basis of race, color, religion, national origin, sex, marital status, age, receipt of public assistance, or good faith exercise of any rights under the Consumer Credit Protection Act. But other federal antidiscrimination laws protect classes with different characteristics. *See, e.g.*, 29 C.F.R. §37.1 (implementing the "nondiscrimination …

provisions of the Workforce Investment Act of 1998" which include "age, disability, [and] political affiliation or belief," among other unique criteria).

b.  ECOA expressly identifies certain activities that are *not* discrimination, such as inquiring about an applicant's age or whether the applicant's income derives from public assistance programs if such inquiries are "for the purpose of determining the amount and probable continuance of income levels, credit history, or other pertinent element[s] of credit-worthiness as provided in regulations of the Bureau." 15 U.S.C. §1691(b)(2). The CFPB included no such guidance for its pronouncement.

c.  Nor did the CFPB explain how regulated entities, which are prohibited in some instances from collecting customer demographic information, are supposed to conduct the sort of assessments that the agency appears to be contemplating. *See, e.g.*, 12 C.F.R. §1002.5(b)-(d).

58.  These amendments to the manual harm Plaintiffs' members by imposing heavy compliance costs that are ultimately passed down to consumers in the form of higher prices and reduced access to products. In fact, that's the point. Director Chopra recently stated that the CFPB informs industry how it will "exercise its supervisory authority and enforcement authority" by "publish[ing] our examination manuals, which is essentially guidance to our examiners about what they might look at when they decide in the scope of an exam to dig into a specific set of complaints or issues." Jon Hill, *From Crypto to Apps, CFPB's Chopra Has Payments in Focus*, Law360 (July 27, 2022) (Exhibit G).

59.  To come into compliance with these new directives, Plaintiffs' members have no choice but to update their UDAAP compliance policies and programs, at significant cost, and they will perpetually incur costs to remain in compliance.

60.  Plaintiffs also have members who are not supervised by the CFPB but will be affected by the updated manual. The CFPB is the agency charged by Congress with enforcing the UDAAP

provision of the Dodd-Frank Act, 12 U.S.C. §5536(a)(1)(B), so any entity subject to the Dodd-Frank provisions governing UDAAP is affected by the CFPB's pronouncements. Plaintiffs each have members not primarily regulated by the CFPB who provide consumer financial products and/or are service providers for such products. Such entities are thus subject to Dodd-Frank's prohibitions on UDAAP. *Compare* 12 USC §5481(6) (defining a "covered person" for the purpose of the exercise of UDAAP authority under Dodd-Frank as "(A) any person that engages in offering or providing a consumer financial product or service; and (B) any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person"), *with* Ex. C at 1 n.2 (The CFPB claims "supervisory authority" over "(1) non-depository consumer financial service companies and their service providers; (2) large insured depository institutions, large insured credit unions, and their affiliates, as well as service providers to these entities; and (3) service providers to a substantial number of small insured depository institutions or small insured credit unions." (citing 12 U.S.C. §5514-5517)).

### E.  The CFPB's updated manual exceeds its statutory authority.

61.     The CFPB has stretched its UDAAP authority beyond the bounds carefully set by Congress. In describing the update, the CFPB's mistaken notion that "[d]iscrimination … can trigger liability under [the] ban on unfair acts or practices" ignores the text, structure, and history of Dodd-Frank, as well as similar legislation addressing agencies' authority to regulate unfairness. Ex. F.

62.     Dodd-Frank discusses "unfairness" and "discrimination" as two distinct concepts, and it defines "unfairness" without making any reference to "discrimination" or disparate impact liability. *See Mtn. States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("The responsibility of determining the limits of statutory grants of authority … is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." (quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944))). Further, given the substantial "economic and political significance" the CFPB's interpretation would have, courts have "reason to hesitate before concluding that Congress

- 16 -

meant to confer such authority." *West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2608 (2022) (internal quotation marks omitted).

### F.  The CFPB's updated manual is arbitrary and capricious.

63.     The CFPB's implementation of its expansive view of "unfairness" is also arbitrary and capricious because it contradicts the historical use and understanding of the term. *See Texas*, 524 F. Supp. 3d at 652 (requiring "reasoned decisionmaking").

64.     In 1938, Congress authorized the Federal Trade Commission (FTC) to protect consumers from "unfair or deceptive acts or practices in or affecting commerce." Pub. L. No. 75-447, 52 Stat. 111 (1938) (codified as amended at 15 U.S.C. §45(a)(1)). After initially leaving the term "unfair" undefined, Congress later curtailed the Commission's use of its unfairness authority. *See* Pub. L. No. 96-252, 94 Stat. 374 (1980) (codified as amended in scattered sections of 15 U.S.C.). It codified a constrained definition of unfairness—that does not include discrimination—to limit the Commission's ability to use unfairness to pursue unlimited public-policy goals. 15 U.S.C. §45(n). These efforts confirm that the "unfairness" authority conferred by Congress did not extend to discrimination.

65.     This context is important because Congress borrowed the unfairness definition that governs the CFPB from the Federal Trade Commission Act. *See* Ex. A at 1 n.2, 2 n.4. As Director Chopra conceded in recent testimony, "'[U]nfairness' … derive[s] from the FTC Act. It is identical language." *The Consumer Financial Protection Bureau's Semi-Annual Report to Congress, Hearing before the Senate Comm. on Banking, Hous., and Urb. Affairs*, 117th Cong. (2022) (statement of Rohit Chopra, Director of the CFPB). Where Congress borrows terms of art from other acts, it presumably conveys the same meaning. *Morissette v. United States*, 342 U.S. 246, 263 (1952).

66.     What's more, the CFPB's contemplation of *disparate-impact* liability—a specific form of liability that not even most antidiscrimination laws create—flouts congressional intent and Supreme Court precedent. *See* Ex. A at 15 (addressing determinations "that result in discrimination").

67.     CFPB has confirmed several times that its updated manual covers disparate-impact liability. For example, the CFPB stated that "[c]onsumers can be harmed by discrimination regardless of whether it is intentional," so CFPB examiners now consider "discriminatory outcomes." Ex. F. And the CFPB stated elsewhere that actions producing "disparate treatment or a discriminatory outcome … fall squarely within our mandate to address and eliminate unfair practices." Ex. B. Yet neither Director Chopra (Ex. F) nor his colleagues (Ex. B) root this expansion of the agency's authority in anything besides existing UDAAP authority.

68.     This position cannot be squared with the Supreme Court's admonition that statutes can authorize disparate-impact liability only in narrow circumstances. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Proj., Inc.*, 576 U.S. 519, 534 (2015). Namely, the Supreme Court has required two conditions to imply disparate-impact liability is permissible: the statute must be an antidiscrimination law, and the statute must contain results-oriented language demonstrating that it is designed to impose liability for disparate-impact claims. *Id.*

69.     Dodd-Frank has neither characteristic: It is not an antidiscrimination statute, and neither it nor any of the other relevant statutes have any results-oriented language showing that Congress intended for the CFPB to address disparate-impact claims. Accordingly, Dodd-Frank provides no textual support for the notion that Congress authorized the CFPB to pursue disparate-impact claims under its UDAAP authority.

70.     Additionally, the CFPB's manual update also ignores the reliance interests which have grown up around its prior approach to UDAAP authority. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("In explaining its changed position, an agency must also be cognizant that

- 18 -

longstanding policies may have 'engendered serious reliance interests that must be taken into account.'").*

71.     This unreasoned change does not clear the APA's arbitrary-and-capricious standard. It fails to consider the CFPB's prior position on UDAAP authority, provides no well-founded reasons for the update, and does not consider reliance interests. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) ("*State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy]."); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.").

72.     The manual update is thus arbitrary and capricious. 5 U.S.C. §706(2)(A).

### G.  The updated manual violates the APA's notice-and-comment requirement.

73.     With exceptions not relevant here, the APA requires legislative rules to go through the rigors of notice and comment. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) ("'Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated.'").

---

*Even if UDAAP authority could be interpreted to include discrimination claims, due process would bar the CFPB from attempting to hold companies responsible under this new UDAAP definition for conduct *before* the CFPB announced its new definition. *PHH Corp. v. CFPB*, 839 F.3d 1, 44 (D.C. Cir. 2016) *reh'g en banc granted, order vacated* (Feb. 16, 2017), *on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) ("But change becomes a problem—a fatal one—when the Government decides to turn around and retroactively apply that new interpretation to proscribe conduct that occurred before the new interpretation was issued.").

74.     The updated manual is a legislative rule subject to the APA's notice-and-comment requirement because it "change[s] the legal status of regulated parties" by subjecting them to supervision and examination on discrimination under UDAAP. *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022); *see also Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (exceptions to notice and comment "must be narrowly construed").

75.     Indeed, the update sets out a substantive rule that the CFPB will carry out when regulating. *See Prof'ls. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (the focus is "primarily on whether the rule has binding effect on agency discretion or severely restricts it"). Put another way, the update "marks the consummation of the agency's decisionmaking process," and "legal consequences" will flow from it. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).

76.     The update specifically "impose[s] new … duties" on businesses by empowering examiners to investigate—and thus requiring businesses to keep—certain records and policies. *Mann Constr.*, 27 F.4th at 1143; *see also* Ex. F (confirming the update's finality and explaining that discrimination can presently "trigger liability" for regulated entities under the UDAAP authority).

77.     That the CFPB was revising the previous manual does not excuse the CFPB from the APA's procedural requirements. *See Clean Water Action v. United States Envtl. Prot. Agency*, 936 F.3d 308, 312 (5th Cir. 2019) (An agency must "follow the same process to revise a rule as it used to promulgate it." (citing *Perez*, 575 U.S. at 100)).

78.     The update is not a mere clarification of existing rules, but imposes new substantive obligations on regulated entities without going through the required notice-and-comment procedure under the APA.

79.     The CFPB's action, taken without legislative authority, opens the door to uncertain and excessive regulation in the financial marketplace that imposes significant financial burdens on Plaintiffs, their members, and the public.

## CLAIMS FOR RELIEF
## COUNT I
### Updated Manual
### Violation of the APA: Exceeds Statutory Authority
### (5 U.S.C. §706(2)(A), (C); 12 U.S.C. §5536)

80.     Plaintiffs repeat and reincorporate all their prior allegations.

81.     Under the APA, a "reviewing court shall … hold unlawful and set aside agency action … found to be … not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

82.     Dodd-Frank created the CFPB and gave it authority to enforce a statute that makes it unlawful for an entity "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. §5536(a)(1)(B).

83.     The CFPB's March 2022 updated manual exceeds the CFPB's statutory authority by adding discrimination to its UDAAP authority. Dodd-Frank does not authorize the CFPB to regulate discrimination under that distinct authority.

84.     The updated manual is final agency action under the APA because it imposes concrete obligations on Plaintiffs' members.

85.     Because the updated manual contravenes the limits of the CFPB's power under Dodd-Frank, the update violates the APA and should be set aside.

## COUNT II
### Updated Manual
### Violation of the APA: Arbitrary and Capricious
### (5 U.S.C. §706(2)(A))

86.     Plaintiffs repeat and reincorporate all their prior allegations.

87.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

88.     Despite acknowledging that its UDAAP authority is modeled on the FTC's unfairness authority, the CFPB failed to grapple with Congress's decision to narrow the FTC's authority in a way that does not include discrimination. The updated manual is thus arbitrary and capricious because it contradicts the historical use and understanding of the term "unfair."

89.     The CFPB also failed to adopt safeguards that are essential for pursuing disparate-impact liability.

90.     Because the updated manual is arbitrary and capricious with respect to its expansion of UDAAP authority, it is invalid and should be set aside.

## COUNT III
## Updated Manual
## Violation of the APA: Notice and Comment
## (5 U.S.C. §553)

91.     Plaintiffs repeat and reincorporate all their prior allegations.

92.     The updated manual is a legislative rule subject to the APA's notice-and-comment requirement.

93.     The CFPB did not submit the updated manual for notice and comment.

94.     Because the updated manual violates the APA, it is invalid and should be set aside.

## COUNT IV
## CFPB's Funding Structure
## Violation of the Appropriations Clause
## (U.S. Const. art I, §9, cl. 7)

95.     Plaintiffs repeat and reincorporate all their prior allegations.

96.     In addition to all the defects with the manual update noted above, it was also issued with funds not properly appropriated in accordance with law.

97.     The Appropriations Clause requires legislative appropriations prior to executive expenditures. U.S. Const. art I, §9, cl. 7.

98.     Contrary to the ordinary process for annual appropriations from Congress, the CFPB has an unprecedented level of budgetary independence, under which it requisitions funds directly from the Federal Reserve, without involvement or oversight by Congress. For an agency that exercises vast executive authority, such budgetary independence defies the separation of powers. *See Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 232 (5th Cir. 2022) (Jones, J., concurring) ("The CFPB's budgetary independence makes it unaccountable to Congress and the people. An agency that wields vast amounts of executive, legislative, and adjudicatory power and is completely unaccountable to Congress is inimical to the Constitution's structural checks and balances.").

99.     The CFPB's funding scheme is distinct from other financial regulators that enjoy some level of self-funding. *See id.* at 235-36 (distinguishing the CFPB's unique funding structure from that of the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency because (1) "the mission and corresponding authority of those agencies is more targeted"; (2) "both the Federal Reserve and the Federal Deposit Insurance Corporation operate as independent agencies"; (3) each agency maintains "some level of political accountability" through "multimember leadership" and its relationship with regulated entities; and (4) no other agency with some measure of budgetary independence "wields enforcement or regulatory authority remotely comparable to the authority the CFPB may exercise throughout the economy").

100.     The CFPB relies on this unconstitutional funding scheme to carry out its overly expansive UDAAP authority to Plaintiffs' detriment.

101.     Because the CFPB's funding structure violates the Appropriations Clause, this Court should declare that structure unconstitutional and set aside the manual update. A narrow ruling

regarding the CFPB's unique funding structure would not affect other agencies who lack the same markers of vast regulatory power without political accountability.

## PRAYER FOR RELIEF

Plaintiffs ask this Court to enter judgment in their favor and to provide the following relief:

a.  a declaration that the CFPB's March 2022 update to its manual exceeds the agency's statutory authority;

b.  a declaration that the CFPB's March 2022 update to its manual is arbitrary and capricious;

c.  a declaration that the CFPB's March 2022 update to its manual is invalid because the CFPB failed to submit it through proper notice-and-comment rulemaking procedures;

d.  a declaration that the CFPB's funding structure, upon which it relies to exercise its UDAAP authority, violates the Appropriations Clause;

e.  an injunction setting aside the CFPB's March 2022 update to the manual;

f.  an injunction preventing the CFPB from pursuing any examinations or enforcement actions based on the interpretation of its UDAAP authority announced in the March 2022 update;

g.  an injunction ordering the CFPB to cease accepting funds in violation of the Appropriations Clause;

h.  attorney's fees and costs incurred in relation to this case; and

i.  all other relief to which Plaintiffs are entitled that the Court deems just and proper.

Dated: September 28, 2022

Jennifer B. Dickey*
Jordan L. Von Bokern*
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
jdickey@uschamber.com
jvonbokern@uschamber.com

Thomas Pinder*
AMERICAN BANKERS ASSOCIATION
1120 Connecticut Ave. NW
Washington, DC, 20036
(202) 663-5035
tpinder@aba.com

David Pommerehn*
CONSUMER BANKERS ASSOCIATION
1225 New York Avenue, N.W.
Suite 1100
Washington, DC, 20005
(202) 552-6368
dpommerehn@consumerbankers.com

Respectfully Submitted,

Bruce A. Smith
SBN 18542800
Ward, Smith & Hill PLLC
P. O. Box 1231
Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)
bsmith@wsfirm.com

Cameron T. Norris*
Bryan K. Weir*
David L. Rosenthal*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
bryan@consovoymccarthy.com
david@consovoymccarthy.com

*Pro hac vice application forthcoming

Attorneys for Plaintiffs Chamber of Commerce of the United States of America, Longview Chamber of Commerce, American Bankers Association, Consumer Bankers Association, Independent Bankers Association of Texas, Texas Association of Business, and Texas Bankers Association.