# Exhibit C

# CFPB Supervision and Examination Process     Overview

## Background

Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the Act)[1] established the Consumer Financial Protection Bureau (CFPB) and authorizes it to supervise certain consumer financial services companies and large depository institutions and their affiliates for consumer protection purposes.[2] The Bureau's purpose is set forth by Section 1021 of the Act:

> (a) **PURPOSE.—The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.**[3]

*Federal consumer financial law*

Subject to the provisions of the Act, the CFPB has responsibility to implement, examine for compliance with, and enforce "Federal consumer financial law."[4] Those laws include, among other things, Title X itself, which prohibits unfair, deceptive, or abusive acts and practices in connection with consumer financial products and services,[5] and the following "enumerated consumer laws"[6] and the implementing regulations.[7]

---

[1] The Act can be found here:  http://www.gpo.gov/fdsys/pkg/PLAW-111publ203/pdf/PLAW-111publ203.pdf.

[2] Sec. 1024 of the Act authorizes CFPB to supervise certain entities and individuals that engage in offering or providing a consumer financial product or service and their service providers that are not covered by Secs. 1025 or 1026 of the Act.  Specifically, Sec. 1024 applies to those entities and individuals who offer or provide mortgage-related products or services and payday and private student loans as well as larger participants of other consumer financial service or product markets as defined by a CFPB rule, among others, plus their service providers. Sec. 1025 authorizes CFPB to supervise those entities that are large insured depository institutions and credit unions with more than $10 billion in total assets and all their affiliates (including subsidiaries), as well as service providers for such entities. Sec. 1026 provides the prudential regulators with consumer compliance examination authority for smaller depository institutions ($10 billion or less in total assets) not covered by Sec. 1025. The Bureau may, under Sec. 1026, include its examiners on a sampling basis at examinations of smaller insured depository institutions to assess compliance with the requirements of Federal consumer financial law. Under Sec. 1026, the Bureau has supervisory authority over a service provider to a substantial number of smaller depository institutions. "Insured depository institutions" include banks and savings associations. Under Sec. 1029, the Bureau may not exercise any authority over certain dealers predominantly engaged in the servicing and sale or leasing of motor vehicles. For ease of reference for purposes of this manual, entities and individuals within the scope of Sec. 1024 are referred to as "non-depository consumer financial service companies," and those within the scope of Sec. 1025 are referred to as "large depository institutions and their affiliates." The following are referred to as "supervised entities":  (1) non-depository consumer financial service companies and their service providers; (2) large insured depository institutions, large insured credit unions, and their affiliates, as well as service providers to these entities; and (3) service providers to a substantial number of small insured depository institutions or small insured credit unions.

[3] Emphasis added. See also Sec. 1021(b)(4).

[4] *See* Sec. 1002(14) for the definition of "Federal consumer financial law."

[5] *See* Sec. 1036; *see also* 1031.

[6] *See* Sec. 1002(12). Parts of Title XIV of the Act are also designated as enumerated consumer laws. *See* Sec. 1400(b).

[7] *See* Sec. 1002(12).

# CFPB Supervision
# and Examination Process    Overview

- Alternative Mortgage Transaction Parity Act of 1982 (12 U.S.C. 3801 et seq.);

- Consumer Leasing Act of 1976 (15 U.S.C. 1667 et seq.);

- Electronic Fund Transfer Act (15 U.S.C. 1693 et seq.), except with respect to Section 920 of that Act;

- Equal Credit Opportunity Act (15 U.S.C. 1691et seq.);

- Fair Credit Billing Act (15 U.S.C. 1666 et seq.);

- Fair Credit Reporting Act (15 U.S.C. 1681et seq.), except with respect to Sections 615(e) and 628 of that Act (15 U.S.C. 1681m(e), 1681w);

- Home Owners Protection Act of 1998 (12 U.S.C. 4901 et seq.);

- Fair Debt Collection Practices Act (15 U.S.C. 1692 et seq.);

- Subsections (b) through (f) of Section 43 of the Federal Deposit Insurance Act (12 U.S.C. 1831t(b)–(f));

- Sections 502 through 509 of the Gramm-Leach-Bliley Act of 2009 [Privacy of Consumer Financial Information](15 U.S.C. 6802–6809) except for Section 505 as it applies to Section 501(b);

- Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2801 et seq.);

- Home Ownership and Equity Protection Act of 1994 (15 U.S.C. 1601 note);

- Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.);

- S.A.F.E. Mortgage Licensing Act of 2008 (12 U.S.C. 5101 et seq.);

- Truth in Lending Act (15 U.S.C. 1601 et seq.);

- Truth in Savings Act (12 U.S.C. 4301 et seq.);

- Section 626 of the Omnibus Appropriations Act of 2009, Public Law 111–8; and

- Interstate Land Sales Full Disclosure Act (15 U.S.C. 1701).

In addition, the CFPB may enforce the following rules issued by the Federal Trade Commission:

- Telemarketing Sales Rule (16 CFR Part 310);[8]

- Use of Prenotification Negative Option Plans (16 CFR Part 425);

- Rule Concerning Cooling-Off Period for Sales Made at Homes or at Certain Other Locations (16 CFR Part 429);

- Preservation of Consumers' Claims and Defenses (16 CFR Part 433);

- Credit Practices (16 CFR Part 444);

- Mail or Telephone Order Merchandise (16 CFR Part 435);

- Disclosure Requirements and Prohibitions Concerning Franchising (16 CFR Part 436);

- Disclosure Requirements and Prohibitions Concerning Business Opportunities (16 CFR Part 437).

*Supervision and examination*

The statutory frameworks for supervision of large depository institutions and their affiliates and for non-depository consumer financial service companies are largely the same,[9] although the supervision authority for each is found in separate sections of the Act. The frameworks include:

- The purpose of supervision, including examination, to:

    o assess compliance with Federal consumer financial laws,

    o obtain information about activities and compliance systems or procedures, and

    o detect and assess risks to consumers and to markets for consumer financial products and services;

- The requirement to coordinate with other Federal and state regulators; and

- The requirement to use where possible publicly available information and existing reports to Federal or state regulators pertaining to supervised entities.

---

[8] The CFPB may enforce the Telemarketing and Consumer Fraud and Abuse Prevention Act.

[9] Most of the differences in the grants of supervision and examination authority will not be relevant for examiners in their daily work; supervised entities will be examined consistent with the applicable statutory provision.

# CFPB Supervision
# and Examination Process                    Overview

## Supervision and Examination Principles

Three main principles guide the CFPB supervision process.

*Focus on consumers*

The CFPB will focus on risks to consumers when it evaluates the policies and practices of a financial institution. We expect that institutions will offer consumer financial products and services in accordance with Federal consumer financial laws and will maintain effective systems and controls to manage their compliance responsibilities. As we conduct our reviews, we will focus on an institution's ability to detect, prevent, and correct practices that present a significant risk of violating the law and causing consumer harm.[10]

*Data Driven*

Like all CFPB activities, the supervision function rests firmly on analysis of available data about the activities of entities it supervises, the markets in which they operate, and risks to consumers posed by activities in these markets. Supervision staff (examiners and analysts) will use data from a wide range of sources:  data obtained from the entity and through direct observation during monitoring and examination; information provided by the CFPB's Research, Markets and Regulations and Consumer Education and Engagement divisions, the Office of Fair Lending and Equal Opportunity, the Enforcement division, Consumer Response Center, and Offices addressing the special needs of students, Older Americans, Service members, and the underserved; and other state and Federal regulatory agencies.

*Consistency*

The CFPB will supervise both depository institutions that offer a wide variety of consumer financial products and services and non-depository consumer financial services companies that offer one or more such products. In order to fulfill its statutory mandate to consistently enforce Federal consumer financial law, the CFPB will apply consistent standards in its supervision of both types of entities, to the extent possible. To help accomplish this, the CFPB will use the same procedures to examine all supervised entities that offer the same types of consumer financial products or services, or conduct similar activities.

Such consistency, however, does not dictate uniformity in supervisory expectations. While all of the firms under our jurisdiction must follow the law, we understand that the means that they employ to achieve that goal will – and likely should – differ. We recognize that large, complex entities necessarily have different compliance oversight and management systems than smaller entities or those offering a more limited number of products or services.

---

[10] The discussion of the Risk Assessment under Pre-examination Planning in this Manual describes more fully what the CFPB means by risks or potential risks of consumer harm.

# CFPB Supervision
# and Examination Process            Overview

## Examination Scheduling

Non-depository consumer financial services companies will be identified for examination on the basis of risks to consumers, including consideration of the company's asset size, volume of consumer financial transactions, extent of state oversight, and other factors determined relevant by CFPB. Examinations will be coordinated with State and prudential regulators as applicable.[11]

Regular examination schedules for large depository institutions and affiliates will depend on two considerations: (1) an assessment of risks to consumers and (2) ensuring consistency with statutory requirements that CFPB and prudential regulators coordinate the scheduling of examinations of large depository institutions and affiliates and conduct "simultaneous" examinations of depository institutions, as well as coordinating examinations with State regulators.[12]

Supervised entities will generally be notified in advance of an upcoming examination.

## General Description of Examinations

Examiners will coordinate throughout the supervision and examination process with Supervision managers, and analysts, experts, and attorneys from Supervision, Research, Markets and Regulations, the Office of General Counsel, and other CFPB divisions at Headquarters. Supervision will work especially closely with the Office of Fair Lending and Equal Opportunity (OFLEO) and the Enforcement division when reviewing fair lending compliance and evaluating other potential violations of Federal consumer financial laws. In this Manual the coordination process will generally be referred to as "consulting internally." Alternatively, "Headquarters" will be used to signify the involvement of multiple divisions or offices in addition to Supervision.

Specific examination procedures will be similar to those of the prudential and, in some instances, State regulators.[13] As appropriate and in accordance with CFPB policy, examiners and Supervision managers will generally do the following in the course of an examination:

- Collect and review available information (from within the CFPB, from other Federal and state agencies, and from public sources), consistent with statutory requirements;

- Request and review supplementary documents and information from the entity to be examined;

- Develop and obtain internal approval for a preliminary risk focus and scope for the onsite portion of the examination;

- Go onsite to observe, conduct interviews, and review additional documents and information;

---

[11] *See* Sec. 1024(b)(3).

[12] *See* Sec. 1025(e).

[13] Prudential regulators refer to the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, National Credit Union Association, and Office of the Comptroller of the Currency.

- Consult internally if the examination indicates potential unfair, deceptive, or abusive acts or practices; discrimination; or other violations of law;

- Draw preliminary conclusions about the regulated entity's compliance management and its statutory and regulatory compliance;

- Consult internally about follow-up corrective actions that the institution should take, whether through informal agreement or a formal enforcement action, if warranted by findings;

- Draft the examination report;

- Obtain appropriate internal review and approval for the examination work and draft examination report;

- Share the draft report with the prudential regulator and obtain and consider any comments they may offer, consistent with statutory requirements; and

- After final internal clearance, finalize and transmit the report to the supervised entity.

During the examination, the Examiner in Charge will communicate with appropriate supervised entity personnel about preliminary findings and conclusions. CFPB will seek cooperation from the entity to correct any problems identified.

**The CFPB considers all supervisory information, including examination reports and ratings, highly confidential. Requirements for the handling of supervisory information not only by CFPB employees, but also by supervised institutions are described in its regulation on the** *Disclosure of Records and Information*.[14]

Detailed examination procedures are located in Part II of this Manual.

## Examination Follow-up

How the CFPB addresses negative examination findings will depend, among other things, on the individual facts and circumstances at issue. Whether informal supervisory measures or formal enforcement action is necessary will depend on the type of problem(s) found and the severity of harm to consumers. Self-correction will be encouraged, but some circumstances may nevertheless be sufficiently serious to warrant a public enforcement action. With respect to large depository institutions and their affiliates, CFPB will share draft examination reports and consult with prudential regulators regarding supervisory action, consistent with statutory requirements.[15]

---

[14] 12 CFR Part 1070 (76 FR 45372) (July 28, 2011)).

[15] *See* Sec.1025(e).

# CFPB Supervision
# and Examination Process      Overview

## Target and Horizontal Reviews

In addition to regularly scheduled examinations, CFPB expects to conduct Target and Horizontal Reviews. Target Reviews will generally involve a single entity and will focus on a particular situation such as significant volume of particular customer complaints or a specific concern that has come to CFPB's attention. Horizontal Reviews will look across multiple entities to examine issues arising from particular products or practices and determine whether supervisory measures or enforcement actions are needed.

## Enforcement Authority

CFPB is authorized to conduct investigations to determine whether any person is, or has, engaged in conduct that violates Federal consumer financial law.[16] Investigations may be conducted jointly with other regulators,[17] and may include subpoenas or civil investigative demands for testimony, responses to written questions, documents, or other materials.[18]

CFPB may bring administrative enforcement proceedings[19] or civil actions in Federal district court.[20] The Bureau can obtain "any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law," including, but not limited to:

- Rescission or reformation of contracts.

- Refund of money or return of real property.

- Restitution.

- Disgorgement or compensation for unjust enrichment.

- Payment of damages or other monetary relief.

- Public notification regarding the violation.

- Limits on the activities or functions of the person against whom the action is brought.

- Civil monetary penalties (which can go either to victims or to financial education).

CFPB has no criminal enforcement authority.

---

[16] Sec. 1051

[17] Sec. 1052(a)

[18] Sec. 1052(b) and (c)

[19] Sec. 1053

[20] Sec. 1054

# CFPB Supervision
# and Examination Process                                Overview

## Referral of Matters or Information to Other Agencies

*Criminal Activity*

In the course of their work, examiners may obtain evidence that a regulated entity or a customer has engaged in conduct that may constitute a violation of Federal criminal law. The CFPB is required by the Act[21] to refer such findings to the Department of Justice (DOJ) for further review and action. Examiners who, during the course of conducting their examination duties, believe they have found evidence of criminal conduct should consult internally to discuss their findings and the appropriate next steps. Headquarters will handle referral of appropriate matters to DOJ.

Some examples of fact scenarios that may necessitate a referral to the DOJ include, but are not limited to, the following:

- Based on documented information that the examiner has obtained, a regulated entity's financial records are comprised of data that appear to be false.

- A regulated entity's records or files show that it has direct business relationships with individuals or businesses based in a country that is the target of one or more types of United States government sanctions. (See sanctioned country lists at www.treasury.gov and www.state.gov.)

- A loan file or other type of file or record concerning a customer of a regulated entity contains one or more of the following documents that may indicate that the customer has engaged in potentially criminal conduct:

    o Bank statements that show that the customer has one or more bank accounts in a country that is a target of United States government sanctions. (*See* sanctioned country lists at www.treasury.gov and www.state.gov.)

    o Based on documented information in a loan file, (1) a loan application appears to contain false information, (2) an appraisal for real property appears to contain false information, or (3) a document used to verify loan eligibility appears to contain false information. (Documents used to verify loan eligibility include but are not limited to bank statements, Forms 1099, Forms W-2, and/or federal income tax returns.)

*Tax Law Non-Compliance*

The CFPB is also required under the Act to refer information identifying possible tax law non-compliance to the Internal Revenue Service (IRS).[22] Examiners who, during the course of conducting their examination duties, believe they have found evidence of tax law non-compliance should consult internally about the appropriate next steps. Headquarters will handle referral of matters to the IRS.

---

[21] *See* Sec. 1056

[22] *See* Secs. 1024(b)(6) and 1025(b)(5).

Some examples of fact scenarios that may necessitate a referral to the IRS include, but are not limited to, the following:

- Based on documented information that the examiner has obtained, a regulated entity's tax returns are comprised of data that appear false.

- A loan file or other type of file or record concerning a customer of a regulated entity contains one or more of the following documents that may indicate that the customer has failed to comply with the tax laws:

    o Documents used to verify loan eligibility that clearly document that the customer has substantially greater income than the income that the customer reported on Federal income tax returns. Documents used to verify loan eligibility include statements showing a customer's investment portfolio, bank statements, and/or Forms 1099.

### *ECOA/pattern or practice*

The Equal Credit Opportunity Act (ECOA) requires the CFPB to refer matters to DOJ whenever the CFPB "has reason to believe that one or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of Section 1691(a)" of ECOA, which states ECOA's basic prohibitions against discrimination.[23] In matters that do not involve a pattern or practice of discouragement or denial, the CFPB may refer the matter to the DOJ whenever the agency has reason to believe that one or more creditors has violated Section 1691(a).[24] Headquarters will handle referral of appropriate matters to DOJ.

### *Matters not within the CFPB's authority*

When examiners find information that may indicate violations of law that are not within the CFPB's authority, the information will be passed on to the appropriate prudential, other Federal, or state regulator. These situations will generally be handled by the Examiner in Charge, after consulting internally.

---

[23] 15 U.S.C. § 1691e(g).

[24] *Id.*

# CFPB Supervision and Examination Process

# Overview

## Supervision Examination Cycle

As shown in the graphic and described in this section, CFPB supervision operates as a continuous cycle.

**Pre-Examination / Scoping**

- Review and analyze available information to identify risks, areas of inquiry, and focus.
- Request and review documents and information needed to begin examination (e.g., internal policies, audit reports, training materials, recent data)
- Make initial plan for on-site testing and review

**Examination (offsite and onsite)**

- Interview senior managers, loan officers, compliance officers, and account personnel as appropriate
- Observe operations (e.g., call center, branches)
- Compare policies and procedures to actual practices by reviewing a sample of transactions
- Compare conduct to legal requirements and policy guidance

**Monitoring**

- Product / Market analysis
- Periodic checks on institution activities; calls and meetings
- Review reports and information
- Review status of corrective actions
- Scoping for the next exam

**Communicate conclusions and required corrective action**

- Communicate findings and expected corrective actions to management and Board of Directors
- Pursue appropriate supervisory agreement or formal enforcement action as needed

# CFPB Supervision
# and Examination Process    Overview

*Examination Prioritization*: Given the large number, size, and complexity of entities falling under its supervisory authority, the CFPB uses a "prioritization" approach to examining. The CFPB's prioritization approach focuses on risks to consumers rather than risks to institutions. The prioritization approach focuses on individual product lines at an institution rather than on a comprehensive focus of all products and services offered by an institution. This approach allows the CFPB to assess the likely risk to consumers across the consumer financial marketplace in all product lines at all stages of a product's life cycle, including product development and implementation.

The prioritization process begins by analyzing an institution's products and services and breaking the institution down into its distinct product lines that are offered to consumers. For example, a large depository institution might have several product lines – auto lending, credit cards, deposit accounts, international money transfers, mortgage origination, and mortgage servicing – while a nonbank mortgage company might have just two – mortgage origination and servicing. We refer to each distinct product line at a regulated entity as an "Institution Product Line." These are the basic units of analysis for the CFPB's prioritization approach.

Once broken down into institution product lines, the product lines are compared across entities, charters, or licenses. This approach promotes an evaluation of each product line not by the provider's form of organization but by the product line activity within an organization. Each product line is evaluated on the potential consumer harm related to a particular market; the size of the product market; the regulated entity's market share; and risks inherent to the regulated entity's operations and offering of financial consumer products within that market.

The prioritization framework assesses risks to the consumer at two levels: the market level and the institution level. At the market-wide level, the CFPB assesses the risk to the consumer from the products and practices being offered in a particular market. In addition, the prioritization approach considers the relative product market size in the overall consumer finance marketplace.

At the institution level, the prioritization framework distinguishes that some institutions' business models within a market pose greater risks of harm to consumers than do others. Accordingly, prioritization efforts assess the relative risks to consumers from each institution's activity within any given market. This process takes into account a broad range of factors that bear upon the likelihood of consumer harm. The process starts with a regulated entity's market share within an individual product line, which corresponds to the number of consumers affected. Relatively large entities with a more dominant presence have a greater ability to impact more consumers, thus are prioritized over relatively small entities.

The prioritization approach augments this size consideration significantly with "field and market intelligence." Field and market intelligence includes both qualitative and quantitative factors for each institution product line, such as the strength of compliance management systems, findings from prior examinations, metrics gathered from public reports, and the number and severity of consumer complaints the CFPB receives. In addition, given the CFPB's mandate to ensure fair, equitable, and nondiscriminatory access to credit for all consumers, fair-lending-focused

information supplements general field and market intelligence in order to ensure that fair lending risks are identified and prioritized as well.

Taken together, the information about each institution product line, both at the market level and at the institutional level, allows the CFPB to focus on areas where consumers have the greatest potential to be harmed, specifically, on relatively higher risk institution product lines within relatively higher risk markets.

*Central Point of Contact Duties*: The CFPB may assign a staff member to perform central point of contact (CPC) duties at an institution to monitor the institution's on-going compliance efforts and to serve as the primary communication conduit between the company and the CFPB. CPC duties may be assigned to a field manager, an examiner or an analyst. CPC duties will vary from institution to institution based upon the company's risk profile and the examination schedule developed pursuant to the examination prioritization process described above.

*Monitoring*: The primary purpose of institution monitoring is to maintain current information about the institution's activities in order to determine whether changes in risks to consumers or markets warrant a change in the CFPB's prioritization strategy. Monitoring also allows the CFPB to assess institutional compliance with previously established corrective action and to evaluate on-going efforts by institution management to improve the company's compliance program. The frequency and scope of monitoring will vary depending on the organization's risk profile and will be established by CFPB management.

Examples of monitoring activities include:
- Reviewing supervisory and public information about the entity, such as:
    - Prudential and state regulator examination reports;
    - Community Reinvestment Act performance evaluations;
    - Current enforcement actions;
    - Call report data;
    - Complaint data;
    - Home Mortgage Disclosure Act data;
    - Home Affordable Modification Program Data;
    - SEC filings;
    - Licensing or registration information;
    - Reports from the entity to prudential or state regulators, if any;
    - CFPB research analyst reports;
    - Institution website; and
    - CFPB consumer complaints.

- Contacting the appropriate officer of the institution to discuss new products or services, events that may impact compliance management, and any questions raised by information reviewed by the CPC.

- Contacting the federal prudential regulator and relevant state regulators to discuss any recent events and any questions raised by supervisory or public information about the institution.

- Consulting internally.

Information developed through monitoring will be used to regularly assess the institution's risk profile and will be incorporated into the examination prioritization as described above.

*Supervision Plan*: A Supervision Plan is created and revised periodically for large depository institutions and certain nonbank institutions depending on the organization's risk profile. The Supervision Plan summarizes the plan for monitoring and examining the institution and its affiliates. It describes the priorities for CFPB supervision activities to assist in allocating and scheduling examiner resources. The Plan should be updated at least annually and may be updated at any time as a result of changes in the risk profile of the entity.