# Exhibit D

- Content of the supervised entity's website

Before contacting the supervised entity to gather additional information, the EIC (or designee(s)) reviews the material gathered from these sources to help avoid duplicative requests. Of course, it may still be necessary to verify or update the information or documents with the supervised entity, but the burden of production will be reduced.

## Develop a Scope Summary

Consistent with the Bureau's risk-based prioritization process, the EIC prepares the Scope Summary, which provides all members of the examination team with a central point of reference throughout the examination. The initial Scope Summary is based on internal consultation and a review of available information and documents gathered prior to sending the Information Request to the supervised entity.

The initial Scope Summary addresses the following:

- Key dates;
- Composition of the examination team;
- Contact information for the entity and any applicable prudential and state regulators;
- Communication plan;
- Activities to be undertaken to review:
  - The compliance management system (CMS);
  - Examination Procedures to be completed;
  - Areas selected for transaction testing, including estimated sampling sizes and methodology used to select the sample;
  - Areas where potential legal violations may exist, including those involving unfair, deceptive, or abusive acts or practices;
  - Fair lending compliance, if applicable.
  - Issues arising from complaints; and
  - Specific regulatory compliance issues.

At the conclusion of the examination, the EIC updates the initial Scope Summary with the following:

- Description of changes to the scope during the course of the review, and reasons for such changes; and

- Recommendations for the scope of subsequent reviews.

The initial Scope Summary, as well as any material changes to the scope during the review, should be approved in accordance with current Bureau requirements. The Scope Summary is maintained with the review records in the Supervision and Examination System.

The customizable Scope Summary template is available in the Supervision and Examination System.

## Contact the Entity

For most reviews, the EIC, or designee, contacts the supervised entity's management no later than 60 days prior to the scheduled onsite date for the examination to arrange either a telephone or in-person discussion of the Information Request. The principal purpose of the discussion is to gather current information to ensure that the request is tailored to what is necessary to properly conduct the review of that particular institution.

The EIC or designee should also use the discussion to help determine whether certain information needed for the review should be sent to the examination team for review offsite or held for onsite review. The discussion should include the timing of production and the subsequent onsite review. The EIC should use the discussions to apprise management about who should be available to be interviewed during the onsite portion of the review. If not already known, the EIC should obtain information about the organization of the entity and where it maintains certain operations for the purpose of deciding which operation centers and/or branches the team will review.

## Prepare and Send the Information Request

After conducting the review and discussion outlined above, the EIC or designee will use the monitoring information and any other relevant information to customize an Information Request that includes only items that are pertinent to the review of a particular entity. Not all items will be relevant to every review. In addition, the Information Request must specify the review period when it requests information or documentation such as periodic reports, ledgers, policies and procedures, and administrative changes, to avoid receiving data not relevant to the review.

The EIC or designee may provide the Information Request to entity management in either hard copy or electronic format, although electronic is preferred, indicating where the materials should be delivered and in what format. If at all possible, the requested materials should be delivered to the Bureau electronically. Examiners should consult with their field managers about what system should be used for secure requests and transmission of electronic examination files. The timing of the request and the response date must ensure that entity staff has sufficient time to assemble the requested information and the examination team has sufficient time to adequately review the materials.

Contacting the supervised entity at least 60 days prior to the onsite date, whenever feasible, and

sending the Information Request as soon as possible thereafter will generally ensure that staff of the supervised entity have sufficient time to properly gather and submit the response, and that the examination team has time to conduct its offsite review. To the extent possible and consistent with statutory requirements, examiners should coordinate the information request with the prudential and state regulator(s) and keep them abreast of monitoring efforts, correspondence with the supervised entity, and schedule planning.

The customizable Information Request templates are available in the Supervision and Examination System.

## *Conduct the Review*

After receiving and reviewing the information and documents requested from the entity, the EIC will determine how to deploy the examination team to complete the examination procedures identified in the Scope Summary, conduct interviews, make observations, conduct transaction testing, and oversee other processes. Available examination procedures are part of this Supervision and Examination Manual. Templates should be downloaded from the Supervision and Examination System and used to create workpapers.

Upon determining the onsite start date, the EIC should arrange an entrance meeting with the appropriate member(s) of the supervised entity's management. At the meeting, the EIC can introduce the examination team, discuss generally the expected activities, clarify any questions about arrangements for being onsite at the entity (such as building security, work space, etc.), and set the tone for the examination.

Thereafter, the EIC should meet regularly with the entity point of contact to discuss interim findings and progress of the review. The EIC should also communicate regularly with his or her point of contact at the entity's prudential or state regulator(s). Throughout the examination, the EIC should follow current Bureau procedures for providing updates to regional and headquarters stakeholders

## *Close the Review*

### Closing Meeting

When all onsite activities and internal Bureau consultations are complete, the EIC should meet with the supervised entity's management to discuss the preliminary examination findings; expected Matters Requiring Attention or Supervisory Recommendations; recommended rating (if applicable); and next steps, if any. Management should be reminded that supervisory information, including ratings, is confidential and should not be shared except as allowed by Bureau regulation. Depending on the severity of the findings, other Bureau representatives may attend this meeting as well. Management should be alerted if a meeting with the board of directors or principals of the supervised entity will be required.

Entity management must be informed that examination findings, including compliance ratings, are

not final until internal Bureau reviews are conducted and, in the case of an insured depository institution or affiliate, the prudential regulator has had the opportunity to review and comment on the draft report.

## *Determine the Compliance Rating*

When an Examination Report is issued, it will include a compliance rating that reflects the Bureau's assessment of the effectiveness of the institution's compliance management system to ensure compliance with consumer protection laws and regulations and reduce the risk of harm to consumers. The Bureau has adopted and uses the FFIEC Uniform Consumer Compliance Rating System (CC Rating System)[2] to determine compliance ratings. The system is based upon a numeric scale of "1" through "5" in increasing order of supervisory concern. Thus, "1" represents the highest rating and consequently the lowest degree of supervisory concern, while "5" represents the lowest rating and the most critically deficient level of performance, and therefore, the highest degree of supervisory concern. Ratings of "1" or "2" represent satisfactory or better performance. Ratings of "3," "4," or "5" indicate performance that is less than satisfactory.

- The highest rating of "1" is assigned to a financial institution that maintains a strong compliance management system (CMS) and takes action to prevent violations of law and consumer harm.

- A rating of "2" is assigned to a financial institution that maintains a CMS that is satisfactory at managing consumer compliance risk in the institution's products and services and at substantially limiting violations of law and consumer harm.

- A rating of "3" reflects a CMS deficient at managing consumer compliance risk in the institution's products and services and at limiting violations of law and consumer harm.

- A rating of "4" reflects a CMS seriously deficient at managing consumer compliance risk in the institution's products and services and/or at preventing violations of law and consumer harm. "Seriously deficient" indicates fundamental and persistent weaknesses in crucial CMS elements and severe inadequacies in core compliance areas necessary to operate within the scope of statutory and regulatory consumer protection requirements and to prevent consumer harm.

- A rating of "5" reflects a CMS critically deficient at managing consumer compliance risk in the institution's products and services and/or at preventing violations of law and consumer harm. "Critically deficient" indicates an absence of crucial CMS elements and a demonstrated lack of willingness or capability to take the appropriate steps

---

[2] This description of the rating system is adapted for Bureau purposes from the revised Uniform Interagency Consumer Compliance Rating System (CC Rating System) effective March 31, 2017. *See* ffiec.gov/press/pr110716.htm. The revisions update the original CC Rating System adopted by the FFIEC in 1980.

necessary to operate within the scope of statutory and regulatory consumer protection requirements and to prevent consumer harm.

## *CC Rating System Categories and Assessment Factors*

### CC Rating System – Categories

The CC Rating System is organized under three broad categories:

1. Board and Management Oversight,
2. Compliance Program, and
3. Violations of Law and Consumer Harm.

The Consumer Compliance Rating Definitions below list the assessment factors considered within each category, along with narrative descriptions of performance. The first two categories, Board and Management Oversight and Compliance Program, are used to assess a financial institution's CMS. As such, examiners should evaluate the assessment factors within these two categories commensurate with the institution's size, complexity, and risk profile. All institutions, regardless of size, should maintain an effective CMS. The sophistication and formality of the CMS typically will increase commensurate with the size, complexity, and risk profile of the entity.

Additionally, compliance expectations contained within the narrative descriptions of these two categories extend to third-party relationships[3] into which the financial institution has entered. There can be certain benefits to financial institutions engaging in relationships with third parties, including gaining operational efficiencies or an ability to deliver additional products and services, but such arrangements also may expose financial institutions to risks if not managed effectively.

As noted in the Consumer Compliance Rating Definitions, examiners should evaluate activities conducted through third-party relationships as though the activities were performed by the institution itself. Examiners should review a financial institution's management of third-party relationships and servicers as part of its overall compliance program.

The third category, Violations of Law and Consumer Harm, includes assessment factors that evaluate the dimensions of any identified violation or consumer harm. Examiners should weigh each of these four factors – root cause, severity, duration, and pervasiveness – in evaluating relevant violations of law and any resulting consumer harm.

---

[3] For the purposes of assessing compliance ratings, the FFIEC refers to these relationships as being with "third parties." Because the Bureau has adopted the FFIEC's CC Rating System, the Bureau is using that terminology in this section of the manual. However, the Bureau generally uses the term "service provider" in its supervisory documents. For more information, see Bureau Bulletin 2016-02.

# CFPB Supervision and Examination Process — Examinations and Targeted Reviews

## Consumer Compliance Rating Definitions

**Board and Management Oversight – Assessment Factors**

Under Board and Management Oversight, the examiner should assess the financial institution's board of directors and management, as appropriate for their respective roles and responsibilities, based on the following assessment factors:

- Oversight of and commitment to the institution's CMS;

- Effectiveness of the institution's change management processes, including responding timely and satisfactorily to any variety of change, internal or external, to the institution;

- Comprehension, identification, and management of risks arising from the institution's products, services, or activities; and

- Self-identification of consumer compliance issues and corrective action undertaken as such issues are identified.

**Compliance Program – Assessment Factors**

Under Compliance Program, the examiner should assess other elements of an effective CMS, based on the following assessment factors:

- Whether the institution's policies and procedures are appropriate to the risk in the products, services, and activities of the institution;

- The degree to which compliance training is current and tailored to risk and staff responsibilities;

- The sufficiency of the monitoring and audit to encompass compliance risks throughout the institution; and

- The responsiveness and effectiveness of the consumer complaint resolution process.

**Violations of Law and Consumer Harm – Assessment Factors**

Under Violations of Law and Consumer Harm, the examiner should analyze the following assessment factors:

- The root cause, or causes, of any violations of law identified during the examination;

- The severity of any consumer harm resulting from violations;

- The duration of time over which the violations occurred; and

- The pervasiveness of the violations.

# CFPB Supervision and Examination Process

## Examinations and Targeted Reviews

As a result of a violation of law, consumer harm may occur. While many instances of consumer harm can be quantified as a dollar amount associated with financial loss, such as charging higher fees for a product than was initially disclosed, consumer harm may also result from a denial of an opportunity. For example, a consumer could be harmed when a financial institution denies the consumer credit or discourages an application in violation of the Equal Credit Opportunity Act, whether or not there is resulting financial harm.

This next category of the Consumer Compliance Rating Definitions defines four factors by which examiners can assess violations of law and consumer harm.

1. **Root Cause.** The Root Cause assessment factor analyzes the degree to which weaknesses in the CMS gave rise to the violations. In many instances, the root cause of a violation is tied to a weakness in one or more elements of the CMS. Violations that result from critical deficiencies in the CMS evidence a critical absence of management oversight and are of the highest supervisory concern.

2. **Severity.** The Severity assessment factor of the Consumer Compliance Rating Definitions weighs the type of consumer harm, if any, that resulted from violations of law. More severe harm results in a higher level of supervisory concern under this factor. For example, some consumer protection violations may cause significant financial harm to a consumer, while other violations may cause negligible harm, based on the specific facts involved.

3. **Duration.** The Duration assessment factor considers the length of time over which the violations occurred. Violations that persist over an extended period of time will raise greater supervisory concerns than violations that occur for only a brief period of time. When violations are brought to the attention of an institution's management and management allows those violations to remain unaddressed, such violations are of the highest supervisory concern.

4. **Pervasiveness.** The Pervasiveness assessment factor evaluates the extent of the violation(s) and resulting consumer harm, if any. Violations that affect a large number of consumers will raise greater supervisory concern than violations that impact a limited number of consumers. If violations become so pervasive that they are considered to be widespread or present in multiple products or services, the institution's performance under this factor is of the highest supervisory concern.

## Self-Identification of Violations of Law and Consumer Harm

Strong compliance programs are proactive. They promote consumer protection by preventing, self-identifying, and addressing compliance issues in a proactive manner. Accordingly, the CC Rating System provides incentives for such practices through the definitions associated with a 1 rating.

Self-identification and prompt correction of violations of law reflect strengths in an institution's

CMS. A robust CMS appropriate for the size, complexity and risk profile of an institution's business often will prevent violations or will facilitate early detection of potential violations.

This early detection can limit the size and scope of consumer harm. Moreover, self-identification and prompt correction of serious violations represents concrete evidence of an institution's commitment to responsibly address underlying risks. In addition, appropriate corrective action, including both correction of programmatic weaknesses and full redress for injured parties, limits consumer harm and prevents violations from recurring in the future. Thus, the CC Rating System recognizes institutions that consistently adopt these strategies as reflected in the Consumer Compliance Rating Definitions.

## Evaluating Performance Using the Consumer Compliance Rating Definitions

The consumer compliance rating is derived through an evaluation of the financial institution's performance under each of the assessment factors described above. The consumer compliance rating reflects the effectiveness of an institution's CMS to identify and manage compliance risk in the institution's products and services and to prevent violations of law and consumer harm, as evidenced by the financial institution's performance under each of the assessment factors.

The consumer compliance rating reflects a comprehensive evaluation of the financial institution's performance under the CC Rating System by considering the categories and assessment factors in the context of the size, complexity, and risk profile of an institution. It is not based on a numeric average or any other quantitative calculation. Specific numeric ratings will not be assigned to any of the 12 assessment factors. Thus, an institution need not achieve a satisfactory assessment in all categories in order to be assigned an overall satisfactory rating.

Conversely, an institution may be assigned a less than satisfactory rating even if some of its assessments were satisfactory.

The relative importance of each category or assessment factor may differ based on the size, complexity, and risk profile of an individual institution. Accordingly, one or more category or assessment factor may be more or less relevant at one financial institution as compared to another institution. While the expectations for compliance with consumer protection laws and regulations are the same across institutions of varying sizes, the methods for accomplishing an effective CMS may differ across institutions.

The evaluation of an institution's performance within the Violations of Law and Consumer Harm category of the Consumer Compliance Rating Definitions considers each of the four assessment factors: Root Cause, Severity, Duration, and Pervasiveness. At the levels of "4" and "5" in this category, the distinctions in the definitions are focused on the root cause assessment factor rather than Severity, Duration, and Pervasiveness. This approach is consistent with the other categories where the difference between a "4" and a "5" is driven by the institution's capacity and willingness to maintain a sound consumer compliance system.

# CFPB Supervision and Examination Process

## Examinations and Targeted Reviews

In arriving at the final rating, the examiner must balance potentially differing conclusions about the effectiveness of the financial institution's CMS over the individual products, services, and activities of the organization. Depending on the relative materiality of a product line to the institution, an observed weakness in the management of that product line may or may not impact the conclusion about the institution's overall performance in the associated assessment factor(s). For example, serious weaknesses in the policies and procedures or audit program of the mortgage department at a mortgage lender would be of greater supervisory concern than those same gaps at an institution that makes very few mortgage loans and strictly as an accommodation. Greater weight should apply to the financial institution's management of material products with significant potential consumer compliance risk.

An institution may receive a less than satisfactory rating even when no violations were identified, based on deficiencies or weaknesses identified in the institution's CMS. For example, examiners may identify weaknesses in elements of the CMS in a new loan product. Because the presence of those weaknesses left unaddressed could result in future violations of law and consumer harm, the CMS deficiencies could impact the overall consumer compliance rating, even if no violations were identified.

Similarly, an institution may receive a "1" or "2" rating even when violations were present, if the CMS is commensurate with the risk profile and complexity of the institution. For example, when violations involve limited impact on consumers, were self-identified, and resolved promptly, the evaluation may result in a "1" or "2" rating. After evaluating the institution's performance in the two CMS categories, Board and Management Oversight and Compliance Program, and the dimensions of the violations in the third category, the examiner may conclude that the overall strength of the CMS and the nature of observed violations viewed together do not present significant supervisory concerns.

# CFPB Supervision and Examination Process

# Examinations and Targeted Reviews

## Consumer Compliance Rating Definitions

| ASSESSMENT FACTORS TO BE CONSIDERED | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Board and Management Oversight** Board and management oversight factors should be evaluated commensurate with the institution's size, complexity, and risk profile. Compliance expectations below extend to third-party relationships. | | | | | |
| **Oversight and Commitment** | Board and management demonstrate strong commitment and oversight to the financial institution's compliance management system. | Board and management provide satisfactory oversight of the financial institution's compliance management system. | Board and management oversight of the financial institution's compliance management system is deficient. | Board and management oversight, resources, and attention to the compliance management system are seriously deficient. | Board and management oversight, resources, and attention to the compliance management system are critically deficient. |
| | Substantial compliance resources are provided, including systems, capital, and human resources commensurate with the institution's size, complexity, and risk profile. Staff is knowledgeable, empowered and held accountable for compliance with consumer laws and regulations. | Compliance resources are adequate and staff is generally able to ensure the financial institution is in compliance with consumer laws and regulations. | Compliance resources and staff are inadequate to ensure the financial institution is in compliance with consumer laws and regulations. | Compliance resources and staff are seriously deficient and are ineffective at ensuring the financial institution's compliance with consumer laws and regulations. | Compliance resources are critically deficient in supporting the financial institution's compliance with consumer laws and regulations, and management and staff are unwilling or incapable of operating within the scope of consumer protection laws and regulations. |
| | Management conducts comprehensive and ongoing due diligence and oversight of third parties consistent with agency expectations to ensure that the financial institution complies with consumer protection laws, and exercises strong oversight of third parties' policies, procedures, internal controls, and training to ensure consistent oversight of compliance responsibilities. | Management conducts adequate and ongoing due diligence and oversight of third parties to ensure that the financial institution complies with consumer protection laws, and adequately oversees third parties' policies, procedures, internal controls, and training to ensure appropriate oversight of compliance responsibilities. | Management does not adequately conduct due diligence and oversight of third parties to ensure that the financial institution complies with consumer protection laws, nor does it adequately oversee third parties' policies, procedures, internal controls, and training to ensure appropriate oversight of compliance responsibilities. | Management oversight and due diligence over third-party performance, as well as management's ability to adequately identify, measure, monitor, or manage compliance risks, is seriously deficient. | Management oversight and due diligence of third-party performance is critically deficient. |

CFPB Supervision and Examination Process
Examinations and Targeted Reviews

| ASSESSMENT FACTORS TO BE CONSIDERED | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Change Management** | Management anticipates and responds promptly to changes in applicable laws and regulations, market conditions and products and services offered by evaluating the change and implementing responses across impacted lines of business.<br><br>Management conducts due diligence in advance of product changes, considers the entire life cycle of a product or service in implementing change, and reviews the change after implementation to determine that actions taken have achieved planned results. | Management responds timely and adequately to changes in applicable laws and regulations, market conditions, products and services offered by evaluating the change and implementing responses across impacted lines of business.<br><br>Management evaluates product changes before and after implementing the change. | Management does not respond adequately and/or timely in adjusting to changes in applicable laws and regulations, market conditions, and products and services offered. | Management's response to changes in applicable laws and regulations, market conditions, or products and services offered is seriously deficient. | Management fails to monitor and respond to changes in applicable laws and regulations, market conditions, or products and services offered. |
| **Comprehension, Identification and Management of Risk** | Management has a solid comprehension of and effectively identifies compliance risks, including emerging risks, in the financial institution's products, services, and other activities.<br><br>Management actively engages in managing those risks, including through comprehensive self-assessments. | Management comprehends and adequately identifies compliance risks, including emerging risks, in the financial institution's products, services, and other activities.<br><br>Management adequately manages those risks, including through self-assessments. | Management has an inadequate comprehension of and ability to identify compliance risks, including emerging risks, in the financial institution's products, services, and other activities. | Management exhibits a seriously deficient comprehension of and ability to identify compliance risks, including emerging risks, in the financial institution. | Management does not comprehend nor identify compliance risks, including emerging risks, in the financial institution. |
| **Corrective Action and Self-Identification** | Management proactively identifies issues and promptly responds to compliance risk management deficiencies and any violations of laws or regulations, including remediation. | Management adequately responds to and corrects deficiencies and/or violations, including adequate remediation, in the normal course of business. | Management does not adequately respond to compliance deficiencies and violations including those related to remediation. | Management response to deficiencies, violations and examination findings is seriously deficient. | Management is incapable, unwilling and/or fails to respond to deficiencies, violations or examination findings. |

# CFPB Supervision and Examination Process

# Examinations and Targeted Reviews

| ASSESSMENT FACTORS TO BE CONSIDERED | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Compliance Program** Compliance Program factors should be evaluated commensurate with the institution's size, complexity, and risk profile. Compliance expectations below extend to third-party relationships. | | | | | |
| **Policies and Procedures** | Compliance policies and procedures and third-party relationship management programs are strong, comprehensive and provide standards to effectively manage compliance risk in the products, services and activities of the financial institution. | Compliance policies and procedures and third-party relationship management programs are adequate to manage the compliance risk in the products, services and activities of the financial institution. | Compliance policies and procedures and third-party relationship management programs are inadequate at managing the compliance risk in the products, services and activities of the financial institution. | Compliance policies and procedures and third-party relationship management programs are seriously deficient at managing compliance risk in the products, services and activities of the financial institution. | Compliance policies and procedures and third-party relationship management programs are critically absent. |
| **Training** | Compliance training is comprehensive, timely, and specifically tailored to the particular responsibilities of the staff receiving it, including those responsible for product development, marketing and customer service.<br><br>The compliance training program is updated proactively in advance of the introduction of new products or new consumer protection laws and regulations to ensure that all staff are aware of compliance responsibilities before rolled out. | Compliance training outlining staff responsibilities is adequate and provided timely to appropriate staff.<br><br>The compliance training program is updated to encompass new products and to comply with changes to consumer protection laws and regulations. | Compliance training is not adequately comprehensive, timely, updated, or appropriately tailored to the particular responsibilities of the staff. | Compliance training is seriously deficient in its comprehensiveness, timeliness, or relevance to staff with compliance responsibilities, or has numerous major inaccuracies. | Compliance training is critically absent. |

# CFPB Supervision and Examination Process

# Examinations and Targeted Reviews

| ASSESSMENT FACTORS TO BE CONSIDERED | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Monitoring and/or Audit** | Compliance monitoring practices, management information systems, reporting, compliance audit, and internal control systems are comprehensive, timely, and successful at identifying and measuring material compliance risk management throughout the financial institution.<br><br>Programs are monitored proactively to identify procedural or training weaknesses to preclude regulatory violations. Program modifications are made expeditiously to minimize compliance risk. | Compliance monitoring practices, management information systems, reporting, compliance audit, and internal control systems adequately address compliance risks throughout the financial institution. | Compliance monitoring practices, management information systems, reporting, compliance audit, and internal control systems do not adequately address risks involving products, services or other activities including timing and scope. | Compliance monitoring practices, management information systems, reporting, compliance audit, and internal controls are seriously deficient in addressing risks involving products, services or other activities. | Compliance monitoring practices, management information systems, reporting, compliance audit, or internal controls are critically absent. |
| **Consumer Complaint Response** | Processes and procedures for addressing consumer complaints are strong. Consumer complaint investigations and responses are prompt and thorough.<br><br>Management monitors consumer complaints to identify risks of potential consumer harm, program deficiencies, and customer service issues and takes appropriate action. | Processes and procedures for addressing consumer complaints are adequate. Consumer complaint investigations and responses are generally prompt and thorough.<br><br>Management adequately monitors consumer complaints and responds to issues identified. | Processes and procedures for addressing consumer complaints are inadequate. Consumer complaint investigations and responses are not thorough or timely.<br><br>Management does not adequately monitor consumer complaints. | Processes and procedures for addressing consumer complaints and consumer complaint investigations are seriously deficient.<br><br>Management monitoring of consumer complaints is seriously deficient. | Processes and procedures for addressing consumer complaints are critically absent. Meaningful investigations and responses are absent.<br><br>Management exhibits a disregard for complaints or preventing consumer harm. |
| **Violations of Law and Consumer Harm** | | | | | |
| **Root Cause** | The violations are the result of minor weaknesses, if any, in the compliance risk management system. | Violations are the result of modest weaknesses in the compliance risk management system. | Violations are the result of material weaknesses in the compliance risk management system. | Violations are the result of serious deficiencies in the compliance risk management system. | Violations are the result of critical deficiencies in the compliance risk management system. |
| **Severity** | The type of consumer harm, if any, resulting from the violations would have a minimal impact on consumers. | The type of consumer harm resulting from the violations would have a limited impact on consumers. | The type of consumer harm resulting from the violations would have a considerable impact on consumers. | The type of consumer harm resulting from the violations would have a serious impact on consumers. | |

| ASSESSMENT FACTORS TO BE CONSIDERED | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Duration** | The violations and resulting consumer harm, if any, occurred over a brief period of time. | The violations and resulting consumer harm, if any, occurred over a limited period of time. | The violations and resulting consumer harm, if any, occurred over an extended period of time. | The violations and resulting consumer harm, if any, have been long standing or repeated. | |
| **Pervasiveness** | The violations and resulting consumer harm, if any, are isolated in number. | The violations and resulting consumer harm, if any, are limited in number. | The violations and resulting consumer harm, if any, are numerous. | The violations and resulting consumer harm, if any, are widespread or in multiple products or services. | |

## *Draft the Examination Report or Supervisory Letter*

Examinations that result in the assignment of a consumer compliance rating will be communicated to the entity through an Examination Report. Targeted reviews that do not result in a rating will be communicated through a Supervisory Letter. Examination Report and Supervisory Letter templates are provided in Part III.

The primary purpose of these reports and letters is to communicate findings to the board of directors or principals and senior executives of a supervised entity. The narratives should be concise, constructive, and direct. In general, the commentaries for stable entities with low consumer or compliance risk should be brief, while the commentaries for those with elevated or increasing risk should successively provide more support and detail.

Comments should clearly cite statutory or regulatory violations and describe the basis for the findings. This will ensure that the supervised entity understands the basis for the conclusions and so that enforcement actions, if required, are well supported.

For each specific area reviewed, the narrative sections of the report have two parts:

1. **Conclusion:** The Conclusion contains an overall conclusion followed by a concise summary of findings. The conclusion should match the tone and language of the rating definition. This section should include summary details or facts supporting the conclusion, including a summary of material deficiencies. Avoid an overly detailed conclusion section. Include details supporting the conclusion in the Comments and Supporting Analysis section. Do not include cross-references within the Conclusion section.

2. **Comments and Supporting Analysis**: Comments discuss major strengths and/or weaknesses to support the conclusions. Supporting Analysis is information that demonstrates conclusions.

Examination reports and Supervisory Letters may include two types of communication to convey supervisory expectations related to violations of Federal consumer financial law, consumer harm, or compliance management weaknesses:

1. **Matters Requiring Attention (MRAs)**: MRAs are used by the Bureau to communicate to an institution's Board of Directors, senior management, or both, specific goals to be accomplished in order to correct violations of Federal consumer financial law, remediate harmed consumers, and address related weaknesses in the CMS that the examiners found are directly related to violations of Federal consumer financial law. MRAs include timeframes for periodic reporting of efforts taken to address these matters, as well as expected timeframes for implementation.

2. **Supervisory Recommendations (SRs)**: SRs are used by the Bureau to recommend actions for management to consider taking if it chooses to address the Bureau's supervisory concerns related to CMS. SRs are used when the Bureau has not identified a violation of Federal consumer financial law, but has observed weaknesses in CMS. SRs do not include provisions for periodic reporting or expected timelines for implementation. However, the Bureau will review through monitoring the steps institutions have taken to address SRs, including any information that institutions may provide regarding actions taken.

Neither MRAs nor SRs are legally enforceable. The Bureau will, however, consider an institution's response in addressing identified violations of Federal consumer financial law, weaknesses in CMS, or other noted concerns when assessing an institution's Compliance rating, or otherwise considering the risks that an institution poses to consumers and to markets. These risk considerations may be used by the Bureau when prioritizing future supervisory work or assessing the need for potential enforcement action.

## *Submit Examination Report or Supervisory Letter for Review*

After the Examination Report or Supervisory Letter draft is complete, the Region will obtain any reviews required by internal Bureau policy.

If an Examination Report concerns an insured depository institution, the draft must be shared with the institution's prudential regulator.[4] The regulator must be given a reasonable opportunity to review and comment (not less than 30 days after the date of receipt of the report by the prudential regulator). The Bureau must take into consideration any concerns raised by the prudential regulator prior to issuing a final Examination Report or taking supervisory action. The interagency comment process will be managed by the Bureau's regional offices, with input from Bureau headquarters as appropriate. If a conflict arises between the Bureau and the prudential regulator regarding a proposed supervisory determination, regional and headquarters management will seek to resolve the issue as expeditiously as possible, with due regard for each agency's supervisory responsibilities. If the Bureau's review of an insured depository institution results in a Supervisory Letter, the final Supervisory Letter will be shared with the institution's

---

[4] Dodd-Frank Act, section 1025(e)(1)(C)

prudential regulator prior to issuance to the institution.

If the Examination Report concerns other types of regulated entities, opportunities for comment by state regulators will depend on whether Bureau is conducting joint or coordinated examinations with the relevant state regulators. The comment process will also be handled by the regional offices.

## Board of Directors or Principal(s) Meeting

The purpose of a meeting with a supervised entity's board of directors or principal(s) is to convey the findings of a review directly to those individuals ultimately responsible for the policies and procedures of the institution. Board meetings should be conducted after the closing meeting with management, and should be attended by at least a quorum of directors or by the entity principal(s). The EIC and appropriate Bureau management should attend. The board or principals should be reminded that the Examination Report/Supervisory Letter and rating are confidential and should not be disclosed except as permitted by Bureau regulation.[5]

A board or principal(s) meeting is required when one or more of the following circumstances are present:

- The proposed compliance rating is "3," "4," or "5";
- A supervisory agreement or enforcement action is recommended; or
- The supervised entity's management, board, or principal(s) requests such a meeting.

The meeting should be used to discuss examination findings, supervisory actions, and expected corrective actions; advise the board or principal(s) of the recommended compliance rating; and discuss any recommended enforcement actions.

The timing of a board or principal(s) meeting will depend on the specific situation, and the EIC should work this out with his or her Field Manager, who will ensure the necessary internal coordination. Meetings should be coordinated with prudential and state examiners, and planned for regularly scheduled meetings whenever possible.

## Send the Examination Report or Supervisory Letter

The EIC signs the final Examination Report or Supervisory Letter. Regional office administrative staff will handle transmission to the supervised entity.

## Upload Final Examination Documents

At the conclusion of the examination, the EIC must finalize the Scope Summary, ensure all workpapers are complete, and be certain that all required documents and information are uploaded or entered into the Supervision and Examination System.

| CFPB Supervision and Examination Process | Examinations and Targeted Reviews |
|---|---|

## Workpapers

During a review, examiners collect and review information from the supervised entity to reach conclusions about its practices, its compliance management system, and its compliance with Federal consumer financial law. The records documenting the review are called workpapers.

Workpapers should contain sufficient information and supporting documents to explain to a knowledgeable reviewer the basis for the review's conclusions.

**Purposes of Workpapers**

Examiners develop and maintain workpapers for three principal purposes:

- To provide a record of the work performed during the review that supports findings and conclusions;

- To maintain the evidence necessary to support supervisory agreements or enforcement actions; and

- To facilitate internal quality control reviews.

All information collected and all records created during the review that are used to support findings and conclusions could potentially be included in the workpapers. For example, if an examiner interviews a Real Estate Lending Officer, the write-up of the interview notes becomes a workpaper if the information provided by the lending officer was used to support a particular finding or conclusion. If the examiner also scans pages of the supervised entity's RESPA procedures manual to help illustrate deviations from policy, the scanned pages should be included in the workpapers. Other examples of workpapers include, but are not limited to:

- Scope Summary document

- Completed Bureau Examination Procedures (downloadable templates that allow the examiner to enter narrative findings as they follow the procedures);

- Completed Bureau Checklists;

- Other documents created during the examination to record work, such as spreadsheets or completed job aids;

- Documentation of staff and management interviews;

- Meeting agendas, attendance lists, and notes or minutes;

- Documentation of compliance research performed, including consultations with Bureau stakeholders (e.g., legal opinions, regulation sections reviewed, regulatory alerts); and

- Scanned copies of material obtained from the supervised entity, such as policies, procedures, rate sheets, internal memos and reports, external audit reports, and complaint letters, that are necessary to support a finding or conclusion.

Generally, workpapers should document or support the:

- Proposed scope of the review and any changes to the scope during the course of the review;

- Work performed during the review (what you did);

- Sampling process and methodology used (how you did it);

- Findings and violations noted during the review (what you found);

- Matters Requiring Attention issued;

- Decision to address issues through supervisory or enforcement action;

- Communications with management regarding findings;

- Management's response (oral and written) to findings and violations;

- Commitments made by management regarding corrective action, remediation, and financial relief;

- Changes to the Risk Assessment;

- Consumer Compliance Rating; and

- Changes to the Supervision Plan (where applicable).

The amount of supporting documentation from the entity's records that is necessary to maintain in the workpapers will depend on the particular situation.

**Review and Signoff**

The EIC is responsible for the adequacy of the workpapers created during the review. Since large team examinations require the EIC to delegate numerous specific areas of review to other examiners, the EIC must track the:

- Workpapers developed;

- Responsible examination team member; and

- EIC's review and approval of the workpapers.

Workpapers that require additional analysis or support should be discussed with and returned to the responsible examiner for further development. The Workpaper Checklist, found in the Supervision and Examination System, must be used to record the EIC's review and sign off on all workpapers developed during the review.

After the EIC reviews and signs off on the workpapers, the Field Manager or Senior Examination Manager assigned to the review should also review and sign off on their adequacy.

**Electronic Format and Encryption**

All workpapers and related documentation for the review should be maintained in electronic form. If the supervised entity is only able to provide a document in hard copy form, the examiner should scan the document and return the original. Workpapers should be uploaded to the Supervision and Examination System with the completed examination to be preserved as part of the examination record and made available for future reference.

All electronic documents received from the supervised entity should be transmitted and maintained on encrypted media. Examiners should be mindful at all times of the need to protect personally identifiable information (e.g., names, social security numbers, account numbers) and confidential supervisory information. Hard copies should not be left anywhere unattended (even onsite at the entity), should not be removed from the examination site, and if printed while working offsite, should be kept in a locked cabinet when not being used.

Consult Bureau's Privacy and FOIA regulations and guidance for further information.[5]

**Quality Control Reviews**

Workpapers will also be reviewed through an internal quality control process to ensure they meet the Bureau's standards related to their documentation and proper storage.

---

[5]*See* Disclosure of Records and Information, 12 CFR Part 1070 (76 Fed. Reg. 45372 (July 28, 2011)), and any subsequent related guidance that may be issued.