# Exhibit G



Portfolio Media. Inc. | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# From Crypto To Apps, CFPB's Chopra Has Payments In Focus

By **Jon Hill**

Law360 (July 27, 2022, 12:02 AM EDT) -- Consumer Financial Protection Bureau Director Rohit Chopra is pushing forward on a busy agenda that includes keeping tabs on the downstream consumer impacts of higher interest rates, preparing for the age of real-time payments and taking a tough line with so-called repeat offender companies. "Stay tuned," he told Law360.



Rohit Chopra

In a wide-ranging interview, Chopra discussed how the CFPB could seek to help mortgage borrowers strained by the Federal Reserve's battle against inflation and how the agency is looking at cryptocurrency, which the rest of Washington, D.C., is scrambling to regulate.

Chopra cast crypto as part of a wave of innovations that are making faster payments a reality for many consumers. But these innovations, which include mobile payment apps and other technologies, raise new consumer protection questions that Chopra said the CFPB is studying, like whether additional fraud-related guidance is needed amid a bevy of complaints from peer-to-peer payments users.

Chopra also downplayed prospects for new rulemaking on payday loans, defended recent examination policy changes aimed at extending the CFPB's anti-discrimination scrutiny to consumer financial markets not covered by traditional fair lending laws, and highlighted efforts to strengthen enforcement for companies that repeatedly break the law.

*This interview has been edited for length and clarity.*

### Let's start with the macro perspective. We're on the verge of the Fed's fourth interest rate hike in five months, and more are expected. Consumers haven't seen a tightening cycle like this in decades. So where do you see potential pitfalls for them? And how is the bureau responding to those?

In terms of the rate environment, we're looking at how it is affecting each of the big consumer verticals. In order, that would be mortgages, student loans, auto [loans] and then credit cards.

For student [loans], because of the federal piece of it, it's a little bit de-linked from the overall rate environment.

Mortgages, we obviously are seeing quite a bit of a tick-up, although it's relaxed recently. A key place that we're thinking through there is the extent to which the macro-environment changes and there is depreciation, or a reduction of the amount of home equity in the system, that could spell some challenges in terms of mortgage servicing.

Also, with those elevated rates for people who are getting mortgages now, I am interested in figuring out ways we could do any targeted changes to the [qualified mortgage] rule so that we can have more streamlined refinances or streamlined loan modifications to benefit people when rates go down or to benefit people who need loan modifications.

Auto is big. I think with the issues in the global automotive supply chain — we continue to see forecasts of where inventories are going to be, and I think we're expecting for new and used car [prices] to remain elevated above historical levels for the next year or so — we project that the $1.4 trillion auto loan market is going to get a little bigger as loan sizes increase.

We're really watching in terms of credit tiers, on how performance is moving. I personally think some of the accelerations in delinquency that you see in auto and credit card debt may be a bit more of a story about normalization. However, I don't know if that's going to sustain. It really depends on the labor market, and it depends on really what's going to happen with inflation overall.

On credit card debt, we are seeing that people are noticing some higher rates, and the same is true with auto and mortgage debt. I think that increases the stakes on how do we make sure there's good competition and refinancing later, not just when rates go down, but also when people's income increases or their credit score is increasing. Are they able to take advantage of that?

And then of course there's deposit accounts. You're seeing a lot of banks actually try and shrink the amount of assets that they have on their balance sheets. We see that cash deposits still tend to be a little higher than they were in 2019, though it has come down a little bit. We'll see how that plays through in terms of credit performance on consumer financial instruments, but that's how I see the macro picture. It's going to be very dependent on where the labor market is.

### The Fed's tightening is credited with contributing to recent turmoil in the crypto market, where a lot of consumers have been burned by falling coin prices and freezes on withdrawals. There's a debate about who should regulate these assets, but how closely is the bureau monitoring this turbulence? Are you seeing any worrying practices from a consumer protection standpoint?

I would say our primary focus is really on the effect of real-time consumer payments, which need not use blockchain-based technologies. We know FedNow [a real-time payment network **being built by the Fed**] is turning on next year, there's broad adoption of apps and other ways to transfer money in real time. There's a lot of attendant consumer protection issues that every developed country experiences when those technologies gain broader adoption.

But right now, cryptocurrency, including stablecoins, are not primarily used in consumer payments. They're really used for speculative trading purposes.

We're obviously monitoring it along with the other regulators. There are a couple of things that come to mind.

One, we have published some guidance about misrepresentations about deposit insurance, and the [Federal Deposit Insurance Corp.] has also **finalized a rulemaking** related to those misrepresentations. I think there are questions that some individuals have had about is their money in a dollar-denominated stablecoin, or is it in a true cash deposit that's insured? Many people may not know the difference. We think people should be upfront about that.

We're also confronting the question of will a stablecoin or other type of digital currency one day ride the rails of the Big Tech payment platforms? Then adoption for consumer payments could really surge.

So we have really looked at this primarily through payments. I'm not saying there aren't some other consumer financial product issues — we have started to hear about how the intersections of crypto and credit cards, ATMs, mortgages and other loan products are working. But I would say the primary focus, at least from the CFPB perspective, is around preparing for real-time payments.

## Is this a potential use case for the bureau's risk-based nonbank supervision authority?

To be clear, our Section 1024(a)(1)(C) authority doesn't create any new jurisdiction for the CFPB. It allows us to supervise entities based on indicia of risk, but those entities would already be covered under the enforcement jurisdiction.

I think there are certain payments issues that could be applicable there. I think more broadly, there are a lot of firms involved in data — collection and monetization of financial data. There are also a host of other nonbanks that are growing very, very rapidly, where we may be seeing consumer complaints or other issues.

It's not an authority that I think will be bread and butter, but it's an important vehicle for us to supervise certain nonbank firms in addition to the existing enforcement jurisdiction.

## Speaking of payments, another fintech-related issue is fraud in peer-to-peer payments on platforms like Zelle and Venmo. From where you sit now, do you think banks and other platform operators are doing a good enough job of helping consumers who get scammed on these services?

I actually got a real front-row view of this in a few different areas in the past decade. One was in student debt relief at my first stint at the bureau and while I was at the Department of Education. At the [Federal Trade Commission], I devoted quite a bit of time looking into romance scams, which often disproportionately target the elderly, and identity theft issues writ large. The more and more data there is about us, the easier it seems to be for people to steal our identities. So I don't want to make any overall assessment of where the industry is or is not living up to its expectations.

I do think that, on one hand, there has been the experience across the developed world that, when real-time payments turns on and gets broadly adopted, the amount of fraud and errors and scams surges. I would like the United States to take a different path.

We're looking at this broadly. It's part of what we are asking about in our Big Tech payments orders that we issued about six months ago. I don't want to comment specifically on Zelle or Venmo, but we obviously look very closely at how those apps are operating. And we will continue to look at some of those issues and figuring out ways forward.

I want to acknowledge that there are a number of players in this space that have started to make changes to their user interface and user experience to address some of those customer issues, including asking someone what the last four digits of the recipient's phone number are or going through a couple more steps to make sure that the sender-recipient transaction is a legitimate one.

### So is this a problem where you see the solution as more based in improving disclosure and education? Or is this actually going to come down to maybe trying to redraw the lines of liability?

I think there's a whole host of issues. One is about consumer expectations. When you use your debit card or your credit card, there are certain embedded protections about it. You're asking about what would be considered the consumer's mistake versus what would be considered a bank error, what's fraud and what not. Right now, I've asked the staff to take a look at really the voluminous number of complaints we've been receiving and surface whether there's things we need to communicate, whether we need to pursue any other regulatory initiatives on it.

I don't have an answer for you now, and I'm being hesitant because you mentioned two company names, and I don't really want to comment on those two companies. But we're looking holistically at real-time payments and the attendant issues.

### Let's pivot to another fintech issue. Deputy Director Zixta Martinez said last month that the CFPB is "taking a close look" at "rent-a-bank" lending partnerships, and that the bureau shares concerns consumer advocates have raised about these arrangements. Can you elaborate on the bureau's concerns and how it's scrutinizing these partnerships?

One, we're very interested in making sure we're adequately enforcing the Military Lending Act. The Military Lending Act, starting in 2013, is part of our enforcement jurisdiction. There had been issues where some entities that have partnered with banks have been violating some of those provisions.

More big-picture, I think we're very interested in the issue of relationship banking. We often hear, and it's true, that there is a different model for small institutions that operate in the community. They're mostly funding loans through deposits, they're dealing with a lot of repeat customers, and it's slanted more toward small business and consumer lending.

But at the same time, when small institutions are mostly just a vehicle for a rent-a-bank arrangement, that makes it harder for us to make sure that everything is above board. We do not have supervisory authority over those small, small banks, generally speaking, though many of the nonbanks that partner with them are subject to our supervisory authority.

Look, it's an ongoing issue. We hear concerns from a lot of states about how entities are evading certain state consumer protection laws. Federal law sets up a framework for how preemption should work and not work, and there is a concern from some that this is a vehicle to evade that framework.

### The bureau has used its Unfair, Deceptive or Abusive Acts or Practices authority in the context of tribal lending to go after alleged instances of sham partnerships facilitating high-cost loans. State attorneys general have also brought cases against fintechs that are in these partnerships. Is there scope for the bureau to use its UDAAP authority to challenge partnerships between banks and nonbank lenders?

I wouldn't frame it the way you're framing it. I think the jurisprudence on unfairness, if you look at both CFPB and FTC precedent, uses the unfairness prongs not as a matter of looking at the nature of the partnership, but as a matter of analyzing the conduct. To be liable, it has to meet the prongs of injury not being reasonably avoidable, and not having countervailing benefits that outweigh it.

For example, the FTC has done a series of cases, and the CFPB has as well, on payment processors and the extent to which they had adequate safeguards in place to police certain types of conduct.

### In some of those lending partnership cases, there's been an allegation of deception — that it's deceptive to enforce a loan that you as the nonbank "true lender" couldn't have validly made in the first place.

Yeah, that's true. And in fact, you might want to take a look at our recent ACE Cash Express **complaint**, and as well as our report that we published on state extended repayment plans. I think it touches on some of what you're saying, including with respect to deception theory.

### Repayment plans were also brought up by the deputy director in comments on payday lending, which the bureau tried to regulate with ability-to-repay requirements that were **promulgated in a 2017 rule**. Those requirements were challenged and **eventually repealed**, and there's an **ongoing challenge** to other payment-related parts of the 2017 rule.

That's still going through the process. But we are continuing to work with states and others on supervision of payday firms. We will continue like we did with ACE Cash, with enforcement.

We're still looking closely at that market. I will say, though, that there are differences from many years ago, including that there have been a number of states that have **implemented rate caps**. Those rate cap laws have changed a lot of those state-based marketplaces, so we're going to continue to look at the data and see where it takes us.

### I didn't hear rulemaking in that. Is this an area that you might consider revisiting with rulemaking?

I think it's too early to tell. As we've shared publicly, our focus on rulemaking is really the rulemakings that have not been implemented yet.

We have a number of very significant ones. One of them is somewhat more narrow, about algorithmic appraisals, but two are very significant — one, the required rule on **small business data collection**, and the other one, the Section 1033 rule on personal financial data rights.

And we have other rulemakings. We finalized a **Libor transition rule**, and we're starting our work on **credit card late fees**. So we have a lot of rules going on, and we'll make more determinations as the weeks and months go on.

### You just mentioned credit card late fees, but you've also talked a lot about **overdraft fees** as part of your efforts to **curb excessive fees** charged to consumers. Are you seeing results from these efforts?

Yes, particularly when it comes to overdraft and nonsufficient funds fees, we're seeing a real set of changes in the market. I think a lot of banks are starting to rationalize their full set of fees that they charge, and we're asking that our examiners **focus more attention** on the institutions that have an aberrant level of their deposit account fee revenue coming from those sources. We've also worked on **pay-to-pay fees** in the debt collection context, and we received an overwhelming 80,000 submissions to our request for information on fees charged in financial services.

I think a lot of financial institutions realize they don't want to scare their customers away with junk fees. They want to keep them with good service. I think the institutions that really treat it as a service are going to do well. But there are some that program their systems in ways to trigger more fees, and you've seen the CFPB enforcement actions on some of these. Not everyone treats it like a service.

### You've **made some changes** to the way the bureau examines for discriminatory conduct, expanding that to include this concept of unfair discrimination that relies on the bureau's UDAAP authority. How do you respond to **concerns from industry** about whether this means the CFPB will start pursuing disparate impact-style claims using its UDAAP authority?

Disparate impact is a different doctrine that is aligned with the Equal Credit Opportunity Act, Fair Housing Act and others. It is different than unfairness doctrine, and I think I have not heard of a robust rebuttal that discrimination may not meet the criteria under the unfairness standard. This

issue has been a subject of previous examination manuals by the banking regulators.

One of the pieces of feedback I've heard over the years was that industry wants to know more about how the CFPB might exercise its supervisory authority and enforcement authority. We've tried to respond to that about what sometimes is described as regulation by enforcement — most law enforcement agencies, they bring enforcement cases and they use the U.S. common law system to develop the law. We've tried to dramatically increase the number of guidance documents that share how we might exercise that authority on a broad range of laws. And we publish our examination manuals, which is essentially guidance to our examiners about what they might look at when they decide in the scope of an exam to dig into a specific set of complaints or issues.

So it is our attempt to try to really share with entities, what does the test look like if they get complaints of discrimination on noncredit products?

### When you put out some of this guidance, there has been procedural criticism that it's not being put out for notice and comment, that it should go through a formal rulemaking process. And there have been a number of policies issued in some sort of final form, and then you might accept comment on them after.

So let me pin you down on that. What have those been? Because I keep hearing this, but no one will give me specifics. So I hear you on the UDAAP, but what else?

### Another example would be the administrative adjudication procedural rules that were changed.

Well, on administrative adjudication procedural rules, I believe that the standard is those are procedural rules. We have not even used them. Every single one of our enforcement actions and litigations we brought through federal court. We're certainly taking feedback and comments on those rules, which we are assessing. But I think the premise of your question was that there was some sort of change in the obligations of financial firms, so that's why I was probing a little.

### I mean, that is the argument that some critics in the industry make. For example, with the UDAAP exam manual, they say it does impose new requirements.

But how, though? How does it impose a new burden? That's what I would have you ask them. The truth is, there are supervisory highlights that include citations of noncompliant conduct on a range of laws, including the prohibition on unfair, deceptive and abusive practices. So to me, the better, more responsible way is to share when we do have some sort of analytical approach.

We're trying to be responsive to many who say, "Please do share it, because it actually helps us evaluate the complaints we're getting, evaluate our systems."

### The fair lending laws list specific protected classes that they prohibit discrimination against, but the new UDAAP exam manual doesn't list specific classes like that. Is that something the bureau plans to shade in through additional updates?

We have heard those questions. We're looking at that to see what we can share more, but remember that this is unfairness. There are different standards, the standards being injury, reasonable avoidability and countervailing benefits.

And by the way, that's not a new standard. That standard has been in place since 1980, when the [FTC's] unfairness policy statement was put into place. And of course, the [FTC Act] prohibition on unfairness has been there since the early 1930s. There is quite a bit of doctrine and legal precedent that has interpreted that, for which that might be instructive.

### You've made a big point of wanting to take on corporate recidivists and repeat offenders. When might we see this translate into enforcement action settlement terms, like including

### some admission of wrongdoing? Is that something you're considering as part of your enforcement approach?

I've emphasized in the past the importance of findings of liability, sometimes admissions, and I think you should expect that we are focusing quite a bit on **large market actors** engaged in repeat offenses.

I have asked the staff to take a broad look at updating our approach to remedies. I think we want to be more focused on making sure that we look at the underlying business incentives, the individuals that called the shots, and I think maybe perhaps a little bit less of an emphasis on the kind of paperwork provisions, although the documentation can be important. So stay tuned.

Certainly, we did **finalize an action** that essentially was a repeat offender and that ultimately led to a prohibition on continuing to do lending.

And we have established some more focus and units within the agency on compliance order monitoring. Overall, we believe that the approach to compliance order monitoring across the board is increasing, but we will scrutinize carefully when court orders and agency orders are being violated.

### You've created additional units focused on compliance order monitoring?

That's not to say that there weren't groups doing it before. But we have sharpened our focus on it and increased attention and, often, resources to it.

You should look at the body of work to date, and if you look at the CFPA civil penalty factors, the issue of whether there was intentional and willful misconduct has a major part in the remedial approach. And as I've previously shared, the CFPB can — in terms of its full set of remedies — not just get redress and disgorgement and civil penalties, but also order limitations on the activities of the firm that has violated the law.

Also, you're going to see, and I think you've probably already seen, some more joint actions with state agencies. We also recently **finalized one** with the [Office of the Comptroller of the Currency]. Those other entities may have additional remedial tools at their disposal, as well.

### So you're taking a very broad approach, and we will see the bureau pursue a broader range of remedies under your leadership.

Yeah, and remember, it's different when it's a case before a federal court or a settlement. We would have to argue in federal court that a remedy was authorized by law and is appropriate, and even in settlements, most enforcement matters take years to develop. It's not something that happens overnight.

I have also taken the view that it's highly inappropriate to only think about individual liability with small firms. We should be focused on the facts, and if the fact pattern is the same, with individual liability, there's not an exemption because you work at a larger firm. And in **one of our repeat offender actions**, we did charge a longtime former executive with certain counts.

### Just one more thing before you have to go — you've taken a lot of flak **from Republicans** and industry groups since you came in as director. What do you take away from these criticisms? Is it at all changing how you approach your job?

Well, we try and listen carefully to everyone. I don't really see this as a partisan issue, but across the board, Big Tech companies are certainly pushing back against the government for coming under scrutiny — I've seen this firsthand. We have to deal with the fact that these large tech firms are entering financial services, and they have to play by the same rules. We will go through the process of gathering evidence to make determinations, and that's how we have to proceed.

--Editing by Marygrace Anderson and Emily Kokoll.

All Content © 2003-2022, Portfolio Media, Inc.