# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA;
LONGVIEW CHAMBER OF COMMERCE;
AMERICAN BANKERS ASSOCIATION;
CONSUMER BANKERS ASSOCIATION;
INDEPENDENT BANKERS ASSOCIA-
TION OF TEXAS; TEXAS ASSOCIATION
OF BUSINESS; and TEXAS BANKERS AS-
SOCIATION.

*Plaintiffs*,

v.

Case No. 6:22-cv-00381-JCB

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his offi-
cial capacity as Director of the Consumer Fi-
nancial Protection Bureau,

*Defendants.*

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Introduction ...................................................................................................................... 1

Background ......................................................................................................................... 2

Argument ............................................................................................................................ 8

    I.      Plaintiffs are entitled to summary judgment. ............................................... 9

        A.    The CFPB is unconstitutionally funded. ...................................... 10

        B.    The manual update violates the APA. ............................................ 11

            1.    The update exceeds the CFPB's statutory authority. .................. 12

            2.    The update is arbitrary and capricious. ......................................... 17

            3.    The update violates the notice-and-comment requirement. ...................... 21

    II.     Plaintiffs are entitled to vacatur and a permanent injunction. ............................................. 25

        A.    This Court should set aside the manual update. ................................. 25

        B.    This Court should also enter declaratory and permanent injunctive relief. ............. 27

            1.    Without permanent injunctive relief, Plaintiffs will suffer irreparable harm. ........... 27

            2.    A permanent injunction would not harm Defendants or disserve the public interest. ........ 32

Conclusion .......................................................................................................................... 33

# TABLE OF AUTHORITIES

## CASES

*Ala. Rural Fire Ins. Co. v. Naylor,*
  530 F.2d 1221 (5th Cir. 1976) ........................................................................................9

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
  522 U.S. 359 (1998).......................................................................................................12

*Am. Forest & Paper Ass'n v. EPA,*
  137 F.3d 291 (5th Cir. 1998) ..........................................................................................9

*Basinkeeper v. U.S. Army Corps of Eng'rs,*
  715 F. App'x 399 (5th Cir. 2018) ..................................................................................25

*Burgess v. FDIC,*
  871 F.3d 297 (5th Cir. 2017) ........................................................................................31

*California v. Bernhardt,*
  472 F. Supp. 3d 573 (N.D. Cal. 2020) ..........................................................................21

*Carr v. Hibernia Nat. Bank,*
  251 F. App'x 855 (5th Cir. 2007)....................................................................................9

*CFPB v. All Am. Check Cashing,*
  33 F. 4th 218 (2022)................................................................................................. 10, 11

*Chamber of Com. of Am. v. U.S. Dep't of Lab.,*
  2018 WL 3301737 (5th Cir.)..........................................................................................26

*Chamber of Com. Of United States of Am. v. U.S. Dep't of Lab.,*
  885 F.3d 360 (5th Cir. 2018) ........................................................................................25

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979).......................................................................................................22

*Clean Water Action v. EPA,*
  936 F.3d 308 (5th Cir. 2019) ........................................................................................24

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
  51 F.4th 616 (5th Cir. 2022) ...................................................................................passim

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
  No. 22-448 (Nov. 14, 2022) ............................................................................................9

*Cmty. Nutrition Inst. v. Young,*
  818 F.2d 943 (D.C. Cir. 1987) ......................................................................................22

*Contra United States v. Jicarilla Apache Nation,*
  564 U.S. 162 (2011).......................................................................................................16

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
  710 F.3d 579 (5th Cir. 2013) ........................................................................................32

*Davidson v. Glickman,*
  169 F.3d 996 (5th Cir. 1999) ........................................................................................22

*Dep't of Commerce v. New York,*
139 S. Ct. 2551 (2019) ...................................................................................................18

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
140 S. Ct. 1891 (2020) ...................................................................................................21

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) .................................................................................................21, 22

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ........................................................................................................21

*FCC v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021) ...................................................................................................18

*Free Enterprise Fund v. PCAOB,*
561 U.S. 477 (2010) ........................................................................................................22

*Gulf Restoration Network v. McCarthy,*
783 F.3d 227 (5th Cir. 2015) .........................................................................................23

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995) ........................................................................................................15

*Harmon v. Thornburgh,*
878 F.2d 484 (D.C. Cir. 1989) .......................................................................................25

*Health Freedom Def. Fund, Inc. v. Biden,*
2022 WL 1134138 (M.D. Fla.) ......................................................................................26

*Heartland Reg'l Med. Ctr. v. Sebelius,*
566 F.3d 193 (D.C. Cir. 2009) .......................................................................................26

*Hornbeck Offshore Servs., LLC v. Salazar,*
696 F. Supp. 2d 627 (E.D. La. 2010) .......................................................................28, 32

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,*
804 F.2d 1390 (5th Cir. 1986) .......................................................................................28

*Kiakombua v. Wolf,*
498 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................................26

*League of Women Voters of U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ...........................................................................................32

*Long Island R. Co. v. Int'l Ass'n of Machinists,*
874 F.2d 901 (2d Cir. 1989) ...........................................................................................28

*Make the Road New York v. Wolf,*
962 F.3d 612 (D.C. Cir. 2020) .......................................................................................18

*Mann Constr., Inc. v. United States,*
27 F.4th 1138 (6th Cir. 2022) ........................................................................................23

*Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.,*
142 S. Ct. 1968 (2022) ...................................................................................................20

*McLouth Steel Prod. Corp. v. Thomas,*
838 F.2d 1317 (D.C. Cir. 1988) ................................................................. 22, 23

*Morissette v. United States,*
342 U.S. 246 (1952) ..................................................................................... 19

*Mtn. States Legal Found. v. Bush,*
306 F.3d 1132 (D.C. Cir. 2002) ................................................................... 14

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998) ............................................................. 25, 26

*NFIB v. Sebelius,*
567 U.S. 519 (2012) ..................................................................................... 14

*Nken v. Holder,*
556 U.S. 418 (2009) ..................................................................................... 27

*O'Connor v. Smith,*
427 F. App'x 359 (5th Cir. 2011) ................................................................ 27

*OPM v. Richmond,*
496 U.S. 414 (1990) ..................................................................................... 10

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92 (2015) ................................................................................. 21, 24

*PHH Corp. v. CFPB,*
839 F.3d 1 (D.C. Cir. 2016) ........................................................................ 20

PHH Corp. v. CFPB,
881 F.3d 75 (D.C. Cir. 2018) ...................................................................... 20

*Prof'ls. & Patients for Customized Care v. Shalala,*
56 F.3d 592 (5th Cir. 1995) ........................................................................ 23

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
140 S. Ct. 2183 (2020) ........................................................................ 1, 10, 11

*Shell Offshore Inc. v. Babbitt,*
238 F.3d 622 (5th Cir. 2001) ...................................................................... 22

*Stark v. Wickard,*
321 U.S. 288 (1944) ..................................................................................... 14

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.,*
576 U.S. 519 (2015) ............................................................................ 8, 19, 20

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
992 F.3d 350 (5th Cir. 2021) ...................................................................... 10

*Texas v. Biden,*
20 F.4th 928 (5th Cir. 2021) .................................................................. 18, 31

*Texas v. Brooks-LaSure,*
2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) ...................................... 26, 31

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ........................................................................30

*Texas v. United States*,
    515 F. Supp. 3d 627 (S.D. Tex. 2021) ........................................................26

*Texas v. United States*,
    524 F. Supp. 3d 598 (S.D. Tex. 2021) ...................................................passim

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................................23

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ......................................................................................30

*U.S. Dep't of Labor v. Kast Metals Corp.*,
    744 F.2d 1145 (5th Cir. 1984) ......................................................................22

*United States v. Nature's Way Marine, LLC*,
    904 F.3d 416 (5th Cir. 2018) ..........................................................................9

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ................................................................................15, 16

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ..................................................................................17

## STATUTES & REGULATIONS

12 C.F.R. §1002.5 ...............................................................................................30

12 C.F.R. §1041.7 ...............................................................................................13

12 C.F.R. §1070.47 ...............................................................................................5

29 C.F.R. §37.1 ...................................................................................................17

12 U.S.C. §5481 ......................................................................................7, 15, 32

12 U.S.C. §5493 ..........................................................................................7, 15

12 U.S.C. §5497 ............................................................................................8, 11

12 U.S.C. §5511 ........................................................................................1, 7, 14

12 U.S.C. §5514 ......................................................................................1, 3, 32

12 U.S.C. §5515 ......................................................................................1, 3, 32

12 U.S.C. §5516 ...................................................................................................32

12 U.S.C. §5517 ...................................................................................................32

12 U.S.C. §5531 ..........................................................................2, 7, 13, 16

12 U.S.C. §5536 ....................................................................1, 2, 12, 31

12 U.S.C. §5562 .....................................................................................................1

12 U.S.C. §5564 .....................................................................................................1

12 U.S.C. §5565 ........................................................................................................................... 1

15 U.S.C. §1691 ......................................................................................................................... 30

15 U.S.C. §45 ...................................................................................................................... 18, 19

5 U.S.C. §553 ................................................................................................................. 7, 12, 22

5 U.S.C. §702 ............................................................................................................................. 12

5 U.S.C. §706 .................................................................................................................... passim

## OTHER

CFPB, *Supervision and Examination Manual* (Mar. 2022) ............................................ 3, 7, 13, 23

CFPB, *Supervisory Highlights* at 27 (Summer 2015) .......................................................... 4

Dodd-Frank Conference Report (June 29, 2010) ................................................................. 16

Fed. R. Civ. P. 56 ...................................................................................................................... 9

*The Consumer Financial Protection Bureau's Semi-Annual Report to Congress, Hearing before the Senate Comm. on Banking, Hous., and Urb. Affairs*, 117th Cong. (2022) ............................................ 19

The Federalist No. 58 ............................................................................................................. 10

The Federalist No. 78 ............................................................................................................. 10

## CONSTITUTIONAL PROVISIONS

U.S. Const. art I, §9, cl. 7 ................................................................................................. 1, 10, 24

## INTRODUCTION

The CFPB has "vast authority," *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2210 (2020), but even vast authority must have limits. The Dodd-Frank Act established the CFPB to "implement and . . . enforce Federal consumer financial law." 12 U.S.C. §5511(a). In creating the agency, "Congress transferred the administration of 18 existing federal statutes to the CFPB, including the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and the Truth in Lending Act." *Seila Law*, 140 S. Ct. at 2193. Congress also charged the agency with enforcing a prohibition on "any unfair, deceptive, or abusive act or practice"—often called the UDAAP authority. 12 U.S.C. §5536(a)(1)(B). To carry out these duties, the CFPB can "require reports and conduct examinations on a periodic basis" of certain entities—including members of each Plaintiff—to "assess[] compliance with the requirements of Federal consumer financial law," and "obtain[] information about [their] activities and compliance systems or procedures." *Id.* §§5514-15. The CFPB can also "conduct investigations, issue subpoenas and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court." *Seila Law*, 140 S. Ct. at 2193 (citing 12 U.S.C. §§5562, 5564(a), (f)). Through those processes, the CFPB can exact penalties like restitution, rescission of contracts, disgorgement, and injunctive relief. 12 U.S.C. §5565.

The CFPB's vast authority makes the legal constraints that do exist on its authority all the more crucial. As relevant here, the CFPB must stay within the limits of Dodd-Frank, including the limits on its UDAAP authority. Under the Administrative Procedure Act, the agency cannot take arbitrary or capricious actions, 5 U.S.C. §706(2)(A), and must submit legislative rules to the notice-and-comment process, §553. And the agency must of course follow the Constitution, including the Appropriations Clause. U.S. Const. art I, §9, cl. 7.

Through its recent examination manual update, the CFPB has, with the stroke of a pen, arrogated an open-ended and novel power to police regulated entities for discrimination—including for

1

mere disparate impacts. This authority is nowhere to be found in the agency's mandate from Congress. Indeed, the CFPB's new rule flies in the face of the text, history, and structure of Dodd-Frank. And while its "update" imposes substantial new obligations on regulated entities, the CFPB entirely by-passed the notice-and-comment process required by the APA. Further, as the Fifth Circuit recently held, the funding structure that allowed the CFPB to announce or impose any of this authority in the first place is unconstitutional. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022). Judicial relief is thus needed to ensure that the CFPB remains accountable to legal constraints, the rule of law, and the public as it pursues an aggressive agenda with far-reaching implications for the American economy, Plaintiffs, and their members.

For these reasons, Plaintiffs seek summary judgment on every claim in their complaint. Specifically, this Court should set aside the CFPB's March 2022 update to the manual. It should also permanently enjoin the CFPB from pursuing any examinations or enforcement actions based on the interpretation of its UDAAP authority announced in the March 2022 update. Plaintiffs are plainly entitled to those remedies under the Appropriations Clause, given the Fifth Circuit's recent decision in *Community Financial*. But because the Supreme Court will likely review that case and take substantial time to decide it, Plaintiffs respectfully ask the Court to alternatively hold that Plaintiffs are entitled to those remedies under the APA as well.

## BACKGROUND

**I.** Dodd-Frank authorizes the CFPB to prohibit covered entities from engaging in an "unfair, deceptive, or abusive act or practice." 12 U.S.C. §5536(a)(1)(B). The law lets the agency "prescribe rules" to "identify[]" UDAAPs and to set "requirements for the purpose of preventing such acts of practices." *Id.* §5531(b). The law also authorizes the CFPB to "require reports and conduct examina-

tions on a periodic basis" of covered entities—including members of each Plaintiff—to "assess[] compliance" and "obtain[] information about the activities and compliance systems or procedures" of the examined entity. *Id.* §§5514-15.

The CFPB's examination of regulated entities is far-reaching, as outlined in the CFPB's Supervision and Examination Manual, spanning nearly 2,000 pages. *See* CFPB, *Supervision and Examination Manual* (Sept. 2022), https://perma.cc/JP4D-6AQS. If the CFPB decides to examine for potential UDAAP violations, it will go "onsite to observe, conduct interviews, and review … documents and information," at which point the CFPB decides whether the examination "indicates potential unfair, deceptive, or abusive acts or practices." CFPB, *Supervision and Examination Manual, Overview Section* at 5-6 (revised Oct. 12, 2012) (Exhibit H). It then evaluates "the regulated entity's compliance management and its statutory and regulatory compliance" and decides whether to identify any "corrective actions that the institution should take." *Id.* This extensive review covers not only potential violations of law, but also whether an entity has adequate policies and procedures in place to prevent violations.

Examiners "assess the quality of the regulated entity's compliance risk management systems, including internal controls and policies and procedures." CFPB, *Supervision and Examination Manual, Unfair, Deceptive, or Abusive Acts or Practices Section* at 11 (revised Mar. 16, 2022) (Exhibit I). They also "identify acts or practices" that examiners believe "materially increase the risk of consumers being treated in an unfair, deceptive, or abusive manner." *Id.* Examiners have free rein (subject to applicable privileges) to obtain and review copies of the entity's internal documents, including "Training materials"; "Procedure manuals and written policies"; "Internal control monitoring and auditing materials"; and "Minutes of the meetings of the Board of Directors and of management committees, including those related to compliance." *Id.* Examiners' evaluations also include "reviewing all relevant written policies and procedures" and "internal and external audit reports." *Id.* at 12.

The examiners then "determine whether the entity's internal controls are adequate to prevent" UDAAPs. *Id.* at 13. That determination hinges on whether the "compliance management program includes measures aimed at avoiding unfair, deceptive, or abusive practices"; whether the entity "conducts prior UDAAP reviews on advertising and promotional materials"; whether the entity "reviews new products and changes in terms and conditions of existing products for potential UDAAP concerns"; whether the entity "has established policies and procedures to review, test, and monitor any decision-making processes it uses for potential UDAAP concerns"; and whether the entity "has established policies and procedures to mitigate potential UDAAP concerns arising from the use of its decision-making processes." *Id.* at 13-14.

Supervisory findings have direct consequences for the examined entity.  When examiners identify an entity's violations or inadequate compliance programs, the CFPB can pursue additional supervision and enforcement of the entity. The agency can issue a "Matter Requiring Attention," identifying goals, expected timeframes for implementation, and reporting requirements. CFPB, *Supervision and Examination Manual, Examinations and Targeted Reviews Section* at 17 (revised Feb. 2019) (Exhibit J). The CFPB also sometimes refers matters to its "Action Review Committee," which can choose to proceed through confidential supervisory action or a public enforcement action. CFPB, *Supervisory Highlights* at 27 (Summer 2015), https://perma.cc/9UKM-XNZ2; *see also* CFPB, *Supervisory Highlights* at 37-38 (Sept. 2017), https://perma.cc/WF76-JTNW ("about one-third" of matters referred to the Action Review Committee result in public enforcement proceedings).

Enforcement actions based on findings made in the examination process can have substantial monetary and reputational consequences, such as "civil monetary penalties," "disgorgement" of profits, "restitution," and "[p]ublic notification regarding the violation." Ex. I at 7. These enforcement matters have garnered nearly $1.7 billion dollars in restitution, underscoring the massive financial effect that the CFPB's exercise of UDAAP authority has on the marketplace. Administrative Record

("AR") 06018 (Exhibit N). Even when the agency does not proceed directly to enforcement, it still considers a Matter Requiring Attention, and responsive action, in "assessing an institution's Compliance rating, or otherwise considering the risks that an institution poses to consumers and to markets," which "may be used by the Bureau when prioritizing future supervisory work or assessing the need for potential enforcement action." Ex. J at 17. Examination findings and resulting compliance ratings can also be used by an institution's prudential regulator. *See*, *e.g.*, 12 U.S.C. 5515(e)(1)(C) (authorizing the CFPB to share examination findings with the supervised entity's prudential regulator). And the CFPB treats this entire process as confidential, largely prohibiting regulated entities from disclosing information "without the prior written permission of the Director" of the CFPB. 12 C.F.R. §1070.47(a)(2).

In short, the CFPB's authority to examine for UDAAPs—even when correctly interpreting and applying Dodd-Frank—is expansive. Compliance is onerous, while regulated entities face both a high degree of uncertainty and severe consequences if the agency determines—rightly or wrongly— that there are inadequacies. And the whole process of examination and enforcement is shielded from public scrutiny.

**II.** Earlier this year, the CFPB reinterpreted its UDAAP authority to be still more sweeping. On March 16, the CFPB updated several portions of its examination manual to claim authority to examine entities for alleged discriminatory conduct under its UDAAP authority. Ex. I, at 11, 13, 14, 17; CFPB, *see also CFPB Targets Unfair Discrimination in Consumer Finance* (Mar. 16, 2022) (Exhibit K).

This novel position adds a new and burdensome layer to regulated entities' UDAAP compliance programs. The manual now dictates that a regulated "entity's compliance program includes an established process for periodic analysis and monitoring of all decision-making processes used in connection with consumer financial products or services, and a process to take corrective action to address any potential UDAAP concerns related to their use, *including discrimination*." Ex. I at 13 (emphasis

added). It further requires that a regulated "entity has established policies and procedures to review, test, and monitor any decision-making processes it uses for potential UDAAP concerns, *including discrimination*." *Id.* at 14 (emphasis added). Entities must now have "established policies and procedures to mitigate potential UDAAP concerns arising from the use of its decision-making processes, *including discrimination*." *Id.* (emphasis added). They must also "ensur[e] that employees and third parties who market or promote products or services are adequately trained so that they do not engage in unfair, deceptive, or abusive acts or practices, *including discrimination*." *Id.* at 17 (emphasis added). They must further take care "that employees and third party contractors refrain from engaging in servicing or collection practices that lead to differential treatment or *disproportionately adverse impacts* on a discriminatory basis." *Id.* at 18 (emphasis added).

Examiners now have an entire new field to scrutinize in the evaluation of regulated entities. The updated manual instructs examiners to consider whether an "entity has a process to take prompt corrective action if the decision-making processes it uses produce deficiencies or discriminatory results." *Id.* The updated manual claims that its examination objectives include identifying "acts or practices that materially increase the risk of consumers being treated in an unfair, deceptive, or abusive manner, *including discriminatory* acts or practices." *Id.* at 11 (emphasis added). Examiners are instructed to obtain documentation from regulated entities "regarding the use of models, algorithms, and decision-making processes used in connection with consumer financial products and services"; "[i]nformation collected, retained or used regarding customer demographics, including the demographics of customers using various products or services"; and "any demographic research or analysis relating to marketing or advertising of consumer financial products or services." *Id.* at 12.

This claim of anti-discrimination authority is both entirely novel and legally incorrect. Before this year, the CFPB had never interpreted its UDAAP authority to include the power to regulate discriminatory conduct. Since its first iteration in October 2012, the manual made no mention of

discrimination in the UDAAP section. *See* CFPB, *Unfair, Deceptive, or Abusive Acts or Practices Examination Manual* (revised Oct. 2012) (Exhibit L). To the contrary, the CFPB's statutory authorities consistently treat "unfairness" and "discrimination" as distinct concepts, *e.g.*, 12 U.S.C. §5511(b); §5481(13); §5493(c)(2)(A); §5531(c), and so did the CFPB's manual, CFPB, *Supervision and Examination Manual* at 1783, 1785, 1792, 1794, 1795, 1796, 1799 (Sept. 2022), https://perma.cc/JP4D-6AQS; AR 01434, 01463, 01465, 01466, 01467, 02278, 02280, 02287, 02289, 02290, 02291, 02294 (same references for provisions included in the 2012 manual) (Exhibit U). Yet the CFPB did not hide the novelty or import of its decision; instead it proclaimed, "We will be *expanding* our anti-discrimination efforts to combat discriminatory practices *across the board* in consumer finance." Ex. K (emphases added). To make matters worse, when the agency introduced this new rule, it bypassed the APA's mandatory notice-and-comment procedures. 5 U.S.C. §553.

**III.** The CFPB's "update" has already inflicted significant harm on financial-services companies—including Plaintiffs' members—through increased, unrecoverable compliance costs and negative effects on business operations. *See* Ex. A-G (declarations from each Plaintiff organization). The update puts a Hobson's choice to supervised entities. Supervised entities must choose between undertaking the substantial burden and expense of incorporating this unlawful standard into their operations and compliance management systems, or dare the CFPB to make supervisory findings and ultimately bring an enforcement action based on failure to guard against these alleged violations. For highly regulated entities such as Plaintiffs' members, this no choice at all.  They must comply.

The CFPB's addition of discrimination-related compliance issues adds to the already burdensome UDAAP compliance regime. Conforming to the CFPB's new regime will come at significant cost to regulated entities, including Plaintiffs' members, as they are forced to update their own UDAAP compliance policies and programs. Regulated entities will also perpetually incur costs to remain in compliance. These costs will ultimately hurt consumers as well, in the form of higher prices

and reduced access to products. These costs are magnified because, to date, the CFPB has provided

no instructions about what might constitute unfair discrimination or actionable disparate impacts. It

has not identified protected classes or characteristics, delineated what legal test it will use to determine

whether discrimination actually took place—which, for example, could raise "serious constitutional

questions" if "based solely on a showing of statistical disparity," *Tex. Dep't of Hous. & Cmty. Affs. v.*

*Inclusive Communities Project, Inc.*, 576 U.S. 519, 540 (2015)—identified safe-harbor activities that are not

discriminatory, or explained to regulated entities how they are supposed to conduct assessments of

their activities for compliance purposes.

**IV.** Even if the CFPB's UDAAP authority extended to discrimination, the CFPB could not

exercise that authority or issue the manual update because its funds are not constitutionally appropri-

ated. Contrary to the ordinary process for annual appropriations from Congress, the CFPB has an

unprecedented level of budgetary independence. Instead of requesting funds from Congress, as most

agencies must do, the CFPB Director "simply requests [from the Federal Reserve] an amount 'deter-

mined by the Director to be reasonably necessary to carry out the' agency's functions," subject to

Federal Reserve budget caps but not congressional oversight. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v.*

*CFPB*, 51 F.4th 616, 624 (5th Cir. 2022) (quoting 12 U.S.C. §5497(a)(1)). This arrangement gives the

CFPB a "perpetual funding mechanism" outside even the "*indirect control*" of Congress. *Id.* at 638. No

other agency, including other financial regulators, enjoys this kind of fiscal independence from Con-

gress. *See id.* at 642. As the Fifth Circuit has now held, such budgetary independence, for an agency

with executive authority as vast as the CFPB, defies the Appropriations Clause and the separation of

powers.

## ARGUMENT

Because the Constitution, Dodd-Frank, and the APA all forbid the CFPB's claimed UDAAP

authority over discrimination, Plaintiffs are entitled to summary judgment on every claim. To remedy

these violations, this Court should vacate the manual update, declare that the CFPB has no lawful power to regulate discrimination under UDAAP, and permanently enjoin the CFPB from doing so.

## I.      Plaintiffs are entitled to summary judgment.

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 626 (quoting Fed. R. Civ. P. 56(a)). A federal court must overturn an agency action "if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record." *United States v. Nature's Way Marine, LLC*, 904 F.3d 416, 419 (5th Cir. 2018). Federal courts also can award "equitable relief" against a federal officer when "(1) the officer's powers are limited by statute and he acts in excess of that authority or (2) the officer acts in an unconstitutional manner or pursuant to an unconstitutional grant of authority." *Ala. Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1226 (5th Cir. 1976). Constitutional and administrative-law claims like Plaintiffs' are "purely legal" and thus particularly appropriate for adjudication at the summary-judgment stage. *E.g.*, *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 297 (5th Cir. 1998); *Cmty. Fin.*, 51 F.4th at 626, 644.

Plaintiffs are entitled to summary judgment on every claim. The CFPB could not issue the manual update or regulate discrimination under its UDAAP authority because its funding structure violates the Appropriations Clause, as the Fifth Circuit recently held in *Community Financial.* Though *Community Financial* binds this Court and entitles Plaintiffs to full relief, it will likely be reviewed by the Supreme Court. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, No. 22-448 (Nov. 14, 2022) (certiorari petition filed by the U.S. Solicitor General). Moreover, even if it could be cured by congressional action that would still not resolve the other problems that Plaintiffs have identified with the manual update. To preserve resources and avoid harm to Plaintiffs' members, Plaintiffs respectfully ask this Court to enter judgment on both their constitutional claim and their APA claims. *See, e.g.*, *Carr v. Hibernia Nat. Bank*, 251 F. App'x 855, 857 (5th Cir. 2007) (affirming, as courts often do, the district

court's "alternative ruling"). An alternative holding under the APA would mean that, whatever the Supreme Court decides in *Community Financial*, Plaintiffs' members will be protected from irreparable harm and this case will be ready for appellate review. And as explained below, Plaintiffs' APA claims are correct and entitle them to full relief.

### A.     The CFPB is unconstitutionally funded.

The legislature's power of the purse is a bedrock feature of our constitutional separation of powers. "The Constitution carefully separates the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) (citing The Federalist Nos. 78 (Alexander Hamilton), 58 (James Madison)). For this reason, Article I's Appropriations Clause gives a "'straightforward and explicit command' ensur[ing] Congress's *exclusive* power over the federal purse." *Cmty. Fin.*, 51 F.4th at 637 (quoting *OPM v. Richmond*, 496 U.S. 414, 424 (1990)). Specifically, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]" U.S. Const., art. I, §9, cl.7. This commitment of legislative power "'maintain[s] the boundaries between the branches and preserve[s] individual liberty from the encroachments of executive power.'" *Id.* (quoting *CFPB v. All Am. Check Cashing*, 33 F.4th 218, 231 (2022) (Jones, J., concurring)).

The CFPB's unique budgetary independence, as the Fifth Circuit held in *Community Financial*, violates the Appropriations Clause. *Id.* at 635-38. "[T]he [Bureau] receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments." *Id.* at 624 (quoting *Seila Law*, 140 S. Ct. at 2194). This "self-actualizing, perpetual funding mechanism" insulates the agency from Congress's power of the purse. *Id.* at 638. Indeed, because the CFPB is entitled to funding (as much as it has ever needed) directly from the Federal Reserve, which is itself outside the normal appropriations process, it can exploit "a double insulation from Congress's purse strings that is 'unprecedented' across the government." *Id.* at 639 (quoting *All Am. Check Cashing*, 33

F.4th at 225 (Jones, J., concurring)). Nor can Congress "review agency funding on the back end," because CFPB funds from the Federal Reserve "'shall not be construed to be Government funds or appropriated monies'" and "'shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate.'" *Id.* (citing 12 U.S.C. §5497(a)(2)(C), (c)(2)). The Fifth Circuit further explained that "[t]he constitutional problem is more acute because of the Bureau's capacious portfolio of authority" as "'a mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and levying knee-buckling penalties against private citizens.'" *Id.* at 640 (quoting *Seila Law*, 140 S. Ct. at 2202 n.8).

The Fifth Circuit's decision compels this Court to reach the same conclusion. The Fifth Circuit held that plaintiffs who challenge an action by the CFPB are entitled to relief if they can "show that the unconstitutional funding provision inflicted harm." *Id.* at 643 (cleaned up). The court then determined that issue to be "straightforward" where "the funding employed by the Bureau to promulgate the [challenged action] was wholly drawn through the agency's unconstitutional funding scheme." *Id.* That's true here. "[W]ithout its unconstitutional funding, the Bureau lacked any other means to promulgate the [manual update]" or exercise any authority over discrimination. *Id.* Plaintiffs' members "were thus harmed by the Bureau's improper use of unappropriated funds" and "are therefore entitled to 'a rewinding of [the Bureau's] action.'" *Id.* Plaintiffs have submitted several declarations detailing the specific and significant harms that the CFPB's unlawful rule imposes on their members. Ex. A-G. Under *Community Financial*, Plaintiffs are thus entitled to summary judgment on constitutional grounds.

### B.    The manual update violates the APA.

The CFPB's manual update also exceeds its statutory authority and violates the Administrative Procedure Act in three main ways. First, the CFPB exceeded its statutory authority outlined in Dodd-Frank by adopting the novel position that the CFPB can examine entities for alleged discriminatory conduct under its UDAAP authority. Ex. I, at 11, 13, 14, 17; *see also* Compl. ¶¶80-85 (Count I). Second,

the update is "arbitrary" and "capricious" due to the CFPB's failure to recognize Congress's narrow conception of unfairness authority. 5 U.S.C. §706(2)(A); *see also* Compl. ¶¶86-90 (Count II). Third, the update violates the APA's procedural requirements because it constitutes a legislative rule that the CFPB created without notice and comment. 5 U.S.C. §553; *see also* Compl. ¶¶91-94 (Count III). Each of these legal shortfalls provides an independent justification for granting summary judgment to Plaintiffs.

### 1.    The update exceeds the CFPB's statutory authority.

The APA broadly waives the sovereign immunity of the United States and its federal agencies. It lets parties who are adversely affected or aggrieved by agency action seek judicial review. 5 U.S.C. §§702, 704. Under the APA, agency action must be vacated if it is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." *Id.* §706(2)(A) & (C). The APA further dictates that a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." *Id.* §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.' This necessarily means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *Texas v. United States*, 524 F. Supp. 3d 598, 652 (S.D. Tex. 2021) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

Dodd-Frank gave the CFPB authority to prohibit "unfair" acts or practices by covered entities. *See* 12 U.S.C. §5536(a)(1)(B) (giving the CFPB the authority to enforce a statute that makes it unlawful for a covered entity "to engage in any unfair, deceptive, or abusive act or practice"). But in enacting Dodd-Frank, Congress did *not* provide the CFPB with authority to root out discrimination as a general matter. Rather, it provided the CFPB with authority over two discrete anti-discrimination laws and no more—even though any number of anti-discrimination laws, such as the Fair Housing Act, existed at

the time and any variety of new anti-discrimination provisions could have been included in Dodd-Frank itself.

Specifically, Dodd-Frank authorized the CFPB to "prescribe rules applicable to a covered person or service provider identifying as unlawful, unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service," including "requirements for the purpose of preventing such acts or practices." *Id.* §5531(b). In some cases, the CFPB has done so. *See, e.g.*, 12 C.F.R. §1041.7 & Supp. I.

But here, the CFPB has elected to declare its exercise of UDAAP authority through its nearly 2,000-page Supervision and Examination Manual. *See* CFPB, *Supervision and Examination Manual* (Sept. 2022), https://perma.cc/JP4D-6AQS. The manual explains that Dodd-Frank "authorizes it to supervise certain financial companies and large depository institutions and their affiliates for consumer protection purposes." Ex. H, at 1. As a result, the CFPB "has the responsibility to implement, examine for compliance with, and enforce 'Federal consumer financial law.'" *Id.* This law includes the requirement that CFPB monitor compliance with Dodd-Frank's prohibitions on "unfair, deceptive, or abusive acts and practices in connection with consumer products and services." *Id.*

Before this year, the CFPB had never interpreted its UDAAP authority to include the power to regulate discriminatory conduct. Since its first iteration in October 2012, the manual made no mention of discrimination in the UDAAP section. *See* Ex. L. To the contrary, the manual repeatedly treated UDAAP and discrimination separately. CFPB, *Supervision and Examination Manual* at 8, 13, 45, 48, 50, 52, 64, 68, 70, 1783, 1785, 1792, 1794, 1795, 1796, 1799 (Sept. 2022), https://perma.cc/JP4D-6AQS; AR 01434, 01463, 01465, 01466, 01467, 02278, 02280, 02287, 02289, 02290, 02291, 02294 (same references for provisions included in the 2012 manual). But on March 16, the CFPB updated several

13

portions of its examination manual to claim authority to regulate discrimination under its UDAAP authority. *See* Ex. K.

In taking this unprecedented step, the CFPB has stretched its UDAAP authority beyond the bounds carefully set by Congress. In describing the update, the CFPB asserted that "[d]iscrimination … can trigger liability under [the] ban on unfair acts or practices." Ex. K. That mistaken assertion ignores the text, structure, and history of Dodd-Frank, as well as similar legislation addressing agencies' authority to regulate unfairness.

To start, "the best evidence of Congress's intent is the statutory text." *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). And of course, "[t]he responsibility of determining the limits of statutory grants of authority … is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." *Mtn. States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944)). Here, the exercise of that function should be straightforward. Dodd-Frank discusses "unfairness" and "discrimination" as two distinct concepts, and it defines "unfairness" without making any reference to "discrimination." Indeed, at the time Congress passed Dodd-Frank, no relevant legal authority had conflated those two concepts, and Dodd-Frank defines "unfairness" without making any reference to "discrimination."

Specifically, Dodd-Frank sets forth Congress's objectives for the CFPB and makes clear that Congress "authorized [the CFPB] to exercise its authorities under Federal consumer financial law for the purposes of ensuring that, with respect to consumer financial products and services . . . consumers are protected from unfair, deceptive or abusive acts and practices *and* from discrimination." 12 U.S.C. §5511(b) (emphasis added). Congress's word choice is significant. Congress did not authorize the CFPB to protect consumers from unfair acts or practices "including" or "such as" discrimination, as it would if Congress had meant for discrimination to be viewed as a type of unfairness. *See id.* Instead,

14

Congress chose to authorize the CFPB to protect consumers from unfair acts or practices "and" from discrimination, separately.

Nor did it give the CFPB authority to define and prohibit "unfair, deceptive, *discriminatory*, or abusive acts or practices"; again, it gave the CFPB authority to define and prohibit "unfair, deceptive, or abusive acts or practices." *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("Given this clear language, it would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope."). Congress's omission was no accident, as other agencies have recognized. *See, e.g.*, AR 02490-91 (FDIC statement recognizing the distinct nature of unfairness and discrimination) (Exhibit O); AR 02657 (OCC publication considering UDAAP issue separately from discrimination) (Exhibit P).

Other examples of Congress's design are easy to find. In section 1002(13) of Dodd-Frank, Congress defined "fair lending" as "fair, equitable, and nondiscriminatory access to credit for consumers." 12 U.S.C. §5481(13). This definition shows that when Congress wants the concept of fairness to include nondiscrimination in a specific context, it knows how to do so. If "fair" naturally included "nondiscriminatory," Congress would not have needed to include nondiscriminatory in its definition of fair lending. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant."). This distinction is again apparent in Dodd-Frank's creation of the CFPB's Office of Fair Lending and Equal Opportunity. 12 U.S.C. §5493. There, Congress authorized the Director of the CFPB to delegate to the Office the authority to oversee and enforce federal laws designed to ensure the "fair, equitable, and nondiscriminatory access to credit" (*i.e.*, federal "fair lending" laws), of which the Equal Credit Opportunity Act and Home Mortgage Disclosure Act—but not the CFPB's unfairness authority—are listed as examples. 12 U.S.C. §5493(c)(2)(A). Again, if "fair" naturally meant "nondiscriminatory," the additional language would be "altogether redundant." *Gustafson*, 513 U.S. at 574.

The CFPB's novel position is likewise unsupported by the structure of Dodd-Frank. "Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *Nassar*, 570 U.S. at 353. For example, the section that defines "unfairness" does not mention discrimination. 12 U.S.C. §5531(c). If discrimination was already considered "unfair," then the inclusion of the two non-discrimination laws would be surplusage. *Contra United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

Legislative history also disfavors the CFPB's expansive approach to its unfairness authority. Nothing in the history of the passage of Dodd-Frank indicates that Congress intended for the CFPB to use its unfairness authority to address discrimination. Instead, the legislative history supports the contrary conclusion: that the CFPB's authority to address discrimination flows only from existing antidiscrimination laws. The only mention of how the CFPB should address discrimination in Dodd-Frank's conference report focuses on preexisting antidiscrimination laws. *See* H.R. Rep. No. 111-517, at 875 (June 29, 2010) (Dodd-Frank Conference Report) ("[T]he Office of Fair Lending and Equal Opportunity within the [CFPB] … will oversee the enforcement of federal laws intended to ensure fair, equitable and nondiscriminatory access to credit for individuals and communities, including the Equal Credit Opportunity Act (ECOA) and Home Mortgage Disclosure Act (HMDA)."). And though the conference report twice mentions the CFPB's UDAAP authority, it does so in separate paragraphs without any mention of discrimination. *See* Dodd-Frank Conference Report at 874-75.

The CFPB's interpretation is also inconsistent with the broader statutory context. The unfairness authority is patterned off the FTC's similar unfairness authority, and the FTC's has long been understood to exclude discrimination. *See infra* 18-19. Moreover, in the many statutes that Congress has passed to address discrimination, it always defines what classes are protected and specifies exemp-

tions, none of which appears in the CFPB's general grant of authority to address unfair acts or practices. *See, e.g.*, 29 C.F.R. §37.1 (implementing the "nondiscrimination … provisions of the Workforce Investment Act of 1998" which include "age, disability, [and] political affiliation or belief," among other unique criteria); *see also* AR 02437 (2021 CFPB statement recognizing that its UDAAP authority is "[i]n addition" to, and therefore distinct from, authority granted under antidiscrimination statutes) (Exhibit Q). Even supporters of the CFPB's new rule acknowledge this shortcoming, but the CFPB has nevertheless persisted on this faulty course. *See* AR 05561 ("The unfairness-discrimination theory would require identifying protected classes because they are not enumerated in the FTC or Dodd-Frank Acts.") (Exhibit R).

In sum, the text, structure, and history of the Dodd-Frank Act demonstrate that the updated manual exceeds the CFPB's statutory authority. And given the substantial "economic and political significance" the CFPB's rule would have, courts have "reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (cleaned up). This Court should reject it as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C).

### 2.   The update is arbitrary and capricious.

The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Texas v. United States*, 524 F. Supp. 3d at 652. This rule "means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *Id.*; *see also FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."). In other words, reviewing courts must ensure that "the agency has acted within a zone of

reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158.

Courts "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Texas v. Biden*, 20 F.4th 928, 989 (5th Cir. 2021). After all, "a central purpose" of the APA's requirements "is to subject agency decisionmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced." *Make the Road New York v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020). And the "significant mismatch" between the decision and the administrative rationale indicates a lack of reasoned decisionmaking and pretext. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) ("We are presented, in other words, with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process.").

The CFPB's expansive view of "unfairness" is arbitrary and capricious because it contradicts the historical use and understanding of that term. *See Texas v. United States*, 524 F. Supp. 3d at 652 (requiring "reasoned decisionmaking"). In 1938, Congress authorized the Federal Trade Commission (FTC) to protect consumers from "unfair or deceptive acts or practices in or affecting commerce." Pub. L. No. 75-447, 52 Stat. 111 (1938) (codified as amended at 15 U.S.C. §45(a)(1)). After initially leaving the term "unfair" undefined, Congress later curtailed the Commission's use of its unfairness authority. *See* Pub. L. No. 96-252, 94 Stat. 374 (1980) (codified as amended in scattered sections of 15 U.S.C.). It codified a constrained definition of unfairness—that does not include discrimination—to limit the Commission's ability to use unfairness to pursue unlimited public-policy goals. 15 U.S.C. §45(n). This context is important because Congress borrowed the unfairness definition that governs the CFPB from the Federal Trade Commission Act. *See* Ex. I at 1 n.2, 2 n.4. As Director Chopra conceded in recent testimony, "'[U]nfairness' … derive[s] from the FTC Act. It is identical language." *The Consumer Financial Protection Bureau's Semi-Annual Report to Congress, Hearing before the Senate Comm. on*

*Banking, Hous., and Urb. Affairs*, 117th Cong. (2022) (statement of Rohit Chopra, Director of the CFPB). Where Congress borrows terms of art from other acts, it presumably conveys the same meaning. *Morissette v. United States*, 342 U.S. 246, 263 (1952).

What's more, the CFPB's contemplation of *disparate-impact* liability—a specific form of liability that not even most antidiscrimination laws create—flouts congressional intent and Supreme Court precedent. *See* Ex. I at 15 (addressing determinations "that result in discrimination"). CFPB has confirmed several times that its updated manual covers disparate-impact liability. For example, the CFPB stated that "[c]onsumers can be harmed by discrimination regardless of whether it is intentional," so CFPB examiners now consider "discriminatory outcomes." Ex. K. And the CFPB stated elsewhere that actions producing "disparate treatment or a discriminatory outcome … fall squarely within our mandate to address and eliminate unfair practices." Halperin & Salas, *Cracking Down on Discrimination in the Financial Sector*, CFPB (Mar. 16, 2022) (Exhibit M). Yet neither Director Chopra (Ex. K) nor his colleagues (Ex. M) root this expansion of the agency's authority in anything besides existing UDAAP authority. Nor has Director Chopra or anyone else at the CFPB attempted to "reasonably explain[]" this novel interpretation. *See Prometheus Radio Project*, 141 S. Ct. at 1158.

This position cannot be squared with the Supreme Court's admonition that statutes can authorize disparate-impact liability only in narrow circumstances. *Inclusive Cmtys.*, 576 U.S at 534. Namely, the Supreme Court has required two conditions to imply disparate-impact liability is permissible: the statute must be an antidiscrimination law, and the statute must contain results-oriented language demonstrating that it is designed to impose liability for disparate-impact claims. *Id.*; *see also* M*arietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*, 142 S. Ct. 1968, 1974 (2022).

Dodd-Frank has neither characteristic: It is not an antidiscrimination statute, and neither it nor any of the other relevant statutes have any results-oriented language showing that Congress in-

tended for the CFPB to address disparate-impact claims. Accordingly, Dodd-Frank provides no textual support for the notion that Congress authorized the CFPB to pursue disparate-impact claims under its UDAAP authority.

The CFPB's purported regulation of disparate impacts also fails to include the essential safeguards that the Supreme Court requires for disparate-impact liability. *See Inclusive Cmtys.*, 576 U.S. at 542 (insisting on a "robust causality requirement"). Those safeguards are needed to prevent constitutional violations; without them, federal law would impermissibly "inject racial considerations" into every decision and invite "racial quotas." *Id.* at 543. The Court's precedent teaches that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 533. Yet the CFPB has failed to even acknowledge, let alone discuss, these well-established guardrails.

Even if UDAAP authority could be interpreted to include discrimination claims, due process would bar the CFPB from attempting to hold companies responsible under this new UDAAP definition for conduct *before* the CFPB announced its new definition. *PHH Corp. v. CFPB*, 839 F.3d 1, 44 (D.C. Cir. 2016) *reh'g en banc granted, order vacated* (Feb. 16, 2017), *on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) ("But change becomes a problem—a fatal one—when the Government decides to turn around and retroactively apply that new interpretation to proscribe conduct that occurred before the new interpretation was issued."). The agency considered none of these problems.

Relatedly, the CFPB's manual update ignores the reliance interests that have grown up around its prior approach to UDAAP authority. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"). *Cf. California v. Bernhardt*, 472 F. Supp. 3d 573, 600-01 (N.D. Cal. 2020) ("[A]n agency cannot flip-flop regulations on [a]

whim[.]" Rather, "[t]he APA requires reasoning, deliberation, and process. These requirements exist, in part, because markets and industries rely on stable regulations.").

This unreasoned change flouts the APA's arbitrary-and-capricious standard. It fails to consider the CFPB's prior position on UDAAP authority, provides no well-founded reasons for the update, and does not consider reliance interests. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) ("*State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy]."); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position."). The manual update is thus arbitrary and capricious. 5 U.S.C. §706(2)(A).

### 3.   The update violates the notice-and-comment requirement.

The APA also requires that an agency action be set aside if it is promulgated "without observance of procedure required by law." 5 U.S.C. §706(2)(D). A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," including "the approval or prescription . . . of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. §551(4). This definition includes "virtually every statement an agency can make." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983).

Unless covered by an exception, all agency rules must go through the APA's notice-and-comment process. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). This process "was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984). Notice-and-comment procedures thus provide a crucial and necessary safeguard against the consequences of an unchecked administrative state. *See Free Enterprise Fund v. PCAOB*, 561

U.S. 477, 499 (2010) ("The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the people.").

The APA further distinguishes between "legislative rules" and "interpretive rules." The former are subject to the Act's notice-and-comment requirements. 5 U.S.C. §553(b)(3)(A). In determining whether a rule is legislative or interpretive, the agency's label is not dispositive. Rather, any rules that operate as "substantive agency regulations" are deemed legislative. *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 313-15 (1979). "Legislative or substantive rules are those which 'affect individual rights and obligations.'" *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001). They effectively "create law" by "impos[ing] conditions … beyond those required by the regulation" that existed before the new agency action. *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999) (invalidating the application of a Farm Services Agency handbook provision because it was a legislative rule that altered the rights of parties without notice and comment). To determine whether an agency action is a legislative rule, courts first look to whether the agency "intended the regulation to carry the force of law." *Encino Motorcars*, 579 U.S. at 220. To uncover this intent, courts examine the "language actually used by the agency." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987). If an agency action "limits administrative discretion," it constitutes a legislative rule. *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988) (holding that a rule was legislative because it "substantially curtails EPA's discretion" and "accordingly has present binding effect" (*id.* at 1322)). Courts in this Circuit also must consider whether the rule will "produce … significant effects on private interests." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 236 (5th Cir. 2015).

The CFPB's updated manual is a legislative rule subject to the APA's notice-and-comment requirement because it "change[s] the legal status of regulated parties" by subjecting them to supervision and examination for discrimination under UDAAP. *Mann Constr., Inc. v. United States*, 27 F.4th

1138, 1143 (6th Cir. 2022); *see also Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (exceptions to notice and comment "must be narrowly construed"). Indeed, the update sets out a substantive rule that the CFPB will carry out when regulating. *See Prof'ls. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (the focus is "primarily on whether the rule has binding effect on agency discretion or severely restricts it"). It binds the agency's personnel to a particular method of investigation when conducting UDAAP reviews, thus marking the withdrawal of discretion by purporting to impose a new legal norm. *See id.*

Tellingly, the CFPB takes the position that the update "impose[s] new … duties" on businesses by empowering examiners to investigate—and thus requiring businesses to keep—certain records and policies. *Mann Constr.*, 27 F.4th at 1143; *see also* Ex. K (confirming the update's finality and explaining that discrimination can presently "trigger liability" for regulated entities under the UDAAP authority). Indeed, the manual is written with mandatory language to its examiners; it uses the word "must" more than 2,000 times. Ex. A ¶10; *see also* CFPB, *Supervision and Examination Manual* (Sept. 2022), https://perma.cc/JP4D-6AQS. It both restrains the discretion of agency decisionmakers and announces the CFPB's view of specific substantive legal requirements that regulated entities have no choice but to follow today. *See McLouth Steel Prod. Corp.*, 838 F.2d at 1322; *see also Prof'ls. & Patients for Customized Care*, 56 F.3d at 594-95 (analyzing whether a rule affects an agency decisionmaker's discretion to "initiate federal enforcement actions against entities and responsible persons").

To that end, the CFPB has proclaimed that its examiners "will look at how companies test and monitor their decision-making process for unfair discrimination." Ex. K at 3. CFPB's incorrect legal rule will compel agents to look at transactions for UDAAP and supposed discrimination. It hinders business operations and supposes that regulated entities' compliance systems will run new algorithms to identify a unique species of information. This new policy has already led Plaintiffs' members to expand their existing UDAAP compliance systems, including their risk assessments, checklists, and

other tools, to include nondiscrimination and by applying existing compliance systems that cover non-discrimination to consumer financial products not covered by the ECOA or HMDA. Ex. A ¶¶16-19 (detailing costs to Chamber members from $10,000 to over $1 million annually per member); Ex. B ¶¶13-16; Ex. C ¶¶16-18; Ex. D ¶¶16-18; Ex. E ¶¶16-18; Ex. F ¶¶9-12; Ex. G ¶¶16-18. Examiners will seek out this information to expand the scope of examinations and investigations under the updated manual, thus draining unrecoverable business resources.

That the CFPB was revising the previous manual does not excuse the CFPB from the APA's procedural requirements. *See Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019) (An agency must "follow the same process to revise a rule as it used to promulgate it." (citing *Perez*, 575 U.S. at 100)). Regardless of whether some sections of the manual previously went through notice-and-comment, the update is not a mere clarification of existing rules. Rather, the update imposes new substantive obligations on regulated entities without going through the required notice-and-comment procedure under the APA.

In fact, many outside the CFPB understand that any attempt to expand UDAAP authority must go through the notice-and-comment process. Former CFPB senior adviser Michael Pierce wrote an email to his "CFPB Colleagues" urging the agency to "issue notice-and-comment rules formalizing the unfairness-discrimination application" which would afford it "the opportunity to articulate substantive standards and requirements for compliance, which may not be possible in less formal guidance." AR 05265 (Exhibit S); AR 05713 (same) (Exhibit T). Doing so would afford the CFPB "the opportunity to articulate substantive standards and requirements for compliance, which may not be possible in less formal guidance." *Id.* Yet the CFPB declined.

24

The CFPB's action, taken without legislative authority, imposes uncertain and excessive regulation in the financial marketplace, along with the attendant financial burdens on Plaintiffs, their members, and the public. Because the CFPB failed to go through the requisite notice-and-comment process, the manual update violates the APA on this third, independent claim.

## II.     Plaintiffs are entitled to vacatur and a permanent injunction.

The parties agree that this case should be finally resolved at summary judgment, *see* Doc. 15, so if the Court grants summary judgment to Plaintiffs, it should simultaneously craft a remedy. Under the governing law, Plaintiffs are entitled to both vacatur and other equitable relief, including a declaration and a permanent injunction.

### A.     This Court should set aside the manual update.

For starters, this Court should vacate—*i.e.*, "set aside"—the manual update. 5 U.S.C. §706(2). As the Fifth Circuit held in *Community Financial*, vacatur is an appropriate remedy for the CFPB's violations of the Appropriations Clause. *See* 51 F.4th at 643. And as courts have held many times, vacatur is also the appropriate remedy when an agency action violates the APA.

When a rule is procedurally or substantively defective, the "ordinary result" is vacatur. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). That rule is binding precedent in the Fifth Circuit. *Basinkeeper v. U.S. Army Corps of Eng'rs*, 715 F. App'x 399, 402 n.3 (5th Cir. 2018); *see also Chamber of Com. Of United States of Am. v. U.S. Dep't of Lab.*, 885 F.3d 360, 388 (5th Cir. 2018), *judgment entered sub nom. Chamber of Com. Of Am. v. U.S. Dep't of Lab.*, 2018 WL 3301737 (5th Cir.) (vacating the Department of Labor's Fiduciary

Rule under the APA because the rule was "arbitrary, capricious" and "in excess of statutory … authority" (citing 5 U.S.C. §706(2)(A), (C))).

Indeed, the APA *requires* courts to "hold unlawful and set aside" agency actions that violate its commands. 5 U.S.C. §706(2). To "set aside" means "to annul or vacate." Set Aside, *Black's Law Dictionary* (11th ed. 2019); *accord* Set Aside, *Black's Law Dictionary* (3d ed. 1933) ("cancel, annul, or revoke"); Set Aside, *Black's Law Dictionary* (4th ed. 1951) (same). And vacatur "applies to the rule generally, not to just the plaintiffs in a suit." *Health Freedom Def. Fund, Inc. v. Biden*, 2022 WL 1134138, at *20 (M.D. Fla.) (citing *Nat'l Mining Ass'n v.*, 145 F.3d at 1409); *accord Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) ("'it is the long-held understanding that once a rule is vacated, it is vacated for everyone'"). The only possible exception to vacatur—enjoinment as to these plaintiffs and their members, but not others—is a contested exception that contradicts the governing practice in this circuit. *See Texas v. United States*, 515 F. Supp. 3d 627, 638 n.6 (S.D. Tex. 2021) (reasoning "that a geographically restricted injunction issued to remedy likely unlawful agency actions meant to be applied universally would, among other things, invite arbitrary enforcement on the part of the federal agency and create more questions than it answers" (cleaned up)).

Because the CFPB's manual update violates the APA in several respects, vacatur of that offending rule is an important first step. *See Texas v. Brooks-LaSure*, 2021 WL 5154219, at *7 (E.D. Tex.) (Barker, J.) (setting aside an agency action "in excess of statutory authority and as arbitrary and capricious" (citing 5 U.S.C. §706(2)(A), (C)); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that normally requires vacatur of the rule."). Even if total vacatur were inappropriate in certain circumstances, it would be appropriate here—a case where the plaintiffs represent a large, nationwide swath of the entities who are being injured by the CFPB's unlawful action. *See, e.g.*, Ex. A

¶4; Ex. C ¶¶7-8 (Plaintiff Consumer Bankers Association's members comprise over one-third of the total number of CFPB depository institutions); *see also* Ex. C-3 (list of applicable CBA members).

### B.     This Court should also enter declaratory and permanent injunctive relief.

Beyond setting aside the manual update, this Court should declare that the CFPB has no UDAAP authority over discrimination and enter a permanent injunction barring the CFPB from exercising that authority. Specifically, an injunction should bar the CFPB from pursuing any examinations or enforcement actions based on the interpretation of its UDAAP authority announced in the March 2022 update.

Plaintiffs are entitled to that relief if they establish

1. "success on the merits";
2. "that a failure to grant the injunction will result in irreparable injury";
3. "that said injury outweighs any damage that the injunction will cause the opposing party"; and
4. "that the injunction will not disserve the public interest."

*O'Connor v. Smith*, 427 F. App'x 359, 365 (5th Cir. 2011). The first factor is satisfied, as explained above; because the CFPB lacks constitutionally appropriate funds or statutory authority to regulate discrimination under its UDAAP authority, it should be enjoined from exercising that unlawful authority. Because defendants are the government, moreover, the last two factors for injunctive relief "merge." *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (evaluating substantively identical elements in request for stay of lower court ruling). Those factors, as well as the irreparable-harm factor, are satisfied here.

### 1.     Without permanent injunctive relief, Plaintiffs will suffer irreparable harm.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d

1390, 1394 (5th Cir. 1986). Plaintiffs "need only show" harm that "'cannot be undone through monetary remedies.'" *Texas v. United States*, 524 F. Supp. 3d at 663. Plaintiffs easily clear that threshold, both for their members and the public at large. *See Hornbeck Offshore Servs., LLC v. Salazar*, 696 F. Supp. 2d 627, 638-39 (E.D. La. 2010) ("[I]n making the determination of irreparable harm, 'both harm to the parties and to the public may be considered.'"); *Long Island R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 910 (2d Cir. 1989) ("In making the determination of irreparable harm, both harm to the parties and to the public may be considered.").

In its blog post accompanying the update, the CFPB acknowledged that the manual would now impose new obligations on regulated entities. CFPB examiners "will require supervised companies to show their processes for assessing risks *and discriminatory outcomes [i.e., "disparate impact"]*, including documentation of customer demographics and the impact of products and fees on different demographic groups." Ex. K (emphasis added). And the CFPB "will look at how companies test and monitor their decision-making processes for unfair discrimination, *as well as discrimination* under [the ECOA]." *Id.* (emphasis added).

The CFPB's redefinition of the unfairness prong of UDAAP means that the CFPB will now examine for and enforce its novel interpretation. As a matter of course, the CFPB shares violations it finds in examinations with the Enforcement Division, which results in Enforcement opening investigations and lawsuits. The CFPB's update thus requires institutions to comply or risk legal action. And its exercise of enforcement authority in this new area will affect all consumer financial-services companies, including Plaintiffs' members. In fact, CFPB has already said that it will use the updated manual to do just that. *See* Ex. M ("Under the updated examination guidelines, we will continue to scrutinize

any conduct of covered institutions that violates the federal prohibition against unfair practices, including determining if an entity has unfairly discriminated against certain people.").

These seismic amendments to the manual harm Plaintiffs' members by imposing heavy compliance costs through the expansion of UDAAP compliance programs and systems. *See, e.g.*, Ex. A ¶¶16-19; Ex. C ¶¶7-8. Plaintiffs' members have no choice but to update their UDAAP compliance policies and programs *today*, at significant cost, or run the risk of prolonged fights with the CFPB over the adequacy of compliance procedures. Indeed, they must divert resources from other business operations, limit innovation, and curtail the diversity of product offerings in the consumer financial-services area.

Plaintiffs' members are already incurring steep costs to comply with CFPB's unlawful manual update. *See, e.g.*, Ex. A ¶¶16-18. Directly, the costs on Chamber members from complying with the CFPB's new rule vary from $10,000 to more than $1 million annually per member. *Id.* ¶19. And these are not "one off" costs; they are business expenses that will occur over and over. *Id.* These costs will continue to accumulate as long as the updated manual remains in effect. Yet these costs do not even account for the threat of costly enforcement actions against Plaintiffs' members that will further compound the harm. *Id.* ¶¶23-25.

Compliance is all the more burdensome because the CFPB asserted its new anti-discrimination authority without explaining key aspects of the updated regime. Regulated entities have no instructions, for example, on what might constitute unfair discrimination or an actionable disparate impact. *Id.* ¶20. Unlike most anti-discrimination laws and regulations, the updated manual does not identify protected classes or characteristics. *Id.* It also does not identify activities that *cannot* be discrimination, another important feature of anti-discrimination laws. *See id.* For one example, the ECOA expressly permits inquiry about an applicant's age or sources of income "for the purpose of determining the amount and probable continuance of income levels, credit history, or other pertinent element[s] of

credit-worthiness as provided in regulations of the Bureau." 15 U.S.C. §1691(b)(2). The CFPB included no such guidance in its update.

Nor does the agency explain how regulated entities are supposed to conduct the kind of demographic assessments the update contemplates. Regulated entities are sometimes prohibited from collecting customer demographic information. *E.g.* 12 C.F.R. §1002.5(b)-(d) (limits under the ECOA on inquiry into an applicant's race, color, religion, national origin, sex, marital status, and other characteristics). The CFPB offers no explanation how regulated entities should comply with such regulations while still implementing, per the updated manual, "policies and procedures to review, test, and monitor any decision-making processes" for potential discrimination, including mere disparate impact. Regulated entities, including Plaintiffs' members, are bearing the burden of all this uncertainty while trying to get into compliance with the agency's update.

In fact, the prospect of potential disparate-impact liability limits Plaintiffs' members from offering innovative consumer financial-services products. *See, e.g.*, Ex. A ¶26. Under the novel standards announced in the manual update, the CFPB has created a risk of UDAAP scrutiny for new product offerings, particularly attempts to increase access to consumer financial products for underserved communities. *Id.* The update thus forces Plaintiffs' members to limit offerings in a way that hinders business operations—not to mention the harm this causes to consumers.

This harm incurred by Plaintiffs' members cannot be remedied without a permanent injunction. Specifically, once Plaintiffs' members build out the compliance infrastructure, those costs are lost for good. Indeed, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concur-

ring in part and in the judgment)); *Brooks-LaSure*, 2021 WL 5154219, at *12 (Barker, J.) (finding irreparable harm where "[d]amages are unavailable … because the Administrative Procedure Act does not waive the federal government's sovereign immunity from damages actions").

Thus, a plaintiff has established irreparable harm when a government action "impose[s] costs" which the plaintiff "will be unable to recover . . . from the federal government." *Texas v. Biden*, 20 F.4th 928, 1002 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). If the updated manual were set aside as unlawful, Plaintiffs and their members would have no claim against the CFPB for the compliance costs they have already incurred. That means their harm "cannot be undone through monetary remedies" and is therefore irreparable. *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017); *see also Texas v. United States*, 524 F. Supp. 3d at 663 (finding a "financial injury" was irreparable because "the Court [could not] conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm").

And Plaintiffs' members will perpetually incur costs to remain in compliance. *See, e.g.*, Ex. A ¶19. The longer that the threat of unlawful enforcement of the manual update looms, the more unrecoverable resources Plaintiffs and their members end up devoting to new compliance programs. This uncertainty in the marketplace and mounting compliance costs thus causes significant irreparable harm to Plaintiffs and their members subject to the CFPB's unlawful update.

Plaintiffs also have members who are not supervised by the CFPB but are likewise irreparably harmed by the CFPB's unprecedented and incorrect rule. *Id.* ¶¶21-22. The CFPB is the agency charged by Congress with enforcing the UDAAP provision of Dodd-Frank., 12 U.S.C. §5536(a)(1)(B), so any entity subject to the Dodd-Frank provisions governing UDAAP is affected by the CFPB's pronouncements. Plaintiffs each have members not primarily regulated by the CFPB who provide consumer financial products or are service providers for such products. These entities are subject to Dodd-

Frank's prohibitions on UDAAP. *Compare* 12 U.S.C. §5481(6) (defining a "covered person" for the purpose of the exercise of UDAAP authority under Dodd-Frank as "(A) any person that engages in offering or providing a consumer financial product or service; and (B) any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person"), *with* Ex. H at 1 n.2 (The CFPB claims "supervisory authority" over "(1) non-depository consumer financial service companies and their service providers; (2) large insured depository institutions, large insured credit unions, and their affiliates, as well as service providers to these entities; and (3) service providers to a substantial number of small insured depository institutions or small insured credit unions." (citing 12 U.S.C. §§5514-5517)). Each of these entities will face irreparable harm by being brought under the ambit of CFPB's unlawful action.

### 2.    A permanent injunction would not harm Defendants or disserve the public interest.

Finally, the public interest and balance of harms strongly favor a permanent injunction. Simply put, Defendants "have no legitimate interest in the implementation of an unlawful" regulation. *Texas v. United States*, 524 F. Supp. 3d. at 663. Instead, "the public is served when the law is followed." *Id.* at 665 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). And the public has a strong interest in the proper function of the banking industry nationwide. "An invalid agency decision to suspend [business] simply cannot justify the immeasurable effect on the plaintiffs, the local economy," and "the critical present-day aspect" of the entire industry. *Hornbeck*, 696 F. Supp. 2d at 639. So too here.

## CONCLUSION

For all these reasons, this Court should grant summary judgment in Plaintiff's favor and enter declaratory and permanent injunctive relief setting aside the CFPB's March 2022 update to the manual and forbidding the CFPB from pursuing any examinations or enforcement actions based on the interpretation of its UDAAP authority announced in the March 2022 update.

Dated: November 29, 2022

Respectfully submitted,

Jennifer B. Dickey*
Jordan L. Von Bokern*
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
jdickey@uschamber.com
jvonbokern@uschamber.com

Thomas Pinder*
AMERICAN BANKERS ASSOCIATION
1120 Connecticut Ave. NW
Washington, DC, 20036
(202) 663-5035
tpinder@aba.com

David Pommerehn*
CONSUMER BANKERS ASSOCIATION
1225 New York Avenue, N.W.
Suite 1100
Washington, DC, 20005
(202) 552-6368
dpommerehn@consumerbankers.com

_/s/ Cameron T. Norris_
Bruce A. Smith
SBN 18542800
Ward, Smith & Hill PLLC
P. O. Box 1231
Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)
bsmith@wsfirm.com

Cameron T. Norris*
Bryan K. Weir*
David L. Rosenthal*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
bryan@consovoymccarthy.com
david@consovoymccarthy.com

*Admitted pro hac vice

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify on this 29th day of November, 2022, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

*/s/ Cameron T. Norris*
Cameron T. Norris