# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF BUSINESS; and TEXAS BANKERS ASSOCIATION,<br><br>*Plaintiffs,*<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>*Defendants.* | Case No. 6:22-cv-00381<br><br>**DECLARATION OF VIRGINIA O'NEILL IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

**DECLARATION OF VIRGINIA O'NEILL**

I, Virginia O'Neill, declare as follows:

1. I am an Executive Vice President (EVP) of the American Bankers Association (ABA). I lead our Regulatory Compliance and Policy group, which is responsible for consumer regulatory policy advocacy.

2. ABA is a national trade association for the American banking industry. ABA represents banks of all sizes and charters and is the voice for the nation's $23.7 trillion banking industry. ABA advocates for banks before Congress, regulatory agencies, and the courts to drive pro-growth policies that help customers, clients, and communities thrive. ABA regularly advocates before the Consumer Financial Protection Bureau (CFPB) to promote regulatory and supervisory policies that protect consumers while ensuring that markets for consumer financial products and services are fair

and transparent and encourage innovation and competition to support economic growth. *See, e.g.*, Letter to CFPB on the Consumer Response Intake Form (Nov. 4, 2022), https://www.aba.com/advocacy/policy-analysis/cfpb-ltr-consumer-response-intake-form; Letter to CFPB on P2P Payments and Scams (Oct. 27, 2022), https://www.aba.com/advocacy/policy-analysis/letter-to-cfpb-on-p2p-payments-and-scams.

3. The purpose of this declaration is to discuss the effects of a new rule announced by the CFPB in an amendment to its Supervision and Examination Manual, Unfair, Deceptive, or Abusive Acts or Practices Section, issued on March 16, 2022 ("Manual Update").

4. Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of ABA. If called as a witness, I could and would testify competently thereto.

### I. ABA's Mission and Members

5. ABA represents FDIC insured banks and trust companies of all sizes and types, including banks that operate internationally. As a result, ABA has as members depository institutions that are subject to CFPB supervision and examination, *see* 12 U.S.C. §5515, and listed as such on the CFPB's website at: https://files.consumerfinance.gov/f/documents/cfpb_depository-institutions-list_2022.pdf.

6. ABA also has members not currently subject to CFPB supervision but subject to the prohibition on unfair, deceptive, abusive, acts, or practices ("UDAAP") in the Dodd-Frank Act because some ABA members offer and provide consumer financial products and services but are not on the CFPB list for supervision and examination described above.

7. A core part of ABA's mission is to support commonsense policies that allow banks of all sizes to better serve their customers and communities. ABA thus advocates for a regulatory framework that is uniform and transparent, with public confidence in the financial system at the forefront.

ABA supports private initiatives and government policies that expand banks' collective ability to meet unmet needs, invest in untapped potential, and support the financial well-being of every American household. To carry out this mission, ABA regularly advocates before Congress and regulatory agencies. ABA also participates in litigation against the government to defend the legal and economic rights of its members.

## II.     The Impact of the CFPB's UDAAP Rule on ABA Members

8.     As ABA's EVP for Regulatory Compliance and Policy, I have worked closely with many ABA members to understand how the new legal rule announced in the Manual Update will affect member banks. I have also discussed with ABA members the substantial and irreparable harm that they will incur as a result of the new rule.

### A. The CFPB's new UDAAP rule is forcing ABA members to incur burdensome compliance costs.

9.     ABA members understand that the CFPB considers requirements in its Supervision and Examination Manual to be binding on regulated entities. This understanding comes from the fact that the manual generally uses mandatory language and the fact that the CFPB has publicly cited the manual as the source of law for interpreting its UDAAP authority, *see e.g.*, *Limited Applicability of Consumer Financial Protection Act's "Time or Space" Exception with Respect to Digital Marketing Providers*, 87 Fed. Reg. 50556, 50557 n.10 (Aug. 17, 2022) (citing UDAAP manual for proposition that "discrimination may constitute an unfair act or practice that violates the . . . UDAAP prohibition."). ABA's members thus have no choice but to treat the manual as articulating legal requirements that they must follow.

10.     Failure to comply with requirements articulated in the Supervision and Examination Manual can carry adverse consequences. If a regulated entity fails to demonstrate what the CFPB deems an adequate compliance program, the CFPB can issue a "Matter Requiring Attention," which

identifies specific goals for the regulated entity and timeframes in which those goals must be accomplished. An entity's response to a "Matter Requiring Attention" can affect its Compliance rating, which the CFPB assigns at the end of an examination; is communicated to the bank's management and, in some cases, its Board of Directors; and can lead to additional examinations, investigations, or public enforcement actions. "Matters Requiring Attention" are shared with a supervised entity's prudential regulator, which has additional tools to leverage compliance. The CFPB can also refer an issue to a committee to consider further supervisory or enforcement action without issuing a "Matter Requiring Attention."

11. A change to the scope of UDAAP through the manual therefore imposes direct costs on regulated entities. Entities must undergo examinations and comply with the CFPB's demands for records, information, and other materials. The CFPB's expanded interpretation of UDAAP leads to an expansion of the materials that will be relevant to the CFPB's examination and thus imposes additional examination costs on regulated entities as they respond to these expanded examinations.

12. Another cost from the expansion of UDAAP is the cost of ensuring that the regulated entity has sufficient compliance policies and procedures to satisfy the CFPB. Regulated entities will have to expend resources to introduce and maintain new compliance programs to account for the CFPB's expanded interpretation of UDAAP.

13. ABA members have already begun complying with the CFPB's new rule by conducting gap assessments, expanding their consumer compliance management systems (CMS), including their risk assessments, monitoring and testing, and other controls and tools to identify and prevent potential disparate outcomes associated with consumer financial products and services not covered by the Equal Credit Opportunity Act or Home Mortgage Disclosure Act. For example, Member A paid a consultant $50,000 to review its UDAAP prevention program, including its UDAAP risk assessment and its UDAAP policy. The consultant advised the bank that it needs additional UDAAP Risk Statements

covering non-credit products and services and additional monitoring, testing and controls. The additional monitoring and testing will require either more staff or more time from existing staff, new training, and additional business line resources for the implementation of new controls.

14. In addition, ABA members have begun monitoring and reviewing potential discrimination claims under a different legal analysis—the one applicable to alleged "unfair" acts under UDAAP. For example, Member A noted that the bank will apply both a UDAAP and a Fair Lending Risk Statement to credit operations. This change also requires more staff or more time from existing staff, new training programs, and additional business line resources.

15. Some members have also begun performing additional analyses of consumer demographics for deposit products, which are not subject to the Equal Credit Opportunity Act (ECOA) or the Home Mortgage Disclosure Act (HMDA) but are subject to the prohibition on UDAAP. For example, Member B initiated its regulatory change control process for the bank's deposit products. This included a review of the bank's deposit models (used to detect and prevent fraud) to identify potential disparate impacts on protected groups. The bank has amended its Fair and Responsible Banking Policy, has begun the process of implementing new testing and new controls, and has updated its UDAAP training modules, including its training for the bank's executive staff.

16. Based on their particular businesses and product lines, the costs on ABA members from complying with the CFPB's new rule vary from $10,000 to more than $1 million annually per member. And these are not "one off" costs; these are unrecoverable business expenses members will incur each year.

17. The compliance costs experienced by ABA members are compounded by the fact that the Manual Update does not provide important details about the scope of its new edict. Other non-discrimination provisions—such as the ECOA—provide the bases on which regulated entities may not discriminate, *see, e.g.*, 15 U.S.C. § 1691(a)(1), and identify activities that are nondiscriminatory, *see id.*

§ 1691(b), (c). The Manual Update offers no similar specifications, leaving regulated entities to guess as to what potential disparate impacts the CFPB may deem unfair under UDAAP. This lack of clarity further increases compliance costs.

18. ABA's members would not have undertaken the above-described compliance activities but for the announcement from the CFPB that it interprets UDAAP to include liability for discrimination and disparate impacts.

### B. The CFPB's UDAAP rule threatens ABA members with costly enforcement actions.

19. In addition to harming ABA members by forcing them to incur compliance costs with the unlawful update, the CFPB also harms members by exposing them to the risk of enforcement actions for violations of the UDAAP expansion.

20. The CFPB can choose to bring an enforcement action based on findings it made during the examination process. In that enforcement action, the CFPB can issue penalties, including a variety of monetary penalties.

21. The prospect of defending an expensive enforcement action, with the potential for monetary penalties, will lead members to change their behavior to avoid liability. Members that choose not to accede to CFPB's expansion of UDAAP will have to incur those costs and risk those penalties.

### C. The CFPB's UDAAP rule threatens innovation and the diversity of offerings in the consumer financial-services industry.

22. Innovation in financial services has the potential to increase U.S. competitiveness, promote financial inclusion, and expand access to banking services that drive the economy. ABA is focused on supporting the health and vitality of the banking industry by ensuring banks of all sizes can deploy the modern, innovative tools they need to compete effectively in today's marketplace and serve their customers.

23.     However, the prospect of potential disparate-impact liability threatens to force ABA's members to eliminate or forgo innovative consumer financial-services products. Under the vague standards announced in the Manual Update, it is impossible to know whether the CFPB would view it as unfair to offer a particular deposit product to consumers with more well-established relationships with a bank because such consumers would tend to be older than those opening their first bank accounts. Similarly, the prospect of disparate-impact liability looms large even over attempts made to increase access to consumer financial products for underserved communities.

### III.    Enjoining CFPB's UDAAP Expansion Would Remedy Harms to ABA Members.

24.     Enjoining the CFPB's actions would remedy the harms to ABA's members from the Manual Update. Members could safely forgo the additional compliance costs that the Manual Update imposes and would save the resources they would otherwise expend on compliance. They would also be saved from the additional cost of complying with examinations based on the expanded interpretation of UDAAP. And members could also introduce or retain products that would otherwise pose a risk of violating the expanded UDAAP interpretation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of November, 2022 at Washington, D.C.

*Virginia O'Neill*

Virginia O'Neill