# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF BUSINESS; and TEXAS BANKERS ASSOCIATION, *Plaintiffs*, v. CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, *Defendants*. | Case No. 6:22-cv-00381 **DECLARATION OF CHRISTOPHER WILLISTON VI IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## DECLARATION OF CHRISTOPHER WILLISTON VI

I, Christopher Williston VI, declare as follows:

1. I am the President and CEO of the Independent Bankers Association of Texas (IBAT). In that capacity, I oversee all of IBAT's operations.

2. The purpose of this declaration is to discuss the effects of a new rule announced by the CFPB in an amendment to its Supervision and Examination Manual, Unfair, Deceptive, or Abusive Acts or Practices Section, issued by the Consumer Financial Protection Bureau on March 16, 2022 ("Manual Update").

3. Unless otherwise stated, this Declaration is based upon my personal knowledge and belief or upon my review of business records of IBAT. If called as a witness, I could and would testify competently thereto.

**I.      IBAT's Mission and Members**

4. Formed in 1974, IBAT represents Texas community banks. The Austin-based group is the largest state community banking organization in the nation, with membership comprised of more than 2,000 banks and branches in 700 Texas communities.

5. Providing safe and responsible financial services to all Texans, IBAT member bank assets range in size from $28 million to $52 billion. IBAT member banks are committed to supporting and investing in their local communities.

6. IBAT has as members depository institutions that are subject to CFPB supervision and examination, *see* 12 U.S.C. §5515, and listed as such on the CFPB's website at: https://files.consumerfinance.gov/f/documents/cfpb_depository-institutions-list_2022-03.pdf.

7. IBAT also has members not currently subject to CFPB supervision but subject to the prohibition on unfair, deceptive, abusive, acts, or practices ("UDAAP") in the Dodd-Frank Act, which applies to "covered person[s]" and "service provider[s]. 12 U.S.C. §5531(a). "[C]overed person" is defined to include "(A) any person that engages in offering or providing a consumer financial product or service" and "any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person." §5481(6). We have members who offer and provide consumer financial products and services but are not on the CFPB list for supervision and examination described above.

**II.     The Impact of the CFPB's UDAAP Rule on Members' Businesses**

8. As President and CEO, I have worked closely with many IBAT members to understand how the new legal rule announced in the Manual Update will affect member businesses and the substantial and irreparable harm that will result from it.

### A. The CFPB's new UDAAP rule is forcing members to incur burdensome compliance costs.

9. To ensure compliance with Dodd-Frank's requirements and proscriptions, the CFPB subjects regulated entities to compliance examinations. CFPB personnel go onsite to regulated entities to observe, conduct interviews, and review documents and information. They review both whether there is evidence of violations and whether there are adequate policies and procedures in place to prevent violations. These examinations require substantial time and attention by the employees of regulated entities, time and attention that must be diverted from other business activities. Compliance with Dodd-Frank's prohibition on UDAAP is one matter that the CFPB investigates through its examination process.

10. The CFPB gives its examiners direction on how to assess compliance with federal consumer financial laws in these examinations through its Supervision and Examination Manual. This 1800+ page manual provides regulated entities with information about how the CFPB assesses their compliance with federal consumer financial laws and sets forth expectations for every institution under the CFPB's supervision and enforcement authority. For example, in an examination of an entity's compliance management system, the manual directs CFPB examiners to request and review a whole host of specified documents; determine whether those documents address specified issues; draw from that review preliminary conclusions about whether an entity's compliance program is strong, satisfactory, deficient, seriously deficient, or critically deficient; identify action needed to correct weaknesses in the entity's compliance management system; discuss findings with the institution's management and, if necessary, obtain a commitment for corrective action; and prepare a memorandum for inclusion in the CFPB's official system of record that outlines planning and strategy considerations for the next examination or interim follow-up. The manual is written with mandatory language to its examiners; indeed, it uses the word "must" more than 2,000 times.

11. The CFPB treats the manual as setting forth legal requirements for regulated entities. For example, it has already cited the UDAAP section of its manual for the proposition that "discrimination may constitute an unfair act or practice that violates the UDAAP prohibition." *Limited Applicability of Consumer Financial Protection Act's "Time or Space" Exception with Respect to Digital Marketing Providers*, 87 Fed. Reg. 50556, 50557 (Aug. 17, 2022) (citing UDAAP manual). Other examples abound. *See, e.g.*, Equal Credit Opportunity (Regulation B); Revocation or Unfavorable Changes to the Terms of Existing Credit Arrangements, 87 Fed. Reg. 30097, 30098 (May 18, 2022) ("In addition, the Bureau's *Supervision and Examination Manual* makes clear that creditors subject to the Bureau's supervisory jurisdiction must comply with ECOA and Regulation B's requirements with respect to existing accounts. For instance, the Examination Manual explains that '[n]otification of adverse action taken on an *existing* account must also be made within 30 days.'"). IBAT's members thus have no choice but to treat the manual as articulating legal requirements that they must follow.

12. To ensure that a regulated entity is taking sufficient steps to prevent UDAAP violations, the CFPB directs its examiners to review the entity's compliance risk management systems, including internal controls, policies, and procedures; the entity's training materials; the entity's procedure manuals and written policies; the entity's internal control monitoring and auditing materials; the entity's minutes for board meetings and management committees; and all relevant written policies and procedures and internal and external audit reports.

13. If a regulated entity fails to demonstrate what the CFPB deems an adequate compliance program, the CFPB can issue a "Matter Requiring Attention," which identifies specific goals for the regulated entity and timeframes in which those goals must be accomplished. An entity's response to a "Matter Requiring Attention" can affect its Compliance rating, which the CFPB assigns at the end of an examination; is communicated to the bank's management and, in some cases, its Board of Directors; and can lead to additional examinations, investigations, or public enforcement actions.

Additional supervisory or enforcement actions impose costs on regulated entities. "Matters Requiring Attention" are shared with a supervised entity's prudential regulator, which has additional tools to leverage compliance. The CFPB can also refer an issue to a committee to consider further supervisory or enforcement action without issuing a "Matter Requiring Attention."

14. A change to the scope of UDAAP therefore imposes direct costs on regulated entities. Entities must undergo examinations and comply with the CFPB's demands for records, information, and other materials. The CFPB's expanded interpretation of UDAAP leads to an expansion of the materials that will be relevant to the CFPB's examination and thus imposes additional examination costs on regulated entities as they respond to these expanded examinations.

15. Another cost from the expansion of UDAAP is the cost of ensuring that the regulated entity has sufficient compliance policies and procedures to satisfy the CFPB. Regulated entities will have to expend resources to introduce and maintain new compliance programs to account for the CFPB's expanded interpretation of UDAAP.

16. Members of IBAT have already begun complying with the CFPB's new rule by expanding their UDAAP compliance systems, including their risk assessments, checklists, and other tools, to include nondiscrimination and by applying existing compliance systems that cover nondiscrimination to consumer financial products not covered by the Equal Credit Opportunity Act or Home Mortgage Disclosure Act. These enhanced compliance programs require either more staff or more time from existing staff, new training programs, and additional business line resources for the implementation of additional controls.

17. In addition, members of IBAT have begun monitoring and reviewing potential discrimination claims under a different legal analysis—the one applicable to alleged "unfair" acts under UDAAP. This change also requires more staff or more time from existing staff, new training programs, and additional business line resources.

18. Some members have also begun performing additional analyses of consumer demographics for deposit products, which are not subject to ECOA or the HMDA but are subject to the prohibition on UDAAP. As noted above, members are preparing to expand their testing of compliance risks throughout the lifecycle of deposit products.

19. The compliance costs experienced by our members are compounded by the fact that the Manual Update does not identify any protected classes or characteristics. ECOA prohibits discrimination "on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)"; "because all or part of the applicant's income derives from any public assistance program"; and "because the applicant has in good faith exercised any right under this chapter." 15 U.S.C. §1691(a). But ECOA also identifies certain activities that are not discrimination in the credit space, such as "mak[ing] an inquiry of marital status if such inquiry is for the purpose of ascertaining the creditor's rights and remedies applicable to the particular extension of credit and not to discriminate in a determination of credit-worthiness"; "mak[ing] an inquiry of the applicant's age or whether the applicant's income derives from any public assistance program if such inquiry is for the purpose of determining the amount and probable continuance of income levels, credit history, or other pertinent element of credit-worthiness"; and "refus[ing] to extend credit pursuant to" certain credit assistance programs if the "refusal is required by or made pursuant to such program." 15 U.S.C. §1691(b). The Manual Update offers no similar specification, leaving regulated entities to guess as to what potential disparate impacts the CFPB may deem unfair under UDAAP. This lack of clarity further increases compliance costs.

20. The increased compliance costs are not limited to those IBAT members whom the CFPB supervises. Because the CFPB is the agency charged by Congress with interpreting the UDAAP provision of the Dodd-Frank Act, 12 U.S.C. §5536(a)(1)(B), any entity subject to the Dodd-Frank provisions governing UDAAP is affected by the CFPB's pronouncements.

21. Our members would not have undertaken these compliance activities but for the announcement from the CFPB that it interprets UDAAP to include liability for discrimination and disparate impacts.

### B. The CFPB's UDAAP rule threatens members with costly enforcement actions.

22. In addition to harming members by forcing them to incur compliance costs with the unlawful update, CFPB also harms members by exposing them to the risk of enforcement actions for violations of the UDAAP expansion.

23. The CFPB can choose to bring an enforcement action based on findings it made during the examination process. In that enforcement action, the CFPB can issue penalties, including a variety of monetary penalties.

24. The prospect of defending an expensive enforcement action, with the potential for monetary penalties, will lead members to change their behavior to avoid liability. Members that choose not to accede to CFPB's expansion of UDAAP will have to incur those costs and risk those penalties.

### C. The CFPB's UDAAP rule threatens innovation and diversity of offerings in the consumer financial-services industry.

25. The prospect of potential disparate-impact liability also threatens to force IBAT's members to eliminate or forgo innovative consumer financial-services products. Under the vague standards announced in the Manual Update, it is impossible to know whether the CFPB would view it as unfair to offer a particular deposit product to consumers with more well-established relationships with a bank because such consumers would tend to be older than those opening their first bank accounts. Similarly, the prospect of disparate-impact liability looms large even over attempts made to increase access to consumer financial products for underserved communities.

### III. Enjoining CFPB's UDAAP Expansion Would Remedy Harms to Members

26. Enjoining the CFPB's actions would remedy the harms to IBAT's members from the Manual Update. Members could safely forgo the additional compliance costs that the Manual Update imposes and would save the resources they would otherwise expend on compliance. They would also be saved from the additional cost of complying with examinations on the expanded interpretation of UDAAP. And members could also introduce or retain products that would otherwise pose a risk of violating the expanded UDAAP interpretation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this <u>28th</u> day of November at Austin, Texas.

_____
Christopher L. Williston VI