Exhibit Q

BILLING CODE: 4810-AM-P

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**Statement Regarding the Provision of Financial Products and Services to Consumers with Limited English Proficiency**

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Notice.

**SUMMARY:** The Bureau of Consumer Financial Protection (Bureau) is issuing this Statement Regarding the Provision of Financial Products and Services to Consumers with Limited English Proficiency (Statement) to encourage financial institutions to better serve consumers with limited English proficiency (LEP) and to provide principles and guidelines to assist financial institutions in complying with the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), the Equal Credit Opportunity Act (ECOA), and other applicable laws.

**DATES:** The Bureau released this Statement on its website on January 13, 2021.

**FOR FURTHER INFORMATION CONTACT:** Ena P. Koukourinis, Senior Counsel, Office of Fair Lending and Equal Opportunity, at CFPB_FairLending@cfpb.gov or 202-435-7000. If you require this document in an alternative electronic format, please contact CFPB_Accessibility@cfpb.gov.

**SUPPLEMENTARY INFORMATION:**

**I.    Statement Regarding the Provision of Financial Products and Services to Consumers with Limited English Proficiency**

*A.  Background*

The Bureau works to ensure a fair, transparent, and competitive consumer financial marketplace. To that end, the Bureau seeks to promote access to financial products and services

for all consumers, including LEP consumers.[1]  Despite having considerable credit needs and representing a large segment of the U.S. population, LEP consumers often encounter significant barriers to participating in the consumer financial marketplace.[2]  Many of these challenges stem from language access issues—financial disclosures and written documents are generally not available in languages other than English and some financial institutions do not have bilingual employees or access to interpretation services.[3]

Recognizing the compliance risks and uncertainty that many financial institutions raise as challenges to better serving LEP consumers in non-English languages, the Bureau is issuing this Statement to outline compliance principles and guidelines that encourage financial institutions to expand access to products and services for LEP consumers.  In doing so, the Bureau seeks to: (1) promote access to financial products for all consumers; (2) facilitate compliance by providing clear rules of the road; and (3) educate and empower consumers to make better informed financial decisions.[4]  Financial institutions play an important role in building a more inclusive financial system and presenting opportunities for LEP consumers to build their financial capabilities.[5]  The effective and responsible integration of LEP consumers into the financial

---

[1] In this document, a consumer with "limited English proficiency" or a "limited English proficient" (LEP) consumer means a person who has a limited ability to read, write, speak, or understand English.

[2] *See* Consumer Financial Protection Bureau, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace, 6-7 (Nov. 2017), https://files.consumerfinance.gov/f/documents/cfpb_spotlight-serving-lep-consumers_112017.pdf.

[3] *Id*. at 12.

[4] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 (2010), sec. 1021 (Dodd-Frank Act); *see also* CFPB Director Kathleen Kraninger, *Kraninger Marks Second Year as Director of the Consumer Financial Protection Bureau* (Dec. 11, 2020), https://www.consumerfinance.gov/about-us/newsroom/kraninger-marks-second-year-director-consumer-financial-protection-bureau/.

[5] *Supra* note 2.

ADMINRECORD-02419

marketplace has the potential to create positive benefits for consumers and the financial services industry alike.[6]

The Dodd-Frank Act emphasizes the Bureau's role in ensuring "fair, equitable, and nondiscriminatory access to credit."[7]  Consistent with that purpose, the Bureau encourages financial institutions to promote access to financial products and services for all consumers by better serving LEP consumers.  In providing such assistance and serving LEP consumers, financial institutions must also comply with Dodd-Frank Act prohibitions against engaging in any unfair, deceptive, or abusive act or practice (UDAAP)[8] and the ECOA.[9]  This Statement provides guidance on how financial institutions can provide access to credit in languages other than English in a manner that is beneficial to consumers, while taking steps to ensure financial institutions' actions are compliant with the ECOA, the prohibitions against UDAAPs, and other applicable laws.

Approximately 22 percent of the U.S. population over the age of 5 (in all, 67.8 million people) speak a language other than English at home and, of these, 37.6 percent are LEP.[10]  LEP consumers face unique challenges in learning about and accessing financial products and services.[11]  For instance, limited English proficiency can hinder consumers' financial literacy and

---

[6] Consumer Financial Protection Bureau, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace, 6-7 (Nov. 2017), https://files.consumerfinance.gov/f/documents/cfpb_spotlight-serving-lep-consumers_112017.pdf.

[7] Dodd-Frank Act, sec. 1013(c)(2)(A), 124 Stat. 1376 (2010) (codified as 12 U.S.C. 5493(c)(2)(A)).

[8] *Id.* at sec. 1036 (codified as 12 U.S.C. 5536).

[9] 15 U.S.C 1691 *et seq*.

[10] U.S. CENSUS BUREAU, 2019 AMERICAN COMMUNITY SURVEY 1-YEAR ESTIMATES, TABLE S1601: LANGUAGE SPOKEN AT HOME (2019), https://data.census.gov/cedsci/table?q=speak%20language%20other%20than%20english&tid=ACSST1Y2019.S1601&hidePreview=false.

[11] *Supra* note 6; *see also* New York City Dept. of Consumer Aff., Lost in Translation (2019), https://www1.nyc.gov/assets/dca/downloads/pdf/partners/LEPDebtCollection_Report.pdf (documenting greater challenges faced by LEP consumers in navigating the consumer debt collection system); Americans for Financial

ADMINRECORD-02420

make it difficult to conduct everyday financial affairs, including understanding and completing key financial documents, managing bank accounts, resolving problems with financial products and institutions, and accessing financial education and money management tools.[12]  Attempts to address these challenges have led to myriad Federal and State statutes and regulations.[13]

Over the past several years, to gain insights to inform policy decisions, the Bureau has engaged with stakeholders on fair lending compliance topics and access to credit issues.  The Bureau participated in robust information-gathering activities, including meetings with consumer and civil rights advocacy organizations, other Federal agencies, policymakers, representatives from financial institutions of various sizes, and trade associations to obtain feedback on the provision of financial products and services to LEP consumers.  Bureau leadership and staff presented on LEP-related topics and gathered feedback from stakeholders at conferences and

---

Reform, Barriers to Language Access in the Housing Market: Stories from the Field (May 2016), https://ourfinancialsecurity.org/wp-content/uploads/2016/05/AFR_LEP_Narratives_05.26.2016.pdf; Edward Golding, Laurie Goodman, and Sarah Strochak, Urban Institute, Is Limited English Proficiency a Barrier to Homeownership? (2018), https://www.urban.org/research/publication/limited-english-proficiency-barrier-homeownership.

[12] CFPB, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace (Nov. 2017), https://www.consumerfinance.gov/data-research/research-reports/spotlight-serving-limited-english-proficient-consumers/; *see also* FDIC, 2013 FDIC National Survey of Unbanked and Underbanked Households, 16-17 (Oct. 2014), https://www.fdic.gov/householdsurvey/2013report.pdf (finding that 34.9 percent of households where Spanish is the only language spoken are "unbanked," compared to just 7.1 percent of households where Spanish is not the only language spoken); U.S. Government Accountability Office, Factors Affecting the Financial Literacy of Individuals with Limited English Proficiency at Highlights, GAO-10-518 (May 2010), http://www.gao.gov/assets/310/304561.pdf.

[13] *See, e.g.*, 12 CFR 1005.31(g)(1)(i) (requiring disclosures in languages other than English in certain circumstances involving remittance transfers); 12 CFR 1026.24(i)(7) (addressing obligations relating to advertising and disclosures in languages other than English for closed-end credit); 12 CFR 1002.4(e) (providing that disclosures made in languages other than English must be available in English upon request); 12 CFR 1005.18(b)(9) (requiring financial institutions to provide pre-acquisition disclosures in a foreign language if the financial institution uses that same foreign language in connection with the acquisition of a prepaid account in certain circumstances); Cal. Civ. Code sec. 1632(b) (as amended Sept. 25, 2020) (requiring that certain agreements "primarily" negotiated in Spanish, Chinese, Tagalog, Vietnamese, or Korean must be translated to the language of the negotiation under certain circumstances); Or. Rev. Stat. sec. 86A.198 (requiring a mortgage banker, broker, or originator to provide translations of certain notices related to the mortgage transaction if the banker, broker, or originator advertises and negotiates in a language other than English under certain circumstances); Tex. Fin. Code Ann. sec. 341.502(a-1) (providing that for certain loan contracts negotiated in Spanish, a summary of the loan terms must be made available to the debtor in Spanish in a form identical to required TILA disclosures for closed-end credit); 6 RCNY sections 5-77 (imposing certain language-related requirements on debt collection entities).

ADMINRECORD-02421

other external and internal events.  In addition, the Bureau conducted research on complaints submitted to the Bureau reflecting LEP consumers' experience with financial institutions.  These efforts resulted in the Bureau's November 2017 publication, *Spotlight on serving limited English proficient consumers*.[14]  In addition, the Bureau's 2016 Fall edition of *Supervisory Highlights* provides supervisory observations regarding financial institutions' provision of non-English language services to LEP consumers.[15]

Since that time, the Bureau has continued its work on LEP-related issues.  In the Bureau's 2019 Fair Lending Report to Congress, the Director identified that "[o]ne particular fair lending issue ripe for innovative solutions is making financial products and services more accessible to consumers who are unbanked and underbanked, including those who are Limited English Proficient."[16]

In July 2020, the Director held an LEP Consumer and Industry Roundtable that convened representatives from consumer and civil rights advocacy organizations, policymakers, industry, and trade associations.  The Bureau has also received input through numerous stakeholder meetings, comments to rulemakings, and various Requests for Information (RFIs) regarding

---

[14] CFPB, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace (Nov. 2017), https://www.consumerfinance.gov/data-research/research-reports/spotlight-serving-limited-english-proficient-consumers/.

[15] *See* CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 21-26 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf; s*ee also* CFPB, ECOA Baseline Review Module 4, 13-14, 21-22 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (These modules are used by CFPB examination teams to conduct ECOA Baseline Reviews to evaluate how an institution's CMS identifies and manages fair lending risk under ECOA.  The observations described in the referenced LEP section of *Supervisory Highlights* resulted from, at least in part, Bureau examiners' review of financial institutions' fair lending risks and controls related to servicing options for LEP consumers).

[16] CFPB, FAIR LENDING REPORT OF THE BUREAU OF CONSUMER FINANCIAL PROTECTION (April 2020), 1, https://files.consumerfinance.gov/f/documents/cfpb_2019-fair-lending_report.pdf.

ADMINRECORD-02422

access to credit for LEP consumers.[17]  Many of these responsive comments and submissions urged the Bureau to provide additional guidance to institutions seeking to expand their offering of products and services to LEP consumers while maintaining compliance with applicable laws.[18]

Most recently, on August 3, 2020, the Bureau issued an RFI "to identify opportunities to prevent credit discrimination, encourage responsible innovation, promote fair, equitable, and nondiscriminatory access to credit, address potential regulatory uncertainty, and develop viable solutions to regulatory compliance challenges under the ECOA and Regulation B."[19]  Among the requests, the Bureau sought information that would enable it "to understand the challenges specific to serving LEP consumers and to find ways to encourage creditors to increase assistance to LEP consumers."[20]  Specifically, the RFI asked:

> Should the Bureau provide additional clarity under ECOA and/or Regulation B to further encourage creditors to provide assistance, products, and services in languages other than English to consumers with limited English proficiency?  If so, in what way(s)?[21]

---

[17] *See, e.g.*, CFPB, Request for Information on the Equal Credit Opportunity Act and Regulation B, 85 FR 46600-46603 (Aug. 3, 2020); CFPB, Request for Information to Assist the Taskforce on Federal Consumer Financial Law, 85 FR 18214–18217 (Apr. 1, 2020); CFPB, Request for Information Regarding the Bureau's Adopted Regulations and New Rulemaking Authorities, 83 FR 12286–12289 (Mar. 21, 2018).

[18] *See, e.g.*, U.S. Chamber of Com. Center for Capital Markets Competitiveness, Comment Letter on Request for Information Regarding the Bureau's Inherited Regulations and Inherited Rulemaking Authorities, Docket No. CFPB-2018-0012, 5-6 (June 25, 2018); Mortgage Bankers Association, Comment Letter on Request for Information Regarding the Bureau's Adopted Regulations and New Rulemaking Authorities, Docket No. CFPB-2018-0011, 27-28 (June 19, 2018); Americans for Financial Reform *et al.*, Comment to CFPB's Proposed Debt Collection Rule (Sept. 18, 2019), https://www.consumeradvocates.org/sites/default/files/2019.9.18%20Debt%20Collection%20-%20Language%20Access%20Comment%20Letter_0.pdf (comment of 43 consumer, civil and human rights, labor, community, housing, and legal services organizations recommending certain protections for LEP consumers in the Bureau's proposed debt collection rule).

[19] CFPB, Request for Information on the Equal Credit Opportunity Act and Regulation B, 85 FR 46600-46603 (Aug. 3, 2020), https://www.federalregister.gov/documents/2020/08/25/2020-18557/request-for-information-on-the-equal-credit-opportunity-act-and-regulation-b-extension-of-comment; CFPB, Request for Information on the Equal Credit Opportunity Act and Regulation B; Extension of Comment Period, 85 FR 165 (Aug. 25, 2020), https://beta.regulations.gov/document/CFPB-2020-0026-0032.

[20] *Id.* at 46601.

[21] *Id.* at 46601-02.

ADMINRECORD-02423

The Bureau received a wide variety of responses to this question from several stakeholder groups, including consumer and civil rights advocacy organizations, financial institutions, industry trade associations, other financial regulators, and individuals.[22]  Almost all commenters recognize the importance of providing products and services to LEP consumers.  Some consumer advocacy organizations request that changes to LEP-related legal requirements take place via notice-and-comment rulemaking.  They also suggest that the Bureau require institutions to develop a Language Access Plan, similar to guidance by other Federal agencies.[23]  Consumer advocacy organizations, financial institutions, and industry trade associations alike encourage the Bureau to provide more translated documents and notices.

Financial institutions and industry trade association commenters advocate for flexibility in serving LEP consumers, including allowing risk-based approaches to decision making related to the scope and support for non-English languages.  These commenters explained that, because

---

[22] *See, e.g.*, Americans for Financial Reform Education Fund Language Access Task Force, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0145; National Community Reinvestment Coalition, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0128; East Bay Community Law Center, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0131; Housing Policy Council, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0103; Consumer Bankers Association, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0147; National Association of Federal Credit Unions, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0135; Anonymous, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0067; National Fair Housing Alliance, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-133; American Financial Services Association, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0140; American Bankers Association, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0143; Center for Capital Markets, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0136; City of Houston City Controller, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0120.

[23] *See, e.g.*, U.S. Dept. of Justice, Language Access Plan (2012), https://www.justice.gov/civil/file/997661/download (noting that its LEP Access Plan is "not intended to create new services or obligations, but to eliminate or reduce limited English proficiency as a barrier or impediment to accessing the core programs and activities of the Civil Division").

ADMINRECORD-02424

there are over 350 languages spoken in the United States, it would be unrealistic and cost-prohibitive for any financial institution to fulfill all the credit needs of all customers in all languages. In addition, industry representatives express uncertainty regarding how to prioritize one language over others and what factors may be considered when institutions seek to provide services in one or more languages.[24] Some industry groups also request clarity regarding marketing in non-English languages, including whether a disclosure describing the extent of services in that language is sufficient on its own to dispel risks that the practice would be considered an unfair, deceptive, or abusive practice.[25]

A few trade associations also underscore the technical, operational, and compliance challenges specific to providing translated documents to LEP consumers. For example, the commenters point to the operational complexity of translating and disseminating documents and data through technology platforms designed to rely on standard English characters.[26] Moreover, if financial institutions do opt to translate documents, they cite uncertainty regarding which documents to translate, how to determine the accuracy of those translations, and how to defend the rationale for selecting particular forms or disclosures for translation.[27] As a result, some of these industry groups assert that providing verbal interpretation via telephone is a more effective short-term solution to improving services for LEP consumers.

---

[24] *See, e.g.*, Housing Policy Council, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0094, 2 (Dec. 1, 2020).

[25] *See, e.g.*, Mortgage Bankers Association, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0115, 4 (Dec. 1, 2020) (noting that some institutions forego providing marketing in non-English languages as a result of the regulatory uncertainty).

[26] *See, e.g.*, Housing Policy Council, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0094, 2 (Dec. 1, 2020).

[27] *See e.g.*, *id.* at 3.

ADMINRECORD-02425

In considering whether and how to offer services to LEP consumers in languages other than English, industry stakeholders express a willingness and desire to serve LEP consumers, but cite challenges related to balancing legal requirements and practical considerations, including resource and operational constraints.  Specifically, these challenges arise in making:

(1) Language selection(s): determining in which non-English language(s) to provide products and services; and

(2) Product and lifecycle selections: deciding (a) which products and services to offer in non-English language(s), and (b) where in the product lifecycle to provide services in non-English language(s).

Industry and trade association stakeholders are particularly concerned about potential fair lending risks under ECOA regarding making and implementing decisions about language selection for non-English language services.  These stakeholders are also concerned about potential UDAAP risks in determining how and in which languages to offer products and services, particularly where not all products and services are provided in languages other than English.  Some of these groups request Bureau clarification that: (1) an inability to offer support in languages other than English, unless specifically required by law, does not violate ECOA or Regulation B, and/or (2) offering support in a specific non-English language and not in other non-English languages is not considered an unfair, deceptive, abusive, or discriminatory practice. These groups also encourage the Bureau to clarify that collecting consumers' language preference information does not violate the ECOA or Regulation B.[28]

---

[28] *See, e.g.*, U.S. Bank, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0110, 3 (Dec. 1, 2020).

9

These legal issues create some uncertainty and can impose costs, which may inhibit some financial institutions from serving LEP consumers.[29]  As a result, LEP consumers may not be able to easily access generally available credit, lower-priced credit, or creditor assistance (whether before or after credit is extended).  The Bureau is issuing this Statement to assist financial institutions seeking to increase access to fair and nondiscriminatory credit for LEP consumers.

*B.  Statement*

This Statement provides principles and guidelines to inform and assist financial institutions in their decision making related to serving LEP consumers.  Section B.1 provides general principles for financial institutions to consider in serving LEP consumers in languages other than English.  Section B.2 provides guidelines institutions can use to help implement those principles and develop compliance solutions, including key considerations to inform those decisions and specific information about common components of a compliance management system (CMS).

### 1.  *Guiding principles for serving LEP consumers*

**The Bureau encourages financial institutions to better serve LEP consumers while ensuring compliance with relevant Federal, State, and other legal requirements**.[30]  Industry stakeholders note that potential legal uncertainty discourages some financial institutions from serving LEP consumers in languages other than English.  The Bureau has also spoken to many

---

[29] The Bureau has a variety of tools that financial institutions can use to reduce legal uncertainty, including the No-Action Letter Policy, Compliance Assistance Sandbox Policy, and Policy to Encourage Trial Disclosure Programs. *See* CFPB, Innovation at the Bureau, https://www.consumerfinance.gov/rules-policy/innovation/ (last accessed 12/14/20).  Similarly, the Bureau's Advisory Opinion program provides written guidance to assist financial institutions in understanding their legal and regulatory obligations through advisory opinions; *see also* CFPB, Advisory Opinion program, https://www.consumerfinance.gov/compliance/advisory-opinion-program/ (last accessed 12/14/20) (published in the *Federal Register* at 85 FR 77987 (Dec. 3, 2020)).

[30] *See, e.g., supra* note 13.

ADMINRECORD-02427

financial institutions that nevertheless choose to serve LEP consumers in myriad ways and to varying degrees.[31]  The Bureau encourages institutions to better serve LEP consumers by applying the principles and guidelines in this Statement.  The Bureau anticipates that if financial institutions do so, there will continue to be variations among financial institutions in the manner, and the extent to which, they provide products and services to LEP consumers.

**Financial institutions that wish to implement pilot programs or other phased approaches for rolling out LEP-consumer-focused products and services may consider doing so in a manner consistent with the guidelines in section B.2 of this Statement**.  Phased approaches may allow financial institutions to serve LEP consumers incrementally while managing risks and taking steps to ensure compliance with appliable laws.

**Financial institutions may consider developing a variety of compliance approaches related to the provision of products and services to LEP consumers consistent with the guidelines in section B.2 of this Statement**.  Factors relevant in the compliance context may vary depending on the size, complexity, and risk profile of an institution.[32]  Therefore, differences in financial institutions and the ways they choose to serve LEP consumers will likely require different compliance solutions.

---

[31] *See, e.g.*, CFPB, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace, 8-10 (Nov. 2017), https://www.consumerfinance.gov/data-research/research-reports/spotlight-serving-limited-english-proficient-consumers/ (providing insights from financial institutions about serving LEP consumers, including assessment of language needs, centralized point of contact for technical assistance, translation and interpretation systems, training and support for staff and contractors, and interactions with consumers).

[32] CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 25 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf; s*ee also* CFPB, ECOA Baseline Review Module 2, 6 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (providing instructions to Bureau examiners on evaluating a financial institution's fair lending CMS, including its approach to managing the fair lending risks posed by its service providers).

ADMINRECORD-02428

**Financial institutions may mitigate certain compliance risks by providing LEP consumers with clear and timely disclosures in non-English languages describing the extent and limits of any language services provided throughout the product lifecycle**.[33]  In those disclosures, financial institutions may provide information about the level of non-English language support as well as communication channels through which LEP consumers can obtain additional information and ask questions.

**Financial institutions may wish to consider extending credit pursuant to a legally compliant special purpose credit program (SPCP) to increase access to credit for certain underserved LEP consumers**.  Regulation B, which implements the ECOA, sets forth standards and general rules for SPCPs.[34]  By permitting the consideration of a prohibited basis such as race or national origin in connection with an SPCP, ECOA and Regulation B provide creditors with a tool to help meet the credit needs of underserved communities.  The Bureau recently issued an advisory opinion to provide stakeholders with guidance concerning how to develop and implement an SPCP.[35]  While SPCPs are a useful tool to further that goal, financial institutions may responsibly serve LEP consumers without the use of SPCPs.

---

[33] *See* CFPB, Supervisory Highlights: Fall 2016, 23 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf (referencing supervisory observations of fair lending risks related to marketing only some available credit card products to Spanish-speaking consumers, while marketing several additional credit card products to English-speaking consumers.  To mitigate any compliance risks related to these practices, one or more financial institutions revised their marketing materials to notify consumers in Spanish of the availability of other credit card products and included clear and timely disclosures to prospective consumers describing the extent and limits of any language services provided throughout the product lifecycle).

[34] 12 CFR 1002.8.

[35] CFPB, Advisory Opinion: Equal Credit Opportunity Act (Regulation B) Special Purpose Credit Programs (Dec. 2020), https://files.consumerfinance.gov/f/documents/cfpb_advisory-opinion_special-purpose-credit-program_2020-12.pdf.

ADMINRECORD-02429

## 2. *Guidelines for developing compliance solutions when serving LEP consumers*

Financial institutions may use the following key considerations and CMS guidelines to mitigate ECOA, UDAAP, and other legal risks when making threshold determinations and other decisions related to serving LEP consumers in languages other than English.[36]

### a. *Key considerations*

#### i. Language Selection

In determining whether to provide non-English language services to LEP consumers and in which language(s), financial institutions may consider documented and verifiable information (*e.g.*, the stated language preferences of its current customers[37] or U.S. Census Bureau demographic or language data[38]). For example, the Bureau has previously noted that some nationwide institutions largely focus on serving Spanish-speaking consumers, while regional institutions typically align any language services with local demographics.[39]

---

[36] Although in a different context, other agencies have provided similar guidance in an attempt to increase access to services for LEP individuals. *See, e.g.,* U.S. Dept. of Housing and Urban Dev., Office of General Counsel Guidance on Fair Housing Act Protections for Persons with Limited English Proficiency (2016), https://www.hud.gov/sites/documents/LEPMEMO091516.PDF ("This guidance discusses how the Fair Housing Act applies to a housing provider's consideration of a person's limited ability to read, write, speak or understand English. Specifically, this guidance addresses how the disparate treatment and discriminatory effects methods of proof apply in Fair Housing Act cases in which a housing provider bases an adverse housing action–such as a refusal to rent or renew a lease–on an individual's limited ability to read, write, speak or understand English."); U.S. Dept. of Justice, Language Access Plan (2012), https://www.justice.gov/civil/file/997661/download ("This policy and the LEP Access Plan are not intended to create new services or obligations, but to eliminate or reduce limited English proficiency as a barrier or impediment to accessing the core programs and activities of the Civil Division."); U.S. Dept. of Justice, Common Language Access Questions, Technical Assistance, and Guidance for Federally Conducted and Federally Assisted Programs (Aug. 2011), https://www.lep.gov/sites/lep/files/resources/081511_Language_Access_CAQ_TA_Guidance.pdf.

[37] *See infra* section B.2.a.iii for additional information on language preference collection and tracking.

[38] *See* SUPERVISORY HIGHLIGHTS: FALL 2016, 21-22 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[39] CFPB, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace, 8 (Nov. 2017), https://files.consumerfinance.gov/f/documents/cfpb_spotlight-serving-lep-consumers_112017.pdf.

13

ii.    <u>Product and Service Selection</u>

In determining which products and services to offer in languages other than English, financial institutions may consider a variety of factors, including the extent to which LEP consumers use particular products and the availability of non-English language services.[40]

In determining when during the product lifecycle financial institutions can offer services in non-English languages and the extent of those services, financial institutions may consider activities and communications—whether verbal or written—that most significantly impact consumers.  To determine whether a verbal or written communication is one that significantly impacts consumers, financial institutions may consider whether the communication conveys essential information about credit terms and conditions (*e.g.*, loan pricing), or about borrower obligations and rights, including those related to delinquency and default servicing, loss mitigation, and debt collection.  Financial institutions may also consider existing customer data on what services LEP consumers use most frequently.[41]

In making product and service selections, financial institutions should review relevant policies, procedures, and practices for features that may pose heightened risk of unlawful discrimination, including distinctions in product offerings or terms related to prohibited bases (*e.g.*, national origin, age) or proxies for prohibited bases (*e.g.*, geography).[42]

---

[40] *See infra* section B.2.a.iii for additional information on language preference collection and tracking.

[41] *Id.*

[42] *See* 12 CFR 1002.4(a); *see also* CFPB, ECOA Baseline Review Module 2, 8 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (instructing examiners to review aspects of institutions' policies and procedures that may pose heightened fair lending risk); *In re American Express Centurion Bank*, No. 2017-CFPB-0016 (Aug. 23, 2017), https://files.consumerfinance.gov/f/documents/201708_cfpb_american-express_content-order.pdf (taking action against two American Express banking subsidiaries for discriminating against certain consumers with Spanish-language preferences, and consumers in Puerto Rico, the U.S. Virgin Islands, and other U.S. territories by charging them higher interest rates, imposing stricter credit cutoffs, and providing less debt forgiveness compared to consumers without Spanish-language preferences or addresses in Puerto Rico and the U.S. territories).

ADMINRECORD-02431

iii.    Language Preference Collection and Tracking

Financial institutions may collect and track customer language information in a variety of ways to facilitate communication with LEP consumers in non-English languages.[43]  For example, in 2017, the Bureau issued an official approval of the final redesigned Uniform Residential Loan Application (URLA) that was to include a question to collect mortgage applicants' language preference.[44]  Although the Federal Housing Finance Agency (FHFA) later opted to remove the language preference question from the URLA, the Bureau has not rescinded the approval, which confirms that financial institutions' use of the URLA containing the question identifying a mortgage applicant's language preference does not violate Regulation B sections 1002.5(b) – (d) or the ECOA.[45]  The Bureau specifically reviewed the language preference question with respect to Regulation B, section 1002.5(b) concerning requests for information about national origin and determined it to be compliant.  Financial institutions can use similar questions to collect customer language preference information outside of the mortgage context.  Financial

---

[43] CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 21 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[44] The URLA question stated:

**Language Preference – Your loan transaction is likely to be conducted in English**.  This question requests information to see if communications are available to assist you in your preferred language.  Please be aware that communications may NOT be available in your preferred language.

*Optional* – Mark the language you would prefer, if available:

O English O Chinese O Korean O Spanish O Tagalog O Vietnamese O Other: _____ O I do not wish to respond

Your answer will NOT negatively affect your mortgage application.  Your answer does not mean the Lender or Other Loan Participants agree to communicate or provide documents in your preferred language.  However, it may let them assist you or direct you to persons who can assist you.

Language assistance and resources may be available through housing counseling agencies approved by the U.S. Department of Housing and Urban Development.  To find a housing counseling agency, contact one of the following Federal government agencies:

• U.S. Department of Housing and Urban Development (HUD) at (800) 569-4287 or www.hud.gov/counseling.
• Consumer Financial Protection Bureau (CFPB) at (855) 411-2372 or www.consumerfinance.gov/find-a-housing-counselor.

[45] 82 FR 55810 (Nov. 20, 2017).

ADMINRECORD-02432

institutions do not violate the ECOA or Regulation B when they collect the language preference of an applicant or borrower in a credit transaction.

However, financial institutions should ensure that information collected about a consumer's language preference is not used in a way that violates applicable laws.  For example, the Bureau has brought enforcement actions against institutions for violations that resulted, at least in part, from the exclusion of consumers with non-English language preferences from offers provided to similarly situated consumers without those language preferences.[46]  Financial institutions choosing to collect and track customer language preferences should consider closely monitoring how that information is used within the institution to ensure compliance with applicable laws.[47]

iv.    <u>Translated Documents</u>

Financial institutions must adhere to Federal and State laws requiring that they provide consumers with translated documents under certain circumstances.[48]  Nothing in this Statement alters the applicability of those requirements.

If the translation of documents is not legally mandated, financial institutions may assess whether and to what extent to provide translated documents to consumers.  Financial institutions may conduct these assessments and document the related decisions consistent with the guidelines

---

[46] *See, e.g.*, *In re Synchrony Bank*, No. 2014-CFPB-0007 (June 19, 2014), http://files.consumerfinance.gov/f/201406_cfpb_consent-order_synchrony-bank.pdf (citing violations of ECOA resulting from the exclusion of consumers from offers that would otherwise have been provided but for the Bank's language preference flag and/or the fact that the consumers had addresses in Puerto Rico or the U.S. territories*); In re American Express Centurion Bank*, No. 2017-CFPB-0016 (Aug. 23, 2017), https://files.consumerfinance.gov/f/documents/201708_cfpb_american-express_content-order.pdf (taking action against two American Express banking subsidiaries for discriminating against certain consumers with Spanish-language preferences, and consumers in Puerto Rico, the U.S. Virgin Islands, and other U.S. territories by charging them higher interest rates, imposing stricter credit cutoffs, and providing less debt forgiveness compared to consumers without Spanish-language preferences or addresses in Puerto Rico and the U.S. territories).

[47] *See infra* section B.2.b.ii on CMS-related monitoring.

[48] *See, e.g.*, *supra* note 13.

16

provided in section B.2.b.i.  Financial institutions that choose to provide translated documents to LEP consumers, must ensure the accuracy of those translations[49] and should seek to prioritize communications and activities that most significantly impact consumers.[50]

In addition, financial institutions may wish to use translated documents provided by the Bureau and other government agencies.[51]  Links to the Bureau's LEP-related resources, including glossaries of financial terms, can be found on its website.[52]  The Bureau is committed to continuing to provide more translated documents in the future.

b. *Generally applicable CMS guidelines*

Financial institutions can mitigate fair lending and other risks associated with providing services in languages other than English by implementing a strong compliance management system that affirmatively considers how to serve LEP consumers in a compliant manner. Financial institutions serving LEP consumers may: (1) develop an LEP-specific CMS, or (2)

---

[49] Several Federal financial regulatory agencies have published translated forms, disclosures, and glossaries for use by financial institutions in ensuring the accuracy and consistency in translated terms.  *See, e.g.*, CFPB, Glossary of English-Spanish Financial Terms (Oct. 2018), https://files.consumerfinance.gov/f/documents/cfpb_adult-fin-ed_spanish-style-guide-glossary.pdf; CFPB, Glossary of English-Chinese Financial Terms (Feb. 2019), https://files.consumerfinance.gov/f/documents/cfpb_adult-fin-ed_chinese-style-guide-glossary.pdf; FHFA, Mortgage Translations Home, https://www.fhfa.gov/MortgageTranslations (includes Mortgage Translations clearinghouse, an easy-to-use collection of translated documents and tools to assist lenders, servicers, housing counselors, and others in helping LEP mortgage borrowers).

[50] *See supra* section B.2.a.ii on product and service selection, providing considerations for assessing whether written or verbal communications significantly impact consumers; *see, e.g.*, U.S. Dept. of Housing and Urban Development, Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 2736 (Jan. 2007), https://www.federalregister.gov/documents/2007/01/22/07-217/final-guidance-to-federal-financial-assistance-recipients-regarding-title-vi-prohibition-against (highlighting that "[t]he decision as to what program-related documents should be translated into languages other than English is a complex one" and describing factors that recipients of Federal financial assistance can consider in "deciding: (1) [w]hat documents should be translated; (2) what target languages other than English are appropriate; and (3) whether more effective alternatives exist").

[51] *See, e.g.*, CFPB, Loan estimate and closing disclosure forms and samples, https://www.consumerfinance.gov/policy-compliance/guidance/mortgage-resources/tila-respa-integrated-disclosures/forms-samples/ (linking to various Spanish versions of TRID model and sample forms); FHFA, Mortgage Translations Home, https://www.fhfa.gov/MortgageTranslations.

[52] CFPB, Helping newcomers and multilingual communities, https://www.consumerfinance.gov/language/.

ADMINRECORD-02434

integrate an LEP focus into the financial institution's broader fair lending, UDAAP, and/or consumer compliance CMS.  To be most effective, the CMS coverage should be comprehensive and commensurate with the financial institution's size, complexity, and risk profile.[53]

Common features of a well-developed CMS include: a compliance program (*i.e.*, policies and procedures, training, monitoring and/or audit, and consumer complaint response) and third-party service provider oversight.[54]  In the fair lending context, financial institutions should consider an in-depth review of policies and procedures for products containing features that may pose heightened risk of unlawful discrimination.[55]  The following subsections provide specific detail about components that can be included (or refined if existing) in a financial institution's CMS to mitigate fair lending and other risks associated with providing products and services in non-English languages.

i.    Documentation of decisions

A well-developed CMS will sufficiently document applicable policies, procedures, and decision making.[56] The Bureau strongly encourages financial institutions providing products and services in non-English languages to document decisions related to the selection of: (1)

---

[53] *Supra*, note 32.

[54] *See* CFPB, SUPERVISORY HIGHLIGHTS: SUMMER 2013, (Aug. 2013), https://files.consumerfinance.gov/f/201308_cfpb_supervisory-highlights_august.pdf (discussing the pillars of a well-functioning CMS); *see also* CFPB, ECOA Baseline Review Module 2, 6 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (providing instructions to Bureau examiners on evaluating a financial institution's fair lending CMS, including its approach to managing the fair lending risks posed by its service providers).

[55] *See* 12 CFR 1002.4(a); *see also* CFPB, ECOA Baseline Review Module 2, 8 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (instructing examiners to review aspects of institutions' policies and procedures that may pose heightened fair lending risk, including (1) particular incentives created by employee compensation or performance goal structures (both compensation and non-compensation based); (2) discretion over underwriting, pricing, or product selection (*e.g.*, steering risk); or (3) distinctions related to geography or prohibited bases).

[56] SUPERVISORY HIGHLIGHTS: FALL 2016, 24 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

ADMINRECORD-02435

language(s), (2) product(s), and (3) service(s).[57]  Documentation may include anything that a financial institution considers in making the language(s), product(s), or service(s) decision, including infrastructure, systems, or other operational limitations; cost estimates; or any other information that allows a regulator to understand the decision-making process.

For example, that documentation may include any information that the financial institution considered in selecting a particular language or languages in which to serve LEP consumers (*e.g.*, the stated language preferences of its current customers[58] or U.S. Census Bureau demographic or language data[59]).  In addition, the documentation may include the reasons for selecting particular products and services, including the extent of non-English language communications and other customer support resources.  The documentation may also include the financial institution's plan to phase-in additional languages, products, or services over time.

Financial institutions seeking to expand language, product, and/or service offerings, may document the existing offerings and decisions related to expanded offerings.  In determining whether to expand or discontinue particular products or services, financial institutions may consider documenting the extent of consumer use (or lack thereof) of those product and service offerings.

---

[57] *See id*. at 23 (underscoring that the lack of documentation describing how one or more institutions decided to exclude certain products from Spanish language marketing raised questions about the adequacy of the institution's fair lending-related CMS).

[58] *See supra* section B.2.a.iii for additional information on language preference collection and tracking.

[59] *See* SUPERVISORY HIGHLIGHTS: FALL 2016, 21-22 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

ADMINRECORD-02436

ii.  <u>Monitoring</u>

Common features of a well-developed CMS include quality assurance testing and monitoring of business transactions and processes.[60]  The Bureau encourages financial institutions providing services in languages other than English to regularly monitor those services, including changes in those services, for fair lending and UDAAP risks.[61] For example, financial institutions should consider assessing the quality of customer assistance provided in non-English languages, including by assessing whether personnel receive the same training, convey the same information, and have the same authority as other customer service personnel.[62]

In addition, financial institutions should consider monitoring or conducting regular fair lending and UDAAP-related assessments of their advertising, including promotional materials and marketing scripts for new products.[63]  If institutions market products to particular populations, including LEP consumers, they should consider the nature and extent of that

---

[60] *Id*. at 24.

[61] *See id*. at 24-25; *see also In re Synchrony Bank*, No. 2014-CFPB-0007 (June 19, 2014), http://files.consumerfinance.gov/f/201406_cfpb_consent-order_synchrony-bank.pdf (citing violations of ECOA resulting from the exclusion of consumers from offers that would otherwise have been provided but for the Bank's language preference flag and/or the fact that the consumers had addresses in Puerto Rico or the U.S. territories); *In re American Express Centurion Bank,* No. 2013-CFPB-0011 (Dec. 24, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent_amex_centurion_011.pdf (citing the institution for, among other things, deceptive acts or practices in telemarketing of a credit card add-on product to Spanish-speaking customers in Puerto Rico because the institution did not adequately alert consumers enrolling via Spanish-language telemarketing calls about the steps necessary to receive and access the full product benefits).

[62] CFPB, ECOA Baseline Review Module 4, 13-14, 21-22 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (instructing examiners to evaluate institutions' fair lending risk related to servicing options for LEP consumers).

[63] *See* CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 25 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf; *see also* CFPB, Unfair, Deceptive, or Abusive Acts or Practices Examination Procedures, Management and Policy-Related Examination Procedures, 13-16 (Oct. 2012), https://files.consumerfinance.gov/f/documents/102012_cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf (The Bureau's examiners use UDAAP Examination Procedures to assess the quality of the financial institution's CMS, including internal controls and policies and procedures, for avoiding unfair, deceptive, or abusive acts or practices.  The Management and Policy-Related Examination Procedures, specifically, describe UDAAP-related transaction testing of (1) marketing and disclosures, (2) availability of terms and services as advertised, and (3) availability of actual credit to the consumer.).

ADMINRECORD-02437

marketing and whether any particular populations are missing or excluded.[64] Furthermore, institutions should consider reviewing new products, as well as changes in the terms and conditions of existing products, for potential UDAAP concerns to determine whether their internal controls are adequate.

Financial institutions should also ensure that marketing, disclosures, and other materials are appropriately designed to ensure accurate understanding by LEP consumers.[65]  In 2013, the Bureau brought an enforcement action against a financial institution for illegal credit card practices, including deceptive marketing with respect to credit card "add-on products" (*i.e.*, payment protection and credit monitoring).[66] While sales calls to enroll the vast majority of Puerto Rico consumers in this product were conducted in Spanish, the institution did not provide uniform Spanish-language scripts for these enrollment calls, and all written materials provided to consumers were in English.[67]

---

[64] *See In re Synchrony Bank, No. 2014-CFPB-0007* (June 19, 2014), http://files.consumerfinance.gov/f/201406_cfpb_consent-order_synchrony-bank.pdf (citing violations of ECOA resulting from the exclusion of consumers from offers that would otherwise have been provided but for the Bank's language preference flag and/or the fact that the consumers had addresses in Puerto Rico or the U.S. territories).

[65] *See In re American Express Centurion Bank,* No. 2013-CFPB-0011 (Dec. 24, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent_amex_centurion_011.pdf (citing the institution for, among other things, deceptive acts or practices in telemarketing of a credit card add-on product to Spanish-speaking customers in Puerto Rico because the institution did not adequately alert consumers enrolling via Spanish-language telemarketing calls about the steps necessary to receive and access the full product benefits); *see also Federal Trade Commission v. Mortgages para Hispanos.com,* (Case No. 4:06-cv-00019 (E.D.Tex. 2006) (bringing an action against a company targeting Hispanic homeowners for a home refinance which was negotiated in Spanish but presented English-language closing documents with different, less favorable terms).  Several Federal and State financial regulatory agencies have published translated forms, disclosures, and glossaries for use by financial institutions in ensuring the accuracy and consistency in translated terms.  *See, e.g.*, CFPB, Glossary of English-Spanish Financial Terms (Oct. 2018), https://files.consumerfinance.gov/f/documents/cfpb_adult-fin-ed_spanish-style-guide-glossary.pdf; CFPB, Glossary of English-Chinese Financial Terms (Feb. 2019), https://files.consumerfinance.gov/f/documents/cfpb_adult-fin-ed_chinese-style-guide-glossary.pdf; FHFA, Mortgage Translations Home, https://www.fhfa.gov/MortgageTranslations (includes FHFA's Mortgage Translations Clearinghouse, an easy-to-use collection of translated documents and tools to assist lenders, servicers, housing counselors, and others in helping LEP mortgage borrowers).

[66] *See In re American Express Centurion Bank,* No. 2013-CFPB-0011 (Dec. 24, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent_amex_centurion_011.pdf.

[67] *Id.*

ADMINRECORD-02438

iii.    <u>Fair lending testing</u>

Common features of a well-developed CMS include regular statistical analysis of loan-level data for potential disparities on a prohibited basis (*e.g.*, national origin) in underwriting, pricing, or other aspects of the credit transaction, including in mortgage and non-mortgage products (*e.g.*, credit cards, auto lending, small business lending, and student lending).[68]

iv.    <u>Third-party vendor oversight</u>

If a financial institution contracts with service providers to offer any products or services to LEP consumers on behalf of the financial institution, it should ensure that the products and services provided to LEP consumers do not violate applicable laws or pose fair lending or UDAAP risks to LEP consumers.[69]  Those financial institutions should implement a service provider oversight program that incorporates a review of fair lending, UDAAP, and other applicable laws.[70]  While third-parties may offer a host of essential products and services to LEP consumers, some of which are provided in languages other than English,[71] financial institutions'

---

[68] CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 24-25 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[69] *See, e.g.*, *In re American Express Centurion Bank,* No. 2013-CFPB-0011 (Dec. 24, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent_amex_centurion_011.pdf (referring to marketing practices that involved three of the institution's subsidiaries and their vendors and telemarketers, who engaged in misleading and deceptive tactics to sell some of the company's credit card add-on products.  Pursuant to the Consent Order, American Express was required to continue to strengthen its management of third-party vendors who provided the subject add-on products).

[70] *See* CFPB, SUPERVISORY HIGHLIGHTS: SUMMER 2013 (Aug. 2013), https://files.consumerfinance.gov/f/201308_cfpb_supervisory-highlights_august.pdf (providing findings related to service provider oversight reviews); *see also* CFPB Bulletin 2012-03 (April 12, 2012) http://files.consumerfinance.gov/f/201204_cfpb_bulletin_service-providers.pdf (providing the Bureau's expectations of service provider relationships).

[71] For example, the Bureau is aware that some of the National Credit Reporting Agencies provide Interactive Voice Response (IVR) phone support in Spanish.

ADMINRECORD-02439

service provider oversight programs should consider focusing particular attention on third parties who participate in underwriting or pricing decisions.[72]

### 3. *Conclusion*

Recognizing the compliance risks and uncertainty that many financial institutions raise as challenges to better serving LEP consumers in non-English languages, the Bureau is issuing this Statement to outline compliance principles and guidelines that encourage financial institutions to expand access to products and services for LEP consumers.

Nothing in this Statement should be interpreted to relieve institutions from their obligation to comply with laws applicable to providing financial products and services to LEP consumers. Nor does this Statement mandate any particular approach to serving LEP consumers.[73]

## II. Signing Authority

The Director of the Bureau, Kathleen L. Kraninger, having reviewed and approved this document, is delegating the authority to electronically sign this document to Grace Feola, a Bureau Federal Register Liaison, for purposes of publication in the *Federal Register*.

Dated: January 13, 2021.

_____

**Grace Feola**,

*Federal Register Liaison, Bureau of Consumer Financial Protection.*

---

[72] *See* CFPB, ECOA Baseline Review Module 2, 9 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (instructing examiners to evaluate institutions' compliance program policies and procedures related to its third-party monitoring and audit functions).

[73] This Statement does not impose any legal requirements on external parties, nor does it create or confer any substantive rights on external parties that could be enforceable in any administrative or civil proceeding.

ADMINRECORD-02440