Exhibit R



# DISCRIMINATION IS "UNFAIR"

## Interpreting UDA(A)P to Prohibit Discrimination

April 2021

Prepared by:

Stephen Hayes
Partner

Kali Schellenberg
Attorney



ADMINRECORD-05546

# About the Authors

Stephen Hayes is a Partner at Relman Colfax. Stephen originally joined the firm in 2011 and returned in 2018 after several years at the Consumer Financial Protection Bureau (CFPB). His work focuses on designing best-in-class practices on a range of civil rights and consumer protection issues. Stephen has also represented individuals and organizations in numerous discrimination actions.

Kali Schellenberg is an Attorney at Relman Colfax. Her civil rights litigation practice includes cases involving discrimination in housing and public accommodations.

The views expressed in this article are the authors' alone.

---



Protect Borrowers

ADMINRECORD-05547

DISCRIMINATION IS "UNFAIR"                                                           2021

# Table of Contents

Executive Summary                                                                    04

Introduction                                                                         05

Legal Overview                                                                       07

Primer on UDA(A)P                                                                    07

    Primer on Antidiscrimination Laws                           08

    Resulting Gaps in Antidiscrimination Coverage               10

    Case Study: Student Financial Services                       11

The Interpretive Case for Unfairness-Discrimination Claims                           14

    The Statutory Text and Interpretive Guardrails               14

    Protected Classes                                            16

    Disparate Impact-Specific Considerations                     17

    Assessing the Benefits Across Categories of Unfairness-Discrimination Claims    18

    Opportunities for Agency Action                              20

Conclusion                                                                           22

ADMINRECORD-05548

# Executive Summary

This Article explores a theory that discrimination is a type of "unfair" practice covered by federal and state laws prohibiting unfair, deceptive (and sometimes abusive) acts and practices ("UDA(A)Ps"). An "unfair" practice is defined by statute as something "(1) likely to cause substantial injury to consumers; (2) which is not reasonably avoidable; and (3) that is not outweighed by countervailing benefits to consumers or competition." Discrimination fits neatly within this statutory language, and its incorporation as an unfair practice is consistent with the purposes and traditional guardrails around application of UDA(A)P law, as well as general principles in civil rights jurisprudence. Applying the "unfairness-discrimination" theory would fill important gaps in the existing patchwork of antidiscrimination laws, which currently leave large swaths of the economy unregulated and unprotected from a variety of discriminatory practices, including those with a disparate impact. By taking seriously the plain language of UDA(A)P law, federal entities like the CFPB and FTC, state attorneys general and agencies, and in some cases private individuals, could make great strides towards ensuring that entire markets and industries are not free to discriminate.

ADMINRECORD-05549

# Introduction

The Biden administration has declared racial equity a top priority and directed agencies to work to end discrimination and lift barriers that restrict equal opportunities.[1] The Consumer Financial Protection Bureau ("CFPB"), for its part, has recognized that policies in the financial services industry have caused racial inequality and announced that it will "look more broadly, beyond fair lending"—its traditional antidiscrimination purview— "to identify and root out unlawful conduct that disproportionately impacts communities of color and other vulnerable populations."[2]

That statement of priorities elides (or perhaps alludes to) the reality that traditional interpretations of antidiscrimination laws leave significant gaps. Discrimination—or in some cases, certain forms of discrimination—are not expressly prohibited or regulated in large swaths of our nation's economy. The existing patchwork of antidiscrimination laws creates anomalies, even just within financial services markets. For example, financial regulatory agencies focus on *credit* discrimination but historically have not regulated discrimination related to other core consumer financial activities like opening checking accounts, credit reporting, or third-party debt collection. Moreover, while all antidiscrimination laws prohibit intentional discrimination (sometimes called "disparate treatment"), not all have been interpreted to prohibit "disparate impact" discrimination, which is an important tool for eliminating subtle forms of discrimination. Potential gaps are acute with respect to student financial services: there should be no room for doubt that discrimination is illegal and will be regulated with respect to predatory for-profit schools, exotic education-financing arrangements, fraudulent "financial advisory" services, student-specific consumer reporting, and third-party debt collection of student loans. Unfortunately, the current legal waters are muddy in some of these critical areas.

This Article offers a strategy for clarifying coverage and ensuring consistent enforcement—namely, confirming that discrimination is a type of "unfair" practice covered by federal and state laws prohibiting unfair, deceptive (and sometimes abusive) acts and practices ("UDA(A)Ps"). The CFPB and Federal Trade Commission ("FTC") both have authority to regulate "unfair" acts, defined as those that are: (1) likely to cause substantial injury to consumers; (2) which is not reasonably avoidable; and (3) that is not outweighed by countervailing benefits to consumers or competition.[3] FTC Commissioner Rohit Chopra—recently nominated to be the next Director of the CFPB—has advocated this theory, noting that "[d]iscriminatory practices often are three for three, causing grievous harm that cannot be avoided."[4] The current Acting Chair of the FTC, Rebecca Kelly Slaughter, agrees.[5] The Washington Attorney General also recently settled discrimination claims against Facebook under a similar unfairness theory, albeit under a state law that is not identical to federal unfairness laws.[6]

This "unfairness-discrimination" application of UDA(A)P laws is a straightforward legal interpretation. It would also ensure that entire markets and industries are not free to discriminate. Under this application, discrimination is prohibited not just for "creditors" explicitly covered by the Equal Credit Opportunity Act ("ECOA"), but also credit reporting agencies, predatory debt counseling companies, and even ridesharing companies or other entities engaged in interstate commerce.[7] It would bring regulating these discriminatory practices within the purview of federal agencies like the CFPB and FTC. It would also bolster enforcement by state attorneys general and regulatory agencies against discriminatory abuses by entities like predatory for-profit schools. And where permitted by state unfairness statutes, it would empower private enforcement. Finally, this application would ensure that disparate impact liability exists in these areas. In the markets where it has been applied (such as credit, employment, and housing), disparate-impact law has been a critical tool in uncovering hidden forms of discrimination and removing unnecessary barriers to equal access.

> **If the Biden administration and agencies like the CFPB and FTC are serious about racial equity and rooting out unlawful conduct that disproportionately impacts communities of color and other vulnerable populations, they cannot leave entire markets unregulated.**

If the Biden administration and agencies like the CFPB and FTC are serious about racial equity and rooting out unlawful conduct that disproportionately impacts communities of color and other vulnerable populations, they cannot leave entire markets unregulated. Federal and state agencies could pursue this theory in enforcement and supervision immediately. The CFPB and FTC could also engage in rulemaking, which is not necessary but offers additional benefits. Regardless of the vehicle, application of the unfairness-discrimination theory would be a major step toward combating discrimination and advancing equality.

ADMINRECORD-05551

# Legal Overview

## Primer on UDA(A)P

The Federal Trade Commission Act ("FTC Act"), enforced by the FTC, has prohibited unfair or deceptive acts or practices in commerce for almost 70 years. Section 5 of the FTC Act prohibits, in part, "unfair . . . acts or practices in or affecting commerce."[8] The CFPB has independent unfairness authority, granted by Title X of the Dodd-Frank Act. That authority is interpreted similarly to Section 5 of the FTC Act, and the FTC and CFPB have agreed to coordinate their rulemaking and enforcement activities to ensure consistency and avoid duplication.[9]

Both statutes prohibit "unfair" and "deceptive" practices, and the Dodd-Frank Act separately prohibits "abusive" practices.[10] We focus here on "unfairness" because it is an obvious fit for addressing common types of discriminatory conduct.[11] As noted, an "unfair practice" is one that: (1) causes or is likely to cause substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by countervailing benefits to consumers or to competition.[12] In determining whether a practice is unfair, the agencies may "consider established public policies as evidence to be considered with all other evidence," but "public policy considerations may not serve as a primary basis for such determination."[13]

Coverage under both statutes is particularly broad. The FTC Act applies to all persons engaged in interstate commerce.[14] Accordingly, it gives the FTC broad authority to take action against businesses that engage in unfair practices.[15] Certain entities, such as banks, savings associations, and credit unions are exempt from FTC authority, but the banking agencies—the Federal Deposit Insurance Corporation ("FDIC"), Office of the Comptroller of the Currency ("OCC"), the Federal Reserve Board ("Board"), and the National Credit Union Administration ("NCUA")—have authority to enforce Section 5 of the FTC Act for the institutions they supervise.[16]

The CFPB's UDAAP authority generally covers any person (or affiliate or service provider) that offers *any* consumer financial product or service, which is broadly defined. It includes not only credit transactions but also services related to leases, real estate settlements, deposit-taking, transmitting funds, stored value or payment instruments, check cashing, payment processing, financial advisory services like credit counseling and debt management, collecting and providing consumer report information, debt collection, and more.[17] This breadth was in part a congressional response to structural flaws in the financial system prior to Dodd-Frank, including that consumer financial protection was not the primary focus of any single agency and that diffuse responsibilities across agencies had led to regulatory arbitrage and lax regulation in certain areas.[18]

ADMINRECORD-05552

States also have important UDAP authority and can enforce unfairness laws in a variety of ways. First, state attorneys general have authority under Section 1042 of the Dodd-Frank Act to enforce the Act's UDAAP provisions against non-banks and state-chartered financial institutions under their jurisdiction.[19] Second, states have their own UDAP laws on the books, which state attorneys general can enforce. Some of these state UDAP statutes include private rights of action, which present opportunities to litigate emerging unfairness issues. However, state UDAP law varies, and may have significant gaps.[20] Section 1042 and the fact that many states interpret their statutes in light of federal law, can help fill some of those gaps.

# Primer on Antidiscrimination Laws

Unlike federal unfairness law, which reaches across most markets and entities, antidiscrimination law is a patchwork of statutes that often overlap and complement each other, but also leaves notable gaps. A complete survey of antidiscrimination law is beyond the scope of this Article, but the following provides an overview.

## Disparate Treatment and Disparate Impact

As an initial matter, the two traditional forms of discrimination liability are disparate treatment and disparate impact. Disparate treatment occurs when an entity explicitly or intentionally treats people differently based on prohibited factors, such as race, national origin, or sex. Unlike disparate treatment, disparate impact does not require any showing of intent to discriminate or that the protected characteristic was considered at all by the defendant. Instead, the focus of disparate impact is on effects and outcomes. Generally, unlawful disparate impact occurs when a (1) facially neutral policy or practice disproportionately harms members of protected classes, and either (2) the policy or practice does not advance a legitimate interest, or (3) is not the least discriminatory way to serve that interest.[21]

Disparate-impact law has been critical in reducing inequalities in the contexts where it has been applied. As explained below, however, not all antidiscrimination laws have been interpreted to prohibit disparate impact, which significantly limits their effectiveness in combating persistent discrimination.

## Survey of Antidiscrimination Laws

First, ECOA is the primary federal statute prohibiting credit discrimination. ECOA makes it unlawful for "any creditor" to "discriminate against any applicant, with respect to any aspect of a credit transaction" on the basis of membership in a protected class: race, color, religion, national origin, sex (including sexual orientation and gender identity), marital status, age, receipt of public assistance, or the good faith exercise of any right under the Consumer Credit Protection Act.[22] Regulation B, which implements ECOA, makes clear that the antidiscrimination protections also prohibit practices that could discourage "prospective applicants" from

applying for credit.[23] For a transaction to be covered by ECOA, then, it must include involvement of a "creditor," an "applicant" or "prospective applicant," and "credit" as defined by ECOA and Regulation B.[24] ECOA prohibits both disparate treatment and disparate impact.[25]

Second, the FHA, among other things, prohibits any person or other entity from discriminating in housing (including in residential real estate transactions) because of race, color, religion, sex, handicap, familial status, or national origin.[26] Similar to ECOA, the FHA prohibits discriminatory advertising.[27] Because some real estate-related transactions are also credit transactions (for example, home mortgages), certain transactions are covered by both the FHA and ECOA. Like ECOA, the FHA prohibits both disparate treatment and disparate impact.[28]

ECOA and the FHA are the two main antidiscrimination statutes enforced by federal regulatory agencies such as the CFPB, FTC, the Department of Housing and Urban Development ("HUD"), the Department of Justice ("DOJ"), and prudential financial regulatory agencies such as the OCC, FDIC, the Board, and the NCUA. Not all these agencies enforce both statutes (for example, the CFPB and FTC do not have authority over the FHA, while HUD does not have authority over ECOA), and their jurisdiction over matters falling under each varies significantly.

Third, sections of the Civil Rights Act of 1866 also prohibit discriminatory conduct. Section 1981 guarantees to "[a]ll persons within the jurisdiction of the United States" the same right as "white citizens" to "make and enforce contracts."[29] Section 1981 prohibits discrimination on the basis of race, alienage, ethnicity, ancestry, certain religions, and color.[30] Section 1982 has a similar scope, and prohibits intentional discrimination in real and personal property transactions.[31] Both statutes apply to credit and other financial arrangements.[32] These statutes often overlap with ECOA and the FHA (and other antidiscrimination statutes, such as Title VII), but are both broader and narrower in coverage. They are broader in that they are not limited to credit or housing. However, disparate impact is not cognizable under either statute. They also protect fewer classes, and they are not enforced or administered by federal regulatory agencies.

Fourth, some antidiscrimination laws apply only to entities that receive federal funds. For example, Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in programs or activities that receive federal funds.[33] Title IX of the Education Amendments of 1972, in turn, prohibits discrimination on the basis of sex in "any education program or activity receiving federal financial assistance."[34] Title IX is often interpreted similarly to Title VI.[35] Private parties seeking judicial enforcement of Title VI's nondiscrimination protections must prove intentional discrimination.[36] These laws, too, can overlap with other antidiscrimination laws. But they leave out all entities that do not receive such funds and establishing receipt of funds can be complicated.[37]

A collection of other federal antidiscrimination laws exists but are less relevant to the types of discrimination against consumers addressed in this Article.[38]

ADMINRECORD-05554

Finally, most states and localities have their own fair lending, fair housing, and public accommodations antidiscrimination statutes. Some state public accommodations laws are particularly broad, covering discriminatory conduct by nearly all business establishments.[39] These state and local laws often mirror the protections provided by federal law, but cover more protected classes. Some of the more common additional protected classes include familial status, explicit coverage of sexual orientation, creed, explicit coverage of gender identity or gender expression, military/veteran status, source of income, disability, and pregnancy. Some but not all these laws permit disparate impact claims,[40] and in most cases the question simply has not been authoritatively addressed.

## Resulting Gaps in Antidiscrimination Coverage

The patchwork of laws described above leaves notable gaps in coverage. Some are obvious: ECOA applies to credit transactions only; it does not apply, for example, to non-credit transactions like opening deposit accounts without credit components, cashing checks, or predatory scams related to deceptive financial advisory services.[41]

Other gaps are less obvious. Sticking with ECOA, questions inevitably arise when it comes to credit-adjacent and credit-like products, such as leases. Coverage questions also exist even when credit is clearly involved. ECOA broadly applies to "any aspect of a credit transaction."[42] At the same time, ECOA's prohibitions are limited to discrimination against "applicants" and "prospective applicants," which has created uncertainty about ECOA's reach. As one example, creditors are prohibited from discouraging "prospective applicants,"[43] but some regulatory materials have indicated that some marketing discrimination—such as pre-screened solicitations of potential applicants on a prohibited basis—may not violate ECOA.[44] Similarly, ECOA only prohibits conduct by "creditors." That term is defined broadly, including entities that regularly participate in a credit decision or regularly refer applicants or prospective applicants to creditors.[45] But some agency materials have suggested that potential assignees "who establish[] underwriting guidelines for [their] purchases but [do] not influence individual credit decisions" would *not* be creditors subject to ECOA liability—despite the fact that such entities could effectively dictate the substance of credit decisions in entire markets.[46]

To be sure, other existing antidiscrimination laws might apply where ECOA does not. For example, sections 1981 and 1982 prohibit discrimination in contracting and property transactions, respectively, which would cover deposit accounts and other non-credit products. But these laws have their own limitations: they are limited to intentional discrimination, they do not prohibit advertising or other representations that indicate discriminatory preferences, and they cover fewer protected classes.[47] Perhaps more importantly, they are not enforced by federal regulatory agencies like the CFPB, FTC, or DOJ. That means if discriminatory conduct falls outside certain statutes (like ECOA for the CFPB and FTC, and ECOA and the FHA for other banking agencies), it is unregulated by federal agencies. That limitation is crucial: a significant amount of discriminatory conduct is uncovered

ADMINRECORD-05555

through federal investigations and supervision. Many of these agencies have at their disposal extensive pre-suit mechanisms like civil investigative demands and examination authority, which are substantially more robust than the limited investigative tools available to private litigants, especially where a private suit has not been filed or not yet survived a motion to dismiss. These agencies also do not face procedural litigation hurdles related to standing, forced arbitration, or limits on collective relief that are commonly invoked to stymie private enforcement of civil rights.

Similar limitations are present in state and local law. States have varying laws, and even more varying practices for enforcement. As in the federal context, discriminatory conduct that falls outside existing state law and enforcement mechanisms can essentially go unregulated by the states.

## Case Study: Student Financial Services

Racial and national origin disparities are prevalent in financial markets related to higher education. Black and Latino student consumers—who are often less likely to rely on familial wealth to pay for their postsecondary education—take on student debt at a significantly higher rate than their white peers and face unique and substantial hardships in repayment; Black and Latino borrowers are more likely to struggle paying down balances and experience delinquency and default on their student loans.[48] In the six years after starting school, one-in-three Black borrowers and one-in-five Latino borrowers have defaulted on a student loan compared to roughly one-in-ten white borrowers.[49] Communities of color have also been targeted for abusive practices: there is evidence that private student loan companies target Black and Latino borrowers with high-cost, high risk products; debt collectors single out communities of color with illegal practices; loan servicers provide inferior service to borrowers of color, driving them into delinquency and default; and for-profit schools engage in reverse redlining practices that exploit students and communities of color.[50]

> [A]n unfairness discrimination theory would cut through potential coverage questions and ensure regulators, states, and private parties have the legal tools to address disparities in these markets.

The following examples illustrate where an unfairness-discrimination theory would cut through potential coverage questions and ensure regulators, states, and private parties have the legal tools to address disparities in these markets.

First, with respect to discriminatory conduct by schools themselves, there usually will be very strong arguments that these entities are "creditors" covered by ECOA.[51] Many for-profit schools originate their own private student loans, and, even if they do not originate loans, they assist students with the loan process, satisfying ECOA's requirement that a creditor "regularly arrange" for extensions of credit.[52] However, contrary (and in our view incorrect) authority exists.[53]

Second, some industry players have argued (again, in our view incorrectly) that newer higher education financing mechanisms, like income share agreements, are not "credit," and thus outside the purview of ECOA.[54] Similarly, schools could attempt to disguise credit as an account receivable, or otherwise attempt to obscure that amounts owed by students in bills or collections are in fact credit—practices similar to prior allegations against for-profit schools.[55] There is also a long history in consumer financial services of entities attempting to disguise credit transactions to evade regulatory coverage;[56] we can expect variations of these practices to continue, which will contribute to ambiguities.

Third are entities engaged in "financial advisory services." To illustrate: the CFPB brought UDAAP claims against Global Financial Support, alleging Global charged consumers for a generic "financial aid" guidebook, despite consumers believing they were paying for help in actually applying for financial aid or being matched with opportunities tailored to meet their backgrounds.[57] The court agreed with the CFPB that Global was a "covered person" subject to UDAAP because it provided "financial advisory services."[58] Had discrimination been at issue, it would have been less clear that Global was a "creditor," creating uncertainty as to whether ECOA would have applied.[59]

Fourth is third-party student loan debt collection, which might otherwise fall through cracks in antidiscrimination laws. Regulation B is clear that ECOA applies to post-origination conduct such as termination of credit and collection procedures.[60] Some courts, however, have declined to apply ECOA where a loan or debt was assigned by the "creditor" to another party, unless the assignee participated in the original credit decision or the applicant subsequently applied for credit with the assignee.[61] That limitation could leave discrimination by third-party student loan debt collectors unregulated, despite warning signs that potential discrimination in debt collection exists. For example, the CFPB has identified discrimination in debt settlement practices in other markets,[62] and a recent report issued by the Student Borrower Protection Center ("SBPC") and others found a striking pattern of debt collection lawsuits being filed disproportionately in communities of color.[63] Because engaging in debt collection related to any consumer financial product or service makes an entity a covered person subject to CFPB's UDAAP authority, such gaps would be covered.[64]

Fifth are organizations that maintain and sell information on college students, such as the National Student Clearinghouse ("NSC") and MeasureOne. Absent unique circumstances, these entities are unlikely to qualify as "creditors" under ECOA. However, the SBPC has urged the CFPB to supervise the NSC as a consumer reporting agency ("CRA"), similar to Equifax, TransUnion, and Experian.[65] Collecting, analyzing, maintaining, or providing consumer reporting information can qualify an entity as a "covered person" subject to UDAAP authority.[66] We are not aware of any existing discriminatory practices by such entities related to student information. But discriminatory practices, of course, could exist in these CRAs. For example, in a recent decision, Connecticut Fair Housing Center v. CoreLogic Rental Property Solutions, LLC, 478 F. Supp. 3d 259 (D. Conn. 2020), the court permitted FHA disparate impact and disparate treatment claims against a CRA to proceed past summary

judgment. There is no reason to believe discrimination does not occur in student-related markets or that relevant CRA-like entities that sell student information should be immune from antidiscrimination prohibitions.

ADMINRECORD-05558

# The Interpretive Case for Unfairness-Discrimination Claims

## The Statutory Text and Interpretive Guardrails

The most straightforward reading of a statute is often the best. As noted, under both the FTC and Dodd-Frank statutes, a practice is unfair if it is: (1) likely to cause substantial injury to consumers; (2) which is not reasonably avoidable; and (3) that is not outweighed by countervailing benefits to consumers or competition.[67] In the words of Commissioner Chopra: "[d]iscriminatory practices often are three for three."[68] It's hard to argue against that conclusion.

Beginning with the plain text, discrimination and unfairness are often synonymous. The term "unfair" has been used for decades to describe discrimination based on protected classes.[69] Foundational antidiscrimination laws like the "Fair Housing Act" and "Fair Lending" laws reflect this usage.[70] This is true for both disparate treatment and disparate impact: as the Supreme Court stated in *Griggs Duke Power Co.*, when it first approved disparate impact liability, the foundational employment discrimination statute "proscribes not only overt discrimination but also practices that are *fair* in form, but discriminatory in operation."[71] Courts use similar language today: "[I]n disparate-impact cases, effect, not motivation, is the touchstone because a thoughtless housing practice can be as *unfair* to minority rights as a willful scheme."[72] This relationship between discrimination and fairness is intuitive and ubiquitous; discrimination easily fits within the plain text of the operative term "unfair."

> Beginning with the plain text, discrimination and unfairness are often synonymous. The term "unfair" has been used for decades to describe discrimination based on protected classes. Foundational antidiscrimination laws like the "Fair Housing Act" and "Fair Lending" laws reflect this usage.

Of course, under the Dodd-Frank Act or the FTC Act, an act or practice cannot be considered "unfair" unless it satisfies the three statutory elements. Discrimination allegations will ordinarily readily do so. First, viable discrimination claims nearly always involve substantial injury to consumers. The FTC has interpreted this to mean not "trivial or merely speculative harms," but instead, generally, monetary harm.[73] Discrimination claims—whether disparate treatment or disparate impact—can easily satisfy this requirement. In most cases, the alleged

ADMINRECORD-05559

injury is not only the discrimination standing alone (although perhaps the case could be made for these injuries in certain cases), but rather the economic consequences of such discrimination (*e.g.*, paying higher fees, the opportunity costs associated with discriminatory credit denials, and the like). These harms fall neatly into the consumer injury prong, as interpreted by the FTC and CFPB.

Second, discriminatory harms are generally unavoidable by consumers. The requirement that the harm cannot be reasonably avoidable exists because the "marketplace is self-correcting; it is governed by consumer choice and the ability of individual consumers to make their own private decisions without regulatory intervention."[74] The CFPB therefore looks to whether the practice "interferes with [consumers'] ability to effectively make decisions or to take action to avoid injury."[75] This prong is essentially satisfied by definition in cases of discrimination. Where a product or service is denied entirely for discriminatory reasons, there is nothing a consumer can do to avoid the harm. Similarly, in cases of steering into an inferior product or service, a consumer will generally not even know of the discrimination. Accordingly, discrimination is an "obstacle to the free exercise of consumer decision-making,"[76] because consumers are almost never in a position to take action to avoid the injury.

> **Where a product or service is denied entirely for discriminatory reasons, there is nothing a consumer can do to avoid the harm. Similarly, in cases of steering into an inferior product or service, a consumer will generally not even know of the discrimination. Accordingly, discrimination is an "obstacle to the free exercise of consumer decision-making[.]"[1]**

The final prong of the unfairness standard looks at whether the injury is outweighed by countervailing benefits to consumers or competition. The FTC has explained that this analysis is conducted against the reality that business practices "entail a mixture of economic and other costs and benefits for purchasers. . . . The Commission is aware of these tradeoffs and will not find that a practice unfairly injures consumers unless it is injurious in its net effects."[77] This prong, too, dovetails neatly with discrimination claims. Most defendants would be reluctant even to articulate an argument that intentional discrimination against an historically protected class is justified by countervailing benefits to competition or consumers, let alone be able to make a compelling case.

Disparate impact claims, too, align with the third unfairness prong, because a practice that fails the three-step disparate impact analysis is unlikely to be outweighed by benefits to consumers or competition. The second step of the disparate impact analysis asks whether a practice with a disparate impact satisfies a legitimate business need. If not, disparate impact liability will lie. The third prong of the unfairness test would be satisfied as well because there likely is no reasonable argument that a discriminatory practice with no business justification

ADMINRECORD-05560

benefits consumers or competition. Along similar lines, the third step of the disparate impact analysis asks whether the legitimate business need could be achieved with a less discriminatory alternative practice. If a less discriminatory alternative exists, then disparate impact liability will lie because the discriminatory effect of the practice could have been avoided consistent with business needs.  That step encompasses a mix of economic and other costs and benefits, as does the third step of the unfairness analysis. A practice that meaningfully benefits consumers or competition can be a type of business need. However, if no benefits can be shown, both disparate impact and unfairness liability would flow. If there are meaningful benefits, in the form of lower prices, or wider availability of products, but the harms of the practice can be avoided, it would still be considered an unfair practice, and would likewise fail at the third prong of the disparate impact analysis.[78]

Finally, the FTC has explained that in evaluating unfairness, it also considers whether the conduct "violates public policy as it has been established by statute, common law, industry practice, or otherwise," because such information can provide "additional evidence on the degree of consumer injury caused by specific practices."[79] This consideration weighs heavily in favor of interpreting unfairness to encompass discrimination claims. The existence of antidiscrimination principles prohibiting discrimination on the basis of traditionally-protected classes such as race, national origin, religion, and sex have been engrained for decades in statutes and judicial decisions—precisely the sorts of formal sources noted by the FTC.[80] Few would question that the prohibitions against discrimination on at least these core grounds reflect established and widely-shared public policy. These rules are also easily administered and ascertainable: agencies and courts at the state and federal level already apply them under the existing antidiscrimination laws and there is no reason to think application would be more complicated in other contexts.

In short, the definition of unfairness, under UDA(A)P statutes, comfortably includes discrimination.

## Protected Classes

The unfairness-discrimination theory would require identifying protected classes because they are not enumerated in the FTC or Dodd-Frank Acts. This scenario, however, would not be unique; other antidiscrimination laws have been interpreted to apply to classifications not expressly enumerated.[81]

In federal law, not all existing antidiscrimination laws protect the same classes, but there is a strong argument that any federally-protected class should be covered by UDA(A)P laws as long as the three statutory unfairness prongs are met. For example, the FHA and ECOA both prohibit discrimination based on race, national origin, religion, and sex. At a minimum, these core protected classes—common across many federal antidiscrimination statutes—should be protected by the unfairness-discrimination theory. The FHA also prohibits disability and familial status discrimination. ECOA does not, but it does prohibit age, receipt of public assistance, and marital status discrimination (which the FHA does not). Discrimination based on characteristics that are not uniform but

commonly protected in federal law—for example disability and age—will also likely satisfy the three unfairness prongs, and so the default rule should be that these are protected as well. Entities should not be surprised that they are prohibited from discriminating against these historically-protected classes.[82]

Some state laws cover even more protected classes, such as military and veteran status. Assuming discrimination on these additional grounds would satisfy the three unfairness prongs (and in many cases there is good reason to think they would), whether additional classes should nonetheless be carved out from UDA(A)P protection likely depends on a range of considerations such as whether there are strong arguments that such discrimination would not violate public policy, existing protections under federal and state law, counter-arguments for legitimate reasons to discriminate on those grounds in certain contexts, and the like. At bottom, entities that *want* to discriminate on certain grounds already protected by federal or state law in other contexts should make the case why such discrimination should not also be prohibited by UDA(A)P laws. Those practical business-judgment arguments would best inform the public policy considerations in the unfairness analysis. If entities are not willing to (or cannot effectively) make that case, the classes should also be protected.

## Disparate Impact-Specific Considerations

While the plain text, and principles gleaned from historic applications of that text, are consistent with applying the unfairness-discrimination theory—and in this sense, at a minimum, prohibitions on unfairness are prohibitions against intentional discrimination—disparate impact warrants additional consideration. After all, not all explicit antidiscrimination statutes contemplate disparate impact claims. The best roadmap for whether a statute can encompass such claims is the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), in which the Court confirmed that the FHA permits disparate impact claims.[83]

The Court's analysis began with the statutory text. It instructed that antidiscrimination statutes "must be constructed to encompass disparate-impact claims when their text refers to the consequences of actions and not just the mindset of actors."[84] This type of language is sufficient on its own to indicate an antidiscrimination statute encompasses disparate impact. "Unfairness" claims do not include any scienter or intent requirements.[85] The statutory language defining an "unfair" practice is entirely focused on consumer injury, which is a quintessential effect; there is no reference to the mindset of actors.[86] This key prong, then, is satisfied.

This textual interpretation is "consistent with [the] statutory purpose[s]."[87] As discussed above, application of disparate impact fits well with the purposes of the FTC and Dodd-Frank Acts, as well as the unfairness guardrails and principles articulated by the implementing agencies. Provisions of the Dodd-Frank Act also strongly support the interpretation. In particular, the Dodd-Frank Act amended a section of the Truth in Lending Act, authorizing the CFPB to prescribe regulations to prohibit "abusive or unfair lending practices that *promote disparities* among

consumers of equal credit worthiness but *of different race, ethnicity, gender, or age.*"[88] This is the classic language of disparate impact, demonstrating that practices can be unfair because they are discriminatory. Other sections of Dodd-Frank similarly support this interpretation. Dodd-Frank, for example, directed the CFPB to monitor for risks to support its rulemaking and other functions, including directing it to consider "the extent, if any, to which the risks of a consumer financial product or service may disproportionately affect traditionally underserved consumers."[89] That language, which is not limited to credit-related products or services, mirrors traditional disparate impact descriptions.[90]

In the end, we come back to where we began: the most straightforward reading of the statute is that it encompasses discrimination, including disparate impact. That interpretation is consistent with principles guiding historical application of unfairness claims, and it is supported by statutory context. Application of disparate impact principles is also consistent with Supreme Court guidance regarding when disparate impact is cognizable under antidiscrimination laws.

## Assessing the Benefits Across Categories of Unfairness-Discrimination Claims

This unfairness-discrimination application offers benefits in several scenarios. First, it extends protections to areas where challenged practices would *not* be unfair absent the discrimination. Consider, for example, a CRA with a policy of subjecting white students' complaints of inaccurate information to more robust investigation than the complaints of Black students. Or consider a bank that imposed more rigorous requirements for opening a deposit account or cashing a check for protected groups. In both cases, the discriminatory treatment creates substantial injury to the disfavored group. Nonetheless, absent a UDA(A)P-discrimination theory, the CFPB could be powerless to address either scenario because the challenged practices—the CRA's investigation procedures or the bank's account-opening requirements—might not be considered "unfair" if applied equally to all consumers. It is the discriminatory treatment, in combination with the resulting harm suffered by the disfavored group (*e.g.*, the inability to access credit because of inaccurate information or the denial of a deposit account), that defines the substantial injury.

This class of cases is particularly important for disparate impact allegations. For example, imagine a third-party student loan debt collector with a policy of settling for less payment with, or not pursuing, debtors in certain zip codes on the theory that residents in those areas would effectively negotiate for lower settlements anyway. Although the debt collector's policy is likely to disproportionately harm protected groups given patterns of residential segregation, it is not clear it would be considered an unfair practice absent the disparate-impact concern.[91]

ADMINRECORD-05563

Second, there may be circumstances in which a practice *would be* unfair (or otherwise a UDA(A)P) even absent the discrimination. Consider a recent suit by the CFPB, in partnership with Virginia, Massachusetts, and New York, against Libre by Nexus, Inc. The CFPB alleged that Libre engaged in deceptive and abusive acts by "prey[ing] on immigrants, primarily Hispanics, who speak little or no English and are being held in federal detention centers" by luring them "through a series of false and misleading statements about its programs, pressuring them to sign abusive, English-only contracts that bind the immigrants to years of exorbitant monthly payments."[92] The complaint does not include allegations of discrimination, although the language above alludes to potential discrimination against Hispanics. If those allegations were more explicit, the case might have also been pursued under a theory of "reverse redlining," which generally requires a showing that an entity: (1) offered a predatory or unfair product or practice; and (2) either the entity intentionally targeted that product or practice based on a protected class or that there was a disparate impact on that basis.[93] The alleged deceptive and abusive conduct by Libre would almost certainly trigger the first prong of that test.

What, though, would the discrimination piece add to such claims? Two things. First, there is crucial signaling and remediation value to treating civil rights violations *as* civil rights violations. Remedial and prospective policy responses that do not treat these abuses as civil rights issues will fall short of providing historically disadvantaged consumers and communities of color adequate redress and preventing future exploitative practices. At a minimum, entities— including state actors that have a more robust history of bringing unfairness actions than discrimination actions—should consider the discriminatory effects of unfair practices when framing and resolving cases. Over the past decade state and federal consumer protection officials have developed experience applying UDAP law to address a range of abuses by for-profit schools, including practices alleged to disproportionately harm Black, Latino, and female students. The application of an unfairness-discrimination theory to these firms and these practices would follow this path, while more explicitly acknowledging the discriminatory effects of these abuses.[94]

> [T]here is crucial signaling and remediation value to treating civil rights violations *as* civil rights violations. Remedial and prospective policy responses that do not treat these abuses as civil rights issues will fall short of providing historically disadvantaged consumers and communities of color adequate redress and preventing future exploitative practices.

Second, unfairness-discrimination should serve to enhance penalties, including civil money penalties ("CMPs"). Section 1055(c)(2) of the Dodd-Frank Act sets forth a three-tiered framework for maximum CMPs the CFPB may assess. Maximum daily CMPs are $25,000 where a person "recklessly" engages in a violation, and up to $1,000,000 a day when a person "knowingly" violates the law.[95] Evidence of intentional discrimination should

ADMINRECORD-05564

move defendants into those higher tiers. It should also serve to counter potential mitigating factors. The Dodd-Frank Act directs the CFPB to consider factors such as good faith, the gravity of the violation, severity of risks to consumers, and "such other matters as justice may require."[96] The existence of discrimination should weigh against favorable consideration of those criteria.

Finally, the unfairness-discrimination theory is not undermined by the fact that: (1) it would fill gaps left by more explicit existing laws; *or* (2) it would prohibit conduct already prohibited by those laws. It is well settled both that a UDA(A)P "may also violate other federal or state laws" and that "a transaction that is in technical compliance with other federal or state laws may nevertheless violate the prohibition against UDAAPs."[97] The agencies already use UDA(A)P to fill in gaps left by more explicit laws. For example, the Fair Debt Collection Practices Act ("FDCPA") makes it illegal for debt collectors to, among other things, engage in unfair or unconscionable practices.[98] But the FDCPA generally only applies to *third-party* debt collectors, such as collection agencies and debt purchasers, not creditors collecting their own debts.[99] The CFPB has made clear that UDAAP fills that significant gap in the FDCPA, extending FDCPA-like protections to entities collecting their own debts.[100] Similarly, the agencies commonly pursue UDA(A)P violations, even if the UDA(A)P application overlaps with other federal or state laws.[101] The unfairness-discrimination theory is no different than these historic applications of unfairness.

## Opportunities for Agency Action

> **[A]gencies and states could pursue the unfairness-discrimination theory immediately through supervision or enforcement.**

In many cases, agencies and states could pursue the unfairness-discrimination theory immediately through supervision or enforcement. As discussed, most applications of the unfairness-discrimination theory flow from a straightforward interpretation of the unfairness laws. Where state law allows, private parties could enforce rights through private rights of action. Particularly in cases with strong evidence of intentional discrimination against traditionally protected classes, defenses that entities did not have sufficient notice of this application of unfairness statutes are unlikely to be persuasive.

The federal agencies with administrative authority over the unfairness laws should also pursue complementary regulatory actions. First, they could issue guidance or interpretive rules that do not require notice-and-comment rulemaking in which they formally adopt this construction and advise entities of how the agencies intend to exercise their supervisory and enforcement authorities in this area.[102] That type of announcement has the benefit of reminding entities of their non-discrimination obligations and obviating any potential fair-notice defense that an entity might attempt in future supervision or enforcement actions. This type of clarification also facilitates

ADMINRECORD-05565

DISCRIMINATION IS "UNFAIR"                                                                                           2021

enforcement of the Dodd-Frank Act by state attorneys general and enforcement agencies that might be reluctant to be first movers advancing the unfairness-discrimination application.[103] And, this guidance can play an important deterrent effect: notice of this application can prompt entities to adopt and extend policies, procedures, and compliance systems designed to mitigate risks, even if enforcement is not prioritized or widespread.

Second, the agencies—particularly the CFPB—could issue notice-and-comment rules formalizing the unfairness-discrimination application. Notice-and-comment rulemaking would make the interpretation eligible for *Chevron* deference, meaning that reviewing courts must accept the unfairness-discrimination interpretation absent holding the interpretation is unambiguously precluded by the unfairness statutes (which, as we have discussed, it is not).[104] A notice-and-comment rulemaking would also afford the agencies the opportunity to articulate substantive, detailed standards and requirements for compliance, which administrative law principles might limit them from articulating through less formal guidance. These three vehicles—immediate enforcement in strong cases, agency guidance, and notice-and-comment rulemaking—are complementary and could be pursued sequentially or simultaneously.

ADMINRECORD-05566

# Conclusion

The Biden administration and agencies like the CFPB and FTC should not shy away from legal theories that further their important goals of addressing discrimination and racial equity across markets. The unfairness-discrimination theory is an arrow in that quiver.

ADMINRECORD-05567

# Endnotes

[1] See, e.g., Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/; Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies (Jan. 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-redressing-our-nations-and-the-federal-governments-history-of-discriminatory-housing-practices-and-policies/.

[2] CFPB Blog, Dave Uejio, "The Bureau is taking much-needed action to protect consumers, particularly the most economically vulnerable" (Jan. 28, 2021), https://www.consumerfinance.gov/about-us/blog/the-bureau-is-taking-much-needed-action-to-protect-consumers-particularly-the-most-economically-vulnerable/.

[3] 12 U.S.C. § 5531 (CFPB UDAAP authority); 15 U.S.C. § 45(n) (FTC UDAP authority).

[4] Introductory Remarks of Commissioner Rohit Chopra, NFHA 2020 Conference (Oct. 6, 2020), https://www.ftc.gov/system/files/documents/public_statements/1581594/final_remarks_of_rchopra_to_nfha_v3.pdf; see also Statement of Commissioner Rohit Chopra, *In the Matter of Liberty Chevrolet, Inc.* (May 27, 2020), https://www.ftc.gov/system/files/documents/public_statements/1576002/bronx_honda_final_rchopra_bronx_honda_statement.pdf.

[5] Statement of Commissioner Rebecca Kelly Slaughter, *In the Matter of Liberty Chevrolet, Inc.*, at 4 (May 27, 2020) ("I also share Commissioner Chopra's view that discriminatory pricing practices that result from dealer markup are unfair under section 5 of the Federal Trade Commission Act."), https://www.ftc.gov/system/files/documents/public_statements/1576006/bronx_honda_2020-5-27_bx_honda_rks_concurrence_for_publication.pdf.

[6] *In re Facebook, Inc.*, Assurance of Discontinuance (July 24, 2018), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/2018_07_23%20AOD.pdf.

[7] *See* Chopra, *Liberty Chevrolet*, *supra* note 4, at 2 n.6 ("For example, if a rideshare app's pricing algorithm systematically charges higher prices to women requesting rides at night, compared to similar ride requests for men, this could constitute a violation of the FTC Act's prohibition on unfair acts or practices."); *see also* Elisa Jillson, *Aiming for truth, fairness, and equity in your company's use of AI*, Federal Trade Comm'n., (Apr. 20, 2021), https://www.ftc.gov/news-events/blogs/business-blog/2021/04/aiming-truth-fairness-equity-your-companys-use-ai.

[8] 15 U.S.C. § 45(a)(1).

[9] Memorandum of Understanding Between the Consumer Financial Protection Bureau and the Federal Trade Commission (Feb. 25, 2019), https://www.ftc.gov/system/files/documents/cooperation_agreements/ftc-cfpb_mou_225_0.pdf. Separate unfairness statutes exist in other regulatory schemes, and similar theories may apply there as well.  See e.g., 49 U.S.C. § 41712 (Department of Transportation, Civil Aeronautics Act and Federal Aviation Act); 7 U.S.C. § 213 (Department of Agriculture, Packers and Stockyard Act); 46 U.S.C. § 58106 (Department of Commerce, Merchant Marine Act). Commissioner Rohit Chopra commented specifically on the Department of Transportation's unfairness authority, arguing that unfairness in that statute should be interpreted more broadly than the FTC's definition. Comment of Federal Trade Commissioner Rohit Chopra, Docket No. DOT-OST-2019-0182,

ADMINRECORD-05568

https://www.ftc.gov/system/files/documents/public_statements/1576174/chopra_comment_to_us_department_of_transportations_dot-ost-2019-0182.pdf.

[10] This Article uses "UDAP" to refer to laws that prohibit unfair and deceptive acts, "UDAAP" to refer to the Dodd-Frank Act provisions that include unfair, deceptive, and abusive acts, and "UDA(A)P" to refer to these laws collectively.

[11] This Article does not address deception and abusiveness, but they too could be effective tools in certain circumstances. For example, deceptive techniques may be used to steer protected class members into inferior products or higher rates. And abusive practices may take unreasonable advantage of consumers' inability to protect themselves because differences in treatment are based on immutable protected characteristics.

[12] 12 U.S.C. § 5531(c)(1); 15 U.S.C. § 45(n).

[13] *Id.*

[14] Board, FDIC, "Unfair or Deceptive Acts or Practices by State-Chartered Banks" (Mar. 11, 2004), https://www.fdic.gov/news/financial-institution-letters/2004/fil2604a.html.

[15] The FTC Act has been interpreted as protecting business, as well as individuals from unfair practices. *See, e.g., FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 934 (N.D. Ill. 2008).

[16] The banking agencies have supervisory and enforcement authority both for the UDAP provisions of Section 5 of the FTC Act and the UDAAP provisions of the Dodd-Frank Act. Prudential UDA(A)P enforcement standards have historically been derived from historic FTC UDAP principles, are generally consistent with FTC and CFPB applications, and would need to align with an FTC or CFPB UDA(A)P rule that had the force and effect of law. *See, e.g.,* OCC Handbook, "Unfair or Deceptive Acts or Practices and Unfair, Deceptive or Abusive Acts or Practices," v.1.0 (June 2020), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/unfair-deceptive-act/index-udaap.html; Interagency Guidance Regarding Unfair or Deceptive Credit Practices (Aug. 22, 2014), https://files.consumerfinance.gov/f/201408_cfpb_guidance_ffiec_credit-card-practices.pdf; OCC Advisory Letter 2002-3, "Guidance on Unfair or Deceptive Acts or Practices," (March 22, 2002), https://www.occ.treas.gov/news-issuances/advisory-letters/2002/advisory-letter-2002-3.pdf.

[17] 12 U.S.C. § 5536; 12 U.S.C. § 5481(6), (15), & (26).

[18] *See* Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*, 32 Rev. Banking & Fin. L. 321, 329 (2013).

[19] 12 U.S.C. § 5552(a)(1).

[20] *See, e.g.,* Carolyn L. Carter, NCLC, "Consumer Protection in the States: A 50-State Report on Unfair and Deceptive Acts and Practices Statutes" (Feb. 2009) (noting "glaring" holes in state UDAP laws, explaining that "[l]egislation or court decisions in dozens of states have narrowed the scope of UDAP laws or granted sweeping exemptions to entire industries," and that "[o]ther states have placed substantial legal obstacles in the path of officials charged with UDAP enforcement," and "several states have stacked the financial deck against consumers who go to court to enforce the law themselves").

[21] *See, e.g.,* 12 C.F.R. part 1002, Supp. I, ¶ 6(a)-2 (ECOA articulation); 24 C.F.R. § 100.500(c)(1) (FHA articulation); 42 U.S.C. § 2000e-2(k) (Title VII articulation).

[22] 15 U.S.C. § 1691. Although sexual orientation and gender identity are not listed as separate classes under ECOA, they are protected. See CFPB Interpretive Rule, Equal Credit Opportunity (Regulation B): Discrimination on the Bases of Sexual Orientation and Gender Identity, 86 Fed. Reg. 14363 (Mar. 16, 2021).

ADMINRECORD-05569

23 12 C.F.R. § 1002.4(b).

24 12 C.F.R. part 1002.

25 See, e.g., 12 C.F.R. § 1002.6(a) (current regulatory codification of the disparate impact "effects test"); Official Staff Commentary, 12 C.F.R. pt. 1002, Supp. I, 6(a)-2 (similar); Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18266 (Apr. 15, 1994).

26 42 U.S.C. § 3604; 42 U.S.C. § 3605(a).

27 42 U.S.C § 3604(c).

28 *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, 576 U.S. 519, 539 (2015) (holding disparate impact claims are cognizable under the FHA).

29 42 U.S.C. § 1981.

30 *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976) (noting that § 1981 was enacted to protect persons of "every race and color"); *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (holding that § 1981 was "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics").

31 42 U.S.C. § 1982.

32 *See, e.g., Perez v. Wells Fargo & Co.,* No. 17-cv-00454-MMC, 2017 WL 3314797, at *3 (N.D. Cal. 2017); *Daniels v. Winn Dixie Montgomery, Inc.*, No. CV 08-AR-0063-S, 2008 WL 11377627, at *2 (N.D. Ala. May 8, 2008); *Dobson v. Cent. Carolina Bank & Tr. Co.*, 240 F. Supp. 2d 516, 524 (M.D.N.C. 2003); *Evans v. First Fed. Sav. Bank of Ind.*, 669 F. Supp. 915, 918 (N.D. In. 1987); *see also Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 307 (D. Conn. 2017).

33 42 U.S.C. § 2000d.

34 20 U.S.C. § 1681, *et seq.*

35 *See, e.g.*, Cannon v. Univ. of Chi., 441 U.S. 677, 694-98 (1979) (stating that Congress intended for Title XI to be interpreted and applied similarly to Title VI).

36 Alexander v. Sandoval, 532 U.S. 275, 280-81 (2001).

37 *See, e.g.*, Nat'l Collegiate Athletic Ass'n v. Smith, 525 U.S. 459, 468 (1999).

38 For example, a series of laws prohibit discrimination in employment. 42 U.S.C. §§ 2000e-2000e-27 ("Title VII"); 42 U.S.C. §§ 12111-17 ("ADA"); 29 U.S.C. §§ 621-623 ("ADEA"). And Title II of the Civil Rights Act of 1964 prohibits discrimination in public accommodations, such as hotels, restaurants, theatres, and stadiums. 42 U.S.C. § 2000a.

39 Cal. Civ. Code § 51(b) (declaring that all persons are "entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever"); D.C. Code Ann. § 2-1402.31(a)(1), § 2-1401.02(24) (prohibiting discrimination by "establishments dealing with goods or services of any kind, including, but not limited to, the credit facilities thereof: banks, savings and loan associations, establishments of mortgage bankers and brokers, all other financial institutions"); Mass. Gen. Laws ch. 272 § 98, § 92A (prohibiting discrimination by "any place which is open to and accepts or solicits the patronage of the general public").

ADMINRECORD-05570

[40] *See, e.g.*, D.C. Code §§ 2-1401.3, 2-1402.68; N.Y.C. Admin. Code § 8-107.17.

[41] There have been recent allegations of discrimination related to check cashing and account opening activities. *See, e.g.,* Emily Flitter, N.Y. Times, *"Banking While Black": How Cashing a Check Can be a Minefield* (June 18, 2020), https://www.nytimes.com/2020/06/18/business/banks-black-customers-racism.html; Christine Hauser, N.Y. Times, *A Bank Wouldn't Take His Bias Settlement Money. So He's Suing.* (Jan. 23, 2020), https://www.nytimes.com/2020/01/23/us/race-discrimination-check-sauntore-thomas.html.

[42] 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.2(m).

[43] 12 C.F.R. § 1002.4(b).

[44] *See* FFIEC Interagency Fair Lending Examination Procedures, Appendix at p. 29-30, https://www.ffiec.gov/pdf/fairappx.pdf.

[45] 12 C.F.R. § 1002.2(l).

[46] Board, Final Rule, 68 Fed. Reg. 13144, 13145 (Mar. 18, 2003); *see also Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698 (5th Cir. 2017).

[47] *See, e.g., Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968) (stating § 1982 does not prohibit discriminatory advertising); *Patterson v. McLean Credit Union*, 491 U.S. 164, 190 (1989) (construing § 1981 in light of § 1982); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 35 (1990) (dismissing §§ 1981 and 1982 claims aimed at advertising).

[48] *See e.g.*, Student Borrower Protection Center, Letter to CFPB on Racial Equity and Student Debt (Feb. 8, 2021), https://protectborrowers.org/wp-content/uploads/2021/02/SBPC_Students-loans-and-racial-equity.pdf; Katherine Welbeck, *Race: Examining Legal Remedies for Disparate Student Debt Outcomes*, Consumer Finance Law Quarterly Report (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3712516; Judith Scott-Clayton, Shrinking Racial Gaps in Student Debt and Default: Recommendations to Congress (March 6, 2019), https://ccrc.tc.columbia.edu/easyblog/shrinking-racial-gaps-student-debt-default-congress.html; Ben Miller, *The Continued Student Loan Crisis for Black Borrowers*, Center for American Progress (Dec. 2, 2019), https://www.americanprogress.org/issues/education-postsecondary/reports/2019/12/02/477929/continued-student-loan-crisis-black-borrowers/.

[49] Student Borrower Protection Center, Letter to CFPB, *supra* note 48.

[50] *See generally* Stephen Hayes & Andrea Lowe, "Combating Exploitative Education" at 6-9 (Dec. 2020), https://protectborrowers.org/wp-content/uploads/2020/12/Combating-Exploitative-Education_2020.pdf; Student Borrower Protection Center, Letter to CFPB, *supra* note 48; Katherine Welbeck, *Race: Examining Legal Remedies, supra* note 48; Judith Scott-Clayton, Shrinking Racial Gaps, *supra* note 48; Ben Kaufman, *New Data Show Dramatic Disparities for Borrowers of Color with Private Student Loans*, Student Borrower Protection Center (Oct. 14, 2020), https://protectborrowers.org/new-data-show-dramatic-disparities-for-borrowers-of-color-with-private-student-loans; Student Borrower Protection Center, *The Long Legacy of Predatory Private Student Loans* (Jan. 2021), https://protectborrowers.org/wp-content/uploads/2021/01/Maryland-NCSLT.pdf.

[51] These entities might also be subject to other antidiscrimination protections, such as Title VI and Title IX, if they participate in federal student aid programs. Private parties seeking judicial enforcement of those laws must prove intentional discrimination, which can be a significant obstacle. Sandoval, 532 U.S at 280-81. Coverage of private student lenders under these theories may also be complicated if they do not directly receive federal funds. Finally, these laws are enforced by agencies responsible for extending federal financial assistance and the U.S. attorney general, but not major financial regulators like the CFPB.

[52] Hayes & Lowe, "Combating Exploitative Education," *supra* note 50, at 17.

ADMINRECORD-05571

[53] *Brook v. Sistema Universitario Ana G. Mendez, Inc.*, 2017 WL 1743500, at *3 (M.D. Fl. 2017).

[54] Joanna Pearl, Brian Shearer, *Credit by any Other Name*, at 4 (July 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3661989.

[55] For example, the State of California alleged that for-profit college operator Bridgepoint Education engaged in illegal debt collection practices when seeking to collect on "unexpected tuition expenses" imposed by its Ashford University chain of schools and assessed "unlawful debt collection fees." *See* Press Release, "Attorney General Xavier Becerra Sues For-Profit Ashford University For Defrauding and Deceiving Students" (Nov. 29, 2017), https://oag.ca.gov/news/press-releases/attorney-general-xavier-becerra-sues-profit-ashford-university-defrauding-and.

[56] *See, e.g.,* National Consumer Law Center, Credit Discrimination § 2.2.2.2.2 ("Disguised credit sales") (7th ed. 2018).

[57] *Consumer Financial Protection Bureau v. Global Financial Support, Inc.*, No. 15-cv-2440-GPC-AHG, 2021 WL 242939 (S.D. Cal. Jan. 25, 2021).

[58] *Id.* at *8 (quoting 12 U.S.C. § 5481(15)(A)(viii)).

[59] A similar example is *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, in which the CFPB alleged that ITT Educational Services, a for-profit school, committed UDAAP violations by inducing students to take out irresponsible private loans. The court thought ITT was not a creditor or a broker, but it agreed with the CFPB that ITT provided "financial advisory services." 219 F. Supp. 3d 878, 909-910 (S.D. Ind. 2015). If there were evidence of discrimination—for example, targeting these predatory schemes to communities of color—application of the more general UDAAP provisions would eliminate any ambiguity over coverage as a "creditor."

[60] 12 C.F.R. § 1002.2(m).

[61] *Adhvaryu v. Bank of America, N.A.*, 2019 WL 3000611, at *4 (C.D. Cal. 2019) (citing *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 706 (5th Cir. 2017)).

[62] *See* CFPB and American Express Reach Resolution to Address Discriminatory Card Terms in Puerto Rico and U.S. Territories (Aug. 23, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-and-american-express-reach-resolution-address-discriminatory-card-terms-puerto-rico-and-us-territories/; CFPB Orders GE Capital to Pay $225 Million in Consumer Relief for Deceptive and Discriminatory Credit Card Practices (June 19, 2014), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-ge-capital-to-pay-225-million-in-consumer-relief-for-deceptive-and-discriminatory-credit-card-practices/.

[63] *See* Seth Frotman and Tamara Cesaretti, "Maryland is Poised to End the Predatory Student Loan Debt Collection Machine that Barreled on Amidst COVID-19," Student Borrower Prot. Ctr. (January 15, 2021), https://protectborrowers.org/md-pslcollections/; *see also* Student Borrower Protection Center, *Dubious Debts: Ending an era of illegal private student loan debt collection practices* (March 2021), https://protectborrowers.org/ny-ncslt/.

[64] 12 U.S.C. § 5481(15)(x).

[65] Mike Pierce, "How a Data Company at the Center of the Student Loan System is Costing Borrowers Millions," Student Borrower Prot. Ctr. (Jan. 28, 2020), https://protectborrowers.org/how-a-data-company-at-the-center-of-the-student-loan-system-is-costing-borrowers-millions/.

[66] 12 U.S.C. § 5481(15)(ix).

[67] 12 U.S.C. § 5531 (CFPB UDAAP authority); 15 U.S.C. § 45(n) (FTC UDAP authority).

ADMINRECORD-05572

DISCRIMINATION IS "UNFAIR"                                                                    2021

[68] Chopra, *Liberty Chevrolet*, *supra* note 4; Chopra, NFHA, *supra* note 4.

[69] *See, e.g., New Negro Alliance v. Sanitary Grocery, Co.*, 303 U.S. 552, 561 (1938) ("Race discrimination by an employer may reasonably be deemed more unfair and less excusable than discrimination against workers on the ground of union affiliation."); *Corning Glass Works v. Brennan*, 417 U.S. 188, 207 (1974) (describing the Equal Pay Act as representing congressional recognition "that discrimination in wages on the basis of sex constitutes an unfair method of competition." (internal quotation omitted)).

[70] Fair Housing Act, Pub. L. 90-284, 82 Stat. 73 (Jan. 15, 1968); 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limits, for fair housing throughout the United States."); 12 U.S.C. § 5493(c) (Dodd-Frank Act provision establishing within the CFPB an "Office of Fair Lending" empowered to coordinate and enforce "fair lending laws"); 12 U.S.C. § 5481(13) (Dodd-Frank Act provision defining the term "fair lending" to mean "fair, equitable, and nondiscriminatory access to credit for consumers").

[71] *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (emphasis added).

[72] *Reyes v. Waples Mobile Home Park Limited Partnership*, 903 F.3d 415, 430 (4th Cir. 2018) (emphasis added) (quoting *Mt Holly Gardens Citizens in Action, Inc. v. Twp. Of Mount Holly*, 658 F.3d 375, 383-84 (3d. Cir. 2011) (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976)))).

[73] FTC Policy Statement on Unfairness (Dec. 17, 1980), https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness; CFPB Supervision and Examination Manual, UDAAP at 2 (v.2 Oct. 2012), https://files.consumerfinance.gov/f/documents/102012_cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf.

[74] CFPB Manual, UDAAP, *supra* note 73, at 2.

[75] *Id*.

[76] FTC Policy Statement, *supra* note 73.

[77] *Id*.

[78] Disparate impact discrimination allegations fit neatly within the three elements of an unfairness claim. There also may be circumstances where one law prohibits a broader swath of conduct than the other. For example, at the second step of the traditional disparate impact test, a defendant must show that the challenged practice is necessary to achieve a legitimate interest. But under the third prong of the unfairness test, the injury must not be outweighed by benefits to the consumer or to competition. Permissible unfairness justifications may include a narrower range of interests than what is acceptable under disparate impact.

[79] FTC Policy Statement, *supra* note 73.

[80] *Id*.

[81] California's Unruh Act is an example. *See, e.g., Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 839-40 (2005) (noting various classes protected by the Unruh Act but not expressly enumerated in the statute).

[82] This application would expand upon the classes explicitly covered in certain areas, such as those enumerated by ECOA for credit. As discussed below, *see infra* notes 97-101, the expansion of existing laws is not unusual for UDA(A)P applications.

[83] Other commenters have noted that *Inclusive Communities supports this interpretation of UDA(A)P laws. See* Bethany A. Corbin, "Should I Stay or Should I Go?: The Future of Disparate Impact Liability Under the Fair Housing Act and Implications for the Financial Services Industry," 120 Penn St. L. Rev. 421, 474 (2015).

ADMINRECORD-05573

[84] *Inclusive Communities*, 576 U.S. at 532.

[85] Adam J. Levitin, "'Abusive' Acts and Practices: Towards a Definition?" at 17 (June 19, 2019), https://files.consumerfinance.gov/f/documents/cfpb_levitin-written-statement_symposium-abusive.pdf.

[86] FTC Policy Statement, *supra* note 73 ("Unjustified consumer injury is the primary focus of the FTC Act.").

[87] *Inclusive Communities*, 576 U.S. at 533.

[88] 15 U.S.C. § 1639b(c)(3)(C) (emphasis added). The CFPB has yet to exercise the authority granted by this provision, which governs residential mortgage loan originations.

[89] 12 U.S.C. § 5512(c)(2)(E).

[90] *Inclusive Communities*, 576 U.S. at 524 ("[A] plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

[91] As another example, imagine a third-party student loan debt collector with a policy of settling for less payment with debtors who majored in finance and greater payment with debtors who majored in sociology, on the theory that the former group would effectively negotiate for lower settlements anyway. Given existing demographic skews among college majors, such a policy could have a disproportionately negative impact on women. Again, though, it is not clear it would be unfair absent the disparate-impact concern. *See generally* Stephen Hayes & Alexa Milton, "Solving Student Debt or Compounding the Crisis: Income Share Agreements and Fair Lending Risks" (July 2020), https://protectborrowers.org/wp-content/uploads/2020/07/SBPC_Hayes_Milton_Relman_ISA.pdf.

[92] CFPB Press Release, "Consumer Financial Protection Bureau and Virginia, Massachusetts, and New York Attorneys General Sue Libre for Predatory Immigrant-Services Scam" (Feb. 22, 2021), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-and-virginia-massachusetts-and-new-york-attorneys-general-sue-libre-for-predatory-immigrant-services-scam/.

[93] Hayes & Lowe, "Combating Exploitative Education," *supra* note 50, at 10.

[94] *See, e.g.*, NYC Department of Consumer and Worker Prot.,"Department of Consumer Affairs Files Charges Against Berkeley College For Deceptive and Predatory Practices," https://www1.nyc.gov/site/dca/media/pr101918-DCA-Berkeley-Investigation.page (last visited Apr. 21, 2021), (Berkeley lure[d] consumers – many of whom are people of color and first-generation college students with low incomes – to one-on-one sales pitches where they deceive them about potential financial obligations and say misrepresentations about other higher education institutions.); Office of the California Attorney General, "Attorney General Kamala D. Harris Files Suit in Alleged For-Profit College Predatory Scheme" (Oct. 10, 2013), https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-files-suit-alleged-profit-college-predatory (CCI's predatory marketing efforts specifically target vulnerable, low-income job seekers and single parents who have annual incomes near the federal poverty line.).

[95] 12 U.S.C. § 5565(c)(2).

[96] 12 U.S.C. § 5565(c)(3).

[97] CFPB Manual, UDAAP, *supra* note 73, at 10.

[98] 15 U.S.C. § 1692f.

[99] 15 U.S.C. § 1692a(6).

ADMINRECORD-05574

[100] *See* CFPB Bulletin 2013-07, "Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts" (July 10, 2013), https://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf.

[101] For example, a failure to clearly disclose costs and terms of credit in violation of the Truth in Lending Act may also be a UDAAP. *See* CFPB Manual, UDAAP, *supra* note 73, at 10. As another example, in a recent complaint, the CFPB alleged that it was "unfair" for a nonbank to employ mortgage originators that were not licensed under state law. *See CFPB v. 1st Alliance Lending, LLC*, 3:21-cv-00055 ¶¶ 91-105 (Jan. 15, 2021), https://files.consumerfinance.gov/f/documents/cfpb_1st-alliance-lending-llc-et-al_complaint_2021-01.pdf. The CFPB's unfairness claim was not based directly on the violation of state law, but those alleged violations signaled an increased likelihood of unfairness-style injuries.

[102] *See generally* CFPB Final Rule, Role of Supervisory Guidance, 86 Fed. Reg. 9261, 9265 (Feb. 12, 2021).

[103] 12 U.S.C. § 5552(a); 12 C.F.R. part 1082.

[104] *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

ADMINRECORD-05575