# Exhibit T

By Stephen Hayes and Kali Schellenberg | April 22, 2021

We often assume it's clearly illegal for businesses to discriminate against people because of characteristics like race and sex. The truth, though, is more complicated. Discrimination is not expressly prohibited, and has not been regulated, in large swaths of our nation's economy. For example, federal financial regulatory agencies, like the Consumer Financial Protection Bureau ("CFPB"), have focused on *credit* discrimination, but historically have not regulated or brought enforcement actions related to discrimination in other consumer financial activities like opening checking accounts, reporting credit information, or predatory financial "advising." Moreover, while all antidiscrimination laws expressly prohibit intentional discrimination (sometimes called "disparate treatment"), not all have been interpreted to prohibit "disparate impact" discrimination. This inconsistency is critical because disparate impact enforcement has proven essential in eliminating more subtle forms of discrimination and advancing equality in areas where it clearly applies, like employment, housing, and credit.

With respect to student financial services, the need for effective discrimination enforcement is acute: there should be no room for doubt that discrimination is illegal and will be regulated with respect to predatory for-profit schools, exotic education-financing arrangements, fraudulent financial "advisory" services, student-specific consumer reporting, and third-party debt collection of student loans, just to name a few areas. Unfortunately, federal and state regulators and enforcement officials have yet to exercise their full authority to protect students and families from discrimination in this sector.

# There should be no room for doubt that discrimination is illegal and will be regulated with respect to predatory for-profit schools, exotic education-financing arrangements, fraudulent financial "advisory" services, student-specific consumer reporting, and third-party debt collection of student loans, just to name a few areas.

This report (https://protectborrowers.org/discrimination-is-unfair) offers a strategy for leveraging that authority: confirming that discrimination is a type of "unfair" act covered by "UDA(A)P" laws—laws prohibiting unfair, deceptive, (and sometimes abusive) acts and practices. Under these laws, an act is "unfair" if it is: (1) likely to cause substantial injury to consumers; (2) which is not reasonably avoidable; and (3) that is not outweighed by countervailing benefits to consumers or competition. In the words (https://www.ftc.gov/system/files/documents/public_statements/1581594/final_remarks_of_rchopra_to_nfha_v3.pdf) of FTC Commissioner Rohit Chopra—recently nominated to be the next director of the CFPB—"[d]iscriminatory practices often are three for three, causing grievous harm that cannot be avoided." This report demonstrates that Commissioner Chopra's assessment is supported by traditional canons of statutory construction and is consistent with core principles in UDA(A)P and antidiscrimination jurisprudence.

The CFPB and FTC both have unfairness authority, as do several other federal agencies. The reach of these statutes is broad, covering nearly the waterfront of consumer-business relations. States also have authority to enforce federal UDAAP law related to consumer financial products and services, in addition to their own state unfairness statutes, some of which include private rights of action.

ADMINRECORD-05712

# Leveraging UDA(A)P laws can help ensure discrimination is prohibited and regulated in areas where it has traditionally been disregarded. There is also crucial signaling and remediation value to treating civil rights violations as civil rights violations.

Leveraging UDA(A)P laws can help ensure discrimination is prohibited and regulated in areas where it has traditionally been disregarded. There is also crucial signaling and remediation value to treating civil rights violations *as* civil rights violations. Policy and enforcement actions that do not address discriminatory abuses as civil rights issues will fall short of providing historically disadvantaged consumers and communities of color adequate redress and preventing future exploitative practices. To that end:

- **First,** agencies and states should pursue the unfairness-discrimination theory immediately through supervision or enforcement, particularly in strong cases.

- **Second,** the CFPB and FTC should adopt this construction in complementary guidance or interpretive rules. This could be done reasonably quickly, without undergoing notice-and-comment rulemaking. This type of clarification would pave the way for enforcement by states that might be reluctant to be first movers. It would also further important deterrence and compliance goals: notice of this application would prompt entities to adopt policies, procedures, and compliance systems designed to address and mitigate discrimination risks.

- **Third**, agencies—particularly the CFPB—could subsequently issue notice-and-comment rules formalizing the unfairness-discrimination application. Notice-and-comment rulemaking would significantly increase the likelihood of success in litigation. A notice-and-comment rulemaking would also afford the agencies the opportunity to

ADMINRECORD-05713

articulate substantive standards and requirements for compliance, which may not be possible in less formal guidance.

The Biden administration has declared racial equity (https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/) a top priority and directed agencies to work to end discrimination and lift barriers that restrict equal opportunities. The CFPB, for its part, has recognized (https://www.consumerfinance.gov/about-us/blog/the-bureau-is-taking-much-needed-action-to-protect-consumers-particularly-the-most-economically-vulnerable/) that policies in the financial services industry have caused racial inequality and announced that it will "look more broadly, beyond fair lending, to identify and root out unlawful conduct that disproportionately impacts communities of color and other vulnerable populations." The unfairness-discrimination theory is an arrow in that quiver.

###

*Stephen Hayes is a Partner at Relman Colfax. Stephen originally joined the firm in 2011 and returned in 2018 after several years at the Consumer Financial Protection Bureau (CFPB). His work focuses on designing best-in-class practices on a range of civil rights and consumer protection issues.*

*Kali Schellenberg is an Attorney at Relman Colfax. Her civil rights litigation practice includes cases involving discrimination in housing and public accommodations.*

ADMINRECORD-05714