**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF BUSINESS; and TEXAS BANKERS ASSOCIATION, | |
| *Plaintiffs*, | Case No. 6:22-cv-00381-JCB |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau | |
| *Defendants*. | |

**BRIEF OF AMICI CURIAE STATES OF GEORGIA, ALABAMA, ARIZONA, ARKANSAS, IDAHO, INDIANA, LOUISIANA, MISSISSIPPI, OKLAHOMA, SOUTH CAROLINA, TENNESSEE, TEXAS, UTAH, AND WEST VIRGINIA, IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Introduction and Interests of Amici States ................................................................... 1

Argument .......................................................................................................................... 2

    I.      CFPB's manual update is the latest example of the executive branch using agency action to implement a major policy change, without statutory authority, while trying to shield that overreach from judicial review ...................................................................... 2

    II.     The updated examination manual is a final agency action subject to judicial review ............................................................................................................................... 10

    III.    The updated examination manual encroaches on States' traditional authority without clear statutory authorization or notice-and-comment rulemaking. ...................... 13

Conclusion ...................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
141 S. Ct. 2320 (2021)................................................................................................2

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
141 S. Ct. 2485 (2021)................................................................................................3, 15, 18

*Arizona v. United States*,
567 U.S. 387 (2012)....................................................................................................8

*Badgerow v. Walters*,
142 S. Ct. 1310 (2022)................................................................................................16

*Bennett v. Spear*,
520 U.S. 154 (1997)....................................................................................................11, 12, 13

*Bond v. United States*,
572 U.S. 844 (2014)....................................................................................................15

*BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ......................................................................................4

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)....................................................................................................17

*City of Arlington v. FCC*,
569 U.S. 290 (2013)....................................................................................................18

*Davidson v. Glickman*,
169 F.3d 996 (5th Cir. 1999) ......................................................................................17

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020)................................................................................................10

*Garrison v. Dep't of Educ.*,
No. 1:22-cv-01895, 2022 WL 16509532 (S.D. Ind. Oct. 21, 2022) .........................9

*Georgia v. Biden*,
574 F. Supp. 3d 1337 (S.D. Ga. 2021)........................................................................9

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ..................................................................................4

*Hill v. Colorado*,
    530 U.S. 703 (2000)..................................................................................8

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980)................................................................................16

*Mann Constr., Inc. v. United States*,
    27 F.4th 1138 (6th Cir. 2022) ...............................................12, 13, 17

*NFIB v. Dept. of Labor*,
    142 S. Ct. 661 (2022)........................................................................14, 15

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015)..................................................................................17

*Sekhar v. United States*,
    570 U.S. 729 (2013)................................................................................17

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ..............................................................5, 9

*U. S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837 (2020)...........................................................................15

*U.S. Army Corp. of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)................................................................................12

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    141 S. Ct. 777 (2021)..............................................................................12

*United States v. Reynolds*,
    710 F.3d 498 (3d Cir. 2013)..............................................................11, 18

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013)................................................................................14

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)...................................................................7, 10, 16

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)................................................................................12

*Zucht v. King*,
    260 U.S. 174 (1922)..................................................................................8

## Statutes

5 U.S.C. § 553...............................................................................................17, 18

5 U.S.C. § 704 ..............................................................................................................11

5 U.S.C. § 706 .......................................................................................................14, 17

8 U.S.C. § 1226 ...............................................................................................................5

8 U.S.C. § 1231 ...............................................................................................................5

12 U.S.C. § 5493 ...........................................................................................................16

12 U.S.C. § 5531 ....................................................................................................14, 16

12 U.S.C. § 5536 ..............................................................................................1, 14, 16

12 U.S.C. §§ 5563–65 ..................................................................................................13

15 U.S.C. § 45 ...............................................................................................................17

20 U.S.C. § 1098bb .........................................................................................................7

20 U.S.C. § 1098ee ..........................................................................................................7

29 U.S.C. § 655 ...............................................................................................................4

40 U.S.C. § 121 ...............................................................................................................4

42 U.S.C. § 3605 ...........................................................................................................13

Ariz. Rev. Stat. Ann. § 41-1491.20 .......................................................................8, 13

Ark. Code Ann. § 4-87-104 ....................................................................................8, 13

Ark. Code Ann. § 16-123-107 ................................................................................8, 13

Ga. Code Ann. § 7-6-1 ............................................................................................8, 13

Ind. Code Ann. § 24-9-3-9 .....................................................................................8, 13

La. Stat. Ann. § 51:2255 .........................................................................................8, 13

Miss. Code Ann. § 43-33-723 ................................................................................8, 13

Ohio Rev. Code Ann. § 4112.021 ..........................................................................8, 13

Pub. L. No. 96-252, 94 Stat. 374 (1980) ....................................................................17

S.C. Code Ann. § 31-21-60 ....................................................................................8, 13

Tenn. Code Ann. § 47-18-802 ................................................................................8, 13

Tex. Prop Code Ann. § 301.026 ..................................................................8, 13

Utah Code Ann. § 57-21-6..........................................................................8, 13

**Executive Materials**

COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed.
 Reg. 61402 (Nov. 5, 2021)....................................................................4

Enhanced Disclosures by Certain Investment Advisers and Investment Companies
 About Environmental, Social, and Governance Investment Practices, 87 Fed.
 Reg. 36654 (June 17, 2022) ...................................................................6

The Enhancement and Standardization of Climate-Related Disclosures for
 Investors, 87 Fed. Reg. 21334 (Apr. 11, 2022)...................................6

Exec. Order No. 14008, 86 Fed. Reg. 7619 (Jan. 27, 2021)...........................6

Exec. Order No. 14026, 86 Fed. Reg. 22835 (Apr. 27, 2021) ........................5

Exec. Order No. 14030, 86 Fed. Reg. 27967 (May 20, 2021) ........................6

Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sept. 9, 2021) .........................4

FACT SHEET: President Biden Announces Student Loan Relief for Borrowers
 Who Need It Most (Aug. 24, 2022) ......................................................8

Federal Student Aid Programs, 87 Fed. Reg. 61512-01 (Oct. 12, 2022).........7

Jen Psaki, *Press Briefing* (Aug. 3, 2021) ....................................................2

Jen Psaki, *Press Briefing* (July 23, 2021) ...................................................3

Joseph R. Biden, *Remarks Laying Out the Next Steps in Our Effort to Get More
 Americans Vaccinated and Combat the Spread of the Delta Variant* (July 29,
 2021) ....................................................................................................3

Joseph R. Biden, *Remarks on Fighting the COVID-19 Pandemic* (Aug. 3, 2021).........................2

Joseph R. Biden, *Remarks on Strengthening American Leadership on Clean Cars
 and Trucks* (Aug. 5, 2021) .............................................................3, 9

Mun. Secs. Rulemaking Bd., Request for Information on Environmental, Social
 and Governance (ESG) Practices in the Municipal Securities Market (Dec. 8,
 2021) ....................................................................................................6

National Performance Management Measures; Assessing Performance of the
 National Highway System, Greenhouse Gas Emissions Measure, 87 Fed. Reg.
 42401-01 (July 15, 2022).....................................................................6

Office of the Comptroller of the Currency, OCC Bull. No. 2021-62, Principles for Climate-Related Financial Risk Management for Large Banks (Dec. 16, 2021) ....................6

Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 86 Fed. Reg. 57272 (Oct. 14, 2021) ...............................................................6

Request for Information on Climate-Related Financial Risk, 87 Fed. Reg. 34856-01 (June 8, 2022)..............................................................................................6

Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Sept. 24, 2021) ....................................4

Statement of Principles for Climate-Related Financial Risk Management for Large Financial Institutions, 87 Fed. Reg. 19507 (Apr. 4, 2022) ............................6

Technical Conference on Greenhouse Gas Mitigation: Natural Gas Act Sections 3 and 7 Authorizations; Notice Inviting Technical Conference Comments, 86 Fed. Reg. 66293-01 (Nov. 22, 2021) .................................................................6

Temporary Halt in Residential Evictions in Communities With Substantial or High Transmission of COVID-19 to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 43244 (Aug. 6, 2021).......................................................................3

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)........................................................................14

Comm'r Hester M. Peirce, *Statement* (Mar. 21, 2022)...................................................7

Emily Cochrane & Catie Edmondson, *Mionimum wage increase fails as 7 Democrats vote against the measure*, The New York Times (Mar. 5, 2021)............5

H.R. 2034, 117th Cong. § 2 (2021)..................................................................................7

Katie Lobosco, *Biden administration scales back student loan forgiveness plan as states sue*, CNN (Sept. 30, 2022).......................................................................10

Nancy Pelosi, *Transcript of Pelosi Weekly Press Conference Today* (July 28, 2021) ......................................................................................................................7

S. 2235, 116th Cong. § 101 (2019).................................................................................7

U.S. Const. art. I, § 1......................................................................................................10

## INTRODUCTION AND INTERESTS OF AMICI STATES[1]

*Amici curiae*, the States of Georgia, Alabama, Arizona, Arkansas, Idaho, Indiana, Louisiana, Mississippi, Oklahoma, South Carolina, Tennessee, Texas, Utah, and West Virginia respectfully submit this brief in support of Plaintiffs' Motion for Summary Judgment. As separate sovereigns within our federal system, the *amici* States have a strong interest in ensuring that the federal government respects the rule of law and does not arbitrarily impinge upon States' authority. But the Consumer Financial Protection Bureau seems intent on doing the latter, not the former, with its attempt to appoint itself a sort of anti-discrimination czar for the financial services sector.

The manual update at issue here is a clear example of federal executive overreach, with significant impacts on the States' capacity to regulate within their borders. The Dodd-Frank Act empowers CFPB to police "unfair, deceptive, or abusive act[s] [and] practice[s]" in the consumer finance industry. 12 U.S.C. § 5536(a)(1)(B). It does *not* authorize CFPB to investigate or punish general discrimination. Despite that obvious limitation, CFPB has now issued a rule declaring that "unfair" practices include *all* acts of discrimination, including, it seems, even supposed disparate impact claims. *See* Pls' Mot. for Summ. J., Ex. I at 11, 13–15, 17. And it announced this novel rule without any opportunity for notice and comment by interested parties—including *States*, which are deeply concerned with this sort of expansion of federal executive authority.

Unfortunately, this behavior is typical of a recent federal executive practice: undertaking major policy changes through agency action rather than the constitutionally prescribed legislative process. Worse still, agencies bury these significant policies in memos or ostensibly unofficial rules in the hopes of shielding them from State and private challenge. This Court should not

---

[1] Defendants do not oppose the filing of this *amici* brief.

condone such behavior here. It should hold that CFPB exceeded its authority and that Plaintiffs can challenge the updated manual *now*, because it is a final agency action.

## ARGUMENT

I. **CFPB's manual update is the latest example of the executive branch using agency action to implement a major policy change, without statutory authority, while trying to shield that overreach from judicial review.**

CFPB's attempt to impose far-reaching anti-discrimination requirements through an update to its examination manual is another in a long line of recent acts of federal executive overreach. It is also an example of another troubling trend: by trying to bury this major policy shift in a nearly 2,000 page "manual," rather than going through the ordinary process of notice and comment and official rulemaking, the agency seeks to skirt public criticism and judicial review. These tactics have been repeatedly rejected by other courts and they should be rejected here as well.

**1.** The President and his agencies have made a habit of taking actions they know or should know are in excess of their statutory authority—indeed, executive officers have often admitted publically that they lack authority to do something, and then done it anyway. For instance, in June 2021, a majority of the Supreme Court made clear that the Centers for Disease Control and Prevention lacked the authority to issue a nationwide moratorium on evictions during the COVID-19 pandemic. *See Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2320 (2021) (Kavanaugh, J., concurring) ("[T]he Centers for Disease Control and Prevention exceeded its existing statutory authority by issuing a nationwide eviction moratorium."). President Biden agreed with this assessment, acknowledging that any additional moratorium was "not likely to pass constitutional muster." Joseph R. Biden, *Remarks on Fighting the COVID-19 Pandemic* (Aug. 3, 2021), available at https://bit.ly/3untKvw. His press secretary was even more direct: "any further action" on an eviction moratorium "would need legislative steps forward." Jen Psaki, *Press Briefing* (Aug. 3, 2021), available at https://bit.ly/3VsVN8C.

The President, however, was undeterred. Despite acknowledging that he lacked the statutory authority to issue a new eviction moratorium, he did exactly that. *See* Temporary Halt in Residential Evictions in Communities With Substantial or High Transmission of COVID-19 to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 43244, 43244–52 (Aug. 6, 2021). "[I] don't have the authority to [issue a new moratorium]," but "I went ahead and did it." Joseph R. Biden, *Remarks on Strengthening American Leadership on Clean Cars and Trucks* (Aug. 5, 2021), available at https://bit.ly/3XWsQn1. Of course, the Supreme Court intervened again only weeks later to end the unlawful moratorium, noting that the Administration's pretextual reading of the emergency standards provision was "unprecedented" and "breathtaking." *See Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021).

The President used the COVID-19 pandemic as an excuse to act beyond its statutory authority in other contexts as well. In the summer of 2021, the President publically recognized that vaccine mandates are "not the role of the federal government." Jen Psaki, *Press Briefing* (July 23, 2021), available at https://bit.ly/3VyxLJk. He made clear that he wanted to "work with states to encourage unvaccinated people to get vaccinated." Joseph R. Biden, *Remarks Laying Out the Next Steps in Our Effort to Get More Americans Vaccinated and Combat the Spread of the Delta Variant* (July 29, 2021), available at  https://bit.ly/3VNo75j. He even praised political opponents, like "Alabama Republican Governor Kay Ivey" and Senator McConnell, who "spoke out to encourage vaccination." *Id*.

But the White House suddenly changed course in September 2021, issuing a raft of vaccine mandates with the most tenuous of purported statutory authority. For instance, the Occupational Safety and Health Administration issued an unprecedented national vaccine mandate covering two-thirds of all private sector workers, supposedly under its authority to regulate workplace

safety. *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61402, 61403 (Nov. 5, 2021). The mandate relied on 29 U.S.C. § 655(c)(1), which empowers OSHA to issue "emergency temporary standard[s]" when such standards are necessary to protect employees from grave dangers in the workplace—not public health crises. Similarly, the President issued a vaccine mandate directed specifically at employees of federal contractors. *See* Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sept. 9, 2021); Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, at 5 (Sept. 24, 2021), available at https://bit.ly/3VDPjUv. The President claimed authority to impose this mandate on all employees of all federal contractors and subcontractors based on the Federal Property and Administrative Services Act. *Id.* That law—also known as the Procurement Act—is a modest piece of legislation designed to reduce inefficiencies in government by authorizing the president to "prescribe policies and directives" that streamline executive agencies' systems for procuring goods and services. 40 U.S.C. § 121(a).  But the President, relying on a tortured reading of the Act's statement of purpose that essentially converted it into an unlimited source of unilateral authority over all federal contractors, used it to impose, without notice or comment, an "all-encompassing vaccine requirement." *Georgia v. President of the United States*, 46 F.4th 1283, 1296 (11th Cir. 2022). As the President's own chief of staff advertised, these outlandish statutory interpretations were "the ultimate work-around for the Federal govt to require vaccinations." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 612 n.13 (5th Cir. 2021) (quoting retweet from White House Chief of Staff Ron Klain).

Recent executive overreach goes well beyond public health regulation. Consider the President's decision to unilaterally raise the minimum wage for all companies doing business with the federal government. After Congress specifically *rejected* President Biden's effort to raise the

federal minimum wage through legislation, *see* Emily Cochrane & Catie Edmondson, *Mionimum wage increase fails as 7 Democrats vote against the measure*, The New York Times (Mar. 5, 2021), https://nyti.ms/3OVMg7s, the President decided he did not need Congress and would raise the minimum wage on his own, for all federal contractors, *see* Exec. Order No. 14026, 86 Fed. Reg. 22835 (Apr. 27, 2021). Or consider the Administration's recent immigration directive instructing the Department of Homeland Security to deprioritize the removal of certain criminal aliens, *see Texas v. United States*, 40 F.4th 205, 213 (5th Cir. 2022), despite explicit statutory commands that DHS "shall" detain and remove such aliens, *see* 8 U.S.C. §§ 1226(c)(1), 1231(a)(1)–(2). As the Fifth Circuit explained, this new policy was a "disingenuous attempt on behalf of DHS to claim it acts within the bounds of federal law while practically disregarding that law." *Texas*, 40 F.4th at 226. And although the directive foreseeably shifted the "substantial costs associated with [aliens'] criminal recidivism" onto State governments, *id.* at 216, the executive branch never consulted with affected States before instituting the new policy, *id.* at 227–28.

The President and executive agencies have also, again and again, tried to impose climate policy without congressional action. In the last year alone, at least eight federal agencies— including such environmentally focused agencies as the Securities and Exchange Commission, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency—have issued either proposed rules or requests for information indicating their intent to impose burdensome climate-related disclosure and compliance regulations affecting States and private entities.[2] Many of these proposals are a direct response to President Biden's order that federal

---

[2] *See, e.g.*, Mun. Secs. Rulemaking Bd., Request for Information on Environmental, Social and Governance (ESG) Practices in the Municipal Securities Market (Dec. 8, 2021), available at

agencies take "bold, progressive action" to "combat the climate crisis." Exec. Order No. 14008, 86 Fed. Reg. 7619, 7622 (Jan. 27, 2021) (suggesting that federal agencies exercise some "creativity" to "deliver environmental justice … all across America"); *see also* Exec. Order No. 14030, 86 Fed. Reg. 27967, 27967 (May 20, 2021) (encouraging federal agencies to promulgate rules regarding the "disclosure of climate-related financial risk").

But exhortations from the president are no stand-in for statutory authorization. And none of these agencies has any statutory responsibility for climate policy. To take just one example, the SEC has aggressively moved to enforce climate-related disclosures and other policies on regulated entities—but the SEC is the Securities and Exchange Commission, "[n]ot the Securities and

---

https://bit.ly/3VKs8Ym (inquiring into ESG disclosure practices of municipalities); Office of the Comptroller of the Currency, OCC Bull. No. 2021-62, Principles for Climate-Related Financial Risk Management for Large Banks (Dec. 16, 2021), available at https://bit.ly/3z58kqj (dictating corporate governance policies to large banks under the pretext of mitigating "exposures to climate-related financial risks"); Technical Conference on Greenhouse Gas Mitigation: Natural Gas Act Sections 3 and 7 Authorizations; Notice Inviting Technical Conference Comments, 86 Fed. Reg. 66293-01 (Nov. 22, 2021) (regarding how the Federal Energy Regulatory Commission should require natural gas companies to mitigate greenhouse gas emissions); Statement of Principles for Climate-Related Financial Risk Management for Large Financial Institutions, 87 Fed. Reg. 19507 (Apr. 4, 2022) (Federal Deposit Insurance Corporation's proposal to impose the ESG framework on other large financial institutions); Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 86 Fed. Reg. 57272 (Oct. 14, 2021) (proposal from Employee Benefits Security Administration encouraging retirement fund managers to "make investment decisions that reflect climate change and other [ESG] considerations" instead of maximizing financial return); The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed. Reg. 21334 (Apr. 11, 2022) (proposal from the Securities Exchange Commission to impose a variety of intrusive climate-related disclosure requirements on publicly traded companies); Request for Information on Climate-Related Financial Risk, 87 Fed. Reg. 34856-01 (June 8, 2022) (Commodity Futures Trading Commission); Enhanced Disclosures by Certain Investment Advisers and Investment Companies About Environmental, Social, and Governance Investment Practices, 87 Fed. Reg. 36654 (June 17, 2022) (proposal from the SEC requiring ESG funds to provide detailed reports); National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 87 Fed. Reg. 42401-01 (July 15, 2022) (proposal from the Federal Highway Administration to require state transportation departments to establish declining carbon dioxide emission targets).

Environment Commission."  *See, e.g.*, Comm'r Hester M. Peirce, *Statement* (Mar. 21, 2022), available at https://bit.ly/3unuSzg. That point is underscored by the Supreme Court's recent decision in *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022), where the Court held that not even the EPA—an agency that *does* have some measure of responsibility over climate policy—may claim broad authority to "restructure" entire sectors of the American economy in the name of environmental concerns without clear statutory authorization to do so.

Among the most egregious examples of executive overreach is the most recent: President Biden's plan to cancel hundreds of billions of dollars in student loans. *See* Federal Student Aid Programs, 87 Fed. Reg. 61512-01, 61514 (Oct. 12, 2022). Of course, the executive has no inherent authority to remove hundreds of billions of dollars from the federal treasury and distribute it to favored constituents, so the President claims to derive such power from the HEROES Act. *See id.* But one searches the text of the HEROES Act in vain for any such authorization. That Act merely allows the Department of Education to "waive or modify" certain administrative requirements or adjust income calculations for individuals affected by a war or national emergency. 20 U.S.C. §§ 1098bb(a)(1)–(2), 1098ee(2). It does not authorize wholesale debt cancellation.

Indeed, Congress has declined multiple times to pass a bill that would authorize exactly the kind of debt cancellation the President seeks to provide. *See, e.g.*, S. 2235, 116th Cong. § 101 (2019); H.R. 2034, 117th Cong. § 2 (2021). And the Speaker of the House—a member of the President's own party—insisted that the President "does not have [the] power [to cancel loans]. That has to be an act of Congress." Nancy Pelosi, *Transcript of Pelosi Weekly Press Conference Today* (July 28, 2021), available at https://bit.ly/3PcpRD1. President Biden decided to attempt to cancel the loans anyway, to fulfill a "campaign commitment." *See FACT SHEET: President Biden*

*Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022), available at https://bit.ly/3OZz4yI.

All of these actions share another point in common: they intrude on State prerogatives and interests. "It is a traditional exercise of the States' police powers to protect the health and safety of their citizens." *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (citation omitted). That includes, for instance, "compulsory vaccination." *Zucht v. King*, 260 U.S. 174, 176 (1922). Yet the President decided he would override State decisions on this point with barely-there arguments as to his statutory authority. Likewise, States have their own minimum wage laws, and Congress struck a careful balance between State and national interests when it enacted the federal minimum wage— a balance that the President simply disregarded. The President's refusal to deport violent criminals likewise damages States, who are limited in their own authority to enforce immigration law. *See Arizona v. United States*, 567 U.S. 387, 409–10 (2012). CFPB's action here follows the same pattern: States have their own consumer protection and anti-discrimination statutes. *See, e.g.*, Ga. Code Ann. § 7-6-1(a); Ariz. Rev. Stat. Ann. § 41-1491.20; Ark. Code Ann. §§ 4-87-104; 16-123-107(a)(4); Ind. Code Ann. § 24-9-3-9; La. Stat. Ann. § 51:2255; Miss. Code Ann. § 43-33-723; Ohio Rev. Code Ann. § 4112.021; S.C. Code Ann. § 31-21-60(B)(1); Tenn. Code Ann. § 47-18-802; Tex. Prop Code Ann. § 301.026; Utah Code Ann. § 57-21-6(1)(b)(i). If Congress wishes to displace those laws in favor of a unified federal regime, *Congress* must do it.

**2.** There is something more troubling about many of these executive overreaches: they are, at times, designed to *avoid* input from the States and, critically, judicial review. Agencies and the President have repeatedly tried to bury major policy changes in memos and "manuals" rather than go through the more difficult (but *legal*) process of notice and comment. Agencies, moreover, often take advantage of the natural delay in judicial proceedings to prevent courts from passing

judgment on the legality of their actions, or they try to structure their policies so that no one has standing to challenge them.

When he issued the renewed eviction moratorium, for example, President Biden touted that, whatever its legality, and even though the Supreme Court would certainly enjoin it, he could "keep [the new moratorium] going for a month at least" before litigation concluded. Joseph R. Biden, *Remarks on Strengthening American Leadership on Clean Cars and Trucks* (Aug. 5, 2021), available at https://bit.ly/3Vsx7Nz.

In the States' challenge to the Administration's unlawful contractor vaccine mandate, the government repeatedly argued that States lacked standing to sue because they had (supposedly) not *yet* been forced to comply with the mandate. *Georgia v. Biden*, 574 F. Supp. 3d 1337, 1349 (S.D. Ga. 2021). In the government's view, States should have waited to sue until it withdrew hundreds of millions of dollars in contracts. Likewise, when DHS announced it would deprioritize the removal of certain violent criminal aliens, it insisted that its new rule was nothing more than a nonbinding internal memorandum, not a final agency action subject to judicial review. *See Texas*, 40 F.4th at 221, 226 (describing that argument as "untenable").

In the most brazen recent maneuver, the President and Department of Education have repeatedly revised their student loan cancellation plan, not to make the plan more equitable or fair (or, for that matter, legal), but specifically to avoid affecting anyone who might otherwise have standing to challenge it. For instance, when an individual debtholder alleged that forgiveness would increase his state income taxes, the Department of Education "opted [him] out of the loan forgiveness program which prevented [him] from establishing … harm." *Garrison v. Dep't of Educ.*, No. 1:22-cv-01895, 2022 WL 16509532, at *1 (S.D. Ind. Oct. 21, 2022). And when a coalition of States alleged that the federal loan forgiveness program would deprive loan servicers

of the revenue they earn servicing the loans, the Department again revised the policy so that debtholders could no longer consolidate private loans into the federal program. *See* Katie Lobosco, *Biden administration scales back student loan forgiveness plan as states sue*, CNN (Sept. 30, 2022), https://cnn.it/3H2OtfD. The Department has, in essence, tried to make its loan cancellation a moving target, immune to judicial review. And all of that is to say nothing of the fact that, even now, there is still no proposed rule, subject to notice and comment, that would effectuate this massive transfer of wealth—the federal executive branch wants to move half a trillion dollars around as quietly as possible.

As the Supreme Court observed last term, federal agencies cannot treat statutes like an "open book to which [they] may add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609 (alteration adopted and citation omitted). That is not how our system of government operates. *See* U.S. Const. art. I, § 1 (vesting "[a]ll legislative powers … in Congress"). And it upsets the balance between efficient rulemaking and democratic accountability embodied in the Administrative Procedure Act. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) ("The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." (citation omitted)). Yet here again, CFPB seems determined to do as much unless a court orders otherwise.

## II. The updated examination manual is a final agency action subject to judicial review.

CFPB's revision of "unfair practices" to include all instances of discrimination in the consumer finance industry effectively rewrites the Dodd-Frank Act to encompass many practices that Congress could have, but chose not to, regulate. And by implementing these new rules in an otherwise routine update to its nearly 2,000-page examination manual rather than through the APA-prescribed rulemaking process, the agency has attempted to shield itself from judicial review,

not to mention public criticism, including from the States. *See, e.g.*, *United States v. Reynolds*, 710 F.3d 498, 519–20 (3d Cir. 2013) ("The essential purpose of according § 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." (alteration adopted and citation omitted)).

Here, for instance, the government will almost certainly attempt to defend this rule by arguing, among other things, that it is not a final agency action subject to an APA challenge. After all, the government has repeatedly deployed similar arguments against States attempting to challenge illegal encroachments on State authority, from federal vaccine mandates to student debt cancellation. *See supra* Section I.

This Court should not fall for these tactics. Regulated entities cannot feasibly wait *until they are investigated* by CFPB to challenge the agency's gross overreach. The potential liability is staggering. The compliance costs are substantial. CFPB cannot hide illegal requirements in a policy manual, subject private entities to huge costs and uncertainty, and do it all without judicial review—or even public comment.

Judicial review is available for any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An agency action is "final" when it (1) is "the consummation of the agency's decisionmaking process" and (2) determines "rights or obligations" or has "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). CFPB's updated manual satisfies both of these requirements.

There is no question that the updated manual was the consummation of CFPB's decisionmaking process. An agency action consummates the decisionmaking process when it is not "merely tentative or interlocutory." *Id.* at 178. That is true here because there is no further

11

review or approval necessary before the update to the manual—namely, CFPB's revision of the term "unfair" to include discrimination—takes effect. *See U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (explaining a decision is final when it is "not typically revisited"); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478–79 (2001) (finding an agency action final when the agency "rendered its last word on the matter" (citation omitted)). Under the new examination manual, in other words, it is CFPB's "settled position" that regulated entities are liable for discrimination, and examiners are required to conduct their investigations accordingly. *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021); *see* Mot., Ex. I at 13 (instructing examiners to "[d]etermine whether … [t]he entity has a process to prevent discrimination in relation to all aspects of consumer financial products or services").

For much the same reason, the updated manual has clear legal consequences. It "impose[s] new … duties" on Plaintiffs. *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022) (citation omitted). Before the manual update, Plaintiffs were not subject to investigation and enforcement actions by CFPB relating to discrimination, which, as defined by CFPB, could include broad claims of disparate impact; after the update, they are. *See* Mot., Ex. K at 2 (announcing "changes" to CFPB's enforcement of the ban on unfair practices and explaining that the updated manual "expand[s]" liability for "discriminatory practices across the board in consumer finance"); *id.* ("Discrimination or improper exclusion can [now] trigger liability under [the] ban on unfair acts or practices.").

Moreover, "failure to comply with this new rule comes with the risk of penalties." *Mann Constr.*, 27 F.4th at 1143 (citations omitted). Should CFPB determine that a regulated entity is not complying, it may issue a "Matter Requiring Attention" that will be used to determine "the need for potential enforcement action," Mot., Ex. J at 16. Such action could result in financial penalties,

public notification of noncompliance, or limits on the entity's business activities, Mot., Ex. H at 7; *see also* 12 U.S.C. §§ 5563–65.

Put simply, the updated manual is a final action because it "alter[s] the legal regime to which [Plaintiffs] are subject." *Bennett*, 520 U.S. at 178. This is obvious when one considers that Plaintiffs and other regulated entities have *already* had to alter their compliance systems, hire additional staff, and spend more money to ensure they do not run afoul of the new rule. *See, e.g.*, Mot., Ex. A ¶¶ 16–19 (noting that additional compliance costs for Chamber of Commerce members will range from $10,000 to more than $1 million annually).

Of course, States themselves have antidiscrimination laws that apply to these entities, not to mention federal statutes. *See, e.g.*, Ga. Code Ann. § 7-6-1(a); Ariz. Rev. Stat. Ann. § 41-1491.20; Ark. Code Ann. §§ 4-87-104; 16-123-107(a)(4); Ind. Code Ann. § 24-9-3-9; La. Stat. Ann. § 51:2255; Miss. Code Ann. § 43-33-723; Ohio Rev. Code Ann. § 4112.021; S.C. Code Ann. § 31-21-60(B)(1); Tenn. Code Ann. § 47-18-802; Tex. Prop Code Ann. § 301.026; Utah Code Ann. § 57-21-6(1)(b)(i); 42 U.S.C. § 3605. And no one has any interest in seeing those laws flouted. But CFPB's new rule threatens to go far beyond actual discrimination: CFPB will decide what "discrimination" means, when to investigate it, and how it must be remedied, all with enormous costs to employers and without any meaningful judicial oversight until it is far too late. And CFPB has tried to immunize itself from any meaningful legal challenge by hiding these draconian new requirements in a policy manual. That is not the administration of justice; it is a modern version of the Star Chamber, and the Court should reject it.

### III. The updated examination manual encroaches on States' traditional authority without clear statutory authorization or notice-and-comment rulemaking.

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *NFIB v. Dept. of Labor*, 142 S. Ct. 661, 665 (2022). The

APA embodies this rule in its requirement that a reviewing court set aside any agency action "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). Relevant here, the Dodd-Frank Act charges CFPB with enforcing the ban on any "unfair, deceptive, or abusive act or practice under Federal law." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). CFPB now asserts that this provision also authorizes it to punish discrimination within the consumer finance industry. *See* Mot., Ex. K (claiming discrimination "trigger[s] … [the] ban on unfair acts and practices"). But that claim misreads the Act's text and ignores basic canons of construction meant to maintain the separation of powers and the balance of authority between States and the federal government. And it does all this while illegally ignoring notice and comment procedures.

1. Start with the text. The Dodd-Frank Act's ban on unfair acts and practices is just that— a ban on unfair acts and practices, not a ban on discrimination. Both the statutory definition and common usage confirm the distinction. The statutory definition of "unfairness," for one, makes no mention of discrimination. *See* 12 U.S.C. § 5531(c). "[I]t would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) (citation omitted). And in everyday use, "unfairness" and "discrimination" are different words denoting different concepts. *Compare Unfair*, Black's Law Dictionary (11th ed. 2019) ("Not honest, impartial, or candid; unjust"), *with Discrimination*, Black's Law Dictionary (11th ed. 2019) ("[A] failure to treat all persons equally when no reasonable distinction can be found….").

Federalism concerns confirm what the text already makes plain. When the executive branch invokes powers that would "significantly alter the balance between federal and state power," Congress must authorize that change with "exceedingly clear language." *Ala. Ass'n of Realtors*,

141 S. Ct. at 2489 (quoting *U. S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020)). This rule derives from "basic principles of federalism embodied in the Constitution," which permits a federal statute to "intrude[] on the police power of the States" only when plainly authorized by Congress. *Bond v. United States*, 572 U.S. 844, 859–860 (2014) (citation omitted). Employer regulation, antidiscrimination, consumer protection—these are all fundamental aspects of the States' police power. Again, States already have antidiscrimination statutes, they already protect consumers, and they already regulate these types of entities. If CFPB is going to intrude on that sphere of authority, it must have *clear* authorization to do so, and it simply does not.

The major questions doctrine likewise requires a narrower understanding of CFPB's power. Regulation of all forms of discrimination (vaguely defined so that it can include even disparate impact claims) across an entire industry is an enormous power, with considerable implications for both the regulating agency and the regulated companies. *See* Mot., Ex. A ¶ 19 (noting that some companies will incur more than $1 million in annual compliance costs). Where an agency purports to exercise a power of such "vast economic and political significance," it must show that Congress clearly authorized the action at issue. *NFIB*, 142 S. Ct. at 665 (citation omitted). CFPB cannot clear this high bar merely by reference to the Dodd-Frank Act's general prohibition on "unfair" practices. "Extraordinary grants of regulatory authority," after all, "are rarely accomplished through … vague terms" or "implicit delegation." *West Virginia*, 142 S. Ct. at 2609 (citation omitted). That is especially true where, as here, the agency's proposed reading is a novel departure from the established understanding of the statute's meaning. *See id.* at 2608–09. Put differently, CFPB's decision to root out discrimination across the consumer finance industry where it had never done so before is not a mere fill-in-the-blank situation; it is a significant policy

15

decision about what harms it has the authority to address—the sort of decision we would expect Congress to make. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring in the judgment) ("[F]undamental policy decisions" are the "essence of legislative authority under our system" and "must be made by the elected representatives of the people").

Now consider the statutory context. There were, of course, many anti-discrimination statutes in effect when Congress passed the Dodd-Frank Act. Two such statutes *were* incorporated into CFPB's jurisdiction. *See* 12 U.S.C. § 5493(c) (empowering CFPB to oversee the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act to "ensure … nondiscriminatory access to credit"). But the Dodd-Frank Act did *not* incorporate other federal antidiscrimination statutes or confer upon CFPB a general power to combat discrimination in the consumer finance industry. In other words, where Congress wanted CFPB to tackle discrimination, it told CFPB to do so, yet Congress included no such instruction when it empowered CFPB to enforce the ban on unfair practices. *See* 12 U.S.C. §§ 5531(a), 5536(a)(1)(B); *see also Badgerow v. Walters*, 142 S. Ct. 1310, 1318 (2022) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate." (alteration adopted and citation omitted)).

CFPB's new antidiscrimination requirements also ignore the consistent usage of these terms elsewhere in the U.S. Code. For instance, CFPB's novel interpretation of "unfair" departs from the well-established understanding that the term does *not* include discrimination. The Federal Trade Commission Act, from which the Dodd-Frank Act borrowed its unfairness language, has since 1980 defined unfairness without reference to discrimination. *See* Pub. L. No. 96-252, 94 Stat. 374 (1980); 15 U.S.C. § 45(n); *Sekhar v. United States*, 570 U.S. 729, 733 (2013) ("Where

Congress borrows terms of art" with a settled meaning, "it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." (alteration adopted and citation omitted)). And CFPB itself has never before understood "unfairness" to include discrimination. *See* Mot., Ex. L (2012 enforcement manual noticeably lacking any mention of discrimination in the unfair practices section).

**2.** On top of all this, CFPB has tried to accomplish its goals while avoiding notice-and-comment rulemaking. The APA requires setting aside any substantive rule promulgated without an opportunity for notice and comment. *See* 5 U.S.C. §§ 553(b)–(c), 706(2)(D). Any rule that "has the force and effect of law" is a substantive rule. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (citation omitted). That is true of the updated manual because, as explained above, it "impose[s] new … duties" on Plaintiffs. *Mann Constr.*, 27 F.4th at 1143 (citation omitted). It "affects[s] [their] rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979).

CFPB has not even tried to explain why it declined to issue this policy change as a new rule. That is probably because none of the exceptions even arguably apply. This new rule is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(1). Interpretative rules go to understanding *previous* rules, they do not create *new obligations*. *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999). Nor could CFPB have "good cause" to "find[] (and incorporate[] the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). (CFPB did not even try to avail itself of this exception.)

Setting aside the technical illegalities for a moment, it should go without saying that notice and comment is essential for ensuring that "unrepresentative agencies" remain accountable to the

public when issuing substantive rules. *See Reynolds*, 710 F.3d at 520 (citation omitted). And it is especially important for *States* to have an opportunity to weigh in on and object to new federal rules where those rules impinge on state interests or spheres of authority. *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (citation omitted) (warning against regulations that intrude upon matters within "the particular domain of state law").

It seems that avoiding state input and public accountability is exactly what CFPB is trying to do. The APA's procedural requirements, however, are not optional, and that is reason enough to set aside this extraordinary assertion of authority.

## CONCLUSION

CFPB has "gone beyond what Congress has permitted [it] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). This Court should remedy CFPB's overreach, grant summary judgment in Plaintiffs' favor, and set aside the March 2022 update to the examination manual.

Respectfully submitted,

Dated: December 7, 2022

/s/ *Stephen J. Petrany*
Christopher M. Carr
   *Attorney General of Georgia*
Stephen J. Petrany*
   *Solicitor General of Georgia*
   *Lead Counsel*
Paul R. Draper
   *Honors Fellow*
Georgia Department of Law
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
* *pro hac vice application pending*

Steve Marshall
   *Attorney General of Alabama*

Leslie Rutledge
   *Attorney General of Arkansas*

Theodore E. Rokita
   *Attorney General of Indiana*

Lynn Fitch
   *Attorney General of Mississippi*

Alan Wilson
   *Attorney General of South Carolina*

Ken Paxton
   *Attorney General of Texas*

Patrick Morrisey
   *Attorney General of West Virginia*

Mark Brnovich
   *Attorney General of Arizona*

Lawrence G. Wasden
   *Attorney General of Idaho*

Jeff Landry
   *Attorney General of Louisiana*

John M. O'Connor
   *Attorney General of Oklahoma*

Jonathan Skrmetti
   *Attorney General & Reporter of Tennessee*

Sean D. Reyes
   *Attorney General of Utah*

19

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing brief was electronically filed with the Clerk of Court using the CM/ECF system on December 7, 2022, thereby serving all counsel of record.

*/s/ Stephen J. Petrany*
Stephen J. Petrany