**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs* <br><br> v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*, <br><br> *Defendants.* | Case No. 6:22-cv-00381-JCB |

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................4

PROCEDURAL HISTORY ..................................................................................................8

LEGAL STANDARDS .........................................................................................................9

ARGUMENT .....................................................................................................................9

I.      Dismissal Is Warranted Because Plaintiffs Have Not Established Either Their Standing to Sue or That Venue Is Proper in This District ................................................................. 9

II.     The Court Lacks Jurisdiction Because the Exam Manual Is Not Final Agency Action ......12

III.    Plaintiffs' Appropriations Clause Claim Is Contradicted by Supreme Court Precedent, Constitutional Text, and Historical Practice ...................................................................20

IV.     If the Court Decides the Constitutional Claim on the Merits, It Should Not Reach the Non-Constitutional Claims ............................................................................................22

V.      The Bureau Acted Within the Bounds of Its Statutory Authority ...................................24

VI.     The Manual Revisions Are Not Arbitrary and Capricious ...............................................32

VII.    Plaintiffs Are Not Entitled to All of the Relief They Seek ..............................................36

        A.      Plaintiffs Have Not Demonstrated That An Injunction Is Warranted.........................36

        B.      Any Relief Should be Narrowly Tailored ...............................................................39

CONCLUSION ..................................................................................................................42

# TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Airlines, Inc. v. Herman,*
176 F.3d 283 (5th Cir. 1999)....................................................................................................13

*Am. Fin. Servs. Ass'n v. FTC,*
767 F.2d 957 (D.C. Cir. 1985)..................................................................................................30

*Amin v. Mayorkas,*
24 F.4th 383 (5th Cir. 2022) ..............................................................................................*Passim*

*Arizona v. Biden,*
31 F.4th 469 (6th Cir. 2022) ....................................................................................................40

*Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng's,*
217 F.3d 393 (5th Cir. 2000)........................................................................................3, 22, 23

*Bennett v. Spear,*
520 U.S. 154 (1997) ...........................................................................................................2, 13

*Brown v. U.S. Dep't of Educ.,*
2022 WL 16858525 (N.D. Tex. Nov. 10, 2022).......................................................................32

*BST Holdings, L.L.C. v. OSHA,*
17 F. 4th 604 (5th Cir. 2021) ...................................................................................................32

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .................................................................................................................40

*California v. Texas,*
141 S. Ct. 2104 (2021) .............................................................................................................40

*Cell Sci. Sys. Corp. v. La. Health Serv.,*
804 F. App'x 260 (5th Cir. 2020) ..............................................................................................9

*Cellnet Commc'ns, Inc. v. FCC,*
149 F.3d 429 (6th Cir. 1998)....................................................................................................32

*CFPB v. NDG Fin. Corp.,*
2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ........................................................................5, 25

*Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.,*
933 F.2d 1285 (5th Cir. 1991) ..................................................................................................32

*Cincinnati Soap Co. v. United States,*
301 U.S. 308 (1937) ...........................................................................................................20, 21

*Cohen v. Smith,*
534 F. Supp. 618 (S.D. Tex. 1982)...........................................................................................11

*Comm. Fin, Serv. Assoc. of Am. Ltd. v. CFPB,*
51 F.4th 616 (5th Cir. 2022) ..............................................................................................*Passim*

*Ctr. for Biological Diversity v. EPA,*
937 F.3d 533 (5th Cir. 2019)......................................................................................................9

*Ctr. for Biological Diversity v. Spellmon,*
2022 WL 3541879 (D. Mont. Aug. 18, 2022)................................................................2, 11, 12

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
45 F.4th 846 (5th Cir. 2022) ....................................................................................................37

*Dep't of Homeland Sec. v. New York,*
140 S. Ct. 599 (2020) ...............................................................................................................40

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ................................................................................36

*Espinoza v. Pompeo,*
    2020 WL 1941300 (W.D. Tex. Apr. 22, 2020) ..........................................12

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ................................................................................33

*Flast v. Cohen,*
    392 U.S. 83 (1968) ......................................................................................23

*FTC v. Accusearch Inc.,*
    570 F.3d 1187 (10th Cir. 2009) ........................................................26, 27, 31

*FTC v. Sperry & Hutchinson Co.,*
    405 U.S. 233 (1972) ....................................................................................25

*FTC v. Wyndham Worldwide Corp.,*
    799 F.3d 236 (3d Cir. 2015) .................................................................28, 30

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990) ....................................................................................10

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .......................................................................37, 40, 41

*Goldberg v. 400 E. Ohio Condo. Ass'n,*
    12 F. Supp. 2d 820 (N.D. Ill. 1998) ..........................................................35

*Hammoud v. Ma'at,*
    49 F.4th 874 (5th Cir. 2022) ......................................................................23

*Hancock Cnty. Bd. of Supervisors v. Ruhr,*
    487 F. App'x 189 (5th Cir. 2012) ..............................................................10

*Immigrant Assistance Project of the L.A. Cnty. Fed'n of Lab. v. INS,*
    306 F.3d 842 (9th Cir. 2002) ......................................................................11

*In re First Buckingham Cmty., Inc.,*
    73 FTC 938 ......................................................................................5, 28, 34

*Inst. of Certified Pracs., Inc. v. Bentsen,*
    874 F. Supp. 1370 (N.D. Ga. 1994) ...........................................................11

*Kappos v. Hyatt,*
    566 U.S. 431 (2012) ......................................................................................9

*Kazarian v. USCIS,*
    596 F.3d 1115 (9th Cir. 2010) .....................................................................15

*LabMD, Inc. v. FTC,*
    894 F.3d 1221 (11th Cir. 2018) ...................................................................26

*League of United Latin Am. Citizens v. Abbott,*
    2022 WL 1631301 (W.D. Tex. May 23, 2022) .......................................2, 10

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) ................................................................37, 41

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ....................................................................................10

*Madsen v. Women's Health Ctr.,*
    512 U.S. 753 (1994) ....................................................................................40

*McDonnell Douglas Corp. v. Islamic Republic of Iran,*
    758 F.2d 341 (8th Cir.1985) ........................................................................16

*Metro Cnty. Title, Inc. v. FDIC,*
    13 F.3d 883 (5th Cir. 1994) ...................................................................3, 33

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ...................................................................................38

*NAACP v. City of Kyle, Tex.,*
   626 F.3d 233 (5th Cir. 2010)..........................................................................9

*Norfolk S. Ry Co. v. City of Alexandria,*
   608 F.3d 150 (4th Cir. 2010)........................................................................23

*OPM v. Richmond,*
   496 U.S. 414 (1990) .............................................................................20, 21

*Orkin Exterminating Co. v. FTC,*
   849 F.2d 1354 (11th Cir.1988)......................................................................30

*Paez v. Wal-Mart Stores Tex., LLC,*
   2022 WL 3216343 (W.D. Tex. Aug. 9, 2022) .............................................32

*Pennsylvania v. Navient Corp.,*
   354 F. Supp. 3d 529 (M.D. Pa. 2018) ..........................................................35

*Peoples Nat. Bank v. Office of Comptroller of Currency,*
   362 F.3d 333 (5th Cir. 2004)..........................................................................2

*PHH Corp. v. CFPB,*
   881 F.3d 75 (D.C. Cir. 2018)........................................................................21

*Pueblo of Zuni v. United States,*
   2005 WL 8163572 (D.N.M. Oct. 18, 2005)................................................41

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
   140 S. Ct. 2183 (2020) ...........................................................................4, 21

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) .............................................................................10, 11

*Taylor-Callahan-Coleman Cntys. Dist. Adult Prob. Dep't v. Dole,*
   948 F.2d 953 (5th Cir. 1991)..................................................................12, 13

*Tex. Dep't of Hous. & Cmty Affairs v. Inclusive Cmtys. Project, Inc.,*
   576 U.S. 519 (2015).............................................................................34, 35

*Texas v. Becerra,*
   2022 WL 3639525 (N.D. Tex. Aug. 23, 2022) ...........................................41

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021) ........................................................................40

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019).............................................................13, 14, 15

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015).......................................................................41

*Texas v. United States,*
   2022 WL 2109204 (S.D. Tex. June 10, 2022) .............................................13

*Town of Chester, N.Y. v. Laroe Ests., Inc.,*
   137 S. Ct. 1645 (2017) ...........................................................................12, 23

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) .................................................................................40

*United States v. Craig,*
   861 F.2d 818 (5th Cir. 1988)..................................................................22, 23

*VanDerStok v. Garland,*
   2022 WL 4809376 (N.D. Tex. Oct. 1, 2022)...............................................41

*Veldhoen v. U.S. Coast Guard,*
   35 F.3d 222 (5th Cir. 1994)....................................................................12, 13

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ...........................................................................................32
*Zaidi v. United States Sent'g, Comm'n,*
  115 F. Supp. 3d 80 (D.D.C. 2015)........................................................................37

## Statutory and Constitutional Provisions

5 U.S.C. § 553 ..................................................................................................8, 19
5 U.S.C. § 702 .......................................................................................................12
5 U.S.C. § 704 .......................................................................................................13
5 U.S.C. § 706 .................................................................................................*Passim*
12 U.S.C. § 2801 .....................................................................................................4
12 U.S.C. § 5302 ...................................................................................................21
12 U.S.C. § 5481 ...................................................................................................29
12 U.S.C. § 5491 ...............................................................................................4, 20
12 U.S.C. § 5497 .........................................................................................4, 20, 21
12 U.S.C. § 5511 .....................................................................................................4
12 U.S.C. § 5514 ...............................................................................................4, 17
12 U.S.C. § 5515 ...........................................................................................5, 6, 17
12 U.S.C. § 5531 ............................................................................................*Passim*
12 U.S.C. § 5536 ............................................................................................*Passim*
15 U.S.C. § 45 ....................................................................................5, 25, 26, 34
15 U.S.C. § 1691 ...................................................................................................28
28 U.S.C. § 1391 ...................................................................................................11
42 U.S.C. § 3601 ...................................................................................................28
47 U.S.C. § 202.....................................................................................................30
U.S. Const. Art. I, § 8, Cl. 12 ...............................................................................21
U.S. Const. Art. I, § 9, Cl. 7 .................................................................................20

## Rules

Fed. R. Civ. P. 12...............................................................................................9, 12
Fed. R. Civ. P. 56..................................................................................................9
Fed. R. Civ. P. 65..................................................................................................39

## Regulations

Payday, Vehicle Title, and Certain High-Cost Installment Loans.,
  82 Fed. Reg. 54472 (Nov. 17, 2017) .................................................................8

## Other Authorities

Financial Institution Letters (Mar.11, 2004) .......................................5, 28, 30, 34
FTC Policy Statement on Unfairness (Dec. 17, 1980)...........................................26
H.R. Conf. Rep. No. 111-517................................................................................31
OCC, Comptrollers Handbook, Fair Lending...........................................29, 30, 34
Pub. L. No. 63–203................................................................................................25

S. Rep. No. 63–597.............................................................................................................................25

## **INTRODUCTION**

In March 2022, the Consumer Financial Protection Bureau (CFPB or Bureau) revised the manual that it issues to "provide[] internal guidance to its supervisory staff." CFPB, Supervision and Examination Manual ("Exam Manual"), Disclaimer.[1] Specifically, the Bureau made changes to the chapter of the Exam Manual that addresses (i) the statutory prohibition on unfair acts and practices by entities regulated by the Bureau, *see* 12 U.S.C. §§ 5531, 5536, and (ii) the way in which examiners will look for violations of that prohibition. *See* Exam Manual, Unfair, Deceptive, or Abusive Acts and Practices Chapter (UDAAP Chapter) (March 2022), ECF No. 1-2.

Plaintiffs—a group of trade associations suing on behalf of unnamed members—ask the Court to invalidate the March 2022 Manual Revisions. Compl., ECF No. 1, Sept. 28, 2022; Plaintiffs' Mot. for Summ. J. and Incorporated Mem. of Points and Auth. (Pls.' SJ Mem.), ECF No. 17, Nov. 29, 2022. Their most arresting contention is that the conventional wisdom has been wrong all these years: two wrongs do make a right. That is, Plaintiffs contend that conduct cannot be unfair under the statutory prohibition on unfair acts and practices, *see* 12 U.S.C. §§ 5531, 5536, if it is also discriminatory. It is an odd position (favoring discriminatory conduct based, for example, on race or religion), and one that is at odds with the text of the statute. *See* 12 U.S.C. § 5531(c). Nonetheless, Plaintiffs insist that the Bureau contravened the law by failing to recognize this atextual exception to unfairness. They do not stop there, however. Plaintiffs also maintain that, under the Administrative Procedure Act (APA), the Court should vacate the revisions because they are arbitrary and capricious and not issued through notice-and-comment rulemaking. Finally, relying on *Community Financial Services Association of America, Ltd. v. CFPB* (CFSA), 51 F.4th 616, 623 (5th Cir. 2022), Plaintiffs insist that the Court should vacate the March 2022 revisions because they were

---

[1] The complete Exam Manual is available at https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_2022-09.pdf.

issued by the CFPB using funding obtained through a purportedly unconstitutional funding mechanism.

Plaintiffs are mistaken, and the Court should dismiss this case. To start, Plaintiffs do not have standing. An exception to Article III's normal rule that standing to sue in federal court is limited to injured parties allows membership organizations to sue on behalf of injured members. But the organizations must name the members on whose behalf they are suing. After all, "to assess [its] power to decide a case, this Court must know who was injured and how." *League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-259, 2022 WL 1631301, at *6 (W.D. Tex. May 23, 2022) (three-judge panel). Plaintiffs, however, do not identify any member who has been injured. Thus, standing is lacking. Venue is too, for related reasons: since Plaintiffs have not established that any Plaintiff residing in this District has standing, by extension, they have not established that this Court is an appropriate venue. *See, e.g., Ctr. for Biological Diversity v. Spellmon*, No. 21-cv-47, 2022 WL 3541879, at *3 (D. Mont. Aug. 18, 2022) ("When venue is based on a plaintiff's residence, that particular plaintiff must have standing to bring the claims asserted."). This misstep, too, justifies dismissal.

The lack of final agency action provides yet another reason to dismiss the case. In the Fifth Circuit, final agency action is a jurisdictional prerequisite to review of claims relying on the APA's waiver of sovereign immunity. *See Peoples Nat. Bank v. Off. of Comptroller of Currency*, 362 F.3d 333, 336 (5th Cir. 2004). Here, there is no reviewable final agency action. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (defining agency action, in relevant part as an action "by which rights or obligations have been determined, or from which legal consequences will flow" (quotation marks omitted)). The Manual does not determine rights or obligations, nor does it generate legal consequences. It "provides internal guidance to [CFPB] supervisory staff," but "[i]t does not bind the CFPB and does not create any rights, benefits, or defenses, substantive or procedural, that are enforceable by any party in any manner." Exam Manual, Disclaimer. Most importantly, the challenged revisions do not

2

bind the CFPB or its staff to a legal position regarding what constitutes unfair conduct—they do not identify any specific conduct that must be considered unfair—nor do they impose any legal obligations on supervised parties.  Dismissal for lack of final agency action is, therefore, appropriate.

If Plaintiffs surmount these jurisdictional obstacles, then they appear to be entitled to relief under the reasoning of *CFSA*.  *CFSA* vacated a Bureau rule on the basis that it had been issued using money obtained through an unconstitutional funding mechanism.  *CFSA*, 51 F.4th at 643. And while the Bureau disagrees with that decision, its logic would apply to the manual revisions at issue here.  But, as Plaintiffs admit that a decision in their favor on the constitutional claim would afford them "full relief," Pls.' SJ Mem. at 9, the Court should not reach Plaintiffs non-constitutional claims.  An unnecessary decision on these claims would constitute an advisory opinion, which is prohibited under Article III.  *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng's*, 217 F.3d 393, 397 (5th Cir. 2000).  Even if the decision would comport with Article III, principles of comity toward co-equal branches of government weigh against its issuance.

Were the Court to reach the merits of Plaintiffs' non-constitutional claims, it should enter judgment in favor of the Bureau.  Take first Plaintiffs' claim that the revisions exceed statutory authority because, in their view, discriminatory conduct can never be unfair.  *See* Compl. ¶ 83. Plaintiffs' argument depends on there being an exception to the statutory definition of unfairness. *See* 12 U.S.C. § 5531.  But no such exception exists in the text.  Nor is there any basis to read in an exception based on the structure or history of the statute.  Plaintiffs fare no better with their argument that the March 2022 revisions are arbitrary and capricious.  The APA's prohibition on arbitrary and capricious agency action obligates agencies to consider factors relevant to their decisions.  *See Metro Cnty. Title, Inc. v. FDIC*, 13 F.3d 883, 887 (5th Cir. 1994).  The factors identified by Plaintiffs as meriting consideration, however, were not relevant.  Nor was the Bureau required to

enact the March 2022 revisions to its Exam Manual—which do not constitute a legislative rule—through notice-and-comment rulemaking.

If the Court decides that Plaintiffs are entitled to relief, their relief should be limited to declaratory relief and vacatur of March 2022 revisions.  Plaintiffs have not established any entitlement to injunctive relief.  If the Court disagrees, any injunctive relief should be narrowly tailored.

## BACKGROUND

"In the wake of the 2008 financial crisis, Congress established the Consumer Financial Protection Bureau (CFPB), an independent regulatory agency [within the Federal Reserve System] tasked with ensuring that consumer [financial] products are safe and transparent."  *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020).  It did so through the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act or Dodd-Frank), 124 Stat. 1376. According to Dodd-Frank, the Bureau is "to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive."  12 U.S.C.A. § 5511(a).  Congress chose to fund the Bureau by authorizing the agency to draw money each year from the combined earnings of the Federal Reserve System (of which the Bureau is a part); the size of the annual draw is capped by statute.  *See* 12 U.S.C. §§ 5491(a), 5497(a)-(c).

To enable the Bureau to fulfill its purpose, Congress transferred to the Bureau the responsibility for administering a variety of existing federal statutes, including the Equal Credit Opportunity Act (ECOA) 15 U.S.C. § 1691 *et seq.,* and the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. § 2801 *et seq.*  Congress also enacted a prohibition on any "unfair, deceptive, or abusive act or practice [UDAAP]" by certain participants in the consumer-finance sector. 12 U.S.C.

§ 5536(a)(1)(B).   To label an act or practice as unfair under § 5536, the Bureau must have "a reasonable basis to conclude that--(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." *Id.* § 5531(c).   The statute provides no exceptions to this standard for conduct that is also discriminatory.

While the UDAAP authority bestowed upon the CFPB was new, rather than a transferred authority, the language used to define an unfair act or practice was drawn from the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(n) (defining unfair practice in a materially similar way).  *See, e.g.*, *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *13 (S.D.N.Y. Dec. 2, 2016) ("This standard for the meaning of unfair acts or practices is borrowed from the Federal Trade Commission Act[.]").   The FTC Act's unfairness standard has been understood to apply to conduct that meets the statutory definition of unfairness whether or not it is also discriminatory.  *See, e.g.*, *FTC v. Passport Auto. Grp.*, 8:22-cv-2670 (D. Md.), Compl., ¶¶ 59-61 (attached as Ex. 1); Financial Institution Letters, Unfair or Deceptive Acts or Practices by State-Charted Banks, Board of Governors and the FDIC (Financial Institution Letters), March 11, 2004 (ADMINRECORD 02491).   The FTC has long shared the same understanding of the related prohibition on deceptive conduct.  *See In re First Buckingham Cmty., Inc.*, 73 FTC 938, Docket 8750, 1968 F.T.C. Lexis 65 (May 20, 1968) (ADMINRECORD 00006-00012).

Congress also authorized the Bureau to supervise and examine certain financial entities.  The CFPB has supervisory authority over banks, thrifts, and credit unions with assets over $10 billion, as well as their affiliates. 12 U.S.C. § 5515.  In addition, the Bureau has supervisory authority over nonbank mortgage originators and servicers, payday lenders, and private student lenders of all sizes. *Id.* § 5514(a).  The purpose of this supervision and examination authority is to enable the Bureau to "assess[ ] compliance with the requirements of Federal consumer financial laws; [ ] obtain[ ]

5

information about the activities subject to such laws and the associated compliance systems or procedures of such persons; and [ ] detect[ ] and assess[ ] associated risks to consumers and to markets for consumer financial products and services." 12 U.S.C. § 5515(b)(1)(A)-(C).

CFPB examinations are "similar to those of the prudential and, in some instances, State regulators." Exam Manual, CFPB Supervision and Examination Process, Overview, at 5.[2] Prior to conducting an examination, examiners consult with other Bureau personnel and determine the scope of a particular examination, i.e., what topics (e.g., UDAAPs) will be the subject of the examination or what fact-gathering tools (e.g., sampling a particular type of transaction) will be used. *Id.* No examination covers all topics. To assist its examiners, the Bureau issues the Supervision and Examination Manual.[3] *See* Exam Manual. The Exam Manual does not dictate the scope of any particular examination; it is a tool for an examiner to use during the course of an examination that has been otherwise planned by Bureau staff. The Exam Manual "provides internal guidance to [the Bureau's] supervisory staff." *See id.*, Disclaimer. But "[i]t does not bind the CFPB and does not create any rights, benefits, or defenses, substantive or procedural, that are enforceable by any party in any manner." *Id.* In other words, the Exam Manual points examiners in the direction of where to look for information—or what information to look at—with regard to a particular topic, but it does not tell examiners what to do with that information. The examiner, in conjunction with other Bureau staff, has to determine if any of that information causes a concern; the Exam Manual does not provide that answer. *Id.* at 6 (explaining that the examiner should "[c]onsult internally if the examination indicates potential unfair, deceptive, or abusive acts or practices; discrimination; or other violations of law"). Nor does the Exam Manual dictate any potential consequences: "[h]ow

---

[2] https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_2022-12.pdf
[3] Other financial regulators issue similar documents. *See, e.g.*, Board of Governors of the Federal Reserve System, *Commercial Bank Examination Manual* (https://www.federalreserve.gov/publications/files/cbem.pdf).

the CFPB addresses negative examination findings will depend, among other things, on the individual facts and circumstances at issue. Whether informal supervisory measures or formal enforcement action is necessary will depend on the type of problem(s) found and the severity of harm to consumers." *Id.*

The Exam Manual was first issued in 2012 and has been revised numerous times since then, including in March 2022.[4]  In March 2022, the Bureau revised the chapter on UDAAPs.  The chapter can be thought of as having two parts, the first of which describes the legal standards for, and provides historical examples of, UDAAPs, *see* UDAAP Chapter, at 1-10, ECF No. 1-2, and the second of which provides instructions regarding examination objectives and procedures, *id.* at 11-19 (directing examiners to, for example, "obtain and review copies of the following [documents] to the extent relevant to the examination," including "training materials" and "consumer complaint files").  The Bureau revised both parts.  As to the first part, the Bureau refined its description of unfairness by explicitly recognizing what had been implicit, i.e., that discriminatory conduct can be unfair if it meets the statutory standards for unfairness.  *See, e.g., id.* at 2 (noting that "[f]oregone monetary benefits or denial of access to products or services, like that which may result from discriminatory behavior, may also cause substantial injury[ ]").  The Manual did not previously say otherwise; it simply did not specifically mention discriminatory conduct, just as it did not explicitly mention many other potential strains of unfair conduct.  With regard to the second part, the Bureau provided clarity to examiners about how conduct, including potentially discriminatory conduct, should be examined to determine if it is unfair under 12 U.S.C. § 5531.  *See, e.g., id.* at 15 (instructing the examiner to determine whether "[t]he entity engages in targeted advertising or marketing in a discriminatory way").

---

[4] Defendants are aware of no previous challenge to the Exam Manual.

Several months after the March 2022 revisions, on October 19, 2022, in litigation brought by other plaintiffs about a different agency action, the Fifth Circuit issued a decision in *CFSA*. The case centered on a rule entitled "Payday, Vehicle Title, and Certain High-Cost Installment Loans." 82 Fed. Reg. 54,472 (Nov. 17, 2017) (Payday Lending Rule). Plaintiffs in *CFSA* challenged the Payday Lending Rule on a variety of grounds, including that the rule exceeded the Bureau's statutory authority, violated the reasoned decision-making requirements of the APA, and was issued using funds obtained through an unconstitutional funding mechanism. *CFSA*, 51 F.4th at 626. The Fifth Circuit ruled in the Bureau's favor with respect to all but the funding claim. *Id.* at 626-44. As to the funding claim, the Fifth Circuit held that "[t]he Bureau's funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers." *Id.* at 642. By way of remedy, the court "vacate[d] the Payday Lending Rule as the product of the Bureau's unconstitutional funding scheme." *Id.* at 643. The Bureau has filed a petition for a writ of certiorari in the Supreme Court. *CFPB v. Cmty. Fin. Servs Ass'n of Am.*, No. 22-448, Petition for Writ of Certiorari.

## PROCEDURAL HISTORY

Plaintiffs—a group of trade associations—filed suit on behalf of unnamed members in late September 2022. Their complaint includes four counts challenging the March 2022 manual revisions. Specifically, Plaintiffs allege that: (i) the Bureau exceeded its statutory authority, and so violated 5 U.S.C. § 706(2)(A), (C), because "Dodd-Frank does not authorize the CFPB to regulate discrimination under th[e] distinct [unfairness] authority[.]" Compl. ¶ 83; (ii) the Bureau violated the APA's prohibition on arbitrary and capricious agency action because it did not "grapple with Congress's decision to narrow the FTC's [related] authority," *id.* ¶ 88 and "failed to adopt safeguards that are essential for pursuing disparate-impact liability," *id.* ¶ 89; (iii) the Bureau violated the APA's notice-and-comment requirement, 5 U.S.C. § 553, *id.* ¶¶ 92-93; and (iv) the Bureau relied on an

unconstitutional funding scheme when issuing the Exam Manual, *id.* ¶ 100.  As relief, they seek declaratory and injunctive relief, vacatur of the March 2022 manual revisions, and attorney's fees and costs.  Compl., Prayer for Relief.  Plaintiffs have filed a summary judgment motion on all four of their claims.  *See* Pls.' SJ Mem.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), the Court can dismiss a suit for lack of subject matter jurisdiction.  When ruling on a Rule 12(b)(1) motion, the Court may consider matters outside of the Pleadings. *See, e.g., Cell Sci. Sys. Corp. v. La. Health Serv.*, 804 F. App'x 260, 263 (5th Cir. 2020).

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  And in APA cases, "[j]udicial review of an agency decision is typically limited to the administrative record." *Kappos v. Hyatt*, 566 U.S. 431, 438 (2012).

## ARGUMENT

### I.    Dismissal Is Warranted Because Plaintiffs Have Not Established Either Their Standing to Sue or That Venue Is Proper in This District

"Article III standing is a jurisdictional requirement."  *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010).  If Plaintiffs lack standing, "the court cannot proceed *at all* in any cause" and "the only function remaining to the court is that of announcing the fact and *dismissing* the cause."  *Id.* (emphasis in original).

Plaintiffs are trade associations that do not identify any injury-in-fact that they have suffered.  They may nonetheless proceed on behalf of their members, under the doctrine of associational standing, but only if they can provide evidence showing, among other things, that "the[ir] members would independently meet the Article III standing requirements." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).  This means identifying a particular member that "(1) suffered an

injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (holding that Article III "require[s] plaintiff-organizations to make specific allegations establishing that at least one *identified member* had suffered or would suffer harm" (emphasis added)). At the summary judgment stage, a party "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" establishing its standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation marks omitted).

The Court should dismiss this case for lack of subject-matter jurisdiction, because Plaintiffs have failed to establish their Article III standing. Neither Plaintiffs' motion nor their attached declarations "make specific allegations establishing that at least one identified member ha[s] suffered or would suffer harm" as a result of the challenged Bureau action. *Summers*, 555 U.S. at 498; *see also League of United Latin Am. Citizens v. Abbott*, No. 1:21-cv-1006, 2022 WL 1631301, at *6 (W.D. Tex. May 23, 2022) (in decision by three-judge panel, holding that associations lacked standing because, although they claimed to represent members harmed by redistricting plan, they had "identifie[d] none of those members with specificity"). Most of Plaintiffs' declarations refer generically to "members" or "[s]ome members." *See, e.g.*, Pls.' Ex. D at 5-6, ECF No. 17-4. A few refer to unidentified "Member A," "Member B," and so on. *See, e.g.*, Pls.' Ex. A at 6-7, ECF No. 17-1. While that approach might suffice "*at the pleading stage*," *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) (emphasis in original), it is not enough at the summary judgment stage.

At this point, a party cannot show standing merely by claiming that "some (unidentified) members" will suffer harm. *Summers*, 555 U.S. at 497-98; *cf. FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (holding that affidavit failed to demonstrate petitioner's standing because it did not specifically identify individuals harmed by the challenged ordinance). That would "make a mockery" of the requirement that Plaintiffs must show "that at least one *identified* member" has been harmed.

*Summers*, 555 U.S. at 498 (emphasis added).  And it would make it impossible for a court to fulfill its duty "to assure itself" of its jurisdiction and to "verify[]the facts upon which . . . standing depends." *Id.* at 499.  Plaintiffs' approach of referring to unknown "Member A," etc., does not fix this problem, because it does not actually "identify" any particular member and thus does not give the Bureau (or the Court) any way to test, as necessary, Plaintiffs' assertions.[5]

Indeed, Plaintiffs' failure to identify a member that would have standing not only deprives the Court of the ability to assess its jurisdiction, but also of the ability to assess the propriety of this court as a venue.  Plaintiffs' sole basis for claiming that venue is proper in this district is that "one of Plaintiffs resides here."  Compl. ¶ 10 (citing 28 U.S.C. § 1391(e)(1)).  That Plaintiff is, presumably, the Longview Chamber of Commerce.  Crucially, the Plaintiff on whom venue is based must have standing to sue.  *See Immigrant Assistance Project of the L.A. Cnty. Fed'n of Lab. v. INS*, 306 F.3d 842, 867 n.20 (9th Cir. 2002) ("The issue of plaintiff Washington Association of Churches' standing is particularly important because it is the only plaintiff, other than plaintiff John Doe 8, who is a resident of Washington and on whom, therefore, venue in the Western District of Washington could be based."); *Ctr. for Biological Diversity v. Spellmon*, No. 21-cv-47, 2022 WL 3541879, at *3 (D. Mont. Aug. 18, 2022) ("When venue is based [on] a plaintiff's residence, that particular plaintiff must have standing to bring the claims asserted."); *Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) (dismissing case for improper venue where the sole plaintiff located in the district lacked standing); *Cohen v. Smith*, 534 F. Supp. 618, 622 (S.D. Tex. 1982) (holding "that plaintiff Cohen has standing to pursue this action, and consequently, her residence can be considered for purposes of determining whether venue is proper in this district").

---

[5] If Plaintiffs provide further evidence on standing, Defendants reserve the right to (i) seek jurisdictional discovery (particularly if the additional evidence lacks specificity regarding the nature of the alleged injury and its supposed connection to the challenged Exam Manual revisions) and (ii) challenge whether the additional evidence adequately establishes standing.

But the Longview Chamber's declaration, like the others, does not identify any particular member with standing.  It merely repeats verbatim the same boilerplate found in several other declarations that unspecified "[m]embers" have incurred certain costs because of the amended Manual.  *See* Pls.' Ex. E at 5-6, ECF No. 17-5. As explained, that does not suffice to establish the Longview Chamber's standing to pursue any claim in this case.[6] And because Plaintiffs did not meet their burden to establish that any Plaintiff residing in this District has standing, this case should also be dismissed for improper venue.

## II.     The Court Lacks Jurisdiction Because the Exam Manual Is Not Final Agency Action

The Court should dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1) for lack of final agency action.  The presence of a final agency action is a prerequisite to review under the APA.  But the March 2022 revisions do not constitute a final agency action: the revisions do not determine Plaintiffs rights or obligations or carry legal consequences.  Dismissal is, therefore, appropriate.[7]  In addition, for the same reasons, the manual revisions do not constitute a legislative rule that should have been enacted through notice and comment rulemaking.

---

[6] Just as "standing is not dispensed in gross," *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017), neither is venue, *see Ctr. for Biological Diversity*, 2022 WL 3541879, at *3 ("Given that MEIC, the only Montana-resident Plaintiff, cannot establish standing to maintain the ESA claim, the District of Montana does not represent an appropriate venue for Plaintiffs' ESA claim."). Thus, even if Plaintiffs had shown that one or more Plaintiff residing in this District had standing to pursue the Appropriations Clause claim (Count IV), that would not necessarily have been enough to show that venue was proper with respect to Plaintiffs' non-constitutional claims (Counts I-III).

[7] The final agency action requirement applies to all claims, including constitutional claims, that rely on the APA's waiver of sovereign immunity (5 U.S.C § 702).  *See Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994); *Taylor-Callahan-Coleman Ctys. Dist. Adult Prob. Dep't v. Dole*, 948 F.2d 953, 956 (5th Cir. 1991); *Espinoza v. Pompeo*, No. SA-19-CV-01363-XR, 2020 WL 1941300, at *6 (W.D. Tex. Apr. 22, 2020).  And, here, Plaintiffs' constitutional claim is an APA claim because the APA provides the cause of action.  After all, the APA contemplates claims alleging violations of the Constitution, 5 U.S.C. § 706(2)(B), the Fifth Circuit treated the similar claim as an APA claim in *CFSA*, 51 F.4th at 646 (awarding APA-specific relief), and Plaintiffs seek APA-specific relief (i.e., vacatur).  But even if it were not an APA claim, the final agency action requirement would apply,

The APA sets the parameters for judicial review of federal agency actions.  It provides, in relevant part, that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704.  Two conditions must be met for agency action to be deemed final:  1) it must "mark the consummation of the agency's decisionmaking process"; and 2) the "action must be one by which rights or obligations have been determined, or from which legal consequence flow."  *Bennett*, 520 U.S. at 178.  In this Circuit, final agency action is a jurisdictional requirement.  *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999).

The Exam Manual is not final agency action.  The Exam Manual is designed to provide guidance and direction to Bureau employees: "[t]his Supervision and Examination Manual provides internal guidance to our supervisory staff."  *See* Exam Manual, Disclaimer.  Unlike a legislative rule, the Manual is not endowed with the force of law and does not carry legally binding consequences.  *Texas v. United States*, No. 6:21-CV-00016, 2022 WL 2109204, at *23 n.53 (S.D. Tex. June 10, 2022), cert. granted before judgment, No. 22A17 (22-58), 143 S. Ct. 51 (2022) (noting that "legislative rules are necessarily final agency action").  Rather, it is an employee manual that for more than ten years has provided direction to the Bureau's employees in the discharge of their duties.  It does not fix regulated parties' rights or obligations, or carry legal consequences.  Indeed, the Manual itself states that it does not "bind the CFPB and does not create any rights, benefits, or defenses, substantive or procedural, that are enforceable by any party in any manner."  Exam Manual, Disclaimer.

Binding precedent supports this conclusion.  In *Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433 (5th Cir. 2019), the Fifth Circuit assessed whether a guidance document was, in the parlance of the APA, a substantive rule or a policy statement, and in the course of doing so, set out the standard for assessing whether a guidance document constitutes final agency action.

under cases like *Veldhoen* and *Taylor-Callahan-Coleman*, because Plaintiffs invoke the APA's waiver of sovereign immunity, *see* Compl. ¶ 20.

The case centered on a document issued by the EEOC, which, among other things, "direct[ed] [the] decisions [of EEOC staff] about which employers to refer for enforcement actions," "limit[ed] [their] discretion respecting the use of certain evidence," and "prescribed a multi-factor framework" for regulated parties to use and which EEOC employees "must presumptively follow" to determine whether a regulated party complied with governing law.  *Id.* at 443.  Here, by contrast, the only multi-factor test that the Exam Manual identifies for examiners to use in determining whether an entity has engaged in an unfair practice is the three-part test for unfairness that Congress enacted in the Dodd-Frank Act.  UDAAP Chapter at 1-2, ECF No. 1-2; 12 U.S.C. § 5531.  And while the Manual identifies for examiners what kinds of evidence to collect and what kinds of preliminary factual determinations to make, it does not bind examiners' assessment of whether any particular conduct should be cited as an unfair practice.  Instead, it is the three-part test for unfairness created by Congress that examiners must follow when deciding whether an entity has violated the statutory prohibition on unfair acts and practices.[8]  The CFPB's Exam Manual is a tool to assist examiners; on a regular basis, examiners review evidence, ask questions, and analyze legal theories not found in the Exam Manual.  As explained in the Exam Manual: "the particular facts in a case are crucial to a determination of unfairness. It is important to bear in mind that a change in facts could change the

---

[8] The Fifth Circuit concluded in *EEOC* that the guidance document effectively required EEOC staff members to refer employers for enforcement actions in certain circumstances. *EEOC*, 933 F.3d 443. No such predictable consequences follow from the Exam Manual.  If examiners have concerns about a supervised entity, they may decide that no action is warranted, discuss those concerns with the examined party and resolve the matter informally, schedule a follow-up examination, issue a matter requiring attention (MRA)—a communication in which the Bureau conveys its supervisory expectations to the supervised party—which is not legally binding, Exam Manual, Examinations and Targeted Reviews, at 17, https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_2022-09.pdf), communicate the concern to other regulators, refer the matter to the Action Review Committee—a committee within the CFPB's Division of Supervision, Enforcement, and Fair Lending—which determines whether to refer a matter for further consideration by the Enforcement office of the Bureau, and/or factor the concern into the entity's compliance rating. *See, e.g.,* Exam Manual, Overview Chapter, at 6 ("How the CFPB addresses negative examination findings will depend, among other things, on the individual facts and circumstances at issue.").

appropriate determination. Moreover, the brief summaries below do not present all of the material facts relevant to the determinations in each case. The examples show how the unfairness standard may be applied." UDAAP Chapter at 3, ECF No. 1-2.

The Exam Manual resembles a manual that the Fifth Circuit, in *Amin v. Mayorkas*, 24 F.4th 383, 392 (5th Cir. 2022), a post-*EEOC* case, concluded did not "(1) impose[s] any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion."[9]

*Amin* involved a policy memorandum issued by the U.S. Citizenship and Immigration Service amending its "Adjudicator's Field Manual" to "provide guidance to officers assessing extraordinary ability [visa] applications." *Id.* at 388.  In the policy memorandum, USCIS "adopted the two-step approach to [extraordinary ability visa] adjudication[s] outlined in *Kazarian v. USCIS*, 596 F.3d 1115 (9th Cir. 2010)." *Amin,* 24 F.4th at 388 (noting that "[a]t the first step, the agency assesses whether the applicant submitted the required initial evidence listed in the regulation by a preponderance of the evidence," and that at the second step, "the agency then conducts a final merits determination to determine whether, as a whole, the evidence is sufficient to demonstrate that the applicant meets the required high level of expertise.") (quotation marks omitted from parenthetical).

The Court first explained that the policy memorandum did not impose any obligations on visa applicants because "[t]he statute and regulation require applicants to prove their extraordinary ability and to provide 'extensive documentation' of the type listed in the regulation.  The Policy Memo does not require anything more; it merely clarifies the order in which agency adjudicators evaluate the evidence." *Id.* at 392.  Similar logic applies to the Exam Manual.  It does not impose

---

[9] The Court in *Amin* was deciding whether a manual constituted a legislative rule, not whether it constituted final agency action. *Id.* at 392.  But, as *Amin* focuses on (i) whether the agency's manual imposed rights or obligations and (ii) whether it left agency officials with discretion—focal points of the inquiry under *EEOC*, 933 F.3d 441-43—the decision is instructive.

any new legal obligations.  The Dodd-Frank act prohibits unfair practices (i.e., requires entities not to engage in unfair practices)—the Exam Manual "does not require anything more."  The Exam Manual "merely clarifies" that there is no atextual exception for discriminatory conduct:  If conduct satisfies the statutory standard for unfairness, 12 U.S.C. § 5531(c), it does not become legal simply because it is also discriminatory.  *See* UDAAP Chapter, at 1-3, ECF No. 1-2.  The Manual also clarifies the preliminary factual determinations that agency examiners should make as they "evaluate" examined parties for unfairness, *id.* at 11-19, just as the policy memorandum in *Amin* clarified the order in which agency adjudicators should evaluate evidence, *Amin* 24 F.4th at 392.

With respect to whether the policy memorandum left the agency and its decision-makers with discretion, the *Amin* court explained that the policy memorandum is "phrased in permissive language."  *Id.*  On the page of the memorandum cited by the *Amin* Court (p.5), the agency lays out the two-part legal standard that officers "should" use when evaluating extraordinary ability visas.[10] In nonetheless labeling the policy memorandum's language as "permissive," the court was presumably drawing a distinction between hortatory language like "should" on the one hand, and language that connotes a more definitive obligation, like "must," on the other.  *See, e.g., McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346-47 (8th Cir.1985) (labeling "should" as permissive and "must" as mandatory).  The Exam Manual uses more permissive language than the *Amin* policy memorandum when discussing the legal standard for unfairness under Dodd-Frank.  *See* UDAAP Chapter at 2, ECF No. 1-2 (explaining that certain harms, including from discrimination, "may" constitute substantial injury); *id.* at 3 (explaining that consumers "typically" cannot avoid harm from discrimination).

---

[10] *See* U.S. Citizenship & Imm. Servs., Dep't of Homeland Sec., PM-602-0005.1, Evaluation of Evidence Submitted with Certain Form I-140 Petitions; Revisions to the Adjudicators Field Manual (AFM), Chapter 22, AFM Update AD-11-14 (*Amin* Memo), at 5 (attached as Ex. 2).

Plaintiffs nevertheless insist that the March 2022 revisions to the Exam Manual constitute a substantive rule and, by extension, final agency action. Pls.' SJ Mem. at 22-23. They argue that the revisions "change[] the legal status of regulated parties by subjecting them to supervision and examination for discrimination under UDAAP," "impose[] new duties on businesses by empowering examiners to investigate—and thus requiring businesses to keep—certain records," "bind[] the agency's personnel to a particular method of investigation when conducting UDAAP reviews, thus marking the withdrawal of discretion by purporting to impose a new legal norm." They also contend that "the manual is written with mandatory language to its examiners; it uses the word must more than 2,000 times." *Id.* at 22-23.

None of these arguments is persuasive. The Exam Manual does not change the legal status of the parties, including by authorizing new topics of examination. The Dodd-Frank Act prohibited unfairness prior to the issuance of the Manual. 12 U.S.C. § 5536(a)(1)(B). There has never been an unstated, atextual exception to the prohibition on unfairness for discrimination, just as there is not an unstated exception to unfairness for conduct that happens on Leap Day. Nor were CFPB examiners, prior to March 2022, prohibited from examining regulated parties on the topics addressed in the revisions: the updates to the Manual provide a roadmap of additional preliminary factual assessments for examiners to make (depending on the scope of the particular examination), but examiners could have made those preliminary assessments without the updates. After all, the Manual does not provide the source of authority for those examinations—that authority derives primarily from statute. *See* 12 U.S.C. §§ 5514(a), 5515. Relatedly, nothing in the Manual obligates regulated parties to create or retain any additional records. The Manual provides "internal guidance to our supervisory staff," Exam Manual, Disclaimer; it does not provide document retention instructions to examined parties, *see id.* (noting that the Exam Manual does not create "rights" for "any party").

Indeed, Plaintiffs point to no language in the Exam Manual *requiring* examined parties to create or retain additional documents—or do anything else. They attempt to highlight a series of steps they supposedly "must" now take by quoting supposed directives from the Exam Manual. Pls.' SJ Mem. at 6. Their argument wrests the quoted language out of context, distorting its meaning. For example, they claim that "[e]ntities *must* now have 'established policies and procedures to mitigate potential UDAAP concerns arising from the use of its decision-making processes, including discrimination.'" *Id.* (emphasis added and removed) (quoting UDAAP Chapter at 14, ECF No. 1-2). But the Exam Manual says no such thing. What it actually says is that, "[t]hrough discussions with management and a review of *available information*," the examiner should "determine whether the entity's internal controls are adequate to prevent unfair, deceptive or abusive acts," and, in doing, so "*consider* whether . . . [t]he entity has established policies and procedures to mitigate potential UDAAP concerns." UDAAP Chapter at 14, ECF No. 1-2. This language yet again highlights that the Exam Manual provides guidance and direction to supervisory staff; it does not impose obligations on supervised entities.

Plaintiffs' argument that the Exam Manual constitutes a legislative rule because it binds Bureau personnel to a "particular method of investigation" is no more persuasive. The policy memorandum at issue in *Amin* bound officers "to follow the amended procedures in this update . . ." *Amin* Memo. at 4. The Fifth Circuit, nonetheless, determined that the memorandum was not a legislative rule. *Amin*, 24 F.4th at 392. Crucially, the policy memorandum in *Amin* did not bind the agency or its personnel to a "legal position" regarding whether individuals should or should not be granted visas. The same logic applies here. The Manual provides direction on the procedures that examiners should follow and the preliminary factual assessments they should make (with respect to matters within the scope of the exam), but it does not bind the agency or its personnel to a legal position regarding whether an unfair practice has taken place in any particular situation, as explained

18

above.[11] Plaintiffs also point out that the Exam Manual is written in mandatory terms, in part because it uses the word "must" 2,000 times.  But the manual as a whole is not at issue—only the challenged revisions are—and the challenged revisions are permissive under the *Amin* standard, as explained above. Moreover, references to "must" in the UDAAP manual frequently describe the legal standard verbatim (e.g. "the act or practice *must* cause or be likely to cause substantial injury to consumers").  Accordingly, as Plaintiffs have identified no final agency action, dismissal is warranted.

Relatedly, the challenged revisions to the Exam Manual do not constitute a legislative rule that the Bureau was required to adopt through notice-and-comment rulemaking.  An agency must employ notice-and-comment rulemaking when issuing legislative rules (which are sometimes also referred to as a substantive rules). 5 U.S.C. § 553(b), (c); *Amin*, 24 F.4th at 392.  The test for whether an agency action is a legislative rule, as noted above, is the one set out in *Amin*.  *Id*.  And as explained above, under the *Amin* test, the Exam Manual revisions do not constitute a legislative rule: They do not create rights, impose obligations, or bind the agency to a legal position.[12]  Moreover, as

---

[11] Importantly, the Exam Manual revisions do not identify any particular business practice as unfair. The manual revisions identify certain circumstance that *may* meet some of the elements of unfairness. For example, the Exam Manual states that, "[f]oregone monetary benefits or denial of access to products or services, like that which may result from discriminatory behavior, *may* also cause substantial injury."  UDAAP Chapter at 2, ECF No. 1-2 (emphasis added).  It does not say any particular business practice is discriminatory and, thus, unfair.  Nor does it say that every business practice that might be considered discriminatory would be unfair.

[12] Amici states contend that March 2022 Manual Revisions are another chapter in the story of "federal executive overreach," an overreach made worse by the Bureau's decision to "skirt public criticism and judicial review" by not employing notice-and-comment rulemaking.  ECF No. 21 at 2. The facts get in the way of this story.  Declining to recognize an atextual exception to a broad congressional enactment is fidelity to the law, not "executive overreach."  *See* § V below.  What is more, the Bureau made no effort to conceal the revisions to the Manual:  The Bureau publicly announced those changes on its website.  *See* ECF No. 17-11.  Amici's other alleged examples of potential executive overreach similarly fail to move the needle.  *See* ECF No. 21 at 2-10.  The Bureau does not agree with Plaintiffs' evaluation of these other circumstances (which do not involve the Bureau), but in any case, guilt by association is not a recognized administrative law doctrine.

the *Amin* Court noted, "precedent confirms that agency documents like the challenged field manual can be issued without notice and comment. … Both manuals [i.e., the *Amin* memo and a Veterans Administration manual] are internal publications intended to provide guidance to employees implementing agency policies." *Amin*, 24 F.4th at 392.  Just so here.

## III.   Plaintiffs' Appropriations Clause Claim Is Contradicted by Supreme Court Precedent, Constitutional Text, and Historical Practice

Plaintiffs claim they are entitled to summary judgment because the method by which Congress chose to fund the Bureau's operations violates the Appropriations Clause and because the Bureau, in updating the Supervision and Examination Manual, drew and spent money pursuant to that congressional authorization.  *See* Pls.' SJ Mem. at 10-11.  Plaintiffs' argument tracks the Fifth Circuit's holding in *CFSA*.  While the Bureau recognizes that this Court is bound by the decision in *CFSA*, it respectfully maintains that that decision—like Plaintiffs' argument based that decision—is mistaken.

When it established the Bureau within the Federal Reserve System, Congress authorized the Bureau by statute to draw up to a capped amount of money each year from the combined earnings of the System to fund the Bureau's operations. *See* 12 U.S.C. §§ 5491(a), 5497(a)-(c).  In *CFSA*, the Fifth Circuit held that this statutory authorization violates the Appropriations Clause. 51 F.4th at 635-42.  It invalidated a regulation that the Bureau issued using money that the Bureau received under that authorization. *Id.* at 642-43.

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.  The "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321

(1937)).  That "straightforward and explicit" command was satisfied when Congress appropriated money for the Bureau by passing a statute authorizing the Bureau to spend money to carry out its statutory responsibilities and making a source of funds available for it to do so.  Nothing more was required.

While it is true that the Bureau's funding is not set through annual spending bills, the Appropriations Clause does not require annual appropriations.  *Cf.* U.S. Const. art. I, § 8, cl. 12 (limiting appropriations for the Army—but not for any other purpose—to no more than two years). Indeed, since the Founding Era, Congress has chosen to fund important agencies and programs through sources other than annual spending bills. *See, e.g.*, An act to establish the Post-Office and Post Roads within the United States, 1 Stat. 232 (1792) (funding the Post Office through postage rates).  Consistent with that history, courts have recognized that "Congress can, consistent with the Appropriations Clause, create governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process." *PHH Corp. v. CFPB*, 881 F.3d 75, 95 (D.C. Cir. 2018) (en banc), *abrogated on other grounds by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).

Plaintiffs, following *CFSA*, go astray in arguing that any issue with the Bureau's funding would justify the relief they seek.  For example, they object to particular portions of the Bureau's funding provisions, *see* Pls.' SJ Mem. at 11 (citing 12 U.S.C. § 5497(a)(2)(C) and (c)(2)), but fail to consider whether those pieces could simply be severed from Section 5497. *See Seila Law*, 140 S. Ct. at 2208-11 (holding for-cause removal provision in Bureau's statute invalid but severable); 12 U.S.C. § 5302 (providing that if "any provision of this Act" is "held to be unconstitutional," "the remainder of this Act" should "not be affected").  Plaintiffs also offer no explanation why traditional remedial principles would justify unwinding past Bureau actions (including, here, the amendments to the Manual) when such an order would not cure the supposed Appropriations Clause violation by, for example, returning any money to the federal fisc.

## IV.   If the Court Decides the Constitutional Claim on the Merits, It Should Not Reach the Non-Constitutional Claims

Plaintiffs acknowledge that a decision in their favor on the constitutional claim, the resolution of which is controlled by binding circuit precedent (i.e., *CFSA*), in and of itself would provide them "full relief." [13]  Pls.' SJ Mem. at 9.  Given that, the Court need not decide Plaintiffs' non-constitutional claims.  A decision on those claims would be a constitutionally impermissible advisory opinion.  But even if there were no constitutional impediment to deciding Plaintiffs' non-constitutional claims, the Court should decline to opine on them as a matter of prudence. *See United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988) ("This is simply another application of the sound judicial practice of refusing to decide or address issues whose resolution is not necessary to dispose of a case, unless there are compelling reasons to do otherwise.").

*CFSA* is binding on this Court, and the application of its rationale to this case requires the Court (if it disagrees with the Bureau about Plaintiffs' standing and this Court's jurisdiction) to rule for Plaintiffs on their constitutional claim and vacate the March 2022 revisions to the Exam Manual. *See CFSA*, 51 F.4th at 643.  This would provide Plaintiffs with "full relief."  Pls.' SJ Mem. at 9. Thus, there is no need to decide Plaintiffs' non-constitutional claims, and a decision on them would be an impermissible advisory opinion. *See, e.g.*, *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*,

---

[13] Plaintiffs are correct that a decision in their favor on the constitutional claim would afford them "full relief." Pls.' SJ Mem. at 9.  It would not, however, give them all of the relief that they request; they are not entitled to that. *See* § VII below on remedies.  Indeed, Plaintiffs cannot secure an injunction under either theory. *See id.*  Importantly, though, the relief available to them with respect to their constitutional and non-constitutional claims is effectively the same—vacatur of the March 2022 revisions. *See id.*  The term "effectively" is used in the previous sentence because there is a difference in the available declaratory relief, but it does not change the conclusion that Plaintiffs can obtain "full relief."  Plaintiffs apparently agree:  The difference in the available declaratory relief is evident from the face of Plaintiffs' complaint, *see* Compl., Prayer for Relief, and yet Plaintiffs still termed the relief available to them under their constitutional claims as "full."

217 F.3d 393, 397 (5th Cir. 2000); *Hammoud v. Ma'at*, 49 F.4th 874, 882 (5th Cir. 2022); *Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010).

But even if the Court concludes that there is no constitutional impediment to resolving Plaintiffs' non-constitutional claims, it should decline to decide them.  Resolving these claims will have no practical effect on Plaintiffs; Plaintiffs admit that a decision in their favor on their constitutional claim, as required by the reasoning of *CFSA*, will afford them "full relief."  Pls.' SJ Mem. at 9.  Courts routinely decline to reach alternate bases for relief in similar circumstances, and the Court should decline to do so here.  *See Craig*, 861 F.2d at 821.  Conserving scarce judicial resources is one good reason for this general practice.  But there is another good reason to exercise judicial modesty in this case.  The academic non-constitutional questions that Plaintiffs press would require the Court to review actions taken by the Executive branch, i.e., the Bureau's revisions to its Exam Manual, and to determine the scope of an act of Congress, i.e., the Dodd-Frank Act. Principles of comity between the branches weigh against reaching out to unnecessarily decide these questions.  *Cf. Town of Chester, N.Y. v. Laroe Ests., Inc.,* 137 S. Ct. 1645, 1650 (2017) ("Article III of the Constitution limits the exercise of the judicial power to Cases and Controversies. …This fundamental limitation preserves the tripartite structure of our Federal Government, prevents the Federal Judiciary from intruding upon the powers given to the other branches, and confines the federal courts to a properly judicial role." (quotation marks omitted)); *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (explaining that in the context of a request to "to pass upon the validity of actions by the Legislative and Executive Branches of the Government, the rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III").

In these circumstances, the Court could also adopt a practical wait-and-see approach.  That is, if the Court decides it has jurisdiction, it could award temporary relief in favor of Plaintiffs on

their constitutional claim and stay the remainder of the case pending final resolution of *CFSA*.

Once *CFSA* is resolved, the Court could then determine whether permanent relief is appropriate on

Plaintiffs' constitutional claim and whether there is any need to decide the non-constitutional claims.

This approach would conserve resources and would not prejudice Plaintiffs.

**V.      The Bureau Acted Within the Bounds of Its Statutory Authority**

Plaintiffs argue that the Bureau exceeded its statutory authority and so violated the APA by

"interpret[ing] its UDAAP authority to include the power to regulate discriminatory conduct."  Pls.'

SJ Mem. at 13; *see also* 5 U.S.C. § 706(2)(A), (C).  Plaintiffs' arguments fail.  To start, there is no final

agency action upon which the Court can base its review.  (Nor do Plaintiffs have standing, as

demonstrated earlier.)  But, putting these jurisdictional deficiencies aside, Plaintiffs' arguments lack

merit:  Congress did not create a discrimination exception to unfairness, so, in recognizing that

discriminatory conduct can be unfair, the March 2022 revisions to the Exam Manual fall

comfortably within the confines of the Bureau's statutory authority.  Plaintiffs' arguments to the

contrary merely establish that unfairness and discrimination are distinct concepts.  Pls.' SJ Mem. at

12-17.  But "distinct" is not a synonym for "mutually exclusive," so the Bureau did nothing verboten

by recognizing that discriminatory conduct can be unfair (if it satisfies the statutory standards for

unfairness).  Accordingly, the Court should dismiss Plaintiffs' claim that the Bureau exceeded its

statutory authority, Compl. ¶¶ 80-85, or, in the alternative, enter judgment in favor of the Bureau on

that claim.

The APA provides that a court may "hold unlawful and set aside agency action, findings, and

conclusions found to be . . . (a) otherwise not in accordance with law" or "(c) in excess of statutory

jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).  The March 2022 revisions to the

Exam Manual rest well within the Bureau's broad statutory authority.

24

The standard for unfairness contained in Dodd-Frank mirrors the unfairness standard in the FTC Act. *See, e.g., NDG Fin. Corp.*, 2016 WL 7188792, at *13 ("This standard for the meaning of unfair acts or practices is borrowed from the Federal Trade Commission Act[.]").  When originally enacted, the FTC Act's prohibition on unfair conduct stated simply that "unfair methods of competition in commerce" were prohibited.  Pub. L. No. 63–203, § 5, 38 Stat. 717, 719 (codified as amended at 15 U.S.C. § 45(a)).  Congress recognized the breadth of this language, but it "explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition' . . .  by enumerating the particular practices to which it was intended to apply." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40 (1972).  The reasons was simple:  There is no fixed number of unfair practices in the world.  "The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce. … It concluded that . . . there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others."  S. Rep. No. 63–597, at 13 (1914).

In 1994, Congress provided additional structure to definition of "unfairness."  It did so by enacting the requirement that "the Commission shall have no authority under this section . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).  But Congress did not otherwise limit the broad definition of "unfairness" (e.g., it did not add an exception to unfairness for discriminatory conduct).  And it adopted a related statutory provision that emphasizes the continuing breadth and flexibility of the concept of unfairness, explaining that "[i]n determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other

25

evidence," though it noted that "[s]uch public policy considerations may not serve as a primary basis for such determination." *Id.*

*F.T.C. v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009), demonstrates the broadness of this unfairness authority.  In *Accusearch*, the defendant obtained and sold records of third-party telephone communications that it should have known were obtained improperly, and the FTC secured relief in federal district court on the grounds that defendant's conduct constituted an unfair practice.  *Id.* at 1190, 1192.  On appeal, the defendant argued that the unfairness finding was improper because (i) there was no independent statutory prohibition barring its conduct, and (ii) even if its conduct violated a statute, that statute was enforced by a different agency—the Federal Communications Commission.  The Tenth Circuit rejected both arguments.  As to the first, the court held that "the FTCA enables the FTC to take action against unfair practices that have not yet been contemplated by more specific laws."[14] *Id.* at 1194.  And as to the second argument, the Tenth Circuit concluded that the challenged conduct was alleged to have violated the FTC Act's prohibition on unfairness, not the statute administered by the FCC, and in any case, "the FTC may proceed against unfair practices even if those practices violate some other statute that the FTC lacks authority to administer."  *Id.* at 1195.

---

[14] The Eleventh Circuit has concluded that conduct cannot be unfair unless it violates "a well-established legal standard, whether grounded in statute, the common law, or the Constitution." *See LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 (11th Cir. 2018).  The *LabMD* court asserted that the FTC adopted this position in a 1980 policy statement.  *Id.; see* FTC Policy Statement on Unfairness, December 17, 1980 (ADMINRECORD at 2540-2548).  This conclusion appears to be a misinterpretation of the Policy Statement, ADMINRECORD 2543 (explaining that the public policy should be reflected in statutes, judicial decisions, or the Constitution "*to the extent that the Commission relies heavily* on public policy to support a finding of unfairness" (emphasis added)), and on a point that has been superseded by legislation, 15 U.S.C. § 45(n) (stating that public policy considerations may not serve as "a primary basis" for an unfairness determination).  In any event, even if the FTC has imposed such a limitation on itself through its policy statement, the Bureau has not done the same.

The scope of unfairness authority in the FTC Act sinks Plaintiffs' argument that the March 2022 Manual Revisions are contrary to the statute.  Dodd-Frank adopted the broad view of unfairness embodied in the FTC Act, and like the FTC Act, it provided *no exception* for discriminatory conduct.  The Dodd-Frank Act provides that the Bureau cannot declare an act or practice unfair unless: (1) "the act or practice causes or is likely to cause substantial injury to consumers;" (2) the substantial injury "is not reasonably avoidable by consumer;" and (3) "substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).  And as with the FTC Act, Congress recognized that public policy may play a role in the identification of unfair acts or practices (*i.e.*, Congress recognized that the Bureau could consider policy judgments reflected in other statutes when identifying unfair conduct).  *Id.* § 5531(c)(2).  What Congress did not recognize is a discrimination exception to unfairness.[15] Nowhere does the Act say anything to the effect of "otherwise unfair conduct is not unfair if it is also discriminatory."  Congress's failure to create an exception to unfairness for discrimination comports not only with common sense, but with the broad definition of unfairness that Congress has adopted—a definition that allows for the policing of (i) conduct that has not "yet been contemplated by more specific laws," *Accusearch*, 570 F.3d at 1194, and (ii) "practices [that] violate some other statute that the [agency] lacks authority to administer," *id.* at 1195.  The absence of a discrimination exception also comports with public policy, which Congress has concluded is a

---

[15] As pointed out in the section on relief, *see* § VII below, application of an atextual discrimination exception to unfairness would pose substantial difficulties.  To take one example, if a bank opens accounts in consumers' names without their authorization and the conduct satisfies each of the elements of unfairness laid out by Congress in 12 U.S.C. § 5531, is the conduct only unfair if the Bureau can prove that it wasn't also discriminatory?  How would the Bureau make that showing?  Is discrimination an affirmative defense to unfairness?  Or is there a burden shifting framework (i.e., must the Bureau identify a *prima facie* case of unfairness which the entity can rebut by proving that they were discriminating)?  What happens with mixed motives (i.e., is discrimination a defense only if the discriminatory motive is the only one)?  The statute and decades of unfairness precedent are silent on these questions for the simple reason that there is no discrimination exception to unfairness.

relevant factor in the identification of unfair conduct, 12 U.S.C. § 5531(c)(2).  Thus, the Bureau did not exceed the statute, but followed it, by recognizing that discriminatory conduct that satisfies the statutory standard for unfairness can be unfair.  *See* UDAAP Chapter at 1-3, ECF No. 1-2.

Not only would a contrary understanding of the scope of unfairness create an atextual exception for discriminatory conduct, but it would also be inconsistent with how sister agencies— the FTC, the Board of Governors of the Federal Reserve System (Board), the Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of the Currency (OCC)—have long understood the relationship between unfair and deceptive conduct and discrimination. Specifically, the FTC, Board, and FDIC, have all long concluded that discriminatory conduct can be unfair and/or deceptive.  With respect to the FTC, as far back as 1968, the Commission, in the analogous context of deceptive conduct, *see FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245 (3d Cir. 2015) ("We recognize this analysis of unfairness encompasses some facts relevant to the FTC's deceptive practices claim.  But facts relevant to unfairness and deception claims frequently overlap."), declined to recognize an exception for conduct that may also be discriminatory.  *See In re First Buckingham*, 73 FTC 938, Docket 8750, 1968 F.T.C. Lexis 65 (ADMINRECORD 00006-00012).  And more recently, the FTC brought an enforcement action against an automotive dealer group and two of its executives, alleging, among other things, that the dealers engaged in discriminatory conduct that satisfied the statutory standard for unfairness, *see FTC v. Passport Auto. Grp.*, 8:22-cv-2670 (D. Md.), Compl. ¶¶ 59-61.  The Board and the FDIC, for their part, noted in a statement in 2004 that "[u]nfair or deceptive practices that target or have a disparate impact on consumers who are members of these protected classes may violate the ECOA [Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., an anti-discrimination statute] or the FHA [Fair Housing Act, 42 U.S.C. § 3601 et seq., also an anti-discrimination statute], *as well as the FTC Act*."  Financial Institution Letters (ADMINRECORD02491) (emphasis added).  Similarly, in the 2010 Comptroller's

Handbook, the OCC stated that "lending practices that are . . . unfair" "may involve violations of fair lending laws."  OCC, Comptrollers Handbook, Fair Lending (ADMINRECORD 2657).  The atextual exception identified by Plaintiffs, then, would be news not only to the CFPB, but also to the FTC, Board, FDIC, OCC, and the leadership appointed to those agencies over the years, and it would be quite an innovation, springing up decades after these agencies have taken positions to the contrary.

Arguing to the contrary, Plaintiffs contend that they are entitled to relief because "the text, structure, and history of the Dodd-Frank Act demonstrate that the updated manual exceeds the CFPB's statutory authority."  Pls.' SJ Mem. at 17.  But their arguments are incorrect.  Start with the text.  Plaintiffs' basic point is that "Dodd-Frank discusses 'unfairness' and 'discrimination' as two distinct concepts," and that "Congress did not authorize the CFPB to protect consumers from unfair acts or practices 'including' or 'such as' discrimination, as it would if Congress had meant for discrimination to be viewed as a type of unfairness."  Pls.' SJ Mem. at 14.  It is true that Dodd-Frank treats unfairness and discrimination as distinct concepts.  But Plaintiffs' claims depend on the proposition that unfairness and discrimination are mutually exclusive concepts—i.e., that conduct that is discriminatory can never be unfair.  No language in the statute establishes that they are mutually exclusive.[16]  Indeed, courts have recognized that other "distinct concepts" overlap, such

---

[16] Plaintiffs also argue that "[o]ther examples of Congress's design are easy to find.  In section 1002(13) of Dodd-Frank, Congress defined 'fair lending' as 'fair, equitable, and nondiscriminatory access to credit for consumers[,]' 12 U.S.C. § 5481(13)," and, Plaintiffs add, "[i]f 'fair' naturally included 'nondiscriminatory,' Congress would not have needed to include nondiscriminatory in its definition of fair lending."  Pls.' SJ Mem. at 15.  This argument proves too much and not enough.  If it were true, it would also mean that the concept of fairness does not comprise equity.  But the word "fair" naturally includes "equitable," *see* Oxford English Dictionary, available at https://www.oed.com/view/Entry/63831?redirectedFrom=equitable#eid (defining "equitable" as "[c]haracterized by equity or fairness"), and yet Congress included the term "equitable" in defining "fair lending."  Congress, then, can be redundant (and was in § 5481), and one cannot deduce from the inclusion of the term "nondiscriminatory" in the definition of "fair lending" that the concept of discrimination would otherwise be outside the ambit of fairness concerns.  Nothing about how

that, for example, conduct that is "deceptive" can also be "unfair." *See* 12 U.S.C. § 5531(a)

(separately listing "unfair" and "deceptive" practices); *Wyndham Worldwide Corp.*, 799 F.3d at 245

("We recognize this analysis of unfairness encompasses some facts relevant to the FTC's deceptive

practices claim.  But facts relevant to unfairness and deception claims frequently overlap."); *Am. Fin.

Servs. Ass'n v. FTC*, 767 F.2d 957, 980 n. 27 (D.C. Cir. 1985) ("The FTC has determined that . . .

making unsubstantiated advertising claims may be both an unfair and a deceptive practice."); *Orkin

Exterminating Co. v. FTC*, 849 F.2d 1354, 1367 (11th Cir.1988) ("[A] practice may be both deceptive

and unfair . . .")  In addition, as noted earlier, other agencies have recognized that the distinct

concepts of unfairness and discrimination are not mutually exclusive.  Financial Institution Letters,

(ADMINRECORD 02491); OCC, Comptrollers Handbook, Fair Lending (ADMINRECORD

2657).  And, of course, that there may be overlap between discrimination and unfairness does not

mean that they are coterminous, such that discrimination is a "type of unfairness," Pls.' SJ Mem. at

14.  The Bureau has not claimed that all discrimination is categorically unfair; the only conduct that

is unfair is conduct that satisfies the test established by Congress.[17]

    Plaintiffs' structural argument is no more successful than their textual one.  They maintain

that their position finds support in the fact that "the section that defines 'unfairness' [12 U.S.C.

§ 5531] does not mention discrimination."  Pls.' SJ Mem. at 16.  But that the definition of unfairness

does not mention discrimination does not establish that there is an atexual exception for

---

Congress defined fair lending, then, establishes that "unfair" and "discrimination" are mutually
exclusive terms, such that conduct that satisfies the statutory standard for being unfair, 12 U.S.C.
§ 5531, is somehow not unfair if it is also discriminatory.

[17] Discrimination is not a concept that exists solely in civil rights law.  Many laws designed to ensure
fair dealing in the economic sphere prohibit forms of discrimination.  *See, e.g.*, 47 U.S.C. § 202(a)
(prohibiting telecommunications "common carrier to make any unjust or unreasonable
discrimination in charges, practices, classifications, regulations, facilities, or services for or in
connection with like communication service, directly or indirectly, by any means or device, or to
make or give any undue or unreasonable preference or advantage to any particular person, class of
persons, or locality, or to subject any particular person, class of persons, or locality to any undue or
unreasonable prejudice or disadvantage").

discriminatory conduct any more than the failure to reference "fraud" demonstrates that there is an exception for fraudulent conduct.  Put otherwise, the unfairness standards established by Congress cannot be undone by speculation about what the absence of certain hypothetical text must mean. Indeed, Plaintiffs structural argument is inconsistent with how courts have interpreted the parallel language of the FTC Act, *Accusearch Inc.*, 570 F.3d 1194 (interpreting unfairness to encompass conduct not specifically addressed by any law), and with Congress's decision that "established public policy" is relevant to the determination of whether conduct is unfair, 12 U.S.C. § 5531(c)(2). Plaintiffs' structural arguments fail.

Finally, Plaintiffs look to legislative history, but they do not find what they need.  Plaintiffs contend that "[t]he only mention of how the CFPB should address discrimination in Dodd-Frank's conference report focuses on preexisting antidiscrimination laws." Pls.' SJ Mem. at 16.  Specifically, they quote the following language from a House Conference Report: "the Office of Fair Lending and Equal Opportunity within the [CFPB] … will oversee the enforcement of federal laws intended to ensure fair, equitable and nondiscriminatory access to credit for individuals and communities, including the Equal Credit Opportunity Act (ECOA) and Home Mortgage Disclosure Act (HMDA)." H.R. Conf. Rep. No. 111-517, at 875 (June 29, 2010).  The report lists ECOA and HMDA as *examples* of "federal laws intended to ensure fair, equitable, and nondiscriminatory access to credit," not as an exhaustive list of the laws that could be implicated by discriminatory conduct. *Id.* (noting that the relevant laws "include" ECOA and HMDA).  Thus, nothing in the legislative history identified by Plaintiffs comes anywhere close to establishing that Congress actually intended to create a discrimination exception to unfairness under 12 U.S.C. § 5531 (even though Congress neglected to say so in the text of the statute).[18]

---

[18] Plaintiffs contend that the March 2022 revisions to the Exam Manual are "inconsistent with the broader statutory context." Pls.' SJ Mem. at 16.  But this argument too comes up short.  As support,

For the reasons explained above, the Bureau did not exceed its statutory authority when it revised the Exam Manual in March 2022.[19]

## VI.   The Manual Revisions Are Not Arbitrary and Capricious

Plaintiffs contend that the March 2022 revisions to the Exam Manual are arbitrary and capricious under 5 U.S.C. § 706(2)(A) because the Bureau failed to consider several factors. Pls.' SJ Mem. at 17-21.  Not so.  The factors to which Plaintiffs point are irrelevant, so their consideration

---

Plaintiffs point to the interpretation of the unfairness language in the FTC Act.  *Id.* But as explained above, that interpretation supports the Bureau's position.  Plaintiffs also point out that the unfairness standard does not list protected classes or specify any exemptions.  *Id.* at 17.  This fact is irrelevant to the Bureau's position that discriminatory conduct—like any other conduct—can be unfair if (and only if) it satisfies the statutory requirements for unfairness.

[19] In a single sentence, Plaintiffs invoke the major questions doctrine as a basis for rejecting the plain meaning of unfairness in the statute.  Pls.' SJ Mem. at 17 (citing *West Virginia v. EPA*, 142 S. Ct. 2587 (2022)).  This argument is undeveloped and, therefore, waived.  *See, e.g., Paez v. Wal-Mart Stores Texas, LLC*, EP-20-CV-00321, 2022 WL 3216343, at *2 (W.D. Tex. Aug. 9, 2022).  At all events, Plaintiffs do not demonstrate that the circumstances at issue here make this one of the "extraordinary cases," *West Virginia*, 142 S. Ct. at 2595, to which the doctrine applies.  Amici states—who vastly overstate the meaning of the revisions, ECF No. 21 at 15 (describing the Manual revisions as "regulat[ing] all forms of discrimination across an entire industry," rather than, more accurately, as revisions to an employee manual that recognize that there is no atextual exception to the statute standard of unfairness)—similarly do not demonstrate that this is an extraordinary case implicating the major questions doctrine. ECF No. 21 at 15-16.  The states too fail to establish that the March 2022 revisions to the Exam Manual carry the economic or political significance to trigger the doctrine.  *See BST Holdings, L.L.C. v. OSHA*, 17 F. 4th 604, 617 (5th Cir. 2021) (finding $3 billion in costs to be sufficient to trigger doctrine); *Brown v. U.S. Dep't of Educ.*, No. 4:22-CV-0908-P, 2022 WL 16858525, at *12 (N.D. Tex. Nov. 10, 2022) ("An agency action is politically significant if Congress has been engaged in robust debates over bills authorizing something like the agency's action." (quotation marks omitted)).  Amici states also invoke federalism as reason to reject the plain meaning of Dodd-Frank.  But Plaintiffs do not make the argument, so it should be rejected.  *See Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.,* 933 F.2d 1285, 1292 (5th Cir. 1991) (holding that amicus curiae "cannot raise an issue raised by neither of the parties absent exceptional circumstances"); *Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998) ("While an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties.").  Even if the argument has not been waived, however, it fails.  Amici's argument is premised on the notion that Congress must clearly authorize executive action that alters the relationship between the federal government and the states.  ECF No. 21 at 14-15.  But, as explained above, the March 2022 Manual revisions do not change anything.  Nor, in any event, do Amici states explain how it intrudes on their power for the Bureau to police unfair conduct that is also discriminatory:  The states do not claim to have a policy of promoting unfair conduct as long as it is also discriminatory.

was not a necessary component of the reasoned decision making required by § 706(2)(A).  The Court should dismiss Plaintiffs' claim under the arbitrary and capricious clause of the APA or, in the alternative, enter judgment in favor of the Bureau on that claim.

The APA permits a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [and] capricious[.]" 5 U.S.C. § 706(2)(A)  "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency.  A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  The corollary to the requirement that an agency consider relevant factors is that the agency need not consider irrelevant ones to satisfy the APA's reasoned decision-making requirement.  *Metro Cnty. Title, Inc. v. FDIC*, 13 F.3d 883, 887 (5th Cir. 1994) (holding that "[a]n agency need only consider relevant evidence" under the arbitrary and capricious standard).

Plaintiffs argue that March 2022 revisions to the Exam Manual are arbitrary and capricious because the Bureau did not account for (i) the historical use of the term "unfairness" in the context of the Federal Trade Commission (FTC) Act, Pls.' SJ Mem. at 18, (ii) the limits placed on disparate impact liability by the Supreme Court, *id.* at 19-20, (iii) the Due Process implications of applying an allegedly new interpretation to past conduct, *id.* at 20, and (iv) the reliance interests that allegedly had grown up around what Plaintiffs term the Bureau's "prior approach" to unfairness, *id.* at 20-21.

Plaintiffs' argument is flawed.  None of these factors was, in fact, relevant to the March 2022 revisions.  Accordingly, the Bureau was not obligated to consider them.  *See Metro Cnty. Title, Inc.*, 13 F.3d at 887.

Take first the historical understanding of the term unfairness in the context of the Federal Trade Commission Act.  The Bureau does not dispute that the term "unfairness" in 12 U.S.C.

33

§ 5531 derives from the FTC Act.  *See* 15 U.S.C. § 45(n).  But Plaintiffs err in arguing that the "historical use and understanding" of the term unfairness contradicts the statements in the Exam Manual regarding the relationship of discrimination to unfairness, and so needed to be considered by the Bureau prior to issuing the revisions.  Pls.' SJ Mem. at 18-19.  Plaintiffs identify no historical evidence demonstrating that there is a discrimination exception to unfairness as that term is used in the FTC Act; they simply provide evidence for the general proposition that Congress codified a definition of unfairness.  *See id.*  But even if that codified definition excludes certain conduct that previously had been considered unfair, Plaintiffs provide no support for the distinct proposition that there exists an atextual exception to unfairness for conduct that *satisfies the codified definition.*  Indeed, a decades-old enforcement action (in the related context of deceptive conduct), an 18-year-old statement by the FDIC and Federal Reserve Board, and a chapter of an OCC handbook demonstrates the there is no such exception.  *See In re First Buckingham Community, Inc.,* 73 FTC 938, Docket 8750, 1968 F.T.C. Lexis 65 (ADMINRECORD 00006-00012); Financial Institution Letters (ADMINRECORD 02491); OCC, Comptrollers Handbook, Fair Lending (ADMINRECORD 2657).  Quite simply, there was no relevant history of the FTC Act that the Bureau failed to consider, and Plaintiffs' argument fails.

Plaintiffs' argument that the Bureau failed to appropriately consider Supreme Court case law regarding disparate-impact liability, specifically *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519 (2015), is similarly flawed.  *Inclusive Communities* addresses when an anti-discrimination statute (the Fair Housing Act, in that case) can be read to impose disparate-impact liability; it does not address the distinct question of whether Dodd-Frank's statutory prohibition on unfair practices contains an atextual exception for discriminatory conduct. It is true that the statutory standard for unfairness, like disparate-impact liability, focuses on

effects.[20]  12 U.S.C. § 5531 (listing as the first element of unfairness that the act or practice "causes or is likely to cause substantial injury").  It is also true that there is no discrimination exception to unfairness (i.e., discriminatory conduct can be unfair).  But that does not mean that liability for unfairness under Dodd-Frank is the same thing as disparate-impact liability under an anti-discrimination statute.  This argument "confuse[s] an entity and its attributes."  *Goldberg v. 400 E. Ohio Condo. Ass'n*, 12 F. Supp. 2d 820, 823 (N.D. Ill. 1998) (quoting Richard Posner, Overcoming Law 211 (1995)).  Telescopes and microscopes both use lenses to alter an image's magnification—but they are not the same thing.  Similarly, unfairness on the one hand, and disparate-impact liability under an anti-discrimination statute on the other, both focus on effects, and both can capture discriminatory conduct—but they are not the same thing.[21]  For example, Dodd-Frank's prohibition on unfair acts and practices also applies to conduct that is not discriminatory, like an entity refusing to release a lien after a consumer has made a final payment on a mortgage.  *See* UDAAP Chapter at 3, ECF No. 1-2.  And, to take another example, whether the harm was "reasonably avoidable" by the customer is an element of the unfairness inquiry, 12 U.S.C. § 5531(c)(1)(A), but avoidance of harm is not a consideration under traditional disparate impact analysis.  *See, e.g., Inclusive Cmtys. Project, Inc.*, 576 U.S. at 533.  Thus, *Inclusive Communities Project* was not relevant to the March 2022 Manual Revisions, and the Bureau had no obligation to consider it.

Next, Plaintiffs contend that the March 2022 manual revisions are arbitrary and capricious because the Bureau did not consider that the application of the allegedly "new UDAAP definition" to conduct that occurred before the issuance of the revisions would violate the Due Process Clause

---

[20] Intent is not an element of the unfairness inquiry. *See, e.g., Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 566 (M.D. Pa. 2018), *aff'd*, 967 F.3d 273 (3d Cir. 2020) (explaining that demonstrating unfairness under 12 U.S.C. §§ 5531 and 5536 "requires no showing of intent on the part of the plaintiff").

[21] Indeed, Plaintiffs' argument that the Bureau exceeded its statutory authority is premised on the notion that discrimination and unfairness are distinct concepts.  Pls.' SJ Mem. at 12-17.

of the Fifth Amendment.  Pls.' SJ Mem. at 20.  This argument too fails.  The Exam Manual does not announce a new definition of unfairness:  there has never been a discrimination exception to unfairness.  In any case, this argument is an objection to the hypothetical application of the unfairness standard to past conduct; it is not a basis to reject the statements regarding the meaning of unfairness in the March 2022 manual revisions.

Finally, Plaintiffs maintain that the Bureau improperly failed to consider "reliance interests that have grown up around its prior approach to UDAAP authority."  Pls.' SJ Mem. at 20.  This argument also comes up short.  An agency must consider reliance interests when it "changes course."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).  But to sound a now familiar refrain, the Bureau did not change course, because there has never been an atextual discrimination exception to unfairness.  So, Plaintiffs could not have reasonably relied on that supposed exception to engage in any unfair conduct that may also be discriminatory—and the Bureau had no obligation to consider this nonexistent reliance under the APA.

### VII.   Plaintiffs Are Not Entitled to All of the Relief They Seek

#### A.   Plaintiffs Have Not Demonstrated That an Injunction Is Warranted

If Plaintiffs prevail, they are entitled to more limited relief than they seek.  While vacatur of the March 2022 revisions combined with declaratory relief would be an appropriate remedy, Plaintiffs have not demonstrated any entitlement to injunctive relief.  Nor have they adequately explained how their proposed injunction would operate.

Plaintiffs seek vacatur of the March 2022 manual revisions.  *See* Compl., Prayer for Relief. And with respect to both their constitutional and non-constitutional claims, Plaintiffs now seek an injunction "forbidding the CFPB from pursuing any examinations or enforcement actions based on the interpretation of its UDAAP authority announced in the March 2022 update."  Pls.' SJ Mem. at

33.[22]  Plaintiffs also seek declaratory relief, and the requests for declaratory relief vary across the claims in predictable ways related to the legal theory underlying each claim.  *See* Compl., Prayer for Relief (seeking a declaration that the CFPB's funding structure violates the Constitution); *id.* (seeking a declaration that the March 2022 manual revisions are arbitrary and capricious).

Under this Circuit's precedent, vacatur and declaratory relief are available remedies under the APA.  Indeed, in the Fifth Circuit, vacatur is the default remedy for claims arising under the APA.  "The APA gives courts the power to 'hold unlawful and set aside agency action.' . . . The default rule is that vacatur is the appropriate remedy."  *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (cleaned up).  Like claims based on the APA's notice-and-comment or reasoned decision-making requirements, challenges to agency action on the grounds that the agency action violates the Constitution are governed by the APA.  *See* 5 U.S.C. § 706.  The APA specifically authorizes courts to review agency actions for compliance with the Constitution:  It directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be--(B) contrary to *constitutional* right, power, privilege, or immunity."  5 U.S.C.A. § 706(2)(B)  (emphasis added).  Indeed, in *CFSA*, the Fifth Circuit employed the APA remedy of vacatur after concluding that the Payday Lending Rule was constitutionally flawed.  *CFSA*, 51 F.4th at 643; *Data Mktg. P'ship, LP*, 45 F.4th at 859 (explaining how the APA's remedy of vacatur differs from other traditional "non-enforcement remedies").  Declaratory relief is also available for APA claims.  *See, e.g., Zaidi v. United States Sent'g, Comm'n*, 115 F. Supp. 3d 80, 84 (D.D.C. 2015).

---

[22] Plaintiffs' complaint also requested "an injunction ordering the CFPB to cease accepting funds in violation of the Appropriations Clause."  Compl., Prayer for Relief.  Plaintiffs have apparently wisely abandoned that dramatically overbroad request.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (concluding that a nationwide injunction was overly broad) (per curiam).

If the Court determines that Plaintiffs have surmounted their jurisdictional obstacles, then, under *CFSA*, they are entitled to vacatur of the March 2022 manual revisions.  In *CFSA*, the court determined that Payday Lending Rule should be vacated because it is "the product of the Bureau's unconstitutional funding scheme."  51 F.4th at 643.  The same logic would apply to the March 2022 manual revisions.  Declaratory relief would also be available.  The same remedies would be warranted with respect to Plaintiffs' non-constitutional claims, given the remedial framework that applies to APA claims.

But Plaintiffs have not established their entitlement to injunctive relief.  In support of injunctive relief, Plaintiffs discuss the familiar four-part standard, i.e., whether the plaintiff has succeeded on the merits; whether the plaintiff will suffer irreparable harm absent an injunction; whether the balance of equities between the parties warrants the issuance of an injunction; and whether the issuance of an injunction is in the public interest.  Pls.' SJ. Mem. at 27.  This discussion is fine as far as it goes, but it does not go far enough.  An additional showing must be made when an injunction would accompany vacatur, namely, that the injunction sought would "[h]ave any meaningful practical effect independent of its [accompanying] vacatur."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  The reason for this additional requirement is straightforward: "[A]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. … If a less drastic remedy (such as partial or complete vacatur of [a] deregulation decision) was sufficient to redress [the] injury, no recourse to the additional and extraordinary relief of an injunction was warranted."  *Id.*  But Plaintiffs do not explain how an injunction would have any meaningful practical effect independent of vacatur.  Pls.' SJ, Mem. at 27-32.  And as injunctions are an "extraordinary remedy, which should not be granted as a matter of course," the Court cannot presume that the injunction sought will have such an effect.  *CFSA* is instructive on this point, as, in that case, the Fifth Circuit vacated the rule at issue, but did not issue an injunction, notwithstanding

that the plaintiffs had sought one.  *CFSA*, 51 F.4th at 644; *Cmty. Fin. Serv. Ass'n of Am. v. CFPB*, 1:18-cv-295, Amended Compl., Prayer for Relief, ECF No. 76 (E.D. Tex.).  No injunction is warranted.

Plaintiffs also have not adequately explained what their requested injunction would prohibit. Federal Rule of Civil Procedure 65(d)(1)(C) provides that "every order granting an injunction" must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Plaintiffs have not provided the details that the Court would need to craft an injunction.  They seek an injunction "forbidding the CFPB from pursuing any examinations or enforcement actions based on the interpretation of its UDAAP authority announced in the March 2022 update."  Pls.' SJ Mem. at 33.  Does this mean that the Bureau cannot bring an enforcement action for an unfair practice without first satisfying itself that the conduct is not also discriminatory?  Plaintiffs do not say.  If the proposed injunction does mean that, then Plaintiffs' proposal would seem to require the Bureau to obtain the very kind of material that Plaintiffs object to providing, i.e., material about whether the regulated entity engaged in discriminatory conduct. Relatedly, if the regulated entity comes forward with evidence that the unfair conduct is *also discriminatory*, has the Bureau violated the proposed injunction?  Plaintiffs have not answered these questions, but they must.

### B.    Any Relief Should be Narrowly Tailored

Plaintiffs appear to request relief that would extend far beyond themselves and their members.  *See* Pls.' Proposed Order at 2 (asking that the Manual update be "vacated" and the Bureau "enjoined from pursuing *any* examinations or enforcement actions based on the interpretation of the CFPB's UDAAP authority announced in the [Manual] update" (emphasis added)), ECF No. 17-22.  Yet there is no dispute that relief limited solely to Plaintiffs would fully

remedy any injury to Plaintiffs and their members.  Both Article III standing requirements and fundamental principles of equity thus require that any relief in this case be so limited.

An Article III court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018).  Thus, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *id.* at 1934, and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Universal relief of the kind Plaintiffs apparently seek is inconsistent with these Article III and traditional equitable limits.

Universal relief also "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring) (lamenting the "gamesmanship and chaos" created by "conflicting nationwide injunctions"); *Arizona v. Biden*, 31 F.4th 469, 483-85 (6th Cir. 2022) (Sutton, J., concurring) (explaining that "nationwide injunctions or universal remedies … seem to take the judicial power beyond its traditionally understood uses" and "create practical problems too").[23]

---

[23] The Fifth Circuit has held that the APA authorizes courts to render agency actions "void" by ordering universal vacatur. *Texas v. Biden*, 20 F.4th 928, 957 (5th Cir. 2021), *rev'd and remanded on other grounds,* 142 S. Ct. 2528 (June 30, 2022). But the Bureau respectfully submits that the reference in 5 U.S.C. § 706 to courts "set[ting] aside agency action, findings, and conclusions" is better understood as an authorization not to actually unwind or erase agency actions, findings, and conclusions, but to decline to give them effect as between the parties to a dispute, in keeping with the limitations of Article III and the principle that remedies "ordinarily operate with respect to specific parties," rather than "on legal rules in the abstract."  *See California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quotation marks omitted).

The Fifth Circuit recently came to a similar conclusion in granting a partial stay of a preliminary-injunction order, prohibiting application of that order outside the boundaries of the plaintiff states that had sought relief. *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021).  In doing so, the panel explained that "[p]rinciples of judicial restraint" counseled against granting relief to non-parties. *Id.* at 263.  And the court of appeals specifically distinguished the nationwide injunction that it had affirmed in *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), as having been based on a "constitutional uniformity principle" unique to immigration law, as well as "that case's concern that patchwork rulings would undermine an injunction limited to certain jurisdictions." *Louisiana v. Becerra*, 20 F.4th at 263-64.

The concerns at issue in *Texas v. United States* are not present here.  Nor would any other consideration in this case warrant granting relief that is any broader than necessary to remedy Plaintiffs' claimed injuries to themselves and their members.  *See VanDerStok v. Garland,* No. 4:22-CV-00691-O, 2022 WL 4809376, at *2, 10 (N.D. Tex. Oct. 1, 2022) (rejecting "Plaintiffs' invitation to issue a nationwide injunction" and explaining that "a broad injunction would far exceed the 'particular' tailoring necessary to redress [Plaintiffs'] injuries and afford them complete relief" (quoting *Gill*, 138 S. Ct. at 1934)), *appeal pending*, No. 22-11071 (5th Cir.); *Texas v. Becerra*, No. 5:22-cv-185-H, 2022 WL 3639525, at *30 (N.D. Tex. Aug. 23, 2022) (concluding that "the circumstances do not justify or require a nationwide injunction" and explaining that the court would "follow Fifth Circuit precedent and limit the injunction based on the parties, issues, and evidence before it" (citing *Louisiana v. Becerra*, 20 F.4th at 263-64)), *appeal pending*, No. 22-11037 (5th Cir.).[24]

---

[24] Any relief should also be limited to the entities that were members of Plaintiff organizations at the time the suit was filed.  Extending the benefits of any injunction in Plaintiffs' favor to members who join after a decision in this case would be akin to encouraging forum shopping, i.e., for example, to allowing an intervenor to join a suit as a plaintiff after a preliminary injunction has been issued. *Cf. Pueblo of Zuni v. United States*, No. CV 01-1046 LH-LFG, 2005 WL 8163572, at *5 (D.N.M. Oct. 18,

## CONCLUSION

For the reasons stated above, the Court should dismiss Plaintiffs' suit or non-constitutional

claims, or enter judgment in favor of the Bureau on Plaintiffs' non-constitutional claims.


DATED:  December 20, 2022                    Respectfully Submitted,

                                             SETH FROTMAN
                                             General Counsel

                                             STEVEN Y. BRESSLER
                                             Deputy General Counsel

                                             CHRISTOPHER DEAL
                                             Assistant General Counsel

                                              s/ *Justin M. Sandberg*
                                             JUSTIN M. SANDBERG
                                             KEVIN E. FRIEDL
                                             Senior Counsel
                                             Consumer Financial Protection Bureau
                                             1700 G St. NW
                                             Washington, D.C. 20552
                                             Justin.Sandberg@cfpb.gov
                                             Kevin.Friedl@cfpb.gov
                                             (202) 450-8786 (Sandberg)
                                             (202) 435-9268 (Friedl)

---

2005) (denying intervention, in part, to prevent forum shopping).  Future prospective members of these organizations would be permitted to opt into the judgment—by joining one of the Plaintiff organizations—if it is to their liking, or if Plaintiffs do not prevail, to bring a separate suit seeking the same relief somewhere else.  Such legal gamesmanship should not be permitted.

## CERTIFICATE OF SERVICE

I hereby certify on this 20th Day of December 2022, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

*/s/ Justin M. Sandberg*
JUSTIN M. SANDBERG