# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

PASSPORT AUTOMOTIVE GROUP, INC., a
corporation,

PASSPORT MOTORCARS, INC., a corporation,
also d/b/a as PASSPORT NISSAN OF MARLOW
HEIGHTS, also d/b/a as PASSPORT NISSAN OF
VIRGINIA, also d/b/a as PASSPORT INFINITI
OF ALEXANDRIA,

IMPORT MOTORCARS, INC., a corporation,
also d/b/a PASSPORT MAZDA,

AUTOS INTERNATIONAL, INC., a corporation,
also d/b/a PASSPORT INFINITI OF SUITLAND,

PASSPORT IMPORTS, INC., a corporation, also
d/b/a PASSPORT TOYOTA,

PASSPORT MOTORS HOLDING, INC., a
corporation, also d/b/a PASSPORT MINI OF
MONTGOMERY COUNTY,

PASSPORT OF ALEXANDRIA, INC., a
corporation, also d/b/a PASSPORT MINI OF
ALEXANDRIA,

INTERNATIONAL MOTOR CARS, INC., a
corporation, also d/b/a PASSPORT BMW,

Case No. _____

**COMPLAINT FOR PERMANENT
INJUNCTION, MONETARY
RELIEF, AND OTHER RELIEF**

EVERETT A. HELLMUTH, III, individually and
as an owner of PASSPORT AUTOMOTIVE
GROUP, INC., PASSPORT MOTORCARS,
INC., IMPORT MOTORCARS, INC., AUTOS
INTERNATIONAL, INC., PASSPORT
IMPORTS, INC., PASSPORT MOTORS
HOLDING, INC., PASSPORT OF
ALEXANDRIA, INC., and INTERNATIONAL
MOTOR CARS, INC., and

JAY KLEIN, individually and as an officer of
PASSPORT MOTORCARS, INC., IMPORT
MOTORCARS, INC., AUTOS
INTERNATIONAL, INC., PASSPORT
IMPORTS, INC., PASSPORT MOTORS
HOLDING, INC., PASSPORT OF
ALEXANDRIA, INC., and INTERNATIONAL
MOTOR CARS, INC.,

    Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint

alleges:

1.      The FTC brings this action under Sections 5(a), 13(b), and 19 of the Federal

Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b), and 57b, and the Equal Credit

Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f , which authorize the FTC to seek, and the

Court to order, preliminary and permanent injunctive relief, monetary relief, and other relief for

Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and

in violation of the ECOA and its implementing Regulation B, 12 C.F.R. § 202 in connection with

Defendants' deceptive advertising and pricing practices, as well as discriminatory and unfair

financing.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the ECOA, 15 U.S.C. §§ 1691-1691f, which, *inter alia*, prohibits discrimination on the basis of race, color, or national origin in credit transactions.

## DEFENDANTS

5.      Defendant Passport Automotive Group, Inc. ("Passport Auto Group"), is a Virginia corporation with its principal place of business at 5000 Auth Way, Marlow Heights, Maryland 20746.   Passport Auto Group transacts or has transacted business in this District.   At all times relevant to this Complaint, acting alone or in concert with others, Passport Auto Group has advertised, marketed, distributed, or offered vehicles to consumers for sale, and Passport Auto Group regularly arranged for the extension of credit.

6.      Defendant Passport Motorcars, Inc., also d/b/a Passport Nissan of Marlow Heights, also d/b/a Passport Nissan of Virginia, also d/b/a Passport Infiniti of Alexandria ("Passport Motorcars"), is a Virginia corporation with its principal place of business at 150 S.

Pickett Street, Alexandria, Virginia 22304.   Passport Motorcars transacts or has transacted business in this District.   At all times relevant to this Complaint, acting alone or in concert with others, Passport Motorcars has advertised, marketed, distributed, or offered vehicles to consumers for sale, and Passport Motorcars regularly arranged for the extension of credit.

7.      Defendant Import Motorcars, Inc., also d/b/a Passport Mazda ("Import Motorcars"), is a Virginia corporation with its principal place of business at 5000 Auth Way, Suitland, Maryland 20746.   Import Motorcars transacts or has transacted business in this District.   At all times relevant to this Complaint, acting alone or in concert with others, Import Motorcars has advertised, marketed, distributed, or offered vehicles to consumers for sale, and Import Motorcars regularly arranged for the extension of credit.

8.      Defendant Autos International, Inc., also d/b/a Passport Infiniti of Suitland ("Autos International"), is a Virginia corporation with its principal place of business at 5000 Auth Way, Suitland, Maryland 20746.   Autos International transacts or has transacted business in this District.   At all times relevant to this Complaint, acting alone or in concert with others, Autos International has advertised, marketed, distributed, or offered vehicles to consumers for sale, and Autos International regularly arranged for the extension of credit.

9.      Defendant Passport Imports, Inc., also d/b/a Passport Toyota ("Passport Imports"), is a Virginia corporation with its principal place of business at 5000 Auth Way, Suitland, Maryland 20746.   Passport Imports transacts or has transacted business in this District. At all times relevant to this Complaint, acting alone or in concert with others, Passport Imports has advertised, marketed, distributed, or offered vehicles to consumers for sale, and Passport Imports regularly arranged for the extension of credit.

10.     Defendant International Motor Cars, Inc., also d/b/a Passport BMW ("International Motor Cars"), is a Maryland corporation with its principal place of business at 4730 Auth Place, Marlow Heights, Maryland 20746.   International Motor Cars transacts or has transacted business in this District.   At all times relevant to this Complaint, acting alone or in concert with others, International Motor Cars has advertised, marketed, distributed, or offered vehicles to consumers for sale, and International Motor Cars regularly arranged for the extension of credit.

11.     Defendant Passport Motors Holding, Inc., also d/b/a Passport MINI of Montgomery County ("Passport Motors Holding"), is a Virginia corporation with its principal place of business 150 S. Pickett Street, Alexandria, Virginia 22304.   Passport Motors Holding transacts or has transacted business in this District.   At all times relevant to this Complaint, acting alone or in concert with others, Passport Motors Holding has advertised, marketed, distributed, or offered vehicles to consumers for sale, and Passport Motors Holding regularly arranged for the extension of credit.

12.     Defendant Passport of Alexandria, Inc., also d/b/a Passport MINI of Alexandria ("Passport of Alexandria"), is a Virginia corporation with its principal place of business at 5590 Duke Street, Alexandria, Virginia 22304.   Passport of Alexandria transacts or has transacted business in this District.   At all times relevant to this Complaint, acting alone or in concert with others, Passport of Alexandria has advertised, marketed, distributed, or offered vehicles to consumers for sale, and Passport of Alexandria regularly arranged for the extension of credit.

13.     Defendant Everett A. Hellmuth, III ("Hellmuth") is owner and President of Passport Auto Group, Passport Motorcars, Import Motorcars, Autos International, Passport

Imports, International Motor Cars, Passport Motors Holding, and Passport of Alexandria.   At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Passport, including the acts and practices set forth in this Complaint.   Defendant Hellmuth, in connection with the matters alleged herein, transacts or has transacted business in this District.

14.     Defendant Jay Klein ("Klein") is the Vice President of Passport Motorcars, Import Motorcars, Autos International, Passport Imports, International Motor Cars, Passport Motors Holding, and Passport of Alexandria.   At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Passport, including the acts and practices set forth in this Complaint.   Defendant Klein, in connection with the matters alleged herein, transacts or has transacted business in this District.

## COMMON ENTERPRISE

15.     Defendants Passport Auto Group, Passport Motorcars, Import Motorcars, Autos International, Passport Imports, International Motor Cars, Passport Motors Holding, and Passport of Alexandria (collectively, "Corporate Defendants") operate as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below. Corporate Defendants conduct the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations.   Because these Corporate Defendants operate as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

16.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

17.     Defendants are the owners and operators of nine automobile dealerships located in the greater Washington, DC metropolitan region and collectively doing business as the Passport Auto Group (hereinafter, "Passport").   Passport represents in advertisements that consumers can purchase particular inspected, reconditioned, or certified vehicles at specific prices.   However, in many instances, when consumers attempt to purchase these vehicles for the advertised prices, Passport charges them extra hundreds to thousands of dollars in fees, such as for inspection, reconditioning, preparation, and certification.   Passport represents that consumers are required to pay these redundant fees to purchase the vehicles.   But, in fact, Passport already includes the costs of inspection, reconditioning, preparation, and certification in its advertised prices.   Thus, Passport is double charging consumers for inspecting, reconditioning, preparing, and certifying used vehicles.   Passport has charged millions of dollars in such fees.

18.     Passport also unlawfully discriminates on the basis of race, color, and national origin by imposing higher costs on Black and Latino consumers on average than non-Latino White consumers.

### Passport's Deceptive Price and Fee Claims

19.     Through their own websites, print, direct mail, email, and third-party auto classified websites, Passport advertises for sale particular inspected, reconditioned, or certified

vehicles at specific prices.    Passport's vehicle advertisements typically indicate, among other

things, the make and model of the vehicle, the vehicle identification number ("VIN"), and the

sales price of the vehicle.    For example, in the advertisement below, Passport represents that

consumers can purchase a 2019 Nissan Maxima 3.5 SL with a "Nissan Certified 7 Year 100,000

Mile Warranty" for $23,700.

# 2019 Nissan Maxima 3.5 SL



**Body Style:** 4D Sedan
**Model Code:** P
**Engine:** 6 Cyl - 3.50 L
**Transmission:** Automatic
**Drive Type:** FWD
**Ext. Color:** Deep Blue Pearl
**Int. Color:** Charcoal
**Mileage:** 32615
**VIN #:** 1N4AA6AV9KC365783
**Stock #:** P13739

Internet Price:        $23,700

Nissan Certified 7 Year 100,000 Mile Warranty!, Leather, 1 Owner Carfax Certified, NAVIGATION!, PANORAMIC
SUNROOF!, Navigation System. CARFAX One-Owner. Clean CARFAX. 3.5L V6 DOHC 24V Automatic FWD
Deep Blue Pearl 2019 Nissan Maxima 3.5 SL20/30 City/Highway MPGNissan Certified Pre-Owned Details: *
Vehicle History * Includes Car Rental and Trip Interruption Reimbursement * Warranty Deductible: $100 * 167
Point Inspection * Roadside Assistance * Transferable Warranty * Limited Warranty: 84 Month/100,000 Mile
(whichever comes first) from original in-service dateCall a Passport Nissan Internet Sales rep today at 703-823-
9000.

     20.    In numerous instances, however, when consumers attempt to purchase particular

inspected, reconditioned, or certified vehicles for the prices advertised, Passport charges them

additional hundreds to thousands of dollars in fees, resulting in consumers paying more than the

advertised prices to purchase the vehicles or negating any later discounts they negotiate.

     21.    In numerous instances, Passport represents that these extra reconditioning,

inspection, preparation, and certification fees are required, even though Passport's advertised

prices are for vehicles that have already been reconditioned, inspected, and certified.

Additionally, with respect to certified vehicles, manufacturers require dealerships to inspect and recondition those vehicles to the manufacturer's specifications and pay a certification fee to the manufacturer before advertising them as certified.   Many manufacturer policies specifically prohibit Passport from separately charging for the cost of certification or including the certification cost in price negotiation.

22.     For example, Passport Nissan of Marlow Heights advertised a Certified Pre-Owned 2018 Nissan Rogue for $24,050.   However, it subsequently charged the buyer $2,390 in fees, purportedly required for reconditioning and certification.   As a result, the buyer ended up paying at least $2,390 more than the advertised price to purchase the vehicle.   In another instance, Passport Mazda advertised a Certified Pre-Owned 2016 CX-5 for $19,900, but then charged the buyer a $695 fee, purportedly required for certification.   As in the previous example, the addition of this fee resulted in the buyer paying more than the price advertised.

### Passport's Discriminatory Credit Practices

23.     Passport unlawfully discriminates on the basis of race, color, and national origin by imposing higher borrowing costs on Black and Latino consumers than non-Latino White consumers.

24.     Passport arranges financing for consumers to purchase motor vehicles through third-party financing entities.   Passport obtains and completes consumer applications for credit, obtains consumer credit reports, and verifies income to make an initial determination whether a financing applicant will meet financing entities' underwriting guidelines.   Passport then submits applications to one or more financing entities on behalf of consumers.

25.     Each financing entity provides Passport with a specific "buy rate," a risk-based finance charge that reflects the interest rate at which the entity will finance a retail installment contract from the dealer.   In some circumstances, depending on its policies, the financing entity also permits Passport to add a finance charge to the buy rate called a "markup."   Unlike the buy rate, the markup is not based on the underwriting risk or credit characteristics of the applicant. Passport communicates to the consumer only the final total contract rate, which equals the buy rate plus the markup.   The financing entity compensates Passport from the increased interest revenue derived from the markup.   Passport, in turn, compensates its employees based in part on revenue derived from the markup.

*Passport's Discriminatory Interest-Rate Markup Practice*

26.     Passport has a policy, approved by Hellmuth, of charging consumers a standard markup of 200 basis percentage points or 2%, but giving employees discretion to reduce or eliminate the markup for certain reasons, such as if the consumer states they have a competing credit offer or a monthly payment constraint.   If one of these reasons applies, employees may, but are not required to, reduce or eliminate the standard markup.

27.     Under the policy, any deviations from the standard markup must be recorded on a certification form.   Each form must be signed by the employee who arranged the credit transaction, and a program coordinator or another employee who did not participate in the credit transaction must review the form and sign it as well.   The policy also requires random monitoring of dealership credit offers and periodic audits of credit sales to ensure the policy is being effectively implemented.

28.     In practice, however, Passport failed to follow several of the policy's requirements.   For example, in many instances, Passport did not fill out the required certification form or report a specific reason for deviating from the standard markup.   In many other instances, the form included no reviewer certification or was reviewed by the same individual who arranged the credit transaction.   And Passport did not adequately monitor its credit offers or conduct periodic audits of credit sales to ensure the policy was being effectively implemented.

29.     Passport's discretionary markup rate practice has resulted in Passport charging, on average, Black and Latino consumers higher markups than non-Latino White consumers.   These disparities are statistically significant.   Among thousands of consumers who received motor vehicle financing through Passport between August 2017 and August 2020, Passport charged Black consumers, on average, approximately 28 basis points (approximately $291) and Latino consumers, on average, approximately 26 basis points (approximately $235) more in interest than non-Latino White consumers.   Black consumers received the maximum Passport-allowed markup approximately 47% more often and Latino consumers approximately 38% more often than non-Latino White consumers did.

30.     Passport received letters from a finance company – one in June 2019 and another in June 2020 – notifying it of statistically significant differences in the markup rates charged to Black borrowers at two separate Passport dealerships.   Passport took no action to address the markups rate disparities raised in these letters.

31.     Passport's discretionary markup practice is not justified by a business necessity that could not be met by a less discriminatory alternative.   Passport could randomly monitor its credit offers and conduct periodic audits to ensure the policy is being effectively implemented, as

its own written policy requires and as industry guidance advises, especially in light of third-party letters notifying it of disparities.   Passport could further limit employee discretion to charge rate markups by, among other things, not charging markups, charging all consumers the same markup or reducing its standard markup.   Passport could also require employees to disclose to all consumers that its markup is an additional charge added to finance companies' "buy rate" that can be reduced or eliminated under certain conditions.

32.     Black and Latino consumers cannot reasonably avoid Passport charging them higher vehicle financing costs based on their race, color, or national origin, because they do not know that Passport charges other consumers a lower rate.   Nor are there any countervailing benefits to charging certain consumers higher markup rates based on their race, color, or national origin.

<em>Passport's Discriminatory Fee Practices</em>

33.     In addition to charging minority consumers higher interest rate markups, Passport charges Black and Latino consumers extra inspection, reconditioning, vehicle preparation, and certification fees more frequently and in higher amounts than similarly situated non-Latino White consumers.

34.     Among thousands of consumers who received motor vehicle financing through Passport between August 2017 and August 2020, Black consumers were charged at least one such extra fee approximately 24% more often and Latino consumers approximately 42% more often than non-Latino White consumers.   In addition, Black consumers paid, on average, approximately $82 and Latino consumers paid, on average, approximately $81 more in such extra fees than non-Latino White consumers.

Page  12  of  20

35.     Moreover, Passport's fees exhibit statistically significant disparities based on race, color, or national origin that cannot be explained by non-discriminatory reasons.

36.     Black and Latino consumers cannot reasonably avoid Passport charging them higher fees, because they do not know that they are being charged such fees when others are not. Nor are there countervailing benefits to charging Black and Latino consumers more in fees than similarly-situated non-Latino White consumers.

## Hellmuth and Klein's Knowledge of the Misconduct

37.     Hellmuth and Klein are aware of Passport's unlawful practices and, as owners and officers, have the authority to stop them.   Nevertheless, the issues have persisted.

38.     Over the past several years, Hellmuth and Klein have received numerous emails and text messages from Passport employees notifying them about the bogus fees and have specifically discussed the problematic issue.

39.     For example, in January 2018, Passport's then E-Commerce Director sent Klein an email with the subject, "Used Car Recondition Fees."   The email states:

> Everett [Hellmuth] just sent out an email talking about advertising separate recon fees and asking us to get a list of competitors together so we can report them. I just wanted to make sure you know that we are doing this in at least 3 stores that I'm aware of. I have seen it advertised and on worksheets in 3 stores. The stores I know are actively doing bumping for recon fees are Nissan MD, Nissan VA, and Mazda. I responded to Everett and informed him of the same thing.

40.     The next day, the General Manager of Passport Nissan of Alexandria emailed his sales managers, copying Hellmuth, with an example of a used car sale where the dealership included a bogus inspection fee.   The text of the message states, "We do not need to charge extra fees, we already offer [sic] quality and fair prices."   Below this text is an image of a deal worksheet for a used 2011 Toyota Camry.   The worksheet shows that the "Adjusted Price" of

the vehicle, after a discount, was $9,699.00.   However, it also shows that there was a "PDI VA Inspection" fee of $1,095.00 that negated much of the discount.   Hellmuth forwarded the email to Klein noting, "If we stop today, we need to TRAIN all our staff to Tell all customers Who are shopping and don't buy from us, what other dealers are doing around us."   Passport did not stop charging the bogus fees.

41.      More than a year later, in April 2019, a Passport employee sent a picture to Klein via text message of a Passport Nissan deal worksheet that included a $1,589 "RECON" fee. The message states: "RECON!? I just emailed you."   Klein responded, "What recon? What the heck are we doing?"   The employee replied, "We are stealing from people and beating our chest saying how good we are."

42.      In June 2019, Hellmuth sent the same Passport employee a text message asking, "Which stores sell cars over the advertised price?"   The employee responded: "In the last 5 months I had found it at Nissan md, Mazda, Toyota.   I know it has been done at Nissan Virginia as well….I also found it at infiniti VA 2 weeks ago."

43.      In December 2019, a third-party online reputation management service intercepted a negative review about Passport Mazda and emailed it to Klein and other Passport employees.   The review reads:

> I feel like I paid too much for the car. The advertised price was a little high to begin with and then we find out there is $900. additional "restocking fee". apparently I had to pay for repairs done to the car. When the car's book value is determined it is determined based on the condition of the car. This is why people prefer to buy from a dealer rather than a private party. you can usually feel safe to assume that maintenance will have been done prior to the car going on the lot. To have to pay an additional fee for needed maintenance makes no sense to me. I feel this is a dishonest ploy and false advertising.

Passport's Integrated Marketing Manager replied: "Is this a reconditioning fee?   If so, shouldn't this be built into the cost of the car beforehand?   We don't disclose this type of thing in any advertising either so we need to be mindful of that.   It could be seen as bait and switch."

44.     Despite these multiple emails and text messages informing them of Passport's practice of charging consumers bogus fees, Hellmuth and Klein have allowed the practice to continue.

45.     As noted above, Passport also has received finance company letters notifying it of statistically significant differences in the markup rates charged to Black borrowers at two separate Passport dealerships.   Passport's Compliance Manager testified that it was her practice to send any letters from finance companies regarding markup rate disparities to Klein and discuss them with him.

46.     Additionally, in 2021, a financing company that financed Passport deals notified Hellmuth about markup disparities.

47.     In September 2020, Hellmuth and Klein received alerts about the FTC's consent order against a New York dealer that similarly was charging consumers bogus reconditioning, dealer preparation, and certification fees and charging higher interest rate markups and fees to minority borrowers.   The order requires disclosure if charging different markups to different borrowers and provides that notwithstanding a fair lending policy, the company cannot discriminate against credit applicants on the basis of race, color, or national origin.

48.     Despite these notifications, Passport took no steps to modify its discretionary markup policy or practice.

49.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Passport is violating or is about to violate laws enforced by the FTC.

## VIOLATIONS OF THE FTC ACT

50.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

51.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

52.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I

### Misrepresentations Regarding Advertised Prices

53.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale or financing of motor vehicles, including through the means described in Paragraphs 17 through 22, Defendants represent, directly or indirectly, expressly or by implication, that Defendants will sell particular used vehicles at specific prices.

54.     In truth and in fact, in numerous instances in which Defendants make the representations set forth in Paragraphs 17 through 22, Defendants do not sell those vehicles at those prices.

55.     Therefore, Defendants' representations as set forth in Paragraphs 17 through 22 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

## Misrepresentations Regarding Charges

56.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale or financing, or sale and financing of vehicles, including through the means described in Paragraphs 17 through 22, Defendants represent, directly or indirectly, expressly or by implication, that consumers are required to pay certain fees, such as for inspecting, reconditioning, preparing, or certifying vehicles.

57.     In truth and in fact, in numerous instances in which Defendants make the representations set forth in Paragraphs 17 through 22, consumers are not required to pay fees for inspecting, reconditioning, preparing, or certifying vehicles.

58.      Therefore, Defendants' representations as set forth in Paragraphs 17 through 22 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III**

**Unfair Discrimination**

59.     In numerous instances, as described in Paragraphs 23 through 36, Defendants

impose higher costs on Black and Latino consumers than on similarly situated non-Latino White

consumers.

60.     Defendants' actions cause or are likely to cause substantial injury to consumers

that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing

benefits to consumers or competition.

61.     Therefore, Defendants' acts or practices as set forth in Paragraphs 23 through 36

constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT AND REGULATION B**

62.     Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of

Regulation B, 12 C.F.R. § 202.4(a), prohibit a creditor from discriminating against an applicant

with respect to any aspect of a credit transaction on the basis of race, color, religion, national

origin, sex, marital status, or age (provided the applicant has the capacity to contract); because all

or part of the applicant's income derives from any public assistance program; or because the

applicant has in good faith exercised any right under the Consumer Credit Protection Act, 15

U.S.C. Ch. 41.

63.     Defendants are creditors as defined in Section 702(e) of the ECOA, 15 U.S.C. §

1691a(e), and Section 202.2(l) of Regulation B, 12 C.F.R. § 202.2(l).

64.     Section 704(c) of the ECOA, 15 U.S.C. § 1691c(c), specifically empowers the

Commission to enforce the ECOA.   Defendants' violations of the ECOA are deemed to be

violations of the FTC Act and are enforceable as such by the Commission under that Act. Further, the Commission is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the ECOA by any person, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests set by the FTC Act.   This includes the power to enforce a Consumer Financial Protection Bureau regulation promulgated under the ECOA, such as Regulation B, in the same manner as if a violation of that regulation had been a violation of an FTC trade regulation rule.

## Count IV

### Discriminatory Financing Practices

65.     In connection with motor vehicle credit transactions, on the basis of race, color, or national origin, Defendants impose higher costs on Black and Latino applicants on average than similarly situated non-Latino White applicants.

66.     Defendants' acts, policies, and practices as set forth in Paragraphs 23 through 36 constitute discrimination against applicants with respect to any aspect of a credit transaction on the basis of race, color, or national origin in violation of Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of Regulation B, 12 C.F.R. § 202.4(a).

### CONSUMER INJURY

67.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the ECOA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

<u>**PRAYER FOR RELIEF**</u>

Wherefore, Plaintiff requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act and the

ECOA by Defendants;

B.      Grant preliminary injunctive and ancillary relief as may be necessary to avert the

likelihood of consumer injury during the pendency of this action and to preserve the possibility

of effective final relief;

C.      Award monetary and other relief within the Court's power to grant; and

D.      Award any additional relief as the Court determines to be just and proper.


                                         Respectfully submitted,



Dated:    ___10/17/2022_____          _/s/ Samuel Jacobson_____
                                            SAMUEL JACOBSON
                                            LARKIN TURNER
                                            Federal Trade Commission
                                            600 Pennsylvania Ave., NW
                                            Mail Stop CC-10232
                                            Washington, DC 20580
                                            sjacobson@ftc.gov; lturner@ftc.gov
                                            phone: (202) 876-5590 (Jacobson)
                                            fax: (202) 326-3768

                                            Attorneys for Plaintiff
                                            FEDERAL TRADE COMMISSION