**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**

<table>
<tr>
<td>

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.,

*Plaintiffs*,

    v.

CONSUMER FINANCIAL PROTECTION
BUREAU, et al.,

*Defendants.*

</td>
<td>

Case No. 6:22-cv-00381

</td>
</tr>
</table>

**BRIEF OF AMICI CURIAE CALIFORNIA REINVESTMENT COALITION,
NATIONAL COMMUNITY REINVESTMENT COALITION, NATIONAL
ASSOCIATION FOR LATINO COMMUNITY ASSET BUILDERS, CENTER FOR
RESPONSIBLE LENDING, TEXAS APPLESEED, AND NATIONAL CONSUMER LAW
CENTER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

## CORPORATE DISCLOSURE STATEMENT

California Reinvestment Coalition is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of CRC.

National Community Reinvestment Coalition is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of NCRC.

National Association for Latino Community Asset Builders is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of NALCAB.

Center for Responsible Lending is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of CRL. CRL is an affiliate of Self-Help, one of the nation's largest nonprofit community development financial institutions.

Texas Appleseed is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of Texas Appleseed.

The National Consumer Law Center (NCLC) is a Massachusetts non-profit corporation established in 1969 and incorporated in 1971. It is a national research and advocacy organization focusing specifically on the legal needs of low-income, financially distressed, and elderly consumers. NCLC operates as a tax-exempt organization under the provisions of § 501(c)(3) of the Internal Revenue Code. It has no parent corporations and no publicly held company owns 10% or more of its stock. NCLC states that this brief was not authored in whole or in part by any party or its counsel, and that no person other than NCLC, its members, or its counsel contributed any money that was intended to fund the preparation and submission of this brief.

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

Identity and Interests of Amici Curiae ............................................................................ 1

Introduction ..................................................................................................................... 1

Argument ......................................................................................................................... 2

    I.      Discrimination in the financial services industry persists........................................ 2

            A.      Statistical, survey, and anecdotal evidence of discrimination in consumer finance. ........................................................................................................ 3

            B.      Algorithmic discrimination. .......................................................................... 9

    II.     Discrimination is unfair. ....................................................................................... 11

            A.      Discrimination is an "unfair" practice under the Dodd-Frank Act. .......... 11

                  1.     Discriminatory practices impose substantial injury on consumers. ................................................................................................. 12

                  2.     Consumers cannot reasonably avoid discriminatory practices. .... 14

                  3.     Discriminatory practices are not outweighed by countervailing benefits. .................................................................................................. 17

            B.      Discrimination is unfair under the common usage of the term and when read in context with other statutes. ......................................................... 18

Conclusion ..................................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (Ex),
   2016 WL 8849698 (C.D. Cal. Nov. 17, 2016)....................................................................15, 16

*CFPB v. ITT Educ. Servs., Inc.*,
   219 F. Supp. 3d 878 (S.D. Ind. 2015) .....................................................................................12

*CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV,
   2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) .........................................................................14

*CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV,
   2019 WL 13211630 (S.D. Fla. Nov. 13, 2019)........................................................................14

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
   51 F.4th 616 (5th Cir. 2022) ....................................................................................14, 16, 20

*FTC v. IFC Credit Corp.*,
   543 F. Supp. 2d 925 ((N.D. Ill. 2008)......................................................................................12

*FTC v. Passport Auto. Grp., Inc.*,
   No. 8:22-cv-02670-TDC (D. Md. 2022).................................................................................12

*Morris v. BNSF Ry. Co.*,
   429 F. Supp. 3d 545 (N.D. Ill. 2019) .......................................................................................20

*Morris v. BNSF Ry. Co.*,
   969 F.3d 753 (7th Cir. 2020) ...................................................................................................20

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)..................................................................................................................18

*Pagan v. Calderon*,
   448 F.3d 16 (1st Cir. 2006).......................................................................................................20

*Pennsylvania v. Navient Corp.*,
   354 F. Supp. 3d 529 (M.D. Pa. 2018) .....................................................................................14

*Pennsylvania v. Navient Corp.*,
   967 F.3d 273 (3d Cir. 2020)......................................................................................................14

*Robinson v. Shell Oil Co.*,
   519 U.S. 337(1997)...................................................................................................................18

*United Packinghouse, Food & Allied Workers Int'l Union, AFL-CIO v. NLRB*,
   416 F.2d 1126 (D.C. Cir. 1969)...............................................................................................20

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ................................................................................ 11-12

**Statutes**

12 U.S.C. § 5531 ................................................................................1, 9, 11, 17, 18

12 U.S.C. § 5536 ....................................................................................................11

Equal Credit Opportunity Act of 1974, 15 U.S.C. §§ 1691–1691f ...........................2, 16

42 U.S.C. § 12101 ..................................................................................................20

**Other Authorities**

Elizabeth Asiedu et al., *Access to Credit by Small Businesses: How Relevant Are
    Race, Ethnicity, and Gender?*, 102 Am. Econ. Rev. 532 (2012),
    http://dx.doi.org/10.1257/aer.102.3.532 ...................................................................5

Robert Bartlett et al., *Consumer-Lending Discrimination in the FinTech Era* 4
    (Nat'l Bureau of Econ. Rsch., Working Paper No. 25943, 2019),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3491267......................................4, 5, 10

Timothy Bates & Alicia Robb, *Impacts of Owner Race and Geographic Context
    on Access to Small-Business Financing*, 30 Econ. Dev. Q. 159 (2015),
    https://doi.org/10.1177/0891242415620484..................................................................6

David G. Blanchflower et al., *Discrimination in the Small-Business Credit
    Market*, 85 Rev. Econ. & Stats. 930 (2003),
    http://www.jstor.org/stable/3211816?origin=JSTOR-pdf ..............................................5

Debbie Gruenstein Bocian et al., *Race, Ethnicity, and Subprime Home Loan
    Pricing*, 60 J. Econ. & Bus. 110 (2008),
    https://doi.org/10.1016/j.jeconbus.2007.10.001 .........................................................4

Kristen Broady et al., Brookings Inst., *An Analysis of Financial Institutions in
    Black-Majority Communities: Black Borrowers and Depositors Face
    Considerable Challenges in Accessing Banking Services* (2021),
    https://brook.gs/3G7XR0y ................................................................................3, 13

Matthew Adam Bruckner, *The Promise and Perils of Algorithmic Lenders' Use of
    Big Data*, 93 Chi.-Kent L. Rev. 3 (2018) ...........................................................10, 15

Alexander W. Butler et al., *Racial Discrimination in the Auto Loan Market* (Mar.
    31, 2021), https://files.consumerfinance.gov/f/documents/cfpb_mayer_racial-
    discrimination-in-the-auto-loan-market.pdf...............................................................5

iv

Kevin Cavalluzzo & John Wolken, *Small Business Loan Turndowns, Personal Wealth, and Discrimination*, 78 J. Bus. 2153 (2005), https://www.jstor.org/stable/10.1086/497045 ..................................................................5

CFPB, *Unfair, Deceptive, or Abusive Acts or Practices* (2012), https://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf .........................................................................17

CRC & S.F. Off. Fin. Empowerment, *Pre-Existing Conditions: Assessing the Financial Services Response to Racism, Inequality, and COVID-19* (2020), https://sfgov.org/ofe/sites/default/files/2021-01/Pre-Existing%20Conditions%20Banking%20Report%20v3.pdf ...............................13

Press Release, Dept. Justice, Off. Pub. Affs., *Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012), https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief .............................................................4

*Discrimination*, Black's Law Dictionary (11th ed. 2019) ..........................................18

*Discrimination*, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/discrimination?q=Discrimination ...............................................................................18

Emily DiVito, Roosevelt Inst., *Banking for the People: Lessons from California on the Failures of the Banking Status Quo* (2022), https://rooseveltinstitute.org/wp-content/uploads/2022/09/RI_BankingForThePeople_202209.pdf ...........................3

Jacob Faber & Terri Friedline, New Am., *The Racialized Costs of Banking* (2018), https://www.newamerica.org/family-centered-social-policy/reports/racialized-costs-banking/the-racialized-costs-of-banking/ ...........................4, 9

Robert W. Fairlie et al., *Black and White: Access to Capital Among Minority-Owned Startups*, 68 Mgmt. Sci. 2377 (2022), https://doi.org/10.1287/mnsc.2021.3998 ........................................................7

Press Release, Fed. Deposit Ins. Corp., *Despite COVID-19 Pandemic, Record 96% of U.S. Households Were Banked in 2021* (Oct. 25, 2022), https://www.fdic.gov/news/press-releases/2022/pr22075.html ...............................2

Emily Flitter, *'Banking While Black': How Cashing a Check Can Be a Minefield*, N.Y. Times (June 18, 2020), https://nyti.ms/3FQzOld ......................................8, 9

Aria Florant et al., McKinsey Inst. for Black Econ. Mobility, *The Case for Accelerating Financial Inclusion in Black Communities*, McKinsey & Co. (Feb. 25 2020), https://mck.co/3BRnPmf .............................................................14

Jonathan D. Glater, *Law School, Debt, and Discrimination*, 68 J. Legal Educ. 548 (2018)..........................................................................................................................4, 16

Dulce Gonzalez et al., Urb. Inst., *Perceptions of Unfair Treatment or Judgment Due to Race or Ethnicity in Five Settings* (2021), https://urbn.is/3WkYYQ2.......................13

Christine Hauser, *A Bank Wouldn't Take His Bias Settlement Money. So He's Suing*, N.Y. Times (Jan. 23, 2020), https://nyti.ms/3HWLB4o..................................8

Loren Henderson et al., *Credit Where Credit is Due?: Race, Gender, and Discrimination in the Credit Scores of Business Startups*, 42 Rev.  Black Pol. Econ., 459 (2015), https://doi.org/10.1007/s12114-015-9215-4 ..............................................6

Aaron Klein, Brookings Inst., *Reducing Bias in AI-Based Financial Services* (2020), https://brook.gs/3GcAfYu .................................................................................10

Anneliese Lederer & Sara Oros, NCRC, *Lending Discrimination within the Paycheck Protection Program* (2020), https://ncrc.org/wp-content/uploads/dlm_uploads/2020/07/Lending-Discrimination-within-the-PPP-v3.pdf ....................................................................................................................7

Amber Lee et al., NCRC, *Disinvestment, Discouragement and Inequality in Small Business Lending* (2019), https://ncrc.org/wp-content/uploads/2019/09/NCRC-Small-Business-Research-FINAL.pdf ...........................7, 13

Jake Lilien, Nat'l Cmty. Reinvestment Coal., *Faulty Foundations: Mystery-Shopper Testing In Home Appraisals Exposes Racial Bias Undermining Black Wealth* (2022), https://ncrc.org/faulty-foundations-mystery-shopper-testing-in-home-appraisals-exposes-racial-bias-undermining-black-wealth/ ............................................5

Willy E. Rice, *Race, Gender, "Redlining," and the Discriminatory Access to Loans, Credit, and Insurance: An Historical and Empirical Analysis of Consumers Who Sued Lenders and Insurers in Federal and State Courts, 1950-1995*, 33 San Diego L. Rev. 583 (1996).............................................................2

Lorena Rodriguez, *All Data Is Not Credit Data: Closing the Gap between the Fair Housing Act and Algorithmic Decisionmaking in the Lending Industry*, 120 Colum. L. Rev. 1843 (2020) .........................................................................................15

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012).................................................................................................................................19

S.F. Off. of Fin. Empowerment, *Blacklisted: How ChexSystems Contributes to Systemic Financial Exclusion* (2021), https://sfgov.org/ofe/files/2021-06/Blacklisted-How%20ChexSystems%20Contributes%20to%20Systematic%20Financial%20Exclusions.pdf...........................................................................................................................4

Mario L. Small & Devah Pager, *Sociological Perspectives on Racial Discrimination*, 34 J. Econ. Persps. 49 (2020), https://doi.org/10.1257/jep.34.2.49 ..................................................................9

Kevin Stein & Gina Charusombat, CRC, *Displacement, Discrimination and Determination: Small Business Owners Struggle to Access Affordable Credit* 13 (2017), https://calreinvest.org/wp-content/uploads/2018/08/CRC20Small20Business20Report.pdf ...........................................8

Student Borrower Prot. Ctr., *Educational Redlining* (2020), https://protectborrowers.org/wp-content/uploads/2020/02/Education-Redlining-Report.pdf ..........................................................................................10

*Unfair*, Black's Law Dictionary (11th ed. 2019) ......................................................18

*Unfair*, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/unfair?q=unfair ..........................................................................................................18

Sarah D. Wolff, Ctr. for Responsible Lending, *The Cumulative Costs of Predatory Practices* (2015), https://www.responsiblelending.org/state-of-lending/reports/13-Cumulative-Impact.pdf ......................................................4, 13

Maxwell Young & Lex Suvanto, *Financial Firms are Still Falling Short at Serving Communities of Color*, Fortune (Jan. 21, 2022), https://fortune.com/2022/01/21/financial-firms-are-still-falling-short-at-serving-communities-of-color-banks-diversity-edelman/..............................7, 8, 13

## IDENTITY AND INTERESTS OF AMICI CURIAE

California Reinvestment Coalition (CRC), National Community Reinvestment Coalition (NCRC), National Association for Latino Community Asset Builders, Center for Responsible Lending, Texas Appleseed, and National Consumer Law Center are consumer advocacy organizations that represent, advocate for, or work with individual consumers and small businesses across the country, including individuals who may or have faced discrimination within the financial services industry. Amici are dedicated to ending discrimination within the financial services industry and to building an inclusive economy that is equitable and fair. Amici are also at the forefront of research on discrimination within the credit and banking industries. A description of each Amicus is included in Amici's motion for leave to file this brief.

## INTRODUCTION

In March 2022, the Consumer Financial Protection Bureau (CFPB) clarified in its Supervision and Examination Manual[1] that discriminatory behavior by financial service providers may be unfair under the Dodd-Frank Act, 12 U.S.C. § 5531(c). Although Plaintiffs claim that the sky is falling, *see generally* Pls.' Mot. Summ. J., there is no reason to panic. Recognizing that discrimination in consumer financial products or services—particularly, discrimination based on race, ethnicity, national origin, sex, and other personal factors irrelevant to a financial transaction—may be "unfair" is hardly unprecedented. To the contrary, ample evidence shows that discrimination in the financial services industry persists and may be "unfair" in every sense of the word—including, most importantly, the explicit statutory test Congress established to guide the CFPB in determining whether a practice is "unfair."

---

[1] CFPB, *Unfair, Deceptive, or Abusive Acts or Practices* (2022), Compl. Ex. A, ECF No. 1-2 [hereinafter Manual].

As advocates for communities of color and low-income communities in the banking and business sectors, Amici know all too well the extent of discrimination in consumer finance and its negative effects on individuals, businesses, and the economy. Amici submit this brief to underscore the substantial evidence of discriminatory practices in the consumer finance industry and to explain how such discrimination may be "unfair" under the relevant statutory definition. Section I of this brief sets forth the evidence that discrimination in the financial services industry persists. Section II establishes that discriminatory practices may meet the statutory criteria of "unfairness." Should this Court reach the merits of Plaintiffs' claims under the Administrative Procedure Act, it should grant Defendants' motion for partial summary judgment and deny Plaintiffs' motion for summary judgment.

## ARGUMENT

### I.      Discrimination in the financial services industry persists.

Financial institutions have a long history of preventing people of color and other marginalized populations from participating fully and fairly in the mainstream financial economy.[2] Despite the passage of laws such as the Equal Credit Opportunity Act of 1974 (ECOA), 15 U.S.C. §§ 1691–1691f, people and communities of color and women still face significant barriers to full and equitable participation in the financial economy. These barriers come in many forms. As further discussed below, they include inadequate access to financial services; higher rates of denial of loans and banking services; higher interest rates, costs, and fees for consumers and small businesses; discriminatory racial profiling; and discrimination by racially biased algorithms.

---

[2] *See* Willy E. Rice, *Race, Gender, "Redlining," and the Discriminatory Access to Loans, Credit, and Insurance: An Historical and Empirical Analysis of Consumers Who Sued Lenders and Insurers in Federal and State Courts, 1950-1995*, 33 San Diego L. Rev. 583, 584–85 (1996).

A.  **Statistical, survey, and anecdotal evidence of discrimination in consumer finance.**

People of color have inadequate access to financial services. Racial discrimination and market failure have led to "banking and credit deserts" in many communities.[3] In 2021, Black Americans were more than five times as likely as white Americans not to have a bank account, and Latino Americans were more than four times as likely.[4] Unbanked individuals more often need to turn to alternative financial services such as check cashing services and payday loans, which in turn may have higher interest rates or predatory loan terms.[5]

Research shows that many consumers are discriminated against in attempts to open a bank account. In a 2022 field survey, canvassers visited more than 100 bank branches across five counties in California and asked to speak to a banker about opening an account.[6] Canvassers of color were turned away by bank staff 30% of the time; white canvassers were turned away only 4% of the time.[7] Canvassers speaking Spanish were likewise turned away significantly more frequently than canvassers speaking English.[8] A recent report on ChexSystems, which tracks people's banking histories and reports negative information to banks, details how its systemic flaws disproportionately impact Black consumers and other low-income consumers of color,

---

[3] Kristen Broady et al., Brookings Inst., *An Analysis of Financial Institutions in Black-Majority Communities: Black Borrowers and Depositors Face Considerable Challenges in Accessing Banking Services* (2021), https://brook.gs/3G7XR0y.

[4] Press Release, Fed. Deposit Ins. Corp., *Despite COVID-19 Pandemic, Record 96% of U.S. Households Were Banked in 2021* (Oct. 25, 2022), https://www.fdic.gov/news/press-releases/2022/pr22075.html.

[5] Broady et al., *supra* note 3.

[6] Emily DiVito, Roosevelt Inst., *Banking for the People: Lessons from California on the Failures of the Banking Status Quo* 8 (2022), https://rooseveltinstitute.org/wp-content/uploads/2022/09/RI_BankingForThePeople_202209.pdf.

[7] *Id.* at 10 tbl. 1.

[8] *Id.* at 11 tbl. 2.

thereby contributing to the racial gap in bank account access.[9] People of color also pay higher fees for bank accounts. White checking account holders pay, on average, significantly lower monthly bank fees than Black and Latino account holders, and account fees are lower in majority-white neighborhoods than they are in majority-Latino, majority-Black, and other neighborhoods.[10]

People of color may also receive discriminatory consumer and mortgage loan terms. Consumer lenders "systematically charg[e] higher rates to borrowers who are African American."[11] All else equal, Black and Latino borrowers are significantly more likely than non-Latino white borrowers to receive a higher-rate home loan.[12] According to a 2015 analysis by the Center for Responsible Lending, "families of color receive predatory loans at higher rates than white borrowers" in almost every type of loan examined.[13]

A recent analysis of mortgage loan data found that "Latinx and African-American borrowers pay 7.9 and 3.6 basis points more in interest for home purchase and refinance mortgages respectively because of discrimination."[14] The evidence also suggested that "at least 6% of Latinx

---

[9] S.F. Off. of Fin. Empowerment, *Blacklisted: How ChexSystems Contributes to Systemic Financial Exclusion* 7 (2021), https://sfgov.org/ofe/files/2021-06/Blacklisted-How%20ChexSystems%20Contributes%20to%20Systematic%20Financial%20Exclusions.pdf.

[10] Jacob Faber & Terri Friedline, New Am., *The Racialized Costs of Banking* 4–5 (2018), https://www.newamerica.org/family-centered-social-policy/reports/racialized-costs-banking/the-racialized-costs-of-banking/.

[11] Jonathan D. Glater, *Law School, Debt, and Discrimination*, 68 J. Legal Educ. 548, 549 (2019) (citing Press Release, Dept. Justice, Off. Pub. Affs., *Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012), https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief).

[12] Debbie Gruenstein Bocian et al., *Race, Ethnicity, and Subprime Home Loan Pricing*, 60 J. Econ. & Bus. 110, 121 (2008), https://doi.org/10.1016/j.jeconbus.2007.10.001.

[13] Sarah D. Wolff, Ctr. for Responsible Lending, *The Cumulative Costs of Predatory Practices* 23 (2015), https://www.responsiblelending.org/state-of-lending/reports/13-Cumulative-Impact.pdf.

[14] Robert Bartlett et al., *Consumer-Lending Discrimination in the FinTech Era* 4 (Nat'l Bureau of Econ. Rsch., Working Paper No. 25943, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3491267.

and African-American applications are rejected, but would have been accepted had the applicant not been in these minority groups," which amounted to a "rejection of 0.74 to 1.3 million creditworthy minority applications."[15] And a 2021 study observed evidence of racial discrimination in auto loan approvals, interest rates, and defaults.[16] In a 2022 "mystery shopper" study, NCRC documented racial bias in the home appraisal industry: white testers received home valuations $7,000 higher on average than Black testers who showed the same home, and appraisers more often subjected Black testers to serious unprofessional conduct.[17]

Analytical research has long shown that banks discriminate against Black-owned businesses seeking credit, even after controlling for other factors.[18] Recent studies confirm that discrimination based on race, ethnicity, and gender persists in the small business credit market. Even after controlling for observable factors that influence loan decisions, businesses owned by white men have higher loan approval rates and lower interest rates than businesses owned by people of color or white women.[19] A 2015 analysis of credit data found that Black-owned startups receive lower than expected business credit scores, even after controlling for other factors, and that

---

[15] *Id.* at 21.

[16] Alexander W. Butler et al., *Racial Discrimination in the Auto Loan Market* 2 (Mar. 31, 2021), https://files.consumerfinance.gov/f/documents/cfpb_mayer_racial-discrimination-in-the-auto-loan-market.pdf.

[17] Jake Lilien, Nat'l Cmty. Reinvestment Coal., *Faulty Foundations: Mystery-Shopper Testing In Home Appraisals Exposes Racial Bias Undermining Black Wealth* (2022), https://ncrc.org/faulty-foundations-mystery-shopper-testing-in-home-appraisals-exposes-racial-bias-undermining-black-wealth/.

[18] *See, e.g.*, David G. Blanchflower et al., *Discrimination in the Small-Business Credit Market*, 85 Rev. Econ. & Stats. 930, 930 (2003), http://www.jstor.org/stable/3211816?origin=JSTOR-pdf; Kevin Cavalluzzo & John Wolken, *Small Business Loan Turndowns, Personal Wealth, and Discrimination*, 78 J. Bus. 2153, 2154 (2005), https://www.jstor.org/stable/10.1086/497045.

[19] Elizabeth Asiedu et al., *Access to Credit by Small Businesses: How Relevant Are Race, Ethnicity, and Gender?*, 102 Am. Econ. Rev. 532, 532 (2012), http://dx.doi.org/10.1257/aer.102.3.532.

men were treated more favorably than women in attempts to access credit.[20] The authors' model suggested:

> [C]redit lines for Black-owned businesses would more than double, Latino-owned businesses' lines of credit would nearly triple, Asian-owned businesses' lines of credit would more than triple, and those where the primary owners are women would be more than twice as large if their business lines of credit were determined in the same way as those for businesses owned primarily by Whites and by men.[21]

Another study similarly observed that, "[c]ontrolling for risk factors," a business's "location in a minority or inner-city neighborhood has no apparent impact on loan availability or size," whereas "[o]wner race/ethnicity, in contrast, is important."[22] The authors concluded: "Owner race and wealth both powerfully shape loan access: high wealth opens doors, minority ownership closes them."[23]

In 2018, NCRC performed a "mystery shopping" study in which "shoppers" of different races and ethnicities—but with similarly exceptional business, income, and credit profiles—went into banks to ask about obtaining a loan. The study revealed significant discrepancies in treatment. Notably, "Black and Hispanic testers were requested to provide more information than their white counterparts." Hispanic and Black testers were asked to provide personal income tax statements 32% and 28% more frequently than their white counterparts, respectively.[24] Conversely, "[w]hite testers were given significantly better information about business loan products," and were given

---

[20] Loren Henderson et al., *Credit Where Credit is Due?: Race, Gender, and Discrimination in the Credit Scores of Business Startups*, 42 Rev.   Black Pol. Econ., 459, 459 (2015), https://doi.org/10.1007/s12114-015-9215-4.

[21] *Id.*

[22] Timothy Bates & Alicia Robb, *Impacts of Owner Race and Geographic Context on Access to Small-Business Financing*, 30 Econ. Dev. Q. 159, 159 (2015), https://doi.org/10.1177/0891242415620484.

[23] *Id.*

[24] Amber Lee et al., NCRC, *Disinvestment, Discouragement and Inequality in Small Business Lending* 5 (2019), https://ncrc.org/wp-content/uploads/2019/09/NCRC-Small-Business-Research-FINAL.pdf.

information on loan fees 44% and 35% more frequently than Hispanic and Black testers, respectively.[25]

NCRC also conducted "matched-pair" testing in 2020 in which both Black and white "business owners" requested loans under the Paycheck Protection Program. The study showed disparate treatment in 44% of cases, with bank personnel providing Black and women testers with less information about loan products, requesting more information from Black testers, and encouraging white men to apply for loans significantly more often than white or Black women.[26] Another 2020 study concluded that "Black startups report substantially higher levels of loan denials and overall unmet need for capital than white startups, even after controlling for differences in credit scores and founder wealth."[27]

Survey data bolsters these conclusions. Three in-depth surveys conducted during 2021 showed that "Black, Latinx, and Asian respondents reported disproportionate discrimination across the financial services spectrum, including in mortgage and auto lending, banking, credit cards, asset management, and insurance."[28] Additionally, "[t]wenty-three percent of Latinx respondents and 13% of Black respondents with annual incomes under $50,000 said they have been denied service altogether, compared with just 6% of white Americans in the same income

---

[25] *Id.*

[26] Anneliese Lederer & Sara Oros, NCRC, *Lending Discrimination within the Paycheck Protection Program* 5, 10 (2020), https://ncrc.org/wp-content/uploads/dlm_uploads/2020/07/Lending-Discrimination-within-the-PPP-v3.pdf.

[27] Robert W. Fairlie et al., *Black and White: Access to Capital Among Minority-Owned Startups*, 68 Mgmt. Sci. 2377, 2398 (2022), https://doi.org/10.1287/mnsc.2021.3998.

[28] Maxwell Young & Lex Suvanto, *Financial Firms are Still Falling Short at Serving Communities of Color*, Fortune (Jan. 21, 2022), https://fortune.com/2022/01/21/financial-firms-are-still-falling-short-at-serving-communities-of-color-banks-diversity-edelman/.

bracket."[29] Ninety percent of respondents in a California Reinvestment Coalition survey indicated that small business owners face discrimination.[30]

There is also ample anecdotal evidence that financial institutions continue to racially profile people of color and deny them services they provide to white customers. Consider the example of a Black woman who tried to cash a check at a Wells Fargo branch in a wealthy, predominantly white neighborhood. Although three employees examined her check and identification, they refused to look at additional proof she offered, declared the check fraudulent, and called the police.[31] Similarly, a Black man who tried to withdraw money from his Wells Fargo account also came out empty-handed. After a teller questioned his driver's license, the branch manager told him to leave and threatened to call the police.[32] Another Wells Fargo customer, also a Black man, tried to open an additional account at a branch in a wealthy neighborhood, and the manager subjected him to a racial slur.[33] Yet another Black customer's attempt to deposit a check at his TCF Bank led to an accusation of fraud and hour-long questioning by two police officers.[34] Given that the majority of people who experience racial profiling do not report it,[35] these examples are likely just the tip of the iceberg.

---

[29] *Id.*

[30] Kevin Stein & Gina Charusombat, CRC, *Displacement, Discrimination and Determination: Small Business Owners Struggle to Access Affordable Credit* 13 (2017), https://calreinvest.org/wp-content/uploads/2018/08/CRC20Small20Business20Report.pdf.

[31] Emily Flitter, *'Banking While Black': How Cashing a Check Can Be a Minefield*, N.Y. Times (June 18, 2020), https://nyti.ms/3FQzOld.

[32] *Id.*

[33] *Id.*

[34] Christine Hauser, *A Bank Wouldn't Take His Bias Settlement Money. So He's Suing*, N.Y. Times (Jan. 23, 2020), https://nyti.ms/3HWLB4o.

[35] Flitter, *supra* note 31.

The evidence thus demonstrates not only that people of color and businesses owned by them are under-served relative to white people and white-owned businesses, but also that discrimination is a significant explanation for the disparate treatment. Paradoxically, "[t]he discretionary practices that allow banks to flexibly deliver consumer-oriented products and services simultaneously create opportunities for discrimination to emerge and flourish."[36] Organizations like banks also can discriminate through institutional practices even where individual members of the organization do not intend to do so.[37] At bottom, discriminatory practices may harm consumers, regardless whether those practices are intentionally discriminatory.[38]

## B.    Algorithmic discrimination.

The potential for discrimination is especially pronounced in light of a relatively recent development in the credit industry. Service providers increasingly use large data sets and artificial intelligence to inform how they treat consumers. Although the use of artificial intelligence presents many opportunities, it also poses a risk of exacerbating existing bias.[39] Algorithms have "numerous opportunities to pick up human biases and therefore create discriminatory outcomes,"

---

[36] Faber & Friedline, *supra* note 10, at 10.

[37] Mario L. Small & Devah Pager, *Sociological Perspectives on Racial Discrimination*, 34 J. Econ. Persps. 49, 53 (2020), https://doi.org/10.1257/jep.34.2.49.

[38] Plaintiffs assert that allowing for the possibility that discriminatory practices may be "unfair" under the Dodd-Frank Act would permit the CFPB to regulate service providers for "mere disparate impacts." Pls.' Mot. Summ. J. at 2. Plaintiffs misunderstand the law. As discussed further in Section II below, Plaintiffs fail to acknowledge that the CFPB must have a "reasonable basis to conclude" that a practice that may produce a racially disparate impact—like any other practice— is "unfair" under the statutory definition before taking any enforcement action. *See* 12 U.S.C. §§ 5531(a), (c)(1). To the extent that any practices with a racially disparate impact *also* meet the statutory definition of unfairness, it is and has already been within the CFPB's authority to prevent those practices.

[39] *See* Aaron Klein, Brookings Inst., *Reducing Bias in AI-Based Financial Services* (2020), https://brook.gs/3GcAfYu.

9

and "there are several notable examples of human bias bleeding into algorithmic decision-making processes."[40]

A recent study by researchers at University of California-Berkeley found that, although lenders using algorithms discriminated less than face-to-face lenders, "Latinx and African-American [borrowers] pay 5.3 basis points more in interest for purchase mortgages and 2.0 basis points [more] for refinance mortgages originated on FinTech platforms."[41] A 2020 analysis by the Student Borrower Protection Center concluded that lenders' use of education data in algorithms "risks discriminating against borrowers of color and exacerbating income equality across the population at large."[42] The report found that the financial technology company Upstart penalizes borrowers who went to historically Black colleges or universities or to Hispanic-serving institutions (HSI); Upstart charges a hypothetical Howard University graduate "nearly $3,499 more over the life of a five-year loan than a similarly situated NYU graduate" and charges a New Mexico State University (an HSI) graduate "at least $1,724 more over the life of a five-year loan when compared to a similarly situated NYU graduate."[43]

The significant discrimination against people of color that has historically pervaded the consumer finance industry not only persists, but also now threatens to continue in new and insidious ways if left unchecked.

---

[40] Matthew Adam Bruckner, *The Promise and Perils of Algorithmic Lenders' Use of Big Data*, 93 Chi.-Kent L. Rev. 3, 25, 26 (2018).

[41] Bartlett et al., *supra* note 14, at 4.

[42] Student Borrower Prot. Ctr., *Educational Redlining* 9 (2020), https://protectborrowers.org/wp-content/uploads/2020/02/Education-Redlining-Report.pdf.

[43] *Id.* at 4, 5.

## II.      Discrimination is unfair.

It may seem obvious that a financial service provider's practice that invidiously discriminates against consumers based on their race, ethnicity, gender, or other immutable factor can be "unfair." The text of the Dodd-Frank Act and commonsense understanding of the word "unfair" reaffirm this truth.

### A.      Discrimination is an "unfair" practice under the Dodd-Frank Act.

Under the Dodd-Frank Act, it is "unlawful" for a consumer financial service provider or other person covered under the Act "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). An "unfair" practice is one that (1) "causes or is likely to cause substantial injury to consumers," where such injury is (2) "not reasonably avoidable by consumers" and (3) "not outweighed by countervailing benefits to consumers or to competition." *Id*. § 5531(c)(1). The CFPB is empowered to prevent unfair practices so long as it has "a reasonable basis to conclude" that the above criteria are met. *Id.* §§ 5531(a), (c)(1).

In trying to artificially divide "unfair" and "discrimination," Plaintiffs ignore the definition established by Congress. Indeed, other than noting that the word "discrimination" does not appear in the definition of "unfairness," *see* Pls. Mot. Summ. J. at 14; Br. Amici Curiae Georgia et al. at 14, neither Plaintiffs nor their amici engage with the statutory definition of unfairness at all. Discrimination clearly may meet all of the statutory criteria: it can substantially injure consumers by limiting their access to financial services on the basis of immutable or personal characteristics; consumers cannot reasonably avoid discrimination; and discrimination has no countervailing benefit to either consumers or competition.[44] Consistent with this application of the CFPB's

---

[44] Contrary to Plaintiffs' assertion, Pls.' Mot. Summ. J.  at 17, *West Virginia v. EPA* does not counsel hesitation here because the CFPB's authority to combat discrimination is neither an "unheralded" nor "transformative" claim of new authority. 142 S. Ct. 2587, 2610 (2022). Because

unfairness definition, the Federal Trade Commission—whose standard for unfairness was used as the basis for that standard in the Dodd-Frank Act, *see* 15 U.S.C. § 45(n)—recently obtained a stipulated settlement order after filing a complaint alleging that car sellers discriminated against Black and Latino customers under its functionally identical unfairness authority.[45]

### 1. Discriminatory practices impose substantial injury on consumers.

Discrimination in financial services may harm consumers, communities, and the economy. A "substantial injury" is any injury that is more than merely "trivial or speculative." *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 913 (S.D. Ind. 2015) (cleaned up). "[E]ven a small harm may qualify if it affects a large number of people." *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 945 (N.D. Ill. 2008). The injury caused by discriminatory practices can far exceed this threshold.

As discussed in Section I above, consumers navigate a litany of discriminatory practices that make them vulnerable to predatory terms and fees or to exclusion from the market altogether. Discrimination denies consumers access to financial services, including the ability to cash a check or withdraw money from an account; imposes higher fees and interest rates on consumers; denies otherwise credit-worthy individuals and businesses equal access to loans; and lowers the credit scores of consumers on account of their race, ethnicity, gender, or other immutable factors. The

---

the CFPB already has authority to regulate discrimination in financial services, this is not an "extraordinary" case in which an agency worked a "transformative expansion in [its] regulatory authority." *Id.* at 2608, 2610. Even if it were, *West Virginia*'s "skepticism" would be overcome by "clear Congressional authorization." *Id.* at 2614. As discussed in this Section, many discriminatory practices clearly fall within the statutory definition of unfairness.

[45] Complaint, *FTC v. Passport Auto. Grp., Inc.*, No. 8:22-cv-02670-TDC (D. Md. Oct. 18, 2022), ECF No. 1 (including claims of unfair discrimination in the provision of both credit and non-credit products); Stipulated Order, *FTC v. Passport Auto. Grp., Inc.*, No. 8:22-cv-02670-TDC (D. Md. Oct. 21, 2022), ECF No. 10.

higher interest rates imposed on people of color for mortgage refinance loans alone result in an annual disparity of $250 million to $500 million.[46]

The injuries do not end there. Discriminatory practices impose a variety of opportunity and other costs on individuals and families. "Black entrepreneurs are less likely to apply for loans than white entrepreneurs because they expect to be denied credit, even when they have a good credit history."[47] Predatory loans, which disparately impact individuals and families of color, result in unnecessary foreclosures.[48] Victims of a predatory loan are rendered more vulnerable to other lending abuses, and may have no option other than high-cost, fringe financial products to get by.[49] Discriminatory practices impede wealth building and contribute to a significant racial wealth gap.[50] Discriminatory practices also harm consumers' physical and emotional well-being.[51]

Discriminatory practices hurt the economy as a whole. "The foreclosure crisis depleted overall housing wealth and led to millions of job losses; predatory practices have been shown to diminish public trust and confidence in the financial system; and there is evidence that student debt is preventing economic growth, especially for young families."[52] Discriminatory financial practices have hurt the U.S. economy to the tune of $16 trillion since 2000.[53] Financial institutions

---

[46] Lee et al., *supra* note 24, at 37.

[47] Broady et al., *supra* note 3.

[48] Wolff, *supra* note 13, at 6; *see also* Young & Suvanto, *supra* note 28.

[49] Wolff, *supra* note 13, at 5.

[50] *Id.* at 16–17; CRC & S.F. Off. Fin. Empowerment, *Pre-Existing Conditions: Assessing the Financial Services Response to Racism, Inequality, and COVID-19* 6–8 (2020), https://sfgov.org/ofe/sites/default/files/2021-01/Pre-Existing%20Conditions%20Banking%20Report%20v3.pdf.

[51] *See* Dulce Gonzalez et al., Urb. Inst., *Perceptions of Unfair Treatment or Judgment Due to Race or Ethnicity in Five Settings* 1 (2021), https://urbn.is/3WkYYQ2; Young & Suvanto, *supra* note 28.

[52] Wolff, *supra* note 13, at 6.

[53] Young & Suvanto, *supra* note 28.

could realize $2 billion additional revenue per year "if [B]lack Americans had the same access to financial products as white Americans."[54]

The injuries detailed above are at least as significant as injuries courts have recognized as substantial. *See CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853, at *29 (S.D. Fla. Sept. 5, 2019), *adhered to on denial of reconsideration*, No. 17-80495-CIV, 2019 WL 13211630 (S.D. Fla. Nov. 13, 2019) (late fees, incorrect credit reporting, foreclosure threats constituted substantial injuries); *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 563 (M.D. Pa. 2018), *aff'd*, 967 F.3d 273 (3d Cir. 2020) (misrepresentation of the suitability of loan repayment options was substantial injury); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 627 (5th Cir. 2022) (repeated withdrawal attempts resulting in fees was substantial injury). Financial service providers' practices that discriminate against consumers based on their race, ethnicity, or gender may therefore cause substantial injury to consumers. Plaintiffs do not dispute this.

### 2. *Consumers cannot reasonably avoid discriminatory practices.*

Consumers cannot reasonably avoid practices that discriminate on the basis of race, ethnicity, gender, or other immutable or personal characteristics. To determine whether an injury is "reasonably avoidable," "courts generally look to whether the consumers had a free and informed choice." *Cmty. Fin. Servs. Ass'n of Am.*, 51 F.4th at 628 (internal quotation omitted). "An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Id.* (internal quotations omitted).

---

[54] Aria Florant et al., McKinsey Inst. for Black Econ. Mobility, *The Case for Accelerating Financial Inclusion in Black Communities*, McKinsey & Co. (Feb. 25 2020), https://mck.co/3BRnPmf.

Courts take a practical approach to determining whether an injury is reasonably avoidable, because "even diligent consumers c[an] be misled by bad actors." *CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (Ex), 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016).

It is hard to imagine a feature that is less avoidable than discrimination, as it penalizes certain consumers based on immutable characteristics entirely irrelevant to the product or service at issue, often without any notice to the consumer. Consumers have neither a free nor an informed choice to avail themselves only of financial products and services that do not discriminate. As the CFPB correctly recognizes, discriminatory practices "hinder[] a consumer's decision-making." Manual at 2.

Discriminatory practices are particularly unavoidable where, as is usually the case, consumers cannot practically identify them as such. Consumers of color, for example, are not told when the terms of loans provided to them are worse than the terms offered to white consumers with similar qualifications. Bank employees who refuse to allow Black customers to cash checks do not typically tell those customers that they would permit a white customer to cash a check under functionally identical circumstances. Even if consumers were told about these discriminatory practices, they would have no reasonable way to avoid them.

Where discrimination results from the use of a biased algorithm, consumers may not even be aware an algorithm was used at all. Even if they are aware of the use of algorithms generally, "[f]ew consumers understand how algorithmic lending works and how to protect themselves."[55] Moreover, "data used by companies' proprietary algorithms is protected from disclosure by intellectual property law,"[56] limiting consumers' ability to learn whether discriminatory factors

---

[55] Bruckner, *supra* note 40, at 44.

[56] Lorena Rodriguez, *All Data Is Not Credit Data: Closing the Gap between the Fair Housing Act and Algorithmic Decisionmaking in the Lending Industry*, 120 Colum. L. Rev. 1843, 1858 (2020).

led to the algorithm's output. A lender himself "might not even know the criteria used by an artificial intelligence, designed to search for patterns in a great mass of data, or how it weighed them in reaching a conclusion about the appropriate terms of credit."[57]

Courts have upheld CFPB determinations that practices that are theoretically but not practicably avoidable by consumers are unfair. For example, in *Community Financial Services Association of America*, although the Fifth Circuit vacated the payday lending rule at issue in that case, the court agreed that payday loan consumers could not reasonably avoid fees resulting from repeated withdrawal attempts, despite the lender's contention that consumers could avoid the injuries through various means. 51 F.4th at 628–29; *see also D & D Mktg.*, 2016 WL 8849698, at *10 (back-end disclosures were insufficient to allow consumers to avoid predatory lending products sold under conflicting prior disclosures). Discriminatory practices—which are often not even theoretically avoidable—therefore satisfy this prong of the "unfairness" definition. Plaintiffs do not dispute that discriminatory practices are not reasonably avoidable.

Consumers' inability to avoid discriminatory practices would be compounded if the CFPB could not use its enforcement authority to prevent them. Plaintiffs argue that Congress did not intend for any discriminatory practices to constitute "unfair" practices because the ECOA, over which the CFPB also has authority, already prohibits some forms of discrimination in financial services. *See* Pls.' Mot. Summ. J. at 12, 16. Yet some of the discriminatory practices discussed in Section I above do not fall within the reach of the ECOA, which applies only to "credit transaction[s]." *See* 15 U.S.C. § 1691(a). If this Court excepts discriminatory practices from the statutory unfairness definition, then the CFPB would not be able to prevent unfair discrimination in transactions without a credit component, such as opening a bank account that has no credit

---

[57] Glater, *supra* note 11, at 572.

component or in attempting to cash a check. Instead, Congress empowered the CFPB to prevent discrimination in such transactions if the CFPB has "a reasonable basis to conclude" that they are "unfair." *See* 12 U.S.C. § 5531(c)(1); *see also* Manual at 10 ("A discriminatory act or practice is not shielded from the possibility of being unfair, deceptive or abusive even when fair lending laws do not apply to the conduct."). Although the CFPB need not establish that a discriminatory practice is not preventable by other means to show it is unfair,[58] the absence of any regulatory enforcement mechanism means that certain discriminatory practices will, thus left unchecked, likely proliferate, leaving consumers with even fewer avenues of potentially avoiding those practices than might otherwise be available.

### 3. *Discriminatory practices are not outweighed by countervailing benefits.*

The injury caused by discriminatory practices is not outweighed by countervailing benefits to consumers or to competition. Indeed, injury caused by discrimination on account of race, ethnicity, gender, or other immutable factors can never be outweighed by countervailing benefits, because invidious discrimination is immoral and a violation of public policy.[59] Discrimination has a net negative impact on the economy by impeding economic activity and wealth generation, as discussed in Section II(A)(1) above. To Amici's knowledge, no financial services provider has articulated an argument that the harms inflicted by discriminatory practices are outweighed by any countervailing benefits. Nor do Plaintiffs contend that discriminatory practices are outweighed by countervailing benefits.

---

[58] *See* CFPB, *Unfair, Deceptive, or Abusive Acts or Practices*, at 10 (Oct. 2012), ECF No. 17-12 ("An unfair, deceptive, or abusive act or practice may also violate other federal or state laws.").

[59] *See* 12 U.S.C.A. § 5531(c)(2) ("In determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence.").

**B.    Discrimination is unfair under the common usage of the term and when read in context with other statutes.**

"[T]he best evidence of Congress's intent is the statutory text." *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). And all statutory text must be read in context. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). As shown above, in the particular context at issue here, the Court need look no further than the statutory definition of "unfairness" to conclude that unfair discriminatory practices fall within the authority Congress intended to grant to the CFPB. *See* 12 U.S.C. § 5531(c)(1). This is reinforced by the plain meaning of the terms "unfair" and "discrimination."

Rather than engage with the actual statutory test for determining unfairness, the state amici point to Black's Law Dictionary definitions to argue that "discrimination" cannot be "unfair." Br. Amici Curiae Georgia et al., at 14. Yet those definitions suggest the opposite. Black's Law Dictionary defines "unfair" as "unjust" or "[i]nequitable in business dealings . . . ." *Unfair*, Black's Law Dictionary (11th ed. 2019). The Black's Law Dictionary definition of "discrimination" includes "[d]ifferential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *Discrimination*, Black's Law Dictionary (11th ed. 2019). These definitions show that discrimination can indeed be unfair, as it entails treating people unequally, which produces and reproduces inequities among classes of people. The Oxford Advanced Learner's Dictionary similarly defines the two terms.[60]

Plaintiffs and their amici are thus correct that "discrimination" and "unfair" are two different words with two different meanings. *See* Pls.' Mot. Summ. J.  at 14; Br. of Amici Curiae

---

[60] *See Discrimination*, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/discrimination?q=Discriminati on (last visited Dec. 19, 2022); *Unfair*, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/unfair?q=unfair (last visited Dec. 19, 2022).

Georgia et al., at 14. But they are wrong to suggest that the two terms are mutually exclusive. The adjective "unfair" may accurately characterize a broad variety of practices, including discrimination.

Plaintiffs further argue that, because other statutes discuss the term "discrimination" alongside other words denoting the concept of fairness, interpreting Section 5531's definition of "unfair" practices to include discriminatory practices that otherwise meet that definition would render the use of "discrimination" in other provisions surplusage. Pls.' Mot. Summ. J. at 15–16. Not so. Congress may consider it prudent to specify that certain enforcement powers combat discrimination; but in doing so Congress does not impliedly except discriminatory practices from definitions in other statutory provisions. Congress too listed "unfair," "deceptive," and "abusive" practices separately in Section 5531, and yet it is incontestable that, though each of those terms has distinct criteria, "abusive acts also may be unfair or deceptive," and vice versa. Manual at 9. It has been long settled that "[a]n unfair . . . practice may also violate other federal or state laws," including of course the ECOA or other laws that regulate lending practices or that prohibit discrimination. CFPB, *Unfair, Deceptive, or Abusive Acts or Practices*, at 10 (Oct. 2012), ECF No. 17-12. Recognizing that discriminatory practices may violate the ECOA and may also be "unfair" is therefore consistent with the statutory context.

Plaintiffs essentially argue that, if Congress uses a term that by definition encompasses acts of discrimination but Congress does not use the word "discrimination" itself, then "discrimination" is automatically excluded from the broader term. Pls.' Mot. Summ. J. at 14. Plaintiffs cite to no principle of statutory construction to support this counterintuitive reading, nor do they provide examples of any other terms to which such a rule of construction applies. Indeed, Plaintiffs' interpretation of the CFPB's unfairness authority violates the principle that "general words . . . are

19

to be afforded their full and fair scope. They are not to be arbitrarily limited." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) (discussing the General-Terms canon). If the principle of construction Plaintiffs propose is accepted, Congress would be hamstrung by the need to expressly state every concept it intends to include within a definition, so long as the concept is dealt with in other statutory provisions.

Plaintiffs make much of the fact that the CFPB's 2012 manual did not specify that discriminatory practices may be unfair. Pls.' Mot. Summ. J. at 13. But this is immaterial; CFPB's manuals cannot alter the definitions of either term. And clarifying that discriminatory practices are encompassed within the "broad" universe of unfair practices, *see Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th at 624, is consistent with the statutory text, as discussed above.

As shown above, the language of the statute and its context reaffirm the possibility that discriminatory practices may meet the statutory definition of "unfair." It is further worth mentioning that characterizing discrimination as a kind of unfair practice is not a novel idea in the law. Rather, it accords with concepts of discrimination in other legal contexts. For example, in amending the Americans with Disabilities Act of 1990, Congress recognized the "continuing existence of *unfair . . . discrimination*." 42 U.S.C. § 12101(a)(8) (emphasis added). *See also, e.g.*, *United Packinghouse, Food & Allied Workers Int'l Union, AFL-CIO v. NLRB*, 416 F.2d 1126, 1134 (D.C. Cir. 1969) (National Labor Relations Board concluded that racial discrimination by a labor union was an "unfair labor practice" under the Taft-Hartley Act); *Pagan v. Calderon*, 448 F.3d 16, 34 (1st Cir. 2006) (explaining that "invidious discrimination" is a form of "fundamental procedural unfairness"); *Morris v. BNSF Ry. Co.*, 429 F. Supp. 3d 545, 562 (N.D. Ill. 2019), *aff'd*, 969 F.3d 753 (7th Cir. 2020) ("Reasonable jurors could believe . . . that racial discrimination in employment is a type of unfairness").

**CONCLUSION**

The Court should grant Defendants' Motion to Dismiss or, in the Alternative, for Partial

Summary Judgment.

Dated: December 23, 2022                    Respectfully submitted,

_/s/ Rachel L. Fried_
Rachel L. Fried (D.C. Bar No. 1029538)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
rfried@democracyforward.org

*Counsel for Amici Curiae*

* admitted *pro hac vice*