**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF BUSINESS; and TEXAS BANKERS ASSOCIATION. | |
| *Plaintiffs*, | |
| v. | Case No. 6:22-cv-00381-JCB |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| *Defendants.* | |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................................ii

Introduction ..................................................................................................................................1

Argument .......................................................................................................................................2

    I.      The Court has no basis for dismissing Plaintiffs' case. .............................................2

          A.    Article III standing ..........................................................................................3

          B.    Venue.................................................................................................................9

          C.    Final agency action ........................................................................................11

    II.     Plaintiffs are entitled to summary judgment on every claim. .............................18

          A.    Appropriations Clause ..................................................................................18

          B.    Administrative Procedure Act ......................................................................21

               1.    Statutory authority ...........................................................................22

               2.    Arbitrary and capricious decisionmaking ....................................26

               3.    Notice and comment .........................................................................29

    III.    The Court should grant Plaintiffs' requested relief.............................................31

          A.    Vacatur ............................................................................................................31

           B.    Permanent injunction ....................................................................................32

Conclusion ...................................................................................................................................35

## TABLE OF AUTHORITIES

### CASES

*A.J. Taft Coal Co. v. Barnhart,*
   291 F. Supp. 2d 1290 (N.D. Ala. 2003) .................................................................. 10

*AFPF v. Bonta,*
   141 S. Ct. 2373 (2021) ............................................................................................. 6

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,*
   141 S. Ct. 2485 (2021) ........................................................................................... 26

*Ala.-Coushatta Tribe of Texas v. United States,*
   757 F.3d 484 (5th Cir. 2014) ................................................................................. 17

*Amazon.com, Inc. v. Discovery Commc'ns, Inc.,*
   2011 WL 13228465 (W.D. Wash. Jan. 11) ............................................................ 13

*Amin v. Mayorkas,*
   24 F.4th 383 (5th Cir. 2022) ............................................................................ 14, 29

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ............................................................................................... 16

*Balez v. Bellsouth Telecomm'ns, Inc.,*
   2005 WL 2010175 (M.D. La. Aug. 19) .................................................................. 20

*Bennett v. Spear,*
   520 U.S. 154 (1997) .......................................................................................... 11, 12

*Cal. Cmtys. Against Toxics v. EPA,*
   934 F.3d 627 (D.C. Cir. 2019) .............................................................................. 29

*Camreta v. Greene,*
   563 U.S. 692 (2011) ............................................................................................... 20

*Causey v. Cain,*
   2006 WL 4043781 (E.D. La. Oct. 26) .................................................................... 20

*Chamber of Com. of U.S.A. v. DOL,*
   885 F.3d 360 (5th Cir. 2018) ................................................................................. 32

*Church of Scientology of Calif. v. Cazares,*
   638 F.2d 1272 (5th Cir. 1981) ................................................................................. 5

*CIC Servs., LLC v. IRS,*
   592 F. Supp. 3d 677 (E.D. Tenn. 2022) ................................................................. 27

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
   51 F.4th 616 (5th Cir. 2022) ................................................................ 1, 18, 20, 21

*Congress of Racial Equality v. Douglas,*
   318 F.2d 95 (5th Cir. 1963) ..................................................................................... 5

*Crane v. Napolitano,*
   920 F. Supp. 2d 724 (N.D. Tex. 2013) .............................................................. 9, 10

*Cruz v. Braum's, Inc.*,
  2021 WL 979610 (E.D. Tex. Mar. 16) .................................................................. 20

*Data Mktg. P'ship, LP v. DOL*,
  45 F.4th 846 (5th Cir. 2022) ............................................................................... 31

*Davidson v. Glickman*,
  169 F.3d 996 (5th Cir. 1999) ............................................................................... 30

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ........................................................................................ 30

*DHS v. Regents of the Univ. of Calif.*,
  140 S. Ct. 1891 (2020) .......................................................................................... 5

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999) ............................................................................... 5

*Duarte ex rel. Duarte v. City of Lewisville*,
  759 F.3d 514 (5th Cir. 2014) ................................................................................ 4

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ...................................................................................... 29, 30

*Exxon Corp. v. FTC*,
  588 F.2d 895 (3d Cir. 1978) ............................................................................... 10

*FAIR v. Rumsfeld*,
  291 F. Supp. 2d 269 (D.N.J. 2003) ................................................................... 6, 8

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ........................................................................................ 26

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................................................ 26

*Fed. Ins. Co. v. Northfield Ins. Co.*,
  837 F.3d 548 (5th Cir. 2016) ............................................................................... 20

*Fla. Cent. R. Co. v. Schutte*,
  103 U.S. 118 (1880) ............................................................................................ 19

*Franciscan All., Inc. v. Becerra*,
  2021 WL 6774686 (N.D. Tex. Oct. 1) ................................................................. 34

*Franciscan All., Inc. v. Becerra*,
  553 F. Supp. 3d 361 (N.D. Tex. 2021) ................................................................ 32

*FTC v. Accusearch Inc.*,
  570 F.3d 1187 (10th Cir. 2009) ........................................................................... 24

*Gulf Restoration Network v. McCarthy*,
  783 F.3d 227 (5th Cir. 2015) ............................................................................... 30

*Hancock Cnty. Bd. of Sup'rs v. Ruhr*,
  487 F. App'x 189 (5th Cir. 2012) ........................................................................ 11

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n,*
    141 S. Ct. 2172 (2021) ............................................................................................................24

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ..................................................................................................................3

*Johnson v. City of Shelby,*
    574 U.S. 10 (2014) ..................................................................................................................17

*Kayser v. Ocwen Loan Servicing, LLC,*
    2017 WL 3578696 (D.N.J. Aug. 18) .......................................................................................20

*King v. Dep't of Pub. Safety & Corr.,*
    2007 WL 9701279 (M.D. La. Sept. 18) ...................................................................................20

*Larson v. Domestic & Foreign Com. Corp.,*
    337 U.S. 682 (1949) ................................................................................................................16

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................................ 7, 11

*Mann Constr., Inc. v. United States,*
    27 F.4th 1138 (6th Cir. 2022) ...............................................................................................15

*Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.,*
    142 S. Ct. 1968 (2022) ...........................................................................................................28

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ..................................................................................................................3

*Maxon Marine, Inc. v. Dir., Off. of Workers' Comp. Programs,*
    39 F.3d 144 (7th Cir. 1994) ...................................................................................................17

*McLouth Steel Prod. Corp. v. Thomas,*
    838 F.2d 1317 (D.C. Cir. 1988) .............................................................................................29

*Meyer v. Brown & Root Constr. Co.,*
    661 F.2d 369 (5th Cir. 1981) .................................................................................................33

*Michigan v. U.S. Army Corps of Engineers,*
    667 F.3d 765 (7th Cir. 2011) ............................................................................................ 16, 17

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ................................................................................................................32

*Morissette v. United States,*
    342 U.S. 246 (1952) ................................................................................................................27

*Muniz-Muniz v. U.S. Border Patrol,*
    741 F.3d 668 (6th Cir. 2013) .................................................................................................16

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) ..................................................................................................................6

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C.) ............................................................................................ 5, 7

*NAM v. SEC*,
  2022 WL 16727731 (W.D. Tex. Sept. 28) ................................................................. 32

*Nat'l Ass'n of Regul. Util. Comm'rs v. ICC*,
  41 F.3d 721 (D.C. Cir. 1994) .................................................................................... 27

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*,
  308 U.S. 165 (1939) .................................................................................................. 10

*New York v. U.S. Dep't of Com. (Census Cases)*,
  351 F. Supp. 3d 502 (S.D.N.Y. 2019) ....................................................................... 6

*NFIB v. Dept. of Labor*,
  142 S. Ct. 661 (2022) ................................................................................................ 26

*Porter v. Califano*,
  592 F.2d 770 (5th Cir. 1979) .................................................................................... 16

*Presbyterian Church (U.S.A.) v. United States*,
  870 F.2d 518 (9th Cir. 1989) .................................................................................... 17

*Purpura v. Monroe Reg'l Med. Ctr.*,
  2014 WL 12868861 (M.D. Fla. Sept. 16) ................................................................. 20

*Richmond Screw Anchor Co. v. United States*,
  275 U.S. 331 (1928) .................................................................................................. 19

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) .................................................................................... 33

*Seariver Maritime Fin. Holdings, Inc. v. Pena*,
  952 F. Supp. 455 (S.D. Tex. 1996) ........................................................................... 10

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) .................................................................................................... 27

*Shell Offshore Inc. v. Babbitt*,
  238 F.3d 622 (5th Cir. 2001) .................................................................................... 30

*Shell Offshore, Inc. v. Babbitt*,
  61 F. Supp. 2d 520 (W.D. La. 1999) ......................................................................... 32

*Smilde v. Snow*,
  73 F. App'x 24 (5th Cir. 2003) ................................................................................. 10

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ............................................................................. 3, 5, 7

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ........................................................................................ 4, 6, 7, 8

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ............................................................................................ 25, 28

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ..................................................................................... 32

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019) ....................................................................................................passim

*Texas v. United States,*
  2022 WL 2109204 (S.D. Tex. June 10) ...........................................................................................29

*Texas v. United States,*
  50 F.4th 498 (5th Cir. 2022) ...........................................................................................................32

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) .............................................................................................20, 29, 33

*Three Expo Events, LLC v. City of Dallas,*
  907 F.3d 333 (5th Cir. 2018) .............................................................................................................8

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) ........................................................................................................17

*U.S. Army Corp. of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016) ........................................................................................................................12

*United States v. Adamson,*
  665 F.2d 649 (5th Cir. 1982) ...........................................................................................................20

*United States v. Battle,*
  2013 WL 5769982 (D. Vt. Oct. 24) ................................................................................................20

*United States v. Craig,*
  861 F.2d 818 (5th Cir. 1998) ...........................................................................................................20

*United States v. Lovett,*
  328 U.S. 303 (1946) (Frankfurter, J., concurring) .........................................................................21

*United States v. Murillo-Urbina,*
  140 F.3d 1037 (5th Cir. 1998) .........................................................................................................18

*United States v. Portillo-Portillo,*
  2006 WL 8443614 (D.N.M. Oct. 23) ..............................................................................................20

*United States v. Reynolds,*
  710 F.3d 498 (3d Cir. 2013) ............................................................................................................31

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
  570 U.S. 338 (2013) ........................................................................................................................23

*Walmart Inc. v. DOJ,*
  21 F.4th 300 (5th Cir. 2021) ...........................................................................................................17

*Weisgram v. Marley Co.,*
  528 U.S. 440 (2000) ........................................................................................................................20

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ...............................................................................................................26, 30

*White Oak Realty, LLC v. U.S. Army Corp of Engineers,*
  2016 WL 2348065 (E.D. La. May 4) ...............................................................................................17

*Whitman v. Am. Trucking Ass'ns*,
 531 U.S. 457 (2001) ................................................................................................ 12

*Wicker v. McCotter*,
 798 F.2d 155 (5th Cir. 1986) .................................................................................. 19

*Will v. Lumpkin*,
 978 F.3d 933 (5th Cir. 2020) .................................................................................. 19

*YAF v. Gates*,
 560 F. Supp. 2d 39 (D.D.C. 2008) ............................................................................ 6

## STATUTES

12 U.S.C. §5481 ............................................................................................................ 23

12 U.S.C. §5493 ............................................................................................................ 23

12 U.S.C. §5515 ............................................................................................................ 15

12 U.S.C. §5531 ...................................................................................................... 13, 23

15 U.S.C. §45 .......................................................................................................... 23, 27

28 U.S.C. §1331 ............................................................................................................ 17

28 U.S.C. §1391 .............................................................................................................. 9

5 U.S.C. §551 ......................................................................................................... 17, 18

5 U.S.C. §702 ......................................................................................................... 16, 17

5 U.S.C. §704 ................................................................................................................ 18

5 U.S.C. §706 ................................................................................................................ 26

Pub. L. No. 96-252, 94 Stat. 374 (1980) ..................................................................... 27

## OTHER AUTHORITIES

Br. of United States,
 *United States v. Texas*, No. 22-58, 2022 WL 4278395 (U.S. Sept. 12) ....................... 31

Br. of United States,
 *Zeno v. United States*, 2010 WL 4655324 (4th Cir. Nov. 17) .................................... 19

Defs.' Rule 60(b) Mot. (Doc. 208),
 *Franciscan All., Inc. v. Price*, No. 7:16-cv-108 (N.D. Tex. Sept. 31, 2021) ............... 34

Fed. R. Civ. P. 56 ......................................................................................................... 33

Healy, *The Rise of Unnecessary Constitutional Rulings*,
 83 N.C. L. Rev. 847, 918-19 (2005) ......................................................................... 19

*Little Sisters of the Poor Home for the Aged, Denver v. Azar*,
 Doc. 82 at 2-3, No. 1:13-cv-2611 (D. Colo. May 29, 2018) ...................................... 34

*NAM v. DHS*,
 Doc. 109, No. 4:20-cv-4887 (N.D. Cal. Nov. 18, 2020) ............................................ 34

Proposed Order (Doc. 208-1),
    *Franciscan All.*, No. 7:16-cv-108 (N.D. Tex. Sept. 31, 2021).....................................................34

Spann, *Advisory Adjudication*,
    86 Tul. L. Rev. 1289, 1297 (2012) ...........................................................................19

Wright & Miller, 14D Fed. Prac. & Proc. Juris. (4th ed.).............................................9, 10, 16

## INTRODUCTION

Defendants know that, if this Court reaches the merits, then they lose. Defendants concede that, under the Fifth Circuit's decision in *Community Financial*, the CFPB's funding scheme is unconstitutional and so its manual update must be vacated in full. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022). The agency should also be enjoined from exercising the authority asserted in the update, since that authority lacks constitutional funding too. Defendants are in just as much trouble under the APA. If this Court agrees with Plaintiffs that the update is final agency action, then Defendants have *no* defense for why they bypassed notice and comment. Defendants have little to say under the arbitrary-and-capricious standard, since they can't point to any reasoned decisionmaking. And they have nothing persuasive to say about the limits on their statutory authority. Congress knows how to grant agencies the all-important power to regulate discrimination, and it did not silently slip that power into a statute governing "unfairness."

Because Defendants have no defense of their statutory interpretation, they resort to a strawman, falsely characterizing Plaintiffs' position as an attempt to insulate conduct that meets the statutory definition of a UDAAP but that also *happens to be* discriminatory. But the agency did not spend so much time and energy drafting and promoting the update just to tell examiners and regulated entities that UDAAP means what everyone always understood it to mean. The update announces the agency's view that discrimination *is* a UDAAP: Examiners must look for discrimination itself. Regulated entities must set up compliance programs keyed to discrimination itself (in new contexts not covered by actual nondiscrimination statutes). And discrimination itself satisfies the statutory elements of a UDAAP. And not just discrimination, but discrimination based on disparate impacts against an unidentified and potentially endless set of protected classes. *That* is what grossly exceeds the CFPB's statutory authority.

Understanding their predicament on the merits, Defendants ask this Court to dismiss the case on procedural grounds. Though Plaintiffs represent the entities that are directly regulated by Defendants' new rule, Defendants claim that not one of Plaintiffs' members has Article III standing. And though Defendants understand that their manual directs the behavior of agency personnel and regulated entities—indeed, that's the whole point—Defendants claim that the update is not final agency action. These arguments fail. And the final-agency-action argument is not a defense to Plaintiffs' constitutional claim anyway, where Defendants concede that Plaintiffs win on the merits.

This Court should grant Plaintiffs' motion for summary judgment under both the Appropriations Clause and the APA. District courts rule on alternative grounds every day, and addressing all of Plaintiffs' claims together will allow this Court to close the case and avoid the possibility of an unnecessary remand and second appeal. Because Plaintiffs prevail on all their claims, this Court should also deny Defendants' motion to dismiss and cross-motion for summary judgment. And it should enter all forms of relief—vacatur, declaratory, and injunctive—that Plaintiffs are entitled to.

## ARGUMENT

Defendants simultaneously filed a cross-motion for summary judgment and a motion to dismiss. The two documents are word-for-word identical. *Compare* CFPB-Mot. (Doc. 22), *with* MTD (Doc. 23). Neither has merit. Defendants identify no grounds for dismissing this case outright. And Plaintiffs have the better of the argument on which side is entitled to summary judgment.

## I.     The Court has no basis for dismissing Plaintiffs' case.

Defendants claim that this Court lacks the power to decide this case. Specifically, they claim that Plaintiffs lack standing, that this district is the wrong venue, and that the manual update is not final agency action. Defendants are wrong on each point.

2

### A.      Article III standing

Associations like Plaintiffs can sue on behalf of their members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Associational standing exists if the organization has a member with standing, the lawsuit is germane to the organization's mission, and the relief sought makes the members' participation unnecessary. *Id.* at 342-43. Defendants dispute only the first requirement. *See* CFPB-Mot. 9. Plaintiffs meet that requirement if, for any one of their members, they can show injury, causation, and redressability. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020); *see Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) ("Only one [plaintiff] needs to have standing.").

Plaintiffs easily made the required showing. Their members comprise a wide swath of the industry that is heavily regulated by the CFPB. The Chamber of Commerce, for instance, "has as members numerous depository institutions that are subject to CFPB supervision and examination." Quaadman-Decl. (Doc. 17-1) ¶5. "The Chamber also has members not currently subject to CFPB supervision but subject to the prohibition on [UDAAP]." ¶6. Members are directly harmed because, through the compelled expansion of UDAAP compliance programs and systems, the update imposes heavy compliance costs on them. *See* ¶¶14-22. By expanding the scope of UDAAP, the CFPB has forced members "to expend resources to introduce and maintain new compliance programs." ¶15. It is also driving up members' record-retention, examination-readiness, and examination costs while increasing the risk of enforcement actions and penalties. ¶¶14, 23. Specifically, Chamber members "have already begun complying with the CFPB's new rule by expanding their UDAAP compliance systems … to include nondiscrimination and by applying existing compliance systems that cover nondiscrimination to consumer financial products not covered by the Equal Credit Opportunity Act or Home Mortgage Disclosure Act." ¶16. The financial "costs on U.S. Chamber members from complying with the CFPB's new rule vary from $10,000 to more than $1 million annually per member." ¶¶19-20. So too for the other Plaintiffs and their members. *See also* O'Neill-Decl. (Doc. 17-2) ¶¶9-24 (detailing how

ABA members likewise establish harm, causation, and redressability); Smith-Decl. (Doc. 17-3) ¶¶10-20 (CBA); Williston-Decl. (Doc. 17-4) ¶¶9-26 (IBAT); Hall-Decl. (Doc. 17-5) ¶¶9-26 (Longview Chamber); Hamer-Decl. (Doc. 17-6) ¶¶9-19 (TAB); Embrey-Decl. (Doc. 17-7) ¶¶9-26 (TBA).

Defendants do not dispute that these injuries count, that Defendants caused them, or that Plaintiffs' requested relief would remedy them. Defendants make only one argument about Plaintiffs' standing: Relying heavily on *Summers v. Earth Island Institute*, Defendants claim that Plaintiffs must "identif[y]" a specific member who would have standing on its own. CFPB-Mot. 10 (quoting 555 U.S. 488, 498 (2009)). By "identify," Defendants read *Summers* to require associations not only to identify a member with standing, but also to give that member's actual name. *See* CFPB-Mot. 10-11. This argument fails for at least three reasons.

***First***, Plaintiffs did identify members by name. Defendants just ignore Plaintiffs' declaration for the Consumer Bankers Association. That declaration identifies—by name—59 members of the CBA who are also depository institutions subject to the CFPB's supervision and examination. *See* Smith-Decl. ¶¶7-8 & Ex. C-3. The standing of these members is obvious. They are the "object" of the CFPB's UDAAP authority. *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 518 (5th Cir. 2014). By announcing a new rule that expands the CFPB's authority, the agency is injuring them by forcing costly expansion of existing UDAAP compliance systems that cover nondiscrimination over additional products and programs, enhanced monitoring to account for the CFPB's novel legal position, and new analyses of consumer demographics for deposit products subject to the UDAAP prohibition but not existing nondiscrimination statutes. *See* Smith-Decl. ¶¶16-18. Defendants do not argue otherwise.

***Second***, Plaintiffs identified other members by pseudonym. The Chamber alleges facts concerning five specific members (Members A-E). In direct response to the agency's new rule, Member

A "significantly modified its existing compliance management system"; Member B "updated its poli-

cies, controls, and training materials" to apply to non-credit products; Member C "updated its

UDAAP risk assessment to assess discrimination as a possible UDAA risk"; Member D "performed

a breakdown of consumer demographics for its deposit products"; and Member E has begun to in-

ventory new data that "was previously outside the scope of its fair lending program." Quaadman-

Decl. ¶¶16-18. Similarly, Plaintiff American Bankers Association identified two particular members

(Members A-B) and the specific costs they incurred as a result of the CFPB's action. *See* O'Neil-Decl.

¶¶13-15 ("Member A paid a consultant $50,000 to review its UDAAP prevention program," and

"Member B initiated its regulatory change control process" for products not previously subject to it).

Plaintiffs used pseudonyms because, consistent with their First Amendment right to associational pri-

vacy, their membership lists are confidential.

The law does not require associations to publicly disclose their members' *actual* names. As the

Eleventh Circuit has explained, binding Fifth Circuit precedent has long rejected the notion that an

association, even at summary judgment, "must specifically name the individual on whose behalf the

suit is brought." *Doe v. Stincer*, 175 F.3d 879, 884-85 (11th Cir. 1999) (citing *Church of Scientology of Calif.*

*v. Cazares*, 638 F.2d 1272, 1278 (5th Cir. 1981); and *Congress of Racial Equality v. Douglas*, 318 F.2d 95,

102 (5th Cir. 1963)). In *Speech First, Inc. v. Fenves*, for example, the Fifth Circuit found that the plaintiff

had associational standing to seek a preliminary injunction, even though its standing members were

identified only by pseudonyms ("Student A," etc.). *See* 979 F.3d 319, 335 (5th Cir. 2020). And in

*NAACP v. Trump*, the district court found that the plaintiff had associational standing to seek sum-

mary judgment on behalf of its members, DACA beneficiaries whose identities were withheld. 298 F.

Supp. 3d 209, 225 & n.10 (D.D.C.). The Supreme Court affirmed on the merits without questioning

standing. *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1916 (2020).

This rule makes sense. Associations and their members have a First Amendment right to keep their membership anonymous from the government. *AFPF v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)). So "to hold that Article III requires an organization to name those of its members who would have standing would be in tension with one of the fundamental purposes of the associational standing doctrine—namely, protecting individuals who might prefer to remain anonymous." *New York v. U.S. Dep't of Com. (Census Case)*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019) (citing *Patterson*, 357 U.S. at 458-60), *aff'd in relevant part*, 139 S. Ct. 2551, 2565-66 (2019). Here, for example, entities like Plaintiffs' members naturally "fear retaliatory efforts on behalf of the government"—specifically, their regulator, the CFPB—if they "were to participate as named plaintiffs in a [preenforcement] legal challenge." *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 286 (D.N.J. 2003) (holding that an association of law schools could keep its members secret without losing standing), *aff'd in relevant part*, 390 F.3d 219, 228 n.7 (3d Cir. 2004), *aff'd in relevant part*, 547 U.S. 47, 52 n.2 (2006), *aff'd*, 446 F.3d 1317 (3d Cir. 2006). That the CFPB is now demanding that the regulated entities supporting this lawsuit reveal their identities—who the agency can then target for additional examinations and falsely accuse of supporting "discrimination"—proves that the members' fears are justified. Indeed, the "specific" names of Plaintiffs' members are "unnecessary to determine whether [they] would have Article III standing." *Census Case*, 351 F. Supp. 3d at 606 n.48. Defendants don't identify a single fact relevant to standing that they don't know now but would know if they had the names of specific members. Standing here "depends on the facts of" a member's supervision by the CFPB, activities, and costs—"not on [its] name." *Id.*; *accord FAIR*, 291 F. Supp. 2d at 288.

*Summers* does not hold otherwise. Even if *Summers* required associations to "identif[y]" specific members, a member can be identified and described with specificity without using its "*name.*" *YAF v. Gates*, 560 F. Supp. 2d 39, 49 (D.D.C. 2008); *accord Census Case*, 351 F. Supp. 3d at 606 n.48. Though

*Summers* uses the words "name" and "naming" once, the Court merely used those words as a synonym for "identify." *See Summers*, 555 U.S. at 498. It would "overread" *Summers* to think this passing language always "require[s] an organization to name the member who might have standing." *Census Case*, 351 F. Supp. 3d at 606 n.48 (quoting *Summers*, 555 U.S. at 498); *accord NAACP*, 298 F. Supp. 3d at 225-26 n.10 (describing that reading of *Summers* as "tenuous"). Pseudonyms are still names, after all. And the association in *Summers* did not identify *any* specific members—by pseudonym or otherwise. *See Summers*, 555 U.S. at 497-98. So *Summers* could not have passed on the well-established practice of associations using pseudonyms to protect their members. *See Census Case*, 351 F. Supp. 3d at 606 n.48 (explaining that *Summers* is at most "[d]icta" on this point). Post-*Summers* cases like *Speech First* and *NAACP v. Trump* prove that the practice remains legitimate and appropriate.

    **Third**, *Summers* does not even require associations to identify specific members in every case. The associations lacked standing in *Summers* for two main reasons. First, their members were not directly regulated by the challenged regulations, which made standing "'substantially more difficult' to establish." 555 U.S. at 493 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). The challenged regulations allowed the Forest Service to undergo certain projects without first doing an environmental assessment. A member would be harmed only if a project was imminent, the project would affect an area that the member imminently planned to visit, and the project threatened the member's ability to enjoy that area. *See id.* at 494. Second, the associations did not show that they had *any* member who satisfied these criteria. *See id.* at 497-98. There were no affidavits establishing that any of the members would be harmed by the challenged policy; the only affidavit proving standing concerned a part of the case that had settled. *Id.* at 494-95. The associations instead argued that, given the sheer size of their membership, it was a "statistical probability" that they had at least one member with standing. *Id.* at 497. The Court rejected this theory of "probabilistic standing." *Id.* at 499. Because the association did

not identify any specific members, the Court could not verify the key facts needed to evaluate standing: it did not know whether any member "will *ever* visit one of the small parcels at issue." *See id.*

Plaintiffs do not have either of the two problems that plagued the associations in *Summers.* First, Plaintiffs' members are directly supervised and regulated by the CFPB. When the agency expands its UDAAP authority, their members are "the direct object" of that regulation. *Three Expo Events, LLC v. City of Dallas,* 907 F.3d 333, 341 (5th Cir. 2018). Standing in this context is not "more difficult to establish"; it is "'ordinarily little question.'" *Id.* (quoting *Lujan,* 504 U.S. at 562). Second, Plaintiffs are not relying on statistical probabilities. Their declarations swear that they *do* have, among other things, members who are directly supervised by the CFPB. *See* Quaadman-Decl. ¶5 (Chamber); O'Neil-Decl. ¶5 (ABA); Smith-Decl. ¶6 (CBA); Williston-Decl. ¶6 (IBAT); Hall-Decl. ¶6 (Longview Chamber); Hamer-Decl. ¶7 (TAB); Embrey-Decl. ¶6 (TBA). The declarations then explain how the CFPB's expansion of its UDAAP authority *is* injuring these members. *See* Quaadman-Decl. ¶¶9-27 (Chamber); O'Neil-Decl. ¶¶9-24 (ABA); Smith-Decl. ¶¶10-20 (CBA); Williston-Decl. ¶¶9-26 (IBAT); Hall-Decl. ¶¶9-26 (Longview Chamber); Hamer-Decl. ¶¶9-19 (TAB); Embrey-Decl. ¶¶9-26 (TBA). No additional information is needed to prove standing here. Defendants apparently agree. They do not explain what relevant information the members' names would add. And they waived their right to discovery, including jurisdictional discovery. *See* Joint Mot. for Stip. Order (Doc. 15) at 3 ¶6 ("The parties believe … that no discovery is needed prior to this Court's resolution of the parties' respective dispositive motions [to dismiss and for summary judgment].").

*Summers* requires no more. "The Government's argument places undue emphasis on language requiring plaintiff associations to 'identify' or 'name' members." *FAIR,* 291 F. Supp. 2d at 289. That language from cases like *Summers* "goes not to a blanket rule that associations … must identify their membership, but rather to whether the factual allegations in a given context sufficiently demonstrate that an association indeed has members that have suffered an injury-in-fact." *Id. Summers* was simply

8

an application of the general rule "that a plaintiff must prove 'facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury,'" but that rule can be satisfied in many cases "even as to those members whom [the plaintiff] does not identify by name." *Census Case*, 351 F. Supp. 3d at 606 n.48. Courts recognize this fact both before and after *Summers*.[1] This Court should do the same.

### B.    Venue

Venue is proper in this district. Because Defendant Chopra is a federal officer and this case involves no real property, venue is proper wherever "the plaintiff resides." 28 U.S.C. §1391(e)(1). Plaintiff Longview Chamber of Commerce resides here. So venue is proper in this district for all Plaintiffs and all claims. *See Crane v. Napolitano*, 920 F. Supp. 2d 724, 746 (N.D. Tex. 2013) (when venue is based on the plaintiff's residence, "venue is proper as to all plaintiffs" if it is proper for "any one"); Wright & Miller, 14D Fed. Prac. & Proc. Juris. §3808 (4th ed.) (when venue is proper based on the plaintiff's residence, venue is necessarily proper "for all claims").

Defendants do not dispute Plaintiffs' residential basis for venue; they instead try to repurpose their standing argument as a venue argument. If the Longview Chamber lacks standing, Defendants argue, then venue cannot be proper here because only the Longview Chamber resides here. *See* CFPB-Mot. 12. This argument fails because the Longview Chamber *does* have standing, as just explained. *Supra* I.A. But even if this Court had to rely on some other Plaintiff for standing, venue would still be proper here.

---

[1] *E.g.*, *Am.'s Health Ins. Plans v. Hudgens*, 915 F. Supp. 2d 1340, 1351 n.13 (N.D. Ga. 2012) ("[An association] may assert standing on behalf of its members without identifying them"), *aff'd*, 742 F.3d 1319 (11th Cir. 2014); *Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (explaining that associational standing "allows for the member on whose behalf the suit is filed to remain unnamed by the organization"); *NRDC v. Mineta*, 2005 WL 1075355, at *5 (S.D.N.Y. May 3) ("'no absolute requirement that individual members be identified'" (quoting *NYC C.L.A.S.H., Inc. v. City of N.Y.*, 315 F. Supp. 2d 461, 468 (S.D.N.Y. 2004))).

Contrary to Defendants' assumption, a plaintiff can create venue even if it ultimately lacks standing; the two questions are distinct. *See Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939) (stressing the "basic difference" between subject-matter jurisdiction and venue). This Court's "authority for determining venue, Section 1391(e), makes no mention of standing," so "arguments as to standing are not probative on the venue issue." *Seariver Maritime Fin. Holdings, Inc. v. Pena*, 952 F. Supp. 455, 460 (S.D. Tex. 1996). The only recognized grounds for rejecting a venue-creating plaintiff are that the plaintiff's claims are "frivolous" or that the plaintiff was "improperly and collusively joined." Wright & Miller, 14D Fed. Prac. & Proc. Juris. §3815. Standing is relevant only if the venue-creating plaintiff's standing is so baseless that it's "frivolous." *Crane*, 920 F. Supp. 2d at 747. Defendants cannot meet that high burden here. Their only argument about standing—that Plaintiffs failed to identify members by name—is wrong under the caselaw, debatable at best, and not even specific to the Longview Chamber.

Even if a venue-creating plaintiff needed standing, the question would be whether that plaintiff's standing was plausibly *alleged* in the *complaint*—something Defendants don't challenge here. "[V]enue" is "determined at the outset of litigation." *Smilde v. Snow*, 73 F. App'x 24, 26 (5th Cir. 2003) (citing *Exxon Corp. v. FTC*, 588 F.2d 895, 899 (3d Cir. 1978)). It cannot be lost based on "subsequent events," *id.*, including the dismissal of the venue-creating plaintiff, *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1303 (N.D. Ala. 2003); *Exxon*, 588 F.2d at 899. The opposite rule would be unworkable: It would force courts to dismiss cases for lack of venue even after discovery or trial, if the court found that the venue-creating plaintiff failed to carry its burden of proving standing at that stage. The law thus requires courts to determine venue first thing. And because venue must be determined at the outset, a case cannot be dismissed for improper venue where "Plaintiffs have pleaded sufficient facts to support [the venue-creating plaintiff's] standing" in their complaint. *Crane*, 920 F. Supp. 2d at 747.

Plaintiffs plausibly pleaded the Longview Chamber's standing here, and Defendants do not argue otherwise. Defendants challenge only whether Plaintiffs did enough to show standing *at summary judgment*. *See* CPFB-Mot. 10 ("At the summary judgment stage"); *id.* ("at the summary judgment stage"). Their key case on standing, *Summers*, was a summary-judgment case. And their argument that associations must identify their standing members by name is plainly untrue at the pleading stage, where courts "'presume'" that "'general factual allegations'" about standing "'embrace those specific facts that are necessary.'" *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 560-61). Defendants concede as much. *See* CFPB-Mot. 10 (citing *Hancock County*). They acknowledge that the Fifth Circuit has rejected the notion that "an association must set forth the name of a particular member in its complaint." *Hancock Cnty.*, 487 F. App'x at 198. Defendants' no-standing-means-no-venue argument thus fails under its own logic.

### C.   Final agency action

Contrary to Defendants' contention, the CFPB's manual update is a final agency action ripe for judicial review. Even if it weren't, Plaintiffs could still bring their claim under the Appropriations Clause.

Under *Bennett v. Spear*, an agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequence flow." 520 U.S. 154, 178 (1997) (cleaned up). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up). No matter how the agency frames its action, its so-called guidance is final if the "agency intends to bind *itself* to a particular legal position. *Id.* (citing *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997)). One way to determine agency intent is to examine whether the agency action is "applied by the agency in a way that indicates it is binding." *Id.*

11

Defendants do not seriously dispute the first prong of the *Bennett* test—that the issuance of the manual update is "the consummation of the agency's decisionmaking process." 520 U.S. at 178. Indeed, the CFPB "published an updated exam manual," with much fanfare, "for evaluating UDAAPs." CFPB Press Release (Doc. 17-11) at 1. By its words, it issued the updated manual "to guide our supervision of covered financial institutions." CFPB Blog (Doc. 17-13) at 2. And the publication came after extensive evaluation and factfinding concerning "history" and new "systems and technologies" used in the financial-services industry. *Id.* at 1. There is nothing interim or temporary about it. *See U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (explaining a decision is final when it is "typically not revisited"); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478-79 (2001) (finding an agency action final when the agency "rendered its last word on the matter").

The update also satisfies the second prong from *Bennett*—whether the agency action determines "rights or obligations" or whether "legal consequences will flow" from it. 520 U.S. at 178. Defendants admit that the purpose of the updated manual is to "assess compliance with the requirements of Federal consumer financial laws" and to "obtain information about the activities subject to such laws and the associated compliance systems or procedures of such persons." CFPB-Mot. 5-6 (cleaned up; citing 12 U.S.C. §5515(b)(1)(A)-(C)). Even by Defendants' terms, "the Exam Manual points examiners in the direction of where to look for information—or what information to look at"—to determine UDAAPs. *Id.* at 6. Yet as Defendants also admit, the manual goes further by "directing examiners to, for example, 'obtain and review copies of [specific documents] to the extent relevant to the examination.'" *Id.* at 7 (citing UDAAP Manual (Doc. 17-9) 11-19). The manual's specific instruction to examiners controls their processes and marks the "withdrawal of discretion" from agency personnel. *EEOC*, 933 F.3d at 442. Even more powerfully, the specific instruction relates to

an ongoing examination process that certain large depository institutions and their affiliates are sub-
jected to by law. When the CFPB purports to expand the substantive scope of its supervision, it di-
rectly affects the scope of activities upon which supervised entities are examined.

The manual update binds agency personnel to a particular method of investigation—charac-
teristic of a final agency action. *Id.* As Defendants put it, the CFPB made changes to "the way in which
examiners will look for violations" of unfair acts or practices. CFPB-Mot. 1. Further, "the Manual
identifies for examiners what kinds of evidence to collect and what kinds of preliminary factual deter-
minations to make." *Id.* at 14. And the update provides new instructions "to examiners about how
conduct, including potentially discriminatory conduct, should be examined to determine if it is unfair
under 12 U.S.C. §5531." *Id.* at 7. For example, Defendants say that the revised manual is "*instructing*
the examiner to determine whether '[t]he entity engages in targeted advertising or marketing in a dis-
criminatory way.'" *Id.* (quoting UDAAP Manual 15) (emphasis added)).

The manual update also binds CFPB staff to a new and novel legal interpretation of UDAAP,
a "withdrawal of discretion" that "impose[s] or elaborate[s] or interpret[s] a legal norm." *EEOC*, 933
F.3d at 442. As Defendants claim, "the Bureau refined"—meaning, changed[2]—"its description of
unfairness" through the manual update. CFPB-Mot. 7. Instead of limiting reviews to the statutory
definition of UDAAP, the updated manual now directs CFPB staff to consider alleged discriminatory
conduct beyond traditional UDAAPs. The manual, as updated, also provides several examples of con-
duct that the CFPB considers "unfair" and actionable under its UDAAP authority. UDAAP Manual
3-4. While examiners retain some discretion on who and how they examine, the manual articulates the
agency's view on whether and how discrimination constitutes unfairness.

---

[2] *Refine*, Oxford Advanced Learner's Dictionary (Online ed. 2023) ("to improve something by
making small changes"); *see also Amazon.com, Inc. v. Discovery Commc'ns, Inc.*, 2011 WL 13228465, at *3
(W.D. Wash. Jan. 11) ("The Court construes the term 'refine' to mean 'change or alter.'").

Defendants' attempt to analogize the manual update to the immigration policy memorandum in *Amin* is unpersuasive. *See Amin v. Mayorkas*, 24 F.4th 383, 392 (5th Cir. 2022). Critically, the policy memorandum in *Amin* did "not impose any obligations on visa applicants," instead hewing closely to existing statutory requirements. *Id.* This case is different because the manual update diverges from the statutory definition of unfairness to expand the agency's UDAAP authority and to bring additional conduct under the CFPB's regulatory ambit. *See* Pltfs.-Mot. 12-21; *infra* II.B.1-2. Indeed, the manual update adopts a new "legal position" on the breadth of UDAAP, thus binding the agency and its personnel to that novel position in the process. *EEOC*, 933 F.3d at 441.

Defendants next argue that the manual uses "permissive" instead of "mandatory" language, CFPB-Mot. 16, but the CFPB has made clear that examiners must follow the manual's precepts when conducting examinations and investigations. As Plaintiffs explained, "the manual is written with mandatory language to its examiners; it uses the word must more than 2,000 times." Pltfs.-Mot. 3. Contrary to Defendants' argument, the manual update does in fact "authoriz[e] new topics of examination" by expanding the scope of UDAAP authority to reach alleged discrimination that falls outside statutory bounds. CFPB-Mot. 17. Again by Defendants' own words, the manual "provide[s] a roadmap of additional preliminary factual assessments for examiners to make" on a new topic beyond the traditional understanding of UDAAP. CFPB-Mot. 17.[3]

Defendants' argument that the update does not require anything of regulated entities, *see* CFPB-Mot. 18, leaves parties with a false choice: either face the potential consequences of expanded UDAAP scrutiny or establish the policies and procedures to mitigate those concerns today.

---

[3] Ironically, after arguing that the manual is nothing more than non-binding guidance for examiners, Defendants' brief later *cites to the exam manual*, rather than a statute, regulation, court case, binding administrative order—or anything else—to support its assertion about what qualifies as an unfair practice. *See* CFPB-Mot. 35 (citing manual to support assertion that failure to release a lien is an unfair practice).

Where the manual dictates that the adequacy of compliance policies and procedures is a relevant con-

sideration for examinations, regulated entities must react accordingly to avoid scrutiny and potential

consequences. *See* Pltfs.-Mot. 29-31, 4 (citing Exam. Process Manual (Doc. 17-10) at 17). The manual

has the effect of "impos[ing] new … duties" on Plaintiffs' members because "failure to comply with

this new rule comes with the risk of penalties." *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143

(6th Cir. 2022). The update has motivated specific compliance-system innovations that costs Plaintiffs'

members millions of dollars. Pltfs.-Mot. 23-24 (citing Quaadman-Decl.) ¶¶16-19 (detailing costs to

Chamber members from $10,000 to over $1 million annually per member)). Such actions were prac-

tically, if not legally, necessary based on the direction to the CFPB to consider the "compliance systems

or procedures" of regulated entities. 12 U.S.C. §5515(b)(1)(B). Accordingly, the update necessarily

affects the obligations of supervised entities who are subject to examination and investigation accord-

ing to the manual's precepts.

  Defendants' amici put the lie to the notion that the manual update has no practical effect.

Amici contend that, if the Court accepts Plaintiffs' position, "then the CFPB would not be able to

prevent unfair discrimination in transactions without a credit component." Nonprofits-Br. (Doc. 26)

at 16. They further claim that "the absence of any regulatory enforcement mechanism means that

certain discriminatory practices will [be] left unchecked" because some hypothesized practices "do not

fall within the reach of the ECOA" or other existing antidiscrimination laws. *Id.* at 16-17; *see also id.* at

16 ("Consumers' inability to avoid discriminatory practices would be compounded if the CFPB could

not use its enforcement authority to prevent them."). Though Plaintiffs disagree with amici's hyper-

bole, their arguments highlight that the manual update is a new legal interpretation of the CFPB's

authority. By any measure, the update meets the flexible criteria from *Texas v. EEOC* for a final agency

action that is ripe for judicial review.

Even if the manual update weren't final agency action under the APA, that conclusion would not defeat Plaintiffs' claim under the Appropriations Clause. The final-agency-action requirement applies when a plaintiff must rely on the APA for its cause of action, as Defendants acknowledge. *See* CFPB-Mot. 12 n.7. But Plaintiffs don't need the APA to seek equitable relief against Defendants for violating the Constitution. *See* Compl. (Doc. 1) 3 ¶8. So final agency action isn't required for their constitutional claim. Only agency action is, which is indisputably present here.

Defendants suggest otherwise in a footnote. They assert that "the APA provides the cause of action" for Plaintiffs' constitutional claim. CFPB-Mot. 12 n.7. Defendants apparently assume that, unless the APA provides the cause of action, then Plaintiffs couldn't take advantage of "the APA's waiver of sovereign immunity." *Id.* (citing 5 U.S.C. §702). And when the APA provides the cause of action for a claim, Defendants continue, then the APA's "final agency action requirement applies." *Id.* "Although the United States" has made this exact argument "from time to time," it "has not prevailed" in any circuit. *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 775 (7th Cir. 2011); *accord Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 673 (6th Cir. 2013) (noting the circuits' "unanim[ity]"). It cannot prevail here either.

Defendants' syllogism falls apart because Plaintiffs do not need the APA to have a cause of action for their constitutional claim. Long before the APA, plaintiffs could challenge the constitutionality of agency action through nonstatutory review—a "right to sue directly under the Constitution to enjoin … federal officers from violating [their] constitutional rights." *Porter v. Califano*, 592 F.2d 770, 781 (5th Cir. 1979); *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015) (discussing this "long held," "judge-made" cause of action). This equitable cause of action against officers for violations of the Constitution was recognized, most famously, in *Ex parte Young* (for state officers) and *Larson* (for federal officers). *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 696-97 (1949). The APA "did not eliminate" nonstatutory review. Wright & Miller, 14 Fed. Prac. & Proc. Juris. §3659.

It *expanded* it by making it available against not just federal officers, but also federal agencies and the United States. *See* 5 U.S.C. §702 (second sentence); *Trudeau v. FTC*, 456 F.3d 178, 186-87 (D.C. Cir. 2006) (discussing, based on §702's text and legislative history, how it interacts with nonstatutory review); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525-26 (9th Cir. 1989) (same). Plaintiffs' constitutional claim here is a classic example of a claim that can be brought through nonstatutory review. *See White Oak Realty, LLC v. U.S. Army Corp of Engineers*, 2016 WL 2348065, at *2 (E.D. La. May 4); *Trudeau*, 456 F.3d at 187; *Michigan*, 667 F.3d at 775.[4]

The APA's waiver of sovereign immunity applies to Plaintiffs' constitutional claim under non-statutory review, even though that cause of action does not arise under the APA. As the Fifth Circuit has explained, the APA's waiver of sovereign immunity applies in "two" circumstances. *Ala.-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 489 (5th Cir. 2014). It applies to claims that can be brought only under the APA, and those claims must satisfy the APA's final-agency action requirement. *Id.* But the waiver "also" applies to claims that can be brought outside the APA, including "non-statutory" review like Plaintiffs seek here. *Id.* (citing *Trudeau*, 456 F.3d at 187). For these latter claims, "[t]here is no requirement of 'finality'" for the APA's waiver of sovereign immunity to apply. *Id.* The plaintiff needs to show only "'agency action,'" not final agency action. *Id.* (quoting 5 U.S.C. §551(13)).

Plaintiffs are plainly challenging "agency action" here, whether or not that action is also final under the APA. The manual update is "agency action," even if Defendants were right that it's not a final legislative rule. *See Walmart Inc. v. DOJ*, 21 F.4th 300, 308 (5th Cir. 2021) (explaining that "agency

---

[4] Defendants suggest that Plaintiffs pleaded their claim under the APA in the complaint. *See* CFPB-Mot. 12 n.6. But Plaintiffs need not plead particular causes of action. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014). And regardless, Plaintiffs did not plead their constitutional claim exclusively under the APA. They pleaded 28 U.S.C. §1331 and the Constitution, *see* Compl. 3 ¶8, 5 ¶22, where courts locate the cause of action for nonstatutory review. *See Maxon Marine, Inc. v. Dir., Off. of Workers' Comp. Programs*, 39 F.3d 144, 146 (7th Cir. 1994). Plaintiffs also sought injunctive relief, not just vacatur under the APA, and they never mentioned the APA in their constitutional claim. *See* Compl. 22-24.

17

action" includes "non-substantive rules" that "lack the force of law," including "rules governing internal agency organization or procedures; non-binding agency policy statements; and guidance documents interpreting existing rules"); 5 U.S.C. §704 (contemplating that "agency action" can be "preliminary, procedural, or intermediate"). And the CFPB's enforcement of its UDAAP authority is likewise agency action. *See* 5 U.S.C. §551(13) (defining "agency action" to include "sanction" and "the equivalent"); §551(10) (broadly defining "sanction"). So even assuming Defendants' final-agency-action argument had merit, it would not be a reason to dismiss Plaintiffs' claim under the Appropriations Clause.

## II.   Plaintiffs are entitled to summary judgment on every claim.

Plaintiffs moved for summary judgment on every claim—one constitutional claim under the Appropriations Clause and three nonconstitutional claims under the APA. This Court should reach both sets of claims in a single decision. And Plaintiffs have the better of the argument on each claim.

### A.   Appropriations Clause

Defendants concede that, if this Court reaches the merits, then it must enter summary judgment for Plaintiffs on their constitutional claim. As Defendants note, *Community Financial* held that the Bureau's funding "violates the Appropriations Clause." CFPB-Mot. 20. While Defendants rehearse their disagreements with the Fifth Circuit's decision, *see* CFPB-Mot. 20-21, they acknowledge that their arguments are foreclosed "by binding circuit precedent," CFPB-Mot. 22. Defendants are thus correct that *Community Financial* "requires" this Court to, at a minimum, "rule for Plaintiffs" and "vacate the March 2022 revisions to the Exam Manual." CFPB-Mot. 22; *accord* CFPB-Mot. 3, 38. That outcome is required even if the Supreme Court later grants the government's petition for certiorari in *Community Financial. See United States v. Murillo-Urbina*, 140 F.3d 1037 (5th Cir. 1998) (certiorari grant does not

"vacate" the underlying precedent); *Wicker v. McCotter*, 798 F.2d 155, 158 (5th Cir. 1986) (certiorari grant "does not alter the authority of our prior decisions").

So the question on the merits is not *whether* Defendants violated the law, but in *how many ways.* Defendants ask this Court to enter judgment on Plaintiffs' "constitutional claim" while reserving decision on Plaintiffs' "non-constitutional claims." CFPB-Mot. 22. Plaintiffs, for their part, ask the Court to resolve all their claims together—in a single opinion that first says Defendants violated the Appropriations Clause and then says, in the alternative, that Defendants violated the APA. At their boldest, Defendants claim that such a decision would be an unconstitutional "advisory opinion." CFPB-Mot. 22-23. They also ask this Court to bypass the APA claims as a "matter of prudence." CFPB-Mot. 22. These arguments are way off the mark.

Decisions that rule on alternative grounds are not advisory opinions. When a court reaches the same conclusion on two independent grounds, *both* of its "alternative holdings are binding"— meaning neither is advisory. *Will v. Lumpkin*, 978 F.3d 933, 940 (5th Cir. 2020). That rule has been the law for at least a century. *E.g., Fla. Cent. R. Co. v. Schutte*, 103 U.S. 118, 143 (1880); *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 340 (1928). Alternative rulings are not advisory opinions because they are fully litigated by adverse parties, Healy, *The Rise of Unnecessary Constitutional Rulings*, 83 N.C. L. Rev. 847, 918-19 (2005), and because a seemingly unnecessary ruling can always become necessary later, Spann, *Advisory Adjudication*, 86 Tul. L. Rev. 1289, 1297 (2012). Defendants know this: As the United States has explained before, "[T]he Supreme Court and numerous other Courts of Appeal have recognized the validity of reaching alternative holdings, which are valuable tools of judicial administration and decision making." Br. of United States, *Zeno v. United States*, 2010 WL 4655324, at *17 (4th Cir. Nov. 17).

Indeed, it is "common practice" for courts to "consider and decide" issues that "may not be necessary" to their bottom-line judgment, since doing so often promotes the "important interest in

judicial economy." *United States v. Adamson*, 665 F.2d 649, 656 n.19 (5th Cir. 1982), *on reh'g*, 700 F.2d 953 (5th Cir. 1983); *e.g.*, *Fed. Ins. Co. v. Northfield Ins. Co.*, 837 F.3d 548, 554 (5th Cir. 2016) (considering an "alternative claim in the interest of judicial economy"); *Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015) (deciding an "alternate and additional ground" for reaching the same judgment); *Cruz v. Braum's, Inc.*, 2021 WL 979610, at *3 (E.D. Tex. Mar. 16) (Barker, J.) (same). When district courts issue alternative holdings, they can "avoid protracting the proceedings by obviating the need for multiple appeals." *Weisgram v. Marley Co.*, 528 U.S. 440, 452 n.9 (2000). Addressing only one ground risks a reversal on that ground, a remand to consider the other ground, and then yet another appeal. And while *appellate* courts might hesitate to reach alternative grounds because it unnecessarily creates new law, *cf.* CFPB-Mot. 22-23 (citing *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1998)), district courts don't have that problem; their decisions create no precedent and bind only the parties. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). So where a litigant should win on multiple independent grounds, district courts routinely address all of them "in the interest of judicial economy" and "to facilitate appellate review."[5]

This Court has especially good reasons to issue an alternative ruling on Plaintiffs' APA claims. As explained, the United States has asked the Supreme Court to grant certiorari in *Community Financial*. *See* Pltfs.-Mot. 9. If this Court rules solely on the Appropriations Clause here but the Supreme Court later reverses *Community Financial*, then the Fifth Circuit will likely reverse this Court and remand for

---

[5] *E.g.*, *Causey v. Cain*, 2006 WL 4043781, at *4 (E.D. La. Oct. 26) (alternatively addressing the merits "in the interest of judicial economy"); *Balez v. Bellsouth Telecomm'ns, Inc.*, 2005 WL 2010175, at *5 (M.D. La. Aug. 19) (same); *King v. Dep't of Pub. Safety & Corr.*, 2007 WL 9701279, at *1 (M.D. La. Sept. 18) (same); *Purpura v. Monroe Reg'l Med. Ctr.*, 2014 WL 12868861, at *3 n.8 (M.D. Fla. Sept. 16) (alternatively addressing the merits after finding no jurisdiction "to facilitate appellate review in the event the appellate court disagrees with the ruling regarding jurisdiction"); *Kayser v. Ocwen Loan Servicing, LLC*, 2017 WL 3578696, at *8 (D.N.J. Aug. 18) (same); *United States v. Portillo-Portillo*, 2006 WL 8443614, at *14 (D.N.M. Oct. 23) (alternatively ruling "to provide a complete record and facilitate appellate review"); *United States v. Battle*, 2013 WL 5769982, at *11 (D. Vt. Oct. 24) (same).

it to consider Plaintiffs' APA claims. Resolving those claims now will prevent this unnecessary ping-ponging. Contrary to Defendants' position, an alternative ruling that prevents an unnecessary appeal and decides every claim in one fell swoop—when this Court has all the briefing and arguments freshest in its mind—is the best way to "[c]onserv[e] scarce judicial resources." CFPB-Mot. 23. And a ruling against the government on two grounds rather than one does not implicate "comity between the branches." CFPB-Mot. 23. The best way to promote comity between the branches is to let the executive know whether and how its policies are lawful as soon as possible—not to keep its policies in limbo indefinitely.

Defendants' "wait-and-see approach" would also harm Plaintiffs and their members. CFPB-Mot. 23. Turning constitutional avoidance on its head, Defendants want this Court to rule solely on constitutional grounds. *Cf. United States v. Lovett*, 328 U.S. 303, 320 (1946) (Frankfurter, J., concurring). Their strategy is clear: If this Court rules under the Appropriations Clause alone, then Defendants will ask this Court or the Fifth Circuit to "stay the remainder of the case" until the Supreme Court decides *Community Financial.* CFPB-Mot. 24. In other words, Defendants want regulated entities to wait *years* to find out how the CFPB can use its UDAAP authority to regulate discrimination and disparate impacts. This prolonged uncertainty will harm regulated entities, who need to develop compliance protocols now. *See* Quaadman-Decl. ¶9-27 (Chamber); O'Neil-Decl. ¶¶9-24 (ABA); Smith-Decl. ¶¶10-20 (CBA); Williston-Decl. ¶¶9-26 (IBAT); Hall-Decl. ¶¶9-26 (Longview Chamber); Hamer-Decl. ¶¶9-19 (TAB); Embrey-Decl. ¶¶9-26 (TBA). And it will allow the agency to accomplish some of its regulatory goals by default, even though its new rule violates the law. The better approach is to decide all the issues that have been teed up for this Court now.

### B.      Administrative Procedure Act

While Plaintiffs are entitled to summary judgment under the Appropriations Clause, they are also entitled to summary judgment under the APA. The rule announced in the manual update violates

the APA in three separate ways: it exceeds the CFPB's statutory authority, it's arbitrary and capricious, and it failed to go through notice and comment. No wonder, since Defendants apparently thought that the rule was something that couldn't be challenged in court. *See supra* I.C. Defendants' belated attempts to defend their rule now are unpersuasive.

### 1. Statutory authority

To justify their statutory interpretation, Defendants rely mostly on misdirection. The question is not whether the CFPB can regulate conduct that meets the definition of an "unfair, deceptive, or abusive act or practice" and that also happens to be discriminatory. *Cf.* CFPB-Mot. 24. The question is whether the CFPB can treat discrimination *as* an "unfair, deceptive, or abusive act or practice"— whether it can use its UDAAP authority to grant itself new regulatory authority over the field of antidiscrimination outside of the lending context that Congress authorized. That is what the CFPB purports to do in the manual update. And that is what exceeds the agency's authority.

Despite convoluting its position in briefing, the CFPB made clear when it adopted the update that it was now treating discrimination as a UDAAP with sweeping effect.[6] The update states clearly that the CFPB now considers discrimination itself to be a UDAAP because, according to the agency, discrimination necessarily satisfies the definition. *E.g.*, UDAAP Manual 11, 13, 14, 17 (adopting the position that UDAAPs now "includ[e] discrimination"). And it treats "discrimination" as including disparate effects. *E.g.*, *id.* at 18 (instructing examiners to evaluate if an "entity has a process to take prompt corrective action if the decisionmaking processes it uses produce deficiencies or *discriminatory*

---

[6] *See, e.g.*, CFPB Blog 1 (proclaiming that the CFPB "can target *discriminatory* practices" under its authorizing statute without referencing unfairness); CFPB Press Release 1 ("We will be expanding our anti-discrimination efforts to combat discriminatory practices *across the board in consumer* finance." (emphasis added)); *id.* (The CFPB "will look at how companies test and monitor their decision-making process for unfair discrimination, as well as discrimination under [the ECOA]."); *see also id.* (CFPB examiners now "will require supervised companies to show their processes for assessing risks *and discriminatory outcomes* [i.e., "*disparate impact*"], including documentation of customer demographics and the impact of products and fees on different demographic groups." (emphasis added)).

*results*" (emphasis added)). Regulated entities must thus create compliance protocols and reevaluate products and services outside of the lending context for discrimination itself. *E.g.*, *id.* at 12 (instructing examiners to obtain documentation from regulated entities concerning "the demographics of customers using various products or services" and "any demographic research or analysis relating to marketing or advertising of consumer financial products or services").

Defendants concede that Dodd-Frank "treats unfairness and discrimination as distinct concepts." CFPB-Mot. 29. Rightly so. Congress provided the CFPB, where authorized, with the authority to protect consumers "from unfair, deceptive or abusive acts and practices *and* from discrimination." 12 U.S.C. §5511(b) (emphasis added). The use of "and" was no accident; discrimination is not a type of unfairness under the statute. *See* Pltfs.-Mot. 14. Elsewhere in Dodd-Frank, Congress was specific when it sought to include nondiscrimination in its statutory grant of authority to the CFPB. *See* 12 U.S.C. §5481(13) (addressing "fair, equitable, and nondiscriminatory access to credit"); §5493 (same). When Congress wanted to add nondiscrimination considerations to the CFPB's mix, it did so explicitly and distinctly from "unfairness" consideration—for example, the Equal Credit Opportunity Act (ECOA) and Home Mortgage Disclosure Act (HMDA). *See* Pltfs.-Mot. 16, 29-30. And when Congress defined "unfairness" in Dodd-Frank, it did not make any reference to discrimination. 12 U.S.C. §5531(c). Had Congress meant to incorporate discrimination into unfairness authority, it would have done so. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("[I]t would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope.").

Defendants also concede that "the language used to define an unfair act or practice was drawn from the Federal Trade Commission (FTC) Act." CFPB-Mot. 5 (citing 15 U.S.C. §45(n)). Right again. While Congress did not enumerate every possible example of an unfair practice in Dodd-Frank or the FTC Act, the FTC's unfairness authority has long been understood to exclude discrimination. *See* Pltfs.-Mot. 18-19. Likewise, the CFPB had not previously interpreted its UDAAP authority to

include the power to regulate discriminatory conduct as such in any past iteration of its manual. *Id.* at 13. The manual made no mention of discrimination in the UDAAP section until the 2022 update because the agency knew the concepts were distinct. *Id.* (citing 2012 UDAAP Manual (Doc. 17-12)). This understanding was consistent with the CFPB's own statements. *See* CFPB Statement (Doc. 17-17) (2021 CFPB statement recognizing that its UDAAP authority is "[i]n addition" to that granted under separate nondiscrimination statutes).[7]

Defendants' reliance on an out-of-circuit FTC case is of no help. *See* CFPB-Mot. 26 (citing *FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)). The case has nothing to do with discrimination. While the court held that "the FTC may pursue an unfair practice even if the practice is facilitated by violations of a law not administered by the FTC," it stressed that the agency's authority turns solely on whether the conduct is "'unfair,'" not whether the conduct is unfair because it satisfies some other concept. *Accusearch*, 570 F.3d at 1191, 1194-95. Indeed, the Eleventh Circuit has held that "an act or practice's 'unfairness'" must be "clear and well-established" under traditional sources; it cannot be based on broad public-policy concerns or a "general sense of the national values." *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229-31 (11th Cir. 2018). As Defendants seem to appreciate, that decision cuts against any attempt to shoehorn discrimination into the definition of UDAAP. *See* CFPB-Mot. 26.

Though they try, *see* CFPB-Mot. 31 n.18, Defendants cannot run away from the fact that their "unfairness-discrimination theory would require identifying protected classes because they are not enumerated in the FTC or Dodd-Frank Acts." AR 5561 (Doc. 17-18). Any attempt to convert its UDAAP authority into a nondiscrimination apparatus would generally require the CFPB to define protected classes and specific exemptions. *See* Pltfs.-Mot. 8 (citing *Tex. Dep't of Hous. & Cmty. Affs. v.*

---

[7] Defendants never ask for deference on their interpretation of the statute and thus have forfeited the point. *See, e.g.*, *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) ("[T]he government is not invoking *Chevron*. We therefore decline to consider whether any deference might be due its regulation." (cleaned up)).

*Inclusive Communities Project, Inc.*, 576 U.S. 519, 540 (2015)). Yet Dodd-Frank does not define these classes and does not authorize the CFPB to do so either. A freewheeling unfairness inquiry that treats everything discriminatory as automatically satisfying the first two prongs of the unfairness test would subject an entity to scrutiny based on an endless list of financial products, based solely on the unpredictable effects those products have on any number of demographic groups.

Equally problematic is the CFPB's assertion that its UDAAP authority contemplates *disparate-impact* liability. *See* Pltfs.-Mot. 19. Statutes authorize disparate-impact liability only in narrow circumstances, and Dodd-Frank's provision on UDAAPs satisfies none of them. *Infra* II.B.2. Those limits cannot be ignored, as they exist "to avoid serious constitutional questions" posed by disparate-impact liability. *Inclusive Cmtys.*, 576 U.S. at 521. Defendants' stance that its UDAAP authority now addresses disparate impacts is thus even farther afield of the limits set by Congress and the courts. Defendants apparently believe that Congress not only hid the elephant of discrimination in the mousehole of UDAAP, but that it hid a version of discrimination liability in UDAAP that even *explicit* nondiscrimination statutes usually do not (and constitutionally, cannot) cover. And Congress apparently did so without giving any guidance on how to determine whether particular outcomes are discriminatory, or even defining which classes are protected from discrimination.

Defendants' attempt to insert discrimination into UDAAP also violates the major-questions doctrine. Such a rule would have—and currently is having, to the tune of millions of dollars per year— a tremendous economic effect on Plaintiffs' members and the financial-services industry as a whole. *See* Pltfs.-Mot. 23-24. Plaintiffs' state amici echo these concerns, while also stressing the effect on the balance of state-federal power. *See* States-Br. (Doc. 21) at 13-14; *see also* CFPB Press Release 2 (Under the CFPB's proclamation, "[d]iscrimination or improper exclusion can [now] trigger liability under [the] ban on unfair acts or practices."). The CFPB's decision to overstep statutory bounds "intrud[es]

on State prerogatives and interests" by asserting new federal authority over the fields of antidiscrimination and consumer protection, where States exercise their own authority. States-Br. 8. And it does so in an especially egregious way by claiming the power to regulate disparate-*impact* discrimination—something Congress rarely authorizes and only in the clearest terms. Because the CFPB's assertion of authority "significantly alter[s] the balance between federal and state power" and has "vast economic and political significance," this Court should "'hesitate before concluding that Congress' meant to confer such authority." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021); *see also NFIB v. Dept. of Labor*, 142 S. Ct. 661, 665 (2022); *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)).[8]

For all these reasons, this Court should recognize that the update is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C).

### 2.    Arbitrary and capricious decisionmaking

The update is arbitrary and capricious because it failed to consider, in a reasoned and reasonable way, several key factors. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (agency must have "reasonably considered the relevant issues and reasonably explained the decision"). Those factors include the related history of the FTC's authority, the legal limits on disparate-impact liability,

---

[8] Defendants did not "waive" the major-questions doctrine by not briefing it "enough" in their opening motion. CFPB-Mot. 32 n.19. Plaintiffs did raise it, and the argument was supported by caselaw and all of Plaintiffs' points about how Congress did not intend to give the CFPB this broad authority. *See* Pltfs.-Mot. 17, 12-16; *cf. Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1138 (7th Cir. 1992) (even "one sentence" on an issue was enough to avoid "waive[r]"). Defendants' waiver argument also ignores that *they* filed a separate motion to dismiss and cross-motion for summary judgment, so Plaintiffs would have the right to make expanded (or even new) arguments in opposition to those motions. Plaintiffs are also allowed to "refin[e]" their arguments as the case proceeds, *Liljeberg Enterprises, Inc.*, 304 F.3d 410, 428 n.29 (5th Cir. 2002), and Defendants are not possibly prejudiced by the expanded argument in this brief. They've already spent a half-page, single-spaced footnote responding to the argument, *see* CFPB-Mot. 32 n.19, and they can spend as much time as they want on it in their reply. *See Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 51 n.14 (1st Cir. 2021) (a party "appears to concede that its waiver argument is not a winning one" when "it wrote in [a subsequent] paragraph of its reply brief" its response to the substance of the argument).

and the reliance interests implicated by its retroactive rule. *See* Pltfs.-Mot. 17-21. Defendants do not argue that they *did* consider these issues: That argument would be difficult given the agency's decision to bypass notice and comment and given the rule that agencies cannot justify rules based on retroactive reasoning that they didn't use at the time. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943). Defendants instead argue that they didn't have to consider these issues because none were "relevant." CFPB-Mot. 3. Defendants are mistaken on each issue.

   ***First***, in response to the history and limits on the FTC's authority, Defendants offer little. They raise the familiar strawman argument that Plaintiffs seek an "exception to unfairness" for discrimination. CFPB-Mot. 34. That, again, is not Plaintiffs' argument. And Defendants' mischaracterizations in their brief are not a substitute for contemporaneous, reasoned decisionmaking by the agency. *See CIC Servs., LLC v. IRS*, 592 F. Supp. 3d 677, 686-87 (E.D. Tenn. 2022); *Nat'l Ass'n of Regul. Util. Comm'rs v. ICC*, 41 F.3d 721, 726-27 (D.C. Cir. 1994). Reasoned decisionmaking was required because the FTC's authority is crucially important to understanding the CFPB's. After initially leaving the term "unfair" undefined, Congress later curtailed the FTC's use of its unfairness authority. *See* Pub. L. No. 96-252, 94 Stat. 374 (1980) (codified as amended in scattered sections of 15 U.S.C.). By codifying a constrained definition of unfairness—that does not include discrimination—Congress decidedly limited the FTC's ability to use unfairness to pursue unlimited public-policy goals. 15 U.S.C. §45(n). Just as the "unfairness" authority Congress conferred to the FTC did not cover discrimination, so too with the authority conferred to the CFPB. *See Morissette v. United States*, 342 U.S. 246, 263 (1952) (where Congress borrows terms of art from other acts, it presumably conveys the same meaning).

   ***Second***, Defendants mainly respond to Plaintiffs' arguments about disparate-impact liability by denying that the update seeks to impose it. *See* CFPB-Mot. 35. But Defendants cannot back away from their many statements to the contrary. *See* UDAAP Manual 15 (addressing determinations "that result in discrimination"); CFPB Press Release 2 (proclaiming that CFPB examiners now consider

"discriminatory outcomes"); CFPB Blog 1 (boasting that actions producing "disparate treatment or a discriminatory outcome … fall squarely within our mandate to address and eliminate unfair practices").

The CFPB's assertion that its unfairness authority can "focus on effects," without considering the Supreme Court's admonition that one can infer disparate-impact liability from statutes only in narrow circumstances, is arbitrary and capricious. *See* Pltfs.-Mot. 19-20. Specifically, the Supreme Court has required two conditions to infer that a law permits the imposition of disparate-impact liability: (1) the statute must be an antidiscrimination law, and (2) the statute must contain results-oriented language demonstrating that it is designed to impose liability for disparate-impact claims. *Inclusive Cmtys.*, 576 U.S. at 534; *see also Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*, 142 S. Ct. 1968, 1974 (2022). Dodd-Frank is (1) not an antidiscrimination law and (2) does not contain results-oriented language that supports disparate-impact liability. Defendants' assertion that Dodd-Frank's grant of unfairness authority can be read to "focus on effects" is neither true nor sufficient under the first prong of the Supreme Court's test. CFPB-Mot. 35. And Defendants considered none of these problems at the time of rulemaking.

***Third***, the CFPB did not reasonably consider or explain its decision to make its novel legal position retroactive. *See* Pltfs.-Mot. 20. What Defendants attempt to dismiss as a "hypothetical application" is a serious due-process problem that the agency failed to consider. CFPB-Mot. 36. Relatedly, Defendants contend that the agency "did not change course" by proclaiming that it has the authority to regulate discrimination under its UDAAP authority. CFPB-Mot. 36. But it plainly did, and its about-face presents a serious due-process problem. *See* Pltfs.-Mot. 6-7. Entities subject to Dodd-Frank's prohibition on UDAAPs have been operating for more than a decade now in reliance on the understanding that UDAAP is not a proxy for discrimination, nor a catch-all term for every ill that Defendants may desire to regulate. Defendants do not contest that, if the Court agrees with Plaintiffs that the

28

agency did in fact change positions, then the CFPB's failure to consider these reliance interests violated the APA. Pltfs.-Mot. 20-21; *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"). For all these reasons, the manual update is arbitrary and capricious under the APA.

### 3.    Notice and comment

Defendants make only one argument for why the manual update could bypass notice and comment: because the update is not final agency action, it cannot be a legislative rule. CFPB-Mot. 12, 19-20; *see also Texas v. United States*, 2022 WL 2109204, at *23 n.53 (S.D. Tex. June 10) ("legislative rules are necessarily final agency action" (citing *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 634-35 (D.C. Cir. 2019); *EEOC*, 933 F.3d at 441)), *cert. granted*, 143 S. Ct. 51 (2022). This argument fails because, as illustrated above, the update is final agency action. *Supra* I.C.

More precisely, a legislative rule "(1) 'impose[s] any rights and obligations' and (2) 'genuinely leaves the agency and its decision-makers free to exercise discretion.'" *Amin*, 24 F.4th at 392 (quoting *Texas*, 809 F.3d at 171). Importantly, "[t]here is some overlap in the analysis of those prongs because if a statement denies the decisionmaker discretion in the area of its coverage then the statement is binding, and creates rights or obligations." *Texas*, 809 F.3d at 171 (cleaned up). The less discretion an agency has after taking action, the more likely it is that the action amounts to a legislative rule that needed to go through notice and comment.

The manual update meets this standard. It binds agency personnel to a particular method of investigation, binds agency personnel to a novel legal position on the breadth of the agency's UDAAP authority, and expands areas of examination. *Id.*; *see also* Pltfs.-Mot. 21-24. Each feature is sufficient to comprise a legislative rule. *See McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1322 (D.C. Cir. 1988)

29

(holding that a rule was legislative because it "substantially curtails EPA's discretion" and "accordingly has present binding effect").

The update also "affect[s] individual rights and obligations." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001). As a practical matter, the update has already harmed Plaintiffs' members to the tune of millions of dollars a year, Quaadman-Decl. ¶¶16-19, by "impos[ing] conditions … beyond those required by the regulation" that existed before the new agency action. *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999). The update thus has "produce[d] … significant effects on private interests." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 236 (5th Cir. 2015). What's more, the CFPB's statements, *see, e.g.*, CFPB Blog, and Defendants' amici, Nonprofits-Br. 16-17, confirm the update's legal significance. *See Encino Motorcars*, 579 U.S. at 220 (evaluating whether the agency "intended the regulation to carry the force of law").

The government's attempt to operationalize this novel rule without opportunity for public comment imposes harm on more than just industry. It harms the consumers who are subjected to higher prices as costs of complying with regulations like this one and who might have been able to express such concern through the notice-and-comment process. States, too, "are deeply concerned with this sort of expansion of federal executive authority." States-Br. 1. They are especially concerned with agencies' increasing tendency to "bury major policy changes in memos and 'manuals' rather than go through the more difficult (but legal) process of notice and comment." *Id.* at 8. As the Supreme Court reiterated last term, federal agencies cannot regard their governing statutes as an "open book to which [they] may add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609 (cleaned up). Such actions "upset[] the balance between efficient rulemaking and democratic accountability embodied in the Administrative Procedure Act." States-Br. 10 (citing *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020)). The "essential purpose" of the notice-and-comment requirement is "to reintroduce public participation and fairness to affected parties after governmental authority has

been delegated to unrepresentative agencies." *See, e.g.*, *United States v. Reynolds*, 710 F.3d 498, 519–20 (3d Cir. 2013) (cleaned up). Defendants bypassed that democratic check here.

## III.     The Court should grant Plaintiffs' requested relief.

Because Plaintiffs prevail on the merits, they are entitled to vacatur, declaratory relief, and an injunction. Defendants concede the first two remedies but contest the third. All are available and appropriate.

### A.     Vacatur

If Plaintiffs succeed on any claim, this Court should—at a minimum—vacate the manual update. *See* Pltfs.-Mot. 25-27. Defendants concede that vacatur of the update is "an appropriate remedy" for all of Plaintiffs' claims. CFPB-Mot. 36. Specifically, binding "precedent" makes vacatur an "available" and "warranted" remedy for violations of both the APA and the Appropriations Clause. CFPB-Mot. 37-38.

Notably, vacatur is a universal remedy that extends beyond Plaintiffs and their members. *See Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022). Defendants concede this point too. While they contest Plaintiffs' right to "universal relief," their arguments concern universal *injunctions*, not universal vacatur. *See* CFPB-Mot. 40-41 & n.23. As Defendants admit, under binding Fifth Circuit precedent, vacatur "render[s] agency actions 'void'"; it serves to "erase" the agency action itself. CFPB-Mot. 40 n.23. It provides a form of "universal" relief that isn't confined to the particular "parties to a dispute." CFPB-Mot. 40 n.23. True, the government is currently asking the Supreme Court to overrule the Fifth Circuit's precedent on universal vacatur. *See* Br. of United States 39-44, *United States v. Texas*, No. 22-58, 2022 WL 4278395 (U.S. Sept. 12). But unless and until that precedent is overturned, it continues to bind this Court. In this circuit (and every other), vacatur remains an "appropriate" remedy that renders an agency action entirely "void." *Texas v. Biden*, 20 F.4th 928, 1000,

957 (5th Cir. 2021), *rev'd and remanded on other grounds*, 142 S. Ct. 2528 (2022); *e.g.*, *Chamber of Com. of U.S.A. v. DOL*, 885 F.3d 360, 388 (5th Cir. 2018) (vacating an agency rule "*in toto*").

### B.      Permanent injunction

Though Defendants agree that this Court can remedy Plaintiffs' claims through vacatur (and declaratory relief), they dispute whether this Court could also award a permanent injunction. They concede that Plaintiffs satisfy all the equitable requirements for an injunction—irreparable harm, balance of harms, and public interest. *See* CFPB-Mot. 38. But they claim that an injunction would be overly duplicative, vague, and broad. Defendants are mistaken on each point.

Vacatur does not prevent this Court from also issuing an injunction. Courts routinely issue both.[9] While Defendants are correct that an injunction shouldn't issue when it wouldn't have "any meaningful practical effect independent of vacatur," CFPB-Mot. 38, Plaintiffs easily satisfy that test here. Defendants have suggested that, even if the update were vacated, the Dodd-Frank Act would still authorize the CFPB to go after discrimination under its UDAAP authority. *See, e.g.*, CFPB-Mot. 17, 16, 14. But if Plaintiffs are correct about their constitutional or statutory-authority claims, then the CFPB lacks the constitutional funding or statutory authority to exercise that power. An injunction thus would have "'[a] meaningful practical effect'" by ensuring that the CFPB does not exercise this unlawful authority at all—either under the manual or by some other asserted means. *Franciscan All.*, 553 F. Supp. 3d at 377 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).

---

[9] *E.g.*, *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 377 (N.D. Tex. 2021) (rejecting the government's argument that a permanent injunction was duplicative with vacatur), *aff'd in relevant part*, 47 F.4th 368, 377-80 (5th Cir. 2022); *Texas v. United States*, 50 F.4th 498, 530-31 (5th Cir. 2022) (affirming the district court's grant of both vacatur and a nationwide injunction); *Shell Offshore, Inc. v. Babbitt*, 61 F. Supp. 2d 520, 529 (W.D. La. 1999) (both setting aside an order and enjoining the agency from enforcing it), *aff'd in relevant part*, 238 F.3d 622, 630-31 (5th Cir. 2011); *NAM v. SEC*, 2022 WL 16727731, at *5 (W.D. Tex. Sept. 28) (following "the ordinary practice" of granting both vacatur and an injunction).

Nor would an injunction be too vague to satisfy Rule 65. *Cf.* CFPB-Mot. 39. Rule 65 requires an injunction to "state its terms specifically; and describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 56(d)(1). This specificity requirement "is not unwieldy." *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981). And overspecificity risks exceeding this Court's proper role: "The district court cannot be expected to act as an executive or legislative agent of the state, dictating with intricate precision the policies the state should adopt in order to fulfill its statutory obligations." *Scott v. Schedler*, 826 F.3d 207, 213 (5th Cir. 2016). In this case, Plaintiffs requested an injunction "forbidding the CFPB from pursuing any examinations or enforcement actions based on the interpretation of its UDAAP authority announced in the March 2022 update." Pltfs.-Mot. 33. That injunction is sufficiently clear, especially in light of the update itself, the parties' arguments in this litigation, and what this Court will say in its opinion. *See Meyer*, 661 F.2d at 373 (affirming an order "enjoining the corporation from 'engaging in the stated unlawful employment practice'" because statements in the judgment "adequately inform[ed] defendant of the conduct prohibited"); *Scott*, 826 F.3d at 213 (explaining that an injunction restricting the defendant from "employ[ing] any oppressive child labor (as defined in Section 3(l) of the Act)" was sufficiently clear). The only source of ambiguity, according to Defendants, is whether the CFPB could continue to regulate "unfair conduct [that] is *also discriminatory*." CFPB-Mot. 39. The answer is obviously yes, which this Court can make clear in its order. And if the injunction needs to be clearer still, this Court is free to craft it differently.

Lastly, Defendants argue that an injunction should not protect anyone beyond "Plaintiffs and their members." CFPB-Mot. 40-41. The Fifth Circuit has not embraced Defendants' sweeping criticism of so-called "universal" injunctions. *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("It is not beyond the power of a [district] court, in appropriate circumstances, to issue a nationwide injunction."). But Plaintiffs do not object in principle to limiting any injunction in their favor to Plaintiffs' members. Plaintiffs do object, however, to excluding members who were not yet members "at

the time the suit was filed." CFPB-Mot. 41 n.24. Defendants cite no authority for that limitation, and

their concern with "gamesmanship" is speculative and far-fetched. CFPB-Mot. 41 n.24. Courts rou-

tinely grant injunctions that include both present and future members. *E.g.*, *NAM v. DHS*, Doc. 109,

No. 4:20-cv-4887 (N.D. Cal. Nov. 18, 2020) (covering any entity who "is a member at the time" the

government takes a future action against them, not at the time the case was filed); *Little Sisters of the*

*Poor Home for the Aged, Denver v. Azar*, Doc. 82 at 2-3, No. 1:13-cv-2611 (D. Colo. May 29, 2018)

(covering "all current and future participating employers" in the entity).

Plaintiffs would request that any such limitation not require Plaintiffs to disclose their confi-

dential membership lists to the agency. To prevent that, this Court could add a provision like the one

the government proposed in *Franciscan Alliance*. Like this case, *Franciscan Alliance* involved associational

plaintiffs whose members were "not known" to the agency. Defs.' Rule 60(b) Mot. (Doc. 208) at 1,

*Franciscan All., Inc. v. Price*, No. 7:16-cv-108 (N.D. Tex. Sept. 31, 2021). The government thus proposed

a process that would let a member choose to disclose this fact to the agency to stop an enforcement

action covered by the injunction. *See* Proposed Order (Doc. 208-1), *Franciscan All.*, No. 7:16-cv-108

(N.D. Tex. Sept. 31, 2021). The district court incorporated this process into its final order. *See Francis-*

*can All., Inc. v. Becerra*, 2021 WL 6774686, at *1 (N.D. Tex. Oct. 1).[10]

---

[10] The relevant part of the order states, in full: "HHS does not violate this order by taking any
of the above-described actions against Plaintiffs, their current or future members, or those acting in
concert or participation with them, including their respective health plans and any insurers or third-
party administrators in connection with such health plans, if the agency officials directly responsible
for taking these actions are unaware that an entity is a member of one of the Plaintiffs or has a relevant
relationship to one of the Plaintiffs/Plaintiff-members.

However, if HHS, unaware that an entity is a member of one of the Plaintiffs or has the
relevant relationship to one of the Plaintiffs/Plaintiff-members, takes any of the above-described ac-
tions, the member and the relevant Plaintiff may promptly notify a directly responsible agency official
of the fact of the member's membership or the entity's relevant relationship to the member and its
protection under this order. Once such official receives such notice from the member and verification
of the same by the relevant Plaintiff, the agency shall promptly comply with this order with respect to
such member or related entity." *Franciscan All.*, 2021 WL 6774686, at *1.

## CONCLUSION

For all these reasons, this Court should grant summary judgment for Plaintiffs and enter declaratory and permanent injunctive relief setting aside the CFPB's March 2022 manual update and forbidding CFPB from pursuing any examinations or enforcement actions based on its faulty interpretation of its UDAAP authority.

Respectfully submitted,

Dated: January 10, 2023

/s/ Cameron T. Norris

| | |
|---|---|
| Jennifer B. Dickey* | Bruce A. Smith |
| Jordan L. Von Bokern* |   SBN 18542800 |
| U.S. CHAMBER LITIGATION CENTER | WARD, SMITH & HILL PLLC |
| 1615 H Street, NW | P. O. Box 1231 |
| Washington, D.C. 20062 | Longview, TX 75606-1231 |
| (202) 463-5337 | (903) 757-6400 (telephone) |
| jdickey@uschamber.com | (903) 757-2323 (facsimile) |
| jvonbokern@uschamber.com | bsmith@wsfirm.com |
| | |
| Thomas Pinder* | Cameron T. Norris* |
| AMERICAN BANKERS ASSOCIATION | Bryan K. Weir* |
| 1120 Connecticut Ave. NW | David L. Rosenthal* |
| Washington, D.C., 20036 | CONSOVOY MCCARTHY PLLC |
| (202) 663-5035 | 1600 Wilson Blvd., Suite 700 |
| tpinder@aba.com | Arlington, VA 22209 |
| | (703) 243-9423 |
| David Pommerehn* | cam@consovoymccarthy.com |
| CONSUMER BANKERS ASSOCIATION | bryan@consovoymccarthy.com |
| 1225 New York Avenue, N.W., Suite 1100 | david@consovoymccarthy.com |
| Washington, D.C., 20005 | |
| (202) 552-6368 | *Admitted pro hac vice |
| dpommerehn@consumerbankers.com | |

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I e-filed this document on January 10, 2023, which emailed everyone requiring service.

_/s/ Cameron T. Norris_