**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>    *Plaintiffs*<br><br>    v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*,<br><br>    *Defendants.* | Case No. 6:22-cv-00381-JCB |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................................................3

INTRODUCTION...........................................................................................................................8

ARGUMENT.................................................................................................................................10

    I.    This Case Should Be Dismissed Because Plaintiffs Lack Standing and Venue Is Improper..10

           A.  Plaintiffs Lack Standing..............................................................................................10

           B.  This Court Is Not a Proper Venue..............................................................................14

           C.  Jurisdictional Discovery May Be Warranted ............................................................17

    II.    The March 2022 Revisions to the Exam Manual Were Not Final Agency Action ..................18

    III.    Plaintiffs' Appropriations Clause Claim Is Deeply Flawed ............................................22

    IV.    The Court Need Not Reach the Merits of the Non-Constitutional Claims ...............................22

    V.    The Bureau Acted Within the Scope of Its Statutory Authority .......................................24

    VI.    The March 2022 Revisions Are Not Arbitrary and Capricious .........................................30

    VII.    Plaintiffs Are Not Entitled to the Relief They Seek ..........................................................31

CONCLUSION.............................................................................................................................32

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*A.J. Taft Coal Co. v. Barnhart,*
   291 F. Supp. 2d 1290 (N.D. Ala. 2003) ............................................................................17

*Am. Airlines, Inc. v. Herman,*
   176 F.3d 283 (5th Cir. 1999) ...........................................................................................8

*Amin v. Mayorkas,*
   24 F.4th 383 (5th Cir. 2022) .....................................................................................18, 21

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet,*
   118 F. Supp. 3d 388 (D.D.C. 2015) ................................................................................23

*Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.,*
   713 F.3d 1187 (9th Cir. 2013) .........................................................................................10

*Bennett v. Spear,*
   520 U.S. 154 (1997) .........................................................................................8, 18, 19

*Brothers v. Federated Mut. Ins. Co.,*
   No. 5:18-cv-1071, 2019 WL 8063987 (W.D. Tex. June 21, 2019) ...................................16

*BST Holdings, L.L.C. v. OSHA,*
   17 F. 4th 604 (5th Cir. 2021) .........................................................................................30

*Chamber of Com. for Greater Philadelphia v. City of Philadelphia,*
   No. 17-cv-1548, 2017 WL 11544778 (E.D. Pa. May 30, 2017) .......................................12

*Chamber of Com. of U.S. v. EPA,*
   642 F.3d 192 (D.C. Cir. 2011) ........................................................................................10

*Clark & Reid Co. v. United States,*
   804 F.2d 3 (1st Cir. 1986) ...............................................................................................15

*Community Financial Services Association of America, Ltd. v. CFPB,*
   51 F.4th 616 (5th Cir. 2022) ....................................................................9, 22, 23, 24

*Crane v. Napolitano,*
   920 F. Supp. 2d 724 (N.D. Tex. 2013) ...........................................................................15

*Ctr. for Biological Diversity v. Spellmon,*
   No. 21-cv-47, 2022 WL 3541879 (D. Mont. Aug. 18, 2022) ...........................................15

*Data Mktg. P'ship, LP v. United States Dep't of Lab.,*
   45 F.4th 846 (5th Cir. 2022) .........................................................................................21

*Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
   576 U.S. 519 (2015)..............................................................................................29, 30, 31

*Do No Harm v. Pfizer Inc.*,
   No. 1:22-cv-07908, 2022 WL 17740157 (S.D.N.Y. Dec. 16, 2022).....................................10, 11, 12, 14

*Doe v. Stincer*,
   175 F.3d 879 (11th Cir. 1999)...............................................................................11

*Draper v. Healey*,
   827 F.3d 1 (1st Cir. 2016)....................................................................................10

*FAIR v. Rumsfeld*,
   291 F. Supp. 2d 269 (D.N.J. 2003)........................................................................11, 12

*FTC v. Capital City Mortgage Corp.*,
   No. 98-cv-237 (D.D.C. Feb. 2005) ........................................................................19

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015)................................................................................26, 27

*Ga. Republican Party v. SEC*,
   888 F.3d 1198 (11th Cir. 2018)............................................................................10, 11

*Hancock Cnty. Bd. of Sup'rs v. Ruhr*,
   487 F. App'x 189 (5th Cir. 2012).........................................................................17

*Hunter v. Branch Banking & Tr. Co.*,
   No. 3:12-cv-2437, 2012 WL 5845426 (N.D. Tex. Nov. 19, 2012)...........................................17

*In re First Buckingham Cmty., Inc.*,
   73 FTC 938, 1968 WL 94609 (May 20, 1968) ...........................................................27

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004) .............................................................................21

*Inst. of Certified Pracs., Inc. v. Bentsen*,
   874 F. Supp. 1370 (N.D. Ga. 1994)........................................................................15

*Lites Out, LLC v. OutdoorLink, Inc.*,
   No. 4:17-cv-00192, 2017 WL 5068348 (E.D. Tex. Nov. 2, 2017)..........................................16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).........................................................................................14, 16

*Metro Cnty. Title, Inc. v. FDIC*,
   13 F.3d 883 (5th Cir. 1994)................................................................................30

*NAACP v. Trump,*
   298 F. Supp. 3d 209 (D.D.C. 2018) ........................................................................................12

*Neirbbo Co. v. Bethlehem Shipbuilding Corp.,*
   308 U.S. 165 (1939) ..............................................................................................................15

*New York v. United States Dep't of Commerce,*
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ...................................................................................12

*Orkin Exterminating Co. v. FTC,*
   849 F.2d 1354 (11th Cir. 1988) ............................................................................................28

*S. Walk at Broadlands Homeowner's Ass'n, v. OpenBand at Broadlands, LLC,*
   713 F.3d 175 (4th Cir. 2013) .................................................................................................10

*Seariver Maritime Financial Holdings, Inc. v. Pena,*
   952 F. Supp. 455 (S.D. Tex. 1996) .......................................................................................15

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ...........................................................................................11, 12

*Summers v. Earth Island Institute,*
   555 U.S. 488 (2009) .......................................................................................................*passim*

*Taylor Energy Co. LLC v. United States,*
   2021 WL 1876845 (E.D. La. May 10, 2021) .......................................................................21

*Tenn. Republican Party v. SEC,*
   863 F.3d 507 (6th Cir. 2017) .................................................................................................10

*Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n,*
   989 F.3d 368 (5th Cir. 2021) .................................................................................................11

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ...........................................................................................18, 19

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021) .................................................................................................31

*Three Expo Events, L.L.C. v. City of Dallas,*
   907 F.3d 333 (5th Cir. 2018) .................................................................................................13

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ..........................................................................................................32

*United States v. Craig,*
   861 F.2d 818 (5th Cir. 1988) .......................................................................................9, 22, 23

*United States v. Hardrick*,
  No. CRIM.A. 10-202, 2012 WL 4883666 (E.D. La. Oct. 15, 2012)........................................23

*United States v. Harvey*,
  659 F.2d 62 (5th Cir. 1981)........................................................................................19

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ..............................................................................................29

*YAF v. Gates*,
  560 F. Supp. 2d 39 (D.D.C. 2008)................................................................................11

**Statutes**

5 U.S.C. § 706 ...........................................................................................................21

12 U.S.C. § 1818 .......................................................................................................13

12 U.S.C. § 5511 .......................................................................................................26

12 U.S.C. § 5531 ...................................................................................................*passim*

12 U.S.C. § 5536 ....................................................................................................8, 29

**Rules**

Fed. R. Civ. P. 12(b)(1) ..............................................................................................15

Fed. R. Civ. P. 12(b)(6) ..............................................................................................16

Fed. R. Civ. P. 12(h)(1) ..............................................................................................16

**Other Authorities**

Bank of America, Advancing racial equality & economic opportunity, *available at*
  https://about.bankofamerica.com/en/making-an-impact/racial-equality-economic-opportunity 13

Board of Governors and the FDIC, Financial Institution Letters, Unfair or Deceptive Acts or
  Practices by State-Charted Banks (March 11, 2004).....................................................21

Citi, Racial Equity Homepage, *available at* https://www.citigroup.com/citi/racial-
  equity/our_approach_strengthen.html........................................................................13

Compl., *FTC v. Passport Automotive Group, Inc.*,
  No. 8:22-cv-02670 (D. Md. Oct. 18, 2022) ...............................................................13

Fed. Reserve Bd., Consumer Compliance Handbook, FTC Act Sec. 5 Unfair or Deceptive Acts or
  Practices App. 1 (2016)...........................................................................................13

OCC, Comptrollers Handbook, Fair Lending...................................................................21

S. Rep. No. 63–597 (1914) ........................................................................................................28

U.S. Chamber of Commerce, Chamber of Commerce v. CFPB, *available at*
    https://www.chamberlitigation.com/cases/chamber-commerce-v-cfpb.............................................13

**INTRODUCTION**

Plaintiffs—six national and state-level membership organizations, and the Longview Chamber of Commerce—still refuse to properly name the members on whose behalf they're suing, in this challenge to revisions made by the Consumer Financial Protection Bureau (CFPB or Bureau) to its Supervision and Examination Manual (Exam Manual or Manual).  *See* Plaintiffs' Combined Reply and Opp. (Pls.' Opp.), Jan. 10, 2023, ECF No. 28.  Their identities are not matters of idle curiosity.  They are foundational elements of Article III standing that are required by Supreme Court precedent.  *See Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009).  And while the allegedly harmed members' apparent desire not to be publicly associated with this suit—the central tenet of which is that there is an atextual requirement for the Bureau to ignore discriminatory practices when assessing unfairness, *see* 12 U.S.C. §§ 5531, 5536—is understandable, it is not consistent with the law. Plaintiffs also cannot establish venue for their claims in this Court for related reasons.

Plaintiffs' jurisdictional woes extend beyond their lack of standing, to final agency action. *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999) (holding that final agency action requirement is jurisdictional).  Plaintiffs have not established that the March 2022 revisions to the Unfair, Deceptive, or Abusive Acts and Practices Chapter (UDAAP Chapter) of the Exam Manual constitute final agency action.  The revisions to the Exam Manual do not fix regulated parties' rights or obligations, nor do they carry legal consequences.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). The revisions leave the Bureau and its staff free to apply the statutory standard for unfairness to regulated parties according to its terms, *see* 12 U.S.C. § 5531, and the new procedural instructions to examiners do not have the effects necessary to constitute final agency action under *Bennett*.  The lack of final agency action sinks Plaintiffs' constitutional and non-constitutional claims alike, as they all arise under the APA.  *See* Compl., ECF No. 1, ¶¶ 80-101.

If the Court reaches the merits, then Plaintiffs appear to be entitled to relief on their

constitutional claim, under *Community Financial Services Association of America, Ltd. v. CFPB* (*CFSA*), 51 F.4th 616, 623 (5th Cir. 2022).  But the Court should not, at this juncture, reach the merits of Plaintiffs' non-constitutional claims, given the "sound judicial practice of refusing to decide or address issues whose resolution is not necessary to dispose of a case, unless there are compelling reasons to do otherwise."  *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988).  Plaintiffs provide no compelling reason for the Court to decide these claims.

In any event, Plaintiffs' non-constitutional claims fail on the merits.  To start, the Bureau acted well within its statutory authority in recognizing that discriminatory acts or practices can constitute unfairness under the Dodd-Frank Act, if they satisfy the statutory standard set out in 12 U.S.C. § 5531(c).  Plaintiffs apparently argue that the Bureau must ignore discrimination when determining whether acts or practices are unfair under the statute.  *See* Pls.' Opp. at 22-26.  But this approach is contrary to the statutory text, which contains no exception for discrimination, 12 U.S.C. § 5531(c), and which explicitly permits the Bureau to "consider established public policies," *id.* § 5531(c)(2), when determining whether an act or practice is unfair.  Plaintiffs' other arguments are no more promising.  The Bureau was not obligated to issue the March 2022 revisions through notice-and-comment rulemaking because the revisions are not a legislative rule.  And the Bureau did not act in an arbitrary and capricious manner, as explained in Defendants' opening brief.

If the Court decides that Plaintiffs are entitled to relief, then their relief should be limited to declaratory relief and vacatur of the March 2022 revisions.  But even if Plaintiffs have established some entitlement to injunctive relief, the injunction should be narrowly tailored and should not be open-ended, such that any entity can claim its benefits—even years down the line—simply by joining one of the Plaintiff organizations.

## ARGUMENT

I.   **This Case Should Be Dismissed Because Plaintiffs Lack Standing and Venue Is Improper.**

   A.   **Plaintiffs Lack Standing.**

Plaintiffs must *name* their members that have suffered injuries-in-fact.  All but one of the Plaintiffs outright refuse to name any of their members, and that refusal is fatal to their standing.  They wrongly assert that "[t]he law does not require associations to publicly disclose their members' actual names."  Pls.' Opp. at 5.  In fact, it does.  In *Summers v. Earth Island Institute*, the Supreme Court held that an association must "name the individuals who were harmed." 555 U.S. 488, 498 (2009).  Plaintiffs attempt to re-write *Summers*.  They concede that the case "uses the words 'name' and 'naming,'" but suggest the Court actually meant to say something else.  Pls.' Opp. at 7.  Not so: The Supreme Court meant what it said.  A recent decision of the Southern District of New York is instructive.  There, the plaintiff claimed standing based on "anonymous declarations" because its "members wish[ed] to remain unnamed."  *Do No Harm v. Pfizer Inc.,* No. 1:22-cv-07908, 2022 WL 17740157, at *7 (S.D.N.Y. Dec. 16, 2022).  The court found that "*Summers* [was] controlling" and dismissed the suit for lack of standing.  *Id.* at *6.  "The weight of authority in federal courts reaffirms that at least one member must be named for associational standing."  *Id.* at *7.  Those federal courts of appeals "that have addressed the naming requirement since *Summers* have repeatedly held" that an association cannot show standing "unless it names" an injured member.  *Id.* at *8; *see, e.g., Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018); *Tenn. Republican Party v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); *Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013)*; S. Walk at Broadlands Homeowner's Ass'n, v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011).  Indeed, the Fifth Circuit has recognized the naming

requirement as well.  *See Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 378 (5th Cir. 2021) ("Even though the other petitioners have not named members that manufacture the prohibited phthalates, the presence of one petitioner with standing is sufficient for Article III purposes.").

Plaintiffs contend that this rule does not apply to them because their members would prefer to be identified "by pseudonym." Pls.' Opp. at 4-7. While Plaintiffs' members may prefer not to be publicly associated with this lawsuit, they have no right to invoke the power of the federal courts without revealing their identities.  And none of the cases they cite give them that right. For one, the bulk of the cases Plaintiffs cite pre-date *Summers*, even though they concede that the best way to determine whether pseudonymous treatment "remains legitimate" is to consult "[p]ost-*Summers* cases." *Id.* at 7.  For instance, they cite *Doe v. Stincer*, 175 F.3d 879, 884–85 (11th Cir. 1999), for the proposition that an association need not "name the individual on whose behalf the suit is brought." But more recently, the Eleventh Circuit has adhered to *Summers* and has done so without so much as mentioning *Stincer*. *See Ga. Republican Party*, 888 F.3d at 1204; *see also Do No Harm*, 2022 WL 17740157, at *8 & n.3 (disregarding authorities that "pre-date *Summers*").  So *Stincer* is no longer good law—and neither are the other pre-*Summers* cases on which Plaintiffs rely.  *E.g.*, *YAF v. Gates*, 560 F. Supp. 2d 39 (D.D.C. 2008); *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269 (D.N.J. 2003).

Plaintiffs, perhaps aware that they are mostly citing bad law, stress two "[p]ost-*Summers*" decisions where an association's members remained anonymous. Pls.' Opp. at 7.  But the issue was not substantively addressed in either.  In *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020), there is no discussion of anonymity, and *Summers* is not even cited.  That is likely because the plaintiffs sought a preliminary injunction meaning they only had to show that "standing [was] likely to obtain." *Id.* at 330.  That lenient standard does not apply to Plaintiffs' request for a permanent injunction here.  Moreover, the *Speech First* plaintiffs' "First Amendment challenge [raised] unique

standing issues," not applicable here, and the court emphasized that "[i]t is not hard to sustain standing" to challenge "regulations governing bedrock political speech." *Id.* at 331.  In *NAACP v. Trump*, 298 F. Supp. 3d 209, 226 (D.D.C. 2018), the defendants abandoned the anonymity issue, and the court's analysis cites only pre-*Summers* authorities.

Plaintiffs also invoke their members' privacy rights.  They rely heavily on a footnote in *New York v. United States Department of Commerce*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019), which says that allowing associations to keep their membership secret is "one of the fundamental purposes of the associational standing doctrine."  *See* Pls.' Opp. at 6.  This assertion is wrong and results from a mischaracterization of the caselaw.  *See Do No Harm*, 2022 WL 17740157, at *9 & n.5.[1]  Plaintiffs then claim they fear retaliation.  Pls.' Opp. at 6.  But what evidence do they proffer?  None.  The mere assertion that they fear retaliation, unsupported by evidence, is not enough to warrant allowing Plaintiffs' members the right to litigate in secret.  *See Do No Harm*, 2022 WL 17740157, at *9 (noting that "[t]here are procedures for keeping information confidential in litigation, if legal standards are met").  Plaintiffs cite a single, out-of-circuit, pre-*Summers* case on the topic of retaliation, but that case was decided at the pleading stage.  *See FAIR,* 291 F. Supp. 2d at 286.  And, in any event, the plaintiffs there alleged that retaliation had "already materialized."  *Id.*  That is not the case here.

Plaintiffs also suggest that it is not necessary to reveal their members' names.  They claim because they are "the direct object" of the UDAAP authority they obviously have standing.  Pls.' Opp. at 8.  But "[i]n *Summers*, the Supreme Court did not limit its identification requirement to cases where members of an association were not the object of a challenged law."  *Chamber of Com. for Greater Philadelphia v. City of Philadelphia,* No. 17-cv-1548, 2017 WL 11544778, at *3 (E.D. Pa. May 30,

---

[1] Even assuming that *Summers'* rules for associational standing could be relaxed in light of some sort of uniquely compelling privacy interests, this case does not come close to presenting those circumstances.  Here, Plaintiffs seek to shield the compliance efforts of (we assume) large publicly traded companies from the agency Congress empowered to supervise such efforts.

2017).  And while parties that are the direct object of a regulation may "ordinarily" have standing, *Three Expo Events, L.L.C. v. City of Dallas,* 907 F.3d 333, 341 (5th Cir. 2018), it is not automatic.  They still must make "a factual showing of perceptible harm."  *Summers,* 555 U.S. at 499.

There is a real question as to whether Plaintiffs' members have been harmed.  Those members are subject to anti-discrimination laws, and they acknowledge that, even prior to the manual update, one of the Bureau's "important responsibilities" was "protect[ing] consumers against discrimination."  Chamber of Commerce v. CFPB, U.S. Chamber of Commerce.[2]  Accordingly, they have substantial compliance obligations that are unrelated to the manual update, and they may voluntarily implement non-discrimination measures for political, moral, or other reasons, as many of Plaintiffs' members have publicly announced they are doing.[3]  *See, e.g.,* Bank of America, Advancing racial equality & economic opportunity (professing a "commitment to addressing the root causes of inequality through a company-wide commitment to advancing racial equality")[4]; Citi, Racial Equity Homepage (professing "a commitment to becoming an antiracist institution" and announcing a "racial equity audit" aimed at helping "close the racial wealth gap").[5]  Thus, it is not at all clear that

---

[2] *Available at* https://www.chamberlitigation.com/cases/chamber-commerce-v-cfpb.

[3] Similarly, knowing the identities of the injured members would allow Defendants to understand what type of entities purport to be injured.  Different entities are, of course, subject to different regulators and regulations, and without this information it is impossible to assess the credibility of Plaintiffs' claims that the manual revisions caused their members to incur compliance expenses that they would not otherwise incur.  For example, given the FTC's position that discriminatory conduct can be unfair, *e.g.,* Compl., *FTC v. Passport Automotive Group, Inc.,* No. 8:22-cv-02670 (D. Md. Oct. 18, 2022) (asserting unfairness claim for discriminatory conduct), any new compliance measures undertaken by a non-bank that is subject to the FTC's enforcement authority, or a bank subject to the Federal Reserve Board's enforcement of the FTC Act, *see* 12 U.S.C. § 1818(b) (authorizing federal banking agencies to take action to stop certain improper conduct);  Fed. Reserve Bd., Consumer Compliance Handbook, FTC Act Sec. 5 Unfair or Deceptive Acts or Practices App. 1, 7 (2016) (explaining that, through § 1818, the Federal Reserve Board has the authority to enforce the unfairness provision of the FTC Act and that, when determining whether a practice is unfair, the Board is guided by FTC practice), may not be attributable to the Bureau's manual revisions.

[4] *Available at* https://about.bankofamerica.com/en/making-an-impact/racial-equality-economic-opportunity.

[5] *Available at* https://www.citigroup.com/citi/racial-equity/our_approach_strengthen.html.

the Exam Manual revisions resulted in *new* compliance costs, and without the allegedly injured members' names, there is no way to know. *See Do No Harm*, 2022 WL 17740157, at *9. Plaintiffs' refusal to name their members has denied Defendants the chance to point to evidence in the public record (or in the Bureau's possession) that tends to contradict their anonymous, self-serving allegations—and denied this Court the complete record necessary to establish jurisdiction.

For these reasons, those Plaintiffs that have not named their allegedly injured members do not have standing and should be dismissed. Plaintiffs, however, argue that the Consumer Bankers Association (CBA) has identified members who were injured. Pls.' Opp. at 4. Plaintiffs point to a list attached to an affidavit from a CBA executive that purports to identify CBA's members that are supervised by the Bureau. Smith Decl., ECF No. 17-3, ¶ 7. But the affidavit does not mention any of the supervised members by name or attest to any particular injury that any specific supervised member suffered. Instead, it asserts that its membership has generally implemented "enhanced compliance programs." *Id.* ¶ 16. This generic boilerplate falls far short of the "specific facts" that are required to establish standing at summary judgment. *Summers*, 555 U.S. at 498 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

### B.     This Court Is Not a Proper Venue.

The Longview Chamber of Commerce is the only Plaintiff that resides in this district. But the Longview Chamber, like its co-Plaintiffs, refuses to reveal which of its members have allegedly been harmed. That refusal is fatal to its standing. Absent standing, the Longview Chamber must be dismissed. And the dismissal of the venue-creating Plaintiff means venue is improper.

Plaintiffs offer two theories as to why this case should proceed in this District even if the Longview Chamber lacks standing. First, they assert that the Longview Chamber "can create venue even if it ultimately lacks standing." Pls.' Opp. at 10. Second, they claim that even if the Longview Chamber must have standing, the question is "whether … standing was plausibly *alleged* in the

*complaint*" not whether it has been shown at summary judgment.  *Id.*

Both theories are wrong.  Let's begin with the suggestion that the venue-creating plaintiff need not show standing.  This approach would beget absurdity.  Any plaintiff could manufacture venue by joining a sham plaintiff who resides in the chosen district but has no stake in the outcome of the dispute.  The sham plaintiff would be dismissed under Rule 12(b)(1) soon enough.  But the case would march on to the merits in the chosen forum, and the statutory venue provisions would be made a farce.  No court has endorsed this approach.  To the contrary, courts have held that Plaintiffs cannot "manufacture venue by adding . . . a party" that "lacks standing to bring th[e] action."  *Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) (cleaned up). The party that creates venue "must have standing."  *Clark & Reid Co. v. United States*, 804 F.2d 3, 5 (1st Cir. 1986).  That's why courts routinely find venue to be improper when the venue-creating plaintiff comes up short on standing. *E.g., Ctr. for Biological Diversity v. Spellmon*, No. 21-cv-47, 2022 WL 3541879, at *3 (D. Mont. Aug. 18, 2022); *see also* Defs.' Mot., Dec. 20, 2022, ECF No. 22, at 11.

Plaintiffs fail to cite a single case where the venue-creating plaintiff was dismissed for lack of standing but venue was nonetheless held proper.  The cases Plaintiffs cite are irrelevant and mischaracterized.  Pls.' Opp. at 10.  Take, for instance, *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939), which Plaintiffs offer as support for their claim that "a plaintiff can create venue even if it lacks standing."  It says no such thing.  Rather, it makes the observation that venue objections, unlike jurisdictional objections, are waivable.  Same with *Seariver Maritime Financial Holdings, Inc. v. Pena*, 952 F. Supp. 455, 459 (S.D. Tex. 1996).  There, the court rejected the argument that "the place of injury is relevant to the venue decision."  *Id.*  Nobody is making that argument here.  And in *Crane v. Napolitano*, 920 F. Supp. 2d 724, 747 (N.D. Tex. 2013), the Court held the venue-creating plaintiff *did have standing*.  So, of course, venue was proper.

Plaintiffs go on to say that, even if the Longview Chamber must show standing, it can do so

purely in reference to the allegations in its complaint because venue is determined once and for all at the "outset of [the] litigation." Pls.' Opp. at 10. This theory fails too. First, we are at the outset of this litigation. Defendants raised the issue of venue at their earliest opportunity. Plaintiffs intimate that it is too late for the court to consider venue. But there is no serious argument that venue has been waived. *See Lites Out, LLC v. OutdoorLink, Inc.*, No. 4:17-cv-00192, 2017 WL 5068348, at *4 (E.D. Tex. Nov. 2, 2017) (no waiver where defendant "did not delay, deny, or defer its objection for improper venue"); *see also* Fed. R. Civ. P. 12(h)(1). And courts commonly hear motions to dismiss for improper venue at the same time as cross-motions for summary judgment. *E.g., Brothers v. Federated Mut. Ins. Co.*, No. 5:18-cv-1071, 2019 WL 8063987, at *2 (W.D. Tex. June 21, 2019). Defendants timely raised their venue defense.

The only question is what legal standard governs that defense. Plaintiffs are correct that a motion to dismiss for improper venue is generally considered under a similar standard to a motion to dismiss under Rule 12(b)(6). *Id.* But what Plaintiffs miss is that no venue-relevant facts are in dispute. Everyone agrees that the Longview Chamber resides in this District and, therefore, if it is a proper party to this litigation, then venue is also proper. What is in dispute, however, is whether Longview Chamber should even be a party to this case. And that is a jurisdictional question that must be resolved using the summary judgment standard. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[Standing] must be supported … with the manner and degree of evidence required at the successive stages of the litigation.").

So, the Court should first consider standing, which is evaluated under the summary judgment standard. Under that standard, the Longview Chamber must be dismissed. The court should then dismiss the remainder of the case because the venue-creating plaintiff is no longer a party. Plaintiffs protest that venue cannot be lost due to events "subsequent" to filing, including the dismissal of the venue-creating plaintiff. Pls.' Opp. at 10. But Defendants' arguments do not hinge

16

on subsequent events:  the Longview Chamber should be dismissed because it was *never* injured and *never* had standing.  *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1303 (N.D. Ala. 2003), cited by Plaintiffs, illustrates the point.  The venue-creating plaintiffs were dismissed because subsequent factual developments rendered their claims moot.  But the court first assured itself that "[v]enue [was] proper … because at least one [venue-creating] plaintiff had standing."  *Id.* at 1304.  While it assessed the plaintiffs' standing "at the time of filing," it did so in reference to the full record and did not limit its analysis to the pleadings.  *Id.* at 1306.  That is what this court should do as well.

But even if Plaintiffs are correct and the Longview Chamber's standing must be assessed on the pleadings, venue is still improper.  The Longview Chamber is only referenced in a single sentence in the Complaint.  ECF No. 1, ¶ 12.  That sentence makes no mention of any injuries suffered by any of its members.  Plaintiffs are, *at minimum*, required to plead some "general factual allegations of injury."  *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012).  The allegations pertaining to the Longview Chamber fail to satisfy even that lenient standard.

## C.     Jurisdictional Discovery May Be Warranted.

This case should be dismissed for lack of standing or for improper venue.  But if the Court disagrees, it should, at minimum, authorize a period of jurisdictional discovery before adjudicating the merits.  Limited jurisdictional discovery will allow Defendants to determine whether Plaintiffs' members have been injured by the manual update.[6]

---

[6] Contrary to Plaintiffs' suggestion, Defendants did not "waive[ ] their right to discovery."  Pls.' Opp. at 8.  Defendants previously stated that they "believe … no discovery is needed."  Jnt. Mot. for Stip. Order, Nov. 10, 2022, ECF No. 15, at 3.  That belief has proven unfounded now that Plaintiffs have elected to stonewall rather than name their injured members in compliance with *Summers*.  In any event, standing cannot be waived, and the Court has "substantial discretion" to "devise a method to make a determination as to jurisdiction."  *Hunter v. Branch Banking & Tr. Co.*, No. 3:12-cv-2437, 2012 WL 5845426, at *1 (N.D. Tex. Nov. 19, 2012) (cleaned up).  The Court is free to exercise that discretion if it believes a more complete record is necessary to establish Plaintiffs' Article III standing.

II.     **The March 2022 Revisions to the Exam Manual Were Not Final Agency Action**.

The Court should dismiss Plaintiffs' complaint for lack of final agency action.  *See* Defs.'

Mot. at 12-20; *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (defining final agency action, in relevant part,

as an action "by which rights or obligations have been determined, or from which legal

consequences will flow" (quotation marks omitted)).  The Exam Manual is an employee manual that,

for more than ten years, has provided advice and direction to the Bureau's employees in the

discharge of their duties, and the revised text does not fix regulated parties' rights or obligations, or

carry legal consequences.  Defs.' Mot. at 12-20.  The statutory standard for unfairness, 12 U.S.C.

§ 5531—not the Exam Manual—determines rights and obligations.  Fifth Circuit precedent

confirms that the Manual is not final agency action.  *See Amin v. Mayorkas*, 24 F.4th 383, 392 (5th Cir.

2022).  For related reasons, the Bureau was not required to issue the Exam Manual through notice

and comment rulemaking.  Defs.' Mot. at 19-20.

Plaintiffs (predictably) disagree.  Their disagreement hinges primarily on two arguments.

First, Plaintiffs assert that "[t]he manual update binds agency personnel to a particular method of

investigation—characteristic of a final agency action."  Pls.' Opp. at 13.  Second, they contend that

the Exam Manual "binds CFPB staff to a new and novel legal interpretation of UDAAP. . . ."  *Id.*

Neither argument has merit.

Providing instructions to agency personnel about a "particular method of investigation" does

not constitute a final agency action.  It does not establish the regulated parties' rights or obligations

or carry legal consequences.  *See Bennett*, 520 U.S. at 178.  This differentiates the Exam Manual from

the document at issue in *Texas v. EEOC*, in which the Fifth Circuit held that an "agency guidance

document" that binds "it and its staff to a *legal position* produce[s] legal consequences or determine[s]

rights and obligations, thus meeting the second prong of *Bennett*."  933 F.3d 433, 441 (5th Cir. 2019)

(emphasis added).  The document at issue in that case constituted final agency action because,

among other things, it "prescribe[d] a multi-factor framework" for regulated parties to use and which EEOC employees "must presumptively follow" to determine whether a regulated party complied with governing law. *Id.* But while the UDAAP Chapter of the Exam Manual directs examiners regarding examination objectives and procedures (to the extent unfairness is within the scope of a given examination), it does not bind examiners' assessment of whether any particular conduct should be cited as an unfair practice, i.e., it does not bind the Bureau or its staff to a *legal position*. *See* UDAAP Chapter, ECF No. 1-2, at 1-3. It is not the case that every agency document that binds agency employees is per se final agency action. If the Bureau instructed examiners to staple their internal reports on the left side, that would not establish rights or obligations or carry legal consequences for regulated parties. *See EEOC*, 933 F.3d at 441. Similarly, the Exam Manual's revised procedural directions to examiners do not constitute final agency action.[7] *Cf. United States v. Harvey*, 659 F.2d 62, 65 (5th Cir. 1981) (explaining, in the context of a VA loan servicing manual with permissive language, that "courts have likewise refused to give such internal policy pronouncements the force and effect of law").

Relatedly, Plaintiffs insist that "Defendants' argument that the update does not require anything of regulated entities . . . leaves parties with a false choice: either face the potential consequences of expanded UDAAP scrutiny or establish the policies and procedures to mitigate those concerns today." Pls.' Opp. at 14. Not so. Defendants' argument focuses on the standard set out by *Bennett*, which establishes that an agency action is final only if the action is one by which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett*, 520 U.S. at 178 (quotation marks omitted). The instructions to examiners do not establish examined

---

[7] Plaintiffs assert in a footnote that it was "ironic[ ]" that Defendants cited to the Exam Manual rather than, among other things, a court case when providing an example of what constitutes an unfair practice. Pls.' Opp. at 14 n.3. No irony here: the referenced example in the Manual is a summary of a district court decision. *See* Defs.' Mot. at 35; UDAAP Chapter, ECF No. 1-2, at 3 n.7 (citing *FTC v. Capital City Mortgage Corp.*, No. 98-cv-237 (D.D.C. Feb. 2005)).

parties' rights or obligations—they are directions to examiners about the information that may be relevant when identifying potential violations of the consumer laws.  *See, e.g.,* UDAAP Chapter, ECF 1-2, at 11-12 (identifying documents to be reviewed).  Nor does the Exam Manual have "direct and appreciable legal consequences," as required by *Bennett.  Id.*  If an examined party does not have some document or information that an examiner asks for, then that fact is simply one consideration that the examiner must account for when assessing the whole of the information gathered during the examination, and, in response, the Bureau ultimately may do a number of things—including nothing. *See* Defs.' Mot. at 14 n.8.[8]

Plaintiffs' argument that the Exam Manual "binds CFPB staff to a new and novel legal interpretation of UDAAP," Pls.' Opp. at 13, is no more successful.  The Manual does not bind CFPB staff to any interpretation of unfairness, much less a "new and novel one."  The Manual recites the *statutory* elements of unfairness, *see* UDAAP Chapter at 1-2, ECF 1-2, and identifies factors for the examiner to consider when assessing practices under the statutory standard.  For example, the Exam Manual states that "[f]oregone monetary benefits or denial of access to products or services, like that which may result from discriminatory behavior, *may* also cause substantial injury."  *Id.* at 2 (emphasis added).  There is nothing binding about this language, or similar language used elsewhere in the Manual.  *See, e.g., id.* ("Nevertheless, in certain circumstances, such as . . . discriminatory conduct, emotional impacts or dignitary harms may amount to or contribute to substantial injury.").  Indeed, in *Amin*, the policy memorandum at issue used significantly more directive language than this—it delineated the two-part legal standard that officers "should" use when evaluating certain visa applications—and yet the Fifth Circuit concluded that memorandum

---

[8] Relatedly, Plaintiffs argue that the Exam Manual "expand[s] the substantive scope of [the Bureau's] supervision."  Pls.' Opp. at 13.  But, as explained above the Exam Manual does not impose any legal obligations on examined parties, nor (as explained below and in Defendants' opening brief) does it "expand" the definition of unfairness.  *See* Defs.' Mot. at 17-19.  Thus, the March 2022 revisions to the Exam Manual do not constitute final agency action.

was "phrased in permissive language." *Amin*, 24 F.4th at 392; *see Amin* Memo at 5 (attached as Ex. 2 to Defs.' Mot.).  The plain meaning of terms like "may" and "typically," bolstered by *Amin*'s holding, demonstrates that the Manual does not bind the CFPB staff to any legal interpretation.

Moreover, recognizing that discriminatory conduct that satisfies the statutory standard for unfairness is unfair did not constitute an interpretation of the unfairness standard, much less a "new" or "novel" one.  There was no statutory exception for discrimination after the Bureau issued the March 2022 manual revisions, just as there was none before.  *See* 12 U.S.C. § 5531.  In other words, the March 2022 manual revisions "left the world just as it found it, and thus cannot be fairly described as . . . interpreting . . . law or policy." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (Roberts, J.).  Nor was there anything "new" or "novel" about acknowledging that discriminatory conduct can be unfair.  *See, e.g.*, Financial Institution Letters, Unfair or Deceptive Acts or Practices by State-Charted Banks, Board of Governors and the FDIC, March 11, 2004 (ADMINRECORD 02491); OCC, Comptrollers Handbook, Fair Lending (ADMINRECORD 2657).[9]  Indeed, even Plaintiffs admit that the Bureau can "obviously" "regulate unfair conduct that is also discriminatory."  Pls.' Opp. at 33 (cleaned up).

Finally, as Defendants explained in their opening brief, the March 2022 manual revisions did

---

[9] Plaintiffs argue that their constitutional claim survives even absent final agency action because it is not (necessarily) an APA claim and the common law provides a cause of action and waiver of sovereign immunity in these circumstance.  *See* Pls.' Opp. at 16-18.  But Plaintiffs' constitutional claim is an APA claim (i.e., they rely on the APA for their cause of action):  the constitutional claim "repeat[s] and reincorporate[s]" prior APA allegations, Compl. ¶ 95; the constitutional claim uses the language of the APA, *compare* Compl. ¶¶ 96 and 101 (using the terms not "in accordance with law" and "set aside") with 5 U.S.C. § 706(2); Plaintiffs seek the APA-specific remedy of vacatur as relief for their constitutional claim, *see* Pls.' SJ. Br. at 25 (contending that "vacatur is an appropriate remedy for the CFPB's violations of the Appropriations Clause"), *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022); and the Complaint makes no mention of a nonstatutory claim or the ultra vires doctrine, terms that one would expect to see if the Plaintiffs' constitutional claim were a non-APA claim.  *See, e.g., Taylor Energy Co. LLC v. United States*, 2021 WL 1876845, at *3 (E.D. La. May 10, 2021).  Thus, Plaintiffs' constitutional claim falls for lack of final agency action.

not constitute a legislative rule that needed to be enacted through notice and comment because they did not create rights, obligations, or legal consequences, nor did they bind the Bureau to a legal position.  *See* Defs.' Mot. at 19-20.  In their response, Plaintiffs attempt to bolster the fruitless legal arguments laid out above, *see* Pls.' Opp. at 29-30, with two policy arguments.  Neither is persuasive.  First, they assert that declining to engage in notice and comment "harms the consumers who are subjected to higher prices . . . who might have been able to express such concern through the notice-and-comment process."  Pls.' Opp. at 30.  This argument is unconvincing:  Policy arguments do not trump the law; unfair conduct (including unfair conduct that is discriminatory) carries costs of its own if left unabated; and no consumer group has lodged a brief in support of Plaintiffs' suit.  *Cf.* Amicus Brief, National Consumer Law Center, *see* ECF No. 26 (opposing suit).  Plaintiffs also suggest that the March 2022 revisions allow the Bureau to evade public accountability because the changes were "bur[ied]" in the Exam Manual. Pls.' Opp. at 30-31.  Again, the APA determines when notice-and-comment rulemaking is required, and it wasn't here.  In any case, Plaintiffs' argument fails on its own terms:  The changes to the Manual were not made under cover of night; they were widely publicized by the Bureau, *see* ECF No. 17-11.

## III.    **Plaintiffs' Appropriations Clause Claim Is Deeply Flawed.**

Defendants respectfully submit, for reasons previously explained, *see* Defs.' Mot. at 20-22, that *CFSA v. CFPB*, 51 F.4th 616 (5th Cir. 2022), is mistaken.

## IV.    **The Court Need Not Reach the Merits of the Non-Constitutional Claims.**

In their opening brief, Defendants urged the Court, in light of *CFSA*, to avoid unnecessarily deciding Plaintiffs' non-constitutional APA claims, as Plaintiffs have admitted that a decision in their favor on the constitutional claim would afford them "full relief," Pls.' SJ Br., ECF No. 17, at 9.  Defs.' Mot. at 22-24; *see also United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988).  Defendants also noted that the Court could award temporary relief to Plaintiffs on their constitutional claim under

*CFSA* and, then, stay the remainder of the case to allow Defendants' pursuit of further review of *CFSA* to play out before determining how or whether to resolve Plaintiffs' non-constitutional claims.  Defs.' Mot. at 23-24.

Plaintiffs take a different view, though they never dispute that a decision in their favor on the constitutional claim would afford them "full relief."  Plaintiffs insist that the "sound practice" of unnecessarily deciding questions of federal law applies only to courts of appeal, and not district courts, because district court decisions "create no precedent and bind only the parties."  Pls.' Opp. at 20.  Plaintiffs cite no support for this proposition, and, to the contrary, district courts have cited and followed *Craig*.  *See United States v. Hardrick*, No. CRIM.A. 10-202, 2012 WL 4883666, at *5 (E.D. La. Oct. 15, 2012); *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 397 (D.D.C. 2015).  Moreover, the argument that the unnecessary resolution of issues in a district court is of no concern because the decisions  "create no precedent and bind only the parties," Pls.' Opp. at 20, lacks force when the Plaintiffs seeks a "universal remedy" (vacatur) and an opt-in injunction that future members of their organizations can benefit from simply by joining, *id.* at 31, 33-34.

Plaintiffs next assert that the best way to conserve resources is to issue a decision on the non-constitutional issues now, whether they need to be decided or not, to avoid unnecessary appeals (that might occur if the issues were separated and the subject of separate appeals) and while the issue is "freshest in [the Court's] mind." *Id.* at 21.  But a stay would eliminate the concern over the possibility of separate appeals, and the potential to save unnecessary work such as oral argument and opinion writing should outweigh the risk of having to re-read a few briefs.  Similarly unavailing is Plaintiffs' argument that "[t]he best way to promote comity between the branches is to let the executive know whether and how its policies are lawful as soon as possible," Pls.' Opp. at 21.  Unnecessarily telling the Executive Branch that it violated the APA—which it did not—would not demonstrate mutual respect.  Finally, Plaintiffs' argument that they would be harmed by a stay

because they "need to develop compliance protocols now" lacks merit.  *Id.*  The March 2022 revisions do not require Plaintiffs' members to do anything.  And, in any case, Plaintiffs do not demonstrate how the issuance of temporary injunctive relief on the constitutional claim, accompanied by a stay of the other claims pending final resolution in *CFSA*, would place Plaintiffs' members in a worse position than they are in now.

## V.    The Bureau Acted Within the Scope of Its Statutory Authority.

The March 2022 revisions to the Exam Manual did not exceed the Bureau's statutory authority.  Defs.' Mot. at 24-32.  There is no discrimination exception to the statutory unfairness standard , *see* 12 U.S.C. § 5531, so the Bureau acted appropriately by acknowledging that fact.  To the contrary, the unfairness standard is a broad one, Defs.' Mot. at 25-27, the application of which may be informed by considerations of public policy, 12 U.S.C. § 5531(c)(2).

Plaintiffs contend that Bureau exceeded its statutory authority by treating discrimination as an unfair practice, asserting that text, history, and common sense forbid it.  Pls.' Opp. at 22-25.  They also insist that the Bureau improperly imported disparate-impact analysis into the unfairness standard and that the March 2022 revisions trigger the major questions doctrine.  *Id.* at 25-26.

These arguments are flawed, and they will be refuted point by point.  But first, it makes sense to (i) clarify the nature of the parties' underlying disagreement (i.e., what's at stake) and, relatedly, (ii) correct a misapprehension of Defendants' argument that pervades Plaintiffs' brief.  First, the stakes.  While Plaintiffs admit that Defendants can "regulate unfair conduct that is also discriminatory," *id.* at 33, they maintain that Defendants cannot "treat discrimination *as*" an unfair practice, *id.* at 22.  The precise meaning of Plaintiffs' position is not clear.  For instance, if a bank refused to open a bank account for a consumer on the basis of race or religion and that conduct met the statutory standard for unfairness, *see* 12 U.S.C. § 5531(c)(1), would that be "unfair conduct that is also discriminatory" (which Plaintiffs concede the Bureau may regulate)?  Or would concluding such

conduct is unfair constitute treating discrimination "*as*" an unfair practice (which Plaintiffs say the Bureau can't do)?  Considering Plaintiffs' filings as a whole, it seems that Plaintiffs believe that the Bureau must ignore the fact that conduct is discriminatory when assessing whether it is unfair.  *See* Pls.' Opp. at 22-26.  Defendants disagree, and for good reason: that view would be inconsistent with the statute's plain language, especially as the statute permits the Bureau to consider public policy when determining whether conduct is unfair, 12 U.S.C. § 5531(c)(2).  What Defendants have not done, and here we arrive at the second goal of this paragraph, is decree that "discrimination necessarily satisfies the definition [of unfairness]," Pls.' Opp. at 22, or "treat[ ] everything discriminatory as automatically satisfying the first two prongs of the unfairness test," *id.* at 25.  These are straw men.  Nothing in the Exam Manual indicates that discriminatory conduct necessarily satisfies any of the statutory elements.[10]  *See* UDAAP Chapter at 2-3, ECF 1-2.  Nor, as a logical matter, would discriminatory conduct ineluctably satisfy the unfairness standard, especially in view of the reasonable avoidability element of the standard.  *See* 12 U.S.C. § 5531(c)(1)(A).  Moreover, since the Bureau's position is that discriminatory conduct can be (but is not necessarily) unfair, and Plaintiffs concede that everyone has always understood that conduct can be unfair even if it is also discriminatory, it is unclear whether and to what extent Plaintiffs actually disagree with the Exam Manual's recitation of the law.[11]  Having set the stage, it now makes sense to explain in detail where Plaintiffs' arguments go wrong.

    Take first Plaintiffs' textual argument.  It rests on two pillars.  The first is that discriminatory conduct cannot be unfair because Congress used the word "and" to separate the phrases "unfair,

---

[10] While the Exam Manual states that "[c]onsumers cannot reasonably avoid discrimination," it uses permissive language to explain "that consumers *typically* cannot avoid the *harms* of discrimination." UDAAP Chapter, ECF No. 1-2 at 2,3 (emphasis added).  The latter statement is the legally relevant one, as the statutory standard focuses on the avoidability of the "substantial injury."  *See* 12 U.S.C. § 5531(c)(1)(A).

[11] This uncertainty makes it all the more appropriate for the court to wait to decide Plaintiffs' statutory claims until it is actually necessary to do so.

deceptive, or abusive acts and practices" from the word "discrimination" when setting out the Bureau's objectives. *See* 12 U.S.C. § 5511(b)(2); Pls.' Opp. at 23. The second is that, according to Plaintiffs, "Congress was specific when it sought to include nondiscrimination in its statutory grant of authority to the CFPB," but "when Congress defined 'unfairness' in Dodd-Frank, it did not make any reference to discrimination." Pls.' Opp. at 23.

Neither pillar supports Plaintiffs' argument. Congress's use of the word "and" is too thin of a reed on which to determine that, as a categorical matter, the Bureau's unfairness authority requires it to turn a blind eye to the discriminatory nature of an entity's conduct. To be sure, discrimination is a distinct concept from unfairness. Distinct does not mean mutually exclusive, however, and Plaintiffs' claim depends on the concepts being mutually exclusive (i.e., that discrimination cannot be unfair). Plaintiffs offer no support for the proposition that "and" in § 5531 indicates that the item that follows is mutually exclusive from the ones that precede it. Use of the word "and" does not, as a logical matter, denote mutual exclusivity. For example, if a person states that they like "juice, coffee and milk," one would not assume that the person only drinks their coffee black. Importantly, courts have recognized that the other distinct concepts in the statute overlap, namely, the distinct prohibitions on unfair conduct and deceptive conduct. *See* 12 U.S.C. § 5531(a) (separately listing "unfair" and "deceptive" practices); *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245 (3d Cir. 2015) (collecting cases discussing the overlap). In short, Congress could have instructed the Bureau to ignore discrimination, but it didn't do so when it defined "unfair," 12 U.S.C. § 5531(c)[12]—and it didn't so when it used the word "and" in § 5511.

Plaintiffs' second argument—that discriminatory conduct cannot be unfair because the word "discrimination" is not used in § 5531—is no more persuasive. To the extent Plaintiffs argue that

---

[12] Indeed, Congress specifically authorized the Bureau to consider public policy. 12 U.S.C. § 5531(c)(2).

Congress used the word "discrimination" every time it wanted discrimination to be relevant, that argument fails because it assumes the conclusion it seeks to prove. Pls.' Opp. at 23. Moreover, Congress chose to define unfairness broadly in light of the many kinds of unfair conduct that can exist. Defs.' Mot. at 25, 27. An act or practice need not be mentioned by category to be unfair. For example, the word "deceptive" is not used in the definition of unfairness, but deceptive practices can be unfair. *See Wyndham Worldwide Corp.*, 799 F.3d at 245. Were it otherwise, the unfairness standard would be gutted: application of Plaintiffs' magic words test would create an infinite number of atextual exceptions.

Plaintiffs' argument from history is similarly a dud. They contend that the FTC's unfairness authority—from which the CFPB's authority derives—"has long been understood to exclude discrimination." Pls.' Opp. at 23. In support of this proposition they cite two pages of their opening brief which argue, in relevant part, that Congress codified a definition of unfairness that does not use the word discrimination. Pls.' SJ Br. at 18-19. But this argument collapses for the same reason as the arguments above: it concludes that a failure to specifically reference discrimination as an unfair practice creates an atextual exception to unfairness, contrary to logic, legislative history, and the text of the statute. The argument also ignores the actual history of the application of the Federal Trade Commission Act, under which the Commission declined to recognize a discrimination exception to the related prohibition on deceptive acts and practices. *See In re First Buckingham Cmty., Inc.*, 73 FTC 938, 1968 WL 94609 (May 20, 1968) (ADMINRECORD 00006-00012). Plaintiffs next assert that the prohibition on unfair acts and practices must exclude discriminatory acts because the Exam Manual did not mention discrimination in relation to unfairness before the March 2022 update. Pls' Opp. at 23-24. A manual cannot amend a statute, however, so the absence of any mention of discrimination in the Exam Manual does not change the fact that there is no discrimination exception to the unfairness standard. *See* 12 U.S.C. § 5531(c).

Moving from history to logic, Plaintiffs maintain that, to be workable, "[a]ny attempt to convert its UDAAP authority into a nondiscrimination apparatus would generally require the CFPB to define protected classes and specific exemptions," and that the law does not create any such classes and exemptions or authorize the Bureau to create them. Pls.' Opp. at 24-25. This argument is flawed. The Bureau is not "convert[ing] its UDAAP authority into a nondiscrimination apparatus," rather, it is declining to conjure an atextual exception to unfairness (for discrimination) out of thin air. What is more, Plaintiffs' argument reads like an objection to the breadth of the unfairness standard, but Congress—not the Bureau—chose to make unfairness a broad standard, and sensibly so. *See* Defs.' Mot. at 25, 27. As noted in the legislative history of the related FTC Act, "there [a]re too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others." S. Rep. No. 63–597, at 13 (1914).

Plaintiffs next raise arguments about disparate-impact liability. Specifically, they contend that the Bureau has asserted that its "UDAAP authority contemplates disparate-impact liability" and that this is problematic because Dodd-Frank does not mention disparate-impact liability or contain the guardrails needed to obviate the "serious constitutional questions" posed by disparate-impact liability. Pls.' Opp. at 25. This argument falters at the premise and goes downhill from there. The Bureau has not claimed that the unfairness standard is the same as a disparate-impact liability standard. As support for their claim, Plaintiffs cite instances of Bureau officials indicating that, under the unfairness standard, effects matter and there is no intention requirement. *See* Pls.' Mot. at 19. But that there is no intent requirement under the unfairness standard is black letter law. *See, e.g., Orkin Exterminating Co. v. FTC,* 849 F.2d 1354, 1368 (11th Cir. 1988). And a focus on effects does not equal the imposition of disparate-impact liability. Defs.' Mot. at 34-35. Indeed, to the contrary, the Bureau has made it quite clear, *see id.* at 34-35, that the statutory test for unfairness stands on its own two feet. For example, the unfairness standard requires consideration of whether harm was

"reasonably avoidable" by the consumer, 12 U.S.C. § 5531(c)(1)(A), whereas avoidance of harm is not a consideration under traditional disparate-impact analysis, *see Department of Housing & Community Affairs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 533 (2015). The difference between the standards for unfairness and disparate-impact liability explains why Dodd-Frank does not mention disparate-impact liability: The Dodd-Frank Act, in 12 U.S.C. § 5536, does not prohibit acts under a disparate-impact standard; it prohibits (among other things) unfair acts and practices under the distinct standard set out in 12 U.S.C. § 5531.

Nor does the unfairness standard raise any serious constitutional questions. In *Inclusive Communities*, 576 U.S. at 540, the Supreme Court stated that disparate-impact liability could raise "serious constitutional questions" (apparently related to quotas, *id.* at 543), if not properly limited. The only example the Court gave was that constitutional questions would be raised if "such liability were imposed based solely on a showing of a statistical disparity." But the Bureau could not establish that an act or practice was unfair under the statutory unfairness standard solely by "showing a statistical disparity," as the statute requires the Bureau to show a substantial injury, which could not be reasonably avoided, and that any substantial injury "is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).

Lastly, Plaintiffs invoke the major questions doctrine. Under the major questions doctrine, in "extraordinary cases," courts will require "clear congressional authorization" for certain agency actions when called for by the "history and the breadth of the authority that the agency has asserted and the economic and political significance of that assertion." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (quotation marks omitted). Plaintiffs rely on two barebones arguments to try to satisfy this standard. First, they assert vaguely that the March 2022 manual revisions are having a "tremendous economic effect on Plaintiffs' members and the financial-services industry as a whole," amounting to "millions of dollars per year." Pls.' Opp. at 25-26. The Exam Manual, however, did

not impose any obligations—nor, by extension, costs—on Plaintiffs' members.  Even if the Manual did have legal effect, Plaintiffs have not adequately established any harm from the March 2022 revisions.  *See* § I.A. above.  Nor have they described an alleged effect from the revisions that would make this case an "extraordinary" one.  For example, two million dollars per year in effects would be "millions of dollars per year," Pls.' Opp. at 25-26, but it would not come close to making this case "extraordinary."  *Cf. BST Holdings, L.L.C. v. OSHA*, 17 F. 4th 604, 617 (5th Cir. 2021) (finding $3 billion in costs, in conjunction with other factors, to be sufficient to trigger doctrine).  Second, Plaintiffs claim that the major questions doctrine applies because the revisions to the UDAAP Chapter of the Exam Manual alter "the balance of state-federal power."  Pls.' Opp. at 25.  But, as the March 2022 revisions did not alter the scope of the unfairness standard, they did not "alter" the balance of state and federal power.  Nor, in any case, have Plaintiffs, none of whom are states, explained how a restriction on unfair discrimination intrudes on state authority:  Plaintiffs do not contend that the states have a practice of allowing unfair discriminatory conduct.

**VI.    The March 2022 Revisions Are Not Arbitrary and Capricious.**

The March 2022 revisions to the Exam Manual are not arbitrary and capricious.  As Defendants established in their opening brief, the matters that Plaintiffs allege the Bureau improperly failed to consider—the historical use of the term "unfair" in the context of the FTC Act, the limits placed on disparate-impact liability by the Supreme Court in *Inclusive Communities*, the Due Process implications of applying an allegedly new interpretation to past conduct, and the reliance interests that allegedly had grown up around what Plaintiffs term the Bureau's "prior approach" to unfairness, Pls.' SJ Br. at 17-21—were not factors relevant to the revisions, so the Bureau had no obligation to consider them.  *See Metro Cnty. Title, Inc. v. FDIC*, 13 F.3d 883, 887 (5th Cir. 1994) (holding that "[a]n agency need only consider relevant evidence" under the arbitrary and capricious standard).  Defs.' Mot. at 32-36.

Plaintiffs' latest brief does nothing to rehabilitate its arguments. With respect to the history of the use of the term "unfair" under the FTC Act, Plaintiffs reiterate their argument that Congress codified a definition of unfairness under the FTC Act and ported it over to the Dodd-Frank Act. Pls.' Opp. at 27. Defendants do not dispute that the FTC Act is the original source of the unfairness authority integrated into Dodd-Frank, but Plaintiffs' argument fails because, among other things, it irrationally assumes that the failure to specifically address discrimination as an unfair act in the FTC Act established an atextual exception to unfairness for discriminatory conduct. *See* Defs.' Mot. at 33-34. Their rebuttal on *Inclusive Communities* is similarly unpersuasive. Essentially, Plaintiffs maintain that *Inclusive Communities* was relevant to the Exam Manual revisions because the revisions impose disparate-impact liability. Pls.' Opp. at 28. To plow already well-tilled ground, they do not. *See above* at pp. 24-25; Defs.' Mot. at 34-35. Nor did the revisions, with their allegedly "new" interpretation of unfairness, trigger the need to consider retroactivity under the Due Process Clause. Pls.' Opp. at 28. The revisions did not establish a new interpretation of unfairness, and, at all events, any retroactivity objection would apply only to the hypothetical application of the unfairness standard to past conduct. Finally, as to the need to consider reliance interests, Plaintiffs point out that Defendants do not dispute that the Bureau would have an obligation to consider reliance interests if the March 2022 revisions, in fact, altered the Bureau's position on unfairness. Pls.' Opp. at 28-29. No matter: the revisions did not alter the Bureau's position on unfairness.

**VII.   <u>Plaintiffs Are Not Entitled to the Relief They Seek.</u>**

If Plaintiffs were able to demonstrate jurisdiction and venue, then the parties agree that vacatur would be an appropriate remedy, *see* Defs.' Mot. at 38, and, in the Fifth Circuit, universal vacatur is allowed, *Texas v. Biden*, 20 F.4th 928, 957 (5th Cir. 2021), *rev'd and remanded on other grounds,* 142 S. Ct. 2528 (June 30, 2022).

But Plaintiffs are not entitled to the broad injunction they seek. Even assuming that

Plaintiffs have demonstrated an entitlement to some injunction, the scope of the proposed injunction is too broad.  Plaintiffs purport to disclaim any desire for a universal injunction with one breath, Pls.' Opp. at 33, while, with the next, "object[ing] . . . to excluding [from an injunction] members who were not yet members at the time the suit was filed."  Pls.' Opp. at 33-34 (quotation marks omitted).  Their insistence on an opt-in injunction renders their concession meaningless.  The injunction in this case would become a de facto universal injunction:  Any entity that wants to benefit from the injunction would simply need to join one of the seven Plaintiff organizations—at least any that the Court might find has standing—making the proposed injunction one of the perks of membership, and effectively empowering Plaintiffs to issue licenses for access to its benefits.  The proposed injunction, then, would raise the same troubling issues as a traditional universal injunction, including "preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."[13] *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).  No such opt-in injunction is necessary to provide relief to Plaintiffs as they are currently constituted, and, therefore, no such injunction would be appropriate.  *See* Defs.' Mot. at 40-41.

## CONCLUSION

For the reasons stated above, the Court should dismiss Plaintiffs' suit, or enter judgment in favor of the Bureau on Plaintiffs' non-constitutional claims.

DATED: January 24, 2023                         Respectfully Submitted,

SETH FROTMAN                                  */s/ Justin M. Sandberg*
General Counsel                               JUSTIN M. SANDBERG

---

[13] The proposed injunction would also be difficult to implement because of the vagueness inherent in Plaintiffs' position, under which they assert that the Bureau can "regulate unfair conduct that is also discriminatory," Pls.' Opp. at 33, but cannot "treat discrimination as" an unfair practice, *id.* at 22.  And this vagueness means the Court would be facing disputes over the meaning of the proposed injunction for decades to come.

STEVEN Y. BRESSLER
Deputy General Counsel

CHRISTOPHER DEAL
Assistant General Counsel

RYAN COOPER
Senior Counsel
Consumer Financial Protection Bureau
1700 G St. NW
Washington, D.C. 20552
Justin.Sandberg@cfpb.gov
Ryan.Cooper@cfpb.gov
(202) 450-8786 (Sandberg)
(202) 702-7541 (Cooper)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 24th Day of January 2023, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

 _s/ Justin M. Sandberg_____
JUSTIN M. SANDBERG
