# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF BUSINESS; and TEXAS BANKERS ASSOCIATION.<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>*Defendants*. | Case No. 6:22-cv-00381-JCB |

## JOINT APPENDIX OF ADMINISTRATIVE RECORD

## JOINT APPENDIX INDEX

| Document | AR Pages | JA Pages |
|---|---|---|
| Index of the Administrative Record (Nov. 18, 2022) (served by Defendants in compliance with the Court's order at Doc. 16) | - | JA0003-JA0010 |
| *In re First Buckingham Cmty., Inc.*, 73 FTC 938, Docket 8750, 1968 F.T.C. Lexis 65 (May 20, 1968) | 00006 - 00012 | JA0011-JA0017 |
| CFPB Supervision and Examination Manual (Oct. 1, 2012) | 01424 - 02347 | JA0018-JA0941 |
| CFPB, *Statement regarding the Provision of Financial Products and Services to Consumers with Limited English Proficiency* (Jan. 13, 2021) | 02418 - 02440 | JA0942-JA0964 |
| Financial Institution Letters, *Unfair or Deceptive Acts or Practices by State-Chartered Banks,* FDIC (Mar. 11, 2004) | 02488 - 02493 | JA0965-JA0970 |
| FTC Policy Statement on Unfairness (Dec. 17, 1980) | 02540 - 02548 | JA0971-JA0979 |
| OCC Comptroller's Handbook, Fair Lending (2010) | 02629 - 02809 | JA0980-JA1160 |
| Email regarding *Discrimination is "Unfair"* (Apr. 22, 2021) | 05264 - 05265 | JA1161-JA1162 |
| Hayes & Schellenberg, *Discrimination is "Unfair,"* Student Borrower Prot. Ctr. (Apr. 2021) | 05546 - 05575 | JA1163-JA1192 |
| Hayes & Schellenberg, *Leveraging UDA(A)P in the Fight Against Discrimination*, Student Borrower Prot. Ctr. (Apr. 22, 2021) | 05711 - 05714 | JA1193-JA1196 |
| Baker Donelson, *The Elaborate Guessing Game: The CFPB and Its Authority Under The UDAAP* (Apr. 9, 2015) | 06018 - 06020 | JA1197-JA1199 |

## Index to the Administrative Record

| Bates # | Date | Document Title | Author |
|---|---|---|---|
| **Cases** | | | |
| ADMINRECORD-00001 | 09/23/1968 | In The Matter Of E. G. Reinsch, Inc., Et Al. | FTC |
| ADMINRECORD-00006 | 05/20/1968 | In The Matter Of First Buckingham Community, Inc., Et Al. | FTC |
| ADMINRECORD-00013 | 01/30/1969 | In The Matter Of E. G. Reinsch, Inc., Et Al. | FTC |
| ADMINRECORD-00016 | 09/19/2013 | In The Matter Of JPmorgan Chase Bank, N.A.; And Chase Bank USA, N.A. | CFPB |
| ADMINRECORD-00042 | 07/12/1985 | American Financial Services Association V. FTC | United States Court of Appeals, District of Columbia Circuit |
| ADMINRECORD-00079 | 03/21/1972 | Arthur Murray Studio Of Washington, Inc V. FTC | United States Court of Appeals, Fifth Circuit |
| ADMINRECORD-00084 | 09/09/2010 | Clark V. Prudential Insurance Company Of America | United States District Court, D. New Jersey |
| ADMINRECORD-00117 | 03/06/2015 | CFPB V. Itt Educational Services, Inc | United States District Court, S.D. Indiana, Indianapolis Division |
| ADMINRECORD-00149 | 08/31/2012 | Davis V. HSBC Bank Nevada, N.A. | United States Court of Appeals, Ninth Circuit |
| ADMINRECORD-00166 | 03/09/2010 | FTC V. Golden Empire Mortgage, Inc | United States District Court, C.D. California |
| ADMINRECORD-00169 | 09/28/2007 | FTC V. Accusearch, Inc. | United States District Court, D. Wyoming |
| ADMINRECORD-00177 | 06/29/2009 | FTC V. Accusearch, Inc. | United States Court of Appeals, Tenth Circuit |
| ADMINRECORD-00191 | 02/20/2004 | FTC V. Capital Choice Consumer Credit, Inc., | United States District Court, S.D. Florida |
| ADMINRECORD-00232 | 06/22/2012 | FTC V. Commerce Planet, Inc. | United States District Court, C.D. California, Southern Division |
| ADMINRECORD-00262 | 06/10/2008 | FTC V. Compucredit Corporation - Complaint | United States District Court, N.D. Georgia, Atlanta Division |
| ADMINRECORD-00382 | 01/24/2001 | FTC V. Crescent Pub. Group, Inc. | United States District Court, S.D. New York |
| ADMINRECORD-00400 | 07/18/2013 | FTC V. Direct Benefits Group, LLC | United States District Court, M.D. Florida, Orlando Division |
| ADMINRECORD-00417 | 04/09/2008 | FTC V. IFC Credit Corp. | United States District Court, N.D. Illinois, Eastern Division |
| ADMINRECORD-00441 | 09/21/2010 | FTC V. Inc21.Com Corp. | United States District Court, N.D. California |
| ADMINRECORD-00473 | 04/07/2000 | FTC V. J.K. Publications, Inc. | United States District Court, C.D. California. |
| ADMINRECORD-00508 | 05/21/2020 | FTC V. Liberty Chevrolet, Inc. - Complaint | United States District Court, S.D. New York |
| ADMINRECORD-00529 | 01/18/2006 | FTC V. Mortgages Para Hispanos.Com Corporation - Complaint | United States District Court, E.D. Texas, Sherman Division |

1

| Bates# | Date | Document Title | Author |
|---|---|---|---|
| ADMINRECORD-00536 | 09/25/2006 | FTC V. Mortgages Para Hispanos.Com Corporation - Stipulation | United States District Court, E.D. Texas, Sherman Division |
| ADMINRECORD-00561 | 06/15/2010 | FTC V. Neovi, Inc. | United States Court of Appeals, Ninth Circuit |
| ADMINRECORD-00569 | 03/28/2013 | FTC V. NHS Systems, Inc. | United States District Court, E.D. Pennsylvania |
| ADMINRECORD-00584 | 12/13/2000 | FTC V. Verity Intern., Ltd. | United States District Court, S.D. New York |
| ADMINRECORD-00598 | 03/27/2006 | FTC V. Verity Intern., Ltd. | United States Court of Appeals, Second Circuit |
| ADMINRECORD-00616 | 09/17/2004 | FTC V. Verity Intern., Ltd. | United States District Court, S.D. New York |
| ADMINRECORD-00640 | 06/28/2010 | FTC V. Wells | United States Court of Appeals, Ninth Circuit |
| ADMINRECORD-00643 | 09/13/2011 | FTC V. Willms | United States District Court, W.D. Washington, at Seattle |
| ADMINRECORD-00653 | 09/30/1997 | FTC V. Windward Marketing, Inc. | United States District Court, N.D. Georgia |
| ADMINRECORD-00670 | 08/24/2015 | Ftc V. Wyndham Worldwide Corporation - Opinion | United States Court of Appeals, Third Circuit |
| ADMINRECORD-00717 | 09/28/2011 | FTC V. Zamani | United States District Court, C.D. California |
| ADMINRECORD-00730 | 09/29/2000 | Hargraves V. Capital City Mortg. Corp. | United States District Court, District of Columbia |
| ADMINRECORD-00744 | 10/11/1961 | Holland Furnace Co. V. FTC | United States Court of Appeals, Seventh Circuit |
| ADMINRECORD-00748 | 03/28/2019 | HUD V. Facebook, Inc. | HUD |
| ADMINRECORD-00755 | 04/22/2010 | In Re Facebook PPC Advertising Litigation | United States District Court, N.D. California, San Jose Division |
| ADMINRECORD-00766 | 06/24/2010 | In Re Facebook, Inc. | State of Washington, King County Superior Court |
| ADMINRECORD-00774 | 07/11/1972 | In Re Pfizer Inc. | FTC |
| ADMINRECORD-00808 | 07/08/1965 | In The Matter Of Bear Sales Co. Et Al. | FTC |
| ADMINRECORD-00815 | 07/15/1975 | In The Matter Of Beneficial Corporation, Et Al. | FTC |
| ADMINRECORD-00860 | 09/23/1954 | In The Matter Of Calvine Cotton Mills, Inc. | FTC |
| ADMINRECORD-00865 | 02/19/1952 | In The Matter Of Eugene F. Agee Trading As Commercial Extension School Of Commerce | FTC |
| ADMINRECORD-00872 | 12/21/1984 | In The Matter Of International Harvester Co. | FTC |
| ADMINRECORD-00970 | 12/02/1968 | In The Matter Of Leon A. Tashof Trading As New York, Jewelry Company | FTC |

2

| Bates # | Date | Document Title | Author |
|---|---|---|---|
| ADMINRECORD-01004 | 12/15/1986 | In The Matter Of Orkin Exterminating Company, Inc. | FTC |
| ADMINRECORD-01096 | 06/04/1957 | In The Matter Of R. B. James Et Al. | FTC |
| ADMINRECORD-01102 | 07/17/1970 | In The Matter Of Talent Research Bureau, Inc., Et Al. | FTC |
| ADMINRECORD-01107 | 04/12/2021 | Juarez V. Social Finance, Inc. | United States District Court, N.D. California |
| ADMINRECORD-01116 | 07/06/2010 | Kent V. Hewlett-Packard Co. | United States District Court, N.D. California, San Jose Division |
| ADMINRECORD-01126 | 06/06/2018 | Labmd, Inc. V. FTC | United States Court of Appeals, Eleventh Circuit |
| ADMINRECORD-01144 | 10/06/2009 | Mayoral V. WMC Mortg., LLC | United States District Court, N.D. Illinois, Eastern Division |
| ADMINRECORD-01149 | 12/02/2015 | Molina V. Aurora Loan Services, LLC | United States Court of Appeals, Eleventh Circuit |
| ADMINRECORD-01157 | 06/25/2018 | National Fair Housing Alliance V. Facebook, Inc. – First Amended Complaint | United States District Court, S.D. New York |
| ADMINRECORD-01215 | 07/15/1988 | Orkin Exterminating Co., Inc. V. FTC | United States Court of Appeals, Eleventh Circuit |
| ADMINRECORD-01230 | 10/24/2007 | Pena V. Freedom Mortg. Team, Inc. | United States District Court, N.D. Illinois, Eastern Division |
| ADMINRECORD-01236 | 10/24/2007 | Pena V. Freedom Mortg. Team, Inc. – Opinion And Order | United States District Court, N.D. Illinois, Eastern Division |
| ADMINRECORD-01249 | 08/03/2017 | Perez V. Wells Fargo & Co. | United States District Court, N.D. California |
| ADMINRECORD-01256 | 05/06/2019 | Rhodeman V. Ocwen Loan Servicing, LLC | United States District Court, C.D. California |
| ADMINRECORD-01266 | 06/25/2015 | Texas Dept. Of Housing And Community Affairs V. Inclusive Communities Project, Inc. | Supreme Court of the United States |
| ADMINRECORD-01299 | 08/31/2011 | Thomas V. Biller Associates Tri-State, LLC | Superior Court of Connecticut, Judicial District of New Haven |
| ADMINRECORD-01325 | 05/08/2013 | Torres V. JC Penney Corp., Inc. | United States District Court, N.D. California |
| **Agency Materials** | | | |
| ADMINRECORD-01333 | 12/21/2011 | 12 CFR Part 1002 – Ecoa (Regulation B) | CFPB |
| ADMINRECORD-01416 | 03/01/1984 | 16 CFR Part 444 – Credit Practices | FTC |
| ADMINRECORD-01420 | 11/24/1962 | 27 Fed. Reg. 11527 – Executive Order 11063, Equal Opportunity In Housing | Executive Branch |
| ADMINRECORD-01424 | 10/01/2012 | CFPB Supervision And Examination Manual | CFPB |
| ADMINRECORD-02348 | 04/19/2021 | Aiming For Truth, Fairness, And Equity In Your Company's Use Of AI | FTC |
| ADMINRECORD-02354 | 05/27/2020 | Auto Dealership Bronx Honda, General Manager To Pay $1.5 Million To Settle | FTC |

3

| Bates # | Date | Document Title | Author |
|---|---|---|---|
| | | FTC Charges They Discriminated Against African-American, Hispanic Car Buyers | |
| ADMINRECORD-02358 | 01/2016 | Big Data: A Tool For Inclusion Or Exclusion? | FTC |
| ADMINRECORD-02408 | 05/27/2020 | Statement Of Commissioner Rohit Chopra | FTC |
| ADMINRECORD-02411 | 11/02/2021 | CFPB Finds Credit Report Disputes Far More Common In Majority Black And Hispanic Neighborhoods | CFPB |
| ADMINRECORD-02414 | 10/19/2021 | CFPB Penalizes JPay For Siphoning Taxpayer-Funded Benefits Intended To Help People Re-Enter Society After Incarceration | CFPB |
| ADMINRECORD-02418 | 01/13/2021 | Statement Regarding The Provision Of Financial Products And Services To Consumers With Limited English Proficiency | CFPB |
| ADMINRECORD-02441 | 05/28/2020 | Comment Of Federal Trade Commissioner Rohit Chopra - Defining Unfair Or Deceptive Practices | FTC |
| ADMINRECORD-02452 | 12/22/2015 | Enforcement Policy Statement On Deceptively Formatted Advertisements | FTC |
| ADMINRECORD-02468 | 12/2006 | Complying With The Credit Practices Rule | FTC |
| ADMINRECORD-02481 | 1978 | Civil Aeronautics Board Reports – 78 CAB 860 | Civil Aeronautics Board |
| ADMINRECORD-02488 | 03/11/2004 | Unfair Or Deceptive Acts Or Practices By State-Chartered Banks | FDIC |
| ADMINRECORD-02494 | 11/17/2017 | 82 Fed. Reg. 54519 | CFPB |
| ADMINRECORD-02500 | 11/17/2017 | 82 Fed. Reg. 54594 | CFPB |
| ADMINRECORD-02505 | 10/06/2020 | Introductory Remarks Of Commissioner Rohit Chopra - National Fair Housing Alliance 2020 National Conference | FTC |
| ADMINRECORD-02507 | 09/27/2006 | FTC Announces New Successes In Campaign To Stop Fraud Targeting Hispanics | FTC |
| ADMINRECORD-02514 | 01/30/1998 | FTC Charges D.C. Mortgage Lender With Deception And Unfairness Against Borrowers | FTC |
| ADMINRECORD-02519 | 01/31/2006 | FTC Continues Campaign To Stop Fraud In The Spanish Language | FTC |
| ADMINRECORD-02525 | 10/14/1983 | FTC Policy Statement On Deception | FTC |
| ADMINRECORD-02540 | 12/17/1980 | FTC Policy Statement On Unfairness | FTC |
| ADMINRECORD-02549 | 03/20/2009 | FTC Tells U.S. Civil Rights Commission About Efforts To Protect Consumers From Unfair Mortgage Lending Practices | FTC |
| ADMINRECORD-02553 | 08/06/2015 | Housing And Civil Enforcement Cases Documents | DOJ |

4

| Bates # | Date | Document Title | Author |
|---|---|---|---|
| ADMINRECORD-02581 | 01/14/2022 | It's Illegal To Penalize Borrowers For Being Religious | CFPB |
| ADMINRECORD-02585 | 01/2022 | Justice-Involved Individuals And The Consumer Financial Marketplace | CFPB |
| ADMINRECORD-02629 | 01/2010 | Fair Lending - Comptroller's Handbook | Comptroller of the Currency |
| ADMINRECORD-02810 | 05/2010 | Unfair Or Deceptive Acts Or Practices, Federal Trade Commission Act, Section 5 | Office of Thrift Supervision |
| ADMINRECORD-02826 | 10/19/2021 | Statement Of CFPB Director Rohit Chopra On The JPay Enforcement Action | CFPB |
| ADMINRECORD-02829 | 05/27/2020 | Statement Of Commissioner Rebecca Kelly Slaughter: In The Matter Of Liberty Chevrolet | FTC |
| ADMINRECORD-02834 | 05/30/2003 | The FTC's Use Of Unfairness Authority: Its Rise, Fall, And Resurrection | FTC |
| ADMINRECORD-02850 | 06/09/1999 | 64 Fed. Reg. 30902 | Commodity Futures Trading Commission |
| **Statutes** | | | |
| ADMINRECORD-02853 | 01/18/2014 | 15 U.S.C.A. § 1691 | U.S. Congress |
| ADMINRECORD-02857 | 07/21/2010 | 12 U.S.C.A. § 5531 | U.S. Congress |
| ADMINRECORD-02860 | 07/21/2010 | Dodd-Frank Wall Street Reform And Consumer Protection Act | U.S. Congress |
| ADMINRECORD-03709 | 06/2022 | Federal Trade Commission Act, Section 5 And Dodd-Frank Wall Street Reform And Consumer Protection Act, Sections 1031 And 1036 | FDIC |
| ADMINRECORD-03719 | 04/11/1968 | 42 U.S.C.A. § 3602 | U.S. Congress |
| ADMINRECORD-03722 | 12/22/2006 | 15 U.S.C.A. § 45 | U.S. Congress |
| ADMINRECORD-03729 | 08/26/1994 | Federal Trade Commission Act Amendments Of 1994 | U.S. Congress |
| **Legislative History Materials** | | | |
| ADMINRECORD-03735 | 09/20/1982 | Federal Trade Commission Authorization Act Of 1982 | U.S. Congress |
| ADMINRECORD-03773 | 08/15/1967 | Congressional Record - House | U.S. Congress |
| ADMINRECORD-03796 | 12/15/1967 | Congressional Record - Senate | U.S. Congress |
| ADMINRECORD-03798 | 02/06/1968 | Civil Rights Legislation In The 90th Congress | U.S. Congress |
| ADMINRECORD-03818 | 08/29/2022 | 87 Fed. Reg. 52677 | Department of Transportation |
| ADMINRECORD-03823 | 08/21/1967 | Fair Housing Act Of 1967 – Hearings Before The Subcommittee On Housing And Urban Affairs Of The Committee On Banking And Currency United States Senate | U.S. Congress |

5

| Bates # | Date | Document Title | Author |
|---|---|---|---|
| ADMINRECORD-04337 | 08/01/1967 | Civil Rights Act Of 1967 - Hearings Before The Subcommittee On Constitutional Rights Of The Committee On The Judiciary United States Senate | U.S. Congress |
| ADMINRECORD-04862 | 05/26/1993 | FTC Reauthorization - Hearing Before The Subcommittee On Transportation And Hazardous Materials Of The Committee On Energy And Commerce House Of Representatives | U.S. Congress |
| ADMINRECORD-05237 | 08/24/1993 | S. Rep. 103-130 - Federal Trade Commission Act Amendments Of 1993 | U.S. Congress |
| **Secondary Sources** | | | |
| ADMINRECORD-05264 | 04/22/2021 | Email - [NEW REPORT] Discrimination Is "Unfair": Interpreting UDA(A)P To Prohibit Discrimination | Mike Pierce – Student Borrower Protection Center |
| ADMINRECORD-05266 | 09/17/2015 | Big Data Is A Crystal Ball: Privacy, Discrimination And The Predictive Power Of Data Analytics | Professor Dennis Hirsch – Capital University Law School |
| ADMINRECORD-05302 | 06/18/2020 | Banking While Black': How Cashing A Check Can Be A Minefield | Emily Flitter – The NY Times |
| ADMINRECORD-05308 | 05/16/2017 | UDAAP Update: Recent Cases And The Future Of State AG & Consumer Advocate Activity | Adam D. Maarec, Andrew T. Dougherty, Daniel A. Edelman, Joseph R. Rodriguez |
| ADMINRECORD-05368 | 2018 | The Promise And Perils Of Algorithmic Lenders' Use Of Big Data | MATTHEW ADAM BRUCKNER – Chicago Kent Law Review |
| ADMINRECORD-05426 | 07/24/2018 | AG Ferguson Investigation Leads To Facebook Making Nationwide Changes To Prohibit Discriminatory Advertisements On Its Platform | Office of the Attorney General of Washington State |
| ADMINRECORD-05430 | 08/2021 | Algorithms And Economic Justice: A Taxonomy Of Harms And A Path Forward For The Federal Trade Commission | Rebecca Kelly Slaughter with Janice Kopec and Mohamad Batal – Yale Journal of Law & Technology |
| ADMINRECORD-05493 | 2003 | All We Are Saying Is Give Business A Chance: The Application Of State UDAP Statutes To Business-To-Business Transactions | Michael Flynn - Loyola Consumer Law Review |
| ADMINRECORD-05512 | 03/29/2019 | Conference On Consumer Finance Law 2019 Frederick Fisher Memorial Program: Robot Loans: Artificial Intelligence And Its Place In Consumer Finance? | John Chiles - Consumer Finance Law Quarterly Report |
| ADMINRECORD-05540 | 12/13/2019 | Jamie Dimon Says He's 'Disgusted By Racism' And Progress Is Needed At JP Morgan After Report | Hugh Son - CNBC |
| ADMINRECORD-05546 | 04/2021 | Discrimination Is "Unfair" Interpreting UDA(A)P To Prohibit Discrimination | Stephen Hayes, Kali Schellenberg – Student Borrower Protection Center |

6

| Bates # | Date | Document Title | Author |
|---|---|---|---|
| ADMINRECORD-05576 | 12/20/2017 | Dozens Of Companies Are Using Facebook To Exclude Older Workers From Job Ads | Julia Angwin, Noam Scheiber, Ariana Tobin – Propublica.org |
| ADMINRECORD-05588 | 01/28/2021 | Facebook Ad Services Let Anyone Target Us Military Personnel | Lily Hay Newman – Wired.com |
| ADMINRECORD-05603 | 09/14/2017 | Facebook Enabled Advertisers To Reach 'Jew Haters' | Julia Angwin, Madeleine Varner, Ariana Tobin - Propublica.org |
| ADMINRECORD-05610 | 07/09/2021 | Facebook Got Rid Of Racial Ad Categories. Or Did It? | Jon Keegan – Themarkup.org |
| ADMINRECORD-05621 | 10/31/2019 | Facebook Hit With Massive National Civil Rights Class Action By Women And Older People Denied Financial Services Opportunities On Facebook For Years | PRNEWSWIRE— OUTTEN & GOLDEN LLP |
| ADMINRECORD-05624 | 09/18/2018 | Facebook Is Letting Job Advertisers Target Only Men | Ariana Tobin and Jeremy B. Merrill – Propublica.org |
| ADMINRECORD-05653 | 03/19/2019 | Fair Housing Groups Settle Lawsuit With Facebook: Transforms Facebook's Ad Platform Impacting Millions Of Users | Jessica Aiwuyor – Nationalfairhousing.org |
| ADMINRECORD-05657 | 06/07/2019 | FTC Investigates Small Business Financing Based On Expansive View Of UDAP Authority | Mark Dabertin – and Troutman Pepper – JDSupra.com |
| ADMINRECORD-05666 | 06/11/2020 | Google's New Rules Clamp Down On Discriminatory Housing, Job Ads | Paresh Dave |
| ADMINRECORD-05671 | 02/18/2021 | Algorithmic Bias Explained | Gissela Moya and Vinhcent Le - The Greenlining Institute |
| ADMINRECORD-05707 | 09/18/2019 | Housing Companies Used Facebook's Ad System To Discriminate Against Older People, According To New Human Rights Complaints | Marie C. Baca – The Washington Post |
| ADMINRECORD-05711 | 04/22/2021 | Leveraging UDA(A)P In The Fight Against Discrimination | Stephen Hayes and Kali Schellenberg - Student Borrower Protection Center |
| ADMINRECORD-05715 | 05/21/2018 | Meet The New Boss; Same As The Old Boss? The CFPB's Take On UDAAP Might Surprise You | Ori Lev – Cfsreview.com |
| ADMINRECORD-05718 | 06/13/2016 | B2B Or Not B2B, That Is The Question: The CFPB And Applicability Of Federal Consumer Financial Laws To Small Business And Business-Purpose Lending | Mayer Brown |
| ADMINRECORD-05725 | 12/09/2021 | 5.3.2.4 Marketing Discrimination As A Force In Predatory Lending | NCLC Digital Library |
| ADMINRECORD-05727 | 12/09/2021 | 5.3.2.5 How Discrimination In Marketing Happens | NCLC Digital Library |
| ADMINRECORD-05731 | 07/05/2019 | New York Is Investigating Whether Facebook Lets Advertisers Discriminate | Ariana Tobin – ProPublica.org |
| ADMINRECORD-05734 | 12/2014 | How Big Data Enables Economic Harm To Consumers, Especially To Low-Income And Other Vulnerable Sectors Of The Population | Nathan Newman |

7

| Bates # | Date | Document Title | Author |
|---|---|---|---|
| ADMINRECORD-05752 | 02/04/2012 | Facebook Is Using You | Lori Andrews – The NY Times |
| ADMINRECORD-05756 | 2003 | Regulating Target Marketing And Other Race-Based Advertising Practices | Ross D. Petty, Anne-Marie G. Harris, Toni Broaddus, William M. Boyd III – Michigan Journal of Race and Law |
| ADMINRECORD-05817 | 03/2014 | Big Data: A Big Disappointment For Scoring Consumer Credit Risk | Persis Yu, Jillian McLaughlin, Marina Levy - National Consumer Law Center |
| ADMINRECORD-05859 | 10/19/2021 | Solving The Problem Of Racially Discriminatory Advertising On Facebook | Jinyan Zang – Brookings.edu |
| ADMINRECORD-05877 | 2019 | Making Consumer Finance Work | Natasha Sarin – SSRN.com |
| ADMINRECORD-05955 | 05/2014 & 06/2014 | The Consumer Financial Protection Bureau As A Privacy & Data Security Regulator | Jonathan G. Cedarbaum, Elijah Alper - Fintech Law Report |
| ADMINRECORD-05968 | 08/25/2021 | The Secret Bias Hidden In Mortgage-Approval Algorithms | Emmanuel Martinez and Lauren Kirchner – Themarkup.org |
| ADMINRECORD-05989 | 06/20/2018 | The Racialized Costs Of Banking | Jacob Faber & Terri Friedline – Newamerica.org |
| ADMINRECORD-06018 | 04/09/2015 | The Elaborate Guessing Game: The CFPB And Its Authority Under The UDAAP | Baker Donelson |
| ADMINRECORD-06021 | 12/11/2019 | This Is What Racism Sounds Like In The Banking Industry | Emily Flitter – The NY Times |
| ADMINRECORD-06025 | 12/14/2021 | U.S. Bank Apologizes, Settles With Black Customer Who Claimed Mistreatment In 2020 Branch Visit | Kavita Kumar – Startribune.com |

8

## 73 F.T.C. 938;  1968 FTC LEXIS 65

Federal Trade Commission

May 20, 1968, Decision ; Complaint, Nov. 30, 1967

Docket 8750 .

**Reporter**
1968 FTC LEXIS 65 *;  73 F.T.C. 938

# IN THE MATTER OF FIRST BUCKINGHAM COMMUNITY, INC., ET AL.

## Core Terms

advertising, hearing examiner, motion to dismiss, respondents', apartments, rental, public interest, restrictions, color, national origin, of the Federal Trade Commission Act, hearings, misleading, deception, newspapers, adduced

## Syllabus

Order vacating initial decision and dismissing complaint which charged nine affiliated Arlington, Va., apartment complexes with using advertising which deceptively carried the impression that their apartments were available to the general public without restriction as to *race*, color, or national origin.

## Complaint

COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act, and by virtue of the authority vested in it by said Act, the Federal Trade Commission, having reason to believe that First Buckingham Community, Inc., Second Buckingham Community, Inc., Third Buckingham Community, Inc., Fourth Buckingham Community, Inc., Fifth Buckingham Community, Inc., Sixth Buckingham Community, Inc., Paramount Communities, Inc., Claremont Communities, Inc. and Paramount Motors Incorporated, corporations, and Frances W. Freed Beatrice W. Lesses and Maxwell C. Lieberman, individually and as officers of said corporations, hereinafter referred to as respondents, have violated the provisions of said Act, and it appearing to the Commission that a proceeding by it in respect thereof would **[*2]** be in the public interest, hereby issues its complaint stating its charges in that respect as follows:

PARAGRAPH 1.  First Buckingham Communitiy, Inc., Second Buckingham Community, Inc., Third Buckingham Community, Inc., Fourth Buckingham Community, Inc., Fifth Buckingham Community, Inc., Sixth Buckingham Community, Inc., Paramount Communities, Inc., Claremount Communities, Inc., are corporations organized, existing and doing business under and by virtue of the laws of the State of Virginia, with their principal office and place of business located at 313 North Glebe Road, in the county of Arlington, State of Virginia.

Paramount Motors Incorporated, is a corporation organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal office and place of business located at 313 North Glebe Road, in the county of Arlington, State of Virginia.

Corporate respondents First Buckingham Community, Inc., Second Buckingham Community, Inc., Third Buckingham Community, Inc., Fourth Buckingham Community, Inc., Fifth Buckingham Community, Inc., Sixth

ADMINRECORD-00006

Buckingham Community, Inc., own, manage and operate Buckingham Community, 313 North Glebe Road, **[*3]** Arlington, Virginia. Corporate respondent, Claremont Communities, Inc., owns, manages and operates Claremont Community, 2733 South Walter Reed Drive, Arlington, Virginia; and corporate respondent Paramount Communities, Inc., owns, manages and operates Chatham, 4501 Arlington Boulevard, Arlington, Virginia. Corporate respondent, Paramount Motors Incorporated, is a holding company which owns all of the stock in each of the aforesaid corporations.

Respondents Frances W. Freed, Beatrice W. Lesses and Maxwell C. Lieberman are individuals and are officers and directors of each of the corporate respondents. They formulate, direct and control the acts and practices of the corporate respondents, including the acts and practices hereinafter set forth. Their business address is the same as that of the corporate respondents.

All of the aforementioned respondents cooperate and act together in carrying out the acts and practices hereinafter set forth.

PAR. 2. Respondents are now, and for some time last past have been, engaged in the advertising, offering for rent, rental and general management of the aforesaid apartment complexes located in Arlington, Virginia.

PAR. 3. In the **[*4]** course and conduct of their business, respondents have caused rental advertisements for the aforesaid properties to be published in newspapers and other publications of interstate circulation, including The Washington Post, The Evening Star and the Apartment Shopper's Guide. Said respondents have performed various acts in commerce relating to the advertising of the aforesaid apartments, such as transmitting payment for published advertisements from their place of business in the State of Virginia to the District of Columbia, and maintain, and at all times mentioned herein have maintained a substantial course of business in commerce, as "commerce" is defined in the Federal Trade Commission Act.

PAR. 4. In the course and conduct of their aforesaid business, and for the purpose of inducing persons to apply for rental of their apartments, respondents now cause and have caused to be published in newspapers of interstate circulation certain advertisements, of which the following is typical and illustrative, but not all inclusive thereof:

CHARACTER!

PRESTIGE!

Two Outstanding Garden Apartment Communities with One of the Largest

Swimming Pools in Virginia!

BUCKINGHAM

313 **[*5]** North Glebe Road, Arlington

Efficiencies, 1, 2 and 3 Bedroom Simplex and Duplex   from $74

JA 2-5004

DIRECTIONS: From Washington - Across Memorial Bridge, take Route 50 to Glebe Road (Route 120).

CLAREMONT

2733 S. Walter Reed Drive, Arlington

2 Bedroom Simplex and Duplex   from $107

WE 1-0400

1968 FTC LEXIS 65, *5

DIRECTIONS: Across 14th Street Bridge, out Shirley Highway to Route 7, Right 1/2 mile to S. Walter Reed Drive off King Street to Claremont.

PAR. 5.  By and through the use of the above- quoted statements and representations, and others of similar import and meaning but not expressed herein, respondents represent, and have represented, directly or by implication, that such apartments are available to the general public without restrictions or limitations as to _**race**_, color, national origin or number of family members.

PAR. 6.  In truth and in fact, such apartments are not available to the general public without restrictions or limitations as to _**race**_, color, national origin or number of family members.  These apartments are not available for rental to applicants who are Negro.  Further, respondents limit the occupancy of the one bedroom apartments to two persons and **[*6]** the two bedroom apartments to four persons.

Therefore, the statements and representations as set forth in Paragraphs Four and Five hereof were and are false, misleading and deceptive.

PAR. 7.  The use by respondents of the aforesaid false, misleading and deceptive statements, representations and practices has had, and now has, the capacity and tendency to mislead members of the general public into the erroneous and mistaken belief that said statements and representations were and are true.

PAR. 8.  The aforesaid acts and practices of respondents, as herein alleged, were and are all to the prejudice and injury of the public and constituted, and now constitute, unfair and deceptive acts and practices in commerce, in violation of Section 5 of the Federal Trade Commission Act.

## Counsel

_Mr. Lewis Franke_ and _Mr. George D. Beischer_ supporting the complaint.

_Mr. Charles W. Mander_ and _Mr. Jay Cutler_ of Washington, D.C., for respondents.

**Initial Decision:**

INITIAL DECISION BY JOHN LEWIS, HEARING EXAMINER

APRIL 24, 1968

STATEMENT OF PROCEEDINGS

The Federal Trade Commission issued its complaint against the above-named respondents on November 30, 1967, charging **[*7]** them with engaging in unfair and deceptive acts and practices in commerce, in violation of Section 5 of the Federal Trade Commission Act, by falsely representing in newspaper advertisements that the apartments in certain apartment building complexes owned, managed and operated by the corporate respondents are available for rental by the general public, without restrictions or limitations as to _**race**_, color, national origin or number of family members.  After being served with said complaint, respondents appeared by counsel and thereafter filed their answer denying having engaged in the illegal practices charged and raising the affirmative defenses that, (a) the complaint fails to state a cause of action against them in that they are engaged in intrastate commerce in the ownership, management and rental of real properties, and the Commission does not have jurisdiction over them based upon the mere insertion of announcements in newspapers concerning the possible availability of their apartments, (b) they have not exceeded in any way what they may lawfully do in the exercise of their right to select tenants for their rental properties, (c) the insertion of announcements in newspapers **[*8]** does not constitute advertising, within the meaning of the Federal Trade Commission Act, requiring the affirmative disclosure of restrictions on the use and occupancy of the apartments, and (d) this proceeding is not in the public interest.

1968 FTC LEXIS 65, *8

A motion filed by respondents for dismissal of the complaint on the ground that it did not allege facts sufficient to sustain the jurisdiction of the Commission over them was denied by order of the examiner, dated February 12, 1968, without prejudice to the renewal thereof at a later appropriate stage of this proceeding.  A motion filed by National Apartment Association to intervene as a party was denied by order of the examiner, dated January 8, 1968, but said Association was granted permission to participate as *Amicus curiae* .

Prehearing conferences were thereafter convened before the undersigned hearing examiner on February 15, 1968, and March 13, 1968, at which there was a considerable narrowing of the issues, at which various factual stipulations were reached, and at which substantially all documentary exhibits were received in evidence.  The transcripts of said conference were, by agreement of the parties, made a part of the public **[*9]** record, and the results of said conferences were embodied in the examiner's prehearing Orders Nos. 1 and 2.

Hearings for the reception of testimony and other evidence were held in Washington, D.C., on April 1-2, 1968.  All parties were represented by counsel, participated in the hearings and were afforded full opportunity to be heard and to examine and cross-examine witnesses.  At the close of all the evidence the parties were granted leave to file proposed findings of fact and conclusions of law on May 2, 1968, and replies thereto on May 13, 1968.

Following the close of hearings and before date fixed for the filing of proposed findings, respondents filed a motion for dismissal of the complaint herein on the ground that the Civil Rights Act of 1968 (Public Law 90-284), signed by the President on April 11, 1968, will render any decision on the merits moot for the reason that such Act makes unlawful, restrictions on the sale or rental of real estate based on *race*, color or national origin, and there is, therefore, "no real possibility that the alleged restrictions as to *race*, color or national origin which respondents allegedly failed to reveal in advertising can be continued. **[*10]** " While said Act does not cover restrictions as to the number of persons who may occupy premises, respondents contend that such allegation in the complaint involves a "minor" matter and that any order which might result in this proceeding "is rendered ineffective, inconsequential and no longer in the public interest." Counsel supporting the complaint have filed answer to respondents' motion to dismiss, in which they assert that "they do not oppose respondents' Motion to Dismiss in this matter." The evidence adduced herein establishes that following the issuance of the complaint herein, respondents endeavored to insert in their advertisements an affirmative statement to the effect that their apartments were only available on a restricted occupancy basis.  However, the two principal newspapers in the District of Columbia used by respondents for the insertion of rental advertisements refused to accept and advertisement containing such a statement (Tr. 171).  It may be inferred that such refusal was based on the fact that a local ordinance of the District of Columbia prohibits the knowing publication of any advertisement which states that the transfer of an interest in real property will **[*11]** be refused or restricted on account of *race*, color, religion or national origin (RX 9-A).

This matter is now before the examiner for final consideration on respondents' motion to dismiss, which is unopposed by counsel supporting the complaint.  The undersigned has concluded that the issues in this proceeding have been largely rendered moot by the enactment of Public Law 90-284, following the close of hearings.  Since it will henceforth be unlawful, even in areas beyond the District of Columbia, to **_discriminate_** in the rental of apartments because of *race*, color or national origin, or to make any reference in advertisements of an intention to **_discriminate_** on such grounds, there would appear to be no further substantial public interest in an adjudicative disposition of the issues, as framed by the pleadings and developed by the evidence adduced herein.  Accordingly, it would appear to be appropriate to grant respondents' motion and to dismiss the complaint herein.

ORDER

*It is ordered* , That the complaint in the above-entitled proceeding be, and the same hereby is, dismissed.

# Action

**[*1]**

1968 FTC LEXIS 65, *1

ORDER, OPINION, ETC., IN REGARD TO THE ALLEGED VIOLATION OF THE FEDERAL TRADE COMMISSION ACT

# Opinion

OPINION OF THE COMMISSION

MAY 20, 1968

BY ELMAN, *Commissioner:*

In this proceeding, **[*12]** in which the complaint issued on November 30, 1967, the hearing examiner filed an initial decision on April 24, 1968, granting an unopposed motion by respondents to dismiss the complaint. No appeal having been filed, the matter is before the Commission under Section 3.51 of the Rules of Practice to determine whether the case should be placed on its own docket for review.

Respondents' motion to dismiss the complaint was filed on April 16, 1968, following the close of evidentiary hearings. In granting the motion, the examiner made no findings of fact on whether the allegations of the complaint were supported by the evidence adduced at the hearings. His dismissal of the complaint was based solely on the ground that "the issues in this proceeding have been largely rendered moot by the enactment [on April 11, 1968] of Public Law 90-284 [the Civil Rights Act of 1968]," and that, therefore, "there would appear to be no further substantial interest in an adjudicative disposition of the issues, as framed by the pleadings and developed by the evidence adduced herein."

The hearing examiner's action is inexplicable, on several grounds.

To begin with, respondents' motion to dismiss **[*13]** was one upon which the hearing examiner had no authority to rule, and which he was required instead to certify to the Commission under Section 3.22 of the Rules of Practice. *Drug Research Corporation* , Docket 7179, October 3, 1963 [*63 F.T.C. 998*]; *cf. Florida Citrus Mutual, et al. , 50 F.T.C. 959, 961 (1954)*. The Commission has not delegated to its hearing examiners the authority to rule upon motions to dismiss complaints on the grounds of alleged lack of public interest. Such a motion is addressed to the administrative discretion of the Commission, and necessarily involves reference to policy considerations outside the authority and competence of hearing examiners performing essentially adjudicative functions. As the Supreme Court has held, "the Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." *Moog Industries v. Federal Trade Commission , 355 U.S. 411, 413 (1958)*.

A parallel situation was presented to the Commission in the **[*14]** *Drug Research* case, *supra* , where the hearing examiner also dismissed the complainton the ground that further proceedings would not be in the public interest. In vacating such action, the Commission stated [63 F.T.C. 1014-1015]:

Complaint counsel's motion to dismiss the complaint was addressed to the Commission in its administrative capacity, as the complainant in this proceeding, and not in its adjudicative capacity; no question going to the merits of the violations of law alleged in the complaint was raised by the motion. In considering such administrative matters as whether to issue a complaint, or, as here, whether to go on with further proceedings in a case that has already been commenced by issuance of a complaint, the Commission is required to take into account a broad range of considerations bearing upon the public interest. In order to discharge its responsibility to make the most effective possible allocation of its necessarily limited resources of funds and personnel, the Commission must consider - as a matter of administrative judgment and discretion - which of the various courses of action open to it should be followed.

Thus, the factors **[*15]** appropriate to the Commission's decision in such a matter are not within the authority and competence of the hearing examiner, whose duty it is, in such a case, to certify the motion to the Commission for its

1968 FTC LEXIS 65, *15

consideration and disposition rather than to act upon it himself.  For, as stated in Section 8 [1] of the Commission's Statement of Organization, "Hearing examiners are officials to whom the Commission, in accordance with law, delegates the initial performance of its *adjudicative fact-finding* functions to be exercised in conformity with Commission decisions and policy directives and with its rules of practice." Disposition of a motion such as that filed by complaint counsel in this matter is not an "adjudicative fact-finding" function.  Since the examiner had no authority to rule upon the motion, he should promptly have certified it to the Commission, pursuant to Section 3.6(a) [2] of the Commission's Rules of Practice.

It may be observed that the Commission's practice in this regard implies no disparagement of the important adjudicative functions performed by hearing examiners. "An examiner's cardinal function is to sit [*16]  in a judicial capacity." (*Florida Citrus Mutual, supra* at p. 961.) It enhances the judicial role of hearing examiners to insulate them from such matters of policy and discretion as are involved in determining whether the public interest justifies issuance of, or continuation with, a complaint.  We strengthen the judicial character of hearing examiners' determinations of fact and law on the record by relieving them from participation in determinations of broad administrative policy and discretion which cannot be closeted within the record of a single case.

Accordingly, following the precedents cited above, we must vacate the initial decision as *ultra vires* the hearing examiner. We shall instead treat respondents' motion to dismiss the complaint as if it had been properly certified to the Commission by the examiner.

It is clear that the issues of fact and law raised by the complaint in this case were not rendered moot by the subsequent enactment of the Civil Rights Act of 1968.  The complaint here challenged the legality of certain newspaper advertisements under Section 5 of the Federal Trade Commission Act. The essence of the complaint was that respondents [*17]  are engaged in the business of rental and management of described apartment complexes in Arlington, Virginia; that they published advertisements in interstate commerce which conveyed the impression that their apartments were available to the general public without restrictions as to *race* or color; that, in fact, these apartments were not available for rental to applicants who are Negro; and that, therefore, the advertisements were false, misleading, and deceptive.

If these allegations of the complaint were proved by the evidence adduced at the hearings, a violation of the Federal Trade Commission Act would have been established.  Section 5 proscribes "any advertising matter whatsoever which creates a misleading impression in the mind of the ordinary purchaser * * *.  [An] advertisement may be deemed misleading even though the statements of fact it contains are not in and of themselves deceptive. The statutory ban applies to that which is suggested as well as that which is asserted." Handler, *The Control of False Advertising Under the Wheeler-Lea Act* , 6 Law & Comtemp. Prob. 91, 102 (1939).  An advertiser's failure to disclose material facts in circumstances where the effect [*18]  of nondisclosure is to deceive a substantial segment of the public is as much deception as if it were accomplished through affirmative misrepresentations.  "To tell less than the whole truth is a well known method of deception." *P. Lorillard Co. v. F.T.C., 186 F.2d 52, 58 (4th Cir. 1950).*

It is also clear that the enactment of the Civil Rights Act of 1968 does not render lawful any acts or practices which would otherwise be deemed unlawful under the Federal Trade Commission Act. Neither in its terms nor its legislative history does the Civil Rights Act disclose an intent by Congress to repeal or modify, in whole or in part, expressly or by implication, directly or indirectly, any provision of the Federal Trade Commission Act. Congress surely could not have intended, in passing the Civil Rights Act, to grant anyone a license to engage in false and misleading advertising that violates the Federal Trade Commission Act. Thus, if the facts presented before the hearing examiner showed a violation of the Federal Trade Commission Act, it would be immaterial that they might

---

[1] Now Section 14.

[2] Now Section 3.22.

1968 FTC LEXIS 65, *18

also show a violation of the Civil Rights Act of 1968.  Conduct that violates one federal **[*19]** statute does not become immune because it also violates another statute.

Accordingly, it is not necessary for us to consider whether respondents' conduct violated, or was subject to the remedies or sanctions of, the Civil Rights Act of 1968.  To the extent that compliance with the requirements of that Act may eliminate false and misleading advertising which violates the Federal Trade Commission Act, and thereby obviates the need for corrective action against such advertising under the statutes administered by this Commission, the enactment of the Civil Rights Act does bear significantly on the public interest which we must consider in developing "that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." *Moog Industries, supra* .

However, we reject any contention that enactment of the Civil Rights Act of 1968 constitutes a mandate by Congress to this Commission to cease and desist enforcement of the Federal Trade Commission Act in the area of fase and misleading advertising of housing covered by the Civil Rights Act. **[*20]**  In this connection, we have noted the following provision in the Fair Housing Title of that Act:

All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this title and shall cooperate with the Secretary [of Housing and Urban Development] to further such purposes.  (Title VIII, Section 808(d), 82 Stat. 73, 84-85.)

In the context of these general considerations, we return to the question of the disposition of respondents' motion to dismiss. In their motion, the respondents specifically state that there is "no real possibility that the alleged restrictions as to *race*, color and national origin which respondents allegedly failed to reveal in advertising can be continued." The Commission interprets this statement as a positive, unqualified affirmation that respondents have discontinued, and will not resume, a policy of restricting the availability of their apartments on the basis of *race*, color, or national origin. Such a change of rental policy necessarily eliminates from their advertising the deception challenged in the complaint.  At this time, therefore, **[*21]** it would appear that the allegedly illegal acts and practices have been effectively terminated and that an order to cease and desist would serve no useful purpose.  If it should transpire, however, that we are mistaken in this regard, the matter can always be reopened if necessary.

In view of the unique circumstances presented, therefore, the Commission has determined that the initial decision should be vacated and the complaint dismissed.

## Administrative Law Judge-Decision

LEWIS

## Order

ORDER VACATING INITIAL DECISION AND DISMISSING COMPLAINT

For the reasons stated in the accompanying opinion,

*It is ordered* , That initial decision of the hearing examiner, filed April 24, 1968, be, and it hereby is, vacated, and that the complaint in this proceeding be, and it hereby is, dismissed.

End of Document

Version 2 – October 2012

# CFPB Supervision and Examination Manual

This examination manual provides internal guidance to supervisory staff of the CFPB. It does not bind the CFPB and does not create any rights, benefits, or defenses, substantive or procedural, that are enforceable by any party in any manner. While every effort has been made to ensure accuracy, examination procedures should not be relied on as a legal reference.



Consumer Financial
Protection Bureau

 Consumer Financial Protection Bureau

October 1, 2012

To the Reader:

Today we are releasing Version 2 of the *CFPB Supervision and Examination Manual,* the guide our examiners use in overseeing companies that provide consumer financial products and services. Our manual, originally released in October 2011, describes how the CFPB supervises and examines these providers and gives our examiners direction on how to determine if companies are complying with consumer financial protection laws.

We updated the supervision manual to reflect the renumbering of the consumer financial protection regulations for which the CFPB is responsible. The numbering conventions in the Code of Federal Regulations (CFR) allow the reader to easily identify which regulations fall under a particular agency's responsibility. The renumbering incorporated throughout the manual reflects the Dodd-Frank Act of 2010 transfer of rulemaking responsibility for many consumer financial protection regulations from other Federal agencies to the CFPB. In December 2011, the CFPB published its renumbered regulations in the *Federal Register*. The renumbered regulations also included certain technical changes but no substantive changes. The CFPB's renumbering reflects the codification of its regulations in Title 12 (Banks and Banking), Chapter X (Bureau of Consumer Financial Protection) of the CFR. For example, before July 21, 2011, the Federal Reserve had rulemaking authority for the Home Mortgage Disclosure Act, which was codified in Title 12, Chapter II (Federal Reserve System), Part 203. The CFPB's implementing regulation for the Home Mortgage Disclosure Act is now codified in Title 12, Chapter X, Part 1003.

In addition to changes related to the renumbering of the CFPB regulations, the manual incorporates updated interagency examination procedures for the Truth in Lending Act (TILA) and for the Fair Credit Reporting Act (FCRA), both of which were revised to reflect statutory and regulatory changes. Specifically, changes to the TILA procedures include amendments to TILA and its implementing Regulation Z pursuant to the Credit Card Accountability Responsibility and Disclosure Act of 2009. Changes to the FCRA procedures include Dodd-Frank Act amendments that require the disclosure of a credit score and related information when a credit score is used in taking an adverse action or in risk-based pricing.

Finally, we updated the manual to incorporate:
- new examination procedures released since the issuance of the manual in October 2011 (covering mortgage origination; short-term, small-dollar lending; SAFE Act; and consumer reporting);
- the June 21, 2012, Interagency Guidance on Mortgage Servicing Practices Concerning Military Homeowners with Permanent Change of Station Orders; and
- technical corrections and formatting changes.

The CFPB welcomes feedback and suggestions from industry representatives and participants, consumer groups, and members of the public. Comments may be sent to CFPB_Supervision@CFPB.gov.

**Preface**
- Preface
- Table of Contents

**Part I – Compliance Supervision and Examination**

Supervision and Examination Process
- Overview
- Examination Process

**Part II – Examinations Procedures**

A. <u>Compliance Management System</u>

Compliance Management Review
- Examination Procedures

B. <u>Product-Based Procedures</u>

Consumer Reporting Larger Participants
- Examination Procedures

Mortgage Origination
- Examination Procedures

Mortgage Servicing
- Examination Procedures

Short-Term, Small-Dollar Lending
- Examination Procedures

C. <u>Statutory- and Regulation-Based Procedures</u>

Unfair, Deceptive or Abusive Acts or Practices
- Narrative
- Examination Procedures

Equal Credit Opportunity Act
- Narrative
- Examination Procedures
- Interagency Fair Lending Examination Procedures
- Interagency Fair Lending Examination Procedures – Appendix

Home Mortgage Disclosure Act
- Narrative

- Examination Procedures
- Checklist

Truth in Lending Act
- Narrative
- Examination Procedures

Real Estate Settlement Procedures Act
- Narrative
- Examination Procedures
- Checklist

Homeowners Protection Act
- Narrative
- Examination Procedures

Consumer Leasing Act
- Narrative
- Examination Procedures
- Checklist

Secure and Fair Enforcement for Mortgage Licensing (SAFE) Act
- Narrative
- Examination Procedures

Fair Credit Reporting Act
- Narrative
- Examination Procedures

Fair Debt Collection Practices Act
- Narrative
- Examination Procedures

Electronic Fund Transfer Act
- Narrative
- Examination Procedures
- Checklist

Truth in Savings Act
- Narrative
- Examination Procedures
- Checklist

Privacy of Consumer Financial Information (Gramm-Leach-Bliley Act)
- Narrative

- Examination Procedures
- Examination Procedures Attachment
- Checklist

**Part III – Examination Process Templates**

Templates
- Entity Profile
- Risk Assessment
- Supervision Plan
- Examination Scope Summary
- Compliance Management Review
- Examination Report – Cover Letter
- Examination Report
- Supervisory Letter – Cover Letter
- Supervisory Letter

# CFPB Supervision
# and Examination Process                    Overview

## Background

Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the Act)[1] established the Consumer Financial Protection Bureau (CFPB) and authorizes it to supervise certain consumer financial services companies and large depository institutions and their affiliates for consumer protection purposes.[2] The Bureau's purpose is set forth by Section 1021 of the Act:

> (a) **PURPOSE.—The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.[3]**

*Federal consumer financial law*

Subject to the provisions of the Act, the CFPB has responsibility to implement, examine for compliance with, and enforce "Federal consumer financial law."[4] Those laws include, among other things, Title X itself, which prohibits unfair, deceptive, or abusive acts and practices in connection with consumer financial products and services,[5] and the following "enumerated consumer laws"[6] and the implementing regulations.[7]

---

[1] The Act can be found here: http://www.gpo.gov/fdsys/pkg/PLAW-111publ203/pdf/PLAW-111publ203.pdf.

[2] Sec. 1024 of the Act authorizes CFPB to supervise certain entities and individuals that engage in offering or providing a consumer financial product or service and their service providers that are not covered by Secs. 1025 or 1026 of the Act. Specifically, Sec. 1024 applies to those entities and individuals who offer or provide mortgage-related products or services and payday and private student loans as well as larger participants of other consumer financial service or product markets as defined by a CFPB rule, among others, plus their service providers. Sec. 1025 authorizes CFPB to supervise those entities that are large insured depository institutions and credit unions with more than $10 billion in total assets and all their affiliates (including subsidiaries), as well as service providers for such entities. Sec. 1026 provides the prudential regulators with consumer compliance examination authority for smaller depository institutions ($10 billion or less in total assets) not covered by Sec. 1025. The Bureau may, under Sec. 1026, include its examiners on a sampling basis at examinations of smaller insured depository institutions to assess compliance with the requirements of Federal consumer financial law. Under Sec. 1026, the Bureau has supervisory authority over a service provider to a substantial number of smaller depository institutions. "Insured depository institutions" include banks and savings associations. Under Sec. 1029, the Bureau may not exercise any authority over certain dealers predominantly engaged in the servicing and sale or leasing of motor vehicles. For ease of reference for purposes of this manual, entities and individuals within the scope of Sec. 1024 are referred to as "non-depository consumer financial service companies," and those within the scope of Sec. 1025 are referred to as "large depository institutions and their affiliates." The following are referred to as "supervised entities": (1) non-depository consumer financial service companies and their service providers; (2) large insured depository institutions, large insured credit unions, and their affiliates, as well as service providers to these entities; and (3) service providers to a substantial number of small insured depository institutions or small insured credit unions.

[3] Emphasis added. See also Sec. 1021(b)(4).

[4] *See* Sec. 1002(14) for the definition of "Federal consumer financial law."

[5] *See* Sec. 1036; *see also* 1031.

[6] *See* Sec. 1002(12). Parts of Title XIV of the Act are also designated as enumerated consumer laws. *See* Sec. 1400(b).

[7] *See* Sec. 1002(12).

---

# CFPB Supervision
# and Examination Process                              Overview

- Alternative Mortgage Transaction Parity Act of 1982 (12 U.S.C. 3801 et seq.);

- Consumer Leasing Act of 1976 (15 U.S.C. 1667 et seq.);

- Electronic Fund Transfer Act (15 U.S.C. 1693 et seq.), except with respect to Section 920 of that Act;

- Equal Credit Opportunity Act (15 U.S.C. 1691et seq.);

- Fair Credit Billing Act (15 U.S.C. 1666 et seq.);

- Fair Credit Reporting Act (15 U.S.C. 1681et seq.), except with respect to Sections 615(e) and 628 of that Act (15 U.S.C. 1681m(e), 1681w);

- Home Owners Protection Act of 1998 (12 U.S.C. 4901 et seq.);

- Fair Debt Collection Practices Act (15 U.S.C. 1692 et seq.);

- Subsections (b) through (f) of Section 43 of the Federal Deposit Insurance Act (12 U.S.C. 1831t(b)–(f));

- Sections 502 through 509 of the Gramm-Leach-Bliley Act of 2009 [Privacy of Consumer Financial Information](15 U.S.C. 6802–6809) except for Section 505 as it applies to Section 501(b);

- Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2801 et seq.);

- Home Ownership and Equity Protection Act of 1994 (15 U.S.C. 1601 note);

- Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.);

- S.A.F.E. Mortgage Licensing Act of 2008 (12 U.S.C. 5101 et seq.);

- Truth in Lending Act (15 U.S.C. 1601 et seq.);

- Truth in Savings Act (12 U.S.C. 4301 et seq.);

- Section 626 of the Omnibus Appropriations Act of 2009, Public Law 111–8; and

- Interstate Land Sales Full Disclosure Act (15 U.S.C. 1701).

# CFPB Supervision
# and Examination Process                    Overview

In addition, the CFPB may enforce the following rules issued by the Federal Trade Commission:

- Telemarketing Sales Rule (16 CFR Part 310);[8]

- Use of Prenotification Negative Option Plans (16 CFR Part 425);

- Rule Concerning Cooling-Off Period for Sales Made at Homes or at Certain Other Locations (16 CFR Part 429);

- Preservation of Consumers' Claims and Defenses (16 CFR Part 433);

- Credit Practices (16 CFR Part 444);

- Mail or Telephone Order Merchandise (16 CFR Part 435);

- Disclosure Requirements and Prohibitions Concerning Franchising (16 CFR Part 436);

- Disclosure Requirements and Prohibitions Concerning Business Opportunities (16 CFR Part 437).

*Supervision and examination*

The statutory frameworks for supervision of large depository institutions and their affiliates and for non-depository consumer financial service companies are largely the same,[9] although the supervision authority for each is found in separate sections of the Act. The frameworks include:

- The purpose of supervision, including examination, to:

  o assess compliance with Federal consumer financial laws,

  o obtain information about activities and compliance systems or procedures, and

  o detect and assess risks to consumers and to markets for consumer financial products and services;

- The requirement to coordinate with other Federal and state regulators; and

- The requirement to use where possible publicly available information and existing reports to Federal or state regulators pertaining to supervised entities.

---

[8] The CFPB may enforce the Telemarketing and Consumer Fraud and Abuse Prevention Act.

[9] Most of the differences in the grants of supervision and examination authority will not be relevant for examiners in their daily work; supervised entities will be examined consistent with the applicable statutory provision.

# CFPB Supervision and Examination Process                    Overview

## Supervision and Examination Principles

Three main principles guide the CFPB supervision process.

*Focus on consumers*

The CFPB will focus on risks to consumers when it evaluates the policies and practices of a financial institution. We expect that institutions will offer consumer financial products and services in accordance with Federal consumer financial laws and will maintain effective systems and controls to manage their compliance responsibilities. As we conduct our reviews, we will focus on an institution's ability to detect, prevent, and correct practices that present a significant risk of violating the law and causing consumer harm.[10]

*Data Driven*

Like all CFPB activities, the supervision function rests firmly on analysis of available data about the activities of entities it supervises, the markets in which they operate, and risks to consumers posed by activities in these markets. Supervision staff (examiners and analysts) will use data from a wide range of sources: data obtained from the entity and through direct observation during monitoring and examination; information provided by the CFPB's Research, Markets and Regulations and Consumer Education and Engagement divisions, the Office of Fair Lending and Equal Opportunity, the Enforcement division, Consumer Response Center, and Offices addressing the special needs of students, Older Americans, Service members, and the underserved; and other state and Federal regulatory agencies.

*Consistency*

The CFPB will supervise both depository institutions that offer a wide variety of consumer financial products and services and non-depository consumer financial services companies that offer one or more such products. In order to fulfill its statutory mandate to consistently enforce Federal consumer financial law, the CFPB will apply consistent standards in its supervision of both types of entities, to the extent possible. To help accomplish this, the CFPB will use the same procedures to examine all supervised entities that offer the same types of consumer financial products or services, or conduct similar activities.

Such consistency, however, does not dictate uniformity in supervisory expectations. While all of the firms under our jurisdiction must follow the law, we understand that the means that they employ to achieve that goal will – and likely should – differ. We recognize that large, complex entities necessarily have different compliance oversight and management systems than smaller entities or those offering a more limited number of products or services.

---

[10] The discussion of the Risk Assessment under Pre-examination Planning in this Manual describes more fully what the CFPB means by risks or potential risks of consumer harm.

# CFPB Supervision and Examination Process                    Overview

## Examination Scheduling

Non-depository consumer financial services companies will be identified for examination on the basis of risks to consumers, including consideration of the company's asset size, volume of consumer financial transactions, extent of state oversight, and other factors determined relevant by CFPB. Examinations will be coordinated with State and prudential regulators as applicable.[11]

Regular examination schedules for large depository institutions and affiliates will depend on two considerations: (1) an assessment of risks to consumers and (2) ensuring consistency with statutory requirements that CFPB and prudential regulators coordinate the scheduling of examinations of large depository institutions and affiliates and conduct "simultaneous" examinations of depository institutions, as well as coordinating examinations with State regulators.[12]

Supervised entities will generally be notified in advance of an upcoming examination.

## General Description of Examinations

Examiners will coordinate throughout the supervision and examination process with Supervision managers, and analysts, experts, and attorneys from Supervision, Research, Markets and Regulations, the Office of General Counsel, and other CFPB divisions at Headquarters. Supervision will work especially closely with the Office of Fair Lending and Equal Opportunity (OFLEO) and the Enforcement division when reviewing fair lending compliance and evaluating other potential violations of Federal consumer financial laws. In this Manual the coordination process will generally be referred to as "consulting internally." Alternatively, "Headquarters" will be used to signify the involvement of multiple divisions or offices in addition to Supervision.

Specific examination procedures will be similar to those of the prudential and, in some instances, State regulators.[13] As appropriate and in accordance with CFPB policy, examiners and Supervision managers will generally do the following in the course of an examination:

- Collect and review available information (from within the CFPB, from other Federal and state agencies, and from public sources), consistent with statutory requirements;

- Request and review supplementary documents and information from the entity to be examined;

- Develop and obtain internal approval for a preliminary risk focus and scope for the onsite portion of the examination;

- Go onsite to observe, conduct interviews, and review additional documents and information;

---

[11] *See* Sec. 1024(b)(3).

[12] *See* Sec. 1025(e).

[13] Prudential regulators refer to the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, National Credit Union Association, and Office of the Comptroller of the Currency.

# CFPB Supervision and Examination Process                    Overview

- Consult internally if the examination indicates potential unfair, deceptive, or abusive acts or practices; discrimination; or other violations of law;

- Draw preliminary conclusions about the regulated entity's compliance management and its statutory and regulatory compliance;

- Consult internally about follow-up corrective actions that the institution should take, whether through informal agreement or a formal enforcement action, if warranted by findings;

- Draft the examination report;

- Obtain appropriate internal review and approval for the examination work and draft examination report;

- Share the draft report with the prudential regulator and obtain and consider any comments they may offer, consistent with statutory requirements; and

- After final internal clearance, finalize and transmit the report to the supervised entity.

During the examination, the Examiner in Charge will communicate with appropriate supervised entity personnel about preliminary findings and conclusions. CFPB will seek cooperation from the entity to correct any problems identified.

**The CFPB considers all supervisory information, including examination reports and ratings, highly confidential. Requirements for the handling of supervisory information not only by CFPB employees, but also by supervised institutions are described in its regulation on the *Disclosure of Records and Information*.**[14]

Detailed examination procedures are located in Part II of this Manual.

## Examination Follow-up

How the CFPB addresses negative examination findings will depend, among other things, on the individual facts and circumstances at issue. Whether informal supervisory measures or formal enforcement action is necessary will depend on the type of problem(s) found and the severity of harm to consumers. Self-correction will be encouraged, but some circumstances may nevertheless be sufficiently serious to warrant a public enforcement action. With respect to large depository institutions and their affiliates, CFPB will share draft examination reports and consult with prudential regulators regarding supervisory action, consistent with statutory requirements.[15]

---

[14] 12 CFR Part 1070 (76 FR 45372) (July 28, 2011)).

[15] *See* Sec.1025(e).

# CFPB Supervision and Examination Process                Overview

## Target and Horizontal Reviews

In addition to regularly scheduled examinations, CFPB expects to conduct Target and Horizontal Reviews. Target Reviews will generally involve a single entity and will focus on a particular situation such as significant volume of particular customer complaints or a specific concern that has come to CFPB's attention. Horizontal Reviews will look across multiple entities to examine issues arising from particular products or practices and determine whether supervisory measures or enforcement actions are needed.

## Enforcement Authority

CFPB is authorized to conduct investigations to determine whether any person is, or has, engaged in conduct that violates Federal consumer financial law.[16] Investigations may be conducted jointly with other regulators,[17] and may include subpoenas or civil investigative demands for testimony, responses to written questions, documents, or other materials.[18]

CFPB may bring administrative enforcement proceedings[19] or civil actions in Federal district court.[20] The Bureau can obtain "any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law," including, but not limited to:

- Rescission or reformation of contracts.

- Refund of money or return of real property.

- Restitution.

- Disgorgement or compensation for unjust enrichment.

- Payment of damages or other monetary relief.

- Public notification regarding the violation.

- Limits on the activities or functions of the person against whom the action is brought.

- Civil monetary penalties (which can go either to victims or to financial education).

CFPB has no criminal enforcement authority.

---

[16] Sec. 1051

[17] Sec. 1052(a)

[18] Sec. 1052(b) and (c)

[19] Sec. 1053

[20] Sec. 1054

# CFPB Supervision
# and Examination Process                              Overview

## Referral of Matters or Information to Other Agencies

### *Criminal Activity*

In the course of their work, examiners may obtain evidence that a regulated entity or a customer has engaged in conduct that may constitute a violation of Federal criminal law. The CFPB is required by the Act[21] to refer such findings to the Department of Justice (DOJ) for further review and action. Examiners who, during the course of conducting their examination duties, believe they have found evidence of criminal conduct should consult internally to discuss their findings and the appropriate next steps. Headquarters will handle referral of appropriate matters to DOJ.

Some examples of fact scenarios that may necessitate a referral to the DOJ include, but are not limited to, the following:

- Based on documented information that the examiner has obtained, a regulated entity's financial records are comprised of data that appear to be false.

- A regulated entity's records or files show that it has direct business relationships with individuals or businesses based in a country that is the target of one or more types of United States government sanctions. (See sanctioned country lists at www.treasury.gov and www.state.gov.)

- A loan file or other type of file or record concerning a customer of a regulated entity contains one or more of the following documents that may indicate that the customer has engaged in potentially criminal conduct:

    o Bank statements that show that the customer has one or more bank accounts in a country that is a target of United States government sanctions. (*See* sanctioned country lists at www.treasury.gov and www.state.gov.)

    o Based on documented information in a loan file, (1) a loan application appears to contain false information, (2) an appraisal for real property appears to contain false information, or (3) a document used to verify loan eligibility appears to contain false information. (Documents used to verify loan eligibility include but are not limited to bank statements, Forms 1099, Forms W-2, and/or federal income tax returns.)

### *Tax Law Non-Compliance*

The CFPB is also required under the Act to refer information identifying possible tax law non-compliance to the Internal Revenue Service (IRS).[22] Examiners who, during the course of conducting their examination duties, believe they have found evidence of tax law non-compliance should consult internally about the appropriate next steps. Headquarters will handle referral of matters to the IRS.

---

[21] *See* Sec. 1056

[22] *See* Secs. 1024(b)(6) and 1025(b)(5).

# CFPB Supervision
# and Examination Process                    Overview

Some examples of fact scenarios that may necessitate a referral to the IRS include, but are not limited to, the following:

- Based on documented information that the examiner has obtained, a regulated entity's tax returns are comprised of data that appear false.

- A loan file or other type of file or record concerning a customer of a regulated entity contains one or more of the following documents that may indicate that the customer has failed to comply with the tax laws:

  o Documents used to verify loan eligibility that clearly document that the customer has substantially greater income than the income that the customer reported on Federal income tax returns. Documents used to verify loan eligibility include statements showing a customer's investment portfolio, bank statements, and/or Forms 1099.

### *ECOA/pattern or practice*

The Equal Credit Opportunity Act (ECOA) requires the CFPB to refer matters to DOJ whenever the CFPB "has reason to believe that one or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of Section 1691(a)" of ECOA, which states ECOA's basic prohibitions against discrimination.[23] In matters that do not involve a pattern or practice of discouragement or denial, the CFPB may refer the matter to the DOJ whenever the agency has reason to believe that one or more creditors has violated Section 1691(a).[24] Headquarters will handle referral of appropriate matters to DOJ.

### *Matters not within the CFPB's authority*

When examiners find information that may indicate violations of law that are not within the CFPB's authority, the information will be passed on to the appropriate prudential, other Federal, or state regulator. These situations will generally be handled by the Examiner in Charge, after consulting internally.

---

[23] 15 U.S.C. § 1691e(g).

[24] *Id.*

# CFPB Supervision and Examination Process                    Overview

## The Supervision and Examination Cycle

| Pre-Examination / Scoping |
|---|
| ▪ Review and analyze available information to identify risks, areas of inquiry, and focus<br>▪ Request and review documents and information needed to begin examination (e.g., internal policies, audit reports, training materials, recent data)<br>▪ Make initial plan for on-site testing and review |

| Examination (offsite and onsite) |
|---|
| ▪ Interview senior managers, loan officers, compliance officers, and account personnel as appropriate<br>▪ Observe operations (e.g., call center, branches)<br>▪ Compare policies and procedures to actual practices by reviewing a sample of transactions<br>▪ Compare conduct to legal requirements and policy guidance |

| Monitoring |
|---|
| ▪ **Nonbank** – Product / Market analysis<br>▪ **Bank** – Periodic checks on institution activities; calls and meetings<br><br>**Both —**<br><br>▪ Risk Assessment<br>▪ Review reports and information |

| Communicate conclusions and required corrective action |
|---|
| ▪ Communicate findings and expected corrective actions to management and Board of Directors<br>▪ Pursue appropriate supervisory agreement or formal enforcement action as needed |

As shown in the graphic and described in more detail below, CFPB supervision will operate as a continuous cycle. Although specific examination procedures are consistent, there are some differences in the Bureau's approach to supervising depository institutions, and non-depository consumer financial services companies, as outlined below.

# CFPB Supervision
# and Examination Process                           Overview

*Non-depository consumer financial services companies*

The Nonbank Supervision Risk Analytics and Monitoring team (RAM) in Headquarters will provide risk-based analysis of consumer financial markets and participants in the financial marketplace to support the examination program. This team will acquire and analyze qualitative and quantitative information and data pertaining to consumer financial product and service markets to determine what industries and institutions pose the greatest risk to consumers. The data will include external data, including, but not limited to, Home Mortgage Disclosure Act and Home Affordable Modification Program data, institution and industry reports, state and Federal reports of examination, and legal documents. It will also include CFPB-generated data, such as complaints, reports of examination, and market and other reports. Using consumer risk indicators for particular markets, RAM will provide a risk ranking of entities to program teams for use in scheduling examinations. Once a particular examination is scheduled, the examination team will follow the same general examination process used for all supervised entities, including preparation of a Risk Assessment and an Examination Scope Summary. The Supervision Plan template will generally not be used for non-depository consumer financial services companies. These documents are described below and in Part II of this Manual.

*Depository Institutions*

Each large depository institution will be assigned a Lead Examiner who will, either individually or with a team, monitor information about the entity and its affiliates. That information will be collected in an Institution Profile and used as the basis for a Risk Assessment and a Supervision Plan. The Lead Examiner may or may not be the Examiner in Charge of a particular examination of the entity. The Institution Profile, Risk Assessment, and Supervision Plan will be updated as appropriate with information gathered through regular monitoring as well as examinations.

*Monitoring:* The purpose of depository institution monitoring is to maintain reasonably current information about the institution's activities in order to determine whether changes in risks to consumers or markets warrant a change in the CFPB Supervision Plan. Affiliated entities are considered together. The frequency and depth of monitoring will vary depending on the organization's risk profile, but should be undertaken at least quarterly. As an initial matter, Lead Examiners and their supervisors will agree on a monitoring schedule.

# CFPB Supervision
# and Examination Process                               Overview

Basic monitoring activities include:

- Reviewing supervisory and public information about the entity, such as:

    o Prudential and state regulator examination reports;

    o Community Reinvestment Act (CRA) performance evaluations;

    o Current enforcement actions;

    o Call report data;

    o Complaint data;

    o Home Mortgage Disclosure Act;

    o Home Affordable Modification Program Data;

    o SEC filings;

    o Licensing or registration information;

    o Reports from the entity to prudential or state regulators, if any;

    o CFPB research analyst reports; and

    o Institution website.

- Contacting the appropriate officer of the institution to discuss new products or services, events that may impact compliance management, and any questions raised by information reviewed by the Lead Examiner.

- Contacting the prudential regulator to discuss any recent events and any questions raised by supervisory or public information about the institution.

- Consulting internally.

After reviewing periodic monitoring information, the Lead Examiner should update the Institution Profile, Risk Assessment, and Supervision Plan as appropriate.

*Institution Profile:*  The Institution Profile contains summary information about a depository institution and its affiliates and provides a quick reference guide. An Institution Profile template is provided in Part III.

*Risk Assessment:*  The Lead Examiner completes and periodically updates a Risk Assessment for a large depository institution and its affiliates. The Risk Assessment may be the product of multiple individual Risk Assessments of specific lines of business or companies. It provides the basis for the Supervision Plan, which is the CFPB plan for supervising a depository institution and its affiliates and for allocating supervision resources to the organization. The same risk assessment process is also used to scope examinations, as discussed in Part II, where the process is discussed in more detail. A Risk Assessment template is provided in Part III.

# CFPB Supervision and Examination Process                    Overview

*Supervision Plan*:  The Supervision Plan, which is based on the Institution Profile and Risk Assessment, summarizes the plan for monitoring and examining the institution and its affiliates. It describes the priorities for CFPB supervision activities to assist in allocating and scheduling examiner resources. It describes the plan and timeline for monitoring the institution, including any follow-up required for Matters Requiring Attention identified during examinations, other supervisory measures, or enforcement actions. The minimum monitoring schedule is quarterly. The Supervision Plan describes the proposed focus and scope of examination activities during the year (either a full examination or a series of limited examinations); information about scheduling coordination with the prudential and/or state regulators; and the proposed number of examiners, deployment schedule, and any special skills or knowledge needed.

The Plan should be updated at least annually and may be updated at any time as a result of changes in the Risk Assessment. A Supervision Plan template is provided in Part III.

# CFPB Supervision and Examination Process                     Examinations

## Pre-Examination Planning

The goal of a risk-focused examination is to direct resources toward areas with higher degrees of risk. CFPB examinations focus on risks of harm to consumers, including the risk a supervised entity will not comply with Federal consumer financial law. The overall objective of pre-examination planning is to collect information necessary to determine the examination's scope, resource needs, and work plan. This information allows the Examiner in Charge (EIC) or designee and the examination team to plan and conduct its work both offsite and onsite during the examination. The information available, timing, and order in which steps are performed may vary by the type of examination or supervised entity.

Pre-examination planning consists of gathering available information and documents and preparation of an examination Information Request. The examination Information Request is a tailored list of information and documents that the supervised entity is asked to forward to CFPB for offsite review or make available when the examiners arrive onsite. It may include a request for an electronic data download. The pre-examination planning process will vary depending on the size, complexity, business strategy, products, systems, and risk profile of a particular supervised entity. This section provides a general overview of the process.

*Gather Available Information*

The EIC and examination team members collect information about a supervised entity from both internal and external sources to aid in constructing the risk focus and scope of an examination. Examiners should gather as much information as possible from within the CFPB, other regulatory agencies, and third-party public sources, because the Bureau is required by statute to use, to the fullest extent possible, information available from other agencies or reported publicly.[1]

The following key documents and information are relevant to understanding a supervised entity and its ability to manage its compliance responsibilities and risks to consumers. Not all documents will necessarily be available for a particular entity.

*From CFPB Internal Sources and Other Regulatory Agencies*

- Monitoring information;

- Most recent Risk Assessment;

- Prior Scope Summary, Supervision Plan, or similar document produced by state or prudential regulator;

- Prior Examination Reports and supporting workpapers (internal and from Federal prudential regulator, state regulator(s), or other agency);

---

[1] *See* Dodd-Frank Act, Secs. 1024(b)(4) and 1025(a)(3).

# CFPB Supervision
# and Examination Process                    Examinations

- Information about prior corrective actions (such as restitution) and responses to Examination Reports;

- Information on enforcement or other public actions (if applicable);

- Correspondence from prudential or state regulator(s) and CFPB correspondence files;

- State licensing information for the entity;

- Complaint information (internal, state, CFPB, other sources);

- FTC Consumer Sentinel database;

- Uniform Bank Performance Report (UBPR) and Call Reports;

- Previous years' FFIEC Home Mortgage Disclosure Act Loan Application Registers (HMDA LARs);

- Home Affordable Modification Program data;

- Fair lending analysis;

- Office of the Comptroller of the Currency (OCC) Federal Housing Home Loan Data System (FHHLDS) report;

- Mortgage Call Report (MCR) from the Nationwide Mortgage Licensing System (NMLS); and

- Registration or licensing information for mortgage originators (Secure and Fair Enforcement for Mortgage Licensing Act (SAFE Act)

*From Public Information or Third Parties*

- Institution securities filings, its offered securitizations, and similar public records;

- Industry publications showing credit ratings, product performance, and areas of profitability;

- Newspaper articles, web postings, or blogs that raise examination related issues;

- Neighborhood Watch: http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/lender/nw_home;

- Vendor programs; and

- Content of the supervised entity's website.

Before contacting the supervised entity to gather additional information, the EIC (or designee(s)) reviews the material gathered from these sources to help avoid duplicative requests. Of course, it may still be necessary to verify or update the information or documents with the supervised entity, but the burden of production will be reduced.

# CFPB Supervision and Examination Process                    Examinations

*Update or Prepare the Risk Assessment*

CFPB's Risk Assessment is designed to evaluate on a consistent basis the extent of risk to consumers arising from the activities of a supervised entity or particular lines of business within it and to identify the sources of that risk. "Risk to consumers" for the purpose of the CFPB Risk Assessment is the *potential* for consumers to suffer economic loss or other legally-cognizable injury (e.g., invasion of privacy) from a violation of Federal consumer financial law. The risk assessment includes factors related particularly to the potential for unfair, deceptive or abusive practices, or discrimination. Two sets of factors interact to result in a finding that the overall risk in a business or entity is low, moderate, or high. The first set of factors relate to the inherent risk in the particular line of business or the entity overall. The second set of factors is the quality of controls that manage and mitigate that risk. The Risk Assessment also includes a judgment, based on current or recent information, about the expected change in the overall risk: decreasing, increasing, or unchanged.

The CFPB uses the Risk Assessment described below, and presented as a template in Part III, to develop its plan for supervising and examining large depository institutions and their affiliates (the Supervision Plan), and to determine the focus of particular examinations. Risk Assessments will be used to set priorities and focus examination and supervision activities.

***Risk assessments are not used to reach conclusions about whether an entity has violated a particular law or regulation.***

The Lead Examiner completes or updates a Risk Assessment at least annually for a large depository institution and its depository and non-depository affiliates. When evaluating the group of entities as a whole, considerations include the extent to which these affiliates share or allocate risk (such as when one entity purchases or services loans originated by another) and the ways in which they manage risk under a corporate compliance program (quality of risk management).

CFPB's Nonbank Supervision Risk Analytics and Monitoring unit and other Headquarters units, including the Office of Fair Lending and Equal Opportunity, will collect data about and from supervised non-depository consumer financial services companies in order to help define and assess risk for purposes of examination prioritization. The examination team will perform a more specific Risk Assessment as part of the pre-examination process.

In undertaking a Risk Assessment, examiners should consider both the volume and the nature of consumer complaints received by the entity or by regulatory bodies including the CFPB. In addition to shedding important light on the extent and types of concerns of consumers utilizing the entity's consumer financial products or services, complaints may provide indications of potential regulatory violations, including unfair, deceptive, or abusive acts or practices (UDAAPs). How the entity handles complaints is also a key element in evaluating its compliance management system.

Regulatory violations or matters requiring attention identified in prior examinations by the CFPB or by other regulatory agencies, including the prudential regulators, should also be considered when assessing risk and planning an examination.

# CFPB Supervision and Examination Process                    Examinations

*Inherent Risk*

For markets which involve the sale of financial services products or services to consumers, the key factors that are relevant in assessing risk are (i) the nature and structure of the products offered, (ii) the consumer segments to which such products are offered, (iii) the methods of selling the products, and (iv) the methods of managing the delivery of the products or services and the ongoing relationship with the consumer.[2]

*Quality of Controls and Mitigation of Inherent Risk*

The second part of the Risk Assessment entails an evaluation of the extent to which the institution has established controls to monitor and mitigate inherent risks to consumers. Some of these controls will necessarily be established and assessed across the lines of business at the institution or enterprise level, while others will operate at the line of business level to mitigate identified risks.

After risks are identified, the focus and priorities for examination or review activities will take into account the number of consumers potentially harmed and the severity of that potential harm.

*Expected Change/Direction of Risk*

Finally, the Risk Assessment calls for a determination of the direction of risk at the entity: increasing, decreasing, or stable. The direction determination should be based on the findings of very recent reviews or the most recent examination, recent changes in entity structure, new business strategy, monitoring information, or other information about prospective risk and risk management. The date of the most recent change in the direction of risk should also be noted. An institution that has been stable for a long time that suddenly changes will likely require a different supervisory response than one that has been on the same trajectory for some time, although both may be of serious concern.

A Risk Assessment template is provided in Part III.

*Develop a Scope Summary*

The Scope Summary is based in large part on the conclusions of the Risk Assessment. The table of risk conclusions from the Risk Assessment should be included in the Scope Summary.

The Examiner in Charge prepares the Scope Summary, which provides all members of the examination team with a central point of reference throughout the examination. The initial Scope Summary is based on internal consultation and a review of available information and documents gathered prior to sending the Information Request to the supervised entity; the Summary is developed after preparing the Risk Assessment.

---

[2] Some markets for consumer financial products or services operate on a business to business basis; this is true, for example, of the credit reporting market and the collections market. The factors that are indicative of inherent risk in these markets will be different from those in the business to consumer markets. Risk assessments for such businesses will be developed separately.

# CFPB Supervision
# and Examination Process                    Examinations

The initial Scope Summary addresses the following:

- The basis for the Risk Assessment; and

- Examination activities to be undertaken to review:

  o the compliance management system;

  o potential legal violations involving unfair, deceptive, or abusive practices;

  o fair lending compliance;

  o issues arising from complaints; and

  o specific regulatory compliance issues.

At the conclusion of the examination, the EIC updates the initial Scope Summary with the following:

- Description of changes to the examination scope during the course of the examination, and reasons for such changes; and

- Recommendations for the scope of the following examination.

The initial Scope Summary, as well as any material changes to the scope of the examination during the examination, should be approved in accordance with current CFPB requirements. The Scope Summary is maintained with the examination records in the Supervision and Examination System.

A Scope Summary template is found in Part III and may be tailored to individual circumstances as appropriate.

*Contact the Entity to be Examined*

For most full-scope examinations, the EIC, or designee, contacts the supervised entity's management approximately 60 days prior to the scheduled onsite date for the examination to arrange either a telephone or in-person discussion of the examination Information Request. The principal purpose of the discussion is to gather current information to ensure that the request is tailored to what is necessary to properly conduct the examination of that particular institution.

The EIC or designee should also use the discussion to help determine whether certain information needed for the examination should be sent to the examination team for review offsite or held for onsite review. The discussion should include the timing of production and the subsequent onsite examination. The EIC should use the discussions to apprise management about who should be available to be interviewed during the onsite portion of the examination. If not already known, the EIC should obtain information about the organization of the entity and where it maintains certain operations for the purpose of deciding which operation centers and/or branches the team will review.

# CFPB Supervision
# and Examination Process                     Examinations

For depository institutions under a continuous examination schedule, periodic requests will be necessary and the lead time may vary depending on the product, service, or regulation being reviewed.

Early contact and review provides the EIC the opportunity to determine if specialized examiner or other CFPB resources are needed for particular examination activities and then to obtain them.

A customizable Interview template is available in the Supervision and Examination System. It may be used as a tool to help guide the discussion with the supervised entity and the subsequent tailoring of the Information Request.

*Prepare and Send the Information Request*

After conducting the review and discussion outlined above, the EIC or designee will use the monitoring information and any other relevant information to customize an Information Request that includes only items that are pertinent to the examination of a particular entity. Not all items will be relevant to every examination. In addition, the Information Request must specify the review period when it requests information or documentation such as periodic reports, ledgers, policies and procedures, and administrative changes, to avoid receiving data not relevant to the examination.

The EIC or designee may provide the examination Information Request to entity management in either hard copy or electronic format, although electronic is preferred, indicating where the materials should be delivered and in what format. If at all possible, the requested materials should be delivered to the CFPB electronically. Examiners should consult with their field managers about what system should be used for secure requests and transmission of electronic examination files. The timing of the request and the response date must ensure that entity staff has sufficient time to assemble the requested information and the examination team has sufficient time to adequately review the materials.

Contacting the supervised entity at least 60 days prior to the onsite date, whenever feasible, and sending the examination information request as soon as possible thereafter will generally ensure that staff of the supervised entity have sufficient time to properly gather and submit the response, and that the examination team has time to conduct its offsite review. To the extent possible and consistent with statutory requirements, coordinate the examination information request with the prudential and state regulator(s) and keep them abreast of monitoring efforts, correspondence with the supervised entity, and schedule planning.

The customizable Information Request template is available in the Supervision and Examination System.

# CFPB Supervision
# and Examination Process                    Examinations

## Conduct the Examination

After receiving and reviewing the information and documents requested from the entity, the EIC will determine the specific examination procedures to use during the onsite review and how to deploy the examination team to conduct interviews, observations, transaction testing, and other processes. Guided by the Risk Assessment, every examination must include a review of compliance management, any potential unfair, deceptive, or abusive practices, and regulatory compliance matters presenting risks to consumers. Every examination of lending must also include a review for discrimination.

Available examination procedures are part of this Supervision / Examination Manual. Templates should be downloaded from the Supervision and Examination System and used to create workpapers.

Upon determining the onsite start date, the EIC should arrange an entrance meeting with the appropriate member(s) of the supervised entity's management. At the meeting, the EIC can introduce the examination team, discuss generally the expected activities, clarify any questions about arrangements for being onsite at the entity (such as building security, work space, etc.), and set the tone for the examination.

Thereafter, the EIC should meet regularly with the entity point of contact to discuss interim findings and examination progress. The EIC should also communicate regularly with his or her point of contact at the entity's prudential or state regulator(s).

Throughout the examination, the EIC should coordinate with his or her Field Manager regarding internal consultation and review requirements and should provide progress reports as required.

## Close the Examination

*Closing Meeting*

When the EIC determines that all onsite activities and internal CFPB consultations are complete, he or she should meet with the supervised entity's management to discuss the preliminary examination findings, expected corrective actions, recommended rating, and next steps, if any. Management should be reminded that supervisory information, including ratings, is confidential and should not be shared except as allowed by CFPB regulation. Depending on the severity of the findings, other CFPB representatives may attend this meeting as well. Management should be alerted if a meeting with the board of directors or principals of the supervised entity will be required.

***Entity management must be informed that examination findings, including compliance ratings, are not final until internal CFPB reviews are conducted and, in the case of an insured depository institution or affiliate, the prudential regulator has had the opportunity to review and comment on the draft report.***

# CFPB Supervision
# and Examination Process                    Examinations

*Determine the Compliance Rating*

The CFPB has adopted the FFIEC Uniform Consumer Compliance Rating System.[3] Under this system, after an examination a supervised entity is assigned a confidential consumer compliance rating based upon an evaluation of its present compliance with Federal consumer financial law and the adequacy of its systems designed to ensure compliance on a continuing basis. The rating system is based upon a scale of 1 through 5 in increasing order of supervisory concern. Thus, "1" represents the highest rating and consequently the lowest level of supervisory concern, while "5" represents the lowest, most critically deficient level of performance and therefore the highest degree of supervisory concern. Each of the five ratings is described in greater detail below.

In assigning a consumer compliance rating, all relevant factors must be evaluated and weighed. In general, these factors include the nature and extent of present compliance with Federal consumer financial law, the commitment of management to compliance and its ability and willingness to take the necessary steps to assure compliance, and the adequacy of systems, including internal procedures, controls, and audit activities designed to ensure compliance on a routine and consistent basis. The assignment of a compliance rating may incorporate other factors that impact significantly the overall effectiveness of an institution's compliance efforts.

While each type of entity supervised by the CFPB has differences in its general business powers, all generally are subject to the same Federal consumer financial laws covered by the rating system. Thus, there is no need to evaluate different types of entities on specific criteria relating to their particular industry. As a result, the assignment of a consumer compliance rating based on a set of uniform criteria will help direct supervisory attention in an efficient and consistent manner that does not depend solely upon the nature of the institution's business. The primary purpose of the uniform rating system is to help identify those institutions whose compliance with Federal consumer financial law displays weaknesses requiring special supervisory attention and which are cause for more than a normal degree of supervisory concern. To accomplish this objective, the rating system identifies an initial category of institutions that have compliance deficiencies that warrant more than normal supervisory concern. These institutions are not deemed to present a significant risk of financial or other harm to consumers, but do require a higher than normal level of supervisory attention. Institutions in this category are generally rated "3." The rating system also identifies certain institutions whose weaknesses are so severe that they may represent a substantial or general disregard for the law. These institutions are, depending upon nature and degree of their weaknesses, rated "4" or "5."

---

[3] This description of the rating system is adapted for CFPB purposes from the 1980 FFIEC resolution adopting the rating system.

# CFPB Supervision and Examination Process                    Examinations

The uniform identification of institutions causing more than a normal degree of supervisory concern will help ensure:

- That the degree of supervisory attention and the type of supervisory response are based upon the severity and nature of the institution's deficiencies;

- That supervisory attention and action are, to the extent possible, administered consistently, regardless of the type of institution or the identity of the supervising agency; and

- That appropriate supervisory action is taken with respect to those institutions whose compliance problems entail the greatest potential for financial or other harm to consumers.

## Consumer Compliance Ratings

Consumer Compliance Ratings are defined and distinguished as follows:

**One**

*An [entity] in this category is in a strong compliance position.* Management is capable of and staff is sufficient for effectuating compliance. An effective compliance program, including an efficient system of internal procedures and controls, has been established. Changes in consumer statutes and regulations are promptly reflected in the institution's policies, procedures, and compliance training. The institution provides adequate training for its employees. If any violations are noted they relate to relatively minor deficiencies in forms or practices that are easily corrected. There is no evidence of discriminatory acts or practices, reimbursable violations, or practices resulting in repeat violations. Violations and deficiencies are promptly corrected by management. As a result, the institution gives no cause for supervisory concern.

**Two**

*An [entity] in this category is in a generally strong compliance position.* Management is capable of administering an effective compliance program. Although a system of internal operating procedures and controls has been established to ensure compliance, violations have nonetheless occurred. These violations, however, involve technical aspects of the law or result from oversight on the part of operating personnel. Modification in the institution's compliance program and/or the establishment of additional review/audit procedures may eliminate many of the violations. Compliance training is satisfactory. There is no evidence of discriminatory acts or practices, reimbursable violations, or practices resulting in repeat violations.

# CFPB Supervision and Examination Process                    Examinations

**Three**

*Generally, an [entity] in this category is in a less than satisfactory compliance position.* It is a cause for supervisory concern and requires more than normal supervision to remedy deficiencies. Violations may be numerous. In addition, previously identified practices resulting in violations may remain uncorrected. Overcharges, if present, involve a few consumers and are minimal in amount. There is no evidence of discriminatory acts or practices. Although management may have the ability to effectuate compliance, increased efforts are necessary. The numerous violations discovered are an indication that management has not devoted sufficient time and attention to consumer compliance. Operating procedures and controls have not proven effective and require strengthening. This may be accomplished by, among other things, designating a compliance officer and developing and implementing a comprehensive and effective compliance program. By identifying an institution with marginal compliance early, additional supervisory measures may be employed to eliminate violations and prevent further deterioration in the institution's less-than-satisfactory compliance position.

**Four**

*An [entity] in this category requires close supervisory attention and monitoring to promptly correct the serious compliance problems disclosed.* Numerous violations are present. Overcharges, if any, affect a significant number of consumers and involve a substantial amount of money. Often practices resulting in violations and cited at previous examinations remain uncorrected. Discriminatory acts or practices may be in evidence. Clearly, management has not exerted sufficient effort to ensure compliance. Its attitude may indicate a lack of interest in administering an effective compliance program that may have contributed to the seriousness of the institution's compliance problems. Internal procedures and controls have not proven effective and are seriously deficient. Prompt action on the part of the supervisory agency may enable the institution to correct its deficiencies and improve its compliance position.

**Five**

*An [entity] in this category is in need of the strongest supervisory attention and monitoring.* It is substantially in non-compliance with the consumer statutes and regulations. Management has demonstrated its unwillingness or inability to operate within the scope of consumer statutes and regulations. Previous efforts on the part of the regulatory authority to obtain voluntary compliance have been unproductive. Discrimination, substantial overcharges, or practices resulting in serious repeat violations are present.

# CFPB Supervision
# and Examination Process                    Examinations

*Draft the Examination Report*

An Examination Report template is provided in Part III. Instructions are embedded in it.

The primary purpose of the report is to communicate examination findings to the board of directors or principals and senior executives of a supervised entity. The report narrative should be concise, constructive, and direct. The commentaries for stable 1-rated entities with low consumer or compliance risk should be brief, while the commentaries for 2- through 5-rated institutions and those with elevated or increasing risk should successively provide more support and detail.

Comments should clearly cite statutory or regulatory violations and describe the basis for the findings. This will ensure that the supervised entity understands the basis for the conclusions and so that enforcement actions, if required, are well supported. Matters Requiring Attention and Required Corrective Actions must include specific expectations and the expected time frame for implementation.

For each specific area reviewed, the narrative sections of the report have three parts: conclusion, comments and supporting analysis, and required corrective actions:

- *Conclusion* – The Conclusion contains an overall conclusion followed by a concise summary of findings. The conclusion should match the tone and language of the rating definition. This section should include summary details or facts supporting the conclusion, including a summary of material deficiencies that support 3, 4, and 5 ratings. Avoid an overly detailed conclusion section. Include details supporting the conclusion in the Comments and Supporting Analysis section. Do not include cross-references within the Conclusion section.

- *Comments and Supporting Analysis* – Comments discuss major strengths and/or weaknesses to support the conclusions. Supporting Analysis is information that demonstrates conclusions.

- *Required Corrective Actions* – Required Corrective Actions identify actions that management needs to take to resolve supervisory concerns. They should include specific action requirements and time frames for completion. If there are no corrective actions for a particular area, just insert "N/A."

If a finding is sufficiently serious to bring to the attention of the board of directors or principals of an entity, the Required Corrective Action should be included in the Matters Requiring Attention section of the Examination Conclusions. Include repeat deficiencies as Matters Requiring Attention.

Suggestions or ideas for management to consider may be included in the Recommendations section. The CFPB does not require follow-up for Recommendations; they are provided as suggestions to improve already satisfactory operations.

The Examination Report comments should focus on those matters that support the overall conclusion and rating; they do not need to cover every area reviewed during an examination.

# CFPB Supervision and Examination Process

Examinations

*Submit Examination Report for Review*

After the Examination Report draft is complete, the EIC uploads it into the Supervision and Examination System. The Field Manager or designee will review it and will obtain any other reviews required by internal CFPB policy.

If the report concerns an insured depository institution, the draft must be shared with the institution's prudential regulator.[4] The regulator must be given a reasonable opportunity to review and comment (not less than 30 days after the date of receipt of the report by the prudential regulator). The CFPB must take into consideration any concerns raised by the prudential regulator prior to issuing a final Examination Report or taking supervisory action. The interagency comment process will be managed by the CFPB's regional offices, with input from CFPB headquarters as appropriate. If a conflict arises between the CFPB and the prudential regulator regarding a proposed supervisory determination, regional and Headquarters management will seek to resolve the issue as expeditiously as possible, with due regard for each agency's supervisory responsibilities.

If the report concerns other types of regulated entities, opportunities for comment by state regulators will depend on whether CFPB is conducting joint or coordinated examinations with the relevant state regulators. The comment process will also be handled by the regional offices.

*Board of Directors or Principal(s) Meeting*

The purpose of a meeting with a supervised entity's board of directors or principal(s) is to convey the findings of an examination directly to those individuals ultimately responsible for the policies and procedures of the institution. Board meetings should be conducted after the closing meeting with management, and should be attended by at least a quorum of directors or by the entity principal(s). The EIC and appropriate CFPB management should attend. The board or principals should be reminded that the examination report and rating are confidential and should not be disclosed except as permitted by CFPB regulation.[5]

A board or principal(s) meeting is required when one or more of the following circumstances are present:

- The proposed compliance rating is "3," "4," or "5";

- An informal supervisory agreement or formal enforcement action is recommended; or

- The supervised entity's management, board, or principal(s) requests such a meeting.

The meeting should be used to discuss examination findings, Matters Requiring Attention, and expected corrective actions; advise the board or principal(s) of the recommended compliance rating; and discuss any recommended enforcement actions.

---

[4] Dodd-Frank Act, Section 1025(e)(1)(C)

[5] *See* 12 CFR 1070.42

# CFPB Supervision and Examination Process                    Examinations

The timing of a board or principal(s) meeting will depend on the specific situation, and the EIC should work this out with his or her Field Manager, who will ensure the necessary internal coordination. Meetings should be coordinated with Federal prudential and state examiners, and planned for regularly scheduled meetings whenever possible.

*Send the Examination Report*

The EIC signs the final Examination Report. Regional office administrative staff will handle transmission to the supervised entity.

*Upload Final Examination Documents*

At the conclusion of the examination, the EIC must finalize the Scope Summary, ensure all workpapers are complete, and be certain that all required documents and information are uploaded or entered into the Supervision and Examination System.

## Examination Workpapers

During an examination, examiners collect and review information from the supervised entity to reach conclusions about its practices, its compliance management, and its compliance with specific laws and regulations. The records documenting the review are called workpapers. Workpapers should contain sufficient information and supporting documents to explain – to a knowledgeable reviewer – the basis for the examination conclusions.

*Purposes of Workpapers*

Examiners develop and maintain workpapers for three principal purposes:

- To provide a record of the work performed during the examination that supports findings or recommendations made during the examination;

- To maintain the evidence necessary to support supervisory agreements or formal enforcement actions; and

- To facilitate internal quality control reviews.

All information collected and all records created during the examination could potentially be included in the workpapers. For example, if an examiner interviews a Real Estate Lending Officer, the write-up of the interview notes becomes a workpaper. If the examiner also scans pages of the supervised entity's RESPA procedures manual to help illustrate deviations from policy, the scanned pages should be included in the workpapers. Other examples of workpapers include, but are not limited to:

- Completed CFPB Examination Procedures (downloadable templates that allow the examiner to enter narrative findings as they follow the procedures);

- Completed CFPB Checklists;

# CFPB Supervision
# and Examination Process                    Examinations

- Other documents such as spreadsheets created during the examination;

- Documentation of staff and management interviews;

- Meeting agendas, attendance lists, and notes or minutes;

- Documentation of compliance research performed (e.g., legal opinions, regulation sections reviewed, regulatory alerts); and

- Scanned copies of material obtained from the supervised entity, such as policies, procedures, rate sheets, internal memos and reports, external audit reports, complaint letters.

Generally, workpapers should document or support the:

- Proposed scope of the examination and any changes to the scope during the course of the examination;

- Work performed during the examination (what you did);

- Sampling process used (how you did it);

- Findings and violations noted during the examination (what you found);

- Recommendations made (new and repeated);

- Communications with management regarding findings, corrective actions, and recommendations;

- Management's response (oral and written) to findings and violations;

- Commitments made by management regarding corrective action, remediation, and financial relief;

- Changes to the Risk Assessment;

- Consumer Compliance Rating; and

- Changes to the Supervision Plan (where applicable).

The amount of supporting documentation from the entity's records that is necessary to maintain in the workpapers will depend on the particular situation. The general principle is that examinations involving numerous problems in high-risk areas require especially thorough documentation to support the conclusions reached and any potential supervisory measures or enforcement action. Examination of areas of low risk and few problems normally require less documentation.

# CFPB Supervision
# and Examination Process                    Examinations

*Examiner in Charge Review and Signoff*

The EIC is responsible for the adequacy of the workpapers created during the examination. Since large team examinations require the EIC to delegate numerous specific areas of review to other examiners, the EIC must track the:

- Workpapers developed;

- Responsible examination team member; and

- EIC's review and approval of the workpapers.

Workpapers that require additional analysis or support should be discussed with and returned to the responsible examiner for further development. The Workpaper Table of Contents and EIC Signoff document, found in the Supervision and Examination System, must be used to record the EIC's review and sign off on all workpapers developed during the examination. After the EIC reviews and signs off on the workpapers, the Field Manager should also review and sign off on their adequacy.

*Electronic Format and Encryption*

All workpapers and related documentation for the examination should be maintained in electronic form. If the supervised entity is only able to provide a document in hard copy form, the examiner should scan the document and return the original. Workpapers should be uploaded to the Supervision and Examination System with the completed examination to be preserved as part of the examination record and made available for future reference.

All electronic documents received from the supervised entity should be transmitted and maintained on encrypted media. Examiners should be mindful at all times of the need to protect personally identifiable information (e.g., names, social security numbers, account numbers) and confidential supervisory information. Hard copies should not be left anywhere unattended (even onsite at the entity), should not be removed from the examination site, and if printed while working offsite, should be kept in a locked cabinet when not being used. *Consult CFPB's Privacy and FOIA regulations and guidance for further information.*[6]

*Quality Control Reviews*

Workpapers will also be reviewed through an internal quality control process. Workpapers should be sufficiently detailed so that an internal quality control reviewer will understand what the examiner did, follow the logic of the examiner's analyses, and understand how the examiner reached his or her conclusion(s). The level of documentation should be commensurate with the risks and problems associated with the areas under review. (The optional Workpaper Checklist can help ensure that workpapers are sufficient.)

---

[6] *See* Disclosure of Records and Information, 12 CFR Part 1070 (76 Fed. Reg. 45372 (July 28, 2011)), and any subsequent related guidance that may be issued.

# CFPB
# Compliance Management Review                           CMR

## General Principles and Introduction

Supervised entities within the scope of CFPB's supervision and enforcement authority include both depository institutions and non-depository consumer financial services companies. These financial service providers operate in a dynamic environment influenced by challenges to profitability and survival, increased focus on outcomes to consumers, industry consolidation, advancing technology, market globalization, and changes in laws and regulations.

To remain competitive and responsive to consumer needs in such an environment, supervised entities continuously assess their business strategies and modify product and service offerings and delivery channels. To maintain legal compliance, a supervised entity must develop and maintain a sound compliance management system that is integrated into the overall framework for product design, delivery, and administration — that is, the entire product and service lifecycle. Ultimately, compliance should be part of the day-to-day responsibilities of management and the employees of a supervised entity; issues should be self-identified; and corrective action should be initiated by the entity. Supervised entities are also expected to manage relationships with service providers to ensure that these providers effectively manage compliance with Federal consumer financial laws applicable to the product or service being provided.[1]

Weaknesses in compliance management systems can result in violations of law or regulation and associated harm to consumers. Therefore, the CFPB expects every regulated entity under its supervision and enforcement authority to have an effective compliance management system adapted to its business strategy and operations. Each CFPB examination will include review and testing of components of the supervised entity's compliance management system. An initial review will help determine the scope and intensity of an examination. The findings of more detailed reviews and transaction testing will determine the effectiveness of the compliance management system and whether enhancements or corrective actions are appropriate.

CFPB understands that compliance will likely be managed differently by large banking organizations with complex compliance profiles and a wide range of consumer financial products and services[2] at one end of the spectrum, than by entities that may be owned by a single individual and feature a narrow range of financial products and services, at the other end of the spectrum. Compliance may be managed on a firm- or enterprise-wide basis, and supervised entities may engage outside firms to assist with compliance management. However compliance is managed, a provider of consumer financial products or services under CFPB's supervisory purview is expected to comply with Federal consumer financial laws and appropriately address and prevent violations of law and associated harms to consumers through its compliance management process.

---

[1] See CFPB Bulletin 2012-03, Service Providers (April 13, 2012), which describes the CFPB's expectation that supervised banks and nonbanks oversee their business relationships with service providers in a manner that ensures compliance with Federal consumer financial law. http://files.consumerfinance.gov/f/201204_cfpb_bulletin_service-providers.pdf

[2] For example, the Federal Reserve Board of Governors expects large banking organizations with complex compliance profiles to implement firm-wide compliance risk management programs and have a corporate compliance function. SR 08-8 / CA 08-11, October 16, 2008. The CFPB will expect no less.

# CFPB

# Compliance Management Review                    CMR

CFPB also understands that supervised entities will organize compliance management to include compliance with consumer-related state and Federal laws that are outside the scope of CFPB's supervision responsibilities, in addition to the matters that are within CFPB's scope. CFPB, therefore, expects that compliance management activities will be organized within a firm, legal entity, division, or business unit in the way that is most effective for the supervised entity, and that the manner of organization will vary from entity to entity.

This section of the Manual discusses the common elements of an effective consumer compliance management system: board of directors and management oversight, the compliance program, response to consumer complaints, and audit coverage of compliance matters.

## Compliance Management System

A compliance management system is how a supervised entity:

- Establishes its compliance responsibilities;

- Communicates those responsibilities to employees;

- Ensures that responsibilities for meeting legal requirements and internal policies are incorporated into business processes;

- Reviews operations to ensure responsibilities are carried out and legal requirements are met; and

- Takes corrective action and updates tools, systems, and materials as necessary.

An effective compliance management system commonly has four interdependent control components:

- Board and management oversight;

- Compliance program;

- Response to consumer complaints; and

- Compliance audit.

When all of these four control components are strong and well-coordinated, a supervised entity should be successful at managing its compliance responsibilities and risks.

# CFPB
# Compliance Management Review                               CMR

## Compliance Management Examination Procedures

### Board of Directors and Management Oversight

In a depository institution, the board of directors is ultimately responsible for developing and administering a compliance management system that ensures compliance with Federal consumer financial laws and regulations and addresses and prevents associated risks of harm to consumers. In a non-depository consumer financial services company, that ultimate responsibility may rest with a board of directors in the case of a corporation or with a controlling person or some other arrangement. For the balance of this section of the Manual, references to the "board of directors" or "board" generally refer to the board of directors or other individual or group exercising similar oversight functions. In addition, some supervised entities may be governed by firm-wide standards, policies, and procedures developed by a holding company or other top-tier corporation for adoption, use, and modification, as necessary, by subsidiary entities.

### Board of Directors and Management Oversight — Examination Objectives

Because the effectiveness of a compliance management system is grounded in the actions taken by its board and senior management, CFPB examiners should seek to determine whether the board and senior management have:

1. Demonstrated clear expectations about compliance, not only within the entity, but also to service providers.

2. Adopted clear policy statements regarding consumer compliance.

3. Appointed an appropriately qualified and experienced chief compliance officer and provided for other compliance officers with authority and accountability. (In smaller or less complex entities where staffing is limited, a full-time compliance officer may not be necessary. However, management should have clear responsibility for compliance management and compliance staff should be assigned to carry out this function in a manner commensurate with the size of the entity and the nature and risks of its activities.)

4. Established a compliance function to set policies, procedures, and standards.

5. Allocated resources to the compliance function commensurate with the size and complexity of the entity's operations and practices, the Federal consumer financial laws and regulations to which the entity is subject, and necessary to avoid the potential consumer harm associated with violations of such laws and regulations.

6. Addressed consumer compliance issues and associated risks of harm to consumers throughout product development, marketing, and account administration, and through the entity's handling of consumer complaints and inquiries.

7. Required audit coverage of compliance matters and reviewed the results of periodic compliance audits.

# CFPB
# Compliance Management Review                    CMR

8. Provided for recurring reports of compliance risks, issues, and resolution through a committee structure or to the board.

### Board of Directors and Management Oversight — Examination Procedures

Through pre-examination work or follow-up to previous examinations, examiners should request and review records, and discuss issues and questions with senior management. With respect to board and senior management oversight, examiners should:

1. Review board meeting minutes and supporting materials during the period under review for coverage of compliance matters.

2. Determine board committee structures and delegated responsibility for compliance matters, such as to an audit committee or risk committee, and review the meeting minutes and supporting materials of those committees for coverage of compliance matters.

3. Determine any management committees with delegated authority and accountability for compliance matters, including fair lending, and review their composition, functions, and reporting to committees of the board or to the board.

4. Determine the authority and accountability for compliance matters of regional or business unit governance bodies; and review their composition, functions, and reporting.

5. Review policies for clarity, comprehensiveness, currency, and appropriate reflection of risks to consumers posed by the organization's practices, as well as compliance issues and risks facing the organization.

6. Review the formal written compliance function document adopted by the board of directors or an appropriate committee of the board, and determine the resource allocation to compliance as part of the entity's budget and planning process.

7. Identify the chief compliance officer and other responsible individuals.

8. Review the role of the chief compliance officer for authority to lead a compliance program and independence from business units.

9. Review board and board committee records for evidence of the chief compliance officer's independent access to board members and governance bodies.

10. Review processes for the identification of new regulatory requirements, changes in requirements, and planning for implementation.

11. Review processes for development and implementation of new consumer financial products or services, distribution channels or strategies, to determine degree of compliance function participation. Determine whether these processes consider fair lending compliance risk.

12. Determine degree of compliance review of draft marketing material (including scripts) and their implementation.

# CFPB
# Compliance Management Review                    CMR

13. Review reporting for the identification and resolution of issues and the timeliness and completeness of such actions.

14. Review board or committee consideration of compliance audit matters for coverage of key risks, independence from business functions, and resolution of identified issues.

15. Draw preliminary conclusions about the strength, adequacy, or weakness of board and senior management oversight, subject to risk focused review and testing for compliance.

In the absence of a board of directors and board committee structure, the examiner should determine that the person or group exercising similar oversight functions receives relevant information about compliance and consumer protection matters and takes steps to ensure that the key elements, resources, and individuals necessary for a compliance management system commensurate with the supervised entity's risk profile are in place and functioning.

## Compliance Program

A sound compliance program is essential to the efficient and successful operation of the supervised entity, much as a business plan. A compliance program includes the following components:

- Policies and procedures;

- Training; and

- Monitoring and corrective action.

A supervised entity should establish a formal, written compliance program, and that program generally should be administered by a chief compliance officer. In addition to being a planned and organized effort to guide the entity's compliance activities, a written program represents an essential source document that may serve as a training and reference tool for employees. A well planned, implemented, and maintained compliance program will prevent or reduce regulatory violations, protect consumers from non-compliance and associated harms, and help align business strategies with outcomes. The examination objectives and procedures for the compliance program are divided in this section of the Manual among the three components of a program.

### *Policies and Procedures – Examination Objectives*

Compliance policies and procedures should be documented and in sufficient detail to implement the board-approved policy documents. Overall, examiners should seek to determine whether compliance policies and procedures:

1. Are consistent with board-approved policies.

2. Address compliance with applicable Federal consumer financial laws in a manner designed to prevent violations and to detect and prevent associated risks of harm to consumers.

3. Cover product or service lifecycles.

# CFPB
# Compliance Management Review                    CMR

4.  Are maintained and modified to remain current and to serve as a reference for employees in their day-to-day activities.

***Policies and Procedures — Examination Procedures***

Examiners should request and review compliance policies and procedures and discuss elements with compliance officers or other responsible officers and employees of the supervised entity, as follows:

1.  Request and review policies and procedures related to consumer compliance, including fair lending and other Federal consumer financial laws and policies and procedures related to offering consumer financial products and services.

2.  Review policies and procedures for changes management committed to make following recent monitoring, audit, and examination findings and recommendations.

3.  Review policies and procedures to determine whether and how they address new or amended Federal consumer financial laws and regulations since the preceding examination or since the most recent consumer compliance examination by a state or prudential regulator, if applicable, if this is CFPB's first examination.

4.  Request and review policies and procedures to determine whether they cover consumer financial products or services introduced since the preceding examination or since the most recent consumer compliance examination by a state or prudential regulator, if applicable, if this is CFPB's first examination.

5.  Review policies and procedures relating to compliance with specific regulatory requirements (such as fair lending or the privacy of consumer financial information) and their implementing procedures.

6.  Review for outdated content, the names of unaffiliated entities, or other indicators that policies are overly general or not tailored to the needs and actual practices of the supervised entity being examined.

7.  Review policies and procedures for products with features that may inhibit consumer understanding or otherwise pose heightened risks of (a) unfair, deceptive, or abusive practices, or (b) fair lending.

8.  Review policies and procedures for products containing features that may pose heightened risk of unlawful discrimination.  Such features may include:

    a.  particular incentives created by employee compensation structures;

    b.  discretion over product selection, underwriting, or pricing; or

    c.  distinctions related to geography or prohibited bases (such as age or marital status).

# CFPB
# Compliance Management Review                          CMR

9. Review policies and procedures designed to ensure that the entity's service providers comply with legal obligations applicable to the product or service of the examined entity and the provider.

10. Review policies and procedures maintained by different regional, business unit, or legal entities subject to the same corporate or board-level policies for consistency.

11. Review policies and procedures for record retention and destruction timeframes to ensure compliance with legal requirements.

12. If compliance procedures are embedded in automated tools or business unit procedures, determine that a qualified compliance officer or contractor reviewed these tools for consistency with policies and procedures and compliance with applicable Federal consumer laws and approved them for the purpose for which they are utilized.

13. Draw preliminary conclusions regarding the strength, adequacy, or weakness of policies and procedures, and identify business units, delivery channels, or offices for transaction testing. Test to confirm that actual practices are consistent with strong or adequate written policies and procedures. Test to determine the impact of apparently weak procedures.

***Training – Examination Objectives***

Education of an entity's board of directors, management, and staff is essential to maintaining an effective compliance program. Board members should receive sufficient information to enable them to understand the entity's responsibilities and the commensurate resource requirements. Management and staff should receive specific, comprehensive training that reinforces and helps implement written policies and procedures. Requirements for compliance with Federal consumer financial laws, including prohibitions against unlawful discrimination and unfair, deceptive, and abusive acts and practices, should be incorporated into training for all relevant officers and employees, including audit personnel. Examiners should seek to determine whether:

1. Compliance training is current, complete, directed to appropriate individuals based on their roles, effective, and commensurate with the size of the entity and nature and risks to consumers presented by its activities.

2. Training is consistent with policies and procedures and designed to reinforce those policies and procedures.

3. Compliance professionals have access to training that is necessary to administer a compliance program that is appropriate for that supervised entity and its business strategy and operations.

# CFPB
# Compliance Management Review                    CMR

---

*Training – Examination Procedures*

Examiners should request and review training records and interview management and staff as appropriate to evaluate this element of the compliance program and to refine and focus the examination. Examiners should:

1. Request and review the schedule, record of completion, and materials for recent compliance training of board members and executive officers.

2. Determine the involvement of compliance officer(s) in selecting, reviewing, or delivering training content.

3. Request and review policies, standards, schedules, and records of completion for compliance-specific training of compliance professionals, managers, and staff, and documents demonstrating that service providers who have consumer contact or compliance responsibilities are appropriately trained.

4. Request and review samples of the content of training materials and comprehension tests, including training related to fair lending, new regulatory requirements, new products or channels of distribution, and marketing (including scripts).

5. Request and review training developed as a result of management commitments to address monitoring, audit, or examination findings and recommendations or issues raised in consumer complaints and inquiries.

6. Determine whether the program is designed to provide training about the specific regulatory requirements relevant to the functions of particular positions for loan officers, such as the Truth in Lending Act and the Equal Credit Opportunity Act.

7. Review records of follow-up, escalation, and enforcement for units with training completion rates that do not meet the supervised entity's standards or deadlines.

8. Request and review the supervised entity's plans for additions, deletions, or modifications to compliance training over the next 12 months and any plans for changes to the overall training resources and compare actual training activities to prior plans.

9. Draw preliminary conclusions about the strength, adequacy, or weakness of the training element of the compliance program, and select lines of business, organizational units, or other areas for more detailed review and testing.

*Monitoring and Corrective Action – Examination Objectives*

Monitoring is a compliance program element that seeks, in an organized and risk-focused way, to identify procedural or training weaknesses in an effort to provide for a high level of compliance by promptly identifying and correcting weaknesses. Monitoring and testing is generally more frequent and less formal than compliance audit coverage and reporting, may be carried out by the business unit, and does not require the same level of independence from the business or

---

# CFPB
# Compliance Management Review                    CMR

compliance function that an audit program does. Examiners should evaluate monitoring and audit programs to determine whether, considered together, they are adequate and comprehensive.

Examiners review of compliance monitoring and testing should determine whether:

1.  Monitoring is scheduled and completed and leads to timely corrective actions where appropriate.

2.  The supervised entity is determining that transactions and other consumer contacts are handled according to the entity's policies and procedures.

3.  Monitoring and testing consider the results of risk assessments or other guides for prioritizing reviews.

4.  Monitoring addresses deficiencies identified in internal or external audits, and the board's or management's directives on resolving the deficiencies.

5.  Findings are escalated to management and to the board of directors if appropriate.

### Monitoring and Corrective Action – Examination Procedures

Examiners should review monitoring, testing, and corrective action reports; sample supporting documents; and interview individuals responsible for compliance monitoring, testing, and corrective action. Examiners should:

1.  Determine the chief compliance officer's role in the compliance monitoring element of the compliance program.

2.  Request and review the monitoring and testing schedule for the current year or next 12 months, and review the currency of reviews in process against the current schedule.

3.  Request and review the risk assessments or other documents that led to the monitoring and testing program plan, including any fair lending risk assessments.

4.  Discuss with the compliance officer or monitoring manager the coverage of service providers that have contact with consumers.

5.  Determine whether and to what extent monitoring includes calculation tools, the content of consumer disclosures and notices, marketing materials, and scripts or guides for employee contacts with consumers.

6.  Request and review all compliance monitoring, testing and corrective action reports completed during a specific period of time.  Include reports related to fair lending compliance, such as fair lending "self-evaluations."  (But do not request reports of fair lending "self-tests" that meet the strict requirements set forth in 12 CFR 1002.15.)

7.  Review reports for indications of systemic weaknesses, repeat violations of law and resulting risks or harms to consumers, or other matters of significant concern such as potential discriminatory effects of policies or procedures or particular business units with continuing or high levels of non-compliance.

# CFPB
# Compliance Management Review                CMR

8. Review a sample of reports and supporting documents covering potential unfair, deceptive, or discriminatory practices or related matters that pose heightened risks to consumers for thoroughness of review, accuracy of findings, and appropriateness of recommendations.

9. Determine whether monitoring results in corrective action that is timely and appropriate in size and scope.

10. Draw a preliminary conclusion regarding the strength, adequacy, or weakness of the monitoring and corrective action element of the compliance program, and select areas for further review either because of lack of coverage by the monitoring program or to confirm monitoring or corrective action findings.

## Consumer Complaint Response

An effective compliance management system should ensure that a supervised entity is responsive and responsible in handling consumer complaints and inquiries. Intelligence gathered from consumer contacts should be organized, retained, and used as part of an institution's compliance management system.

### *Consumer Complaint Response – Examination Objectives*

Examiners will consider consumer complaints to determine whether:

1. Consumer complaints and inquiries, regardless of where submitted, are appropriately recorded and categorized.

2. Complaints and inquiries, whether regarding the entity or its service providers, are addressed and resolved promptly.

3. Complaints that raise legal issues involving potential consumer harm from unfair treatment or discrimination, or other regulatory compliance issues, are appropriately escalated.

4. Complaint data and individual cases drive adjustments to business practices as appropriate.

5. Consumer complaints result in retrospective corrective action to correct the effects of the supervised entity's actions when appropriate.

6. Weaknesses in the compliance management system exist, based on the nature or number of substantive complaints from consumers.

### *Consumer Complaint Response – Examination Procedures*

Examiners should review records, interview management, and contact consumers if needed to evaluate this consumer response component of the compliance management system. Examiners should:

1. Obtain and review records of recent consumer complaints and inquiries received by CFPB about the entity and its service providers.

# CFPB
# Compliance Management Review                    CMR

2. Review industry or other benchmarking complaint data collected by CFPB.

3. To the extent available, obtain and review records of recent consumer complaints against the institution from the prudential regulator, from state regulators, from state attorneys general offices or licensing and registration agencies, and from private or other industry sources.

4. Request and review from the institution being examined its policies and procedures for receiving, escalating, and resolving consumer complaints and inquiries.

5. Request and review the record of consumer complaints and inquiries received by the institution for a specific recent period of time.

6. Identify complaints alleging deception, unfair treatment, unlawful discrimination, or other significant consumer injury; and review some or all of those complaints for handling, timeliness, disposition, and any prospective and retrospective corrective actions.

7. Determine whether corrective action is offered or taken for any complaint resulting in a conclusion of violation of law or regulation.

8. Determine whether complaints involving service providers or other third parties referring business to the supervised entity receive prompt and appropriate handling and follow-up by the entity.

9. If a supervised entity maintains multiple consumer response centers or units, determine whether it employs a common set of best practices as applicable.

10. Determine whether evaluations of consumer contacts are shared within the supervised entity and included in compliance management reporting to the Board and senior management, and whether such information is used in modifying policies, procedures, training, and monitoring.

11. Draw preliminary conclusions regarding the strength, adequacy, or weakness of the supervised entity's response to consumer issues and concerns, and identify business conduct areas, specific regulations, or organizational units for more detailed review.

## Compliance Audit

Audit coverage of compliance matters is the fourth component of an effective compliance management system. The audit function should review an institution's compliance with Federal consumer financial laws and adherence to internal policies and procedures and be independent of both the compliance program and business functions that include customer sales or service.

A compliance audit program provides a board of directors or its designated committees with a determination of whether policies and standards adopted by the board to guide risk management are being implemented to provide for the level of compliance and consumer protection established by the board. The audit should also identify any significant gaps in board policies and standards.

# CFPB
# Compliance Management Review                    CMR

*Compliance Audit – Examination Objectives*

Examiners will seek to determine whether:

1.  The audit program is sufficiently independent and reports to the board or a committee of the board.

2.  The audit program addresses compliance with all applicable Federal consumer financial laws.

3.  The schedule and coverage of audit activities is appropriate to the size of the entity, its consumer financial product offerings, and its manner of conducting its consumer financial products business.

4.  All appropriate compliance and business unit managers receive copies of audit reports in a timely manner.

5.  Audit results lead to appropriate, timely corrective action.

*Compliance Audit – Examination Procedures*

Examiners will review records of the compliance audit program and discuss the audit methods, results, and reporting with audit managers. Examiners should:

1.  Request the supervised entity's audit plans and schedules for the prior year, current year, and the following year.

2.  If compliance audit is performed by a third party, request and review the engagement letters or contracts covering the prior year and the current year.

3.  Determine the basis for the audit plan and schedule and whether reporting is to the board of directors or to an audit committee or other committee of the board.

4.   Request and review all compliance audit reports for a specified period of time, including any fair lending audit reports.

5.  Determine whether written audit reports identify the scope, sampling techniques, findings/deficiencies, recommendations for corrective action, and management responses with time frames for corrective action.

6.  Determine whether audit scopes include previous audit, and examination findings, new requirements, new products and channels, and self-identified higher risk areas of the supervised entity's operations.

7.  Request and review audit workpapers for a sample of audits covering fair lending laws and regulations; potential unfair, deceptive, or abusive practices; or other areas that may pose heightened risks to consumers.

8.  Determine whether corrective actions are tracked and any delay in appropriate management response or lack of corrective action is escalated.

# CFPB
# Compliance Management Review                              CMR

9.  Determine whether the supervised entity's chief compliance officer and appropriate business unit head(s) receive copies of audit reports, so that adjustments can be made to compliance program elements in a timely manner.

10. Review audit function structure and policies and procedures to ensure that the audit function, whether internal or external, is sufficiently independent of the business line and compliance management function.

11. Draw preliminary conclusions about the strength, adequacy, or weakness of the compliance audit component of the compliance management system, and identify areas for further review based on gaps in audit coverage or to confirm the accuracy of audit findings and reporting.

**CFPB                          Consumer Reporting**
**Examination Procedures      Larger Participants**

# Examination Procedures
# Consumer Reporting Agencies

These examination procedures are intended for use in examining larger participants in the consumer reporting market. The procedures contain a series of modules, grouping similar requirements together. Prior to using these procedures, examiners should complete a risk assessment and scope memorandum. Depending on the scope, and in conjunction with the compliance management system review procedures, each examination will cover one or more of the following modules:

1. Entity Business Model

2. Accuracy of Information and Furnisher Relations

3. Contents of Consumer Reports

4. Permissible Purposes and Other User Issues

5. Consumer File and Score Disclosures

6. Consumer Inquiries, Complaints, and Disputes and the Reinvestigation Process

7. Consumer Alerts and Identity Theft Provisions

8. Prescreening, Employment Reports, and Investigative Consumer Reports

9. Other Products and Services and Risks to Consumers

## Examination Objectives

- To evaluate the quality of the regulated entity's compliance management systems, including its internal controls and policies and procedures, related to its consumer reporting business.

- To identify acts or practices that materially increase the risk of violations of federal consumer financial law in connection with consumer reporting.

- To gather facts that help to determine whether a regulated entity engages in acts or practices that violate the requirements of federal consumer financial law.

- To determine, in accordance with CFPB internal consultation requirements, whether a violation of federal consumer financial law has occurred and whether further supervisory or enforcement actions are appropriate.

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

## Background

A consumer report contains information about a consumer, such as a credit history and other transaction details. Lenders use one type of consumer report—commonly referred to as credit reports—to assess borrower risk when evaluating applications for credit cards, home mortgage loans, automobile loans, and other types of credit. Consumer reports also may be used for a number of other purposes, such as to determine eligibility and pricing for other types of products and services and other relationships. The consumer reporting market affects hundreds of millions of consumers.

The Dodd-Frank Act (12 U.S.C. 5514(a)(1)(B)) gave the Consumer Financial Protection Bureau ("CFPB") supervisory authority over "larger participants" of markets for consumer financial products or services, as the CFPB defines by rule. In July 2012, the CFPB finalized its larger participant regulation in the market of consumer reporting (77 Fed. Reg. 42874). The rule, which appears in 12 CFR Part 1090, and was published in the Federal Register on July 20, 2012, is effective September 30, 2012. It provides that a nonbank covered person that offers or provides consumer reporting is a larger participant of the consumer reporting market if the person's annual receipts resulting from consumer reporting are more than $7 million. (12 CFR 1090.104(b)). Under the regulation, "consumer reporting" includes different types of consumer reporting entities, such as credit bureaus, resellers, specialty consumer reporting agencies, and analyzers of consumer report information and other account information. (12 CFR 1090.104(a)(4); 77 Fed. Reg. at 42875, 42883-85).

These entities perform a variety of functions. For example, credit bureaus collect information, including credit account information, items sent for collection, and public records such as judgments and bankruptcies. Resellers purchase consumer information from one or more consumer reporting agencies, typically provide further input to the consumer report (including by merging files from multiple agencies or adding information from other data sources), and then resell the report to lenders and other users. Specialty consumer reporting agencies primarily collect and provide specific types of information that may be used to make eligibility decisions for particular consumer financial products or services, such as payday loans or checking accounts, or for decisions in other areas, such as employment or rental housing. Analyzers apply statistical and other methods to consumer report information to facilitate the interpretation of that information and its use in decisions regarding other products and services. For example, they may develop and sell credit scoring services and products.

A key federal consumer financial law relevant specifically to the consumer reporting market is the Fair Credit Reporting Act ("FCRA") (15 U.S.C. 1681 et seq.).[1] The FCRA was enacted in 1971 and significantly amended in 1996, 2003, and 2010. Together with its implementing regulation,

---

[1] For clarity, these procedures refer to the FCRA by listing the section of the Act followed by the relevant section of Title 15 of the U.S. Code (e.g., Section 603; 15 U.S.C. 1681a).

**CFPB**                                    **Consumer Reporting**
**Examination Procedures**           **Larger Participants**

Regulation V,[2] it creates a regulatory framework for the furnishing, use, and disclosure of information in reports associated with credit, insurance, employment, and other decisions made about consumers. In doing so, it imposes a number of obligations on entities that qualify as "consumer reporting agencies." It also imposes obligations on persons who use consumer report information ("users") or furnish information to consumer reporting agencies ("furnishers").

While there is considerable overlap, the definition of "consumer reporting" in the CFPB's larger participant rule does not mirror the FCRA's definitions of "consumer report" or "consumer reporting agency."[3] As a result, an entity that is subject to the larger participant rule may or may not be a "consumer reporting agency" for FCRA purposes. Module 1 includes procedures to determine whether a particular larger participant is a "consumer reporting agency" and meets other FCRA definitions. If a particular larger participant is determined not to be a "consumer reporting agency" in Module 1, examiners should consult with Headquarters on the extent to which the remaining modules apply to the entity being examined (since many presuppose the existence of a consumer reporting agency) and on the extent to which other federal consumer financial laws apply to the entity.

If a larger participant operates as a consumer reporting agency, the FCRA requires it to employ reasonable procedures, in preparing consumer reports, to "assure maximum possible accuracy" of the information concerning the individual about whom the report relates. (Section 607(b); 15 U.S.C. 1681e(b)). A consumer reporting agency may provide only consumer reports in specific circumstances and must adopt reasonable procedures to ensure a consumer report is provided only when the requester has a permissible purpose. (Section 604; 15 U.S.C. 1681b; Section 607(a); 15 U.S.C. 1681e(a)). Consumers have the right to access information in their files at consumer reporting agencies and the right to dispute information and have it corrected if it is found to be inaccurate. (Section 609(a); 15 U.S.C. 1681g(a); Section 611(a)(1); 15 U.S.C. 1681i(a)(1)). The FCRA provides consumers additional protections such as the opportunity to elect not to receive prescreening offers and to request fraud and active duty alerts. (Section 604(e)(5); 15 U.S.C. 1681b(e)(5); Section 605A; 15 U.S.C. 1681c-1).

The FCRA also imposes special obligations on two types of consumer reporting agencies that operate nationwide, known as "nationwide consumer reporting agencies" (Section 603(p); 15 U.S.C. 1681a(p)) and "nationwide specialty consumer reporting agencies" (Section 603(x); 15 U.S.C. 1681a(x)). For example, these nationwide agencies generally must provide consumers a free file disclosure every twelve months upon request. (Section 612(a); 15 U.S.C. 1681j(a)).

In addition to complying with all applicable provisions of the FCRA, larger participants of the consumer reporting market must comply with other applicable federal consumer financial laws. For example, the Gramm-Leach-Bliley Act (GLBA) and its implementing regulation, Regulation

---

[2] Pursuant to its authority under the Dodd-Frank Act, the CFPB in late 2011 restated the FCRA's implementing rules in Regulation V, 12 CFR Part 1022.

[3] *Compare* 12 CFR 1090.104 *with* FCRA Section 603(d), (f); 15 U.S.C. 1681a(d), (f).

---

P,[4] govern how nonpublic personal information that financial institutions collect about consumers can be shared with nonaffiliated third parties and what financial institutions must tell consumers about their information-sharing practices. These provisions limit how consumer reporting agencies can disclose to nonaffiliated third parties nonpublic personal information obtained from financial institutions (such as credit header information[5]) if the disclosure is not part of a consumer report. (12 CFR 1016.11; *see generally* 65 Fed. Reg. 33646, 33668 (May 24, 2000)).

To carry out the objectives set forth in the Examination Objectives section, the examination process also will include assessing other risks to consumers. These risks may include potentially unfair, deceptive, or abusive acts or practices (UDAAPs). Please refer to the examination procedures regarding UDAAPs in the CFPB examination manual for information about the legal standards and the CFPB's approach to examining for UDAAPs. The particular facts and circumstances in a case are crucial to the determination of UDAAPs. As set out in the Examination Objectives section, examiners should consult with Headquarters to determine whether the applicable legal standards have been met before a violation of any federal consumer financial law could be cited, including a UDAAP violation.

## General Considerations

Completing the following examination modules will allow examiners to develop a thorough understanding of the regulated entity's practices and operations. To complete the modules, examiners should obtain and review the following as applicable:

- Organizational charts and process flowcharts;

- Board minutes, annual reports, or the equivalent to the extent available;

- Relevant management reporting;

- Policies and procedures, including complaint monitoring procedures;

- Applications from prospective furnishers and users;

- Furnisher and user audit results;

- Samples of individual consumer reports, file disclosures, and disputes and responses to them, and other consumer reporting product outputs, notes, and disclosures;

- Telephone recordings;

- Operating and compliance checklists, worksheets, and review documents;

---

[4] In 2011, the CFPB restated various privacy regulations that had been issued by other federal agencies under the Gramm-Leach-Bliley Act. The resulting Regulation P appears at 12 CFR Part 1016.

[5] "Credit header" information refers to basic information in a credit report that identifies the person who is the subject of the report, such as name, variations of names, current and prior addresses, and phone numbers.

**CFPB
Examination Procedures**

**Consumer Reporting
Larger Participants**

- Relevant computer program and system details;

- Due diligence and monitoring procedures;

- Compensation policies;

- Historical examination information;

- Audit and compliance reports, and management responses to findings;

- Training programs and materials;

- Third-party contracts, including agreements with furnishers and users; and

- Advertisements, marketing research, and website information.

Depending on the scope of the examination, examiners should perform transaction testing using sampling procedures, which may require use of a judgmental or statistical sample. Examiners also should conduct interviews with management and staff to determine whether they understand and consistently follow the policies, procedures, and regulatory requirements applicable to consumer reporting and implement effective controls.

Examiners should review relevant consumer complaints in scoping and conducting examinations, as appropriate. Examiners also may consider conducting user, furnisher, and/or consumer interviews.

**CFPB**                             **Consumer Reporting**
**Examination Procedures**           **Larger Participants**

## Examination Procedures
## Module 1 - Entity Business Model

### NATURE OF OPERATIONS FOR FCRA PURPOSES

Assess whether the entity operates as a "consumer reporting agency," a "nationwide consumer reporting agency," a "nationwide specialty consumer reporting agency," and/or a "reseller" for FCRA purposes by making the following determinations:

1. **Consumer Reporting Agency.** Determine in consultation with Headquarters if the entity operates as a "consumer reporting agency." (Section 603(f); 15 U.S.C. 1681a(f)). Definitions of "consumer reporting agency" and "consumer report" (including a list of items that are not "consumer reports") are set forth in the Glossary. If the entity does not operate as a "consumer reporting agency," contact Headquarters for instructions before proceeding with the remaining examination procedures.

2. **Nationwide Consumer Reporting Agency**. Determine in consultation with Headquarters whether the entity operates as a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis (hereinafter a "nationwide consumer reporting agency") by assessing whether it is a consumer reporting agency that regularly engages in the practice of assembling or evaluating, and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, each of the following regarding consumers residing nationwide:

   a. Public record information and

   b. Credit account information from persons who furnish that information regularly and in the ordinary course of business. (Section 603(p); 15 U.S.C. 1681a(p)).

3. **Circumvention or Evasion of Treatment as a Nationwide Consumer Reporting Agency.** If the answer to step 2 above is no, assess whether the entity is circumventing or evading treatment as a nationwide consumer reporting agency by any means, including but not limited to:

   a. Corporate organization, reorganization, structure, or restructuring, including merger, acquisition, dissolution, divestiture, or asset sale of a consumer reporting agency (for example, by (1) restructuring operations so that certain data types are assembled and maintained only by a corporate affiliate or (2) restructuring so that corporate affiliates separately assemble and maintain all information on consumers residing in each state); or

   b. Maintaining or merging public record and credit account information in a manner that is substantially equivalent to that described in steps 2a and 2b above.

   If the entity is circumventing or evading treatment as a nationwide consumer reporting agency, assess whether the entity is in compliance with all obligations imposed upon nationwide consumer reporting agencies in reviewing the remaining modules. (15 U.S.C. 1681x; 12 CFR 1022.140(c)).

**CFPB
Examination Procedures**

**Consumer Reporting
Larger Participants**

4. **Nationwide Specialty Consumer Reporting Agency.** Determine in consultation with Headquarters whether the entity qualifies as a "nationwide specialty consumer reporting agency" by determining whether it is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis relating to:

   a. Medical records or payments,

   b. Residential or tenant history,

   c. Check writing history,

   d. Employment history, or

   e. Insurance claims. (Section 603(x); 15 U.S.C. 1681a(x)).

5. **Reseller**. Determine in consultation with Headquarters whether the entity operates as a "reseller" by determining whether it is a consumer reporting agency that:

   a. Assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and

   b. Does not maintain a database of the assembled or merged information from which new consumer reports are produced. (Section 603(u); 15 U.S.C. 1681a(u)).

**AFFILIATES AND OTHER THIRD-PARTY RELATIONSHIPS**

6. **Affiliates**.

   a. Ascertain whether the entity is affiliated with any other entities.

   b. If so, determine:

      i. The identities of the affiliates,

      ii. The nature of their business activities, including whether any of the affiliates operate as consumer reporting agencies, and

      iii. The ownership and governance structure of the affiliates.

7. **Service Providers.** Determine whether the entity uses any service providers in conducting its consumer reporting business. If so:

   a. Identify who the service providers are, whether they are affiliated with the entity, and what services they perform, and

   b. Assess whether the entity:

      i. Requests and reviews the service providers' policies, procedures, internal controls, and training materials to ensure that the service providers conduct appropriate

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

training and oversight of employees or agents that have consumer contact or compliance responsibilities;

ii. Includes in its contracts with its service providers clear expectations about compliance as well as appropriate and enforceable consequences for violating any compliance-related responsibilities;

iii. Establishes internal controls and ongoing monitoring to determine whether its service providers are complying with federal consumer financial law; and

iv. Takes prompt action to address fully any problems identified through the monitoring process, including terminating the relationship where appropriate. *See* CFPB Bulletin 2012-03 (April 13, 2012).

## INTERNAL STRUCTURE, CONTROLS, AND COMPLIANCE MANAGEMENT

8. **Organizational Structure.** Review the organizational chart to determine the reporting structure and the responsibilities of key managers for consumer reporting activities.

9. **Staff Who Interact With Consumers.** Review the qualifications, experience levels, and training programs that the company requires or uses for staff who interact with consumers.

10. **Compliance Management Review.** Review the entity's general compliance management system using the compliance management review section of the CFPB examination manual.

## CUSTOMER BASE AND PRODUCTS AND SERVICES OFFERED

11. **Furnishers**. If the entity assembles information about consumers, identify who furnishes the information to the entity (including, for example, by type of business or industry).

12. **Users**. If the entity provides consumer reports to third parties, identify the third parties that use reports from the entity (including, for example, by type of business or industry).

13. **Specialization**. Ascertain whether the entity specializes in collecting and reporting particular types of information and, if so, what types.

14. **Prescreening**. Determine if the entity engages in "prescreening," by furnishing consumer reports (e.g., lists of consumers) in connection with any credit or insurance transactions that are not initiated by the consumers (to solicit the consumers to obtain credit or insurance) and where the consumers have not authorized the entity to provide such reports. (Section 603(*l*); 15 U.S.C. 1681a(*l*); Section 604(c)(1); 15 U.S.C. 1681b(c)(1)). Prescreening is discussed further in Module 8.

15. **Employment Reports.** Determine if the entity furnishes any reports for employment purposes and, if so, to whom (including, for example, by type of business or industry). (Section 603(h); 15 U.S.C. 1681a(h); Section 604(b); 15 U.S.C. 1681b(b)). Employment reports are discussed further in Module 8.

**CFPB
Examination Procedures**

**Consumer Reporting
Larger Participants**

16. **Investigative Consumer Reports.** Determine whether the entity provides any "investigative consumer reports." (Section 603(e); 15 U.S.C. 1681a(e)). Investigative consumer reports are defined in the Glossary and discussed in Module 8.

17. **Credit Scoring and Other Scoring Products.**

   a. Determine whether the entity offers any credit scores to third parties. Refer to the Glossary for the definition of "credit score" for these procedures.

   b. Determine whether the entity offers any other types of scoring products to third parties, such as insurance scores.

   c. If the answer to (a) or (b) above is yes, determine:

      i. What role the entity plays in developing or modifying the scores and scoring products,

      ii. Whether any other parties are involved in developing or modifying the scores and scoring products, and

      iii. To whom the scores and scoring products are offered and provided.

18. **Other Products or Services.** Ascertain whether the entity offers any types of products or services other than consumer reports and scoring products. If so, review all of these products and services and to whom they are offered and provided. Other products and services are discussed further in Module 9.

19. **Relationship of FCRA and Non-FCRA Products and Services.**

   a. Determine if the entity offers some products and services that are subject to the FCRA and other products and services that the entity does not treat as subject to the FCRA.

   b. If so, identify:

      i. All products and services that the entity treats as not subject to the FCRA,

      ii. The information sources and uses for such products, and

      iii. Any policies, practices, and procedures deployed by the entity to differentiate between the products and services that it treats as subject to the FCRA and those that it treats as not subject to the FCRA.

   c. For products that the entity deems not subject to the FCRA, identify the criteria relied on for treating each product as non-FCRA.

   d. Assess in consultation with Headquarters whether there are any products or services offered by the entity that constitute "consumer reports," but that the entity is not treating as subject to the FCRA.

   e. Consult with Headquarters on whether any other federal consumer financial laws should be reviewed with respect to those products and services that are not subject to the FCRA.

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

## Module 2 - Accuracy of Information and Furnisher Relations

This module discusses the FCRA requirement that consumer reporting agencies employ reasonable procedures in preparing consumer reports to assure maximum possible accuracy of consumer information, as well as other FCRA requirements relating to dealings with furnishers. Additional FCRA requirements related to accuracy are addressed in other modules (such as Module 6, which addresses how disputes must be handled).

1. **Reasonable Procedures to Ensure Maximum Possible Accuracy.** Assess whether the entity follows reasonable procedures, in preparing a consumer report, to assure maximum possible accuracy of information concerning the individual to whom the report relates. (Section 607(b); 15 U.S.C. 1681e(b)). In doing so, consider all relevant factors, including the following:

   a. **Screening of furnishers.** Determine what measures the entity uses to screen furnishers.

   b. **Form and manner in which information is reported.** Assess the steps the entity takes to ensure that information is furnished in a form and manner that minimizes the likelihood that the information may be incorrectly reflected in a consumer report. Consider, for example, whether the entity ensures that reported information:

      i.  Includes appropriate identifying information about the consumer to whom it pertains,

      ii. Is furnished in a clearly understandable form and manner, and

      iii. Is furnished with a date specifying the time period to which the information pertains.

   c. **Screening and matching of information from furnishers.**

      i.  Review procedures used by the entity to screen information received from furnishers for accuracy, including any audit procedures or other quality control measures. Identify relevant data quality metrics used by the entity. Assess how the entity responds if it receives poor quality data from a particular furnisher.

      ii. Review procedures used by the entity to match data to the appropriate consumer file.

   d. **Measures to prevent duplicative tradelines on reports.** Assess the measures utilized by the entity to ensure that reports do not include duplicative tradelines. Review, for example, what information the entity requires furnishers to provide—such as information to identify the original creditor for debts—before it accepts tradelines.

   e. **Other measures to test accuracy.** Review any other measures utilized by the entity to assess the accuracy of consumer information. Identify the nature of all such measures.

2. **Notice of Furnisher Responsibilities.** Determine whether the entity provides a notice of furnisher responsibilities under the FCRA to every person who regularly and in the ordinary course of business furnishes consumer information to the entity. (Section 607(d); 15 U.S.C. 1681e(d)). Review the terms of the notice provided to determine whether it is substantially similar to the model notice in Appendix M to Regulation V (12 CFR Part 1022).

**CFPB** **Consumer Reporting**
**Examination Procedures** **Larger Participants**

## Module 3 - Contents of Consumer Reports

This module addresses the FCRA's requirements governing what consumer reporting agencies must include in or exclude from consumer reports.

1. **Required Information in Consumer Reports.** Determine whether the entity includes the following required information in its consumer reports:

   a. **Bankruptcy information.** If the report identifies information regarding a case under Title 11 of the U.S. Code that involves the consumer:

      i. The chapter of Title 11 invoked (e.g., chapter 7, 11, etc.) if provided by the source of the information and

      ii. The fact that the bankruptcy action has been withdrawn before a final judgment, if the entity has received documentation so certifying. (Section 605(d)(1); 15 U.S.C. 1681c(d)(1)).

   b. **Voluntary closure of account.** The fact that an account was voluntarily closed by the consumer, if the entity includes information related to the account in the report after receiving notification from the furnisher that the account was voluntarily closed. (Section 605(e); 15 U.S.C. 1681c(e)).

   c. **Inquiries as factor.** If the entity provides a consumer report that contains any credit or other risk score or predictor on any consumer and a key factor that adversely affected such score or predictor was the number of inquiries, a clear and conspicuous statement that a key factor that adversely affected such score or predictor was the number of inquiries (unless the entity is a check services company, acting as such, to the extent that it is engaged in issuing authorizations for the purpose of approving or processing negotiable instruments, electronic fund transfers, or similar methods of payments). (Section 605(d)(2); 15 U.S.C. 1681c(d)(2)).

   d. **Existence of a dispute.** The fact that the consumer disputes information, if the entity includes disputed information in the report after receiving notification from a furnisher of the dispute. (Section 605(f); 15 U.S.C. 1681c(f)).

   e. **Overdue child support obligations.** Any information on the failure of the consumer to pay overdue support which:

      i. Is provided

         A. To the consumer reporting agency by a state or local child support enforcement agency; or

         B. To the consumer reporting agency and verified by any local, state, or federal government agency; and

      ii. Predates the report by seven years or less. (Section 622; 15 U.S.C. 1681s-1).

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

2. **Prohibited Information in Consumer Reports.** Determine whether the entity provides reports that include any of the following prohibited types of information.

a. **Previously deleted information.** Determine whether the entity includes in consumer reports or in a consumer's file information that was previously deleted from the consumer's file (unless the information has been reinserted based on a certification from the furnisher that the information is complete and accurate). (Section 611(a)(5)(B)(i), (5)(C); 15 U.S.C. 1681i(a)(5)(B)(i), (5)(C)).

b. **Obsolete information.** The FCRA prohibits the inclusion of the five types of information listed below in all reports except those reports used in connection with (1) credit transactions or life insurance underwriting that involve or may reasonably be expected to involve at least $150,000 or (2) individual employment decisions where the annual salary equals or may reasonably be expected to equal $75,000 or more. For all reports that do not fall within these two exemptions, determine whether the entity includes any of the following types of prohibited information:

i. Cases under Title 11 or the Bankruptcy Act, if the date of entry of the order for relief or the date of adjudication is more than 10 years earlier than the date of the report;

ii. Civil suits, civil judgments, and records of arrest, if:

A. The governing statute of limitations had expired as of the date of the report and

B. The date of entry is more than seven years before the date of the report;

iii. Paid tax liens if the date of payment is more than seven years before the date of the report;

iv. Accounts placed for collection or charged to profit and loss that are more than seven years old as of the date of the report, provided that:

A. For delinquent accounts placed for collection, charged to profit and loss, or subjected to any similar action, the seven-year period begins 180 days after the date of delinquency that immediately preceded the collection activity, charge to profit and loss, or similar action, but

B. Special triggering rules apply for reporting on Federal Family Education Loans, 20 U.S.C. 1080a(f), and

C. Information regarding the status of Perkins Loans may be reported until the loan is paid in full, 20 U.S.C. 1087cc(c)(3); or

v. Any other adverse item of information (other than records of convictions of crimes) that is more than seven years old as of the date of the report. (Section 605(a)-(c); 15 U.S.C. 1681c(a)-(c)).

c. **Medical contact information.** Determine whether the entity includes the name, address, and telephone number of any medical information furnisher that has notified the agency of its status, *other than* under the following permitted circumstances:

   i. The name, address, and telephone number are restricted or reported using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of the services, products, or devices to a person other than the consumer or

   ii. The report is being provided to an insurance company for a purpose relating to engaging in the business of insurance other than property and casualty insurance. (Section 605(a)(6); 15 U.S.C. 1681c(a)(6)).

d. **Other prohibited medical information.** Determine whether the entity provides consumer reports that contain any medical information about a consumer for employment purposes or in connection with a credit or insurance transaction, other than under any one of the following permitted circumstances:

   i. The information consists of medical contact information treated in the manner specified in 2c above;

   ii. If furnished in connection with an insurance transaction, the consumer affirmatively consented to the furnishing of the report;

   iii. If furnished for employment purposes or in connection with a credit transaction:

      A. The information is relevant to process or effect the employment or credit transaction and

      B. The consumer provided specific written consent for the furnishing of the report that describes in clear and conspicuous language the use for which the information will be furnished; or

   iv. The information pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devises, where such information, other than account status or amounts, is restricted or reported using codes that do not identify, or do not provide information sufficient to infer, the specific provider or the nature of such services, products, or devices, as provided in step 2c above. (Section 604(g); 15 U.S.C. 1681b(g)).

e. **Information subject to an identity theft block.** Determine whether the entity provides any consumer reports that include information that must be blocked pursuant to an identity theft block, as explained in steps 15-21 of Module 7. (Section 605B; 15 U.S.C. 1681c-2).

f. **Prohibited information about prescreening inquiries.** Determine whether the entity includes information about "credit or insurance transactions that are not initiated by the consumer" (which are typically related to prescreened offers) in consumer reports. This

prohibition does not apply to disclosure to the consumer of such inquiries made no more than one year prior to the consumer's request for a file disclosure. Note that the term "credit or insurance transactions that are not initiated by the consumer" does *not* include the use of a consumer report by a person with which the consumer has an account or insurance policy, for purposes of reviewing the account or insurance policy or collecting the account. (Section 603(m); 15 U.S.C. 1681a(m); Section 604(c)(3); 15 U.S.C. 1681b(c)(3)).

g. **Prohibited disclosure of the fact that government has sought or obtained information for counterterrorism purposes.**

   i. Determine whether the entity has disclosed, in a consumer report or in any other manner, any information indicating that the FBI has sought or obtained a consumer report or information identifying the consumer's financial institutions. If so, determine whether prior to making the disclosure, the agency received a certification from an appropriate FBI official that disclosure may:

   A. Threaten national security;

   B. Interfere with a criminal, counterterrorism, or counterintelligence investigation;

   C. Interfere with diplomatic relations; or

   D. Endanger the life or physical safety of any person. (Section 626(d); 15 U.S.C. 1681u(d)).

   ii. Determine whether the entity discloses, in a consumer report or in any other manner, any information indicating that a government agency that conducts investigations, intelligence or counterintelligence activities, or analysis related to international terrorism has sought or obtained access to a consumer report or other information in the consumer's file. If so, determine whether prior to making the disclosure, the agency received a certification from an appropriate agency official that disclosure may:

   A. Threaten national security;

   B. Interfere with a criminal, counterterrorism, or counterintelligence investigation;

   C. Interfere with diplomatic relations; or

   D. Endanger the life or physical safety of any person. (Section 627(c); 15 U.S.C. 1681v(c)).

h. **Adverse information from previously prepared investigative reports.** If the entity prepares investigative consumer reports, determine whether any of its consumer reports include any adverse information from a previously-generated investigative consumer report (other than information that is a matter of public record). If so, determine whether:

**CFPB**                                    **Consumer Reporting**
**Examination Procedures**          **Larger Participants**

    i.  Such adverse information was verified in the process of preparing the subsequent consumer report or

    ii.  The adverse information was received within the three-month period preceding the date the subsequent report was furnished. (Section 614; 15 U.S.C. 1681*l*).

3.  **Procedures Regarding Contents of Consumer Reports.** Determine whether the entity maintains adequate procedures to meet the FCRA requirements regarding information that must be contained in or excluded from consumer reports (described in steps 1 and 2 above). Consider in particular the following:

    a.  Whether the entity has reasonable procedures in place to ensure that required information about bankruptcies, voluntary closures of accounts, and inquiries as factors is included and that disputed information is marked as such, as described in step 1 above;

    b.  Whether the entity uses reasonable procedures to ensure that information described in step 2b above is excluded from consumer reports once it is too old to be disclosed; and

    c.  Whether the entity has reasonable procedures in place to protect medical contact information, as described in step 2c above. (Section 607(a); 15 U.S.C. 1681e(a)).

(Procedures to prevent the reappearance of deleted information are addressed in step 15 of Module 6. Procedures related to identity theft and prescreening inquiries are discussed in step 1 of Module 7 and step 11 of Module 8, respectively.)

**CFPB**                                    **Consumer Reporting**

**Examination Procedures**              **Larger Participants**

## Module 4 - Permissible Purposes and Other User Issues

This module discusses various requirements that the FCRA imposes on consumer reporting agencies in their dealings with users of consumer reports. One such requirement is the obligation to ensure that anyone to whom it furnishes a consumer report has a permissible purpose (as detailed below) to obtain a report.

Examiners should note that reports made to governmental agencies that contain only identifying information (i.e., name, address, former addresses, places of employment, or former places of employment) are not subject to the permissible purpose requirement described below. (Section 608; 15 U.S.C. 1681f). The FCRA also requires certain disclosures, on proper certification, to the FBI for counterintelligence purposes and to other governmental agencies for counterterrorism purposes. (Section 626; 15 U.S.C. 1681u; Section 627; 15 U.S.C. 1681v).

1. **Verification of Identity and Uses of Prospective Users.** Determine whether the entity makes a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing a consumer report to the user.  (Section 607(a); 15 U.S.C. 1681e(a)). Determine the steps the entity takes to verify the uses certified by prospective users (such as onsite visits to the users' places of business, checking the users' references, confirmation of applicants' business identity, examining applications and supporting documentation supplied by applicants, or other methods, to detect suspect representations, discrepancies, illogical information, suspicious patterns, factual anomalies, and other indicia of unreliability).

2. **Certification of Purposes.** Determine whether the entity's procedures require prospective users of consumer reports to:

   a.  Identify themselves,

   b.  Certify the purposes for which the information is sought, and

   c.  Certify that the information will be used for no other purpose.  (Section 607(a); 15 U.S.C. 1681e(a)).

3. **Reasonable Procedures Regarding Permissible Purposes.** Determine whether the entity maintains reasonable procedures to ensure that, aside from the provision of consumer reports to government agencies in appropriate circumstances, consumer reports are furnished only in the following permissible circumstances:

   a.  In response to a court order or federal grand jury subpoena.

   b.  In accordance with the written instructions of the consumer.

   c.  To a person that the entity has reason to believe intends to use the report as information for any of the following reasons:

i. In connection with a credit transaction involving the consumer on whom information is to be furnished and that involves (a) extending credit to the consumer, (b) reviewing an account of the consumer, or (c) collecting an account of the consumer;

ii. For employment purposes;

iii. In connection with the underwriting of insurance involving the consumer;

iv. In connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality that is required by law to consider an applicant's financial responsibility or status;

v. As a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation;

vi. Otherwise has a legitimate business need for the information:

   A. In connection with a business transaction that the consumer initiates or

   B. To review an account to determine whether the consumer continues to meet the terms of the account.

vii. To executive departments and agencies in connection with the issuance of government-sponsored individually billed travel charge cards.

d. In response to a request by the head of a state or local child support enforcement agency (or authorized appointee) if the person making the request makes various certifications to the consumer reporting agency regarding the need to obtain the report.

e. To an agency administering a state plan under 42 U.S.C. 654 to set an initial or modified child support award.

f. To the Federal Deposit Insurance Corporation or the National Credit Union Administration in connection with its appointment or operation as a conservator, receiver, or liquidating agent for an insured depository institution or insured credit union or its resolution or liquidation of a failed or failing insured depository institution or insured credit union. (Section 604; 15 U.S.C. 1681b; Section 607(a); 15 U.S.C. 1681e(a)).

4. **Reasonable Grounds for Belief That Information Will Be Misused.** Determine whether the entity has furnished a consumer report to any person even though the entity had reasonable grounds for believing that the consumer report would not be used for one of the permissible purposes listed in step 3 above. (Section 607(a); 15 U.S.C. 1681e(a)).

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

5. **Specific Permissible Use Issues for Consumer Reporting Agencies That Furnish Reports for Resale.**

   a. Determine whether the entity provides reports to any person that seeks the report for purposes of reselling the report or any information in the report. (For purposes of this analysis and step 5b below, do not consider any reselling where the end-user is a federal agency or department that obtains the information in order to determine the consumer's eligibility for access to classified information and that certifies that nondisclosure is required for the reasons set forth in Section 607(e)(3) (15 U.S.C. 1681e(e)(3)).)

   b. If the entity does furnish reports that are used for resale, determine whether the entity requires the reseller to disclose to the entity the following information:

      i. The identity of the end-user of the report (or information) and

      ii. Each permissible purpose for which the report is furnished to the end-user of the report (or information). (Section 604; 15 U.S.C. 1681b; Section 607(e); 15 U.S.C. 1681e(e)).

6. **Specific Permissible Use Issues for Entities that Resell Reports (or Information From Reports) Obtained From Other Consumer Reporting Agencies.**

   a. Determine whether the entity obtains consumer reports from another consumer reporting agency for purposes of reselling the report or any information in the report.  (For purposes of this analysis and step 6b below, do not consider any reselling where the end-user is a federal agency or department that obtains the information in order to determine the consumer's eligibility for access to classified information and that certifies that nondisclosure is required for the reasons set forth in Section 607(e)(3) (15 U.S.C. 1681e(e)(3)).)

   b. If so, consider the following with respect to the entity's reselling activities:

      i. Determine whether the entity discloses to the originating consumer reporting agency:

         A. The identity of the end-user of the report or information and

         B. Each permissible purpose for which the report or information is furnished to the end-user. (Section 607(e)(1); 15 U.S.C. 1681e(e)(1)).

      ii. Assess whether the entity has established and complies with reasonable procedures designed to ensure that the report or information is resold only for a permissible purpose identified in step 3 above.  Determine, for example, whether the entity requires each person to which the report or information is resold and that resells or provides the report or information to any other person to:

         A. Identify each end-user of the resold report or information,

         B. Certify each purpose for which the report or information will be used, and

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

    C.  Certify that the report or information will be used for no other purpose. (Section 607(e)(2)(A); 15 U.S.C. 1681e(e)(2)(A)).

   iii.  Assess whether the entity makes reasonable efforts before reselling any report to verify the identifications and certifications referred to in step 6bii above. (Section 607(e)(2)(B); 15 U.S.C. 1681e(e)(2)(B)).

7.  **Improper Limits on User Disclosures to Consumers.** Determine whether the entity prohibits any user of its consumer reports from disclosing the report's contents to the consumer, if adverse action against the consumer has been taken by the user based in whole or in part on the report. (Section 607(c); 15 U.S.C. 1681e(c)).

8.  **Required Notices to Users.** Determine whether the entity provides users with a notice of their responsibilities under the FCRA. (Section 607(d); 15 U.S.C. 1681e(d)). Review the content of the notice provided to determine:

   a.  Whether it is substantially similar to the content prescribed in Appendix N to Regulation V (12 CFR Part 1022) and

   b.  Whether the information is clearly and prominently displayed.

9.  **Address Discrepancy Notices.** If the entity is a nationwide consumer reporting agency, determine whether it notifies persons who request consumer reports of the existence of an address discrepancy in all instances when:

   a.  A request includes an address for the consumer that substantially differs from the addresses in the consumer's file and

   b.  The entity provides a consumer report in response to the request. (Section 605(h); 15 U.S.C. 1681c(h)).

10.  **Unauthorized disclosures by officers or employees.** Determine whether the entity has policies and procedures in effect to ensure that officers and employees do not provide information concerning an individual from the agency's files to a person not authorized to receive that information. (Section 620; 15 U.S.C. § 1681r).

**CFPB**                    **Consumer Reporting**
**Examination Procedures**       **Larger Participants**

## Module 5 - Consumer File and Score Disclosures

This module assesses compliance with the FCRA provisions that require consumer reporting agencies to give consumers access to their files and scores.

1. **Identification Required for Consumer Disclosures.**

   a. Determine whether the entity requires consumers to furnish proper identification in order to obtain disclosure of their files and/or scores. (Section 610(a)(1); 15 U.S.C. 1681h(a)(1)).

   b. Assess whether the entity has developed and implemented reasonable requirements for the types of information consumers need to provide to constitute proof of identity. Evaluate whether the entity:

      i. Ensures that the information is sufficient to enable the entity to match consumers with their files and

      ii. Adjusts the information to be commensurate with an identifiable risk of harm arising from misidentifying the consumer. (For illustrative examples, see 12 CFR 1022.123.)

2. **Statement of Rights to Be Provided With Disclosures**. Determine whether the entity provides the following with each written file disclosure provided at the consumer's request:

   a. A summary of rights that:

      i. Is substantially similar to the CFPB's model summary in Appendix K to Regulation V (12 CFR Part 1022),

      ii. Has all information clearly and prominently displayed, and

      iii. Includes a description of:

         A. The right of a consumer to obtain a copy of a consumer report under Section 609(a) (15 U.S.C. 1681g(a)) from each consumer reporting agency;

         B. The frequency and circumstances under which a consumer is entitled to receive a free consumer report under Section 612 (15 U.S.C. 1681j);

         C. The right of a consumer to dispute information in the consumer's file under Section 611 (15 U.S.C. 1681i);

         D. The right of a consumer to obtain a credit score from a consumer reporting agency and a description of how to obtain a credit score;

         E. The method by which a consumer can contact, and obtain a free consumer report from, a nationwide consumer reporting agency; and

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

F.  The method by which a consumer can contact, and obtain a consumer report from, a nationwide specialty consumer reporting agency;

b.  In the case of a nationwide consumer reporting agency, a toll-free telephone number for the entity at which personnel are accessible to consumers during normal business hours;

c.  A list of all federal agencies responsible for enforcing the FCRA (with addresses and phone numbers), in a form that will assist the consumer in selecting the appropriate agency;

d.  A statement that the consumer may have additional rights under state law and that the consumer may wish to contact a state or local consumer protection agency or a state attorney general (or the equivalent thereof) to learn of those rights; and

e.  A statement that a consumer reporting agency is not required to remove accurate derogatory information from a consumer's file, unless the information is outdated under Section 605 (15 U.S.C. 1681c) or cannot be verified. (Section 609(c)(1)-(2); 15 U.S.C. 1681g(c)(1)-(2); 12 CFR Part 1022, Appendix K).

3.  **Information to Be Provided in Response to File Requests.** Determine whether the entity clearly and accurately discloses the following to consumers upon request:

a.  All information in the consumer's file at the time of the request, except—

   i.   The entity must not disclose the first five digits of the consumer's Social Security number (or similar identification number) if the consumer requests (after providing appropriate proof of identity) that they be truncated (as explained in step 1b above); and

   ii.  The entity need not disclose any information concerning credit scores or any other risk scores or predictors relating to the consumer (except under the circumstances described in step 4 below).

b.  The sources of the information, except for sources acquired and used solely in preparing an investigative consumer report.  (For disclosures required with respect to investigative consumer reports, see step 19 of Module 8.)

c.  The name or trade name written in full (and, if requested by the consumer, the address and telephone number) of each person that procured a consumer report (including all end-users, but not including certain federal government users for purposes related to classified information in national security investigations):

   i.   For employment purposes, during the two-year period preceding the date of the request; or

   ii.  For any other purpose, during the one-year period preceding the date of the request.

d.  The dates, original payees, and amounts of any checks that:

**CFPB**　　　　　　　　　　　　　**Consumer Reporting**
**Examination Procedures**　　　　　**Larger Participants**

i. Are included in the file at the time of the disclosure and

ii. Form the basis for any adverse characterization of the consumer.

e. A record of all inquiries received by the entity during the 1-year period preceding the request that identified the consumer in connection with a credit or insurance transaction that was not initiated by the consumer.

f. If the consumer requests a credit file and not a credit score, a statement that the consumer may request and obtain a credit score.  (Section 609(a); 15 U.S.C. 1681g(a)).

4. **Information to Be Provided in Response to Credit Score Requests.**

a. Determine whether the entity:

i. Distributes any scores that are used in connection with residential real property loans or

ii. Develops any scores that assist credit providers in understanding a consumer's general credit behavior and predicting the consumer's future credit behavior. (Section 609(f)(4); 15 U.S.C. 1681g(f)(4)).

If the answers to (i) and (ii) above are both "no," skip to step 5 below.

b. Assess the entity's handling of consumer requests for credit scores. Refer to the Glossary and step 17 of Module 1 for the definition of "credit score." In evaluating the entity's handling of consumer requests for credit scores, consider:

i. Whether the entity provides the following information when a consumer requests a credit score:

A. A statement indicating that the information and credit scoring model may be different than the credit score that may be used by the lender and

B. A notice that includes:

(1) The current credit score of the consumer or the most recent credit score of the consumer that was previously calculated by the entity for a purpose related to the extension of credit;

(2) The range of possible credit scores under the model used;

(3) All of the key factors (as defined in the Glossary) that adversely affected the credit score of the consumer in the model used (not to exceed four factors, except that if the number of inquiries is a key factor it must be included without regard to the numerical limit);

(4) The date on which the credit score was created; and

(5) The name of the source that provided the credit score or credit file upon which the credit score was created. (Section 609(f)(1), (f)(2)(B), (f)(7), (f)(9); 15 U.S.C. 1681g(f)(1), (f)(2)(B), (f)(7), (f)(9)).

   ii. Whether the entity provides a credit score that:

     A. Is derived from a credit scoring model that the entity distributes widely to users in connection with residential real property loans or

     B. Should assist the consumer in understanding the credit scoring assessment of the consumer's credit behavior and predictions about the consumer's future credit behavior. (Section 609(f)(7); 15 U.S.C. 1681g(f)(7)).

5. **Explaining File and Score Disclosures.** Evaluate whether the entity provides trained personnel to explain information in the disclosures to consumers described above. (Section 610(c); 15 U.S.C. 1681h(c)).

6. **Contact Information for Developer of Score or Methodology.** When a consumer requests a credit score that the entity distributes but did not develop or modify, assess whether the entity provides the consumer with the name, address, and website for contacting the person or entity that developed the score or developed the methodology for the score. (Section 609(f)(5); 15 U.S.C. 1681g(f)(5)).

7. **Form of Disclosures.** Determine whether the entity:

   a. Makes the disclosures described in steps 2, 3, 4, and 6 above in writing, unless the consumer authorizes another form (Section 610(a)(2), (b); 15 U.S.C. 1681h(a)(2), (b)) and

   b. Allows a consumer obtaining a disclosure described above to be accompanied by one other person of his or her choosing who furnishes reasonable identification (Section 610(d); 15 U.S.C. 1681h(d)).

8. **Free Annual Reports.** The FCRA requires nationwide consumer reporting agencies and nationwide specialty consumer reporting agencies to provide free annual reports if they have been in continuous operation for at least a year. Nationwide consumer reporting agencies must jointly operate a "centralized source" that consumers can use to obtain their free reports. Each nationwide specialty consumer reporting agency must make free reports available through a "streamlined process."

   a. **Who must provide free annual reports.** Determine if the entity has an obligation to provide free annual reports in response to consumer requests by assessing whether:

     i. It has been furnishing consumer reports to third parties on a continuing basis with respect to consumers residing nationwide for the last 12 months and

     ii. It is a nationwide consumer reporting agency or a nationwide specialty consumer reporting agency (as determined in steps 2 and 4 of Module 1).

**CFPB
Examination Procedures**

**Consumer Reporting
Larger Participants**

If the answer to (i) or (ii) above is no, skip to step 9 below regarding free disclosures after adverse actions. (Section 612(a)(1)(A), (a)(4); 15 U.S.C. 1681j(a)(1)(A), (a)(4)).

b. **Basic compliance.** Determine whether the entity provides all of the disclosures described in steps 2 and 3 above without charge to the consumer upon a consumer's request once during any 12-month period. For nationwide consumer reporting agencies, this obligation applies only to requests made through the centralized source. (Section 612(a)(1)(A)-(B); 15 U.S.C. 1681j(a)(1)(A)-(B)).

c. **Timeliness.** Assess whether the entity provides free annual reports within the statutory timeframe, which is within 15 days after the date the request is received. (Section 612(a)(2); 15 U.S.C. 1681j(a)(2)).

d. **Special requirements for nationwide consumer reporting agencies.** If the entity is a nationwide consumer reporting agency, assess whether it meets the following requirements in addition to those described in (b) and (c) above:

   i. **Ease of access.** Determine whether the entity through the centralized source does the following when consumers seek information regarding their files with the entity:

   A. Makes available a standardized form for consumers to use when requesting an annual file disclosure request by mail or through the website;

   B. Provides information through the centralized source website and telephone number regarding how to make a request through the website, by a toll-free telephone number, and by a single mail address;

   C. Provides clear and easily understandable information and instructions, including:

   (1) Providing information on the progress of the consumer's request;

   (2) Providing access on the website to a "help" or "frequently asked questions" screen, which includes specific information that consumers might reasonably need to request file disclosures, answers to questions that consumers might reasonably ask, and instructions on how to file a complaint with the centralized source and the CFPB;

   (3) If a consumer cannot be properly identified, notifying the consumer and providing directions on how to complete the request, including what additional information or documentation will be required to complete the request, and how to submit such information; and

   (4) A statement indicating that the consumer has reached the website or telephone number for ordering free annual credit reports as required by federal law. (12 CFR 1022.136(a)-(b)).

   ii. **Collection of personally identifiable information.** Determine whether the entity collects only as much personally identifiable information through the centralized

**CFPB
Examination Procedures**

**Consumer Reporting
Larger Participants**

source as is reasonably necessary to properly identify the consumer and to process the transaction(s) requested by the consumer. (12 CFR 1022.136(b)(2)(ii)).

iii. **Procedures to anticipate and respond to volume of consumers who request consumer reports from the centralized source.** Determine whether the entity, in conjunction with the other nationwide consumer reporting agencies, has implemented reasonable procedures to anticipate, and respond to, the volume of consumers who use the centralized source to meet the requirements of 12 CFR 1022.136(b)(2)(i), (c), & (e).

iv. **Reports owned by an associated consumer reporting agency.** Determine whether, in response to a consumer's request (accompanied by proper identification) through the centralized source, the entity provides a file disclosure of every consumer report that the entity has the ability to provide to a third party relating to that consumer, regardless of whether the consumer report is owned by the entity or by an associated consumer reporting agency. (12 CFR 1022.136(d)).

v. **Advertising, marketing, or establishment of accounts.** If any advertising or marketing for products or services or requests to establish accounts are done through the centralized source, determine whether:

A. They are delayed until after the consumer has obtained his or her annual file disclosure and

B. Any communications, instructions, or permitted advertising or marketing do not interfere with, detract from, contradict, or otherwise undermine the purpose of the centralized source. (12 CFR 1022.136(g)).

vi. **Conditions.** Determine whether the centralized source requires consumers to set up an account or asks or requires consumers to agree to terms or conditions in connection with obtaining an annual file disclosure from the entity. (12 CFR 1022.136(h)).

e. **Special requirements for nationwide specialty consumer reporting agencies.** If the entity is a nationwide specialty consumer reporting agency, assess whether it meets the following requirements in addition to those described in 8b and 8c above:

i. **Streamlined process.** Determine whether the entity has established a streamlined process for accepting and processing consumer requests for free annual disclosures that:

A. Includes a toll-free telephone number that:

(1) Allows consumers to request their disclosures;

(2) Provides clear and prominent instructions for requesting disclosures by any additional available request methods that do not interfere with, detract from,

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

contradict, or otherwise undermine the ability of consumers to obtain annual file disclosures through the streamlined process;

(3) Is published in conjunction with other published numbers for the entity; and

(4) Is clearly and prominently posted on any website related to consumer reporting that the entity owns or maintains, along with instructions for requesting disclosures by any additional available request methods; and

B. Provides clear and easily understandable information and instructions to consumers, including:

(1) Providing information on the status of the consumer's request;

(2) For a website request method, providing access to a "help" or "frequently asked questions" screen, which includes more specific information on how to order file disclosures, answers to questions that consumers might reasonably ask, and instructions on how to file a complaint with the entity and the CFPB; and

(3) If a consumer cannot be properly identified, providing notice of that fact and directions on how to complete the request, including what additional information or documentation is required and how to submit it.  (12 CFR 1022.137(a)).

ii. **Collection of personal information.** Determine whether the entity collects only as much personal information as is reasonably necessary to properly identify the consumer. (12 CFR 1022.137(a)(2)(ii)).

iii. **Anticipating and responding to volume of consumers.** Determine whether the entity has implemented reasonable procedures to anticipate, and respond to, the volume of consumers who will use the streamlined process to meet the requirements of 12 CFR 1022.137(a)(2)(i), (b), & (c).

iv. **Requests received through other methods.** Determine whether the entity accepts consumer requests for annual file disclosures from consumers who use methods other than the streamlined process or instructs such consumers on how to use the streamlined process. (12 CFR 1022.137(e)).

f. **Handling of personally identifiable information.**  Determine whether the entity (or the centralized source) uses or discloses any personally identifiable information collected from a consumer because of the consumer's request for an annual or other disclosure required by the FCRA from the entity that the consumer made through the centralized source or the streamlined process, for any reason other than the following:

i. To provide the FCRA disclosure requested by the consumer;

ii. To process a transaction requested by the consumer at the same time as the disclosure request;

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

    iii.  To comply with applicable legal requirements; or

    iv.  To update personally identifiable information already maintained by the entity for the purpose of providing consumer reports, provided that the entity uses and discloses the updated personally identifiable information subject to the same legal restrictions that would apply to the information that is updated or replaced. (12 CFR 1022.136(f), 1022.137(d)).

9. **Free Disclosures After Adverse Action**. Determine whether the entity complies with its obligation to provide a statement of rights and make the file disclosure described in steps 2 and 3 above without charge to any consumer about whom it maintains a file if the consumer makes a request within 60 days after receiving either:

    a.  An adverse action notice or

    b.  A notification from a debt collection agency affiliated with the entity stating that the consumer's credit rating may be or has been adversely affected. (Section 612(b); 15 U.S.C. 1681j(b)).

10. **Free Disclosures in Connection With Fraud Alerts**. If the entity is a nationwide consumer reporting agency and inserts a fraud alert in the consumer's file at the request of the consumer or the consumer's representative, determine whether it:

    a.  Discloses to the consumer that the consumer may request:

        i.  A free file disclosure (in the case of an initial fraud alert) or

        ii.  Two free file disclosures in the 12-month period beginning on the date of the fraud alert (in the case of an extended fraud alert); and

    b.  Provides all disclosures described in steps 2 and 3 above without charge within three business days after the consumer requests the disclosure. (Section 605A(a)(2), (b)(2); 15 U.S.C. 1681c-1(a)(2), (b)(2)).

11. **Other Free Disclosures**. Determine whether the entity makes all disclosures described in steps 2 and 3 above without charge to any consumer upon request once during any 12-month period if the consumer certifies in writing that the consumer:

    a.  Is unemployed and intends to apply for employment in the 60-day period beginning on the date of the certification,

    b.  Is a recipient of public welfare assistance, or

    c.  Has reason to believe that the consumer's file at the entity contains inaccurate information due to fraud. (Section 612(c); 15 U.S.C. 1681j(c)).

12. **Charges for Other File Disclosures.** Determine whether any charges imposed by the entity for file disclosures not covered in steps 8 to 11 above are:

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

---

    a. Reasonable,

    b. Not in excess of the annually adjusted maximum amount ($11.50 as of January 2012), and

    c. Indicated to the consumer before the disclosure is made. (Section 612(f); 15 U.S.C. 1681j(f)).

13. **Charges for Credit Score Disclosures**. Determine in consultation with Headquarters whether the fees charged by the entity for credit score disclosures are reasonable and fair. (Section 609(f)(8); 15 U.S.C. 1681g(f)(8)).

14. **"Free" Disclosures in Exchange for Other Purchases**.

    a. Determine whether the entity offers any file disclosures prepared by or obtained from, directly or indirectly, a nationwide consumer reporting agency that are represented, either expressly or by implication, to be available to the consumer at no cost if the consumer purchases a product or service or agrees to purchase a product or service subject to cancellation.

    b. If so, determine in consultation with Headquarters whether all such offers prominently include the disclosures required by 12 CFR 1022.138(b), as applicable, and comply with the general requirements of 12 CFR 1022.138(a)(3)(i)-(vi). Advertising issues are also addressed in Module 9.

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

## Module 6 - Consumer Inquiries, Complaints, and Disputes and the Reinvestigation Process

This module addresses consumer inquiries, complaints, and disputes, as well as the investigation procedures the FCRA requires a consumer reporting agency to follow if a consumer disputes the completeness or accuracy of any item of information contained in his or her file. Compliance management is addressed in Module 1 and in the compliance management review section of the examination manual, and consumer file disclosure requests are discussed in detail in Module 5.

### GENERAL PROCESSES

1. **Channels for Consumers to Contact the Entity**.

   a. Identify all channels the entity makes available for consumers to submit inquiries, complaints, and disputes, including telephone, physical locations, addresses for written submissions, websites, email addresses, and other Internet-based channels.

   b. Assess the effectiveness of each of these channels, including ease of access for consumers, wait times, and company responsiveness. Consider the limits, if any, that each channel places on the amount or type of information or documentation that consumers can submit in support of their dispute.

2. **Toll-Free Number for Nationwide Consumer Reporting Agencies**. If the entity is a nationwide consumer reporting agency, determine whether it has established a toll-free telephone number at which personnel are accessible to consumers during normal business hours. Assess the ease of accessing a live person, including hold times and call abandonment rates. (Section 609(c)(2)(B); 15 U.S.C. 1681g(c)(2)(B)).

3. **Responsiveness and Training of Personnel**. Assess the responsiveness and training of company personnel who handle consumer inquiries, complaints, and disputes. In doing so:

   a. Determine if staffing levels are sufficient for the volume of inquiries, complaints, and disputes. Assess whether assumptions used for staffing determinations are supported by analysis. (For procedures related to staffing levels for the centralized source and streamlined processes, see also steps 8d and 8e of Module 5).

   b. Consider response times and other performance metrics used by the entity.

   c. Assess the level of training provided or required for all staff that handle consumer inquiries, complaints, and disputes. (For procedures related to training of personnel who explain file disclosures, see step 5 of Module 5.)

4. **Systems and Procedures Review**.

   a. Evaluate the systems, procedures, and policies used by the entity for capturing, logging, categorizing, tracking, handling, investigating, and resolving consumer inquiries, disputes, and complaints. Assess whether these systems and procedures are adequate to

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

ensure compliance with the requirements identified in steps 5-25 below. Include in this review any systems and procedures used to communicate information to and from furnishers, users, and other consumer reporting agencies.

b. Assess how the systems and procedures identify and handle:

   i. Patterns of complaints or disputes that suggest systematic problems and

   ii. Repeated complaints or disputes by the same consumer.

5. **Handling of CFPB Complaints.** If the entity is a nationwide consumer reporting agency, assess the following with respect to complaints it receives from the CFPB:

   a. Whether the entity reviews each such complaint to determine whether its legal obligations under the FCRA have been met (including any obligation imposed by an applicable court or administrative order);

   b. Whether it provides reports to the CFPB regarding the determinations of and actions taken in connection with its review of such complaints; and

   c. Whether it maintains, for a reasonable time period, records regarding the disposition of each such complaint. (Section 611(e)(3); 15 U.S.C. 1681i(e)(3)).

## DISPUTES AND THE REINVESTIGATION PROCESS

Steps 6 to 21 below apply to consumer reporting agencies except those that operate only as resellers (as defined in the Glossary and step 5 of Module 1). If the entity operates only as a reseller, skip to steps 22 to 25 below.

6. **Reasonable Reinvestigation.** Determine whether the entity conducts a reasonable reinvestigation, free of charge, when a consumer notifies the entity (directly or through a reseller) that the consumer disputes the completeness or accuracy of any item of information contained in the consumer's file at the entity. (Section 611(a)(1); 15 U.S.C. 1681i(a)(1)).

7. **Termination of Frivolous or Irrelevant Reinvestigations.** Assess the circumstances under which the entity declines to investigate a dispute on the grounds that it is frivolous or irrelevant. Determine:

   a. Whether the entity reasonably determines before terminating such a reinvestigation that the dispute by the consumer is frivolous or irrelevant (such as if a consumer fails to provide sufficient information to investigate the disputed information) and

   b. Whether the entity provides notice to the consumer within five business days after determining that a dispute is frivolous or irrelevant, by mail or other means authorized by the consumer, that:

   i. Includes the reasons for the determination and

**CFPB**

**Examination Procedures**

**Consumer Reporting**

**Larger Participants**

ii. Identifies any information required to investigate the disputed information (the entity may identify this information by using a standardized form describing the general nature of such information). (Section 611(a)(3); 15 U.S.C. 1681i(a)(3)).

8. **Review of All Relevant Information.** Determine whether in conducting its reinvestigations the entity reviews and considers all relevant information submitted by the consumer within 30 days after receiving the dispute from the consumer or reseller. (Section 611(a)(1)(A), (a)(4); 15 U.S.C. 1681i(a)(1)(A), (a)(4)). Review how the entity handles and uses attachments and other supplementary materials and text provided by the consumer in disputes submitted by mail, Internet, telephone, or other means.

9. **Timely and Complete Notification to Furnisher.**

a. Determine whether within five business days after receiving notice of a dispute, the entity provides notification to the furnisher (other than in cases of "expedited dispute resolutions" described in step 19 below).

b. Assess whether this notification includes all relevant information regarding the dispute that the entity has received from the consumer or reseller. (Section 611(a)(2)(A); 15 U.S.C. 1681i(a)(2)(A)). In making this assessment:

i. Consider disputes that come in through all of the different channels that consumers can use to lodge disputes.

ii. Assess how information from attachments submitted by consumers is handled.

10. **Update to Furnisher if Additional Information Received.** If the entity receives additional information from the consumer or reseller after it provides the initial notification to the furnisher, but within thirty days after receiving the dispute, determine whether the entity provides such information to the furnisher (other than in cases of "expedited dispute resolutions" described in step 19 below). (Section 611(a)(2)(B); 15 U.S.C. 1681i(a)(2)(B)).

11. **Time Limits for Completing Reinvestigation.** For disputes that are not terminated as frivolous or irrelevant (see step 7 above), determine whether the entity completes the reinvestigation and records the current status or deletes the information before the applicable statutory deadline. The deadline is 30 days after the entity receives the notice from the consumer or reseller, except under the following two circumstances:

a. The time can be extended up to 15 additional days if:

i. The entity receives information from the consumer during the initial 30-day period that is relevant to the reinvestigation and

ii. The disputed information is not found to be inaccurate or incomplete or unverifiable in the initial 30-day period (Section 611(a)(1); 15 U.S.C. 1681i(a)(1)); or

**CFPB**                                    **Consumer Reporting**
**Examination Procedures**          **Larger Participants**

b. The deadline is 45 days after receipt of the notice from the consumer or reseller if the dispute was sent after the consumer received an annual free report (Section 612(a)(3); 15 U.S.C. 1681j(a)(3)).

12. **Inaccurate, Incomplete, or Unverifiable Information**. If information disputed by a consumer is found to be inaccurate, incomplete, or cannot be verified, determine if the entity:

   a. Promptly deletes the information from the consumer's file, or modifies it as appropriate;

   b. Promptly notifies the furnisher that the information has been modified or deleted from the consumer's file; and

   c. Ensures that the information is not reinserted into the consumer's file unless the furnisher certifies that the information is complete and accurate. (Section 611(a)(5)(A), (a)(5)(B)(i); 15 U.S.C. 1681i(a)(5)(A), (a)(5)(B)(i)).

13. **Handling of Disputes Related to Credit Scores Developed by Others.** If the entity declines to process disputes relating to credit scores that were developed by another person or entity, confirm:

   a. That the entity did not itself develop or modify the scores and

   b. That the entity provides the consumer with the name and address and website for contacting the person or entity who developed the score or developed the methodology of the score. (Section 609(f)(5); 15 U.S.C. 1681g(f)(5)).

14. **Reinsertion of Deleted Information.** If information deleted from a consumer's file through a reinvestigation is later reinserted in the file, determine whether the entity provides the consumer the following in writing within five business days of the reinsertion:

   a. A statement that the disputed information has been reinserted;

   b. The business name and address (and telephone number, if reasonably available) of any furnisher contacted by the entity or that contacted the entity in connection with the reinsertion of such information; and

   c. A notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information. (Section 611(a)(5)(B); 15 U.S.C. 1681i(a)(5)(B)).

15. **Procedures to Prevent Reappearance of Deleted Information.** Assess whether the entity maintains reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports, of information that is deleted based on a reinvestigation (other than information that is reinserted after the furnisher certifies that it is complete and accurate). (Section 611(a)(5)(C); 15 U.S.C. 1681i(a)(5)(C)). See also step 2a of Module 3, which addresses whether the entity actually has included previously deleted information in consumer reports.

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

16. **Automated System for Furnishers to Report Reinvestigation Results.** If the entity is a nationwide consumer reporting agency, determine if it provides furnishers access to an automated system that allows them to report the results of a reinvestigation that finds incomplete or inaccurate information to other nationwide consumer reporting agencies. (Section 611(a)(5)(D); 15 U.S.C. 1681i(a)(5)(D)).

17. **Notice to Consumer of Results of Reinvestigation.** Determine if the entity provides written notice to a consumer (or the reseller, if the dispute was provided through a reseller) of the results of a reinvestigation, by mail or by any other means authorized by the consumer, within five business days after the completion of the reinvestigation (except in the case of "expedited resolutions" described in step 19 below). Determine whether, as part of this notice or in addition to this notice, the entity provides the following to the consumer in writing within the five-day period:

   a. A statement that the reinvestigation is completed;

   b. A consumer report based upon the consumer's file as revised;

   c. A notice that, if requested by the consumer, a description of the procedure used to determine the information's accuracy and completeness will be provided by the entity, including the business name and address of any furnisher contacted in connection with such information (with telephone number, if reasonably available);

   d. A notice that the consumer has the right to add a statement to the consumer's file disputing the information's accuracy or completeness; and

   e. A notice that the consumer has the right to request that the entity furnish notifications regarding deletions or statements of dispute to certain users who have received reports containing the information. (Section 611(a)(6); 15 U.S.C. 1681i(a)(6)).

18. **Description of Procedures Used.** If a consumer requests a description of the procedures used, determine whether the entity provides such a description within 15 days after receiving the request (except in cases of "expedited dispute resolutions" described in step 19 below). (Section 611(a)(7); 15 U.S.C. 1681i(a)(7)).

19. **Expedited Dispute Resolutions.**

   a. Determine whether the entity engages in any "expedited dispute resolutions" in which it does not provide timely and complete notification or updates to the furnisher, does not provide written notice to the consumer of the results of the reinvestigation, and/or does not make available a description of the procedures used upon consumer request (per steps 9, 10, 17, and 18 above).

   b. If so, determine whether for each of these "expedited dispute resolutions," the entity:

      i. Deletes the disputed information within three business days after the date on which the entity receives notice of the dispute from the consumer,

    ii. Provides prompt notice of the deletion to the consumer (or to the reseller, if the complaint came through a reseller) by telephone,

    iii. Provides written confirmation of the deletion and a revised consumer report, within five business days after making the deletion, and

    iv. Includes in the telephone notice described in 19bii above or in a written notice accompanying the confirmation and copy of the report described in 19biii above a statement of the consumer's right to request that the entity notify certain prior users under Section 611(d) (15 U.S.C. 1681i(d)). (Section 611(a)(8); 15 U.S.C. 1681i(a)(8)).

20. **Statements of Dispute.**

    a. If the reinvestigation does not resolve the dispute, determine whether the entity allows the consumer to file a brief statement setting forth the nature of the dispute.  (Section 611(b); 15 U.S.C. 1681i(b)).

    b. If the entity limits the length of such statements of dispute, determine whether:

        i. The entity allows the consumer up to at least 100 words and

        ii. The entity provides the consumer with assistance in writing a clear summary of the dispute.  (Section 611(b); 15 U.S.C. 1681i(b)).

    c. In instances where consumers file statements of dispute:

        i. Determine whether the entity:

            A. Clearly notes in any subsequent reports containing the information in question that it is disputed by the consumer and

            B. Provides either the consumer's statement or a codification or summary thereof that is clear and accurate.

        ii. If not, assess whether there are reasonable grounds for the entity to believe that the dispute is frivolous or irrelevant. (Section 611(c); 15 U.S.C. 1681i(c)).

21. **Notification to Users of Deletions or Disputes.** Review whether the entity notifies users upon consumer request of (1) any deletion of information which is found to be inaccurate or whose accuracy can no longer be verified or (2) any notation as to disputed information. Such notification must be provided to any person specifically designated by the consumer who has received a consumer report containing the deleted or disputed information:

    a. For employment purposes within the previous two years or

    b. For any other purpose within the previous six months. (Section 611(d); 15 U.S.C. 1681i(d)).

**CFPB**                                    **Consumer Reporting**

**Examination Procedures**          **Larger Participants**

## RESELLER RESPONSIBILITIES REGARDING DISPUTES

The following procedures should be used to review a reseller's conduct when the reseller receives consumer disputes concerning the completeness or accuracy of information contained in a consumer report produced by the reseller.

22. **Assessment by Reseller.** Determine whether the reseller determines whether the item of information is incomplete or inaccurate as a result of an act or omission of the reseller within five business days of receiving notice of a dispute from a consumer and without charge to the consumer. (Section 611(f)(2)(A); 15 U.S.C. 1681i(f)(2)(A)).

23. **Timely Correction of Reseller Errors.** When the reseller determines that disputed information is incomplete or inaccurate as a result of its own act or omission, determine whether the reseller corrects the information in the consumer report or deletes it within 20 days after receiving the notice without charge to the consumer. (Section 611(f)(2)(B)(i); 15 U.S.C. 1681i(f)(2)(B)(i)).

24. **Notice to Consumer Reporting Agency That Produced Report.**

    a. For instances where the reseller determines that the item of information is not incomplete or inaccurate as a result of its own acts or omissions, determine whether the reseller conveys notice of the dispute to each consumer reporting agency that provided the reseller with the information at issue without charge to the consumer.

    b. If so, determine:

        i. Whether the reseller includes with the notice all relevant information provided by the consumer and

        ii. Whether the reseller uses an address or a notification mechanism specified by the consumer reporting agency for such notices. (Section 611(f)(2)(B); 15 U.S.C. 1681i(f)(2)(B)).

25. **Conveyance of Reinvestigation Notices to Consumers.** Determine whether the reseller immediately reconveys reinvestigation notices that it receives from the consumer reporting agency to the consumer, including any notice of a deletion by telephone. (Section 611(f)(3); 15 U.S.C. 1681i(f)(3)).

## Module 7 - Consumer Alerts and Identity Theft Provisions

This Module addresses a number of requirements that the FCRA imposes on consumer reporting agencies to address identity theft and to protect active duty military consumers, including fraud and active duty alerts and blocking of reporting of information that stems from identity theft. In addition to the procedures set out below, other modules also touch on identity protection issues – including, for example, the requirement that consumer reporting agencies notify parties requesting reports regarding address discrepancies (discussed in step 9 of Module 4).

### POLICIES AND PROCEDURES

1. Review and assess the entity's general policies and procedures governing how the entity responds when consumers assert that they are or have been a victim of fraud or identity theft. For policies and procedures specifically related to alerts, see step 5 below.

### FRAUD AND ACTIVE DUTY ALERTS

2. **Duty to Provide Contact Information.** If the entity is not a nationwide consumer reporting agency, determine whether it explains to consumers who suspect they have been or are about to be a victim of fraud or a related crime (including identity theft) how to contact the CFPB and the nationwide consumer reporting agencies to obtain more detailed information and request alerts. (Section 605A(g); 15 U.S.C. 1681c-1(g)).

3. **Reseller Responsibility to Reconvey Alerts.** If the entity acts as a reseller (see step 5 of Module 1), determine whether it complies with its statutory obligation to include in its reports any fraud alert or active duty alert placed in the file of a consumer by another consumer reporting agency. (Section 605A(f); 15 U.S.C. 1681c-1(f)).

4. **Applicability of Requirement to Include Alerts.** The procedures in steps 5 to 12 below apply only to nationwide consumer reporting agencies. If the entity is not a nationwide consumer reporting agency, skip to step 13 below.

5. **Specific Policies and Procedures Regarding Alerts.** Determine whether the nationwide consumer reporting agency has established policies and procedures relating to fraud alerts and active duty alerts, including:

   a. Procedures that inform consumers of the availability of such alerts and

   b. Procedures that allow consumers to request initial, extended, or active duty alerts in a simple and easy manner, including by telephone. (Section 605A(d); 15 U.S.C. 1681c-1(d)).

6. **Requirements for Alerts.** Determine whether the nationwide consumer reporting agency includes an initial fraud alert, extended fraud alert, or active duty alert in a consumer's file when the entity:

   a. Maintains a file on the consumer,

   b. Has received appropriate proof of the requester's identity (see step 1b of Module 5), and

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

c. Receives from the consumer (or an individual acting on behalf of or as a personal representative of a consumer):

   i. *In the case of an initial fraud alert*, a direct request that asserts in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime, including identity theft;

   ii. *In the case of an extended fraud alert*, a direct request and an identity theft report (as defined in the Glossary); or

   iii. *In the case of an active duty alert*, a direct request from an active duty military consumer (or an individual acting on behalf of or as a personal representative of an active duty military consumer). (Section 605A(a)(1), (b)(1), (c); 15 U.S.C. 1681c-1(a)(1), (b)(1), (c)). An active duty military consumer means a consumer in military service who:

      A. Is on active duty[6] or is a reservist performing duty under a call or order to active duty under a provision of law referred to in 10 U.S.C. 101(a)(13), and

      B. Is assigned to service away from the usual duty station of the consumer. (Section 603(q)(1); 15 U.S.C. 1681(q)(1)).

7. **Duration of Alerts.** Determine whether the nationwide consumer reporting agency includes any fraud or active duty alert in the consumer's file and provides the alert along with any credit score generated in using that file for:

   a. Not less than 90 days from the request date for initial fraud alerts,

   b. 7 years from the request date for extended fraud alerts, and

   c. 12 months from the request date for active duty alerts,

   unless the consumer or his or her representative requests that the alert be removed earlier and provides appropriate proof of the requester's identity (see step 1b of Module 5). (Section 605A(a)(1)(A), (b)(1)(A), (c)(1); 15 U.S.C. 1681c-1(a)(1)(A), (b)(1)(A), (c)(1); 12 CFR 1022.121).

8. **Referrals to and From Other Nationwide Consumer Reporting Agencies of Alerts.**

   a. Determine whether the nationwide consumer reporting agency refers information regarding fraud alerts, extended fraud alerts, and active duty alerts to each of the other nationwide consumer reporting agencies and has appropriate referral procedures in place.

---

[6] The term "active duty" here means full-time duty in the active military service of the United States. This includes full-time training duty, annual training duty, and attendance while in the active military service, at a school designated as a service school by law or by the Secretary of the military department concerned. It does not include full-time National Guard duty. (10 U.S.C. 101(d)(1)).

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

(Section 605A(a)(1)(B), (b)(1)(C), (c)(3); 15 U.S.C. 1681c-1(a)(1)(B), (b)(1)(C), (c)(3); Section 621(f); 15 U.S.C. 1681s(f)).

 b. When the nationwide consumer reporting agency receives referrals of fraud alerts and active duty alerts from other nationwide consumer reporting agencies, determine whether it responds in the same way that it would if it received the request directly from the consumer. (Section 605A(e); 15 U.S.C. 1681c-1(e)).

9. **Free Disclosures in Connection with Fraud Alerts.** See step 10 of Module 5 for procedures regarding nationwide consumer reporting agencies' obligation to provide upon request a free file disclosure in connection with an initial fraud alert or two free file disclosures in connection with an extended fraud alert and to disclose the consumer's right to such disclosures. (Section 605A(a)(2), (b)(2); 15 U.S.C. 1681c-1(a)(2), (b)(2)).

10. **Exclusion From Prescreening During Extended Fraud Alerts and Active Duty Alerts.** See steps 9 and 10 of Module 8 for procedures relating to the requirement that nationwide consumer reporting agencies exclude consumers with extended fraud alerts and active duty alerts from prescreening lists for five or two years respectively, unless the consumer asks to be included. (Section 605A(b)(1)(B), (c)-(d); 15 U.S.C. 1681c-1(b)(1)(B), (c)-(d)).

11. **Contents of Alerts.** Determine whether the entity's fraud alerts and active duty alerts:

 a. Notify all prospective consumer report users that the consumer may be the victim of fraud, including identity theft, or is an active duty military consumer, as applicable, and

 b. Are presented in a manner that facilitates clear and conspicuous view of such notification by any person requesting a consumer report about the consumer. (Section 603(q)(2); 15 U.S.C. 1681a(q)(2)).

12. **Notification in Alerts Regarding Credit Extensions.**

 a. Determine whether each initial fraud alert, extended fraud alert, and active duty alert included in a file by the entity notifies prospective users that the consumer does not authorize establishment of any new credit plan or extension of credit in the consumer's name (other than under an open-end credit plan), or issuance of an additional card on an existing credit account requested by the consumer, or any increase in credit limit on an existing credit account requested by the consumer, except under specific circumstances permitted by Section 605A(h); 15 U.S.C. 1681c-1(h).

 b. In the case of extended fraud alerts, determine whether each alert included by the entity also provides a telephone number or other reasonable contact method designated by the consumer. (Section 605A(h); 15 U.S.C. 1681c-1(h)).

JA0101

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

## IDENTITY THEFT STATEMENT OF RIGHTS

The FCRA requires consumer reporting agencies under certain circumstances to provide a summary of rights of identity theft victims that contains all of the information required by the CFPB.

13. **Who Receives a Statement of Rights.** Determine if the entity provides a statement of rights to any consumer who expresses a belief to the entity that the consumer is a victim of fraud or identity theft involving credit, an electronic fund transfer, or an account or transaction at or with a financial institution or other creditor. (Section 609(d)(2); 15 U.S.C. 1681g(d)(2)).

14. **Content and Format of Statement of Rights.** Confirm that:

    a. The disclosures provided are substantially similar to the CFPB's model summary in Appendix I to Regulation V, 12 CFR Part 1022, and

    b. All required information is clearly and prominently displayed. (Section 609(d); 15 U.S.C. 1681g(d); 12 CFR Part 1022, Appendix I).

## IDENTITY THEFT BLOCKING REQUIREMENT

Consumer reporting agencies must "block" the reporting of certain information resulting from an alleged identity theft. Special rules apply to two different types of consumer reporting agencies.

15. **Entities Subject to Different Blocking Requirements.** Check services companies and resellers have different obligations than other consumer reporting agencies when consumers request an identity theft block. Determine if the entity is:

    a. A reseller (as determined in step 5 of Module 1) or

    b. A check services company acting as such that issues authorizations for the purpose of approving or processing negotiable instruments, electronic funds transfers, or similar methods of payment.

    If so, skip to step 19 (for resellers) or 20 (for check services companies) below. (Section 605B(d)-(e); 15 U.S.C. 1681c-2(d)-(e)).

16. **Blocking Requirement.** Absent the circumstances described in step 17 below, determine whether the entity blocks the reporting of consumer file information that the consumer identifies as resulting from an alleged identity theft (other than in reports provided to a federal, state, or local law enforcement agency) within four business days after the entity receives:

    a. Appropriate proof of the identity of the consumer (see step 1b of Module 5),

    b. A copy of an identity theft report,

    c. The identification of such information by the consumer, and

d. A statement by the consumer that the information is not information relating to any transaction by the consumer. (Section 605B(a), (f); 15 U.S.C. 1681c-2(a), (f)).

17. **Requirements If Declining to Block Information.** The FCRA allows consumer reporting agencies to decline a block request or rescind a block under limited circumstances. If the entity declines to implement an identity theft block, or rescinds any identity theft block, assess whether it:

a. Notifies the consumer promptly, in the same manner as consumers are notified of the reinsertion of previously-deleted information and

b. Reasonably determines that:

i. The information was blocked in error or a block was requested by the consumer in error;

ii. The information was blocked, or a block was requested by the consumer, on the basis of a material misrepresentation of fact by the consumer relevant to the request to block; or

iii. The consumer obtained possession of goods, services, or money as a result of the blocked transaction or transactions. (Section 605B(c); 15 U.S.C. 1681c-2(c)).

18. **Notification to Furnishers of Identity Theft Block.** Determine whether the entity promptly notifies the furnisher of information subject to an identity theft block request:

a. That the information may be a result of identity theft,

b. That an identity theft report has been filed,

c. That a block has been requested, and

d. Of the block's effective dates. (Section 605B(b); 15 U.S.C. 1681c-2(b)).

19. **Reseller Obligations.** If the entity is a reseller, review how it responds when consumers request an identity theft block to determine if the reseller does the following:

a. In instances where the reseller is not otherwise furnishing or reselling a consumer report concerning the information identified by the consumer at the time of the block request, determine if the reseller informs the consumer that the consumer may report the identity theft to the CFPB to obtain consumer information regarding identity theft.

b. In instances where the consumer identifies to the entity information in the consumer's file that resulted from identity theft and where the entity is a reseller of the identified information, determine if the reseller:

i. Blocks any consumer report it maintains from subsequent use and

ii. Provides notice to the consumer of the file block, including the name, address, and telephone number of the consumer reporting agency from which the information was obtained. (Section 605B(d); 15 U.S.C. 1681c-2(d)).

20. **Obligations of Check Services Company.** If the entity is a check services company, determine whether it refrains from reporting to a nationwide consumer reporting agency any information that an identity theft report identifies as resulting from identity theft beginning four business days after the entity receives:

   a. Appropriate proof of the identity of the consumer (as explained in step 1b in Module 5),

   b. A copy of an identity theft report, and

   c. The consumer's identification of such information. (Section 605B(e); 15 U.S.C. 1681c-2(e)).

21. **Acceptance of Identity Theft Reports.** If the entity asks for additional information or documentation before accepting an identity theft report in connection with a request for an extended fraud alert or for identity theft blocking, determine whether:

   a. The entity's request is reasonable and made for the purpose of determining the validity of the alleged identity theft,

   b. The entity makes its request within 15 days after the later of the date it receives the copy of the report form or the request by the consumer for the extended fraud alert or for identity theft blocking, and

   c. The entity makes any supplemental requests for information or documentation and its final determination on the acceptance of the identity theft report by the statutory deadline, which is:

      i. 15 days after its initial request for information or documentation or

      ii. If the entity receives any additional information or documentation on the eleventh day or later within the 15-day period, within five days after the date of receipt. (12 CFR 1022.3(i)).

## Module 8 - Prescreening, Employment Reports, and Investigative Consumer Reports

This module addresses the requirements that the FCRA imposes on consumer reporting agencies that engage in prescreening or furnish employment reports or investigative consumer reports.

### PRESCREENING

The FCRA includes detailed requirements that must be followed when consumer reporting agencies provide consumer reports not authorized by the consumer that are used to solicit consumers to obtain credit or insurance, a process known as "prescreening." In prescreening, a consumer reporting agency typically either edits a list of consumers developed by the requesting creditor or insurer (or its agents) or independently creates a list of consumers according to the requesting entity's specifications.

In addition to the examination procedures listed below, step 2f of Module 3 and step 3e of Module 5 address the FCRA's requirements that consumer reporting agencies include prescreening inquiries from the preceding year in consumer file disclosures, but not list prescreening inquiries in consumer reports issued to third parties. (Section 604(c)(3); 15 U.S.C. 1681b(c)(3); Section 609(a)(5); 15 U.S.C. 1681g(a)(5)).

1. **Whether Entity Engages in Prescreening.** Determine if the entity engages in "prescreening," by furnishing consumer reports in connection with any credit or insurance transactions that are not initiated by the consumers (to solicit the consumers to obtain credit or insurance) and where the consumers have not authorized the entity to provide such reports (as determined in step 14 of Module 1). (Section 603(l); 15 U.S.C. 1681a(l); Section 604(c)(1); 15 U.S.C. 1681b(c)(1)). If not, skip to step 12 below.

2. **Consumer Information Released in Prescreening.** Determine whether the entity provides any information about the consumer other than the following in connection with prescreening:

   a. The name and address of a consumer,

   b. An identifier that is not unique to the consumer and that is used solely for the purpose of verifying the consumer's identity, and

   c. Other information pertaining to the consumer that does not identify the relationship or experience of the consumer with respect to a particular creditor or other entity. (Section 604(c)(2); 15 U.S.C. 1681b(c)(2)).

3. **Notification System for Opt-Outs.** Determine whether the entity maintains a notification system, including a toll-free telephone number, which permits any consumer whose consumer report is maintained by the entity to notify the entity, with appropriate identification, of the consumer's election to be excluded ("opt out") from any list of names and addresses provided by the entity for prescreening. (Section 604(e)(5); 15 U.S.C. 1681b(e)(5)).

a. **Affiliates.** If the entity has affiliates that engage in prescreening, determine whether they are part of the notification system and whether opt-outs are honored by all of the affiliated entities. (Section 604(e)(4)(D), (e)(5); 15 U.S.C. 1681b(e)(4)(D), (e)(5)).

b. **Joint notification system for nationwide consumer reporting agencies.** If the entity is a nationwide consumer reporting agency, determine whether it maintains a joint notification system with other nationwide consumer reporting agencies to accomplish the purposes described in step 3 above. (Section 604(e)(6); 15 U.S.C. 1681b(e)(6)).

c. **Publicity**. Assess how information about the notification system is disseminated to consumers, including whether the entity annually publishes in a publication of general circulation in the area served by the entity:

   i. A notification that information in consumer files maintained by the entity may be used in connection with prescreening and

   ii. The address and toll-free telephone number to use to opt out.  (Section 604(e)(5); 15 U.S.C. 1681b(e)(5)).

4. **Entity Response After System Notification.** When the entity's notification system provides notification of a consumer's election, determine whether the entity:

   a. Informs the consumer that the election is effective only for five years unless the consumer submits to the entity a signed notice of election form issued by the entity and

   b. Provides a notice of election form if requested by the consumer (which must be provided within five business days after receipt of the election notification, if the request is made with the system notification). (Section 604(e)(3); 15 U.S.C. 1681b(e)(3)).

5. **Tracking Opt-Outs.** Assess the systems and procedures that the entity uses for tracking which consumers have opted out and the effective period for each such opt-out, which must:

   a. Begin no more than five business days after the date of notification and

   b. Continue until:

      i. The consumer notifies the entity through its notification system that the election is no longer effective or

      ii. If the consumer did not provide a signed notice of election form issued by the entity, five years and five business days after the notification. (Section 604(e)(4); 15 U.S.C. 1681b(e)(4)).

6. **Honoring Opt-Outs.** Assess whether the entity has systems and processes in place to ensure that consumers who have opted out are not included in prescreening lists. Determine whether the entity provides any consumer reports for prescreening about consumers who have opted out (either through the notification system or by submitting a signed notice of election form

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

issued by the entity) during the effective period of the opt-outs. (Section 604(c)(1); 15 U.S.C. 1681b(c)(1)).

7. **Firm Offer of Credit.** Determine whether the entity has adequate procedures in place to determine whether the persons to whom it provides prescreened consumer reports are extending firm offers of credit or insurance (as defined in the Glossary) to each identified consumer. (Section 603(*l*); 15 U.S.C. 1681a(*l*); Section 604(c)(1); 15 U.S.C. 1681b(c)(1)).

8. **Consumers Under 21.** Determine whether the entity provides consumer reports for prescreening that contain dates of birth that show that the consumers are not yet 21, without first obtaining the consumers' consent. (Section 604(c)(1)(B)(iv); 15 U.S.C. 1681b(c)(1)(B)(iv)).

9. **Extended Fraud Alerts.** Determine whether the entity excludes any consumer whose file includes an extended fraud alert from any list of consumers it prepares and provides to any third party for prescreening, unless:

   a. The consumer or the consumer's representative requests that such exclusion be rescinded or

   b. More than five years have elapsed since the consumer requested the extended fraud alert. (Section 605A(b)(1)(B); 15 U.S.C. 1681c-1(b)(1)(B)).

10. **Active Duty Alerts.** Determine whether the entity excludes any consumer whose file includes an active duty alert from any list of consumers that it prepares and provides to any third party for prescreening, unless:

   a. The consumer or the consumer's representative requests that such exclusion be rescinded or

   b. More than two years have elapsed since the consumer requested the active duty alert. (Section 605A(c)(2); 15 U.S.C. 1681c-1(c)(2)).

11. **Tracking Inquiries.** Assess the systems and procedures that the entity uses to track prescreening inquiries. Evaluate whether these systems and procedures are adequate to meet the entity's obligations to provide to the consumer a list of all prescreening inquiries over the last year with any consumer file disclosure, but not to disclose information about such inquiries in consumer reports furnished to others (see steps 2f in Module 3 and step 3e in Module 5). (Section 604(c)(3); 15 U.S.C. 1681b(c)(3); Section 609(a)(5); 15 U.S.C. 1681g(a)(5)).

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

## EMPLOYMENT REPORTS

The FCRA imposes additional requirements on consumer reporting agencies when they prepare and furnish reports for employment purposes.

12. **Whether Entity Provides Employment Reports.** Determine if the entity furnishes any reports for employment purposes (as determined in step 15 of Module 1). If not, skip to step 18 below.

13. **Certification Regarding Employment Laws.** Determine if prior to furnishing consumer reports for employment purposes, the entity obtains a certification from the person requesting the report that information from the consumer report will not be used in violation of any applicable federal or state equal employment opportunity law or regulation. (Section 604(b)(1)(A)(ii); 15 U.S.C. 1681b(b)(1)(A)(ii)).

14. **Other Certifications.** Determine if prior to furnishing consumer reports for employment purposes (other than in connection with an application for employment in a position regulated by the Secretary of Transportation under 49 U.S.C. 31502 or subject to safety regulation by a state transportation agency, when the application was made solely by mail, telephone, computer, or other similar means), the entity obtains a certification from the person requesting the report that:

   a. A separate, clear, and conspicuous written disclosure has been provided to the consumer before the report is procured or caused to be procured indicating that a consumer report may be obtained for employment purposes;

   b. The consumer has authorized in writing (on the disclosure described in (a) above or on another document) the procurement of the report by that person; and

   c. Before taking any adverse action based in whole or in part on the report the requester will provide the following to the consumer to whom the report relates (unless the user is a federal agency or department and appropriate certifications relating to a national security investigation are made under Section 604(b)(4)(A) (15 U.S.C. 1681b(b)(4)(A))):

      i. A copy of the report and

      ii. A written description of the consumer's FCRA rights, as prescribed by the CFPB. (Section 604(b); 15 U.S.C. 1681b(b)).

15. **Summary of Rights.** Determine if the entity provides a summary of the consumer's FCRA rights, as prescribed by the CFPB, either before furnishing the report or with the report. (Section 604(b)(1)(B); 15 U.S.C. 1681b(b)(1)(B); Section 609(c); 15 U.S.C. 1681g(c)).

16. **Certain Transportation-Related Reports.** When consumer reports are issued for use in decisions regarding employment in positions regulated by the Secretary of Transportation under 49 U.S.C. 31502 or subject to safety regulation by a state transportation agency, in connection with applications made solely by mail, telephone, computer, or other similar

means, determine if prior to furnishing such reports, the entity obtains a certification from the person requesting the report that:

a. The requester has provided to the consumer, by oral, written, or electronic means, notice that a consumer report may be obtained for employment purposes and a summary of the consumer's rights under Section 615(a)(3); 15 U.S.C. 1681m(a)(3);

b. The consumer has consented, orally, in writing, or electronically, to the procurement of the report by the requester;

c. If the requester takes adverse action on the employment application based in whole or in part on the report, the requester will provide to the consumer to whom the report relates within three business days of taking such action, an oral, written, or electronic notification:

   i. That adverse action has been taken based in whole or in part on a consumer report received from a consumer reporting agency;

   ii. Of the name, address, and telephone number of the consumer reporting agency that furnished the consumer report (including a toll-free telephone number established by the entity if the entity is a nationwide consumer reporting agency);

   iii. That the consumer reporting agency did not make the decision to take the adverse action and is unable to provide to the consumer the specific reasons why the adverse action was taken; and

   iv. That the consumer may, upon providing proper identification, request a free copy of a report and may dispute with the consumer reporting agency the accuracy or completeness of any information in the report; and

d. If the consumer requests a copy of the consumer report from the person after receiving the disclosure identified above, the person will send or provide to the consumer a copy of the report and a written description of the consumer's FCRA rights, as prescribed by the CFPB, within three business days of receiving the consumer's request, together with proper identification.  (Section 604(b)(2)-(3); 15 U.S.C. 1681b(b)(2)-(3)).

17. **Public Record Information for Employment Purposes.**

a. Determine whether the entity in preparing consumer reports for employment purposes compiles and reports items of information on consumers that are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment (excluding any situations where the user is a federal agency or department and appropriate certifications relating to a national security investigation are made under Section 604(b)(4)(A) (15 U.S.C. 1681b(b)(4)(A))).

b. If the answer is yes, determine whether the entity:

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

i.  Notifies the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported, at the time that the public record information is reported to the user of the consumer report; or

ii.  Maintains strict procedures designed to ensure that whenever public record information that is likely to have an adverse effect on a consumer's ability to obtain employment is reported, it is complete and up-to-date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments are considered up-to-date if the current public record status of the item at the time of the report is reported.  (Section 613; 15 U.S.C. 1681k).

## INVESTIGATIVE CONSUMER REPORTS

The FCRA imposes additional requirements on consumer reporting agencies when they prepare and furnish "investigative consumer reports."  The term "investigative consumer report" is defined in the Glossary and is a type of consumer report that includes information obtained through personal interviews with the consumer's neighbors, friends, associates, or others.

In addition to the procedures listed below, step 2h in Module 3 addresses when adverse information from investigative consumer reports can be included in subsequent consumer reports under Section 614 (15 U.S.C. 1681*l*), and step 3b in Module 5 relates to information sources for investigative consumer reports under Section 609 (15 U.S.C. 1681g).

18. **Whether the Entity Furnishes Investigative Reports.** Determine if the entity furnishes any investigative reports (as determined in step 16 of Module 1). If not, skip steps 19-20 below.

19. **Certification From Person Requesting Report.** Determine whether prior to preparing or furnishing investigative consumer reports, the entity obtains from the person requesting the report a certification that:

a.  Within three days after first requesting the report, the requester mailed or otherwise delivered a written disclosure to the consumer that

i.  Clearly and accurately discloses that an investigative consumer report including information as to his character, general reputation, personal characteristics, and mode of living, whichever are applicable, may be made, and

ii.  Includes a statement informing the consumer of his or her right to request the additional disclosures described below and a written summary of rights under Section 609(c) (15 U.S.C. 1681g); and

b.  Upon written request made by the consumer within a reasonable period of time after the receipt of the disclosure mentioned above, the requester will make a complete and accurate disclosure of the nature and scope of the investigation requested, in writing mailed, or otherwise delivered, to the consumer within five days after the date the disclosure request was received or the date the report was first requested, whichever is

later. (Section 606(a)(1)-(2); 15 U.S.C. 1681d(a)(1)-(2); Section 606(d)(1); 15 U.S.C. 1681d(d)(1)).

20. **Prohibited Activities.** Determine whether the entity engages in any of the following prohibited activities:

    a. **Inquiries that would violate employment law if made by an employer.** Making an inquiry for the purpose of preparing an investigative consumer report for employment purposes if the making of the inquiry by an employer or prospective employer of the consumer would violate any applicable federal or state equal employment opportunity law or regulation. (Section 606(d)(2); 15 U.S.C. 1681d(d)(2)).

    b. **Certain public record information.** Furnishing an investigative consumer report that includes public record information relating to an arrest, indictment, conviction, civil judicial action, tax lien, or outstanding judgment, unless:

        i. The entity has verified the information's accuracy during the 30-day period ending on the date the report is furnished or

        ii. The report is for employment purposes and complies with all of the requirements described in step 17 above. (Section 606(d)(3); 15 U.S.C. 1681d(d)(3)).

    c. **Certain adverse information from personal interviews.** Preparing or furnishing an investigative consumer report on a consumer that contains information that is adverse to the consumer's interest and that is obtained through a personal interview with a neighbor, friend, or associate of the consumer or with another person with whom the consumer is acquainted or who has knowledge of such item of information, unless:

        i. The entity has followed reasonable procedures to obtain confirmation of the information from an additional source that has independent and direct knowledge of the information or

        ii. The person interviewed is the best possible source of the information. (Section 606(d)(4); 15 U.S.C. 1681d(d)(4)).

## Module 9 - Other Products and Services and Risks to Consumers

Larger participants of the consumer reporting market may provide consumer financial products or services that are not covered in the preceding modules. Examiners should consider whether any of the entity's consumer financial products or services creates other risks to consumers. In addition, products and services that are covered in Modules 2 to 8 may be subject to federal consumer financial laws that are not specifically addressed in those modules, including the prohibition on engaging in any unfair, deceptive, or abusive acts or practices. The advertising and Gramm-Leach-Bliley privacy procedures below provide examples of the types of conduct to identify. Please refer also to the UDAAP examination procedures in doing this review. Examiners should consult with Headquarters to determine whether the applicable legal standards have been met before citing any violation.

### ADVERTISING ISSUES

1. Review any advertising and promotional materials prepared by or on behalf of the entity to market the entity's products or services to consumers in any media or channel.  Determine whether they contain any material misrepresentations, expressly or by implication, including of the following:

   a. The existence, nature, or amount of fees or other costs,

   b. The nature and benefits of the product or service advertised,

   c. The means by which to close or cancel an account, or

   d. Account terms.

   In doing this review, consider how the entity's representations compare to its actual practices, including, for example, how companies close or cancel accounts based on consumer requests, especially for accounts that were part of a free trial or that involve automatic billing or renewal.

2. Determine whether advertisements and promotional materials directed to consumers in any media or channel clearly disclose all material limitations or conditions on the terms or availability of products or services marketed to consumers, such as:

   a. The expiration date for terms that apply only during an introductory period or

   b. Material prerequisites for obtaining particular products, services, or benefits (e.g., discounts, refunds, or rebates).

3. Determine whether advertisements and promotional materials directed to consumers in any media or channel avoid using fine print, separate statements, or inconspicuous disclosures to correct potentially misleading headlines.

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

4. If additional products or services are sold or offered in connection with products or services sold to consumers, determine if the entity ensures that:

   a. Marketing materials, including direct mail promotions, telemarketing scripts, internet and print ads, radio recordings, and television commercials, reflect the actual terms and conditions of the product and are not deceptive or misleading to consumers;

   b. Employee incentive or compensation programs tied to the sale and marketing of add-on products require adherence to company-specific program guidelines and do not create incentives for employees to provide inaccurate information about the products;

   c. Scripts and manuals used by the entity's telemarketing and customer service centers:

      i. Direct the telemarketers and customer service representatives to accurately state the terms and conditions of the various products, including material limitations on eligibility for benefits;

      ii. Prohibit enrolling consumers in programs without clear affirmative consent to purchase the add-on product, obtained after the consumer has been informed of the terms and conditions;

      iii. Provide clear guidance as to the wording and appropriate use of rebuttal language and any limits on the number of times that the telemarketer or customer service representative may attempt to rebut the consumer's request for additional information or to decline the product; and

      iv. Where applicable, make clear to consumers that the purchase of add-on products is not required as a condition of obtaining the requested product or service, unless there is such a requirement;

   d. To the maximum extent practicable, telemarketers and customer service representatives do not deviate from approved scripts; and

   e. Cancellation requests are handled in a manner that is consistent with the product's actual terms and conditions and that does not mislead the consumer.

   *See generally* CFPB Bulletin 2012-06 (July 18, 2012). (For "free" file disclosures that require purchase of additional products or services, see also step 14 in Module 5).

5. For each product or service that the entity markets to consumers, assess whether the entity designs advertisements, promotional materials, disclosures, and scripts used in any media or channel to be comprehensible by the target audience.

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

**GRAMM-LEACH-BLILEY ACT/REGULATION P**

6. For information that is not in or from a consumer report subject to the FCRA:

    a. Identify the types of consumer information that the entity shares with third parties (other than consumer reports subject to the FCRA) and any policies and procedures that the entity has in place governing such information sharing.

    b. Determine whether the entity discloses to nonaffiliated third parties nonpublic personal information that it receives from financial institutions (other than in the form of a consumer report subject to the FCRA). This could occur, for example, if a consumer reporting agency discloses credit header information obtained from a financial institution to nonaffiliated direct marketers or others that do not have a permissible purpose to obtain that information as part of a consumer report. If not, skip to step 7 below.

    c. If the answer to step 6b is yes, determine:

        i. Whether the originating financial institution provided notice to its customers of the sharing described in step 6b and gave them an opportunity to opt out and

        ii. Whether the redisclosure of the information by the entity under examination described in step 6b was done in a manner that was consistent with the originating financial institution's privacy policy and any applicable consumer opt-out directions.

        If the answer to step 6ci or 6cii is no, consult with Headquarters regarding Gramm-Leach-Bliley Act/Regulation P limitations on reuse and redisclosure. (12 CFR 1016.11). For background on this topic, see 65 Fed. Reg. 33646, 33668 (May 24, 2000)).

7. Determine whether the entity's privacy and information-sharing practices are otherwise consistent with the requirements of Sections 502 to 509 of the Gramm-Leach-Bliley Act (15 U.S.C. 6802-09) and Regulation P (12 CFR Part 1016), to the extent they apply. Refer to the Privacy of Consumer Financial Information examination procedures for more information.

# CFPB
# Examination Procedures

# Consumer Reporting
# Larger Participants

**GLOSSARY**:

1. "**Consumer reporting agency**" is any person who, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and who uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. (Section 603(f); 15 U.S.C. 1681a(f)).

2. "**Consumer report**" is any written, oral, or other communication of any information by a consumer reporting agency that bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living that is used or expected to be used or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for any of the following:

   a. Credit or insurance to be used primarily for personal, family, or household purposes.

   b. Employment purposes.

   c. Any other purpose authorized under Section 604 (15 U.S.C. 1681b). (Section 603(d); 15 U.S.C. 1681a(d)).

   BUT the term "**consumer report**" does not include any of the following (except with respect to certain disclosures of medical information, as explained in Section 603(d)(3) (15 U.S.C. 1681a(d)(3)) and Section 604(g)(3) (15 U.S.C. 1681b(g)(3)):

   a. Any report containing information solely about transactions or experiences between the consumer and the institution making the report.

   b. Any communication of that transaction or experience information among entities related by common ownership or affiliated by corporate control (for example, different institutions that are members of the same holding company or subsidiary companies of an insured institution).

   c. Communication of other information among persons related by common ownership or affiliated by corporate control if:

      i. It is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons; and

      ii. The consumer is given the opportunity, before the time that the information is communicated, to direct that the information not be communicated among such persons.

   d. Any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device.

**CFPB**
**Examination Procedures**

**Consumer Reporting**
**Larger Participants**

e. Any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer, such as a lender who has received a request from a broker, conveys his or her decision with respect to such a request, if the third party advises the consumer of the name and address of the person to whom the request was made, and such person makes the disclosures the consumer required under Section 615 (15 U.S.C. 1681m).

f. A communication that meets the requirements of Section 603(o) (15 U.S.C. 1681a(o)) by a person who regularly performs employment procurement services.

g. An employee investigation report of the specific type described in Section 603(y) (15 U.S.C. 1681a(y)). (Section 603(d)(2); 15 U.S.C. 1681a(d)(2)).

3. "**Credit score**":

a. Means a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default;

b. But does not include –

   i. Any mortgage score or rating of an automated underwriting system that considers one or more factors in addition to credit information, including the loan to value ratio, the amount of down payment, or the financial assets of a consumer; or

   ii. Any other elements of the underwriting process or underwriting decision. (Section 609(f)(2)(A)(ii); 15 U.S.C. 1681g(f)(2)(A)(ii)).

4. "**Firm offer of credit or insurance**" means an offer of credit or insurance that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer. Despite this general definition, the offer may be made conditional on one or more of the following:

a. That the consumer must be found, based on information in the consumer's application, to meet specific criteria bearing on credit worthiness or insurability, as applicable. These specific criteria must be established:

   i. Before selection of the consumer for the offer and

   ii. For the purpose of determining whether to extend credit or insurance pursuant to the offer.

b. That there must be a verification:

   i. That the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or

**CFPB** | **Consumer Reporting**
**Examination Procedures** | **Larger Participants**

ii. Of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.

c. That the consumer must furnish any collateral that is a requirement for the extension of the credit or insurance. Such a requirement must be established before selection of the consumer for the offer of credit or insurance and must be disclosed to the consumer in the offer of credit or insurance. (Section 603(l); 15 U.S.C. 1681a(l)).

5. "**Identity theft**" means a fraud committed or attempted using the identifying information of another person without authority. (12 CFR 1022.3(h)).

6. "**Identity theft report**" means a report that alleges identity theft with as much specificity as the consumer can provide and that is a copy of an official valid report filed by the consumer with a law enforcement agency, the filing of which subjects the person filing the report to criminal penalties if the information is false, as well as any additional information or documentation that an information furnisher or consumer reporting agency reasonably requests to determine the validity of the alleged identity theft pursuant to the procedures set forth in the FCRA. (12 CFR 1022.3(i)).

7. "**Investigative consumer reports**" means consumer reports or portions thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information. This does not include specific factual information on a consumer's credit record obtained directly from a creditor of the consumer or from a consumer reporting agency when such information was obtained directly from a creditor of the consumer or from the consumer. (Section 603(e); 15 U.S.C. 1681a(e)).

8. "**Key factors**" means all relevant elements or reasons adversely affecting the credit score for the particular individual, listed in the order of their importance based on their effect on the credit score. (Section 609(f)(2)(B); 15 U.S.C. 1681g(f)(2)(B)).

9. "**Nationwide consumer reporting agency**" is a consumer reporting agency that regularly engages in the practice of assembling or evaluating and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, each of the following regarding consumers residing nationwide:

a. Public record information and

b. Credit account information from persons who furnish that information regularly and in the ordinary course of business. (Section 603(p); 15 U.S.C. 1681a(p)).

10. "**Nationwide specialty consumer reporting agency**" is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis relating to:

a. Medical records or payments,

**CFPB**                    **Consumer Reporting**

**Examination Procedures**       **Larger Participants**

---

b.  Residential or tenant history,

c.  Check writing history,

d.  Employment history, or

e.  Insurance claims. (Section 603(x); 15 U.S.C. 1681a(x)).

11. "**Reseller**" is a consumer reporting agency that:

a.  Assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and

b.  Does not maintain a database of the assembled or merged information from which new consumer reports are produced. (Section 603(u); 15 U.S.C. 1681a(u)).

# CFPB
# Examination Procedures

# Mortgage
# Origination

## Mortgage Origination

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

These Mortgage Origination Examination Procedures ("Procedures") consist of modules covering the various elements of the mortgage origination process; each module identifies specific matters for review. Examiners will use the Procedures in examinations of mortgage brokers and mortgage lenders. Before using the Procedures, examiners should complete a risk assessment and examination scope memorandum in accordance with general CFPB procedures. Depending on the scope, and in conjunction with the compliance management system review, including consumer complaint review, each examination will cover one or more of the following modules.

Module 1     Company Business Model
Module 2     Advertising and Marketing
Module 3     Loan Disclosures and Terms
Module 4     Underwriting, Appraisals, and Originator Compensation
Module 5     Closing
Module 6     Fair Lending
Module 7     Privacy

## Examination Objectives

1. To assess the quality of a supervised entity's compliance management systems in its mortgage origination business.

2. To identify acts or practices that materially increase the risk of violations of federal consumer financial law, and associated harm to consumers, in connection with mortgage origination.

3. To gather facts that help determine whether a supervised entity engages in acts or practices that are likely to violate federal consumer financial law in connection with mortgage origination.

4. To determine, in accordance with CFPB internal consultation requirements, whether a violation of a federal consumer financial law has occurred and whether further supervisory or enforcement actions are appropriate.

**CFPB**

**Examination Procedures**

**Mortgage**

**Origination**

# Background

This section of the Procedures provides background on the mortgage business and the federal consumer financial law requirements that apply.

## A.    Mortgage Types

Residential mortgage loans offer a variety of features to meet differing consumer needs. The length of a mortgage can vary from one year to 50 years, with a number of lengths available in between. Interest rates can be fixed or adjustable. Some adjustable rate mortgage loans (ARMs) are "hybrid," having a fixed interest rate for a certain period of time and then changing to an adjustable rate. Hybrid ARMs often are identified using two numbers, such as 5/1. The first number identifies the number of years the interest rate will be fixed, and the second number identifies the frequency with which the interest rate will adjust after the fixed interest rate period ends. A "5/1" loan would have a fixed interest rate for five years, and then the interest rate would adjust one time per year. Alternatively, the second number denotes the number of years the loan will have an adjustable rate: in a "2/28 loan," the loan would have a fixed interest rate for two years, and then the interest rate would adjust periodically over the subsequent 28 years.

Most, but not all, loans are "fully amortizing," meaning that the borrower pays down part of the principal and the full amount of interest that is due each month so that at the end of the loan term, the principal is paid off. Other loans might not amortize fully over their terms. An example is an "interest-only" (I-O) loan, which requires the payment of only interest for a certain time period at the beginning of the loan; after the initial period, the borrower either makes increased principal and interest payments to amortize the principal over the remaining term or pays a large "balloon" payment, usually at the end of the term. I-O loans can be fixed- or adjustable-rate. In addition, for a period of time, payment option adjustable rate mortgages ("Pay Option ARMs" or "Option Payment ARMs") were offered to many consumers. These loans offer borrowers several payment choices each month during the loan's introductory period, including a minimum payment that is less than the interest accruing and due on the principal each month. If the borrower chooses the minimum payment option, the interest amount that remains unpaid each month is added to the loan balance, so the principal amount owed by the borrower increases. This is known as negative amortization. In addition, the loan is recast after the introductory period (typically five years), and the borrower's fully amortizing payments typically increase in order to repay the increased principal and the interest rate due at the adjusted rate over the remaining loan term. Interest-only loans and Pay Option ARMs often are called "non-traditional loans."

Mortgage originators offer various mortgage products that may be classified in different ways, such as:

### 1.    Purpose

Mortgages often are categorized by whether they are used to purchase real property (called "purchase money loans") or to refinance an existing loan ("refinances"). Refinance loans are sometimes "cash out" loans, made for more than the existing loan's outstanding principal balance. The borrower receives the cash borrowed in excess of the amount necessary to pay off

the existing loan. Another category is a "home equity" loan, in which the borrower can receive funds to use for any purpose by borrowing against home equity. Equity is the amount the property is currently worth, minus the outstanding principal balance of any other mortgage the consumer has. Reverse mortgages are available to older homeowners to borrow against the equity they have in their homes. (See below for fuller discussion of reverse mortgages.)

## 2. Lien position

Lien position determines which mortgage loan receives priority over other loans in the event of a foreclosure or bankruptcy. A mortgage that is in a first lien position, sometimes called a senior loan, has priority for payment over a mortgage in a junior lien position if there is a foreclosure or bankruptcy proceeding. The proceeds from the foreclosure sale are divided according to lien position. A "simultaneous second lien" is a second lien originated at the same time as a first lien mortgage, which may allow a consumer to borrow an amount that is 100% of the value of the home. Sometimes lenders have allowed consumers to borrow an amount greater than the value of the property, although this practice is not common in today's mortgage marketplace.

## 3. Closed-end or open-end

Most purchase money and refinance mortgages are considered "closed-end credit" under the Truth in Lending Act, generally consisting of installment financing where the amount borrowed and repayment schedule are set at the transaction's outset. Closed-end mortgages can take first or junior lien positions.

In contrast, home equity lines of credit (HELOCs) are "open-end credit," extended to a consumer under a plan in which:

- the creditor reasonably contemplates repeated transactions;

- the credit line generally is made available to the consumer to the extent that any unpaid balance is repaid; and

- the creditor may impose a finance charge from time to time on an outstanding unpaid balance.[1]

During the time while borrowers are able to draw down funds, they usually must pay a monthly interest charge on the outstanding balance. If the borrower owes funds after a fixed period of years, called the "draw period," the consumer enters the "repayment period" and must pay off the outstanding balance in regular periodic payments of principal and interest. The repayment period is also a fixed term of years. HELOCs are often, but not always, in a junior lien position.

---

[1] 12 CFR 1026.2(a)(20).

**CFPB**
**Examination Procedures**

**Mortgage**
**Origination**

Depending upon the lender and the HELOC agreement, the consumer may have to pay back the entire outstanding balance as soon as the draw period ends. In these cases, there is no repayment period, just a balloon payment in the amount of the outstanding balance when the draw period ends. HELOCs usually have an adjustable interest rate that changes over time, so the consumer's payments may not be the same from month to month.

**4. Reverse Mortgages**

A reverse mortgage is a special type of loan that allows homeowners 62 and older to borrow against the equity in their homes. It is called "reverse" because the consumer receives payments *from* the lender, without making loan payments to the lender. In exchange for borrowing the money and receiving these payments, the borrower grants a lien interest in the home in the favor of the lender. The lender charges interest each month and is paid off when the consumer leaves the home permanently. In taking out a reverse mortgage loan, a consumer can receive a lump-sum payment, regular monthly payments, or a line of credit. The consumer does not have to pay back the loan as long as he continues to live in the home, maintain it, and stay current on expenses like homeowner's insurance and property taxes. If the consumer moves, passes away, or goes into assisted living or a nursing home on a long-term basis, the loan has to be paid off, usually by selling the house.

The vast majority of reverse mortgages extended today are through the Home Equity Conversion Mortgage (HECM) program, which is the reverse mortgage product insured by the Federal Housing Administration.

Because of the unique features of reverse mortgages, examiners should follow the procedures that are specific to reverse mortgages and be aware that other examination procedures may not apply to reverse mortgages.

**5. Conventional Lending**

Conventional lending generally refers to prime standardized mortgage products that are not government-backed loans (discussed below). Conventional loans can be "conforming" or "non-conforming." Conventional conforming mortgages meet the underwriting and documentation standards set by the government sponsored enterprises (GSEs): Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac). On the other hand, non-conforming mortgages have, among other attributes, principal balances that exceed the loan limits set by the GSEs. Loans that are larger than the limits set by the GSEs also are called jumbo mortgages.

**6. Subprime and Alt-A Lending**

Subprime mortgages carry interest rates higher than the rates of prime mortgages. A subprime mortgage is generally a higher cost loan that is meant to be offered to prospective borrowers with impaired credit records – those borrowers whose credit rating is "subprime." The higher interest rate is intended to compensate the lender for accepting the greater risk in lending to such borrowers. Traditionally, "subprime" has been the riskiest lending category,

followed by "Alt-A," or Alternative-A, and then A-paper, or "prime," as the least risky. Alt-A borrowers may have prime credit, but some aspect of the loan makes it riskier.

### 7. Governmental Support

Government-backed lending includes mortgage lending that is insured by the Federal Housing Administration (FHA) or guaranteed by the U.S. Department of Veteran Affairs (VA). Government-supported loans generally offer terms similar to conventional loans, but these loans allow additional benefits such as smaller down payments, higher loan-to-value ratios (amount of loan as a proportion of the appraised value of the home), or lower interest rates. FHA loans also are available to consumers with lower credit scores who otherwise meet FHA underwriting standards. Generally, consumers that qualify for these loans must pay additional insurance or guarantee fees.

## B. Business of Mortgage Origination

Mortgage lending generally occurs through retail, wholesale, or correspondent lending channels. Sometimes there are no clear lines of demarcation among the channels, as a participant may operate in more than one of them. Each channel is described in more detail below.

### 1. Retail Channel

In the retail channel, the lender conducts the origination process directly with the consumer, either in person or through an online application. An employee of the lender, generally called a loan officer, solicits the loan, takes the application, and tracks the application through to the closing process.

### 2. Wholesale Channel − Mortgage Brokers

In the wholesale channel, a mortgage broker solicits the loan and takes the application from the consumer. Mortgage brokers are independent contractors and are not employees of the lender. The broker establishes relationships with multiple mortgage lenders and offers different mortgage loan products from these lenders. Mortgage brokers generally do not make underwriting decisions and do not actually fund the loans. In this channel, it is the mortgage lender that makes the underwriting decision, based on information provided by the broker. These mortgage lenders, called wholesale lenders, often are divisions of larger depository institutions. Generally, a wholesale lender requires a broker to enter into a wholesale lending agreement before the broker may originate loans on the lender's behalf.

In a variant of standard wholesale mortgage originations, some brokers "table fund" loans. In a table-funded transaction, the mortgage broker closes the loan as the lender of record and then assigns the loan to a purchaser at or immediately after the closing. The loan purchaser provides the funding for the loan, but the documents name the mortgage broker as the creditor.

**CFPB**
**Examination Procedures**

**Mortgage Origination**

3.  **Correspondent Channel – Small Mortgage Lenders**

Correspondent lending, a hybrid of retail channel and wholesale channel lending, often features smaller institutions, acting as correspondent lenders. Correspondent lenders are the primary interface with consumers, conducting all steps in the mortgage origination process and funding their own loans. They generally originate and deliver loans pursuant to underwriting standards set by other lenders or investors, usually larger depository lenders, upon advance commitment on price. In addition to soliciting consumers directly, correspondent lenders may receive applications and mortgage documents from mortgage brokers and subsequently speak directly with the consumer. Generally, a wholesale lender requires a correspondent to enter into a written correspondent lending agreement before the correspondent may originate loans for sale to the wholesale lender.

C.    **Federal Consumer Financial Law Requirements**

Mortgage originators must comply with the following federal consumer financial laws:

- The Real Estate Settlement Procedures Act (RESPA) and its implementing regulation, Regulation X, require lenders or brokers, with respect to mortgage origination, to provide borrowers with disclosures regarding the nature and costs of the real estate settlement process. The Act also protects borrowers against certain abusive practices, such as kickbacks, and places requirements on the administration of, and limitations upon required deposits into, escrow accounts. The main disclosure requirements applicable at origination include:

    o   Good Faith Estimate of settlement costs within three business days after application;

    o   Disclosure of affiliated business arrangements;

    o   An initial notice explaining whether the lender is likely to sell the servicing rights to the loan; and

    o   A listing of the final settlement charges of borrowers and sellers on a prescribed settlement statement (HUD-1 or HUD-1A) that is provided at or before closing (and, at the borrower's request and whether it is complete or not, must be available for inspection one business day before closing).

- The Truth in Lending Act (TILA) and its implementing regulation, Regulation Z, provide a uniform system for creditors' disclosures of credit terms. In addition, they:

    o   Impose certain advertising rules;

    o   Require written disclosure and re-disclosure of certain loan terms;

    o   Provide consumers with rescission rights in certain circumstances;

    o   Delineate and prohibit certain unfair and deceptive mortgage lending practices;

    o   Prohibit certain mortgage loan originator compensation structures;

**CFPB
Examination Procedures**

**Mortgage
Origination**

- o Prohibit certain terms and practices in the origination of "higher-priced" loans and prohibit additional terms and practices on a subset of these loans known as "HOEPA loans;" and

- o Prohibit certain appraisal practices.

- The Equal Credit Opportunity Act (ECOA), and its implementing regulation, Regulation B, prohibit creditors from discriminating against any applicant with respect to any aspect of a credit transaction:

  - o On the basis of race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract);

  - o Because all or part of the applicant's income derives from any public assistance program; or

  - o Because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.[2]

  Creditors also are prohibited from making any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

  In addition, ECOA and Regulation B require lenders to provide adverse action notices and appraisal reports to consumers.

- The Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (SAFE Act) establishes requirements for registration and, when applicable, standards for licensing of individuals who are residential mortgage loan originators. The registration and licensing requirements are administered, in part, through the Nationwide Mortgage Licensing System and Registry (NMLSR). The SAFE Act and Regulation H require each mortgage loan originator who is not an employee of a federally regulated depository institution or certain subsidiaries of such an institution to obtain a state license, register with the NMLSR, obtain a unique identifier, and maintain the license and registration. In addition, the SAFE Act requires states to meet specific minimum standards for licensing and renewing licenses of state-licensed originators. State regulators are responsible for determining whether to grant licenses to loan originator applicants. Employees of depository institutions and certain subsidiaries of those institutions, as well as institutions regulated by the Farm Credit Administration, are subject to different requirements under the SAFE Act and Regulation G. Each such employee who acts as a residential mortgage loan originator must register through

---

[2] The Consumer Credit Protection Act, 15 U.S.C. 1601 et seq., is the collection of federal statutes that protects consumers when applying for or receiving credit. The Act includes statutes that have dispute rights for consumers, such as the Fair Credit Reporting Act. The ECOA prohibits discriminating against an applicant who has exercised a dispute right pursuant to one of the statutes outlined in the Act.

the NMLSR, obtain a unique identifier and provide it to consumers in certain circumstances, and maintain registration − but generally is not required to be licensed.

- The Home Mortgage Disclosure Act (HMDA) and its implementing regulation, Regulation C, require mortgage lenders that meet certain threshold conditions to collect, report to federal regulators, and disclose to the public certain data about applications for, and originations and purchases of, home purchase loans, home improvement loans, and refinancings for each calendar year. The data include information about the loan or application (e.g., loan amount, loan purpose, action taken), the applicant (e.g., sex, ethnicity and race), and the property (e.g., property type and geographic information such as state and metropolitan statistical area (MSA)).

- The Gramm-Leach-Bliley Act (GLB), through its implementing regulation, Regulation P, requires covered entities to provide privacy notices and limit information sharing in particular ways.

- The Fair Credit Reporting Act (FCRA) and its implementing regulation, Regulation V, impose disclosure and other requirements on mortgage lenders that obtain information from a consumer reporting agency to determine a consumer's credit worthiness. These include the disclosure of credit score information, disclosure of adverse action, and disclosure of risk-based pricing.

- Mortgage Acts and Practices – Advertising Rule (MAP Rule), Regulation N, issued pursuant to the 2009 Omnibus Appropriations Act as clarified by the Credit Card Accountability Responsibility and Disclosure Act of 2009, applies only to non-depository mortgage lenders and state-chartered credit unions, as well as entities that market and advertise mortgage products but are not mortgage lenders, such as mortgage brokers, real estate brokers, advertising agencies, lead generators, and rate aggregators. The MAP Rule sets forth specific deceptive acts and practices in the advertising of mortgage loan products and prohibits misrepresentation in any commercial communication concerning terms of mortgage loan products.[3]

These laws historically have been implemented by regulations published by one or more of seven federal agencies, including the Federal Trade Commission, the Department of Housing and Urban Development, the Board of Governors of the Federal Reserve System, and other prudential regulators. The Dodd-Frank Act generally transferred these agencies' rulemaking authority under those laws to the Bureau, which has published new implementing regulations under its authority, effective December 30, 2011. Citations to implementing regulations in this manual are to the Bureau's regulations. In examining an institution, however, formal citations for any observed violations of regulatory requirements should be to the regulation that was in effect at the time the cited act occurred.

---

[3] The MAP Rule became effective on August 19, 2011. Mortgage Acts and Practices – Advertising, 76 Fed. Reg. 43826 (July 22, 2011).

# CFPB
# Examination Procedures

# Mortgage
# Origination

To carry out the objectives set forth in the **Examination Objectives** section, the examination process also will include assessing other risks to consumers generally prohibited by the Dodd-Frank Act.  These risks may include potentially unfair, deceptive, or abusive acts or practices (UDAAPs) with respect to mortgage originators' interactions with consumers.[4] The standards the CFPB will use in assessing UDAAPs are:

o   A representation, omission, act, or practice is deceptive when:

  (1) the representation, omission, act, or practice misleads or is likely to mislead the consumer;

  (2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

  (3) the misleading representation, omission, act, or practice is material.

o   An act or practice is unfair when:

  (1) it causes or is likely to cause substantial injury to consumers;

  (2) the injury is not reasonably avoidable by consumers; and

  (3) the injury is not outweighed by countervailing benefits to consumers or to competition.

o   An abusive act or practice:

  (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

  (2) takes unreasonable advantage of –

    ▪ a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

    ▪ the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

    ▪ the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

Please refer to CFPB's examination procedures regarding UDAAPs for more information about the legal standards and the CFPB's approach to examining for UDAAPs.

The particular facts in a case are crucial to a determination of unfair, deceptive, or abusive practices. As set out in the Examination Objectives section, examiners should consult with

---

[4] Sec. 1036 of the Dodd Frank Act (July 21, 2010).

Headquarters to determine whether the applicable legal standards have been met before a violation of any federal consumer financial law could be cited, including a UDAAP violation.

## General Considerations

Completing the following examination modules will allow examiners to develop a thorough understanding of mortgage brokers' and lenders' practices and operations. To complete the modules, examiners should obtain and review, as applicable, each entity's: organizational charts and process flowcharts; board minutes, annual reports, or the equivalent to the extent available; relevant management reporting; policies and procedures; rate sheets; loan applications, loan account documentation, notes, disclosures, and all other contents of loan underwriting and closing files; operating checklists, worksheets, and review documents; relevant computer program and system details; wholesale and correspondent lending agreements, due diligence and monitoring procedures, and lending procedures; underwriting guidelines; compensation policies; historical examination information; audit and compliance reports; management's responses to findings; training programs and materials; service provider contracts;[5] advertisements; and complaints.

Depending on the scope of the examination, examiners should perform transaction testing using approved sampling procedures, which may require use of a judgmental or statistical sample. Examiners also should conduct interviews with management and staff to determine whether they understand and consistently follow the policies, procedures, and regulatory requirements applicable to mortgage lending; manage change appropriately; and implement effective controls. Examiners also should consider observing customer interactions and, if consumer complaints or document review indicate potential concerns, interviewing customers.

---

[5] CFPB issued a bulletin highlighting its expectation that supervised banks and nonbanks oversee their business relationships with service providers in a manner that ensures compliance with Federal consumer financial law. *See* CFPB Bulletin 2012-03, Service Providers (April 13, 2012), http://files.consumerfinance.gov/f/201204_cfpb_bulletin_service-providers.pdf

**CFPB**                                                    **Mortgage**
**Examination Procedures**                          **Origination**

## Examination Procedures

### Module 1 – Company Business Model

Conduct initial interviews for all relevant departments.

1.  Determine the type of mortgage origination channel(s) used by the entity. Is the entity:

    - Acting as a broker;

    - Acting as a correspondent;

    - Lending through a retail system;

    - Lending through a wholesale or correspondent system; or

    - Using a combination of these strategies?

2.  Determine the funding source(s) that the entity uses.

3.  Ascertain the product volume, mix, trends, and concentrations, including in any of the branches.

4.  Review the organizational chart and reporting structure for mortgage loan origination to determine the reporting structure and responsibilities of key managers.

5.  Determine whether the quality control (or audit, as applicable), underwriting, and appraisal functions operate independently of the production function (sales unit).

6.  Review and list the types of products the entity offers. Determine whether the entity offers hybrid ARMs, interest-only loans, Payment Option ARMs, simultaneous second liens, Alt-A loans, or subprime loans. If the entity offers reverse mortgages, determine whether it offers HECMs and, if so, what percentage of the reverse mortgages originated are HECMs.

7.  Review the qualifications, experience levels, and training programs for originators, processors, underwriters, closers, and the quality control (or audit, as applicable) staff.

8.  Determine whether the entity uses service providers in conducting its business, such as mortgage brokers (if it is a lender), lead generators or affinity groups, business process outsourcing, processors, underwriters, appraisers, or insurers.

9.  Review compensation arrangements, including incentive programs for employees and service providers.

10. Review the entity's general compliance management system using the compliance management review section of the CFPB examination manual and its fair lending compliance management using Section A of the ECOA Examination Procedures if you have not already done so.

## Module 2 – Advertising and Marketing

This module applies to both mortgage brokers and mortgage lenders. Examiners should develop a detailed understanding of the entity's marketing program to determine whether its marketing policies, procedures, and practices are consistent with the requirements of applicable laws and regulations. First, examiners should evaluate the originator's advertising materials and disclosures across all media, including: print, television, radio, telephone solicitation scripts, and electronic media including the Internet, email and text messages. If the entity engages in telemarketing, examiners also should listen to a selection of the sales calls. Finally, examiners should determine whether the entity employs or acts as a third-party lead generator, and should understand the extent of any relationships that the entity has with affiliated or other service providers (i.e., as a broker or agent) to advertise, offer, or provide loans or other products and services.

**TILA, Regulation Z**

1.  Assess compliance with TILA, Advertising Provisions, for advertisements concerning open-end accounts. Please refer to the examination procedures regarding TILA, 12 CFR 1026.16, for more information.

2.  Assess compliance with TILA, Advertising Provisions, for advertisements concerning closed-end loans. Please refer to the examination procedures regarding TILA, 12 CFR 1026.24, for more information.

**RESPA, Regulation X**

3.  Determine whether the entity complies with the RESPA Section 8 prohibitions against giving or accepting kickbacks for the referral of settlement service business and unearned fees. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.14, for more information.

**ECOA, Regulation B**

4.  Assess compliance with ECOA's prohibition against discrimination or discouragement on a prohibited basis. Please refer to the examination procedures regarding ECOA / Regulation B, 12 CFR 1002.4, for more information. See Module 6 for more information on fair lending examinations.

**SAFE Act**

5.  For federal regulated depository institutions and certain of their subsidiaries, assess compliance with the SAFE Act's requirements to register in the NMLSR (and obtain a unique identifier) and to maintain that registration.  For examinations of those institutions, please refer to the SAFE Act examination procedures for more information.

**CFPB**                                     **Mortgage**
**Examination Procedures**                   **Origination**

**Other Risks to Consumers - General**

6.    Determine whether advertisements and promotional materials for mortgage loan products contain material misrepresentations, expressly or by implication, of the following:[6]

   a.   the existence, nature, or amount of fees or other costs;

   b.   number, amount, or timing of payments, including whether the payment includes amounts for monthly escrow payments for taxes and insurance;

   c.   credit qualifications for a particular product or program;

   d.   potential for default;

   e.   product type;

   f.   product effectiveness with respect to debt elimination;

   g.   nature of counseling services; or

   h.   the existence, nature, or amount of prepayment penalties.

7.    Determine whether advertisements and promotional materials for mortgage loan products contain misleading representations that a lender or broker is acting in a fiduciary capacity or in the consumer's best interest.

8.    Determine whether advertisements and promotional materials for mortgage loan products clearly disclose all material limitations or conditions on the terms or availability of products or services, such as:

   a.   special interest rates for a limited time period (teaser rates);

   b.   the expiration date for terms that apply only during an introductory period;

   c.   interest rate resets that could cause significant increases in payments;

   d.   material prerequisites for obtaining particular products, services, or benefits (e.g., discounts, refunds or rebates);

   e.   non-amortizing or less-than-fully amortizing loan terms;

   f.   balloon payments; or

   g.   prepayment penalties.

---

[6] The MAP Rule, 12 CFR 1014.3, which applies to nonbanks and certain state-chartered credit unions, lists 19 examples of specific prohibited claims, including the claims described in this item.

# CFPB
# Examination Procedures

# Mortgage
# Origination

9.  Determine whether advertisements and promotional materials avoid using fine print, separate statements, or inconspicuous disclosures to correct potentially misleading headlines.

10. If additional products or services are sold or offered in connection with the loan, such as credit insurance products, home warranties, or annuities, determine whether advertisements and promotional materials provide timely, clear, and understandable information about the existence of costs, payment terms, penalties, or other terms and charges, the reasons for their imposition, and the salesperson's compensation from cross-sales.

11. Determine the target audience for each type of advertisement and product and whether the entity designs advertisements, promotional materials, disclosures and scripts to be comprehensible by the target audience.

12. Determine whether the entity maintains appropriate procedures for resolving complaints about marketing practices.

**Other Risks to Consumers - Non-traditional Mortgage Loans**

13. Determine whether advertisements and promotional materials:

    a.  Provide information about the costs, terms, and features associated with non-traditional mortgage loans, including information about payment shock, balloon clauses, negative or less than full amortization, prepayment penalties, and the cost of reduced documentation;

    b.  Provide timely, clear, and understandable information about the relative risks of non-traditional mortgage products;

    c.  Clearly disclose key terms, including limitations and conditions that are important in enabling the consumer to make an informed decision regarding whether the product or service meets the consumer's needs.

**Other Risks to Consumers - Reverse Mortgages**

14. Determine whether the entity offers other financial products, like an annuity or long-term care insurance, with the proceeds of the reverse mortgage. If so, determine whether the entity provides timely, clear, and understandable information about these products.

15. Determine whether the entity provides timely, clear, and understandable information about the costs and relative risks of reverse mortgages.

16. Determine whether the entity provides timely, clear, and understandable information about the requirements to pay property taxes, insurance, utilities, maintenance, and other expenses after obtaining a reverse mortgage.

17. Determine whether the entity provides timely, clear, and understandable information about the circumstances under which the borrower may be required to pay the loan in full.

18. Determine whether the entity has adequate safeguards against improper marketing of reverse mortgages to seniors who have medical or cognitive problems or in situations raising concerns about undue influence by third parties.

**Conduct of Employees and Service Providers**

19. Determine whether the entity has developed appropriate training and monitoring policies and procedures for employees and service providers, including:

   a. monitoring outbound calls to consumers to ensure compliance with applicable law and internal policies;

   b. ensuring service provider compliance with legal obligations; and

   c. regular evaluations of employee and service provider performance.

   Refer to the Compliance Management Review - Compliance Program examination procedures for more information.

# Module 3 – Loan Disclosures and Terms

When lenders take applications, evaluate applicants, and originate mortgage loans, they are subject to disclosure and operational requirements. Examiners should identify acts, practices, or materials that indicate potential violations of federal consumer financial laws.

1. Examiners should review financial institution policies, procedures, and systems to determine whether the applicable disclosures listed below are scheduled to be furnished when required.

2. Examiners should obtain a list of consumer accounts and select a sample for further review.

   a. Consider weighting the sample so that more loans from branches with a larger volume of complaints are reviewed.

   b. Obtain complete loan files, which contain the disclosures required by federal consumer financial laws and other legal documents, as well as underwriting documents, rate sheets, and all documents provided to the consumer.

3. Review the sample of loan origination files to assess the adequacy and completeness of required disclosures, as described below.

4. Determine whether the required disclosures were made as required and ensure the presence and accuracy of the items below, as applicable.

5. If consumer complaints or document review indicate potential violations in the areas discussed below, examiners also may conduct review of recorded telephone calls and/or

# CFPB                                    Mortgage
# Examination Procedures              Origination

complaints, if available, and interviews of consumers from the sample and ask questions relevant to each topic area below.

**RESPA, Regulation X**

Under RESPA and it implementing regulation, Regulation X, the lender/creditor is responsible for providing the Good Faith Estimate (GFE) and the Settlement Cost Booklet. The regulations permit the mortgage broker to provide the disclosures, but the lender must ascertain whether the GFE has been provided. During an examination of a mortgage broker, examiners should determine whether it has agreed to provide the GFE and Booklet and if so, whether it is doing so.

6. For mortgage lenders, determine whether the lender complies with RESPA Special Information Booklet Provisions. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.6, for more information.

7. For mortgage lenders, determine whether the lender complies with RESPA GFE requirements. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.7, for more information.

8. For any person making a referral to an entity that is part of an affiliated business arrangement, determine whether the entity complies with RESPA requirements for affiliated business arrangements. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.15, for more information.

9. Review the final settlement statement (HUD-1 or HUD-1A), and assess compliance with RESPA disclosure requirements and tolerance limits on settlement charges. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.7, for more information.

**TILA, Regulation Z**

10. Assess compliance with TILA's disclosure provisions, including appropriate disclosure of amount financed, annual percentage rate, and payment schedule or rate and payment summary table (as applicable). Please refer to the examination procedures regarding TILA, 12 CFR 1026.4, 1026.5, 1026.40, and 1026.6 (open-end accounts) and 1026.4, 1026.17 – 1026.20 (closed-end accounts), for more information.

11. Assess compliance with TILA disclosure provisions for appropriate calculation of finance charge and annual percentage rate. Please refer to the regulation and examination narrative and procedures regarding TILA, 12 CFR 1026.4 and 1026.14 (open-end accounts) and 1026.4 and 1026.22 (closed-end accounts), for more information.

**CFPB**　　　　　　　　　　　　　　　　　　　　　**Mortgage**

**Examination Procedures**　　　　　　　　　　　**Origination**

12. If the creditor originates high-cost mortgage loans, assess compliance with TILA provisions concerning those mortgage loans.[7] Please refer to the examination procedures regarding TILA, 12 CFR 1026.32 and 1026.34, for more information.

13. If the creditor originates reverse mortgage loans, assess compliance with TILA provisions concerning those loans. Please refer to the examination procedures regarding TILA, 12 CFR 1026.33, for more information.

14. If the creditor originates higher-priced mortgage loans, assess compliance with TILA provisions concerning those.[8] Please refer to the examination procedures regarding TILA, 12 CFR 1026.35, for more information.

15. Ensure that the creditor does not structure a high-cost or higher-priced mortgage loan as an open-end plan to evade the requirements of Regulation Z.

16. If the creditor originates high-cost mortgage loans, assess compliance with TILA and Regulation Z provisions concerning restrictions on prepayment penalties and required escrow account for property taxes and homeowners insurance, for high-cost, closed-end mortgages. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.32, for more information.

**ECOA, Regulation B, Adverse Action Notices**

17. Review loan files to determine whether ECOA adverse action notices were provided when required. Please refer to the examination procedures regarding Regulation B, 12 CFR 1002.9, for more information.

18. Assess compliance with ECOA's prohibition against discrimination or discouragement on a prohibited basis. Please refer to the examination procedures regarding ECOA / Regulation B, 12 CFR 1002.4, for more information. See Module 6 for more information on fair lending examinations.

**FCRA, Regulation V**

---

[7] A "high-cost" loan is a consumer credit transaction secured by the consumer's principal dwelling, in which either:

• The APR at consummation will exceed by more than 8 percentage points for first-lien mortgage loans, or by more than 10 percentage points for subordinate-lien mortgage loans, the yield on Treasury securities having comparable periods of maturity to the loan's maturity (as of the 15th day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor); or

• The total points and fees (as defined in the regulation) payable by the consumer at or before loan closing will exceed the greater of 8 percent of the total loan amount or $579 for the calendar year 2010. (This dollar amount is adjusted annually based on changes in the Consumer Price Index. See staff commentary to 12 CFR 1026.32(a)(1)(ii) for a historical list of dollar amount adjustments.)

[8] A "higher-priced" mortgage loan is a consumer credit transaction secured by the consumer's principal dwelling with an APR that exceeds the average prime offer rate for a comparable transaction as of the date the interest rate is set by: 1.5 or more percentage points for loans secured by a first lien on a dwelling; or 3.5 or more percentage points for loans secured by a subordinate lien on a dwelling.

---

# CFPB
# Examination Procedures

# Mortgage
# Origination

19.  Review the loan file to determine whether FCRA adverse action and risk-based pricing notices were provided when required. Please refer to the examination procedures regarding FCRA, 15 U.S.C. 1681m(a) and 12 CFR 1022.72, for more information.

**Homeowners Protection Act**

20.  Determine whether the entity provided a notice to the borrower of the borrower's ability to terminate private mortgage insurance. Please refer to the examination procedures regarding the Homeowners Protection Act for more information.

**Other Risks to Consumers**

21.  Review the loan file to determine whether loan documentation, including income documentation, has been altered or forged. Any indications of fraud should be handled in accordance with CFPB internal consultation procedures, and examiners should refer them to other authorities, as appropriate.

22.  Review policies and procedures regarding rate locks, and review the loan file to determine whether there are instances where consumers lose their rate locks prior to its expiration, resulting in their being placed in more expensive mortgage products, despite obtaining a rate lock and submitting all required documentation within required time frames.

## Module 4 – Underwriting, Appraisals, and Originator Compensation

Underwriting, appraisals, and originator compensation are important parts of the origination process and important areas for review.

### Underwriting

This section of the Procedures applies only to mortgage lenders, not mortgage brokers.

**TILA, Regulation Z – High-cost or higher-priced mortgage loans**

If the entity originates high-cost mortgage loans (12 CFR 1026.32) or higher-priced mortgage loans (12 CFR 1026.35), assess compliance with provisions concerning the borrower's repayment ability for closed-end, high-cost mortgages, including required documentation of income and assets. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.32 and 1026.35, for more information.

**Other Risks to Consumers**

1.  Review the mortgage lender's underwriting policies and guidelines to determine whether they contain:

    a.  Verifiable standards for qualifying borrowers, including ranges/limits for applicable debt-to-income (DTI) ratios, credit scores, and loan-to-value (LTV) ratios for the different loan products offered by the institution.

    b.  Authenticated processes and bases for approving exceptions to underwriting standards.

    c.  Standards and methods for determining, verifying, and documenting that the borrower has the ability to repay the loan.

2.  Review communication logs or notes in the mortgage loan files, and interview sales and production staff of the mortgage lender or broker to determine the independence of underwriters from the sales or production unit, with an emphasis on any influence mortgage loan originators may have over underwriters.

3.  Determine whether the compensation systems for underwriters (whether in-house or contracted) affects their incentives concerning the speed and quality of their underwriting.

4.  If the lender offers non-traditional or subprime loan products:

    a.  Determine if underwriting standards take adjusted payments into account in considering borrower ability to repay at expected payment change dates.

    b.  If the lender offers loans that have two or more risky characteristics (called "risk layering"), determine whether risk layering is taken into account as part of the underwriting policies, whether any mitigating factors are required for approval, and

# CFPB
## Examination Procedures

# Mortgage
## Origination

whether actual underwriting practices conform with policies. Risky characteristics are any of the following:

- Limited or no documentation of income, assets, and/or employment;

- Simultaneous second lien;

- Negative amortization, option payment, or interest-only features;

- Introductory rate 200 basis points or more below fully-indexed rate;

- Borrowers with subprime characteristics;

- No escrow for property taxes and homeowner's insurance;

- Extended amortization period or extended loan terms; or

- Balloon clauses.

   c. Determine whether a customer is referred up to prime if he qualifies for prime and whether the referral is structured or framed to discourage the customer from applying for a prime loan.

5. Review the documentation used to make underwriting decisions, including applications, tax returns, verifications of income, assets, and employment, credit reports, and all other required documentation to determine that the entity complied with applicable underwriting policies and procedures and with regulatory requirements. If not, determine the reasons for and frequency of exceptions.

6. For loans made using automated underwriting systems, determine whether the originator entered the correct inputs and that all of the conditions on the feedback certificate were satisfied and documented before the loan was funded.

7. Confirm that the lender has an adequate quality assurance program both pre-funding and post-closing to detect and correct any violations of its underwriting policies.

8. Determine whether the lender has appropriate policies and procedures related to underwriting of loans to be sure that the borrower is able to repay without selling or refinancing and whether the lender is adhering to its policies.

9. Determine whether the lender frequently uses exceptions to override underwriting decisions in order to allow a greater volume of loans into the pipeline.

10. Review underwriting guidelines and use of exceptions for changes and deterioration in lending standards.

# CFPB
# Examination Procedures

# Mortgage
# Origination

**ECOA**

11.   Assess compliance with ECOA's prohibition against discrimination or discouragement on a prohibited basis. Please refer to the examination procedures regarding ECOA / Regulation B, 12 CFR 1002.4, for more information. See Module 6 for more information on fair lending examinations.

## Appraisals

Review appraisal policies and procedures. Interview employees about their relationships with independent third-party appraisers to determine whether there are conflicts of interest. Determine whether the entity has an affiliated appraisal company or appraisal management company.

**TILA, Regulation Z – Valuation Independence**

12.   Determine whether the lender complies with the Regulation Z requirements for valuation independence. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.42 for more information.

**ECOA, Regulation B – Providing Appraisal Reports**

13.   Determine whether the regulated entity provides appraisals to applicants in accordance with Regulation B, 12 CFR 1002.14.

**Other Risks to Consumers**

14.   Determine whether practices of the mortgage lender or its employees undermine appraisal independence.

15.   Confirm that the entity maintains adequate oversight of the appraisers it uses (including termination where necessary) and safeguards against appraisal fraud.

## Originator Compensation

Review compensation policies and procedures. Interview employees to assess the entity's actual compensation practices. Review loan files and originator compensation records to confirm that the entity is complying with its applicable policies and procedures.

**TILA, Regulation Z - Prohibited Payments to Loan Originators**

16.   Determine that, in connection with a consumer credit transaction secured by a dwelling, no loan originator receives and no person pays to a loan originator, directly or indirectly, compensation that is based on any of the transaction's terms or conditions (12 CFR

1026.36(d)(1)(i)).[9] Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.36(d)(1)(i) for more information.

17.    If any loan originator receives compensation directly from a consumer in a consumer credit transaction secured by a dwelling, determine that (12 CFR 1026.36(d)(2)):

   a.  No loan originator receives compensation, directly or indirectly, from any person other than the consumer in connection with the transaction (12 CFR 1026.36(d)(2)(i)); and

   b.  No person who knows or has reason to know of the consumer-paid compensation to the loan originator (other than the consumer) pays any compensation to a loan originator, directly or indirectly, in connection with the transaction (12 CFR 1026.36(d)(2)(ii)). Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.36(d)(2), for more information.

**TILA, Regulation Z - Prohibition on Steering**

18.    Confirm that, in connection with a consumer credit transaction secured by a dwelling, a loan originator does not direct or "steer" a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer, unless the consummated transaction is in the consumer's interest (12 CFR 1026.36(e)(1)). The rule provides a safe harbor to facilitate compliance with the prohibition on steering in 12 CFR 1026.36(e)(1). The loan originator is deemed to comply with the anti-steering prohibition if the consumer is presented with loan options that meet specific conditions for each type of transaction in which the consumer expressed an interest. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026. 36(e)(1), for more information.

**ECOA**

19.    Assess compliance with ECOA's prohibition against discrimination or discouragement on a prohibited basis. Please refer to the examination procedures regarding ECOA / Regulation B, 12 CFR 1002.4, for more information. See Module 6 for more information on fair lending examinations.

---

[9] This prohibition does not apply if the loan originator receives compensation directly from a consumer in a consumer credit transaction secured by a dwelling. Additionally, the amount of credit extended is not deemed to be a transaction term or condition, provided compensation received by or paid to a loan originator, directly or indirectly, is based on a fixed percentage of the amount of credit extended. Such compensation may be subject to a minimum or maximum dollar amount.

# CFPB                                    Mortgage
# Examination Procedures                  Origination

## Module 5 – Closing

In addition to making sure they comply with the disclosure requirements covered in Module 3 – Mortgage Disclosures and Terms, lenders are responsible for the way their closings are conducted. If consumer complaints or document review indicate potential violations in these areas, examiners also may conduct interviews of consumers from the sample and ask questions relevant to each topic area below.

1.  Determine whether the entity has adopted written policies and procedures to ensure that all disclosures required to be provided to the borrower at or before closing, including the final TILA disclosure, HUD-1 (or HUD-1A), servicing transfer disclosure, PMI cancellation notice, and privacy and opt-out notices, were provided.

2.  Determine whether the entity allows borrowers to choose their settlement agents or requires the borrowers to use any other settlement service provider (other than an attorney, credit reporting agency, or appraiser chosen by the entity to represent its interests in the transaction, all of which are permitted).

3.  Review the sample of loan files to assess the entity's closing procedures.

4.  Determine whether the settlement agent established escrow accounts for taxes and insurance as required for higher-priced mortgages under Regulation Z, 12 CFR 1026.35(b)(3). Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.35(b)(3), for more information.

5.  If escrow accounts were established, determine whether the borrower received an initial escrow account statement. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.17, for more information.

6.  Determine whether each borrower received copies of the notice of the right to rescind required by Regulation Z for a loan secured by a principal dwelling. Please refer to the examination procedures regarding TILA, 12 CFR 1026.15 (open-end credit) and 1026.23(b) (closed-end accounts), for more information.

7.  Review policies or scripts that explain loan terms to consumers, in connection with loan closings, in a deceptive manner.

8.  Determine whether the entity's practices obscure or obfuscate key loan terms, fees, or provisions. Compare initial GFEs and TIL disclosures with final HUD-1 settlement statements and final TIL disclosures for any evidence of bait-and-switch tactics with respect to the interest rate, points, closing costs, or the loan product or loan features.

9.  Review complaints and closing files for evidence of coercion of or fraud against the borrower at settlement.

# CFPB                                    Mortgage
# Examination Procedures                  Origination

## Module 6 – Fair Lending

The purpose of a fair lending examination is to determine whether the creditor discriminated on a prohibited basis in any aspect of its credit operations. This includes examining whether any of the creditor's policies and procedures has an adverse impact on a prohibited basis, and is not supported by a legitimate business need that cannot be met by a less discriminatory alternative. Most fair lending examinations will involve requesting loan-level data and detailed information concerning lending practices. Headquarters staff will perform statistical modeling and analysis based on entity-specific information and data. Examiners are responsible for collecting and reviewing policies and procedures, interviewing bank employees, and conducting comparative file reviews. Examiners and Headquarters staff will work together to scope the fair lending examination.

For fair lending scoping and examination procedures, the CFPB is using the FFIEC Interagency Fair Lending Examination Procedures which are referenced in Section B of the CFPB's ECOA Examination Program. When conducting a fair lending examination, consult and work with Headquarters.

### HMDA, Regulation C

HMDA data are used for fair lending examinations. See HMDA Examination Procedures.

Financial institutions routinely provide HMDA data on an annual basis as required by the statute. The CFPB usually has this information, so it is not necessary to ask the regulated entity to produce HMDA data. However, we will ask the entity to produce additional non-HMDA data fields when conducting a fair lending examination.

### ECOA, Regulation B

See Section B (Fair Lending Examination Procedures) of the ECOA Examination Procedures for details.

**CFPB**                                                    **Mortgage**
**Examination Procedures**                                 **Origination**

## Module 7 – Privacy

Financial institutions often sell and share consumer information. The main objectives for evaluating privacy and information sharing are to ensure consumers' non-public information is protected as required by federal consumer financial law. Mortgage lenders and brokers must adhere to disclosure requirements and information sharing restrictions under the Gramm-Leach Bliley Act (GLBA) and its implementing regulation, Regulation P, as well as the FCRA and its implementing regulation, Regulation V. These requirements generally are triggered at the start of the customer relationship, depending on the information that entity is sharing or selling.

**GLBA, Regulation P**

GLBA and Regulation P govern the treatment of nonpublic personal information about consumers by financial institutions and restrict the sharing of nonpublic personal information with unaffiliated third parties. GLBA requires financial institutions to disclose their privacy policies to consumers. GLBA also permits consumers to opt out of certain sharing practices.

1. Determine whether the entity's information sharing practices are consistent with the requirements of the GLBA and implementing rule. Please refer to the examination procedures regarding Regulation P, 12 CFR 1016.4, for more information.

**FCRA, Regulation V**

FCRA's privacy provisions cover information sharing among affiliates. In general, entities may share customer transaction and experience information with affiliated entities. However, an entity may not use information received from an affiliate to market its products or services to a consumer, unless the consumer is given notice and a reasonable and simple method to opt out of the making of such solicitations.

2. Assess compliance with FCRA's affiliate marketing rule. Please refer to the examination procedures regarding Regulation V, 12 CFR 1022.20 – 1022.27, for more information.

# CFPB                                        Mortgage
# Examination Procedures          Servicing

## Mortgage Servicing

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

After completing the risk assessment and examination scoping, examiners should use these procedures, in conjunction with the compliance management system review procedures, to conduct a mortgage servicing examination. The examination procedures contain a series of modules, grouping similar requirements together. Depending on the scope, each examination will cover one or more of the following modules:

Routine Servicing

Module 1      Servicing Transfers, Loan Ownership Transfers, and Escrow Disclosures

Module 2      Payment Processing and Account Maintenance

Module 3      Customer Inquiries and Complaints

Module 4      Maintenance of Escrow Accounts and Insurance Products

Module 5      Credit Reporting

Module 6      Information Sharing and Privacy

Default Servicing

Module 7      Collections and Accounts in Bankruptcy

Module 8      Loss Mitigation

Foreclosure

Module 9      Foreclosures

---

## Examination Objectives

1. To assess the quality of the regulated entity's compliance risk management systems, including internal controls and policies and procedures, for preventing violations of federal consumer financial law in its mortgage servicing business.

2. To identify acts or practices that materially increase the risk of violations of federal consumer financial law in connection with mortgage servicing.

3. To gather facts that help determine whether a regulated entity engages in acts or practices that are likely to violate federal consumer financial law in connection with mortgage servicing.

4. To determine, in consultation with Headquarters, whether a violation of a federal consumer financial law has occurred and whether further supervisory or enforcement actions are appropriate.

## Background

A servicer may service loans on behalf of itself or an affiliate. It may service as a contractor of the trustee where a mortgage is included in a mortgage-backed security, or it may service whole loans for an outside third-party investor.[1] A servicer may sell the rights to service the loan separately from any ownership transfers. This is because some entities have expertise in payment processing and other servicing responsibilities, while others seek to invest in the underlying mortgages. These procedures apply whether the servicer obtained the servicing rights from another entity or the servicing responsibility is transferred within a company from the origination platform to the servicing platform.

Servicers must comply with various laws to the extent that the law applies to the particular servicer and its activities:

- The Real Estate Settlement Procedures Act (RESPA) and its implementing regulation, Regulation X, impose requirements for servicing transfers, written consumer inquiries, and escrow account maintenance.

- The Truth in Lending Act (TILA) and its implementing regulation, Regulation Z, generally impose requirements on owners for home mortgage ownership transfers. It also imposes requirements on servicers regarding crediting of payments, imposition of late fee and delinquency charges, and provision of payoff statements with respect to closed-end consumer credit transactions secured by a principal dwelling. For open-end mortgages, Regulation Z provisions related to payment crediting and error resolution apply to the extent that the servicer is a creditor.

- The Electronic Funds Transfer Act (EFTA) and its implementing regulation, Regulation E, impose requirements if servicers within the scope of coverage obtain electronic payments from borrowers.

- The Fair Debt Collection Practices Act (FDCPA) governs collection activities conducted by third-party collection agencies, as well as servicer collection activities if the servicer acquired the loan when it was already in default.

- The Homeowners Protection Act (HPA) limits private mortgage insurance that can be assessed on customer accounts.

- The Fair Credit Reporting Act (FCRA) requires servicers that furnish information to consumer reporting agencies to ensure the accuracy of data placed in the consumer reporting system. The FCRA also limits certain information sharing between company affiliates.

---

[1] If the owner is a separate entity, the servicer generally has contractual commitments to the owner of the loan. In the private securitization market, the contracts generally are called Pooling and Servicing Agreements or PSAs. If a Fannie Mae or Freddie Mac owns the loan, the commitments are set forth in the company's seller/servicer guides.

**CFPB**

**Examination Procedures**

**Mortgage Servicing**

- The Gramm-Leach-Bliley Act (GLBA) requires servicers within the scope of coverage to provide privacy notices and limit information sharing in particular ways.

- The Equal Credit Opportunity Act (ECOA) and its implementing regulation, Regulation B, apply to those servicers that are creditors, such as those who participate in a credit decision about whether to approve a mortgage loan modification. The statute makes it unlawful to discriminate against any borrower with respect to any aspect of a credit transaction:

  o On the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

  o Because all or part of the applicant's income derives from any public assistance program; or

  o Because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.[2]

To carry out the objectives set forth in the **Examination Objectives** section, the examination process also will include assessing other risks to consumers that are not governed by specific statutory or regulatory provisions. These risks may include potentially unfair, deceptive, or abusive acts or practices (UDAAPs) with respect to servicers' interactions with consumers.[3] Collecting information about risks to consumers, whether or not there are specific legal guidelines addressing such risks, can help inform the Bureau's policymaking. The standards the CFPB will use in assessing UDAAPs are:

  o A representation, omission, act, or practice is deceptive when:

   (1) the representation, omission, act, or practice misleads or is likely to mislead the consumer;

   (2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

   (3) the misleading representation, omission, act, or practice is material.

  o An act or practice is unfair when:

   (1) it causes or is likely to cause substantial injury to consumers;

   (2) the injury is not reasonably avoidable by consumers; and

---

[2] The Consumer Credit Protection Act, 15 U.S.C. 1601 et seq., is the collection of federal statutes that protects consumers when applying for or receiving credit. The Act includes statutes that have dispute rights for consumers, such as the Fair Credit Reporting Act. The ECOA prohibits discriminating against an applicant who has exercised a dispute right pursuant to one of the statutes outlined in the Act.

[3] Dodd-Frank Act, Sec. 1036, PL 111-203 (July 21, 2010).

# CFPB                                          Mortgage
# Examination Procedures                        Servicing

      (3)  the injury is not outweighed by countervailing benefits to consumers or to competition.

o  An abusive act or practice:

      (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or

      (2) takes unreasonable advantage of –

         ▪  a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

         ▪  the inability of the consumer to protect its interests in selecting or using a consumer financial product or service; or

         ▪  the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

Please refer to the examination procedures regarding UDAAPs for more information about the legal standards and the CFPB's approach to examining for UDAAPs.

The particular facts in a case are crucial to a determination of unfair, deceptive, or abusive practices. As set out in the **Examination Objectives** section, examiners should consult with Headquarters to determine whether the applicable legal standards have been met before a violation of any federal consumer financial law could be cited, including a UDAAP violation.

# Module 1 – Servicing Transfers, Loan Ownership Transfers, and Escrow Disclosures

## Servicing Transfers

Examiners should engage in several steps to assess potential violations of law in connection with servicing transfers, loan ownership transfers, and escrow disclosures. First, examiners should review a sample of servicing records, from the servicer's primary computer system, for loans transferred within the previous year. Examiners also may need to review copies of the electronic and paper documents transferred from the prior servicer. Additionally, they should review relevant records outside the servicer's primary computer system, such as copies of monthly statements sent to consumers, copies of the RESPA disclosures, and evidence of delivery. If consumer complaints or document review indicate potential violations in these areas, examiners also may conduct interviews of consumers from the sample and ask questions relevant to each topic area below.

**RESPA**

1. Assess compliance with RESPA, Notice of Transfer Provisions. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.21, for more information.

   **[Click&type]**

**FDCPA**

2. Assess compliance with FDCPA, Right to Validation Notice for Certain Consumers. Please refer to the examination procedures regarding FDCPA, 15 U.S.C. 1692g (a), for more information.

   **[Click&type]**

**Other Risks to Consumers**

3. Determine whether the servicer conducts adequate due diligence in connection with acquiring servicing rights to ensure that it does not misrepresent amounts owed after transfer of account servicing.

   **[Click&type]**

4. For loans subject to modification agreements and forbearance agreements:

   a. Determine that the servicer has received executed copies of prior servicers' modification agreements and forbearance agreements.

   b. Determine whether the servicer is properly applying, after transfer, payments due under a loan modification agreement or other payment modification to which the prior servicer agreed.

   c. Determine whether the servicer is charging amounts not due under a loan modification agreement or forbearance agreement.

   **[Click&type]**

5. For loans subject to negotiations related to modification agreements and forbearance agreements, determine whether the servicer receives adequate information about loan modifications or other foreclosure alternatives that were ***under discussion*** with the prior servicer. If the servicer does not receive system notes or other information documenting such discussions, assess and document the information that the servicer does receive.

   **[Click&type]**

## Ownership Transfer

### Regulation Z

Examiners should determine whether the servicer is required to transmit the loan ownership transfer notice. The institution would have this obligation if (a) it owns any of the loans in the servicing portfolio and (b) the loan is secured by the principal dwelling of the consumer. (12 CFR 1026.39(a)(1)).[4]

To assess whether the servicer is complying with obligations under Regulation Z to notify consumers of changes in the loan ownership, examiners should sample from the list of loans in which the ***loan's owner*** changed within the previous year. For the loans in the sample, examiners should review copies of consumer disclosures regarding loan ownership and evidence of delivery.

6. Assess compliance with Regulation Z, Notice of Ownership Transfer Provision. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.39, for more information.

   **[Click&type]**

---

[4] A servicer of a mortgage loan is not treated as an owner of the obligation if the servicer holds title to the loans, or title is assigned to the servicer, solely for the administrative convenience of the servicer in servicing the obligation.

Contractually, the loan owner may have delegated the Regulation Z obligation to the servicer. Although the loan owner cannot delegate its obligation under law, examiners should assess whether the servicer is fulfilling its commitment, if applicable.

# CFPB
# Examination Procedures

# Mortgage
# Servicing

## Escrow Transfers

**RESPA**

To assess whether the servicer is complying with obligations under Regulation X to notify consumers of changes in the escrow account requirements resulting from a transfer of servicing, examiners should sample from the list of loans transferred within the previous year that included escrow accounts. For the loans in the sample, examiners should review copies of consumer disclosures regarding the escrow accounts and evidence of delivery.

7. Assess compliance with RESPA, Escrow Transfer Provisions. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.17, for more information.

   **[Click&type]**

**CFPB**                                           **Mortgage**

**Examination Procedures**                **Servicing**

# Module 2 – Payment Processing and Account Maintenance

To assess payment posting and fee practices, examiners should review a sample of servicing records. Examiners should begin by reviewing a sample of records from the servicer's primary record system; if potential problems are found, examiners should review copies of relevant records outside the primary system, such as copies of monthly statements, copies of consumer payment records, and copies of bills from vendors *documenting* any services related to the consumer's loan account. If consumer complaints or document review indicates potential violations in these areas, examiners also may conduct interviews of consumers from the sample and ask questions relevant to each topic area below.

## Payment Processing

### Regulation Z

1. Assess compliance with Regulation Z, Payment Posting Provisions for closed-end accounts. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.36, for more information.

   **[Click&type]**

2. Assess compliance with Regulation Z, Payment Posting Provisions for open-end mortgages. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.10, for more information.

   **[Click&type]**

### Other Risks to Consumers – Payment Posting

3. Assess how the servicer uses suspense accounts in the time period before the servicer has provided the customer notice that the contract has been declared in default and the remaining payments due under the contract have been accelerated.

a. *For loans that are not Daily Simple Interest Loans:*

   i. Determine the circumstances under which the servicer places payments into a suspense account. Determine whether the servicer informs consumers of these actions in a timely, clear, and understandable manner.

   **[Click&type]**

ii. Determine the servicer's practices in connection with crediting amounts held in a suspense account, including whether the servicer leaves money in the suspense account without assessing whether the consumer has cumulatively made a PITI payment and applying such a payment.

**[Click&type]**

iii. Determine the servicer's practices in connection with the use of funds in a suspense account, including whether the servicer pays late fees or default-related fees from suspense accounts before crediting those funds towards the PITI payment.

**[Click&type]**

iv. Determine the circumstances under which the servicer sends back payments, including, if applicable, whether the servicer in a timely, clear, and understandable manner explains the reason a payment is sent back, and the future payment amount that would be accepted.

**[Click&type]**

b. *For Daily Simple Interest Loans:* Determine whether the servicer promptly accepts and applies all borrower payments, including cure payments, trial modification payments, and payments by or on behalf of a borrower in bankruptcy while the case is pending, as well as non-conforming payments.

**[Click&type]**

4. Determine whether the servicer credits payments toward principal and interest before it applies payments to fees and other charges.

**[Click&type]**

## Optional Products

### ECOA

5. Determine whether the servicer offers debt cancellation, debt suspension, or other similar additional products or services and, if so, which products and/or services the servicer offers.

**[Click&type]**

6. Determine whether each such optional product or service is offered and provided in a manner consistent with ECOA. Targeted marketing of these products on the basis of race, for example, may indicate an increased risk of potential ECOA violations and require further inquiry. In consultation with Headquarters, assess whether marketing is targeted on such a basis to particular consumers or in particular areas.

**[Click&type]**

**CFPB**                                                    **Mortgage**

**Examination Procedures**                        **Servicing**

**Other Risks to Consumers**

7. Determine whether the servicer offers additional products or services (such as payment protection or credit protection) and, if so, which products and/or services the servicer offers.

   **[Click&type]**

8. Review marketing materials, whether they are telemarketing scripts, direct mail, web-based, or other media, and determine whether each optional product's costs and terms are clearly and prominently disclosed. If consumer complaints or document review indicates potential violations in these areas and the servicer engages in telemarketing, monitor call center activity, and statements of representatives marketing the products. If the servicer engages in web-based marketing, monitor Internet communications related to the marketing.

   **[Click&type]**

9. Determine whether the servicer added on optional products or services without obtaining explicit authorization from the consumer. If the servicer obtains written authorization, review records of customers who received additional products or services to ensure that written authorization has been provided and retained.

   **[Click&type]**

**CFPB**                                                              **Mortgage**

**Examination Procedures**                                            **Servicing**

## Fees

**Other Risks to Consumers — Fees Imposed to Protect the Owner's Security Interest**

10. Determine the servicer's practices in assessing attorney's fees, property inspection fees, sheriff's fees, publication fees, and other charges, including whether the servicer ensures that fees are only assessed when the activity or service actually takes place.

   a. Determine the servicer's practices in assessing foreclosure attorney's fees, including whether these fees are assessed in stages to ensure that the servicer does not charge the entire fee for a foreclosure at the initial stage of the foreclosure referral before all of the charged services have been rendered.

   **[Click&type]**

   b. Determine the servicer's practices in connection with obtaining invoices for services rendered, for example determining whether it assesses charges when it has a valid invoice.

   **[Click&type]**

   c. Determine whether the servicer assesses charges for estimated fees in connection with the reinstatement or payoff of a loan in foreclosure, including, if applicable, whether it:

      1. Clearly and conspicuously explains the estimated fees; and

      2. For borrowers who reinstate or pay off the loan, (1) perform a timely reconciliation of the fees paid to ensure that all fees assessed were imposed for services that were valid and actually performed and (2) reimburses the borrower in the event of any overpayment, within a reasonable time, using reasonable efforts to update the borrower's address.

   **[Click&type]**

   d. Determine whether the servicer or any of its affiliates impose mark-ups on any third-party fees or insurance products without performing administrative work, quality control, or providing other services consistent with the mark-up.

   **[Click&type]**

11. Document the timing and frequency of fees, and determine whether the servicer has established reasonable intervals for repeat services.

   **[Click&type]**

## Periodic Statements and Other Disclosures

Examiners must review the servicer's policies, procedures, and systems to assess the adequacy of periodic statements and whether applicable disclosures are furnished when required by Regulation Z. Examiners also should review a sample of periodic statements.

# CFPB
# Examination Procedures

# Mortgage
# Servicing

## Regulation Z

12. Assess compliance with Regulation Z – Change in Term Disclosures for Open-End Mortgages. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.9, for more information.

**[Click&type]**

13. Assess compliance with Regulation Z – Periodic Statements for Open End Mortgages. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.7, for more information.

**[Click&type]**

## EFTA

14. Assess compliance with EFTA – Electronic Payments. Please refer to the examination procedures regarding EFTA's provisions on pre-authorized electronic transfers, 12 CFR 1005, for more information.

**[Click&type]**

## Other Risks to Consumers — Periodic Statements

15. Review sample periodic statements to ensure that information provided is clear and understandable. If the servicer uses general categories such as "other fees," determine whether the reason for the fee is otherwise made clear.

**[Click&type]**

16. Determine whether the servicer adequately informs the customer of the reason for any amounts due (particularly those other than PITI) in a timely manner.

**[Click&type]**

17. Determine whether the servicer has adequate controls and an adequate data integrity program to ensure that information about amounts due and the loan's status that is communicated to consumers is accurate and contains all material information.

**[Click&type]**

18. Determine whether the factual assertions made in periodic statements and other communications to the borrower are accurate and contain all material information.

**[Click&type]**

19. For any adjustable rate mortgage, determine whether the monthly payment amount stated on a periodic statement after an interest rate change is consistent with the consumer's obligations under the note.

**[Click&type]**

**CFPB** **Mortgage**
**Examination Procedures** **Servicing**

## Payoff Statements

### Regulation Z – Payoff Statements

20. Examiners should verify whether the servicer failed to provide, within a reasonable time after receiving a request from the consumer or person acting on behalf of the consumer, an accurate statement of the total outstanding balance that would be required to satisfy the consumer's obligations in full as of a specific date. Please refer to the examination procedures regarding Regulation Z, 12 CFR 1026.36, for more information.

   **[Click&type]**

### Other Risks to Consumers – Payoff Statements

21. Determine whether, when calculating the payoff amount, the servicer includes late charges and fees owed in the payoff amount or instead deducts such fees and charges from the escrow account.

   **[Click&type]**

## Treatment of Credit Balances

### Regulation Z – Treatment of Credit Balances

22. Assess compliance with Regulation Z – Treatment of Credit Balances. Please refer to the regulation and examination narrative and procedures regarding Regulation Z, 12 CFR 1026.11 and 1026.21, for more information.

   **[Click&type]**

## Treatment of Private Mortgage Insurance

### Homeowners' Protection Act of 1998

23. Assess compliance with Homeowners' Protection Act. Please refer to the examination procedures regarding the HPA, 12 U.S.C. 4902, for more information.

   **[Click&type]**

**CFPB**                                                    **Mortgage**

**Examination Procedures**                          **Servicing**

# Module 3 – Customer Inquiries and Complaints

Examiners should review consumer complaints and call specific complaining consumers to interview them regarding their experiences. Examiners should determine whether their complaints were resolved adequately, and whether they were resolved in a timely manner.

## RESPA – Responses to Qualified Written Requests

1. Assess compliance with RESPA – Requirements Related to Responses to Qualified Written Requests. Please refer to the examination procedures regarding RESPA, 12 CFR 1024.21(e), for more information.

   **[Click&type]**

## Open-End Mortgages – Billing Errors

2. Assess compliance with Regulation Z – Open-End Credit, Billing Errors Procedures. Please refer to the examination procedures regarding this regulation, 12 CFR 1026.13, for more information.

   **[Click&type]**

### Other Risks to Consumers

3. Identify all channels and physical locations the servicer provides for receipt of customer complaints and inquiries.

   **[Click&type]**

4. Evaluate the comprehensiveness of systems, procedures, and/or flowcharts for capturing, logging, tracking, handling, and reporting complaints and their resolutions.

   **[Click&type]**

5. Assess the effectiveness of any telephone line available for inquiries or complaints, including (a) whether it is toll-free, (b) the ease of accessing a live person, (c) the hold times, and (c) the call abandonment rates.

   **[Click&type]**

6. Assess the effectiveness of other means available for inquiries or complaints, including written submissions and any online portal.

   **[Click&type]**

7. Evaluate the servicer's processes and speed for responses to consumer complaints. Review reports to management and the board of directors (or principals). Review the consumer complaint log(s), performance metrics, and exception/trend reports to determine whether consumer complaints are captured, correctly categorized, and are handled appropriately.

   **[Click&type]**

**CFPB**                                  **Mortgage**

**Examination Procedures**             **Servicing**

8. Determine if staffing levels are sufficient for volume. Then determine whether assumptions used for staffing determinations are validated or supported by analysis.

   **[Click&type]**

9. Listen to live calls and taped calls to assess the quality and training of call center personnel.

   **[Click&type]**

# Module 4 – Maintenance of Escrow Accounts and Insurance Products

## Maintenance of Escrow

Examiners should obtain a sample of servicing records. For the loans in the sample, examiners should assess whether the servicer is complying with the law in the areas listed below. If the file review indicates potential risks, examiners also should conduct interviews of a sample of consumers and staff, if appropriate, to assess consumer experiences with escrow accounts and any force-placed insurance products.

### Escrow Disclosures

1. Assess compliance with RESPA – Escrow Disclosures. Please refer to the RESPA examination procedures, 12 CFR 1024.17, for more information.

   **[Click&type]**

### Escrow Disbursement

2. Assess compliance with RESPA – Escrow Disbursement. Please refer to the RESPA examination procedures, 12 CFR 1024.21, for more information.

   **[Click&type]**

### Other Risks to Consumers

3. Determine whether the customer incurred penalties or unnecessary charges in the event the servicer failed to make disbursements of escrow funds for insurance, taxes, and other charges with respect to the property in a timely manner.

   **[Click&type]**

4. Evaluate whether the servicer has established adequate procedures to ensure customers are not improperly assessed force-placed insurance, including the servicer's procedures for notifying customers that the servicer needs evidence of insurance coverage.

   **[Click&type]**

5. Review the extent to which borrowers are provided with relevant information about force-placed insurance in a timely, accurate, and understandable manner. Review the servicer's practices when borrowers fail to respond to such notices.

   **[Click&type]**

6. Determine whether the servicer cancels force-placed insurance when the customer provides adequate evidence of existing and sufficient insurance coverage.

   **[Click&type]**

# CFPB
# Examination Procedures

# Mortgage
# Servicing

7. Determine whether the servicer refunds insurance premiums and any related fees that were assessed for force-placed insurance coverage that ran concurrent with the customer's existing insurance coverage.

   **[Click&type]**

8. Determine whether the servicer or any of its affiliates imposes mark-ups, or received commissions or other payments, related to any force-placed insurance products.

   **[Click&type]**

**CFPB**                                                                    **Mortgage**

**Examination Procedures**                                      **Servicing**

## Module 5 – Credit Reporting

Examiners should obtain a sample of loan servicing records. For the loans in the sample, compare the information in the servicer's system of record with the information reported to the credit reporting agencies. If consumer complaints or document review indicates potential FCRA violations, examiners also may conduct interviews of consumers from the sample.

## FCRA Furnisher Requirements

1. Assess compliance with FCRA Furnisher Requirements. Please refer to the FCRA examination procedures, 12 CFR 1022.40-43, for more information.

   **[Click&type]**

**CFPB**                                                    **Mortgage**

**Examination Procedures**                                 **Servicing**

## Module 6 – Information Sharing and Privacy

### Privacy Notices

1. Assess compliance with Privacy of Consumer Financial Information Regulation that implements the GLBA. Please refer to the GLBA examination procedures, 12 CFR 1016.4 and 1016.5, for more information.

   **[Click&type]**

### Information Sharing With Affiliates

2. Assess compliance with the FCRA Affiliate Marketing Rule. Please refer to the FCRA examination procedures, 12 CFR 1022.21, for more information.

   **[Click&type]**

# CFPB
# Examination Procedures

# Mortgage
# Servicing

## Module 7 – Collections and Accounts in Bankruptcy

Examiners should obtain a sample of servicing records of customers in default, including a sufficient number of loans in which the consumer has filed for bankruptcy, to assess collection practices. Examiners should obtain collection call records and listen to a sample of collection calls. If consumer complaints or document review indicates potential violations in these areas, examiners also may conduct interviews of consumers from the sample and ask questions relevant to each topic area below. In connection with these steps, examiners should evaluate the following.

Under the FDCPA, a "debt collector" is defined as any person who regularly collects, or attempts to collect, consumer debts for another person or institution or uses some name other than its own when collecting its own consumer debts, with certain exceptions. The definition includes, for example, an institution that regularly collects debts for an unrelated institution.

The debt collector definition has an exception that frequently applies to mortgage servicing: an institution is not a debt collector under the FDCPA when it collects debts that were **not** in default when they were obtained by the servicer.[5] Thus, a servicer that purchases the servicing rights for a portfolio of loans will be a debt collector only for loans that were in "default" at the time of the purchase.[6]

Examiners should obtain a sample of collection call records and assess whether collectors complied with the requirements listed in the FDCPA procedures. Examiners should also listen on a sample of collection calls.

## FDCPA

1. Assess compliance with FDCPA. Please refer to the FDCPA examination procedures for more information.

   **[Click&type]**

## Other Risks to Consumers

2. Determine whether the servicer contacts borrowers in an appropriate manner:

   a. Employees and third-party contractors clearly indicate to consumers that they are calling about the collection of a debt.

   b. Employees and third-party contractors do not disclose the existence of a consumer's debt to the public without the consent of the consumer, except as permitted by law.

---

[5] 15 U.S.C. 1692a (6)(F)(iii).

[6] The FDCPA itself does not contain a definition of the term "default." The standard mortgage note states that the debt is in default if the payment is even one day late.

**CFPB**                                                                    **Mortgage**

**Examination Procedures**                                        **Servicing**

     c.  The entity has policies on avoiding repeated telephone calls to consumers that annoy, abuse, or harass any person at the number called.

**[Click&type]**

3.  Determine whether the servicer's representatives make misrepresentations or use deceptive means to collect debts.

**[Click&type]**

4.  Determine whether collections staff transfer borrowers to loss mitigation staff, in accordance with the institution's policies and procedures, to discuss loss mitigation alternatives.

**[Click&type]**

## Bankruptcy

### Other Risks to Consumers

5.  If the servicer does not perform an annual escrow analysis because of the bankruptcy, determine whether the borrower is notified of any escrow account deficiency or shortage.

**[Click&type]**

6.  For customers who have filed for bankruptcy, determine whether the servicer provides notice of fees or other amounts charged to the account to the debtor, the bankruptcy trustee, or the court during the pendency of the bankruptcy case.

**[Click&type]**

7.  Determine whether payments received from a bankruptcy trustee are properly applied to the customer's account.

**[Click&type]**

# Module 8 – Loss Mitigation

Examiners should obtain a sample of servicing records of customers who are delinquent or at imminent risk of default to assess loss mitigation activity. If consumer complaints or document review indicates potential concerns in these areas, examiners also may conduct interviews of consumers from the sample who sought loss mitigation in the prior year and ask questions relevant to each topic area below.

## ECOA

### Disparate Treatment in Loss Mitigation

As discussed above, examiners should obtain a sample of servicing records of customers in default or at imminent risk of default to assess loss mitigation activity. While conducting the review of the servicer's loss mitigation activities discussed above, examiners must be mindful of activities that may indicate disparate treatment of consumers in violation of the ECOA on the bases of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

Examiners should:

1. Determine whether the file documents indicate that decisions were made based upon any protected status.

   **[Click&type]**

2. Determine whether there were clear policies and procedures for making loss mitigation decisions or whether there was broad employee discretion. If employees have discretion, determine whether the procedures, controls, and monitoring that govern the exercise of discretion are adequate.

   **[Click&type]**

3. Assess policies and procedures for assessing fees, with a specific focus on discretion.

   **[Click&type]**

4. Determine whether there were adequate processes and controls for policy exceptions and adequate documentation of decisions.

   **[Click&type]**

5. Review complaints of discrimination and litigation alleging discrimination.

   **[Click&type]**

6. Review any internal fair lending audits or reports.

   **[Click&type]**

# CFPB
# Examination Procedures

# Mortgage
# Servicing

## Disparate Impact in Loss Mitigation

An examination of whether a servicer's loss mitigation program results in adverse impact on the basis of a protected class will rely on procedures outlined in the CFPB's ECOA Examination Program Manual and the Interagency Fair Lending Examination Procedures (IFLEP).

Examiners, in consultation with Headquarters, should:

7. Obtain information sufficient to determine whether loss mitigation workouts have been provided to consumers in compliance with ECOA and Regulation B. For example, this may involve an analysis of the distribution of protected class members in the pool of delinquent borrowers versus the distribution of protected class members receiving a range of loss mitigation outcomes, including: reinstatement, repayment plan, forbearance, loan modification, short sale, deed-in-lieu, and foreclosure.

   **[Click&type]**

8. Obtain information sufficient to determine whether loan modifications have been provided in compliance with ECOA and Regulation B. For example, this may involve an analysis of processing times and loan modification attributes including interest rate, principal, and monthly payment reductions for protected class members when compared to non-protected class members.

   **[Click&type]**

9. Obtain information sufficient to determine whether the rate and timing of foreclosures are in compliance with ECOA and Regulation B. For example, this may include analysis of the representation of protected classes in the group of seriously delinquent borrowers versus their representation among borrowers who lose their homes to foreclosure.

   **[Click&type]**

To complete a disparate impact analysis of a servicer's loss mitigation program, and determine whether a facially neutral policy or practice that has an adverse effect on a protected class meets a legitimate business need that cannot reasonably be achieved by a less discriminatory alternative, refer to Section B of the CFPB's Fair Lending Examination Procedures and consult with Headquarters.

**CFPB**

**Examination Procedures**

**Mortgage**

**Servicing**

## Other Risks to Consumers

### Application Process

10. Determine whether information provided to consumers about loss mitigation alternatives is clear, prominent, and readily understandable.

   **[Click&type]**

11. Determine whether the servicer is providing military homeowners who have informed the servicer that they have received military Permanent Change of Station orders with accurate, clear, and readily understandable information about available assistance options for which the consumer may qualify.

   **[Click&type]**

12. Determine whether the servicer advises customers to stop payments in order to qualify for loss mitigation relief.

   **[Click&type]**

13. Determine whether the servicer is providing customers with accurate information throughout the loss mitigation process.

   If there are consumer complaints or other indications that the servicer is not providing customers with accurate information throughout the process, evaluate the servicer's practices in the following areas:

   a. Determine whether the servicer provides adequate methods for consumers to contact it for information about the loss mitigation process, and timely responds to those contacts.

   **[Click&type]**

   b. Determine whether the servicer adequately documents its contacts with consumers regarding loss mitigation. Appropriate documentation of oral contacts includes the dates of communications, names of contact person(s), and a summary of the conversation.

   **[Click&type]**

   c. If the servicer represents to consumers that it is accessible for intake of loss mitigation requests, including if it represents that it has a "single point of contact" system in place, evaluate whether consumers can readily access the servicer's representatives and obtain complete responses.

   **[Click&type]**

   d. Determine whether the servicer has procedures in place to ensure all paperwork is collected and tracked in an efficient and reliable manner.

   **[Click&type]**

# CFPB
# Examination Procedures

# Mortgage
# Servicing

e. Determine whether the servicer is providing customers with timely information on the status of loan modifications and other foreclosure alternatives.

**[Click&type]**

f. Determine whether the servicer is accurately applying its procedures for evaluating customers for foreclosure alternatives, including compliance with Home Affordable Modification Program requirements, if applicable.

**[Click&type]**

g. Determine whether any collection contacts occurring during the loss mitigation process acknowledge the loss mitigation process and avoid UDAAPs. In particular, determine whether collections staff transfer borrowers to loss mitigation staff, in accordance with the institution's policies and procedures, to discuss loss mitigation alternatives.

**[Click&type]**

h. If the servicer denies the customer's application for loan modification, determine whether it provides the customer with timely notice of rejection as well as the rationale and any other options that may be available to the consumer.

**[Click&type]**

i. Evaluate the servicer's training programs for employees involved in the loan modification process.

**[Click&type]**

14. Determine whether the servicer discloses all fees associated with modifications in a timely, prominent, and understandable manner.

**[Click&type]**

## Consequences of Loss Mitigation

15. Determine whether the servicer discloses any rescheduling of payments that may occur under an existing obligation in a clear, prominent, and understandable manner.

**[Click&type]**

16. Determine whether the servicer discloses any negative consequences that may occur as a result of the borrower's failing to make payments during the loss mitigation process.

**[Click&type]**

17. Determine whether the servicer discloses any material negative consequences that may occur as a result of a completed loan modification (e.g., decreased credit score, income tax implications if principal reduction is offered, and any increase in monthly payment amount).

**[Click&type]**

# CFPB
# Examination Procedures

# Mortgage
# Servicing

18. Determine whether the servicer discloses future changes in the modified loan terms (e.g., with respect to any principal forbearance or temporary interest rate reductions).

   **[Click&type]**

19. Determine whether the servicer asks consumers to waive their legal rights under the Servicemembers Civil Relief Act or any other law as a prerequisite to the servicer either providing information to the consumer about available options or evaluating the consumer's eligibility for assistance.

   **[Click&type]**

20. Determine if the servicer includes any waiver of legal rights in its loan modification or other foreclosure alternative agreements.

   **[Click&type]**

## Short Sales

21. If the servicer is offering short sales as a loss mitigation tool, determine whether it provides clear, timely disclosures to the customer about the process.

   **[Click&type]**

22. If the servicer demands deficiency payments upon agreeing to a short sale to recoup any principal not recovered through the short sale, determine whether the servicer discloses in a clear, prominent, and understandable manner that it or an investor will demand a deficiency payment or related cash contribution and the approximate amount of that deficiency.

   **[Click&type]**

## Deeds-In-Lieu of Foreclosures

23. If the servicer offers deeds-in-lieu of foreclosures, determine whether it provides clear, timely disclosures about requirements and cost to the customer.

   **[Click&type]**

**CFPB**                                    **Mortgage**

**Examination Procedures**                  **Servicing**

## Module 9 – Foreclosures

Examiners should obtain a sample of servicing records of consumers whose loans have been referred to foreclosure. For the loans in the sample, examiners should focus on whether the consumer is in fact in default and whether all amounts due are correct. Examiners should review amounts set forth in foreclosure affidavits, compare them to amounts recorded in the servicer's primary computer system, and compare them to all statements made in communications from the borrower, including consumer complaints. Examiners also should review all complaints of consumers whose loans were referred to foreclosure in the prior year. In reviewing foreclosure practices, examiners should focus on the following areas:

### ECOA

1. See above, Module 8. Examiners should collect information sufficient to determine whether there has been disparate treatment discrimination in violation of the ECOA and Regulation B in the servicer's foreclosure processing as part of the file review. Examiners should work with OFLEO to determine whether there has been disparate impact discrimination in foreclosure processing as part of the loss mitigation data analysis discussed above.

   **[Click&type]**

## Other Risks to Consumers

### Referrals to Foreclosure

2. Evaluate the servicer's process for determining whether to refer a loan to foreclosure. Determine whether the servicer has reviewed adequate information to confirm the borrower's default, including the borrower's loan history, notes in the servicing system regarding borrower communications, whether the borrower is entitled to protection from foreclosure under applicable law, and any complaints lodged with the servicer.

   **[Click&type]**

3. Determine whether the servicer has referred to foreclosure, or foreclosed upon, any customer who is current or not seriously delinquent.

   **[Click&type]**

**CFPB**                                                          **Mortgage**

**Examination Procedures**                        **Servicing**

### Dual Tracking

4. Determine whether the servicer has foreclosed on any customers paying on a trial modification agreement, permanent modification agreement, forbearance agreement, or other similar agreement.

   **[Click&type]**

5. Determine whether the servicer has foreclosed on any customer with whom the servicer had agreed to a modification agreement, forbearance agreement, or other similar agreement, but the first payment was not yet due.

   **[Click&type]**

6. Determine whether the servicer has proceeded with foreclosure without giving customers an adequate opportunity for consideration for a foreclosure alternative, or has foreclosed on any customer who has a modification or forbearance agreement request pending.

   **[Click&type]**

### Accuracy of Filings

7. Determine whether the factual assertions made in foreclosure documents filed by or on behalf of the financial institution are accurate and adequately supported by file documentation. Examiners should focus on whether the borrower is in default and statements regarding amounts owed.

   **[Click&type]**

8. Determine whether affiants have reviewed adequate information to confirm the right to foreclose, including required ownership documentation.

   **[Click&type]**

9. Determine under what circumstances the servicer files a lost note affidavit instead of filing the note in a foreclosure action.

   **[Click&type]**

### Walkaways

10. Evaluate the servicer's process for informing consumers about changes in the foreclosure process, including decisions not to go forward.

    **[Click&type]**

# GLOSSARY

**BPOs:** broker price opinions, which provide estimates of the property value.

**Consumer Reporting Agency:** a person which, for monetary fees, dues, or on a cooperative non-profit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

**Daily Simple Interest Loan:** any loan on which interest is calculated based on a daily accrual or daily interest method. For these loans, if a consumer pays before the payment due date, the amount of interest paid should decrease. If a consumer pays after the due date, the amount of interest paid should increase.

**Deed in Lieu of Foreclosure:** a foreclosure alternative in which the consumer voluntarily transfers the property title to the servicer in exchange for cancellation of the remainder of the debt.

**Escrow Account:** an account the servicer maintains to pay property taxes and insurance on behalf of the borrower.

**Forbearance:** a foreclosure alternative in which the servicer reduces or suspends the customer's mortgage payments for an agreed period of time. At the end of that time, the consumer resumes making the regular payments as well as a lump sum payment or additional monthly payments to bring the loan current. Forbearance may be an option if the consumer's income is reduced temporarily and the mortgage is affordable.

**Force-Placed Insurance:** an insurance policy taken out by a lender or creditor when it determines that a customer has breached the mortgage contract by failing to carry appropriate insurance on the home that is collateral for the mortgage.

**Foreclosure Trustee:** an individual or company chosen to administer the assets of the beneficiary and facilitate the foreclosure process.

# CFPB
# Examination Procedures

# Mortgage
# Servicing

**HAMP:** The Home Affordable Modification Program (HAMP) is a temporary government program encouraging certain loan modifications. HAMP modifications lower consumer's mortgage payment to 31 percent of verified monthly gross income.

A consumer is eligible to apply for a HAMP modification if he: (a) occupies the house as his primary residence; (b) obtained the mortgage on or before January 1, 2009; (c) has a mortgage payment that is more than 31 percent of monthly gross income; (d) owes up to $729,750 on the home; (e) has a financial hardship and is either delinquent or in danger of falling behind; (f) has sufficient, documented income to support the modified payment; and (g) has not been convicted within the last ten years of felony larceny, theft, fraud or forgery, money laundering or tax evasion, in connection with a mortgage or real estate transaction.

The list of servicers participating in HAMP is available at http://www.makinghomeaffordable.gov/get-assistance/contact-mortgage/Pages/default.aspx.

**Loan Instruments:** the promissory note and the security instrument that detail the rights and obligations of the parties.

**Loan Modification:** a foreclosure alternative in which the servicer changes one or more of the terms of the mortgage contract, typically to lower the monthly payments. Modifications may include reducing the interest rate, extending the term of the loan, or adding missed payments to the loan balance. A modification also may involve reducing the amount of money the consumer owes by forgiving a portion of the mortgage debt, which is known as "principal forgiveness."

**Loss Mitigation:** a process for considering alternatives to foreclosure when customers fall behind on their mortgage payments or are at risk of default.

**PITI Payment:** principal, interest, taxes, and insurance payment

**Promissory Note:** a document that evidences the debt and the promise to repay.

**Property Inspection Fees:** fees for inspections of the property so that the servicer can make sure that it is occupied and not abandoned.

**Property Preservation Fees:** fees for services purchased to maintain the property in good condition and typically include lawn mowing, winterizing, and making repairs.

**Proprietary Loan Modifications:** loan modifications other than HAMP modifications. The eligibility requirements and structure of these modifications depend on the servicer and the investor that owns the particular loan.

**Reinstatement:** a process by which, after going into default, the customer pays the loan servicer the entire past-due amount, plus any late fees or penalties, by an agreed date. This option may be appropriate if the consumer's problem paying the mortgage is temporary.

**Repayment Plan:** a foreclosure alternative in which the servicer allows the customer a fixed amount of time to repay the amount he is behind by adding a portion of what is past due to the

**CFPB**                                            **Mortgage**
**Examination Procedures**                          **Servicing**

regular payment. This option may be appropriate if the consumer has missed a small number of payments and can afford the mortgage.

**Security Instrument:** a document that evidences the lien on the property. Depending on the state, the security instrument is called either a deed of trust or mortgage deed.

**Short Sale:** a foreclosure alternative in which the servicer allows the consumer to sell the home for less than the mortgage balance before it forecloses on the property and may agree to forgive any shortfall between the sale price and the mortgage balance.

**Suspense Account:** an account holding funds that are earmarked for — but not immediately credited to — the consumer's loan account. Also called an unapplied funds account.

**Uniform Instruments**: form instruments developed by Fannie Mae and Freddie Mac that are used to document the large majority of mortgage loans.

# CFPB
# Examination Procedures

# Short-Term,
# Small-Dollar Lending

## Short-Term, Small-Dollar Lending

### Commonly Known as Payday Lending

| | |
|---|---|
| Exam Date: | [Click&type] |
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

These examination procedures apply to the short-term, small-dollar credit market, commonly known as payday lending. The procedures are comprised of modules covering a payday loan's lifecycle, and each module identifies relevant matters for review. Prior to using the procedures, however, examiners should complete a risk assessment and examination scope memorandum. Depending on the scope, and in conjunction with the compliance management system and consumer complaint response review procedures, each examination will cover one or more of the following modules:

1. Marketing
2. Application and Origination
3. Payment Processing and Sustained Use
4. Collections, Accounts in Default, and Consumer Reporting
5. Service Provider Relationships

## Examination Objectives

In consultation with headquarters:

1. To assess the quality of the regulated entity's compliance risk management systems, including its internal controls and policies, for its payday lending business.

2. To identify acts or practices that materially increase the risk of violations of federal consumer financial laws in connection with payday lending.

3. To gather facts that help to determine whether a regulated entity engages in acts or practices that violate the requirements of federal consumer financial laws.

4. To determine if a violation of a federal consumer financial law has occurred and whether supervisory or enforcement actions are appropriate.

# CFPB                                                      Short-Term,
# Examination Procedures      Small-Dollar Lending

## Background

Lenders typically market payday loans to consumers as a means of bridging a cash-flow shortage between pay or benefits checks. Payday loans generally have three features: the loans are small-dollar; borrowers must repay loan proceeds quickly (i.e., they are short-term); and they require that a borrower give lenders access to repayment through a claim on the borrower's deposit account.

Other loan features vary. Although often structured to pay off in one balloon payment, installment payments and interest-only payments are not unusual. Loans may be open-end or closed-end, and although loans are commonly issued for terms under one month, others may have terms for as long as six months. Loans may be disbursed in cash, on a prepaid card, through the Automated Clearing House ("ACH") network, or by check.

Most loans are for several hundred dollars and have finance charges of $15 to $20 per each $100 borrowed. For the two-week term typical of a payday loan, these fees equate to an Annual Percentage Rate ("APR") ranging from 391 percent to 521 percent. Loan amounts and finance charges can vary due to factors including differences in state law.

Although lenders sometimes access third-party data about their customers, lenders generally do not underwrite their applicants using traditional credit criteria. Because consumers provide lenders with access to their bank accounts in advance — through, for example, a personal check in the amount of the outstanding balance (i.e., loan amount and finance charge) owed — consumers typically need only a regular source of income and a checking account in good standing to qualify.

If the consumer does not repay the loan in full by the due date, the loan agreement typically permits the lender to deposit the consumer's check to obtain payment. In the case of a web-originated loan, the loan agreement typically preauthorizes repayment through an electronic debit transaction (such as an ACH transaction). Store-front lenders may use ACH transactions as well.

Some banks market a payday loan variant they call an "advance" — a direct deposit advance, an early access advance, a ready advance, or a checking account advance[1]. A typical credit line is $500 and costs $10 per $100 borrowed. To qualify for an advance, a consumer must have a deposit account with the bank or credit union offering the advance and a recurring direct deposit of funds into that deposit account. The loan and accompanying fee generally must be repaid through the consumer's next direct deposit of funds or within 35 days of the extension of credit. Once repaid, the line is replenished, and consumers are able to obtain additional funds without further application.

---

[1] For clarity, this product is neither an overdraft line of credit nor an overdraft service. An overdraft service means a service under which a financial institution assesses a fee or charge on a consumer's account held by the institution for paying a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account.

# CFPB                                          Short-Term,
# Examination Procedures    Small-Dollar Lending

Regardless of the channel used by lenders to conduct business — whether through a lead generator, online, through a brick and mortar location, by mail, or by telephone — the following federal consumer financial laws and regulations apply to payday loans:

- The Truth in Lending Act (TILA) and its implementing regulation, Regulation Z, require lenders to disclose loan terms and Annual Percentage Rates. Regulation Z also requires lenders to provide advertising disclosures, credit payments properly, process credit balances in accordance with its requirements, and provide periodic disclosures. Note that the requirements for open-end and closed-end loans differ.

- The Electronic Fund Transfer Act (EFTA) and its implementing regulation, Regulation E, protect consumers engaging in electronic fund transfers. Among other things, Regulation E prohibits lenders from requiring, as a condition of loan approval, a customer's authorization for loan repayment through a recurring electronic funds transfer (EFT), except in limited circumstances.

- The Fair Debt Collection Practices Act (FDCPA) governs collection activities conducted by: (1) third-party collection agencies collecting on behalf of lenders; (2) lenders collecting their own debt using an assumed name, to suggest that a third person is collecting or attempting to collect such debt; and (3) any collection agency that acquires the debt if the collector acquired the debt when it already was in default.

- The Fair Credit Reporting Act (FCRA) and its implementing regulations require that furnishers of information to consumer reporting agencies ensure the accuracy of data placed in the consumer reporting system. Additionally, the FCRA prohibits the use of consumer reports for impermissible purposes, and it requires users of consumer reports to provide certain disclosures to consumers. The FCRA also limits certain information sharing between affiliated companies. Examiners should note that the FCRA's implementing regulations may differ for depository and non-depository institutions.

- The Gramm-Leach-Bliley Act (GLBA) and its implementing regulations prevent financial institutions from impermissibly sharing a consumer's nonpublic personal information with third parties, and it requires that financial institutions disclose their privacy policies. Examiners should note that the GLBA's implementing regulations may differ for depository and non-depository institutions.

- The Equal Credit Opportunity Act (ECOA) and its implementing regulation, Regulation B, set forth requirements for accepting applications and providing notice of any adverse action, and they prohibit discrimination against any borrower with respect to any aspect of a credit transaction:

  o On the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

  o Because all or part of the applicant's income derives from any public assistance program; or

---

**CFPB**                                                    **Short-Term,**

**Examination Procedures    Small-Dollar Lending**

o Because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

To carry out the objectives set forth in the Examination Objectives section, examiners also should assess other consumer risks, including potentially unfair, deceptive, or abusive acts or practices (UDAAPs) with respect to lenders' interactions with consumers. The standards the CFPB will use in assessing UDAAPs are:

o A representation, omission, act, or practice is deceptive when:

   (1) the representation, omission, act, or practice misleads or is likely to mislead the consumer;

   (2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

   (3) the misleading representation, omission, act, practice is material.

o An act or practice is unfair when:

   (1) it causes or is likely to cause substantial injury to consumers;

   (2) the injury is not reasonably avoidable by consumers; and

   (3) the injury is not outweighed by countervailing benefits to consumers or to competition.

o An abusive act or practice:

   (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

   (2) takes unreasonable advantage of –

      ▪ a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

      ▪ the inability of the consumer to protect its interests in selecting or using a consumer financial product or service; or

      ▪ the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

Refer to the examination procedures regarding UDAAPs for more information about the legal standards and the CFPB's approach to examining for UDAAPs. The particular facts and circumstances in a case are crucial to the determination of UDAAPs. Examiners should consult with headquarters to determine whether the applicable legal standards have been met before a UDAAP violation is cited.

**CFPB**                                              **Short-Term,**

**Examination Procedures     Small-Dollar Lending**

## General Considerations

Completing the following examination modules will allow examiners to develop a thorough understanding of lenders' practices and operations. To complete the modules, examiners should obtain and review the following as applicable: organizational charts and process flowcharts; board minutes, annual reports, or the equivalent to the extent available; relevant management reporting, including aggregate loan data to the extent available; policies and procedures; price structure; loan applications, loan account documentation, telephone recordings, notes, and disclosures; operating checklists, worksheets, and review documents; relevant computer program and system details; historical examination information; audit and compliance reports; training programs and materials; service provider contracts; advertisements, marketing research, and website information; and complaints.

Depending on the scope of the examination, examiners should perform transaction testing using approved sampling procedures, which may require use of a judgmental or statistical sample. Examiners should also conduct interviews with management and staff to determine whether they understand and consistently follow the policies, procedures, and regulatory requirements applicable to payday lending; manage change appropriately; and implement effective controls. In consultation with headquarters, examiners may also consider using customer surveys.

| CFPB | Short-Term, |
|---|---|
| **Examination Procedures** | **Small-Dollar Lending** |

# Module 1 – Marketing

Examiners should develop a detailed understanding of the lender's marketing program to determine whether its marketing policies, procedures, and practices are consistent with the requirements of applicable federal consumer financial laws and regulations.

- Identify a lender's marketing targets and its methods for reaching those targets.

- Evaluate the lender's advertising materials and disclosures across all media, including: print, television, radio, telephone solicitation scripts, and electronic media including the Internet, email, and text messages. The evaluation should include a review of advertising materials provided in languages other than English, the media used to distribute those materials, and a comparison to English language materials and media.

- Identify the practices and product features that are rewarded by any incentive compensation programs.

- Determine whether a lender employs or acts as a lead generator and the extent of any relationships that the lender has with affiliated or other third parties (e.g., as a broker or agent) to advertise, offer, or provide loans or other products and services.

## Advertising Requirements

### Truth in Lending Act/Regulation Z

1. Determine whether the loans being offered are closed end or open end.

2. Determine whether the lender's advertisements are consistent with the requirements of Regulation Z. Examiners should conduct the advertising review by following the open-end and closed-end advertising procedures in the TILA examination procedures, as applicable, focusing carefully on whether advertisements contain triggering terms and include required statements, information, and disclosures.

### Equal Credit Opportunity Act/Regulation B

1. Assess how the lender reaches its potential customers through its statements, advertising, or other marketing representations. Examiners should review:

   a. Marketing and advertising materials, including signs or other displays and prescreened solicitations;

   b. The criteria used to determine the potential recipients of the particular solicitation;

   c. Any scripts and interview forms used for sales and taking applications; and

   d. Product information used in discussing available types of credit with applicants.

# CFPB
## Examination Procedures

# Short-Term,
## Small-Dollar Lending

**Other Risks to Consumers**

1. Assess whether the lender clearly and prominently discloses the material terms of the payday loan.

2. Determine whether the promotional materials clearly and prominently disclose any material limitations, conditions, or restrictions on the offer. This is of particular importance when the lender uses terms such as "rewards," "discounts," or "free."

3. Assess (i) whether the lender clearly and prominently discloses the costs and any other material terms for any additional products marketed to the consumer (e.g., pre-paid debit card or credit insurance) in connection with the payday loan; and, (ii) whether the lender clearly and prominently discloses that the additional products are or are not required to obtain credit and are or are not considered in decisions to grant credit. If the cross-marketed product is mandatory, under the TILA, it may need to be disclosed in the APR. Refer to the TILA examination procedures for additional detail.

4. Determine whether the lender reviews or monitors recorded telephone calls, transcripts of online communication, and websites to ensure that advertising and solicitations comply with applicable federal consumer financial laws.

## Compensation Practices

Evaluate compensation practices and programs. If the lender offers an incentive compensation program, identify the products, product features, services, referrals, and sales goals or behaviors that qualify for rewards under the program. Evaluate the quality and impact of controls on the compensation program. Finally, in consultation with headquarters, assess whether the program incentivizes behaviors or practices that result in heightened risk to consumers.

## Lead Generation

Lenders both employ and are employed as lead generators, which are businesses that identify potential borrowers for lenders. A lead generator typically charges lenders for its services and, in some cases, may charge borrowers as well. Some lenders operate as lead generators when they are unable to originate a particular loan — when, for example, they are not licensed to originate loans in a particular state. In these instances, the lead generator will contract with another lender that is able to make the loan.

When examining lenders, examiners should:

1. Identify whether the lender is, or uses, a lead generator and, as applicable, review the advertising materials of:

   a. Lead generators or brokers employed by the lender.

   b. The lender, in its capacity of lead generator or broker.

# CFPB                                          Short-Term,
# Examination Procedures    Small-Dollar Lending

2. Determine whether the nature of the relationship between the parties is clearly disclosed, including whether the lead generator or broker represents to consumers that it is working on behalf of third-party organizations and whether the new lender is identified when referred to another party.

3. Determine whether the statements and representations made by a company on another's behalf are accurate and non-deceptive.

4. Determine whether all fees for referred services are appropriately disclosed to consumers.

To the extent set forth in the scoping memorandum, examiners should further evaluate any service provider relationships under the provisions of the vendor management, privacy, and information sharing sections in the Service Provider Relationships Module.

**CFPB**                                                          **Short-Term,**
**Examination Procedures**       **Small-Dollar Lending**

## Module 2 – Application and Origination

When lenders take applications, evaluate applicants, and originate payday loans, they are subject to the disclosure and other legal requirements discussed below. Examiners should identify acts, practices, or materials that indicate potential violations of federal consumer financial laws and regulations.

## Equal Credit Opportunity Act/Regulation B

Examiners should use the CFPB's ECOA examination procedures to assess the lender's compliance with requirements for taking applications, evaluating customer qualifications, providing disclosures (i.e., adverse action), and extending and denying credit.

## Fair Credit Reporting Act

As noted previously, lenders typically do not access traditional credit reporting agency data. However, alternative third-party data providers may be consumer reporting agencies, as defined by the FCRA. Lenders that obtain information from a consumer reporting agency to determine a consumer's credit worthiness must comply with the requirements of FCRA. When a lender does not offer a loan or provides a loan on materially less favorable terms to a consumer (e.g., charging a higher interest rate) because of the consumer report information it obtains, the lender must provide appropriate adverse action or risk-based pricing notices to the consumer. Examiners should refer to the CFPB's FCRA examination procedures for additional information.

## Truth In Lending Act/Regulation Z

1. Determine whether the loans being offered are closed-end or open-end.

2. Determine whether the appropriate disclosures required for the loan type (i.e., disclosures for closed-end credit vs. open-end credit) are being provided by the lender. Examiners should use the TILA/Regulation Z examination procedures to evaluate the lender's compliance with the open- and closed-end disclosure requirements of Regulation Z, as may be applicable depending on the products offered by the lender.

3. Examine the loan product to verify that the product being offered conforms to the lender's representations or to determine if the lender has mischaracterized or misclassified its product and therefore is not complying with the proper set of requirements (e.g., the lender characterizes its loan product as closed-end where the product in fact is open-end, and the lender should be complying with TILA/Regulation Z's requirements for open-end credit).

4. For refinanced loans, determine whether the appropriate disclosures are being provided by the lender.

# CFPB
# Examination Procedures

# Short-Term,
# Small-Dollar Lending

## Electronic Fund Transfer Act/Regulation E

Depending on how the lender transfers funds to and from consumers, the lender may be required to comply with the requirements of the EFTA. If the lender has established electronic fund transfers from the borrower's account, examiners should use the CFPB's EFTA examination procedures to review the extent to which the lender is complying with the EFTA.

1. Determine if the agreement contemplates or involves initiating an electronic fund transfer subject to EFTA/Regulation E ("EFT"). Consider if the lender is using methods subject to EFTA or using remotely-created checks or other non-EFT methods, which are not subject to EFTA.

2. Determine whether the EFT is a single or a recurring EFT that is a preauthorized electronic transfer. To qualify as a preauthorized electronic fund transfer, the transfer is one that is authorized in advance to recur at substantially regular intervals.

3. If the lender initiates preauthorized EFTs, assess the lender's or financial institution's compliance with the applicable advance authorization, disclosures, and other requirements relating to preauthorized electronic fund transfers under the EFTA and Regulation E.

   a. Does the lender obtain proper written authorization for preauthorized electronic fund transfers from a consumer's account and provide a copy of the authorization to the consumer?

   b. Does the lender require compulsory use of EFTs and condition the extension of credit to consumers on the repayment of loans by preauthorized electronic debits?

      i. Examine the agreement for terms requiring that the borrower agree to electronic payment. Such terms may violate the EFTA's prohibition on requiring repayment by means of preauthorized electronic fund transfers as a condition of the extension of credit, except as authorized.

      ii. Determine if the lender offers the borrower an option to pay using a non-EFT method of payment.

   c. Will the preauthorized transfers vary in amount? If so, does the payee or financial institution, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with applicable regulations, of the amount to be transferred and the scheduled date of transfer?

4. If the loan agreement provides for a single or one-time EFT, assess whether the lender obtained authorization from the consumer to initiate an EFT.

# CFPB                                                 Short-Term,
# Examination Procedures    Small-Dollar Lending

## Other Risks to Consumers

1. Determine whether, in the application and origination process, the lender makes statements, representations, or claims, or provides information to consumers that may mislead the consumer regarding the cost, value, availability, cost savings, benefits, or terms of the product or service.

2. Determine whether the lender accurately and non-deceptively represents the amount of potential, approved, or useable credit that the consumer will receive.

3. Determine whether the lender clearly and prominently discloses its funds disbursement practices, including:

   a. Whether the lender clearly and prominently discloses all fees that the borrower might incur to gain access to loan funds. For example:

      i.   If the lender disburses funds by check, does the lender disclose its check cashing fee?

      ii.  If the lender disburses funds by prepaid debit card, does it disclose its ATM access fee?

4. Determine whether the lender offers additional products or services, either related or unrelated to the payday loan in connection with the payday loan. If yes:

   a. Determine whether the lender clearly and prominently discloses material terms of the optional product or service, including costs.

   b. Determine whether the lender receives and documents the consumer's express authorization prior to adding optional products or services to the payday loan.

   c. Review to ensure authorizations were provided and documented. Review methods of obtaining authorization to ensure that customer affirmatively selects product.

5. Determine whether the lender discloses its repayment and collection practices.

6. Determine whether the lender clearly and prominently discloses the consumer's rights regarding payment methods.

7. In assessing application risks to consumers, examiners may find evidence of violations of – or an absence of compliance policies and procedures with respect to – other laws applicable to payday lending, such as the Military Lending Act. In these circumstances, examiners should identify such matters for possible referral to federal or state regulators or other appropriate action.

# Module 3 – Payment Processing and Sustained Use

As set forth in the examination scope memorandum, examiners should review a sample of customer accounts for the following issues:

## Truth In Lending Act/Regulation Z

1. Determine whether the loans being offered are closed-end or open-end.

2. Assess compliance, as applicable, with the open- or closed-end TILA requirements for payment processing, billing errors and inquiries, credit balances larger than $1, and periodic statements.

## Electronic Fund Transfer Act/Regulation E

1. Determine whether the lender is complying with the appropriate disclosure requirements if the lender is converting check payments from borrowers to electronic fund transfers.

2. Determine whether the lender is complying with the appropriate disclosure requirements if the lender is collecting returned item fees by electronic fund transfer.

## Sustained Use

When a borrower cannot repay a loan by its due date, lenders may allow the borrower to modify or "roll over" the loan by paying an additional fee to extend the loan term. A lender may also engage in a transaction in which a borrower uses the proceeds from a new loan to satisfy and pay off an older loan. If these transaction types are prohibited by state law, a borrower may be asked to repay one loan before opening a new loan. This is often called a back-to-back transaction. All of these borrowing patterns may constitute sustained use. Note that in some instances, lenders may allow borrowers to convert a balloon payment into an installment plan.

Examiners first should determine whether the lender offers any of the above options. If yes, then:

1. Determine whether the lender represents accurately and non-deceptively the payment options that will be available to borrowers.

2. Determine whether the lender provides borrowers with all available repayment options offered by the lender.

3. Determine whether the lender discloses clearly and prominently all fees and material terms associated with the sustained use transactions.

4. Determine whether the lender has policies and procedures related to sustained use of the loan product and whether the lender is adhering to its policies.

5. If a sequential transaction is considered a refinance, determine whether the lender provides loan disclosures as required by Regulation Z.

# CFPB                                    Short-Term,
# Examination Procedures    Small-Dollar Lending

6.  If a consumer's request for new terms is an application as defined by Regulation B, determine whether the lender's practices are consistent with the application and disclosure requirements of Regulation B. Refer to the ECOA examination procedures for additional information.

7.  Determine whether the lender monitors or limits a borrower's usage of payday loans on an ongoing basis.

8.  Determine whether the lender assesses income or other financial information to determine an applicant's ability to repay a loan without modifying or refinancing the loan.

## Other Risks to Consumers

1.  Determine whether payments are applied properly.

2.  Determine whether the lender informs consumers in a clear and timely manner about fees, penalties, or other charges that have been imposed and the reasons for their imposition.

| CFPB | Short-Term, |
|------|-------------|
| **Examination Procedures** | **Small-Dollar Lending** |

## Module 4 – Collections, Accounts in Default, and Consumer Reporting

A lender may collect a payday loan in default by directly engaging in collection activities on its own behalf by assigning collection activity to third parties for a fee; or, by selling defaulted debts to a third party. The FDCPA does not apply to a lender collecting debts on its own behalf and under its own name. Practices that would otherwise violate the FDCPA, however, may be unfair, deceptive, or abusive.

### Fair Debt Collection Practices Act

Assess compliance with the FDCPA when the lender is engaging in debt collection practices (e.g., they have purchased defaulted payday loans from another lender, or are using an assumed name). Refer to the FDCPA examination procedures for additional information.

### Fair Credit Reporting Act

1. Note that, although lenders typically do not obtain a consumer report at the application stage, they may obtain a report for collection purposes. If a lender obtains a consumer report in the collection process, assess the lender's compliance with the FCRA. Refer to the FCRA examination procedures for additional information.

2. Lenders may choose to report information about a borrower to a consumer reporting agency. This may include providing information to a traditional credit bureau, but may also include providing information to another type of consumer reporting company (e.g., check verification firms). Reported information may include the number of outstanding loans, loan balances, and defaulted loan balances. Assess whether lenders maintain written policies and procedures regarding data accuracy, report information accurately, and have procedures in place to ensure that inquiries and complaints concerning reported data are appropriately resolved in accordance with FCRA requirements.

3. Assess compliance with the FCRA's furnisher requirements. Refer to the FCRA examination procedures for more information.

### Other Risks to Consumers

1. Determine whether the lender contacts borrowers in an appropriate manner by assessing whether:

   a. Employees and third-party contractors clearly disclose to consumers that they are contacting the consumer about the collection of a debt.

   b. Employees and third-party contractors do not disclose the existence of a consumer's debt to members of the public without the consent of the consumer, except as permitted by law.

   c. The lender has policies on avoiding repeated telephone calls that abuse or harass any person at the number called.

2. Determine whether the lender makes misrepresentations or uses other deceptive means to collect debts. Determine whether the lender has appropriate controls to prevent such practices.

**CFPB** **Short-Term,**

**Examination Procedures** **Small-Dollar Lending**

# Module 5 – Service Provider Relationships

Lenders sell and buy consumer information. Additionally, lenders often employ and may be employed by third parties to perform services, from marketing and origination to servicing and collection activities. The lender's use of information in these contexts is subject to GLBA and its implementing regulations, which primarily cover the sharing of nonpublic personal information among third parties. GLBA requires financial institutions to disclose their privacy policies to consumers and prohibits them from disclosing nonpublic personal information about a consumer to certain third parties unless the institution satisfies notice and opt-out requirements. GLBA also requires financial institutions to permit customers to opt out of certain sharing practices with unaffiliated entities.

FCRA covers information sharing between affiliates (e.g., any company that controls, is controlled by, or is under common control with another company). Generally, although financial institutions may share customer transaction and experience information with affiliated entities, an affiliated entity may not use that information for marketing purposes unless the consumer is given notice and an opportunity to opt out and the consumer does not opt out.

Moreover, lenders may be responsible for the activities of service providers. Examiners should ensure that such lenders appropriately manage their relationships with service providers. For more information please refer to CFPB Bulletin 2012-03 (April 13, 2012) regarding service providers.[2]

## Gramm-Leach-Bliley Act and Fair Credit Reporting Act Requirements

1. Examiners should assess a lender's compliance with the GLBA examination procedures.

   a. Determine whether the lender's information-sharing practices are consistent with the requirements of the GLBA.

   b. Determine whether the lender accurately and timely discloses its sharing practices to consumers and customers. (For example, a person who applies for a payday loan is a consumer. A person who obtains a payday loan is a customer.)

   c. Determine whether the lender properly manages opt-out requests.

2. Assess compliance with the FCRA's affiliate marketing rule. Refer to the FCRA examination procedures for more information.

---

[2] http://files.consumerfinance.gov/f/201204_cfpb_bulletin_service-providers.pdf

**CFPB**                                              **Short-Term,**

**Examination Procedures     Small-Dollar Lending**

## Vendor Management

Examiners should evaluate copies of any agreements between lenders and service providers acting on behalf of the lender for purposes of assessing risks to consumers.

1. Evaluate whether the lender has compliance management controls for selecting and monitoring affiliates and/or service providers.

2. Evaluate whether the lender takes steps to ensure that the service providers it uses are licensed or registered to the extent required.

3. Evaluate whether the lender performs initial due diligence concerning the service providers' prior regulatory compliance history before entering into an agreement (i.e., determining the existence and extent of any prior enforcement actions against the service providers).

4. Evaluate whether the lender monitors the screening, hiring, and training practices of service providers employees who perform services on the lender's behalf.

5. Evaluate whether the lender takes steps to ensure service providers compliance with the lender's privacy policy with respect to data that the service providers receives from or on behalf of the lender.

6. Evaluate whether the lender reviews the internal or external audit reports covering service providers' activities and whether the lender responds appropriately to identified concerns.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

## Unfair, Deceptive, or Abusive Acts or Practices

Unfair, deceptive, or abusive acts and practices (UDAAPs) can cause significant financial injury to consumers, erode consumer confidence, and undermine the financial marketplace. Under the Dodd-Frank Act, it is unlawful for any provider of consumer financial products or services or a service provider to engage in any unfair, deceptive or abusive act or practice.[1] The Act also provides CFPB with rule-making authority and, with respect to entities within its jurisdiction, enforcement authority to prevent unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.[2]  In addition, CFPB has supervisory authority for detecting and assessing risks to consumers and to markets for consumer financial products and services.[3]

As examiners review products or services, such as deposit products or lending activities, they generally should identify the risks of harm to consumers that are particular to those activities. Examiners also should review products that combine features and terms in a manner that can increase the difficulty of consumer understanding of the overall costs or risks of the product and the potential harm to the consumer associated with the product.

These examination procedures provide general guidance on:

- The principles of unfairness, deception, and abuse in the context of offering and providing consumer financial products and services;
- Assessing the risk that an institution's practices may be unfair, deceptive, or abusive;
- Identifying unfair, deceptive or abusive acts or practices (including by providing examples of potentially unfair or deceptive acts and practices); and
- Understanding the interplay between unfair, deceptive, or abusive acts or practices and other consumer protection statutes.

## Unfair Acts or Practices

The standard for unfairness in the Dodd-Frank Act is that an act or practice is unfair when:

(1) It causes or is likely to cause substantial injury to consumers;

(2) The injury is not reasonably avoidable by consumers; and

---

[1] Dodd-Frank Act, Title X, Subtitle C, Sec. 1036; PL 111-203 (July 21, 2010).

[2] Sec. 1031 of the Dodd-Frank Act. The principles of "unfair" and "deceptive" practices in the Act are similar to those under Sec. 5 of the Federal Trade Commission Act (FTC Act). The Federal Trade Commission (FTC) and federal banking regulators have applied these standards through case law, official policy statements, guidance, examination procedures, and enforcement actions that may inform CFPB.

[3] Dodd-Frank Act, Secs. 1024; 1025(b)(1); 1026(b) of the Act.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

(3) The injury is not outweighed by countervailing benefits to consumers or to competition.[4]

- ***The act or practice must cause or be likely to cause substantial injury to consumers.***
  Substantial injury usually involves monetary harm. Monetary harm includes, for example, costs or fees paid by consumers as a result of an unfair practice.[5]An act or practice that causes a small amount of harm to a large number of people may be deemed to cause substantial injury.

  Actual injury is not required in every case. A significant risk of concrete harm is also sufficient. However, trivial or merely speculative harms are typically insufficient for a finding of substantial injury. Emotional impact and other more subjective types of harm also will not ordinarily amount to substantial injury. Nevertheless, in certain circumstances, such as unreasonable debt collection harassment, emotional impacts may amount to or contribute to substantial injury.

- ***Consumers must not be reasonably able to avoid the injury.***
  An act or practice is not considered unfair if consumers may reasonably avoid injury. Consumers cannot reasonably avoid injury if the act or practice interferes with their ability to effectively make decisions or to take action to avoid injury. Normally the marketplace is self-correcting; it is governed by consumer choice and the ability of individual consumers to make their own private decisions without regulatory intervention. If material information about a product, such as pricing, is modified after, or withheld until after, the consumer has committed to purchasing the product; however, the consumer cannot reasonably avoid the injury. Moreover, consumers cannot avoid injury if they are coerced into purchasing unwanted products or services or if a transaction occurs without their knowledge or consent.

  A key question is not whether a consumer could have made a better choice. Rather, the question is whether an act or practice hinders a consumer's decision-making. For example, not having access to important information could prevent consumers from comparing available alternatives, choosing those that are most desirable to them, and avoiding those that are inadequate or unsatisfactory. In addition, if almost all market participants engage in a practice, a consumer's incentive to search elsewhere for better terms is reduced, and the practice may not be reasonably avoidable.[6]

  The actions that a consumer is expected to take to avoid injury must be reasonable. While a consumer might avoid harm by hiring independent experts to test products in advance or by bringing legal claims for damages in every case of harm, these actions generally

---

[4] The standard for unfairness in the Dodd-Frank Act has the same three-part test as the FTC Act. This standard was first stated in the FTC Policy Statement on Unfairness (Dec. 17, 1980), *available at*:  http://www.ftc.gov/bcp/policystmt/ad-unfair htm. Congress later amended the FTC Act to include this specific standard in the Act itself. 15 U.S.C. § 45(n).

[5] FTC Policy Statement on Unfairness, at p. 3.

[6] *See* Credit Practices Rule, 49 Fed. Reg. 7740, 7746 (1984).

# CFPB Consumer
# Laws and Regulations                                    UDAAP

would be too expensive to be practical for individual consumers and, therefore, are not reasonable.

- ***The injury must not be outweighed by countervailing benefits to consumers or competition.***

    To be unfair, the act or practice must be injurious in its net effects — that is, the injury must not be outweighed by any offsetting consumer or competitive benefits that also are produced by the act or practice. Offsetting consumer or competitive benefits of an act or practice may include lower prices to the consumer or a wider availability of products and services resulting from competition.

    Costs that would be incurred for measures to prevent the injury also are taken into account in determining whether an act or practice is unfair. These costs may include the costs to the institution in taking preventive measures and the costs to society as a whole of any increased burden and similar matters.

Public policy, as established by statute, regulation, judicial decision, or agency determination, may be considered with all other evidence to determine whether an act or practice is unfair. However, public policy considerations by themselves may not serve as the primary basis for determining that an act or practice is unfair.

## Examples

The examples described below stem from federal enforcement actions. They provide insight into practices that have been alleged to be unfair by other regulators and may inform CFPB's determinations. However, the particular facts in a case are crucial to a determination of unfairness. It is important to bear in mind that a change in facts could change the appropriate determination. Moreover, the brief summaries below do not present all of the material facts relevant to the determinations in each case. The examples show how the unfairness standard may be applied.

<u>**Refusing to release lien after consumer makes final payment on a mortgage.**</u>[7] The FTC brought an enforcement action against a mortgage company based on allegations, described below, that repeatedly failed to release liens after consumers fully paid the amount due on their mortgages.

- <u>Substantial injury.</u> Consumer's sustained economic injury when the mortgage servicer did not release the liens on their properties after the consumers had repaid the total amount due on the mortgages.

- <u>Not outweighed by benefits.</u> Countervailing benefits to competition or consumers did not result from the servicer's alleged failure to appropriately service the mortgage loan and release the lien promptly.

---

[7] *FTC v. Capital City Mortgage Corp.*, Civil No. 98 CV-237 (D.D.C. Feb. 2005), *available at* http://www.ftc.gov/opa/2005/02/capitalcity.shtm.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

- <u>Not reasonably avoidable</u>. Consumers had no way to know in advance of obtaining the loan that the mortgage servicer would not release the lien after full payment. Moreover, consumers generally cannot avoid the harm caused by an improper practice of a mortgage servicer because the servicer is chosen by the owner of the loan, not the borrower. Thus, consumers cannot choose their loan servicer and cannot change loan servicers when they are dissatisfied with the quality of the loan servicing.

**Dishonoring credit card convenience checks without notice**.[8] The OTS and FDIC brought enforcement actions against a credit card issuer that sent convenience checks with stated credit limits and expiration dates to customers. For a significant percentage of consumers, the issuer reduced credit lines after the checks were presented, and then the issuer dishonored the consumers' checks.

- <u>Substantial injury.</u> Customers paid returned-check fees and may have experienced a negative impact on credit history.

- <u>Not outweighed by benefits.</u> The card issuer later reduced credit limits based on credit reviews. Based on the particular facts involved in the case, the harm to consumers from the dishonored convenience checks outweighed any benefit of using new credit reviews.

- <u>Not reasonably avoidable.</u> Consumers reasonably relied on their existing credit limits and expiration dates on the checks when deciding to use them for a payment. Consumers had received no notice that the checks they used were being dishonored until they learned from the payees. Thus, consumers could not reasonably have avoided the injury.

**Processing payments for companies engaged in fraudulent activities.**[9] The OCC brought an enforcement action in a case involving a bank that maintained deposit account relations with telemarketers and payment processors, based on the following allegations. The telemarketers regularly deposited large numbers of remotely created checks drawn against consumers' accounts. A large percentage of the checks were not authorized by consumers. The bank failed to establish appropriate policies and procedures to prevent, detect, or remedy such activities.

- <u>Substantial injury.</u> Consumers lost money from fraudulent checks created remotely and drawn against their accounts.

- <u>Not outweighed by benefits.</u> The cost to the bank of establishing a minimum level of due diligence, monitoring, and response procedures sufficient to remedy the problem would have been far less than the amount of injury to consumers that resulted from the bank's avoiding those costs.

---

[8]*In re American Express Bank, FSB* (Cease and Desist Order WN-09-016, and Order of Assessment of a Civil Money Penalty for $250,000, WN-09-017, June 29, 2009) OTS Docket No. 15648; *In re American Express Centurion Bank*, (Cease and Desist Order, June 30, 2009) Docket FDIC-09-251b, available at http://www.fdic.gov/news.

[9]*In re Wachovia Bank, National Association,* available at http://www.occ.treas.gov

# CFPB Consumer
# Laws and Regulations                                    UDAAP

- <u>Not reasonably avoidable.</u> Consumers could not avoid the harm because the harm resulted principally from transactions to which the consumers had not consented.

## Deceptive Acts or Practices

A representation, omission, actor practice is deceptive when

(1) The representation, omission, act, or practice misleads or is likely to mislead the consumer;

(2) The consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

(3) The misleading representation, omission, act, or practice is material.[10]

- ***There must be a representation, omission, act, or practice that misleads or is likely to mislead the consumer.***

  Deception is not limited to situations in which a consumer has already been misled. Instead, an act or practice may be deceptive if it is *likely to mislead* consumers.

  It is necessary to evaluate an individual statement, representation, or omission not in isolation, but rather in the context of the entire advertisement, transaction, or course of dealing, to determine whether the overall net impression is misleading or deceptive. A representation may be an express or implied claim or promise, and it may be written or oral. If material information is necessary to prevent a consumer from being misled, it may be deceptive to omit that information.

  Written disclosures may be insufficient to correct a misleading statement or representation, particularly where the consumer is directed away from qualifying limitations in the text or is counseled that reading the disclosures is unnecessary. Likewise, oral or fine print disclosures or contract disclosures may be insufficient to cure a misleading headline or a prominent written representation. Similarly, a deceptive act or practice may not be cured by subsequent truthful disclosures.

  Acts or practices that may be deceptive include: making misleading cost or price claims; offering to provide a product or service that is not in fact available; using bait-and-switch techniques; omitting material limitations or conditions from an offer; or failing to provide the promised services.

  The FTC's "four Ps" test can assist in the evaluation of whether a representation, omission, act, or practice is likely to mislead:

  o Is the statement <u>prominent</u> enough for the consumer to notice?

---

[10] *See* FTC Policy Statement on Deception, available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm. Examiners should be informed by the FTC's standard for deception.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

    o  Is the information <u>presented</u> in an easy-to-understand format that does not contradict other information in the package and at a time when the consumer's attention is not distracted elsewhere?

    o  Is the <u>placement</u> of the information in a location where consumers can be expected to look or hear?

    o  Finally, is the information in close <u>proximity</u> to the claim it qualifies?[11]

- ***The representation, omission, act, or practice must be considered from the perspective of the reasonable consumer.***

  In determining whether an act or practice is misleading, one also must consider whether the consumer's interpretation of or reaction to the representation, omission, act, or practice is reasonable under the circumstances. In other words, whether an act or practice is deceptive depends on how a reasonable member of the target audience would interpret the representation. When representations or marketing practices target a specific audience, such as older Americans, young people, or financially distressed consumers, the communication must be reviewed from the point of view of a reasonable member of that group.

  Moreover, a representation may be deceptive if the majority of consumers in the target class do not share the consumer's interpretation, so long as a significant minority of such consumers is misled. When a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation.

  Exaggerated claims or "puffery," however, are not deceptive if the claims would not be taken seriously by a reasonable consumer.

- ***The representation, omission, or practice must be material.***

  A representation, omission, act, or practice is material if it is likely to affect a consumer's choice of, or conduct regarding, the product or service. Information that is important to consumers is material.

  Certain categories of information are presumed to be material. In general, information about the central characteristics of a product or service – such as costs, benefits, or restrictions on the use or availability – is presumed to be material. Express claims made with respect to a financial product or service are presumed material. Implied claims are presumed to be material when evidence shows that the institution intended to make the claim (even though intent to deceive is not necessary for deception to exist).

---

[11] FTC, *Dot Com Disclosures, Information about On-Line Advertising,* available at:  http://business.ftc.gov/documents/bus41-dot-com-disclosures-information-about-online-advertising.pdf.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

Claims made with knowledge that they are false are presumed to be material. Omissions will be presumed to be material when the financial institution knew or should have known that the consumer needed the omitted information to evaluate the product or service.

If a representation or claim is not presumed to be material, it still would be considered material if there is evidence that it is likely to be considered important by consumers.

## Examples

The examples described below stem from federal enforcement actions. They provide insight into practices that have been alleged to be deceptive by other regulators and may inform CFPB's determinations. However, as with unfairness, the particular facts in a case are crucial to a determination of deception. It is important to bear in mind that a change in facts could change the appropriate determination. Moreover, the brief summaries below do not present all of the material facts relevant to the determinations in each case. The examples show how the deception standard may be applied.

**Inadequate disclosure of material lease terms in television advertising.**[12] The FTC brought actions against vehicle leasing companies alleging that their television advertisements represented that consumers could lease vehicles for "$0 down" when advertising a monthly lease payment. However, the FTC alleged that the "blur" of "unreadable fine print" that flashed on the screen at the end of the advertisement disclosed costs of at least $1,000. The settlements prohibited the vehicle leasing companies from misrepresenting the amount consumers must pay when signing the lease.

In addition, the FTC required that if the companies make any representation about the amounts due at lease signing, or that there is "no down payment," the companies must make an equally prominent (readable and audible) disclosure of the total amount of all fees due when consumers sign the lease.

- Representation or omission likely to mislead.  The television advertisements featured prominent statements of "no money down" or "$0 down" at lease signing. The advertisement also contained, at the bottom of the screen, a "blur" of small print in which disclosures of various costs required by Regulation M (the Consumer Leasing Act) were made. The FTC alleged that the disclosures were inadequate because they were not clear, prominent, or audible to consumers.

- Reasonable consumer perspective. A reasonable consumer would believe that he did not have to put any money down and that all he owed was the regular monthly payment.

- Material representation. The stated "no money down" or "$0 down" plus the low monthly lease payment were material representations to consumers. The fact that the additional,

---

[12] *In the matters of Mazda Motor of America, Inc.; Mitsubishi Motor Sales of America, Inc.; American Honda Motor Company, Inc.; General Motors Corporation; American Isuzu Motors, Inc.,* available at *http://www.ftc.gov/opa/1997/02/petapp09.shtm.*

# CFPB Consumer
# Laws and Regulations                                          UDAAP

material costs were disclosed at signing of the lease did not cure the deceptive failure to disclose in the television advertising, the FTC claimed.

**Misrepresentation about loan terms.**[13] In 2004, the FTC sued a mortgage broker advertising mortgage refinance loans at "3.5% fixed payment 30-year loan" or "3.5% fixed payment for 30 years," implying that the offer was for a 30-year loan with a 3.5% fixed interest rate. Instead, the FTC claimed that the broker offered adjustable rate mortgages (ARMs) with an option to pay various amounts, including a minimum monthly payment that represented only a portion of the required interest. As a result, unpaid interest was added to the principal of the loan, resulting in negative amortization.[14]

- Practice likely to mislead. The FTC claimed that the advertisements were misleading because they compared payments on a mortgage that fully amortized to payments on a non-amortizing loan with payments that increased after the first year. In addition, the FTC claimed that after application, the broker provided Truth in Lending Act (TILA) disclosures that misstated the annual percentage rate (APR) and that failed to state that the loan was a variable rate loan.

- Reasonable consumer perspective. It was reasonable for consumers to believe that they would obtain fixed-rate mortgages, based on the representations.

- Material representation. The representations were material because consumers relied on them when making the decision to refinance their fully amortizing 30-year fixed loans. As a result, the consumers ended up with adjustable rate mortgages that would negatively amortize if they made payments at the stated 3.5% payment rate.

---

[13] FTC v. Chase Financial Funding, Inc., No. SACV04-549 (C.D.Cal. 2004), Stipulated Preliminary Injunction, available at http://www.ftc.gov/os/caselist/0223287/0223287.shtm.

[14] In 2008, amendments to the Truth in Lending Act's Regulation Z were adopted to prohibit certain advertising practices, such as misleading advertising of fixed rates and payments, for credit secured by a dwelling. Similar practices could be identified as deceptive in other product lines. See 73 Fed. Reg. 44522 (July 30, 2008) (promulgating 12 CFR 226.24), which has since been recodified as 12 CFR 1026.24.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

## Abusive Acts or Practices

The Dodd-Frank Act makes it unlawful for any covered person or service provider to engage in an "abusive act or practice."[15] An abusive act or practice:

- Materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or

- Takes unreasonable advantage of:

  o A lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

  o The inability of the consumer to protect its interests in selecting or using a consumer financial product or service; or

  o The reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

Although abusive acts also may be unfair or deceptive, examiners should be aware that the legal standards for abusive, unfair, and deceptive each are separate.

## The Role of Consumer Complaints in Identifying Unfair, Deceptive, or Abusive Acts or Practices

Consumer complaints play a key role in the detection of unfair, deceptive, or abusive practices. Consumer complaints have been an essential source of information for examinations, enforcement, and rule-making for regulators. As a general matter, consumer complaints can indicate weaknesses in elements of the institution's compliance management system, such as training, internal controls, or monitoring.

While the absence of complaints does not ensure that unfair, deceptive, or abusive practices are not occurring, complaints may be one indication of UDAAPs. For example, the presence of complaints alleging that consumers did not understand the terms of a product or service may be a red flag indicating that examiners should conduct a detailed review of the relevant practice. This is especially true when numerous consumers make similar complaints about the same product or service. Because the perspective of a reasonable consumer is one of the tests for evaluating whether a representation, omission, act, or practice is potentially deceptive, consumer complaints alleging misrepresentations or misunderstanding may provide a window into the perspective of the reasonable consumer.

When reviewing complaints against an institution, examiners should consider complaints lodged against subsidiaries, affiliates, and third parties regarding the products and services offered through the institution or using the institution's name. In particular, examiners should determine

---

[15] Dodd-Frank Act, Sec. 1036(a)(1)(B), 12 U.S.C. § 5536(a)(1)(B).

# CFPB Consumer
# Laws and Regulations                                    UDAAP

whether an institution itself receives, monitors, and responds to complaints filed against subsidiaries, affiliates, and third parties. Consumers can file complaints at a number of entities: the institution itself, the Better Business Bureau, State Attorneys General, the FTC's Consumer Sentinel, the CFPB Consumer Response Center, other Federal and State agencies, or on-line consumer complaint boards such as www.ripoffreport.com or www.complaints.com.

## Analyzing Complaints

Analysis of consumer complaints may assist in the identification of potential unfair, deceptive, or abusive practices. Examiners should consider the context and reliability of complaints; every complaint does not indicate violation of law. When consumers repeatedly complain about an institution's product or service, however, examiners should flag the issue for possible further review. Moreover, even a single substantive complaint may raise serious concerns that would warrant further review. Complaints that allege, for example, misleading or false statements, or missing disclosure information, may indicate possible unfair, deceptive, or abusive acts or practices needing review.

Another area that could indicate potential unfair, deceptive, or abusive acts or practices is a high volume of charge-backs or refunds for a product or service. While this information is relevant to the consumer complaint analysis, it may not appear in the institution's complaint records.

## Relationship to Other Laws

An unfair, deceptive, or abusive act or practice may also violate other federal or state laws. For example, pursuant to the TILA, creditors must "clearly and conspicuously" disclose the costs and terms of credit. An act or practice that does not comply with these provisions of TILA may also be unfair, deceptive, or abusive.

Conversely, a transaction that is in technical compliance with other federal or state laws may nevertheless violate the prohibition against UDAAPs. For example, an advertisement may comply with TILA's requirements, but contain additional statements that are untrue or misleading, and compliance with TILA's disclosure requirements does not insulate the rest of the advertisement from the possibility of being deceptive.

# CFPB
# Examination Procedures                                    UDAAP

## Unfair, Deceptive, or Abuse Acts and Practices

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

## Examination Objectives

- To assess the quality of the regulated entity's compliance risk management systems, including internal controls and policies and procedures, for avoiding unfair, deceptive, or abusive acts or practices (UDAAP).

- To identify acts or practices that materially increase the risk of consumers being treated in an unfair, deceptive, or abusive manner.

- To gather facts that help determine whether a regulated entity engages in acts or practices when offering or providing consumer financial products or services that are likely to be unfair, deceptive, or abusive.

- To determine, in consultation with Headquarters, whether an unfair, deceptive or abusive act or practice has occurred and whether further supervisory or enforcement actions are appropriate.

## General Guidance

Based on the results of the risk assessment of the entity, examiners should review for potential unfair, deceptive, or abusive acts or practices, taking into account an entity's marketing programs, product and service mix, customer base, and other factors, as appropriate.  Even if the risk assessment has not identified potential unfair, deceptive, or abusive acts or practices, examiners should be alert throughout an examination for situations that warrant review.

1. **Document Review**
   a. To initially identify potential areas of UDAAP concerns, obtain and review copies of the following to the extent relevant to the examination:

   b. Training materials.

   c. Lists of products and services, including descriptions, fee structure, disclosures, notices, agreements, and periodic and account statements.

   d. Procedure manuals and written policies, including those for servicing and collections.

   e. Minutes of the meetings of the Board of Directors and of management committees, including those related to compliance.

   f. Internal control monitoring and auditing materials.

   g. Compensation arrangements, including incentive programs for employees and third parties.

# CFPB
# Examination Procedures                                    UDAAP

h. Documentation related to new product development, including relevant meeting minutes of Board of Directors, and of compliance and new product committees.

i. Marketing programs, advertisements, and other promotional material in all forms of media (including print, radio, television, telephone, Internet, or social media advertising).

j. Scripts and recorded calls for telemarketing and collections.

k. Organizational charts, including those related to affiliate relationships and work processes.

l. Agreements with affiliates and third parties that interact with consumers on behalf of the entity.

m. Consumer complaint files.

n. Documentation related to software development and testing, as applicable.

## Management and Policy-Related Examination Procedures

1. Identify potential UDAAP concerns by reviewing all relevant written policies and procedures, customer complaints received by the entity or by the CFPB, internal and external audit reports, statistical and management reports, and examination reports. Determine whether:

a. The scope of the entity's compliance audit includes a review of potential unfair, deceptive, or abusive acts or practices.

b. The compliance audit work is performed consistent with the audit plan and scope.

c. The frequency and depth of audit review is appropriate to the nature of the activities and size of the entity.

d. Management and the Board of Directors are made aware of and review significant deficiencies and their causes.

e. Management has taken corrective actions to followup on any identified deficiencies.

f. The entity's compliance programs ensure that policies are being followed through its sampling of relevant product types and decision centers, including sales, processing, and underwriting.

g. The entity has a process to respond to consumer complaints in a timely manner and determine whether consumer complaints raise potential UDAAP concerns.

h. The entity has been subject to any enforcement actions or has been investigated by a regulatory or law enforcement agency for violations of consumer protection laws or regulations that may indicate potential UDAAP concerns.

**[Click&type]**

**CFPB**
# Examination Procedures                                    UDAAP

**2.** Through discussions with management and a review of available information, determine whether the entity's internal controls are adequate to prevent unfair, deceptive or abusive acts or practices. Consider whether:

   a. The compliance management program includes measures aimed at avoiding unfair, deceptive, or abusive practices, including:

   - Organization charts and process flowcharts;

   - Policies and procedures; and

   - Monitoring and audit procedures.

   b. The entity conducts prior UDAAP reviews of advertising and promotional materials, including promotional materials and marketing scripts for new products.

   c. The entity evaluates initial and subsequent disclosures, including customer agreements and changes in terms, for potential UDAAP concerns.

   d. The entity reviews new products and changes in the terms and conditions of existing products for potential UDAAP concerns.

   e. The entity has a thorough process for receiving and responding to consumer complaints and has a process to receive complaints made to third parties, such as the Better Business Bureau or the CFPB.

   f. The entity evaluates servicing and collections for UDAAP concerns.

   g. The entity has established policies and controls relating to employee and third-party conduct, including:

   - Initial and ongoing training;

   - Performance reviews or audits;

   - Discipline policies and records of disciplinary actions;

   - Third-party agreements and contractual performance standards;

   - Compensation programs; and

   - Monitoring.

   h. The entity's internal control processes are documented.

   i. Computer programs are tested and documented to ensure accurate and timely disclosures to consumers.

   **[Click&type]**

**CFPB**

**Examination Procedures**                                    **UDAAP**

3. **Potential Areas for Transaction Testing**

Through a high-level assessment of the entity's products, services, and customer base, identify areas for potential transaction testing. This process should determine whether:

a. The entity does not underwrite a given credit product on the basis of ability to repay.

b. A product's profitability depends significantly on penalty fees or "back-end" rather than upfront fees.

c. A product has high rates of repricing or other changes in terms.

d. A product combines features and terms in a manner that can increase the difficulty of consumer understanding of the overall costs or risks of the product and the potential harm.

e. Penalties are imposed on a customer when he terminates his relationship with the entity.

f. Fees or other costs are imposed on a consumer to obtain information about his account.

g. A product is targeted to particular populations, without appropriate tailoring of marketing, disclosures, and other materials designed to ensure understanding by the consumers.

**[Click&type]**

# Transaction-Related Examination Procedures

If upon conclusion of the management and policy-related examination procedures, procedural weaknesses, or other UDAAP risks require further investigation, conduct transaction testing, as necessary, using the following examination procedures. Use judgment in deciding to what extent to sample individual products, services, or marketing programs. Increase the sample size to achieve confidence that all aspects of the entity's products and services are reviewed sufficiently. Consult with Headquarters to obtain assistance with the sampling process.

1. **Marketing and Disclosures**

Through a review of marketing materials, customer agreements, and other disclosures, determine whether, before the consumer chooses to obtain the product or service:

a. All representations are factually based.

b. All materials describe clearly, prominently, and accurately:

o costs, benefits, and other material terms of the products or services being offered;

o related products or services being offered either as an option or required to obtained certain terms; and

o material limitations or conditions on the terms or availability of products and services, such as time limitations for favorable rates, promotional features, expiration dates, prerequisites for obtaining particular products or services, or conditions for canceling services.

**CFPB**

**Examination Procedures**                                                  **UDAAP**

---

c.  The customer's attention is drawn to key terms, including limitations and conditions, that are important to enable the consumer to make an informed decision.

d.  All materials clearly and prominently disclose the fees, penalties, and other charges that may be imposed and the reason for the imposition.

e.  Contracts clearly inform customers of contract provisions that permit changes in terms and conditions of the product or service.

f.  All materials clearly communicate the costs, benefits, availability, and other terms in language that can be understood when products are targeted to particular populations, such as reverse mortgage loans for the elderly.

g.  Materials do not misrepresent costs, conditions, limitations, or other terms either affirmatively or by omission.

h.  The entity avoids advertising terms that are generally not available to the typical targeted consumer.

**[Click&type]**

**2.  Availability of Terms or Services as Advertised**

Evaluate whether product(s) and service(s) that consumers are receiving are consistent with the disclosures and policies.  For each product and service being reviewed, select a sample that:

a.  Is sufficient in size to reach a supportable conclusion about such consistency;

b.  Includes, as appropriate, transactions from different origination and underwriting channels — for example, different geographical areas or different sectors of the entity's organization structure; and

c.  Includes approved and/or denied accounts.

Determine whether:

a.  Consumers are reasonably able to obtain the products and services, including interest rates or rewards, as represented by the entity.

b.  Consumers receive the specific product or service that they request.

c.  Counter-offers clearly, prominently, and accurately explain the difference between the original product or services requested and the one being offered.

d.  Actual practices are consistent with stated policies, procedures, or account disclosures.

**[Click&type]**

---

**CFPB**

**Examination Procedures**                                           **UDAAP**

3.  **Availability of Actual Credit to the Consumer**

Evaluate whether the entity represents the amount of useable credit that the consumer will receive in a truthful way.  Consider whether:

a.  The available credit is sufficient to allow the consumer to use the product as advertised and disclosed to the consumer.

b.  The fees and charges, typically imposed on the average targeted customer, both initially and throughout the term of the loan, remain in a range that does not prevent the availability of credit.

c.  The entity honors convenience checks when used by the customer in a manner consistent with introductory or promotional materials and disclosures.

**[Click&type]**

4.  **Employees and Third Parties Interacting with Consumers**

Evaluate how the entity monitors the activities of employees and third-party contractors, marketing sales personnel, vendors, and service providers to ensure they do not engage in unfair, deceptive, or abusive acts or practices with respect to consumer interactions. Interview employees and third parties, as appropriate.  Specifically, consider whether:

a.  The entity ensures that employees and third parties who market or promote products or services are adequately trained so that they do not engage in unfair, deceptive, or abusive acts or practices.

b.  The entity conducts periodic evaluations or audits to check whether employees or third parties follow the entity's training and procedures and has a disciplinary policy in place to deal withany deficiencies.

c.  The entity reviews compensation arrangements for employees, third-party contractors, and service providers to ensure that they do not create unintended incentives to engage in unfair, deceptive, or abusive acts or practices, particularly with respect to product sales, loan originations, and collections.

d.  Performance evaluation criteria do not create unintended incentives to engage in unfair, deceptive, or abusive acts or practices, including criteria for sales personnel based on sales volume, size, terms of sale, or account performance.

e.  The entity implements and maintains effective risk and supervisory controls to select and manage third-party contractors and service providers.

**[Click&type]**

**CFPB**

**Examination Procedures**                                              **UDAAP**

---

5. **Servicing and Collections**

   Evaluate whether servicing and collections practices raise potential UDAAP concerns, by considering whether**:**

   a.  The entity has policies detailing servicing and collections practices and has monitoring systems to prevent unfair, deceptive or abusive acts or practices.

   b.  Call centers, either operated by the entity itself or by third parties, effectively respond to consumers' calls.

   c.  The entity ensures that employees and third party contractors:

      o  represent fees or charges on periodic statements in a manner that is not misleading;

      o  post and credit consumer payments in a timely manner;

      o  apply payments in a manner that does not unnecessarily increase customer payments, without clear justification;

      o  only charge customers for products and services, such as insurance or credit protection programs, that are specifically agreed to;

      o  mail periodic statements in time to provide the consumer ample opportunity to avoid late payments; and

      o  do not represent to consumers that they may pay less than the minimum amount without clearly and prominently disclosing any fees for paying the reduced amount.

   d.  The entity has policies to ensure compliance with the standards under the Fair Debt Collections Practices Act to prevent abusive, deceptive, or unfair debt collection practices.

   e.  Employees and third party contractors clearly indicate to consumers that they are calling about the collection of a debt.

   f.  Employees and third party contractors do not disclose the existence of a consumer's debt to the public without the consent of the consumer, except as permitted by law.

   g.  The entity avoids repeated telephone calls to consumers that annoy, abuse, or harass any person at the number called.

   **[Click&type]**

6. **Interviews with Consumers**

   If potential UDAAP issues are identified that would necessitate interviews with consumers, consult with regional management who will confer with Headquarters.

   **[Click&type]**

---

**CFPB**

**Examination Procedures**                                    **UDAAP**

## Examiner's Summary, Recommendations, and Comments

**[Click&type]**

# CFPB Consumer
# Laws and Regulations                              ECOA

# Equal Credit Opportunity Act (ECOA)

The Equal Credit Opportunity Act (ECOA), which is implemented by Regulation B, applies to all creditors. When originally enacted, ECOA gave the Federal Reserve Board responsibility for prescribing the implementing regulation. The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) transferred this authority to the Consumer Financial Protection Bureau ("CFPB" or "Bureau"). The Dodd-Frank Act granted rule-making authority under ECOA to the CFPB and, with respect to entities within its jurisdiction, granted authority to the CFPB to supervise for and enforce compliance with ECOA and its implementing regulations.[1]   In December 2011, the CFPB restated the Federal Reserve's implementing regulation at 12 CFR Part 1002 (76 Fed. Reg. 79442)(December 21, 2011).

The statute provides that its purpose is to require financial institutions and other firms engaged in the extension of credit to "make credit equally available to all creditworthy customers without regard to sex or marital status." Moreover, the statute makes it unlawful for "any creditor to discriminate against any applicant with respect to any aspect of a credit transaction (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program; or (3) because the applicant has in good faith exercised any right under the Consumer Credit Protection Act." The ECOA has two principal theories of liability: disparate treatment and disparate impact. Disparate treatment occurs when a creditor treats an applicant differently based on a prohibited basis such as race or national origin.[2] Disparate impact occurs when a creditor employs facially neutral policies or practices that have an adverse effect or impact on a protected class unless it meets a legitimate business need that cannot reasonably be achieved as well by means that are less disparate in their impact.[3]

In keeping with the broad reach of the statute's prohibition, the regulation covers creditor activities before, during, and after the extension of credit.  A synopsis of some of the more important points of Regulation B follows, and an examination program is provided for a more thorough review.

For fair lending scoping and examination procedures, the CFPB is temporarily adopting the FFIEC Interagency Fair Lending Examination Procedures that are referenced in the examination program.  However, in applying those procedures the CFPB takes into account that the Fair

---

[1] Sec.1071 of the Dodd-Frank Act added a new Sec. 704B to ECOA to require the collection of small business loan data. Sec.1474 amended subsection 701(e) of ECOA to generally require creditors to provide applicants copies of written appraisals and valuations developed in connection with the applicant's application for a loan that is secured or would have been secured by a first lien on a dwelling promptly upon completion. Those amendments will be reflected in this document at a later date once they become effective.

[2] 12 CFR Part 1002 Supp. I Sec. 1002.4(a)-1; 12 CFR Part 1002 Supp. I Sec. 1002.4(a)-1. "Disparate treatment" may be "overt" (when the creditor openly discriminates on a prohibited basis) or it may be found  through comparing the treatment of applicants who receive different treatment for no discernable reason other than a prohibited basis.  In the latter case, it is not necessary that the creditor acts with any specific intent to discriminate.

[3] 12 CFR Part 1002 Supp. I Sec. 1002.6(a)-2.

# CFPB Consumer
# Laws and Regulations                                    ECOA

Housing Act (FHAct), 42 U.S.C. 3601 *et seq*., unlike ECOA, is not a "Federal consumer
financial law" as defined by the Dodd-Frank Act for which the CFPB has supervisory authority.[4]

## Applicability – 12 CFR 1002.2(e), 1002.2(f), 1002.2(j), 1002.2(l), 1002.2(m), and 1002.2(q)

Regulation B applies to all persons who, in the ordinary course of business, regularly participate
in the credit decision, including setting the terms of the credit. The term "creditor" includes a
creditor's assignee, transferee, or subrogee who so participates. For purposes of discrimination or
discouragement, 12 CFR 1002.4(a) and (b), the term creditor also includes a person who, in the
ordinary course of business, regularly refers applicants or prospective applicants to creditors, or
selects or offers to select creditors to whom requests for credit may be made.

Regulation B's prohibitions apply to every aspect of an applicant's dealings with a creditor
regarding an application for credit or an existing extension of credit (including, but not limited
to: information requirements; investigation procedures; standards of creditworthiness; terms of
credit; furnishing of credit information; revocation, alteration, or termination of credit; and
collection procedures).  The regulation defines "applicant" as any person who requests or who
has received an extension of credit from a creditor and includes any person who is or may
become contractually liable regarding an extension of credit. Under Regulation B, an
"application" means an oral or written request for an extension of credit made in accordance with
procedures used by a creditor for the type of credit requested. "Extension of credit" means "the
granting of credit in any form (including, but not limited to, credit granted in addition to any
existing credit [,] the refinancing or other renewal of credit...or the continuance of existing credit
without any special effort to collect at or after maturity)." Because the ECOA and Regulation B
prohibit discrimination in any aspect of a credit transaction, a creditor violates the statute and
regulation when discriminating against borrowers on a prohibited basis in approving or denying
loan modifications.  Moreover, as the definition of credit includes the right granted by a creditor
to an applicant to defer payment of a debt, a loan modification is itself an extension of credit and
subject to ECOA and Regulation B.  Examples of loan modifications that are extensions of credit
include, but are not limited to, the right to defer payment of a debt by capitalizing accrued
interest and certain escrow advances, reducing the interest rate, extending the loan term, and/or
providing for principal forbearance.[5]

---

[4] In addition to potential ECOA violations, an examiner may identify potential violations of the FHAct through the course of an
examination.  The FHAct prohibits discrimination in the sale, rental, and financing of dwellings, and in other housing-related
transactions, based on race, color, national origin, religion, sex, familial status (including children under the age of 18 living with
parents or legal custodians, pregnant women, and people securing custody of children under the age of 18), and handicap
(disability). The CFPB cooperates with the U.S. Department of Housing and Urban Development (HUD) to further the purposes
of the FHAct. If a potential FHAct violation is identified, the examiner must consult with Headquarters to determine whether a
referral to HUD or the U.S. Department of Justice and, if applicable, the creditor's prudential regulator is appropriate.

[5] *See* Federal Reserve Board Consumer Affairs Letter 09-13 (December 4, 2009)
(http://www.federalreserve.gov/boarddocs/caletters/2009/0913/caltr0913.htm).

# CFPB Consumer
# Laws and Regulations                                ECOA

## Prohibited Practices – 12 CFR 1002.4

Regulation B contains two basic and comprehensive prohibitions against discriminatory lending practices:

- A creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction.

- A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage, on a prohibited basis, a reasonable person from making or pursuing an application.

Note that the regulation is concerned not only with the treatment of persons who have initiated the application process, but also with lender behavior before the application is even taken. Lending officers and employees must be careful to take no action that would, on a prohibited basis, discourage a reasonable person from applying for a loan. For example, a creditor may not advertise its credit services and practices in ways that would tend to encourage some types of borrowers and discourage others on a prohibited basis. In addition, a creditor may not use prescreening tactics likely to discourage potential applicants on a prohibited basis. Instructions to loan officers or brokers to use scripts, rate quotes, or other means to discourage applicants from applying for credit on a prohibited basis are also prohibited.

The prohibition against discouraging applicants applies to in-person oral and telephone inquiries as well as to written applications. Lending officers must refrain from requesting prohibited information in conversations with applicants during the pre-interview phase (that is, before the application is taken) as well as when taking the written application.

To prevent discrimination in the credit-granting process, the regulation imposes a delicate balance between the creditor's need to know as much as possible about a prospective borrower with the borrower's right not to disclose information irrelevant to the credit transaction as well as relevant information that is likely to be used in connection with discrimination on a prohibited basis. To this end, the regulation addresses taking, evaluating, and acting on applications as well as furnishing and maintaining credit information.

## Electronic Disclosures – 12 CFR 1002.4(d)

Disclosures required to be given in writing may be provided to the applicant in electronic form, generally subject to compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. 7001 *et seq.*).

## Rules for Taking Applications – 12 CFR 1002.5

Regulation B permits creditors to ask for any information in connection with a credit transaction, so long as they avoid certain clearly defined areas set forth in 12 CFR 1002.5, which include both the specific prohibited bases of discrimination and certain types of information that often relates to discrimination on a prohibited basis.

# CFPB Consumer
# Laws and Regulations                                    ECOA

## Applicant Characteristics

Creditors may not request or collect information about an applicant's race, color, religion, national origin, or sex. Exceptions to this rule generally involve situations in which the information is necessary to test for compliance with fair lending rules or is required by a state or federal regulatory agency or other government entity for a particular purpose, such as to determine eligibility for a particular program. For example, a creditor may request prohibited information:

- In connection with a self-test being conducted by the creditor (provided that the self-test meets certain requirements) (12 CFR 1002.15);

- For monitoring purposes in relation to credit secured by real estate (12 CFR 1002.13; the Home Mortgage Disclosure Act, 12 U.S.C. 2801 ("HMDA"); Home Affordable Modification Program ("HAMP")); or

- To determine an applicant's eligibility for special-purpose credit programs (12 CFR 1002.8(b), (c) and (d)).

## Information about a Spouse or Former Spouse — 12 CFR 1002.5(c)

A creditor may not request information about an applicant's spouse or former spouse except under the following circumstances:

- The non-applicant spouse will be a permitted user of or joint obligor on the account. (NOTE: The term "permitted user" applies only to open-end accounts.)

- The non-applicant spouse will be contractually liable on the account.

- The applicant is relying on the spouse's income, at least in part, as a source of repayment.

- The applicant resides in a community property state, or the property upon which the applicant is relying as a basis for repayment of the credit requested is located in such a state.

- The applicant is relying on alimony, child support, or separate maintenance income as a basis for obtaining the credit.

# CFPB Consumer
# Laws and Regulations                    ECOA

## Inquiries Concerning Marital Status — 12 CFR 1002.5(d)(1) and 1002.5(d)(3)

### Individual Credit

When an applicant applies for individual credit, the creditor may not ask the applicant's marital status. There are two exceptions to this rule:

- If the credit transaction is to be secured, the creditor may ask the applicant's marital status. (This information may be necessary to determine what would be required to gain access to the collateral in the event of default.)

- If the applicant either resides in a community property state or lists assets to support the debt that are located in such a state, the creditor may ask the applicant's marital status. (In community property states, assets owned by a married individual may also be owned by the spouse, thus complicating the availability of assets to satisfy a debt in the event of default.)

### Joint Credit

When a request for credit is joint (made by two or more individuals who will be primarily liable), the creditor may ask the applicant's marital status, regardless of whether the credit is to be secured or unsecured, but may use only the terms "married," "unmarried," and "separated." This requirement applies to oral as well as written requests for marital status information. ''Unmarried'' may be defined to include divorced, widowed, or never married, but the application must not be structured in such a way as to encourage the applicant to distinguish among these.

## Alimony, Child Support, or Separate Maintenance Income — 12 CFR 1002.5(d)(2)

A creditor may ask if an applicant is receiving alimony, child support, or separate maintenance payments. However, the creditor must first disclose to the applicant that such income need not be revealed unless the applicant wishes to rely on that income in the determination of creditworthiness. An appropriate notice to that effect must be given whenever the creditor makes a general request concerning income and the source of that income. Therefore, a creditor either must ask questions designed to solicit only information about specific income (for example, "salary," "wages," "employment," or other specified categories of income) or must state that disclosure of alimony, child support, or separate maintenance payments is not required.

## Residency and Immigration Status — 12 CFR 1002.5(e)

The creditor may inquire about the applicant's permanent residence and immigration status in the United States in determining creditworthiness.

# CFPB Consumer
# Laws and Regulations                    ECOA

## Rules for Evaluating Applications – 12 CFR 1002.6

### General Rule

A creditor may consider any information in evaluating applicants, so long as the use of the information does not have the *intent* or the *effect* of discriminating against an applicant on a prohibited basis. Generally, a creditor may not:

- Consider any of the prohibited bases, including age (providing the applicant is old enough, under state law, to enter into a binding contract) and the receipt of public assistance;

- Use child-bearing or child-rearing information, assumptions, or statistics to determine whether an applicant's income may be interrupted or decreased;

- Consider whether there is a telephone listing in the applicant's name (but the creditor may consider whether there is a telephone in the applicant's home); or

- Discount or exclude part-time income from an applicant or the spouse of an applicant.

### Systems for Analyzing Credit

Regulation B neither requires nor endorses any particular method of credit analysis. Creditors may use traditional methods, such as judgmental systems that rely on a credit officer's subjective evaluation of an applicant's creditworthiness, or they may use more-objective, statistically developed techniques such as credit scoring.

### Credit Scoring Systems

Section 1002.2(p) of Regulation B prescribes the standards that a credit scoring system must meet to qualify as an ''empirically derived, demonstrably and statistically sound, credit system.'' All forms of credit analysis that do not meet the standards are automatically classified as ''judgmental'' systems. This distinction is important because creditors that use a ''demonstrably and statistically sound'' system may take applicant age directly into account as a predictive variable,[6] whereas judgmental systems may do so only to determine a pertinent element of creditworthiness or to favor an elderly applicant.

### Judgmental Evaluation Systems

Any system other than one that is empirically derived and demonstrably and statistically sound, is a judgmental system (including any credit scoring system that does not meet the prescribed technical standards). With limited exception, such a system may not take applicant age directly into account in evaluating creditworthiness. The act and the regulation permit a creditor to consider the applicant's age for the purpose of evaluating other applicant information that has a

---

[6] This applies provided that the age of an elderly applicant is not assigned a negative factor or value.

# CFPB Consumer
# Laws and Regulations                                    ECOA

demonstrable relationship to creditworthiness.[7] Additionally, in any system of evaluating creditworthiness, a creditor may consider the age of an elderly applicant to favor the applicant in extending credit.

## Rules for Extensions of Credit — 12 CFR 1002.7

Section 1002.7 of Regulation B provides a set of rules proscribing certain discriminatory practices regarding the creation and continuation of credit accounts.

### Signature Requirements

The primary purpose of the signature requirements is to permit creditworthy individuals (particularly women) to obtain credit on their own. Two general rules apply:

- A creditor may not require a signature other than the applicant's or joint applicant's if under the creditor's standards of creditworthiness the applicant qualifies for the amount and terms of the credit requested.

- A creditor has more latitude in seeking signatures on instruments necessary to reach property used as security, or in support of the customer's creditworthiness, than it has in obtaining the signatures of persons other than the applicant on documents that establish the contractual obligation to repay.

When assessing the level of a creditor's compliance with the signature requirements, examiners should consult with the Examiner-in-Charge if any questions arise.

## Special-Purpose Credit Programs — 12 CFR 1002.8

The ECOA and Regulation B allow creditors to establish special-purpose credit programs for applicants who meet certain eligibility requirements. Generally, these programs target an economically disadvantaged class of individuals and are authorized by federal or state law. Some are offered by not-for-profit organizations that meet certain IRS guidelines, and some by for-profit organizations that meet specific tests outlined in 12 CFR 1002.8.

Examiners are encouraged, if an issue arises regarding such a program, to consult with Headquarters.

## Notifications — 12 CFR 1002.9

A creditor must notify an applicant of action taken on the applicant's request for credit, whether favorable or adverse, within 30 days after receiving a completed application. Notice of approval may be expressly stated or implied (for example, the creditor may give the applicant the credit card, money, property, or services for which the applicant applied).

Notification of adverse action taken on an existing account must also be made within 30 days.

---

[7] Judgmental systems may consider the amount and probable continuance of income. A planned reduction in income due to retirement may, for example, be considered.

# CFPB Consumer
# Laws and Regulations                                    ECOA

Under at least two circumstances, the creditor need not comply with the 30-day notification rule:

- The creditor must notify an applicant of adverse action within 90 days after making a counteroffer unless the applicant accepts or uses the credit during that time.

- The creditor may not have to notify an applicant of adverse action if the application was incomplete and the creditor sent the applicant a notice of incompleteness that met certain requirements set forth in 12 CFR 1002.9(c).

## Adverse Action Notice – 12 CFR 1002.9(a)(2)

A notification of adverse action must be in writing and must contain certain information, including the name and address of the creditor and the nature of the action that was taken. In addition, the creditor must provide an ECOA notice that includes the identity of the federal agency responsible for enforcing compliance with the act for that creditor. This notice is generally included on the notification of adverse action. The creditor must also either provide the applicant with the specific principal reason for the action taken or disclose that the applicant has the right to request the reason(s) for denial within 60 days of receipt of the creditor's notification, along with the name, address, and telephone number of the person who can provide the specific reason(s) for the adverse action. The reason may be given orally if the creditor also advises the applicant of the right to obtain the reason in writing upon request.

## Incomplete Applications – 12 CFR 1002.9(c)

When a creditor receives an incomplete application, it may send one of two alternative notifications to the applicant. One is a notice of adverse action; the other is a notice of incompleteness. The notice of incompleteness must be in writing and must specify the information the creditor needs if it is to consider the application; it must also provide a reasonable period of time for the applicant to furnish the missing information.

## Applications Submitted Through a Third Party – 12 CFR 1002.9(g)

When more than one creditor is involved in a transaction and adverse action is taken with respect to the application for credit by all the creditors involved, each creditor that took such action must provide a notice of action taken. The notification may be given by a third party; however, the notice must disclose the identity of each creditor on whose behalf the notice is given. If one of the creditors approves the application, the creditors that took adverse action need not provide notification.

## Notification to Business Credit Applicants – 12 CFR 1002.9(a)(3)

The notification requirements for business credit applicants are different from those for consumer credit applicants and are more extensive if the business had gross revenues of

# CFPB Consumer
# Laws and Regulations                                    ECOA

$1,000,000 or less in the preceding fiscal year. Extensions of trade credit, credit incident to a factoring agreement, and similar types of credit are subject to the same rules as those that apply to businesses that had gross revenues of more than $1,000,000.

Generally, a creditor must comply with the same notification requirements for business credit applicants with gross revenues of $1,000,000 or less as it does for consumer credit applicants. However, the creditor has more options when dealing with these business credit applicants. First, the creditor may tell the business credit applicant orally of the action taken. Second, if the creditor chooses to provide a notice informing the business credit applicant of the right to request the reason for action taken, it may, rather than disclose the reason itself, provide the notice at the time of application. If the creditor chooses to inform the applicant of the right to request a reason, however, it must provide a disclosure with an ECOA notice that is in retainable form and that gives the applicant the same information that must be provided to consumer credit applicants when this option is used (see 12 CFR 1002.9(a)(2)(ii)). Finally, if the application was made entirely over the phone, the creditor may provide an oral statement of action taken and of the applicant's right to a statement of reasons for adverse action.

The notification requirements for business credit applicants with gross revenues of more than $1,000,000 are relatively simple. The creditor must notify the applicant of the action taken within a reasonable time period. The notice may be oral or in writing; a written statement of the reasons for adverse action and the ECOA notice need be provided only if the applicant makes a written request within 60 days of the creditor's notification of the action taken.

## Designation of Accounts — 12 CFR 1002.10(a)

A creditor that furnishes credit information to a consumer reporting agency must designate:

- Any new account to reflect the participation of both spouses if the applicant's spouse is permitted to use or is contractually liable on the account; and

- Any existing account to reflect the participation of both spouses within 90 days after receiving a written request to do so from one of the spouses.

If a creditor furnishes credit information to a consumer reporting agency, the creditor must furnish the information in the name of the spouse about whom the information was requested.

## Record Retention — 12 CFR 1002.12

### Applications

In general, a creditor must preserve all written or recorded information connected with an application for 25 months (12 months for business credit) after the date on which the creditor informed the applicant of action taken on an application or of incompleteness of an application.

# CFPB Consumer
# Laws and Regulations                                    ECOA

## Prohibited Information

A creditor may retain information in its files that it may not use in evaluating applications. However, the information must have been obtained inadvertently or in accordance with federal or state law or regulation.

## Existing Accounts

A creditor must preserve any written or recorded information concerning adverse action on an existing account as well as any written statement submitted by the applicant alleging a violation of the ECOA or Regulation B. This evidence must be kept for 25 months (12 months for business credit).

## Prescreened Solicitations

The 25-month retention rule also applies when a creditor makes an offer of credit to potential customers. In such cases, the creditor must retain for 25 months following the date of the solicitation:

- The text of any prescreened solicitation;

- The list of criteria the creditor used to select potential recipients of the solicitation; and

- Any correspondence related to complaints (formal or informal) about the solicitation.

# Rules for Providing Appraisal Reports — 12 CFR 1002.14

Regulation B requires that creditors provide a copy of the appraisal report used in connection with an application for credit to be secured by a lien on a dwelling. A creditor may provide the copy either routinely (whether or not credit is granted or the application is withdrawn) or upon an applicant's written request. If the creditor provides an appraisal report only upon request, it must inform the applicant in writing of the right to receive a copy of the report.

# Incentives for Self-Testing and Self-Correction — 12 CFR 1002.15

A self-test, as discussed in 12 CFR 1002.15 of Regulation B, must meet two criteria. First, it must be a program, practice, or study that a lender designs and uses specifically to determine the extent or effectiveness of its compliance with the regulation. Second, the results of the self-test must create data or factual information that is otherwise not available and cannot be derived from loan or application files or other records related to credit transactions. The findings of a self-test that is conducted voluntarily by a creditor and that meets the conditions set forth in 12 CFR 1002.15 are privileged against discovery or use by (1) a government agency in any examination or investigation related to the ECOA or Regulation B or (2) a government agency or an applicant in any legal proceeding involving an alleged violation of the ECOA or Regulation B. Privileged information includes the report or results of the test; data or other information created by the test; and any analysis, opinions, or conclusions regarding the results of the test.

# CFPB Consumer
# Laws and Regulations                    ECOA

To qualify for the privilege, appropriate corrective action is required when the results of a self-test show that it is more likely than not that there has been a violation of the ECOA or Regulation B.[8] The privilege does not cover information about whether a test was conducted; the methodology, scope, time period, or dates covered by the test; loan or application files or other business records; and information derived from such files and records, even if aggregated, summarized, or reorganized.

## Enforcement, Penalties, and Liabilities — 12 CFR 1002.16

In addition to actual damages, the Act provides for punitive damages of up to $10,000 in individual lawsuits and up to the lesser of $500,000 or 1 percent of the creditor's net worth in class action suits. Successful complainants are also entitled to an award of court costs and attorney's fees.

A creditor is not liable for failure to comply with the notification requirements of 12 CFR 1002.9 or the reporting requirements of 12 CFR 1002.10 if the failure was caused by an inadvertent error and the creditor, after discovering the error (1) corrects the error as soon as possible and (2) begins compliance with the requirements of the regulation. ''Inadvertent errors'' include mechanical, electronic, and clerical errors that the creditor can show (1) were not intentional and (2) occurred despite the fact that the creditor maintains procedures reasonably adapted to avoid such errors. Similarly, failure to comply with 12 CFR 1002.6(b)(6), 1002.12, and 1002.13 is not considered a violation if it results from an inadvertent error and the creditor takes the corrective action noted above. Errors involving 12 CFR 1002.12 and 1002.13 may be corrected prospectively by the creditor.

# REFERENCES

## Laws

12 U.S.C. 1691 *et seq.*          Equal Credit Opportunity Act

## Regulations

### Consumer Financial Protection Bureau Regulation (12 CFR)

Part 1002                         Equal Credit Opportunity (Regulation B)

---

[8] 12 CFR 1002.15(c)

**CFPB**

# Examination Procedures                    ECOA

# Equal Credit Opportunity Act

## Examination Procedures

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

- To determine whether the creditor has established policies, procedures, and internal controls to ensure that it is in compliance with the Equal Credit Opportunity Act (ECOA) and its implementing Regulation B.

- To determine whether the creditor discriminated against members of one or more protected classes in any aspect of its credit operations.

- To determine whether the creditor is in compliance with those requirements of ECOA that are set forth in Regulation B.

NOTE: This document refers throughout to the Interagency Fair Lending Examination Procedures ("IFLEP"). When applying those procedures, it is important to keep in mind that the Fair Housing Act, unlike ECOA, is not a "Federal consumer financial law" for which the CFPB has supervisory authority.

## Section A: ECOA / REGULATION B COMPLIANCE MANAGEMENT / RISK ASSESSMENT EXAMINATION PROCEDURES

### A. Examination Objective & Purpose

- To determine whether the creditor has established policies, procedures and internal controls to ensure that it is in compliance with the ECOA and Regulation B. The intensity and scope of the current ECOA / Regulation B examination will depend in part on the adequacy of the creditor's compliance management program.

### B. Examination Procedures

1. Review the creditor's overall compliance management program. Following the *Compliance Management Review* procedures in the *CFPB' Supervision/Examination Manual*; verify that the ECOA and Regulation B compliance is effectively integrated into the creditor's compliance management program.

2. Consult Part II ("*Compliance Management Review*") of the IFLEP and apply the *Compliance Management Analysis Checklist* in the IFLEP Appendix.

NOTE: When performing 1 and 2 above, pay special close attention to the creditor's compliance management policies and procedures with respect to the following:

- Does any aspect of the creditor's credit operations appear to vary by any of the prohibited bases? Examples: (i) The creditor establishes most of its branches in predominately non-

**CFPB**

**Examination Procedures**                                                      **ECOA**

minority neighborhoods and does not have a presence in nearby minority neighborhoods; or (ii) Spanish and English advertisements emphasize different credit products.

• Do the creditor's underwriting or pricing guidelines contain any unusual criteria that could have a possibly negative disparate impact on a protected class? (e.g., underwriting or price models that use ZIP codes.

• Are the creditor's policies, procedures, or guidelines vague or unduly subjective with respect to (i) underwriting; (ii) pricing; (iii) referring applicants to subsidiaries, affiliates, or lending channels within the creditor; (iv) classifying applicants as "prime" or "sub-prime" borrowers; or (v) deciding what kinds of alternative loan products should be offered or recommended to applicants?

• Does the creditor allow exceptions to its underwriting, pricing, or product recommendation policies and procedures to be made subjectively or without clear guidance? Even if the policies and procedures are clear, does the creditor make a large number of such exceptions?

• Does the creditor give its employees significant discretion to decide what products to offer or the price to offer, including both interest rates and fees?

• Does any employee receive incentives depending, directly or indirectly, on the terms or conditions of the credit product sold or the price (including both interest rates and fees) charged?

• Does the creditor rely on third parties, such as brokers, for a significant part of its credit operations?

These factors create conditions under which the risk of fair lending violations may be increased. Whether any particular factor constitutes a fair lending violation requires consideration of the particular facts and circumstances at issue.

**C.  Examiner's Compliance Management / Risk Assessment Examination Summary, Recommendation and Comments**

**[Click&type]**

# CFPB
# Examination Procedures                                    ECOA

## Section B: FAIR LENDING EXAMINATION PROCEDURES

### A. Examination Objective & Purpose

- To determine whether the creditor discriminated against members of one or more protected classes in any aspect of its credit operations.

### B. Pre-Examination Procedures – Data Request[1]

1. For mortgages, determine if the CFPB has received all the data typically used by creditors in pricing and underwriting decisions.[2] If not, in consultation with Headquarters, request from the creditor all relevant data in electronic format.

2. For non-mortgage products, in consultation with Headquarters, request from the creditor all relevant data in electronic format.

NOTE: It may take a significant amount of time for the creditor to produce data and for Headquarters to review it. Data requests should be sent out as early as practicable to ensure the incorporation of all analyses in the examination.

### C. Pre-Examination Procedures – Scoping

No single fair lending examination can reasonably be expected to scrutinize every aspect of an institution's credit operations. The purpose of pre-examination scoping is to help examiners target areas with the highest fair lending risk.

The examiners, together with Headquarters, should use statistical analyses whenever appropriate to scope fair lending examinations in addition to following the procedures in Part I of the IFLEP ("*Examination Scope Guidelines*").

1. Review any preliminary data screens provided by Headquarters to identify possible examination focal points.[3]

2. Review information from previous compliance examinations that could inform potential focal points of the current examination.

3. Follow the steps in the *Examination Scope Guidelines*. Inform Headquarters of the information you gathered about the creditor. Consult Headquarters to determine what additional information would be helpful to improve data analyses and refine scoping.

4. Together with Headquarters, finalize the scope and intensity of the fair lending examination.

---

[1] If it is decided that statistical methods will not be used in the examination, this step can be skipped.

[2] For some creditors, the CFPB routinely requests additional mortgage data fields beyond the HMDA data. For these creditors, the examiners will likely not have to make any pre-examination mortgage data requests.

[3] A focal point is a combination of loan product(s), market(s), decision center(s), time frame and prohibited basis to be analyzed during the fair lending examination.

# CFPB
# Examination Procedures                                    ECOA

## D.  Examination Procedures

The IFLEP's examination procedures (Part III) are focused on conducting comparative file reviews and not statistical analysis. It is important to supplement the IFLEP examination procedures whenever statistical analysis is involved.

1. When statistical analysis is not part of the examination, follow Part III of the IFLEP to examine the creditor. Working with Headquarters, assess possible violations, and follow Part IV of the IFLEP, Steps 1–3, when discussing results with the creditor and reviewing all responses.

2. When statistical analysis is part of the examination, examiners should work closely with Headquarters to do the following:

   a. Follow Part III of the IFLEP to examine the creditor, including conducting comparative file reviews as appropriate.

   b. Integrate creditor-specific information into statistical models. Follow Part III.A of the IFLEP to verify the accuracy of the data. To the extent HMDA data is used, apply the HMDA / Regulation C examination procedures to verify data integrity. For non-mortgage data, consult with Headquarters on how to verify data integrity. If the most recent Compliance Management review indicates that the creditor does not have adequate policies and procedures in place to ensure data integrity, increase the sample size for the data verification.

   c. Assess possible violations, and follow Part IV of the IFLEP, Step 1, to discuss results with the creditor, including sharing our statistical analyses with the creditor and asking for comments and explanations.

   d. Review the creditor's response. Follow Part IV of the IFLEP, Steps 2–3. If necessary, in consultation with Headquarters, refine our statistical models and re-analyze.

3. Consult with Headquarters to reach the final conclusions. Follow Part IV of the IFLEP, Steps 4–5.

## E.  Examiner's Fair Lending Examination Summary, Recommendation and Comments

**[Click&type]**

**CFPB**

**Examination Procedures**                                             **ECOA**

## Section C: REGULATION B EXAMINATION CHECKLIST

### A.  Examination Objective & Purpose

- To determine whether the creditor is in compliance with those requirements of ECOA that are set forth in Regulation B.

### B.  Examination Procedures

The ECOA and its implementing Regulation B not only prohibit discrimination in credit transactions, but also set forth additional requirements, such as requiring adverse action notices in appropriate circumstances. Thus, not all items on the checklist relate to discrimination. Some items on the checklist, however, do reflect a possible fair lending violation even though they are not stated in those terms.

Accordingly, depending on the general risk profile of the creditor and the Section A Compliance Management/Risk Assessment, not all items on the checklist need be included in every fair lending exam. Examiners should consult with Headquarters to determine which sections of this checklist should be completed in an examination.

The checklist, supporting documentation for any apparent violations, and management response should be included in the work papers. In consultation with Headquarters, the Examiner-in-Charge, and the Regional Manager, request that the management responsible for the transactions provide a response on any apparent violations.

A "No" answer indicates a possible exception or deficiency and should be explained in the work papers.[4] If a line item is not applicable within the area you are reviewing, indicate "NA."

---

[4] If the violation of 12 CFR 1002.6(b)(6), 1002.9, 1002.10, 1002.12, or 1002.13 results from an inadvertent error, namely a mechanical, electronic, or clerical error that the creditor demonstrates was not intentional and occurred notwithstanding the maintenance of procedures reasonably adapted to avoid such errors, there is no violation. On discovering an inadvertent error under 12 CFR 1002.9 and 1002.10, the creditor must correct it as soon as possible; inadvertent errors under 12 CFR 1002.12 and 1002.13 must be corrected prospectively.  To determine whether an error is inadvertent, you should consult with the Examiner-in-Charge.

# CFPB
# Examination Procedures                                                ECOA

*All citations are to Regulation B, 12 CFR Part 1002.*

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| **Prohibited Practices** | ☐ | ☐ | [Click&type] |
| *Discrimination* | ☐ | ☐ | [Click&type] |
| *See Section B: Fair Lending Examination Procedures* | ☐ | ☐ | [Click&type] |
| *Discouragement* | ☐ | ☐ | [Click&type] |
| *Obtain and review marketing and advertising materials (including signs or other displays), prescreened solicitations, and the criteria used to determine the potential recipients of the particular solicitation, scripts, and interview forms used for pre-application interviews and for taking applications, and rate sheets and product information used in discussing available types of credit with applicants.  Conduct loan agent interviews to determine whether they show an understanding of the regulatory requirements.* | ☐ | ☐ | [Click&type] |
| 1.  Does the creditor not make any oral or written statements, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application? (12 CFR 1002.4(b)) | ☐ | ☐ | [Click&type] |
| 2.  Does the creditor not use statements that the applicant should not bother to apply based on a prohibited basis (e.g., you shouldn't bother to apply because you are retired)? (12 CFR Part 1002, Supp. I, Comment  1002.4(b)-1(i)) | ☐ | ☐ | [Click&type] |
| 3.  Does the creditor not use words, symbols, models or other forms of communication in advertising that express, imply, or suggest a discriminatory preference or a policy of exclusion in violation of the ECOA? (Comment 1002.4(b)-1(ii)) | ☐ | ☐ | [Click&type] |
| 4.  Does the creditor not use scripts that discourage applications on a prohibited basis? (Comment 1002.4(b)-1(iii)) | ☐ | ☐ | [Click&type] |
| 5.  Are the criteria used for prescreened solicitations not discriminatory on a prohibited basis? (12 CFR 1002.4(a), (b)) | ☐ | ☐ | [Click&type] |

JA0225

# CFPB
# Examination Procedures                                                    ECOA

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| 6.   Does the text of any prescreened solicitations avoid statements that would tend to discourage, on a prohibited basis, a reasonable person from making or pursuing an application? (12 CFR 1002.4(b)) | ☐ | ☐ | [Click&type] |
| **Rules for Taking Applications**[5] | | | |
| *Obtain and review application forms (including scripts for telephone applications and screen shots of online applications), disclosures, a sample of loan files,[6] creditor policies and procedures and audits pertaining to the taking of applications, and training materials. Conduct loan officer interviews to determine whether they show an understanding of the regulatory requirements and that policies and procedures are consistently applied.* | | | |
| 7.   Does the creditor use written applications for credit that is primarily for the purchase or refinancing of dwellings that are occupied or to be occupied by the applicant as a principal residence and where the credit will be secured by the dwellings? (12 CFR 1002.4(c), 1002.13(a)) | ☐ | ☐ | [Click&type] |
| 8.   If the creditor collects information (in addition to information required for government monitoring purposes, such as 12 CFR 1002.13, HMDA, and HAMP) on the race, color, religion, national origin, or sex of the applicant or any other person in connection with a credit transaction for purposes of a "self-test": | | | |
| a.   Does the creditor meet the "self-test" requirements of 12 CFR 1002.15 (*see* Checklist Items 70–71)? | ☐ | ☐ | [Click&type] |

---

[5] A creditor may obtain information that is otherwise restricted to determine eligibility for a special purpose program, as provided in 12 CFR 1002.8(b), (c), and (d).  To the extent there is an appropriately established and administered special purpose program under which any otherwise restricted information was requested, obtaining such information should not constitute a violation, and Headquarters and the Examiner-in-Charge should be consulted.

[6] To the extent the institution maintains any information in its files that is prohibited by the ECOA or Regulation B for use in evaluating applications, that information may be retained if it was obtained (a) prior to March 23, 1977; (b) from consumer reporting agencies, an applicant, or others without the specific request of the creditor; or (c) as required to monitor compliance with the ECOA and Regulation B or other federal or state statutes or regulations.  (12 CFR 1002.12(a))

# CFPB
# Examination Procedures                                                ECOA

|  |  | Yes No | Basis of Conclusion |
|---|---|---|---|
| b. | Does the creditor disclose to the applicant, orally or in writing, when requesting the information that: (1) the applicant is not required to provide the information; (2) the creditor is requesting the information to monitor its compliance with the federal ECOA; (3) Federal law prohibits the creditor from discriminating on the basis of this information, or on the basis of an applicant's decision not to furnish the information; and (4) if applicable, certain information will be collected based on visual observation or surname if not provided by the applicant or other person? (12 CFR 1002.5(b)(1)) | ☐   ☐ | [Click&type] |
| 9. | If a designation of title, such as Ms., Miss, Mrs., or Mr. is requested on an application form, does the form disclose that such designation is optional, and does the application form otherwise use only terms that are neutral as to sex? (12 CFR 1002.5(b)(2)) | ☐   ☐ | [Click&type] |
| 10. | Does the creditor only request any information concerning the spouse or former spouse of an applicant when: |  |  |
| a. | The spouse will be permitted to use the account; | ☐   ☐ | [Click&type] |
| b. | The spouse will be contractually liable on the account; | ☐   ☐ | [Click&type] |
| c. | The applicant is relying on the spouse's income as a basis for repayment of the credit requested; | ☐   ☐ | [Click&type] |
| d. | The applicant resides in a community property state or is relying on property located in such a state as a basis for repayment of the credit requested; or | ☐   ☐ | [Click&type] |
| e. | The applicant is relying on alimony, child support, or separate maintenance payments from a spouse or former spouse as a basis for repayment of the credit requested? (12 CFR 1002.5(c)(2)) | ☐   ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                    **ECOA**

| | Yes No | Basis of Conclusion |
|---|---|---|
| 11.  In the case of applications for individual unsecured credit, does the creditor inquire about the applicant's marital status only when the applicant resides in a community property state or is relying on property located in such a state as a basis for repayment of the credit requested? (12 CFR 1002.5(d)(1)) | ☐ ☐ | [Click&type] |
| 12.  In the case of applications for other than individual unsecured credit, are the creditor's inquiries into marital status limited to the terms "married," "unmarried," and "separated" (a creditor may explain that the category "unmarried" includes single, divorced, and widowed persons)? (12 CFR 1002.5(d)(1)) | ☐ ☐ | [Click&type] |
| 13.  If the creditor inquires whether income stated in an application is derived from alimony, child support, or separate maintenance payments, does the creditor also disclose to the applicant that such income need not be revealed if the applicant does not want the creditor to consider the information in determining the applicant's creditworthiness? (12 CFR 1002.5(d)(2)) | ☐ ☐ | [Click&type] |
| 14.  Does the creditor not inquire about birth control practices, intentions concerning the bearing or rearing of children, or capability to bear children? (A creditor may inquire about the number and ages of an applicant's dependents or about dependent-related financial obligations or expenditures, provided such information is requested without regard to sex, marital status, or any other prohibited basis.) (12 CFR 1002.5(d)(3)) | ☐ ☐ | [Click&type] |
| **Rules for Evaluating Applications** | | |
| *Obtain and review policies and procedures, training materials, a sample of loan files, audits pertaining to evaluating, and pricing applications for credit (including, but not limited to those regarding loan servicing, modifications, collections, and loss mitigation), and information regarding statistical models used in credit evaluations.  Conduct loan underwriter interviews to determine whether they show an understanding of the regulatory requirements and that policies and procedures are consistently applied.* | | |

**CFPB**

**Examination Procedures**                                                                  **ECOA**

| | | Yes | No | Basis of Conclusion |
|---|---|---|---|---|
| 15. | To the extent that a creditor takes into account an applicant's age (assuming that the applicant has the capacity to enter into a binding contract), determine whether the creditor uses age in an empirically derived, demonstrably and statistically sound, credit scoring system or a judgmental system. (12 CFR 1002.2(p)) | | | |
| | a. In an empirically derived, demonstrably and statistically sound, credit scoring system, is age a predictive variable and is the age of an elderly applicant (62 or older) not assigned a negative factor or value? (12 CFR 1002.6(b)(2)(ii)) | ☐ | ☐ | [Click&type] |
| | b. In a judgmental system of evaluating creditworthiness, is the applicant's age considered only for the purpose of determining a pertinent element of creditworthiness? (12 CFR 1002.6(b)(2)(iii)) | ☐ | ☐ | [Click&type] |
| | c. Except as set forth in Checklist Item 15(b) above (use for pertinent element of creditworthiness), in any system for evaluating creditworthiness, is the age of an applicant 62 or older considered only to favor him or her in extending credit? (12 CFR 1002.6(b)(2)(iv)) | ☐ | ☐ | [Click&type] |
| 16. | Does the creditor only take into account whether an applicant's income derives from any public assistance program in a judgmental system of evaluating creditworthiness and only for the purpose of determining a pertinent element of creditworthiness? (12 CFR 1002.6(b)(2)(iii)) | ☐ | ☐ | [Click&type] |
| 17. | When evaluating creditworthiness, does the creditor not make assumptions or use aggregate statistics relating to the likelihood that any category of persons will bear or rear children or will, for that reason, receive diminished or interrupted income in the future? (12 CFR 1002.6(b)(3)) | ☐ | ☐ | [Click&type] |
| 18. | Does the creditor not take into account whether there is a telephone listing in the name of an applicant for consumer credit? (12 CFR 1002.6(b)(4)) | ☐ | ☐ | [Click&type] |

**CFPB**

# Examination Procedures

**ECOA**

|  | Yes | No | Basis of Conclusion |
|---|---|---|---|
| 19. Does the creditor count, and not discount or exclude from consideration, the income of an applicant or the spouse of an applicant because of a prohibited basis? (12 CFR 1002.6(b)(5)) (A creditor may consider the amount and probable continuance of any income in evaluating an applicant's creditworthiness.) | ☐ | ☐ | [Click&type] |
| 20. Does the creditor consider income derived from part-time employment, alimony, child support, separate maintenance payments, retirement benefits, or public assistance on an individual basis, and not on the basis of aggregate statistics? (Comment 1002.6(b)(5)-1) | ☐ | ☐ | [Click&type] |
| 21. Does the creditor count, and not discount or exclude from consideration, the income of an applicant or the spouse of an applicant because the income is derived from part-time employment, is an annuity, pension, or other retirement benefit, or comes from multiple income streams? (12 CFR 1002.6(b)(5), Comment 1002.6(b)(5)-4) (A creditor may consider the amount and probable continuance of any income in evaluating an applicant's creditworthiness.) | ☐ | ☐ | [Click&type] |
| 22. When an applicant relies on alimony, child support, or separate maintenance payments in applying for credit, does the creditor consider such payments as income to the extent that they are likely to be consistently made? (12 CFR 1002.6(b)(5)) | ☐ | ☐ | [Click&type] |
| 23. To the extent the creditor considers credit history in evaluating the creditworthiness of similarly qualified applicants for a similar type and amount of credit, in evaluating an applicant's creditworthiness, does the creditor consider: | ☐ | ☐ | [Click&type] |
| a. The credit history, when available, of accounts designated as accounts that the applicant and the applicant's spouse are permitted to use or for which both are contractually liable? (12 CFR 1002.6(b)(6)(i)) | ☐ | ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                    **ECOA**

|  | Yes | No | Basis of Conclusion |
|---|---|---|---|
| b. On the applicant's request, any information that the applicant may present that tends to indicate the credit history being considered by the creditor does not accurately reflect the applicant's creditworthiness? (12 CFR 1002.6(b)(6)(ii)) | ☐ | ☐ | [Click&type] |
| c. On the applicant's request, the credit history, when available, of any account reported in the name of the applicant's spouse or former spouse that the applicant can demonstrate accurately reflects the applicant's creditworthiness? (12 CFR 1002.6(b)(6)(iii)) | ☐ | ☐ | [Click&type] |
| 24. Does the creditor not deny credit in whole or in part based on the country an applicant is from? (Comment 1002.2(z)-2)) | ☐ | ☐ | [Click&type] |
| 25. Are married and unmarried applicants evaluated by the same standards? (12 CFR 1002.6(b)(8)) | ☐ | ☐ | [Click&type] |
| 26. In evaluating joint applicants, are joint applicants treated in the same manner regardless of the existence, absence, or likelihood of a marital relationship between the parties? (12 CFR 1002.6(b)(8)) | ☐ | ☐ | [Click&type] |
| 27. Does the creditor not consider race, color, religion, or sex (or an applicant's or other person's decision not to provide the information) in any aspect of a credit transaction? (12 CFR 1002.6(b)(1), (9)) | ☐ | ☐ | [Click&type] |
| **Rules for Extensions of Credit** | | | |
| *Obtain and review policies and procedures, training materials, a sample of loan files, closing instructions on a sample of loans, and audits pertaining to extensions of credit (including, but not limited to signature requirements and account management).  Conduct loan officer and closing agent interviews to determine whether they show an understanding of the regulatory requirements and that policies and procedures are consistently applied.* | | | |
| 28. Does the creditor not refuse to grant an individual account to a creditworthy applicant on a prohibited basis?  (12 CFR 1002.7(a)) | ☐ | ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                        **ECOA**

| | | Yes | No | Basis of Conclusion |
|---|---|---|---|---|
| 29. | Does the creditor not refuse to allow an applicant to open or maintain an account in a birth-given first name and a surname that is the applicant's birth-given surname, the spouse's surname, or a combined surname? (12 CFR 1002.7(b)) | ☐ | ☐ | [Click&type] |
| 30. | With respect to applicants who are contractually liable on an existing open-end account, does the creditor on the basis of the applicant's reaching a certain age or retiring or on the basis of a change in the applicant's name or marital status, not require reapplication (except as permitted by 12 CFR 1002.7(c)(2), see Checklist Item 31), change the terms of the account, or terminate the account, unless there is evidence of the applicant's inability or unwillingness to repay?  (12 CFR 1002.7(c)(1)) | ☐ | ☐ | [Click&type] |
| 31. | To the extent the creditor requires reapplication for an open-end account on the basis of a change in the marital status of an applicant who is contractually liable: | | | |
| | a.  Does it do so only when (1) the original credit granted was based in whole or in part on the income of the applicant's spouse; and (2) the creditor has information available to it indicating that the applicant's income may not support the amount of credit currently available; and | ☐ | ☐ | [Click&type] |
| | b.  Does it allow the account holder full access to the account under the existing contract terms while the reapplication is pending? (12 CFR 1002.7(c)(2), Comment 1002.7(c)(2)-1) | ☐ | ☐ | [Click&type] |
| 32. | For joint applications, is there evidence of an intent to apply for joint credit at the time of application?  (The creditor shall not deem the submission of a joint financial statement or other evidence of jointly held assets as an application for joint credit.) (12 CFR 1002.7(d)(1), Comment 1002.7(d)(1)-3) | ☐ | ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                                    **ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| 33. Does the creditor allow an applicant who is individually creditworthy to obtain credit without a spouse's or other person's signature (other than as a joint applicant)? (12 CFR 1002.7(d)(1), Comment 1002.7(d)(1)-1) | ☐ | ☐ | [Click&type] |
| 34. Does the creditor require a signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument in only the following circumstances and based only on existing forms of ownership and not on the possibility of a subsequent change (Comment 1002.7(d)(2)-1(i)): | ☐ | ☐ | [Click&type] |
|    a. If an applicant requests unsecured credit and relies in part upon property that the applicant owns jointly with another person to satisfy the creditor's standards of creditworthiness, the creditor requires the signature of the other person only on the instrument(s) necessary, or reasonably believed by the creditor to be necessary, under the law of the state in which the property is located, to enable the creditor to reach the property being relied upon in the event of the death or default of the applicant. (12 CFR 1002.7(d)(2)) | ☐ | ☐ | [Click&type] |
|    b. If a married applicant requests unsecured credit and resides in a community property state, or if the applicant is relying on property located in such a state, the creditor requires the signature of the spouse only on any instrument necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the community property available to satisfy the debt in the event of default and (1) applicable state law denies the applicant power to manage or control sufficient community property to qualify for the credit requested under the creditor's standards of creditworthiness; and (2) the applicant does not have sufficient separate property to qualify for the credit requested without regard to community property.  (12 CFR 1002.7(d)(3)) | ☐ | ☐ | [Click&type] |

**CFPB**

# Examination Procedures

**ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| c. If an applicant requests secured credit, the creditor requires the signature of the applicant's spouse or other person only on those instruments necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the property being offered as security available to satisfy the debt in the event of default (for example, an instrument to create a valid lien, pass clear title, waive inchoate rights, or assign earnings). (12 CFR 1002.7(d)(4)) | ☐ | ☐ | [Click&type] |
| 35. Does the creditor refrain from routinely requiring a non-applicant joint owner to sign an instrument (such as a quitclaim deed) that would result in the forfeiture of the joint owner's interest in the property? (Comment 1002. 7(d)(2)-1(ii)(C)) | ☐ | ☐ | [Click&type] |
| 36. In those situations when under the creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the credit requested, does the creditor allow the applicant to have either his or her spouse or someone other than his or her spouse to serve as the additional party? (12 CFR 1002.7(d)(5)) | ☐ | ☐ | [Click&type] |
| 37. If a borrower's creditworthiness is reevaluated when a credit obligation is renewed, does the creditor determine whether an additional party is still warranted and, if not warranted, release the additional party?  (Comment 1002.7(d)(5)-3) | ☐ | ☐ | [Click&type] |
| 38. Does the creditor not refuse to extend credit and not terminate an account because credit life, health, accident, or disability insurance is not available because of the applicant's age? (12 CFR 1002.7(e)) | ☐ | ☐ | [Click&type] |
| **Special-Purpose Credit Programs** | | | |
| *Inquire as to whether the creditor offers a special-purpose credit program.* | | | |

**CFPB**

# Examination Procedures

**ECOA**

|  |  | Yes | No | Basis of Conclusion |
|---|---|---|---|---|
| 39. | To the extent an issue arose regarding a special-purpose credit program, were the Examiner-in-Charge and Headquarters consulted? <br><br> In the Basis of Conclusion section, describe the issue, the office (and person) consulted at Headquarters, and the resolution. If not applicable, please note in the Basis of Conclusion. | ☐ | ☐ | [Click&type] |
| **Notifications** | | | | |
| *Obtain and review policies and procedures, training materials, a sample of loan files, and audits pertaining to notifications (including, but not limited to those that pertain to prequalification and preapproval processes, incomplete applications, counteroffers, loan modifications, and those that apply when there are third parties or multiple creditors). Conduct loan officer interviews to determine whether they show an understanding of the regulatory requirements and that policies and procedures are consistently applied.* | | | | |
| **Consumer Credit** | | | | |
| 40. | With respect to **consumer credit**, the creditor appropriately notified applicants as follows: | | | |
| | a.  Within 30 days after receiving a completed application, the creditor notified applicants concerning the creditor's approval of, counteroffer to, or adverse action on the application (*unless* the parties contemplated that the applicant would inquire about the status, the application was approved, and the applicant failed to inquire within 30 days after applying, in which case the creditor may treat the application as withdrawn). (12 CFR 1002.9(a)(1)(i) and 1002.9(e)) | ☐ | ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                    **ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| b.   Within 30 days after taking adverse action on an incomplete application, the creditor notified applicants of the adverse action in writing (*unless* written notice of incompleteness is provided within 30 days of receipt of the incomplete application, specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application), (12 CFR 1002.9(a)(1)(ii) and 1002.9(c)) | ☐ | ☐ | [Click&type] |
| c.   Within 30 days after taking adverse action on an existing account, the creditor notified applicants of the adverse action in writing; (12 CFR 1002.9(a)(1)(iii)) | ☐ | ☐ | [Click&type] |
| d.   Within 90 days after notifying the applicant of a counteroffer, if the applicant does not expressly accept or use the credit offered, the creditor notified applicants of the adverse action taken in writing (unless the counteroffer was accompanied by the notice of adverse action on the credit terms originally sought) (12 CFR 1002.9(a)(1)(iv), Comment 1002.9(a)(1)-6) | ☐ | ☐ | [Click&type] |
| 41.   With respect to **consumer credit**, the creditor's notifications given to an applicant when an adverse action is taken are in writing, capable of being retained, and contain all of the following: | ☐ | ☐ | [Click&type] |
| a.   A statement of the action taken; | ☐ | ☐ | [Click&type] |
| b.   The name and address of the creditor; | ☐ | ☐ | [Click&type] |
| c.   A statement of the provisions of Section 701(a) of the ECOA;7 | ☐ | ☐ | [Click&type] |

---

[7] This statement must be substantially similar to the following:  "The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is [name and address as specified by the appropriate agency listed in appendix A of this regulation]."  (12 CFR 1002.9(b)(1))

**CFPB**

# Examination Procedures

**ECOA**

|  | Yes No | Basis of Conclusion |
|---|---|---|
| d.  The name and address of the federal agency that administers compliance with respect to the creditor; and | ☐  ☐ | [Click&type] |
| e.  Either:<br><br>i.  A statement of specific reasons for the action taken that is specific and indicates the principal reason(s) for the adverse action  (Statements that the adverse action was based on the creditor's internal standards or policies or that the applicant, joint applicant, or similar party failed to achieve a qualifying score on the creditor's credit scoring system are insufficient);  *or*<br><br>ii.  A disclosure (which contains the name, address, and telephone number of the person or office from which the statement of reasons can be obtained) of the applicant's right to a statement of specific reasons within 30 days, if the statement is requested within 60 days of the creditor's notification (and if, the creditor chooses to provide the reasons orally, the creditor shall also disclose the applicant's right to have them confirmed in writing within 30 days of receiving the applicant's written request for confirmation).  (12 CFR 1002.4(d)(1) and 1002.9(a)(2), (b)(1), (b)(2)) | ☐  ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                              **ECOA**

| | Yes No | Basis of Conclusion |
|---|---|---|
| ***Small Business Credit*** | | |
| 42.   Except for transactions conducted entirely by phone, in connection with **business credit for businesses with gross revenues of $1 million or less** in the preceding fiscal year or to start a new business (Comment 1002.9(a)(3)-1) (other than an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit): | | |
| a.   Within 30 days after receiving a completed application, the creditor notified applicants concerning the creditor's approval of, counteroffer to, or adverse action on the application orally or in writing (*unless* the parties contemplated that the applicant would inquire about the status, the application was approved, and the applicant failed to inquire within 30 days after applying, in which case the creditor may treat the application as withdrawn). (12 CFR 1002.9(a)(1)(i), 1002.9(e), and 1002.9(a)(3)(i)(A)) | ☐  ☐ | [Click&type] |
| b.   Within 30 days after taking adverse action on an incomplete application, the creditor notified applicants of the adverse action orally or in writing (unless written notice of incompleteness is provided within 30 days of receipt of the incomplete application, specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application), (12 CFR 1002.9(a)(1)(ii), 1002.9(c), and 1002.9(a)(3)(i)(A)) | ☐  ☐ | [Click&type] |
| c.   Within 30 days after taking adverse action on an existing account, the creditor notified applicants of the adverse action orally or in writing; (12 CFR 1002.9(a)(1)(iii) and 1002.9(a)(3)(i)(A)) | ☐  ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                              **ECOA**

|  |  | Yes | No | Basis of Conclusion |
|---|---|---|---|---|
| d. | Within 90 days after notifying the applicant of a counteroffer, if the applicant does not expressly accept or use the credit offered, the creditor notified applicants of the adverse action orally or in writing (unless the counteroffer was accompanied by the notice of adverse action on the credit terms originally sought) (12 CFR 1002.9(a)(1)(iv), Comment 1002.9(a)(1)-6, and 12 CFR 1002.9(a)(3)(i)(A)) | ☐ | ☐ | [Click&type] |
| 43. | Except for transactions conducted entirely by phone, in connection with business credit for businesses with gross revenues of $1 million or less in the preceding fiscal year or to start a new business (Comment 1002.9(a)(3)-1) (other than an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit), the creditor's adverse action notices contained (orally or in writing): |  |  |  |
| a. | A statement of the action taken; | ☐ | ☐ | [Click&type] |
| b. | The name and address of the creditor; | ☐ | ☐ | [Click&type] |
| c. | A statement of the provisions of Section 701(a) of the ECOA;[8] | ☐ | ☐ | [Click&type] |
| d. | The name and address of the federal agency that administers compliance with respect to the creditor (namely, CFPB); and | ☐ | ☐ | [Click&type] |

---

[8] *See* supra note 7.

# CFPB

## Examination Procedures

ECOA

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| e. Either: <br><br> i. A statement of specific reasons for the action taken (that is specific and indicates the principal reason(s) for the adverse action); *or* <br><br> ii. Unless provided at the time of application, a written, capable of being retained, disclosure (which contains the name, address, telephone number of the person or office from which the statement of reasons can be obtained, and, if given at the time of application, a statement of the provisions of Section 701(a) of the ECOA9) of the applicant's right to a statement of specific reasons within 30 days, if the statement is requested within 60 days of the creditor's notification (and if, the creditor chooses to provide the reasons orally, the creditor shall also disclose the applicant's right to have them confirmed in writing within 30 days of receiving the applicant's written request for confirmation). (12 CFR 1002.9(a)(2), 1002.9(a)(3)(i)(A), 1002.9(a)(3)(i)(B), and 1002.9(b)(1)) | ☐ | ☐ | [Click&type] |
| 44. With respect to **applications made entirely by telephone in connection with business credit for businesses with gross revenues of $1 million or less** in the preceding fiscal year or to start a new business (Comment 1002.9(a)(3)-1) (other than an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit), the creditor at least made an oral statement of the action taken and of the applicant's right to a statement of reasons for adverse action. (12 CFR 1002.9(a)(3)(i)(C)) | ☐ | ☐ | [Click&type] |

---

[9] *See* supra note 7.

# CFPB
# Examination Procedures
# ECOA

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| **Large Business Credit** | | | |
| 45.  For **businesses with gross revenues in excess of $1 million** in the preceding fiscal year, or for extensions of trade credit, credit incident to a factoring agreement or other similar types of business credit, did the creditor at least: <br><br> a. Communicate the notification of action taken within a reasonable time orally or in writing, and <br><br> b. In response to an applicant's written request for the reasons within 60 days of the creditor's notification, provide in writing the reasons for adverse action and a statement of the provisions of Section 701(a) of the ECOA[10]? (12 CFR 1002.9(a)(3)(ii)) | ☐ | ☐ | [Click&type] |
| **All Credit Transactions** | | | [Click&type] |
| 46.  Within 30 days after receiving an application that is incomplete regarding matters than an applicant can complete, does the creditor (a) notify the applicant of adverse action (in the manner appropriate for the type of credit – business or consumer), or (b) send a written notice to the applicant specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application?  (Although the creditor may inform the applicant orally of the need for additional information, if the application remains incomplete it must provide either notice within the specified time period.) (12 CFR 1002.9(c)) | ☐ | ☐ | [Click&type] |

---

[10] *See* supra note 7.

# CFPB
# Examination Procedures

# ECOA

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| 47. When declining a request for a modification of a loan, does the creditor always provide an adverse action notice when the consumer is not delinquent or in default? (12 CFR 1002.9(a)(1); see Federal Reserve Board Consumer Affairs Letter 09-13 (December 4, 2009) (http://www.federalreserve.gov/boarddocs/caletters/2009/0913/caltr0913.htm). | ☐ | ☐ | [Click&type] |
| 48. When an application involves multiple applicants, does the creditor provide notification of action to the primary applicant, when one is readily apparent? (12 CFR 1002.9(f)) | ☐ | ☐ | [Click&type] |
| 49. When an application is made on behalf of an applicant by a third party to multiple creditors, including the creditor, and no credit is offered or if the applicant does not expressly accept or use the credit offered, does the creditor provide the appropriate adverse action notice either directly or through the third party (disclosing the identify of each creditor on whose behalf the notice is given)? (12 CFR 1002.9(g)) | ☐ | ☐ | [Click&type] |
| **Designation of Accounts** | | | |
| *Obtain and review policies and procedures, training materials, and audits pertaining to the designation of accounts on furnishing them to credit reporting agencies, as well as a sample of information reported to the credit reporting agencies.* | | | |
| 50. To the extent the creditor furnishes consumer credit information, does it designate any new account to reflect the participation of both spouses if the applicant's spouse is permitted to use or is contractually liable on the account (other than as a guarantor, surety, endorser, or similar party) (12 CFR 1002.10(a), Comment 1002.10-1) | ☐ | ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                                 **ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| 51. To the extent the creditor furnishes consumer credit information, does it designate any existing account to reflect the participation of both spouses if the applicant's spouse is permitted to use or is contractually liable on the account (other than as a guarantor, surety, endorser, or similar party) within 90 days after receiving a written request to do so from one of the spouses? (12 CFR 1002.10(a), Comment 1002.10-1) | ☐ | ☐ | [Click&type] |
| 52. To the extent the creditor furnishes consumer credit information to a consumer reporting agency concerning accounts designated to reflect the participation of both spouses, does the creditor furnish the information in a manner that enables the consumer reporting agency to provide access to the information in the name of each spouse?  (12 CFR 1002.10(b), Comment 1002.10-1) | ☐ | ☐ | [Click&type] |
| 53. To the extent the creditor furnishes consumer credit information in response to inquiries about accounts designated to reflect the participation of both spouses, does the creditor furnish the information in the name of the spouse about whom the information is requested? (12 CFR 1002.10(c), Comment 1002.10-1) | ☐ | ☐ | [Click&type] |

**CFPB**

# Examination Procedures

**ECOA**

|  | Yes | No | Basis of Conclusion |
|---|---|---|---|
| **Record Retention** | | | |
| *Obtain and review policies and procedures, training materials, audits, a sample of loan files, relevant third-party contracts, and other records required to be retained (e.g., information relating to prescreened offers of credit and self-tests) that pertain to record retention (including but not limited to record retention schedules, retention of documents relating to prescreened offers of credit, and retention of documents relating to any self-tests). Inquire into whether there is any enforcement action or investigation involving the creditor.* | | | |
| 54.  Does the creditor retain for 25 months (12 months for business credit regarding businesses with gross revenues of $1 million or less in the previous fiscal year, except an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit) after the date that the creditor notifies an applicant of action taken or of incompleteness, an original or copy of the following: | ☐ | ☐ | [Click&type] |
| a.  The application and any other written or recorded information used in evaluating the application that is not returned to the applicant at the applicant's request? (12 CFR 1002.12(b)(1)(i)) | ☐ | ☐ | [Click&type] |
| b.  Any information required to be obtained concerning characteristics of the applicant to monitor compliance with the ECOA and Regulation B or other similar law, such as the Home Mortgage Disclosure Act or Home Affordable Modification Program? (12 CFR 1002.12(b)(1)(i)) | ☐ | ☐ | [Click&type] |
| c.  A copy of the notification of action taken, if written, or any notation or memorandum by the creditor, if made orally? (12 CFR 1002.12(b)(1)(ii)(A)) | ☐ | ☐ | [Click&type] |
| d.  A statement of specific reasons for adverse action, if written, or any notation or memorandum by the creditor, if made orally? (12 CFR 1002.12(b)(1)(ii)(B)) | ☐ | ☐ | [Click&type] |

# CFPB

# Examination Procedures

# ECOA

| | | Yes | No | Basis of Conclusion |
|---|---|---|---|---|
| e. | Any written statement submitted by the applicant alleging a violation of the ECOA or Regulation B? (12 CFR 1002.12(b)(1)(iii)) | ☐ | ☐ | [Click&type] |
| 55. | Does the creditor retain for 25 months (12 months for business credit regarding businesses with gross revenues of $1 million or less in the previous fiscal year, except an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit) after the date that the creditor notifies an applicant of adverse action regarding an existing account, an original or copy of the following: | | | |
| a. | Any written or recorded information concerning the adverse action? (12 CFR 1002.12(b)(2)(i)) | ☐ | ☐ | [Click&type] |
| b. | Any written statement submitted by the applicant alleging a violation of the ECOA or Regulation B? (12 CFR 1002.12(b)(2)(ii)) | ☐ | ☐ | [Click&type] |
| 56. | Does the creditor retain for 25 months (12 months for business credit regarding businesses with gross revenues of $1 million or less in the previous fiscal year, except an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit) after the date the creditor receives an application for which 1002.9's notification requirements do not apply (*e.g.*, when an application is expressly withdrawn, or an application is submitted to more than one creditor on behalf of the applicant, and the application is approved by one of the other creditors) all written or recorded information in its possession concerning the applicant, including any notation of action taken? (12 CFR 1002.12(b)(3), Comment 1002.12(b)(3)-1) | ☐ | ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                            **ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| 57. If the creditor has actual notice that it is under investigation or is subject to an enforcement proceeding for an alleged violation of the ECOA or Regulation B by the Attorney General of the United States or by the CFPB or other enforcement agency charged with monitoring the creditor's compliance with the ECOA and Regulation B, or if it has been served with notice of an action filed pursuant to Section 706 of the ECOA, did the creditor retain the foregoing information identified in Checklist Items 54–56 until final disposition of the matter (unless an earlier time is allowed by order of the agency or court).  (12 CFR 1002.12(b)(4)) | ☐ | ☐ | [Click&type] |
| 58. For business credit from businesses with gross revenues of more than $1 million in the previous fiscal year, or an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit, does the creditor retain records for at least 60 days after notifying the applicant of the action taken, or for 12 months if the applicant requests in writing during the 60-day time period the reasons for adverse action or that records be retained? (12 CFR 1002.12(b)(5)) | ☐ | ☐ | [Click&type] |
| 59. If the creditor conducts a self-test pursuant to 12 CFR 1002.15: | | | |
|    a. Does the creditor retain for 25 months after the self-test is completed, all written or recorded information about the self-test? | ☐ | ☐ | [Click&type] |
|    b. If the creditor has actual notice that it is under investigation or is subject to an enforcement proceeding for an alleged violation, or if it has been served with notice of a civil action, does the creditor retain the information until final disposition of the matter (unless an earlier time is allowed by the appropriate agency or court order)?  (12 CFR 1002.12(b)(6)) | ☐ | ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                      **ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| 60. For prescreened solicitations, does the creditor retain for 25 months (12 months for business credit except regarding businesses with gross revenues of more than $1 million in the previous fiscal year, or an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit) after the date on which an offer of credit was made to potential customers: (a) the text of any prescreened solicitation; (b) the list of criteria the creditor used both to determine the potential recipients of the particular solicitation and to determine who will actually be offered credit; and (c) any correspondence related to complaints (formal or informal) about the solicitation? (12 CFR 1002.12(b)(7), Comment 1002.12(b)(7)-2) | ☐ | ☐ | [Click&type] |
| **Information for Monitoring Purposes as to Applications from Natural Persons** | | | |
| *Obtain and review policies and procedures, training materials, a sample of loan files, quality control reports, and audits pertaining to information gathered for monitoring. Conduct loan officer interviews to determine whether they show an understanding of the regulatory requirements and that policies and procedures are consistently applied.* | | | |
| 61. With respect to applications for credit that are primarily for the purchase or refinancing of dwellings (as defined in 12 CFR 1002.13(a)(2)) that are occupied or to be occupied by the applicant as a principal residence where the credit will be secured by the dwelling,[11] does the creditor request (but not require) either on the application form or on a separate form that refers to the application (12 CFR 1002.13(b)) the following information regarding the applicant: | | | |

[11] Examiners should ensure that the institution limits its requests for government monitoring information under this section to only these loans, except as permitted by 12 CFR 1002.5(a)&(b) (see Checklist Item 8) or as required by HMDA (reaching home purchase loans, home improvement loans, refinancings, and (optionally) home equity lines of credit made in whole or in part for the purpose of home improvement or home purchase), or other governmental program or directive such as the Home Affordable Modification Program (HAMP).

# CFPB
# Examination Procedures                                    ECOA

|  |  | Yes No | Basis of Conclusion |
|---|---|---|---|
| a. | Ethnicity, using the categories "Hispanic or Latino," and "Not Hispanic or Latino"; and race, using the categories "American Indian or Alaska Native," "Asian," "Black or African American," "Native Hawaiian or Other Pacific Islander," and "White," and allowing applicants to select more than one racial designation? (12 CFR 1002.13(a)(1)(i), Comment 1002.13(b)-1) | ☐ ☐ | [Click&type] |
| b. | Sex? (12 CFR 1002.13(a)(1)(ii)) | ☐ ☐ | [Click&type] |
| c. | Marital status, using the categories married, unmarried, and separated? (12 CFR 1002.13(a)(1)(iii) | ☐ ☐ | [Click&type] |
| d. | Age? (12 CFR 1002.13(a)(1)(iv)) | ☐ ☐ | [Click&type] |
| 62. | If an applicant chooses not to provide the requested information or any part of it, does the creditor note that on the monitoring form and note on the form, to the extent possible, the ethnicity, race, and sex of the applicant(s) on the basis of visual observation or surname? (12 CFR 1002.13(b)) | ☐ ☐ | [Click&type] |
| 63. | If the creditor receives applications by mail, telephone, or electronic media and it is not evident on the face of an application how it was received, does the creditor indicate on the form or other application record how it was received? (Comment 1002.13(b)-3(iii)) | ☐ ☐ | [Click&type] |
| 64. | Does the creditor inform applicant(s) (a) that the information regarding ethnicity, race, sex, marital status, and age is being requested by the federal government for the purpose of monitoring compliance with federal statutes that prohibit creditors from discriminating against applicants on those bases; and (b) that if the applicant(s) chooses not to provide the information, the creditor is required to note the ethnicity, race and sex on the basis of visual observation or surname? (12 CFR 1002.13(c)) | ☐ ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                    **ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| **Appraisal Reports[12]** | | | |
| *Obtain and review policies and procedures, training materials, a sample of loan files, and audits pertaining to providing appraisal reports.  Conduct loan officer interviews to determine whether they show an understanding of the regulatory requirements and that policies and procedures are consistently applied.* | | | |
| 65.  With respect to applications for credit to be secured by a lien on a dwelling, does the creditor either:<br><br>    a.  Routinely provide a copy of an appraisal report to an applicant (whether credit is granted or denied or the application is withdrawn); or<br><br>    b.  Provide a copy upon an applicant's written request and notify (at any time during the application process and no later than when the creditor provides notice of action taken) an applicant in writing of the right to receive a copy of the appraisal report, specifying (i) that the applicant's request must be in writing, (ii) the creditor's mailing address, and (iii) that the request must be received within 90 days after the creditor provides notice of action taken on the application or 90 days after the application is withdrawn?  (12 CFR 1002.14(a)) | ☐ | ☐ | [Click&type] |
| 66.  Does the creditor mail or deliver a copy of the appraisal report promptly (generally within 30 days) after the creditor receives the applicant's request, receives the report, or receives reimbursement from the applicant for the report, whichever is last to occur?  (12 CFR 1002.14(a)(2)(ii)) | ☐ | ☐ | [Click&type] |

---

[12] A creditor that is subject to the National Credit Union Administration regulations on making copies of appraisal reports available is not subject to these requirements (12 CFR 1002.14(b)).

# CFPB
# Examination Procedures                                    ECOA

| | Yes No | Basis of Conclusion |
|---|---|---|
| **Disclosures** | | |
| *Obtain and review policies and procedures, training materials, and a sample of loan files, audits related to disclosures, and disclosures.* | | |
| 67.  Are the creditor's written disclosures that are required by Regulation B clear, conspicuous, and except for those required by 12 CFR 1002.5 (self-tests) and 1002.13 (monitoring), in a form the applicant can retain? (12 CFR 1002.4(d)) | ☐ ☐ | [Click&type] |
| 68.  Are those disclosures that are required to be in writing that are made in electronic form provided in compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce (E-Sign) Act, where applicable? (12 CFR 1002.4(d)(2)) | ☐ ☐ | [Click&type] |
| 69.  If an applicant accesses a credit application electronically from a place other than the creditor's office, did the creditor provide the disclosures in a timely manner on or with the application, namely in electronic form (such as with the applications form on its website)? (Comment 1002.4(d)-2) | ☐ ☐ | [Click&type] |

**CFPB**

**Examination Procedures**                                                    **ECOA**

|  | Yes | No | Basis of Conclusion |
|---|---|---|---|
| **Voluntary Self-Tests** | | | |
| *Identify whether the creditor purports to conduct self-tests. If so, request and review information required to be maintained under 12 CFR 1002.12(b)(6), including but not limited to information regarding its design and expected outputs, corrective actions, the methodology used or the scope of the self-test, the time period covered by the self-test, the dates it was conducted, and entities to whom it was disclosed.* | | | |
| 70.    To the extent the creditor conducts voluntary self-tests: | | | |
| a.    Is the program, practice or study (1) designed and used specifically to determine the extent or effectiveness of the creditor's compliance with the ECOA or Regulation B; and (2) resulting in data or factual information that is not available and cannot be derived from loan or application files or other records related to credit transactions; and | ☐ | ☐ | [Click&type] |
| b.    Has the creditor taken or is it taking appropriate and timely corrective action when the self-test shows that it is more likely than not that a violation occurred (even though no violation has been formally adjudicated), namely action that is reasonably likely to remedy the cause and effect of a likely violation by identifying the policies and practices that are the likely cause of the violation and assessing the extent and scope of any violation?  (12 CFR 1002.15(a)(2), (b)(1), (c), Comment 1002.15(a)(2)-2) | ☐ | ☐ | [Click&type] |

**CFPB**

# Examination Procedures                                    **ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| 71.    To the extent the creditor is claiming that the self-test privilege applies: | | | |
| a.    Is the creditor providing information that is not privileged, including (a) information about whether the creditor conducted a self-test, the methodology used or the scope of the self-test, the time period covered by the self-test, or the dates it was conducted; (b) loan and application files or other business records related to credit transactions, and information derived from such files and records, even if the information has been aggregated, summarized, or reorganized to facilitate analysis; and (c) the creditor's property appraisal reports, minutes of loan committee meetings, analysis performed as part of processing or underwriting a credit application, or other documents reflecting the basis for a decision to approve or deny an application, loan policies or procedures, underwriting  standards, and broker compensation records?  (12 CFR 1002.15(b)(3), Comments 1002.15(b)(1)(ii)-2 and 1002.15(b)(3)(ii)-1) | ☐ | ☐ | [Click&type] |
| b.    Has the creditor not voluntarily disclosed any part of the report or results, or any other privileged information, as a self test, to an applicant, government agency, or the public?  (12 CFR 1002.15(d)(2)(i)) | ☐ | ☐ | [Click&type] |
| c.    Has the creditor not disclosed any part of the report or results, or any other information privileged as a self-test, as a defense to charges that the creditor has violated the ECOA or Regulation B? (12 CFR 1002.15(d)(2)(ii)) | ☐ | ☐ | [Click&type] |
| d.    Has the creditor produced written or recorded information about the self-test that is required to be retained by 12 CFR 1002.12(b)(6)? (12 CFR 1002.15(d)(2)(iii)) | ☐ | ☐ | [Click&type] |

# CFPB
# Examination Procedures                                    **ECOA**

| | Yes | No | Basis of Conclusion |
|---|---|---|---|
| e.  As applicable, has the creditor provided the self-test report, results, and any other information privileged under Regulation B in order to determine a penalty or remedy for a violation of the ECOA or Regulation that has been adjudicated or admitted?  (12 CFR 1002.15(d)(3)) | ☐ | ☐ | [Click&type] |

## Examiner's Overall Summary, Recommendations, and Comments

**[Click&type]**

_____

**Office of the Comptroller of the Currency**

**Federal Deposit Insurance Corporation**

**Federal Reserve Board**

**Office of Thrift Supervision**

**National Credit Union Administration**

_____

# INTERAGENCY FAIR LENDING
# EXAMINATION PROCEDURES

**August 2009**

# CONTENTS

**INTRODUCTION**                                                                                   **3**
**PART I: EXAMINATION SCOPE GUIDELINES**                                                           **8**
**Background**                                                                                     **8**
    Step One: Develop an Overview                                              12
    Step Two: Identify Compliance Program Discrimination Risk Factors          13
    Step Three: Review Residential Loan Products                                13
    Step Four: Identify Residential Lending Discrimination Risk Factors         14
    Step Five: Organize and Focus Residential Risk Analysis                     18
    Step Six: Identify Consumer Lending Discrimination Risk Factors             19
    Step Seven: Identify Commercial Lending Discrimination Risk Factors         19
    Step Eight: Complete the Scoping Process                                    19
**PART II: COMPLIANCE MANAGEMENT REVIEW**                                                          **21**
**PART III: EXAMINATION PROCEDURES**                                                               **22**
    A.  Verify Accuracy of Data                                                 22
    B.  Documenting Overt Evidence of Disparate Treatment                       22
    C.  Transactional Underwriting Analysis - Residential and Consumer Loans.    23
    D.  Analyzing Potential Disparities in Pricing and Other Terms and Conditions  26
    E.  Steering Analysis                                                       28
    F.  Transactional Underwriting Analysis - Commercial Loans.                 31
    G.  Analysis of Potential Discriminatory "Redlining".                       33
    H.  Analysis of Potential Discriminatory Marketing Practices.               40
    I.  Credit Scoring.                                                         42
    J.  Disparate Impact Issues.                                                42
**PART IV: OBTAINING AND EVALUATING RESPONSES**
**FROM THE INSTITUTION AND CONCLUDING THE EXAMINATION**                                            **43**
**APPENDIX**
       I.  Compliance Management Analysis Checklist
       II.  Considering Automated Underwriting and Credit Scoring
       III.  Evaluating Responses to Evidence of Disparate Treatment
       IV.  Fair Lending Sample Size Tables
       V.  Identifying Marginal Transactions
       VI.  Potential Scoping Information
       VII.  Special Analyses
       VIII.  Using Self-Tests and Self-Evaluations to Streamline the Examination

# Interagency Fair Lending Examination Procedures

# INTRODUCTION

## Overview of Fair Lending Laws and Regulations

This overview provides a basic and abbreviated discussion of federal fair lending laws and regulations.  It is adapted from the Interagency Policy Statement on Fair Lending issued in March 1994.

### *1. Lending Discrimination Statutes and Regulations*

The Equal Credit Opportunity Act (ECOA) prohibits discrimination in any aspect of a credit transaction. It applies to any extension of credit, including extensions of credit to small businesses, corporations, partnerships, and trusts.

The ECOA prohibits discrimination based on:

- Race or color;
- Religion;
- National origin;
- Sex;
- Marital status;
- Age (provided the applicant has the capacity to contract);
- The applicant's receipt of income derived from any public assistance program; or
- The applicant's exercise, in good faith, of any right under the Consumer Credit Protection Act.

The Federal Reserve Board's Regulation B, found at 12 CFR Part 202, implements the ECOA.[1] Regulation B describes lending acts and practices that are specifically prohibited, permitted, or required. Official staff interpretations of the regulation are found in Supplement I to 12 CFR part 202.

The Fair Housing Act (FHAct) prohibits discrimination in all aspects of "residential real-estate-related transactions," including but not limited to:

- Making loans to buy, build, repair, or improve a dwelling;
- Purchasing real estate loans;
- Selling, brokering, or appraising residential real estate; or
- Selling or renting a dwelling.

The FHAct prohibits discrimination based on:

- Race or color;
- National origin;
- Religion;
- Sex;
- Familial status (defined as children under the age of 18 living with a parent or legal custodian, pregnant women, and people securing custody of children under 18); or
- Handicap.

---

[1] In December 2011, the Consumer Financial Protection Bureau restated the Federal Reserve's implementing regulation at 12 CFR Part 1002 (76 Fed. Reg. 79442)(December 21, 2011).

# Interagency Fair Lending Examination Procedures

HUD's regulations implementing the FHAct are found at 24 CFR Part 100. Because both the FHAct and the ECOA apply to mortgage lending, lenders may not discriminate in mortgage ending based on any of the prohibited factors in either list.

Under the ECOA, it is unlawful for a lender to discriminate on a prohibited basis in any aspect of a credit transaction, and under both the ECOA and the FHAct, it is unlawful for a lender to discriminate on a prohibited basis in a residential real-estate-related transaction. Under one or both of these laws, a lender may not, because of a prohibited factor

- Fail to provide information or services or provide different information or services regarding any aspect of the lending process, including credit availability, application procedures, or lending standards;
- Discourage or selectively encourage applicants with respect to inquiries about or applications for credit;
- Refuse to extend credit or use different standards in determining whether to extend credit;
- Vary the terms of credit offered, including the amount, interest rate, duration, or type of loan;
- Use different standards to evaluate collateral;
- Treat a borrower differently in servicing a loan or invoking default remedies; or
- Use different standards for pooling or packaging a loan in the secondary market.

A lender may not express, orally or in writing, a preference based on prohibited factors, or indicate that it will treat applicants differently on a prohibited basis. A violation may still exist even if a lender treated applicants equally.

A lender may not discriminate on a prohibited basis because of the characteristics of

- An applicant, prospective applicant, or borrower;
- A person associated with an applicant, prospective applicant, or borrower (for example, a co-applicant, spouse, business partner, or live-in aide); or
- The present or prospective occupants of either the property to be financed or the characteristics of the neighborhood or other area where property to be financed is located.

Finally, the FHAct requires lenders to make reasonable accommodations for a person with disabilities when such accommodations are necessary to afford the person an equal opportunity to apply for credit.

## 2. Types of Lending Discrimination

The courts have recognized three methods of proof of lending discrimination under the ECOA and the FHAct:

- Overt evidence of disparate treatment;
- Comparative evidence of disparate treatment;
- Evidence of disparate impact.

# Interagency Fair Lending Examination Procedures

**Disparate Treatment**

The existence of illegal disparate treatment may be established either by statements revealing that a lender explicitly considered prohibited factors (overt evidence) or by differences in treatment that are not fully explained by legitimate nondiscriminatory factors (comparative evidence).

*Overt Evidence of Disparate Treatment*. There is overt evidence of discrimination when a lender openly discriminates on a prohibited basis.

> <u>Example</u>: A lender offered a credit card with a limit of up to $750 for applicants aged 21-30 and $1,500 for applicants over 30. This policy violated the ECOA's prohibition on discrimination based on age.

There is overt evidence of discrimination even when a lender expresses - but does not act on - a discriminatory preference:

> <u>Example</u>: A lending officer told a customer, "We do not like to make home mortgages to Native Americans, but the law says we cannot discriminate and we have to comply with the law." This statement violated the FHAct's prohibition on statements expressing a discriminatory preference as well as Section 202.4(b) of Regulation B, which prohibits discouraging applicants on a prohibited basis.

*Comparative Evidence of Disparate Treatment*. Disparate treatment occurs when a lender treats a credit applicant differently based on one of the prohibited bases. It does not require any showing that the treatment was motivated by prejudice or a conscious intention to discriminate against a person beyond the difference in treatment itself.

Disparate treatment may more likely occur in the treatment of applicants who are neither clearly well-qualified nor clearly unqualified. Discrimination may more readily affect applicants in this middle group for two reasons. First, if the applications are "close cases," there is more room and need for lender discretion. Second, whether or not an applicant qualifies may depend on the level of assistance the lender provides the applicant in completing an application. The lender may, for example, propose solutions to credit or other problems regarding an application, identify compensating factors, and provide encouragement to the applicant. Lenders are under no obligation to provide such assistance, but to the extent that they do, the assistance must be provided in a nondiscriminatory way.

> <u>Example</u>: A non-minority couple applied for an automobile loan. The lender found adverse information in the couple's credit report. The lender discussed the credit report with them and determined that the adverse information, a judgment against the couple, was incorrect because the judgment had been vacated. The non-minority couple was granted their loan. A minority couple applied for a similar loan with the same lender. Upon discovering adverse information in the minority couple's credit report, the lender denied the loan application on the basis of the adverse information without giving the couple an opportunity to discuss the report.

The foregoing is an example of disparate treatment of similarly situated applicants, apparently based on a prohibited factor, in the amount of assistance and information the lender provided.

If a lender has apparently treated similar applicants differently on the basis of a prohibited factor, it must provide an explanation for the difference in treatment. If the lender's explanation is found

# Interagency Fair Lending Examination Procedures

to be not credible, the agency may find that the lender discriminated.

_Redlining_ is a form of illegal disparate treatment in which a lender provides unequal access to credit, or unequal terms of credit, because of the race, color, national origin, or other prohibited characteristic(s) of the residents of the area in which the credit seeker resides or will reside or in which the residential property to be mortgaged is located. Redlining may violate both the FHAct and the ECOA.

## Disparate Impact

When a lender applies a racially or otherwise neutral policy or practice equally to all credit applicants, but the policy or practice disproportionately excludes or burdens certain persons on a prohibited basis, the policy or practice is described as having a "disparate impact."

> Example: A lender's policy is not to extend loans for single family residences for less than $60,000. This policy has been in effect for 10 years. This minimum loan amount policy is shown to disproportionately exclude potential minority applicants from consideration because of their income levels or the value of the houses in the areas in which they live.

The fact that a policy or practice creates a disparity on a prohibited basis is not alone proof of a violation.  When an Agency finds that a lender's policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by "business necessity." The justification must be manifest and may not be hypothetical or speculative. Factors that may be relevant to the justification could include cost and profitability. Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be in violation if an alternative policy or practice could serve the same purpose with less discriminatory effect.  Finally, evidence of discriminatory intent is not necessary to establish that a lender's adoption or implementation of a policy or practice that has a disparate impact is in violation of the FHAct or ECOA.

These procedures do not call for examiners to plan examinations to identify or focus on potential disparate impact issues. The guidance in this Introduction is intended to help examiners recognize fair lending issues that may have a potential disparate impact. Guidance in the Appendix to the Interagency Fair Lending Examination Procedures provides details on how to obtain relevant information regarding such situations along with methods of evaluation, as appropriate.

## General Guidelines

These procedures are intended to be a basic and flexible framework to be used in the majority of fair lending examinations conducted by the FFIEC agencies.  They are also intended to guide examiner judgment, not to supplant it.  The procedures can be augmented by each agency as necessary to ensure their effective implementation.

While these procedures apply to many examinations, agencies routinely use statistical analyses or other specialized techniques in fair lending examinations to assist in evaluating whether a prohibited basis was a factor in an institution's credit decisions.  Examiners should follow the procedures provided by their respective agencies in these cases.

For a number of aspects of lending – for example, credit scoring and loan pricing – the "state of the art" is more likely to be advanced if the agencies have some latitude to incorporate promising

# Interagency Fair Lending Examination Procedures

innovations. These interagency procedures provide for that latitude.

Any references in these procedures to options, judgment, etc., of "examiners" means discretion within the limits provided by that examiner's agency. An examiner should use these procedures in conjunction with his or her own agency's priorities, examination philosophy, and detailed guidance for implementing these procedures. These procedures should not be interpreted as providing an examiner greater latitude than his or her own agency would. For example, if an agency's policy is to review compliance management systems in all of its institutions, an examiner for that agency must conduct such a review rather than interpret Part II of these interagency procedures as leaving the review to the examiner's option.

The procedures emphasize racial and national origin discrimination in residential transactions, but the key principles are applicable to other prohibited bases and to nonresidential transactions.

Finally, these procedures focus on analyzing institution compliance with the broad, nondiscrimination requirements of the ECOA and the FHAct. They do not address such explicit or technical compliance provisions as the signature rules or adverse action notice requirements in Sections 202.7 and 202.9, respectively, of Regulation B.

# Interagency Fair Lending Examination Procedures

## PART I
## EXAMINATION SCOPE GUIDELINES

### Background

The scope of an examination encompasses the loan product(s), market(s), decision center(s), time frame, and prohibited basis and control group(s) to be analyzed during the examination. These procedures refer to each potential combination of those elements as a "focal point." Setting the scope of an examination involves, first, identifying all of the potential focal points that appear worthwhile to examine. Then, from among those, examiners select the focal point(s) that will form the scope of the examination, based on risk factors, priorities established in these procedures or by their respective agencies, the record from past examinations, and other relevant guidance. This phase includes obtaining an overview of an institution's compliance management system as it relates to fair lending.

When selecting focal points for review, examiners may determine that the institution has performed "self-tests" or "self-evaluations" related to specific lending products. The difference between "self-tests" and "self-evaluations" is discussed in the *Using Self-Tests and Self-Evaluations to Streamline the Examination* section of the Appendix. Institutions must share all information regarding "self-evaluations" and certain limited information related to "self-tests." Institutions may choose to voluntarily disclose additional information about "self-tests." Examiners should make sure that institutions understand that voluntarily sharing the results of self-tests will result in a loss of confidential status of these tests. Information from "self-evaluations" or "self-tests" may allow the scoping to be streamlined. Refer to *Using Self-Tests and Self-Evaluations to Streamline the Examination* in the Appendix for additional details.

Scoping may disclose the existence of circumstances – such as the use of credit scoring or a large volume of residential lending – which, under an agency's policy, call for the use of regression analysis or other statistical methods of identifying potential discrimination with respect to one or more loan products. Where that is the case, the agency's specialized procedures should be employed for such loan products rather than the procedures set forth below.

Setting the intensity of an examination means determining the breadth and depth of the analysis that will be conducted on the selected loan product(s). This process entails a more involved analysis of the institution's compliance risk management processes, particularly as they relate to selected products, to reach an informed decision regarding how large a sample of files to review in any transactional analyses performed and whether certain aspects of the credit process deserve heightened scrutiny.

Part I of these procedures provides guidance on establishing the scope of the examination. Part II (Compliance Management Review) provides guidance on determining the intensity of the examination. There is naturally some interdependence between these two phases. Ultimately, the scope and intensity of the examination will determine the record of performance that serves as the foundation for agency conclusions about institutional compliance with fair lending obligations. The examiner should employ these procedures to arrive at a well-reasoned and practical conclusion about how to conduct a particular institution's examination of fair lending performance.

In certain cases where an agency already possesses information that provides examiners with

# Interagency Fair Lending Examination Procedures

guidance on priorities and risks for planning an upcoming examination, such information may expedite the scoping process and make it unnecessary to carry out all of the steps below. For example, the report of the previous fair lending examination may have included recommendations for the focus of the next examination.  However, examiners should validate that the institution's operational structure, product offerings, policies, and risks have not changed since the prior examination before condensing the scoping process.

The scoping process can be performed either off-site, onsite, or both, depending on whatever is determined appropriate and feasible.  In the interest of minimizing burdens on both the examination team and the institution, requests for information from the institution should be carefully thought out so as to include only the information that will clearly be useful in the examination process.  Finally, any off-site information requests should be made sufficiently in advance of the on-site schedule to permit institutions adequate time to assemble necessary information and provide it to the examination team in a timely fashion.  (See "Potential Scoping Information" in the Appendix for guidance on additional information that the examiner might wish to consider including in a request).

Examiners should focus the examination based on:

- An understanding of the credit operations of the institution;
- The risk that discriminatory conduct may occur in each area of those operations; and
- The feasibility of developing a factually reliable record of an institution's performance and fair lending compliance in each area of those operations.

## *1. Understanding Credit Operations*

Before evaluating the potential for discriminatory conduct, the examiner should review sufficient information about the institution and its market to understand the credit operations of the institution and the representation of prohibited basis group residents within the markets where the institution does business.  The level of detail to be obtained at this stage should be sufficient to identify whether any of the risk factors in the steps below are present. Relevant background information includes:

- The types and terms of credit products offered, differentiating among broad categories of credit such as residential, consumer, or commercial, as well as product variations within such categories (fixed vs. variable, etc.);
- Whether the institution has a special purpose credit program or other program that is specifically designed to assist certain under-served populations;
- The volume of, or growth in, lending for each of the credit products offered;
- The demographics (e.g., race, national origin, etc.) of the credit markets in which the institution is doing business;
- The institution's organization of its credit decision-making process, including identification of the delegation of separate lending authorities and the extent to which discretion in pricing or setting credit terms and conditions is delegated to various levels of managers, employees or independent brokers or dealers;
- The institution's loan officer or broker compensation program;
- The types of relevant documentation/data that are available for various loan products and what is the relative quantity, quality and accessibility of such information (e.g., for which loan product(s) will the information available be most likely to support a sound and

# Interagency Fair Lending Examination Procedures

reliable fair lending analysis); and

- The extent to which information requests can be readily organized and coordinated with other compliance examination components to reduce undue burden on the institution. (Do not request more information than the exam team can be expected to utilize during the anticipated course of the examination.)

In thinking about an institution's credit markets, the examiner should recognize that these markets may or may not coincide with an institution's Community Reinvestment Act (CRA) assessment area(s). Where appropriate, the examiner should review the demographics for a broader geographic area than the assessment area.

Where an institution has multiple underwriting or loan processing centers or subsidiaries, each with fully independent credit-granting authority, consider evaluating each center and/or subsidiary separately, provided a sufficient number of loans exist to support a meaningful analysis. In determining the scope of the examination for such institutions, examiners should consider whether:

- Subsidiaries should be examined. The agencies will hold a financial institution responsible for violations by its direct subsidiaries, but not typically for those by its affiliates (unless the affiliate has acted as the agent for the institution or the violation by the affiliate was known or should have been known to the institution before it became involved in the transaction or purchased the affiliate's loans). When seeking to determine an institution's relationship with affiliates that are not supervised financial institutions, limit the inquiry to what can be learned in the institution and do not contact the affiliate without prior consultation with agency staff.
- The underwriting standards and procedures used in the entity being reviewed are used in related entities not scheduled for the planned examination. This will help examiners to recognize the potential scope of policy-based violations.
- The portfolio consists of applications from a purchased institution. If so, for scoping purposes, examiners should consider the applications as if they were made to the purchasing institution. For comparison purposes, applications evaluated under the *purchased* institution's standards should not be compared to applications evaluated under the *purchasing* institution's standards.)
- The portfolio includes purchased loans. If so, examiners should look for indications that the institution specified loans to purchase based on a prohibited factor or caused a prohibited factor to influence the origination process.
- A complete decision can be made at one of the several underwriting or loan- processing centers, each with independent authority. In such a situation, it is best to conduct on-site a separate comparative analysis at each underwriting center. If covering multiple centers is not feasible during the planned examination, examiners should review their processes and internal controls to determine whether or not expanding the scope and/or length of the examination is justified.

# Interagency Fair Lending Examination Procedures

- Decision-making responsibility for a single transaction may involve more than one underwriting center. For example, an institution may have authority to decline mortgage applicants, but only the mortgage company subsidiary may approve them. In such a situation, examiners should learn which standards are applied in each entity and the location of records needed for the planned comparisons.
- Applicants can be steered from the financial institution to the subsidiary or other lending channel and vice versa and what policies and procedures exist to monitor this practice.
- Any third parties, such as brokers or contractors, are involved in the credit decision and how responsibility is allocated among them and the institution. The institution's familiarity with third-party actions may be important, for an institution may be in violation if it participates in transactions in which it knew or reasonably ought to have known other parties were discriminating.

As part of understanding the financial institution's own lending operations, it is also important to understand any dealings the financial institution has with affiliated and non-affiliated mortgage loan brokers and other third-party lenders.

These brokers may generate mortgage applications and originations solely for a specific financial institution or may broadly gather loan applications for a variety of local, regional, or national lenders. As a result, it is important to recognize what impact these mortgage brokers and other third-party lender actions and application processing operations have on the lending operations of a financial institution. Because brokers can be located anywhere in or out of the financial institution's primary lending or CRA assessment areas, it is important to evaluate broker activity and fair lending compliance related to underwriting, terms and conditions, redlining, and steering, each of which is covered in more depth in sections of these procedures. Examiners should consult with their respective agencies for specific guidance regarding broker activity.

If the institution is large and geographically diverse, examiners should select only as many markets or underwriting centers as can be reviewed readily in depth, rather than selecting proportionally to cover every market. As needed, examiners should narrow the focus to the Metropolitan Statistical Area (MSA) or underwriting center(s) that are determined to present the highest discrimination risk. Examiners should use Loan Application Register (LAR) data organized by underwriting center, if available. After calculating denial rates between the control and prohibited basis groups for the underwriting centers, examiners should select the centers with the highest fair lending risk. This approach would also be used when reviewing pricing or other terms and conditions of approved applicants from the prohibited basis and control groups. If underwriting centers have fewer than five racial or national origin denials, examiners should not examine for racial discrimination in underwriting. Instead, they should shift the focus to other loan products or prohibited bases or examination types, such as a pricing examination.

However, if examiners learn of other indications of risks that favor analyzing a prohibited basis with fewer transactions than the minimum in the sample-size tables, they should consult with their supervisory office on possible alternative methods of analysis. For example, there is strong reason to examine a pattern in which almost all of 19 male borrowers received low rates, but almost all of four female borrowers received high rates, even though the number of each group is fewer than the stated minimum. Similarly, there would be strong reason to examine a pattern in which almost all of 100 control group applicants were approved, but all four prohibited basis group applicants were not, even though the number of prohibited basis denials was fewer than

# Interagency Fair Lending Examination Procedures

five.

## *2. Evaluating the Potential for Discriminatory Conduct*

### Step One: Develop an Overview

Based on his or her understanding of the credit operations and product offerings of an institution, an examiner should determine the nature and amount of information required for the scoping process and should obtain and organize that information. No single examination can reasonably be expected to evaluate compliance performance as to every prohibited basis, in every product, or in every underwriting center or subsidiary of an institution.  In addition to information gained in the process of Understanding Credit Operations, above, the examiner should keep in mind the following factors when selecting products for the scoping review:

- Which products and prohibited bases were reviewed during the most recent prior examination(s), and conversely, which products and prohibited bases have not recently been reviewed?
- Which prohibited basis groups make up a significant portion of the institution's market for the different credit products offered?
- Which products and prohibited basis groups the institution reviewed using either a voluntarily disclosed self-test or a self-evaluation?

Based on consideration of the foregoing factors, the examiner should request information for all residential and other loan products considered appropriate for scoping in the current examination cycle. In addition, wherever feasible, examiners should conduct preliminary interviews with the institution's key underwriting personnel and those involved with establishing the institution's pricing policies and practices.

Using the accumulated information, the examiner should evaluate the following, as applicable:

- Underwriting guidelines, policies, and standards;
- Descriptions of credit scoring systems, including a list of factors scored, cutoff scores, extent of validation, and any guidance for handling overrides and exceptions. (Refer to *Part A* of the *Considering Automated Underwriting and Credit Scoring* section of the Appendix for guidance);
- Applicable pricing policies, risk-based pricing models, and guidance for exercising discretion over loan terms and conditions;
- Descriptions of any compensation system, including whether compensation is related to loan production or pricing;
- The institution's formal and informal relationships with any finance companies, subprime mortgage or consumer lending entities, or similar institutions;
- Loan application forms;
- Home Mortgage Disclosure Act – Loan Application Register (HMDA-LAR) or loan registers and lists of declined applications;
- Description(s) of databases maintained for loan product(s) to be reviewed;
- Records detailing policy exceptions or overrides, exception reporting, and monitoring processes;
- Copies of any consumer complaints alleging discrimination and related loan files;
- Compliance program materials (particularly fair lending policies), training manuals, organization charts, as well as record keeping, monitoring protocols, and internal

# Interagency Fair Lending Examination Procedures

controls; and

- Copies of any available marketing materials or descriptions of current or previous marketing plans or programs or pre-screened solicitations.

## Step Two: Identify Compliance Program Discrimination Risk Factors

Review information from agency examination work papers, institutional records, and any available discussions with management representatives in sufficient detail to understand the organization, staffing, training, recordkeeping, auditing, policies, and procedures of the institution's fair lending compliance systems. Review these systems and note the following risk factors:

C1.    Overall institution compliance record is weak.

C2.    Prohibited basis monitoring information required by applicable laws and regulations is nonexistent or incomplete.

C3.    Data and/or recordkeeping problems compromised reliability of previous examination reviews.

C4.    Fair lending problems were previously found in one or more institution products or in institution subsidiaries.

C5.    The size, scope, and quality of the compliance management program, including senior management's involvement, designation of a compliance officer, and staffing is materially inferior to programs customarily found in institutions of similar size, market demographics, and credit complexity.

C6.    The institution has not updated compliance policies and procedures to reflect changes in law or in agency guidance.

C7.    Fair lending training is nonexistent or weak.

Consider these risk factors and their impact on particular lending products and practices as you conduct the product specific risk review during the scoping steps that follow. Where this review identifies fair lending compliance system deficiencies, give them appropriate consideration as part of the Compliance Management Review in Part II of these procedures.

## Step Three: Review Residential Loan Products

Although home mortgages may not be the ultimate subject of every fair lending examination, this product line must at least be considered in the course of scoping every institution that is engaged in the residential lending market.

Divide home mortgage loans into the following groupings:  home purchase, home improvement, and refinancings. Subdivide those three groups further if an institution does a significant number of any of the following types or forms of residential lending and consider them separately:

- Government-insured loans;
- Mobile home or manufactured housing loans;
- Wholesale, indirect, and brokered loans; and
- Portfolio lending (including portfolios of Fannie Mae/Freddie Mac rejections).

# Interagency Fair Lending Examination Procedures

In addition, determine whether the institution offers any conventional "affordable" housing loan programs special purpose credit programs or other programs that are specifically designed to assist certain borrowers, such as under-served populations and whether their terms and conditions make them incompatible with regular conventional loans for comparative purposes. If so, consider them separately.

If previous examinations have demonstrated the following, then an examiner may limit the focus of the current examination to alternative underwriting or processing centers or to other residential products that have received less scrutiny in the past:

- A strong fair lending compliance program;
- No record of discriminatory transactions at particular decision centers or in particular residential products;
- No indication of a significant change in personnel, operations or underwriting or pricing policies at those centers or in those residential products;
- No unresolved fair lending complaints, administrative proceedings, litigation or similar factors; or
- No discretion to set price or credit terms and conditions in particular decision centers or for particular residential products.

**Step Four: Identify Residential Lending Discrimination Risk Factors**

- Review the lending policies, marketing plans, underwriting, appraisal and pricing guidelines, broker/agent agreements, and loan application forms for each residential loan product that represents an appreciable volume of, or displays noticeable growth in, the institution's residential lending.
- Review also any available data regarding the geographic distribution of the institution's loan originations with respect to the race and national origin percentages of the census tracts within its assessment area or, if different, its residential loan product lending area(s).
- Conduct interviews of loan officers and other employees or agents in the residential lending process concerning adherence to and understanding of the above policies and guidelines as well as any relevant operating practices.
- In the course of conducting the foregoing inquiries, look for the following risk factors (factors are numbered alphanumerically to coincide with the type of factor, e.g., "O" for "overt"; "P" for "pricing", etc.).

NOTE: For risk factors below that are marked with an asterisk (*), examiners need not attempt to calculate the indicated ratios for racial or national origin characteristics when the institution is not an HMDA reporter.  However, consideration should be given in such cases to whether or not such calculations should be made based on gender or racial-ethnic surrogates.

*Overt indicators of discrimination such as:*

O1.  Including explicit prohibited basis identifiers in the institution's written or oral policies and procedures (underwriting criteria, pricing standards, etc.).

O2.  Collecting information, conducting inquiries or imposing conditions contrary to express requirements of Regulation B.

O3.  Including variables in a credit scoring system that constitute a basis or factor

# Interagency Fair Lending Examination Procedures

prohibited by Regulation B or, for residential loan scoring systems, the FHAct. (If a credit scoring system scores age, refer to *Part E* of the *Considering Automated Underwriting and Credit Scoring* section of the Appendix.).

O4.  Statements made by the institution's officers, employees, or agents that constitute an express or implicit indication that one or more such persons have engaged or do engage in discrimination on a prohibited basis in any aspect of a credit transaction.

O5.  Employee or institutional statements that evidence attitudes based on prohibited basis prejudices or stereotypes.

*Indicators of potential **disparate treatment in Underwriting** such as:*

U1.  **\***Substantial disparities among the approval/denial rates for applicants by monitored prohibited basis characteristic (especially within income categories).

U2.  **\***Substantial disparities among the application processing times for applicants by monitored prohibited basis characteristic (especially within denial reason groups).

U3.  **\***Substantially higher proportion of withdrawn/incomplete applications from prohibited basis group applicants than from other applicants.

U4.  Vague or unduly subjective underwriting criteria.

U5.  Lack of clear guidance on making exceptions to underwriting criteria, including credit scoring overrides.

U6.  Lack of clear loan file documentation regarding reasons for any exceptions to standard underwriting criteria, including credit scoring overrides.

U7.  Relatively high percentages of either exceptions to underwriting criteria or overrides of credit score cutoffs.

U8.  Loan officer or broker compensation based on loan volume (especially loans approved per period of time).

U9.  Consumer complaints alleging discrimination in loan processing or in approving/denying residential loans.

*Indicators of potential **disparate treatment in Pricing** (interest rates, fees, or points) such as:*

P1.   Financial incentives for loan officers or brokers to charge higher prices (including interest rates, fees, and points).  Special attention should be given to situations where financial incentives are accompanied by broad pricing discretion (as in P2), such as through the use of overages or yield-spread premiums.

P2.   Presence of broad discretion in loan pricing (including interest rate, fees, and points), such as through overages, underages, or yield-spread premiums.  Such discretion may be present even when institutions provide rate sheets and fees schedules if loan officers or brokers are permitted to deviate from those rates and fees without clear and objective criteria.

P3.  Use of risk-based pricing that is not based on objective criteria or applied consistently.

P4.  **\***Substantial disparities among prices being quoted or charged to applicants who

# Interagency Fair Lending Examination Procedures

differ as to their monitored prohibited basis characteristics.

P5.  Consumer complaints alleging discrimination in residential loan pricing.

P6.  *In mortgage pricing, disparities in the incidence or rate spreads[2] of higher-priced lending by prohibited basis characteristics as reported in the HMDA data.

P7.  *A loan program that contains only borrowers from a prohibited basis group or has significant differences in the percentages of prohibited basis groups, especially in the absence of a Special Purpose Credit Program under ECOA.

*Indicators of potential **disparate treatment by Steering** such as:*

S1.  Lack of clear, objective, and consistently implemented standards for (i) referring applicants to subsidiaries, affiliates, or lending channels within the institution (ii) classifying applicants as "prime" or "sub-prime" borrowers or (iii) deciding what kinds of alternative loan products should be offered or recommended to applicants (product placement).

S2.  Financial incentives for loan officers or brokers to place applicants in nontraditional products (e.g., negative amortization, "interest only", "payment option" adjustable rate mortgages) or higher cost products.

S3.  For an institution that offers different products based on credit risk levels, any significant differences in percentages of prohibited basis groups in each of the alternative loan product categories.

S4.  *Significant differences in the percentage of prohibited basis applicants in loan products or products with specific features relative to control group applicants.  Special attention should be given to products and features that have potentially negative consequences for applicants (e.g., non-traditional mortgages, prepayment penalties, lack of escrow requirements, or credit life insurance).

S5.  *For an institution that has one or more sub-prime mortgage subsidiaries or affiliates, any significant differences, by loan product, in the percentage of prohibited basis applicants of the institution compared to the percentage of prohibited basis applicants of the subsidiary(ies) or affiliate(s).

S6.  *For an institution that has one or more lending channels that originate the same loan product, any significant differences in the percentage of prohibited basis applicants in one of the lending channels compared to the percentage of prohibited basis applicants of the other lending channel.

S7.  Consumer complaints alleging discrimination in residential loan pricing or product placement.

S8.  *For an institution with sub-prime mortgage subsidiaries, a concentration of those subsidiaries' branches in minority areas relative to its other branches.

*Indicators of potential **discriminatory Redlining** such as:*

R1.  **Significant differences, as revealed in HMDA data, in the number of applications

---

[2] Regulation C, Section 203.4(a)(12).

# Interagency Fair Lending Examination Procedures

received, withdrawn, approved not accepted, and closed for incompleteness or loans originated in those areas in the institution's market that have relatively high concentrations of minority group residents compared with areas with relatively low concentrations of minority residents.

R2. *Significant differences between approval/denial rates for all applicants (minority and non-minority) in areas with relatively high concentrations of minority group residents compared with areas with relatively low concentrations of minority residents.

R3. *Significant differences between denial rates based on insufficient collateral for applicants from areas with relatively high concentrations of minority residents and those areas with relatively low concentrations of minority residents.

R4. * Significant differences in the number of originations of higher-priced loans or loans with potentially negative consequences for borrowers, (e.g., non-traditional mortgages, prepayment penalties, lack of escrow requirements) in areas with relatively high concentrations of minority residents compared with areas with relatively low concentrations of minority residents.

R5. Other patterns of lending identified during the most recent CRA examination that differ by the concentration of minority residents.

R6. Explicit demarcation of credit product markets that excludes MSAs, political subdivisions, census tracts, or other geographic areas within the institution's lending market or CRA assessment areas and having relatively high concentrations of minority residents.

R7. Difference in services available or hours of operation at branch offices located in areas with concentrations of minority residents when compared to branch offices located in areas with concentrations of non-minority residents.

R8. Policies on receipt and processing of applications, pricing, conditions, or appraisals and valuation, or on any other aspect of providing residential credit that vary between areas with relatively high concentrations of minority residents and those areas with relatively low concentrations of minority residents.

R9. The institution's CRA assessment area appears to have been drawn to exclude areas with relatively high concentrations of minority residents.

R10. Employee statements that reflect an aversion to doing business in areas with relatively high concentrations of minority residents.

R11. Complaints or other allegations by consumers or community representatives that the institution excludes or restricts access to credit for areas with relatively high concentrations of minority residents. Examiners should review complaints against the institution filed either with their agency or the institution; the CRA public comment file; community contact forms; and the responses to questions about redlining, discrimination, and discouragement of applications, and about meeting the needs of racial or national origin minorities, asked as part of obtaining local perspectives on the performance of financial institutions during prior CRA examinations.

R12. An institution that has most of its branches in predominantly non-minority neighborhoods at the same time that the institution's sub-prime mortgage subsidiary has

# Interagency Fair Lending Examination Procedures

branches which are located primarily in predominantly minority neighborhoods.

_Indicators of potential **disparate treatment in Marketing** of residential products, such as:_

M1.  Advertising patterns or practices that a reasonable person would believe indicate prohibited basis customers are less desirable.

M2.  Advertising only in media serving non-minority areas of the market.

M3.  Marketing through brokers or other agents that the institution knows (or has reason to know) would serve only one racial or ethnic group in the market.

M4.  Use of marketing programs or procedures for residential loan products that exclude one or more regions or geographies within the institution's assessment or marketing area that have significantly higher percentages of minority group residents than does the remainder of the assessment or marketing area.

M5.  Using mailing or other distribution lists or other marketing techniques for pre-screened or other offerings of residential loan products that:

- Explicitly exclude groups of prospective borrowers on a prohibited basis or
- Exclude geographies (e.g., census tracts, ZIP codes) within the institution's marketing area that have significantly higher percentages of minority group residents than does the remainder of the marketing area.

M6.  **\***Proportion of prohibited basis applicants is significantly lower than that group's representation in the total population of the market area.

M7.  Consumer complaints alleging discrimination in advertising or marketing loans.

## Step Five: Organize and Focus Residential Risk Analysis

Review the risk factors identified in Step 4 and, for each loan product that displays risk factors, articulate the possible discriminatory effects encountered and organize the examination of those loan products in accordance with the following guidance.  For complex issues regarding these factors, consult with agency supervisory staff.

- Where overt evidence of discrimination, as described in factors O1-O5, has been found in connection with a product, document those findings as described in Part III, B, besides completing the remainder of the planned examination analysis.
- Where any of the risk factors U1-U9 are present, consider conducting an underwriting comparative file analysis as described in Part III, C.
- Where any of the risk factors P1-P7 are present, consider conducting a pricing comparative file analysis as described in Part III, D.
- Where any of the risk factors S1-S8 are present, consider conducting a steering analysis as described in Part III, E.
- Where any of the risk factors R1-R12 are present, consider conducting an analysis for redlining as described in Part III, G.
- Where any of the risk factors M1-M7 are present, consider conducting a marketing analysis as described in Part III, H.
- Where an institution uses age in any credit scoring system, consider conducting an

# Interagency Fair Lending Examination Procedures

examination analysis of that credit scoring system's compliance with the requirements of Regulation B as described in Part III, I.

## Step Six: Identify Consumer Lending Discrimination Risk Factors

For any consumer loan products selected in Step One for risk analysis, examiners should conduct a risk factor review similar to that conducted for residential lending products in Steps Three through Five, above.  Examiners should consult with agency supervisory staff regarding the potential use of surrogates to identify possible prohibited basis group individuals.

> NOTE:  The term surrogate in this context refers to any factor related to a loan applicant that potentially identifies that applicant's race, color, or other prohibited basis characteristic in instances where no direct evidence of that characteristic is available. Thus, in consumer lending, where monitoring data is generally unavailable, a Hispanic or Asian surname could constitute a surrogate for an applicant's race or national origin because the examiner can assume that the institution (which can rebut the presumption) perceived the person to be Hispanic or Asian. Similarly, an applicant's given name could serve as a surrogate for his or her gender. A surrogate for a prohibited basis group characteristic may be used to set up a comparative analysis with control group applicants or borrowers.

Examiners should then follow the rules in Steps Three through Five, above, and identify the possible discriminatory patterns encountered and consider examining those products determined to have sufficient risk of discriminatory conduct.

## Step Seven: Identify Commercial Lending Discrimination Risk Factors

Where an institution does a substantial amount of lending in the commercial lending market, most notably small business lending, and the product has not recently been examined or the underwriting standards have changed since the last examination of the product, the examiner should consider conducting a risk factor review similar to that performed for residential lending products, as feasible, given the limited information available. Such an analysis should generally be limited to determining risk potential based on risk factors U4-U8; P1-P3; R5-R7; and M1-M3.

If the institution makes commercial loans insured by the Small Business Administration (SBA), determine from agency supervisory staff whether SBA loan data (which codes race and other factors) are available for the institution and evaluate those data pursuant to instructions accompanying them.

For large institutions reporting small business loans for CRA purposes and where the institution also voluntarily geocodes loan denials, look for material discrepancies in ratios of approval-to-denial rates for applications in areas with high concentrations of minority residents compared to areas with concentrations of non-minority residents.

Articulate the possible discriminatory patterns identified and consider further examining those products determined to have sufficient risk of discriminatory conduct in accordance with the procedures for commercial lending described in Part III, F.

## Step Eight: Complete the Scoping Process

# Interagency Fair Lending Examination Procedures

To complete the scoping process, the examiner should review the results of the preceding steps and select those focal points that warrant examination, based on the relative risk levels identified above. In order to remain within the agency's resource allowances, the examiner may need to choose a smaller number of focal points from among all those selected on the basis of risk.  In such instances, set the scope by first, prioritizing focal points on the basis of (i) high number and/or relative severity of risk factors; (ii) high data quality and other factors affecting the likelihood of obtaining reliable examination results; (iii) high loan volume and the likelihood of widespread risk to applicants and borrowers; and (iv) low quality of any compliance program and, second, selecting for examination review as many focal points as resources permit.

Where the judgment process among competing focal points is a close call, information learned in the phase of conducting the compliance management review can be used to further refine the examiner's choices.

# Interagency Fair Lending Examination Procedures

## PART II
## COMPLIANCE MANAGEMENT REVIEW

The Compliance Management Review enables the examination team to determine:

- The intensity of the current examination based on an evaluation of the compliance management measures employed by an institution.
- The reliability of the institution's practices and procedures for ensuring continued fair lending compliance.

Generally, the review should focus on:

- Determining whether the policies and procedures of the institution enable management to prevent, or to identify and self-correct, illegal disparate treatment in the transactions that relate to the products and issues identified for further analysis under Part I of these procedures.
- Obtaining a thorough understanding of the manner by which management addresses its fair lending responsibilities with respect to (a) the institution's lending practices and standards, (b) training and other application-processing aids, (c) guidance to employees or agents in dealing with customers, and (d) its marketing or other promotion of products and services.

To conduct this review, examiners should consider institutional records and interviews with appropriate management personnel in the lending, compliance, audit, and legal functions. The examiner should also refer to the *Compliance Management Analysis Checklist* contained in the Appendix to evaluate the strength of the compliance programs in terms of their capacity to prevent, or to identify and self-correct, fair lending violations in connection with the products or issues selected for analysis. Based on this evaluation:

- Set the intensity of the transaction analysis by minimizing sample sizes within the guidelines established in Part III and the *Fair Lending Sample Size Tables* in the Appendix to the extent warranted by the strength and thoroughness of the compliance programs applicable to those focal points selected for examination.
- Identify any compliance program or system deficiencies that merit correction or improvement and present these to management in accordance with Part IV of these procedures.

Where an institution performs a self-evaluation or has voluntarily disclosed the report or results of a self-test of any product or issue that is within the scope of the examination and has been selected for analysis pursuant to Part I of these procedures, examiners may streamline the examination, consistent with agency guidance, provided the self-test or self-evaluation meets the requirements set forth in *Using Self-Tests and Self-Evaluations to Streamline the Examination* located in the Appendix.

# Interagency Fair Lending Examination Procedures

# PART III
# EXAMINATION PROCEDURES

Once the scope and intensity of the examination have been determined, assess the institution's fair lending performance by applying the appropriate procedures that follow to each of the examination focal points already selected.

## A. Verify Accuracy of Data

Prior to any analysis and preferably before the scoping process, examiners should assess the accuracy of the data being reviewed. Data verifications should follow specific protocols (sampling, size, etc.) intended to ensure the validity of the review. For example, where an institution's LAR data are relied upon, examiners should generally validate the accuracy of the institution's submitted data by selecting a sample of LAR entries and verifying that the information noted on the LAR was reported according to instructions by comparing information contained in the loan file for each sampled loan. If the LAR data are inconsistent with the information contained in the loan files, depending on the nature of the errors, examiners may not be able to proceed with a fair lending analysis until the LAR data have been corrected by the institution. In cases where inaccuracies impede the examination, examiners should direct the institution to take action to ensure data integrity (data scrubbing, monitoring, training, etc.).

NOTE: While the procedures refer to the use of HMDA data, other data sources should be considered, especially in the case of non-HMDA reporters or institutions that originate loans, but are not required to report them on an LAR.

## B. Documenting Overt Evidence of Disparate Treatment

Where the scoping process or any other source identifies overt evidence of disparate treatment, the examiner should assess the nature of the policy or statement and the extent of its impact on affected applicants by conducting the following analysis

**Step 1: Where the indicator(s) of overt discrimination are found in or based on a written policy (for example, a credit scorecard) or communication, determine and document:**

    a. The precise language of the apparently discriminatory policy or communication and the nature of the fair lending concerns that it raises;

    b. he institution's stated purpose in adopting the policy or communication and the identity of the person on whose authority it was issued or adopted;

    c. How and when the policy or communication was put into effect;

    d. How widely the policy or communication was applied; and

    e. Whether and to what extent applicants were adversely affected by the policy or communication.

**Step 2: Where any indicator of overt discrimination was an oral statement or unwritten practice, determine and document:**

    a. The precise nature of both the statement or practice and of the fair lending concerns that they raise;

# Interagency Fair Lending Examination Procedures

    b.   The identity of the persons making the statement or applying the practice and their descriptions of the reasons for it and the persons authorizing or directing the use of the statement or practice;

    c.   How and when the statement or practice was disseminated or put into effect;

    d.   How widely the statement or practice was disseminated or applied; and

    e.   Whether and to what extent applicants were adversely affected by the statement or practice.

Assemble findings and supporting documentation for presentation to management in connection with Part IV of these procedures.

## C.  Transactional Underwriting Analysis - Residential and Consumer Loans.

### Step 1: Set Sample Size

    a.   For each focal point selected for this analysis, two samples will be utilized: (i) prohibited basis group denials and (ii) control group approvals, both identified either directly from monitoring information in the case of residential loan applications or through the use of application data or surrogates in the case of consumer applications.

    b.   Refer to Fair Lending Sample Size Tables, Table A in the Appendix and determine the size of the initial sample for each focal point, based on the number of prohibited basis group denials and the number of control group approvals by the institution during the 12 month (or calendar year) period of lending activity preceding the examination.  In the event that the number of denials and/or approvals acted on during the preceding 12 month period substantially exceeds the maximum sample size shown in Table A, reduce the time period from which that sample is selected to a shorter period.  (In doing so, make every effort to select a period in which the institution's underwriting standards are most representative of those in effect during the full 12-month period preceding the examination.)

    c.   If the number of prohibited basis group denials or control group approvals for a given focal point that were acted upon during the 12-month period referenced in 1.b., above, do not meet the minimum standards set forth in the Sample Size Table, examiners need not attempt a transactional analysis for that focal point.  Where other risk factors favor analyzing such a focal point, consult with agency supervisory staff on possible alternative methods of judgmental comparative analysis.

    d.   If agency policy calls for a different approach to sampling (e.g., a form of statistical analysis, a mathematical formula, or an automated tool) for a limited class of institutions, examiners should follow that approach.

### Step 2: Determine Sample Composition.

    a.   To the extent the institution maintains records of loan outcomes resulting from exceptions to its credit underwriting standards or other policies (e.g., overrides to credit score cutoffs), request such records for both approvals and denials, sorted by loan product and branch or decision center, if the institution can do so.  Include in the initial sample for each focal point all exceptions or overrides applicable to that focal point.

    b.   Using HMDA/LAR data or, for consumer loans, comparable loan register data to the

# Interagency Fair Lending Examination Procedures

extent available, choose approved and denied applications based on selection criteria that will maximize the likelihood of finding marginal approved and denied applicants, as discussed below.

c. To the extent that the above factors are inapplicable or other selection criteria are unavailable or do not facilitate selection of the entire sample size of files, complete the initial sample selection by making random file selections from the appropriate sample categories in the Sample Size Table.

**Step 3: Compare Approved and Denied Applications**

<u>Overview</u>:  Although a creditor's written policies and procedures may appear to be nondiscriminatory, lending personnel may interpret or apply policies in a discriminatory manner. In order to detect any disparate treatment among applicants, the examiner should first eliminate all but "marginal transactions" (see 3.b. below) from each selected focal point sample.  Then, a detailed profile of each marginal applicant's qualifications, the level of assistance received during the application process, the reasons for denial, the loan terms, and other information should be recorded on an Applicant Profile Spreadsheet**.**  Once profiled, the examiner can compare the target and control groups for evidence that similarly qualified applicants have been treated differently as to either the institution's credit decision or the quality of assistance provided.

a. Create Applicant Profile Spreadsheet

Based upon the institution's written and/or articulated credit standards and loan policies, identify categories of data that should be recorded for each applicant and provide a field for each of these categories on a worksheet or computerized spreadsheet.  Certain data (income, loan amount, debt, etc.) should always be included in the spreadsheet, while the other data selected will be tailored for each loan product and institution based on applicable underwriting criteria and such issues as branch location and underwriter.  Where credit bureau scores and/or application scores are an element of the institution's underwriting criteria (or where such information is regularly recorded in loan files, whether expressly used or not), include a data field for this information in the spreadsheet.

In order to facilitate comparisons of the quality of assistance provided to target and control group applicants, respectively, every work sheet should provide a "comments" block appropriately labeled as the site for recording observations from the file or interviews regarding how an applicant was, or was not, assisted in overcoming credit deficiencies or otherwise qualifying for approval.

b.  Complete Applicant Profiles

From the application files sample for each focal point, complete applicant profiles for selected denied and approved applications as follows:

- A principal goal is to identify cases where similarly qualified prohibited basis and control group applicants had different credit outcomes, because the agencies have found that discrimination, including differences in granting assistance during the approval process, is more likely to occur with respect to applicants who are *not* either clearly qualified or unqualified, e.g., "marginal" applicants.  The examiner-in-charge should, during the following steps, judgmentally select from the initial sample only

# Interagency Fair Lending Examination Procedures

those denied and approved applications which constitute marginal transactions. (See Appendix on *Identifying Marginal Transactions* for guidance.)

- If few marginal control group applicants are identified from the initial sample, review additional files of approved control group applicants. This will either increase the number of marginal approvals or confirm that marginal approvals are so infrequent that the marginal denials are unlikely to involve disparate treatment.

- The judgmental selection of both marginal-denied and marginal-approved applicant loan files should be done together, in a "back and forth" manner, to facilitate close matches and a more consistent definition of "marginal" between these two types of loan files.

- Once the marginal files have been identified, the data elements called for on the profile spreadsheet are extracted or noted and entered.

- While conducting the preceding step, the examiner should simultaneously look for and document on the spreadsheet any evidence found in marginal files regarding the following:

  - The extent of any assistance, including both affirmative aid and waivers or partial waivers of credit policy provisions or requirements, that appears to have been provided to marginal-approved control group applicants, which enabled them to overcome one or more credit deficiencies, such as excessive debt-to-income ratios; and

  - The extent to which marginal-denied target group applicants with similar deficiencies were, or were not, provided similar affirmative aid, waivers, or other forms of assistance.

c.  Review and Compare Profiles

- For each focal point, review all marginal profiles to determine if the underwriter followed institution lending policies in denying applications and whether the reason(s) for denial were supported by facts documented in the loan file and properly disclosed to the applicant pursuant to Regulation B. If any (a) unexplained deviations from credit standards, (b) inaccurate reasons for denial, or (c) incorrect disclosures are noted, (whether in a judgmental underwriting system, a scored system, or a mixed system) the examiner should obtain an explanation from the underwriter and document the response on an appropriate workpaper.

  NOTE: In constructing the applicant profiles to be compared, examiners must adjust the facts compared so that assistance, waivers, or acts of discretion are treated consistently between applicants. For example, if a control group applicant's DTI ratio was lowered to 42% because the institution decided to include short-term overtime income, and a prohibited basis group applicant who was denied due to "insufficient income" would have had his ratio drop from 46% to 41% if his short-term overtime income had been considered, then the examiners should consider 41%, not 46%, in determining the benchmark.

- For each reason for denial identified within the target group, rank the denied prohibited basis applicants, beginning with the applicant whose qualification(s) related to that reason for denial were least deficient. (The top-ranked denied

# Interagency Fair Lending Examination Procedures

applicant in each such ranking will be referred to below as the "benchmark" applicant.)

- Compare each marginal control group approval to the benchmark applicant in each reason-for-denial ranking developed in step (b), above. If there are no approvals who are equally or less qualified, then there are no instances of disparate treatment for the institution to account for. For all such approvals that appear no better qualified than the denied benchmark applicant:
  - Identify the approved loan on the worksheet or spreadsheet as an "overlap approval;" and
  - Compare that overlap approval with other marginal prohibited basis denials in the ranking to determine whether additional overlaps exist. If so, identify all overlapping approvals and denials as above.
- Where the focal point involves use of a credit scoring system, the analysis for disparate treatment is similar to the procedures set forth in (c) above, and should focus primarily on overrides of the scoring system itself. For guidance on this type of analysis, refer to *Considering Automated Underwriting and Credit Scoring, Part C,* in the Appendix.

**Step 4: If there is some evidence of violations in the underwriting process, but not enough to clearly establish the existence of a pattern or practice, the examiner should expand the sample as necessary to determine whether a pattern or practice does or does not exist.**

**Step 5: Discuss all findings resulting from the above comparisons with management and document both the findings and all conversations on an appropriate worksheet.**

## D. Analyzing Potential Disparities in Pricing and Other Terms and Conditions

Depending on the intensity of the examination and the size of the borrower population to be reviewed, the analysis of decisions on pricing and other terms and conditions may involve a comparative file review, statistical analysis, a combination of the two, or other specialized technique used by an agency. Each examination process assesses an institution's credit-decision standards and whether decisions on pricing and other terms and conditions are applied to borrowers without regard to a prohibited basis.

The procedures below encompass the examination steps for a comparative file review. Examiners should consult their own agency's procedures for detailed guidance where appropriate. For example, when file reviews are undertaken in conjunction with statistical analysis, the guidance on specific sample sizes referenced below may not apply.

## Step 1: Determine Sample Selection

Examiners may review data in its entirety or restrict their analysis to a sample depending on the examination approach used and the quality of the institution's compliance management system. The *Fair Lending Sample Size Tables* in the Appendix provide general guidance about appropriate sample sizes. Generally, the sample size should be based on the number of

# Interagency Fair Lending Examination Procedures

prohibited basis group and control group originations for each focal point selected during the 12 months preceding the examination and the outcome of the compliance management system analysis conducted in Part II.  When possible, examiners should request specific loan files in advance and request that the institution have them available for review at the start of the examination.

## Step 2:  Determine Sample Composition and Create Applicant Profiles

Examiners should tailor their sample and subsequent analysis to the specific factors that the institution considers when determining its pricing, terms, and conditions.  For example, while decisions on pricing and other terms and conditions are part of an institution's underwriting process, general underwriting criteria should not be used in the analysis if they are not relevant to the term or condition to be reviewed.  Additionally, consideration should be limited to factors which examiners determine to be legitimate.

    a.  While the period for review should be 12 months, prohibited basis group and control group borrowers should be grouped and reviewed around a range of dates during which the institution's practices for the term or condition being reviewed were the same. Generally, examiners should use the loan origination date or the loan application date.

    b.  Identify data to be analyzed for each focal point to be reviewed and record this information for each borrower on a spreadsheet to ensure a valid comparison regarding terms and conditions.  For example, in certain cases, an institution may offer slightly differentiated products with significant pricing implications to borrowers.  In these cases, it may be appropriate to group these procedures together for the purposes of evaluation.

## Step 3:  Review Terms and Conditions; Compare with Borrower Outcomes

    a.  Review all loan terms and conditions (rates, points, fees, maturity variations, LTVs, collateral requirements, etc.) with special attention to those that are left, in whole or in part, to the discretion of loan officers or underwriters. For each such term or condition, identify (a) any prohibited basis group borrowers in the sample who appear to have been treated unfavorably with respect to that term or condition and (b) any control group borrowers who appear to have been treated favorably with respect to that term or condition. The examiner's analysis should be thoroughly documented in the workpapers.

    b.  Identify from the sample universe any control group borrowers who appear to have been treated more favorably than one or more of the above-identified prohibited basis group borrowers and who have pricing or creditworthiness factors (under the institution's standards) that are equal to or less favorable than the prohibited basis group borrowers.

    c.  Obtain explanations from the appropriate loan officer or other employee for any differences that exist and reanalyze the sample for evidence of discrimination.

    d.  If there is some evidence of violations in the imposition of terms and conditions, but not enough to clearly establish the existence of a pattern or practice, the examiner should expand the sample as necessary to determine whether a pattern or practice does or does not exist.

# Interagency Fair Lending Examination Procedures

e.  Discuss differences in comparable loans with the institution's management and document all conversations on an appropriate worksheet.  For additional guidance on evaluating management's responses, refer to *Part A, 1 - 5, Evaluating Responses to Evidence of Disparate Treatment* in the Appendix.

## E.  Steering Analysis

An institution that offers a variety of lending products or product features, either through one channel or through multiple channels, may benefit consumers by offering greater choices and meeting the diverse needs of applicants.  Greater product offerings and multiple channels, however, may also create a fair lending risk that applicants will be illegally steered to certain choices based on prohibited characteristics.

Several examples illustrate potential fair lending risk:

- An institution that offers different lending products based on credit risk levels may present opportunities for loan officers or brokers to illegally steer applicants to the higher-risk products;
- An institution that offers nontraditional loan products or loan products with potentially onerous terms (such as prepayment penalties) may present opportunities for loan officers or brokers to illegally steer applicants to certain products or features; and
- An institution that offers prime or sub-prime products through different channels may present opportunities for applicants to be illegally steered to the sub-prime channel.

The distinction between guiding consumers toward a specific product or feature and illegal steering centers on whether the institution did so on a prohibited basis, rather than based on an applicant's needs or other legitimate factors.  It is not necessary to demonstrate financial harm to a group that has been "steered."  It is enough to demonstrate that action was taken on a prohibited basis regardless of the ultimate financial outcome.  If the scoping analysis reveals the presence of one or more risk factors S1 through S8 for any selected focal point, consult with agency supervisory staff about conducting a steering analysis as described below.

## Step 1: Clarify what options are available to applicants.

Through interviews with appropriate personnel of the institution and review of policy manuals, procedure guidelines, and other directives, obtain and verify the following information for each product-alternative product pairing or grouping identified above:

a.  All underwriting criteria for the product or feature and their alternatives that are offered by the institution or by a subsidiary or affiliate.  Examples of products may include stated income, negative amortization, and options ARMs.  Examples of terms and features include prepayment penalties and escrow requirements.  The distinction between a product, term, and feature may vary institution to institution.  For example, some institutions may consider "stated income" a feature, whiles others may consider that a distinct product.

b.  Pricing or other costs applicable to the product and the alternative product(s), including interest rates, points, and all fees.

# Interagency Fair Lending Examination Procedures

**Step 2: Document the policies, conditions or criteria that have been adopted by the institution for determining how referrals are to be made and choices presented to applicants.**

    a. Obtain not only information regarding the product or feature offered by the institution and alternatives offered by subsidiaries/affiliates, but also information on alternatives offered solely by the institution itself.

    b. Obtain any information regarding a subsidiary of the institution directly from that entity, but seek information regarding an affiliate or holding company subsidiary only from the institution itself.

    c. Obtain all appropriate documentation and provide a written summary of all discussions with loan personnel and managers.

    d. Obtain documentation and/or employee estimates as to the volume of referrals made from or to the institution, for each product, during a relevant time period.

    e. Resolve to the extent possible any discrepancies between information found in the institution's documents and information obtained in discussions with loan personnel and managers by conducting appropriate follow-up interviews.

    f. Identify any policies and procedures established by the institution and/or the subsidiary or affiliate for (i) referring a person who applies to the institution, but does not meet its criteria, to another internal lending channel, subsidiary, or affiliate; (ii) offering one or more alternatives to a person who applies to the institution for a specific product or feature, but does not meet its criteria; or (iii) referring a person who applies to a subsidiary or affiliate for its product, but who appears qualified for a loan from the institution, to the institution; or referring a person who applies through one internal lending channel for a product, but who appears to be qualified for a loan through another lending channel to that particular lending channel.

    g. Determine whether loan personnel are encouraged, through financial incentives or otherwise, to make referrals, either from the institution to a subsidiary/affiliate or vice versa.  Similarly, determine whether the institution provides financial incentives related to products and features.

**Step 3: Determine how referral decisions are made and documented within the institution.**

Determine how a referral is made to another internal lending channel, subsidiary, or affiliate. Determine the reason for referral and how it is documented.

**Step 4: Determine to what extent individual loan personnel are able to exercise personal discretion in deciding what loan products or other credit alternatives will be made available to a given applicant.**

# Interagency Fair Lending Examination Procedures

**Step 5: Determine whether the institution's stated policies, conditions, or criteria in fact are adhered to by individual decision makers. If not, does it appear that different policies or practices are actually in effect?**

Enter data from the prohibited basis group sample on the spreadsheets and determine whether the institution is, in fact, applying its criteria as stated. For example, if one announced criterion for receiving a "more favorable" prime mortgage loan was a back-end debt ratio of no more than 38%, review the spreadsheets to determine whether that criteria were adhered to. If the institution's actual treatment of prohibited basis group applicants appears to differ from its stated criteria, document such differences for subsequent discussion with management.

**Step 6: To the extent that individual loan personnel have any discretion in deciding what products and features to offer applicants, conduct a comparative analysis to determine whether that discretion has been exercised in a nondiscriminatory manner.**

Compare the institution's or subsidiary/affiliate's treatment of control group and prohibited basis group applicants by adapting the "benchmark" and "overlap" technique discussed in Part III, Section C, of these procedures. For purposes of this Steering Analysis, that technique should be conducted as follows:

a. For each focal point to be analyzed, select a sample of prohibited basis group applicants who received "less favorable" treatment (e.g., referral to a finance company or a subprime mortgage subsidiary or counteroffers of less favorable product alternatives).

> NOTE: In selecting the sample, follow the guidance of *Fair Lending Sample Size Tables, Table B* in the Appendix and select "marginal applicants" as instructed in Part III, Section C, above.

b. Prepare a spreadsheet for the sample which contains data entry categories for those underwriting and/or referral criteria that the institution identified in Step 1.b as used in reaching underwriting and referral decisions between the pairs of products.

c. Review the "less favorably" treated prohibited basis group sample and rank this sample from least qualified to most qualified.

d. From the sample, identify the best qualified prohibited basis group applicant based on the criteria identified for the control group, above. This applicant will be the "benchmark" applicant. Rank order the remaining applicants from best to least qualified.

e. Select a sample of control group applicants. Identify those who were treated "more favorably" with respect to the same product-alternative product pair as the prohibited basis group. (Again refer to the Sample Size Table B and marginal applicant processes noted above in selecting the sample.)

f. Compare the qualifications of the benchmark applicant with those of the control group applicants, beginning with the least qualified member of that sample. Any control group applicant who appears less qualified than the benchmark applicant should be identified on the spreadsheet as a "control group overlap."

g. Compare all control group overlaps with other, less qualified prohibited basis group applicants to determine whether additional overlaps exist.

# Interagency Fair Lending Examination Procedures

    h.   Document all overlaps as possible disparities in treatment. Discuss all overlaps and related findings (e.g., any differences between stated and actual underwriting and/or referral criteria) with management, documenting all such conversations.

**Step 7:  Examiners should consult with their agency's supervisory staff if they see a need to contact control group or prohibited basis group applicants to substantiate the steering analysis.**

## F.  Transactional Underwriting Analysis - Commercial Loans.

**Overview:**  Unlike consumer credit, where loan products and prices are generally homogenous and underwriting involves the evaluation of a limited number of credit variables, commercial loans are generally unique and underwriting methods and loan pricing may vary depending on a large number of credit variables.  The additional credit analysis that is involved in underwriting commercial credit products will entail additional complexity in the sampling and discrimination analysis process.  Although ECOA prohibits discrimination in all commercial credit activities of a covered institution, the agencies recognize that small businesses (sole proprietorships, partnerships, and small, closely-held corporations) may have less experience in borrowing. Small businesses may have fewer borrowing options, which may make them more vulnerable to discrimination.  Therefore, in implementing these procedures, examinations should generally be focused on small business credit (commercial applicants that had gross revenues of $1,000,000 or less in the preceding fiscal year), absent some evidence that a focus on other commercial products would be more appropriate.

## Step 1:  Understand Commercial Loan Policies

For the commercial product line selected for analysis, the examiner should first review credit policy guidelines and interview appropriate commercial loan managers and officers to obtain written and articulated standards used by the institution in evaluating commercial loan applications.

NOTE:  Examiners should consult their own agencies for guidance on when a comparative analysis or statistical analysis is appropriate and follow their agencies procedures for conducting such a review/analysis.

## Step 2:  Conduct Comparative File Review

    a.   Select all (or a maximum of 10) denied applications that were acted on during the three-month period prior to the examination.  To the extent feasible, include denied applications from businesses that are (i) located in minority and/or integrated geographies or (ii) appear to be owned by women or minority group members, based on the names of the principals shown on applications or related documents.  (In the case of institutions that do a significant volume of commercial lending, consider reviewing more than ten applications.)

    b.   For each of the denied commercial applications selected, record specific information from loan files and through interviews with the appropriate loan officer(s), about the principal owners, the purpose of the loan, and the specific, pertinent financial information about the commercial enterprise (including type of business - retail, manufacturing, service, etc.), that was used by the institution to evaluate the credit

# Interagency Fair Lending Examination Procedures

request.  Maintenance or use of data that identifies prohibited basis characteristics of those involved with the business (either in approved or denied loan applications) should be evaluated as a potential violation of Regulation B.

c. Select 10 approved loans that appear to be similar with regard to business type, purpose of loan, loan amount, loan terms, and type of collateral, as the denied loans sampled.  For example, if the denied loan sample includes applications for lines of credit to cover inventory purchases for retail businesses, the examiner should select approved applications for lines of credit from retail businesses.

d. For each approved commercial loan application selected, obtain and record information parallel to that obtained for denied applications.

e. The examiner should first compare the credit criteria considered in the credit process for each of the approved and denied applications to established underwriting standards, rather than comparing files directly.

f. The examiner should identify any deviations from credit standards for both approved and denied credit requests and differences in loan terms granted for approved credit requests.

g. The examiner should discuss each instance where deviations from credit standards and terms were noted, but were not explained in the file, with the commercial credit underwriter.  Each discussion should be documented.

## Step 3: Conduct Targeted Sampling

a.  If deviations from credit standards or pricing are not sufficiently explained by other factors either documented in the credit file or the commercial underwriter was not able to provide a reasonable explanation, the examiner should determine if deviations were detrimental to any protected classes of applicants.

b. The examiner should consider employing the same techniques for determining race and gender characteristics of commercial applicants as those outlined in the consumer loan sampling procedures.

c. If it is determined that there are members of one or more prohibited basis groups among commercial credit requests that were not underwritten according to established standards or received less favorable terms, the examiner should select additional commercial loans, where applicants are members of the same prohibited basis group and select similarly situated control group credit requests in order to determine whether there is a pattern or practice of discrimination.  These additional files should be selected based on the specific applicant circumstance(s) that appeared to have been viewed differently by lending personnel on a prohibited basis.

d. If there are not enough similarly situated applicants for comparison in the original sample period to draw a reasonable conclusion, the examiner should expand the sample period.  The expanded sample period should generally not go beyond the date of the prior examination.

Sampling Guidelines

a. Generally, the task of selecting an appropriate expanded sample of prohibited basis and control group applications for commercial loans will require examiner judgment.

# Interagency Fair Lending Examination Procedures

The examiner should select a sample that is large enough to be able to draw a reasonable conclusion.

b. The examiner should first select from the applications that were acted on during the initial sample period, but were not included in the initial sample, and select applications from prior time periods as necessary.

c. The expanded sample should include both approved and denied, prohibited basis and control group applications, where similar credit was requested by similar enterprises for similar purposes.

## G. Analysis of Potential Discriminatory "Redlining"

**Overview:**  For purposes of this analysis, traditional "redlining" is a form of illegal disparate treatment in which an institution provides unequal access to credit, or unequal terms of credit, because of the race, color, national origin, or other prohibited characteristic(s) of the residents of the area in which the credit seeker resides or will reside or in which the residential property to be mortgaged is located. Redlining may also include "reverse redlining," the practice of targeting certain borrowers or areas with less advantageous products or services based on prohibited characteristics.

The redlining analysis may be applied to determine whether, on a prohibited basis:

- An institution fails or refuses to extend credit in certain areas;
- An institution targets certain borrowers or certain areas with less advantageous products;
- An institution makes loans in such an area, but at a restricted level or upon less-favorable terms or conditions as compared to contrasting areas; or
- An institution omits or excludes such an area from efforts to market residential loans or solicit customers for residential credit.

This guidance focuses on possible discrimination based on race or national origin. The same analysis could be adapted to evaluate relative access to credit for areas of geographical concentration on other prohibited bases – for example, age.

NOTE: It is true that neither the Equal Credit Opportunity Act (ECOA) nor the Fair Housing Act (FHAct) specifically uses the term "redlining."  However, federal courts as well as  agencies that have enforcement responsibilities for the FHAct have interpreted it as prohibiting institutions from having different marketing or lending practices for certain geographic areas, compared to others, where the purpose or effect of such differences would be to discriminate on a prohibited basis. Similarly, the ECOA would prohibit treating applicants for credit differently on the basis of differences in the racial or ethnic composition of their respective neighborhoods.

Like other forms of disparate treatment, redlining can be proven by overt or comparative evidence.  If any written or oral policy or statement of the institution (see risk factors R6-10 in Part I, above) suggests that the institution links the racial or national origin character of an area with any aspect of access to or terms of credit, the examiners should refer to the guidance in Section B of this Part III, on documenting and evaluating overt evidence of discrimination.

Overt evidence includes not only explicit statements, but also any geographical terms used by the institution that would, to a reasonable person familiar with the community in question, connote a

# Interagency Fair Lending Examination Procedures

specific racial or national origin character. For example, if the principal information conveyed by the phrase "north of 110th Street" is that the indicated area is principally occupied by Hispanics, then a policy of not making credit available "north of 110th Street" is overt evidence of potential redlining on the basis of national origin.

Overt evidence is relatively uncommon. Consequently, the redlining analysis usually will focus on comparative evidence (similar to analyses of possible disparate treatment of individual customers) in which the institution's treatment of areas with contrasting racial or national origin characters is compared.

When the scoping process (including consultation within an agency as called for by agency procedures) indicates that a redlining analysis should be initiated, examiners should complete the following steps of comparative analysis:

1. Identify and delineate any areas within the institution's CRA assessment area and reasonably expected market area for residential products that have a racial or national origin character;

2. Determine whether any minority area identified in Step 1 appears to be excluded, under-served, selectively excluded from marketing efforts, or otherwise less-favorably treated in any way by the institution;

3. Identify and delineate any areas within the institution's CRA assessment area and reasonably expected market area for residential products that are non-minority in character and that the institution appears to treat more favorably;

4. Identify the location of any minority areas located just outside the institution's CRA assessment area and market area for residential products, such that the institution may be purposely avoiding such areas;

5. Obtain the institution's explanation for the apparent difference in treatment between the areas and evaluate whether it is credible and reasonable; and

6. Obtain and evaluate other information that may support or contradict interpreting identified disparities to be the result of intentional illegal discrimination.

These steps are discussed in detail below.

## Using information obtained during scoping

Although the six tasks listed are presented below as examination steps in the order given above, examiners should recognize that a different order may be preferable in any given examination. For example, the institution's explanation (Step 5) for one of the policies or patterns in question may already be documented in the CRA materials reviewed (Step 1) and the CRA examiners may already have verified it, which may be sufficient for purposes of the redlining analysis.

As another example, as part of the scoping process, the examiners may have reviewed an analysis of the geographic distribution of the institution's loan originations with respect to the racial and national origin composition of census tracts within its CRA assessment or residential market area. Such analysis might have documented the existence of significant discrepancies between areas, by degree of minority concentration, in loans originated (risk factor R1), approval/denial rates (risk factor R2), and/or rates of denials because of insufficient collateral

# Interagency Fair Lending Examination Procedures

(risk factor R3).  In such a situation in which the scoping process has produced a reliable factual record, the examiners could begin with Step 5 (obtaining an explanation) of the redlining analysis below.

In contrast, when the scoping process only yields partial or questionable information or when the risk factors on which the redlining analysis is based on complaints or allegations against the institution, Steps 1-4 must be addressed.

## Comparative analysis for redlining

**Step 1:  Identify and delineate any areas within the institution's CRA assessment area and reasonably expected market area for residential products that are of a racial or national origin minority character.**

> NOTE: The CRA assessment area can be a convenient unit for redlining analysis because information about it typically already is in hand.  However, the CRA assessment area may be too limited.  The redlining analysis focuses on the institution's decisions about how much access to credit to provide to different geographical areas.  The areas for which those decisions can best be compared are areas where the institution actually marketed and provided credit and where it could reasonably be expected to have marketed and provided credit.  Some of those areas might be beyond or otherwise different from the CRA assessment area.

If there are no areas identifiable for their racial or national origin minority character within the institution's CRA assessment area or reasonably expected market area for residential products, a redlining analysis is not appropriate.  (If there is a substantial, but dispersed minority population, potential disparate treatment can be evaluated by a routine comparative file review of applicants.)

This step may have been substantially completed during scoping, but unresolved matters may remain.  (For example, several community spokespersons may allege that the institution is redlining, but disagree in defining the area.)   The examiners should:

a.  Describe as precisely as possible why a specific area is recognized in the community (perceptions of residents, etc.) and/or is objectively identifiable (based on census or other data) as having a particular racial or national origin minority character.

- The most obvious identifier is the predominant race or national origin of the residents of the area.  Examiners should document the percentages of racial or national origin minorities residing within the census tracts that make up the area.  Analyzing racial and national origin concentrations in quartiles (such as 0 to <=25%, >25% to < = 50%, >50% to <= 75%, and >75%) or based on majority concentration (0 to <=50%, and >50%) may be helpful.  However, examiners should bear in mind that it is illegal for the institution to consider a prohibited factor in any way.  For example, an area or neighborhood may only have a minority population of 20%, but if the area's concentration appears related to lending practices, it would be appropriate to use that area's level of concentration in the analysis.  Contacts with community groups can be helpful to learn whether there are such subtle features of racial or ethnic character within a particular neighborhood.

- Geographical groupings that are convenient for CRA may obscure racial patterns.  For example, an under-served, low-income, predominantly minority

# Interagency Fair Lending Examination Procedures

neighborhood that lies within a larger low-income area that primarily consisted of non-minority neighborhoods may seem adequately served when the entire low-income area is analyzed as a unit. However, a racial pattern of underservice to minority areas might be revealed if the low-income minority neighborhood shared a border with an under-served, middle-income, minority area and those two minority areas were grouped together for purposes of analysis.

b. Describe how the racial or national origin character changes across the suspected redlining area's various boundaries.

c. Document or estimate the demand for credit within the minority area. This may include the applicable demographics of the area, including the percentage of homeowners, the median house value, median family income, or the number of small businesses, etc. Review the institution's non-originated loan applications from the suspected redlined areas. If available, review aggregate institution data for loans originated and applications received from the suspected redlined areas. Community contacts may also be helpful in determining the demand for such credit. If the minority area does not have a significant amount of demand for such credit, the area is not appropriate for a redlining analysis.

**Step 2: Determine whether any minority area identified in Step 1 is excluded, under-served, selectively excluded from marketing efforts, or otherwise less-favorably treated in any way by the institution.**

The examiners should begin with the risk factors identified during the scoping process. The unfavorable treatment may have been substantially documented during scoping and needs only to be finished in this step. If not, this step will verify and measure the extent to which HMDA data show the minority areas identified in Step 1 to be under-served and/or how the institution's explicit policies treat them less favorably.

a. Review prior CRA lending test analyses to learn whether they have identified any excluded or otherwise under-served areas or other significant geographical disparities in the institution's lending. Determine whether any of those are the minority areas identified in Step 1.

b. Learn from the institution itself whether, as a matter of policy, it treats any separate or distinct geographical areas within its marketing or service area differently from other areas. This may have been done completely or partially during scoping analysis related to risk factors R5-R9. The differences in treatment can be in marketing, products offered, branch operations (including the services provided and the hours of operation), appraisal practices, application processing, approval requirements, pricing, loan conditions, evaluation of collateral, or any other policy or practice materially related to access to credit. Determine whether any of those less-favored areas are the minority areas identified in Step 1.

c. Obtain from the institution: (i) its reasons for such differences in policy, (ii) how the differences are implemented, and (iii) any specific conditions that must exist in an area for it to receive the particular treatment (more favorable or less favorable) that the institution has indicated.

# Interagency Fair Lending Examination Procedures

**Step 3:  Identify and delineate any areas within the institution's CRA assessment area and reasonably expected market area for residential products that are non-minority in character and that the institution appears to treat more favorably.**

To the extent not already completed during scoping:

a.  Document the percentages of control group and of racial or national origin minorities residing within the census tract(s) that comprise(s) the non-minority area;

b.  Document the nature of the housing stock in the area;

c.  Describe, to the extent known, how the institution's practices, policies, or its rate of lending change from less- to more-favorable as one leaves the minority area at its various boundaries (Examiners should be particularly attentive to instances in which the boundaries between favored and disfavored areas deviate from boundaries the institution would reasonably be expected to follow, such as political boundaries or transportation barriers.); and

d.  Examiners should particularly consider whether, within a large area that is composed predominantly of racial or national origin minority households, there are enclaves that are predominantly non-minority or whether, along the area's borders, there are irregularities where the non-minority group is predominant.  As part of the overall comparison, examiners should determine whether credit access within those small non-minority areas differs from credit access in the larger minority area.

**Step 4:  Identify the location of any minority areas just outside the institution's CRA assessment area and market area for residential products, such that the institution may be purposely avoiding such areas.**

Review the analysis from prior CRA examinations of whether the assessment area appears to have been influenced by prohibited factors.  If there are minority areas that the institution excluded from the assessment area improperly, consider whether they ought to be included in the redlining analysis. Analyze the institution's reasonably expected market area in the same manner.

**Step 5: Obtain the institution's explanation for the apparent difference in treatment between the areas and evaluate whether it is credible and reasonable.**

This step completes the comparative analysis by soliciting from the institution any additional information not yet considered by the examiners that might show that there is a nondiscriminatory explanation for the apparent disparate treatment based on race or ethnicity.

For each matter that requires explanation, provide the institution full information about what differences appear to exist in how it treats minority and non-minority areas and how the examiners reached their preliminary conclusions at this stage of the analysis.

a.  Evaluate whether the conditions identified by the institution in Step 2 as justifying more favorable treatment pursuant to institutional policy existed in minority neighborhoods that did not receive the favorable treatment called for by institutional policy.  If there are minority areas for which those conditions existed, ask the institution to explain why the areas were treated differently despite the similar conditions.

# Interagency Fair Lending Examination Procedures

b. Evaluate whether the conditions identified by the institution in Step 2 as justifying less favorable treatment pursuant to institutional policy existed in non-minority neighborhoods that received favorable treatment nevertheless.  If there are non-minority areas for which those conditions existed, ask the institution to explain why those areas were treated differently, despite the similar conditions.

c. Obtain explanations from the institution for any apparent differences in treatment observed by the examiners, but not called for by the institution's policies

- If the institution's explanation cites any specific conditions in the non-minority area(s) to justify more favorable treatment, determine whether the minority area(s) identified in Step 1 satisfied those conditions.   If there are minority areas for which those conditions existed, ask the institution to explain why the areas were treated differently despite the similar conditions.

- If the institution's explanation cites any specific conditions in the minority area(s) to justify less favorable treatment, determine whether the non-minority area(s) had those conditions.   If there are non-minority areas for which those conditions existed, ask the institution to explain why those areas were treated differently, despite the similar conditions.

d. Evaluate the institution's responses by applying appropriate principles selected from the Appendix on *Evaluating Responses to Evidence of Disparate Treatment*.

**Step 6:  Obtain and evaluate specific types of other information that may support or contradict a finding of redlining.**

As a legal matter, discriminatory intent can be inferred simply from the lack of a legitimate explanation for clearly less-favorable treatment of racial or national origin minorities. Nevertheless, if the institution's explanations do not adequately account for a documented difference in treatment, the examiners should consider additional information that might support or contradict the interpretation that the difference in treatment constituted redlining.

a. <u>Comparative file review</u>.   If there was a comparative file review conducted in conjunction with the redlining examination, review the results; or if it is necessary and feasible to do so to clarify what appears to be discriminatory redlining, compare denied applications from within the suspected redlining area to approved applications from the contrasting area.

- Learn whether there were any denials of fully qualified applicants from the suspected redlining area.  If so, that may support the view that the institution was avoiding doing business in the area.

- Learn whether the file review identified instances of illegal disparate treatment against applicants of the same race or national origin as the suspected redlining area.  If so, that may support the view that the institution was avoiding doing business with applicants of that group, such as the residents of the suspected redlining area.  Learn whether any such identified victims applied for transactions in the suspected redlining area.

- If there are instances of either of the above, identify denied non-minority residents, if any, of the suspected redlining area and review their application files to learn whether they appear to have been treated in an irregular or less favorable

# Interagency Fair Lending Examination Procedures

way.  If so, that may support the view that the character of the area rather than of the applicants themselves appears to have influenced the credit decisions.

- Review withdrawn and incomplete applications for the suspected redlining area, if those can readily be identified from the HMDA-LAR, and learn whether there are reliable indications that the institution discouraged those applicants from applying.  If so, that may support the view that the institution was avoiding conducting business in the area and may constitute evidence of a violation of Section 202.4(b) of Regulation B.

Conversely, if the comparisons of individual transactions show that the institution treated minority and non-minority applicants within and outside the suspected redlining area similarly, that tends to contradict the conclusion that the institution avoided the areas because it had minority residents.

b.  Interviews of third parties.  The perspectives of third parties will have been taken into account to some degree through the review of available materials during scoping.  Later in the examination, in appropriate circumstances, information from third parties may help determine whether the institution's apparent differences in treatment of minority and non-minority areas constitute redlining.

- Identify persons (such as housing or credit counselors, home improvement contractors, or real estate and mortgage brokers) who may have extensive experience dealing with credit applicants from the suspected redlined area.
- After obtaining appropriate authorization and guidance from your agency, interview those persons to learn of their first-hand experiences related to:
  - Oral statements or written indications by an institution's representatives that loan applications from a suspected redlined area were discouraged;
  - Whether the institution treated applicants from the suspected redlining area as called for in its own procedures (as the examiners understand them) and/or whether it treated them similarly to applicants from non-minority areas (as the examiners are familiar with those transactions);
  - Any unusual delays or irregularities in loan processing for transactions in the suspected redlining area; and
  - Differences in the institution's pricing, loan conditions, property valuation practices, etc., in the suspected redlining area compared to contrasting areas.

Also, learn from the third parties the names of any consumers they described as having experienced the questionable behavior recounted by the third party, and consider contacting those consumers.

If third parties witnessed specific conduct by the institution that indicates the institution wanted to avoid business from the area or prohibited basis group in question, this would tend to support interpreting the difference in treatment as intended.  Conversely, if third parties report proper treatment or positive actions toward such area or prohibited basis group, this would tend to contradict the view that the institution intended to discriminate.

c.  Marketing.  A clear exclusion of the suspected redlining area from the institution's marketing of residential loan products supports the view that the institution did not want to do business in the area. Marketing decisions are affirmative acts to include or exclude areas.  Disparities in marketing between two areas may reveal that the

# Interagency Fair Lending Examination Procedures

institution prefers one to the other.  If sufficiently stark and supported by other evidence, a difference in marketing to racially different areas could itself be treated as a redlining violation of the Fair Housing Act.  Even below that level of difference, marketing patterns can support or contradict the view that disparities in lending practices were intentional.

- Review materials that show how the institution has marketed in the suspected redlined area and in non-minority areas.   Begin with available CRA materials and discuss the issues with CRA examiners, then review other materials as appropriate. The materials may include, for example, the institution's guidance for the geographical distribution of pre-approved solicitations for credit cards or home equity lines of credit, advertisements in local media or business or telephone directories, business development calls to real estate brokers, and calls by telemarketers.

d.  Peer performance.  Market share analysis and other comparisons to competitors are insufficient by themselves to prove that an institution engaged in illegal redlining.  By the same token, an institution cannot justify its own failure to market or lend in an area by citing other institutions' failures to lend or market there.

However, an institution's inactivity in an under-served area where its acknowledged competitors are active would tend to support the interpretation that it intends to avoid doing business in the area.  Conversely, if it is as active as other institutions that would suggest that it intends to compete for, rather than avoid, business in the area.

- Develop a list of the institution's competitors.
- Learn the level of lending in the suspected redlining area by competitors.  Check any public evaluations of similarly situated competitors obtained by the CRA examiners as part of evaluating the performance context or obtain such evaluations independently.

e.  Institution's record.  Request from the institution information about its overall record of serving or attempting to serve the racial or national origin minority group with which the suspected redlining area is identified.  The record may reveal an intent to serve that group that tends to contradict the view that the institution intends to discriminate against the group.

NOTE:  For any information that supports interpreting the situation as illegal discrimination, obtain and evaluate an explanation from the institution as called for in Part IV.  If the institution's explanation is that the disparate results are the consequence of a specific, neutral policy or practice that the institution applies broadly, such as not making loans on homes below a certain value, review the guidance in the *Special Analyses* section of the Appendix under *Disproportionate Adverse Impact Violations* and consult agency managers.

## H.  Analysis of Potential Discriminatory Marketing Practices.

When scoping identifies significant risk factors (M1-M7) related to marketing, examiners should consult their agency's supervisory staff and experts about a possible marketing discrimination analysis.  If the supervisory staff agrees to proceed, the examiners should collect information as follows:

# Interagency Fair Lending Examination Procedures

**Step 1:  Identify the institution's marketing initiatives**.

a.  Pre-approved solicitations

- Determine whether the institution sends out pre-approved solicitations:
  - for home purchase loans;
  - for home improvement loans; and
  - for refinance loans.
- Determine how the institution selects recipients for such solicitations:
  - learn from the institution its criteria for such selections; and
  - review any guidance or other information the institution provided credit-reporting companies or other companies that supply such lists.

b.  Media Usage

- Determine in which newspapers and broadcast media the institution advertises;
  - identify any racial or national origin identity associated with those media; and
  - determine whether those media  focus on geographical communities of a particular racial or national origin character.
- Learn the institution's strategies for geographic and demographic distribution of advertisements.
- Obtain and review copies of the institution's printed advertising and promotional materials.
- Determine what criteria the institution communicates to media about what is an attractive customer or an attractive area to cultivate business.
- Determine whether advertising and marketing are the same to racial and national origin minority areas as compared to non-minority areas.

c.  Self-produced promotional materials

- Learn how the institution distributes its own promotional materials, both methods and geographical distribution; and
- Learn what the institution regards as the target audience(s) for those materials.

d.  Realtors, brokers, contractors, and other intermediaries

- Determine whether the institution solicits business from specific realtors, brokers, home improvement contractors, and other conduits;
  - learn how the institution decides which intermediaries it will solicit;
  - identify the parties contacted and determine the distribution between minority and non-minority areas;
  - obtain and review the types of information the institution distributes to intermediaries; and
  - determine how often the institution contacts intermediaries.

# Interagency Fair Lending Examination Procedures

- Determine what criteria the institution communicates to intermediaries about the type of customers it seeks or the nature of the geographic areas in which it wishes to do business.

e.  Telemarketers or predictive dialer programs

- Learn how the institution identifies which consumers to contact and whether the institution sets any parameters on how the list of consumers is compiled.

**Step 2:  Determine whether the institution's activities show a significantly lower level of marketing effort toward minority areas or toward media or intermediaries that tend to reach minority areas.**

**Step 3:  If there is any such disparity, document the institution's explanation for it**.

For additional guidance, refer to *Part C* of the *Special Analyses* section in the Appendix**.**

**I.  Credit Scoring.**

If the scoping process results in the selection of a focal point that includes a credit or mortgage scored loan product, refer to the *Considering Automated Underwriting and Credit Scoring* section of the Appendix**.**

If the institution utilizes a credit scoring program which scores *age* for any loan product selected for review in the scoping stage, either as the sole underwriting determinant or only as a guide to making loan decisions, refer to *Part E* of the *Considering Automated Underwriting and Credit Scoring* section of the Appendix.

**J.  Disparate Impact Issues.**

These procedures have thus far focused primarily on examining comparative evidence for possible unlawful disparate treatment. Disparate impact has been described briefly in the Introduction. Whenever an examiner believes that a particular policy or practice of an institution appears to have a disparate impact on a prohibited basis, the examiner should refer to Part A of the *Special Analyses* section of the Appendix or consult with agency supervisory staff for further guidance.

# Interagency Fair Lending Examination Procedures

## PART IV
## OBTAINING AND EVALUATING RESPONSES FROM THE INSTITUTION AND CONCLUDING THE EXAMINATION

**Step 1:  Present to the institution's management for explanation:**

a.  Any overt evidence of disparate treatment on a prohibited basis.

b.  All instances of apparent disparate treatment (e.g., overlaps) in either the  underwriting of loans or in loan prices, terms, or conditions.

c.  All instances of apparent disparate treatment in the form of discriminatory steering, redlining, or marketing policies or practices.

d.  All instances where a denied prohibited basis applicant was not afforded the same level of assistance or the same benefit of discretion as an approved control group applicant who was no better qualified with regard to the reason for denial.

e.  All instances where a prohibited basis applicant received conspicuously less favorable treatment by the institution than was customary from the institution or was required by the institution's policy.

f.  Any statistically significant average difference in either the frequency or amount of pricing disparities between control group and prohibited basis group applicants.

g.  Any evidence of neutral policies, procedures, or practices that appear to have a disparate impact or effect on a prohibited basis.

Explain that unless there are legitimate, nondiscriminatory explanations (or in the case of disparate impact, a compelling business justification) for each of the preliminary findings of discrimination identified in this Part, the agency could conclude that the institution is in violation of the applicable fair lending laws.

**Step 2:  Document all responses that have been provided by the institution, not just its "best" or "final" response.  Document each discussion with dates, names, titles, questions, responses, any information that supports or undercuts the institution's credibility, and any other information that bears on the issues raised in the discussion(s).**

# Interagency Fair Lending Examination Procedures

**Step 3:  Evaluate whether the responses are consistent with previous statements, information obtained from file review, documents, reasonable banking practices, and other sources, and satisfy common-sense standards of logic and credibility.**

a.  Do not speculate or assume that the institution's decision-maker had specific intentions or considerations in mind when he or she took the actions being evaluated.  Do not, for example, conclude that because you have noticed a legitimate, nondiscriminatory reason for a denial (such as an applicant's credit weakness) that no discrimination occurred unless it is clear that, at the time of the denial, the institution actually based the denial on that reason.

b.  Perform follow-up file reviews and comparative analyses, as necessary, to determine the accuracy and credibility of the institution's explanations.

c.  Refer to Evaluating Responses to Evidence of Disparate Treatment in the Appendix for guidance as to common types of responses.

d.  Refer to the Disproportionate Adverse Impact Violations portion of the Special Analyses section of the Appendix for guidance on evaluating the institution's responses to apparent disparate impact.

**Step 4:  If, after completing Steps 1 - 3 above, you conclude that the institution has failed to adequately demonstrate that one or more apparent violations had a legitimate nondiscriminatory basis or were otherwise lawful, prepare a documented list or discussion of violations, or a draft examination report, as prescribed by agency directives.**

**Step 5:  Consult with agency supervisory staff regarding whether (a) any violations should be referred to the Departments of Justice or Housing and Urban Development and (b) enforcement action should be undertaken by your agency.**

# INTERAGENCY FAIR LENDING EXAMINATION

# PROCEDURES

# APPENDIX

# TABLE OF CONTENTS

**INTRODUCTION**     **3**

**I.**     **COMPLIANCE MANAGEMENT ANALYSIS CHECKLIST**     **4**

A.     Preventive Measures     4

B.     Corrective Measures     10

**II.**     **CONSIDERING AUTOMATED UNDERWRITING AND CREDIT SCORING**     **11**

A.     Structure and Organization of the Scoring System     11

B.     Adverse Action Disclosure Notices     12

C.     Disparate Treatment in the Application of Credit Scoring Programs     12

D.     Disparate Impact and Credit Scoring Algorithms     13

E.     Credit Scoring Systems That Include Age     13

F.     Examination for Empirical Derivation and Statistical Soundness     13

**III.**     **EVALUATING RESPONSES TO EVIDENCE OF DISPARATE TREATMENT**     **14**

A.     Responses to Comparative Evidence of Disparate Treatment     14

B.     Responses to Overt Evidence of Disparate Treatment     18

**IV.**     **FAIR LENDING SAMPLE SIZE TABLES**     **20**

Table A: Underwriting (Accept/Deny) Comparisons     20

Table B: Terms and Conditions Comparisons     20

**V.**     **IDENTIFYING MARGINAL TRANSACTIONS**     **22**

A.     Marginal Denials     22

B.     Marginal Approvals     23

**VI.**     **POTENTIAL SCOPING INFORMATION**     **24**

A.     Internal Agency Documents and Records     24

B.     Information from the Institution     24

**VII.**     **SPECIAL ANALYSES**     **27**

A.     Disproportionate Adverse Impact Violations     27

B.     Discriminatory Pre-application Screening     30

C.     Possible Discriminatory Marketing     30

**VIII.**     **USING SELF-TESTS AND SELF-EXAMINATIONS TO STREAMLINE THE EXAMINATION**     **32**

# Introduction

This Appendix offers a full range of information that might conceivably be brought to bear in an examination. In that sense, it is a menu of resources to be considered and selected from, depending on the nature and scope of the examination being conducted.

# Interagency Fair Lending Procedures

## I.     Compliance Management Analysis Checklist

This checklist is for use in conjunction with Part II of these procedures as a device for examiners to evaluate the strength of an institution's compliance program in terms of its capacity to prevent and to identify and self-correct fair lending violations in connection with the products or issues selected for analysis. The checklist is not intended to be an absolute test of an institution's compliance management program. Programs containing all or most of the features described in the list may nonetheless be flawed for other reasons; conversely, a compliance program that encompasses only a portion of the factors listed below may nonetheless adequately support a strong program under appropriate circumstances. In short, the examiner must exercise his or her best judgment in utilizing this list and in assessing the overall quality of an institution's efforts to ensure fair lending compliance.

If the transactions within the proposed scope are covered by a listed preventive measure, and the answer is "Yes," check the box in the left column. You may then reduce the intensity (mainly the sample size) of the planned comparative file review to the degree that the preventive measures cover transactions within the proposed scope. Document your findings in sufficient detail to justify any resulting reduction in the intensity of the examination.

You are not required to learn whether preventive measures apply to specific products outside the proposed scope. However, if the information you have obtained shows that the  measure is a general practice of the institution, and thus applies to all loan products, check the box in the second column in order to assist future examination planning.

## A.     Preventive Measures

Determine whether policies and procedures exist that tend to prevent illegal disparate treatment in the transactions you plan to examine. There is no legal or agency requirement for institutions to conduct these activities. The absence of any of these policies and practices is never, by itself, a violation.

# Interagency Fair Lending Procedures

**1. Lending Practices and Standards**

a. Principal policy issues

| | YES | NO | NA |
|---|---|---|---|
| • Are underwriting practices clear, objective and generally consistent with industry standards? | ☐ | ☐ | ☐ |
| • Is pricing within reasonably confined ranges with guidance linking variations to risk and/or cost factors? | ☐ | ☐ | ☐ |
| • Does management monitor the nature and frequency of exceptions to its standards? | ☐ | ☐ | ☐ |
| • Are denial reasons accurately and promptly communicated to unsuccessful applicants? | ☐ | ☐ | ☐ |
| • Are there clear and objective standards for referring applicants to (i) subsidiaries, affiliates, or other lending channels within the institution, (ii) classifying applicants as "prime" or "subprime" borrowers, or (iii) deciding what kinds of alternative loan products should be offered or recommended to applicants? | ☐ | ☐ | ☐ |
| • Are loan officers required to document any deviation from the rate sheet? | ☐ | ☐ | ☐ |
| • Does management monitor consumer complaints alleging discrimination in loan pricing or underwriting? | ☐ | ☐ | ☐ |

b. Do training, application-processing aids, and other guidance correctly and adequately describe:

| | YES | NO | NA |
|---|---|---|---|
| • Prohibited bases under ECOA, Regulation B, and the Fair Housing Act? | ☐ | ☐ | ☐ |
| • Other substantive credit access requirements of Regulation B (e.g., spousal signatures, improper inquiries, protected income)? | ☐ | ☐ | ☐ |

c. Is it specifically communicated to employees that they must not, on a prohibited basis:

| | YES | NO | NA |
|---|---|---|---|
| • Refuse to deal with individuals inquiring about credit? | ☐ | ☐ | ☐ |
| • Discourage inquiries or applicants by delays, discourtesy, or other means? | ☐ | ☐ | ☐ |
| • Provide different, incomplete, or misleading information about the availability of loans, application requirements, and processing and approval standards or procedures (including selectively informing applicants about certain loan products while failing to inform them of alternatives)? | ☐ | ☐ | ☐ |
| • Encourage or more vigorously assist only certain inquirers or applicants? | ☐ | ☐ | ☐ |
| • Refer credit seekers to other institutions, more costly loan products, or potentially onerous features? | ☐ | ☐ | ☐ |
| • Refer credit seekers to nontraditional products (i.e., negative | ☐ | ☐ | ☐ |

# Interagency Fair Lending Procedures

amortization, "interest only," "payment option" adjustable rate mortgages) when they could have qualified for traditional mortgages.

- Waive or grant exceptions to application procedures or credit standards? ☐ ☐ ☐
- State a willingness to negotiate? ☐ ☐ ☐
- Use different procedures or standards to evaluate applications? ☐ ☐ ☐
- Use different procedures to obtain and evaluate appraisals? ☐ ☐ ☐
- Provide certain applicants opportunities to correct or explain adverse or inadequate information, or to provide additional information? ☐ ☐ ☐
- Accept alternative proofs or creditworthiness? ☐ ☐ ☐
- Require co-signers? ☐ ☐ ☐
- Offer or authorize loan modifications? ☐ ☐ ☐
- Suggest or permit loan assumptions? ☐ ☐ ☐
- Impose late charges, reinstatement fees, etc.? ☐ ☐ ☐
- Initiate collection or foreclosure? ☐ ☐ ☐

d. Has the institution taken specific initiatives to prevent the following practices?

- Basing credit decisions on assumptions derived from racial, gender, and other stereotypes, rather than facts? ☐ ☐ ☐
- Seeking consumers from a particular racial, ethnic, or religious group, or of a particular gender, to the exclusion of other types of consumers, on the basis of how "comfortable" the employee may feel in dealing with those different from him/her? ☐ ☐ ☐
- Limiting the exchange of credit-related information or the institution's efforts to qualify an applicant from a prohibited basis group. ☐ ☐ ☐
- Drawing the institution's CRA assessment area by unreasonably excluding minority areas? ☐ ☐ ☐
- Targeting certain borrowers or areas with less advantageous products? ☐ ☐ ☐

e. Does the institution have procedures to ensure that it does not:

- State racial or ethnic limitations in advertisements? ☐ ☐ ☐
- Employ words or use photos in advertisements that convey racial or ethnic limitations or preferences? ☐ ☐ ☐
- Place advertisement that a reasonable person would regard as indicating minority consumers are less desirable? ☐ ☐ ☐
- Advertise only in media serving predominately minority or ☐ ☐ ☐

# Interagency Fair Lending Procedures

nonminority areas of the market?

- Conduct other forms of marketing differentially in minority or nonminority areas of the market?    ☐ ☐ ☐

- Market only through brokers known to serve one racial or ethnic group in the market?    ☐ ☐ ☐

- Use a prohibited basis in any prescreened solicitation?    ☐ ☐ ☐

- Provide financial incentives for loan officers to place applicants in non-traditional products or higher-risk products?    ☐ ☐ ☐

## 2. Compliance Audit Function: Does the Institution Attempt to Detect Prohibited Disparate Treatment by Self-Test or Self-Evaluation?

NOTE: A self-test is any program, practice, or study that is designed and specifically used to assess the institution's compliance with the ECOA and the Fair Housing Act. It creates data or factual information that is not otherwise available and cannot be derived from loan, application, or other records related to credit transactions (12 CFR 202.15(b)(1)[1] and 24 CFR 100.141). The report, results, and many other records associated with a self-test are privileged unless an institution voluntarily discloses the report or results or otherwise forfeits the privilege. See 12 CFR 202.15(b)(2) and 24 CFR 100.142(a) for a complete listing of the types of information covered by the privilege. A self-evaluation, while generally having the same purpose as a self-test, does not create any new data or factual information, but uses data readily available in loan or application files and other records used in credit transactions and, therefore, does not meet the self-test definition. See *Using Self-Tests and Self-Evaluations to Streamline the Examination* in this Appendix for more information about self-tests and self-evaluations.

---

[1] In December 2011, the Consumer Financial Protection Bureau restated the Federal Reserve's implementing regulation at 12 CFR Part 1002 (76 Fed. Reg. 79442)(December 21, 2011).

# Interagency Fair Lending Procedures

While you may request the results of self-evaluations, you should not request the results of self-tests or any of the information listed in 12 CFR 202.15(b)(2) and 24 CFR 100.142(a). If an institution discloses the self-test report or results to its regulator, it will lose the privilege. The following items are intended to obtain information about the institution's approach to self-testing and self-evaluation, not the findings. Complete the checklist below for each self-evaluation and each self-test, where the institution voluntarily discloses the report or results. Evaluating the results of self-evaluations and voluntarily disclosed self-tests is described in *Using Self-tests Self-Evaluations to Streamline the Examination* in this Appendix.

|  | Yes | No | NA |
|---|---|---|---|
| a. Are the transactions reviewed by an independent analyst who: | | | |
| • Is directed to report objective results? | ☐ | ☐ | ☐ |
| • Has an adequate level of expertise? | ☐ | ☐ | ☐ |
| • Produces written conclusions? | ☐ | ☐ | ☐ |
| b. Does the institution's approach for self-testing or self-evaluation call for: | | | |
| • Attempting to explain major patterns shown in the HMDA or other loan data? | ☐ | ☐ | ☐ |
| • Determining whether actual practices and standards differ from stated ones and basing the evaluation on the actual practices? | ☐ | ☐ | ☐ |
| • Evaluating whether the reasons cited for denial are supported by facts relied on by the decision maker at the time of the decision? | ☐ | ☐ | ☐ |
| • Comparing the treatment of prohibited basis group applicants to control group applicants? | ☐ | ☐ | ☐ |
| • Obtaining explanations from decision makers for any unfavorable treatment of the prohibited basis group that departed from policy or customary practice? | ☐ | ☐ | ☐ |
| • Covering significant decision points in the loan process where disparate treatment or discouragement might occur, including: | | | |
| ○ The approve/deny decision? | ☐ | ☐ | ☐ |
| ○ Pricing? | ☐ | ☐ | ☐ |
| ○ Other terms and conditions? | ☐ | ☐ | ☐ |
| • Covering at least as many transactions as examiners would independently, if using the Fair Lending Sample Size Tables for a product with the application volumes of the product to be evaluated? | ☐ | ☐ | ☐ |
| • Maintaining information concerning personal characteristics collected as part of a self-test separately from application or loan files? | ☐ | ☐ | ☐ |
| • Timely analysis of the data? | ☐ | ☐ | ☐ |
| • Taking appropriate and timely corrective action? | ☐ | ☐ | ☐ |
| c. In the institution's plan for comparing the treatment of prohibited basis group applicants with that of control group applicants: | | | |

# Interagency Fair Lending Procedures

- Are control and prohibited basis groups based on a prohibited basis found in ECOA or the FHAct and defined clearly to isolate that prohibited basis for analysis? ☐ ☐ ☐

- Are appropriate data to be obtained to document treatment of applicants and the relative qualifications vis-à-vis the requirement in question? ☐ ☐ ☐

- Will the data to be obtained reflect the data on which decisions were based? ☐ ☐ ☐

- Does the plan call for comparing the denied applicants' qualifications related to the stated reason for denial with the corresponding qualifications for approved applicants? ☐ ☐ ☐

- Are comparisons designed to identify instances in which prohibited basis group applicants were treated less favorably than control group applicants who were no better qualified? ☐ ☐ ☐

- Is the evaluation designed to determine whether control and prohibited basis group applicants were treated differently in the processes by which the institution helped applicants overcome obstacles and by which their qualifications were enhanced? ☐ ☐ ☐

- Are responses and explanations to be obtained for any apparent disparate treatment on a prohibited basis or other apparent violations of credit rights? ☐ ☐ ☐

- Are reasons cited by credit decision makers to justify or explain instances of apparent disparate treatment to be verified? ☐ ☐ ☐

d. For self-tests under ECOA that involved the collection of applicant personal characteristics, did the institution:

- Develop a written plan that describes or identifies the:
  - Specific purpose of the self-test? ☐ ☐ ☐
  - Methodology to be used? ☐ ☐ ☐
  - Geographic area(s) to be covered? ☐ ☐ ☐
  - Type(s) of credit transactions to be reviewed? ☐ ☐ ☐
  - Entity that will conduct the test and analyze the data? ☐ ☐ ☐
  - Timing of the test, including start and end dates or the duration of the self-test ☐ ☐ ☐
  - Other related self-test data that is not privileged? ☐ ☐ ☐

- Disclose at the time applicant characteristic information is requested, that:
  - The applicant will not be required to provide the information? ☐ ☐ ☐
  - The creditor is requesting the information to monitor its compliance with ECOA? ☐ ☐ ☐
  - Federal law prohibits the creditor from discriminating on the basis of this information or on the basis of an applicant's decision not to furnish the information? ☐ ☐ ☐

# Interagency Fair Lending Procedures

    o   If applicable, certain information will be collected based on visual observation or surname if not provided by the applicant? ☐ ☐ ☐

## B.   Corrective Measures

  a. Determine whether the institution has provisions to take appropriate corrective action and provide adequate relief to victims for any violations in the transactions you plan to review.

- Who is to receive the results of a self-evaluation or voluntarily disclosed self-test? ☐ ☐ ☐
- What decision process is supposed to follow delivery of the information? ☐ ☐ ☐
- Is feedback to be given to staff whose actions are reviewed? ☐ ☐ ☐
- What types of corrective action may occur? ☐ ☐ ☐
- Are consumers to be:
  - o  Offered credit if they were improperly denied? ☐ ☐ ☐
  - o  Compensated for any damages, both out of pocket and compensatory? ☐ ☐ ☐
  - o  Notified of their legal rights? ☐ ☐ ☐

  b. Other corrective action:

- Are institutional policies or procedures that may have contributed to the discrimination to be corrected? ☐ ☐ ☐
- Are employees involved to be trained and/or disciplined? ☐ ☐ ☐
- Is the need for community outreach programs and/or changes in marketing strategy or loan products to better serve minority segments of the institution's market to be considered? ☐ ☐ ☐
- Are audit and oversight systems to be improved in order to ensure there is not recurrence of any identified discrimination? ☐ ☐ ☐

**COMMENTS**

[Click&type]

# Interagency Fair Lending Procedures

## II.   Considering Automated Underwriting and Credit Scoring

These procedures are designed to help you in drawing and supporting fair lending conclusions in situations involving automated underwriting or credit scoring risk factors.

## A.      Structure and Organization of the Scoring System

Determine the utilization of credit scoring at the institution including:

1.   For each customized credit scoring model or scorecard for any product, or for any credit scoring model used in connection with a product held in portfolio, identify and obtain:

    a.   The number and inter-relationship of each model or scorecard applied to a particular product.

    b.   The purposes for which each scorecard is employed (e.g., approval decision, set credit limits, set pricing, determine processing requirements, etc.).

    c.   The developer of each scorecard used (e.g., in-house department, affiliate, independent vendor name) and describe the development population utilized.

    d.   The types of monitoring reports generated (including front-end, back-end, account management, and any disparate impact analyses), the frequency of generation, and recent copies of each.

    e.   All policies applicable to the use of credit scoring.

    f.   Training materials and programs on credit scoring for employees, agents, and brokers involved in any aspect of retail lending.

    g.   Any action taken to revalidate or re-calibrate any model or scorecard used during the exam period and the reason(s) why.

    h.   The number of all high-side and low-side overrides for each type of override occurring during the exam period and any guidance given to employees on their ability to override.

    i.   All cutoffs used for each scorecard throughout the examination period and the reasons for the cutoffs and any change made during the exam period.

    j.   All variables scored by each product's scorecard(s) and the values that each variable may take.

    k.   The method used to select for disclosure those adverse action reasons arising from application of the model or scorecard.

2.   For each judgmental underwriting system that includes as an underwriting criterion a standard credit bureau or secondary market credit score identify:

    a.   The vendor of each credit score and any vendor recommendation or guidance on the usage of the score relied upon by the institution;

    b.   The institution's basis for using the particular bureau or secondary market score and the cutoff standards for each product's underwriting system, and the reasons for any changes to the same during the exam period;

    c.   The number of exceptions or overrides made to the credit score component of the underwriting criteria and the basis for those exceptions or overrides, including any guidance given to employees on their ability to depart from credit score underwriting standards, and;

# Interagency Fair Lending Procedures

    d.  Types of monitoring reports generated on the judgmental system or its credit scoring component (including front-end, back-end, differential processing, and disparate impact analysis), and the frequency of generation and recent copies of each.

## B.   Adverse Action Disclosure Notices

Determine the methodology used to select the reasons why adverse action was taken on a credit application denied on the basis of the applicant's credit score. Compare the methodology used to the examples recited in the Commentary to Regulation B and decide acceptability against that standard. Identify any consumer requests for reconsideration of credit score denial reasons and review the action taken by management for consistency across applicant groups.

Where a credit score is used to differentiate application processing and an applicant is denied for failure to attain a judgmental underwriting standard that would not be applied if the applicant had received a better credit score (thereby being considered in a different – presumably less stringent – application processing group), ensure that the adverse action notice also discloses the bases on which the applicant failed to attain the credit score required for consideration in the less stringent processing group.

## C.   Disparate Treatment in the Application of Credit Scoring Programs

1.  Determine what controls and policies management has implemented to ensure that the institution's credit scoring models or credit score criteria are not applied in a discriminatory manner, in particular:

    a.  Examine institution guidance on using the credit scoring system, on handling overrides, and on processing applicants and how well that guidance is understood and observed by the targeted employees and monitored for compliance by management; and

    b.  Examine institution policies that permit overrides or that provide for different processing or underwriting requirements based on **geographic identifiers** or **borrower score ranges** to assure that they do not treat protected group applicants differently than other similarly situated applicants.

2.  Evaluate whether any of the bases for granting credit to control group applicants who are low-side overrides are applicable to any prohibited basis denials whose credit score was equal to or greater than the lowest score among the low-side overrides. If such cases are identified, obtain and evaluate management's reason for why such different treatment is not a fair lending violation.

3.  Evaluate whether any of the bases for denying credit to any prohibited basis applicants who are high side overrides are applicable to any control group approvals whose credit score was equal to or less than the highest score among the prohibited basis high-side overrides. If such cases are identified, obtain and evaluate management's reason for why such different treatment is not a fair lending violation.

4.  If credit scores are used to segment applicants into groups that receive different processing or are required to meet additional underwriting requirements (e.g., "tiered risk underwriting"), perform a comparative file review, or confirm the results and adequacy

# Interagency Fair Lending Procedures

of management's comparative file review, that evaluates whether all applicants within each group are treated equally.

## D.    Disparate Impact and Credit Scoring Algorithms

Consult with agency supervisory staff to assess potential disparate treatment issues relating to the credit scoring algorithm.

## E.    Credit Scoring Systems That Include Age

Regulation B expressly requires the initial validation and periodic revalidation of a credit scoring system that considers age. There are two ways a credit scoring system can consider age: 1) the system can be split into different scorecards depending on the age of the applicant and 2) age may be directly scored as a variable. Both features may be present in some systems. Regulation B requires that all credit scoring systems that consider age in either of these ways must be validated (in the language of the regulation, empirically derived, demonstrably and statistically sound (EDDSS)).

1.    Age-Split Scorecards: If a system is split into only two cards and one card covers a wide age range that encompasses elderly applicants (applicants 62 or older), the system is treated as considering, but not scoring, age. Typically, the younger scorecard in an age-split system is used for applicants under a specific age between 25 and 30. It de-emphasizes factors such as the number of trade lines and the length of employment and increases the negative weight of any derogatory information on the credit report. Systems such as these do not raise the issue of assigning a negative factor or value to the age of an elderly applicant. However, if age is directly scored as a variable (whether or not the system is age-split) or if elderly applicants are included in a card with a narrow age range in an age-split system, the system is treated as scoring age.

2.    Scorecards that Score Age: If a scorecard scores age directly, in addition to meeting the EDDSS requirement, the creditor must ensure that the age of an elderly applicant is not assigned a negative factor or value. (See the staff commentary about 12 CFR 202.2(p) and 202.6(b)(2)). A negative factor or value means utilizing a factor, value, or weight that is less favorable than the creditor's experience warrants **or** is less favorable than the factor, value, or weight assigned to the most favored age group below the age of 62 (12 CFR 202.2(v)).

## F.    Examination for Empirical Derivation and Statistical Soundness

Regulation B requires credit scoring systems that use age to be empirically derived *and* demonstrably and statistically sound. This means that they must fulfill the requirements of 12 CFR Section  202.2(p)(1)(i)(iv). Obtain documentation provided by the developer of the system and consult your agency's most recent guidance for making that determination.

# Interagency Fair Lending Procedures

## III. Evaluating Responses to Evidence of Disparate Treatment

### A.  Responses to Comparative Evidence of Disparate Treatment

The following are responses that an institution may offer – separately or in combination – to attempt to explain that the appearance of illegal disparate treatment is misleading and that no violation has in fact occurred. The responses, **if true**, may rebut the appearance of disparate treatment. You must evaluate the validity and credibility of the responses.

1.  The institution's personnel were unaware of the prohibited basis identity of the applicant(s).

    If the institution claims to have been unaware of the prohibited basis identity (race, etc.) of an applicant or neighborhood, ask it to show that the application in question was processed in such a way that the institution's staff could not have learned the prohibited basis identity of the applicant.

    If the product is one for which the institution maintains prohibited basis monitoring information, assume that all employees could have taken those facts into account. Assume the same when there was face-to-face contact between any employee and the consumer.

    If there are other facts about the application from which an ordinary person would have recognized the applicant's prohibited basis identity (for example, the surname is an easily recognizable Hispanic one), assume that the institution's staff drew the same conclusions. If the racial character of a community is in question, ask the institution to provide persuasive evidence why its staff would **not** know the racial character of any community in its service area.

2.  The difference in treatment was justified by differences in the applicants (applicants not "similarly situated").

    Ask the institution to account for the difference in treatment by pointing out a specific difference between the applicants' qualifications or some factor not captured in the application, but that legitimately makes one applicant more or less attractive to the institution or some nonprohibited factor related to the processing of their applications. The difference identified by the institution must be one that is important enough to justify the difference in treatment in question, not a meaningless difference.

    The factors commonly cited to show that applicants are not similarly situated fall into two groups:  those that can be evaluated by how consistently they are handled in other transactions, and those that cannot be evaluated in that way.

    a.  Verifying "not similarly situated" explanations by consistency

        The appearance of disparate treatment remains if a factor cited by the institution to justify favorable treatment for a control group applicant also exists for an otherwise similar prohibited basis applicant who was treated **un**favorably. Similarly, the appearance of disparate treatment remains if a factor cited by the institution to justify **un**favorable treatment for a prohibited basis applicant also exists for a control group applicant that got

# Interagency Fair Lending Procedures

favorable treatment. If this is not so, ask the institution to document that the factor cited in its explanation was used consistently for control group and prohibited basis applicants.

Among the responses that should be evaluated this way are:

— **Consumer relationship.** Ask the institution to document that a consumer relationship was also sometimes considered to the benefit of prohibited basis applicants and/or that its absence worked against control group consumers.

— **"Loan not saleable or insurable."** If file review is still in progress, be alert for loans approved despite the claimed fatal problem. At a minimum, ask the institution to be able to produce the text of the secondary market or insurer's requirement in question.

— **Difference in standards or procedures between branches or underwriters.** Ask the institution to provide transactions documenting that each of the two branches or underwriters applied its standards or procedures consistently to both prohibited basis and control group applications it processed and that each served similar proportions of the prohibited basis group.

— **Difference in applying the same standard (difference in "strictness") between underwriters, branches, etc.** Ask the institution to provide transactions documenting that the stricter employee, branch, etc., was strict for both prohibited basis and control group applicants and that the other was lenient for both and that each served similar proportions of the prohibited basis group. The best evidence of this would be prohibited basis applicants who received favorable treatment from the lenient branch and control group applicants who received less favorable treatment from the "strict" branch.

— **Standards or procedures changed during period reviewed.** Ask the institution to provide transactions documenting that during each period the standards were applied consistently to both prohibited basis and control group applicants.

— **Employee misunderstood standard or procedure.** Ask the institution to provide transactions documenting that the misunderstanding influenced both prohibited basis and control group applications. If that is not available, find no violation if the misunderstanding is a reasonable mistake.

b.  Evaluating "not similarly situated" explanations by other means.

If consistency cannot be evaluated, *consider* an explanation *favorably* even without examples of its consistent use if:

— The factor is documented to exist in (or be absent from) the transactions, as claimed by the institution.

— The factor is one a prudent institution would consider and is consistent with the institution's policies and procedures.

# Interagency Fair Lending Procedures

— File review found no evidence that the factor is applied selectively on a prohibited basis (in other words, the institution's explanation is "not inconsistent with available information").

— The institution's description of the transaction is generally consistent and reasonable.

Some factors that may be impossible to compare for consistency are:

— **Unusual underwriting standard.** Ask the institution to show that the standard is prudent. If the standard is prudent and not inconsistent with other information, accept this explanation even though there is no documentation that it is used consistently.

— **"Close calls."** The institution may claim that underwriters' opposite decisions on similar applicants reflect legitimate discretion that you should not second guess. That is **not** an acceptable explanation for **identical** applicants with different results, but is acceptable when the applicants have differing strengths and weaknesses that different underwriters might reasonably weigh differently. However, do not accept the explanation if other files reveal that these "strengths" or "weaknesses" are counted or ignored selectively on a prohibited basis.

— **"Character loan."** Expect the institution to identify a specific history or specific facts that make the applicant treated favorably a better risk than those treated less favorably.

— **"Accommodation loan."** There are many legitimate reasons that may make a transaction appealing to an institution apart from the familiar qualifications demanded by the secondary market and insurers. For example, a consumer may be related to or referred by an important consumer, be a political or entertainment figure who would bring prestige to the institution, be an employee of an important business consumer, etc. It is not illegal discrimination to make a loan to an otherwise unqualified control group applicant who has such attributes while denying a loan to an otherwise similar prohibited basis applicant without them. However, be skeptical when the institution cites reasons for "accommodations" that an ordinary prudent institution would not value.

— **"Gut feeling."** Be skeptical when institutions justify an approval or denial by a general perception or reaction to the consumer. Such a perception or reaction may be linked to a racial or other stereotype that legally must not influence credit decisions. Ask whether any specific event or fact generated the reaction. Often, the institution can cite something **specific** that made him or her confident or uncomfortable about the consumer. There is no discrimination if it is credible that the institution indeed considered such a factor and did not apply it selectively on a prohibited basis.

c.  Follow up consumer contacts

# Interagency Fair Lending Procedures

If the institution's explanation of the handling of a particular transaction is based on consumer traits, actions, or desires not evident from the file, consider *obtaining agency authorization to* contact the consumer to verify the institution's description. Such contacts need not be limited to possible victims of discrimination, but can include *control group applicants* or other witnesses.

3. The different results stemmed from an inadvertent error.

   If the institution claims an **identified error** such as miscalculation or misunderstanding caused the favorable or unfavorable result in question, evaluate whether the facts support the assertion that such an event occurred.

   If the institution claims an **"unidentified error"** caused the favorable or unfavorable result in question, expect the institution to provide evidence that discrimination is inconsistent with its demonstrated conduct, and therefore that discrimination is the less logical interpretation of the situation. Consider the context (as described below).

4. The apparent disparate treatment on a prohibited basis is a misleading portion of a larger pattern of random inconsistencies.

   Ask the institution to provide evidence that the unfavorable treatment is not limited to the prohibited basis group and that the favorable treatment is not limited to the control group. Without such examples, do not accept an institution's unsupported claim that otherwise inexplicable differences in treatment are distributed randomly.

   If the institution can document that similarly situated prohibited basis applicants received the favorable treatment in question approximately **as frequently** and **in comparable degree** as the control group applicants, conclude there is no violation.

   NOTE:  Transactions are relevant to "random inconsistency" only if they are "similarly situated" to those apparently treated unequally.

5. Loan terms and conditions.

   The same analyses described in the preceding sections with regard to decisions to approve or deny loans also apply to pricing differences. Risks and costs are legitimate considerations in setting prices and other terms and conditions of loan products. However, generalized reference by the institution to "cost factors" is insufficient to explain pricing differences.

   If the institution claims that specific borrowers received different terms or conditions because of **cost or risk considerations**, ask the institution to be able to identify specific risk or cost differences between them.

   If the institution claims that specific borrowers received different terms or conditions because they were **not similarly situated as negotiators**, consider whether application records might provide relevant evidence. If the records are not helpful, consider seeking authorization to contact consumers to learn whether the institution in fact behaved comparably toward prohibited basis and control group consumers. The contacts would be to learn such information as the institution's opening quote of terms to the consumer and the progress of the negotiations.

# Interagency Fair Lending Procedures

If the institution responds that an average price difference between the control and prohibited basis groups is based on cost or risk factors, ask it to identify specific risk or cost differences between individual control group applicants with the lowest rates and prohibited basis group applicants with the highest that are significant enough to justify the pricing differences between them. If the distinguishing factors cited by the institution are legitimate and verifiable as described in the sections above, remove those applications from the average price calculation. If the average prices for the remaining control group and prohibited basis group members still differ more than minimally, consult with agency supervisory staff about further analysis. Findings or violations based on disparate treatment or disparate impact regarding cost or risk factors should be discussed with agency supervisory staff.

## B.    Responses to Overt Evidence of Disparate Treatment

1.  Descriptive references vs. lending considerations.

    A reference to race, gender, etc., does not constitute a violation if it is merely descriptive – for example, "the applicant was young." In contrast, when the reference reveals that the prohibited factor influenced the institution's decisions and/or consumer behavior, treat the situation as an apparent violation to which the institution must respond.

2.  Personal opinions vs. lending considerations.

    If an employee involved with credit availability states unfavorable views regarding a racial group, gender, etc., but does not explicitly relate those views to credit decisions, review that employee's credit decisions for possible disparate treatment of the prohibited basis group described unfavorably. If there are no instances of apparent disparate treatment, treat the employee's views as permissible private opinions. Inform the institution that such views create a risk of future violations.

3.  Stereotypes related to credit decisions.

    There is an apparent violation when a prohibited factor influences a credit decision through a stereotype related to creditworthiness, even if the action based on the stereotype seems well-intended – for example, a loan denial because "a single woman could not maintain a large house." If the stereotyped beliefs are offered as "explanations" for unfavorable treatment, regard such unfavorable treatment as apparent illegal disparate treatment. If the stereotype is only a general observation unrelated to particular transactions, review that employee's credit decisions for possible disparate treatment of the prohibited basis group in question. Inform the institution that such views create a risk of future violations.

4.  Indirect reference to a prohibited factor.

    If negative views related to creditworthiness are described in nonprohibited terms, consider whether the terms would commonly be understood as surrogates for prohibited terms. If so, treat the situation as if explicit prohibited basis terms were used. For example, an institution's statement that "It's too risky to lend north of 110th Street" might be reasonably interpreted as a refusal to lend because of race if that portion of the institution's lending area north of 110th Street were predominantly black and the area south white.

5.  Lawful use of a prohibited factor

    a.   Special Purpose Credit Program (SPCP).

# Interagency Fair Lending Procedures

If an institution claims that its use of a prohibited factor is lawful because it is operating an SPCP, ask the institution to document that its program conforms to the requirements of Regulation B. An SPCP must be defined in a written plan that existed before the institution made any decisions on loan applications under the program. The written plan must:

— Demonstrate that the program will benefit persons who would otherwise be denied credit or receive credit on less favorable terms.

— State the time period the program will be in effect or when it will be re-evaluated.

No provision of an SPCP should deprive people who are not part of the target group of rights or opportunities they otherwise would have. Qualified programs operating on an otherwise-prohibited basis will not be cited as a violation.

NOTE:  Advise the institution that an agency finding that a program is a lawful SPCP is not absolute security against legal challenge by private parties. Suggest that an institution concerned about legal challenge from other quarters use exclusions or limitations that are not prohibited by ECOA or the FHAct, such as "first-time home buyer."

b.  Second review program.

Such programs are permissible if they do no more than ensure that lending standards are applied fairly and uniformly to all applicants. For example, it is permissible to review the proposed denial of applicants who are members of a *prohibited basis group* by comparing their applications to the approved applications of similarly qualified individuals who are *in the control group* to determine if the applications were evaluated consistently.

Ask the institution to demonstrate that the program is a safety net that merely attempts to prevent discrimination, and does not involve underwriting terms or practices that are preferential on a prohibited basis.

Statements indicating that the mission of the program is to apply different standards or efforts on behalf of a particular racial or other group constitute overt evidence of disparate treatment. Similarly, there is an apparent violation if comparative analysis of applicants who are processed through the second review and those who are not discloses dual standards related to the prohibited basis.

c.  Affirmative marketing/advertising program:

Affirmative advertising and marketing efforts that do not involve application of different lending standards are permissible under both the ECOA and the FHAct. For example, special outreach to a minority community would be permissible.

# Interagency Fair Lending Procedures

## IV.  Fair Lending Sample Size Tables

### Table A: Underwriting (Accept/Deny) Comparisons

|  | Sample 1 Prohibited Basis Denials | | | | Sample 2 Control Group Approvals | | |
|---|---|---|---|---|---|---|---|
| Number of Denials or Approvals | 5 - 50 | 51 - 150 | > 150 | | 20 - 50 | 51 – 250 | > 250 |
| Minimum to review: | All | 51 | 75 | | 20 | 51 | 100 |
| Maximum to review: | 50 | 100 | 150 | | 5x prohibited basis sample (up to 50) | 5x prohibited basis sample (up to 125) | 5x prohibited basis sample (up to 300) |

### Table B: Terms and Conditions Comparisons

|  | Sample 1 Prohibited Basis Approvals | | | | Sample 2 Control Group Approvals | | |
|---|---|---|---|---|---|---|---|
| Number of Approvals | 5-25 | 26 - 100 | > 100 | | 20 -50 | 51 – 250 | > 250 |
| Minimum to review: | All | 26 | 50 | | 20 | 40 | 60 |
| Maximum to review: | 25 | 50 | 75 | | 5x prohibited basis sample (up to 50) | 5x prohibited basis sample (up to 75) | 5x prohibited basis sample (up to 100) |

**See Explanatory Notes on following page.**

# Interagency Fair Lending Procedures

**Explanatory Notes to Sample Size Tables**

1. Examiners should not follow Table B when conducting a pricing review that involves a regression analysis. Consult with agency supervisory staff for specific protocol in these cases.

2. When performing both underwriting and terms and conditions comparisons, use the same control group approval sample for both tasks.

3. If there are fewer than five prohibited basis denials or 20 control group approvals, refer to "Sample Size" instructions in the procedures.

4. "Minimum" and "maximum" sample sizes: select a sample size between the minimum and maximum numbers identified above. Examiners should base the size of their review on the level of risk identified during the preplanning and scoping procedures. Once the sample size has been determined, select individual transactions judgmentally. Refer to procedures.

5. If two prohibited basis groups (e.g., black and Hispanic) are being compared against one control group, select a control group that is five times greater than the larger prohibited basis group sample, up to the maximum.

6. Where the institution's discrimination risk profile identifies significant discrepancies in withdrawal/incomplete activity between control and prohibited basis groups or where the number of marginal prohibited basis group files available for sampling is small, an examiner may consider supplementing samples by applying the following rules:

   - If prohibited basis group withdrawals/incompletes occur after the applicant has received an offer of credit that includes pricing terms, this is a reporting error under Regulation C (the institution should have reported the application as approved, but not accepted) and therefore these applications should be included as prohibited basis group approvals in a terms and conditions comparative file analysis.

   - If prohibited basis group incompletes occur due to lack of an applicant response with respect to an item that would give rise to a denial reason, then include them as denials for that reason when conducting an underwriting comparative file analysis.

# Interagency Fair Lending Procedures

## V.  Identifying Marginal Transactions

These procedures are intended to assist an examiner in identifying denied and approved applications that were not either clearly qualified or unqualified, i.e., marginal transactions.

### A.  Marginal Denials

Denied applications with any or all the following characteristics are "marginal." Such denials are compared to marginal approved applications. Marginal denied applications include those that:

- Were close to satisfying the requirement that the adverse action notice said was the reason for denial.

- Were denied by the institution's rigid interpretation of inconsequential processing requirements.

- Were denied quickly for a reason that normally would take a longer time for an underwriter to evaluate.

- Involved an unfavorable subjective evaluation of facts that another person might reasonably have interpreted more favorably (for example, whether late payments actually showed a "pattern" or whether an explanation for a break in employment was "credible").

- Resulted from the institution's failure to take reasonable steps to obtain necessary information.

- Received unfavorable treatment as the result of a departure from customary practices or stated policies. For example, if it is the institution's stated policy to request an explanation of derogatory credit information, a failure to do so for a prohibited basis applicant would be a departure from customary practices or stated policies even if the derogatory information seems to be egregious.

- Were similar to an approved control group applicant who received unusual consideration or service, but were not provided such consideration or service.

- Received unfavorable treatment (for example, were denied or given various conditions or more processing obstacles), but appeared fully to meet the institution's stated requirements for favorable treatment (for example, approval on the terms sought).

- Received unfavorable treatment related to a policy or practice that was vague, and/or the file lacked documentation on the applicant's qualifications related to the reason for denial or other factor.

- Met common secondary market or industry standards even though failing to meet the institution's more rigid standards.

- Had a strength that a prudent institution might believe outweighed the weaknesses cited as the basis for denial.

# Interagency Fair Lending Procedures

- Had a history of previously meeting a monthly housing obligation equivalent to or higher than the proposed debt.

- Were denied for an apparently "serious" deficiency that might easily have been overcome. For example, an applicant's total debt ratio of 50 percent might appear grossly to exceed the institutions guideline of 36 percent, but this may in fact be easily corrected if the application lists assets to pay off sufficient nonhousing debts to reduce the ratio to the guideline, or if the institution were to count excluded part-time earnings described in the application.

## B.    Marginal Approvals

Approved applications with any or all of the following characteristics are "marginal." Such approvals are compared to marginal denied approved applications. Marginal approvals include those:

- Whose qualifications satisfied the institution's stated standard, but very narrowly.

- That bypassed stated processing requirements (such as verifications or deadlines).

    o  For which stated creditworthiness requirements were relaxed or waived.

- That, if the institution's own standards are not clear, fell short of common secondary market or industry lending standards.

- That a prudent conservative institution might have denied.

- Whose qualifications were raised to a qualifying level by assistance, proposals, counteroffers, favorable characterizations, or questionable qualifications, etc.

- That in any way received unusual service or consideration that facilitated obtaining the credit.

# Interagency Fair Lending Procedures

## VI.   Potential Scoping Information

As part of the scoping process described in Part I of the procedures, you will need to gather documents and information to sufficiently identify their focal points for review. Below is a list of suggested information that you may wish to gather internally, as well as from the institution itself.

### A.   Internal Agency Documents and Records

1.  Previous examination reports and related work papers for the most recent Compliance/CRA and Safety and Soundness Examinations.

2.  Complaint Information.

3.  Demographic data for the institution's community.

Comment:  The examiner should obtain the most recent agency demographic data for information on the characteristics of the institution's assessment/market areas.

### B.   Information from the Institution

Comment:  Prior to beginning a compliance examination, the examiner should request the institution to provide the information outlined below. This request should be made far enough in advance of the on-site phase of the examination to facilitate compliance by the institution. In some institutions, the examiner may not be able to review some of this information until the on-site examination. The examiner should generally request only those items that correspond to the product(s) and time period(s) being examined.

1.  **Institution's Compliance Program.** (For examinations that will include analysis of the institution's compliance program.)

    a.  Organization charts identifying those individuals who have lending responsibilities or compliance, HMDA, or CRA responsibilities, together with job descriptions for each position.

    b.  Lists of any pending litigation or administrative proceedings concerning fair lending matters.

    c.  Results of self-evaluations or self-tests (where the institution chooses to share the self-test results), and copies of audit or compliance reviews of the institution's program for compliance with fair lending laws and regulations, including both internal and independent audits.

        NOTE:  The request should advise the institution that it is not required to disclose the report or results of any self-tests of the type protected under amendments to ECOA and the FHAct programs.

    d.  Complaint file.

    e.  Any written or printed statements describing the institution's fair lending policies and/or procedures.

# Interagency Fair Lending Procedures

   f.   Training materials related to fair lending issues including records of attendance.

   g.   Records detailing policy exceptions or overrides, exception reporting, and monitoring processes.

**2.  Lending Policies / Loan Volume**

   a.   Internal underwriting guidelines and lending policies for all consumer and commercial loan products.

      <u>Comment</u>: If guidelines or policies differ by branch or other geographic location, request copies of each variation.

   b.   A description of any credit scoring system(s) in use now or during the exam period.

      <u>Comment</u>: Inquire as to whether a vendor or in-house system is used; the date of the last verification; the factors relied on to construct any in-house system; and, if applicable, any judgmental criteria used in conjunction with the scoring system.

   c.   Pricing policies for each loan product, and for both direct and indirect loans.

      <u>Comment</u>: The institution should be specifically asked whether its pricing policies for any loan products include the use of **"overages"**. The request should also ask whether the institution offers any **"subprime"** loan products or otherwise uses any form of **risk-based pricing**. A similar inquiry should be made regarding the use of any **cost-based pricing**. If any of these three forms are or have been in use since the last exam, the institution should provide pricing policy and practice details for each affected product, including the institution's criteria for differentiating between each risk *or cost* level and any policies regarding overages. Regarding **indirect lending**, the institution should be asked to provide any forms of agreement *(including compensation)* with brokers/dealers, together with a description of the roles that both the institution and the dealer/broker play in **each stage** of the lending process.

   d.   A description of each form of compensation plan for all lending personnel and managers.

   e.   Advertising copy for all loan products.

   f.   The most recent HMDA LAR, including unreported data if available.

      <u>Comment</u>:  The integrity of the institution's HMDA LAR data should be verified prior to the pre-examination analysis.

   g.   Any existing loan registers for each non-HMDA loan product.

      <u>Comment</u>:  Loan registers for the three-month period preceding the date of the examination, together with any available lists of **declined** loan applicants for the same period should be requested. Registers or lists should contain, to the extent available, the complete name and address of loan applicants and applicable loan terms, including loan amount, interest rate, fees, repayment schedule, and collateral codes.

# Interagency Fair Lending Procedures

h. A description of any application or loan-level databases maintained, including a description of all data fields within the database or that can be linked at the loan level.

i. Forms used in the application and credit evaluation process for each loan product.

   Comment:  At a minimum, this request should include all types of credit applications, forms requesting financial information, underwriter worksheets, any form used for the collection of monitoring information, and any quality control or second-review forms or worksheets.

j. Lists of service providers.

   Comment:  Service providers may include: brokers, realtors, real estate developers, appraisers, underwriters, home improvement contractors, and private mortgage insurance companies. Request the full name and address and geographic area served by each provider. Also request documentation of any fair lending requirements imposed on, or commitments required of, any of the institution's service providers.

k. Addresses of any Internet site(s).

   Comment: Internet "home pages" or similar sites that an institution may have on the Internet may provide information concerning the availability of credit, or means for obtaining it. All such information must comply with the nondiscrimination requirements of the fair lending laws. In view of the increasing capability to conduct transactions on the Internet, it is extremely important for examiners to review an institution's Internet sites to ensure that all of the information or procedures set forth therein are in compliance with any applicable provisions of the fair lending statutes and regulations.

**3. Community Information**

a. Demographic information prepared or used by the institution.

b. Any fair lending complaints received and institution responses thereto.

JA0323

# Interagency Fair Lending Procedures

## VII.    Special Analyses

These procedures are intended to assist examiners who encounter disproportionate adverse impact violations, discriminatory pre-application screening and possible discriminatory marketing.

## A.    Disproportionate Adverse Impact Violations

When all five conditions below exist, consult within your agency to determine whether to present the situation to the institution and solicit the institution's response. Note that condition 5 can be satisfied by **either** of two alternatives.

The contacts between examiners and institutions described in this section are information-gathering contacts within the context of the examination and are not intended to serve as the formal notices and opportunities for response that an agency's enforcement process might provide. Also, the five conditions are not intended as authoritative statements of the legal elements of a disproportionate adverse impact proof of discrimination; they are paraphrases intended to give you practical guidance on situations that call for more scrutiny and on what additional information is relevant.

NOTE:  Even if it appears likely that a policy or criterion causes a disproportionate adverse impact on a prohibited basis (condition 3), consult agency supervisory staff if the policy or criterion is obviously related to predicting creditworthiness and is used in a way that is commensurate with its relationship to creditworthiness or is obviously related to some other basic aspect of prudent lending, and there appears to be no equally effective alternative for it. Examples are reliance on credit reports or use of debt-to-income ratio in a way that appears consistent with industry standards and with a prudent evaluation of credit risk.

### *Conditions*

1.  A specific policy or criterion is involved.

    The policy or criterion suspected of producing a disproportionate adverse impact on a prohibited basis should be clear enough that the nature of action to correct the situation can be determined.

    NOTE: Gross HMDA denial or approval rate disparities are not appropriate for disproportionate adverse impact analysis because they typically cannot be attributed to a specific policy or criterion.

2.  The policy or criterion on its stated terms is neutral for prohibited bases.

3.  The policy or criterion falls disproportionately on applicants or borrowers in a prohibited basis group.

    The difference between the rate at which prohibited basis group members are harmed or excluded by the policy or criterion and the rate for control group members must be large enough that it is unlikely that it could have occurred by chance. If there is reason to suspect a significant disproportionate adverse impact may exist, consult with agency supervisory staff, as appropriate.

# Interagency Fair Lending Procedures

4. There is a causal relationship between the policy or criterion and the adverse result.

   The link between the policy or criterion and the harmful or exclusionary effect must not be speculative. It must be clear that changing or terminating the policy or criterion would reduce the disproportion in the adverse result.

5. Either *a* or *b*:

   a. The policy or criterion has no clear rationale, appears to exist merely for convenience or to avoid a minimal expense, or is far removed from common sense or standard industry underwriting considerations or lending practices.

      The legal doctrine of disproportionate adverse impact provides that the policy or criterion that causes the impact must be justified by "business necessity" if the institution is to avoid a violation. There is very little authoritative legal interpretation of that term with regard to lending, but that should not stop examiners from making the preliminary inquiries called for in these procedures. For example, the rationale is generally not clear for basing credit decisions on factors such as location of residence, income level (*per se* rather than relative to debt), and accounts with a finance company. If prohibited basis group applicants were denied loans more frequently than control group applicants because they failed an institution's minimum income requirement, it would appear that the first four conditions plus 5a existed; therefore, the examiners should consult within your agency about obtaining the institution's response, as described in the next section below.

   b. Alternatively, even if there is a sound justification for the policy, it appears that there may be an equally effective alternative for accomplishing the same objective with a smaller disproportionate adverse impact.

      The law does not require an institution to abandon a policy or criterion that is clearly the most effective method of accomplishing a legitimate business objective. However, if an alternative that is approximately equally effective is available that would cause a less severe impact, the policy or criterion in question will be a violation.

      At any stage of the analysis of possible disproportionate adverse impact, if there appears to be such an alternative, and the first four conditions exist, consult within the agency how to evaluate whether the alternative would be equally effective and would cause a less severe impact. If the conclusion is that it would, solicit a response from the institution, as described in the next section.

# Interagency Fair Lending Procedures

## *Obtaining the institution's response*

If the first four conditions plus either 5a or 5b appear to exist, consult with agency supervisory staff about whether and how to inform the institution of the situation and solicit the institution's business justification. The communication with the institution may include the following:

- The specific neutral policy or criterion that appears to cause a disproportionate adverse impact.

- How the examiners learned about the policy.

- How widely the examiners understand it to be implemented.

- How strictly they understand it to be applied.

- The prohibited basis on which the impact occurs.

- The magnitude of the impact.

- The nature of the injury to individuals.

- The data from which the impact was computed.

The communication should request that the institution provide any information supporting the business justification for the policy and request that the institution describe any alternatives it considered before adopting the policy or criterion at issue.

## *Evaluating and following up on the response*

The analyses of "business necessity" and "less discriminatory alternative" tend to converge because of the close relationship of the questions of what purpose the policy or criterion serves and whether it is the most effective means to accomplish that purpose.

Evaluate whether the institution's response persuasively contradicts the existence of the significant disparity or establishes a business justification. Consult with agency supervisory staff as appropriate.

# Interagency Fair Lending Procedures

## B.    Discriminatory Pre-application Screening

Obtain an explanation for any:

- Withdrawals by applicants in prohibited basis groups without documentation of consumer intent to withdraw.

- Denials of applicants in prohibited basis groups without any documentation of applicant qualifications; or

- On a prohibited basis, selectively quoting *unfavorable* terms (for example, high fees or down payment requirements) to prospective applicants, or quoting *unfavorable* terms to all prospective applicants but waiving such terms for control group applicants. (Evidence of this might be found in withdrawn or incomplete files.)

- Delays between application and action dates on a prohibited basis.

If the institution cannot explain the situations, examiners should consider obtaining authorization from their agency to contact the consumers to verify the institution's description of the transactions. Information from the consumer may help determine whether a violation occurred.

In some instances, such as possible "prescreening" of applicants by institution personnel, the results of the procedures discussed so far, including interviews with consumers, may be inconclusive in determining whether a violation has occurred. In those cases, examiners should, if authorized by their agency, consult with agency supervisory staff regarding the possible use of "testers" who would pose as apparently similarly situated applicants, differing only as to race or other applicable prohibited basis characteristic, to determine and compare how the institution treats them in the application process.

## C.    Possible Discriminatory Marketing

1.  Obtain full documentation of the nature and extent, together with management's explanation, of any:

    - Prohibited basis limitations stated in advertisements.

    - Code words in advertisements that convey prohibited limitations.

    - Advertising patterns or practices that a reasonable person would believe indicate prohibited basis consumers are less desirable or are only eligible for certain products.

2.  Obtain full documentation as to the nature and extent, together with management's explanation, for any situation in which the institution, despite the availability of other options in the market:

    - Advertises only in media serving either minority or nonminority areas of the market.

    - Markets through brokers or other agents that the institution knows, or could reasonably be expected to know, to serve only one racial or ethnic group in the market.

# Interagency Fair Lending Procedures

- Utilizes mailing or other distribution lists or other marketing techniques for prescreened or other offerings of residential loan products* that:

  — Explicitly exclude groups of prospective borrowers on a prohibited basis;

  — Exclude geographies (e.g., census tracts, ZIP codes, etc.) within the institution's marketing area that have demonstrably higher percentages of minority group residents than does the remainder of the marketing area, but which have income and other credit-related characteristics similar to the geographies that were targeted for marketing; or

  — Offer different products to such geographies, especially if subprime products are primarily marketed to racial or ethnic minorities.

  *NOTE: Pre-screened solicitation of potential applicants on a prohibited basis does not violate ECOA. Such solicitations are, however, covered by the FHAct. Consequently, analysis of this form of potential marketing discrimination should be limited to residential loan products.

3. Evaluate management's response particularly with regard to the credibility of any nondiscriminatory reasons offered as explanations for any of the foregoing practices. Refer to the *Evaluating Responses to Evidence of Disparate Treatment* section in this Appendix for guidance.

JA0328

# Interagency Fair Lending Procedures

## VIII.    Using Self-Tests and Self-Examinations to Streamline the Examination

Institutions may find it advantageous to conduct self-tests or self-evaluations to measure or monitor their compliance with ECOA and Regulation B. A self-test is any program, practice, or study that is designed and specifically used to assess the institution's compliance with fair lending laws that creates data not available or derived from loan, application, or other records related to credit transactions (12 CFR 202.15(b)(1) and 24 CFR 100.140-100.148). For example, using testers to determine whether there is disparate treatment in the pre-application stage of credit shopping may constitute a self-test. The information set forth in 12 CFR 202.15(b)(2) and 24 CFR 100.142(a) is privileged unless an institution voluntarily discloses the report or results or otherwise forfeits the privilege. A self-evaluation, while generally having the same purpose as a self-test, does not create any new data or factual information, but uses data readily available in loan or application files and other records used in credit transactions and, therefore, does not meet the self-test definition.

Examiners should not request any information privileged under 12 CFR 202.15(b)(2) and 24 CFR 100.142(a), related to self-tests. If the institution discloses the results of any self-tests, or has performed any self-evaluations, and examiners can confirm the reliability and appropriateness of the self-tests or -evaluations (or even parts of them), they need not repeat those tasks.

NOTE: When the term self-evaluation is used below, it is meant to include self-tests where the institution has voluntarily disclosed the report or results.

If the institution has performed a self-evaluation of any of the product(s) selected for examination, obtain a copy thereof and proceed through the remaining steps of this section on Streamlining the Examination.

Determine whether the research and analysis of the planned examination would duplicate the institution's own efforts. If the answers to Questions A and B below are both Yes, each successive Yes answer to Questions C through L indicates that the institution's work up to that point can serve as a basis for eliminating examination steps.

If the answer to either Question A or B2 is No, the self-evaluation cannot serve as a basis for eliminating examination steps. However, you should still consider the self-evaluation to the degree possible in light of the remaining questions and communicate the findings to the institution so that it can improve its self-evaluation process.

JA0329

# Interagency Fair Lending Procedures

A. Did the transactions covered by the self-evaluation occur not longer than two years ago prior to the examination? If the self-evaluation covered more than two years prior to the examination, incorporate only results from transactions in the most recent two years.

B. Did it cover the same product, prohibited basis, decision center, and stage of the lending process (for example, underwriting, setting of loan terms) as the planned examination?

C. Did the self-evaluation include comparative file review?

NOTE: One type of "comparative file review" is statistical modeling to determine whether similar control group and prohibited basis group applicants were treated similarly. If an institution offers self-evaluation results based on a statistical model, consult appropriately within your agency.

D. Were control and prohibited basis groups defined accurately and consistently with ECOA and/or the FHAct?

E. Were the transactions selected for the self-evaluation chosen so as to focus on marginal applicants or, in the alternative, selected randomly?

F. Were the data analyzed (whether abstracted from files or obtained from electronic databases) accurate? Were those data actually relied on by the credit decision makers at the time of the decisions?

To answer these two questions and Question G for the institution's control group sample and each of its prohibited basis group samples, request to review 10 percent (but not more than 50 for each group) of the transactions covered by the self-evaluation. For example, if the institution's self-evaluation reviewed 250 control group and 75 prohibited basis transactions, plan to verify the data for 25 control group and seven prohibited basis transactions.

G. Did the 10 percent sample reviewed for Question F also show that consumer assistance and institution judgment that assisted or enabled applicants to qualify were recorded systematically and accurately and were compared for differences on any prohibited bases?

H. Were prohibited basis group applicants' qualifications related to the underwriting factor in question compared to corresponding qualifications of control group approvals? Specifically, for self-evaluations of approve/deny decisions, were the denied applicants' qualifications related to the stated reason for denial compared to the corresponding qualifications for approved applicants?

I. Did the self-evaluation sample cover at least as many transactions at the initial stage of review as examiners would initially have reviewed using the sampling guidance in these procedures?

If the institution's samples are significantly smaller than those in the sampling guidance but its methodology otherwise is sound, review additional transactions until the numbers

# Interagency Fair Lending Procedures

of reviewed control group and prohibited basis group transactions equal the minimums for the initial stage of review in the sampling guidance.

J.  Did the self-evaluation identify instances in which prohibited basis group applicants were treated less favorably than control group applicants who were no better qualified?

K.  Were explanations solicited for such instances from the persons responsible for the decisions?

L.  Were the reasons cited by credit decision makers to justify or explain instances of apparent disparate treatment supported by legitimate, persuasive facts or reasoning?

If the questions above are answered **Yes**, incorporate the findings of the self-evaluation (whether supporting compliance or violations) into the examination findings. Indicate that those findings are based on verified data from the institution's self-evaluation. In addition, consult appropriately within your agency regarding whether or not to conduct corroborative file analyses in addition to those performed by the institution.

If not all of the questions in the section above are answered **Yes**, resume the examination procedures at the point where the institution's reliable work would not be duplicated. In other words, use the reliable portion of the self-evaluation and correspondingly reduce independent comparative file review by examiners. For example, if the institution conducted a comparative file review that compared applicants' qualifications without taking account of the reasons they were denied, the examiners could use the qualification data abstracted by the institution (if accurate), but would have to construct independent comparisons structured around the reasons for denial.

# CFPB Consumer Laws and Regulations

**HMDA**

# Home Mortgage Disclosure Act[1]

The Home Mortgage Disclosure Act (HMDA) was enacted by the Congress in 1975 and is implemented by Regulation C (12 CFR Part 1003).[2] The period of 1988 through 1992 saw substantial changes to HMDA. Especially significant were the amendments to the act resulting from the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). Coverage was expanded in the FIRREA amendments to include many independent nondepository mortgage lenders, in addition to the previously covered banks, savings associations, and credit unions. Coverage of independent mortgage bankers was further expanded effective January 1, 1993, with the implementation of amendments contained in the Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA). For a more detailed discussion of the history of HMDA, see the FFIEC's website at www.ffiec.gov/hmda/history2.htm.

HMDA grew out of public concern over credit shortages in certain urban neighborhoods. The Congress believed that some financial institutions had contributed to the decline of some geographic areas by their failure to provide adequate home financing to qualified applicants on reasonable terms and conditions. Thus, one purpose of HMDA and Regulation C is to provide the public with information that will help show whether financial institutions are serving the housing credit needs of the neighborhoods and communities in which they are located. A second purpose is to aid public officials in targeting public investments from the private sector to areas where they are needed. Finally, the FIRREA amendments of 1989 require the collection and disclosure of data about applicant and borrower characteristics to assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes.

As the name implies, HMDA is a disclosure law that relies upon public scrutiny for its effectiveness. It does not prohibit any specific activity of lenders, and it does not establish a quota system of mortgage loans to be made in any Metropolitan Statistical Area (MSA) or other geographic area as defined by the Office of Management and Budget.

Financial institutions must report data regarding loan originations, applications, and loan purchases, as well as requests under a preapproval program (as defined in 12 CFR 1003.2) if the preapproval request is denied or results in the origination of a home purchase loan. HMDA requires lenders to report the ethnicity, race, gender, and gross income of mortgage applicants and borrowers. Lenders must also report information regarding the pricing of the loan and whether the loan is subject to the Home Ownership and Equity Protection Act, 15 U.S.C. 1639. Additionally, lenders must identify the type of purchaser for mortgage loans that they sell. The Dodd-Frank Act requires that the CFPB amend Regulation C to require the reporting of

---

[1] These reflect FFIEC-approved procedures.

[2] Dodd-Frank Act, Pub. L. No. 111-203, Secs. 1001–1100H, 124 Stat. 1955, 1955-2113 (2010), granted HMDA rulemaking, supervision, and enforcement authority to the Consumer Financial Protection Bureau (CFPB). Before the CFPB, the Federal Reserve Board had rulemaking authority for Regulation C. In December 2011, the CFPB restated the Federal Reserve's implementing regulation at 12 CFR 1003 (76 Fed. Reg. 78465)(December 19, 2011).

# CFPB Consumer
# Laws and Regulations                                    HMDA

additional data fields. Financial institutions will be required to comply with the additional reporting requirements after those amendments are finalized.

Regulation C requires institutions to report lending data to their supervisory agencies on a loan-by-loan and application-by-application basis by way of a "register" reporting format. The supervisory agencies, through the Federal Financial Institutions Examination Council (FFIEC), compile this information in the form of individual disclosure statements for each institution, and in the form of aggregate reports for all covered institutions within each MSA. In addition, the FFIEC produces other aggregate reports that show lending patterns by median age of homes and by the central city or non-central city location of the property. The public may obtain the individual disclosures and aggregate reports from the FFIEC or from central depositories located in each MSA. Individual disclosure statements may also be obtained from financial institutions.

## Applicability

The regulation covers two categories of financial institutions. The first category is a "depository institution," which the regulation defines as a bank, savings association, or a credit union that meets the following criteria:

- On the preceding December 31, had assets in excess of the annually published asset threshold;

- On the preceding December 31, had a home or branch office in an MSA;

- In the preceding calendar year, originated at least one first-lien home purchase loan (or a refinancing of such loan) on a one-to-four-family dwelling; and

- Meets one of the following criteria:

    (1) the institution is federally insured or regulated;

    (2) the mortgage loan referred to is federally guaranteed, insured, or supplemented; or

    (3) the institution intended to sell the loan to Fannie Mae or Freddie Mac.

The second category is a for-profit, nondepository "mortgage lending institution." A nondepository mortgage lending institution is covered if:

- In the preceding calendar year, it originated home purchase loans (including refinancings of home purchase loans) that either: (1) equaled ten percent or more of its loan origination volume, measured in dollars; or (2) equaled $25 million or more;

- On the preceding December 31, had a home or branch office in an MSA[3]; and

---

[3] The institution may or may not have a physical presence in the MSA per 12 CFR 1003.2 of Regulation C.

# CFPB Consumer
# Laws and Regulations                                      HMDA

- Either: (1) on the preceding December 31, had total assets of more than $10 million, counting the assets of any parent corporation; or (2) in the preceding calendar year, originated at least 100 home purchase loans, or refinancings of home purchase loans.

For purposes of this discussion and the examination procedures, the term "financial institution" will signify both a depository and a nondepository institution.

The definition of mortgage lending institution changed over time. It now covers mortgage lending subsidiaries and independent mortgage companies. Mortgage lending subsidiaries are treated as distinct entities from their "parent," and must file separate reports with their parent's supervisory agency.

The CFPB may exempt from Regulation C state-chartered or state-licensed financial institutions if they are covered by a substantially similar state law that contains adequate provision for enforcement by the state. As of January 1, 2009, no exemptions are in effect.

## Compilation of Loan Data

For each calendar year, a financial institution must report data regarding its applications, originations, and purchases of home purchase loans, home improvement loans, and refinancings. Loans secured by real estate that are neither refinancings nor made for home purchase or home improvements are not reported. Data must also be given for loan applications that did not result in originations: applications approved by the institution but not accepted by the applicant, denied, withdrawn, or closed for incompleteness. Required reporting also includes certain denials of requests for preapproval of a home purchase loan under a program in which a lender issues a written commitment to lend to a creditworthy borrower up to a specific amount for a specific time.

*Loan Information*

For each application or loan, institutions are required to identify the purpose (home purchase, home improvement, or refinancing), lien status, and whether the property relating to the loan or loan application is to be owner-occupied as a principal dwelling. As defined by Regulation C, a home purchase loan is a loan secured by a dwelling and made for the purpose of purchasing that (or another) dwelling. A dwelling is a residential structure that may or may not be attached to real property, located in a state, the District of Columbia or the Commonwealth of Puerto Rico. It includes an individual condominium or cooperative unit, a mobile or manufactured home, and a multifamily structure such as an apartment building. A home improvement loan is defined by the regulation as one that is at least in part for the purpose of repairing, rehabilitating, remodeling or improving a dwelling or the real property on which the dwelling is located. Home improvement loans not secured by a dwelling should be reported only if the institution classifies the loan as a home improvement loan, and dwelling secured home improvement loans should be reported without regard to classification. Finally, a refinancing is defined as a transaction in which a new obligation satisfies and replaces an existing obligation by the same borrower. For coverage purposes (i.e., to determine whether or not an institution is covered by HMDA), the existing obligation must be a home purchase loan and both the new and existing obligation must be

# CFPB Consumer
# Laws and Regulations                                              **HMDA**

secured by first liens on dwellings. For reporting purposes, both the existing obligation and the new obligations must be secured by liens on dwellings.

In addition, the regulation requires financial institutions to identify the following general loan types: conventional, FHA-insured, VA-guaranteed, and FSA/RHS guaranteed. Institutions must report the property type as a one-to-four family dwelling, multifamily dwelling, or manufactured housing. The amount of the loan or loan application, application date, action date, and the type of action taken must also be reported.

*Property Location*

Certain geographic location information must be reported by financial institutions for loans on, and applications for, properties in any MSA where the institution has a home or branch office.[4] This geographic data is optional for loans on properties located outside these MSAs or outside any MSA, except in the case of large financial institutions subject to additional data reporting requirements under the Community Reinvestment Act (CRA). The geographic information consists of the MSA or MD number, state and county codes, and the census tract number of the property to which the loan or loan application relates.

Large institutions subject to both the CRA and HMDA must collect and report geographic information for all loans and applications (whether located in an MSA or not), not just for loans and applications relating to property in MSAs where the institution has a home or branch office.[5] Under the CRA, a large institution is a bank or savings association that has assets of $1 billion or more.

*Applicant Information*

In addition, institutions must report data regarding the ethnicity, race, sex, and annual income of applicants for applications and originated loans; reporting these data is optional for purchased loans. Information regarding the ethnicity, race, and the sex of the borrower or applicant must be requested by the lender, including for applications made entirely by telephone, mail, or Internet. If the information is not provided by the applicant and if the application is submitted in person, the lender is required to note the information on the basis of visual observation or surname. Regulation C contains a model form that can be used for the collection of data on ethnicity, race, and sex. Alternatively, the form used to obtain monitoring information under 12 CFR 1002.13 of Regulation B (Equal Credit Opportunity) may be used.

If an institution originates or purchases a loan and then sells it in the same calendar year, it must report the type of entity that purchased the loan. Except in the case of large secondary market purchasers such as Fannie Mae and Freddie Mac, the exact purchaser need not be identified. For example, an institution may indicate that it had sold a loan to a bank, without identifying the particular bank.

---

[4] In the case of an MSA divided into Metropolitan Divisions (MDs), the relevant unit for this purpose is the MD.

[5] In a county with less than 30,000 in population, the institution may enter NA.

# CFPB Consumer
# Laws and Regulations                    HMDA

*Pricing-Related Data*

Institutions must report the rate spread between the annual percentage rate (APR) and the average prime offer rate for a comparable transaction as of the date the interest rate is set, if the spread is equal to or greater than 1.5 percentage points for first-lien loans, or equal to or greater than 3.5 percentage points for subordinate-lien loans. The rate-spread reporting is required only on originations of home purchase loans, dwelling-secured home improvement loans, and refinancings. The following are excluded from the rate-spread reporting requirement: (1) applications that are incomplete, withdrawn, denied, or approved but not accepted; (2) purchased loans; (3) home-improvement loans not secured by a dwelling; (4) assumptions; (5) home equity lines of credit; and (6) loans not subject to Regulation Z. To determine the applicable rate spread, the financial institution may use the table published on the FFIEC's website (www.ffiec.gov/hmda) entitled "Average Prime Offer Rates Tables."

Lenders must also report whether the loan is subject to the Home Ownership and Equity Protection Act (HOEPA), 15 U.S.C. 1639. A loan becomes subject to HOEPA when the APR or the points and fees on the loan exceed the HOEPA triggers. (Additional information on HOEPA coverage is found in the FFIEC Truth in Lending Act and HOEPA examination procedures.)

Lenders must also report the lien status of the loan or application (first lien, subordinate lien, or not secured by a lien on a dwelling).

*Optional Data*

Finally, under HMDA financial institutions may report the reasons for denying a loan application.[6] Institutions may also choose to report certain requests for pre-approval that are approved by the institution but not accepted by the applicant and home equity lines of credit made in whole or in part for the purpose of home improvement or home purchase.

*Excluded Data*

A financial institution should not report loan data for:

- Loans originated or purchased by the institution acting as trustee or in some other fiduciary capacity;

- Loans on unimproved land;

- Temporary financing (such as bridge or construction loans);

- The purchase of an interest in a pool of loans (such as mortgage-participation certificates);

---

[6] Financial institutions regulated by the OCC, including subsidiaries of national banks and savings associations, are required to provide reasons for denials. Credit unions regulated by the NCUA are also required to provide reason for denial. These requirements are imposed by the respective prudential regulator for these institutions pursuant to laws within their jurisdiction. Apparent violations of these requirements should be referred to the applicable prudential regulator.

# CFPB Consumer Laws and Regulations                    HMDA

- The purchase of mortgage loan servicing rights; or

- Loans originated prior to the current reporting year and acquired as part of a merger or acquisition or acquisition of all the assets and liabilities of a branch office.

## Reporting Format

Financial institutions are required to record data regarding each application for, and each origination and purchase of, home purchase loans, home improvement loans, and refinancings on a Loan/Application Register, also known as the HMDA-LAR. Financial institutions are also required to record data regarding requests under a preapproval program (as defined in 12 CFR 1003.2), but only if the preapproval request is denied or results in the origination of a home purchase loan. Transactions are to be reported for the year in which final action was taken. If a loan application is pending at the end of the calendar year, it will be reported on the HMDA-LAR for the following year, when the final disposition is made. Loans originated or purchased during the calendar year must be reported for the calendar year of origination even if they were subsequently sold.

The HMDA-LAR is accompanied by a listing of codes to be used for each entry on the form. Detailed instructions and guidance on the requirements for the register are contained in Appendix A to Regulation C. Additional information is available in the FFIEC publication, "A Guide to HMDA Reporting: Getting it Right!" and on the FFIEC website.

Financial institutions must record data on their HMDA-LAR within 30 calendar days of the end of the calendar quarter in which final action was taken. Financial institutions, however, have flexibility in determining how to maintain the HMDA-LAR since the entries need not be grouped in any prescribed fashion. For example, an institution could record home purchase loans on one HMDA-LAR and home improvement loans on another; alternatively, both types of loans could be reported on one register. Similarly, separate registers may be kept at each branch office, or a single register may be maintained at a centralized location for the entire institution. These separate registers must be combined into one consolidated register when submitted to the relevant supervisory agency.

For each calendar year, a financial institution must submit to its supervisory agency its HMDA-LAR, accompanied by a Transmittal Sheet. Unless it has 25 or fewer reportable transactions, an institution is required to submit its data in automated form. For registers submitted in paper form, two copies must be mailed to the institution's supervisory agency. For both automated and hard-copy submissions, the layout of the register that is used must conform exactly to that of the register published by the Consumer Financial Protection Bureau as Appendix A to Regulation C.

The HMDA-LAR must be submitted to the financial institution's regulatory agency by March 1 following the calendar year covered by the data. The FFIEC then will produce a disclosure statement for each institution, cross-tabulating the individual loan data in various groupings, as well as an aggregate report for each MSA. The FFIEC posts these disclosure statements at www.ffiec.gov/hmda. Disclosure statements are no longer mailed to financial institutions.

# CFPB Consumer
# Laws and Regulations                                    HMDA

## Disclosure

As the result of amendments to HMDA incorporated within the Housing and Community Development Act of 1992, an institution must make its disclosure statement available to the public at its home office within three business days after it is posted on the FFIEC website. An institution must also either (1) make its disclosure statement available to the public in at least one branch office in each additional MSA or MD where it has offices within 10 business days of its posting on the FFIEC website, or (2) post the address for requests in each branch office in each additional MSA or MD where it has offices, and send the disclosure statement within 15 calendar days after receiving a written request.

Also, an institution must make its loan application register available to the public after deleting the following fields: application or loan number, date application received, and date of action taken. These deletions are required to protect the privacy interests of applicants and borrowers. The modified HMDA-LAR for a given year must be publicly available by March 31 of the following year for requests received on or before March 1, and within 30 days for requests received after March 1.

The FFIEC also produces aggregate tables to illustrate the lending activity of all covered financial institutions in each MSA or MD. These tables and the individual disclosure statements are available on the FFIEC website, www.ffiec.gov/hmda, and through central depositories, such as libraries, in each MSA or MD. A list of the depositories is also available on the FFIEC website.

A financial institution must retain its full (unmodified) HMDA-LAR for at least three years for examination purposes. It must also be prepared to make each modified HMDA-LAR available for three years and each FFIEC disclosure statement available for five years. Institutions may impose reasonable fees for costs incurred in providing or producing the data for public release.

Finally, institutions must post a notice at their home office and at each branch in an MSA, to advise the public of the availability of the disclosure statements.

# CFPB Consumer
# Laws and Regulations                           HMDA

## Enforcement

As set forth in Section 305 of HMDA (12 U.S.C. 2804),[7] compliance with the act and regulation is enforced by the CFPB, Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the U.S. Department of Housing and Urban Development. Administrative sanctions, including civil money penalties, may be imposed by the supervisory agencies.

An error in compiling or recording loan data is not a violation of the act or the regulation if it was unintentional and occurred despite the maintenance of procedures reasonably adopted to avoid such errors.

## REFERENCES

### Laws

12 U.S.C. 2801 et seq.          Home Mortgage Disclosure Act

### Regulations

**Consumer Financial Protection Bureau Regulations (12 CFR)**

Part 1003                       Home Mortgage Disclosure (Regulation C)

---

[7] As amended by Dodd-Frank Act, Sec. 1094, 124 Stat. 2097-2101 (2010).

# CFPB
# Examination Procedures                                    HMDA

## Home Mortgage Disclosure Act[1]

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

## Examination Objectives

- To appraise the quality of the financial institution's compliance risk management system to ensure compliance with the Home Mortgage Disclosure Act (HMDA) and Regulation C.

- To determine the reliance that can be placed on the financial institution's compliance risk management system, including internal controls, policies, procedures, and compliance review and audit functions for the Home Mortgage Disclosure Act and Regulation C.

- To determine the accuracy and timeliness of the financial institution's submitted HMDA-LAR.

- To initiate corrective action when policies or internal controls are deficient, or when violations of law or regulation are identified.

## Examination Procedures

### A. Initial Procedures

1. If the financial institution is a depository institution, determine whether it is subject to the requirements of HMDA and Regulation C by checking if the regulatory criteria addressed in 12 CFR 1003.2 are met.

   **[Click&type]**

2. If the financial institution is a for-profit nondepository mortgage-lending institution, determine whether it is subject to the requirements of HMDA and Regulation C by checking if the regulatory criteria addressed in 12 CFR 1003.2  are met.

   **[Click&type]**

3. If there were any mergers or acquisitions since January 1, of the preceding calendar year, determine whether all required HMDA data for the acquired financial institutions were reported separately or in consolidation. Examination procedures that follow concerning accuracy and disclosure also apply to an acquired financial institution's data, even if separately reported. Use the following rules to decide if transactions by either institution during the year of the merger must be reported.

   a. If neither institution was required to report under HMDA that year the merged institution does not have to report transactions that occurred during the year of the merger. Data collection should begin on January 1, of the following calendar year.

---

[1] These reflect FFIEC-approved procedures.

# CFPB

# Examination Procedures                                HMDA

b. If a reporting institution merged with a non-reporting institution, and the reporting institution is the surviving institution, for the year of the merger, data collection is required for the reporting institution's transactions; data collection is optional for the transactions handled in offices of the previously exempt non-reporting institution.

c. If a reporting institution merged with a non-reporting institution, and the non-reporting institution is the surviving institution, or a new institution is formed, for the year of the merger, data collection is required for the reporting institution for transactions that occurred prior to the merger; data collection is optional for transactions that occurred after the merger date.

d. If both institutions were HMDA reporters, data collection is required for the entire year of the merger.  The merged institution may file either a consolidated submission or separate submissions.

**[Click&type]**

NOTE: If HMDA and Regulation C are applicable, then the following examination procedures should be performed separately for the financial institution and any of its majority-owned mortgage subsidiaries.  Complete a separate checklist for each institution subject to HMDA and Regulation C.  Also, when determining whether a financial institution is subject to HMDA, the examiner should remain cognizant of any newly created MSAs and changes in MSA boundaries, including counties that may have been added or deleted from an MSA, thus causing a financial institution either to become a new HMDA reporter or no longer be a HMDA reporter.  Refer to the FFIEC's website and to the booklet, "A Guide to HMDA Reporting: Getting It Right!"  This can be a source of reference, as it lists counties in an MSA by state.

## B.  Evaluation of Compliance Management

Examiners should obtain information necessary to make a reasonable assessment regarding the institution's ability to collect data regarding applications for, and originations and purchases of, home purchase loans, home improvement loans, and refinancings for each calendar year in accordance with the requirements of the HMDA and Regulation C.

Examiners should determine, through a review of written policies, internal controls, the HMDA Loan Application Register (HMDA-LAR), and discussions with management, whether the financial institution adopted and implemented comprehensive procedures to ensure adequate compilation of home mortgage disclosure information in accordance with 12 CFR 1003.4(a)-(e).

During your review of the financial institution's system for maintaining compliance with HMDA and Regulation C obtain and review policies and procedures along with any applicable audit and compliance program materials to determine whether:

1. Policies and procedures as well as training are adequate, on an ongoing basis, to ensure compliance with the Home Mortgage Disclosure Act and Regulation C.

**CFPB**

**Examination Procedures**                                    **HMDA**

---

2. Internal review procedures and audit schedules comprehensively cover all of the pertinent regulatory requirements associated with HMDA and Regulation C.

3. The audits or internal analysis performed include a reasonable amount of transactional analysis, written reports that detail findings and recommendations for corrective actions.

4. Internal reviews include any regulatory changes that may have occurred since the prior examination.

5. The financial institution has assigned one or more individuals responsibility for oversight, data update, and data entry, along with timeliness of the financial institution's data submission.  Also determine whether the Board of Directors is informed of the results of all analyses.

6. The individuals who have been assigned responsibility for data entry receive appropriate training in the completion of the HMDA-LAR and receive copies of Regulation C, Instructions for Completion of the HMDA-LAR (Appendix A), the Staff Commentary to Regulation C, and the FFIEC's "Guide to HMDA Reporting: Getting it Right!" in a timely manner.

7. The institution has ensured effective corrective action in response to previously identified deficiencies.

8. The financial institution performs HMDA-LAR volume analysis from year-to-year to detect increases or decreases in activity for possible omissions of data.

9. The financial institution maintains documentation for those loans it packages and sells to other institutions.

**[Click&type]**

---

# CFPB
# Examination Procedures                                    HMDA

## C.  Evaluation of Policies and Procedures

Evaluate whether the institution's informal procedures and internal controls are adequate to ensure compliance with HMDA and Regulation C. Consider the following:

1.  Whether the individual(s) assigned responsibility for the institution's compliance with HMDA and Regulation C possess(es) an adequate level of knowledge and has established a method for staying abreast of changes to laws and regulations.

2.  If the institution ensures that individuals assigned compliance responsibilities receive adequate training to ensure compliance with the requirements of the regulation.

3.  Whether the individuals assigned responsibility for the institution's compliance with HMDA and Regulation C know whom to contact, at the financial institution or their supervisory agency, if they have questions not answered by the written materials.

4.  If the institution has established and implemented adequate controls to ensure that separation of duties exists (e.g., data entry, review, oversight, and approval).

5.  Any internal reports or records documenting policies and procedures revisions as well as any informal self-assessment of the institution's compliance with the regulation.

6.  If the institution offers preapprovals, whether the institution's preapproval program meets the specifications detailed in the HMDA regulation.  If so, whether the institution's policies and procedures provide adequate guidance for the reporting of preapproval requests that are approved or denied in accordance with the regulation.

7.  Whether the institution's policies and procedures address the reporting of (1) non-dwelling secured loans that are originated in whole or in part for home improvement and classified as such by the institution; and (2) dwelling-secured loans that are originated in whole or in part for home improvement, whether or not classified as such.

8.  Whether the institution established a method for determining and reporting the lien status for all originated loans and applications.

9.  Whether the institution's policies and procedures contain guidance for collecting ethnicity, race, and sex for all loan applications, including applications made by telephone, mail, and Internet.

10. Whether the institution's policies and procedures address the collection of the rate spread (difference between the APR and the average prime offer rate for a comparable transaction as of the date the interest rate is set) and whether the institution has established a system for tracking rate lock dates and calculating the rate spread.

11. Whether the institution's policies and procedures address how to determine if a loan is subject to the Home Ownership and Equity Protection Act and the reporting of applications involving manufactured home loans.

# CFPB
# Examination Procedures                                      HMDA

12. Whether the HMDA-LAR is updated within 30 days after the end of each calendar quarter.

13. Whether data are collected at all branches, and if so, whether the appropriate personnel are sufficiently trained to ensure that all branches are reporting data under the same guidelines.

14. Whether the financial institution's loan officers, including loan officers in the commercial loan department who may handle loan applications reportable under HMDA (including loans and applications for multi-family or mixed-use properties and small business refinances secured by residential real estate), are informed of the reporting requirements necessary to assemble the information.

15. Whether the Board of Directors has established an independent review of the policies, procedures, and HMDA data to ensure compliance and accuracy, and is advised each year of the accuracy and timeliness of the financial institution's data submissions.

16. What procedures the institution has put in place to comply with the requirement to submit data in machine-readable form and whether the institution has some mechanism in place to ensure the accuracy of the data that are submitted in machine-readable form.

17. Whether the financial institution's loan officers are familiar with the disclosure, reporting and retention requirements associated with the loan application registers and the FFIEC public disclosure statements.

18. Whether the financial institution's loan officers are familiar with the disclosure statements that will be produced from the data.

19. Whether the financial institution's loan officers are aware that civil money penalties may be imposed when an institution has submitted erroneous data and has not established adequate procedures to ensure the accuracy of the data.

20. Whether the financial institution's loan officers are aware that correction and resubmission of erroneous data may be required when data are incorrectly reported for at least 5 percent of the loan application records.

   **[Click&type]**

**CFPB**

**Examination Procedures**                                              **HMDA**

**D.  Transaction Testing**

Verify that the financial institution accurately compiled home mortgage disclosure information on a register in the format prescribed in Appendix A, by testing a sample of loans and applications.

The review of the HMDA-LAR, for submitted data, should include a sample of the applications represented on the HMDA-LAR to verify the accuracy of each entry.  A sample of the current year's data should also be reviewed.  The samples may include the following:

1.  Approved and denied transactions subject to HMDA;

2.  Housing-related purchased loans;

3.  Withdrawn housing-related loan applications.

**E.  Disclosure and Reporting**

1.  Determine whether the financial institution:

    a.  Submits its HMDA-LAR to the appropriate supervisory agency no later than March 1 following the calendar year for which the data are compiled and maintains its HMDA-LAR for at least three years thereafter.

        NOTE: Financial institutions that report 25 or fewer entries on their HMDA-LAR may collect and report HMDA data in a paper form.  Any financial institution opting to submit its data in such a manner must send two copies that are typed or computer printed. They must use the format of the HMDA-LAR, but need not use the form itself.

    b.  Makes its FFIEC disclosure statement available to the public at its home office no later than three business days after receiving its statement from the FFIEC (which effectively occurs when the FFIEC posts its disclosure statement on the FFIEC website and provides notice of that fact to the institution).

    c.  Either

        (1) makes its FFIEC disclosure statement available to the public in at least one branch office in each additional MSA or MD where the financial institution has offices within 10 business days after receiving the disclosure statement from the FFIEC (which effectively occurs when the FFIEC posts the disclosure statement on the FFIEC website and provides notice of that fact to the institution); or

        (2) posts the address for sending written requests for the disclosure statement in the lobby of each branch office in additional MSAs or MDs where the institution has offices and mails or delivers a copy of the disclosure statement within 15 calendar days of receiving the written request.

# CFPB
# Examination Procedures                                    HMDA

d.  Makes its modified HMDA-LAR (loan application number, date application received, and date action taken excluded from the data) available to the public by March 31, for requests received on or before March 1, and within 30 days for requests received after March 1.

e.  Maintains its modified HMDA-LAR for three years and its disclosure statement for five years and has policies and procedures to ensure its modified HMDA-LAR and disclosure statement are available to the public during those terms.

f.  Makes available the modified HMDA-LAR and disclosure statement for inspection and copying during the hours the office is normally open to the public for business. If it imposes a fee for costs incurred in providing or reproducing the data, the fee is reasonable.

g.  Posts a general notice about the availability of its HMDA data in the lobby of its home office and of each branch office located in an MSA.

h.  Provides promptly upon request the location of the institution's offices where the statement is available for inspection and copying, or includes the location in the lobby notice.

**[Click&type]**

2.  If the financial institution has a subsidiary covered by HMDA, determine that the subsidiary completed a separate HMDA-LAR and either submitted it directly or through its parent's supervisory agency.

**[Click&type]**

3.  Determine that the HMDA-LAR transmittal sheet is accurately completed and that an officer of the financial institution signed and certified to the accuracy of the data contained in their register. See Appendix A.

NOTE:  If the HMDA-LAR was submitted via the Internet, this signature should be retained on file at the institution.

**[Click&type]**

4.  Review the financial institution's last disclosure statement, HMDA-LAR, modified HMDA-LAR, and any applicable correspondence, such as notices of noncompliance. Determine what errors occurred during the previous reporting period.  If errors did occur, determine what steps the financial institution took to correct and prevent such errors in the future.

**[Click&type]**

5.  Determine if the financial institution has the necessary tools to compile the geographic information.

**CFPB**

**Examination Procedures**                                              **HMDA**

a.  Determine if the financial institution uses the U.S. Census Bureau's Census Tract Street Address Lookup Resources for 2010, the Census Bureau's 2000 Census Tract Outline Maps,[2] LandView 6 equivalent materials available from the Census Bureau or from a private publisher, or an automated geocoding system in order to obtain the proper census tract numbers.

b.  If the financial institution relies on outside assistance to obtain the census tract numbers (for example, private "geocoding" services or real estate appraisals), verify that adequate procedures are in place to ensure that the census tract numbers are obtained in instances where they are not provided by the outside source. For example, if the financial institution usually uses property appraisals to determine census tract numbers, it must have procedures to obtain this information if an appraisal is not received; such as in cases where a loan application is denied before an appraisal is made.

c.  Verify that the financial institution has taken steps to ensure that the provider of outside services is using the appropriate 2000 Census Bureau data.

d.  Verify that the financial institution uses current MSA and MD definitions to determine the appropriate MSA and MD numbers and boundaries. MSA definitions and numbers (and state and county codes) are available from the supervisory agency, the Office of Management and Budget, or the FFIEC's publication "A Guide to HMDA Reporting: Getting it Right!"

**[Click&type]**

6.  For banks required to report data on small-business, small-farm, and community development lending under the CRA, verify that they also collect accurate data on property located outside MSAs or MDs in which the institution has a home or branch office, or outside any MSAs or MDs.

**[Click&type]**

---

[2] Once the 2010 versions are available, the financial institution should use the latest versions.

# CFPB
# Examination Procedures                                    HMDA

## Examination Conclusions

1. Summarize the findings, supervisory concerns, and regulatory violations.

   **[Click&type]**

2. For the violations noted, determine the root cause by identifying weaknesses in internal controls, audit and compliance reviews, training, management oversight, or other factors; also, determine whether the violation(s) are repetitive or systemic.

   **[Click&type]**

3. Identify action needed to correct violations and weaknesses in the institution's compliance system.

   **[Click&type]**

4. Discuss findings with the institution's management and obtain a commitment for corrective action.

   **[Click&type]**

# CFPB
# Examination Checklist                                                HMDA

## Home Mortgage Disclosure Act[1]

### Applicability

**Depository Institutions**

| | |
|---|---|
| **Exam Date:** | **[Click&type]** |
| **Prepared By:** | **[Click&type]** |
| **Reviewer:** | **[Click&type]** |
| **Docket #:** | **[Click&type]** |
| **Entity Name:** | **[Click&type]** |

|  | Yes | No |
|---|---|---|
| 1. Is the depository institution a bank or credit union that originated in the preceding calendar year at least one home purchase loan (or refinancing of a home purchase loan) secured by a first lien on a one-to-four family dwelling? (12 CFR 1003.2) | ☐ | ☐ |
| 2. Does the depository institution meet at least one of the criteria below? | | |
| a. The depository institution is a federally insured or regulated institution (12 CFR 1003.2); | ☐ | ☐ |
| b. The depository institution originated a mortgage loan (reference checklist question #1) that was insured, guaranteed, or supplemented by a federal agency (12 CFR 1003.2); or | ☐ | ☐ |
| c. The depository institution originated a mortgage loan (reference checklist question #1) intending to sell it to Fannie Mae or Freddie Mac (12 CFR 1003.2). | ☐ | ☐ |
| 3. Did the depository institution have either a home or branch office in an MSA on December 31, of the preceding calendar year? (12 CFR 1003.2) | ☐ | ☐ |
| 4. On the preceding December 31, did the depository institution have assets in excess of the asset threshold that is adjusted annually and published annually by the Consumer Financial Protection Bureau? (12 CFR 1003.2) | ☐ | ☐ |

If the answers to checklist questions #1 through #4 are "Yes," then the depository institution is subject to the requirements of HMDA and Regulation C, and the examiner should complete the remaining portion of the checklist.

---

[1] These reflect FFIEC-approved procedures.

# CFPB
# Examination Checklist                                    HMDA

## For-Profit Non-depository Mortgage-Lending Institutions

|  | Yes | No |
|---|---|---|

5.  In the preceding calendar year, did the for-profit nondepository mortgage-lending institution either:

   a.  Originate home purchase loans or refinancings of home purchase loans that equaled at least 10 percent of its total loan-origination volume, measured in dollars? (12 CFR 1003.2) or ☐ ☐

   b.  Originate home purchase loans or refinancings of home purchase loans that equaled at least $25 million? (12 CFR 1003.2) ☐ ☐

6.  Did the for-profit nondepository mortgage-lending institution have a home or branch office[2] in an MSA as of December 31, of the previous year? (12 CFR 1003.2) and ☐ ☐

7.  Does the for-profit nondepository mortgage-lending institution meet at least one of the criteria below? (12 CFR 1003.2)

   a.  The for-profit nondepository mortgage-lending institution had total assets (when combined with the assets of the parent corporation, if any) exceeding $10 million on the previous December 31; or ☐ ☐

   b.  The for-profit nondepository mortgage-lending institution originated at least 100 home purchase loans (including refinancings of home purchase loans) in the preceding calendar year. ☐ ☐

If the answers to questions #5 through #7 are "Yes," then the for-profit nondepository mortgage-lending institution is subject to the requirements of HMDA and Regulation C.

## Subsidiaries

8.  If one financial institution has a majority interest in another financial institution, and both institutions are subject to HMDA and Regulation C, then the examiner should complete a separate checklist for each institution beginning with question #9. If only one of the institutions is subject to Regulation C and HMDA, the examiner should use the remaining portion of this checklist for that institution. The examiner should note to which financial institution the remaining checklist questions apply.

## Compilation of Loan Data

9.  Does the financial institution collect the following data in accordance with 12 CFR 1003.4(a) and Appendix A? ☐ ☐

---

[2] A nondepository institution is deemed to have a branch office in an MSA or MD if, in the preceding calendar year, it received applications for, originated, or purchased five or more home purchase loans, home improvement loans, or refinancings in that MSA or MD.

# CFPB
# Examination Checklist                                    HMDA

|  |  | Yes | No |
|---|---|:---:|:---:|
| a. | An identifying number (that does not include the applicant's name or social security number) for the loan or loan application, and the date the application was received? (12 CFR 1003.4(a)(1)) | ☐ | ☐ |
| b. | The type of the loan or application? (12 CFR 1003.4(a)(2)) | ☐ | ☐ |
| c. | The purpose of the loan or application? (12 CFR 1003.4(a)(3)) | ☐ | ☐ |
| d. | Whether the application is for a preapproval and whether it resulted in a denial or an origination. (12 CFR 1003.4(a)(4)) | ☐ | ☐ |
| e. | The property type to which the loan or application relates? (12 CFR 1003.4(a)(5)) | ☐ | ☐ |
| f. | The owner-occupancy status of the property to which the loan or application relates? (12 CFR 1003.4(a)(6)) | ☐ | ☐ |
| g. | The loan amount or the amount requested on the application? (12 CFR 1003.4(a)(7)) | ☐ | ☐ |
| h. | The type of action taken? (12 CFR 1003.4(a)(8)) | ☐ | ☐ |
| i. | The date such action was taken? (12 CFR 1003.4(a)(8)) | ☐ | ☐ |
| j. | The location of the property to which the loan or application relates by (12 CFR 1003.4(a)(9)): | ☐ | ☐ |
|  | i.   MSA or MD number (5 digits)? | ☐ | ☐ |
|  | ii.  State (2 digits)? | ☐ | ☐ |
|  | iii. County (3 digits)? | ☐ | ☐ |
|  | iv.  Census tract number (6 digits)? | ☐ | ☐ |
| k. | The ethnicity and race of the applicant or borrower? (12 CFR 1003.4(a)(10)) | ☐ | ☐ |
| l. | The ethnicity and race of the co-applicant or co-borrower? (12 CFR 1003.4(a)(10)) | ☐ | ☐ |
| m. | The sex of the applicant or borrower? (12 CFR 1003.4(a)(10)) | ☐ | ☐ |
| n. | The sex of the co-applicant or co-borrower? (12 CFR 1003.4(a)(10)) | ☐ | ☐ |
| o. | The gross annual income relied on in processing the applicant's request? (12 CFR 1003.4(a)(10)) | ☐ | ☐ |

# CFPB
# Examination Checklist                                   HMDA

|  |  | Yes | No |
|---|---|---|---|

NOTE: Collection of data concerning ethnicity, race, and sex is mandatory for all transactions unless the financial institution purchased the loans or the borrower is not a natural person (a corporation or partnership). Data on annual income is mandatory for all transactions unless the financial institution purchased the loan, the borrower is not a natural person, the loan is for a multifamily dwelling, income was not relied upon in the credit decision, or the loan is to an employee.

p. The type of entity purchasing a loan that the financial institution originates or purchases and then sells within the same calendar year? (12 CFR 1003.4(a)(11)) ☐ ☐

q. For originated loans subject to Regulation Z, the difference between the loan's APR and the average prime offer rate for a comparable transaction as of the date the interest is set, if that difference is equal to or greater than 1.5 percentage points for first lien loans or equal to or greater than 3.5 percentage points for subordinate lien loans on a dwelling. (12 CFR 1003.4(a)(12)) ☐ ☐

r. Whether the loan is subject to HOEPA? (12 CFR 1003.4(a)(13)) ☐ ☐

s. The lien status of the loan or application? (12 CFR 1003.4(a)(14)) ☐ ☐

t. Does the financial institution provide the reasons for denial of an application? (12 CFR 1003.4(c)(1)) If yes, are the reasons accurate? ☐ ☐

u. Is the HMDA-LAR updated within 30 calendar days after the end of the quarter in which final action is taken? (12 CFR 1003.4(a)) ☐ ☐

10. Does the institution request ethnicity, race, and sex data for all telephone, mail and Internet applications in accordance with Appendix B? (12 CFR 1003.4(b)(1)) ☐ ☐

11. For applications taken face-to-face, does the financial institution note data concerning ethnicity, race, and sex on the basis of visual observation or surname if the applicant chooses not to provide this information? (12 CFR 1003.4(b)(1)) ☐ ☐

NOTE: If the applicant fails to provide this information in mail, telephone, or Internet applications, the ethnicity, race, and sex are not recorded; instead, an applicable code number is provided (ethnicity 3, race 6, and sex 3; NA should not be used for these three situations).

# CFPB
# Examination Checklist                                    **HMDA**

|  | Yes | No |
|---|---|---|

**Disclosure and Reporting**

12. Is the loan or applicant data presented in the format prescribed in Appendix A of the regulation? (12 CFR 1003.4(a)) ☐ ☐

13. Has the institution reported all applications for, originations of, and purchases of home-purchase loans, home-improvement loans, and refinancings? (12 CFR 1003.4(a)) ☐ ☐

14. Has the financial institution refrained from reporting: (12 CFR 1003.4(d)) ☐ ☐

   a. Loans originated or purchased by the financial institution acting in a fiduciary capacity (such as trustee)? ☐ ☐

   b. Loans on unimproved land? ☐ ☐

   c. Temporary financing (such as a bridge or construction loan)? ☐ ☐

   d. Purchase of an interest in a pool of loans (such as mortgage-participation certificates, mortgage-backed securities, or real estate mortgage investment conduits)? ☐ ☐

   e. Purchase solely of the right to service loans? ☐ ☐

   f. Loans originated prior to the current reporting year and acquired as part of a merger or acquisition or as part of the acquisition of all assets and liabilities of a branch office? ☐ ☐

   g. A refinancing if, under the loan agreement, the financial institution is unconditionally obligated to refinance the obligation, or is obligated to refinance the obligation subject to conditions under the borrower's control? (Appendix A, I.A.5a) ☐ ☐

15. Did the financial institution submit its completed HMDA-LAR to the appropriate supervisory agency in automated machine-readable format by March 1 following the calendar year for which the data are compiled? (12 CFR 1003.5(a)) ☐ ☐

NOTE: Financial institutions that report 25 or fewer entries on their HMDA-LAR may collect and report their HMDA data in a paper form. Any financial institution opting to submit its data in such a manner must send two copies that are typed or computer printed. The institution must use the format of the HMDA-LAR, but need not use the form itself.

16. Has an officer of the financial institution signed the HMDA-LAR transmittal sheet certifying the accuracy of the data contained in the register? (Appendix A) ☐ ☐

17. Is the transmittal sheet accurately completed? (Appendix A) ☐ ☐

18. Has the financial institution maintained its HMDA-LAR in its records for at least three years? (12 CFR 1003.5(a)) ☐ ☐

# CFPB
# Examination Checklist                                    HMDA

|  | Yes | No |
|---|---|---|

19. Has the financial institution made its FFIEC prepared disclosure statement:

    a.  Available to the public at its home office no later than three business days after receiving it from the FFIEC (which effectively occurs when the FFIEC posts its disclosure statement on the FFIEC website and provides notice of that fact to the institution)? *and*  ☐ ☐

    b.  Available within 10 business days in at least one branch office in each additional MSA or MD where the financial institution has offices or posted the address for sending written requests in the lobby of each branch office in other MSAs or MDs where the institution has offices and delivered a copy of the disclosure statement within 15 calendar days of receiving a written request? (12 CFR 1003.5(b))  ☐ ☐

20. Has the financial institution made its modified HMDA-LAR (loan application number, date application received, and date action taken excluded from the data) for the preceding calendar year available to the public, by March 31 for requests received on or before March 1, and within 30 days for requests received after March 1? (12 CFR 1003.5(c))  ☐ ☐

21. Has the financial institution maintained its modified HMDA-LAR for three years? Does the financial institution have policies and procedures to ensure its modified HMDA-LAR is available to the public during that term? (12 CFR 1003.5(d))  ☐ ☐

22. Has the financial institution maintained its disclosure statement for five years? (12 CFR 1003.5(d))  ☐ ☐

23. Does the financial institution have policies and procedures to ensure its disclosure statement is available to the public during that term? (12 CFR 1003.5(d))  ☐ ☐

24. Does the financial institution make available the modified HMDA-LAR and disclosure statement for inspection and copying during the hours the office is normally open to the public for business? If it imposes a fee for costs incurred in providing or reproducing the data, is it reasonable? (12 CFR 1003.5(d))  ☐ ☐

25. Has the financial institution posted a general notice about the availability of its disclosure statement in the lobby of its home office and in each branch office located in an MSA? (12 CFR 1003.5(e))  ☐ ☐

26. Does the institution provide promptly upon request the location of the institution's offices where the statement is available for inspection and copying, or include the location in the lobby notice? (12 CFR 1003.5(e))  ☐ ☐

# CFPB
# Examination Checklist                                    HMDA

|  | Yes | No |
|---|---|---|

27. Did errors occur in the previous reporting period? (Review the financial institution's last disclosure statement, HMDA-LAR, modified HMDA-LAR, and any applicable correspondence from the regulatory agency, such as notices of noncompliance.)  ☐ ☐

28. If errors did occur, has the financial institution taken appropriate steps to correct and prevent such errors in the future?

    a. Have individuals who are responsible for all data-entry:

        i. Received appropriate training in the completion of the HMDA-LAR?  ☐ ☐

        ii. Been provided copies of Regulation C, including the instructions for completion of the HMDA-LAR, and the "A Guide to HMDA Reporting: Getting it Right!?"  ☐ ☐

        iii. Know whom to contact, at the financial institution or the institution's supervisory agency, if they have questions not answered by the written materials?  ☐ ☐

    b. Are the financial institution's loan officers including loan officers in the commercial loan department who may handle loan applications for HMDA reportable loans (such as multi-family or mixed-use properties and small business refinances secured by residential real estate):

        i. Informed of the reporting requirements so they can assemble the necessary information, and do they understand the importance of accuracy?  ☐ ☐

        ii. Familiar with the disclosure statements that are produced from the data and cognizant of the ramifications for the financial institution if the data are wrong?  ☐ ☐

        iii. Maintain appropriate documentation of the information entered on the HMDA-LAR?  ☐ ☐

    c. If data are collected at more than one branch, are the appropriate personnel sufficiently trained to ensure that all branches report data using the same guidelines?  ☐ ☐

    d. Does the financial institution have internal control processes to ensure that the persons who capture and code the data are doing so accurately and consistently?  ☐ ☐

    e. Does the financial institution have controls established to ensure separation of duties (e.g., data entry, review, oversight approval, etc.)?  ☐ ☐

# CFPB Consumer Laws and Regulations                    TILA

## Truth in Lending Act[1]

The Truth in Lending Act (TILA), 15 U.S.C. 1601 et seq., was enacted on May 29, 1968, as title I of the Consumer Credit Protection Act (Pub. L. 90-321). The TILA, implemented by Regulation Z (12 CFR 1026), became effective July 1, 1969.

The TILA was first amended in 1970 to prohibit unsolicited credit cards. Additional major amendments to the TILA and Regulation Z were made by the Fair Credit Billing Act of 1974, the Consumer Leasing Act of 1976, the Truth in Lending Simplification and Reform Act of 1980, the Fair Credit and Charge Card Disclosure Act of 1988, the Home Equity Loan Consumer Protection Act of 1988.

Regulation Z also was amended to implement section 1204 of the Competitive Equality Banking Act of 1987, and in 1988, to include adjustable rate mortgage loan disclosure requirements. All consumer leasing provisions were deleted from Regulation Z in 1981 and transferred to Regulation M (12 CFR 1013).

The Home Ownership and Equity Protection Act of 1994 amended the TILA. The law imposed new disclosure requirements and substantive limitations on certain closed-end mortgage loans bearing rates or fees above a certain percentage or amount. The law also included new disclosure requirements to assist consumers in comparing the costs and other material considerations involved in a reverse mortgage transaction and authorized the Federal Reserve Board to prohibit specific acts and practices in connection with mortgage transactions.

The TILA amendments of 1995 dealt primarily with tolerances for real estate secured credit. Regulation Z was amended on September 14, 1996 to incorporate changes to the TILA. Specifically, the revisions limit lenders' liability for disclosure errors in real estate secured loans consummated after September 30, 1995. The Economic Growth and Regulatory Paperwork Reduction Act of 1996 further amended the TILA. The amendments were made to simplify and improve disclosures related to credit transactions.

The Electronic Signatures in Global and National Commerce Act (the E-Sign Act), 15 U.S.C. 7001 et seq., was enacted in 2000 and did not require implementing regulations. On November 9, 2007, the amendments to Regulation Z and the official staff commentary were issued to simplify the regulation and provide guidance on the electronic delivery of disclosures consistent with the E-Sign Act.

In July 2008, Regulation Z was amended to protect consumers in the mortgage market from unfair, abusive, or deceptive lending and servicing practices. Specifically, the change applied protections to a newly defined category of "higher-priced mortgages" that includes virtually all closed-end subprime loans secured by a consumer's principal dwelling. The revisions also applied new protections to mortgage loans secured by a dwelling, regardless of loan price, and required the delivery of early disclosures for more types of transactions. The revisions also

---

[1] These reflect FFIEC-approved procedures.

# CFPB Consumer
# Laws and Regulations                                              TILA

banned several advertising practices deemed deceptive or misleading. The Mortgage Disclosure Improvement Act of 2008 (MDIA) broadened and added to the requirements of the Board's July 2008 final rule by requiring early truth-in-lending disclosures for more types of transactions and by adding a waiting period between the time when disclosures are given and consummation of the transaction. In 2009, Regulation Z was amended to address those provisions. The MDIA also requires disclosure of payment examples if the loan's interest rate or payments can change, as well as disclosure of a statement that there is no guarantee the consumer will be able to refinance in the future. In 2010, Regulation Z was amended to address these provisions, which became effective on January 30, 2011.

In December 2008, the Board adopted two final rules pertaining to open-end (not home-secured) credit. The first rule involved Regulation Z revisions and made comprehensive changes applicable to several disclosures required for: applications and solicitations, new accounts, periodic statements, change in terms notifications, and advertisements. The second was a rule published under the Federal Trade Commission (FTC) Act and was issued jointly with the Office of Thrift Supervision and the National Credit Union Administration. It sought to protect consumers from unfair acts or practices with respect to consumer credit card accounts. Before these rules became effective, however, the Credit Card Accountability Responsibility and Disclosure Act of 2009 (Credit CARD Act) amended the TILA and established a number of new requirements for open-end consumer credit plans. Several provisions of the Credit CARD Act are similar to provisions in the Board's December 2008 TILA revisions and the joint FTC Act rule, but other portions of the Credit CARD Act address practices or mandate disclosures that were not addressed in these rules. In light of the Credit CARD Act, the Board, NCUA, and OTS withdrew the substantive requirements of the joint FTC Act rule. On July 1, 2010, compliance with the provisions of the Board's rule that were not impacted by the Credit CARD Act became effective.

The Credit CARD Act provisions became effective in three stages. The provisions effective first (August 20, 2009) required creditors to increase the amount of notice consumers receive before the rate on a credit card account is increased or a significant change is made to the account's terms. These amendments also allowed consumers to reject such increases and changes by informing the creditor before the increase or change goes into effect. The provisions effective next (February 22, 2010) involved rules regarding interest rate increases, over-the-limit transactions, and student cards. Finally, the provisions effective last (August 22, 2010) addressed the reasonableness and proportionality of penalty fees and charges and re-evaluation of rate increases.

In 2009, Regulation Z was amended following the passage of the Higher Education Opportunity Act (HEOA) by adding disclosure and timing requirements that apply to lenders making private education loans.

In 2009, the Helping Families Save Their Homes Act amended the TILA to establish a new requirement for notifying consumers of the sale or transfer of their mortgage loans. The purchaser or assignee that acquires the loan must provide the required disclosures no later than 30 days after the date on which it acquired the loan.

In 2010, the Board further amended Regulation Z to prohibit payment to a loan originator that is based on the terms or conditions of the loan, other than the amount of credit extended. The

# CFPB Consumer
# Laws and Regulations                                    **TILA**

amendment applies to mortgage brokers and the companies that employ them, as well as to mortgage loan officers employed by depository institutions and other lenders. In addition, the amendment prohibits a loan originator from directing or "steering" a consumer to a loan that is not in the consumer's interest to increase the loan originator's compensation. Separately, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) amended the TILA to include several provisions that protect the integrity of the appraisal process when a consumer's home is securing the loan. The rule also requires that appraisers receive customary and reasonable payments for their services. The appraiser and loan originator compensation requirements became effective on April 1, 2011.

The Dodd-Frank Act granted rulemaking authority under the TILA to the Consumer Financial Protection Bureau (CFPB).[2]

## Format of Regulation Z

The disclosure rules creditors must follow differ depending on whether the creditor is offering open-end credit, such as credit cards or home-equity lines, or closed-end credit, such as car loans or mortgages.

Subpart A (sections 1026.1 through 1026.4) of the regulation provides general information that applies to open-end and closed-end credit transactions. It sets forth definitions and stipulates which transactions are covered and which are exempt from the regulation. It also contains the rules for determining which fees are finance charges.

Subpart B (sections 1026.5 through 1026.16) relates to open-end credit. It contains rules on account-opening disclosures and periodic statements. It also describes special rules that apply to credit card transactions, treatment of payments and credit balances, procedures for resolving credit billing errors, annual percentage rate calculations, rescission requirements, and advertising.

Subpart C (sections 1026.17 through 1026.24) relates to closed-end credit. It contains rules on disclosures, treatment of credit balances, annual percentage rate calculations, rescission requirements, and advertising.

Subpart D (sections 1026.25 through 1026.30) contain rules on oral disclosures, disclosures in languages other than English, record retention, effect on state laws, state exemptions, and rate limitations.

Subpart E (sections 1026.31 through 1026.45) contains special rules for certain mortgage transactions. It contains rules on certain disclosures and provides limitations for closed-end loans that have rates or fees above specified amounts and disclosure requirements for home equity plans. It contains requirements for reverse mortgage transactions. It provides for additional prohibitions for specific acts and practices in connection with an extension of credit secured by a dwelling. Finally, it contains rules on valuation independence requirements.

---

[2] Dodd-Frank Act §§1002(12)(O), 1022(b), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. §§5481(12)(O), 5512, 5514(b)-(c), and 5515(b)-(c).

# CFPB Consumer
# Laws and Regulations                    TILA

Subpart F (sections 1026.46 through 1026.48) relates to private education loans. It contains rules on disclosures, limitations on changes in terms after approval, the right to cancel the loan, and limitations on co-branding in the marketing of private education loans.

Subpart G (sections 1026.51 through 1026.60) relates to credit card accounts under an open-end (not home-secured) consumer credit plan (except for § 1026.57(c), which applies to all open-end credit plans). This subpart contains rules regarding credit and charge card application and solicitation disclosures. It also contains rules on evaluation of a consumer's ability to make the required payments under the terms of an account, limits the fees that a consumer can be required to pay, and contains rules on allocation of payments in excess of the minimum payment. It also sets forth certain limitations on the imposition of finance charges as the result of a loss of a grace period, and on increases in annual percentage rates, fees, and charges for credit card accounts, including the reevaluation of rate increases. This subpart prohibits the assessment of fees or charges for over-the-limit transactions unless the consumer affirmatively consents to the creditor's payment of over-the-limit transactions. This subpart also sets forth rules for reporting and marketing of college student open-end credit. Finally, it sets forth requirements for the Internet posting of credit card accounts under an open-end (not home-secured) consumer credit plan.

Several appendices contain information such as the procedures for determinations about state laws, state exemptions and issuance of official interpretations, special rules for certain kinds of credit plans, and the rules for computing annual percentage rates in closed-end credit transactions and total-annual-loan-cost rates for reverse mortgage transactions.

Official staff interpretations of the regulation are published in a commentary. Good faith compliance with the commentary protects creditors from civil liability under the TILA. In addition, the commentary includes more detailed information on disclosures or other actions required of creditors. It is virtually impossible to comply with Regulation Z without reference to and reliance on the commentary.

NOTE: The following narrative does not discuss all the sections of Regulation Z, but rather highlights only certain sections of the regulation and the TILA.

# CFPB Consumer Laws and Regulations

# TILA

## Subpart A — General

### Purpose of the TILA and Regulation Z

The TILA is intended to ensure that credit terms are disclosed in a meaningful way so consumers can compare credit terms more readily and knowledgeably. Before its enactment, consumers were faced with a bewildering array of credit terms and rates. It was difficult to compare loans because they were seldom presented in the same format. Now, all creditors must use the same credit terminology and expressions of rates. In addition to providing a uniform system for disclosures, the act:

- Protects consumers against inaccurate and unfair credit billing and credit card practices;

- Provides consumers with rescission rights;

- Provides for rate caps on certain dwelling-secured loans;

- Imposes limitations on home equity lines of credit and certain closed-end home mortgages; and

- Delineates and prohibits unfair or deceptive mortgage lending practices.

The TILA and Regulation Z do not, however, tell financial institutions how much interest they may charge or whether they must grant a consumer a loan.

### Summary of Coverage Considerations — Sections 1026.1 & 1026.2

Lenders must carefully consider several factors when deciding whether a loan requires Truth in Lending disclosures or is subject to other Regulation Z requirements. The coverage considerations under Regulation Z are addressed in more detail in the commentary to Regulation Z. For example, broad coverage considerations are included under section 1026.1(c) of the regulation and relevant definitions appear in section 1026.2.

### Exempt Transactions — Section 1026.3

The following transactions are exempt from Regulation Z:

- Credit extended primarily for a business, commercial, or agricultural purpose;

- Credit extended to other than a natural person (including credit to government agencies or instrumentalities);

# CFPB Consumer
# Laws and Regulations                                    TILA

- Credit in excess of $50 thousand not secured by real property or by personal property used or expected to be used as the principal dwelling of the consumer;[3]

- Public utility credit;

- Credit extended by a broker-dealer registered with the Securities and Exchange Commission (SEC) or the Commodity Futures Trading Commission (CFTC), involving securities or commodities accounts;

- Home fuel budget plans not subject to a finance charge; and

- Certain student loan programs.

However, when a credit card is involved, generally exempt credit (e.g., business purpose credit) is subject to the requirements that govern the issuance of credit cards and liability for their unauthorized use. Credit cards must not be issued on an unsolicited basis and, if a credit card is lost or stolen, the cardholder must not be held liable for more than $50 for the unauthorized use of the card. (Comment 3-1)

When determining whether credit is for consumer purposes, the creditor must evaluate all of the following:

- Any statement obtained from the consumer describing the purpose of the proceeds.

    o For example, a statement that the proceeds will be used for a vacation trip would indicate a consumer purpose.

    o If the loan has a mixed-purpose (e.g., proceeds will be used to buy a car that will be used for personal and business purposes), the lender must look to the primary purpose of the loan to decide whether disclosures are necessary. A statement of purpose from the consumer will help the lender make that decision.

    o A checked box indicating that the loan is for a business purpose, absent any documentation showing the intended use of the proceeds could be insufficient evidence that the loan did not have a consumer purpose.

- The consumer's primary occupation and how it relates to the use of the proceeds. The higher the correlation between the consumer's occupation and the property purchased from the loan proceeds, the greater the likelihood that the loan has a business purpose. For example, proceeds used to purchase dental supplies for a dentist would indicate a business purpose.

---

[3] The Dodd-Frank Act requires that this threshold be adjusted annually by any annual percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W). Accordingly, based on the annual percentage increase in the CPI-W as of June 1, 2011, the exemption threshold increased from $50,000 to $51,800, effective January 1, 2012.

# CFPB Consumer
# Laws and Regulations                                    **TILA**

- Personal management of the assets purchased from proceeds. The lower the degree of the borrower's personal involvement in the management of the investment or enterprise purchased by the loan proceeds, the less likely the loan will have a business purpose. For example, money borrowed to purchase stock in an automobile company by an individual who does not work for that company would indicate a personal investment and a consumer purpose.

- The size of the transaction. The larger the size of the transaction, the more likely the loan will have a business purpose. For example, if the loan is for a $5,000,000 real estate transaction, that might indicate a business purpose.

- The amount of income derived from the property acquired by the loan proceeds relative to the borrower's total income. The lesser the income derived from the acquired property, the more likely the loan will have a consumer purpose. For example, if the borrower has an annual salary of $100,000 and receives about $500 in annual dividends from the acquired property, that would indicate a consumer purpose.

All five factors must be evaluated before the lender can conclude that disclosures are not necessary. Normally, no one factor, by itself, is sufficient reason to determine the applicability of Regulation Z. In any event, the financial institution may routinely furnish disclosures to the consumer. Disclosure under such circumstances does not control whether the transaction is covered, but can assure protection to the financial institution and compliance with the law.

# CFPB Consumer Laws and Regulations

# TILA

## Coverage Considerations under Regulation Z



Is the purpose of the credit for personal, family or household use? — **No** → Regulation Z does not apply, except for the rules of issuance of and unauthorized use liability for credit cards  (Exempt credit includes loans with a business or agricultural purpose, and certain student loans  Credit extended to acquire or improve rental property that is not owner-occupied is considered business purpose credit )

**Yes** ↓

Is the consumer credit extended to a consumer? — **No** → Regulation Z does not apply  (Credit that is extended to a land trust is deemed to be credit extended to a consumer )

**Yes** ↓

Is the consumer credit extended by a creditor? — **No** → The institution is not a "creditor" and Regulation Z does not apply unless at least one of the following tests is met:

1)  The institution extends consumer credit regularly and

   a) The obligation is initially payable to the institution and

   b) The obligation is either payable by written agreement in more than four installments or is subject to a finance charge

2)  The institution is a card issuer that extends closed-end credit that is subject to a finance charge or is payable by written agreement in more than four installments

3)  The institution is not the card issuer, but it imposes a finance charge at the time of honoring a credit card

**Yes** ↓

Is the loan or credit plan secured by real property or by the consumer's principal dwelling? — **No** → Is the amount financed or credit limit $50,000 or less? — **No** → Regulation Z does not apply, but may apply later if the loan is refinanced for $51,800 or less  If the principal dwelling is taken as collateral after consummation, rescission rights will apply and, in the case of open-end credit, billing disclosures and other provisions of Regulation Z will apply

**Yes**      **Yes** ↓

Regulation Z applies

# CFPB Consumer
# Laws and Regulations

**TILA**

# Determination of Finance Charge and Annual Percentage Rate ("APR")

## Finance Charge (Open-End and Closed-End Credit) — Section 1026.4

The finance charge is a measure of the cost of consumer credit represented in dollars and cents. Along with APR disclosures, the disclosure of the finance charge is central to the uniform credit cost disclosure envisioned by the TILA.

The finance charge does not include any charge of a type payable in a comparable cash transaction. Examples of charges payable in a comparable cash transaction may include taxes, title, license fees, or registration fees paid in connection with an automobile purchase.

Finance charges include any charges or fees payable directly or indirectly by the consumer and imposed directly or indirectly by the financial institution either as an incident to or as a condition of an extension of consumer credit. The finance charge on a loan always includes any interest charges and often, other charges. Regulation Z includes examples, applicable both to open-end and closed-end credit transactions, of what must, must not, or need not be included in the disclosed finance charge (§1026.4(b)).

## Accuracy Tolerances (Closed-End Credit) — Sections 1026.18(d) & 1026.23(g)

Regulation Z provides finance charge tolerances for legal accuracy that should not be confused with those provided in the TILA for reimbursement under regulatory agency orders. As with disclosed APRs, if a disclosed finance charge were legally accurate, it would not be subject to reimbursement.

Under the TILA and Regulation Z, finance charge disclosures for open-end credit must be accurate since there is no tolerance for finance charge errors. However, both the TILA and Regulation Z permit various finance charge accuracy tolerances for closed-end credit.

Tolerances for the finance charge in a closed-end transaction, other than a mortgage loan, are generally $5 if the amount financed is less than or equal to $1,000 and $10 if the amount financed exceeds $1,000. Tolerances for certain transactions consummated on or after September 30, 1995 are noted below.

- Credit secured by real property or a dwelling (closed-end credit only):

    o The disclosed finance charge is considered accurate if it is not understated by more than $100.

    o Overstatements are not violations.

- Rescission rights after the three-business-day rescission period (closed-end credit only):

# CFPB Consumer
# Laws and Regulations                                              **TILA**

o   The disclosed finance charge is considered accurate if it does not vary from the actual finance charge by more than one-half of 1 percent of the credit extended or $100, whichever is greater.

o   The disclosed finance charge is considered accurate if it does not vary from the actual finance charge by more than 1 percent of the credit extended for the initial and subsequent refinancings of residential mortgage transactions when the new loan is made at a different financial institution. (This excludes high cost mortgage loans subject to section 1026.32, transactions in which there are new advances, and new consolidations.)

- Rescission rights in foreclosure:

  o   The disclosed finance charge is considered accurate if it does not vary from the actual finance charge by more than $35.

  o   Overstatements are not considered violations.

  o   The consumer can rescind if a mortgage broker fee that should have been included in the finance charge was not included.

  NOTE: Normally, the finance charge tolerance for a rescindable transaction is either 0.5 percent of the credit transaction or, for certain refinancings, 1 percent of the credit transaction. However, in the event of a foreclosure, the consumer may exercise the right of rescission if the disclosed finance charge is understated by more than $35.

See the "Finance Charge Tolerances" charts within these examination procedures for help in determining appropriate finance charge tolerances.

## Calculating the Finance Charge (Closed-End Credit)

One of the more complex tasks under Regulation Z is determining whether a charge associated with an extension of credit must be included in, or excluded from, the disclosed finance charge. The finance charge initially includes any charge that is, or will be, connected with a specific loan. Charges imposed by third parties are finance charges if the financial institution requires use of the third party. Charges imposed by settlement or closing agents are finance charges if the bank requires the specific service that gave rise to the charge and the charge is not otherwise excluded. The "Finance Charge Tolerances" charts within this document briefly summarize the rules that must be considered.

## Prepaid Finance Charges — Section 1026.18(b)(3)

A prepaid finance charge is any finance charge paid separately to the financial institution or to a third party, in cash or by check before or at closing, settlement, or consummation of a transaction, or withheld from the proceeds of the credit at any time.

Prepaid finance charges effectively reduce the amount of funds available for the consumer's use; usually before or at the time the transaction is consummated.

# CFPB Consumer
# Laws and Regulations

**TILA**

Examples of finance charges frequently prepaid by consumers are borrower's points, loan origination fees, real estate construction inspection fees, odd days' interest (interest attributable to part of the first payment period when that period is longer than a regular payment period), mortgage guarantee insurance fees paid to the Federal Housing Administration, private mortgage insurance (PMI) paid to such companies as the Mortgage Guaranty Insurance Company (MGIC), and, in non-real-estate transactions, credit report fees.

## Precomputed Finance Charges

A precomputed finance charge includes, for example, interest added to the note amount that is computed by the add-on, discount, or simple interest methods. If reflected in the face amount of the debt instrument as part of the consumer's obligation, finance charges that are not viewed as prepaid finance charges are treated as precomputed finance charges that are earned over the life of the loan.

# CFPB Consumer Laws and Regulations

# TILA

**Finance Charge Chart**



# CFPB Consumer
# Laws and Regulations                                          TILA

## Instructions for the Finance Charge Chart

The finance charge initially includes any charge that is, or will be, connected with a specific loan. Charges imposed by third parties are finance charges if the creditor requires use of the third party. Charges imposed on the consumer by a settlement agent are finance charges only if the creditor requires the particular services for which the settlement agent is charging the borrower and the charge is not otherwise excluded from the finance charge.

Immediately below the finance charge definition, the chart presents five captions applicable to determining whether a loan related charge is a finance charge.

The first caption is charges always included. This category focuses on specific charges given in the regulation or commentary as examples of finance charges.

The second caption, charges included unless conditions are met, focuses on charges that must be included in the finance charge unless the creditor meets specific disclosure or other conditions to exclude the charges from the finance charge.

The third caption, conditions, focuses on the conditions that need to be met if the charges identified to the left of the conditions are permitted to be excluded from the finance charge. Although most charges under the second caption may be included in the finance charge at the creditor's option, third-party charges and application fees (listed last under the third caption) must be excluded from the finance charge if the relevant conditions are met. However, inclusion of appraisal and credit report charges as part of the application fee is optional.

The fourth caption, charges not included, identifies fees or charges that are not included in the finance charge under conditions identified by the caption. If the credit transaction is secured by real property or the loan is a residential mortgage transaction, the charges identified in the column, if they are bona fide and reasonable in amount, must be excluded from the finance charge. For example, if a consumer loan is secured by a vacant lot or commercial real estate, any appraisal fees connected with the loan must not be included in the finance charge.

The fifth caption, charges never included, lists specific charges provided by the regulation as examples of those that automatically are not finance charges (e.g., fees for unanticipated late payments).

# CFPB Consumer
# Laws and Regulations

# TILA

## Annual Percentage Rate Definition – Section 1026.22 (Closed-End Credit)

Credit costs may vary depending on the interest rate, the amount of the loan and other charges, the timing and amounts of advances, and the repayment schedule. The APR, which must be disclosed in nearly all consumer credit transactions, is designed to take into account all relevant factors and to provide a uniform measure for comparing the cost of various credit transactions.

The APR is a measure of the cost of credit, expressed as a nominal yearly rate. It relates the amount and timing of value received by the consumer to the amount and timing of payments made. The disclosure of the APR is central to the uniform credit cost disclosure envisioned by the TILA.

The value of a closed-end credit APR must be disclosed as a single rate only, whether the loan has a single interest rate, a variable interest rate, a discounted variable interest rate, or graduated payments based on separate interest rates (step rates), and it must appear with the segregated disclosures. Segregated disclosures are grouped together and do not contain any information not directly related to the disclosures required under section 1026.18.

Since an APR measures the total cost of credit, including costs such as transaction charges or premiums for credit guarantee insurance, it is not an "interest" rate, as that term is generally used. APR calculations do not rely on definitions of interest in state law and often include charges, such as a commitment fee paid by the consumer, that are not viewed by some state usury statutes as interest. Conversely, an APR might not include a charge, such as a credit report fee in a real property transaction, which some state laws might view as interest for usury purposes. Furthermore, measuring the timing of value received and of payments made, which is essential if APR calculations are to be accurate, must be consistent with parameters under Regulation Z.

The APR is often considered to be the finance charge expressed as a percentage. However, two loans could require the same finance charge and still have different APRs because of differing values of the amount financed or of payment schedules. For example, the APR is 12 percent on a loan with an amount financed of $5,000 and 36 equal monthly payments of $166.07 each. It is 13.26 percent on a loan with an amount financed of $4,500 and 35 equal monthly payments of $152.18 each and final payment of $152.22. In both cases the finance charge is $978.52. The APRs on these example loans are not the same because an APR does not only reflect the finance charge. It relates the amount and timing of value received by the consumer to the amount and timing of payments made.

The APR is a function of:

- The amount financed, which is not necessarily equivalent to the loan amount. For example, if the consumer must pay at closing a separate 1 percent loan origination fee (prepaid finance charge) on a $100,000 residential mortgage loan, the loan amount is $100,000, but the amount financed would be $100,000 less the $1,000 loan fee, or $99,000.

# CFPB Consumer
# Laws and Regulations                                                    TILA

- The finance charge, which is not necessarily equivalent to the total interest amount (interest is not defined by Regulation Z, but rather is defined by state or other federal law). For example:

  ○ If the consumer must pay a $25 credit report fee for an auto loan, the fee must be included in the finance charge. The finance charge in that case is the sum of the interest on the loan (i.e., interest generated by the application of a percentage rate against the loan amount) plus the $25 credit report fee.

  ○ If the consumer must pay a $25 credit report fee for a home improvement loan secured by real property, the credit report fee must be excluded from the finance charge. The finance charge in that case would be only the interest on the loan.

- The payment schedule, which does not necessarily include only principal and interest (P + I) payments. For example:

  ○ If the consumer borrows $2,500 for a vacation trip at 14 percent simple interest per annum and repays that amount with 25 equal monthly payments beginning one month from consummation of the transaction, the monthly P + I payment will be $115.87, if all months are considered equal, and the amount financed would be $2,500. If the consumer's payments are increased by $2.00 a month to pay a non-financed $50 loan fee during the life of the loan, the amount financed would remain at $2,500 but the payment schedule would be increased to $117.87 a month, the finance charge would increase by $50, and there would be a corresponding increase in the APR. This would be the case whether or not state law defines the $50 loan fee as interest.

  ○ If the loan above has 55 days to the first payment and the consumer prepays interest at consummation ($24.31 to cover the first 25 days), the amount financed would be $2,500 - $24.31, or $2,475.69. Although the amount financed has been reduced to reflect the consumer's reduced use of available funds at consummation, the time interval during which the consumer has use of the $2,475.69, 55 days to the first payment, has not changed. Since the first payment period exceeds the limitations of the regulation's minor irregularities provisions (see §1026.17(c)(4)), it may not be treated as regular. In calculating the APR, the first payment period must not be reduced by 25 days (i.e., the first payment period may not be treated as one month).

Financial institutions may, if permitted by state or other law, precompute interest by applying a rate against a loan balance using a simple interest, add-on, discount or some other method, and may earn interest using a simple interest accrual system, the Rule of 78's (if permitted by law) or some other method. Unless the financial institution's internal interest earnings and accrual methods involve a simple interest rate based on a 360-day year that is applied over actual days (even that is important only for determining the accuracy of the payment schedule), it is not relevant in calculating an APR, since an APR is not an interest rate (as that term is commonly used under state or other law). Since the APR normally need not rely on the internal accrual systems of a bank, it always may be computed after the loan terms have been agreed upon (as long as it is disclosed before actual consummation of the transaction).

# CFPB Consumer
# Laws and Regulations                                    TILA

**Special Requirements for Calculating the Finance Charge and APR**

Proper calculation of the finance charge and APR are of primary importance. The regulation requires that the terms "finance charge" and "annual percentage rate" be disclosed more conspicuously than any other required disclosure, subject to limited exceptions. The finance charge and APR, more than any other disclosures, enable consumers to understand the cost of the credit and to comparison shop for credit. A creditor's failure to disclose those values accurately can result in significant monetary damages to the creditor, either from a class action lawsuit or from a regulatory agency's order to reimburse consumers for violations of law.

If an APR or finance charge is disclosed incorrectly, the error is not, in itself, a violation of the regulation if:

- The error resulted from a corresponding error in a calculation tool used in good faith by the financial institution.

- Upon discovery of the error, the financial institution promptly discontinues use of that calculation tool for disclosure purposes.

- The financial institution notifies the CFPB in writing of the error in the calculation tool.

When a financial institution claims a calculation tool was used in good faith, the financial institution assumes a reasonable degree of responsibility for ensuring that the tool in question provides the accuracy required by the regulation. For example, the financial institution might verify the results obtained using the tool by comparing those results to the figures obtained by using another calculation tool. The financial institution might also verify that the tool, if it is designed to operate under the actuarial method, produces figures similar to those provided by the examples in appendix J to the regulation. The calculation tool should be checked for accuracy before it is first used and periodically thereafter.

# Subpart B — Open-End Credit

## Time of Disclosures (Periodic Statements) — Section 1026.5(b)

For credit card accounts under an open-end (not home-secured) consumer credit plan, creditors must adopt reasonable procedures designed to ensure that periodic statements are mailed or delivered at least 21 days prior to the payment due date disclosed on the periodic statement and that payments are not treated as late for any purpose if they are received within 21 days after mailing or delivery of the statement. In addition, for all open-end consumer credit accounts with grace periods, creditors must adopt reasonable procedures designed to ensure that periodic statements are mailed or delivered at least 21 days prior to the date on which a grace period (if any) expires and that finance charges are not imposed as a result of the loss of a grace period if a payment is received within 21 days after mailing or delivery of a statement. For purposes of this requirement, a "grace period" is defined as a period within which any credit extended may be repaid without incurring a finance charge due to a periodic interest rate. For non-credit card

# CFPB Consumer
# Laws and Regulations

**TILA**

open-end consumer plans without a grace period, creditors must adopt reasonable policies and procedures designed to ensure that periodic statements are mailed or delivered at least 14 days prior to the date on which the required minimum periodic payment is due. Moreover, the creditor must adopt reasonable policies and procedures to ensure that it does not treat as late a required minimum periodic payment received by the creditor within 14 days after it has mailed or delivered the periodic statement.

## Subsequent Disclosures (Open-End Credit) — Section 1026.9

### For open-end, not home-secured credit, the following applies:

Creditors are required to provide consumers with 45 days' advance written notice of rate increases and other significant changes to the terms of their credit card account agreements. The list of "significant changes" includes most fees and other terms that a consumer should be aware of before use of the account. Examples of such fees and terms include:

- Penalty fees;

- Transaction fees;

- Fees imposed for the issuance or availability of the open-end plan;

- Grace period; and

- Balance computation method.

Changes that do not require advance notice include:

- Reductions of finance charges;

- Termination of account privileges resulting from an agreement involving a court proceeding;

- The change is an increase in an APR upon expiration of a specified period of time previously disclosed in writing;

- The change applies to increases in variable APRs that change according to an index not under the card issuer's control; and

- Rate increases due to the completion of, or failure of a consumer to comply with, the terms of a workout or temporary hardship arrangement, if those terms are disclosed prior to commencement of the arrangement.

A creditor may suspend account privileges, terminate an account, or lower the credit limit without notice. However, a creditor that lowers the credit limit may not impose an over limit fee or penalty rate as a result of exceeding the new credit limit without a 45-day advance notice that the credit limit has been reduced.

# CFPB Consumer
# Laws and Regulations                                    TILA

For significant changes in terms (with the exception of rate changes, increases in the minimum payment, certain changes in the balance computation method, and when the change results from the consumer's failure to make a required minimum periodic payment within 60 days after the due date), a creditor must also provide consumers the right to reject the change. If the consumer does reject the change prior to the effective date, the creditor may not apply the change to the account (§1026.9(h)(2)(i)).

In addition, when a consumer rejects a change or increase, the creditor must not:

- Impose a fee or charge or treat the account as in default solely as a result of the rejection; or

- Require repayment of the balance on the account using a method that is less beneficial to the consumer than one of the following methods: (1) the method of repayment prior to the rejection; (2) an amortization period of not less than five years from the date of rejection; or (3) a minimum periodic payment that includes a percentage of the balance that is not more than twice the percentage included prior to the date of rejection.

## Finance Charge (Open-End Credit) — Sections 1026.6(a)(1) & 1026.6(b)(3)

Each finance charge imposed must be individually itemized. The aggregate total amount of the finance charge need not be disclosed.

### Determining the Balance and Computing the Finance Charge

The examiner must know how to compute the balance to which the periodic rate is applied. Common methods used are the previous balance method, the daily balance method, and the average daily balance method, which are described as follows:

- Previous balance method. The balance on which the periodic finance charge is computed is based on the balance outstanding at the start of the billing cycle. The periodic rate is multiplied by this balance to compute the finance charge.

- Daily balance method. A daily periodic rate is applied to either the balance on each day in the cycle or the sum of the balances on each of the days in the cycle. If a daily periodic rate is multiplied by the balance on each day in the billing cycle, the finance charge is the sum of the products. If the daily periodic rate is multiplied by the sum of all the daily balances, the result is the finance charge.

- Average daily balance method. The average daily balance is the sum of the daily balances (either including or excluding current transactions) divided by the number of days in the billing cycle. A periodic rate is then multiplied by the average daily balance to determine the finance charge. If the periodic rate is a daily one, the product of the rate multiplied by the average balance is multiplied by the number of days in the cycle.

# CFPB Consumer
# Laws and Regulations                                    TILA

In addition to those common methods, financial institutions have other ways of calculating the balance to which the periodic rate is applied. By reading the financial institution's explanation, the examiner should be able to calculate the balance to which the periodic rate was applied. In some cases, the examiner may need to obtain additional information from the financial institution to verify the explanation disclosed. Any inability to understand the disclosed explanation should be discussed with management, who should be reminded of Regulation Z's requirement that disclosures be clear and conspicuous.

When a balance is determined without first deducting all credits and payments made during the billing cycle, that fact and the amount of the credits and payments must be disclosed.

If the financial institution uses the daily balance method and applies a single daily periodic rate, disclosure of the balance to which the rate was applied may be stated as any of the following:

- A balance for each day in the billing cycle. The daily periodic rate is multiplied by the balance on each day and the sum of the products is the finance charge.

- A balance for each day in the billing cycle on which the balance in the account changes. The finance charge is figured by the same method as discussed previously, but the statement shows the balance only for those days on which the balance changed.

- The sum of the daily balances during the billing cycle. The balance on which the finance charge is computed is the sum of all the daily balances in the billing cycle. The daily periodic rate is multiplied by that balance to determine the finance charge.

- The average daily balance during the billing cycle. If this is stated, the financial institution may, at its option, explain that the average daily balance is or can be multiplied by the number of days in the billing cycle and the periodic rate applied to the product to determine the amount of interest.

If the financial institution uses the daily balance method, but applies two or more daily periodic rates, the sum of the daily balances may not be used. Acceptable ways of disclosing the balances include:

- A balance for each day in the billing cycle;

- A balance for each day in the billing cycle on which the balance in the account changes; or

- Two or more average daily balances. If the average daily balances are stated, the financial institution may, at its option, explain that interest is or may be determined by 1) multiplying each of the average daily balances by the number of days in the billing cycle (or if the daily rate varied during the cycle), 2) by multiplying each of the results by the applicable daily periodic rate, and 3) adding these products together.

In explaining the method used to find the balance on which the finance charge is computed, the financial institution need not reveal how it allocates payments or credits. That information may be disclosed as additional information, but all required information must be clear and conspicuous.

# CFPB Consumer
# Laws and Regulations

# TILA

NOTE: Section 1026.54 prohibits a credit card issuer from calculating finance charges based on balances for days in previous billing cycles as a result of the loss of a grace period (a practice sometimes referred to as "double-cycle billing").

**Finance Charge Resulting from Two or More Periodic Rates**

Some financial institutions use more than one periodic rate in computing the finance charge. For example, one rate may apply to balances up to a certain amount and another rate to balances more than that amount. If two or more periodic rates apply, the financial institution must disclose all rates and conditions. The range of balances to which each rate applies also must be disclosed. It is not necessary, however, to break the finance charge into separate components based on the different rates.

## Annual Percentage Rate (Open-End Credit)

The disclosed APR on an open-end credit account is accurate if it is within one-eighth of one percentage point of the APR calculated under Regulation Z.

## Determination of APR — Section 1026.14

The basic method for determining the APR in open-end credit transactions involves multiplying each periodic rate by the number of periods in a year. This method is used in all types of open-end disclosures, including:

- The corresponding APR in the initial disclosures;

- The corresponding APR on periodic statements;

- The APR in early disclosures for credit card accounts;

- The APR in early disclosures for home-equity plans;

- The APR in advertising; and

- The APR in oral disclosures.

The corresponding APR is prospective and it does not involve any particular finance charge or periodic balance.

A second method of calculating the APR is the quotient method. At a creditor's option, the quotient method may be disclosed on periodic statements for home-equity plans subject to section 1026.40 ("HELOCs").[4] The quotient method reflects the annualized equivalent of the

---

[4] If a creditor does not disclose the effective (or quotient method) APR on a HELOC periodic statement, it must instead disclose the charges (fees and interest) imposed as provided in section 1026.7(a).  However, an annual percentage rate that differs from the rate that would otherwise apply and is offered only for a promotional period need not be disclosed except in periods in which the offered rate is actually applied under section 1026.7(a)(4).

# CFPB Consumer
# Laws and Regulations                                    TILA

rate that was actually applied during a cycle. This rate, also known as the effective APR, will differ from the corresponding APR if the creditor applies minimum, fixed, or transaction charges to the account during the cycle. (§1026.14(c))

**Brief Outline for Open-End Credit APR Calculations on Periodic Statements**

NOTE: Assume monthly billing cycles for each of the calculations below.

I.      Basic method for determining the APR in an open-end credit transaction. This is the corresponding APR. (§1026.14(b))

    A.  Monthly rate x 12 = APR

II.     Optional effective APR that may be disclosed on home-equity line of credit (HELOC) periodic statements

    A.  APR when only periodic rates are imposed (§1026.14(c)(1))

        1.  Monthly rate x 12 = APR

            Or

        2.  (Total finance charge / sum of the balances) x 12 = APR

    B.  APR when minimum or fixed charge, but not transaction charge imposed. (§1026.14(c)(2))

        1.  (Total finance charge / amount of applicable balance[5]) x 12 = APR[6]

    C.  APR when the finance charge includes a charge related to a specific transaction (such as a cash advance fee), even if the total finance charge also includes any other minimum, fixed, or other charge not calculated using a periodic rate. (1026.14(c)(3))

        1.  (Total finance charge / (all balances + other amounts on which a finance charge was imposed during the billing cycle without duplication[7]) x 12 = APR[8]

---

[5] The APR cannot be determined with this formula if the applicable balance is zero. (§1026.14(c)(2))

[6] Loan fees, points, or similar finance charges that relate to the opening, renewing, or continuing of the account must not be included in the calculation of the APR.

[7] The sum of the balances may include the average daily balance, adjusted balance, or previous balance method. When a portion of the finance charge is determined by application of one or more daily periodic rates, the sum of the balances also means the average of daily balances. *See* Appendix F to Regulation Z.

[8] Cannot be less than the highest periodic rate applied, expressed as an APR (in other words. the largest rate determined by multiplying each periodic rate imposed during the billing cycle by the number of periods in a year).

# CFPB Consumer
# Laws and Regulations

**TILA**

---

D. APR when the finance charge imposed during the billing cycle includes a minimum or fixed charge that does not exceed $.50 for a monthly or longer billing cycles (or pro rata part of $.50 for a billing cycle shorter than monthly). (§1026.14(c)(4))

   1. Monthly rate x 12 = APR

E. APR calculation when daily periodic rates are applicable if only the periodic rate is imposed or when a minimum or fixed charge (but not a transactional charge is imposed. (§1026.14(d))

   1. (Total finance charge / average daily balance) x 12 = APR

      Or

   2. (Total finance charge / sum of daily balances) x 365 = APR

## Timely Settlement of Estates – Section 1026.11(c)

Issuers are required to establish procedures to ensure that any administrator of an estate can resolve the outstanding credit card balance of a deceased account holder in a timely manner. If an administrator requests the amount of the balance:

- The issuer is prohibited from imposing additional fees on the account;

- The issuer is required to disclose the amount of the balance to the administrator in a timely manner (safe harbor of 30 days); and

- If the balance is paid in full within 30 days after disclosure of the balance, the issuer must waive or rebate any trailing or residual interest charges that accrued on the balance following the disclosure.

## Minimum Payments – Section 1026.7(b)(12)

For credit card accounts under an open-end credit plan, card issuers generally must disclose on periodic statements an estimate of the amount of time and the total cost (principal and interest) involved in paying the balance in full by making only the minimum payments, and an estimate of the monthly payment amount required to pay off the balance in 36 months and the total cost (principal and interest) of repaying the balance in 36 months. Card issuers also must disclose a minimum payment warning, and an estimate of the total interest that a consumer would save if that consumer repaid the balance in 36 months, instead of making minimum payments.

---

Loan fees, points, or similar finance charges that relate to the opening, renewing, or continuing of the account must not be included in the calculation of the APR.

# CFPB Consumer Laws and Regulations

# TILA

## Subpart C – Closed-End Credit

### Finance Charge (Closed-End Credit) – Section 1026.17(a)

The aggregate total amount of the finance charge must be disclosed. Each finance charge imposed need not be individually itemized and must not be itemized with the segregated disclosures.

## Annual Percentage Rate (Closed-End Credit) – Section 1026.22

### Accuracy Tolerances

The disclosed APR on a closed-end transaction is accurate for:

- Regular transactions (which include any single advance transaction with equal payments and equal payment periods, or an irregular first payment period and/or a first or last irregular payment), if it is within one-eighth of 1 percentage point of the APR calculated under Regulation Z (§1026.22(a)(2)).

- Irregular transactions (which include multiple advance transactions and other transactions not considered regular), if it is within one-quarter of 1 percentage point of the APR calculated under Regulation Z (§1026.22(a)(3)).

- Mortgage transactions, if it is within one-eighth of 1 percentage point for regular transactions or one-quarter of 1 percentage point for irregular transactions **or if**:

  i.  The rate results from the disclosed finance charge, and the disclosed finance is considered accurate under sections 1026.18(d)(1) or 1026.23(g) or (h) (§1026.22(a)(4)); or

  ii. The disclosed finance charge is calculated incorrectly but is considered accurate under sections 1026.18(d)(1) or 1026.23(g) or (h) and either:

     (A) the finance charge is understated and the disclosed APR is also understated but is closer to the actual APR than the APR that would be considered accurate under section 1026.22(a)(4); or

     (B) the disclosed finance charge is overstated and the disclosed APR is also overstated but is closer to the actual APR than the APR that would be considered accurate under section 1026.22(a)(4).

For example, in an irregular transaction subject to a tolerance of ¼th of 1 percentage point, if the actual APR is 9.00% and a $75 omission from the finance charge corresponds to a rate of 8.50% that is considered accurate under section 1026.22(a)(4), a disclosed APR of 8.65% is considered accurate under section 1026.22(a)(5). However, a disclosed APR below 8.50% or above 9.25% would not be considered accurate.

# CFPB Consumer
# Laws and Regulations                                    TILA

## Construction Loans — Section 1026.17(c)(6) & Appendix D

Construction and certain other multiple advance loans pose special problems in computing the finance charge and APR. In many instances, the amount and dates of advances are not predictable with certainty since they depend on the progress of the work. Regulation Z provides that the APR and finance charge for such loans may be estimated for disclosure.

At its option, the financial institution may rely on the representations of other parties to acquire necessary information (for example, it might look to the consumer for the dates of advances). In addition, if either the amounts or dates of advances are unknown (even if some of them are known), the financial institution may, at its option, use appendix D to the regulation to make calculations and disclosures. The finance charge and payment schedule obtained through appendix D may be used with volume one of the CFPB's APR tables or with any other appropriate computation tool to determine the APR. If the financial institution elects not to use appendix D, or if appendix D cannot be applied to a loan (e.g., appendix D does not apply to a combined construction-permanent loan if the payments for the permanent loan begin during the construction period), the financial institution must make its estimates under section 1026.17(c)(2) and calculate the APR using multiple advance formulas.

On loans involving a series of advances under an agreement to extend credit up to a certain amount, a financial institution may treat all of the advances as a single transaction or disclose each advance as a separate transaction. If advances are disclosed separately, disclosures must be provided before each advance occurs, with the disclosures for the first advance provided before consummation.

In a transaction that finances the construction of a dwelling that may or will be permanently financed by the same financial institution, the construction-permanent financing phases may be disclosed in one of three ways listed below.

- As a single transaction, with one disclosure combining both phases.

- As two separate transactions, with one disclosure for each phase.

- As more than two transactions, with one disclosure for each advance and one for the permanent financing phase.

If two or more disclosures are furnished, buyer's points or similar amounts imposed on the consumer may be allocated among the transactions in any manner the financial institution chooses, as long as the charges are not applied more than once. In addition, if the financial institution chooses to give two sets of disclosures and the consumer is obligated for both construction and permanent phases at the outset, both sets of disclosures must be given to the consumer initially, before consummation of each transaction occurs.

If the creditor requires interest reserves for construction loans, special appendix D rules apply that can make the disclosure calculations quite complicated. The amount of interest reserves included in the commitment amount must not be treated as a prepaid finance charge.

# CFPB Consumer
# Laws and Regulations                                                    TILA

If the lender uses appendix D for construction-only loans with required interest reserves, the lender must estimate construction interest using the interest reserve formula in appendix D. The lender's own interest reserve values must be completely disregarded for disclosure purposes.

If the lender uses appendix D for combination construction-permanent loans, the calculations can be much more complex. Appendix D is used to estimate the construction interest, which is then measured against the lender's contractual interest reserves.

If the interest reserve portion of the lender's contractual commitment amount exceeds the amount of construction interest estimated under appendix D, the excess value is considered part of the amount financed if the lender has contracted to disburse those amounts whether they ultimately are needed to pay for accrued construction interest. If the lender will not disburse the excess amount if it is not needed to pay for accrued construction interest, the excess amount must be ignored for disclosure purposes.

## Calculating the Annual Percentage Rate — Section 1026.22

The APR must be determined under one of the following:

- The actuarial method, which is defined by Regulation Z and explained in appendix J to the regulation.

- The U.S. Rule, which is permitted by Regulation Z and briefly explained in appendix J to the regulation. The U.S. Rule is an accrual method that seems to have first surfaced officially in an early nineteenth century United States Supreme Court case, *Story v. Livingston*, 38 U.S. 359 (1839).

Whichever method is used by the financial institution, the rate calculated will be accurate if it is able to "amortize" the amount financed while it generates the finance charge under the accrual method selected. Financial institutions also may rely on minor irregularities and accuracy tolerances in the regulation, both of which effectively permit somewhat imprecise, but still legal, APRs to be disclosed.

## 360-Day and 365-Day Years — Section 1026.17(c)(3)

Confusion often arises over whether to use the 360-day or 365-day year in computing interest, particularly when the finance charge is computed by applying a daily rate to an unpaid balance. Many single payment loans or loans payable on demand are in this category. There are also loans in this category that call for periodic installment payments. Regulation Z does not require the use of one method of interest computation in preference to another (although state law may). It does, however, permit financial institutions to disregard the fact that months have different numbers of days when calculating and making disclosures. This means financial institutions may base their disclosures on calculation tools that assume all months have an equal number of days, even if their practice is to take account of the variations in months to collect interest.

# CFPB Consumer
# Laws and Regulations                                    TILA

For example, a financial institution may calculate disclosures using a financial calculator based on a 360-day year with 30-day months, when, in fact, it collects interest by applying a factor of 1/365 of the annual interest rate to actual days.

Disclosure violations may occur, however, when a financial institution applies a daily interest factor based on a 360-day year to the actual number of days between payments. In those situations, the financial institution must disclose the higher values of the finance charge, the APR, and the payment schedule resulting from this practice.

For example, a 12 percent simple interest rate divided by 360 days results in a daily rate of .033333 percent. If no charges are imposed except interest, and the amount financed is the same as the loan amount, applying the daily rate on a daily basis for a 365-day year on a $10,000 one year, single payment, unsecured loan results in an APR of 12.17 percent (.033333% x 365 = 12.17%), and a finance charge of $1,216.67. There would be a violation if the APR were disclosed as 12 percent or if the finance charge were disclosed as $1,200 (12% x $10,000).

However, if there are no other charges except interest, the application of a 360-day year daily rate over 365 days on a regular loan would not result in an APR in excess of the one eighth of one percentage point APR tolerance unless the nominal interest rate is greater than 9 percent. For irregular loans, with one-quarter of 1 percentage point APR tolerance, the nominal interest rate would have to be greater than 18 percent to exceed the tolerance.

## Variable Rate Information – Section 1026.18(f) & Commentary to Section 1026.17(c)

If the terms of the legal obligation allow the financial institution, after consummation of the transaction, to increase the APR, the financial institution must furnish the consumer with certain information on variable rates. Graduated payment mortgages and step-rate transactions without a variable rate feature are not considered variable rate transactions. In addition, variable rate disclosures are not applicable to rate increases resulting from delinquency, default, assumption, acceleration, or transfer of the collateral.

Some of the more important transaction-specific variable rate disclosure requirements follow.

- Disclosures for variable rate loans must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation.

- If the variable rate transaction includes either a seller buy-down that is reflected in a contract or a consumer buy-down, the disclosed APR should be a composite rate based on the lower rate for the buy-down period and the rate that is the basis for the variable rate feature for the remainder of the term.

- If the initial rate is not determined by the index or formula used to make later interest rate adjustments, as in a discounted variable rate transaction, the disclosed APR must reflect a composite rate based on the initial rate for as long as it is applied and, for the remainder of

# CFPB Consumer
# Laws and Regulations                                    TILA

the term, the rate that would have been applied using the index or formula at the time of consummation (i.e., the fully indexed rate).

○ If a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the adjustment, from changing to the fully indexed rate, the effect of that rate or payment cap needs to be reflected in the disclosures.

○ The index at consummation need not be used if the contract provides a delay in the implementation of changes in an index value (e.g., the contract indicates that future rate changes are based on the index value in effect for some specified period, like 45 days before the change date). Instead, the financial institution may use any rate from the date of consummation back to the beginning of the specified period (e.g., during the previous 45-day period).

• If the initial interest rate is set according to the index or formula used for later adjustments, but is set at a value as of a date before consummation, disclosures should be based on the initial interest rate, even though the index may have changed by the consummation date.

For variable-rate loans that are <u>not</u> secured by the consumer's principal dwelling or that are secured by the consumer's principal dwelling but have a term of one year or less, creditors must disclose the circumstances under which the rate may increase, any limitations on the increase, the effect of an increase, and an example of the payment terms that would result from an increase. (§1026.18(f)(1))

For variable-rate consumer loans secured by the consumer's principal dwelling and having a maturity of more than one year, creditors must state that the loan has a variable-rate feature and that the disclosures were previously given. (§1026.18(f)(2)) Extensive disclosures about the loan program are provided when consumers apply for such a loan (§1026.19(b)), and throughout the loan term when the rate or payment amount is changed (§1026.20(c)).

## Payment Schedule – Section 1026.18(g)

The disclosed payment schedule must reflect all components of the finance charge. It includes all payments scheduled to repay loan principal, interest on the loan, and any other finance charge payable by the consumer after consummation of the transaction.

However, any finance charge paid separately before or at consummation (e.g., odd days' interest) is not part of the payment schedule. It is a prepaid finance charge that must be reflected as a reduction in the value of the amount financed.

At the creditor's option, the payment schedule may include amounts beyond the amount financed and finance charge (e.g., certain insurance premiums or real estate escrow amounts such as taxes added to payments). However, when calculating the APR, the creditor must disregard such amounts.

If the obligation is a renewable balloon payment instrument that unconditionally obligates the financial institution to renew the short-term loan at the consumer's option or to renew the loan subject to conditions within the consumer's control, the payment schedule must be disclosed

# CFPB Consumer
# Laws and Regulations                                      **TILA**

using the longer term of the renewal period or periods. The long-term loan must be disclosed with a variable rate feature.

If there are no renewal conditions or if the financial institution guarantees to renew the obligation in a refinancing, the payment schedule must be disclosed using the shorter balloon payment term. The short-term loan must be disclosed as a fixed rate loan, unless it contains a variable rate feature during the initial loan term.

## Amount Financed – Section 1026.18(b)

Definition – The amount financed is the net amount of credit extended for the consumer's use. It should not be assumed that the amount financed under the regulation is equivalent to the note amount, proceeds, or principal amount of the loan. The amount financed normally equals the total of payments less the finance charge.

To calculate the amount financed, all amounts and charges connected with the transaction, either paid separately or included in the note amount, must first be identified. Any prepaid, precomputed, or other finance charge must then be determined.

The amount financed must not include any finance charges. If finance charges have been included in the obligation (either prepaid or precomputed), they must be subtracted from the face amount of the obligation when determining the amount financed. The resulting value must be reduced further by an amount equal to any prepaid finance charge paid separately. The final resulting value is the amount financed.

When calculating the amount financed, finance charges (whether in the note amount or paid separately) should not be subtracted more than once from the total amount of an obligation. Charges not in the note amount and not included in the finance charge (e.g., an appraisal fee paid separately in cash on a real estate loan) are not required to be disclosed under Regulation Z and must not be included in the amount financed.

In a multiple advance construction loan, proceeds placed in a temporary escrow account and awaiting disbursement in draws to the developer are not considered part of the amount financed until actually disbursed. Thus, if the entire commitment amount is disbursed into the lender's escrow account, the lender must not base disclosures on the assumption that all funds were disbursed immediately, even if the lender pays interest on the escrowed funds.

## Required Deposit – Section 1026.18(r)

A required deposit, with certain exceptions, is one that the financial institution requires the consumer to maintain as a condition of the specific credit transaction. It can include a compensating balance or a deposit balance that secures the loan. The effect of a required deposit is not reflected in the APR. Also, a required deposit is not a finance charge since it is eventually released to the consumer. A deposit that earns at least 5 percent per year need not be considered a required deposit.

# CFPB Consumer
# Laws and Regulations                                    TILA

## Calculating the Amount Financed

A consumer signs a note secured by real property in the amount of $5,435. The note amount includes $5,000 in proceeds disbursed to the consumer, $400 in precomputed interest, $25 paid to a credit reporting agency for a credit report, and a $10 service charge. Additionally, the consumer pays a $50 loan fee separately in cash at consummation. The consumer has no other debt with the financial institution. The amount financed is $4,975.

The amount financed may be calculated by first subtracting all finance charges included in the note amount ($5,435 - $400 - $10 = $5,025). The $25 credit report fee is not a finance charge because the loan is secured by real property. The $5,025 is further reduced by the amount of prepaid finance charges paid separately, for an amount financed of $5,025 - $50 = $4,975. The answer is the same whether finance charges included in the obligation are considered prepaid or precomputed finance charges.

The financial institution may treat the $10 service charge as an addition to the loan amount and not as a prepaid finance charge. If it does, the loan principal would be $5,000. The $5,000 loan principal does not include either the $400 or the $10 precomputed finance charge in the note. The loan principal is increased by other amounts that are financed which are not part of the finance charge (the $25 credit report fee) and reduced by any prepaid finance charges (the $50 loan fee, not the $10 service charge) to arrive at the amount financed of $5,000 + $25 - $50 = $4,975.

## Other Calculations

The financial institution may treat the $10 service charge as a prepaid finance charge. If it does, the loan principal would be $5,010. The $5,010 loan principal does not include the $400 precomputed finance charge. The loan principal is increased by other amounts that are financed which are not part of the finance charge (the $25 credit report fee) and reduced by any prepaid finance charges (the $50 loan fee and the $10 service charge withheld from loan proceeds) to arrive at the same amount financed of $5,010 + $25 - $50 - $10 = $4,975.

# CFPB Consumer
# Laws and Regulations                                    TILA

**Closed-End Credit: Finance Charge Accuracy Tolerances**



\* See 15 U.S.C. 160 (aa)

# CFPB Consumer
# Laws and Regulations                                    **TILA**

**Closed-End Credit: Accuracy and Reimbursement Tolerances for
UNDERSTATED FINANCE CHARGES**



# CFPB Consumer
# Laws and Regulations

**TILA**

**Closed-End Credit: Accuracy Tolerances for**
**OVERSTATED FINANCE CHARGES**



# CFPB Consumer
# Laws and Regulations

**TILA**

## Closed-End Credit: Accuracy Tolerances for OVERSTATED APRs



# CFPB Consumer
# Laws and Regulations
# TILA

**Closed-End Credit: Accuracy and Reimbursement Tolerances for UNDERSTATED APRs**



# CFPB Consumer
# Laws and Regulations

# TILA

## Refinancings – Section 1026.20

When an obligation is satisfied and replaced by a new obligation to the original financial institution (or a holder or servicer of the original obligation) and is undertaken by the same consumer, it must be treated as a refinancing for which a complete set of new disclosures must be furnished. A refinancing may involve the consolidation of several existing obligations, disbursement of new money to the consumer, or the rescheduling of payments under an existing obligation. In any form, the new obligation must completely replace the earlier one to be considered a refinancing under the regulation. The finance charge on the new disclosure must include any unearned portion of the old finance charge that is not credited to the existing obligation. (§1026.20(a))

The following transactions are not considered refinancings even if the existing obligation is satisfied and replaced by a new obligation undertaken by the same consumer:

- A renewal of an obligation with a single payment of principal and interest or with periodic interest payments and a final payment of principal with no change in the original terms.

- An APR reduction with a corresponding change in the payment schedule.

- An agreement involving a court proceeding.

- Changes in credit terms arising from the consumer's default or delinquency.

- The renewal of optional insurance purchased by the consumer and added to an existing transaction, if required disclosures were provided for the initial purchase of the insurance.

However, even if it is not accomplished by the cancellation of the old obligation and substitution of a new one, a new transaction subject to new disclosures results if the financial institution:

- Increases the rate based on a variable rate feature that was not previously disclosed; or

- Adds a variable rate feature to the obligation.

If, at the time a loan is renewed, the rate is increased, the increase is not considered a variable rate feature. It is the cost of renewal, similar to a flat fee, as long as the new rate remains fixed during the remaining life of the loan. If the original debt is not canceled in connection with such a renewal, the regulation does not require new disclosures. Also, changing the index of a variable rate transaction to a comparable index is not considered adding a variable rate feature to the obligation.

# CFPB Consumer
# Laws and Regulations

# TILA

## Advertising – Sections 1026.16 & 1026.24

The regulation requires that loan product advertisements provide accurate and balanced information, in a clear and conspicuous manner, about rates, monthly payments, and other loan features. The advertising rules ban several deceptive or misleading advertising practices, including representations that a rate or payment is "fixed" when in fact it can change.

### Advertising Rules for Open-End Plans – Section 1026.16

If an advertisement for credit states specific credit terms, it must state only those terms that actually are or will be arranged or offered by the creditor. If any finance charges or other charges are set forth in an advertisement, the advertisement must also clearly and conspicuously state the following:

- Any minimum, fixed, transaction, activity or similar charge that is a finance charge under section 1026.4 that could be imposed;

- Any periodic rate that may be applied expressed as an APR as determined under section 1026.14(b). If the plan provides for a variable periodic rate, that fact must be disclosed; and

- Any membership or participation fee that could be imposed.

If any finance charges or other charge or payment terms are set forth, affirmatively or negatively, in an advertisement for a home-equity plan subject to the requirements of section 1026.40, the advertisement also must clearly and conspicuously set forth the following:

- Any loan fee that is a percentage of the credit limit under the plan and an estimate of any other fees imposed for opening the plan, stated as a single dollar amount or a reasonable range;

- Any periodic rate used to compute the finance charge, expressed as an APR as determined under section 1026.14(b); and

- The maximum APR that may be imposed in a variable-rate plan.

Regulation Z's open-end home-equity plan advertising rules include a clear and conspicuous standard for home-equity plan advertisements, consistent with the approach taken in the advertising rules for consumer leases under Regulation M. Commentary provisions clarify how the clear and conspicuous standard applies to advertisements of home-equity plans with promotional rates or payments, and to Internet, television, and oral advertisements of home-equity plans. The regulation allows alternative disclosures for television and radio advertisements for home-equity plans. The regulation also requires that advertisements adequately disclose not only promotional plan terms, but also the rates or payments that will apply over the term of the plan.

# CFPB Consumer
# Laws and Regulations                                    **TILA**

Regulation Z also contains provisions implementing the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which requires disclosure of the tax implications of certain home-equity plans.

## Closed-End Advertising – Section 1026.24

If an advertisement for credit states specific credit terms, it must state only those terms that actually are or will be arranged or offered by the creditor.

Disclosures required by this section must be made "clearly and conspicuously." To meet this standard in general, credit terms need not be printed in a certain type size nor appear in any particular place in the advertisement. For advertisements for credit secured by a dwelling, a clear and conspicuous disclosure means that the required information is disclosed with equal prominence and in close proximity to the advertised rates or payments triggering the required disclosures.

If an advertisement states a rate of finance charge, it must state the rate as an "annual percentage rate," using that term. If the APR may be increased after consummation, the advertisement must state that fact.

If an advertisement is for credit *not* secured by a dwelling, the advertisement must not state any other rate, except that a simple annual rate or periodic rate that is applied to an unpaid balance may be stated in conjunction with, but not more conspicuously than, the APR.

If an advertisement is for credit secured by a dwelling, the advertisement must not state any other rate, except that a simple annual rate that is applied to an unpaid balance may be stated in conjunction with, but not more conspicuously than, the APR. That is, an advertisement for credit secured by a dwelling may not state a periodic rate, other than a simple annual rate, that is applied to an unpaid balance.

 "Triggering terms" - The following are triggering terms that require additional disclosures:

- The amount or percentage of any down payment;

- The number of payments or period of repayment;

- The amount of any payment; and

- The amount of any finance charge.

An advertisement stating a triggering term must also state the following terms as applicable:

- The amount or percentage of any down payment;

- The terms of repayment, which reflect the repayment obligations over the full term of the loan, including any balloon payment; and

# CFPB Consumer
# Laws and Regulations                                    **TILA**

- The "annual percentage rate," using that term, and, if the rate may be increased after consummation, that fact.

For any advertisement secured by a dwelling, other than television or radio advertisements, that states a simple annual rate of interest and more than one simple annual rate of interest will apply over the term of the advertised loan, the advertisement must state in a clear and conspicuous manner:

- Each simple rate of interest that will apply. In variable-rate transactions, a rate determined by adding an index and margin must be disclosed based on a reasonably current index and margin.

- The period of time during which each simple annual rate of interest will apply.

- The APR for the loan.

The regulation prohibits the following seven deceptive or misleading acts or practices in advertisements for closed-end mortgage loans:

- Stating that rates or payments for loans are "fixed" when those rates or payments can vary without adequately disclosing that the interest rate or payment amounts are "fixed" only for a limited period of time, rather than for the full term of the loan;

- Making comparisons between actual or hypothetical credit payments or rates and any payment or rate available under the advertised product that are not available for the full term of the loan, with certain exceptions for advertisements for variable rate products;

- Characterizing the products offered as "government loan programs," "government-supported loans," or otherwise endorsed or sponsored by a federal or state government entity even though the advertised products are not government-supported or -sponsored loans;

- Displaying the name of the consumer's current mortgage lender, unless the advertisement also prominently discloses that the advertisement is from a mortgage lender not affiliated with the consumer's current lender;

- Making claims of debt elimination if the product advertised would merely replace one debt obligation with another;

- Creating a false impression that the mortgage broker or lender is a "counselor" for the consumer; and

- In foreign-language advertisements, providing certain information, such as a low introductory "teaser" rate, in a foreign language, while providing required disclosures only in English.

# CFPB Consumer Laws and Regulations

# TILA

## Subpart D – Miscellaneous

### Civil Liability - TILA Sections 130 and 131

If a creditor fails to comply with any requirements of the TILA, other than with the advertising provisions of chapter 3, it may be held liable to the consumer for

- actual damage, and.

- cost of any successful legal action together with reasonable attorney's fees.

The creditor also may be held liable for any of the following:

- In an individual action, twice the amount of the finance charge involved.

- In an individual action relating to an open-end credit transaction that is not secured by real property or a dwelling, twice the amount of the finance charge involved, with a minimum of $500 and a maximum of $5,000 or such higher amount as may be appropriate in the case of an established pattern or practice of such failure.

- In an individual action relating to a closed-end credit transaction secured by real property or a dwelling, not less than $400 and not more than $4,000.

- In a class action, such amount as the court may allow (with no minimum recovery for each class member). However, the total amount of recovery in any class actions arising out of the same failure to comply by the same creditor cannot be more than $500,000[9] or 1 percent of the creditor's net worth, whichever is less.

A creditor that fails to comply with section 129 of TILA, 15 U.S.C. §1639, (requirements for certain mortgages which include high-cost mortgage loans under 1026.32(a)) may be held liable to the consumer for all finance charges and fees paid by the consumer unless the creditor demonstrates that the failure was not material. Generally, civil actions that may be brought against a creditor may be maintained against any assignee of the creditor only if the violation is apparent on the face of the disclosure statement or other documents assigned, except where the assignment was involuntary. For high-cost mortgage loans (under section 1026.32(a)), any subsequent purchaser or assignee is subject to all claims and defenses that the consumer could assert against the creditor, unless the assignee demonstrates that it could not reasonably have determined that the loan was a high-cost mortgage loan subject to section 1026.32.

In specified circumstances, the creditor or assignee has no liability if it corrects identified errors within 60 days of discovering the errors and prior to the institution of a civil action or the receipt of written notice of the error from the obligor. Additionally, a creditor and assignee will not be

---

[9] Effective January 21, 2013, this dollar figure changes to $1,000,000.  *See* Pub. L. 111-203, approved July 21, 2010; 124 Stat. 2153, §1416. (http://www.gpo.gov/fdsys/pkg/PLAW-111publ203/pdf/PLAW-111publ203.pdf);

# CFPB Consumer
# Laws and Regulations                                    **TILA**

liable for bona fide errors that occurred despite the maintenance of procedures reasonably adapted to avoid any such error.

Refer to Sections 130 and 131 of TILA for more information.

## Criminal Liability — TILA Section 112

Anyone who willingly and knowingly fails to comply with any requirement of the TILA will be fined not more than $5,000 or imprisoned not more than one year, or both.

## Administrative Actions — TILA Section 108

The TILA authorizes federal regulatory agencies to require financial institutions to make monetary and other adjustments to the consumers' accounts when the true finance charge or APR exceeds the disclosed finance charge or APR by more than a specified accuracy tolerance. That authorization extends to unintentional errors, including isolated violations (e.g., an error that occurred only once or errors, often without a common cause, that occurred infrequently and randomly).

Under certain circumstances, the TILA requires federal regulatory agencies to order financial institutions to reimburse consumers when understatement of the APR or finance charge involves:

- Patterns or practices of violations (e.g., errors that occurred, often with a common cause, consistently or frequently, reflecting a pattern with a specific type or types of consumer credit).

- Gross negligence.

- Willful noncompliance intended to mislead the person to whom the credit was extended.

Any proceeding that may be brought by a regulatory agency against a creditor may be maintained against any assignee of the creditor if the violation is apparent on the face of the disclosure statement or other documents assigned, except where the assignment was involuntary under section 131 (15 U.S.C. 1641).

## Relationship to State Law — TILA Section 111

State laws providing rights, responsibilities, or procedures for consumers or financial institutions for consumer credit contracts may be:

- Preempted by federal law;

- Not preempted by federal law; or

- Substituted in lieu of the TILA and Regulation Z requirements.

# CFPB Consumer
# Laws and Regulations                                    TILA

State law provisions are preempted to the extent that they contradict the requirements in the following chapters of the TILA and the implementing sections of Regulation Z:

- Chapter 1, "General Provisions," which contains definitions and acceptable methods for determining finance charges and annual percentage rates.

- Chapter 2, "Credit Transactions," which contains disclosure requirements, rescission rights, and certain credit card provisions.

- Chapter 3, "Credit Advertising," which contains consumer credit advertising rules and APR oral disclosure requirements.

For example, a state law would be preempted if it required a bank to use the terms "nominal annual interest rate" in lieu of "annual percentage rate."

Conversely, state law provisions are generally not preempted under federal law if they call for, without contradicting chapters 1, 2, or 3 of the TILA or the implementing sections of Regulation Z, either of the following:

- Disclosure of information not otherwise required. A state law that requires disclosure of the minimum periodic payment for open-end credit, for example, would not be preempted because it does not contradict federal law.

- Disclosures more detailed than those required. A state law that requires itemization of the amount financed, for example, would not be preempted, unless it contradicts federal law by requiring the itemization to appear with the disclosure of the amount financed in the segregated closed-end credit disclosures.

The relationship between state law and chapter 4 of the TILA ("Credit Billing") involves two parts. The first part is concerned with sections 161 (correction of billing errors) and 162 (regulation of credit reports) of the act; the second part addresses the remaining sections of chapter 4.

State law provisions are preempted if they differ from the rights, responsibilities, or procedures contained in sections 161 or 162. An exception is made, however, for state law that allows a consumer to inquire about an account and requires the bank to respond to such inquiry beyond the time limits provided by federal law. Such a state law would not be preempted for the extra time period.

State law provisions are preempted if they result in violations of sections 163 through 171 of chapter 4. For example, a state law that allows the card issuer to offset the consumer's credit-card indebtedness against funds held by the card issuer would be preempted, since it would violate 12 CFR 1026.12(d). Conversely, a state law that requires periodic statements to be sent more than 14 days before the end of a free-ride period would not be preempted, since no violation of federal law is involved.

# CFPB Consumer
# Laws and Regulations                               TILA

A bank, state, or other interested party may ask the CFPB to determine whether state law contradicts chapters 1 through 3 of the TILA or Regulation Z. They also may ask if the state law is different from, or would result in violations of, chapter 4 of the TILA and the implementing provisions of Regulation Z. If the CFPB determines that a disclosure required by state law (other than a requirement relating to the finance charge, APR, or the disclosures required under section 1026.32) is substantially the same in meaning as a disclosure required under the act or Regulation Z, generally creditors in that state may make the state disclosure in lieu of the federal disclosure.

# Subpart E — Special Rules for Certain Home Mortgage Transactions

## General Rules — Section 1026.31

The requirements and limitations of this subpart are in addition to and not in lieu of those contained in other subparts of Regulation Z. The disclosures for high cost and reverse mortgage transactions must be made clearly and conspicuously in writing, in a form that the consumer may keep and in compliance with specific timing requirements.

## Credit Subject to — Section 1026.32

The requirements of this section apply to a consumer credit transaction secured by the consumer's principal dwelling, in which either:

- The APR at consummation will exceed by more than 8 percentage points for first-lien mortgage loans, or by more than 10 percentage points for subordinate-lien mortgage loans, the yield on Treasury securities having comparable periods of maturity to the loan's maturity (as of the 15th day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor); or

- The total points and fees (see definition below) payable by the consumer at or before loan closing will exceed the greater of eight percent of the total loan amount or $611 for the calendar year 2012. This dollar amount is adjusted annually based on changes in the Consumer Price Index. See staff commentary to 1026.32(a)(1)(ii) for a historical list of dollar amount adjustments. (§1026.32(a)(1))

**Exemptions to the Requirements of 1026.32:**

- Residential mortgage transactions (generally purchase money mortgages);

- Reverse mortgage transactions subject to section 1026.33; or

- Open-end credit plans subject to Subpart B of Regulation Z.

# CFPB Consumer
# Laws and Regulations                                    TILA

**Points and fees include the following:**

- All items required to be disclosed under section 1026.4(a) and (b), except interest or the time-price differential;

- All compensation paid to mortgage brokers; and

- All items listed in section 1026.4(c)(7), other than amounts held for future taxes, <u>unless all of the following conditions are met</u>:

  ○ The charge is reasonable;

  ○ The creditor receives no direct or indirect compensation in connection with the charge; and

  ○ The charge is not paid to an affiliate of the creditor; and

- Premiums or other charges paid at or before closing whether paid in cash or financed, for optional credit life, accident, health, or loss-of-income insurance, and other debt-protection or debt cancellation products written in connection with the credit transaction. (§1026.32(b)(1))

## Prohibited Acts or Practices in Connection with Credit Subject to Section 1026.32 — Section 1026.34

Among other requirements, a creditor extending mortgage credit subject to section 1026.32 ("high-cost" mortgage loans) must not make such loans based on the value of the consumer's collateral without regard to the consumer's repayment ability as of consummation, including *mortgage-related obligations* (§1026.34(a)(4)).

- Mortgage-related obligations are expected property taxes, premiums for mortgage-related insurance required by the creditor, and similar expenses (§1026.34(a)(4)(i)).

- A creditor must also verify amounts of income or assets that it relies on to determine repayment ability using tax returns, payroll receipts, financial institution records, or other third-party documents that provide reasonably reliable evidence of the consumer's income or assets (§1026.34(a)(4)(ii)).

- A creditor must also verify the consumer's current obligations. (§1026.34(a)(4)(ii)(C))

A presumption of compliance is available for some transactions, but only if the creditor:

- Verifies the consumer's repayment ability as required;

- Determines the consumer's repayment ability using the largest payment of principal and interest scheduled in the first seven years following consummation and taking into account current obligations and mortgage-related obligations; and

# CFPB Consumer
# Laws and Regulations                                    **TILA**

- Assesses the consumer's repayment ability taking into account either the ratio of total debts to income or the income the consumer will have after paying debt obligations (§1026.34(a)(4)(iii)).

For high-cost mortgage loans, the regulation prohibits the imposition of prepayment penalties under certain circumstances, and in no case may a penalty be imposed after two years following consummation.

The regulation prohibits prepayment penalties at any time for high-cost mortgage if:

- Other applicable law (e.g., state law) prohibits such penalty;

- The penalty applies where the source of the prepayment funds is a refinancing by the same mortgage lender or an affiliate;

- The consumer's mortgage payment can change during the first four years of the loan term *(applicable only to loans originated on or after October 1, 2009)*; or,

- The consumer's total monthly debt payments (at consummation), including amounts owed under the mortgage, exceed 50 percent of the consumer's monthly gross income.

The regulation prohibits creditors from structuring a home-secured loan as an open-end plan to evade these requirements.

## Reverse Mortgages — Section 1026.33

A reverse mortgage is a non-recourse transaction secured by the consumer's principal dwelling which ties repayment (other than upon default) to the homeowner's death or permanent move from, or transfer of the title of, the home.

## Higher-Priced Mortgage Loans — Section 1026.35

A mortgage loan subject to section 1026.35 ("*higher-priced mortgage loan*") is a consumer credit transaction secured by the consumer's principal dwelling with an APR that exceeds the *average prime offer rate* for a comparable transaction as of the date the interest rate is set by:

- 1.5 or more percentage points for loans secured by a first lien on a dwelling, or

- 3.5 or more percentage points for loans secured by a subordinate lien on a dwelling.

*Average prime offer* rate means an APR that is derived from average interest rates, points, and other loan pricing terms currently offered to consumers by a representative sample of creditors for mortgage transactions that have low-risk pricing characteristics. The CFPB publishes average prime offer rates for a broad range of types of transactions in a table updated at least weekly, as well as the methodology it uses to derive these rates. These rates are available on the website of the Federal Financial Institutions Examination Council.

# CFPB Consumer
# Laws and Regulations                    TILA

A higher-priced mortgage loan does not include:

- a transaction to finance the initial construction of a dwelling,

- a temporary "bridge" loan with a term of 12 months or less,

- a reverse mortgage subject to section 1026.33, or

- a home equity line of credit subject to section 1026.40.

Additionally, creditors extending higher-priced mortgages must verify a consumer's ability to pay, consistent with the requirements for high-cost mortgages under section 1026.34, referenced above. (§1026.35(b))

The regulation prohibits prepayment penalties <u>at any time</u> for higher-priced mortgage loans if:

- Other applicable law (e.g., state law) prohibits such penalty;

- The penalty will apply after the two-year period following consummation;

- The source of the prepayment funds is a refinancing by the same mortgage lender or an affiliate; or,

- The consumer's mortgage payment can change during the first four years of the loan term.

The regulation prohibits creditors from structuring a home-secured loan as an open-end plan to evade these requirements.

With few exceptions, a creditor may not extend a higher-priced mortgage loan, including a high-cost mortgage loan that also meets the definition of a higher-priced mortgage loan, secured by a first lien on a principal dwelling unless an escrow account is established before consummation for payment of property taxes and premiums for mortgage-related insurance required by the creditor. The exceptions involve loans secured by shares in a cooperative or condominium units where the condominium association has an obligation to maintain a master insurance policy. Additionally, a "jumbo" loan secured by a first lien is not subject to the escrow requirement unless its APR rate exceeds the average prime offer rate for a comparable transaction as of the date the interest rate is set by 2.5 or more percentage points. A "jumbo" loan is a transaction with a principal obligation at consummation that exceeds the limit in effect for the maximum principal obligation eligible for purchase by Freddie Mac. (§1026.35(b)(3)(v))

A creditor may allow a consumer to cancel the escrow account one year after consummation if a consumer's written cancellation request is received no earlier than 365 days after consummation.

# CFPB Consumer
# Laws and Regulations

**TILA**

## Prohibited Acts or Practices in Connection with Credit Secured by a Consumer's Dwelling – Section 1026.36

### Loan Servicing Practices

Companies that service mortgage loans are prohibited from engaging in certain practices, such as pyramiding late fees. In addition, servicers are required to credit consumers' loan payments as of the date of receipt and provide a payoff statement within a reasonable time of request.

Specifically, for a consumer credit transaction secured by a consumer's principal dwelling, a loan servicer cannot:

- Fail, with limited exception, to credit a payment to the consumer's loan account as of the date of receipt;

- Impose on the consumer any late fee or delinquency charge in connection with a timely payment made in full, when the only delinquency is attributable to late fees or delinquency charges assessed on an earlier payment; or

- Fail to provide, within a reasonable time after receiving a request from the consumer or person acting on behalf of the consumer, an accurate statement of the total outstanding balance that would be required to satisfy the consumer's obligations in full as of a specific date.

## Loan Originator Compensation

To protect borrowers in the residential mortgage market, certain unfair practices relating to compensation of mortgage brokers and other loan originators are prohibited.

The term ''loan originator'' means, with respect to a particular transaction, a person who for compensation or other monetary gain, or in expectation of compensation or other monetary gain, arranges, negotiates, or otherwise obtains an extension of consumer credit for another person.

Loan originators include mortgage broker companies, including those companies that close loans in their own names in table-funded transactions, and loan officers and other employees of creditors that originate loans. Creditors are not considered to be loan originators unless they use table funding, otherwise fail to provide the funds for the transaction out of the creditor's own resources (including a bona fide warehouse line of credit), or function as a mortgage broker in the transaction.

Loan originators cannot:

- Receive, and no person can pay directly or indirectly, compensation based on a loan's terms or conditions other than the loan amount (and then only provided that such compensation is based on a fixed percentage of the loan amount);

- Receive compensation, directly or indirectly, from a creditor or another party for a loan when a consumer directly pays the loan originator's compensation; or

# CFPB Consumer
# Laws and Regulations                                    TILA

- Direct or "steer" a consumer to a loan t`hat is not in a consumer's interest to increase the loan originator's compensation.

NOTE: In addition to the requirements that loan originators cannot receive compensation from a creditor or another party when a consumer directly pays the loan originator, 1026.36(d)(2)(ii) prohibits a person from compensating a loan originator when that person "knows or has reason to know" that the consumer has paid compensation to the loan originator.

A loan originator can obtain a "safe harbor" for compliance with the anti-steering requirement (but not the compensation provisions) by obtaining loan options from a significant number of the creditors with which the loan originator regularly does business and, for each loan type in which the consumer has expressed interest, presenting the consumer with loan options for which the loan originator believes in good faith the consumer likely qualifies, that include all of the following:

1) The loan with the lowest interest rate;

2) The loan with the lowest interest rate without any risky features (such as prepayment penalties, negative amortization, or a balloon payment in the first seven years); and

3) The loan with the lowest total dollar amount for origination points or fees and discount points.

The loan originator compensation provisions do not apply to open-end home-equity lines of credit or to loans secured by a consumer's interest in a time-share plan.

## Notification of Sale or Transfer of Mortgage Loans – Section 1026.39

Notice of new owner – No later than 30 calendar days after the date on which a mortgage loan is acquired by or otherwise sold, assigned, or otherwise transferred[10] to a third party, the "covered person"[11] shall notify the consumer clearly and conspicuously in writing, in a form that the consumer may keep, of such transfer and include:

- Identification of the loan that was sold, assigned, or otherwise transferred;

- Name, address, and telephone number of the covered person ;

---

[10] The date of transfer to the covered person may, at the covered person's option, be either the date of acquisition recognized in the books and records of the acquiring party or the date of transfer recognized in the books and records of the transferring party.

[11] A "covered person" means any person, as defined in 12 CFR 1026.2(a)(22), that becomes the owner of an existing mortgage loan by acquiring legal title to the debt obligation, whether through a purchase, assignment, or other transfer, and who acquires more than one mortgage loan in any 12-month period. For purposes of this section, a servicer of a mortgage loan shall not be treated as the owner of the obligation if the servicer holds title to the loan or it is assigned to the servicer solely for the administrative convenience of the servicer in servicing the obligation. *See* 12 CFR 1026.39(a)(1).

# CFPB Consumer
# Laws and Regulations
# TILA

- Date of transfer;

- Name, address, and telephone number of an agent or party having authority, on behalf of the covered person, to receive notice of the right to rescind and resolve issues concerning the consumer's payments on the mortgage loan;

- Location where transfer of ownership of the debt to the covered person is or may be recorded in public records or, alternatively, that the transfer of ownership has not been recorded in public records at the time the disclosure is provided; and

- At the option of the covered person, any other information regarding the transaction.

This notice of sale or transfer must be provided for any consumer credit transaction that is secured by the principal dwelling of a consumer. Thus, it applies to both closed-end mortgage loans and open-end home equity lines of credit. This notification is required of the covered person even if the loan servicer remains the same.

Regulation Z also establishes special rules regarding the delivery of the notice when there is more than one covered person. In a joint acquisition of a loan, the covered persons must provide a single disclosure that lists the contact information for all covered persons. However, if one of the covered persons is authorized to receive a notice of rescission and to resolve issues concerning the consumer's payments, the disclosure may state contact information only for that covered person. In addition, if the multiple covered persons each acquire a partial interest in the loan pursuant to separate and unrelated agreements, they may provide either a single notice or separate notices. Finally, if a covered person acquires a loan and subsequently transfers it to another covered person, a single notice may be provided on behalf of both of them, as long as the notice satisfies the timing and content requirements with respect to each of them.

In addition, there are three exceptions to the notice requirement to provide the notice of sale or transfer:

- The covered person sells, assigns, or otherwise transfers legal title to the mortgage loan on or before the 30th calendar day following the date of transfer on which it acquired the mortgage loan;

- The mortgage loan is transferred to the covered person in connection with a repurchase agreement that obligates the transferring party to repurchase the mortgage loan (unless the transferring party does not repurchase the mortgage loan); or

- The covered person acquires only a partial interest in the mortgage loan and the agent or party authorized to receive the consumer's rescission notice and resolve issues concerning the consumer's payments on the mortgage loan does not change as a result of that transfer.

# CFPB Consumer
# Laws and Regulations                                        TILA

## Valuation Independence – Section 1026.42

Regulation Z seeks to ensure that real estate appraisers, and others preparing valuations, are free to use their independent professional judgment in assigning home values without influence or pressure from those with interests in the transactions. Regulation Z also seeks to ensure that appraisers receive customary and reasonable payments for their services. Regulation Z's valuation rules apply to creditors and settlement services providers for consumer credit transactions secured by the consumer's principal dwelling ("covered transaction") and includes several provisions that protect the integrity of the appraisal process when a consumer's principal dwelling is securing the loan. In general, the rule prohibits "covered persons" from engaging in coercion, bribery, and other similar actions designed to cause anyone who prepares a valuation to base the value of the property on factors other than the person's independent judgment.[12] More specifically, Regulation Z:

- Prohibits coercion and other similar actions designed to cause appraisers to base the appraised value of properties on factors other than their independent judgment;

- Prohibits appraisers and appraisal management companies hired by lenders from having financial or other interests in the properties or the credit transactions;

- Prohibits creditors from extending credit based on appraisals if they know beforehand of violations involving appraiser coercion or conflicts of interest, unless the creditors determine that the values of the properties are not materially misstated;

- Prohibits a person that prepares a valuation from materially misrepresenting the value of the consumer's principal dwelling, and prohibits a covered person other than the person that prepares valuations from materially altering a valuation. A misrepresentation or alteration is material if it is likely to significantly affect the value assigned to the consumer's principal dwelling;

- Prohibits any covered person from falsifying a valuation or inducing a misrepresentation, falsification, or alteration of value;

- Requires that creditors or settlement service providers that have information about appraiser misconduct file reports with the appropriate state licensing authorities if the misconduct is material (i.e., likely to significantly affect the value assigned to the consumer's principal dwelling; and

---

[12] This section applies to any consumer credit transaction secured by the consumer's principal dwelling. A ``covered person'' means a creditor with respect to a covered transaction or a person that provides ``settlement services,'' as defined in 12 U.S.C. 2602(3) and implementing regulations, in connection with a covered transaction. A ``covered transaction'' means an extension of consumer credit that is or will be secured by the consumer's principal dwelling, as defined in 12 CFR 1026.2(a)(19).

# CFPB Consumer Laws and Regulations

# TILA

- Requires the payment of reasonable and customary compensation to appraisers who are not employees of the creditors or of the appraisal management companies hired by the creditors.

# Subpart F — Special Rules for Private Education Loans

## Special Disclosure Requirements for Private Education Loans — Section 1026.46

The disclosures required under Subpart F apply only to private education loans. Except where specifically provided otherwise, the requirements and limitations of Subpart F are in addition to the requirements of the other subparts of Regulation Z.

A private education loan means an extension of credit that:

- Is not made, insured, or guaranteed under title IV of the Higher Education Act of 1965;

- Is extended to a consumer expressly, in whole or part, for postsecondary educational expenses, regardless of whether the loan is provided by the educational institution that the student attends; and

- Does not include open-end credit or any loan that is secured by real property or a dwelling.

A private education loan does not include an extension of credit in which the covered educational institution is the creditor if:

- The term of the extension of credit is 90 days or less, or

- An interest rate will not be applied to the credit balance and the term of the extension of credit is one year or less, even if the credit is payable in more than four installments.

## Content of Disclosures — Section 1026.47

### Disclosure Requirements

This section establishes the content that a creditor must include in its disclosures to a consumer at three different stages in the private education loan origination process:

1) Application or Solicitation Disclosures – With any application or solicitation;

2) Approval Disclosures – With any notice of approval of the private education loan; and

3) Final Disclosures – After the consumer accepts the loan. In addition, section 1026.48(d) requires that the disclosures must be provided at least three business days prior to disbursement of the loan funds.

# CFPB Consumer
# Laws and Regulations                                    TILA

**Rights of the Consumer**

The creditor must disclose that, if approved for the loan, the consumer has the right to accept the loan on the terms approved for up to 30 calendar days. The disclosure must inform the consumer that the rate and terms of the loan will not change during this period, except for changes to the rate based on adjustments to the index used for the loan and other changes permitted by law. The creditor must disclose that the consumer also has the right to cancel the loan, without penalty, until midnight of the third business day following the date on which the consumer receives the final disclosures.

## Limitations on Private Educational Loans — Section 1026.48

This section contains rules and limitations on private education loans, including:

1) A prohibition on co-branding in the marketing of private education loans;

2) Rules governing the 30-day acceptance period and three business-day cancellation period and prohibition on disbursement of loan proceeds until the cancellation period has expired;

3) The requirement that the creditor obtain a self-certification form from the consumer before consummation; and

4) The requirement that creditors in preferred lender arrangements provide certain information to covered educational institutions.

**Co-Branding Prohibited**

Regulation Z prohibits creditors from using the name, emblem, mascot, or logo of a covered institution (or other words, pictures, or symbols readily identified with a covered institution) in the marketing of private education loans in a way that implies endorsement by the educational institution. Marketing that refers to an educational institution does not imply endorsement if the marketing includes a clear and conspicuous disclosure that is equally prominent and closely proximate to the reference to the institution that the educational institution does not endorse the creditor's loans, and that the creditor is not affiliated with the educational institution. There is also an exception in cases where the educational institution actually does endorse the creditor's loans, but the marketing must make a clear and conspicuous disclosure that is equally prominent and closely proximate to the reference to the institution that the creditor, and not the educational institution, is making the loan.

# CFPB Consumer Laws and Regulations

# TILA

## Subpart G - Special Rules Applicable To Credit Card Accounts and Open-End Credit Offered To College Students

### Evaluation of the Consumer's Ability to Pay — Section 1026.51

Regulation Z requires credit card issuers to consider a consumer's independent ability to pay before opening a new credit card account or increasing the credit limit for an existing credit card account. Additionally, the rule provides specific requirements that must be met before opening a new credit card account or increasing the credit limit on an existing account when the consumer is under the age of 21.

When evaluating a consumer's ability to pay, credit card issuers must perform a review of a consumer's independent income or assets and current obligations. Creditors are permitted, however, to rely on information provided by the consumer. The rule does not require issuers to verify a consumer's statements; a creditor may base its determination of ability to repay on facts and circumstances known to the card issuer (Comment 51(a)(1)(i)-2). A card issuer may also consider information obtained through any empirically derived, demonstrably and statistically sound model that reasonably estimates a consumer's income or assets.

The rule also requires that issuers consider at least one of the following:

- The ratio of debt obligations to income;

- The ratio of debt obligations to assets; or

- The income the consumer will have after paying debt obligations (i.e., residual income).

The rule also provides that it would be unreasonable for an issuer not to review any information about a consumer's income, assets, or current obligations, or to issue a credit card to a consumer who does not have any income or assets.

Because credit card accounts typically require consumers to make a minimum monthly payment that is a percentage of the total balance (plus, in some cases, accrued interest and fees), creditors are required to consider the consumer's ability to make the required minimum payments. Card issuers must also establish and maintain reasonable written policies and procedures to consider a consumer's income or assets and current obligations. Because the minimum payment is unknown at account opening, the rule requires that creditors use a reasonable method to estimate a consumer's minimum payment. The regulation provides a safe harbor for issuers to estimate the required minimum periodic payment if the card issuer:

1. Assumes utilization, from the first day of the billing cycle, of the full credit line that the issuer is considering offering to the consumer; and

# CFPB Consumer
# Laws and Regulations                                            TILA

2. Uses a minimum payment formula employed by the issuer for the product the issuer is considering offering to the consumer or, in the case of an existing account, the minimum payment formula that currently applies to that account, provided that:

    (a) If the minimum payment formula includes interest charges, the card issuer estimates those charges using an interest rate that the issuer is considering offering to the consumer for purchases or, in the case of an existing account, the interest rate that currently applies to purchases; and

    (b) If the applicable minimum payment formula includes mandatory fees, the card issuer must assume that such fees have been charged to the account.

## Specific Requirements for Underage Consumers — Section 1026.51(b)(1)

Regulation Z prohibits the issuance of a credit card to a consumer who has not attained the age of 21 unless the consumer has submitted a written application and the creditor has:

- Information indicating that the underage consumer has an independent ability to make the required minimum payments on the account; or

- The signature of a cosigner, guarantor, or joint applicant who has attained the age of 21, who has the means to repay debts incurred by the underage consumer in connection with the account, and who assumes joint liability for all debts or secondary liability for any debts incurred before the underage consumer attains 21 years of age.

If the account is opened based on a cosigner's ability to pay, the issuer must also obtain written consent from the cosigner before increasing the credit limit.

## Limitations of Fees — Section 1026.52

### Limitations on Fees During First Year After Account Opening — Section 1026.52(a)

During the first year after account opening, issuers are prohibited from requiring consumers to pay fees (other than fees for late payments, returned payments, and exceeding the credit limit) that in the aggregate exceed 25 percent of the initial credit limit in effect when the account is opened. An account is considered open no earlier than the date on which the account may first be used by the consumer to engage in transactions.

NOTE: On September 23, 2011, a federal district court issued a preliminary injunction affecting § 1026.52(a). *See First Premier Bank, et al. v. United States Consumer Financial Protection Bureau, et al.*, 819 F. Supp. 2d 906 (D.S.D. Sept. 23, 2011). In light of this litigation, the CFPB has proposed amendments to Regulation Z, withdrawing a provision of the rule that includes fees assessed to consumers prior to account opening in the 25 percent limitation. The Agencies will not count fees paid prior to account opening toward the 25 percent limitation.

# CFPB Consumer
# Laws and Regulations                                    TILA

**Limitations on Penalty Fees — Section 1026.52(b)**

TILA requires that penalty fees imposed by card issuers be reasonable and proportional to the
violation of the account terms. Among other things, the regulation prohibits credit card issuers
from charging a penalty fee of more than $25 for paying late or otherwise violating the account's
terms for the first violation (or $35 for an additional violation of the same type during the same
billing cycle or one of the next six billing cycles) unless the issuer determines that a higher fee
represents a reasonable proportion of the costs it incurs as a result of that type of violation and
reevaluates that determination at least once every 12 months.

Credit card issuers are banned from charging penalty fees that exceed the dollar amount
associated with the consumer's violation of the terms or other requirements of the credit card
account. For example, card issuers are no longer permitted to charge a $39 fee when a consumer
is late making a $20 minimum payment. Instead, in this example, the fee cannot exceed $20. The
regulation also bans imposition of penalty fees when there is no dollar amount associated with
the violation, such as "inactivity" fees based on the consumer's failure to use the account to
make new purchases. It also prohibits issuers from charging multiple penalty fees based on a
single late payment or other violation of the account terms.

## Payment Allocation — Section 1026.53

When different rates apply to different balances on a credit card account, issuers are generally
required to allocate payments in excess of the minimum payment first to the balance with the
highest APR and any remaining portion to the other balances in descending order based on the
applicable APR.

For deferred interest programs, however, issuers must allocate excess payments first to the
deferred interest balance during the last two billing cycles of the deferred interest period. In
addition, during a deferred interest period, issuers are permitted (but not required) to allocate
excess payments in the manner requested by the consumer.

For accounts with secured balances, issuers are permitted (but not required) to allocate excess
payments to the secured balance if requested by the consumer.

## Double-Cycle Billing and Partial Grace Period — Section 1026.54

Issuers are generally prohibited from imposing finance charges on balances for days in previous
billing cycles as a result of the loss of a grace period. In addition, when a consumer pays some,
but not all, of a balance prior to the expiration of a grace period, an issuer is prohibited from
imposing finance charges on the portion of the balance that has been repaid.

# CFPB Consumer
# Laws and Regulations                                    TILA

## Restrictions on Applying Increased Rates to Existing Balances and Increasing Certain Fees and Charges – Section 1026.55

Unless an exception applies, a card issuer must not increase an annual percentage rate or a fee or charge required to be disclosed under sections 1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii) on a credit card account. There are some general exceptions to the prohibition against applying increased rates to existing balances and increasing certain fees or charges:

• A temporary or promotional rate or temporary fee or charge that lasts at least six months, and that is required to be disclosed under sections 1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii), provided that the card issuer complied with applicable disclosure requirements. Fees and charges required to be disclosed under sections 1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii) are periodic fees for issuance or availability of an open-end plan (such as an annual fee); a fixed finance charge (and any minimum interest charge) that exceeds $1; or a charge for required insurance, debt cancellation, or debt suspension;

• The rate is increased due to the operation of an index available to the general public and not under the card issuer's control (i.e., the rate is a variable rate);

• The minimum payment has not been received within 60 days after the due date, provided that the card issuer complied with applicable disclosure requirements and adheres to certain requirements when a series of on time payments are received;

• The consumer successfully completes or fails to comply with the terms of a workout arrangement, provided that card issuer complied with applicable disclosure requirements and adheres to certain requirements upon the completion or failure of the arrangement; and

• The APR on an existing balance or a fee or charge required to be disclosed under sections 1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii) has been reduced pursuant to the Servicemembers Civil Relief Act (SCRA) or a similar federal or state statute or regulation. The creditor is permitted to increase the rate, fee, or charge once the SCRA ceases to apply, but only to the rate, fee, or charge that applied prior to the reduction.

Regulation Z's limitations on the application of increased rates and certain fees and charges to existing balances continue to apply when the account is closed, acquired by another institution through a merger or the sale of a credit card portfolio, or when the balance is transferred to another credit account issued by the same creditor (or its affiliate or subsidiary).

Issuers are generally prevented from increasing the APR applicable to new transactions or a fee or charge subject to sections 1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii) during the first year after an account is opened. After the first year, issuers are permitted to increase the APRs that apply to new transactions or a fee or charge subject to sections 1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii) so long as the creditor complies with the regulation's 45-day advance notice requirement (§1026.9).

# CFPB Consumer
# Laws and Regulations                    TILA

Regulation Z's limitations on the application of increased rates to existing balances and limitations on the increase of certain fees or charges apply upon cessation of a waiver or rebate of interest, fees, or charges if the issuer promotes the waiver or rebate.

## Fees for Transactions that Exceed the Credit Limit — Section 1026.56

*Consumer consent requirement* – Regulation Z requires an issuer to obtain a consumer's express consent (or opt in) before the issuer may impose any fees on a consumer's credit card account for making an extension of credit that exceeds the account's credit limit. Prior to providing such consent, the consumer must be notified by the issuer of any fees that may be assessed for an over-the-limit transaction. If the consumer consents, the issuer is also required to provide written confirmation (or electronic confirmation if the consumer agrees) of the consumer's consent and a notice of the consumer's right to revoke that consent on the front page of any periodic statement that reflects the imposition of an over-the-limit fee.

Prior to obtaining a consumer's consent to the payment of over-the-limit transactions, the issuer must provide the consumer with a notice disclosing, among other things, the dollar amount of any charges that will be assessed for an over-the-limit transaction, as well as any increased rate that may apply if the consumer exceeds the credit limit. Issuers are prevented from assessing any over-the-limit fee or charge on an account unless the consumer consents to the payment of transactions that exceed the credit limit.

*Prohibited practices* – Even if the consumer has affirmatively consented to the issuer's payment of over-the-limit transactions, Regulation Z prohibits certain issuer practices in connection with the assessment of over-the-limit fees or charges. An issuer can only charge one over-the-limit fee or charge per billing cycle. In addition, an issuer cannot impose an over-the-limit fee on the account for the same transaction in more than three billing cycles. Furthermore, fees may not be imposed for the same transaction in the second or third billing cycle unless the consumer has failed to reduce the account balance below the credit limit by the payment due date in that cycle.

Regulation Z also prohibits unfair or deceptive acts or practices in connection with the manipulation of credit limits in order to increase over-the-limit fees or other penalty charges. Specifically, issuers are prohibited from engaging in three practices:

- Assessing an over-the-limit fee because the creditor failed to promptly replenish the consumer's available credit;

- Conditioning the amount of available credit on the consumer's consent to the payment of over-the-limit transactions (e.g., opting in to an over-the-limit service to obtain a higher credit limit); and

- Imposing any over-the-limit fee if the credit limit is exceeded solely because of the issuer's assessment of accrued interest charges or fees on the consumer's account.

# CFPB Consumer
# Laws and Regulations                                    TILA

## Special Rules for Marketing to Students – Section 1026.57

Regulation Z establishes several requirements related to the marketing of credit cards and other open-end consumer credit plans to students at an institution of higher education. The regulation limits a creditor's ability to offer a college student any tangible item to induce the student to apply for or participate in an open-end consumer credit plan offered by the creditor. Specifically, Regulation Z prohibits a card issuer from offering tangible items as an inducement:

- On the campus of an institution of higher education;

- Near the campus of an institution of higher education; or

- At an event sponsored by or related to an institution of higher education

A tangible item means physical items, such as gift cards, t-shirts, or magazine subscriptions, but does not include non-physical items such as discounts, reward points, or promotional credit terms. With respect to offers "near" the campus, the commentary to the regulation states that a location that is within 1,000 feet of the border of the campus is considered near the campus.

Regulation Z also requires card issuers to submit an annual report to the CFPB containing the terms and conditions of business, marketing, or promotional agreements with an institution of higher education or an alumni organization or foundation affiliated with an institution of higher education.

## Online Disclosure of Credit Card Agreements – Section 1026.58

The regulation requires that issuers post credit card agreements on their websites and to submit those agreements to the CFPB for posting on a website maintained by the CFPB. There are three exceptions for when issuers are not required to provide statements to the CFPB:

- The issuer has fewer than 10,000 open credit card accounts; or

- The agreement currently is not offered to the public and the agreement is used only for one or more private label credit card plans with credit cards usable only at a single merchant or group of affiliated merchants and that involves fewer than 10,000 open accounts; or

- The agreement currently is not offered to the public and the agreement is for one or more plans offered to test a new product offered only to a limited group of consumers for a limited time that involves fewer than 10,000 open accounts.

## Reevaluation of Rate Increases – Section 1026.59

For any rate increase imposed on or after January 1, 2009, that requires 45 days advance notice, the regulation requires card issuers to review the account no less frequently than once each six months and, if appropriate based on that review, reduce the annual percentage rate. The requirement to reevaluate rate increases applies both to increases in annual percentage rates based on consumer-specific factors, such as changes in the consumer's creditworthiness, and to

# CFPB Consumer
# Laws and Regulations

**TILA**

increases in annual percentage rates imposed based on factors that are not specific to the consumer, such as changes in market conditions or the issuer's cost of funds. If based on its review a card issuer is required to reduce the rate applicable to an account, the final regulation requires that the rate be reduced within 45 days after completion of the evaluation.

This review must consider either the same factors on which the increase was originally based or the factors the card issuer currently considers in determining the annual percentage rate applicable to similar new credit card accounts.

## Specific Defenses — TILA Section 108

### Defense Against Civil, Criminal, and Administrative Actions

A financial institution in violation of TILA may avoid liability by:

- Discovering the error before an action is brought against the financial institution, or before the consumer notifies the financial institution, in writing, of the error.

- Notifying the consumer of the error within 60 days of discovery.

- Making the necessary adjustments to the consumer's account, also within 60 days of discovery. (The consumer will pay no more than the lesser of the finance charge actually disclosed or the dollar equivalent of the APR actually disclosed.)

The above three actions also may allow the financial institution to avoid a regulatory order to reimburse the customer.

An error is "discovered" if it is:

- Discussed in a final, written report of examination.

- Identified through the financial institution's own procedures.

- An inaccurately disclosed APR or finance charge included in a regulatory agency notification to the financial institution.

When a disclosure error occurs, the financial institution is not required to re-disclose after a loan has been consummated or an account has been opened. If the financial institution corrects a disclosure error by merely re-disclosing required information accurately, without adjusting the consumer's account, the financial institution may still be subject to civil liability and an order to reimburse from its regulator.

The circumstances under which a financial institution may avoid liability under the TILA do not apply to violations of the Fair Credit Billing Act (chapter 4 of the TILA).

# CFPB Consumer
# Laws and Regulations                                      TILA

**Additional Defenses Against Civil Actions**

The financial institution may avoid liability in a civil action if it shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error that occurred despite the maintenance of procedures to avoid the error.

A bona fide error may include a clerical, calculation, computer malfunction, programming, or printing error. It does not include an error of legal judgment.

Showing that a violation occurred unintentionally could be difficult if the financial institution is unable to produce evidence that explicitly indicates it has an internal controls program designed to ensure compliance. The financial institution's demonstrated commitment to compliance and its adoption of policies and procedures to detect errors before disclosures are furnished to consumers could strengthen its defense.

## Statute of Limitations — TILA Sections 108 and 130

Civil actions may be brought within one year after the violation occurred. For private education loans, civil actions may be brought within one year from the date on which the first regular payment of principal and interest is due. After that time, and if allowed by state law, the consumer may still assert the violation as a defense if a financial institution were to bring an action to collect the consumer's debt.

Criminal actions are not subject to the TILA one-year statute of limitations.

Regulatory administrative enforcement actions also are not subject to the one-year statute of limitations. However, enforcement actions under the policy guide involving erroneously disclosed APRs and finance charges are subject to time limitations by the TILA. Those limitations range from the date of the last regulatory examination of the financial institution, to as far back as 1969, depending on when loans were made, when violations were identified, whether the violations were repeat violations, and other factors.

There is no time limitation on willful violations intended to mislead the consumer. A summary of the various time limitations follows.

- For open-end credit, reimbursement applies to violations not older than two years.

- For closed-end credit, reimbursement is generally directed for loans with violations occurring since the immediately preceding examination.

## Rescission Rights (Open-End and Closed-End Credit) — Sections 1026.15 & 1026.23

TILA provides that for certain transactions secured by the consumer's principal dwelling, a consumer has three business days after becoming obligated on the debt to rescind the transaction. The right of rescission allows consumer(s) time to reexamine their credit agreements and cost disclosures and to reconsider whether they want to place their homes at risk by offering it as

# CFPB Consumer
# Laws and Regulations                                          TILA

security for the credit. A higher-priced mortgage loan (whether or not it is a HOEPA loan) having a prepayment penalty that does not conform to the prepayment penalty limitations (§§1026.32(c) and (d) and §1026.35(b)(2)) is also subject to a three-year right of rescission. Transactions exempt from the right of rescission include residential mortgage transactions (§1026.2(a)(24)) and refinancings or consolidations with the original creditor where no "new money" is advanced.

If a transaction is rescindable, consumers must be given a notice explaining that the creditor has a security interest in the consumer's home, that the consumer may rescind, how the consumer may rescind, the effects of rescission, and the date the rescission period expires.

To rescind a transaction, a consumer must notify the creditor in writing by midnight of the third business day after the latest of three events:

- Consummation of the transaction,

- Delivery of material TILA disclosures, or

- Receipt[13] of the required notice of the right to rescind.

For purposes of rescission, business day means every calendar day except Sundays and the legal public holidays (§1026.2(a)(6)). The term "material disclosures" is defined in section 1026.23(a)(3) to mean the required disclosures of the APR, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in section 1026.32(c) and (d).

The creditor may not disburse any monies (except into an escrow account) and may not provide services or materials until the three-day rescission period has elapsed and the creditor is reasonably satisfied that the consumer has not rescinded. If the consumer rescinds the transaction, the creditor must refund all amounts paid by the consumer (even amounts disbursed to third parties) and terminate its security interest in the consumer's home.

A consumer may waive the three-day rescission period and receive immediate access to loan proceeds if the consumer has a "bona fide personal financial emergency." The consumer must give the creditor a signed and dated waiver statement that describes the emergency, specifically waives the right, and bears the signatures of all consumers entitled to rescind the transaction. The consumer provides the explanation for the bona fide personal financial emergency, but the creditor decides the sufficiency of the emergency.

---

[13] 12 CFR 1026.15(b) and 1026.23(b)(1) were amended to include the electronic delivery of the notice of the right to rescind. If a paper notice of the right to rescind is used, a creditor must deliver two copies of the notice to each consumer entitled to rescind. However, under the final rule on electronic delivery of disclosures if the notice is in electronic form, in accordance with the consumer consent and other applicable provisions of the E-Sign Act, only one copy to each customer is required.

# CFPB Consumer
# Laws and Regulations                           **TILA**

If the required rescission notice or material TILA disclosures are not delivered or if they are inaccurate, the consumer's right to rescind may be extended from three days after becoming obligated on a loan to up to three years.

# REFERENCES

## Laws

| | |
|---|---|
| 15 USC 1601 et seq. | Truth in Lending Act (TILA) |
| 15 USC 1666 et seq. | Fair Credit Billing Act |
| 15 USC 7001 et seq. | Electronic Signatures in Global and National Commerce Act |

## Regulations

**Consumer Financial Protection Bureau Regulation (12 CFR)**

| | |
|---|---|
| Part 1026 | Truth in Lending (Regulation Z) |

**CFPB**

# Examination Procedures                                              **TILA**

## Truth in Lending[1]

## Examination Objectives

| | |
|---|---|
| Exam Date: | [Click&type] |
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

1.  To appraise the quality of the financial institution's compliance management system for the Truth in Lending Act and Regulation Z.

2.  To determine the reliance that can be placed on the financial institution's compliance management system, including internal controls and procedures performed by the person(s) responsible for monitoring the financial institution's compliance review function for the Truth In Lending Act and Regulation Z.

3.  To determine the financial institution's compliance with the Truth In Lending Act and Regulation Z.

4.  To initiate corrective action when policies or internal controls are deficient, or when violations of law or regulation are identified.

5.  To determine whether the institution will be required to make adjustments to consumer accounts under the restitution provisions of the Truth in Lending Act.

---

[1] These reflect FFIEC-approved procedures.

**CFPB**

**Examination Procedures**                                   **TILA**

## General Procedures

1. Obtain information pertinent to the area of examination from the financial institution's compliance management system program (historical examination findings, complaint information, and significant findings from compliance review and audit).

2. Through discussions with management and review of the following documents, determine whether the financial institution's internal controls are adequate to ensure compliance in the area under review. Identify procedures used daily to detect errors/violations promptly. Also, review the procedures used to ensure compliance when changes occur (e.g., changes in interest rates, service charges, computation methods, and software programs).

   • Organizational charts.

   • Process flowcharts.

   • Policies and procedures.

   • Loan documentation and disclosures.

   • Checklists/worksheets and review documents.

   • Computer programs.

3. Review compliance review and audit workpapers and determine whether:

   a. The procedures used address all regulatory provisions (see Transactional Testing section).

   b. Steps are taken to follow up on previously identified deficiencies.

   c. The procedures used include samples that cover all product types and decision centers.

   d. The work performed is accurate (through a review of some transactions).

   e. Significant deficiencies, and the root cause of the deficiencies, are included in reports to management/board.

   f. Corrective actions are timely and appropriate.

   g. The area is reviewed at an appropriate interval.

4. Review the financial institution's record retention practices to determine whether evidence of compliance (for other than the advertising requirements) is retained for at least two years after the disclosures were required to be made or other action was required to be taken. (§1026.25)

**CFPB**

**Examination Procedures** **TILA**

# Disclosure Forms

5. Determine if the financial institution has changed any TILA disclosure forms or if there are forms that have not been previously reviewed for accuracy. If so:

Verify the accuracy of each disclosure by reviewing the following:

- Credit card application/solicitation disclosures (§1026.60(b)-(e)).

- HELOC disclosures (§1026.40(d) and (e)).

- Initial disclosures (§1026.6) and, if applicable, additional HELOC disclosures (§1026.40).

- Periodic statement disclosures (§1026.7)

- Statement of billing rights and change in terms notice (§1026.9(a),(b),(c) or (g)).

- Note and/or contract forms (including those furnished to dealers).

- Notice of Right to Rescind/Cancel (§§1026.15(b), 1026.23(b)(1)) and 1026.47(c)(4).

- Standard closed-end credit disclosures (§§1026.17(a) and 1026.18).

- ARM disclosures (§1026.19(b)).

- High-cost mortgage disclosures (§1026.32(c)).

- Reverse mortgage disclosures (§1026.33(b)).

- Private education loan disclosures (§1026.47).

## Closed-End Credit Disclosure Forms Review Procedures

a. Determine that the disclosures are clear, conspicuous, and grouped together or segregated as required, in a form the consumer may keep. The terms "Finance Charge" and "Annual Percentage Rate" and corresponding rates or amounts should be more conspicuous than other terms, except for the creditor's identity. For private student loans the term "Annual Percentage Rate" and corresponding rate must be less conspicuous than the term "finance charge" and the corresponding amount, as well as less conspicuous than the interest rate, the notice of the right to cancel and creditor's identity. (§§1026.17(a), 1026.47(b), and (c))

b. Determine the disclosures include the following as applicable. (§1026.18)

1. Identity of the creditor

**CFPB**

**Examination Procedures**                                              **TILA**

---

    2.   Brief description of the finance charge

    3.   Brief description of the APR

    4.   Variable rate information (§1026.18(f)(1) or (2))

    5.   Payment schedule

    6.   Brief description of the total of payments

    7.   Demand feature

    8.   Description of total sales price in a credit sale

    9.   Prepayment penalties or rebates

    10. Late payment amount or percentage

    11. Description for security interest

    12. Insurance conditions for finance charge exclusions (§1026.4(d))

    13. Statement referring to the contract

    14. Statement regarding assumption of the note

    15. Statement regarding required deposits.

c.   Determine that the creditor discloses the number, amounts, and timing of payments scheduled to repay the obligation (other than for a transaction that is subject to section 1026.18(s)[2]. (§1026.18(g))

d.   For a closed-end transaction secured by real property or a dwelling (other than a transaction secured by a consumer's interest in a time-share plan described in 11 U.S.C. 101(53D)), determine that the creditor discloses the following information about the interest rate and payments, as applicable (§1026.18(s)):

<u>Interest Rates</u>

    1.   *For a fixed-rate mortgage*, the interest rate at consummation. (§1026.18(s)(2)(i)(A))

    2.   *For an adjustable-rate or step-rate mortgage* (§1026.18(s)(2)(i)(B)):

       i.   The interest rate at consummation and the period of time until the first interest rate adjustment may occur, labeled as the "introductory rate and monthly

---

[2] For example, home construction loans that are secured by real property or a dwelling are subject to section 1026.18(s) and not section 1026.18 (g). *See* comment App. D-6 of Regulation Z.

---

**CFPB**

**Examination Procedures**                                              **TILA**

payment"; NOTE: As set forth in comment 18(s)-1, if periodic payments are not due monthly, the creditor should use the appropriate term, such as "quarterly" or "annually."

    ii.   The maximum interest rate that may apply during the first five years after the date on which the first regular periodic payment will be due and the earliest date on which that rate may apply, labeled as "maximum during first five years"; and

    iii.   The maximum interest rate that may apply during the life of the loan and the earliest date on which that rate may apply, labeled as "maximum ever."

3. *For a loan that provides for payment increases occurring without regard to an interest rate adjustment* [3] (as described in section 1026.18(s)(3)(i)(B)), the interest rate in effect at the time the first such payment increase is scheduled to occur and the date on which the increase will occur, labeled as "first adjustment" if the loan is an adjustable-rate mortgage or, otherwise, labeled as "first increase."[4] (§1026.18(s)(2)(i)(C))

4. *For a negative amortization loan*[5] (§1026.18(s)(2)(ii)):

    i.   The interest rate at consummation and, if it will adjust after consummation, the length of time until it will adjust, and the label "introductory" or "intro";

    ii.   The maximum interest rate that could apply when the consumer must begin making fully amortizing payments under the terms of the legal obligation;

    iii.   If the minimum required payment will increase before the consumer must begin making fully amortizing payments, the maximum interest rate that could apply at the time of the first payment increase and the date the increase is scheduled to occur; and

    iv.   If a second increase in the minimum required payment may occur before the consumer must begin making fully amortizing payments, the maximum interest rate that could apply at the time of the second payment increase and the date the increase is scheduled to occur.

5. *For an amortizing adjustable-rate mortgage*, if the interest rate at consummation is less than the fully indexed rate, the following (placed in a box directly beneath

---

[3] Note: this category includes interest-only loans, as set forth in comment 1026.18(s)(2)(i)(C)-1.

[4] Because model forms and clauses published by the CFPB are safe harbors, this rate may also be labeled "Maximum Ever," pursuant to section 1026.18(s)(2)(i)((B)(3).

[5] The term "negative amortization loan" means a loan, other than a reverse mortgage subject to section 1026.33 that provides for a minimum periodic payment that covers only a portion of the accrued interest, resulting in negative amortization. section 1026.18(s)(7)(v)

# CFPB
# Examination Procedures                                        TILA

the table required by paragraph 18 (s)(1) of the regulation, in a format substantially similar to Model Clause H–4(I) in the regulation's Appendix H):

   i.   The interest rate that applies at consummation and the period of time for which it applies;

   ii.   A statement that, even if market rates do not change, the interest rate will increase at the first adjustment and a designation of the place in sequence of the month or year, as applicable, of such rate adjustment (e.g., "in the third year"); and

   iii.   The fully-indexed rate.

<u>Payments for Amortizing Loans</u>

1. *Principal and interest payments.* If all periodic payments will be applied to accrued interest and principal, for each interest rate disclosed under section 1026.18(s)(2)(i) (§1026.18(s)(3)(i)):

   i.   The corresponding periodic principal and interest payment, labeled as "principal and interest;"

   ii.   If the periodic payment may increase without regard to an interest rate adjustment, the payment that corresponds to the first such increase and the earliest date on which the increase could occur;

   iii.   If an escrow account is established , an estimate of the amount of taxes and insurance, including any mortgage insurance payable with each periodic payment; and

   iv.   The sum of the amounts disclosed under sections 1026.18(s)(3)(i)(A) and (C) or (s)(3)(i)(B) and (C), as applicable, labeled as "total estimated monthly payment."

2. *Interest-only payments.* If the loan is an interest-only loan, for each interest rate disclosed under section 1026.18(s)(2)(i), the corresponding periodic payment and (§1026.18(s)(3)(ii)):

   i.   If the payment will be applied to only accrued interest, the amount applied to interest, labeled as "interest payment," and a statement that none of the payment is being applied to principal;

   ii.   If the payment will be applied to accrued interest and principal, an itemization of the amount of the first such payment applied to accrued interest and to principal, labeled as "interest payment" and "principal payment," respectively;

   iii.   The escrow information described in section 1026.18(s)(3)(i)(C); and

CFPB

**Examination Procedures**                                               **TILA**

---

    iv.  The sum of all amounts required to be disclosed under sections 1026.18(s)(3)(ii)(A) and (C) or (s)(3)(ii)(B) and (C), as applicable, labeled as "total estimated monthly payment."

3.  *Payments for negative amortization loans.* If the loan is a negative amortization loan (§1026.18(s)(4)):

    i.  The minimum periodic payment required until the first payment increase or interest rate increase, corresponding to the interest rate disclosed under section 1026.18(s)(2)(ii)(A);

    ii.  The minimum periodic payment that would be due at the first payment increase and the second, if any, corresponding to the interest rates described in section 1026.18(s)(2)(ii)(C) and (D);

    iii.  A statement that the minimum payment pays only some interest, does not repay any principal, and will cause the loan amount to increase;

    iv.  The fully amortizing periodic payment amount at the earliest time when such a payment must be made, corresponding to the interest rate disclosed under section 1026.18 (s)(2)(ii)(B); and

    v.  If applicable, in addition to the payments in sections 1026.18(s)(4)(i) and (ii), for each interest rate disclosed under section 1026.18(s)(2)(ii), the amount of the fully amortizing periodic payment, labeled as the "full payment option," and a statement that these payments pay all principal and all accrued interest.

NOTE: The information in sections 1026.18(s)(2)–(4) must be disclosed in the form of a table with no more than five columns, and with headings and format substantially similar to Model Clause H–4(E), H–4(F), H–4(G), or H–4(H) in Appendix H of the regulation. The table should contain only the information required in sections 1026.18 (s)(2)–(4), be placed in a prominent location, and be in a minimum 10-point font. (§1026.18(s)(1))

4.  *Balloon payments.* For loans with balloon payments (defined as a payment that is more than two times a regular periodic payment) (§1026.18(s)(5)):

    i.  Except as provided below, the balloon payment is disclosed separately from other periodic payments disclosed in the table (i.e., is outside the table and in a manner substantially similar to Model Clause H–4(J) in Appendix H to the regulation);

    ii.  If the balloon payment is scheduled to occur at the same time as another payment required to be disclosed in the table, the balloon payment must be disclosed in the table.

---

**CFPB**

**Examination Procedures**                                                **TILA**

e. For a closed-end transaction secured by real property or a dwelling (other than a transaction secured by a consumer's interest in a time-share plan described in 11 U.S.C. 101(53D)), that is a negative amortization loan, determine that the following information is disclosed (in close proximity to the table required in section 1026.18(s)(1), with headings, content, and format substantially similar to Model Clause H–4(G) in Appendix H to this part) (§1026.18(s)(6)):

   i. The maximum interest rate, the shortest period of time in which such interest rate could be reached, the amount of estimated taxes and insurance included in each payment disclosed, and a statement that the loan offers payment options, two of which are shown; and

   ii. The dollar amount of the increase in the loan's principal balance if the consumer makes only the minimum required payments for the maximum possible time and the earliest date on which the consumer must begin making fully amortizing payments, assuming that the maximum interest rate is reached at the earliest possible time.

f. For a closed end transaction secured by real property or a dwelling, (other than a transaction secured by a consumer's interest in a time-share plan described in 11 U.S.C. 101(53D)), determine that the creditor disclosed a statement that there is no guarantee the consumer can refinance the transaction to lower the interest rate or periodic payments. (§1026.18(t)(1))

   NOTE: The statement required by section 1026.18(t)(1) should be in a form substantially similar to Model Clause H–4(K) in Appendix H to the regulation. (§1026.18(t)(2))

g. Determine all variable rate loans with a maturity greater than one year secured by a principal dwelling are given the following disclosures at the time of application. (§1026.19)

   1. Consumer Handbook on Adjustable Rate Mortgages or substitute

   2. Statement that interest rate payments and or terms can change

   3. The index/formula and a source of information

   4. Explanation of the interest rate/payment determination and margin

   5. Statement that the consumer should ask for the current interest rate and margin

   6. Statement that the interest rate is discounted, if applicable

   7. Frequency of interest rate and payment changes

   8. Rules relating to all changes

**CFPB**

**Examination Procedures**                                                                   **TILA**

9. Either a historical example based on 15 years, or the initial rate and payment with a statement that the periodic payment may substantially increase or decrease together with a maximum interest rate and payment

10. Explanation of how to compute the loan payment, giving an example

11. Demand feature, if applicable

12. Statement of content and timing of adjustment notices

13. Statement that other variable rate loan program disclosures are available, if applicable

h. Determine that the disclosures required for high-cost mortgage transactions (§1026.32) clearly and conspicuously include the items below. (§1026.32(c), see Form H-16 in Appendix H)

1. The required statement "you are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan."

2. The APR.

3. Amount of the regular monthly (or other periodic) payment and the amount of any balloon payment. The regular payment should include amounts for voluntary items, such as credit life insurance or debt-cancellation coverage, only if the consumer has previously agreed to the amount (See staff commentary to 32(c)(3)).

4. Statement that the interest rate may increase, and the amount of the single maximum monthly payment, based on the maximum interest rate allowed under the contract, if applicable.

5. For a mortgage refinancing, the total amount borrowed, as reflected by the face amount of the note; and where the amount borrowed includes premiums or other charges for optional credit insurance or debt-cancellation coverage, that fact shall be stated (grouped together with the amount borrowed).

i. For any closed-end mortgage loan (credit transaction that is secured by the principal dwelling of a consumer) that was sold, assigned, or otherwise transferred to the covered person, determine that the covered person notifies the borrower clearly and conspicuously in writing, in a form that the consumer may keep of such transfer, including (§1026.39):

1. An identification of the loan that was sold, assigned, or otherwise transferred;

**CFPB**

**Examination Procedures**                                                    **TILA**

---

2. The name, address, and telephone number of the covered person who owns the mortgage loan;

3. The date of transfer (either the date of acquisition recognized in the books and records of the covered person or that of the transferring party) identified by the covered person;

4. The name, address, and telephone number of an agent or party having authority, on behalf of the covered person, to receive notice of the right to rescind and resolve issues concerning the consumer's payments on the mortgage loan;

5. Where transfer of ownership of the debt to the covered person is or may be recorded in public records or, alternatively, that the transfer of ownership has not been recorded in public records at the time the disclosure is provided; and,

6. At the option of the covered person, any other relevant information regarding the transaction.

7. If there are multiple covered persons, contact information for each of them, unless one of them has been authorized to receive the consumer's notice of the right to rescind and resolve issues concerning the consumer's payments on the loan.

NOTE: This notice of sale or transfer must be provided for any consumer credit transaction that is secured by the principal dwelling of a consumer. This notification is required of the covered person even if the loan servicer remains the same. In addition, if more than one consumer is liable on the obligation, the covered person may mail or deliver the disclosure notice to any consumer who is primarily liable. And, if an acquisition involves multiple covered persons who each acquire a partial interest in the loan pursuant to separate and unrelated agreements, each covered person has a duty to ensure that disclosures related to its acquisition are accurate and provided in a timely manner unless an exception in section 1026.39(c) applies. The parties may, but are not required to, provide a single notice that satisfies the timing and content requirements applicable to each covered person. (Commentary 1026.39(b)(5) – 2)

j. For private education loans subject to Subpart F, ensure that the required disclosures are accurate (§1026.47) and contain the following information:

1. Application or solicitation disclosures disclose the following:

   a. Interest rate, including:

      i. Rate or range, and if the rate depends in part on a determination of the borrower's creditworthiness or other factors, a statement to that effect;

      ii. Whether rate is fixed or variable;

---

**CFPB**

**Examination Procedures**                                    **TILA**

iii. If rate may increase after consummation, any limitations, or lack thereof, and if the limitation is imposed by law, that fact. Also, the creditor must state that the consumer's actual rate may be higher or lower that that disclosed, if applicable; and

iv. Whether the rate will typically be higher if the loan is not co-signed or guaranteed.

b. Fees and default or late payment costs.

c. Repayment terms, including:

i. Term of the loan, which is the period during which regularly scheduled payments of principal and interest will be due.

ii. Deferral options, or if consumer does not have the option to defer, that fact.

iii. For each available deferral option applicable, information as to:

1. Whether interest will accrue during deferral period; and

2. If interest accrues, whether payment of interest may be deferred and added to the principal balance; and

iv. A statement that, if the consumer files bankruptcy, the consumer may still be required to repay the loan.

d. Cost estimates, based on an example of the total cost of the loan, calculated using:

i. The highest interest rate and including all applicable finance charges,

ii. An amount financed of $10,000, or $5,000, if the creditor offers loans less than $10,000; and

iii. Calculated for each payment option.

e. Eligibility (e.g., any age or school enrollment eligibility requirements).

f. Alternatives to private education loans, including:

i. A statement that the consumer may qualify for Federal student loans,

ii. The interest rates available for each program available under title IV of the Higher Education Act of 1965, and whether the rate is variable or fixed;

**CFPB**

**Examination Procedures**                                                                    **TILA**

      iii.   A statement that the consumer may obtain additional information regarding student federal financial assistance from his school or U.S. Department of Education, including an appropriate website; and

      iv.   A statement that a covered educational institution may have school specific educational loan benefits and terms not detailed in the loan disclosure forms.

    g.   A statement that if the loan is approved, that the loan will be available for 30 days and the terms will not change, except for changes to the interest rate in the case of a variable rate and other changes permitted by law.

    h.   A statement that before consummation, the borrower must complete a self-certification form obtained from the student's institution of higher education.

2.   For approval disclosures, the following information is required under section 1026.47(b):

    a.   Interest rate, information, including:

      i.   Interest rate applicable to the loan

      ii.   Whether the interest rate is variable or fixed; and

      iii.   If the interest rate may increase after consummation, any limitations on the rate adjustments, or lack thereof.

    b.   Fees and default or late payment costs, including:

      i.   An itemization of the fees or range of fees required to obtain the loan; and

      ii.   Any fees, changes to the interest rate, and adjustments to principal based on the consumer's defaults or late payments.

    c.   Repayment terms, including:

      i.   Principal amount;

      ii.   Term of the loan;

      iii.   A description of the payment deferral option chosen by the consumer, if applicable, and any other payment deferral options that the consumer may elect at a later time;

      iv.   Any payments required while the student is enrolled at the educational institution, based on the deferral option chosen by the consumer;

      v.   Amount of any unpaid interest that will accrue while the student is enrolled in school, based upon the deferral option chosen by the consumer;

**CFPB**

**Examination Procedures**                                                    **TILA**

vi.  A statement that if the consumer files for bankruptcy, that the consumer may still be required to pay back the loan;

vii.  An estimate of the total amount of payments calculated based upon:

    1.  The interest rate applicable to the loan (compliance with section 1026.18(h) constitutes compliance with this requirement);

    2.  The maximum possible rate of interest for the loan, or, if a maximum rate cannot be determined, a rate of 25%.

    3.  If a maximum rate cannot be determined, the estimate of the total amount for repayment must include a statement that there is no maximum rate and that the total amount for repayment disclosed is an estimate.

viii.  The maximum monthly payment based on the maximum rate of interest for the loan, or, if a maximum rate of interest cannot be determined, a rated of 25%. If a maximum cannot be determined, a statement that there is no maximum rate and that the monthly payment amount disclosed is an estimate and will be higher if the applicable interest rate increases.

d.  Alternatives to private education loans, including:

  i.  A statement that the consumer may qualify for Federal student loans,

  ii.  The interest rates available for each program available under title IV of the Higher Education Act of 1965, and whether the rate is variable or fixed; and

  iii.  A statement that the consumer may obtain additional information regarding student federal financial assistance from his school or U.S. Department of Education, including an appropriate website.

e.  A statement that the consumer may accept the terms of the loan until the acceptance period under section 1026.48(c)(1) has expired. The statement must include:

  i.  The specific date on which the acceptance period expires, based on the date upon which the consumer receives the disclosures required under this subsection for the loan;

  ii.  The method or methods by which the consumer may communicate the acceptance (written, oral, or by electronic means; and

  iii.  A statement that except for changes to the interest rate and other changes permitted by law, the rates and the terms of the loan may not be changed by the creditor during the 30-day acceptance period.

JA0429

**CFPB**

**Examination Procedures**                                          **TILA**

3. After the consumer has accepted the loan in accordance with section 1026.48(c)(1), final disclosures must disclose the information required under section 1026.47(c) and the following:

   a. Interest rate, including:

      i. Interest rate applicable to the loan

      ii. Whether the interest rate is variable or fixed; and

      iii. If the interest rate may increase after consummation, any limitations on the rate adjustments, or lack thereof.

   b. Fees and default or late payment costs, including:

      i. An itemization of the fees or range of fees required to obtain the loan; and

      ii. Any fees, changes to the interest rate, and adjustments to principal based on the consumer's defaults or late payments.

   c. Repayment terms, including:

      i. Principal amount;

      ii. Term of the loan;

      iii. A description of the payment deferral option chosen by the consumer, if applicable, and any other payment deferral options that the consumer may elect at a later time;

      iv. Any payments required while the student is enrolled at the educational institution, based on the deferral option chosen by the consumer;

      v. Amount of any unpaid interest that will accrue while the student is enrolled in school, based upon the deferral option chosen by the consumer;

      vi. A statement that if the consumer files for bankruptcy, that the consumer may still be required to pay back the loan;

      vii. An estimate of the total amount of payments calculated based upon:

         1. The interest rate applicable to the loan (compliance with section 1026.18(h) constitutes compliance with this requirement);

         2. The maximum possible rate of interest for the loan, or, if a maximum rate cannot be determined, a rate of 25 percent;

         3. If a maximum rate cannot be determined, the estimate of the total amount for repayment must include a statement that there is no

# CFPB
# Examination Procedures                                    TILA

maximum rate and that the total amount for repayment disclosed is an estimate.

viii.    The maximum monthly payment based on the maximum rate of interest for the loan, or, if a maximum rate of interest cannot be determined, a rated of 25 percent. If a maximum cannot be determined, a statement that there is no maximum rate and that the monthly payment amount disclosed is an estimate and will be higher if the applicable interest rate increases.

d.  In a text more conspicuous than any other required disclosure, except for the finance charge, the interest rate, and the creditor's identify the following disclosures:

i.    A statement that the consumer has the right to cancel the loan, without penalty, at any time before the midnight of the third business day following the date on which the consumer receives the final loan disclosures. The statement must include the specific date on which the cancellation period expires and that the consumer may cancel by that date. (§1026.47(c)(4)(i))

ii.    A statement that the loan proceeds will not be disbursed until the cancellation period expires. (§1026.47(c)(4)(ii))

iii.    The method or methods by which the consumer may cancel; (§1026.47(c)(4)(ii)) and

iv.    If the creditor permits cancellation by mail, the statement specifying that the consumer's mailed request will be deemed timely if placed in the mail not later than the cancellation date specified on the disclosures. (§1026.47(c)(4)(ii))

## Open-End Credit Forms Review Procedures

a.  Determine that the creditor made the disclosures clearly and conspicuously. (§1026.5(a))

b.  Determine that the creditor made the applicable disclosures in writing, in a form that the consumer may keep, except (§1026.5(a)(1)(ii)):

1.  The following disclosures need not be written: Disclosures under section 1026.6(b)(3) of charges that are imposed as part of an open-end (not home-secured) plan that are not required to be disclosed under section 1026.6(b)(2) and related disclosures of charges under section 1026.9(c)(2)(iii)(B); disclosures under section 1026.9(c)(2)(vi); disclosures under Section1026.9(d) when a finance charge is imposed at the time of the transaction; and disclosures under section 1026.56(b)(1)(i).

**CFPB**

**Examination Procedures**                                                    **TILA**

2. The following disclosures need not be in a retainable form: Disclosures that need not be written under paragraph 1026.5(a)(1)(ii)(A) of this section; the alternative summary billing-rights statement under section 1026.9(a)(2); the credit and charge card renewal disclosures required under section 1026.9(e); the payment requirements under section 1026.10(b), except as provided in section 1026.7(b)(13); ; home-equity disclosures under section 1026.40(d); and disclosures for credit and charge card applications and solicitations under section 1026.60.

3. The disclosures required by this subpart may be provided to the consumer in electronic form, subject to compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. 7001 *et seq.* ). The disclosures required by sections 1026.60, 1026.40, and 1026.16 may be provided to the consumer in electronic form without regard to the consumer consent or other provisions of the E-Sign Act in the circumstances set forth in those sections.

c. Determine that the terminology used in providing the disclosures required by section 1026.5 is consistent. (§1026.5(a)(2)(i))

d. Determine that, for home-equity plans subject to section 1026.40, the terms *finance charge* and *annual percentage rate (APR),* when required to be disclosed with a corresponding amount or percentage rate, shall be more conspicuous than any other required disclosure. The terms need not be more conspicuous when used for periodic statement disclosures under section 1026.7(a)(4) and for advertisements under section 1026.16. (§1026.5(a)(2)(ii))

e. Determine that, if disclosures are required to be presented in a tabular format pursuant to section 1026.5(a)(3), that the term *penalty APR* shall be used, as applicable. (§1026.5(a)(2)(iii))

NOTE: The term *penalty APR* need not be used in reference to the annual percentage rate that applies with the loss of a promotional rate, assuming the annual percentage rate that applies is not greater than the annual percentage rate that would have applied at the end of the promotional period; or if the annual percentage rate that applies with the loss of a promotional rate is a variable rate, the annual percentage rate is calculated using the same index and margin as would have been used to calculate the annual percentage rate that would have applied at the end of the promotional period. If credit insurance or debt cancellation or debt suspension coverage is required as part of the plan, the term *required* shall be used and the program shall be identified by its name. If an annual percentage rate is required to be presented in a tabular format pursuant to paragraph (a)(3)(i) or (a)(3)(iii) of this section, the term *fixed,* or a similar term, may not be used to describe such rate unless the creditor also specifies a time period that the rate will be fixed and the rate will not increase during that period, or if no such time period is provided, the rate will not increase while the plan is open.

# CFPB
# Examination Procedures                                     TILA

---

## Credit and Charge Card Application and Solicitation Disclosures – Section 1026.60

a. Determine that the credit card solicitation or application disclosures were made clearly and conspicuously on or with a solicitation or an application. (§1026.60)

b. For the disclosures in sections 1026.60(b)(1) through (5) (except for (b)(1)(iv)(B) and (b)(7) through (15), determine that the creditor made the disclosures required for sections 1026.60(c), (d)(2), (e)(1) and (f) in the form of a table with headings, content, and format substantially similar to the applicable tables found in G-10 in Appendix G. (§1026.60(a)(2)(i))

c. Determine that the table required by section 1026.60(a)(2)(i) contains only the information required or permitted by that section. If the creditor provides other information, determine that such information appears outside the table. (§1026.60(a)(2)(ii))

d. Determine that the disclosures required by section 1026.60(b)(1)(iv)(B), (b)(1)(iv)(C), and (b)(6) are placed directly beneath the table required by section 1026.60(a)(2)(i). (§1026.60(a)(2)(iii))

e. When a tabular format is required, determine that the following disclosures are disclosed in bold text (§1026.60(a)(2)(iv)):

   i. Annual percentage rate required to be disclosed pursuant to paragraph (b)(1) of this section,

   ii. Introductory rate required to be disclosed pursuant to paragraph (b)(1)(ii) of this section,

   iii. Rate that will apply after a premium initial rate expires required to be disclosed under paragraph (b)(1)(iii) of this section, and

   iv. Fee or percentage amounts or maximum limits on fee amounts required to be disclosed pursuant to paragraphs (b)(2), (b)(4), (b)(8) through (b)(13).

   NOTE: Bold text shall not be used for the amount of any periodic fee disclosed pursuant to paragraph (b)(2) of this section that is not an annualized amount; and other APRs or fee amounts disclosed in the table. (§1026.60(a)(2)(iv))

f. Determine that the card issuer discloses, on or with an solicitation or application: (§1026.60(b))

   1. *Annual percentage rate.* Each periodic rate that may be used to compute the finance charge on an outstanding balance for purchases, a cash advance, or a balance transfer, expressed as an annual percentage rate. When more than one rate

---

**CFPB**
**Examination Procedures**                                    **TILA**

applies for a category of transactions, determine that the range of balances to which each rate is applicable is also disclosed. (§1026.60(b)(1))

NOTE: The APR for purchases disclosed pursuant to section 1026.60(b)(1) shall be in at least 16-point type, except for the following: Oral disclosures of the annual percentage rate for purchases; or a penalty rate that may apply upon the occurrence of one or more specific events.

i.   *Variable rate information.* If a rate is a variable rate, determine that the card issuer discloses the fact that the rate may vary and how the rate is determined. Determine that the card issuer identifies the type of index or formula that is used in setting the rate. Determine that the value of the index and the amount of the margin that are used to calculate the variable rate are not disclosed in the table. Determine further that any applicable limitations on rate increases are not included in the table. (§1026.60(b)(1)(i))

ii.   *Discounted initial rate.* If the initial rate is an introductory rate, determine that the card issuer discloses in the table the introductory rate, the time period during which the introductory rate will remain in effect, and the term "introductory" or "intro" in immediate proximity to the introductory rate. Determine further that the card issuer discloses, as applicable, either the variable or fixed rate that would otherwise apply to the account. (§1026.60(b)(1)(ii))

iii.   *Premium initial rate.* If the initial rate is temporary and is higher than the rate that will apply after the temporary rate expires, determine that the card issuer discloses the premium initial rate and the time period during which the premium initial rate will remain in effect. Determine that the premium initial rate for purchases is in at least 16-point type. Determine that the issuer discloses in the table the rate that will apply after the premium initial rate expires, in at least 16-point type. (§1026.60(b)(1)(iii))

iv.   *Penalty rates.* Except as for provided introductory rate or employee preferential rate requirements (discussed below), if a rate may increase as a penalty for one or more events specified in the account agreement, such as a late payment or an extension of credit that exceeds the credit limit, determine that the card issuer discloses the increased rate that may apply, a brief description of the event or events that may result in the increased rate, and a brief description of how long the increased rate will remain in effect. (§1026.60(b)(1)(iv)(A))

v.   *Introductory rate.* If the issuer discloses an introductory rate in the table or in any written or electronic promotional materials accompanying applications or solicitations (and subject to paragraph (c) or (e) of section 1026.60), determine that the issuer briefly discloses, directly beneath the table, the circumstances, if any, under which the introductory rate may be revoked, and

# CFPB

# Examination Procedures                                    TILA

the type of rate that will apply after the introductory rate is revoked. (§1026.60(b)(1)(iv)(B))

vi. *Employee preferential rates.* If the issuer discloses in the table a preferential APR for which only employees of the card issuer, employees of a third party, or other individuals with similar affiliations with the card issuer or third party are eligible, determine that the issuer briefly discloses directly beneath the table the circumstances under which such preferential rate may be revoked and the rate that will apply after such preferential rate is revoked. (§1026.60(b)(1)(iv)(C))

vii. *Rates that depend on consumer's creditworthiness.* If a rate cannot be determined at the time disclosures are given because the rate depends, at least in part, on a later determination of the consumer's creditworthiness, determine that the card issuer discloses the specific rates or the range of rates that could apply and a statement that the rate for which the consumer may qualify at account opening will depend on the consumer's creditworthiness, and other factors if applicable. (§1026.60(b)(1)(v))

NOTE: If the rate that depends, at least in part, on a later determination of the consumer's creditworthiness is a penalty rate, as described in (b)(1)(iv), the card issuer at its option may disclose the highest rate that could apply, instead of disclosing the specific rates or the range of rates that could apply. (§1026.60(b)(1)(v))

viii. *APRs that vary by state.* Determine that the card issuer does not list annual percentage rates for multiple states in the table. Note, however, that issuers imposing annual percentage rates that vary by state may, at the issuer's option, disclose in the table: the specific annual percentage rate applicable to the consumer's account; or the range of the annual percentage rates, if the disclosure includes a statement that the annual percentage rate varies by state and refers the consumer to a disclosure provided with the table where the annual percentage rate applicable to the consumer's account is disclosed. (§1026.60(b)(1)(vi))

2. *Fees for issuance or availability.* Determine that the card issuer discloses any annual or other periodic fee, expressed as an annualized amount, or any other fee that may be imposed for the issuance or availability of a credit or charge card, including any fee based on account activity or inactivity. (§1026.60(b)(2))

3. *Fixed finance charge; minimum interest charge.* Determine that the creditor discloses any fixed finance charge that could be imposed during a billing cycle, as well as a brief description of that charge. Determine that the creditor discloses any minimum interest charge if it exceeds $1.00 that could be imposed during a billing cycle, and a brief description of the charge. (§1026.60(b)(3))

# CFPB
# Examination Procedures                                    TILA

4. Transaction charge. Determine that the creditor discloses any transaction charge imposed for the use of the card for purchases. (§1026.60(b)(4))

5. *Grace period.* Determine that the issuer discloses the date by which or the period within which any credit extended for purchases may be repaid without incurring a finance charge due to a periodic interest rate and any conditions on the availability of the grace period. If no grace period is provided, determine that this fact is disclosed. In disclosing in the tabular format a grace period that applies to all types of purchases, determine that the issuer uses the phrase "How to Avoid Paying Interest on Purchases" as the heading for the row describing the grace period. If a grace period is not offered on all types of purchases, in disclosing this fact in the tabular format, determine that the issuer uses the phrase "Paying Interest" as the heading for the row describing this fact.

   NOTE: If the length of the grace period varies, the card issuer may disclose the range of days, the minimum number of days, or the average number of days in the grace period, if the disclosure is identified as a range, minimum, or average. (§1026.60(b)(5))

6. *Balance computation method.* Determine that the creditor disclosed the name of the balance computation method that is used to determine the balance on which the finance charge is computed, or an explanation of the method used if it is not listed. In determining which balance computation method to disclose, the creditor should have assumed that the credit extended will not be repaid within any grace period. (§1026.60(b)(6))

   NOTE: Disclosures required by section 1026.60(b)(6) must be placed directly beneath the table.

7. Statement on charge card payments. Determine that the creditor discloses a statement that charges incurred by use of the charge card are due when the periodic statement is received. (§1026.60(b)(7))

8. *Cash advance fee.* Determine that the creditor disclosed any fee imposed for an extension of credit in the form of cash or its equivalent. (§1026.60(b)(8))

9. *Late payment fee.* Determine that the creditor disclosed any fee imposed for a late payment. (§1026.60(b)(9))

10. *Over-the-limit fee.* Determine that the creditor disclosed any fee imposed for exceeding the credit limit. (§1026.60(b)(10))

11. *Balance transfer fee.* Determine that the creditor disclosed any fee imposed to transfer a balance. (§1026.60(b)(11))

12. *Returned payment fee.* Determine that the creditor disclosed any fee imposed for a returned payment. (§1026.60(b)(12))

**CFPB**

Examination Procedures                                                     **TILA**

---

13. *Required insurance, debt cancellation, or debt suspension coverage.* Determine that the fee imposed required insurance, debt cancellation or suspension coverage is disclosed if the insurance, debt cancellation or coverage is required as part of the plan. (§1026.60(b)(13))

14. *Available credit.* Determine whether total of required fees for the issuance or availability of credit and/or security deposit debited to the account at account opening equal or exceed 15 percent of minimum credit limit for the account. If so, determine that the creditor disclosed, as applicable, the available credit remaining after the fees and/or security deposit are debited to the account. (§1026.60(b)(14))

15. *Website reference.* For issuers of credit cards that are not charge cards, determine that the creditor disclosed a reference to the website established by the Consumer Financial Protection Bureau (CFPB) and a statement that the consumers may obtain on the website information about shopping for and using credit cards. (§1026.60(b)(15))

## Requirements for Home Equity Plans – Section 1026.40

a. Determine that the following home equity disclosures were made clearly and conspicuously, at the time of application. (§1026.40)

1. Home equity brochure

2. Statement that the consumer should retain a copy of the disclosure

3. Statement of the time the specific terms are available

4. Statement that terms are subject to change before the plan opens

5. Statement that the consumer may receive a full refund of all fees

6. Statement that the consumer's dwelling secures the credit

7. Statement that the consumer could lose the dwelling

8. Creditors right to change, freeze, or terminate the account

9. Statement that information about conditions for adverse action are available upon request

10. Payment terms including the length of the draw and repayment periods, how the minimum payment is determined, the timing of payments, and an example based on $10,000 and a recent APR

11. A recent APR imposed under the plan and a statement that the rate does not include costs other than interest (fixed rate plans only)

---

# CFPB
# Examination Procedures                                                TILA

12. Itemization of all fees paid to creditor

13. Estimate of any fees payable to third parties to open the account and a statement that the consumer may receive a good faith itemization of third-party fees

14. Statement regarding negative amortization, as applicable

15. Transaction requirements

16. Statement that the consumer should consult a tax advisor regarding the deductibility of interest and charges under the plan

17. For variable rate home equity plans, disclose the following:

   i.   That the APR, payment, or term may change

   ii.  The APR excludes costs other than interest

   iii. Identify the index and its source

   iv.  How the APR will be determined

   v.   Statement that the consumer should request information on the current index value, margin, discount, premium, or APR

   vi.  Statement that the initial rate is discounted and the duration of the discount, if applicable

   vii. Frequency of APR changes

   viii. Rules relating to changes in the index, APR, and payment amount

   ix.  Lifetime rate cap and any annual caps, or a statement that there is no annual limitation

   x.   The minimum payment requirement, using the maximum APR, and when the maximum APR may be imposed

   xi.  A historical example, based on a $10,000 balance, reflecting all significant plan terms

   xii. Statement that rate information will be provided on or with each periodic statement.

b. For home-equity plans subject to section 1026.40, determine that the terms *finance charge* and *annual percentage rate,* when required to be disclosed with a corresponding amount or percentage rate, are more conspicuous than any other required disclosure.

**CFPB**

**Examination Procedures**              **TILA**

NOTE: The terms need not be more conspicuous when used for periodic statement disclosures under section 1026.7(a)(4) and for advertisements under section 1026.16. (§1026.5(a)(2)(ii))

# Account Opening Initial Disclosures – Section 1026.6

a. The following requirements apply only to home-equity plans subject to the requirements of section 1026.40. Determine that the creditor discloses, as applicable (§1026.6(a)):

1. *Finance charge.* The circumstances under which a finance charge will be imposed and an explanation of how it will be determined, including: a statement of when finance charges begin to accrue, and an explanation of whether or not any time period exists within which any credit extended may be repaid without incurring a finance charge; a disclosure of each periodic rate that may be used to compute the finance charge, the range of balances to which it is applicable, and the corresponding annual percentage rate; an explanation of the method used to determine the balance on which the finance charge may be computed; and, an explanation of how the amount of any finance charge will be determined, including a description of how any finance charge other than the periodic rate will be determined. (§1026.6(a)(1))

   If a creditor offers a variable-rate plan, determine that the creditor discloses: the circumstances under which the rate(s) may increase; any limitations on the increase; and the effect(s) of an increase. When different periodic rates apply to different types of transactions, determine that the types of transactions to which the periodic rates shall apply shall also be disclosed. (§1026.6(a)(1))

2. *Other charges.* The amount of any charge other than a finance charge that may be imposed as part of the plan, or an explanation of how the charge will be determined. (§1026.6(a)(2))

3. *Home-equity plan information.* The following disclosures , as applicable (§1026.6(a)(3)):

   i. A statement of the conditions under which the creditor may take certain action, as described in section 1026.40(d)(4)(i), such as terminating the plan or changing the terms.

   ii. The payment information described in section 1026.40(d)(5)(i) and (ii) for both the draw period and any repayment period.

   iii. A statement that negative amortization may occur as described in section 1026.40(d)(9).

**CFPB**

**Examination Procedures**                                         **TILA**

---

iv.   A statement of any transaction requirements as described in section 1026.40(d)(10).

v.    A statement regarding the tax implications as described in section 1026.40(d)(11).

vi.   A statement that the annual percentage rate imposed under the plan does not include costs other than interest as described in section 1026.40(d)(6) and (d)(12)(ii).

vii.  The variable-rate disclosures described in section 1026.40(d)(12)(viii), (d)(12)(x), (d)(12)(xi), and (d)(12)(xii), as well as the disclosure described in section 1026.40(d)(5)(iii), unless the disclosures provided with the application were in a form the consumer could keep and included a representative payment example for the category of payment option chosen by the consumer.

4.  *Security interests.* The fact that the creditor has or will acquire a security interest in the property purchased under the plan, or in other property identified by item or type. (§1026.6(a)(4))

5.  *Statement of billing rights.* A statement that outlines the consumer's rights and the creditor's responsibilities under sections 1026.12(c) and 1026.13 and that is substantially similar to the statement found in Model Form G–3 or, at the creditor's option, G–3(A), in Appendix G to this part. (§1026.6(a)(5))

b.  For open-end (not home-secured) plans determine that the creditor provided the account-opening disclosures specified in section 1026.6(b)(2)(i) through (b)(2)(v) (except for section 1026.6 (b)(2)(i)(D)(2) and section 1026.6 (b)(2)(vii) through (b)(2)(xiv) in the form of a table with the headings, content, and format substantially similar to any of the applicable tables in G–17 in Appendix G. (§1026.6(b)(1))

c.  For open-end (not home-secured) plans, determine that the following disclosures are disclosed in bold text (§1026.6(b)(1)(i)):

1.  Any APR required to be disclosed pursuant to section 1026.6(b)(2)(i);

2.  Any introductory rate permitted to be disclosed pursuant to paragraph (b)(2)(i)(B) or required to be disclosed under paragraph (b)(2)(i)(F) of this section;

3.  Any rate that will apply after a premium initial rate expires permitted to be disclosed pursuant to paragraph (b)(2)(i)(C) or required to be disclosed pursuant to paragraph (b)(2)(i)(F); and

4.  Any fee or percentage amounts or maximum limits on fee amounts disclosed pursuant to paragraphs (b)(2)(ii), (b)(2)(iv), (b)(2)(vii) through (b)(2)(xii).

---

**CFPB**

**Examination Procedures**                                                                **TILA**

---

d. Determine that bold text is not used for: The amount of any periodic fee disclosed pursuant to paragraph (b)(2) of this section that is not an annualized amount; and other annual percentage rates or fee amounts disclosed in the table. (§1026.6(b)(1)(i))

e. Determine that only the information required or permitted by section 1026.6 (b)(2)(i) through (b)(2)(v) (except for (b)(2)(i)(D)(2)) and (b)(2)(vii) through (b)(2)(xiv) are provided in the table. Disclosures required by paragraphs (b)(2)(i)(D)(2), (b)(2)(i)(D)(3), (b)(2)(vi) and (b)(2)(xv) of this section shall be placed directly below the table required by section 1026.6(b)(1). (§1026.6(b)(1)(ii))

   NOTE: Disclosures required by section 1026.6(b)(3) through (b)(5) that are not otherwise required to be in the table and other information may be presented with the account agreement or account-opening disclosure statement, provided such information appears outside the required table.

f. For creditors that impose fees referred to in section 1026.6(b)(2)(vii) through (b)(2)(xi) that vary by state and that provide the disclosures required by section 1026.6(b) in person at the time the open-end (not home-secured) plan is established in connection with financing the purchase of goods or services determine that the creditor discloses in the account-opening table either:

   1. The specific fee applicable to the consumer's account, or

   2. The range of fees, a statement that the amount of the fee varies by state, and a reference to the account agreement or other disclosure provided with the account-opening table where the amount of the fee applicable to the consumer's account is disclosed. (§1026.6(b)(1)(iii))

   NOTE: A creditor is not permitted to list fees for multiple states in the account-opening summary table (§1026.6(b)(1)(iii)).

   3. If the amount of any fee required to be disclosed under this section is determined on the basis of a percentage of another amount, the percentage used and the identification of the amount against which the percentage is applied may be disclosed instead of the amount of the fee. (§1026.6(b)(1)(iv))

g. The following requirements apply to open-end (not home-secured). Determine that the creditor discloses in the appropriate format, as applicable:

   1. *Annual percentage rate.* Each periodic rate that may be used to compute the finance charge on an outstanding balance for purchases, a cash advance, or a balance transfer, expressed as an APR. When more than one rate applies for a category of transactions, determine that the creditor discloses the range of balances to which each rate is applicable. Ensure that the APR for purchases disclosed pursuant to this paragraph is in at least 16-point type, except for a penalty rate that may apply upon the occurrence of one or more specific events. (§1026.6(b)(2)(i))

---

**CFPB**

**Examination Procedures** **TILA**

2. *Variable rate information*. If the rate is a variable rate, determine that the creditor also disclosed the fact that the rate may vary and how the rate is determined (i.e., identify the type of index or formula used in setting the rate). (§1026.6(b)(2)(i)(A))

3. *Discounted initial rate*. If the initial rate is an introductory rate, determine that the creditor disclosed that the rate would otherwise apply to the account. Where the rate is not tied to an index or formula, determine that the creditor disclosed the rate that will apply after the introductory rate expires. For a variable rate account, determine that the creditor disclosed a rate based on the applicable index or formula in accordance with the accuracy requirements. (§1026.6(b)(2)(i)(B))

4. *Premium initial rate.* If the initial rate is temporary and is higher than the rate that will apply after the temporary rate expires, determine that the creditor disclosed the premium initial rate. Determine that the premium rate for purchases is in at least 16-point type. (§1026.6(b)(2)(i)(C))

5. *Penalty rates.* Except for introductory rates and employee preferential rates (discussed below), if the rate is a penalty rate, determine that the creditor disclosed as part of the APR disclosure the increased rate that may apply, a brief description of the event or events that may result in the increased rate, and a brief description of how long the increased rate will remain in effect. (§1026.6(b)(2)(i)(D)(1))

6. *Introductory rates.* If the creditor discloses in the table an introductory rate, as that term is defined in section 1026.16(g)(2)(ii), determine that the creditor briefly disclosed directly beneath the table the circumstances under which the introductory rate may be revoked, and the rate that will apply after the introductory rate is revoked. (§1026.6(b)(2)(i)(D)(2))

7. *Employee preferential rates.* If the creditor discloses in the table a preferential APR for which only employees of the creditor, employees of a third party, or other individuals with similar affiliations with the creditor or third party are eligible, determine that the creditor briefly disclosed beneath the table the circumstances under which the preferential rate may be revoked, and the rate that will apply after the preferential rate is revoked. (§1026.6(b)(2)(i)(D)(3))

8. *Point of sale where APRs vary by state or based on creditworthiness*. If the creditor imposes an APR that varies by state or based on the consumer's creditworthiness and provides required disclosures in person at the time the open-end (not home-secured) plan is established in connection with financing the purchase of goods or services, determine that the creditor discloses either (§1026.6(b)(2)(i)(E)):

     i. The specific APR applicable to the consumer's account, or

# CFPB
# Examination Procedures                                    TILA

    ii. The range of the APRs, if the disclosure includes a statement that the APR varies by state or will be determined based on the consumer's creditworthiness and refers the consumer to the account agreement or other disclosure provided with the account-opening table where the AP applicable to the consumer's account is disclosed. Determine that the creditor does not list APRs for multiple states in the account opening table.

9. *Credit card accounts under an open-end (not home-secured) consumer credit plan*. Determine that the issuer discloses in the table (§1026.6(b)(2)(i)(F)):

    i. Any introductory rate, and

    ii. Any rate that would apply upon expiration of a premium initial rate.

10. *Fees for issuance or availability*. Determine that the credit disclosed any annual or periodic fee that may be imposed for the issuance or availability of an open-end plan (including any fee based on account activity or inactivity); how frequently the fee will be imposed; and the annualized amount of the fee. (§1026.6(b)(2)(ii))

11. *Fixed finance charge and minimum interest charge.* Determine that the creditor disclosed any fixed finance charge and any minimum interest charge if it exceeds $1.00 that could be imposed during a billing cycle, and a brief description of the charge. (§1026.6(b)(2)(iii))

12. Determine that the creditor disclosed any non-periodic fee that relates to opening the plan. A creditor must disclose that the fee is a one-time fee. (§1026.6(b)(2)(ii)(B))

13. *Transaction charges.* Determine that the creditor discloses any transaction charge imposed by the creditor for use of the open-end plan for purchases. (§1026.6(b)(2)(iv))

14. *Grace period*. The date by which or the period within which any credit extended may be repaid without incurring a finance charge due to a periodic interest rate and any conditions on the availability of the grace period. If no grace period is provided, that fact must be disclosed. If the length of the grace period varies, the creditor may disclose the range of days, the minimum number of days, or the average number of the days in the grace period, if the disclosure is identified as a range, minimum, or average. In disclosing in the tabular format a grace period that applies to all features on the account, the phrase "How to Avoid Paying Interest" shall be used as the heading for the row describing the grace period. If a grace period is not offered on all features of the account, in disclosing this fact in the tabular format, the phrase "Paying Interest" shall be used as the heading for the row describing this fact. (§1026.6(b)(2)(v))

15. *Balance computation method*. Determine that the creditor disclosed in the account opening disclosures the name of the balance computation method that is used to

# CFPB
# Examination Procedures                                    TILA

determine the balance on which the finance charge is computed for each feature, or an explanation of the method used if it is not listed, along with a statement that an explanation of the methods required by section 1026.6(b)(4)(i)(D). In determining which balance computation method to disclose, the creditor should have assumed that the credit extended will not be repaid within any grace period. (§1026.6(b)(2)(vi))

16. *Cash advance fee.* Determine that the creditor disclosed any fee imposed for an extension of credit in the form of cash or its equivalent. (§1026.6(b)(2)(vii))

17. *Late payment fee.* Determine that the creditor disclosed any fee imposed for a late payment. (§1026.6(b)(2)(viii))

18. *Over-the-limit fee.* Determine that the creditor disclosed any fee imposed for exceeding the credit limit. (§1026.6(b)(2)(ix))

19. *Balance transfer fee.* Determine that the creditor disclosed any fee imposed to transfer a balance. (§1026.6(b)(2)(x))

20. *Returned payment fee.* Determine that the creditor disclosed any fee imposed for a returned payment. (§1026.6(b)(2)(xi))

21. *Required insurance, debt cancellation, or debt suspension coverage.* Determine that the fee imposed for required insurance, debt cancellation or suspension coverage is disclosed if the insurance, debt cancellation or coverage is required as part of the plan. Creditors must also cross reference additional information about the insurance or coverage as applicable. (§1026.6(b)(2)(xii))

22. *Available credit.* Determine whether total of required fees for the issuance or availability of credit and/or security deposit debited to the account at account opening equal or exceed 15 percent of the credit limit for the account. If so, determine that the creditor disclosed, as applicable, the available credit remaining after the fees and/or security deposit are debited to the account. (§1026.6(b)(2)(xiii))

23. *Website reference.* For issuers of credit cards that are not charge cards, determine that the creditor disclosed a reference to the website established by the CFPB and a statement that the consumers may obtain on the website information about shopping for and using credit cards. (§1026.6(b)(2)(xiv))

24. *Billing error rights reference.* Determine that the creditor disclosed a statement that information about consumers' right to dispute transactions is included in the account-opening disclosures. (§1026.6(b)(2)(xv))

25. *Charges and finance charges.* For charges imposed as part of open-end (not home-secured) plan, the circumstances under which the charge may be imposed, including the amount of the charge or explanation of how the charge is

**CFPB**

**Examination Procedures**                                                              **TILA**

determined. For finance charges, a statement of when finance charges begin to accrue, including an explanation of whether or not any time period exists within which any credit extended may be repaid without incurring a finance charge. If such a time period is provided, a creditor may, at its option and without disclosure, impose no finance charge when payment is received after the time period's expiration. (§1026.6(b)(3)(i))

26. *Disclosure of rates for open*-end (not home-secured) plans. Determine that the creditor disclosed, as applicable, for each periodic rate that may be used to calculate interest (§1026.6(b)(4)(i)):

   i.  The rate (expressed as a periodic rate and a corresponding APR),

   ii. The range of balances to which the rate is applicable,

   iii. The type of transaction to which the periodic rate applies,

   iv. An explanation of the method used to determine the balance to which the rate is applied.

27. *Variable-rate Accounts.* For interest rate changes that are tied to increases in an index or formula (variable-rate accounts) determine that the following are specifically set forth in the account agreement (§1026.6(b)(4)(ii)):

   i.   The fact that the annual percentage rate may increase.

   ii.  How the rate is determined, including the margin.

   iii. The circumstances under which the rate may increase.

   iv.  The frequency with which the rate may increase.

   v.   Any limitation on the amount the rate may change.

   vi.  The effect(s) of an increase.

   vii. Except as specified in paragraph (b)(4)(ii)(H) of this section, a rate is accurate if it is a rate as of a specified date and this rate was in effect within the last 30 days before the disclosures are provided.

27. Rate changes not due to index or formula. For interest rate changes that are specifically set forth in the account agreement and not tied to increases in an index or formula, determine that the creditor discloses (§1026.6(b)(4)(iii)):

   i.  The initial rate (expressed as a periodic rate and a corresponding APR)

   ii. How long the initial rate will remain in effect and the specific events that cause the initial rate to change.

**CFPB**

**Examination Procedures**                                                    **TILA**

    iii. The rate (expressed as a periodic rate and a corresponding APR) that will apply when the initial rate is no longer in effect and any limitation on the time period the new rate will remain in effect.

    iv. The balances to which the new rate will apply.

    v. The balances to which the current rate at the time of the change will apply.

28. *Voluntary credit insurance, debt cancellation, or debt suspension.* Determine that the creditor disclosed the applicable disclosures if the creditor offers optional credit insurance, or debt cancellation or debt suspension coverage. (§1026.6(b)(5)(i))

29. *Security interests.* Determine that the creditor disclosed the fact that the creditor has or will acquire a security interest in the property purchased under the plan, or in other property identified by item or type. (§1026.6(b)(5)(ii))

30. *Statement of billing rights.* Determine that the creditor disclosed a statement that outlines the consumer's rights and the creditor's responsibilities. (§1026.6(b)(5)(iii))

## Periodic Statement Disclosures – Section 1026.7

a. *Rules affecting home-equity plans.* For home-equity plans subject to the requirements of section 1026.40, determine that the creditor disclosed on the periodic statement items 1 through 10 below (§1026.7(a)):

NOTE: The requirements of section 1026.7(a) apply only to home-equity plans subject to the requirements of section 1026.40. Alternatively, a creditor subject to the rules affecting home-equity plans may, at its option, comply with any of the requirements of section 1026.7(b); however, any creditor that chooses not to provide a disclosure under section 1026.7(a)(7) must comply with section 1026.7(b)(6).

1. *Previous balance.* The account balance outstanding at the beginning of the billing cycle. (§1026.7(a)(1))

2. *Identification of transactions.* An identification of each credit transaction in accordance with section 1026.8. (§1026.7(a)(2))

3. *Credits.* Any credit to the account during the billing cycle, including the amount and the date of crediting. The date need not be provided if a delay in accounting does not result in any finance or other charge. (§1026.7(a)(3))

4. *Periodic rates.* Each periodic rate that may be used to compute the finance charge, the range of balances to which it is applicable, and the corresponding annual percentage rate. If different periodic rates apply to different types of transactions, the types of transactions to which the periodic rates apply shall also

**CFPB**

**Examination Procedures**                                                    **TILA**

be disclosed. For variable-rate plans, the fact that the periodic rate(s) may vary. (§1026.7(a)(4))

NOTE: If no finance charge is imposed when the outstanding balance is less than a certain amount, the creditor is not required to disclose that fact, or the balance below which no finance charge will be imposed

NOTE: Further, an annual percentage rate that differs from the rate that would otherwise apply and is offered only for a promotional period need not be disclosed except in periods in which the offered rate is actually applied.

5. *Balance on which finance charge computed.* The amount of the balance to which a periodic rate was applied and an explanation of how that balance was determined. When a balance is determined without first deducting all credits and payments made during the billing cycle, the fact and the amount of the credits and payments shall be disclosed. (§1026.7(a)(5))

6. *Amount of finance charge and other charges.* (§1026.7(a)(6))

   i.  *Finance charges.* The amount of any finance charge debited or added to the account during the billing cycle, using the term *finance charge.* Determine that the components of the finance charge are individually itemized and identified to show the amount(s) due to the application of any periodic rates and the amounts(s) of any other type of finance charge.

       NOTE: If there is more than one periodic rate, the amount of the finance charge attributable to each rate need not be separately itemized and identified. (§1026.7(a)(6)(i))

   ii. *Other charges.* The amounts, itemized and identified by type, of any charges other than finance charges debited to the account during the billing cycle. (§1026.7(a)(6)(ii))

       NOTE: Creditors may comply with paragraphs (a)(6) of section 1026.7, or with paragraph (b)(6) of section 1026.7, at their option.

7. *Annual percentage rate.* At a creditor's option, when a finance charge is imposed during the billing cycle, the annual percentage rate(s) determined under section 1026.14(c) using the term *annual percentage rate.* (§1026.7(a)(7))

8. *Grace period.* The date by which or the time period within which the new balance or any portion of the new balance must be paid to avoid additional finance charges. (§1026.7(a)(8))

9. *Address for notice of billing errors.* The address to be used for notice of billing errors. Alternatively, the address may be provided on the billing rights statement permitted by section 1026.9(a)(2). (§1026.7(a)(9))

**CFPB**

**Examination Procedures**                                             **TILA**

10. *Closing date of billing cycle; new balance.* The closing date of the billing cycle and the account balance outstanding on that date. (§1026.7(a)(10))

b. *Rules affecting open-end (not home-secured) plans.* The requirements of paragraph (b) of this section (1 through 14 below) apply only to plans other than home-equity plans subject to the requirements of section 1026.40. For applicable plans, determine that the creditor discloses on the periodic statement (§1026.7(b)):

1. *Previous balance.* The account balance outstanding at the beginning of the billing cycle. (§1026.7(b)(1))

2. *Identification of transactions.* An identification of each credit transaction in accordance with section 1026.8. (§1026.7(b)(2))

3. *Credits.* Any credit to the account during the billing cycle, including the amount and the date of crediting. The date need not be provided if a delay in crediting does not result in any finance or other charge. (§1026.7(b)(3))

4. *Periodic rates.* Each periodic rate that may be used to compute the interest charge expressed as an annual percentage rate and using the term *Annual Percentage Rate,* along with the range of balances to which it is applicable. (§1026.7(b)(4))

   NOTE: If no interest charge is imposed when the outstanding balance is less than a certain amount, the creditor is not required to disclose that fact, or the balance below which no interest charge will be imposed. The types of transactions to which the periodic rates apply shall also be disclosed. For variable-rate plans, the fact that the APR may vary; and

   A promotional rate, as that term is defined in section 1026.16(g)(2)(i), is required to be disclosed only in periods in which the offered rate is actually applied.

5. *Balance on which finance charge computed.* The amount of the balance to which a periodic rate was applied and an explanation of how that balance was determined, using the term *Balance Subject to Interest Rate.* (§1026.7(b)(5))

6. *Charges imposed.* The amounts of any charges imposed as part of a plan as stated in section 1026.6(b)(3), grouped together, in proximity to transactions identified under paragraph (b)(2) of this section, substantially similar to Sample G–18(A) in Appendix G to this part. (§1026.7(b)(6))

   i. *Interest.* Finance charges attributable to periodic interest rates, using the term *Interest Charge,* must be grouped together under the heading *Interest Charged,* itemized and totaled by type of transaction, and a total of finance charges attributable to periodic interest rates, using the term *Total Interest,* must be disclosed for the statement period and calendar year to date, using a format substantially similar to Sample G–18(A).

**CFPB**

**Examination Procedures**                                    **TILA**

ii. *Fees.* Charges imposed as part of the plan other than charges attributable to periodic interest rates must be grouped together under the heading *Fees,* identified consistent with the feature or type, and itemized, and a total of charges, using the term *Fees,* must be disclosed for the statement period and calendar year to date, using a format substantially similar to Sample G–18(A).

7. *Change-in-terms and increased penalty rate summary for open-end (not home-secured) plans.* Creditors that provide a change-in-terms notice required by section 1026.9(c), or a rate increase notice required by section 1026.9(g), on or with the periodic statement, must disclose the information in sections 1026.9(c)(2)(iv)(A) and (c)(2)(iv)(B) (if applicable) or section 1026.9(g)(3)(i) on the periodic statement in accordance with the format requirements in section 1026.9(c)(2)(iv)(D), and section 1026.9(g)(3)(ii). See Forms G–18(F) and G–18(G). (§1026.7(b)(7))

8. *Grace period.* The date by which or the time period within which the new balance or any portion of the new balance must be paid to avoid additional finance charges. If such a time period is provided, a creditor may, at its option and without disclosure, impose no finance charge if payment is received after the time period's expiration. (§1026.7(b)(8))

9. *Address for notice of billing errors.* The address to be used for notice of billing errors. Alternatively, the address may be provided on the billing rights statement permitted by section 1026.9(a)(2). (§1026.7(b)(9))

10. *Closing date of billing cycle; new balance.* The closing date of the billing cycle and the account balance outstanding on that date disclosed in accordance with section 1026.7(b)(13). (§1026.7(b)(10))

11. *Due date; late payment costs.* With the exception of periodic statements provided solely for charge cards and periodic statements provided for a charged-off account where payment of the entire account balance is due immediately, determine that the creditor disclosed (in accordance with section 1026.7(b)(13)) for a credit card account under an open-end (not home-secured) consumer credit plan:

   i. The due date for a payment (the due date must be the same day of the month for each billing cycle). (§1026.7(b)(11)(i)(A))

   ii. The amount of any late payment fee and any increased periodic rate(s) (expressed as an annual percentage rate(s)) that may be imposed on the account as a result of a late payment. If a range of late payment fees may be assessed, verify that the card issuer either states a range of fees or the highest fee and an indication that the fee imposed could be lower. (§1026.7(b)(11)(i)(B))

# CFPB

## Examination Procedures                                               TILA

NOTE: If the rate may be increased for more than one feature or balance, the card issuer may state the range of rates or the highest rate that could apply and at the issuer's option an indication that the rate imposed could be lower.

NOTE: Further, with the exception of the negative or no amortization disclosures required by section 1026.7(b)(12)(ii), the repayment disclosures in section 1026.7(b)(12) (as listed in step 12 below) are not required for:

i.     Charge card accounts that require payment of outstanding balances in full at the end of each billing cycle;

ii.    A billing cycle immediately following two consecutive billing cycles in which the consumer paid the entire balance in full, had a zero outstanding balance or had a credit balance; and

iii.   A billing cycle where paying the minimum payment due for that billing cycle will pay the entire outstanding balance on the account for that billing cycle.

12. Given those exceptions above, determine that the card issuer disclosed on the periodic statement section 1026.7(b)(12):

i.     The following statement with a bold heading: "**Minimum Payment Warning**: If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance" (§1026.7(b)(12)(i)(A));

ii.    The minimum payment repayment estimate, as described in Appendix M1 to this part. NOTE: If the minimum payment repayment estimate is less than two years, determine that the card issuer disclosed the estimate in months. Otherwise, the estimate must be disclosed in years and rounded to the nearest whole year (§1026.7(b)(12)(i)(B));

iii.   The minimum payment total cost estimate, as described in Appendix M1 to this part, rounded to the nearest whole dollar or to the nearest cent, at the card issuer's option (§1026.7(b)(12)(i)(C));

iv.    A statement that the minimum payment repayment estimate and the minimum payment total cost estimate are based on the current outstanding balance shown on the periodic statement. A statement that the minimum payment repayment estimate and the minimum payment total cost estimate are based on the assumption that only minimum payments are made and no other amounts are added to the balance (§1026.7(b)(12)(i)(D));

v.     A toll-free telephone number where the consumer may obtain from the card issuer information about credit counseling services (§1026.7(b)(12)(i)(E)); and

vi.    The disclosures required for section 1026.7(b)(12)(i)(F)(1):

   a.    The estimated monthly payment for repayment in 36 months, as described in Appendix M1 to this part. The estimated monthly payment for repayment in 36 months must be rounded to the nearest whole dollar or to the nearest cent, at the card issuer's option (§1026.7(b)(12)(i)(F)(1)(i));

   b.    A statement that the card issuer estimates that the consumer will repay the outstanding balance shown on the periodic statement in three years if the consumer pays the estimated monthly payment for three years (§1026.7(b)(12)(i)(F)(1)(ii));

   c.    The total cost estimate for repayment in 36 months, as described in Appendix M1 to this part. The total cost estimate for repayment in 36 months must be rounded to the nearest whole dollar or to the nearest cent, at the card issuer's option (§1026.7(b)(12)(i)(F)(1)(iii)); and

   d.    The savings estimate for repayment in 36 months, as described in Appendix M1 to this part. The savings estimate for repayment in 36 months must be rounded to the nearest whole dollar or to the nearest cent, at the card issuer's option (§1026.7(b)(12)(i)(F)(1)(iv)).

NOTE: The disclosures (a through d above) required for section 1026.7(b)(12)(i)(F)(1) do not apply to a periodic statement in any of the following circumstances:

   a.    The minimum payment repayment estimate that is disclosed on the periodic statement pursuant to paragraph (b)(12)(i)(B) of this section after rounding is three years or less;

   b.    The estimated monthly payment for repayment in 36 months, as described in Appendix M1 to this part, rounded to the nearest whole dollar or nearest cent that is calculated for a particular billing cycle is less than the minimum payment required for the plan for that billing cycle; and

   c.    A billing cycle where an account has both a balance in a revolving feature where the required minimum payments for this feature will not amortize that balance in a fixed amount of time specified in the account agreement and a balance in a fixed repayment feature where the required minimum payment for this fixed repayment feature will amortize that balance in a fixed amount of time specified in the account agreement which is less than 36 months.

vii.    If negative or no amortization occurs when calculating the minimum payment estimate as described in Appendix M1, determine that the card issuer provides the following disclosures on each periodic statement instead of the disclosures set forth in section 1026.7(b)(12)(i) (§1026.7(b)(12)(ii)):

**CFPB**

**Examination Procedures**                                                    **TILA**

a. "**Minimum Payment Warning:** Even if you make no more charges using this card, if you make only the minimum payment each month we estimate **you will never pay off the balance shown on this statement** because your payment will be less than the interest charged each month" (§1026.7(b)(12)(ii)(A));

b. "If you make more than the minimum payment each period, you will pay less in interest and pay off your balance sooner" (§1026.7(b)(12)(ii)(B));

c. The estimated monthly payment for repayment in 36 months rounded to the nearest whole dollar or to the nearest cent, at the creditor's option (§1026.7(b)(12)(ii)(C));

d. A statement that the card issuer estimates that the consumer will repay the outstanding balance shown on the periodic statement in three years if the consumer pays the estimated monthly payment each month for three years (§1026.7(b)(12)(ii)(D)); and

e. A toll-free telephone number where the consumer may obtain from the card issuer information about credit counseling services consistent with section 1026.7(b)(12)(iv) (§1026.7(b)(12)(ii)(E)).

viii. Verify that the items required to be disclosed, as addressed in the procedures in step 12 above (required by section 1026.7(b)(12)) are disclosed in accordance with the format requirements of section 1026.7(b)(13) and are substantially similar to the samples provided in Appendix G of Regulation Z.

ix. Determine that a card issuer provides (to the extent available from the United States Trustee or a bankruptcy administrator) through the disclosed toll-free telephone number the name, street address, telephone number, and website address for at least three organizations that have been approved by the United States Trustee or a bankruptcy administrator to provide credit counseling services in either the state in which the billing address for the account is located or the state specified by the consumer. (§1026.7(b)(12)(iv)(A))

x. Determine that the card issuer at least annually updates the credit counseling information it discloses for consistency with the information available from the United States Trustee or a bankruptcy administrator. (§1026.7(b)(12)(iv)(B))

13. Determine that the card issuer provided periodic statement disclosures according to the following format requirements (§1026.7(b)(13)):

i. The due date is disclosed on the front of the first page of the periodic statement and that the amount of the late payment fee and the APR(s) are stated in close proximity thereto.

**CFPB**

**Examination Procedures** **TILA**

ii. The ending balance and the repayment disclosures (required by paragraph (b)(12) of section 1026.7 are disclosed closely proximate to the minimum payment due.

iii. The due date, late payment fee and APR, ending balance, minimum payment due, and repayment disclosures are grouped together.

NOTE: Sample G-18(D) in Appendix G of Regulation Z sets forth an example of how these terms may be grouped.

14. For accounts with an outstanding balance subject to a deferred interest or similar program, determine that the creditor disclosed the date by which that outstanding balance must be paid in full in order to avoid the obligation to pay finance charges on such balance on the front of any page of each periodic statement issued during the deferred interest period beginning with the first periodic statement issued during the deferred interest period that reflects the deferred interest or similar transaction. The disclosure provided pursuant to this paragraph must be substantially similar to Sample G–18(H) in Appendix G to this part. (§1026.7(b)(14))

## Subsequent Disclosure Requirements — Section 1026.9

a. Determine whether the creditor mailed or delivered the billing rights statement at least once per calendar year, at intervals of not less than 6 months or more than 18 months, customers and whether the institution used the short form notice with each periodic statement. (§1026.9(a)(1))

NOTE: As an alternative to the annual billing rights statement (§1026.9(a)(1)), the creditor may mail or deliver, on or with each periodic statement, a statement substantially similar to Model Form G–4 or Model Form G–4(A) in Appendix G to this part, as applicable. Creditors offering home-equity plans subject to the requirements of section 1026.40 may use either Model Form, at their option. (§1026.9(a)(2))

b. If, 30 days after mailing or delivering the account-opening disclosures under sections 1026.6(a)(1) or (b)(3)(ii)(A), the creditor adds a credit feature or furnishes a credit access device (other than as a renewal, resupply, or the original issuance of a credit card, or except with regard to checks that access a credit card account) on the same finance charge terms, determine that the creditor discloses, before the consumer uses the feature or device for the first time, that it is for use in obtaining credit under the terms previously disclosed. (§1026.9(b)(1))

c. Determine that, except with regard to checks that access a credit card account, whenever a credit feature is added or a credit access device is mailed or delivered to the consumer, and the finance charge terms for the feature or device differ from disclosures previously given, the disclosures required by sections 1026.6(a)(1) or

(b)(3)(ii)(A) that are applicable to the added feature or device are given before the consumer uses the feature or device for the first time. (§1026.9(b)(2))

d. *Checks that access a credit card account.* For open-end plans not subject to the requirements of section 1026.40, if checks that can be used to access a credit card account are provided more than 30 days after account-opening disclosures under section 1026.6(b) are mailed or delivered, or are provided within 30 days of the account-opening disclosures and the finance charge terms for the checks differ from the finance charge terms previously disclosed, determine that the creditor discloses on the front of the page containing the checks the following terms in the form of a table with the headings, content, and form substantially similar to Sample G–19 in Appendix G to this part (§1026.9(b)(3)):

1.  If a promotional rate applies to the checks, determine that the creditor discloses:

    i.   The promotional rate and the time period during which the promotional rate will remain in effect (§1026.9(b)(3)(i)(A)(1));

    ii.  The type of rate that will apply (such as whether the purchase or cash advance rate applies) after the promotional rate expires, and the annual percentage rate that will apply after the promotional rate expires. For a variable-rate account, a creditor must disclose an annual percentage rate based on the applicable index or formula in accordance with the accuracy requirements set forth in paragraph (b)(3)(ii) of this section (§1026.9(b)(3)(i)(A)(2)); and

    iii. The date, if any, by which the consumer must use the checks in order to qualify for the promotional rate. If the creditor will honor checks used after such date but will apply an annual percentage rate other than the promotional rate, the creditor must disclose this fact and the type of annual percentage rate that will apply if the consumer uses the checks after such date (§1026.9(b)(3)(i)(A)(3)).

2.  If any APR required to be disclosed pursuant to section 1026.9(b)(3)(i) is a variable rate, determine that the creditor also disclosed the fact that the rate may vary and how the rate is determined. Determine that the creditor identified the type of index or formula used in setting the rate. Determine that the creditor does not disclose the value of the index and the amount of the margin that are used to calculate the variable rate in the table and that any applicable limitations on rate increases are not included in the table (§1026.9(b)(3)(iii)).

3.  If no promotional rate applies to the checks, determine that the creditor discloses:

    i.   The type of rate that will apply to the checks and the applicable annual percentage rate. For a variable-rate account, a creditor must disclose an annual percentage rate based on the applicable index or formula in accordance with

the accuracy requirements set forth in section 1026.9(b)(3)(ii).
(§1026.9(b)(3)(i)(B)(1))

4.   Determine that the creditor discloses:

   i.   Any transaction fees applicable to the checks disclosed under section
1026.6(b)(2)(iv). (§1026.9(b)(3)(i)(C))

   ii.   Whether or not a grace period is given within which any credit extended by
use of the checks may be repaid without incurring a finance charge due to a
periodic interest rate. When disclosing whether there is a grace period, the
phrase "How to Avoid Paying Interest on Check Transactions" shall be used
as the row heading when a grace period applies to credit extended by the use
of the checks. When disclosing the fact that no grace period exists for credit
extended by use of the checks, the phrase "Paying Interest" shall be used as
the row heading. (§1026.9(b)(3)(i)(D))

NOTE: The disclosures in section 1026.9(b)(3)(i) must be accurate as of the time
the disclosures are mailed or delivered. A variable APR is accurate if it was in
effect within 60 days of when the disclosures are mailed or delivered.
(1026.9(b)(3)(ii))

e.   Determine, for home-equity plans subject to the requirements of section 1026.40:

1.   Whenever any term required to be disclosed under section 1026.6(a) is changed or
the required minimum periodic payment is increased, the creditor mailed or
delivered written notice of the change at least 15 days prior to the effective date of
the change. If the consumer agreed to the change, determine that notice was
provided before the change went into effect. (§1026.9(c)(1)(i))

2.   If the creditor prohibits additional extensions of credit or reduces the credit limit
that the creditor mailed or delivered notice of the action not later than three
business days after such action is taken. The notice must contain the specific
reasons for the action. (§1026.9(c)(1)(iii))

NOTE: Notice is not required when the change involves a reduction of any
component of a finance charge or other charge or when the change results from an
agreement involving a court proceeding. (§1026.9(c)(1)(ii))

f.   For plans other than home-equity plans subject to the requirements of section
1026.40, except as provided in sections 1026.9(c)(2)(i)(B), (c)(2)(iii) and (c)(2)(v),
when a significant change in account terms as described in section 1026.9(c)(2)(ii) is
made, determine that the creditor provides a written notice of the change at least 45
days prior to the effective date of the change to each consumer who may be affected.
(§1026.9(c)(2)(i)(A))

**CFPB**

**Examination Procedures**                                                **TILA**

g.  The 45-day timing requirement, however, does not apply if the consumer has agreed to a particular change as described in section 1026.9(c)(2)(i)(B). For these instances, however, determine that the creditor provided a notice in accordance with the timing requirements of section 1026.9(c)(2)(i)(B). (§1026.9(c)(2)(i)(A))

h.  For open-end (not home-secured) plans, determine that increases in the rate applicable to a consumer's account due to delinquency, default or as a penalty described in section 1026.9(g) that are not due to a change in the contractual terms of the consumer's account are disclosed pursuant to section 1026.9(g) instead of section 1026.9(c)(2). (§1026.9(c)(2)(i)(A))

i.  When a notice of change in terms is required, determine that it is mailed or delivered no later than the effective date of the change, if the consumer agrees to the particular change. section 1026.9(c)(2)(i)(B) applies only when a consumer substitutes collateral or when the creditor can advance additional credit only if a change relatively unique to that consumer is made, such as the consumer's providing additional security or paying an increased minimum payment amount. (§1026.9(c)(2)(i)(B))

NOTE: The 45-day timing requirements discussed in step f above does not apply in certain narrow circumstances, as described in section 1026.9(c)(2)(i)(B). The following are not considered agreements between the consumer and the creditor for purposes of section 1026.9(c)(2)(i)(B):

1.  The consumer's general acceptance of the creditor's contract reservation of the right to change terms;

2.  The consumer's use of the account (which might imply acceptance of its terms under state law);

3.  The consumer's acceptance of a unilateral term change that is not particular to that consumer, but rather is of general applicability to consumers with that type of account; and,

4.  The consumer's request to reopen a closed account or to upgrade an existing account to another account offered by the creditor with different credit or other features. (§1026.9(c)(2)(i)(B))

j.  The 45-day advance notice requirement applies to changes to the following terms (§1026.9(c)(2)(ii)):

1.  APR increase, including each periodic rate that may be used to compute the finance charge on outstanding balances for purchases, a cash advance, or a balance transfer (such rates may include any discounted initial rate, premium initial rate, or penalty rate that may be applied to the account);

    i.   Variable-rate information;

**CFPB**

**Examination Procedures**                                          **TILA**

---

    ii.    Discounted or premium initial rates;

    iii.    Penalty rates;

2. Fees for issuance or availability, including any fee based upon account activity or inactivity;

3. Fixed finance charge or minimum interest charge, if it exceeds $1.00;

4. Transaction charge for purchases;

5. Grace period;

6. Balance computation method;

7. Cash advance fee;

8. Late payment fee;

9. Over-the-limit fee;

10. Balance transfer fee;

11. Returned payment fee;

12. Required insurance, debt cancellation, or debt suspension coverage; and

13. Increase in required minimum periodic payment, or the acquisition of a security interest.

k. Except as provided in section 1026.9(c)(2)(vi), if a creditor increases any component of a charge, or introduces a new charge, required to be disclosed under section 1026.6(b)(3) that is not a significant change in account terms as described in paragraph (c)(2)(ii) of this section, determine that the creditor either (§1026.9(c)(2)(iii)):

1. Complies with the requirements of section 1026.9(c)(2)(i), or

2. Provides notice of the amount of the charge before the consumer agrees to or becomes obligated to pay the charge, at a time and in a manner that a consumer would be likely to notice the disclosure of the charge, either in writing or orally.

l. Ensure that the written change-in-terms notice contains the following disclosures (§1026.9(c)(2)(iv)(A)):

1. A summary of the changes made to terms required by sections 1026.6(b)(1) and (b)(2) or section 1026.6(b)(4), a description of any increase in the required minimum payment, and a description of any security interests being acquired by the creditor.

---

**CFPB**

**Examination Procedures**                                                    **TILA**

2. A statement that changes are being made to the account.

3. For accounts other than credit card accounts under an open-end (not home-secured) consumer credit plan subject to section 1026.9(c)(2)(iv)(B), a statement indicating that the consumer has the right to opt out of the changes, if applicable, and a reference to the opt-out right provided in the notice, if applicable.

4. The date the changes will become effective.

5. If applicable, a statement that the consumer may find additional information about the summarized changes, and other changes, in the notice.

6. In the case of a rate change, other than a penalty rate, a statement that if a penalty rate currently applies to the consumer's account, the new rate described in the notice will not apply to the consumer's account until the consumer's account balances are no longer subject to the penalty rate.

7. If the change in terms being disclosed is an increase in the APR, the balances to which the increased rate will apply. If applicable, creditors should disclose a statement identifying the balances to which the current rate will apply as of the effective date of the change.

8. If the change in terms being disclosed is an increase in an annual percentage rate for a credit card account under an open-end (not home-secured) consumer credit plan, a statement of no more than four principal reasons for the rate increase, listed in their order of importance.

NOTE: The disclosed reasons must accurately describe the principal factors actually considered by the card issuer in increasing the rate. (Commentary §1026.9(c)(2)(iv) - 11)

m. In addition to the disclosures in section 1026.9(c)(2)(iv)(A), if a card issuer makes a significant change in account terms on a credit card account under an open-end (not home-secured) consumer credit plan, determine that the creditor provides the following information on the notice provided pursuant to section 1026.9(c)(2)(i) (§1026.9(c)(2)(iv)(B)):

NOTE: This information is not required to be provided in the case of an increase in the required minimum periodic payment, an increase in a fee as a result of a reevaluation of a determination made under section 1026.52(b)(1)(i) or an adjustment to the safe harbors in section 1026.52(b)(1)(ii) to reflect changes in the Consumer Price Index, a change in an annual percentage rate applicable to a consumer's account, an increase in a fee previously reduced consistent with 50 U.S.C. app. 527 (Servicemembers Civil Relief Act) or similar Federal or State statute or regulation if the amount of the increased fee does not exceed the amount of that fee prior to the reduction, or when the change results from the creditor not receiving the consumer's required minimum periodic payment within 60 days after the due date for that payment.

**CFPB**

**Examination Procedures**                                              **TILA**

1. A statement that the consumer has the right to reject the change or changes prior to the effective date of the changes, unless the consumer fails to make a required minimum periodic payment within 60 days after the due date for that payment;

2. Instructions for rejecting the change or changes, and a toll-free telephone number that the consumer may use to notify the creditor of the rejection; and

3. If applicable, a statement that if the consumer rejects the change or changes, the consumer's ability to use the account for further advances will be terminated or suspended.

n. *Changes resulting from failure to make minimum periodic payment within 60 days from due date for credit card accounts under an open-end (not home-secured) consumer credit plan.* For a credit card account under an open-end (not home-secured) consumer credit plan (§1026.9(c)(2)(iv)(C)):

1. If the significant change required to be disclosed pursuant to section 1026.9(c)(2)(i) of this section is an increase in an annual percentage rate or a fee or charge required to be disclosed under sections 1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii) based on the consumer's failure to make a minimum periodic payment within 60 days from the due date for that payment, determine that the notice provided pursuant to paragraph (c)(2)(i) of this section states that the increase will cease to apply to transactions that occurred prior to or within 14 days of provision of the notice, if the creditor receives six consecutive required minimum periodic payments on or before the payment due date, beginning with the first payment due following the effective date of the increase.

2. If the significant change required to be disclosed pursuant to section 1026.9(c)(2)(i) is an increase in a fee or charge required to be disclosed under sections 1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii) based on the consumer's failure to make a minimum periodic payment within 60 days from the due date for that payment, determine that the notice provided pursuant to section 1026.9(c)(2)(i) also states the reason for the increase.

o. Determine that the summary of changes described in section 1026.9(c)(2)(iv)(A)(1) is in a tabular format (except for a summary of any increase in the required minimum periodic payment, a summary of a term required to be disclosed under section 1026.6(b)(4) that is not required to be disclosed under section 1026.6(b)(1) and (b)(2), or a description of any security interest being acquired by the creditor), with headings and format substantially similar to any of the account-opening tables found in G–17 in Appendix G. Determine that the table discloses the changed term and information relevant to the change, if that relevant information is required by section 1026.6(b)(1) and (b)(2). Determine that the new terms are described in the same level of detail as required when disclosing the terms under section 1026.6(b)(2). (§1026.9(c)(2)(iv)(D)(1))

CFPB

**Examination Procedures** **TILA**

p.  If a notice required by section 1026.9(c)(2)(i) (change in terms) is included on or with a periodic statement, determine that the information described in section 1026.6(c)(2)(iv)(A)(1) is disclosed on the front of any page of the statement. Determine that the summary of changes described in section 1026.9(c)(2)(iv)(A)(1) immediately follows the information described in section 1026.9(c)(2)(iv)(A)(2) through section 1026.9(c)(2)(iv)(A)(7) and, if applicable, sections 1026.9(c)(2)(iv)(A)(8), 1026.9(c)(2)(iv)(B), and 1026.9(c)(2)(iv)(C), and is substantially similar to the format shown in Sample G-20 or G-21 in Appendix G to this part. (§1026.9(c)(2)(iv)(D)(2))

q.  If a notice required by section 1026.9(c)(2)(i) is not included on or with a periodic statement, determine that the information described in section 1026.9(c)(2)(iv)(A)(1) is disclosed on the front of the first page of the notice or segregated on a separate page from other information given with the notice. (§1026.9(c)(2)(iv)(D)(3))

NOTE: The summary of changes required to be in a table pursuant to paragraph (c)(2)(iv)(A)(1) of this section may be on more than one page, and may use both the front and reverse sides, so long as the table begins on the front of the first page of the notice and there is a reference on the first page indicating that the table continues on the following page.

r.  Determine that the summary of changes described in section 1026.9(c)(2)(iv)(A)(1) immediately follows the information described in section 1026.9(c)(2)(iv)(A)(2) through section 1026.9(c)(2)(iv)(A)(7) and, if applicable, sections 1026.9(c)(2)(iv)(A)(8), (c)(2)(iv)(B), and (c)(2)(iv)(C), of this section, and is substantially similar to the format shown in Sample G-20 or G-21 in Appendix G to this part. (§1026.9(c)(2)(iv)(D)(3))

s.  For open-end plans (other than home equity plans subject to the requirements of section 1026.40), note that a creditor is not required to provide notice under this section if (§1026.9(c)(2)(v)):

1.  The change involves:

i.  Charges for documentary evidence;

ii.  A reduction of any component of a finance or other charge;

iii.  A suspension of future credit privileges (except as provided in section 1026.9(c)(2)(vi) of this section) or termination of an account or plan;

iv.  When the change results from an agreement involving a court proceeding;

v.  When the change is an extension of the grace period; or

**CFPB**

**Examination Procedures**                                          **TILA**

    vi.   The change is applicable only to checks that access a credit card account and the changed terms are disclosed on or with the checks in accordance with section 1026.9(b)(3) (§1026.9(c)(2)(v)(A));

2.   The change is an increase in an APR upon the expiration of a specified period of time, provided that (§1026.9(c)(2)(v)(B)):

    i.   Prior to commencement of that period, the creditor disclosed in writing to the consumer, in a clear and conspicuous manner, the length of the period and the APR or fee that would apply after expiration of the period;

    ii.   The disclosure of the length of the period and the APR or fee that would apply after expiration of the period are set forth in close proximity and in equal prominence to the first listing of the disclosure of the rate or fee that applies during the specified period of time; and

    iii.   The APR or fee that applies after that period does not exceed the rate disclosed pursuant to section 1026.9(c)(2)(v)(B)(1) or, if the rate disclosed pursuant to section 1026.9(c)(2)(v)(B)(1) was a variable rate, the rate following any such increase is a variable rate determined by the same formula (index and margin) that was used to calculate the variable rate disclosed pursuant to section 1026.9(c)(2)(v)(B)(1);

3.   The change is an increase in a variable APR in accordance with a credit card or other account agreement that provides for changes in the rate according to operation of an index that is not under the control of the creditor and is available to the general public (§1026.9(c)(2)(v)(C)); or

4.   The change is an increase in an APR, a fee or charge required to be disclosed under sections 1026.6(b)(2)(ii), (b)(2)(iii), (b)(2)(viii), (b)(2)(ix) or (b)(2)(xii), or the required minimum periodic payment due to the completion of a workout or temporary hardship arrangement by the consumer or the consumer's failure to comply with the terms of such an arrangement, provided that (§1026.9(c)(2)(v)(D)):

    i.   The APR or fee or charge applicable to a category of transactions or the required minimum periodic payment following any such increase does not exceed the rate or fee or charge or required minimum periodic payment that applied to that category of transactions prior to commencement of the arrangement or, if the rate that applied to a category of transactions prior to the commencement of the workout or temporary hardship arrangement was a variable rate, the rate following any such increase is a variable rate determined by the same formula (index and margin) that applied to the category of transactions prior to commencement of the workout or temporary hardship arrangement; and

# CFPB
# Examination Procedures                                    TILA

ii.  The creditor has provided the consumer, prior to the commencement of such arrangement, with a clear and conspicuous disclosure of the terms of the arrangement (including any increases due to such completion or failure). This disclosure must generally be provided in writing. However, a creditor may provide the disclosure of the terms of the arrangement orally by telephone, provided that the creditor mails or delivers a written disclosure of the terms of the arrangement to the consumer as soon as reasonably practicable after the oral disclosure is provided.

t.  For open-end plans that are not subject to the requirements of section 1026.40, if a creditor decreases the credit limit on the account, determine that advance notice of the decrease is provided before an over-the-limit fee or a penalty rate can be imposed solely as a result of the consumer exceeding the newly decreased credit limit. Determine that notice is provided in writing or orally at least 45 days prior to imposing the over-the-limit fee or penalty rate and that it states that the credit limit on the account has been or will be decreased. (§1026.9(c)(2)(vi))

u.  Determine that the disclosures contained in section 1026.60(b)(1) through (b)(7) are provided if the account is renewed and (1) the card issuer imposes an annual or other periodic fee for the renewal or (2) the card issuer has changed or amended any term of the account required to be disclosed under section 1026.6(b)(1) and (b)(2) that has not previously been disclosed to the consumer. Additionally, the disclosure provided upon renewal must disclose how and when the cardholder may terminate the credit to avoid paying the renewal fee, if any. (§1026.9(e))

v.  For plans other than home-equity plans subject to the requirements of section 1026.40 (except as provided in section 1026.9(g)(4)), determine that the creditor provides a written notice to each consumer who may be affected when (§1026.9(g)(1)):

1.  A rate is increased due to the consumer's delinquency or default; or

2.  A rate is increased as a penalty for one or more events specified in the account agreement, such as making a late payment or obtaining an extension of credit that exceeds the credit limit.

w.  Whenever any notice is required to be given pursuant to paragraph (g)(1) of this section, determine that the creditor provided written notice of the increase in rates at least 45 days prior to the effective date of the increase. The notice must be provided after the occurrence of the events described in section 1026.9(g)(1)(i) and (g)(1)(ii) that trigger the imposition of the rate increase. (§1026.9(g)(2))

x.  If a creditor is increasing the rate due to delinquency or default or as a penalty, determine that the creditor provided the following information on the notice sent pursuant to section 1026.9(g)(1) (§1026.9(g)(3)(i)(A)):

# CFPB
# Examination Procedures                                    TILA

1. A statement that the delinquency or default rate or penalty rate, as applicable, has been triggered;

2. The date on which the delinquency or default rate or penalty rate will apply;

3. The circumstances under which the delinquency or default rate or penalty rate, as applicable, will cease to apply to the consumer's account, or that the delinquency or default rate or penalty rate will remain in effect for a potentially indefinite time period;

4. A statement indicating to which balances the delinquency or default rate or penalty rate will be applied;

5. If applicable, a description of any balances to which the current rate will continue to apply as of the effective date of the rate increase, unless a consumer fails to make a minimum periodic payment within 60 days from the due date for that payment; and

6. For a credit card account under an open-end (not home-secured) consumer credit plan, a statement of no more than four principal reasons for the rate increase, listed in their order of importance.

NOTE: The disclosed reasons must accurately describe the principal factors actually considered by the card issuer in increasing the rate. (Commentary §1026.9(g) - 7)

y. For a credit card account under an open-end (not home-secured) consumer credit plan, if the rate increase required to be disclosed pursuant to paragraph (g)(1) of this section is an increase pursuant to section 1026.55(b)(4) based on the consumer's failure to make a minimum periodic payment within 60 days from the due date for that payment, determine that the notice provided pursuant to paragraph (g)(1) of this section also states that the increase will cease to apply to transactions that occurred prior to or within 14 days of provision of the notice, if the creditor receives six consecutive required minimum periodic payments on or before the payment due date, beginning with the first payment due following the effective date of the increase. (§1026.9(g)(3)(i)(B))

z. If a notice required by section 1026.9(g)(1) (*Increase in rates due to delinquency or default or as a penalty)* is included on or with a periodic statement, determine that the disclosure described in paragraph (g)(3)(i) is in the form of a table and provided on the front of any page of the periodic statement, above the notice described in paragraph (c)(2)(iv) of this section if that notice is provided on the same statement. (§1026.9(g)(3)(ii)(A))

aa. If a notice required by section 1026.9(g)(1) (increase in rates) is not included on or with a periodic statement, determine that the information described in section 1026.9(g)(3)(i) is disclosed on the front of the first page of the notice. Ensure that

**CFPB**

**Examination Procedures**                                    **TILA**

only information related to the increase in the rate to a penalty rate is included with the notice.

NOTE: This notice may be combined with a notice described in sections 1026.9(c)(2)(iv) or (g)(4) (A statement indicating to which balances the delinquency or default rate or penalty rate will be applied) of this section. (§1026.9(g)(3)(ii)(B))

bb. *Exception for Decreases in the Credit Limit* – If a creditor does not provide the 45-day notice under section 1026.9(g)(1) prior to increasing the rate for obtaining an extension of credit that exceeds the credit limit, determine that the creditor provides at least 45 days in advance of imposing the penalty rate a notice, in writing, that includes (§1026.9(g)(4)):

1. A statement that the credit limit on the account has or will be decreased.

2. The date on which the penalty rate will apply, if the outstanding balance exceeds the credit limit as of that date;

3. A statement that the penalty rate will not be imposed on that date, if the outstanding balance does not exceed the credit limit as of that date;

4. The circumstances under which the penalty rate, if applied, will cease to apply to the account, or that the penalty rate, if applied, will remain in effect for a potentially indefinite period of time;

5. A statement indicating to which balances the penalty rate may be applied; and

6. If applicable, a description of any balances to which the current rate will continue to apply as of the effective date of the rate increase, unless the consumer fails to make a minimum periodic payment within 60 days from the due date for that payment.

   In addition to this notice, determine that the creditor does not increase the applicable rate to the penalty rate if the outstanding balance does not exceed the credit limit on the date set forth in the notice. (§1026.9(g)(4)(ii))

cc. If a notice provided pursuant to section 1026.9(g)(4)(i) is included on or with a periodic statement, determine that the information described in section 1026.9(g)(4)(i) is in the form of a table and provided on the front of any page of the periodic statement (§1026.9(g)(4)(iii)(A)); or,

dd. If a notice required by section 1026.9(g)(4)(i) is not included on or with a periodic statement, determine that the information described in section 1026.9(g)(4)(i) is disclosed on the front of the first page of the notice. Determine that only information related to the reduction in credit limit is included with the notice, except that this notice may be combined with a notice described in sections 1026.9(c)(2)(iv) or (g)(1). (§1026.9(g)(4)(iii)(B))

# CFPB
# Examination Procedures                                               **TILA**

---

ee. When the consumer is given the right to reject a significant change to an account term prior to the effective date of the change, determine whether the consumer was given the option to reject the change by notifying the creditor of the rejection before the effective date of the change. (§1026.9(h)(1))

ff. If the creditor was notified of the rejection of a significant change to an account term, determine that the creditor did not:

1. Apply the charge to the account;

2. Impose a fee or charge or treat the account as in default solely as a result of the rejection; or

3. Require repayment of the balance on the account using a method that is LESS beneficial to the consumer than one of the following methods:

   a. The method of repayment for the account on the date on which the creditor was notified of the rejection;

   b. An amortization period of not less than five years, beginning no earlier than the date on which the creditor was notified of the rejection; or

   c. A required minimum periodic payment that includes a percentage of the balance that is equal to no more than twice the percentage required on the date on which the creditor was notified of the rejection. (§1026.9(h)(2))

   NOTE: These requirements do not apply if the creditor has not received the consumer's required minimum periodic payment within 60 days after the due date for that payment and the creditor has provided timely change in terms disclosures. (§1026.9(h)(3))

gg. Determine that a statement of the maximum interest rate that may be imposed during the term of the obligation is made for any dwelling-secured loan in which the APR may increase during the plan. (§1026.30(b))

hh. For any open-end mortgage loan (credit transaction that is secured by the principal dwelling of a consumer) that was sold, assigned, or otherwise transferred to the covered person, determine that the covered person notifies the borrower in writing of such transfer, including (§1026.39):

1. An identification of the loan that was sold, assigned, or otherwise transferred;

2. The name, address, and telephone number of the covered person who owns the mortgage loan;

3. The date of transfer (either the date of acquisition recognized in the books and records of the covered person or that of the transferring party) identified by the covered person;

---

**CFPB**

**Examination Procedures**                                                      **TILA**

4.  The name, address, and telephone number of an agent or party having authority, on behalf of the covered person, to receive notice of the right to rescind and resolve issues concerning the consumer's payments on the mortgage loan;

5.  Where transfer of ownership of the debt to the covered person is or may be recorded in public records or, alternatively, that the transfer of ownership has not been recorded in public records at the time the disclosure is provided; and

6.  At the option of the covered person, any other relevant information regarding the transaction.

7.  If there are multiple covered persons, contact information for each of them, unless one of them has been authorized to receive the consumer's notice of the right to rescind and resolve issues concerning the consumer's payments on the loan. (§§1026.39(d)-(e))

    NOTE: This notice of sale or transfer must be provided for any consumer credit transaction that is secured by the principal dwelling of a consumer. This notification is required by the covered person even if the loan servicer remains the same. In addition, if more than one consumer is liable on the obligation, the covered person may mail or deliver the disclosure notice to any consumer who is primarily liable. And, if an acquisition involves multiple covered persons who each acquire a partial interest in the loan pursuant to separate and unrelated agreements, each covered person has a duty to ensure that disclosures related to its acquisition are accurate and provided in a timely manner unless an exception in 1026.39(c) applies. The parties may, but are not required to, provide a single notice that satisfies the timing and content requirements applicable to each covered person. (Commentary §1026.39(b)(5) – 2)

## Disclosure Requirements for Over-the-Limit Transactions – Section 1026.56

a.  Determine that the oral, written or electronic "opt-in" notice includes all of the following applicable items (and not any information not specified in or otherwise permitted) (§1026.56(e)(1)):

1.  Fees – The dollar amount of any fees or charges assessed by the card issuer on a consumer's account for an over-the-limit transaction;

2.  APR(s) – Any increased periodic rate(s) (expressed as an APR(s)) that may be imposed on the account as a result of an over-the-limit transaction; and

3.  Disclosure of opt-in right – An explanation of the consumer's right to affirmatively consent to the card issuer's payment of over-the-limit transactions, including the method(s) by which the consumer may consent.

**CFPB**

**Examination Procedures**                                    **TILA**

b. Determine that the written notice informing the consumer of the right to revoke consent following the assessment of an over-the-limit fee or charge describes that right, including the method(s) by which the consumer may revoke consent. (§1026.56(e)(2))

## Reverse Mortgage Forms Review Procedures (Both Open- and Closed-End)

a. Determine that the disclosures required for reverse mortgage transactions are substantially similar to the model form in Appendix K and include the items below (§1026.33):

1. A statement that the consumer is not obligated to complete the reverse mortgage transaction merely because he or she has received the disclosures or signed an application.

2. A good faith projection of the total cost of the credit expressed as a table of "total annual loan cost rates" including payments to the consumer, additional creditor compensation, limitations on consumer liability, assumed annual appreciation, and the assumed loan period.

3. An itemization of loan terms, charges, the age of the youngest borrower, and the appraised property value.

4. An explanation of the table of total annual loan costs rates.

NOTE: Forms that include or involve current transactions, such as change in terms notices, periodic billing statements, rescission notices, and billing error communications, are verified for accuracy when the file review worksheets are completed.

## Timing Requirements

6. Review financial institution policies, procedures, and systems to determine, either separately or when completing the actual file review, whether the applicable disclosures listed below are furnished when required by Regulation Z. Take into account products that have different features, such as closed-end loans or credit card accounts that are fixed or variable rate.

a. Credit card application and solicitation disclosures – On or with the application (§1026.60(b))

b. HELOC disclosures – At the time the application is provided or within three business days under certain circumstances. (§1026.40(b))

c. Open-end credit initial disclosures – Before the first transaction is made under the plan. (§1026.5(b)(1))

**CFPB**

**Examination Procedures**                                                    **TILA**

d. Card Holder Agreement – Verify that the card issuer sends to the cardholder or otherwise make available to the cardholder a copy of the cardholder's agreement in electronic or paper form no later than 30 days after the issuer receives the cardholder's request (§1026.58(e)(1)(ii)). Determine that the issuer has adequate procedures for ensuring that this requirement is met.

e. Periodic statement disclosures for open-end credit under section 1026.7 – Required if at the end of a billing cycle, the account has a debit or credit balance of $1 or more or if a finance charge has been imposed (§1026.5(b)(2)(i)). Also, the creditor must adopt reasonable procedures designed to ensure that periodic statements for credit card accounts are mailed or delivered at least 21 days prior to the payment due date and the date on which any grace period expires (for non-credit card open-end credit, there is a 21-day rule if there is a grace period and a 14-day rule if there is no grace period). (§1026.5(b)(2)(ii)(B)(2))

f. Statement of billing rights – At least once per year. (§1026.9(a))

g. Supplemental credit devices – Before the first transaction under the plan. (§1026.9(b))

h. Open-end credit change in significant terms as a result of a change in contractual terms – 45 days prior to the effective change date. (§1026.9(c)(2))

i. Open-end change in terms or rates due to delinquency or default or as a penalty – 45 days prior to the effective change date. (§1026.9(g))

j. Finance charge imposed at time of transaction – Prior to imposing any fee. (§1026.9(d))

k. Disclosures upon renewal of credit or charge card – 30 days or one billing cycle, whichever is less before the delivery of the periodic statement on which the renewal fee is charged, or at least 30 days prior to the scheduled renewal date if the creditor has changed or amended any term required to be disclosed under section 1026.6(b)(1) and (b)(2) that has not previously been disclosed to the consumer. (§1026.9(e))

l. Change in credit account insurance provider – Certain information 30 days before the change in provider occurs and certain information 30 days after the change in provider occurs. The institution may provide a combined disclosure 30 days before the change in provider occurs. (§1026.9(f))

m. Closed-end credit disclosures – Before consummation. (§1026.17(b))

n. For disclosures for dwelling-secured transactions subject to RESPA (other than open-end), multiple timing requirements apply. Determine whether the creditor provides early disclosures within three business days after receiving the consumer's written application. The creditor is required to deliver or mail the early disclosures no later than three business days after receiving the consumer's application and at least seven

**CFPB**

**Examination Procedures**                                                    **TILA**

business days before consummation (§§1026.19(a)(1)(i) and 1026.19(a)(2)(i)). If the APR stated in the early disclosures is not considered accurate under section 1026.22 when compared to the APR at consummation, determine whether the creditor provided corrected disclosures of all changed terms, including the APR, that the consumer received no later than the third business day before consummation. (§1026.19(a)(2)(ii))

o.  Disclosures for transactions subject to section 1026.32 – Three business days prior to consummation. If such disclosures became inaccurate due to a change by the creditor, ensure that the creditor provided new, accurate disclosures no later than three business days prior to consummation. (§1026.31(c)(1))

p.  Disclosures for reverse mortgages – Three days prior to consummation of a closed-end credit transaction or prior to the first transaction under an open-end credit plan. (§1026.31(c)(2))

q.  Disclosures for adjustable-rate mortgages – At least once each year during which an interest rate adjustment is implemented without an accompanying payment change, and at least 25, but no more than 120 calendar days before a new payment amount is due, or in accordance with other variable-rate subsequent-disclosure regulations issued by a supervisory agency. (§1026.20(c))

r.  Notice of new creditor (§1026.39) – On or before the 30th calendar day following the acquisition.

s.  For private education loans subject to Subpart F (§1026.46), determine that:

   1.  Application or solicitation disclosures were provided on or with any application or solicitation (§1026.46(d)(1)(i));

   2.  Approval disclosures were provided before consummation on or with any notice of approval provided to the consumer (§1026.46(d)(2)); and

   3.  Final disclosures were provided after the consumer accepts the loan and at least three business days prior to disbursing the private education loan funds. (§1026.46(d)(3))

t.  Determine that the issuer provides a written over-the-limit notice prior to the assessment of any over-the-limit fee or charge on a consumer's account. (§1026.56(d)(1)(i))

u.  Determine that, if a consumer consents to the card issuer's payment of any over-the-limit transaction by oral or electronic means, the card issuer provides the required written notice immediately prior to obtaining that consent. (§1026.56(d)(1)(ii))

v.  Determine that the notice confirming the consumer's consent is provided no later than the first periodic statement sent after the consumer has consented to the card issuer's

# CFPB
# Examination Procedures                                    TILA

payment of over-the-limit transactions. The creditor must not assess an over-the-limit fee on the consumer's account without first providing written confirmation. (§1026.56(d)(2))

w.  Determine that the notice providing the consumer notice in writing of the right to revoke consent following the assessment of an over-the-limit fee or charge is provided on the front of any page of each periodic statement that reflects the assessment of an over-the-limit fee or charge on a consumer's account. (§1026.56(d)(3))

x.  For home-equity plans subject to the requirements of section 1026.40, whenever any term required to be disclosed under section 1026.6(a) is changed or the required minimum periodic payment is increased, determine that the creditor mails or delivers written notice of the change to each consumer who may be affected. Determine that the notice is mailed or delivered at least 15 days prior to the effective date of the change. If the change has been agreed to by the consumer, determine that the notice is given before the effective date of the change. (§1026.9(c)(1)(i))

y.  *Notice to restrict credit.* For home-equity plans subject to the requirements of section 1026.40, if the creditor prohibits additional extensions of credit or reduces the credit limit pursuant to section 1026.40(f)(3)(i) or (f)(3)(vi), determine that the creditor mails or delivers written notice of the action to each consumer who will be affected not later than three business days after the action is taken and contains specific reasons for the action. If the creditor requires the consumer to request reinstatement of credit privileges, determine that the notice states that fact. (§1026.9(c)(1)(iii))

# Electronic Disclosures

7.  Assess compliance for an institution's electronic disclosure requirements.

## E-Sign Act

a.  Disclosures may be provided to the consumer in electronic form, subject to compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. 7001 *et seq.*). The E-Sign Act does not mandate that institutions or consumers use or accept electronic records or signatures. It permits institutions to satisfy any statutory or regulatory requirements by providing the information electronically after obtaining the consumer's affirmative consent. Before consent can be given, consumers must be provided with the following information:

1.  Any right or option to have the information provided in paper or non-electronic form;

2.  The right to withdraw the consent to receive information electronically and the consequences, including fees, of doing so;

**CFPB**

**Examination Procedures**                                              **TILA**

3.  The scope of the consent (for example, whether the consent applies only to a particular transaction or to identified categories of records that may be provided during the course of the parties' relationship);

4.  The procedures to withdraw consent and to update information needed to contact the consumer electronically; and

5.  The methods by which a consumer may obtain, upon request, a paper copy of an electronic record after consent has been given to receive the information electronically and whether any fee will be charged.

b.  The consumer must consent electronically or confirm consent electronically in a manner that "reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent." After the consent, if an institution changes the hardware or software requirements such that a consumer may be prevented from accessing and retaining information electronically, the institution must notify the consumer of the new requirements and must allow the consumer to withdraw consent without charge.

c.  If the financial institution makes its disclosures available to consumers in electronic form, determine that the forms comply with the appropriate sections – §1026.5(a)(1); §1026.15(b); §1026.16(c); §1026.17(a)(1); §1026.17(g); §1026.19(c); §1026.23(b)(1); §1026.24(d); §1026.31(b); §1026.40(a)(3); and §1026.60(a)(2)(v).

d.  Card issuers may provide credit card agreements in electronic form under Section 1026.58(d) and (e) without regard to the consumer notice and consent requirements of section 101(c) of the E-Sign Act. (§1026.58(f))

## Annual Report to the CFPB – Section 1026.57

a.  If the card issuer was a party to one or more college credit card agreements in effect at any time during a calendar year, verify that the card issuer submits to the CFPB an annual report regarding those agreements in the form and manner prescribed by the CFPB. (§1026.57(d)(1))

NOTE: A college credit card agreement is any business, marketing, or promotional agreement between a card issuer and an institution of higher education (or an affiliated alumni organization or foundation) in connection with which credit cards are issued to college students at that institution of higher education. (§1026.57(a)(5))

b.  The annual report to the CFPB must include the following (§1026.57(d)(2)):

1.  Identifying information about the card issuer and the agreements submitted, including the issuer's name, address, and identifying number (such as an RSSD ID number or tax identification number);

# CFPB
# Examination Procedures                                    TILA

2. A copy of any college credit card agreement to which the card issuer was a party that was in effect at any time during the period covered by the report;

3. A copy of any memorandum of understanding in effect at any time during the period covered by the report between the card issuer and an institution of higher education or affiliated organization that directly or indirectly relates to the college credit card agreement or that controls or directs any obligations or distribution of benefits between any such entities;

4. The total dollar amount of any payments pursuant to a college credit card agreement from the card issuer to an institution of higher education or affiliated organization during the period covered by the report, and the method or formula used to determine such amounts;

5. The total number of credit card accounts opened pursuant to any college credit card agreement during the period covered by the report; and

6. The total number of credit card accounts opened pursuant to any such agreement that were open at the end of the period covered by the report.

c. If the card issuer is subject to reporting, determine if the card issuer submits its annual report for each calendar year to the CFPB by the first business day on or after March 31 of the following calendar year. (§1026.57(d)(3))

## The Submission of Agreements to the CFPB – Section 1026.58(c)

a. For card issuers that issue credit cards under a credit card account under an open-end (not home-secured) consumer credit plan, determine that the card issuer makes quarterly submissions to the CFPB in the form and manner specified by the CFPB that contain:

1. Identifying information about the card issuer and the agreements submitted, including the issuer's name, address, and identifying number (such as an RSSD ID number or tax identification number) (1026.58(c)(1)(i));

2. The credit card agreements that the card issuer offered to the public as of the last business day of the preceding calendar quarter that the card issuer has not previously submitted to the CFPB (1026.58(c)(1)(ii));

3. Any credit card agreement previously submitted to the CFPB that was amended during the preceding calendar quarter and that the card issuer offered to the public as of the last business day of the preceding calendar quarter as described in section 1026.58(c)(3) (1026.58(c)(1)(iii)); and

**CFPB**

**Examination Procedures**                                          **TILA**

4. Notification regarding any credit card agreement previously submitted to the CFPB that the issuer is withdrawing, as described in section 1026.58(c)(4), (c)(5), (c)(6), and (c)(7) (1026.58(c)(1)(iv)).

b. Verify that quarterly submissions were sent to the CFPB no later than the first business day on or after January 31, April 30, July 31, and October 31, of each year. (§1026.58(c)(1))

c. If a credit card agreement that previously has been submitted to the CFPB is amended, verify that the card issuer submits the entire amended agreement to the CFPB, in the form and manner specified by the CFPB, by the first quarterly submission deadline after the last day of the calendar quarter in which the change became effective. (§1026.58(c)(3))

NOTE: If a credit card agreement has been submitted to the CFPB, the agreement has not been amended and the card issuer continues to offer the agreement to the public, no additional submission regarding that agreement is required.

d. If a card issuer no longer offers to the public a credit card agreement that previously has been submitted to the CFPB, ensure that the card issuer notifies the CFPB by the first quarterly submission deadline after the last day of the calendar quarter in which the issuer ceased to offer the agreement. (§1026.58(c)(4))

NOTE: A card issuer is not required to submit any credit card agreements to the CFPB if the card issuer had fewer than 10,000 open credit card accounts as of the last business day of the calendar quarter. (§1026.58(c)(5)(i))

e. If an issuer that previously qualified for the *de minimis* exception ceases to qualify, determine that the card issuer begins making quarterly submissions to the CFPB no later than the first quarterly submission deadline after the date as of which the issuer ceased to qualify. (§1026.58(c)(5)(ii))

f. If a card issuer that did not previously qualify for the *de minimis* exception qualifies for the *de minimis* exception, determine that the card issuer continues to make quarterly submissions to the CFPB until the issuer notifies the CFPB that the card issuer is withdrawing all agreements it previously submitted to the CFPB. (§1026.58(c)(5)(iii))

g. A card issuer is not required to submit to the CFPB a credit card agreement if, as of the last business day of the calendar quarter, the agreement is offered for accounts under one or more private label credit card plans each of which has fewer than 10,000 open accounts and is not offered to the public other than for accounts under such a plan. (§1026.58(c)(6)(i))

NOTE: A private label credit card is one that is usable only at a single merchant or affiliated group of merchants. A private label credit card plan is all private label credit

# CFPB
# Examination Procedures                                      TILA

card accounts issued by a particular issuer with credit cards usable at the same single merchant or affiliated group of merchants. (§1026.58(b)(8))

h.  If an agreement that previously qualified for the private label credit card exception ceases to qualify, determine that the card issuer submits the agreement to the CFPB no later than the first quarterly submission deadline after the date as of which the agreement ceased to qualify. (§1026.58(c)(6)(ii))

i.  If an agreement that did not previously qualify for the private label credit card exception qualifies for the exception, determine that the card issuer continues to make quarterly submissions to the CFPB with respect to that agreement until the issuer notifies the CFPB that the agreement is being withdrawn. (§1026.58(c)(6)(iii))

    NOTE: A card issuer is not required to submit to the CFPB a credit card agreement if, as of the last business day of the calendar quarter, the agreement is offered as part of a product test offered to only a limited group of consumers for a limited period of time, is used for fewer than 10,000 open accounts, and is not offered to the public other than in connection with such a product test. (§1026.58(c)(7)(i))

j.  If an agreement that previously qualified for the product testing exception ceases to qualify, determine that the card issuer submits the agreement to the CFPB no later than the first quarterly submission deadline after the date as of which the agreement ceased to qualify. (§1026.58(c)(7)(ii))

k.  If an agreement that did not previously qualify for the product testing exception qualifies for the exception, determine that the card issuer continues to make quarterly submissions to the CFPB with respect to that agreement until the issuer notifies the CFPB that the agreement is being withdrawn. (§1026.58(c)(7)(iii))

l.  Verify that each agreement contains the provisions of the agreement and the pricing information in effect as of the last business day of the preceding calendar quarter. (§1026.58(c)(8)(i)(A))

m.  Verify that agreements do not include any personally identifiable information relating to any cardholder, such as name, address, telephone number, or account number. (§1026.58(c)(8)(i)(B))

n.  Verify that agreements are presented in a clear and legible font. (§1026.58(c)(8)(i)(D))

o.  Verify that pricing information is set forth in a single addendum to the agreement that contains only the pricing information. (§1026.58(c)(8)(ii)(A))

    NOTE: With respect to information other than the pricing information that may vary between cardholders depending on creditworthiness, state of residence, or other factors, issuers may, but are not required to, include that information in a single

# CFPB
# Examination Procedures                                        TILA

addendum (the optional variable terms addendum) to the agreement separate from the pricing addendum (§1026.58(c)(8)(iii)).

p.  If pricing information varies from one cardholder to another depending on the cardholder's creditworthiness or state of residence or other factors, verify that the pricing information is disclosed either by setting forth all the possible variations (such as purchase APRs of 13 percent, 15 percent, 17 percent, and 19 percent) or by providing a range of possible variations (such as purchase APRs ranging from 13 percent to 19 percent). (§1026.58(c)(8)(ii)(B))

q.  If a rate included in the pricing information is a variable rate, verify that the issuer identifies the index or formula used in setting the rate and the margin. (§1026.58(c)(8)(ii)(C))

r.  If rates vary from one cardholder to another, verify that the issuer discloses such rates by providing the index and the possible margins (such as the prime rate plus 5 percent, 8 percent, 10 percent, or 12 percent) or range of margins (such as the prime rate plus from 5 to 12 percent). (§1026.58(c)(8)(ii)(C))

NOTE: The value of the rate and the value of the index are not required to be disclosed.

s.  Determine that issuers do not provide provisions of the agreement or pricing information in the form of change-in-terms notices or riders (other than the pricing information addendum and the optional variable terms addendum). (§1026.58(c)(8)(iv))

t.  Determine that changes in provisions or pricing information are integrated into the text of the agreement, the pricing information addendum or the optional variable terms addendum, as appropriate. (§1026.58(c)(8)(iv))

## The Posting of Agreements Offered to the Public — Section 1026.58(d)

a.  Determine that the card issuer posts and maintains on its publicly available website the credit card agreements that the issuer is required to submit to the CFPB under section 1026.58(c). (§1026.58(d)(1))

b.  With respect to an agreement offered solely for accounts under one or more private label credit card plans (and the issuer does not post and maintain the agreements on its publicly available website), determine that the issuer posts and maintains the agreement on the publicly available website of at least one of the merchants where cards issued under each private label credit card plan with 10,000 or more open accounts may be used. (§1026.58(d)(1))

**CFPB**

**Examination Procedures**                                                    **TILA**

---

c.  Verify that agreements posted pursuant to section 1026.58(d) conform to the form and content requirements for agreements submitted to the CFPB specified in section 1026.58(c)(8). (§1026.58(d)(2))

d.  Determine that agreements are posted in an electronic format that is readily usable by the general public. (§1026.58(d)(3))

e.  Verify that agreements are placed in a location on its website that is prominent and readily accessible by the public and accessible without submission of personally identifiable information. (§1026.58(d)(3))

f.  Determine that the card issuer updates the agreements posted on its website at least as frequently as the quarterly schedule required for submission of agreements to the CFPB under section 1026.58(c). (§1026.58(d)(4))

NOTE: If the issuer chooses to update the agreements on its website more frequently, the agreements posted on the issuer's website may contain the provisions of the agreement and the pricing information in effect as of a date other than the last business day of the preceding calendar quarter.

## The Posting of Agreements for "Open" Accounts — Section 1026.58(e)

a.  With respect to any open (i.e., the cardholder can obtain extensions or there is an outstanding balance on the account that has not been charged off) credit card account, determine that the card issuer either:

1.  Posts and maintains the cardholder's agreement on its website; or

2.  Promptly provides a copy of the cardholder's agreement to the cardholder upon the cardholder's request.

b.  If the card issuer makes an agreement available upon request, ensure that the issuer provides the cardholder with the ability to request a copy of the agreement both by:

1.  Using the issuer's website, such as by clicking on a clearly identified box to make the request (§1026.58(e)(1)(ii)), and

2.  Calling a readily available telephone line the number for which is displayed on the issuer's website and clearly identified as to purpose. (§1026.58(e)(1)(ii) and (e)(2))

c.  If an issuer does not maintain a website from which cardholders can access specific information about their individual accounts determine that the issuer makes agreements available upon request by providing the cardholder with the ability to request a copy of the agreement by calling a readily available telephone line the number for which is (§1026.58(e)(2)):

---

**CFPB**

**Examination Procedures**                                    **TILA**

1. Displayed on the issuer's website and clearly identified as to purpose; or

2. Included on each periodic statement sent to the cardholder and clearly identified as to purpose.

d.  Verify that the card issuer sends to the cardholder or otherwise make available to the cardholder a copy of the cardholder's agreement in electronic or paper form no later than 30 days after the issuer receives the cardholder's request. (§1026.58(e)(1)(ii))

e.  Determine that agreements posted on the card issuer's website or made available upon the cardholder's request conform to the form and content requirements for agreements submitted to the CFPB specified in section 1026.58(c)(8). (§1026.58(e)(3)(i))

f.  If the card issuer posts an agreement on its website or otherwise provides an agreement to a cardholder electronically, verify that the agreement is posted or provided in an electronic format that is readily usable by the general public and is placed in a location that is prominent and readily accessible to the cardholder. (§1026.58(e)(3)(ii))

g.  If agreements posted or otherwise provided contain personally identifiable information relating to the cardholder, such as name, address, telephone number, or account number, ensure that the issuer takes appropriate measures to make the agreement accessible only to the cardholder or other authorized persons. (§1026.58(e)(3)(iii))

h.  Determine that agreements posted or otherwise provided set forth the specific provisions and pricing information applicable to the particular cardholder. (§1026.58(e)(3)(iv))

i.  Determine that provisions and pricing information are complete and accurate as of a date no more than 60 days prior to (§1026.58(e)(3)(iv)):

1. The date on which the agreement is posted on the card issuer's website under section 1026.58(e)(1)(i);

2. The date the cardholder's request is received under section 1026.58(e)(1)(ii) or (e)(2).

NOTE: Card issuers may provide credit card agreements in electronic form under section 1026.58(d) and (e) without regard to the consumer notice and consent requirements of section 101(c) of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. 7001 et seq.). (§1026.58(f))

**CFPB**

**Examination Procedures**                                              **TILA**

# Advertising (Open- and Closed-End)

8.  For open- and closed-end loans, sample advertising copy, including any electronic advertising, since the previous examination and verify that the terms of credit are accurate, clear, balanced, and conspicuous. If triggering terms are used, determine that the required disclosures are made (§§1026.16 and 1026.24).

    a.  For advertisements for closed-end credit:

        1.  If a rate of finance charge was stated, determine that it was stated as an APR.

        2.  If an APR will increase after consummation, verify that a statement to that fact is made.

        3.  Determine whether there are deceptive or misleading statements or practices.

    b.  Determine that the creditor does not offer college students any tangible item to induce such students to apply for or open an open-end consumer credit plan offered by such creditor, if such offer is made:

        1.  On the campus of an institution of higher education;

        2.  Near the campus of an institution of higher education; or

        3.  At an event sponsored by or related to an institution of higher education. (§1026.57(c))

    c.  If an open-end credit advertisement refers to an APR as "fixed" (or similar term), determine 1) that the advertisement also specifies a time period that the rate will be fixed and 2) that the rate will not increase during that period. (§1026.16(f))

    d.  If an open-end credit advertisement used the word "fixed" or a similar word and no time period is specified in which the rate will be fixed, determine that the rate will not increase while the plan is open. (§1026.16(f))

    e.  For any advertisement of an open-end (not home-secured) plan, if an APR or fee that may be applied to the account is an introductory rate or introductory fee, determine that the term *introductory* or *intro* is in immediate proximity to each listing of the introductory rate or introductory fee in a written or electronic advertisement. (§1026.16(g)(3))

    f.  For any advertisement of an open-end (not home-secured) plan, if any APR or fee that may be applied to the account is a promotional rate under section 1026.16(g)(2)(i) or any fee that may be applied to the account is a promotional fee under section 1026.16(g)(2)(iv), determine that the following information is stated in a clear and conspicuous manner in the advertisement (§1026.16(g)(4)):

        1.  When the promotional rate or promotional fee will end and

**CFPB**

**Examination Procedures**                                            **TILA**

2.  The annual percentage rate that will apply after the end of the promotional period.

NOTE: If such rate is variable, determine that the annual percentage rate complies with the accuracy standards in sections 1026.60(c)(2), 1026.60(d)(3), 1026.60(e)(4), or 1026.16(b)(1)(ii), as applicable. If such rate cannot be determined at the time disclosures are given because the rate depends at least in part on a later determination of the consumer's creditworthiness, determine that the advertisement discloses the specific rates or the range of rates that might apply. (§1026.16(g)(4)(ii)). Further, if the promotional rate or fee is stated in a written or electronic advertisement, determine that the information in sections 1026.16 (g)(4)(i), and, as applicable, (g)(4)(ii), or (g)(4)(iii) are also stated in a prominent location closely proximate to the first listing of the promotional rate or promotional fee.

g.  If a deferred interest offer is advertised for an open-end account not subject to Section 1026.40, determine that the deferred interest period is stated in a clear and conspicuous manner in the advertisement. If the phrase "no interest" or similar term regarding the possible avoidance of interest obligations under the deferred interest program is stated, determine that the term "if paid in full" is also stated in a clear and conspicuous manner preceding the disclosure of the deferred interest period in the advertisement. If the deferred interest offer is included in a written or electronic advertisement, determine that the deferred interest period and, if applicable, the term "if paid in full" are stated in immediate proximity to each statement of "no interest," "no payments," "deferred interest," "same as cash," or similar term regarding interest or payments during the deferred interest period. (§1026.16(h)(3))

h.  If any deferred interest offer is advertised for an open-end account not subject to Section 1026.40, determine that the (h)(4)(i) and (h)(4)(ii) language (of Section 1026.16(h)(4) ) is stated in the advertisement and is similar to Sample G–24 in Appendix G. If the deferred interest offer is included in a written or electronic advertisement, determine that this information is stated in a prominent location closely proximate to the first statement of "no interest," "no payments," "deferred interest," "same as cash," or similar term regarding interest or payments during the deferred interest period. (§1026.16(h)(4))

NOTE: The requirements in Section 1026.16(h)(4) apply to any advertisement of an open-end credit plan not subject to Section 1026.40 (requirements for home equity plans) Section 1026.16(h)(1). However, the requirements do not apply to an envelope or other enclosure in which an application or solicitation is mailed, or to a banner advertisement or pop-up advertisement linked to an application or solicitation provided electronically. (§1026.16(h)(5))

# Transactional Testing

NOTE: When verifying APR accuracies, use the OCC's APR calculation model or other calculation tool acceptable to your regulatory agency.

**CFPB**

**Examination Procedures**                                    **TILA**

Review the financial institution's closed-end and open-end transactions to ensure accuracy and completeness.

## Closed-End Credit Transactional Testing Procedures

a. For each type of closed-end loan being tested, determine the accuracy of the disclosures by comparing the disclosures to the contract and other financial institution documents. (§1026.17)

b. Determine whether the required disclosures were made before consummation of the transaction and ensure the presence and accuracy of the items below, as applicable. (§1026.18)

1. Creditor

2. Amount financed

3. Itemization of the amount financed (RESPA GFE may substitute)

4. Finance charge

5. APR

6. Variable rate information as follows for loans not secured by a principal dwelling or secured by a principal dwelling with terms of one year or less:

   a. Circumstances which permit rate increase

   b. Limitations on the increase (periodic or lifetime)

   c. Effect of the increase

   d. Hypothetical example of new payment terms that would result from an increase

7. Payment schedule including the number, amount, and timing of payments.

8. Total of payments

9. Demand feature

10. Total sale price (credit sale)

11. Prepayment

12. Late payment

13. Security interest

14. Insurance and debt cancellation

**CFPB**

**Examination Procedures**                                          **TILA**

---

    15. Certain security interest charges

    16. Contract reference

    17. Assumption policy

    18. Required deposit

    19. Interest rate and payment summary for mortgage transactions

    20. No-guarantee-to-refinance statement

c. Determine for adjustable rate mortgage loans with maturities of more than one year that the required early and subsequent disclosures are complete, accurate, and timely. Early disclosures required by section 1026.19(a) should be verified during the closed-end credit forms review. Subsequent disclosures should include the items below, as applicable. (§1026.20(c))

    1. Current and prior interest rates

    2. Index values used to determine current and prior interest rates

    3. Extent to which the creditor has foregone an increase in the interest rate

    4. Contractual effects of the adjustment (new payment and loan balance)

    5. Payment required to avoid negative amortization.

NOTE: The accuracy of the adjusted interest rates and indexes should be verified by comparing them with the contract and early disclosures. Refer to the Additional Variable Rate Testing section of these examination procedures.

d. Determine, for each type of closed-end rescindable loan being tested, the appropriate number of copies of the rescission notice are provided to each person whose ownership interest is or will be subject to the security interest. The creditor must deliver two copies of the notice of right to rescind to each consumer entitled to rescind. The rescission notice must disclose the items below. (§1026.23(b)(1))

    1. Security interest taken in the consumer's principal dwelling

    2. Consumer's right to rescind the transaction

    3. How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business

    4. Effects of rescission

    5. Date the rescission period expires.

e. Ensure funding was delayed until the rescission period expired. (§1026.23(c))

---

# CFPB
# Examination Procedures                                         TILA

f. Determine if the consumer has waived the three-day right to rescind since the previous examination. If applicable, test rescission waivers. (§1026.23(e))

g. Determine whether the maximum interest rate in the contract is disclosed for any consumer credit contract secured by a dwelling if the APR may increase after consummation. (§1026.30(a))

h. For private student loans with a right to cancel, review cancellation requests to determine if they were properly handled. (§1026.47(c))

## Certain Home Mortgage Transactions Subject to Subpart E

a. Determine whether the financial institution originates consumer credit transactions subject to Subpart E of Regulation Z; specifically, certain closed-end home mortgages (high-cost mortgages (§1026.32), reverse mortgages (§1026.33), and "higher-priced mortgage loans" (§1026.35). (Examiners may use the attached worksheet as an aid for identifying and reviewing high-cost mortgages.)

b. In addition to reviewing high-cost mortgages and reverse mortgages for compliance with requirements in other subparts of Regulation Z (for example, disclosure timing requirements under section 1026.19(a)), review such mortgages to ensure the following:

   1. Required disclosures are provided to consumers in addition to, not in lieu of, the disclosures contained in other subparts of Regulation Z. (§1026.31(a))

   2. Disclosures are clear and conspicuous, in writing, and in a form that the consumer may keep. (§1026.31(b))

   3. Disclosures are furnished at least three business days prior to consummation of a mortgage transaction covered by section 1026.32 or a closed-end reverse mortgage transaction (or at least three business days prior to the first transaction under an open-end reverse mortgage). (§1026.31(c))

   4. Disclosures reflect the terms of the legal obligation between the parties. (§1026.31(d))

   5. If the transaction involves more than one creditor, that only one creditor provided the disclosures. Where the obligation involves multiple consumers, ensure that the disclosures were provided to any consumer who is primarily liable on the obligation. Further, for rescindable transactions, verify that the disclosures were provided to each consumer who has the right to rescind. (§1026.31(e))

   6. The APR is accurately calculated and disclosed in accordance with the requirements and within the tolerances allowed in section 1026.22. (§1026.31(g))

**CFPB**

**Examination Procedures**                                              **TILA**

---

c.  For high-cost mortgages (§1026.32), ensure that, in addition to other required disclosures, the creditor discloses the following at least three business days prior to consummation (See model disclosure at App. H-16):

   1.  Notice containing the prescribed language. (§1026.32(c)(1))

   2.  The APR. (§1026.32(c)(2))

   3.  Amount of regular loan payment and the amount of any balloon payment. The disclosed regular payment should be treated as accurate if it is based on an amount borrowed that is deemed accurate under section 1026.32(c)(5). (§1026.32(c)(3))

   4.  For variable rate loans, a statement that the interest rate and monthly payment may increase, and the amount of the single maximum monthly payment allowed under the contract. (§1026.32(c)(4))

   5.  For a mortgage refinancing, the total amount the consumer will borrow (the face amount of the note) and if this amount includes premiums or other charges for optional credit insurance or debt-cancellation coverage, that fact is stated. This disclosure should be treated as accurate if within $100 of the actual amount borrowed. (§1026.32(c)(5))

   6.  A new disclosure is required if, subsequent to providing the additional disclosure but prior to consummation, there are changes in any terms that make the disclosures inaccurate. For example, if a consumer purchases optional credit insurance and, as a result, the monthly payment differs from the payment previously disclosed, re-disclosure is required and a new three-day waiting period applies. (§1026.31(c)(1)(i))

   7.  If a creditor provides new disclosures by telephone when the consumer initiates a change in terms, then at consummation (§1026.31(c)(1)(ii)) : The creditor must provide new written disclosures and both parties must sign a statement that these new disclosures were provided by telephone at least three days prior to consummation.

   8.  If a consumer waives the right to a three-day waiting period to meet a bona fide personal financial emergency, the consumer's waiver must be a dated written statement (not a pre-printed form) describing the emergency and bearing the signature of all entitled to the waiting period (a consumer can waive *only after* receiving the required disclosures and prior to consummation). (§1026.31(c)(1)(iii))

d.  High-cost mortgage transactions (§1026.32) may not include any of the following loan terms:

---

**CFPB**

**Examination Procedures**                                    **TILA**

1. Balloon payment (if term is less than five years, with exceptions). (§1026.32(d)(1)(i) and (ii))

2. Negative amortization. (§1026.32(d)(2))

3. Advance payments from the proceeds of more than 2 periodic payments. (§1026.32(d)(3))

4. Increased interest rate after default. (§1026.32(d)(4))

5. A rebate of interest, arising from a loan acceleration due to default, calculated by a method less favorable than the actuarial method. (§1026.32(d)(5))

6. Prepayment penalty, unless:

   - it will not apply after the two-year period following consummation;

   - it will not apply if the source of prepayment funds is a refinancing by the creditor or an affiliate of the creditor;

   - the consumer's total monthly debt payments (including amounts owed under mortgage), at consummation, is 50 percent or less of the consumer's monthly gross income (as verified in accordance with section 1026.34(a)(4)(ii)); and,

   - The amount of the periodic payment of principal or interest or both may not change during the four-year period following consummation. (§§1026.32(d)(6) and 1026.32(d)(7))

7. A due-on-demand clause permitting the creditor to terminate the loan in advance of maturity and accelerate the balance, with certain exceptions. (§1026.32(d)(8))

e. The creditor is not engaged in the following acts and practices for high-cost mortgages:

1. Home improvement contracts – Paying a contractor under a home improvement contract from the proceeds of a mortgage unless certain conditions are met. (§1026.34(a)(1))

2. Notice to assignee – Selling or otherwise assigning a high-cost mortgage without furnishing the required statement to the purchaser or assignee. (§1026.34(a)(2))

3. Refinancing within one year of extending credit – Within one year of making a high-cost mortgage (§1026.32), a creditor may not refinance any high-cost mortgage to the same borrower into another high-cost mortgage that is not in the borrower's interest. This also applies to assignees that hold or service the high-cost mortgage. Commentary to 34(a)(3) has examples applying the refinancing prohibition and addressing "borrower's interest." (§1026.34(a)(3))

**CFPB**

**Examination Procedures**                                              **TILA**

f.  For higher-priced mortgage loans (§1026.35), ensure that the loan terms do not provide for a prepayment penalty, unless:

   1.  The penalty is otherwise permitted by law, including section 1026.32(d)(6);

   2.  The penalty will not apply after the two-year period following consummation (§1026.35(b)(2)(ii)(A));

   3.  The penalty will not apply if the source of prepayment funds is a refinancing by the creditor or an affiliate of the creditor section 1026.35(b)(2)(ii)(B); and

   4.  The amount of the periodic payment of principal or interest or both may not change during the four-year period following consummation. (§1026.35(b)(2)(ii)(C))

g.  For higher-priced mortgage loans secured by a first lien on a principal dwelling escrow accounts are established before consummation for property taxes and premiums for mortgage-related insurance required by the creditor. (§1026.35(b)(3)(i))

h.  For both high-cost (§1026.32) and higher-priced mortgages (§1026.35), review for the following:

   1.  Ensure the subject loans are not being extended based on the consumer's collateral without regard to repayment ability, including the consumer's current and expected income, current obligations, mortgage related obligations, assets other than collateral, and employment. (§1026.35(b)(1))

   2.  Review underwriting standards.

   3.  Ensure the creditor bases its determination of repayment ability on current or reasonably expected income from employment or other sources, or assets other than the collateral, or both.

   4.  Determine that a creditor verifies amounts of income or assets that it relies on to determine repayment ability, including expected income or assets, by the consumer's Internal Revenue Service Form W-2, tax returns, payroll receipts, financial institution records, or other third-party documents that provide reasonably reliable evidence of the consumer's income or assets.

   5.  To establish whether a presumption of compliance applies, determine whether a creditor verifies the consumer's current obligations by:

      i.  Verifying repayment ability as described above;

      ii.  Determining the consumer's repayment ability by using the largest payment of principal and interest in the first seven years following consummation, taking into account current and mortgage-related obligations; and

**CFPB**

**Examination Procedures**                                                    **TILA**

iii.  Assessing the consumer's repayment ability taking into account at least one of the following: the ratio of total debt obligations to income, or the income the consumer will have after paying debt obligations.

6.  Evasion of requirements: Ensure that the creditor does not structure a high-cost or higher-priced mortgage loan as an open-end plan ("spurious open-end credit") to evade the requirements of Regulation Z. See staff commentary to 34(b) for factors to be considered. (§1026.35(b)(4))

i.  Servicing Practices: The following are prohibited acts or practices in connection with credit secured by a consumer's principal dwelling (§1026.36(c)):

i.  Failed to credit a conforming payment to the consumer's loan account as of the date of receipt, where the delay in crediting resulted in a charge to the consumer or in the reporting of negative information to a credit reporting agency except as provided in section 1026.36(c)(2). (§1026.36(c)(1)(i));

ii.  Imposed on the consumer any late fee or delinquency charge in connection with a payment, when the only delinquency was attributable to late fees or delinquency charges assessed on an earlier payment, and the payment is otherwise a full payment for the applicable period and is paid on its due date or within any applicable grace period (§1026.36(c)(1)(ii)); or,

iii.  Failed to provide, within a reasonable time after receiving a request from the consumer or person acting on behalf of the consumer, an accurate statement of the total outstanding balance that would be required to satisfy the consumer's obligations in full as of a specific date. (§1026.36(c)(1)(iii)) A reasonable time under most circumstances would be to provide the statement within five business days, unless refinance application volume is unusually high. (§1026.36(c)(1)(iii)-1)

## Prohibited Payments to Loan Originators[6]

a.  Determine that, in connection with a consumer credit transaction secured by a dwelling,[7] no loan originator receives and no person pays to a loan originator, directly

---

[6]The term ''loan originator'' means, with respect to a particular transaction, a person who for compensation or other monetary gain, or in expectation of compensation or other monetary gain, arranges, negotiates, or otherwise obtains an extension of consumer credit for another person. The term ''loan originator'' includes an employee of the creditor if the employee meets this definition. The term ''loan originator'' includes the creditor only if the creditor does not provide the funds for the transaction at consummation out of the creditor's own resources, including drawing on a *bona fide* warehouse line of credit, or out of deposits held by the creditor. A mortgage broker with respect to a particular transaction is any loan originator that is not an employee of the creditor. *See* 12 CFR Sec.1026.36 (a)(1)&(2)

**CFPB**

**Examination Procedures**                                           **TILA**

___

or indirectly, compensation[8] that is based on any of the transaction's terms or conditions. (§1026.36(d)(1)(i))

NOTE: This prohibition does not apply if the loan originator receives compensation directly from a consumer in a consumer credit transaction secured by a dwelling. Additionally, the amount of credit extended is not deemed to be a transaction term or condition, provided compensation received by or paid to a loan originator, directly or indirectly, is based on a fixed percentage of the amount of credit extended. Such compensation may be subject to a minimum or maximum dollar amount.

b.  If any loan originator receives compensation directly from a consumer in a consumer credit transaction secured by a dwelling, determine that (§1026.36(d)(2)):

1.  No loan originator receives compensation, directly or indirectly, from any person other than the consumer in connection with the transaction (§1026.36(d)(2)(i)); and

2.  No person who knows or has reason to know of the consumer-paid compensation to the loan originator (other than the consumer) pays any compensation to a loan originator, directly or indirectly, in connection with the transaction. (§1026.36(d)(2)(ii))

## Prohibition on Steering

a.  Determine that, in connection with a consumer credit transaction secured by a dwelling, a loan originator does not direct or "steer" a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer, unless the consummated transaction is in the consumer's interest. (§1026.36(e)(1))

NOTE: The rule provides a safe harbor to facilitate compliance with the prohibition on steering in section 1026.36(e)(1). The loan originator is deemed to comply with the anti-steering prohibition if the consumer is presented with loan options that meet all of the following conditions for each type of transaction in which the consumer expressed an interest:[9]

___

[7] Sections. 1026.36(d) and (e) do not apply to a home-equity line of credit subject to Sec.1026.40 or to a loan that is secured by a consumer's interest in a timeshare plan described in 11 U.S.C. 101(53D). (§1026.36(f))

[8] Compensation includes salaries, commissions, and any financial or similar incentive, such as an annual or periodic bonus. (commentary §1026 36(d)(1)-1)

[9] The term "type of transaction" refers to whether: (i) A loan has an APR that cannot increase after consummation; (ii) A loan has an APR that may increase after consummation; or (iii) A loan is a reverse mortgage. (§1026.36(e)(2))

# CFPB
# Examination Procedures                                    TILA

1. The loan originator obtains loan options from a significant number of the creditors with which the originator regularly does business and, for each type of transaction in which the consumer expressed an interest, presents the consumer with loan options that include (§1026.36(e)(3)(i)):

   i.   The loan with the lowest interest rate;

   ii.   The loan with the lowest interest rate without negative amortization, a prepayment penalty, interest-only payments, a balloon payment in the first seven years of the life of the loan, a demand feature, shared equity, or shared appreciation; or, in the case of a reverse mortgage, a loan without a prepayment penalty, or shared equity or shared appreciation; and

   iii.   The loan with the lowest total dollar amount for origination points or fees and discount points.

2. The loan originator has a good faith belief that the options (presented to the consumer that are set forth, above) are loans for which the consumer likely qualifies. (§1026.36(e)(3)(ii))

3. For each type of transaction, if the originator presents to the consumer more than three loans, the originator highlights the loans that satisfy options 1.i, 1.ii, and 1.iii above. (§1026.36(e)(3)(iii))

NOTE: If the requirements set forth in Section 1026.36(e) are met, the loan originator can, without steering, present fewer than three loans. (§1026.36(e)(4))

## Valuation Independence

a. Determine that the covered person did not attempt to directly or indirectly cause the value assigned to the consumer's principal dwelling to be based on any factor other than the independent judgment of a person that prepares valuations. Examples of such attempts include (§1026.42(c)):

1. Seeking to influence a person that prepares a valuation to report a minimum or maximum value for the consumer's principal dwelling;

2. Withholding or threatening to withhold timely payment to a person that prepares a valuation or performs valuation management functions because the person does not value the consumer's principal dwelling at or above a certain amount;

3. Implying to a person that prepares valuations that current or future retention of the person depends on the amount at which the person estimates the value of the consumer's principal dwelling;

# CFPB
# Examination Procedures                                            TILA

4. Excluding a person that prepares a valuation from consideration for future engagement because the person reports a value for the consumer's principal dwelling that does not meet or exceed a predetermined threshold; and

5. Conditioning the compensation paid to a person that prepares a valuation on consummation of the covered transaction.

b. Determine that the valuation does not materially misrepresent the value of the consumer's principal dwelling. (§1026.42(c)(2)(i))

NOTE: A misrepresentation is material if it is likely to significantly affect the value assigned to the consumer's principal dwelling. A bona fide error shall not be a misrepresentation.

c. Determine that a valuation was not falsified or materially altered. (§1026.42(c)(2)(ii))

NOTE: An alteration is material if it is likely to significantly affect the value assigned to the consumer's principal dwelling.

d. Determine that the covered person does not induce a person to materially misrepresent or falsify the value of a consumer's principal dwelling (in violation of section 1026.42(c)(2)(i) or (ii)). (§1026.42(c)(2)(iii))

e. Prohibition on conflicts of interest. To the extent applicable, determine that the person who prepared the valuations or performed the valuation management functions for a covered transaction did not have a direct or indirect interest, financial or otherwise, in the property or transaction for which the valuation is or will be performed. (§1026.42(d)(1)(i))

NOTE: No person violates this section solely because that the person is an employee or affiliate of the creditor, or provides a settlement service in addition to preparing valuations or performing valuation management functions, or based solely on the fact that the person's affiliate performs another settlement service, as long as the conditions discussed below ((f), (g), and (h)) are met If they are not met, whether the conflicts of interest provisions are violated by the above persons or entities depends on all of the facts and circumstances. In other words, the conditions in (f), (g), and (h) are a safe harbor, but not required.

f. For any consumer credit transaction secured by the consumer's principal dwelling in which the creditor had assets of more than $250 million as of December 31st for both of the past two calendar years, determine that a person subject to section 1026.42(d)(1)(i) who is employed by or affiliated with the creditor does not have a conflict of interest in violation of section 1026.42(d)(1)(i) based solely on the person's employment or affiliate relationship with the creditor if (§1026.42(d)(2)):

1. The compensation of the person preparing a valuation or performing valuation management functions is not based on the value arrived at in any valuation;

**CFPB**

**Examination Procedures**                                    **TILA**

2. The person preparing a valuation or performing valuation management functions reports to a person who is not part of the creditor's loan production function, as defined in section 1026.42(d)(5)(i), and whose compensation is not based on the closing of the transaction to which the valuation relates; and

3. No employee, officer or director in the creditor's loan production function, as defined in section 1026.42(d)(5)(i), is directly or indirectly involved in selecting, retaining, recommending or influencing the selection of the person to prepare a valuation or perform valuation management functions, or to be included in or excluded from a list of approved persons who prepare valuations or perform valuation management functions.

g. For any covered transaction in which the creditor had assets of $250 million or less as of December 31st for either of the past two calendar years, determine that a person subject to section 1026.42(d)(1)(i) who is employed by or affiliated with the creditor does not have a conflict of interest in violation of section 1026.42(d)(1)(i) based solely on the person's employment or affiliate relationship with the creditor if (§1026.42(d)(3)):

1. The compensation of the person preparing a valuation or performing valuation management functions is not based the value arrived at in any valuation; and

2. The creditor requires that any employee, officer or director of the creditor who orders, performs, or reviews a valuation for a covered transaction abstain from participating in any decision to approve, not approve, or set the terms of that transaction.

h. For any covered transaction, determine that a person who prepares a valuation or performs valuation management functions in addition to performing another settlement service for the transaction, or whose affiliate performs another settlement service for the transaction, does not have a conflict of interest in violation of section 1026.42(d)(1)(i) as a result of the person or the person's affiliate performing another settlement service for the transaction if (§1026.42(d)(4)):

1. The creditor had assets of more than $250 million as of December 31st for both of the past two calendar years and the conditions in paragraph (d)(2)(i)-(iii) are met; or

2. The creditor had assets of $250 million or less as of December 31st for either of the past two calendar years and the conditions in paragraph (d)(3)(i)-(ii) are met.

i. If the creditor did know at or before consummation of a violation of sections 1026.42(c) or (d) in connection with a valuation, determine that the creditor did not extend credit based on the valuation, unless the creditor documented that it acted with reasonable diligence to determine that the valuation did not materially misstate or misrepresent the value of the consumer's principal dwelling. (§1026.42(e))

**CFPB**

**Examination Procedures**                                              **TILA**

NOTE: For purposes of section 1026.42(e), a valuation materially misstates or misrepresents the value of the consumer's principal dwelling if the valuation contains a misstatement or misrepresentation that affects the credit decision or the terms on which credit is extended.

j.   Customary and reasonable compensation. For any covered transaction, determine that the creditor and its agents compensated a fee appraiser for performing appraisal services at a rate that is customary and reasonable for comparable appraisal services performed in the geographic market of the property being appraised. (§1026.42(f)(1))

NOTE: For purposes of section 1026.42(f), "agents" of the creditor do not include any fee appraiser as defined in section 1026.42(f)(4)(i). An "agent" could be an appraisal management company to which the creditor has outsourced the valuation function.

k.   If the creditor reasonably believes an appraiser has not complied with the Uniform Standards of Professional Appraisal Practice or ethical or professional requirements for appraisers under applicable state or federal statutes or regulations, determine that the creditor referred the matter within a reasonable period of time to the appropriate state agency if the failure to comply is material. (§1026.42(g)(1))

NOTE: For purposes of section 1026.42(g), a failure to comply is material if it is likely to significantly affect the value assigned to the consumer's principal dwelling.

## Open-End Credit Transactional Testing Procedures

a.   For each open-end credit product tested, determine the accuracy of the disclosures by comparing the disclosure with the contract and other financial institution documents. (§1026.5(c))

b.   Review the financial institution's policies, procedures, and practices to determine whether it provides appropriate disclosures for creditor-initiated direct mail applications and solicitations to open charge card accounts, telephone applications and solicitations to open charge card accounts, and applications and solicitations made available to the general public to open charge card accounts. (§1026.60(b), (c), and (d))

c.   Determine for all home equity plans with a variable rate that the APR is based on an independent index. Further, ensure home equity plans are terminated or terms changed only if certain conditions exist. (§1026.40(f))

d.   Determine that, if any consumer rejected a home equity plan because a disclosed term changed before the plan was opened, all fees were refunded. Verify that non-refundable fees were not imposed until three business days after the consumer received the required disclosures and brochure. (§1026.40(g) and (h))

**CFPB**

**Examination Procedures**                                    **TILA**

___

e. Review consecutive periodic billing statements for each major type of open-end credit activity offered (overdraft and home-equity lines of credit, credit card programs, etc.). Determine whether disclosures were calculated accurately and are consistent with the initial disclosure statement furnished in connection with the accounts (or any subsequent change in terms notice) and the underlying contractual terms governing the plan(s).

f. Determine whether the consumer was given notice of the right to reject the significant change, with the exception of:

   1. An increase in the required minimum periodic payment (§1026.9(c)(2)(iv)(B)),

   2. A change in the APR (§1026.9(c)(2)(iv)(B)),

   3. A change in the balance computation method necessary to comply with section 1026.54, which sets forth certain limitations on the imposition of finance charges as a result of a loss of a grace period, or

   4. Increase in fee pursuant to evaluation under section 1026.52 or adjustment to safe harbors

   5. Increase in fees previously reduced under SCRA

   6. When the change results from the creditor not receiving the required minimum periodic payment within 60 days after the due date for that payment. (§1026.9(c)(2)(iv)(B))

g. Determine that the creditor did not increase the rate applicable to the consumer's account to the penalty rate if the outstanding balance did not exceed the credit limit on the date set forth in the notice. (§1026.9(g)(4))

h. Determine, for each type of open-end rescindable loan being tested, the appropriate number of copies of the rescission notice are provided to each person whose ownership interest is or will be subject to the security interest and perform the procedures 12, 13, and 14 under Closed-End Credit section. (§1026.15(b), (c) and (e))

i. Additional variable rate testing: Verify that when accounts were opened or loans were consummated that loan contract terms were recorded correctly in the financial institution's calculation systems (e.g., its computer). Determine the accuracy of the following recorded information:

   1. Index value,

   2. Margin and method of calculating rate changes,

   3. Rounding method, and

   4. Adjustment caps (periodic and lifetime).

___

**CFPB**

**Examination Procedures**                                           **TILA**

j.  Using a sample of periodic disclosures for open-end variable rate accounts (e.g., home equity accounts) and closed-end rate change notices for adjustable rate mortgage loans:

   1.  Compare the rate-change date and rate on the credit obligation to the actual rate-change date and rate imposed.

   2.  Determine that the index disclosed and imposed is based on the terms of the contract (example: the weekly average of one-year Treasury constant maturities, taken as of 45 days before the change date). (§§1026.7(a) and 1026.20(c)(2))

   3.  Determine that the new interest rate is correctly disclosed by adding the correct index value with the margin stated in the note, plus or minus any contractual fractional adjustment. (§§1026.7(g) and 1026.20 (c)(1))

   4.  Determine that the new payment disclosed (§1026.20(c)(4)) was based on an interest rate and loan balance in effect at least 25 days before the payment change date (consistent with the contract). (§1026.20(c))

## Crediting a Consumer's Account – Section 1026.10

a.  Ensure that the creditor credits payment to a consumer's account as of the date of receipt, except when a delay in crediting does not result in a finance charge or other charge. (§1026.10(a))

b.  If a creditor specifies requirements for payments, determine that they are reasonable and enable most consumers to make conforming payments. (§1026.10(b))

c.  Except as provided by section 1026.10(b)(4)(ii), if a creditor specifies, on or with the periodic statement, requirements for the consumer to follow in making payments as permitted under section 1026.10, but accepts a payment that does not conform to the requirements, determine that the payment is credited within five days of receipt. (§1026.10(b)(4)(i))

d.  If the creditor promotes a method for making payments, determine that the creditor considers such payments conforming payments in accordance with section 1026.10(b) and that they are credited to the consumer's account as of the date of receipt, except when a delay in crediting does not result in a finance charge or other charge. (§1026.10(b)(4)(ii))

e.  If the creditor sets a cut-off time for payments to be received by mail, by electronic means, by telephone, or in person, verify that the cut-off time is 5 p.m. or later on the payment due date at the location specified by the creditor for the receipt of such payments. (§1026.10(b)(2)(ii))

f.  For in-person payments on a credit card account under an open-end (not home-secured) consumer credit plan at a financial institution branch or office that accepts

**CFPB**
**Examination Procedures**                                              **TILA**

such payments, a card issuer shall not impose a cut-off time earlier than the close of business for any such payments made in person at any branch or office of the card issuer at which such payments are accepted. However, a card issuer may impose a cut-off time earlier than 5 p.m. for such payments, if the close of business of the branch or office is earlier than 5 p.m. (§1026.10(b)(3)(i))

g.  If a creditor fails to credit a payment as required and imposes a finance or other charge, ensure that the creditor credits the charge(s) to the consumer's account during the next billing cycle. (§1026.10(c))

h.  If (due to a weekend or holiday, for example) a creditor does not receive or accept payments by mail on the due date for payments, determine that the creditor treats as timely a payment received on the next business day. (§1026.10(d)(1))

NOTE: If a creditor accepts or receives payments made on the due date by a method other than mail, such as electronic or telephone payments, the creditor is not required to treat a payment made by that method on the next business day as timely.

i.  For credit card accounts under an open-end (not home-secured) consumer credit plan, determine that the creditor does not impose a separate fee to allow consumers to make a payment by any method, such as mail, electronic, or telephone payments, unless such payment method involves an expedited service by a customer service representative of the creditor. (§1026.10(e))

NOTE: For purposes of section 1026.10(e), the term "creditor" includes a third party that collects, receives, or processes payments on behalf of a creditor.

j.  If a card issuer makes a material change in the address for receiving payments or procedures for handling payments, and such change causes a material delay in the crediting of a payment to a consumer's account during the 60-day period following the date on which such change took effect, ensure that the card issuer does not impose any late fee or finance charge for a late payment on the credit card account during the 60-day period following the date on which the change took effect. (§1026.10(f))

## Treatment of Credit Balances, Account Termination — Section 1026.11

a.  Determine institution's treatment of credit balances. Specifically, if the account's credit balance is in excess of $1, the institution must take the actions listed below. (§1026.11)

1.  Credit the amount to the consumer's account; and

2.  Either:

    i.  Refund any part of the remaining credit balance within seven business days from receiving a written request from the consumer; or

**CFPB**

**Examination Procedures**                                    **TILA**

    ii.   If no written request is received and the credit remains for more than six months, make a good faith effort to refund the amount of the credit to the consumer by cash, check, money order, or credit to a deposit account of the consumer. No further action is required if the consumer's current location is not known to the creditor and cannot be traced through the consumer's last known address or telephone number.

  b.  Determine that institution has not terminated an account prior to its expiration date solely because the consumer did not incur a finance charge. However, a creditor is not prohibited from closing an account that, for three consecutive months, no credit has been extended (such as by purchase, cash advance, or balance transfer) and the account has had no outstanding balance. (§1026.11(b))

  c.  Determine that, for credit card accounts under an open-end (not home-secured) consumer credit plan, the card issuer has adopted reasonable written policies and procedures designed to ensure that an administrator of an estate of a deceased account holder can determine the amount of and pay any balance on the account in a timely manner. (§1026.11(c)(1)(i))

      NOTE: This does not apply to the account of a deceased consumer if a joint account holder remains on the account.

  d.  Ensure that, upon request by the administrator of an estate, the card issuer provides the administrator with the amount of the balance on a deceased consumer's account in a timely manner. (§1026.11(c)(2)(i))

      NOTE: Providing the amount of the balance on the account within 30 days of receiving the request is deemed to be timely.

  e.  Verify that, after receiving a request from the administrator of an estate for the amount of the balance on a deceased consumer's account, the card issuer does not impose any fees on the account (such as a late fee, annual fee, or over the-limit fee) or increase any annual percentage rate, except as provided by section 1026.55(b)(2) (i.e., due to the operation of an index). (§1026.11(c)(3)(i))

  f.  Determine that, if payment in full of the disclosed balance, pursuant to section 1026.11(c)(2), is received within 30 days after disclosure, the card issuer waives or rebates any additional finance charge due to a periodic interest rate. (§1026.11(c)(3)(ii))

## Special Credit Card Provisions and Billing Error Resolution – Sections 1026.12 and 13

  a.  Review a sample of billing error resolution files and a sample of consumers who have asserted a claim or defense against the financial institution for a credit card dispute regarding property or services. Verify the following (§§1026.12 and 1026.13):

**CFPB**

**Examination Procedures**                                         **TILA**

1. Credit cards are issued only upon request;

2. Liability for unauthorized credit card use is limited to $50;

3. Disputed amounts are not reported delinquent unless remaining unpaid after the dispute has been settled;

4. Offsetting credit card indebtedness is prohibited; and

5. Errors are resolved within two complete billing cycles.

## Ability to Make the Required Minimum Payments — Section 1026.51

a. Determine that the card issuer does not open a credit card account for a consumer under an open-end (not home-secured) consumer credit plan, or increase any credit limit applicable to such account, unless the card issuer considers the independent ability of the consumer to make the required minimum periodic payments under the terms of the account based on the consumer's income or assets and current obligations. (§1026.51(a)(1)(i))

b. Verify that the card issuer establishes and maintains reasonable written policies and procedures to consider a consumer's independent income or assets and current obligations. Reasonable policies and procedures to consider a consumer's ability to make the required payments include a consideration of at least one of the following: (§1026.51(a)(1)(ii))

1. The ratio of debt obligations to income;

2. The ratio of debt obligations to assets; or

3. The income the consumer will have after paying debt obligations.

c. Confirm that the card issuer does not issue a credit card to a consumer who does not have any income or assets, and that the credit does not issue a credit card without reviewing any information about a consumer's income, assets, or current obligations. (§1026.51(a)(1)(ii))

NOTE: A card issuer may consider the consumer's income or assets based on information provided by the consumer, in connection with the credit card account or any other financial relationship the card issuer or its affiliates has with the consumer, subject to any applicable information-sharing rules, and information obtained through third parties, subject to any applicable information-sharing rules. A card issuer may also consider information obtained through any empirically derived, demonstrably and statistically sound model that reasonably estimates a consumer's income or assets. (See Regulation Z Commentary (§1026.51(a)-1-4)))

**CFPB**

**Examination Procedures**                                                    **TILA**

d. Determine that the card issuer uses a reasonable method for estimating the minimum periodic payments the consumer would be required to pay under the terms of the account. (§1026.51(a)(2)(i))

e. A card issuer's estimate of the minimum periodic payment is compliant (i.e., receives the benefit of a safe harbor) if it uses the following method (§1026.51(a)(2)(ii)):

   1. The card issuer assumes utilization, from the first day of the billing cycle, of the full credit line that the issuer is considering offering to the consumer; and

   2. The card issuer uses a minimum payment formula employed by the issuer for the product the issuer is considering offering to the consumer or, in the case of an existing account, the minimum payment formula that currently applies to that account, provided that:

      i. If the applicable minimum payment formula includes interest charges, the card issuer estimates those charges using an interest rate that the issuer is considering offering to the consumer for purchases or, in the case of an existing account, the interest rate that currently applies to purchases; and

      ii. If the applicable minimum payment formula includes mandatory fees, the card issuer must assume that such fees have been charged to the account.

f. Rules affecting young consumers: If the card issuer opens a credit card account under an open-end (not home-secured) consumer credit plan for a consumer less than 21 years old, verify that the issuer requires that such consumers:

   1. Submit a written application; and

   2. Possess an independent ability to make the required minimum periodic payments on the proposed extension of credit in connection with the account under section 1026.51(b)(1)(i)) or provide a signed agreement of a cosigner, guarantor, or joint applicant who is at least 21 years old who has the ability to make the required minimum periodic payments on such debts, and be either jointly liable with the consumer for any debt on the account, or secondarily liable for any debt on the account incurred by the consumer before the consumer has attained the age of 21 pursuant to section 1026.51(b)(1)(ii)(A) and (B).

g. If a credit card account has been opened for a consumer less than 21 years old with a cosigner, guarantor, or joint applicant pursuant to section 1026.51(b)(1)(ii), determine that the issuer does not increase the credit limit on such account before the consumer attains the age of 21 unless the cosigner, guarantor, or joint accountholder who assumed liability at account opening agrees in writing to assume liability on the increase. (§1026.51(b)(2))

**CFPB**

**Examination Procedures**                                                    **TILA**

## Limitations on Fees – Section 1026.52

a.  During the first year after the opening of a credit card account under an open-end (not home-secured) consumer credit plan, determine whether the card issuer required the consumer to pay covered fees in excess of the 25 percent of the credit limit in effect when the account is opened. (§1026.52(a)(1))

NOTE: On September 23, 2011 a federal district court issued a preliminary injunction affecting § 1026.52(a). *See First Premier Bank, et al. v. United States Consumer Financial Protection Bureau, et al.*, 819 F. Supp. 2d 906, 2011 WL 4458785 (D.S.D. Sept. 23, 2011). In light of this litigation, the CFPB has proposed amendments to regulation Z, withdrawing this provision of the rule. The Agencies will not count fees paid prior to account opening toward the 25 percent limitation.

NOTE: An account is considered opened no earlier than the date on which the account may first be used by the consumer to engage in transactions.

Covered fees include fees (Comment 1026.52(a)(2)-1):

1.  For the issuance or availability of credit, including any fees based on account activity or inactivity;

2.  For insurance, debt cancellation or debt suspension coverage, if the insurance or debt cancellation or suspension coverage is required by the terms of the account;

3.  The consumer is required to pay to engage in transactions using the account, such as:

    i.    Cash advance fees;

    ii.   Balance transfer fees;

    iii.  Foreign transaction fees; and

    iv.   Fees for using the account for purchases.

4.  Fees the consumer is required to pay for violating the terms of the account, except to the extent they are specifically excluded (see below);

5.  Fixed finance charges; and

6.  Minimum charges imposed if a charge would otherwise have been determined by applying a periodic interest rate to a balance except for the fact that such charge is smaller than the minimum.

NOTE: Section 1026.52(a) does not authorize the imposition or payment of fees or charges otherwise prohibited by law. (§1026.52(a)(3)

**CFPB**

**Examination Procedures**                                          **TILA**

---

    b.  Fees not covered by this limitation include: (§1026.52(a)(2)(i)

        1. Late payment fees, over-the-limit fees, and returned-payment fees; or

        2. Fees that the consumer is not required to pay with respect to the account, such as:

            i.   An expedited payment fee;

            ii.  Fees for optional services like travel insurance;

            iii.  Fees for reissuing a lost or stolen card; or

            iv.  Statement reproduction fees.

  c.  Review penetration rates of various optional services to determine if they are truly optional and therefore not covered by the 25 percent limitation.

  d.  Ensure that the card issuer does not impose a fee for violating the terms or other requirements of a credit card account under an open-end (not home-secured) consumer credit plan unless the dollar amount of the fee is consistent with sections 1026.52(b)(1) and (b)(2). (§1026.52(b))

  e.  Determine that a card issuer imposes a fee for violating the terms or other requirements of a credit card account under an open-end (not home-secured) consumer credit plan only if the dollar amount of the fee is consistent with either section 1026.52(b)(1)(i) or section 1026.52(b)(1)(ii). (§1026.52(b)(1))

  f.  *Cost determination*. A card issuer may impose a fee for a particular violation (e.g., late payment) if the card issuer has determined that the fee represents a reasonable proportion of the total costs incurred by the issuer as a result of that type of violation. If a card issuer is relying on a cost determination instead of the safe harbors (see below), review (§1026.52(b)(1)(i)):

      1.  The number of violations of a particular type experienced by the card issuer during a prior period of reasonable length (e.g., a 12-month period).

      2.  The costs incurred by the card issuer during that period *as a result of* those violations. Losses and associated costs (including the cost of holding reserves against potential losses and the cost of funding delinquent accounts) must be excluded from this analysis.

      3.  If used by the card issuer when making its determination:

          i.  The number of fees imposed by the card issuer as a result of the type of violation during the period that the issuer reasonably estimates it will be unable to collect.

# CFPB
# Examination Procedures                                    TILA

      ii.   Reasonable estimates for an upcoming period of changes in the number of violations of the relevant type, the resulting costs, and the number of fees that the card issuer will be unable to collect.

    4.   If applicable, whether the items in paragraph 1-3 have been reevaluated by the card issuer at least once during the prior 12 months. If as a result of the reevaluation the card issuer determines that a lower fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of that type of violation, determine that the card issuer begins imposing the lower fee within 45 days after completing the reevaluation.

        NOTE: If as a result of the reevaluation the card issuer determines that a higher fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of that type of violation, the card issuer may begin imposing the higher fee after complying with the notice requirements in section 1026.9. (§1026.52(b)(1)(i))

g.   *Safe harbors.* A card issuer may impose a fee for violating the terms or other requirements of the account if the dollar amount of the fee does not exceed, as applicable (§§1026.52(b)(1)(ii)(A)-(C)):

    1.   $25.00,

    2.   $35.00 if the card issuer previously imposed a fee pursuant to section 1026.52(b)(1)(ii)(A) for a violation of the same type that occurred during the same billing cycle or one of the next six billing cycles or

    3.   Three percent of the delinquent balance on a charge card account that requires payment of outstanding balances in full at the end of each billing cycle if the card issuer has not received the required payment for two or more consecutive billing cycles.

        NOTE: The dollar amounts in paragraphs 1 and 2 above will be adjusted annually by the CFPB to the extent that changes in the Consumer Price Index warrant an increase or decrease of a whole dollar.

h.   Determine that the card issuer does not impose a fee for violating the terms or other requirements of a credit card account under an open-end (not home-secured) consumer credit plan that exceeds the dollar amount associated with the violation. (§1026.52(b)(2)(i)(A))

i.   Determine that a card issuer does not impose a fee for violating the terms or other requirements of a credit card account under an open end (not home-secured) consumer credit plan when there is no dollar amount associated with the violation. For purposes of section 1026.52(b)(2)(i), there is no dollar amount associated with the following violations (§1026.52(b)(2)(i)(B)):

**CFPB**

**Examination Procedures**                                             **TILA**

1. Transactions that the card issuer declines to authorize;

2. Account inactivity; and

3. The closure or termination of an account.

j. Determine that the card issuer does not impose more than one fee for violating the terms or other requirements of a credit card account under an open-end (not home-secured) consumer credit plan based on a single event or transaction. (§1026.52(b)(2)(ii))

## Allocation of Payments — Section 1026.53

a. Determine whether, when a consumer makes a payment in excess of the required minimum periodic payment, the card issuer allocates the excess amount:

1. First to the balance with the highest APR, and

2. Any remaining portion to the other balances in descending order based on the applicable APR.

b. For balances on a credit card account subject to a deferred interest or similar program, determine whether the card issuer allocated any amount paid by the consumer in excess of the required minimum periodic payment:

1. Consistent with the general requirement discussed in (a) above, except that, during the two billing cycles immediately preceding expiration of the deferred interest period, the excess amount must have been allocated first to the balance subject to the deferred interest or similar program and any remaining portion allocated to any other balances consistent with section 1026.53(a) (§1026.53(b)(1)(i)), or

2. In the manner requested by the consumer (§1026.53(b)(1)(ii)).

c. When a balance on a credit card account is secured, the card issuer may at its option allocate any amount paid by the consumer in excess of the required minimum periodic payment to that balance if requested by the consumer. (§1026.53(b)(2))

## Loss of a Grace Period — Section 1026.54

a. Determine whether the card issuer imposed finance charges as a result of the loss of a grace period on a credit card account under an open-end (not home-secured) consumer credit plan based on:

1. Balances for days in billing cycles that precede the most recent billing cycle, a prohibited practice; or

**CFPB**

**Examination Procedures**                                        **TILA**

2. Any portion of a balance subject to a grace period that was repaid prior to the expiration of the grace period. (§1026.54).

b. With respect to the prohibition in a.2 above, issuers are not required to follow any specific methodology, but an issuer is in compliance if it applies the consumer's payment to the balance subject to the grace period and calculates interest charges on the amount of the balance that remains unpaid. (Comment 1026.54(a)(1)-5)

Exceptions: This rule does not apply to adjustments to the finance charge as a result of:

1. The resolution of a dispute under section 1026.12, unauthorized use, or section 1026.13, billing error; or

2. The return of a payment.

## Limitations on Increasing Annual Percentage Rates, Fees, and Charges – Section 1026.55

a. With respect to a credit card account under an open-end (not home-secured) consumer credit plan, determine that the card issuer did not increase an APR or fee or charge required to be disclosed under sections 1026.6(b)(2)(ii) (fee for issuance or availability (e.g., an annual fee)), (b)(2)(iii) (fixed finance charge or minimum interest charge), or (b)(2)(xii) (fee for required insurance, debt cancellation, or debt suspension coverage), unless as permitted by one of the six exceptions:

1. Temporary rate, fee, or charge exception;

2. Variable rate exception;

3. Advance notice exception;

4. Delinquency exception;

5. Workout and temporary hardship arrangement; and

6. Servicemembers Civil Relief Act exception (§1026.55(a)-(b)).

b. To assess whether the temporary rate, fee, or charge exception applies (§1026.55(b)(1)), determine whether:

1. The card issuer increased the APR, fee, or charge upon the expiration of a specified period of six months or longer and

2. Prior to the commencement of that period, the card issuer disclosed in writing to the consumer, in a clear and conspicuous manner, the length of the period and the APR, fee, or charge that would apply after expiration of the period.

**CFPB**

**Examination Procedures**                                                    **TILA**

---

c.  If the temporary rate exception applies, determine that the card issuer:

   1.  Did not apply an APR, fee, or charge to transactions that occurred prior to the period that exceeds the APR, fee, or charge that applied to those transactions prior to the period;

   2.  Provided the required notice, but did not apply an APR, fee, or charge (to transactions that occurred within 14 days after provision of the notice) that exceeds the APR, fee, or charge that applied to that category of transactions prior to provision of the notice; and

   3.  Did not apply an annual percentage rate to transactions that occurred during the period that exceeds the increased APR, fee, or charge.

d.  If the variable rate exception applies (§1026.55(b)(2)), determine that the card issuer did not increase an APR unless:

   1.  The increase in the APR is due to an increase in the index; and

   2.  The annual percentage rate varies according to an index that is not under the card issuer's control and is available to the general public.

      NOTE: For purposes of qualifying under this exception, an index is considered under the card issuer's control if the card issuer applies a minimum rate or floor below which the rate cannot decrease. However, because there is no disadvantage to consumers, issuers are not prevented from setting a maximum rate or ceiling. (Comment 1026.55(b)(2) – 2ii)

e.  If the advance notice exception applies (§1026.55(b)(3)), determine that the card issuer:

   1.  Did not apply that increased APR, fee, or charge to transactions that occurred prior to provision of the notice;

   2.  Did not apply the increased APR, fee, or charge to transactions that occurred prior to or within 14 days after provision of the notice; and

   3.  Did not increase the APR, fee, or charge during the first year after the account is opened.

f.  If the delinquency exception applies (§1026.55(b)(4)), determine that the card issuer:

   1.  Disclosed in a clear and conspicuous manner in the required notice a statement of the reason for the increase, and

   2.  Will cease the increase if the card issuer receives six consecutive required minimum periodic payments on or before the payment due date, beginning with the first payment due following the effective date of the increase.

---

**CFPB**

**Examination Procedures**                                                    **TILA**

g.  If the delinquency exception applies and the card issuer received six consecutive required minimum periodic payments on or before the payment due date beginning with the first payment due following the effective date of the increase, determine that the card issuer reduces any APR, fee, or charge (increased pursuant to the delinquency exception) to the original APR, fee, or charge that applied prior to the increase with respect to transactions that occurred prior to or within 14 days after provision of the required notice.

h.  If the workout and temporary hardship arrangement exception applies (§1026.55(b)(5)), determine that:

1.  Prior to commencement of the arrangement (except as provided in section 1026.9(c)(2)(v)(D)) the card issuer provided the consumer with a clear and conspicuous written disclosure of the terms of the arrangement (including any increases due to the completion or failure of the arrangement); and

2.  Upon the completion or failure of the arrangement, the card issuer did not apply to any transactions that occurred prior to commencement of the arrangement an APR, fee, or charge that exceeds the APR, fee, or charge that applied to those transactions prior to commencement of the arrangement.

i.  If the Servicemembers Civil Relief Act exception applies (§1026.55(b)(6)), determine that the card issuer increased the APR, fee, or charge only after 50 U.S.C. app. 527 or a similar Federal or State statute or regulation no longer applied. Further, determine that the issuer did not apply to any transactions that occurred prior to the decrease an APR, fee, or charge that exceeded the APR, fee, or charge that applied to those transactions prior to the decrease.

j.  For protected balances (§1026.55(c)), determine that the card issuer did not require repayment using a method that is less beneficial to the consumer than one of the following methods:

1.  The method of repayment for the account before the effective date of the increase;

2.  An amortization period of not less than five years, beginning no earlier than the effective date of the increase; or

3.  A required minimum periodic payment that includes a percentage of the balance that is equal to no more than twice the percentage required before the effective date of the increase.

k.  If a card issuer promotes the waiver or rebate of finance charges due to a periodic interest rate or fees or charges (§§1026.6(b)(2)(ii), (b)(2)(iii), or (b)(2)(xii)) and applies the waiver or rebate to a credit card account under an open-end (not home-secured) consumer credit plan, any cessation of the waiver or rebate on that account constitutes an increase in an annual percentage rate, fee, or charge for purposes of section 1026.55.

**CFPB**

**Examination Procedures** **TILA**

## Requirements for Over-the-Limit Transactions – Section 1026.56

a. Joint Relationships. Determine that, if two or more consumers are jointly liable on a credit card account under an open-end (not home-secured) consumer credit plan, the card issuer treats the affirmative consent of any of the joint consumers as affirmative consent for that account. Similarly, determine that the card issuer treats a revocation of consent by any of the joint consumers as revocation of consent for that account. (§1026.56(f))

b. Notwithstanding a consumer's affirmative consent to a card issuer's payment of over-the-limit transactions, determine that the card issuer does not (§1026.56(j)):

1. Impose more than one over-the-limit fee or charge on a consumer's credit card account per billing cycle, and, in any event, only if the credit limit was exceeded during the billing cycle. In addition, the card issuer may not impose an over-the-limit fee or charge on the consumer's credit card account for more than three billing cycles for the same over-the-limit transaction where the consumer has not reduced the account balance below the credit limit by the payment due date for either of the last two billing cycles.

   NOTE: There is an exception to the latter prohibition if another over-the-limit transaction occurred in the last two billing cycles

2. Impose an over-the-limit fee or charge solely because of the card issuer's failure to promptly replenish the consumer's available credit following the crediting of the consumer's payment following the crediting of the consumer's payment under section 1026.10.

3. Condition the amount of a consumer's credit limit on the consumer affirmatively consenting to the card issuer's payment of over-the-limit transactions if the card issuer assesses a fee or charge for such service.

4. Impose an over-the-limit fee or charge for a billing cycle if a consumer exceeds a credit limit solely because of fees or interest charged by the card issuer (defined as charges imposed as part of the plan under section 1026.6(b)(3)) to the consumer's account during that billing cycle.

## Reevaluation of Rate Increases – Section 1026.59

a. If a card issuer increases an APR that applies to a credit card account under an open-end (not home-secured) consumer credit plan, based on the credit risk of the consumer, market conditions, or other factors, or increased such a rate on or after January 1, 2009, and 45 days' advance notice of the rate increase is required pursuant to section 1026.9(c)(2) or (g), determine that the card issuer (§1026.59(a)(1)):

# CFPB
# Examination Procedures                                TILA

1. Evaluates the factors described in section 1026.59(d); and

2. Based on its review of such factors, reduces the APR applicable to the consumer's account, as appropriate.

b. If a card issuer is required to reduce the rate applicable to an account pursuant to section 1026.59(a)(1), determine that the card issuer reduces the rate not later than 45 days after completion of the evaluation described in section 1026.59(a)(1). (§1026.59(a)(2)(i))

NOTE: Any reduction in an APR required pursuant to section 1026.59(a)(1) of this section shall apply to (§1026.59(a)(2)(ii)):

1. Any outstanding balances to which the increased rate described in section 1026.59(a)(1) has been applied; and

2. New transactions that occur after the effective date of the rate reduction that would otherwise have been subject to the increased rate.

c. Determine that the card issuer has reasonable written policies and procedures in place to conduct the review described in section 1026.59(a). (§1026.59(b))

d. Determine that a card issuer that is subject to section 1026.59(a) conducts the review described in section 1026.59(a)(1) not less frequently than once every six months after the rate increase. (§1026.59(c))

e. Except as provided in section 1026.59(d)(2), determine that the card issuer reviews either (§1026.59(d)(1)):

1. The factors on which the increase in an APR was originally based; or

2. The factors that the card issuer currently considers when determining the APRs applicable to similar new credit card accounts under an open-end (not home-secured) consumer credit plan.

f. For rate increases imposed between January 1, 2009 and February 21, 2010, determine that an issuer considered the factors described in section 1026.59(d)(1)(ii) when conducting the first two reviews required under section 1026.59(a), unless the rate increase subject to section 1026.59(a) was based solely upon factors specific to the consumer, such as a decline in the consumer's credit risk, the consumer's delinquency or default, or a violation of the terms of the account. (§1026.59(d)(2))

g. If an issuer increases a rate applicable to a consumer's account pursuant to section 1026.55(b)(4) based on the card issuer not receiving the consumer's required minimum periodic payment within 60 days after the due date, note that the issuer is not required to perform the review described in section 1026.59(a) prior to the sixth payment due date after the effective date of the increase. However, if the APR applicable to the consumer's account is not reduced pursuant to section

**CFPB**

**Examination Procedures**                                          **TILA**

1026.55(b)(4)(ii), determine that the card issuer performs the review described in section 1026.59(a). Determine that the first such review occurs no later than six months after the sixth payment due following the effective date of the rate increase. (§1026.59(e))

h. The obligation to review factors described in sections 1026.59(a) and (d) ceases to apply (§1026.59(f)):

   1. If the issuer reduces the APR applicable to a credit card account under an open-end (not home-secured) consumer credit plan to the rate applicable immediately prior to the increase, or, if the rate applicable immediately prior to the increase was a variable rate, to a variable rate determined by the same formula (index and margin) that was used to calculate the rate applicable immediately prior to the increase; or

   2. If the issuer reduces the APR to a rate that is lower than the rate described in §1026.59(f)(1) of this section.

i. Except as provided in section 1026.59(g)(2), section 1026.59 applies to credit card accounts that have been acquired by the card issuer from another card issuer. (§1026.59(g))

j. Determine that a card issuer that complies with this section by reviewing the factors described in section 1026.59(d)(1)(i) reviews the factors considered by the card issuer from which it acquired the accounts in connection with the rate increase. (§1026.59(g)(1))

k. If, not later than six months after the acquisition of such accounts, a card issuer reviews all of the credit card accounts it acquires in accordance with the factors that it currently considers in determining the rates applicable to its similar new credit card accounts (§1026.59(g)(2)):

   1. Except as provided in section 1026.59(g)(2)(iii), determine that the card issuer conducts reviews described in section 1026.59(a) for rate increases that are imposed as a result of its review under this paragraph.

   2. Except as provided in section 1026.59(g)(2)(iii), note that the card issuer is not required to conduct reviews in accordance with section 1026.59(a) for any rate increases made prior to the card issuer's acquisition of such accounts.

   3. Note that if as a result of the card issuer's review, an account is subject to, or continues to be subject to, an increased rate as a penalty, or due to the consumer's delinquency or default, the requirements of section 1026.59(a) apply.

*Servicemembers Civil Relief Act exception:* Note that the requirements of Section 1026.59 do not apply to increases in an APR that was previously decreased pursuant

# CFPB
# Examination Procedures                                    TILA

to the Servicemembers Civil Relief Act (50 U.S.C. app. 527), provided that such a rate increase is made in accordance with section 1026.55(b)(6). (§1026.59(h)(1))

*Charged off accounts exception:* Note that the requirements of section 1026.59 do not apply to accounts that the card issuer has charged off in accordance with loan-loss provisions. (§1026.59(h)(2))

NOTE: Appendix G to part 1026 is amended by revising Forms G-10(B), G-10(C), G- 10(E), G-17(B), G-17(C), G-18(B), G-18(D), G-18(F), G-18(G), G-20, G-21, G-22, G- 25(A), and G-25(B).

## Administrative Enforcement

10. If there is noncompliance involving understated finance charges or understated APRs subject to reimbursement under the FFIEC Policy Guide on Reimbursement (policy guide):

   a. Document the date on which the administrative enforcement of the TILA policy statement would apply for reimbursement purposes by determining the date of the preceding examination.

   b. If the noncompliance involves indirect (third-party paper) disclosure errors and affected consumers have not been reimbursed.

   c. Prepare comments, discussing the need for improved internal controls to be included in the report of examination.

   d. Notify your supervisory office for follow up with the regulator that has primary responsibility for the original creditor.

   e. If the noncompliance involves direct credit:

      1. Make an initial determination whether the violation is a pattern or practice.

      2. Calculate the reimbursement for the loans or accounts in an expanded sample of the identified population.

      3. Estimate the total impact on the population based on the expanded sample.

      4. Inform management that reimbursement may be necessary under the law and the policy guide, and discuss all substantive facts including the sample loans and calculations.

      5. Inform management of the financial institution's options under section 130 of the TILA for avoiding civil liability and of its option under the policy guide and section 108 (e)(6) of the TILA for avoiding a regulatory agency's order to reimburse affected borrowers.

# CFPB
# Examination Procedures                                   **TILA**

---

| **HIGH-COST MORTGAGE (Section 1026.32) WORKSHEET** |
|---|

| Borrower's Name | Loan Number: |
|---|---|

| **COVERAGE** | | |
|---|---|---|
| | **Yes** | **No** |
| Is the loan secured by the consumer's principal dwelling? [§1026.2(a)(19), §1026.32(a)(1)] | | |
| **If the answer is No, STOP HERE** | | |
| Is the loan for the following purpose? | | |
| 1. Residential Mortgage Transaction – [§1026.2(a)(24)] | | |
| 2. Reverse Mortgage Transaction – [§1026.33] | | |
| 3. Open-End Credit Plan – Subpart B [note prohibition against structuring loans as open-end plans to evade §1026.32 – [§1026.34(b)] | | |
| **If the answer is Yes to Box 1, 2, or 3, STOP HERE. If No, continue to Test 1.** | | |

---

# CFPB
# Examination Procedures                                    TILA

| TEST 1 – CALCULATION OF APR | | |
|---|---|---|
| A. Disclosed APR | | |
| B.  Treasury Security Yield of Comparable Maturity<br><br>Obtain the Treasury Constant Maturities Yield from the FRB's Statistical Release, H-15 – Selected Interest Rates (the "Business" links will display daily yields). Use the yield that has the most comparable maturity to the loan term and is from the 15th day of the month that immediately precedes the month of the application. If the 15th is not a business day, use the yield for the business day immediately preceding the 15th. If the loan term is exactly halfway between two published security maturities, use the lower of the two yields.) NOTE: Creditors may use the FRB's Selected Interest Rates or the actual auction results. See Staff Commentary to Regulation Z for further details.<br>[§ 1026.32(a)(1)(i)]<br><br>http://www.federalreserve.gov/releases/H15/data.htm | | |
| C.  Treasury Security Yield of Comparable Maturity (Box B)<br>    Plus: 8 percentage points for first-lien loan; or<br> 10 percentage points for subordinate-lien loan | | |
| | **Yes** | **No** |
| D. Is Box A greater than Box C? | | |
| **If Yes, the transaction is a High-Cost Mortgage. If No, continue to Test 2, Points and Fees.** | | |

# CFPB
# Examination Procedures                                    TILA

<hr/>

**HIGH-COST MORTGAGE (Section 1026.32) WORKSHEET**

| TEST 2 – CALCULATION OF POINTS AND FEES | | |
|---|---|---|
| **STEP 1: Identify all Charges Paid by the Consumer at or before Loan Closing** | | |
| **A. Finance Charges – Section 1026.4(a) and (b)** (Interest, including per-diem interest, and time price differential are excluded from these amounts.) | | |
| | **Fee** | **Subtotals** |
| Loan Points | | |
| Mortgage Broker Fee | | |
| Loan Service Fees | | |
| Required Closing Agent/Third-Party Fees | | |
| Required Credit Insurance | | |
| Private Mortgage Insurance | | |
| Life of Loan Charges (flood, taxes, etc.) | | |
| Any Other Fees Considered Finance Charges | | |
| **Subtotal** | | |
| **B. Certain Non-Finance Charges Under Section 1026.4(c)(7)** – Include fees paid by consumers <u>only</u> if the amount of the fee is unreasonable or if the creditor receives direct or indirect compensation from the charge or the charge is paid to an affiliate of the bank. (See the example in section 1026.32(b)(1)(ii) of the commentary for further explanation.) | | |
| Title Examination | | |
| Title Insurance | | |
| Property Survey | | |
| Document Preparation Charge | | |
| Credit Report | | |
| Appraisal | | |
| Fee for "Initial" Flood Hazard Determination | | |
| Pest Inspection | | |
| Any Other Fees Not Considered Finance Charges | | |
| Subtotal | | |
| **C. Premiums or Other Charges for Optional Credit Life, Accident, Health, or Loss-of-Income Insurance, or Debt-Cancellation Coverage** | | |
| **D. Total Points & Fees:** Add Subtotals for A, B, C | | |

# CFPB
# Examination Procedures                                    TILA

---

**HIGH-COST MORTGAGE (Section 1026.32) WORKSHEET**

| TEST 2 – CALCULATION OF POINTS AND FEES (continued) | |
|---|---|
| **STEP 2: Determine the Total Loan Amount for Cost Calculation (§1026.32(a)(1)(ii))** | |
| **A.  Determine the Amount Financed** (§1026.18(b))<br>Principal Loan Amount | |
| Plus: Other Amounts Financed by the Lender *(not already included in the principal and not part of the finance charge)* | |
| Less: Prepaid Finance Charges (§1026.2(a)(23)) | |
| Equals: Amount Financed | |
| **B. Deduct costs included in the points and fees under sections 1026.32(b)(1)(iii) and (iv) (Step 1, Box B and Box C) that are financed by the creditor** | |
| **C. Total Loan Amount (Step 2, Box A minus Box B)** | |

| TEST 2 – CALCULATION OF POINTS AND FEES (continued) | | |
|---|---|---|
| **STEP 3: Perform High-Fee Cost Calculation** | | |
| A. Eight Percent of the Total Loan Amount (Step 2, Box C) | | |
| B. Annual Adjustment Amount – (§1026.32(a)(1)(ii))<br>*2012: $611*<br>*(use the dollar amount corresponding to the year of the loan's origination)* | | |
| C. Total Points & Fees (Step 1, Box D) | | |
| | **Yes** | **No** |
| In Step 3, does Box C exceed the greater of Box A or Box B? | | |
| **If Yes, the transaction is a High-Cost Mortgage. If No, the transaction is not a High-Cost Mortgage under Test 2, Points and Fees.** | | |

# CFPB Consumer Laws and Regulations                    RESPA

# Real Estate Settlement Procedures Act[1]

The Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. 2601 *et seq*.) (the "Act") became effective on June 20, 1975. The Act requires lenders, mortgage brokers, or servicers of home loans to provide borrowers with pertinent and timely disclosures regarding the nature and costs of the real estate settlement process. The Act also protects borrowers against certain abusive practices, such as kickbacks, and places limitations upon the use of escrow accounts. The Department of Housing and Urban Development (HUD) originally promulgated Regulation X which implements RESPA. The CFPB has now restated Regulation X (12 CFR Part 1024). The National Affordable Housing Act of 1990 amended RESPA to require detailed disclosures concerning the transfer, sale, or assignment of mortgage servicing. It also requires disclosures for mortgage escrow accounts at closing and annually thereafter, itemizing the charges to be paid by the borrower and what is paid out of the account by the servicer.

In October 1992, Congress amended RESPA to cover subordinate lien loans. HUD, however, decided not to enforce these provisions until Regulation X was amended to cover these loans. On February 10, 1994, Regulation X was amended to extend coverage to subordinate lien loans. The amendments were effective August 9, 1994. Exemptions from coverage of RESPA and Regulation X, set forth in 12 CFR 1024.5(b), were effective March 14, 1994. Technical corrections and amendments to the rule were issued on March 30, 1994, and July 22, 1994.

On June 7, 1996, HUD amended Regulation X, but some of those amendments never took effect; others took effect January 14, 1997. Congress, when it enacted the Economic Growth and Regulatory Paperwork Reduction Act of 1996,[2] further amended RESPA to clarify certain definitions including "controlled business arrangement," which was changed to "affiliated business arrangement." The changes also reduced the disclosures under the mortgage servicing provisions of RESPA.

In 2008, HUD issued a RESPA Reform Rule (73 Fed. Reg. 68204, Nov. 17, 2008) that included substantive and technical changes to the existing RESPA regulations and different implementation dates for various provisions. Substantive changes included a standard Good Faith Estimate form and a revised HUD-1 Settlement Statement that are required as of January 1, 2010. Technical changes, including streamlined mortgage servicing disclosure language, elimination of outdated escrow account provisions, and a provision permitting an "average charge" to be listed on the Good Faith Estimate and HUD-1 Settlement Statement, took effect on January 16, 2009. In addition, HUD clarified that all disclosures required by RESPA are permitted to be provided electronically, in accordance with the Electronic Signatures in Global and National Commerce Act (ESIGN).

---

[1] These reflect FFIEC-approved procedures.

[2] Pub. L. 104-208, Div. A., Title II § 2103 (c), Sept. 30, 1996.

# CFPB Consumer
# Laws and Regulations                                    RESPA

The Dodd-Frank Act granted rule-making authority under RESPA to the Consumer Financial Protection Bureau (CFPB) and, with respect to entities under its jurisdiction, granted authority to the CFPB to supervise for and enforce compliance with RESPA and its implementing regulations.[3]  In December 2011, the CFPB restated HUD's implementing regulation at 12 CFR Part 1024 (76 Fed. Reg. 78978) (December 20, 2011).

# Coverage – 12 CFR 1024.5(a)

RESPA is applicable to all "federally related mortgage loans," which are defined as:

Loans (other than temporary loans), including refinancings secured by a first or subordinate lien on residential real property upon which either:

- A one-to-four family structure is located or is to be constructed using proceeds of the loan (including individual units of condominiums and cooperatives) or

- A manufactured home is located or is to be constructed using proceeds of the loan and to which one of the following applies:

    o Loans made by a lender,[4] creditor,[5] dealer;[6]

    o Loans made or insured by an agency of the federal government;

    o Loans made in connection with a housing or urban development program administered by an agency of the federal government;

    o Loans made and intended to be sold by the originating lender or creditor to FNMA, GNMA, or FHLMC (or its successor);[7]

    o Loans that are the subject of a home equity conversion mortgage or reverse mortgage issued by a lender or creditor subject to the regulation; or

---

[3] Dodd-Frank Act Secs. 1002(12)(M), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. Secs. 5481(12)(M), 5514(b)-(c), and 5515(b)-(c) .

[4] A lender includes financial institutions either regulated by, or whose deposits or accounts are insured by any agency of the federal government.

[5] A creditor is defined in Sec. 103(f) of the Consumer Credit Protection Act (15 U.S.C. Sec. 1602(f)). RESPA covers any creditor that makes or invests in residential real estate loans aggregating more than $1,000,000 per year.

[6] Dealer is defined in Regulation X to mean a seller, contractor, or supplier of goods or services. Dealer loans are covered by RESPA if the obligations are to be assigned before the first payment is due to any lender or creditor otherwise subject to the regulation.

[7] FNMA - Federal National Mortgage Association; GNMA - Government National Mortgage Association; FHLMC - Federal Home Loan Mortgage Corporation.

**CFPB Consumer Laws and Regulations**                                        **RESPA**

- o  Installment sales contracts, land contracts, or contracts for deeds on otherwise qualifying residential property if the contract is funded in whole or in part by proceeds of a loan made by a lender, dealer or creditor subject to the regulation.

# Exemptions – 12 CFR 1024.5(b)

The following transactions are exempt from coverage:

- A loan on property of 25 acres or more (whether or not a dwelling is located on the property).

- A loan primarily for business, commercial or agricultural purposes (definition identical to Regulation Z, 12 CFR 1026.3(a)(1)).

- A temporary loan, such as a construction loan. (The exemption does not apply if the loan is used as, or may be converted to, permanent financing by the same financial institution or is used to finance transfer of title to the first user of the property.) If the lender issues a commitment for permanent financing, it is covered by the regulation.

- Any construction loan with a term of two years or more is covered by the regulation, unless it is made to a bona fide contractor. "Bridge" or "swing" loans are not covered by the regulation.

- A loan secured by vacant or unimproved property where no proceeds of the loan will be used to construct a one-to-four family residential structure. If the proceeds will be used to locate a manufactured home or construct a structure within two years from the date of settlement, the loan is covered.

- An assumption, unless the mortgage instruments require lender approval for the assumption and the lender approves the assumption.

- A renewal or modification where the original obligation (note) is still in effect but modified.

- A bona fide transfer of a loan obligation in the secondary market. (However, the mortgage servicing transfer disclosure requirements of 12 CFR 1024.21 still apply.) Mortgage broker transactions that are table funded (the loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds) are not secondary market transactions and therefore are covered by RESPA.

# CFPB Consumer
# Laws and Regulations                                      RESPA

# Requirements

## Special Information Booklet — 12 CFR 1024.6

A loan originator[8] is required to provide the borrower with a copy of the Special Information Booklet at the time a written application is submitted, or no later than three business days after the application is received. If the application is denied before the end of the three-business-day period, the loan originator is not required to provide the booklet. If the borrower uses a mortgage broker, the broker rather than the lender, must provide the booklet.

The booklet does not need to be provided for refinancing transactions, closed-end subordinate lien mortgage loans and reverse mortgage transactions, or for any other federally related mortgage loan not intended for the purchase of a one-to-four family residential property.

A loan originator that complies with Regulation Z (12 CFR 1026.40) for open-end home equity plans is deemed to have complied with this section.

## Good Faith Estimate (GFE) of Settlement Costs — 12 CFR 1024.7 Standard GFE Required

As of January 1, 2010, a loan originator is required to provide a consumer with the standard GFE form that is designed to allow borrowers to shop for a mortgage loan by comparing settlement costs and loan terms. (See GFE form at Appendix C to 12 CFR Part 1024.)

### Overview of the Standard GFE

The first page of the GFE includes a summary of loan terms and a summary of estimated settlement charges. It also includes information about key dates such as when the interest rate for the loan quoted in the GFE expires and when the estimate for the settlement charges expires. The second page discloses settlement charges as subtotals for 11 categories of costs. The third page provides a table explaining which charges can change at settlement, a trade-off table showing the relationship between the interest rate and settlement charges, and a shopping chart to compare the costs and terms of loans offered by different originators.

### GFE Application Requirements

- The loan originator must provide the standard GFE to the borrower within three business days of receipt of an application for a mortgage loan. A loan originator is not required to provide a GFE if before the end of the three-business-day period, the application is denied or the borrower withdraws the application.

---

[8] The RESPA Reform Rule added the definition of "loan originator" to the list of defined terms in the RESPA regulations. A "loan originator" is defined as a lender or mortgage broker.

# CFPB Consumer
# Laws and Regulations                                    RESPA

- An application can be in writing or electronically submitted, including a written record of an oral application.

- A loan originator determines what information it needs to collect from a borrower and which of the collected information it will use in order to issue a GFE. Under the regulations, an "application" includes at least the following six pieces of information:

  1. the borrower's name;

  2. the borrower's gross monthly income;

  3. the borrower's Social Security number (e.g., to enable the loan originator to obtain a credit report);

  4. the property address;

  5. an estimate of the value of the property; and

  6. the mortgage loan amount sought. In addition, a loan originator may require the submission of any other information it deems necessary.

  A loan originator will be presumed to have relied on such information prior to issuing a GFE and cannot base a revision of a GFE on that information unless it changes or is later found to be inaccurate.

- While the loan originator may require the borrower to submit additional information beyond the six pieces of information listed above in order to issue a GFE, it cannot require, as a condition of providing the GFE, the submission of supplemental documentation to verify the information provided by the borrower on the application. However, a loan originator is not prohibited from using its own sources to verify the information provided by the borrower prior to issuing the GFE. The loan originator can require borrowers to provide verification information after the GFE has been issued in order to complete final underwriting.

- For dealer loans, the loan originator is responsible for providing the GFE directly or ensuring that the dealer provides the GFE.

- For mortgage brokered loans, either the lender or the mortgage broker must provide a GFE within three business days after a mortgage broker receives either an application or information sufficient to complete an application. The lender is responsible for ascertaining whether the GFE has been provided. If the mortgage broker has provided the GFE to the applicant, the lender is not required to provide an additional GFE.

- A loan originator is prohibited from charging a borrower any fee in order to obtain a GFE unless the fee is limited to the cost of a credit report.

# CFPB Consumer
# Laws and Regulations                                    RESPA

### GFE Not Required for Open End Lines of Credit – 12 CFR 1024.7(h)

A loan originator that complies with Regulation Z (12 CFR 1026.40) for open-end home equity plans is deemed to have complied with Section 1024.7.

### Availability of GFE Terms – 12 CFR 1024.7(c)

Regulation X does not establish a minimum period of availability for which the interest rate must be honored. The loan originator must determine the expiration date for the interest rate of the loan stated on the GFE. In contrast, Regulation X requires that the estimated settlement charges and loan terms listed on the GFE be honored by the loan originator for at least 10 business days from the date the GFE is provided. The period of availability for the estimated settlement charges and loan terms as well as the period of availability for the interest rate of the loan stated on the GFE must be listed on the GFE in the "important dates" section of the form.

After the expiration date for the interest rate of the loan stated on the GFE, the interest rate and the other rate related charges, including the charge or credit for the interest rate chosen, the adjusted origination charges and the per diem interest can change until the interest rate is locked.

## Key GFE Form Contents – 12 CFR 1024.7(d)

The loan originator must ensure that the required GFE form is completed in accordance with the Instructions set forth in Appendix C of 12 CFR Part 1024.

### First Page of GFE

- The first page of the GFE discloses identifying information such as the name and address of the "loan originator" which includes the lender or the mortgage broker originating the loan. The "purpose" section indicates what the GFE is about and directs the borrower to the Truth in Lending disclosures and HUD's website for more information. The borrower is informed that only the borrower can shop for the best loan and that the borrower should compare loan offers using the shopping chart on the third page of the GFE.

- The "important dates" section requires the loan originator to state the expiration date for the interest rate for the loan provided in the GFE as well as the expiration date for the estimate of other settlement charges and the loan terms not dependent upon the interest rate.

- While the interest rate stated on the GFE is not required to be honored for any specific period of time, the estimate for the other settlement charges and other loan terms must be honored for at least 10 business days from when the GFE is provided.

- In addition, the form must state how many calendar days within which the borrower must go to settlement once the interest rate is locked (rate lock period). The form also requires disclosure of how many days prior to settlement the interest rate would have to be locked, if applicable.

# CFPB Consumer
# Laws and Regulations                                    RESPA

- The "summary of your loan" section requires disclosure of the loan amount; loan term; initial interest rate; initial monthly payment for principal, interest and any mortgage insurance; whether the interest rate can rise, and if so, the maximum rate to which it can rise over the life of the loan, and the period of time after which the interest rate can first change; whether the loan balance can rise if the payments are made on time and if so, the maximum amount to which it can rise over the life of the loan; whether the monthly amount owed for principal, interest and any mortgage insurance can rise even if payments are made on time, and if so, the maximum amount to which the monthly amount owed can ever rise over the life of the loan; whether the loan has a prepayment penalty, and if so, the maximum amount it could be; and whether the loan has a balloon payment, and if so, the amount of such payment and in how many years it will be due.

- The "escrow account information" section requires the loan originator to indicate whether the loan does or does not have an escrow account to pay property taxes or other property related charges. In addition, this section also requires the disclosure of the monthly amount owed for principal, interest and any mortgage insurance.

- The bottom of the first page includes subtotals for the adjusted origination charges and charges for all other settlement charges listed on page two, along with the total estimated settlement charges.

## Second Page of GFE

The second page of the GFE requires disclosure of all settlement charges. It provides for the estimate of total settlement costs in eleven categories discussed below. The adjusted origination charges are disclosed in "Block A" and all other settlement charges are disclosed in "Block B." The amounts in the blocks are to be added to arrive at the "total estimated settlement charges" which is required to be listed at the bottom of the page.

## Disclosure of Adjusted Origination Charge (Block A)

Block A addresses disclosure of origination charges, which include all lender and mortgage broker charges. The "adjusted origination charge" results from the subtraction of a "credit" from the "origination charge" or the addition of a "charge" to the origination charge.

- Block 1 – the origination charges, which includes lender processing and underwriting fees and any fees paid to a mortgage broker.

**Origination Charge Note:** This block requires the disclosure of all charges that all loan originators involved in the transaction will receive for originating the loan (excluding any charges for points). A loan originator may not separately charge any additional fees for getting the loan such as application, processing or underwriting fees. The amount in Block 1 is subject to zero tolerance, i.e., the amount cannot change at settlement.

- Block 2 – a "credit" or "charge" for the interest rate chosen.

# CFPB Consumer
# Laws and Regulations                                    RESPA

**Credit or Charge for the Interest Rate Chosen Note:**

***Transaction Involving a Mortgage Broker***:  For a transaction involving a mortgage broker,[9] Block 2 requires disclosure of a "credit" or charge (points) for the specific interest rate chosen. The credit or charge for the specific interest rate chosen is the net payment to the mortgage broker (i.e., the sum of all payments to the mortgage broker from the lender, including payments based on the loan amount, a flat rate or any other compensation, and in a table funded transaction, the loan amount less the price paid for the loan by the lender.)

When the net payment to the mortgage broker from the lender is positive, there is a "credit" to the borrower and it is entered as a negative amount. For example, if the lender pays a yield spread premium to a mortgage broker for the loan set forth in the GFE, the payment must be disclosed as a "credit" to the borrower for the particular interest rate listed on the GFE (reflected on the GFE at Block 2, checkbox 2). The term "yield spread premium" is not featured on the GFE or the HUD-1 Settlement Statement.

Points paid by the borrower for the interest rate chosen must be disclosed as a "charge" (reflected on the GFE at Block 2, third checkbox). A loan cannot include both a charge (points) and a credit (yield spread premium).

***Transaction Not Involving a Mortgage Broker.*** For a transaction without a mortgage broker,  a lender may choose not to separately disclose any credit or charge for the interest rate chosen for the loan in the GFE. If the lender does not include any credit or charge in Block 2, it must check the first checkbox in Block 2 indicating that "The credit or charge for the interest rate you have chosen is included in 'our origination charge' above." Only one of the boxes in Block 2 may be checked, as a credit and charge cannot occur together in the same transaction.

## Disclosure of Charges for All Other Settlement Services (Block B)

Block B is the sum of charges for all settlement services other than the origination charges.

- Block 3 – required services by providers selected by the lender such as appraisal and flood certification fees;

- Block 4 – title service fees and the cost of lender's title insurance;

- Block 5 – owner's title insurance;

- Block 6 – other required services for which the consumer may shop;

---

[9] The RESPA Reform Rule changed the definition of "mortgage broker" to mean a person or entity (not an employee of a lender) that renders origination services and serves as an intermediary between a lender and a borrower in a transaction involving a federally related mortgage loan, including such person or entity that closes the loan in its own name and table funds the transaction. The definition will also apply to a loan correspondent approved under 24 CFR 202.8 for Federal Housing Administration (FHA programs). The definition would also include an "exclusive agent" who is not an employee of the lender.

# CFPB Consumer
# Laws and Regulations                                    RESPA

- Block 7 – government recording charges;

- Block 8 – transfer tax charges;

- Block 9 – initial deposit for escrow account;

- Block 10 – daily interest charges;

- Block 11 – homeowner's insurance charges.

**Third Page of GFE**

The third page of the GFE includes the following information:

- A tolerance chart identifying the charges that can change at settlement (see discussion on tolerances below);

- A trade-off table that requires the loan originator to provide information on the loan described in the GFE and at the loan originator's option, information about alternative loans (one with lower settlement charges but a higher interest rate and one with a lower interest rate but higher settlement charges);

- A shopping chart that allows the consumer to fill in loan terms and settlement charges from other lenders or brokers to use to compare loans; and

- Language indicating that some lenders may sell the loan after settlement but that any fees the lender receives in the future cannot change the borrower's loan or the settlement charges.

## Tolerances on Settlement Costs — 12 CFR 1024.7(e) and (i)

The RESPA Reform Rule established "tolerances" or limits on the amount actual settlement charges can vary at closing from the amounts stated on the GFE. The rule established three categories of settlement charges and each category has different tolerances. If, at settlement, the charges exceed the charges listed on the GFE by more than the permitted tolerances, the loan originator may cure the tolerance violation by reimbursing to the borrower the amount by which the tolerance was exceeded, at settlement or within 30 calendar days after settlement.

**Tolerance Categories**

- ***Zero tolerance category.*** This category of fees is subject to a zero tolerance standard. The fees estimated on the GFE may not be exceeded at closing. These fees include:

  o The loan originator's own origination charge, including processing and underwriting fees;

  o The credit or charge for the interest rate chosen (i.e., yield spread premium or discount points) while the interest rate is locked;

# CFPB Consumer
# Laws and Regulations                          RESPA

o   The adjusted origination charge while the interest rate is locked; and

o   State/local property transfer taxes.

- **_Ten percent tolerance category._** For this category of fees, while each individual fee may increase or decrease, the sum of the charges at settlement may not be greater than 10 percent above the sum of the amounts included on the GFE. This category includes fees for:

o   Loan originator required settlement services, where the loan originator selects the third-party settlement service provider;

o   Loan originator required services, title services, required title insurance and owner's title insurance when the borrower selects a third-party provider identified by the loan originator; and

o   Government recording charges.

- **_No tolerance category_**. The final category of fees is not subject to any tolerance restriction. The amounts charged for the following settlement services included on the GFE can change at settlement and the amount of the change is not limited:

o   Loan originator required services where the borrower selects his or her own third-party provider;

o   Title services, lender's title insurance, and owner's title insurance when the borrower selects his or her own provider;

o   Initial escrow deposit;

o   Daily interest charges; and homeowner's insurance.

## Identification of Third-Party Settlement Service Providers

When the loan originator permits a borrower to shop for one or more required third-party settlement services and select the settlement service provider for such required services, the loan originator must list in the relevant block on page two of the GFE the settlement service and the estimated charge to be paid to the provider of each required service. In addition, the loan originator must provide the borrower with a written list of settlement service providers for those required services on a separate sheet of paper at the time the GFE is provided.

## Binding GFE — 12 CFR 1024.7(f)

The loan originator is bound, within the tolerances provided, to the settlement charges and terms listed on the GFE provided to the borrower, unless a new GFE is provided prior to settlement (see discussion below on changed circumstances). This also means that if a lender accepts a GFE issued by a mortgage broker, the lender is subject to the loan terms and settlement charges listed in the GFE, unless a new GFE is issued prior to settlement.

# CFPB Consumer Laws and Regulations

**RESPA**

## Changed Circumstances – 12 CFR 1024.2(b), 1024.7(f)(1) and (f)(2)

Changed circumstances are defined as:

- Acts of God, war, disaster, or other emergency;

- Information particular to the borrower or transaction that was relied on in providing the GFE that changes or is found to be inaccurate after the GFE has been provided;

- New information particular to the borrower or transaction that was not relied on in providing the GFE; or

- Other circumstances that are particular to the borrower or transaction, including boundary disputes, the need for flood insurance, or environmental problems.

Changed circumstances do not include the borrower's name, the borrower's monthly income, the property address, an estimate of the value of the property, the mortgage loan amount sought, and any information contained in any credit report obtained by the loan originator prior to providing the GFE, unless the information changes or is found to be inaccurate after the GFE has been provided. In addition, market price fluctuations by themselves do not constitute changed circumstances.

Changed circumstances affecting ***settlement costs*** are those circumstances that result in increased costs for settlement services such that the charges at settlement would exceed the tolerances or limits on those charges established by the regulations.

Changed circumstances affecting the ***loan*** are those circumstances that affect the borrower's eligibility for the loan. For example, if underwriting and verification indicate that the borrower is ineligible for the loan provided in the GFE, the loan originator would no longer be bound by the original GFE. In such cases, if a new GFE is to be provided, the loan originator must do so within three business days of receiving information sufficient to establish changed circumstances. The loan originator must document the reason that a new GFE was provided and must retain documentation of any reasons for providing a new GFE for no less than three years after settlement.

None of the information collected by the loan originator prior to issuing the GFE may later become the basis for a "changed circumstance" upon which it may offer a revised GFE, unless: 1) it can demonstrate that there was a change in the particular information; or 2) that the information was inaccurate; or 3) that it did not rely on that particular information in issuing the GFE. A loan originator has the burden of demonstrating nonreliance on the collected information, but may do so through various means including through a documented record in the underwriting file or an established policy of relying on a more limited set of information in providing GFEs.

# CFPB Consumer
# Laws and Regulations                                    RESPA

If a loan originator issues a revised GFE based on information previously collected in issuing the original GFE and "changed circumstances," it must document the reasons for issuing the revised GFE, such as its nonreliance on such information or the inaccuracy of such information.

## Borrower Requested Changes — 12 CFR 1024.7(f)(3)

If a borrower requests changes to the mortgage loan identified in the GFE that change the settlement charges or the terms of the loan, the loan originator may provide a revised GFE to the borrower. If a revised GFE is provided, the loan originator must do so within three business days of the borrower's request.

## Expiration of Original GFE — 12 CFR 1024.7(f)(4)

If a borrower does not express an intent to continue with an application within 10 business days after the GFE is provided, or such longer time provided by the loan originator, the loan originator is no longer bound by the GFE.

## Interest Rate Dependent Charges and Terms — 12 CFR 1024.7(f)(5)

If the interest rate has not been locked by the borrower, or a locked interest rate has expired, all interest rate-dependent charges on the GFE are subject to change. The charges that may change include the charge or credit for the interest rate chosen, the adjusted origination charges, per diem interest, and loan terms related to the interest rate. However, the loan originator's origination charge (listed in Block 1 of page 2 of the GFE) is not subject to change, even if the interest rate floats, unless there is another changed circumstance or borrower-requested change.

If the borrower later locks the interest rate, a new GFE must be provided showing the revised interest rate dependent charges and terms. All other charges and terms must remain the same as on the original GFE, unless changed circumstances or borrower-requested changes result in increased costs for settlement services or affect the borrower's eligibility for the specific loan terms identified in the original GFE.

## New Home Purchases — 12 CFR 1024.7(f)(6)

In transactions involving new home purchases, where settlement is expected to occur more than 60 calendar days from the time a GFE is provided, the loan originator may provide the GFE to the borrower with a clear and conspicuous disclosure stating that at any time up until 60 calendar days prior to closing, the loan originator may issue a revised GFE. If the loan originator does not provide such a disclosure, it cannot issue a revised GFE except as otherwise provided in Regulation X.

# CFPB Consumer
# Laws and Regulations                                      RESPA

## Volume-Based Discounts

The RESPA Reform Rule did not formally address the legality of volume-based discounts.
However, HUD indicated in the preamble to the rule that discounts negotiated between loan
originators and other settlement service providers, where the discount is ultimately passed on to
the borrower in full, is not, depending on the circumstances of a particular transaction, a
violation of Section 8 of RESPA.[10]

# Uniform Settlement Statement
# (HUD-1 OR HUD-1A) — 12 CFR 1024.8

Section 4 of RESPA requires the person conducting the settlement (settlement agent) to provide
the borrower with a HUD-1 Settlement Statement at or before settlement that clearly
itemizes all charges imposed on the buyer and the seller in connection with the settlement.
The RESPA Reform rule included a revised HUD-1/1A Settlement Statement form that is
required as of January 1, 2010. The HUD-1 is used for transactions in which there is a borrower
and seller. For transactions in which there is a borrower and no seller (refinancings and
subordinate lien loans), the HUD-1 may be completed by using the borrower's side of the
settlement statement. Alternatively, the HUD-1A may be used.

However, no settlement statement is required for home equity plans subject to the Truth in
Lending Act and Regulation Z. Appendix A to 12 CFR Part 1024 contains the instructions
for completing the forms.

## Key RESPA Reform Enhancements to the HUD-1/1A
## Settlement Statement

While the RESPA Reform Rule did not include any substantive changes to the first page of the
HUD-1/1A form, there were changes to the second page of the form to facilitate comparison
between the HUD-1/1A and the GFE. Each designated line on the second page of the
revised HUD-1/1A includes a reference to the relevant line from the GFE.

With respect to disclosure of "no cost" loans where "no cost" refers only to the loan
originator's fees (see Section L, subsection 800 of the HUD-1 form), the amounts shown for
the "origination charge" and the "credit or charge for the interest rate chosen" should offset, so
that the "adjusted origination charge" is zero.

In the case of a "no cost" loan where "no cost" encompasses loan originator and third-party
fees, all third-party fees must be itemized and listed in the borrower's column on the HUD-
1/1A. These itemized charges must be offset with a negative adjusted origination charge
(Line 803) and recorded in the columns.

---

[10] 73 Fed. Reg. 68204, 68232 (November 17, 2008).

# CFPB Consumer
# Laws and Regulations                                    RESPA

To further facilitate comparability between the forms, the revised HUD-1 includes a new third page (second page of the HUD-1A) that allows borrowers to compare the loan terms and settlement charges listed on the GFE with the terms and charges listed on the closing statement. The first half of the third page includes a comparison chart that sets forth the settlement charges from the GFE and the settlement charges from the HUD-1 to allow the borrower to easily determine whether the settlement charges exceed the charges stated on the GFE. If any charges at settlement exceed the charges listed on the GFE by more than the permitted tolerances, the loan originator may cure the tolerance violation by reimbursing to the borrower the amount by which the tolerance was exceeded. A borrower will be deemed to have received timely reimbursement if the financial institution delivers or places the payment in the mail within 30 calendar days after settlement.

Inadvertent or technical errors on the settlement statement are not deemed to be a violation of Section 4 of RESPA if a revised HUD-1/1A is provided to the borrower within 30 calendar days after settlement.

The second half of the third page sets forth the loan terms for the loan received at settlement in a format that reflects the summary of loan terms on the first page of the GFE, but with additional loan related information that would be available at closing. The note at the bottom of the page indicates that the borrower should contact the lender if the borrower has questions about the settlement charges or loan terms listed on the form.

Section 1024.8(b) and the instructions for completing the HUD-1/1A Settlement Statement provide that the loan originator shall transmit sufficient information to the settlement agent to allow the settlement agent to complete the "loan terms" section. The loan originator must provide the information in a format that permits the settlement agent to enter the information in the appropriate spaces on the HUD-1/1A, without having to refer to the loan documents.

## Average Charge Permitted

As of January 16, 2009, an average charge may be stated on the HUD-1/1A if such average charge is computed in accordance with 12 CFR 1024.8(b)(2). All settlement service providers, including loan originators, are permitted to list the average charge for a settlement service on the HUD-1/1A Settlement Statement (and on the GFE) rather than the exact cost for that service.

The method of determining the average charge is left up to the settlement service provider. The average charge may be used as the charge for any third-party vendor charge, not for the provider's own internal charges. The average charge also cannot be used where the charge is based on the loan amount or the value of the property.

The average charge may be used for any third-party settlement service, provided that the total amounts received from borrowers for that service for a particular class of transactions do not exceed the total amounts paid to providers of that service for that class of transactions. A class of transactions may be defined based on the period of time, type of loan and geographic area. If an average charge is used in any class of transactions defined by the loan originator, then

# CFPB Consumer
# Laws and Regulations                    RESPA

the loan originator must use the same average charge for every transaction within that class. The average charge must be recalculated at least every six months.

A settlement service provider that uses an average charge for a particular service must maintain all documents that were used to calculate the average charge for at least three years after any settlement in which the average charge was used.

## Printing and Duplication of the Settlement Statement — 12 CFR 1024.9

Financial institutions have numerous options for layout and format in reproducing the HUD-1 and HUD-1A that do not require prior CFPB approval such as size of pages; tint or color of pages; size and style of type or print; spacing; printing on separate pages, front and back of a single page or on one continuous page; use of multi-copy tear-out sets; printing on rolls for computer purposes; addition of signature lines; and translation into any language. Other changes may be made only with the approval of the CFPB.

## One-Day Advance Inspection of the Settlement Statement — 12 CFR 1024.10

Upon request by the borrower, the HUD-1 or HUD-1A must be completed and made available for inspection during the business day immediately preceding the day of settlement, setting forth those items known at that time by the person conducting the closing.

## Delivery — 12 CFR 1024.10(a) and (b)

The completed HUD-1 or HUD-1A must be mailed or delivered to the borrower, the seller (if there is one), the lender (if the lender is not the settlement agent), and/or their agents at or before settlement. However, the borrower may waive the right of delivery by executing a written waiver at or before settlement. The HUD-1 or HUD-1A shall be mailed or delivered as soon as practicable after settlement if the borrower or borrower's agent does not attend the settlement.

## Retention — 12 CFR 1024.10(e)

A lender must retain each completed HUD-1 or HUD-1A and related documents for five years after settlement, unless the lender disposes of its interest in the mortgage and does not service the mortgage. If the loan is transferred, the lender shall provide a copy of the HUD-1 or HUD-1A to the owner or servicer of the mortgage as part of the transfer. The owner or servicer shall retain the HUD-1 or HUD-1A for the remainder of the five-year period.

## Prohibition of Fees for Preparing Federal Disclosures — 12 CFR 1024.12

For loans subject to RESPA, no fee may be charged for preparing the Settlement Statement or the Escrow Account statement or any disclosures required by the Truth in Lending Act.

# CFPB Consumer
# Laws and Regulations                                    RESPA

## Prohibition Against Kickbacks and Unearned Fees — 12 CFR 1024.14

Any person who accepts or receives a fee, kickback, or thing of value (payments, commissions, gifts, tangible item or special privileges) for the referral of settlement business is in violation of Section 8(a) of RESPA.  Any person who gives or accepts any portion, split, or percentage of a charge for real estate settlement services, other than for services actually performed, is in violation of Section 8(b) of RESPA.  Appendix B of Regulation X provides guidance on the meaning and coverage of the prohibition against kickbacks and unearned fees.

RESPA Section 8(b) is not violated when a single party charges and retains a settlement service fee, and that fee is unearned or excessive.

Examiners should consult with Supervision Headquarters to determine whether practices that involve unearned settlement service fees – whether split among parties, or charged and retained by a single settlement service provider – constitute unfair, deceptive, or abusive acts or practices. Such situations might arise, for example, where a settlement service provider fails to disclose fees or charges, or misleads the consumer about or misrepresents the amount, purpose or nature of fees being charged to a consumer.

## Penalties and Liabilities

Civil and criminal liability is provided for violating the prohibition against kickbacks and unearned fees including:

- Civil liability to the parties affected, equal to three times the amount of any charge paid for such settlement service.

- The possibility that the costs associated with any court proceeding together with reasonable attorney's fees could be recovered.

- A fine of not more than $10,000 or imprisonment for not more than one year or both.

## Affiliated Business Arrangements — 12 CFR 1024.15

If a loan originator has either an affiliate relationship or a direct or beneficial ownership interest of more than one percent in a provider of settlement services and the loan originator directly or indirectly refers business to the provider it is an affiliated business arrangement. An affiliated business arrangement is not a violation of Section 8 of RESPA and of 12 CFR 1024.14 of Regulation X if the following conditions are satisfied.

Prior to the referral, the person making each referral has provided to each person whose business is referred an Affiliated Business Arrangement Disclosure Statement (Appendix D of Regulation X). This disclosure shall specify the following:

# CFPB Consumer
# Laws and Regulations                                    RESPA

- The nature of the relationship (explaining the ownership and financial interest) between the provider and the loan originator; and

- The estimated charge or range of charges generally made by such provider.

This disclosure must be provided on a separate piece of paper either at the time of loan application, or with the GFE, or at the time of the referral.

The loan originator may not require the use of such a provider, with the following exceptions: the institution may require a buyer, borrower, or seller to pay for the services of an attorney, credit reporting agency, or real estate appraiser chosen by the institution to represent its interest. The loan originator may only receive a return on ownership or franchise interest or payment otherwise permitted by RESPA.

## Title Companies — 12 CFR 1024.16

Sellers that hold legal title to the property being sold are prohibited from requiring borrowers, either directly or indirectly, as a condition to selling the property, to use a particular title company.

Civil liability for violating the provision that a financial institution (seller) cannot require a borrower to use a particular title company is an amount equal to three times all charges made for such title insurance.

## Escrow Accounts — 12 CFR 1024.17

On October 26, 1994, HUD issued its final rule changing the accounting method for escrow accounts, which was originally effective April 24, 1995. The rule establishes a national standard accounting method, known as aggregate accounting. Existing escrow accounts were allowed a three-year phase-in period to convert to the aggregate accounting method. The final rule also established formats and procedures for initial and annual escrow account statements. (The 2008 RESPA Reform Rule eliminated provisions in 12 CFR 1024.17 that related to the phase-in period for aggregate accounting, effective January 16, 2009.)

The amount of escrow funds that can be collected at settlement or upon creation of an escrow account is restricted to an amount sufficient to pay charges, such as taxes and insurance, that are attributable to the period from the date such payments were last paid until the initial payment date. Throughout the life of an escrow account, the servicer may charge the borrower a monthly sum equal to 1/12 of the total annual escrow payments that the servicer reasonably anticipates paying from the account. In addition, the servicer may add an amount to maintain a cushion no greater than 1/6 of the estimated total annual payments from the account.

# CFPB Consumer
# Laws and Regulations                                        RESPA

## Escrow Account Analysis — 12 CFR 1024.17(c)(2) and (3) and 12 CFR 1024.17(k)

Before establishing an escrow account, a servicer must conduct an analysis to determine the periodic payments and the amount to be deposited. The servicer shall use an escrow disbursement date that is on or before the deadline to avoid a penalty and may make annual lump sum payments to take advantage of a discount.

## Transfer of Servicing — 12 CFR 1024.17(e)

If the new servicer changes either the monthly payment amount or the accounting method used by the old servicer, then it must provide the borrower with an initial escrow account statement within 60 days of the date of transfer. When the new servicer provides an initial escrow account statement, it shall use the effective date of the transfer of servicing to establish the new escrow account computation year. In addition, if the new servicer retains the monthly payments and accounting method used by the old servicer, then the new servicer may continue to use the same computation year established by the old servicer or it may choose a different one, using a short year statement.

## Shortages, Surpluses, and Deficiency Requirements — 12 CFR 1024.17(f)

The servicer shall conduct an annual escrow account analysis to determine whether a surplus, shortage, or deficiency exists as defined under 12 CFR 1024.17(b).

If the escrow account analysis discloses a surplus, the servicer shall, within 30 days from the date of the analysis, refund the surplus to the borrower if the surplus is greater than or equal to $50. If the surplus is less than $50, the servicer may refund such amount to the borrower, or credit such amount against the next year's escrow payments. These provisions apply as long as the borrower's mortgage payment is current at the time of the escrow account analysis.

If the escrow account analysis discloses a shortage of less than one month's escrow payments, then the servicer has three possible courses of action:

- The servicer may allow the shortage to exist and do nothing to change it;

- The servicer may require the borrower to repay the shortage amount within 30 days; or

- The servicer may require the borrower to repay the shortage amount in equal monthly payments over at least a 12-month period.

If the shortage is more than or equal to one month's escrow payment, then the servicer has two possible courses of action:

- The servicer may allow the shortage to exist and do nothing to change it; or

# CFPB Consumer Laws and Regulations                    RESPA

- The servicer may require the borrower to repay the shortage in equal monthly payments over at least a 12-month period.

If the escrow account analysis discloses a deficiency, then the servicer may require the borrower to pay additional monthly deposits to the account to eliminate the deficiency.

If the deficiency is less than one month's escrow account payment, then the servicer;

- May allow the deficiency to exist and do nothing to change it;

- May require the borrower to repay the deficiency within 30 days; or

- May require the borrower to repay the deficiency in two or more equal monthly payments.

If the deficiency is greater than or equal to one month's escrow payment, the servicer may allow the deficiency to exist and do nothing to change it, or require the borrower to repay the deficiency in two or more equal monthly payments.

These provisions apply as long as the borrower's mortgage payment is current at the time of the escrow account analysis.

A servicer must notify the borrower at least once during the escrow account computation year if a shortage or deficiency exists in the account.

## Initial Escrow Account Statement – 12 CFR 1024.17(g)

After analyzing each escrow account, the servicer must submit an initial escrow account statement to the borrower at settlement or within 45 calendar days of settlement for escrow accounts that are established as a condition of the loan.

The initial escrow account statement must include the monthly mortgage payment; the portion going to escrow; itemize estimated taxes, insurance premiums, and other charges; the anticipated disbursement dates of those charges; the amount of the cushion; and a trial running balance.

## Annual Escrow Account Statement – 12 CFR 1024.17(i)

A servicer shall submit to the borrower an annual statement for each escrow account within 30 days of the completion of the computation year. The servicer must conduct an escrow account analysis before submitting an annual escrow account statement to the borrower.

The annual escrow account statements must contain the account history; projections for the next year; current mortgage payment and portion going to escrow; amount of past year's monthly mortgage payment and portion that went into the escrow account; total amount paid into the escrow account during the past year; amount paid from the account for taxes, insurance premiums, and other charges; balance at the end of the period; explanation of how the

# CFPB Consumer
# Laws and Regulations                                    RESPA

surplus, shortage, or deficiency is being handled; and, if applicable, the reasons why the estimated low monthly balance was not reached.

## Short-Year Statements — 12 CFR 1024.17(i)(4)

Short-year statements can be issued to end the escrow account computation year and establish the beginning date of the new computation year. Short-year statements may be provided upon the transfer of servicing and are required upon loan payoff. The statement is due to the borrower within 60 days after receiving the pay-off funds.

## Timely Payments — 12 CFR 1024.17(k)

The servicer shall pay escrow disbursements by the disbursement date. In calculating the disbursement date, the servicer must use a date on or before the deadline to avoid a penalty and may make annual lump sum payments to take advantage of a discount.

## Recordkeeping — 12 CFR 1024.17(l)

Each servicer shall keep records that are easily retrievable, reflecting the servicer's handling of each borrower's escrow account. The servicer shall maintain the records for each escrow account for at least five years after the servicer last serviced the account.

# Mortgage Servicing Transfer Disclosures —
# 12 CFR 1024.21

The disclosures related to the transfer of mortgage servicing are required for first mortgage liens, including all refinancing transactions. Subordinate lien loans and open-end lines of credit (home equity plans), that are covered under the TILA and Regulation Z are exempt from this section.

A financial institution that receives an application for a federally related mortgage loan is required to provide the servicing disclosure statement to the borrower within three business days after receipt of the application. The 2008 RESPA Reform Rule included a technical revision to the mortgage servicing disclosure statement in Appendix MS-1 to Regulation X, effective January 16, 2009. The rule streamlined the initial servicing disclosure statement language to be consistent with statutory changes.

When a federally related mortgage loan is assigned, sold or transferred, the transferor (present servicer) must provide a disclosure at least 15 days before the effective date of the transfer. A transfer of servicing notice from the transferee (new servicer) must be provided not more than 15 days after the effective date of the transfer. Both notices may be combined into one notice if delivered to the borrower at least 15 days before the effective date of the transfer. The disclosure must include:

- The effective date of the transfer.

# CFPB Consumer
# Laws and Regulations                                    RESPA

- The name, address for consumer inquiries, and toll-free or collect-call telephone number of the transferee servicer.

- A toll-free or collect-call telephone number for an employee by the transferor servicer that can be contacted by the borrower to answer servicing questions.

- The date on which the transferor servicer will cease accepting payments relating to the loan and the date on which the transferee servicer will begin to accept such payments. The dates must either be the same or consecutive dates.

- Any information concerning the effect of the transfer on the availability of optional insurance and any action the borrower must take to maintain coverage.

- A statement that the transfer does not affect the terms or conditions of the mortgage (except as related to servicing).

- A statement of the borrower's rights in connection with complaint resolution.

During the 60-day period beginning on the date of transfer, no late fee can be imposed on a borrower who has made the payment to the wrong servicer.

The following transfers are not considered an assignment, sale, or transfer of mortgage loan servicing for purposes of this requirement if there is no change in the payee, address to which payment must be delivered, account number, or amount of payment due:

- Transfers between affiliates;

- Transfers resulting from mergers or acquisitions of service or subservicers; and

- Transfers between master servicers, when the subservicer remains the same.

## Servicers Must Respond to Borrower's Inquiries —
## 12 CFR 1024.21(e)

A financial institution servicer must respond to a borrower's qualified written request for information relating to the servicing of the loan and take appropriate action within established time frames after receipt of the inquiry. Generally, the financial institution must provide written acknowledgment within 20 business days, and take certain specified actions within 60 business days of receipt of such inquiry. The written inquiry must include the name and account number of the borrower and the reasons the borrower believes the account is in error.

During the 60 business day period following receipt of a qualified written request from a borrower relating to a payment, a financial institution may not provide adverse information regarding any payment that is the subject of the qualified written request to any consumer reporting agency.

# CFPB Consumer
# Laws and Regulations                                    RESPA

## Relationship to State Law — 12 CFR 1024.21(h) and 12 U.S.C. 2616

Financial institutions complying with the mortgage servicing transfer disclosure requirements of RESPA are considered to have complied with any state law or regulation requiring notice to a borrower at the time of application or transfer of a mortgage.

Other state laws shall not be affected by the act, except to the extent that they are inconsistent and then only to the extent of the inconsistency. The Secretary of Housing and Urban Development is authorized, after consulting with the appropriate federal agencies, to determine whether such inconsistencies exist.

## Penalties and Liabilities — 12 CFR 1024.21(f)

Failure to comply with any provision of 12 CFR 1024.21 will result in actual damages, and where there is a pattern or practice of noncompliance, any additional damages in an amount not to exceed $1,000. In class action cases, each borrower may receive actual damages and additional damages, as the court allows, up to $1,000 for each member of the class, except that the total amount of damages in any class action may not exceed the lesser of $500,000 or one percent of the net worth of the servicer. In addition, costs of the action and attorney fees may be awarded in any successful action.

# REFERENCES

## Laws

12 U.S.C. 2601 et seq.          Real Estate Settlement Procedures Act

## Regulations

### Consumer Financial Protection Bureau Regulation (12 CFR)

Part 1024                        Real Estate Settlement Procedures Act (Regulation X)

# CFPB
# Examination Procedures                                    RESPA

## Real Estate Settlement Procedures Act[1]

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

## Examination Objectives

- To determine if the financial institution has established procedures to ensure compliance with the Real Estate Settlement Procedures Act (RESPA).

- To determine that the financial institution does not engage in any practices prohibited by RESPA, such as kickbacks, payment or receipt of referral fees or unearned fees, or excessive escrow assessments.

- To determine if the Special Information Booklet, Good Faith Estimate, Uniform Settlement Statement (Form HUD-1 or HUD 1A), mortgage servicing transfer disclosures, and other required disclosures are in a form that complies with Regulation X, are properly completed, and provided to borrowers within prescribed time periods.

- To determine if the institution is submitting the required initial and annual escrow account statements to borrowers as applicable, and complying with established limitations on escrow account arrangements.

- To determine whether the institution is responding to borrower inquiries for information relating to the servicing of their loans in compliance with the provisions of RESPA.

## Examination Procedures

If the financial institution has loans covered by the act, determine whether the institution's policies, practices, and procedures are in compliance.

1. Review the types of loans covered by RESPA and applicable exemptions.

   **[Click&type]**

2. Review the Special Information Booklet, good faith estimate (GFE) form, Uniform Settlement Statement form (HUD-1 or HUD-1A), mortgage servicing transfer disclosure forms, and affiliated business arrangement disclosure form for compliance with the requirements of Regulation X. Review standardized and model forms in the appendices to the regulation.

   **[Click&type]**

---

[1] These reflect FFIEC-approved procedures.

# CFPB
# Examination Procedures                                    RESPA

3.  If electronic disclosures are provided, determine whether the institution has policies and procedures to provide electronic delivery in accordance with the Electronic Signatures in Global and National Commerce Act (ESIGN).

    **[Click&type]**

4.  Review written loan policies and operating procedures in connection with federally related mortgage loans and discuss them with institution personnel. Determine whether the financial institution has policies and procedures that address the following:

    - The information that will be collected from applicants in connection with issuing a GFE, and what information will be relied on to issue a GFE.

    - Provision of a revised GFE in the event of changed circumstances.

    - Provision of a revised GFE for transactions involving new home purchases.

    - To cure a tolerance violation by reimbursing the borrower the amount by which the tolerance was exceeded within 30 calendar days from date of settlement.

    - To cure a technical or inadvertent error on the HUD-1/1A by providing a revised settlement statement to the borrower within 30 calendar days of settlement.

    **[Click&type]**

5.  Interview mortgage lending personnel to determine:

    - Identity of persons or entities referring federally related mortgage loan business;

    - The nature of services provided by referral sources, if any;

    - Settlement service providers used by the institution;

    - When the Special Information Booklet is given;

    - The timing of the good faith estimate and how fee information is determined;

    - Any providers whose services are required by the institution;

    - How borrower inquiries regarding loan servicing are handled and within what time frames; and

    - Whether escrow arrangements exist on mortgage loans.

    **[Click&type]**

6.  Assess the overall level of knowledge and understanding of mortgage lending personnel.

    **[Click&type]**

## Special Information Booklet – 12 CFR 1024.6

7.  Determine through discussion with management and review of credit files whether the Special Information Booklet, if required, is provided within three business days after the financial institution or broker receives a written application for a loan (12 CFR 1024.6(a)(1)).

**CFPB**

**Examination Procedures**                                              **RESPA**

[Click&type]

**Good Faith Estimate – 12 CFR 1024.7**

8.  Determine whether the financial institution provides a good faith estimate of charges for settlement services, if required, within three business days after receipt of a written application (12 CFR 1024.7(a)).

    [Click&type]

9.  Review the Good Faith Estimate to determine if it appears exactly as set forth in Appendix C to Part 1024.

    [Click&type]

10. Review a sample of loan files that include GFEs to determine the following:

    •  Whether the financial institution followed GFE application requirements.

    •  If the institution provided a revised GFE to the applicant due to changed circumstances, determine whether institution followed regulatory requirements for issuing a revised GFE due to changed circumstances.

    •  Whether the GFE was completed as required in the regulations and instructions (12 CFR 1024.7 and Appendix C to 12 CFR Part 1024) and whether it included the following information:

        o  Interest rate expiration date;

        o  Settlement charges expiration date;

        o  Rate lock period;

        o  Number of days before settlement the interest rate must be locked, if applicable;

        o  Summary of loan information;

        o  Escrow account information;

        o  Estimates for settlement charges; and

        o  Left hand column on trade-off table completed for loan in the GFE.

    •  Whether, for no cost loans, all third-party fees paid by the financial institution are itemized and listed in the appropriate blocks on the second page of the GFE.

    •  Whether a separate sheet was provided with the GFE that identifies the settlement service providers for the services listed on the GFE.

**[Click&type]**

# CFPB
# Examination Procedures                          RESPA

---

**Uniform Settlement Statement Form (HUD-1 and HUD-1A) —
12 CFR 1024.8**

11.  Using the same sample of loan files as used for the review of the GFE, review the Uniform Settlement Statement (HUD-1 or HUD-1A, as appropriate) (12 CFR 1024.8 and Appendix A to 12 CFR Part 1024) to determine whether:

- Charges are properly itemized in accordance with the instructions for completion of the HUD-1 or HUD-1A (Appendix A to 12 CFR Part 1024).

- All charges paid by the borrower and the seller are itemized and include the name of the recipient (12 CFR 1024.8(b), Appendix A).

- Average charges for settlement services are calculated in accordance with 12 CFR 1024.8(b)(2).

- Charges required by the financial institution but paid outside of closing are itemized on the settlement statement, marked as "paid outside of closing" or "P.O.C.," but not included in cost totals (12 CFR 1024.8(b); Appendix A).

**[Click&type]**

12.  If the financial institution conducts the settlement, determine whether:

- The borrower, upon request, is allowed to inspect the HUD-1 or HUD-1A at least one business day prior to settlement (12 CFR 1024.10(a)).

- The HUD-1 or HUD-1A is provided to the borrower and seller at or before settlement (except where the borrower has waived the right to delivery and in the case of exempt transactions) (12 CFR 1024.10(b)).

- In cases where the right to delivery is waived or the transaction is exempt, the HUD-1/1A is mailed as soon as practicable after settlement (12 CFR 1024.10(b),(c), and (d)).

**[Click&type]**

13.  Determine whether, in the case of an inadvertent or technical error on the HUD-1/1A, the financial institution provides a revised HUD-1/1A to the borrower within 30 calendar days after settlement (12 CFR 1024.8(c)).

**[Click&type]**

14.  Review the HUD-1 or HUD-1A form prepared in connection with each GFE reviewed to determine if the amount stated for any itemized service exceeds the amount shown on the GFE for that service. If the amount stated on the HUD-1 exceeds the amount shown on the GFE and such overcharge violates the tolerance for that category of settlement services, determine whether the financial institution cured the tolerance violation by reimbursing to the borrower the amount by which the tolerance was exceeded, at settlement or within 30 calendar days from date of settlement (12 CFR 1024.7(i)).

**[Click&type]**

---

# CFPB
# Examination Procedures                                 RESPA

15.    Determine whether HUD-1 and HUD-1A forms are retained for five years. If the financial institution disposes of its interest in the mortgage and does not service the loan, determine whether the HUD-1 or HUD-1A form is transferred to the new asset owner with the loan file (12 CFR 1024.10(e)).

   **[Click&type]**

## Mortgage Servicing Transfer Disclosure — 12 CFR 1024.21

16.    Determine whether the disclosure form is substantially in conformity with the model disclosure in Appendix MS-1 to 12 CFR Part 1024.

   **[Click&type]**

17.    Determine that the mortgage servicing transfer disclosure was provided to the applicant within three business days after receipt of the application (12 CFR 1024.21(c)).

   **[Click&type]**

18.    Determine that the disclosure states whether the loan may be assigned, sold, or transferred while the loan is outstanding (12 CFR 1024.21(b)(2)).

   **[Click&type]**

## Notice to Borrower of Transfer of Mortgage Servicing — 12 CFR 1024.21

19.    Determine whether the institution has transferred or received mortgage servicing rights.

   **[Click&type]**

20.    If it has transferred servicing rights, determine whether notice to the borrower was given at least 15 days prior to the transfer (12 CFR 1024.21(d)(2)).

   **[Click&type]**

21.    If it has received servicing rights, determine whether notice was given to the borrower within 15 days after the transfer (12 CFR 1024.21(d)(2)).

   **[Click&type]**

**CFPB**

**Examination Procedures**                                    **RESPA**

22.  Determine whether the notice by transferor and transferee includes the following information (12 CFR 1024.21(d)(3)). Sample language for the notice of transfer is contained in Appendix MS-2 to 12 CFR Part 1024.

- The effective date of the transfer;

- A statement that the transfer does not affect the terms or conditions of the mortgage, other than terms directly related to its servicing;

- The name, consumer inquiry addresses (including, at the option of the servicer, a separate address where qualified written requests must be sent), and a toll-free or collect call telephone number for an employee or department of the transferee servicer;

- A toll-free or collect call telephone number for an employee or department of the transferor servicer that can be contacted by the borrower for answers to servicing transfer inquiries;

- The date on which the present servicer will cease accepting payments and the date the new servicer will begin accepting payments relating to the transferred loan;

- Any information concerning the effect of the transfer on the availability or terms of optional insurance and any action the borrower must take to maintain coverage; and

- A statement of the borrower's rights in connection with complaint resolution (Appendix MS-2 to 12 CFR Part 1024.)

[Click&type]

**Responsibilities of Servicer – 12 CFR 1024.21**

23.  Through a review of late notices or otherwise if the transferor servicer received payment, determine that no late fees have been imposed and that no payments have been treated as late within 60 days following a transfer of servicing (12 CFR 1024.21(d)(5)).

[Click&type]

**CFPB**

**Examination Procedures**                                **RESPA**

24. Determine that the institution, as loan servicer for mortgage loans and refinancings subject to RESPA, responds to borrower inquiries relating to these loans as prescribed in the regulation, including:

Provides the notice of receipt of inquiry for qualified written requests from borrowers within 20 business days (unless the action requested is taken within that period and the borrower is notified in writing of that action) (12 CFR 1024.21(e)(1)).

Provides written notification of the corrections taken on the account, or statement of the reasons the account is correct or explanation why the information requested is unavailable not later than 60 business days after receipt of the qualified written request from the borrower (12 CFR 1024.21(e)(3)).

Determine that the institution does not provide information to any consumer reporting agency regarding overdue payment when investigating a qualified written request from borrower regarding disputed payments during this 60- business-day period (12 CFR 1024.21(e)(4)(i)).

**[Click&type]**

## No Fees for RESPA Disclosures — 12 CFR 1024.12

25. Determine whether the financial institution charges a fee specifically for preparing and distributing the HUD-1 forms, escrow statements or documents required under the Truth in Lending Act (12 CFR 1024.12).

- If any fee is charged before providing a GFE, determine whether such fee is limited to the cost of a credit report (12 CFR 1024.7(a)(4)).

**[Click&type]**

## Purchase of Title Insurance — 12 CFR 1024.16

26. When the financial institution owns the property being sold, determine whether it requires that title insurance be purchased from a particular company (12 CFR 1024.16).

**[Click&type]**

## Payment or Receipt of Referral or Unearned Fees — 12 CFR 1024.14

27. Determine if management is aware of the prohibition against payment and receipt of any fee, kickback, or thing of value in return for the referral of settlement services business. (RESPA Section 8; 12 CFR 1024.14).

**[Click&type]**

28. Determine if management is aware of the prohibition against unearned fees where a charge for settlement services is divided between two or more parties.

**[Click&type]**

**CFPB**

**Examination Procedures**                                          **RESPA**

29.    Through interviews with institution management and personnel, file reviews, review of good faith estimates, and HUD-1 and HUD-1A, determine if federally related mortgage loan transactions are referred to the institution by brokers, affiliates, or other parties. Identify those parties. Also, identify persons or entities to which the institution refers settlement services business in connection with a federally related mortgage transaction.

- Identify the types of services rendered by the broker, affiliate, or service provider.

- By a review of the institution's general ledger or otherwise, determine if fees were paid to the institution or any parties identified.

- Confirm that any fees paid or received by the institution meet the requirements of 12 CFR 1024.14(g) and are not kickbacks or referral fees, but are for goods or facilities actually furnished or services actually performed. This includes payments to an affiliate or the affiliate's employees.

- In cases where a fee is split between the institution and one or more other parties, confirm that the fee met the requirements of Section 1024.14 and that each party actually performed services for that fee. This includes payments to an affiliate or the affiliate's employees.

- In all cases where there is an unearned fee (whether split between parties or not), determine whether the institution may have misled the consumer about or misrepresented the nature, purpose, or amount of a fee, or failed to properly disclose a fee to the consumer. In such cases, consult with Headquarters to discuss whether there may be a basis for a UDAAP claim (for unfair, deceptive, or abusive acts or practices).

    **[Click&type]**

## Affiliated Business Arrangements — 12 CFR 1024.15

30.    Determine from the HUD-1 or HUD-1A and from interviews with institution management if the institution referred a borrower to a settlement service provider.

    **[Click&type]**

31.    If the financial institution referred a borrower to an affiliated settlement service provider, determine whether the Affiliated Business Arrangement disclosure statement (Appendix D to Part 1024) was provided as required by 12 CFR 1024.15(b)(1).

    **[Click&type]**

32.    Other than an attorney, credit reporting agency, or appraiser representing the lender, if the financial institution referred a borrower to a settlement service provider, determine whether the institution required the use of the provider (12 CFR 1024.15(b)(2)).

**CFPB**

**Examination Procedures**                                  **RESPA**

---

**[Click&type]**

## Escrow Accounts — 12 CFR 1024.17

If the institution maintains escrow accounts in connection with a federally related mortgage loan, complete the following procedures.

33.  Determine whether the institution performed an initial escrow analysis (12 CFR 1024.17(c)(2)) and provided the initial escrow statement required by 12 CFR 1024.17(g). The statement must contain the following:

- Amount of monthly payment

- Portion of the monthly payment being placed in escrow

- Charges to be paid from the escrow account during the first 12 months

- Disbursement dates

- Amount of cushion

   **[Click&type]**

34.  Determine if the statement was given to the borrower at settlement or within 45 days after the escrow account was established. This statement may be incorporated into the HUD-1 statement (12 CFR 1024.17(g)(1) and (2)).

   **[Click&type]**

35.  Determine whether the institution performs an annual analysis of the escrow account (12 CFR 1024.17(c)(3) and (7), and 1024.17(i)).

   **[Click&type]**

36.  Determine whether the annual escrow account statement is provided to the borrower within 30 days of the end of the computation year (12 CFR 1024.17(i)).

   **[Click&type]**

37.  Determine if the annual escrow statement contains the following:

- Amount of monthly mortgage payment and portion that were placed in escrow;

- Amount of past year's monthly mortgage payment and portion that went into escrow;

- Total amount paid into escrow during the past computation year;

- Total amount paid out of escrow account during same period for taxes, insurance, and other charges;

- Balance in the escrow account at the end of the period;

- How a surplus, shortage, or deficiency is to be paid/handled; and

- If applicable, the reason why estimated low monthly balance was not reached (12 CFR 1024.17(i)(1)).

---

# CFPB
# Examination Procedures                    RESPA

**[Click&type]**

38.    Determine whether monthly escrow payments following settlement are within the limits of 12 CFR 1024.17(c).

**[Click&type]**

## Examiner Conclusions

1.    Summarize the findings, supervisory concerns and regulatory violations.

**[Click&type]**

2.    For the violations noted, determine the root cause by identifying weaknesses in internal controls, audit and compliance reviews, training, management oversight, or other factors. Determine whether the violation(s) are repetitive or systemic.

**[Click&type]**

3.    Identify action needed to correct violations and weaknesses in the institution's compliance system.

**[Click&type]**

4.    Discuss findings with the institution's management and, if necessary, obtain a commitment for corrective action.

**[Click&type]**

## Examiner's Summary, Recommendations, and Comments

**[Click&type]**

# CFPB
# Examination Checklist                                    RESPA

## Real Estate Settlement Procedures Act[1]

| | |
|---|---|
| Exam Date: | [Click&type] |
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

|  | YES | NO |
|---|---|---|
| 1. Are written loan policies in connection with federally related mortgage loans in compliance with Regulation X? | ☐ | ☐ |
| 2. Does the institution have established operating procedures that address the requirements of Regulation X? | ☐ | ☐ |
| 3. Are mortgage lending personnel knowledgeable of the requirements of RESPA and Regulation X? | ☐ | ☐ |

## Special Information Booklet — 12 CFR 1024.6

| | YES | NO |
|---|---|---|
| 4. For applicable transactions, is the Special Information Booklet provided within three business days after the financial institution or broker receives or prepares a written application for a loan? | ☐ | ☐ |

## Good Faith Estimate — 12 CFR 1024.7

| | YES | NO |
|---|---|---|
| 5. Does the financial institution use the standard/required Good Faith Estimate form (GFE)? | ☐ | ☐ |
| 6. Is a GFE of charges for settlement services, if required, provided within three business days after an application is received or prepared? | ☐ | ☐ |
| 7. Does the GFE appear in the exact form as in Appendix C to Regulation X? | ☐ | ☐ |
|    a. Does the GFE contain the following required elements: | | |
|       i. Interest rate expiration date? | ☐ | ☐ |
|       ii. Settlement charges expiration date? | ☐ | ☐ |
|       iii. Rate lock period? | ☐ | ☐ |
|       iv. Number of days before settlement the interest rate must be locked, if applicable? | ☐ | ☐ |
|       v. Summary of loan information? | ☐ | ☐ |
|       vi. Escrow account information? | ☐ | ☐ |
|       vii. Estimates for settlement charges? | ☐ | ☐ |
|       viii. Left hand column on trade-off table completed for loan in the GFE? | ☐ | ☐ |

---

[1] These reflect FFIEC-approved procedures.

# CFPB
# Examination Checklist                                    RESPA

|  | YES | NO |
|---|---|---|

b.  For all loans, are all third-party fees, including those paid by the financial institution in the case of no cost loans, itemized and listed in the appropriate blocks on the second page of the GFE?  ☐ ☐

c.  Did the financial institution provide a separate sheet that identifies the settlement service providers for the services listed?  ☐ ☐

## Affiliated Business Arrangements – 12 CFR 1024.15

8.  Does the financial institution refer borrowers to settlement service providers?  ☐ ☐

9.  If the institution refers borrowers to affiliated settlement service providers, is the Affiliated Business Disclosure statement provided to each borrower as set forth in Appendix D to Part 1024?  ☐ ☐

10.  Other than an attorney, credit reporting agency, or appraiser representing the lender, does the financial institution require the use of an affiliate?  ☐ ☐

## Uniform Settlement Statement Form (HUD-1 and HUD-1A) – 12 CFR 1024.8

11.  Does the financial institution use the current Uniform Settlement Statement (HUD-1 or HUD-1A) as appropriate?  ☐ ☐

12.  Does the HUD-1 or HUD-1A contain the following:

a.  Charges properly itemized for both borrower and seller in accordance with the instructions for completion of the HUD-1 or HUD-1A?  ☐ ☐

b.  All charges paid to one other than the lender itemized and the recipient named?  ☐ ☐

c.  Charges required by the financial institution but paid outside of closing, itemized on the settlement statement, marked as "paid outside of closing" or "P.O.C.," but not included in totals?  ☐ ☐

d.  Where an average charge was listed for a settlement service, was the charge calculated in accordance with requirements set forth in 12 CFR Section 1024.8(b)(2)?  ☐ ☐

13.  From a review of the HUD-1 or HUD-1/A prepared in connection with each GFE reviewed, are amounts shown on the GFE the same as the fees actually paid by the borrower?  ☐ ☐

14.  If a charge stated on the HUD-1/1A exceeds the charges stated on the GFE by more than the permitted tolerance, does the financial institution cure the tolerance violation by reimbursing the borrower the amount by which the tolerance was exceeded at settlement, or by delivering or placing the payment in the mail within 30 calendar days after settlement?  ☐ ☐

# CFPB
# Examination Checklist                                          RESPA

|  |  | YES | NO |
|---|---|---|---|

15. If the financial institution conducts settlement:

    a.  Is the borrower, upon request, allowed to inspect the HUD-1 or HUD-1A at least one day prior to settlement? ☐ ☐

    b.  Is the HUD-1 or HUD-1A provided to the borrower and seller at settlement? ☐ ☐

    c.  In cases where the right to delivery is waived or the transaction is exempt, is the statement mailed as soon as possible after settlement? ☐ ☐

16. In the case of an inadvertent or technical error on the HUD-1/1A, does the institution provide a revised HUD-1/1A to the borrower within 30 calendar days after settlement? ☐ ☐

17. If the financial institution retains its interest in the mortgage and/or services, is the HUD-1 or HUD-1A form retained for five years? ☐ ☐

18. If the financial institution disposes of its interest in the mortgage and does not service the loan, is the HUD-1/1A transferred to the new asset owner with the loan file? ☐ ☐

## Mortgage Servicing Transfer Disclosure – 12 CFR 1024.21

19. Does the mortgage servicing transfer disclosure form language substantially conform to the model disclosure in Appendix MS-1 to Part 1024? ☐ ☐

20. Does the lender provide the mortgage servicing transfer disclosure within three business days after receipt of the application? ☐ ☐

21. Does the disclosure state whether the loan may be assigned or transferred while outstanding? ☐ ☐

## Notice to Borrower of Transfer of Mortgage Servicing – 12 CFR 1024.21

22. If the institution has transferred servicing rights, was notice to the borrower given at least 15 days prior to the transfer? ☐ ☐

23. If the institution has received servicing rights, was notice given the borrower within 15 days after the transfer? ☐ ☐

24. Does the notice by transferor and transferee include the following information as contained in Appendix MS-2 to Part 1024:

    a.  The effective date of the transfer? ☐ ☐

    b.  The new servicer's name, address, and toll-free or collect call telephone number of the transferor servicer? ☐ ☐

# CFPB
# Examination Checklist                                          RESPA

|  | YES | NO |
|---|---|---|

c.  A toll-free or collect call telephone number of the present servicer to answer inquiries relating to the transfer? ☐ ☐

d.  The date on which the present servicer will cease accepting payments and the date the new servicer will begin accepting payments relating to the transferred loan? ☐ ☐

e.  Any information concerning the effect of the transfer on the availability of terms of optional insurance and any action the borrower must take to maintain coverage? ☐ ☐

f.  A statement that the transfer does not affect the terms or conditions of the mortgage, other than terms directly related to its servicing? ☐ ☐

g.  A statement of the borrower's rights in connection with complaint resolution? ☐ ☐

## Responding to Borrower Inquiries — 12 CFR 1024.21

25.  Have late fees been imposed within 60 days following a transfer of servicing or were payments treated as late when received by transferor rather than transferee? ☐ ☐

26.  Does the institution respond to borrower inquiries relating to servicing of RESPA covered mortgage loans and refinancings as prescribed in the regulation? ☐ ☐

Specifically, does the institution:

a.  Provide a written response acknowledging receipt of a qualified written request from a borrower for information relating to the servicing of the loan within 20 business days? ☐ ☐

b.  If not, has the action requested by the borrower been taken within the 20-business day period? ☐ ☐

c.  Within 60 business days after the receipt of a qualified written request, does the institution make appropriate corrections in the account of the borrower and provide a written notification of the correction (including in the notice the name and the telephone number of a representative of the institution who can provide assistance)? ☐ ☐

**or**

Provide the borrower with a written explanation:

i.  Stating the reasons the account is correct (including the name and telephone number of a representative of the institution who can provide assistance)? ☐ ☐

**or**

# CFPB
# Examination Checklist                                    RESPA

|  |  | YES | NO |
|---|---|---|---|
|  | ii.  Explaining why the information requested is unavailable or cannot be obtained by the institution (including the name and telephone number of a representative of the institution who can provide assistance)? | ☐ | ☐ |
| 27. | Does the institution provide information regarding an overdue payment to any consumer reporting agency during the 60-day period beginning on the date the institution received any qualified written request relating to a dispute regarding the borrower's payments? | ☐ | ☐ |

## Escrow Accounts — 12 CFR 1024.17

| 28. | Does the institution perform an escrow analysis at the creation of the escrow account? | ☐ | ☐ |
|---|---|---|---|
| 29. | Is the initial escrow statement given to the borrower at settlement or within 45 days after the escrow account is established? | ☐ | ☐ |
| 30. | For continuing escrow arrangements, is an annual escrow statement provided to the borrower at least once every 12 months? | ☐ | ☐ |
| 31. | Does the initial escrow statement itemize: | | |
|  | a.  Amount of monthly mortgage payment? | ☐ | ☐ |
|  | b.  Portion of the monthly payment being placed in escrow? | ☐ | ☐ |
|  | c.  Charges to be paid from the escrow account during the first 12 months? | ☐ | ☐ |
|  | d.  Disbursement date? | ☐ | ☐ |
|  | e.  Amount of cushion? | ☐ | ☐ |
| 32. | Is the annual escrow statement provided within 30 days of the completion of the escrow account computation year? | ☐ | ☐ |
| 33. | Does the annual escrow statement itemize: | | |
|  | a.  Current mortgage payment and portion going to escrow? | ☐ | ☐ |
|  | b.  Amount of last year's mortgage payment and portion that went to escrow? | ☐ | ☐ |
|  | c.  Total amount paid into the escrow account during the past computation year? | ☐ | ☐ |
|  | d.  Total amount paid from the escrow account during the year for taxes, insurance premiums, and other charges? | ☐ | ☐ |
|  | e.  Balance in the escrow account at the end of the period? | ☐ | ☐ |
|  | f.  Explanation of how any surplus is being handled? | ☐ | ☐ |
|  | g.  Explanation of how any shortage or deficiency is to be paid by the borrower? | ☐ | ☐ |

# CFPB
# Examination Checklist                                    RESPA

|  |  | YES | NO |
|---|---|---|---|
| | h.  If applicable, the reason(s) why the estimated low monthly balance was not reached? | ☐ | ☐ |
| 34. | Are monthly escrow payments following settlement no larger than 1/12 of the amount expected to be paid for taxes, insurance premiums, and other charges in the following 12 months, plus 1/6 of that amount? | ☐ | ☐ |
| 35. | Does the servicer notify the borrower at least annually of any shortage or deficiency in the escrow account? | ☐ | ☐ |
| 36. | Does the institution make payments from the escrow account for taxes, insurance premiums and other charges in a timely manner as they become due? | ☐ | ☐ |

## No Fees for RESPA Disclosures — 12 CFR 1024.12

|  |  | YES | NO |
|---|---|---|---|
| 37. | Does the financial institution charge a fee specifically for preparing and distributing the HUD-1 forms, escrow statements or documents required under the Truth in Lending Act? | ☐ | ☐ |
| | a.  If a fee is charged for a GFE, is the fee limited to the cost of a credit report (12 CFR 1024.7(a)(4))? | ☐ | ☐ |

## Purchase of Title Insurance — 12 CFR 1024.16

|  |  | YES | NO |
|---|---|---|---|
| 38. | When the financial institution owns the property being sold, does it require that title insurance is required from a particular company? | ☐ | ☐ |

## Payment or Receipt of Referral or Unearned Fees — 12 CFR 1024.14

|  |  | YES | NO |
|---|---|---|---|
| 39. | Is institution management aware of the prohibitions against payment or receipt of kickbacks and unearned fees? | ☐ | ☐ |
| 40. | Are federally related mortgage loan transactions referred by brokers, affiliates, or other parties? | ☐ | ☐ |
| | **or** | | |
| | Does the institution refer settlement services business to brokers, affiliates, or other parties? | ☐ | ☐ |
| 41. | If a referral occurred as described in Item 40 above, did any party give and did any party receive a fee, kickback, or thing of value (payment, commission, gift, tangible item, or special privilege) in return for that referral? | ☐ | ☐ |
| 42. | Is institution management aware of the prohibition against unearned fees where a charge for settlement services is divided between two or more parties? | ☐ | ☐ |
| 43. | Did the institution split a settlement service fee with another party? | ☐ | ☐ |

# CFPB
# Examination Checklist                                    RESPA

|  |  | YES | NO |
|---|---|---|---|
| 44. | If the institution split a settlement service fee with one or more other parties, did all parties actually perform settlement services for that fee? | ☐ | ☐ |
| 45. | In any settlement transaction, did the institution mislead the consumer about or misrepresent the nature, purpose, or amount of a fee charged to the consumer, or fail to properly disclose a fee? | ☐ | ☐ |

## Comments

**[Click&type]**

# CFPB Consumer
# Laws and Regulations                                              HPA

# Homeowners Protection Act (PMI Cancellation Act)[1]

The Homeowners Protection Act of 1998 (HPA or PMI Cancellation Act, or Act) was signed into law on July 29, 1998, became effective on July 29, 1999, and was later amended on December 27, 2000, to provide technical corrections and clarification. The "PMI Cancellation Act" addresses homeowners' difficulties in canceling private mortgage insurance (PMI)[2] coverage. It establishes provisions for canceling and terminating PMI, sets disclosure and notification requirements, and requires the return of unearned premiums.

The Dodd-Frank Act granted authority to the Consumer Financial Protection Bureau to supervise for and enforce compliance with the Homeowners Protection Act with respect to entities within its jurisdiction.[3]

PMI is insurance that protects lenders from the risk of default and foreclosure. PMI allows prospective buyers who cannot, or choose not to, provide significant down payments to obtain mortgage financing at affordable rates. It is used extensively to facilitate "high-ratio" loans (generally, loans in which the loan to value (LTV) ratio exceeds 80 percent). With PMI, the lender can recover costs associated with the resale of foreclosed property, and accrued interest payments or fixed costs, such as taxes or insurance policies, paid prior to resale.

Excessive PMI coverage provides little extra protection for a lender and does not benefit the borrower. In some instances, homeowners have experienced problems in canceling PMI. At other times, lenders may have agreed to terminate coverage when the borrower's equity reached 20 percent, but the policies and procedures used for canceling or terminating PMI coverage varied widely among lenders. Prior to the Act, homeowners had limited recourse when lenders refused to cancel their PMI coverage. Even homeowners in the few states that had laws pertaining to PMI cancellation or termination noted difficulties in canceling or terminating their PMI policies. The Act now protects homeowners by prohibiting life of loan PMI coverage for borrower-paid PMI products and establishing uniform procedures for the cancellation and termination of PMI policies.

## Scope and Effective Date

The Act applies primarily to "residential mortgage transactions," defined as mortgage loan transactions consummated on or after July 29, 1999, to finance the acquisition, initial

---

[1] These reflect FFIEC-approved procedures.

[2] The HPA does not apply to mortgage insurance made available under the National Housing Act, title 38 of the United States Code, or title V of the Housing Act of 1949. This includes mortgage insurance on loans made by the Federal Housing Administration and guarantees on mortgage loans made by the Veterans Administration.

[3] Dodd-Frank Act, Secs. 1002(12)(G), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. Secs. 5481(12)(G), 5514(c), and 5515(c).

# CFPB Consumer Laws and Regulations

**HPA**

construction or refinancing[4] of a single-family dwelling that serves as a borrower's principal residence.[5] The Act also includes provisions for annual written disclosures for "residential mortgages," defined as mortgages, loans or other evidences of a security interest created for a single-family dwelling that is the principal residence of the borrower (12 U.S.C. 4901(14) and (15)). A condominium, townhouse, cooperative or mobile home is considered to be a single-family dwelling covered by the Act.

The Act's requirements vary depending on whether a mortgage is:

- A "residential mortgage" or a "residential mortgage transaction;"

- Defined as high risk (either by the lender in the case of nonconforming loans, or Fannie Mae and Freddie Mac in the case of conforming loans);

- Financed under a fixed rate or an adjustable rate; or

- Covered by borrower-paid private mortgage insurance (BPMI) or lender-paid private mortgage insurance (LPMI).[6]

## Cancellation and Termination of PMI for Non-High Risk Residential Mortgage Transactions

### Borrower Requested Cancellation

A borrower may initiate cancellation of PMI coverage by submitting a written request to the servicer. The servicer must take action to cancel PMI when the cancellation date occurs, which is when the principal balance of the loan reaches (based on actual payments) or is first scheduled to reach 80 percent of the "original value,"[7] irrespective of the outstanding balance, based upon the initial amortization schedule (in the case of a fixed rate loan) or amortization schedule then in effect (in the case of an adjustable rate loan),[8] or any date thereafter that:

---

[4] For purposes of these procedures, "refinancing" means the refinancing of loans any portion of which was to provide financing for the acquisition or initial construction of a single-family dwelling that serves as a borrower's principal residence. *See* 15 U.SC. 1601 et. seq. and 12 CFR 1026.20.

[5] For purposes of these procedures, junior mortgages that provide financing for the acquisition, initial construction or refinancing of a single-family dwelling that serves as a borrower's primary residence are covered.

[6] All sections of these procedures and manual apply to BPMI. For LPMI, relevant sections begin under the heading that follows thereafter.

[7] "Original value" is defined as the lesser of the sales price of the secured property as reflected in the purchase contract or, the appraised value at the time of loan consummation. In the case of a refinancing, the term means the appraised value relied upon by the lender to approve the refinance transaction.

[8] The HPA includes as an adjustable rate mortgage, a balloon loan that "contains a conditional right to refinance or modify the unamortized principal at the maturity date." Therefore, if a balloon loan contains a conditional right to refinance, the initial disclosure for an adjustable rate mortgage would be used even if the interest rate is fixed.

# CFPB Consumer
# Laws and Regulations                               HPA

- The borrower submits a written cancellation request;

- The borrower has a good payment history;[9]

- The borrower is current;[10] and

- The borrower satisfies any requirement of the mortgage holder for: (i) evidence of a type established in advance that the value of the property has not declined below the original value; and (ii) certification that the borrower's equity in the property is not subject to a subordinate lien (12 U.S.C. 4902(a)(4)).

Once PMI is canceled, the servicer may not require further PMI payments or premiums more than 30 days after the later of:

(i)   the date on which the written request was received, or

(ii)  the date on which the borrower satisfied the evidence and certification requirements of the mortgage holder described previously (12 U.S.C. 4902(e)(1)).

## Automatic Termination

The Act requires a servicer to automatically terminate PMI for residential mortgage transactions on the date that:

- The principal balance of the mortgage is first scheduled to reach 78 percent of the original value of the secured property (based solely on the initial amortization schedule in the case of a fixed rate loan or on the amortization schedule then in effect in the case of an adjustable rate loan, irrespective of the outstanding balance) if the borrower is current; or

- If the borrower is not current on that date, on the first day of the first month following the date that the borrower becomes current (12 U.S.C. 4902(b)).

If PMI is terminated, the servicer may not require further payments or premiums of PMI more than 30 days after the termination date or the date following the termination date on which the borrower becomes current on the payments, whichever is sooner (12 U.S.C. 4902(e)(2)).

There is no provision in the automatic termination section of the Act, as there is with the borrower- requested PMI cancellation section that protects the lender against declines in property value or subordinate liens. The automatic termination provisions make no reference to good payment history (as prescribed in the borrower-requested provisions), but state only that the borrower must be *current* on mortgage payments (12 U.S.C. 4902(b)).

---

[9] A borrower has a good payment history if the borrower: (1) has not made a payment that was 60 days or more past due within the first 12 months of the last two years prior to the later of the cancellation date, or the date that the borrower request cancellation; or (2) has not made a payment that was 30 days or more past due within the 12 months prior to the later of the cancellation date or the date that the borrower requests cancellation.

[10] The HPA does not define "current."

# CFPB Consumer
# Laws and Regulations                                    HPA

## Final Termination

If PMI coverage on a residential mortgage transaction was not canceled at the borrower's request or by the automatic termination provision, the servicer must terminate PMI coverage by the first day of the month immediately following the date that is the midpoint of the loan's amortization period if, on that date, the borrower is current on the payments required by the terms of the mortgage. (If the borrower is not current on that date, PMI should be terminated when the borrower does become current.)

The midpoint of the amortization period is halfway through the period between the first day of the amortization period established at consummation and ending when the mortgage is scheduled to be amortized. The servicer may not require further payments or premiums of PMI more than 30 days after PMI is terminated (12 U.S.C. 4902(e)(3)).

## Loan Modifications

If a borrower and mortgage holder agree to modify the terms and conditions of a loan pursuant to a residential mortgage transaction, the cancellation, termination or final termination dates shall be recalculated to reflect the modification (12 U.S.C. 4902(d)).

## Exclusions

The Act's cancellation and termination provisions do not apply to residential mortgage transactions for which Lender Paid Mortgage Insurance (LPMI) is required (12 U.S.C. 4905(b)).

## Return of Unearned Premiums

The servicer must return all unearned PMI premiums to the borrower within 45 days after cancellation or termination of PMI coverage. Within 30 days after notification by the servicer of cancellation or termination of PMI coverage, a mortgage insurer must return to the servicer any amount of unearned premiums it is holding to permit the servicer to return such premiums to the borrower (12 U.S.C. 4902(f)).

## Accrued Obligations for Premium Payments

The cancellation or termination of PMI does not affect the rights of any lender, servicer or mortgage insurer to enforce any obligation of a borrower for payments of premiums that accrued before the cancellation or termination occurred (12 U.S.C. 4902 (h)).

# Exceptions to Cancellation and Termination Provisions for High Risk Residential Mortgage Transactions

The borrower-requested cancellation at 80 percent LTV and the automatic termination at 78 percent LTV requirements of the Act do not apply to "high risk" loans. However, high risk loans are subject to final termination and are divided into two categories – conforming (Fannie Mae/Freddie Mac-defined high-risk loans) and nonconforming (lender-defined high-risk loans) (12 U.S.C. 4902(g)(1)).

# CFPB Consumer
# Laws and Regulations                                    HPA

## Conforming Loans (Fannie Mae/Freddie Mac-Defined High Risk Loans)

Conforming loans are those loans with an original principal balance not exceeding Freddie Mac's and Fannie Mae's conforming loan limits.[11] Fannie Mae and Freddie Mac are authorized under the Act to establish a category of residential mortgage transactions that are not subject to the Act's requirements for borrower-requested cancellation or automatic termination, because of the high risk associated with them.[12] They are, however, subject to the final termination provision of the Act. As such, PMI on a conforming high risk loan must be terminated by the first day of the month following the date that is the midpoint of the loan's initial amortization schedule (in the case of a fixed rate loan) or amortization schedule then in effect (in the case of an adjustable rate loan) if, on that date, the borrower is current on the loan. (If the borrower is not current on that date, PMI should be terminated when the borrower does become current.)

## Nonconforming Loans (Lender-Defined High Risk Loans)

Nonconforming loans are those residential mortgage transactions that have an original principal balance exceeding Freddie Mac's and Fannie Mae's conforming loan limits. Lender-defined high risk loans are not subject to the Act's requirements for borrower-requested cancellation or automatic termination. However, if a residential mortgage transaction is a lender-defined high risk loan, PMI must be terminated on the date on which the principal balance of the mortgage, based solely on the initial amortization schedule (in the case of a fixed rate loan) or the amortization schedule then in effect (in the case of an adjustable rate loan) for that mortgage and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 77 percent of the original value of the property securing the loan.

Like conforming loans that are determined to be high risk by Freddie Mac and Fannie Mae, a residential mortgage transaction that is a lender-defined high risk loan is subject to the final termination provision of the Act.

## Notices

The lender must provide written initial disclosures at consummation for all high-risk residential mortgage transactions (as defined by the lender or Fannie Mae or Freddie Mac), that in no case will PMI be required beyond the midpoint of the amortization period of the loan, if the loan is current. The Act does not require a more specific notice as to the 77 percent LTV termination standards for lender defined high-risk loans.

---

[11] The limit was $322,700 in 2003.

[12] Fannie Mae and Freddie Mac have not defined high-risk loans as of the date of this publication.

# CFPB Consumer
# Laws and Regulations                                    HPA

## Basic Disclosure and Notice Requirements Applicable to Residential Mortgage Transactions and Residential Mortgages

The Act requires the lender in a residential mortgage transaction to provide to the borrower, at the time of consummation, certain disclosures that describe the borrower's rights for PMI cancellation and termination. A borrower may not be charged for any disclosure required by the Act. Initial disclosures vary, based upon whether the transaction is a fixed rate mortgage, adjustable rate mortgage or high-risk loan. The Act also requires that the borrower be provided with certain annual and other notices concerning PMI cancellation and termination. Residential mortgages are subject to certain annual disclosure requirements.

### Initial Disclosures for Fixed Rate Residential Mortgage Transactions

When PMI is required for non-high risk fixed rate mortgages, the lender must provide to the borrower at the time the transaction is consummated: (i) a written initial amortization schedule, and (ii) a written notice that discloses:

- The borrower's right to request cancellation of PMI, and, based on the initial amortization schedule, the date the loan balance is scheduled to reach 80 percent of the original value of the property;

- The borrower's right to request cancellation on an earlier date, if actual payments bring the loan balance to 80 percent of the original value of the property sooner than the date based on the initial amortization schedule;

- That PMI will automatically terminate when the LTV ratio reaches 78 percent of the original value of the property and the specific date that is projected to occur (based on the initial amortization schedule); and

- The Act provides for exemptions to the cancellation and automatic termination provisions for high-risk mortgages and whether these exemptions apply to the borrower's loan (12 U.S.C. 4903(a)(1)(A)).

### Initial Disclosures for Adjustable Rate Residential Mortgage Transactions

When PMI is required for non-high risk adjustable rate mortgages, the lender must provide to the borrower, at the time the transaction is consummated, a written notice that discloses:

- The borrower's right to request cancellation of PMI on:

  (i) the date the loan balance is first scheduled to reach 80 percent of the original value of the property based on the amortization schedule then in effect, or

# CFPB Consumer
# Laws and Regulations                                    HPA

(ii) the date the balance actually reaches 80 percent of the original value of the property based on actual payments.

The notice must also state that the servicer will notify the borrower when either (i) or (ii) occurs;

- That PMI will automatically terminate when the loan balance is first scheduled to reach 78 percent of the original value of the property based on the amortization schedule then in effect. The notice must also state that the borrower will be notified when PMI is terminated (or that termination will occur when the borrower becomes current on payments); and

- That there are exemptions to the cancellation and automatic termination provisions for high risk mortgages and whether such exemptions apply to the borrower's loan (12 U.S.C. 4903(a)(1)(B)).

## Initial Disclosures for High Risk Residential Mortgage Transactions

When PMI is required for high risk residential mortgage transactions, the lender must provide to the borrower a written notice stating that PMI will not be required beyond the date that is the midpoint of the loan's amortization period if, on that date, the borrower is current on the payments as required by the terms of the loan. The lender must provide this notice at consummation. The lender need not provide disclosure of the termination at 77 percent LTV for lender-defined high-risk mortgages (12 U.S.C. 4903(a)(2)).

## Annual Disclosures for Residential Mortgage Transactions

For all residential mortgage transactions, including high risk mortgages for which PMI is required, the servicer must provide the borrower with an annual written statement that sets forth the rights of the borrower to PMI cancellation and termination and the address and telephone number that the borrower may use to contact the servicer to determine whether the borrower may cancel PMI (12 U.S.C. 4903(a)(3)).

## Disclosures for Existing Residential Mortgages

When PMI was required for a residential mortgage consummated before July 29, 1999, the servicer must provide to the borrower an annual written statement that:

- States that PMI may be canceled with the consent of the lender or in accordance with state law; and

- Provides the servicer's address and telephone number, so that the borrower may contact the servicer to determine whether the borrower may cancel PMI (12 U.S.C. 4903(b)).

# CFPB Consumer Laws and Regulations                    HPA

## Notification Upon Cancellation or Termination of PMI Relating to Residential Mortgage Transactions

### General

The servicer must, not later than 30 days after PMI relating to a residential mortgage transaction is cancelled or terminated, notify the borrower in writing that:[13]

- PMI has terminated and the borrower no longer has PMI; and

- No further premiums, payments, or other fees are due or payable by the borrower in connection with PMI (12 U.S.C. 4904(a)).

### Notice of Grounds/Timing

If a servicer determines that a borrower in a residential mortgage transaction does not qualify for PMI cancellation or automatic termination, the servicer must provide the borrower with a written notice of the grounds relied on for that determination. If an appraisal was used in making the determination, the servicer must give the appraisal results to the borrower. If a borrower does not qualify for cancellation, the notice must be provided not later than 30 days following the later of:

(i)    the date the borrower's request for cancellation is received; or

(ii)   the date on which the borrower satisfies any evidence and certification requirements of the mortgage holder. If the borrower does not meet the requirements for automatic termination, the notice must be provided not later than 30 days following the scheduled termination date (12 U.S.C. 4904(b)).

## Disclosure Requirements for Lender-Paid Mortgage Insurance

### Definitions

*Borrower paid mortgage insurance (BPMI)* means PMI that is required for a residential mortgage transaction, the payments for which are made by the borrower.

*Lender-paid mortgage insurance (LPMI)* means PMI that is required for a residential mortgage transaction, the payments for which are made by a person other than the borrower.

---

[13] For adjustable rate mortgages, the initial notice to borrowers must state that the servicer will notify the borrower when the cancellation and automatic termination dates are reached (12 U.S.C. 4903(a)(1)(B)). Servicers should take care that the appropriate notices are made to borrowers when those dates are reached.

# CFPB Consumer
# Laws and Regulations                                      HPA

*Loan commitment* means a prospective lender's written confirmation of its approval, including any applicable closing conditions, of the application of a prospective borrower for a residential mortgage loan (12 U.S.C. 4905(a)).

## Initial Notice

In the case of LPMI required for a residential mortgage transaction, the Act requires that the lender provide a written notice to the borrower not later than the date on which a loan **commitment** is made. The written notice must advise the borrower of the differences between LPMI and BPMI by notifying the borrower that LPMI:

- Differs from BPMI because it cannot be cancelled by the borrower or automatically terminated as provided under the Act;

- Usually results in a mortgage having a higher interest rate than it would in the case of BPMI; and

- Terminates only when the mortgage is refinanced, (as that term is defined in the Truth in Lending Act, 15 U.S.C. 1601 et seq., and Regulation Z, 12 CFR 1026.20), paid off, or otherwise terminated.

The notice must also provide:

- That LPMI and BPMI have both benefits and disadvantages;

- A generic analysis of the costs and benefits of a mortgage in the case of LPMI versus BPMI over a 10-year period, assuming prevailing interest and property appreciation rates; and

- That LPMI may be tax-deductible for federal income taxes, if the borrower itemizes expenses for that purpose (12 U.S.C. 4905(c)(1)).

## Notice at Termination Date

Not later than 30 days after the termination date that would apply in the case of BPMI, the servicer shall provide to the borrower a written notice indicating that the borrower may wish to review financing options that could eliminate the requirement for LPMI in connection with the mortgage (12 U.S.C. 4905(c)(2)).

# Fees for Disclosures

As stated previously, no fee or other cost may be imposed on a borrower for the disclosures or notifications required to be given to a borrower by lenders or servicers under the Act (12 U.S.C. 4906).

# CFPB Consumer
# Laws and Regulations                                    HPA

## Civil Liability

## Liability Dependent upon Type of Action

Servicers, lenders, and mortgage insurers that violate the Act are liable to borrowers as follows:

- Individual Action

    In the case of individual borrowers:

    (i)     Actual damages (including interest accruing on such damages);

    (ii)    Statutory damages not to exceed $2,000;

    (iii)   Costs of the action; and

    (iv)    Reasonable attorney fees.

- Class Action

    In the case of a class action suit against a defendant that is subject to Section 10 of the Act, (i.e., regulated by the federal banking agencies, NCUA or the Farm Credit Administration):

    (i)     Such statutory damages as the court may allow up to the lesser of $500,000 or 1 percent of the liable party's net worth;

    (ii)    Costs of the action; and

    (iii)   Reasonable attorney fees.

    In the case of a class action suit against a defendant that is not subject to Section 10 of the Act, (i.e., not regulated by the federal banking agencies, NCUA, or the Farm Credit Administration):

    (i)     Actual damages (including interest accruing on such damages);

    (ii)    Statutory damages up to $1,000 per class member but not to exceed the lesser of (i) $500,000 or (ii) 1 percent of the liable party's gross revenues;

    (iii)   Costs of the action; and

    (iv)    Reasonable attorney fees (12 U.S.C. 4907(a)).

## Statute of Limitation

A borrower must bring an action under the Act within two years after the borrower discovers the violation (12 U.S.C. 4907(b)).

# CFPB Consumer
# Laws and Regulations                                    HPA

## Mortgage Servicer Liability Limitation

A servicer shall not be liable for its failure to comply with the requirements of the Act if the servicer's failure to comply is due to the mortgage insurer's or lender's failure to comply with the Act (12 U.S.C. 4907(c)).

## Enforcement

The Dodd-Frank Act directs the CFPB to enforce Federal consumer financial laws and specifically enumerates HPA as one of those laws.[14]

HPA also directs the federal banking agencies to enforce the Act under 12 U.S.C. 1818 or any other authority conferred upon the agencies by law. Under HOPA the agencies shall:

- Notify applicable lenders or servicers of any failure to comply with the Act;

- Require the lender or servicer, as applicable, to correct the borrower's account to reflect the date on which PMI should have been canceled or terminated under the Act; and

- Require the lender or servicer, as applicable, to return unearned PMI premiums to a borrower who paid premiums after the date on which the borrower's obligation to pay PMI premiums ceased under the Act (12 U.S.C. 4909).

# REFERENCES

## Laws

12 U.S.C. 4901 et seq.          Homeowners Protection Act

---

[14] CFPA, Secs. 1002(12)(G), 1024(c), and 1025(c); 12 U.S.C. Secs. 5481(12)(G), 5514(c), and 5515(c).

# CFPB
# Examination Procedures                                            HPA

## Homeowners Protection Act

### Examination Objectives[1]

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

- To determine the financial institution's compliance with the Homeowners Protection Act of 1998 (HPA), as amended.

- To assess the quality of the financial institution's policies and procedures for implementing the HPA.

- To determine the reliance that can be placed on the financial institution's internal controls and procedures for monitoring the institution's compliance with the HPA.

- To initiate corrective action when violations of HPA are identified, or when policies or internal controls are deficient.

## Examination Procedures

1. Through discussions with management and review of available information, determine if the institution's internal controls are adequate to ensure compliance with the HPA. Consider the following:
    a. Organization charts;
    b. Process flowcharts;
    c. Policies and procedures;
    d. Loan documentation;
    e. Checklists;
    f. Training; and
    g. Computer program documentation.

    **[Click&type]**

---

[1] These reflect FFIEC-approved procedures.

**CFPB**

**Examination Procedures**                                              **HPA**

2.    Review any compliance audit material, including work papers and reports, to determine whether:

    a.    The institution's procedures address all applicable provisions of HPA;

    b.    Steps are taken to followup on previously identified deficiencies;

    c.    The procedures used include samples covering all product types and decision centers;

    d.    The compliance audit work performed is accurate;

    e.    Significant deficiencies and their causes are included in reports to management and/or to the Board of Directors;

    f.    Corrective action is taken in a timely and appropriate manner; and

    g.    The frequency of compliance review is appropriate.

**[Click&type]**

3.    Review sample transactions, disclosure and notification forms, and the financial institution's policies and procedures to ensure the institution provides:

    a.    Initial Disclosures for

        (i) fixed rate mortgages,

        (ii) adjustable rate mortgages,

        (iii) high risk loans, and

        (iv) lender paid mortgage insurance;

    b.    Annual Notices for

        (i) fixed and adjustable rate mortgages and high risk loans, and

        (ii) existing residential mortgages; and

    c.    Notices of

        (i) cancellation,

        (ii) termination,

        (iii) grounds for not canceling PMI,

        (iv) grounds for not terminating PMI,

        (v) cancellation date for adjustable rate mortgages, and

        (vi) termination date for lender paid mortgage insurance.

    (Refer to Appendix A for required content of the disclosure and notices.)

**[Click&type]**

4.    Using the above sample and bank policies and procedures, determine that borrowers are not charged for any required disclosures or notifications (12 U.S.C. 4906).

**[Click&type]**

**CFPB**

**Examination Procedures**                                                    **HPA**

5.     Obtain and review a sample of recent written requests from borrowers to cancel their
       private mortgage insurance (PMI) on "non-high risk" residential mortgage
       transactions. Verify that the insurance was cancelled on either:

   a.  The date on which the principal balance of the loan was first scheduled to reach 80
       percent of the original value of the property based on the initial amortization schedule
       (in the case of a fixed rate loan) or amortization schedule then in effect (in the case
       of an adjustable rate loan); or

   b.  The date on which the principal balance of the loan actually reached 80 percent of
       the original value of the property based on actual payments, in accordance with the
       applicable provisions in 12 U.S.C. 4902(a)of HPA (i.e., good payment history,
       current payments and, if required by the lender, evidence that the value of the
       mortgaged property did not decline, and certification that the borrower's equity
       was unencumbered by a subordinate lien) (12 U.S.C. 4902(a)).

       **[Click&type]**

6.     Obtain and review a sample of "non-high risk" PMI residential mortgage transactions
       where the borrower did not request cancellation. Select loans from the sample that
       have reached a 78 percent or lower LTV ratio based on the original value of the
       property and that are not current. Verify that PMI was <u>terminated</u>, based on the initial
       amortization schedule (in the case of a fixed rate loan) or the amortization schedule
       then in effect (in the case of an adjustable rate loan) on the date that the principal
       balance of the loan was first scheduled to reach 78 percent of the original value of the
       mortgaged property (if the borrower was current) or on the first day of the first month
       after the date that the borrower became current (12 U.S.C. 4902(b)).

       **[Click&type]**

7.     Obtain a sample of PMI-covered residential mortgage transactions (including high-risk
       loans, if any) that are at or beyond the midpoint of their amortization period.
       Determine whether PMI was terminated by the first day of the following month if the
       loan was current. If the loan was not current at the midpoint, determine that PMI was
       terminated by the first day of the month following the day the loan became current. If,
       at the time of the examination, a loan at the midpoint is not current, determine whether
       the financial institution is monitoring the loan and has systems in place to ensure that
       PMI is terminated when the borrower becomes current (12 U.S.C. 4902(c) and 12
       U.S.C. 4902(g)(2)).

       **[Click&type]**

8.     Obtain a sample of any lender defined "high risk" PMI residential mortgage
       transactions that have a 77 percent or lower LTV based on the original value of the
       property. Verify that PMI was cancelled, based on the initial amortization schedule (in
       the case of a fixed rate loan) or the amortization schedule then in effect (in the case of
       an adjustable rate loan), on the date that the principal balance of the loan was
       scheduled to reach 77 percent of the original value of the mortgaged property (12
       U.S.C. 4902(g)(1)(B)).

# CFPB
# Examination Procedures                                    HPA

**[Click&type]**

9.  Obtain a sample of loans that have had PMI cancelled or terminated (the samples obtained above can be used). For PMI loans cancelled upon the borrowers' requests, determine that the financial institution did not require any PMI payment(s) beyond 30 days of the borrower satisfying the evidence and certification requirements to cancel PMI (12 U.S.C. 4902(e)(1). For the PMI loans that received automatic termination or final termination, determine that the financial institution did not require any PMI payment(s) beyond 30 days of termination (12 U.S.C. 4902(e)(2) and 12 U.S.C. 4902(e)(3)).

**[Click&type]**

10. Using the samples in steps 5, 6, and 7, determine if the financial institution returned unearned premiums, if any, to the borrower within 45 days after cancellation or termination (12 U.S.C. 4902(f)(1)).

**[Click&type]**

**CFPB**

**Examination Procedures**                                          **HPA**

## Conclusions

1.  Summarize all violations and internal deficiencies.

    **[Click&type]**

2.  If the violation(s) and internal deficiencies noted above represent(s) a pattern or practice, determine the root cause by identifying weaknesses in internal controls, compliance review, training, management oversight, or other factors.

    **[Click&type]**

3.  Identify action needed to correct violations and weaknesses in the institution's compliance system, as appropriate.

    **[Click&type]**

4.  Discuss findings with the institution's management and obtain a commitment for corrective action.

    **[Click&type]**

5.  Determine if enforcement action is appropriate. If so, contact appropriate agency personnel for guidance. Section 10(c) of the Act contains a provision requiring restitution of unearned PMI premiums.

    **[Click&type]**

## Examiner's Summary, Recommendations, and Comments

**[Click&type]**

**CFPB**

**Examination Procedures** <div align="right">**HPA**</div>

---

## Appendix A

### Homeowners Protection Act

This appendix provides guidance about the timing and required content of disclosures and notices to be made in connection with the Act.

1. Initial disclosures at consummation for fixed rate residential mortgage transactions must include:

   a. A written amortization schedule (12 U.S.C. 4903(a)(1)(A)(i)).

   b. A notice that the borrower may submit a written request to cancel PMI as of the date that, based on the initial amortization schedule, the principal balance is first scheduled to reach 80percent of the original value of the mortgaged property, irrespective of the outstanding balance of the mortgage, or such earlier date that, based on actual payments, the principal balance actually reaches 80percent of the original value of the mortgaged property and the borrower has a good payment history and has satisfied the lender's requirements that the value of the mortgaged property has not declined and is unencumbered by subordinate liens (12 U.S.C. 4903(a)(1)(A)(ii)(I) and (II)).

   c. The specific date, based on the initial amortization schedule, the loan balance is scheduled to reach 80percent of the original value of the mortgaged property (12 U.S.C. 4903(a)(1)(A)(ii)(I)).

   d. A notice that PMI will automatically terminate on the date that, based on the amortization schedule and irrespective of the outstanding balance of the mortgage, the principal balance is first scheduled to reach 78percent of the original value of the mortgaged property if the loan is current (12 U.S.C. 4903(a)(1)(A)(ii)(III)).

   e. The specific date the loan balance is scheduled to reach 78percent LTV (12 U.S.C. 4903(a)(1)(A)(ii)(III)).

   f. Notice that exemptions to the right to cancel and automatic termination exist for high-risk loans and whether such exemptions apply (12 U.S.C. 4903(a)(1)(A)(ii)(IV)).

**CFPB**

**Examination Procedures** HPA

2. Initial disclosures at consummation for **adjustable rate** residential mortgage transactions must include a notice that:

   a. The borrower may submit a written request to cancel PMI as of the date that, based on the amortization schedule(s) and irrespective of the outstanding balance of the mortgage, the principal balance is first scheduled to reach 80percent of the original value of the mortgaged property or such earlier date that, based on actual payments, the principal balance actually reaches 80percent of the original value of the mortgaged property and the borrower has a good payment history and has satisfied the lender requirements that the value of the mortgaged property has not declined and is unencumbered by subordinate liens (12 U.S.C. 4903(a)(1)(B)(i)).

   b. The servicer will notify the borrower when the cancellation date is reached, i.e., when the loan balance represents 80percent of the original value of the mortgaged property (12 U.S.C. 4903(a)(1)(B)(i)).

   c. PMI will automatically terminate when the loan balance is first scheduled to reach 78percent of the original value of the mortgaged property irrespective of the outstanding balance of the mortgage and the loan is current (12 U.S.C. 4903(a)(1)(B)(ii)).

   d. On the termination date, the borrower will be notified of the termination or the fact that PMI will be terminated when the loan is brought current (12 U.S.C. 4903(a)(1)(B)(ii)).

   e. Exemptions to the right to cancel and automatic termination exist for high-risk loans and whether such exemptions apply (12 U.S.C. 4903(a)(1)(B)(iii)).

3. Lender has established standards regarding the type of evidence it requires borrowers to provide to demonstrate that the value of the mortgage property has not declined and they are provided when a request for cancellation occurs (12 U.S.C. 4902(a)(3)(A)).

4. Lender provides written initial disclosures at consummation for high-risk residential mortgage transactions (as defined by the lender or Fannie Mae or Freddie Mac), that PMI will not be required beyond the midpoint of the amortization period of the loan, if the loan is current (12 U.S.C. 4903(a)(2)).

5. When the financial institution acts as servicer for residential mortgage transactions, it provides an annual written statement to the borrowers explaining their rights to cancel or terminate PMI and an address and telephone number to contact the servicer to determine whether they may cancel PMI (12 U.S.C. 4903(a)(3)).

   NOTE: This disclosure may be included on RESPA's annual escrow account disclosure or IRS interest payment disclosures.

6. When the financial institution acts as servicer, it provides an annual written statement to each borrower who entered into a residential mortgage prior to July 29, 1999, that includes:

# CFPB
# Examination Procedures                                    HPA

a.  A statement that PMI may, under certain circumstances, be canceled by the borrower with the consent of the lender or in accordance with applicable state law (12 U.S.C. 4903(b)(1)).

b.  An address and telephone number that the borrower may use to contact the servicer to determine whether the borrower may cancel the PMI (12 U.S.C. 4903(b)(2)).

NOTE: This disclosure may be included on RESPA's annual escrow account disclosure or IRS interest payment disclosure.

7.  When the financial institution acts as servicer for residential mortgage transactions, it provides borrowers written notices within 30 days after the date of cancellation or termination of PMI that the borrower no longer has PMI and that no further PMI payments or related fees are due (12 U.S.C. 4904(a)).

8.  When the financial institution services residential mortgage transactions, it returns all unearned PMI premiums to the borrower within 45 days of either termination upon the borrower's request or automatic termination under the HPA (12 U.S.C. 4902(e)).

9.  When the financial institution acts as servicer for residential mortgage transactions, it provides borrowers written notices of the grounds it relied on (including the results of any appraisal) to deny a borrower's request for PMI cancellation, no later than 30 days after the date the request is received, or the date on which the borrower satisfies any evidence and certification requirements established by the lender, whichever is later (12 U.S.C. 4904(b)(1) and 12 U.S.C. 4904(b)(2)(A)).

10. When the financial institution acts as servicer for residential mortgage transactions, it provides borrowers written notices of the grounds it relied on (including the results of any appraisal) for refusing to automatically terminate PMI not later than 30 days after the scheduled termination date (12 U.S.C. 4904(b)(2)(B)).

NOTE: The scheduled termination date is reached when, based on the initial amortization schedule (in the case of a fixed rate loan) or the amortization schedule(s) (in the case of an adjustable rate loan), the principal balance of the loan is first scheduled to reach 78percent of the original value of mortgaged property, assuming the borrower is current on that date or the earliest date thereafter on which the borrower becomes current.

11. When the financial institution acts as a servicer for adjustable rate residential mortgage transactions, the financial institution notifies borrowers that the cancellation date has been reached (12 U.S.C. 4903(a)(1)(B)(i)).

12. When the financial institution acts as a servicer for adjustable rate residential mortgage transactions, the financial institution notifies the borrowers on the termination date that PMI has been cancelled or will be cancelled as soon as the borrower is current on loan payments (12 U.S.C. 4903(a)(1)(B)(ii)).

# CFPB
# Examination Procedures                                    HPA

13. When the financial institution requires "Lender Paid Mortgage Insurance" (LPMI) for residential mortgage transactions, it provides a written notice to a prospective borrower on or before the loan commitment date that includes:

   a. A statement that LPMI differs from borrower paid mortgage insurance (BPMI) in that the borrower may not cancel LPMI, while BPMI is subject to cancellation and automatic termination under the HPA (12 U.S.C. 4905(c)(1)(A)).

   b. A statement that LPMI usually results in a mortgage with a higher interest rate than BPMI (12 U.S.C. 4905(c)(1)(B)(i)).

   c. A statement that LPMI only terminates when the transaction is refinanced, paid off, or otherwise terminated (12 U.S.C. 4905(c)(1)(B)(ii)).

   d. A statement that LPMI and BPMI both have benefits and disadvantages and a generic analysis reflecting the differing costs and benefits of each over a 10-year period, assuming prevailing interest and property appreciation rates (12 U.S.C. 4905(c)(1)(C)).

   e. A statement that LPMI may be tax-deductible for federal income taxes if the borrower itemizes expenses for that purpose (12 U.S.C. 4905(c)(1)(D)).

14. When the lender requires LPMI for residential mortgage transactions and the financial institution acts as servicer, it notifies the borrower in writing within 30 days of the termination date that would have applied if it were a BPMI transaction that the borrower may wish to review financing options that could eliminate the requirement for PMI (12 U.S.C. 4905(c)(2)).

15. The financial institution prohibits borrower-paid fees for the disclosures and notifications required under the HPA (12 U.S.C. 4906).

# CFPB Consumer
# Laws and Regulations                    Consumer Leasing

## Consumer Leasing Act[1]

For consumers, leasing is an alternative to buying property either with cash or on credit. A lease is a contract between a lessor (the property owner) and a lessee (the property user) for the use of property subject to stated terms and limitations for a specified period and at a specified payment.

The Consumer Leasing Act (15 U.S.C. 1667 et seq.) (CLA) was passed in 1976 to assure that meaningful and accurate disclosure of lease terms is provided to consumers before entering into a contract. It applies to consumer leases of personal property. With this information, consumers can more easily compare one lease with another, as well as compare the cost of leasing with the cost of buying on credit or the opportunity cost of paying cash. In addition, the CLA puts limits on balloon payments sometimes due at the end of a lease and regulates advertising.

Originally, the CLA was part of the Truth in Lending Act and was implemented by Regulation Z. When Regulation Z was revised in 1981, Regulation M was issued and contained those provisions that govern consumer leases.

The Electronic Signatures in Global and National Commerce Act (the E-Sign Act), 15 U.S.C. 7001 et seq., was enacted in 2000 and did not require implementing regulations. On November 9, 2007, amendments to Regulation M and the official staff commentary were issued to simply the regulation and provide guidance on the electronic delivery of disclosures consistent with the E-Sign Act.[2]

The Dodd-Frank Act granted rulemaking authority under the CLA to the Consumer Financial Protection Bureau (CFPB) and, with respect to entities under its jurisdiction, granted authority to the CFPB to supervise for and enforce compliance with the CLA and its implementing regulations.[3]  In December 2011, the CFPB restated the Federal Reserve's implementing regulation at 12 CFR Part 1013 (76 Fed. Reg. 78500)(December 19, 2011).

Today, a relatively small number of banks engage in consumer leasing. The trend seems to be for leasing to be carried out through specialized bank subsidiaries, vehicle finance companies, other finance companies, or directly by retailers.

---

[1] These reflect FFIEC-approved procedures.

[2] 72 Fed. Reg. 63456, November 9, 2007. These amendments took effect December 10, 2007, with a mandatory compliance date of October 1, 2008.

[3] Dodd-Frank Act, Secs. 1002(12)(B), 1024(b)-(c), and 1025(b)-(c); 12 USC §§ 5481(12)(B), 5514(c), and 5515(c).  Section 1029 of the Dodd-Frank Act generally excludes from this transfer of authority, subject to certain exceptions, any rulemaking authority over a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.

# CFPB Consumer Laws and Regulations                    Consumer Leasing

## Key Definitions

The definition of certain terms is necessary to understand the requirements imposed by the CLA. These terms include lease, lessor, lessee, consumer lease, open-end lease, closed-end lease, realized value, residual value, gross capitalized cost, capitalized cost reduction, and adjusted capitalized cost.

### Lessee

A lessee is a natural person who enters into or is offered a consumer lease.

### Lessor

A lessor is a natural person or organization who regularly leases, offers to lease, or arranges for the lease of personal property under a consumer lease. A person who leases or offers to lease more than five times in the preceding or current calendar year meets this definition.

### Consumer Lease

A consumer lease is a contract between a lessor and a lessee:

- For the use of personal property by an individual (natural person);

- To be used primarily for personal, family, or household purposes;

- For a period of more than four months (week-to-week and month-to-month leases do not meet this criterion, even though they may be extended beyond four months); and

- With a total contractual cost of no more than the threshold amount specified in Appendix C at 12 CFR 1013.2(e)-9.[4]

Specifically *excluded* from coverage are leases that are:

- For business, agricultural or made to an organization or government;

- For real property;

- For personal property which are incidental to the lease of real property, subject to certain conditions; and

- For credit sales, as defined in Regulation Z 12 CFR 1026.2(a)(16).

---

[4] Appendix C states that a consumer lease is exempt from these requirements if the total contractual obligation exceeds the threshold amount in effect at the time of consummation.  The threshold amount for the period January 1, 2012 through December 31, 2012 is $51,800.  See Appendix C for the threshold amounts for different time periods.

# CFPB Consumer
# Laws and Regulations                    Consumer Leasing

A lease meeting all of these criteria is covered by the CLA and Regulation M. If any one of these criteria is not met, for example, if the leased property is used primarily for business purposes or if the total contractual cost exceeds the amount specified in 12 CFR 1013.2(e)-9, the CLA and Regulation M do not apply.

Consumer leases fall into one of two categories: closed end and open end. Since the information required to be disclosed to the consumer will vary with the kind of lease, it is important to note the difference between them. However, to properly understand the difference, realized value and residual value must first be defined.

## Realized Value

The realized value is the price received by the lessor of the leased property at disposition, the highest offer for disposition of the leased property, or the fair market value of the leased property at the end of the lease term.

## Residual Value

The residual value is the value of the leased property at the end of the lease, as estimated or assigned at consummation of the lease by the lessor.

## Open-End Lease

An open-end lease is a lease in which the amount owed at the end of the lease term is based on the difference between the residual value of the leased property and its realized value. The consumer may pay all or part of the difference if the realized value is less than the residual value or he may get a refund if the realized value is greater than the residual value at scheduled termination.

## Closed-End Lease

A closed-end lease is a lease other than an open-end lease. This type of lease allows the consumer to "walk away" at the end of the contract period, with no further payment obligation – unless the property has been damaged or has sustained abnormal wear and tear.

## Gross Capitalized Cost

The gross capitalized cost is the amount agreed upon by the lessor and lessee as the value of the leased property, plus any items that are capitalized or amortized during the lease term. These items may include taxes, insurance, service agreements, and any outstanding prior credit or lease balance.

## Capitalized Cost Reduction

This term means the total amount of any rebate, cash payment, net trade-in allowance, and noncash credit that reduces the gross capitalized cost.

## Adjusted Capitalized Cost

This is the gross capitalized cost less the capitalized cost reduction and the amount used by the lessor in calculating the base periodic payment.

# CFPB Consumer Laws and Regulations

# Consumer Leasing

## General Disclosure Requirements

Lessors are required by federal law to provide the consumer with leasing cost information and other disclosures in a format similar to the model disclosure forms found in Appendix A to the regulation. Certain pieces of this information must be kept together and must be segregated from other lease information. All of the information stated must be accurate, clear and conspicuous, and provided in writing in a form that the consumer may keep.

The institution may provide the general disclosures required by 12 CFR 1013 to the lessee in electronic form, subject to compliance with the consumer consent and other applicable provisions of the E-Sign Act. The E-Sign Act does not mandate that institutions or consumers use or accept electronic records or signatures. It permits institutions to satisfy any statutory or regulatory requirements by providing the information electronically after obtaining the consumer's affirmative consent. The institution must provide consumers with the following information before consumers can give consent:

- Any right or option to have the information provided in paper or non-electronic form;

- The right to withdraw the consent to receive information electronically and the consequences, including fees, of doing so;

- The scope of the consent (for example, whether the consent applies only to a particular transaction or to identified categories of records that may be provided during the course of the parties' relationship);

- The procedures to withdraw consent and to update information needed to contact the consumer electronically; and

- The methods by which a consumer may obtain, after consent and upon request, a paper copy of an electronic record after consent has been given to receive the information electronically and whether any fee will be charged.

The consumer must consent electronically or confirm consent electronically in a manner that "reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent."

After the consent, if an institution changes the hardware or software requirements such that a consumer may be prevented from accessing and retaining information electronically, the institution must notify the consumer of the new requirements and must allow the consumer to withdraw consent without charge.

Institutions must provide disclosures in the following circumstances. (Advertisement requirements are discussed in the advertising section.)

# CFPB Consumer Laws and Regulations                    Consumer Leasing

## Prior to or Due at Lease Signing

A dated disclosure must be given to the consumer before signing the lease and must contain all of the information detailed in Section 4 of the regulation.

## Renegotiations and Extensions

New disclosures also must be provided when a consumer renegotiates, or extends a lease, subject to certain exceptions.

## Multiple Lessors/Lessees

In the event of multiple lessors, one lessor on behalf of all the lessors may make the required disclosures. If the lease involves more than one lessee, the required disclosures should be given to any lessee who is primarily liable.

## Advertising

Advertisements concerning consumer leases must also comply with certain disclosure requirements. All advertisements must be accurate. If an advertisement includes any reference to certain "trigger terms" — the amount of any payment, statement of a capitalized cost reduction (e.g., down payment), or other payment required prior to or at lease signing or delivery, or that no such payment is required — then the ad must also state the following:

- That the transaction is for a lease;

- The total amount due prior to or at lease signing or delivery;

- The number, amounts and due dates or periods of the scheduled payments;

- A statement of whether or not a security deposit is required; and

- A statement that an extra charge may be imposed at the end of the lease term where the lessee's liability (if any) is based on the difference between the residual value of the leased property and its realized value at the end of the lease term (12 CFR 1013.7(d)(2)).

An advertisement for an open-end lease also must include a statement that extra charges may be imposed at the end of the lease based on the difference between the residual value and the realized value at the end of the lease term.

If lessors give a percentage rate in an advertisement, the rate cannot be more prominent than any of the other required disclosures. They must also include a statement that "this percentage may not measure the overall cost of financing this lease." The lessor cannot use the term "annual percentage rate," "annual lease rate," or any equivalent term.

Some fees (license, registration, taxes, and inspection fees) may vary by state or locality. An advertisement may exclude these third-party fees from the disclosure of a periodic payment or total amount due at lease signing or delivery, provided the ad states that these have been excluded.

# CFPB Consumer
# Laws and Regulations                    Consumer Leasing

Otherwise, an ad may include these fees in the periodic payment or total amount due, provided it states that the fees are based on a particular state or locality and indicates that the fees may vary.

For an advertisement accessed by the consumer in electronic form, the required disclosures may be provided to the consumer in electronic form in the advertisement, without regard to the consumer consent or other provisions of the E-Sign Act. An electronic advertisement (such as an advertisement on an Internet website) that provides a table or schedule of the required disclosures is considered a single advertisement if the advertisement clearly refers the consumer to the location where the additional required information begins. For example, in an electronic advertisement, a term triggering additional disclosures may be accompanied by a link that directly connects the consumer to the additional disclosures.

## Limits on Balloon Payments

In order to limit balloon payments that may be required of the consumer, certain sections of the regulation call for reasonable calculations and estimates. These provisions protect the consumer at early termination of a lease, at the end of the lease term, or in delinquency, default, or late payment status. The provisions limit the lessee's liability at the end of the lease term and set reasonableness standards for wear and use charges, early termination charges, and penalties or fees for delinquency.

## Penalties and Liability

Criminal and civil liability provisions of the Truth in Lending Act also apply to the CLA. Actions alleging failure to disclose the required information, or otherwise comply with the CLA, must be brought within one year of the termination of the lease agreement.

## Record Retention

Lessors are required to maintain evidence of compliance with the requirements imposed by Regulation M, other than the advertising requirements under Section 7 of the regulation, for a period of not less than two years after the date of disclosures are required to be made or an action is required to be taken.

# REFERENCES

## Laws

| | |
|---|---|
| 15 U.S.C. 1667 et seq. | Consumer Leasing Act |
| 15 U.S.C. 7001 et seq. | Electronic Signatures in Global and National Commerce Act |

## Regulations

### Consumer Financial Protection Bureau Regulation (12 CFR)

| | |
|---|---|
| Part 1013 | Consumer Leasing (Regulation M) |

# CFPB
# Examination Procedures          Consumer Leasing

## Consumer Leasing Act[1]

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

## Examination Objectives

- To assess the quality of the institution's compliance management system for the Consumer Leasing Act.

- To determine that lessees of personal property are given meaningful and accurate disclosures of lease terms.

- To determine if the limits of liability are clearly indicated to the lessees and correctly enforced by the institution.

- To ensure that the financial institution provides accurate disclosures of its leasing terms in all advertising.

## Examination Procedures

### General Disclosure Requirements

A.  Review the institution's procedures for providing disclosures to ensure that there are adequate controls and procedures to effect compliance.

   **[Click&type]**

B.  Review the disclosures provided by the institution.

   1. Are the disclosures clear and conspicuous and provided in writing in a form the consumer may keep? For disclosures provided electronically (other than for advertising requirements), are the disclosures in electronic form provided in compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act)?[2] For an advertisement accessed by the consumer in electronic form, are the disclosures required by 12 CFR 1013.7 provided to the consumer in electronic form in the advertisement? (12 CFR 1013.3(a))

   2. Are the disclosures given in a dated statement and in the prescribed format? (12 CFR 1013.3(a)(1))

   3. Is the information required by 12 CFR 1013.4(b) through (f), (g)(2), (h)(3), (i)(1), (j), and (m)(1) segregated and in a form substantially similar to the model in Appendix A? (12 CFR 1013.3(a)(2))

   4. Are the disclosures timely? (12 CFR 1013.3(a)(3))

   5. If the lease involves more than one lessee, are the disclosures provided to any lessee

---

[1] These reflect FFIEC-approved procedures.

[2] The final amendment to Regulation M on the electronic delivery of disclosures, consistent with the requirements of the E-Sign Act, became effective December 10, 2007, and required mandatory compliance by October 1, 2008.

# CFPB
# Examination Procedures          Consumer Leasing

who is primarily liable? (12 CFR 1013.3(c))

6. If additional information is provided, is it provided in a manner such that it does not mislead or confuse the lessee? (12 CFR 1013.3(b))

7. Are all estimates clearly identified and reasonable? (12 CFR 1013.3(d))

8. Are the disclosures accurate and do the disclosures contain the information required by 12 CFR 1013.4(a) through (t)? (12 CFR 1013.4)

9. Are disclosures given to lessees when they "renegotiate" or "extend" their leases? (12 CFR 1013.5)

**[Click&type]**

## Lessee Liability

A. Review the lease estimates and calculations to ensure that there is not any unreasonable balloon payment expected of the lessee in the following circumstances:

1. At early termination:

— Does the lessor disclose the conditions under which the lease may be terminated early and the amount and method of determining the amount of any early termination charges? (12 CFR 1013.4(g)(1))

— Are any early termination charges reasonable? (12 CFR 1013.4(g)(1), (q))

2. At end of lease term, for wear and use:

— If the lessor sets standards for wear and use of the leased vehicle are the amounts or method of determining any charge for excess mileage disclosed? (12 CFR 1013.4(h)(3))

— Are standards for wear and use reasonable? (12 CFR 1013.4(h)(2))

3. At end of lease term (for open-end leases):

— Does the lessor disclose the limitations on the lessee's liabilities at the end of the lease term? (12 CFR 1013.4(m)(2))

— Are the lessee and lessor permitted to make a mutually agreeable final adjustment regarding excess liability? (12 CFR 1013.4(m)(3))

4. In delinquency, default or late payment:

— Does the lessor disclose penalties or other charges for delinquency, default or late payments? (12 CFR 1013.4(q))

— Are the penalties or other charges reasonable? (12 CFR 1013.4(q))

**[Click&type]**

# Advertising

A. Review advertising policies and procedures used by the institution to ensure that there are adequate controls and procedures to effect compliance.

**[Click&type]**

**CFPB**

**Examination Procedures**          **Consumer Leasing**

B.    Review a sample of the institution's advertisements. Determine the following:

   1.   Do the advertisements advertise terms that are usually and customarily available? (12 CFR 1013.7(a))

   2.   Are the disclosures contained in the advertisements clear and conspicuous? (12 CFR 1013.7(b))

   3.   Do catalogs, multiple page advertisements and electronic advertisements comply with the page reference requirements? (12 CFR 1013.7(c))

   4.   When triggering terms are used, do the advertisements contain the additional required information? (12 CFR 1013.7(d))

   5.   Do merchandise tags that use triggering terms refer to a sign or display that contains the additional required disclosures? (12 CFR 1013.7(e))

   6.   If television or radio advertisements use triggering terms, if they do not contain the additional terms required by 12 CFR 1013.7(d)(2), do they use alternative disclosure methods (direct consumers to a toll-free number or written advertisement)?  (12 CFR 1013.7(f))

   **[Click&type]**

## Miscellaneous

A.    Are records and other evidence of compliance (other than for advertising requirements under 12 CFR 1013.7) retained for a period of no less than two (2) years?  (12 CFR 1013.8)

   **[Click&type]**

## Examiner's Summary, Recommendations, and Comments

**[Click&type]**

# CFPB
# Examination Checklist                 Consumer Leasing

## Consumer Leasing Act[1]

| | |
|---|---|
| Exam Date: | [Click&type] |
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

|  | YES | NO |
|---|---|---|
| 1. Does the institution engage in consumer leasing or purchase consumer leases from lessors? (12 CFR 1013.2(h)) | ☐ | ☐ |

(If no, there is no need to do further work on Consumer Leasing. If yes, complete the following checklist, answering yes (Y) or no (N) for each item.)

| | YES | NO |
|---|---|---|
| 2. Are the disclosures made prior to consummation of the lease, that is, at the time a binding order is made or the lease is signed? (12 CFR 1013.3(a)(3)) | ☐ | ☐ |
| 3. Are the disclosures clear and conspicuous and provided in writing in a form the consumer may keep? (12 CFR 1013.3(a)) | ☐ | ☐ |
| 4. Are disclosures in electronic form provided in compliance with the consumer consent and other applicable provisions of the Electronic Signature in Global and National Commerce Act (E-Sign Act)? (12 CFR 1013.3(a)) | ☐ | ☐ |
| 5. For an advertisement accessed by the consumer in electronic form, are the disclosures required by 12 CFR 1013.7 provided to the consumer in electronic form in the advertisement? (12 CFR 1013.3(a)) | ☐ | ☐ |
| 6. Are the disclosures given in a dated statement and (i) made either in a separate statement that identifies the consumer lease transaction, (ii) in the contract or (iii) other document evidencing the lease? (12 CFR 1013.3(a)(1)) | ☐ | ☐ |
| 7. Is the information required by 12 CFR 1013.4(b) through (f), (g)(2), (h)(3), (i)(1), (j), and (m)(1) segregated and in a form substantially similar to the model in Appendix A? (12 CFR 1013.3(a)(2)) | ☐ | ☐ |
| 8. If the lease involves more than one lessee, are the disclosures provided to any lessee who is primarily liable? (12 CFR 1013.3(c)) | ☐ | ☐ |
| 9. If additional information is provided, is it provided in a manner such that it does not mislead or confuse the lessee? (12 CFR 1013.3(b)) | ☐ | ☐ |
| 10. Are disclosures provided to at least one lessee where there are multiple lessees and by at least one lessor when there are multiple lessors? (12 CFR 1013.3(c)) | ☐ | ☐ |
| 11. Are all estimates clearly identified and reasonable? (12 CFR 1013.3(d)) | ☐ | ☐ |

---

[1] These reflect FFIEC-approved procedures.

# CFPB
# Examination Checklist          Consumer Leasing

|  | YES | NO |
|---|---|---|
| 12. Are the following disclosures made in the lease? | | |
| A. Description of property; (12 CFR 1013.4(a)) | ☐ | ☐ |
| B. Amount due at lease signing or delivery; (12 CFR 1013.4(b)) | ☐ | ☐ |
| C. Payment schedule and total amount of periodic payments; (12 CFR 1013.4(c)) | ☐ | ☐ |
| D. Other charges; (12 CFR 1013.4(d)) | ☐ | ☐ |
| E. Total of payments; (12 CFR 1013.4(e)) | ☐ | ☐ |
| F. Regarding payment calculations: | | |
|     i. Gross capitalized cost; (12 CFR 1013.4(f)(1)) | ☐ | ☐ |
|     ii. Capitalized cost reduction; (12 CFR 1013.4(f)(2)) | ☐ | ☐ |
|     iii. Adjusted capitalized cost; (12 CFR 1013.4(f)(3)) | ☐ | ☐ |
|     iv. Residual value; (12 CFR 1013.4(f)(4)) | ☐ | ☐ |
|     v. Depreciation and any amortized amounts; (12 CFR 1013.4(f)(5)) | ☐ | ☐ |
|     vi. Rent charge; (12 CFR 1013.4(f)(6)) | ☐ | ☐ |
|     vii. Total of base periodic payments; (12 CFR 1013.4(f)(7)) | ☐ | ☐ |
|     viii. Lease payments; (12 CFR 1013.4(f)(8)) | ☐ | ☐ |
|     ix. Basic periodic payment; (12 CFR 1013.4(f)(9)) | ☐ | ☐ |
|     x. Itemization of other charges; (12 CFR 1013.4(f)(10)) | ☐ | ☐ |
|     xi. Total periodic payment. (12 CFR 1013.4(f)(11)) | ☐ | ☐ |
| G. Regarding early termination: | | |
|     i. Conditions under which the lessee or lessor may terminate the lease prior to the end of the lease term; (12 CFR 1013.4(g)(1)) | ☐ | ☐ |
|     ii. The amount or description of the method for determining the amount of any penalty or other charges for early termination; (12 CFR 1013.4(g)(1)) | ☐ | ☐ |
|     iii. In a form substantially similar to the sample; (12 CFR 1013.4(g)(2)) | ☐ | ☐ |
| H. Regarding notice of wear and use: | | |
|     i. A statement specifying whether the lessor or the lessee is responsible for maintaining or servicing the leased property, with a description of the responsibility; (12 CFR 1013.4(h)(1)) | ☐ | ☐ |

# CFPB
# Examination Checklist          Consumer Leasing

|  |  | YES | NO |
|---|---|:---:|:---:|
| ii. | A statement of the lessor's standards for wear and use, which must be reasonable; (12 CFR 1013.4(h)(2)) | ☐ | ☐ |
| iii. | In a form substantially similar to the sample. (12 CFR 1013.4(h)(3)) | ☐ | ☐ |
| I. | Purchase option; (12 CFR 1013.4(i)) | ☐ | ☐ |
| J. | Statement referencing other non-segregated disclosures; (12 CFR 1013.4(j)) | ☐ | ☐ |
| K. | Liability between residual and realized values; (12 CFR 1013.4(k)) | ☐ | ☐ |
| L. | Right of appraisal; (12 CFR 1013.4(l)) | ☐ | ☐ |
| M. | For open-end leases: | | |
| i. | The rent and other charges paid by lessee; (12 CFR 1013.4(m)(1)) | ☐ | ☐ |
| ii. | Liability at end of lease term based on residual value and any excess liability; (12 CFR 1013.4 (m) and (m)(2)) | ☐ | ☐ |
| iii. | Mutually agreeable final adjustment. (12 CFR 1013.4(m)(3)) | ☐ | ☐ |
| N. | Fees and taxes; (12 CFR 1013.4(n)) | ☐ | ☐ |
| O. | Regarding insurance: | | |
| i. | Are the types and amounts of insurance that the lessee is required to have disclosed? (12 CFR 1013.4(o)) | ☐ | ☐ |
| ii. | If the lessor provides insurance, are the types, amounts, and cost also disclosed? (12 CFR 1013.4(o)(1)) | ☐ | ☐ |
| P. | Warranties or guarantees; (12 CFR 1013.4 (p)) | ☐ | ☐ |
| Q. | Penalties and other charges for late payments, delinquency, or default; (12 CFR 1013.4(q)) | ☐ | ☐ |
| R. | Security interest other than a security deposit; (12 CFR 1013.4(r)) | ☐ | ☐ |
| S. | Regarding any information on rate: | | |
| i. | Does the lessor use the term "annual percentage rate," "annual lease rate," or any equivalent term in the lease disclosure? (12 CFR 1013.4(s)) | ☐ | ☐ |
| ii. | If so, does a statement that "this percentage may not measure the overall cost of financing this lease" accompany the rate? (12 CFR 1013.4(s)) | ☐ | ☐ |
| 13. | Are disclosures given to lessees when they "renegotiate" or "extend" their leases? (12 CFR 1013.5) | ☐ | ☐ |

# CFPB
# Examination Checklist                Consumer Leasing

|  | YES | NO |
|---|---|---|

14. Does the institution advertise its leasing program? If so:   ☐ ☐

   A. Do the advertisements advertise terms that are usually and customarily available? (12 CFR 1013.7(a))   ☐ ☐

   B. Are the advertisements clear and conspicuous? (12 CFR 1013.7(b))   ☐ ☐

      i. Are any affirmative or negative references to a charge that is part of the disclosure required under paragraph (d)(2)(ii) less prominent than the disclosure (except for the statement of a periodic payment? (12 CFR 1013.7(b)(1))   ☐ ☐

      ii. Are the advertisements of lease rates less prominent than any disclosure required by 12 CFR 1013.4 (except the notice of the limitations on rate)? (12 CFR 1013.7(b)(2))   ☐ ☐

   C. Do catalogs and multiple page advertisements and electronic advertisements comply with the page reference requirements? (12 CFR 1013.7(c))   ☐ ☐

   D. If any triggering terms are used, are all the following disclosures made: (12 CFR 1013.7(d)(2))

      i. That the transaction advertised is a lease;   ☐ ☐

      ii. The total amount due prior to or at consummation or by delivery, if delivery occurs after consummation;   ☐ ☐

      iii. The number, amounts, and due dates or periods of scheduled payments under the lease;   ☐ ☐

      iv. A statement of whether or not a security deposit is required;   ☐ ☐

      v. A statement that an extra charge may be imposed at the end of the lease term where the lessee's liability (if any) is based on the difference between the residual value of the leased property and its realized value at the end of the lease term.   ☐ ☐

15. Do merchandise tags that use triggering terms refer to a sign or display that contains the additional required disclosures? (12 CFR 1013.7(e))   ☐ ☐

16. Do television or radio advertisements that do not contain the additional information required by 12 CFR 1013.4(d) direct consumers to a toll-free number or written advertisement for additional information when triggering terms are used? (12 CFR 1013.7)   ☐ ☐

# CFPB
# Examination Checklist          Consumer Leasing

|  | | YES | NO |
|---|---|---|---|
| A. | Is the toll-free number listed along with a reference that the number may be used by the consumer to obtain the information? (12 CFR 1013.7(f)(1)(i)) | ☐ | ☐ |
| B. | Does the written advertisement that is in general circulation in the community served by the station include the name and date of the publication, and is it published beginning at least three days before and ending at least 10 days after broadcast? (12 CFR 1013.7(f)(1)(ii)) | ☐ | ☐ |
| C. | Has the toll-free telephone number been available for no fewer than ten days, beginning on the date of broadcast? (12 CFR 1013.7(f)(2)(i)) | ☐ | ☐ |
| D. | Does the lessor provide the information required by paragraph (d)(2) over the toll-free number, orally or in writing upon request? (12 CFR 1013.7(f)(2)(ii)) | ☐ | ☐ |
| 17. | Are records and other evidence of compliance retained for a period of no less than two (2) years as required by the CLA? (12 CFR 1013.8) | ☐ | ☐ |

## Comments

**[Click&type]**

# CFPB Consumer
# Laws and Regulation                              SAFE Act

## Secure and Fair Enforcement for Mortgage Licensing Act[1]

The Secure and Fair Enforcement for Mortgage Licensing Act of 2008[2] (SAFE Act) was enacted on July 30, 2008, and mandates a nationwide licensing and registration system for residential mortgage loan originators (MLOs).[3]

The SAFE Act prohibits individuals from engaging in the business of a residential mortgage loan originator without first obtaining and maintaining annually:

- For individuals who are employees of covered financial institution, registration as a registered mortgage loan originator and a unique identifier (federal registration), or

- For all other individuals, a state license and registration as a state-licensed mortgage loan originator, and a unique identifier (state licensing/registration).

The SAFE Act requires that federal registration and state licensing and registration be accomplished through the same online registration system, the Nationwide Mortgage Licensing System and Registry (Registry).

The objectives of the SAFE Act include aggregating and improving the flow of information to and between regulators; providing increased accountability and tracking of MLOs; enhancing consumer protections; supporting anti-fraud measures; and providing consumers with easily accessible information at no charge regarding the employment history of and publicly adjudicated disciplinary and enforcement actions against MLOs.[4]

---

[1] These reflect FFIEC-approved procedures.

[2] See 12 U.S.C. Sec. 5101–5116, Title V of the Housing and Economic Recovery Act of 2008 (Pub. L. 110–289, 122 Stat. 2654, 12 U.S.C. 5101 et seq.) as amended by Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) (Pub. L. No. 111–203, 124 Stat. 1376).

[3] More specifically, the SAFE Act required the Office of the Comptroller of the Currency (OCC), Board of Governors of the Federal Reserve System (Board), Federal Deposit Insurance Corporation (FDIC), Office of Thrift Supervision (OTS), and National Credit Union Administration (NCUA), with the Farm Credit Administration (FCA) and through the Federal Financial Institutions Examination Council (FFIEC), to develop and maintain a federal system for registering MLOs employed by covered financial institutions.

[4] SAFE Act Sec. 1502.

---

# CFPB Consumer
# Laws and Regulation                          SAFE Act

On July 28, 2010, the OCC, Board, FDIC, OTS, NCUA, and FCA (collectively the Agencies) published substantively similar regulations implementing the SAFE Act federal registration requirements for the institutions they supervise and the institutions' MLO employees (SAFE Act regulation).[5]

On July 21, 2011, Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) transferred rule-making authority for the SAFE Act from the Agencies to the Consumer Financial Protection Bureau (CFPB).[6] On December 19, 2011, the CFPB restated the implementing SAFE Act regulations to 12 CFR 1007 (76 Federal Register 78483), establishing a new Regulation G, SAFE Mortgage Licensing Act–Federal Registration of Residential Mortgage Loan Originators.[7]

These examination procedures lay out the background and requirements of the SAFE Act and the SAFE Act regulation concerning federal registration.

## Definitions – 12 CFR 1007.102

*Annual renewal period* means November 1st through December 31st of each year.

*Administrative or clerical tasks* means the receipt, collection, and distribution of information common for the processing or underwriting of a loan in the residential mortgage industry and communication with a consumer to obtain information necessary for the processing or underwriting of a residential mortgage loan.

*Covered financial institution* means any national bank, federal branch or agency of a foreign bank, member bank, insured state non-member bank, (including state-licensed insured branches of foreign banks), savings association, or certain of their subsidiaries; branch or agency of a foreign bank or commercial lending company owned or controlled by a foreign bank; Farm

---

[5] 75 Fed. Reg. 44656 (July 28, 2010). The interagency Federal Register notice may be found at http://edocket.access.gpo.gov/2010/pdf/2010-18148.pdf. See also the revised Federal Register Preamble (Aug. 23, 2010), available at http://edocket.access.gpo.gov/2010/pdf/C1-2010-18148.pdf (revising footnote numbering from the original release). CFPB's SAFE Act regulations for federally regulated institutions subject to its supervisory responsibilities are at 12 CFR Part 1007, followed by its rule for State compliance and Bureau registration at 12 CFR Part 1008. 76 Fed. Reg. 78483 (Dec. 19, 2011).

[6] On July 21, 2011, pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act), the CFPB assumed: (1) responsibility for developing and maintaining the federal registration system (including rule-making authority), (2) supervisory and enforcement authority for SAFE Act compliance for entities under the CFPB's jurisdiction, and (3) authority to oversee state compliance with SAFE Act requirements that had previously been under HUD's authority. Refer to Dodd-Frank Act Secs. 1025, 1061, and 1100. In addition, the Dodd-Frank Act merged functions of the OTS into the OCC, FDIC, and Board.

[7] The SAFE Act also authorized the U.S. Department of Housing and Urban Development (HUD) to monitor and enforce states' compliance with the statute's requirements for state licensing and registration, and HUD issued rules setting minimum standards for state licensing and registration. 76 Fed. Reg. 38464 (June 30, 2011). The Dodd-Frank Act transferred that authority from HUD to the CFPB. The CFPB thereafter published Regulation H, SAFE Mortgage Licensing Act – State Compliance and Bureau Registration System, 12 CFR Part 1008, based on HUD's regulation. 76 Fed. Reg. 78483, Dec. 19, 2011. These examination procedures do not cover the state registration requirements.

# CFPB Consumer
# Laws and Regulation                                    SAFE Act

Credit System institution; or federally insured credit union, including certain non-federally insured credit unions.[8]

**Employee** is not defined in the SAFE Act or SAFE Act regulation. However, the regulation's preamble explains that the meaning of "employee" under the SAFE Act regulation is consistent with the common-law right-to-control test. For example, the results of this test generally determine whether an institution files an Internal Revenue Service Form W-2 or Form 1099 for an individual.[9]

**Mortgage loan originator or MLO** means an individual who (1) takes a residential mortgage loan application *and* (2) offers or negotiates terms of a residential mortgage loan for compensation or gain. The term *mortgage loan originator* does not include:

- An individual who performs purely administrative or clerical tasks on behalf of an individual who is an MLO;

- An individual who only performs real estate brokerage activities (as defined in 12 U.S.C. Section 5102(3)(D)) and is licensed or registered as a real estate broker in accordance with applicable state law, unless the individual is compensated by a lender, a mortgage broker, or other MLO or by any agent of such lender, mortgage broker, or other MLO, and meets the MLO definition; or

- An individual or entity solely involved in extensions of credit related to time-share plans, as that term is defined in 11 U.S.C. Section 101(53D).

Appendix A to the SAFE Act regulation provides examples of activities of taking a loan application and offering or negotiating loan terms that fall within or outside of the definition of MLOs for federal registration purposes.

**Registry** means the Nationwide Mortgage Licensing System and Registry, or NMLS system, developed and maintained by the Conference of State Bank Supervisors and the American Association of Residential Mortgage Regulators for the state licensing and registration of state-licensed MLOs, and through which federal MLO registrations must be accomplished.[10]

---

[8] 12 CFR Secs. 1007.101(c), 1007.102.

[9] See 75 Fed. Reg. at 44664 for a discussion of the meaning of "employee" as used in the SAFE Act regulation. Covered financial institutions that are credit unions sometimes rely upon volunteers to originate mortgage loans. The right-to-control test under the common law agency doctrine likewise applies to these credit unions. Credit union management establishes the policies, procedures, and practices that volunteers use in performing their functions. Therefore, these volunteers qualify as employees of the covered financial institution for purposes of the SAFE Act regulation.

[10] See the Nationwide Mortgage and Licensing System and Registry website at: http://mortgage.nationwidelicensingsystem.org/fedreg/Pages/default.aspx. System information on federal registration can be found under the Federal Registration tab at that site.

# CFPB Consumer
# Laws and Regulation                                    SAFE Act

***Registered mortgage loan originator or registrant*** means any individual who (1) meets the MLO definition; (2) is an employee of a covered financial institution; (3) is registered pursuant to the regulation with the Registry; and (4) maintains a unique identifier through the Registry.

***Residential mortgage loan*** means any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling (as defined in Section 103(v) of the Truth in Lending Act, 15 U.S.C. Section 1602(v)) or residential real estate upon which is constructed or intended to be constructed a dwelling (including manufactured homes) and includes refinancings, reverse mortgages, home equity lines of credit, and other first and additional lien loans.

***Unique identifier*** means a number or other identifier that: (1) permanently identifies a registered MLO; (2) is assigned by protocols established by the Registry and the Bureau to facilitate electronic tracking of MLOs, as well as uniform identification of, and public access to, the employment history of and the publicly adjudicated disciplinary and enforcement actions against MLOs; and (3) must not be used for purposes other than those set forth under the SAFE Act.

## *De Minimis* Exception — 12 CFR 1007.101(c)(2)

The SAFE Act regulation provides an exception to the MLO registration requirements for any employee of a covered financial institution who has never been registered or licensed through the Registry as an MLO if during the past 12 months the employee acted as an MLO for five or fewer residential mortgage loans.

When an institution relies on the *de minimis* exception in lieu of registration, the MLO employee must register prior to originating the sixth residential mortgage loan within 12 months. Covered financial institutions are prohibited from engaging in any acts or practices to evade the registration requirement.

## Mortgage Loan Originator (MLO)
## Registration Requirements — 12 CFR 1007.103

Each MLO employee of a covered financial institution must register with the Registry,[11] obtain a "unique identifier," maintain the registration by updating certain information within 30 days of specified changes, and annually renew the registration during the annual renewal period.

---

[11] The SAFE Act rule implementing federal registration took effect on October 1, 2010. It provided a registration period from January 31, 2011, to July 29, 2011, for MLOs who are employees of covered financial institutions to register. After July 29, 2011, those employees must meet the registration requirements before they may originate residential mortgage loans.

# CFPB Consumer
# Laws and Regulation                                                    SAFE Act

### Initial Registration – 12 CFR 1007.103(a)

Each employee of a federally regulated institution who is an MLO must submit to the Registry the following:

- identifying information, including name, home address, social security number, gender, date of birth, and principal business location;

- financial-services-related employment history for the prior 10 years;

- disclosure of specified criminal, civil, judicial, or state, federal, or foreign financial authority regulatory actions against the employee; and

- fingerprints, for purposes of a Federal Bureau of Investigation background check.

The employee must attest to the correctness of the information submitted to the Registry; must authorize the Registry and the institution to obtain information related to any administrative, civil, or criminal action to which the employee is a party; and must authorize the Registry to make certain information available to the public.

### Maintaining Registration – 12 CFR 1007.103(b)

#### Renewal

An MLO must renew his or her registration during the annual renewal period by confirming and updating his or her registration records. This requirement does not apply to an MLO who completed his or her initial registration less than six months prior to the end of the annual renewal period. Any registration that is not renewed during this period will become inactive, and the individual cannot act as an MLO at a covered financial institution until the registration requirements are met. Individuals who fail to update their registrations during this two-month renewal period may renew their registration at any time and need not wait until the start of the next annual renewal period.

#### Updates to Registration

An MLO must update his or her registration within 30 days for specified significant changes, including name changes, employment termination, and reportable changes to legal or regulatory actions.

#### Previously Registered Employees – Change of Employment

The regulations provide streamlined registration requirements for an MLO employee previously registered or licensed through the Registry who maintained this registration or license and who changes employment. Such an employee must update certain information, provide the required attestation and authorizations, and submit new fingerprints unless the employee has fingerprints on file with the Registry that are less than three years old. There is no grace period in this situation. An employee must update his or her Registry record before acting as a loan originator for the new employer.

# CFPB Consumer
# Laws and Regulation                          SAFE Act

*Previously Registered Employees — Mergers, Acquisitions, or Reorganizations*

A registered or licensed MLO whose employment changes as the result of a merger, acquisition, or reorganization has 60 days from the effective date of a merger, acquisition, or reorganization to update information in the Registry.

## Financial Institution Requirements for MLO Registration, Renewal, and Changes to Information — 12 CFR 1007.103(e)

### Required Financial Institution Information — 12 CFR 1007.103(e)(1)(i)

In connection with the registration of one or more MLOs, financial institutions and certain of their subsidiaries must submit certain required information to the Registry:

- contact information;

- Employer Tax Identification Number;

- Research Statistics Supervision and Discount (RSSD) number issued by the Board;

- primary Federal regulator;

- primary point of contact for the Registry;

- individuals with authority to enter information into the Registry; and

- if a subsidiary of a financial institution, indication of that fact and the RSSD number of the parent institution, as applicable.

Once registered, the institution will receive an NMLS identification number for the institution to use in attesting to MLO employment and for other Safe Act-related purposes.

### Attestation — 12 CFR 1007.103(e)(1)(ii)

An individual with authority to enter information in the Registry must verify his or her identity and attest that he or she has that authority, that the information is correct, and that the institution will keep the information current.[12]

---

[12] An institution may designate one or more individuals to serve as the system administrator(s) who may submit required information to the Registry on behalf of employees and attest to their authority to submit information, the accuracy of information submitted, and that the institution will keep information current and submit updates on a timely basis. System administrators generally may not be MLOs; however, an institution is exempt from this regulatory requirement if it has 10 or fewer full-time employees and is not a subsidiary.

# CFPB Consumer
# Laws and Regulation                                    SAFE Act

### Registration — 12 CFR 1007.104(b)

A covered financial institution must require an MLO employee to register with the Registry, maintain this registration, and obtain a unique identifier. A covered financial institution must also confirm each MLO's employment status once the MLO submits registration information to the Registry and before the registration is activated.

Within 30 days of the date an MLO ceases to be an employee of the institution, the institution must notify the Registry of that fact along with the date the MLO ceased being an employee, so that consumers searching for an MLO in the publicly available consumer access portal will know that the MLO no longer has a relationship with the institution.

### Renewal and Updates — 12 CFR 1007.103(e)(1)(iii) and (iv)

A covered financial institution must update the information it submitted to the Registry during the annual registration renewal period and must confirm the registration information provided by MLO employees during this period.

An institution must update the required institution information provided to the Registry within 30 days of any change in such information.

## Policies and Procedures — 12 CFR 1007.104

Covered financial institutions that have one or more MLO employees must adopt and follow written policies and procedures to carry out their SAFE Act responsibilities.[13] The requirement to adopt and follow policies and procedures applies to all covered financial institutions that employ individual MLOs, where MLOs act within the scope of their employment, and regardless of the application of any *de minimis* exception to their employees. In addition, covered financial institutions must conduct annual independent compliance tests to ensure compliance with the regulation. The policies and procedures must be appropriate to the nature, size, complexity, and scope of the institution's mortgage lending activities and apply only to those employees acting within the scope of their employment at the institution. The policies and procedures must:

- Establish a process for identifying which employees of covered financial institutions must be registered;

- Require that all employees who are MLOs be informed of the registration requirements of the SAFE Act and SAFE Act regulation and instructed on how to comply;

- Establish procedures to comply with the SAFE Act regulation's unique identifier requirements;

- Establish reasonable procedures for confirming the adequacy and accuracy of MLO employee registrations, including updates and renewals, by comparisons with its own records;

---

[13] The Registry and the Agencies do not screen or approve registrations received from employees of Agency-related institutions.

# CFPB Consumer
# Laws and Regulation                                    SAFE Act

- Establish reasonable procedures and tracking systems for monitoring compliance with registration and renewal requirements and procedures;

- Provide for annual independent testing for compliance with the SAFE Act regulation by institution personnel or an outside party;

- Provide for appropriate action if an employee fails to comply with the registration requirements of the SAFE Act regulations or the institution's related policies and procedures, including prohibiting such employees from acting as MLOs or other appropriate disciplinary actions;

- Establish a process for reviewing employee criminal history background reports received pursuant to the regulation, taking appropriate action consistent with applicable federal law[14] and implementing regulations with respect to the reports, and maintaining records of the reports and actions taken with respect to applicable employees;[15] and

- Establish procedures designed to ensure that any third party with which the institution has arrangements related to mortgage loan origination has policies and procedures to comply with the SAFE Act and SAFE Act regulation, including appropriate licensing and/or registration of individuals acting as MLOs.[16]

## Unique Identifier — 12 CFR 1007.105

When an MLO registers with the Registry, he or she receives a unique identifier — a series of numeric characters assigned for life. The unique identifiers allow MLOs to be tracked if they move between state and federal jurisdictions and/or change employers, and help consumers to find certain information about a particular MLO when they search on the Registry's consumer access portal. The MLO information that is publicly available on the consumer access portal will ultimately include federal and state registrations and licenses held, the MLO's employment history, and publicly adjudicated disciplinary and enforcement actions, if any.

To make sure that consumers have access to an MLO's unique identifier before committing to a mortgage loan transaction, an MLO must provide the unique identifier upon request (orally or in

---

[14] Including Sec. 19 of the Federal Deposit Insurance Act (FDI Act); (12 U.S.C. 1829); Sec. 5.65(d) of the Farm Credit Act of 1971 (12 U.S.C. 2277a-14(d)); or Sec. 206 of the Federal Credit Union Act (12 U.S.C. 1786(i)).

[15] Sec. 19 of the FDI Act (12 U.S.C. 1829) prohibits, without the prior written consent of the FDIC, insured depository institutions from employing a person who has been convicted of any criminal offense involving dishonesty, breach of trust, or money laundering or has entered into a pretrial diversion or similar program in connection with a prosecution for such offense. See the *FDIC Statement of Policy for Section 19 of the FDI Act*, 63 Fed. Reg. 66184 (Dec. 1, 1998; amended May 10, 2011), available at http://www.fdic.gov/regulations/laws/rules/5000-1300 html.

[16] See FFIEC *Statement on Risk Management of Outsourced Technology Service* (November 28, 2000) for guidance on the assessment, selection, contract review, and monitoring of a third party that provides services to a regulated institution. See also FDIC *Guidance for Managing Third-Party Risk* (FIL-44-08); OCC Bulletin 2001-47, *Third-Party Relationships* (Nov. 1, 2001); OTS Thrift Bulletin 82a, *Third-Party Arrangements* (Sept. 1, 2004); NCUA Letter to Credit Unions: 01-CU-20, *Due Diligence Over Third-Party Service Providers* (Nov. 2001), 07-CU-13, *Supervisory Letter-Evaluating Third-Party Relationships* (December 2007), 08-CU-09, *Evaluating Third-Party Relationships Questionnaire* (Apr. 2008).

# CFPB Consumer
# Laws and Regulation                                    SAFE Act

writing), before acting as an MLO (orally or in writing), and in any initial written communication (paper or electronic) from the MLO to the consumer (such as a commitment letter, good faith estimate, or disclosure statement). MLO unique identifiers may be used on written materials or promotional items distributed by the institution for general use, for example on loan program descriptions, advertisements, business cards, stationery, notepads, and similar materials; the SAFE Act regulation does not prohibit such use.

The regulation also requires institutions to make MLO unique identifiers available to consumers in a practicable way. This could be achieved, for example, by:

- Directing consumers to a listing of registered MLOs and corresponding unique identifiers on the institution's website;

- Posting the information prominently in a publicly accessible place, such as a branch office lobby or lending office reception area; and/or

- Establishing a process to ensure that institution personnel provide MLO unique identifiers when requested by consumers from employees other than the MLO.

## Relation to Other Laws

### TILA, GSE, and HUD Requirements

Title XIV, Section 1402 of the Dodd-Frank Act amended the Truth in Lending Act (TILA) to require (1) MLOs to include on all loan documents any unique identifier of the MLO provided by the NMLS, and (2) the CFPB to issue implementing regulations requiring depository institutions to establish and maintain procedures reasonably designed to assure and monitor compliance with the SAFE Act's federal registration requirements.[17]

In 2009, the Federal Housing Finance Agency directed government-sponsored enterprises (GSEs) Fannie Mae and Freddie Mac to require mortgage loan applications to include the MLO's unique identifier.[18] The GSEs announced that for federally regulated institutions, the unique identifier information is required for all applications on or after July 29, 2011.[19]

On January 5, 2011, HUD issued a mortgagee letter requiring the collection of NMLS unique identifiers for all individuals and entities participating in the origination of Federal Housing Administration (FHA) loans.[20] The mortgagee letter also requires all FHA-approved mortgagees

---

[17] See Pub. L. No. 111-203 (July 21, 2010), available at http://www.gpo.gov/fdsys/pkg/PLAW-111publ203/pdf/PLAW-111publ203.pdf (p. 2139).

[18] See the FHFA news release at http://www.fhfa.gov/webfiles/400/LoanOrigIDS11509.pdf.

[19] See Fannie Mae and Freddie Mac Frequently Asked Questions at https://www.efanniemae.com/sf/guides/ssg/relatedsellinginfo/pdf/mortgageloandelreqsfaqs.pdf and http://www.freddiemac.com/sell/secmktg/loan_level_faq.html.

[20] See Mortgagee Letter 2011-4 at http://portal.hud.gov/hudportal/documents/huddoc?id=11-04ml.pdf.

# CFPB Consumer Laws and Regulation

# SAFE Act

and their employees to comply with the NMLS registration requirements and "entities with jurisdiction over their activities" must register in accordance with the guidance set forth by NMLS.

# REFERENCES

## Laws

| | |
|---|---|
| 12 U.S.C. 5101 *et seq.* | Secure and Fair Enforcement for Mortgage Licensing Act of 2008, amended by the Dodd-Frank Act, Section 1100 |

## Regulations

### Consumer Financial Protection Bureau Regulations (12 CFR)

| | |
|---|---|
| Part 1007 | Secure and Fair Enforcement for Mortgage Licensing Act: Federal Registration of Residential Mortgage Loan Originators (Regulation G) |
| Part 1008 | State Compliance and Bureau Registration System (Regulation H) |

**CFPB**

**Exam Procedures**                                          **SAFE Act**

# Secure and Fair Enforcement for Mortgage Licensing Act[1]

## Examination Objectives

- To determine whether the financial institution has adopted written policies and procedures designed to assure compliance with the SAFE Act regulation.

- To determine whether the annual independent testing of the institution's policies and procedures for assuring compliance with the SAFE Act regulation has been conducted.

- To determine whether any violations or deficiencies identified during the independent testing have been corrected and that steps have been taken to ensure they do not recur.

## Examination Procedures

1. Determine whether the financial institution, or any of its subsidiaries, has one or more MLO employees. For those institutions without any MLO employees, these examination procedures do not need to be completed. (12 CFR 1007.103(a)(2))

   **[Click&Type]**

2. Determine for those financial institutions with MLO employees whether the institution has adopted written policies and procedures and conducts annual independent compliance tests to assure compliance with the SAFE Act regulation. If the institution has failed to adopt policies and procedures and to perform annual independent compliance tests, the examiners should address the violation in the examination report and require corrective action. (12 CFR 1007.104)

   **[Click&Type]**

3. Review the financial institution's written policies and procedures and the annual independent compliance tests to determine whether the institution has taken appropriate steps to assure compliance with the SAFE Act that at a minimum:

   a. Establish a process for identifying which employees of the financial institution are required to be registered MLOs; (12 CFR 1007.104(a))

      **[Click&Type]**

   b. Require that all employees of the financial institution who are MLOs be informed of the registration requirements of the SAFE Act and the SAFE Act regulation and be instructed on how to comply with such requirements and procedures; (12 CFR 1007.104(b))

      **[Click&Type]**

---

[1] These reflect FFIEC-approved procedures.

**CFPB**

**Exam Procedures**                                           **SAFE Act**

c. Establish procedures to comply with the unique identifier requirements in Section 105 of the SAFE Act regulation; (12 CFR 1007.104(c))

**[Click&Type]**

d. Establish reasonable procedures for confirming the adequacy and accuracy of employee registrations, including updates and renewals, by comparisons with its own records; (12 CFR 1007.104(d))

**[Click&Type]**

e. Establish procedures and tracking systems for monitoring compliance with registration and renewal requirements and procedures; (12 CFR 1007.104(e))

**[Click&Type]**

f. Provide for independent testing for compliance with the SAFE Act regulation conducted annually by institution personnel or by an outside party; (12 CFR 1007.104(f))

**[Click&Type]**

g. Provide for appropriate action in the case of an employee who fails to comply with the registration requirements of the SAFE Act, the SAFE Act regulation, or the financial institution's policies and procedures, including prohibiting such employees from acting as an MLO or other appropriate disciplinary actions; (12 CFR 1007.104(g))

**[Click&Type]**

h. Establish a process for reviewing employee criminal history background reports received pursuant to the SAFE Act regulation, taking appropriate action consistent with applicable federal law, including Section 19 of the Federal Deposit Insurance Act (12 U.S.C. Section 1829) and implementing regulations with respect to these reports, and maintaining records of these reports and actions taken with respect to applicable employees; and (12 CFR 1007.104(h))

**[Click&Type]**

i. Establish procedures designed to ensure that any third party with which the institution has arrangements related to mortgage loan origination has policies and procedures to comply with the SAFE Act, including appropriate licensing and/or registration of individuals acting as MLOs. (12 CFR 1007.104(i))

**[Click&Type]**

4. Any significant deficiencies in the institution's SAFE Act regulation policies and procedures or independent compliance tests should be documented in the workpapers and discussed in the examination report together with corrective actions taken.

**[Click&Type]**

# CFPB Consumer Laws and Regulations                                    FCRA

# Fair Credit Reporting Act[1]

The Fair Credit Reporting Act (FCRA)[2] became effective on April 25, 1971. The FCRA is a part of a group of acts contained in the Federal Consumer Credit Protection Act[3] such as the Truth in Lending Act and the Fair Debt Collection Practices Act.

Congress substantively amended the FCRA upon the passage of the Fair and Accurate Credit Transactions Act of 2003 (FACT Act).[4] The FACT Act created many new responsibilities for consumer reporting agencies and users of consumer reports. It contained many new consumer disclosure requirements as well as provisions to address identity theft. In addition, it provided free annual consumer report rights for consumers and improved access to consumer report information to help increase the accuracy of data in the consumer reporting system.

In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), which granted rule-making authority under FCRA (except for Section 615(e) (red flag guidelines and regulation) and Section 628 (disposal of records)) to the Consumer Financial Protection Bureau (CFPB). The Dodd-Frank Act also amended two provisions of the FCRA to require the disclosure of a credit score and related information when a credit score is used in taking an adverse action or in risk-based pricing.[5][6]

On December 21, 2011, the CFPB restated FCRA regulations under its authority at 12 CFR Part 1022 (76 Fed. Reg. 79308).

---

[1] These reflect FFIEC-approved procedures.

[2] 15 U.S.C. Secs. 1681–1681x.

[3] 15 U.S.C. Sec. 1601 et seq.

[4] Pub. L. No. 108-159, 117 Stat. 1952.

[5] Section 1029 of the Dodd-Frank Act generally excludes from this transfer of authority, subject to certain exceptions, any rulemaking authority over a motor vehicle dealer that is predominantly engage in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.

[6] The agency responsible for supervising and enforcing compliance with the provisions of the FCRA and the implementing regulations will depend on the person subject to the FCRA (e.g., for financial institutions, jurisdiction will depend on the size and charter of the institution).

# CFPB Consumer
# Laws and Regulations                                    FCRA

The FCRA contains responsibilities both for entities that are consumer reporting agencies and for persons that operate in any of the following capacities:

1. Procurers and users of information (for example, as credit grantors, purchasers of dealer paper, or when opening deposit accounts);

2. Furnishers and transmitters of information (by reporting information to consumer reporting agencies, other third parties, or to affiliates);

3. Marketers of credit or insurance products; and

4. Employers.

## Structure and Overview of Examination Modules

The examination procedures are structured as a series of modules, grouping similar requirements together.[7] The modules contain general information about each of the requirements:

| | |
|---|---|
| Module 1 | Obtaining Consumer Reports |
| Module 2 | Obtaining Information and Sharing Among Affiliates |
| Module 3 | Disclosures to Consumers and Miscellaneous Requirements |
| Module 4 | Furnishers of Information |
| Module 5 | Consumer Alerts and Identity Theft Protections |

Financial institutions and other persons are subject to a number of different requirements under the FCRA; some are contained directly in the statute, while others are in 12 CFR 1022.

## Key Definitions

The FCRA uses a number of definitions. Key definitions include the following:

***Adverse Action.*** With regard to credit transactions, the term "adverse action" has the same meaning as used in Section 701(d)(6) [15 U.S.C. 1691(d)(6)] of the Equal Credit Opportunity Act (ECOA), Regulation B, and the official staff commentary. Under the ECOA, it means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the same amount or on terms substantially similar to those requested. Under the ECOA, the term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

---

[7] The examination procedures do not currently contain a module on the requirements for consumer reporting agencies.

# CFPB Consumer
# Laws and Regulations                                                    FCRA

For non-credit transactions, the term has the following additional meanings for purposes of the FCRA:

1. a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;

2. a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;

3. a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in Section 604(a)(3)(D) (15 U.S.C. 1681b(a)(3)(D)); and

4. an action taken or determination that is:

   a. Made in connection with an application made by, or transaction initiated by, any consumer or in connection with a review of an account to determine whether the consumer continues to meet the terms of the account.

   b. Adverse to the interests of the consumer.

***Consumer.*** A "consumer" is defined as an individual.

***Consumer Report.*** A "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency that bears on a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living that is used or expected to be used or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for any of the following:

1. credit or insurance to be used primarily for personal, family, or household purposes;

2. employment purposes; or

3. any other purpose authorized under Section 604 (15 U.S.C. 1681b).

The term "consumer report" does not include any of the following:

1. any report containing information solely about transactions or experiences between the consumer and the person making the report;

2. any communication of that transaction or experience information among entities related by common ownership or affiliated by corporate control (for example, different institutions that are members of the same holding company, or subsidiary companies of an insured institution);

JA0600

# CFPB Consumer
# Laws and Regulations                                    FCRA

3. communication of other information among persons related by common ownership or affiliated by corporate control if:

   a. it is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons; and

   b. the consumer is given the opportunity, before the time that the information is communicated, to direct that the information not be communicated among such persons;

4. any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device;

5. any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer, such as a lender who has received a request from a broker, conveys his or her decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made, and such person makes the disclosures to the consumer required under Section 615 (15 U.S.C. 1681m), Requirements on Users of Consumer Reports; or

6. a communication described in subsection (o) or (y) of Section 603 (15 U.S.C. 1681a (o) or (y)) (which relates to certain investigative reports and certain reports to prospective employers).

***Consumer Reporting Agency.*** The term "consumer reporting agency" means any person who, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and who uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

***Credit Score.*** The term "credit score" means a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default (and the numerical value or the categorization derived from such analysis may also be referred to as a "risk predictor" or "risk score"). The term does not include any mortgage score or rating of an automated underwriting system that considers one or more factors in addition to credit information, including the loan to value ratio, the amount of down payment, or the financial assets of a consumer; or any other elements of the underwriting process or underwriting decision.

***Creditor.*** Generally in FCRA, the terms "credit" and "creditor" have the same meanings as in section 702 of ECOA (15 U.S.C. 1691a).

***Employment Purposes.*** The term "employment purposes" when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee.

# CFPB Consumer
# Laws and Regulations                                        FCRA

***Investigative Consumer Report.*** An "investigative consumer report" means a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information. However, such information does not include specific factual information on a consumer's credit record obtained directly from a creditor of the consumer or from a consumer reporting agency when such information was obtained directly from a creditor of the consumer or from the consumer.

***Person.*** A "person" means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity.

JA0602

# CFPB Consumer Laws and Regulations                                    FCRA

## Module 1 – Obtaining Consumer Reports

### Overview

Consumer reporting agencies have a significant amount of personal information about consumers. This information is invaluable in assessing a consumer's creditworthiness for a variety of products and services, including loan and deposit accounts, insurance, and utility services, among others. The FCRA governs access to this information to ensure that a prospective user of the information obtains it for permissible purposes and does not exploit it for illegitimate purposes.

The FCRA requires any prospective user of a consumer report, for example, a lender, insurer, landlord, or employer, among others, to have a legally permissible purpose to obtain a report.

### Permissible Purposes of Consumer Reports – Section 604; 15 U.S.C. 1681b
### Investigative Consumer Reports – Section 606; 15 U.S.C. 1681d

<u>Legally Permissible Purposes</u>. The FCRA allows a consumer reporting agency to furnish a consumer report for the following circumstances and no other:

1. In response to a court order or Federal Grand Jury subpoena.

2. In accordance with the written instructions of the consumer.

3. To a person, including a financial institution, that the agency has reason to believe intends to use the report as information for any of the following reasons:

   a. In connection with a credit transaction involving the consumer (includes extending, reviewing, and collecting credit);

   b. For employment purposes;[8]

   c. In connection with the underwriting of insurance involving the consumer;

   d. In connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality that is required by law to consider an applicant's financial responsibility;

   e. As a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation;

---

[8] Use of consumer reports for employment purposes requires specific advanced authorization, disclosure notices, and, if applicable, adverse action notices. These issues are contained in Module 3 of the examination procedures.

# CFPB Consumer
# Laws and Regulations                                    FCRA

    f.   Otherwise has a legitimate business need for the information:

        i.   In connection with a business transaction that the consumer initiates; or

        ii.   To review an account to determine whether the consumer continues to meet the terms of the account.

        iii.   In response to a request by the head of a State or local child support enforcement agency (or authorized appointee) if the person certifies various information to the consumer reporting agency regarding the need to obtain the report. (Generally, this particular purpose does not impact a person, such as a financial institution, that is not a consumer reporting agency.)

<u>Prescreened Consumer Reports.</u> Users of consumer reports, such as financial institutions, may obtain prescreened consumer reports to make firm offers of credit or insurance to consumers, unless the consumers elected to opt out of being included on prescreened lists. The FCRA contains many requirements, including an opt-out notice requirement when prescreened consumer reports are used. In addition to defining prescreened consumer reports, Module 3 covers these requirements.

<u>Investigative Consumer Reports.</u> Section 606 contains specific requirements for use of an investigative consumer report. This type of consumer report contains information about a consumer's character, general reputation, personal characteristics, or mode of living obtained in whole or in part through personal interviews with neighbors, friends, or associates of the consumer. If a user, such as a financial institution, procures an investigative consumer report, or causes the preparation of one, the user institution must meet the following requirements:

4.   The user clearly and accurately discloses to the consumer that it may obtain an investigative consumer report.

5.   The disclosure contains a statement of the consumer's right to request other information about the report and a summary of the consumer's rights under the FCRA.

6.   The disclosure is in writing and is mailed or otherwise delivered to the consumer not later than three business days after the date on which the report was first requested.

7.   The user procuring the report certifies to the consumer reporting agency that it has complied with the disclosure requirements and will comply in the event that the consumer requests additional disclosures about the report.

<u>Procedures.</u> Given the preponderance of electronically available information and the growth of identity theft, a user should manage the risks associated with obtaining and using consumer reports. Users should employ procedures, controls, or other safeguards to ensure that they obtain and use consumer reports only in situations for which there are permissible purposes.

# CFPB Consumer
# Laws and Regulations                                    **FCRA**

## Module 2 – Obtaining Information and Sharing Among Affiliates

### Overview

The FCRA contains many substantive compliance requirements for consumer reporting agencies designed to help ensure the accuracy and integrity of the consumer reporting system. As noted in the definitions section, a consumer reporting agency is a person that generally furnishes consumer reports to third parties. By their very nature, such third parties as banks, credit unions, and other financial institutions have a significant amount of consumer information that could constitute a consumer report, and thus communication of this information could cause the institution to become a consumer reporting agency. The FCRA contains several exceptions that enable parties, such as a financial institution, to communicate this type of information, within strict guidelines, without becoming a consumer reporting agency.

Rather than containing strict information-sharing prohibitions, the FCRA creates a business disincentive such that if an entity shares consumer report information outside of the exceptions, then the institution is a consumer reporting agency and will be subject to the significant, substantive requirements of the FCRA applicable to those entities. Typically, an entity such as a financial institution will structure its information sharing practices within the exceptions to avoid becoming a consumer reporting agency. This examination module generally covers the various information-sharing practices within these exceptions.

### Consumer Report and Information Sharing – Section 603(d); 15 U.S.C. 1681a(d)

Section 603(d) defines a consumer report to include information about a consumer such as that which bears on a consumer's creditworthiness, character, and capacity among other factors. Communication of this information may cause a person, including a financial institution, to become a consumer reporting agency. The statutory definition contains key exceptions to this definition that enable persons to share this type of information under certain circumstances, without becoming consumer reporting agencies. Specifically, the term "consumer report" does not include:

1. A report containing information solely as to transactions or experiences between the consumer and the person making the report. A person, including a financial institution, may share information strictly related to its own transactions or experiences with a consumer (such as the consumer's payment history, or an account with the institution) with any third party, without regard to affiliation, without becoming a consumer reporting agency. The Privacy of Consumer Financial Information regulations that implement the Gramm-Leach-Bliley Act (GLBA) may restrict this type of information sharing because it meets the definition of nonpublic personal information under the Privacy regulations. Therefore, sharing it with nonaffiliated third parties may be subject to an opt-out notice under the privacy regulations. In turn, the FCRA may also restrict activities that the GLBA permits. For example, the GLBA permits a financial institution to share a list of its customers and

# CFPB Consumer
# Laws and Regulations                                      FCRA

information such as their credit scores with another financial institution to jointly market or sponsor other financial products or services. This communication may be a consumer report under the FCRA and could potentially cause the sharing financial institution to become a consumer reporting agency.

2. Communication of such transaction or experience information among persons, including financial institutions related by common ownership or affiliated by corporate control.

3. Communication of other information (for example, other than transaction or experience information) among persons related by common ownership or affiliated by corporate control, if it is clearly and conspicuously disclosed to the consumer that the information will be communicated among such entities, and before the information is initially communicated, the consumer is given the opportunity to opt out of the communication. This allows a person, such as a financial institution, to share other information (that is, information other than its own transaction and experience information) that could otherwise be a consumer report, without becoming a consumer reporting agency under both of the following circumstances:

   a. The sharing of the "other" information is done with affiliates.

   b. Consumers are provided with the notice and an opportunity to opt out of this sharing before the information is first communicated among affiliates.

For example, "other" information can include information a consumer provides on an application form concerning accounts with other financial institutions. It can also include information a financial institution obtains from a consumer reporting agency, such as the consumer's credit score. If a financial institution shares other information with affiliates without providing a notice and an opportunity to opt out, the financial institution may become a consumer reporting agency subject to all of the other requirements of the FCRA.

The opt-out right required by this section must be contained in a person's, such as a financial institution's**,** Privacy Notice as required by GLBA and its implementing regulations.

### Other Exceptions

Specific Extensions of Credit. In addition, the term consumer report does not include the communication of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device. For example, this exception allows a lender to communicate an authorization through the credit card network to a retailer, to enable a consumer to complete a purchase using a credit card.

Credit Decision to Third Party (for example, auto dealer). The term consumer report also does not include any report in which a person, including a financial institution, who has been requested by a third party to make a specific extension of credit directly or indirectly to a

# CFPB Consumer
# Laws and Regulations                              **FCRA**

consumer, conveys the decision with respect to the request. The third party must advise the
consumer of the name and address of the person, such as a financial institution, to which the
request was made, and such person makes the adverse action disclosures required by Section 615
of the FCRA. For example, this exception allows a lender to communicate a credit decision to an
automobile dealer who is arranging financing for a consumer purchasing an automobile and who
requires a loan to finance the transaction.

"Joint User" Rule. The Federal Trade Commission (FTC) staff commentary discusses another
exception known as the "Joint User Rule." Under this exception, users of consumer reports,
including financial institutions, may share information if they are jointly involved in the decision
to approve a consumer's request for a product or service, provided that each has a permissible
purpose to obtain a consumer report on the individual. For example, a consumer applies for a
mortgage loan that will have a high loan-to-value ratio, and thus the lender will require private
mortgage insurance (PMI) in order to approve the application. An outside company provides the
PMI. The lender and the PMI company can share consumer report information about the
consumer because both entities have permissible purposes to obtain the information and both are
jointly involved in the decision to grant the products to the consumer. This exception applies to
entities that are affiliated or nonaffiliated third parties. It is important to note that the GLBA will
still apply to the sharing of nonpublic, personal information with nonaffiliated third parties;
therefore, a person, such as a financial institution, should be aware the GLBA may still limit or
prohibit sharing allowed under the FCRA joint user rule.

## Protection of Medical Information – Section 604(g); 15 U.S.C. 1681b(g); 12 CFR 1022, Subpart D

Section 604(g) generally prohibits creditors from obtaining and using medical information in
connection with any determination of the consumer's eligibility, or continued eligibility, for
credit. The statute contains no prohibition on creditors obtaining or using medical information
for other purposes that are not in connection with a determination of the consumer's eligibility,
or continued eligibility for credit.

Section 604(g)(5)(A) requires the federal banking agencies and NCUA to prescribe regulations
that permit transactions that are determined to be necessary and appropriate to protect legitimate
operational, transactional, risk, consumer, and other needs (including administrative verification
purposes), consistent with the Congressional intent to restrict the use of medical information for
inappropriate purposes. On November 22, 2005, the FFIEC Agencies published final rules in the
Federal Register (70 FR 70664). The rules contain the general prohibition on obtaining or using
medical information, and provide exceptions for the limited circumstances when medical
information may be used. The rules define "credit" and "creditor" as having the same meanings
as in Section 702 of the ECOA (15 U.S.C. 1691a). On December 21, 2011, the CFPB restated
the implementing regulation at 12 CFR Part 1022 (76 Fed. Reg. 79308).

Obtaining and Using Unsolicited Medical Information (12 CFR 1022.30(c)). A creditor does not
violate the prohibition on obtaining medical information if it receives the medical information
pertaining to a consumer in connection with any determination of the consumer's eligibility, or
continued eligibility, for credit without specifically requesting medical information. However,

# CFPB Consumer
# Laws and Regulations                                    FCRA

the creditor may only use this medical information in connection with a determination of the consumer's eligibility, or continued eligibility, for credit in accordance with either the financial information exception or one of the specific other exceptions provided in the rules. We discuss these exceptions below.

Financial Information Exception (12 CFR 1022.30(d)). The rules allow a creditor to obtain and use medical information pertaining to a consumer in connection with any determination of the consumer's eligibility or continued eligibility for credit, so long as:

1. The information is the type of information routinely used in making credit eligibility determinations, such as information relating to debts, expenses, income, benefits, assets, collateral, or the purpose of the loan, including the use of the loan proceeds.

2. The creditor uses the medical information in a manner and to an extent that is no less favorable than it would use comparable information that is not medical information in a credit transaction.

3. The creditor does not take the consumer's physical, mental, or behavioral health, condition or history, type of treatment, or prognosis into account as part of any such determination.

The financial information exception is designed in part to allow creditors to consider a consumer's medical debts and expenses in the assessment of that consumer's ability to repay the loan according to the loan terms. In addition, the financial information exception also allows a creditor to consider the dollar amount and continued eligibility for disability income, worker's compensation income, or other benefits related to health or a medical condition that is relied on as a source of repayment.

The creditor may use the medical information in a manner and to an extent that is no less favorable than it would use comparable, nonmedical information. For example, a consumer includes on an application for credit information about two $20,000 debts. One debt is to a hospital; the other is to a retailer. The creditor may use and consider the debt to the hospital in the same manner in which it considers the debt to the retailer, such as including the debts in the calculation of the consumer's proposed debt-to-income ratio. In addition, the consumer's payment history of the debt to the hospital may be considered in the same manner as the debt to the retailer. For example, if the creditor does not grant loans to applicants who have debts that are 90-days past due, the creditor could consider the past-due status of a debt to the hospital, in the same manner as the past-due status of a debt to the retailer.

A creditor may use medical information in a manner that is more favorable to the consumer, according to its regular policies and procedures. For example, if a creditor has a routine policy of declining consumers who have a 90-day past due installment loan to a retailer, but does not decline consumers who have a 90-day past due debt to a hospital, the financial information exception would allow a creditor to continue this policy without violating the rules because in these cases, the creditor's treatment of the debt to the hospital is more favorable to the consumer.

# CFPB Consumer
# Laws and Regulations                                              **FCRA**

A creditor may not take the consumer's physical, mental, or behavioral health, condition or history, type of treatment, or prognosis into account as part of any determination regarding the consumer's eligibility, or continued eligibility for credit. The creditor may only consider the financial implications as discussed above, such as the status of a debt to a hospital, continued eligibility for disability income, etc.

Specific Exceptions for Obtaining and Using Medical Information (12 CFR 1022.30(e)). In addition to the financial information exception, the rules also provide for the following nine specific exceptions under which a creditor can obtain and use medical information in its determination of the consumer's eligibility, or continued eligibility for credit:

1. To determine whether the use of a power of attorney or legal representative that is triggered by a medical condition or event is necessary and appropriate, or whether the consumer has the legal capacity to contract when a person seeks to exercise a power of attorney or act as a legal representative for a consumer based on an asserted medical condition or event. For example, if Person A is attempting to act on behalf of Person B under a Power of Attorney that is invoked based on a medical event, a creditor is allowed to obtain and use medical information to verify that Person B has experienced a medical condition or event such that Person A is allowed to act under the Power of Attorney.

2. To comply with applicable requirements of local, state, or Federal laws.

3. To determine, at the consumer's request, whether the consumer qualifies for a legally permissible special credit program or credit-related assistance program that is:

   a. Designed to meet the special needs of consumers with medical conditions and

   b. Established and administered pursuant to a written plan that:

      i. Identifies the class of persons that the program is designed to benefit; and

      ii. Sets forth the procedures and standards for extending credit or providing other credit-related assistance under the program.

4. To the extent necessary for purposes of fraud prevention or detection.

5. In the case of credit for the purpose of financing medical products or services, to determine and verify the medical purpose of the loan and the use of the proceeds.

6. Consistent with safe and sound banking practices, if the consumer or the consumer's legal representative requests that the creditor use medical information in determining the consumer's eligibility, or continued eligibility, for credit, to accommodate the consumer's particular circumstances, and such request is documented by the creditor. For example, at the consumer's request, a creditor may grant an exception to its ordinary policy to accommodate a medical condition that the consumer has experienced. This exception allows a creditor to consider medical information in this

# CFPB Consumer
# Laws and Regulations                                    FCRA

context, but it does not require a creditor to make such an accommodation nor does it require a creditor to grant a loan that is unsafe or unsound.

7. Consistent with safe and sound practices, to determine whether the provisions of a forbearance practice or program that is triggered by a medical condition or event apply to a consumer. For example, if a creditor has a policy of delaying foreclosure in cases where a consumer is experiencing a medical hardship, this exception allows the creditor to use medical information to determine if the policy would apply to the consumer. Like the exception listed in the bullet above, this exception does not require a creditor to grant forbearance, it merely provides an exception so that a creditor may consider medical information in these instances.

8. To determine the consumer's eligibility for the triggering of, or the reactivation of a debt cancellation contract or debt suspension agreement, if a medical condition or event is a triggering event for the provision of benefits under the contract or agreement.

9. To determine the consumer's eligibility for the triggering of, or the reactivation of a credit insurance product, if a medical condition or event is a triggering event for the provision of benefits under the product.

Limits on redisclosure of information (12 CFR 1022.31(b)). If a creditor subject to the medical information rules receives medical information about a consumer from a consumer reporting agency or its affiliate, the creditor must not disclose that information to any other person, except as necessary to carry out the purpose for which the information was initially disclosed, or as otherwise permitted by statute, regulation, or order.

Sharing medical information with affiliates (12 CFR 1022.32(b)). In general, the exclusions from the definition of "consumer report" in Section 603(d)(2) of the FCRA allow the sharing of non-medical information among affiliates. With regard to medical information, Section 603(d) (3) of the FCRA provides that the exclusions in Section 603(d)(2) do not apply when a person subject to the medical information rules shares any of the following information with an affiliate:

1. Medical information.

2. An individualized list or description based on the payment transactions of the consumer for medical products or services.

3. An aggregate list of identified consumers based on payment transactions for medical products or services.

If a person who is subject to the medical rules shares with an affiliate the type of information discussed above, the exclusions from the definition of "consumer report" do not apply. Effectively, this means that if a person shares medical information, that person becomes a consumer reporting agency, subject to all of the other substantive requirements of the FCRA.

# CFPB Consumer
# Laws and Regulations                                    FCRA

The rules provide exceptions to these limitations on sharing medical information with affiliates (12 CFR 1022.32(c)). A person, such as a bank, thrift, or credit union, may share medical information with its affiliates without becoming a consumer reporting agency under any of the following circumstances:

1.  In connection with the business of insurance or annuities (including the activities described in Section 18B of the model Privacy of Consumer Financial and Health Information Regulation issued by the National Association of Insurance Commissioners, as in effect on January 1, 2003).

2.  For any purpose permitted without authorization under the regulations promulgated by the Department of Health and Human Services pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

3.  For any purpose referred to in Section 1179 of HIPAA.

4.  For any purpose described in Section 502(e) of the Gramm-Leach-Bliley Act.

5.  In connection with a determination of the consumer's eligibility, or continued eligibility, for credit consistent with the financial information exceptions or specific exceptions.

6.  As otherwise permitted by order of the CFPB.

## Affiliate Marketing Opt-Out Requirement – Section 624; 15 U.S.C. 1681s-3; 12 CFR 1022, Subpart C

Section 624 gives a consumer the right to restrict an entity, with which it does not have a pre-existing business relationship, from **using** certain information obtained from an affiliate to make solicitations to that consumer. This provision is distinct from Section 603(d)(2)(A)(iii) that gives a consumer the right to restrict the **sharing** of certain consumer information among affiliates.[9]

Under Section 624, an entity may not use information received from an affiliate to market its products or services to a consumer, unless the consumer is given notice and a reasonable opportunity and a reasonable and simple method to opt out of the making of such solicitations. The affiliate marketing opt-out requirement applies to both transaction or experience information and "other" information, such as information from credit reports and credit applications. On November 7, 2007, the federal financial institution regulators published final regulations in the

---

[9] *See* Module 2, Section 603(d) Consumer Report and Information Sharing, for provisions pertaining to the sharing of consumer information. Under Section 603(d)(2)(A)(iii) of the FCRA, entities are responsible for complying with the affiliate *sharing* notice and opt-out requirement, where applicable. Thus, under the FCRA, certain consumer information will be subject to two opt-out notices, a sharing opt-out notice (Section 603(d)) and a marketing use opt-out notice (Section 624). These two opt-out notices may be consolidated.

# CFPB Consumer
# Laws and Regulations                                   FCRA

Federal Register to implement this section (72 FR 62910). On December 21, 2011, the CFPB restated the implementing regulation at 12 CFR Part 1022 (76 Fed. Reg. 79308). [10]

Exceptions to the notice and opt-out requirements apply when an entity uses eligibility information in certain ways, as described later in these procedures.

### Key Definitions – 12 CFR 1022.20[11]

*Eligibility information (12 CFR 1022.20(b)(3))* includes not only transaction and experience information, but also the type of information found in consumer reports, such as information from third-party sources and credit scores. Eligibility information does not include aggregate or blind data that does not contain personal identifiers such as account numbers, names, or addresses. [12]

*Pre-existing business relationship (12 CFR 1022.20(b)(4))* [13] means a relationship between a person, such as a financial institution (or a person's licensed agent), and a consumer based on:

1. A financial contract between the person and the consumer that is in force on the date on which the consumer is sent a solicitation covered by the affiliate marketing regulation;

2. The purchase, rental, or lease by the consumer of the person's goods or services, or a financial transaction (including holding an active account or a policy in force, or having another continuing relationship) between the consumer and the person, during the 18-month period immediately preceding the date on which the consumer is sent a solicitation covered by the affiliate marketing regulation; or

3. An inquiry or application by the consumer regarding a product or service offered by that person during the three-month period immediately preceding the date on which the consumer is sent a solicitation covered by the affiliate marketing regulation.

---

[10] *See* 12 CFR 1022.20(a) for the scope of entities covered by Subpart C of 12 CFR 1022.

[11] *See* 12 CFR 1022.20 for other definitions.

[12] Specifically, "eligibility information" is defined in the affiliate marketing regulation as "any information the communication of which would be a consumer report if the exclusions from the definition of "consumer report" in Section 603(d)(2)(A) of the [Fair Credit Reporting] Act did not apply."

[13] *See* 12 CFR 1022.20(b)(4)(ii) and (iii) for examples of pre-existing business relationships and situations where no pre-existing business relationship exists.

# CFPB Consumer
# Laws and Regulations                                    FCRA

*Solicitation (12 CFR 1022.20(b)(5))* means the marketing of a product or service initiated by
a person, such as a financial institution, to a particular consumer that is:

1. Based on eligibility information communicated to that person by its affiliate; and

2. Intended to encourage the consumer to purchase or obtain such product or service.

Examples of a solicitation include a telemarketing call, direct mail, email, or other form of
marketing communication directed to a particular consumer that is based on eligibility
information received from an affiliate. A solicitation <u>does not</u> include marketing communications
that are directed at the general public (e.g., television, general circulation magazine, and
billboard advertisements).

### Initial Notice and Opt-Out Requirement – 12 CFR 1022.21(a), 1022.24, and 1022.25

A person, such as a financial institution, and its subsidiaries generally may not use eligibility
information about a consumer that it receives from an affiliate to make a solicitation for
marketing purposes to the consumer, unless:

1. It is clearly and conspicuously disclosed to the consumer in writing or, if the
   consumer agrees, electronically, in a concise notice that the person may use eligibility
   information about that consumer that it received from an affiliate to make
   solicitations for marketing purposes to the consumer;

2. The consumer is provided a reasonable opportunity and a reasonable and simple
   method to "opt out" (that is, the consumer prohibits the person from using eligibility
   information to make solicitations for marketing purposes to the consumer);[14] and

3. The consumer has not opted out.

For example, a consumer has a homeowner's insurance policy with an insurance company. The
insurance company shares eligibility information about the consumer with its affiliated
depository institution. Based on that eligibility information, the depository institution wants to
make a solicitation to the consumer about its home equity loan products. The depository
institution does not have a pre-existing business relationship with the consumer and none of the
other exceptions apply. The depository institution may not use eligibility information it received
from its insurance affiliate to make solicitations to the consumer about its home equity loan
products unless the insurance company gave the consumer a notice and opportunity to opt out
and the consumer does not opt out.

---

[14] *See* 12 CFR 1022.24 and 1022.25 for examples of "a reasonable opportunity to opt out" and "reasonable and simple methods
for opting out."

# CFPB Consumer
# Laws and Regulations                                              FCRA

*Making Solicitations – 12 CFR 1022.21(b)* [15]

A person, such as a financial institution, (or a service provider acting on behalf of the person) makes a solicitation for marketing purposes if:

1. The person receives eligibility information from an affiliate, including when the affiliate places that information into a common database that the person may access;

2. The person uses that eligibility information to do one or more of the following:

   a. Identify the consumer or type of consumer to receive a solicitation;

   b. Establish criteria used to select the consumer to receive a solicitation; or

   c. Decide which of the person's products or services to market to the consumer or tailor the financial institution's solicitation to that consumer; and

3. As a result of the person's, such as a financial institution's, use of the eligibility information, the consumer is provided a solicitation.

A person, such as a financial institution, does not make a solicitation for marketing purposes (and therefore the affiliate marketing regulation, with its notice and opt-out requirements, does not apply) in the situations listed below, commonly referred to as "constructive sharing." Constructive sharing occurs when a person, such as a financial institution, provides criteria to an affiliate to use in marketing the financial institution's product and the affiliate uses the criteria to send marketing materials to the affiliate's own customers that meet the criteria. In this situation, the financial institution is not using shared eligibility information to make solicitations.

1. The person provides criteria for consumers to whom it would like its affiliate to market the person's products. Then, based on this criteria, the affiliate uses eligibility information that the affiliate obtained in connection with its own pre-existing business relationship with the consumer to market the person's products or services (or directs its service provider to use the eligibility information in the same manner and the person does not communicate with the service provider regarding that use).

2. A service provider, applying the person's criteria, uses information from an affiliate, such as that in a shared database, to market the person's products or services to the consumer, so long as it meets certain requirements, including all of the following.

   a. The affiliate controls access to and use of its eligibility information by the service provider under a written agreement between the affiliate and the service provider.

---

[15] *See* 12 CFR 1022.21(b)(6) for examples of making solicitations.

# CFPB Consumer
# Laws and Regulations                                    **FCRA**

b.  The affiliate establishes, in writing, specific terms and conditions under which the service provider may access and use the affiliate's eligibility information to market the person's products and services (or those of affiliates generally) to the consumer.

c.  The affiliate requires the service provider, under a written agreement, to implement reasonable policies and procedures designed to ensure that the service provider uses the affiliate's eligibility information in accordance with the terms and conditions established by the affiliate relating to the marketing of the person's products or services.

d.  The affiliate is identified on or with the marketing materials provided to the consumer.

e.  The person does not directly use its affiliate's eligibility information in the manner described above under "Making Solicitations (12 CFR 1022.21(b))," item 2.

### Exceptions to Initial Notice and Opt-Out Requirements – 12 CFR 1022.21(c) [16]

The initial notice and opt-out requirements do not apply to a person, such as a financial institution, if it uses eligibility information that it receives from an affiliate:

1.  To make a solicitation for marketing purposes to a consumer with whom the person has a pre-existing business relationship;

2.  To facilitate communications to an individual for whose benefit the person provides employee benefit or other services pursuant to a contract with an employer;

3.  To perform services on behalf of an affiliate (but this would not allow solicitation where the consumer has opted out);

4.  In response to a communication about the person's products or services initiated by the consumer;

5.  In response to a consumer's authorization or request to receive solicitations; or

6.  If the person's compliance with the affiliate marketing regulation would prevent it from complying with State insurance laws pertaining to unfair discrimination in any state in which the person is lawfully doing business.

---

[16] *See* 12 CFR 1022.21(d) for examples of exceptions to the initial notice and opt-out requirement.

# CFPB Consumer
# Laws and Regulations                                          FCRA

### Contents of Opt-Out Notice – 12 CFR 1022.23

A person, such as a financial institution, must provide to the consumer a reasonable and simple method for the consumer to opt out. The opt-out notice must be clear, conspicuous, and concise, and must accurately disclose specific information outlined in 12 CFR 1022.23(a), including that the consumer may elect to limit the use of eligibility information to make solicitations to the consumer. See Appendix C to the regulation for the model notices contained in the affiliate marketing regulation.

*Alternative contents.* An affiliate that provides a consumer a broader right to opt out than that required by the affiliate marketing regulation may satisfy the regulatory requirements by providing the consumer with a clear, conspicuous, and concise notice that accurately discloses the consumer's opt-out rights.

*Coordinated, consolidated, and equivalent notices.* Opt-out and renewal notices may be coordinated and consolidated with any other notice or disclosure required under any other provision of law, such as the Gramm-Leach-Bliley Act (GLBA), 15 U.S.C. 6801 et seq. Renewal notices, which have additional required content (12 CFR 1022.27), may be consolidated with the annual GLBA privacy notices.

### Delivery of the Opt-Out Notice – 12 CFR 1022.21(a)(3) and 1022.26[17]

An affiliate that has or previously had a pre-existing business relationship with the consumer must provide the notice either individually or as part of a joint notice from two or more members of an affiliated group of companies. The opt-out notice must be provided so that each consumer can reasonably be expected to receive actual notice. A consumer may <u>not</u> reasonably be expected to receive actual notice if, for example, the affiliate providing the notice sends the notice via email to a consumer who has not agreed to receive electronic disclosures by email from the affiliate providing the notice.[18]

### Scope of Opt-Out – 12 CFR 1022.22(a) and 1022.23(a)(2)[19]

As a general rule, the consumer's election to opt out prohibits any affiliate covered by the opt-out notice from using eligibility information received from another affiliate, described in the notice, to make solicitations to the consumer. If two or more consumers jointly obtain a product or service, any of the joint consumers may exercise the right to opt out. It is impermissible to require all joint consumers to opt out before implementing any opt-out direction.

---

[17] *See* 12 CFR 1022.26(b) and (c) for examples of "reasonable expectation of actual notice" and "no reasonable expectation of actual notice."

[18] For opt-out notices provided electronically, the notice may be provided in compliance with either the electronic disclosure provisions of 12 CFR 1022.24(b)(2) and 1022.24(b)(3) or the provisions in section 101 of the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. 7001 <u>et seq.</u>

[19] *See* 12 CFR 1022.22(a) for examples of the scope of the opt-out notice, including examples of continuing relationships.

# CFPB Consumer
# Laws and Regulations                                    FCRA

*Menu of alternatives.* A consumer may be given the opportunity to choose from a menu of alternatives when electing to prohibit solicitations, such as by:

1. Electing to prohibit solicitations from certain types of affiliates covered by the opt-out notice but not other types of affiliates covered by the notice.

2. Electing to prohibit solicitations based on certain types of eligibility information but not other types of eligibility information.

3. Electing to prohibit solicitations by certain methods of delivery but not other methods of delivery.

One of the alternatives, however, must allow the consumer to prohibit all solicitations from all of the affiliates that are covered by the notice.

*Continuing relationship.* If the consumer establishes a continuing relationship with a person, such as a financial institution, or its affiliate, an opt-out notice may apply to eligibility information obtained from one or more continuing relationships (such as a deposit account, a mortgage loan, or a credit card), if the notice adequately describes the continuing relationships covered. The opt-out notice can also apply to future continuing relationships if the notice adequately describes the continuing future relationships that would be covered.

*Special rule for a notice following termination of all continuing relationships.* After all continuing relationships with a person or its affiliate(s) are terminated, a consumer must be given a new opt-out notice if the consumer later establishes another continuing relationship with the person or its affiliate(s) and the consumer's eligibility information is to be used to make a solicitation. The consumer's decision not to opt out after receiving the new opt-out notice would not override a prior opt-out election that applies to eligibility information obtained in connection with a terminated relationship, regardless of whether the new opt-out notice applies to eligibility information obtained in connection with a terminated relationship.

*No continuing relationship (isolated transaction).* If the consumer does not establish a continuing relationship with a person or its affiliate, but the person or its affiliate obtains eligibility information about the consumer in connection with a transaction with the consumer (such as an ATM cash withdrawal, purchase of traveler's checks, or a credit application that is denied), an opt-out notice provided to the consumer only applies to eligibility information obtained in connection with that transaction.

### Time, Duration, and Renewal of Opt-Out – 12 CFR 1022.22(b) and (c) and 1022.27

A consumer may opt out at any time. The opt-out must be effective for a period of at least five years beginning when the consumer's opt-out election is received and implemented, unless the consumer later revokes the opt-out in writing or, if the consumer agrees, electronically. An opt-out period may be set at more than five years, including an opt-out that does not expire unless the consumer revokes it.

# CFPB Consumer
# Laws and Regulations                                              FCRA

*Renewal after opt-out period expires.* After the opt-out period expires, a person, such as a financial institution, may not make solicitations based on eligibility information it receives from an affiliate to a consumer who previously opted out, unless:

1. The consumer receives a renewal notice and opportunity to opt out, and the consumer does not renew the opt-out; or

2. An exception to the notice and opt-out requirements applies.[20]

*Contents of renewal notice.* The renewal notice must be clear, conspicuous, and concise, and must accurately disclose most of the elements of the original opt-out notice, as well as the following information as applicable:

1. The consumer previously elected to limit the use of certain information to make solicitations to the consumer.

2. The consumer's election has expired or is about to expire.

3. The consumer may elect to renew the consumer's previous election.

4. If applicable, that the consumer's election to renew will apply for the specified period of time stated in the notice and that the consumer will be allowed to renew the election once that period expires.

See 12 CFR 1022.27(b) for all the content requirements of a renewal notice.

*Renewal period.* Each opt-out renewal must be effective for a period of at least five years.

*Affiliate who may provide the notice.* The renewal notice must be provided by the affiliate that provided the previous opt-out notice, or its successor; or as part of a joint renewal notice from two or more members of an affiliated group of companies, or their successors, that jointly provided the previous opt-out notice.

*Timing of the renewal notice.* A renewal notice may be provided to the consumer either a reasonable period of time before the expiration of the opt-out period[21] or any time after the expiration of the opt-out period but before solicitations are made to the consumer that would have been prohibited by the expired opt-out.

---

[20] *See* 12 CFR 1022.21(c) for exceptions.

[21] An opt-out period may not be shortened by sending a renewal notice to the consumer before expiration of the opt-out period, even if the consumer does not renew the opt-out. If a person provides an annual privacy notice under the Gramm-Leach-Bliley Act, providing a renewal notice with the last annual privacy notice provided to the consumer before expiration of the opt-out period is a reasonable period of time before expiration of the opt-out in all cases (12 CFR 1022.27(d)).

# CFPB Consumer Laws and Regulations                    FCRA

*Model Forms for Opt-Out Notices – 12 CFR Part 1022, Appendix C*

Appendix C of the affiliate marketing regulation contains model forms that may be used to comply with the requirement for clear, conspicuous, and concise notices. The five model forms are:

C-1    Model Form for Initial Opt-Out Notice (Single-Affiliate Notice)

C-2    Model Form for Initial Opt-Out Notice (Joint Notice)

C-3    Model Form for Renewal Notice (Single-Affiliate Notice)

C-4    Model Form for Renewal Notice (Joint Notice)

C-5    Model Form for Voluntary "No Marketing" Notice

Use of the model forms is not required and a person may make certain changes to the language or format of the model forms without losing the protection from liability afforded by use of the model forms. These changes may not be so extensive as to affect the substance, clarity, or meaningful sequence of the language in the model forms. Institutions making such extensive revisions will lose the safe harbor that Appendix C provides. Examples of acceptable changes are provided in Appendix C to the regulation.

# CFPB Consumer
# Laws and Regulations                                    FCRA

## Module 3 – Disclosures to Consumers and Miscellaneous Requirements

### Overview

The FCRA requires entities such as financial institutions to provide consumers with various notices and information under a variety of circumstances. This module contains examination responsibilities for these various areas.

### Use of Consumer Reports for Employment Purposes – Section 604(b); 15 U.S.C. 1681b(b)

Section 604(b) has specific requirements for persons, such as financial institutions, that obtain consumer reports of its employees or prospective employees prior to, and/or during, the term of employment. The FCRA generally requires the written permission of the consumer to procure a consumer report for "employment purposes." Moreover, the person must provide to the consumer in writing a clear and conspicuous disclosure that it may obtain a consumer report for employment purposes prior to procuring a report.

Prior to taking any adverse action involving employment that is based in whole or in part on the consumer report, the user generally must provide to the consumer:

1. A copy of the report.

2. A description in writing of the rights of the consumer under this title, as the CFPB prescribes under Section 609(c)(1).

At the time a financial institution takes adverse action in an employment situation, Section 615 requires that it must provide the consumer with an adverse action notice described later in this module.

### Prescreened Consumer Reports and Opt-Out Notice – Sections 604(c) and 615(d); 15 U.S.C. 1681b(c) and 15 U.S.C. 1681m(d); and 12 CFR 1022.54

Sections 604(c) allow persons, including financial institutions, to obtain and use consumer reports on any consumer in connection with any credit or insurance transaction that the consumer does not initiate, to make firm offers of credit or insurance. This process, known as prescreening, occurs when a financial institution obtains a list from a consumer reporting agency of consumers who meet certain predetermined creditworthiness criteria and who have not elected to be excluded from such lists.

These lists may only contain the following information:

1. The name and address of a consumer.

2. An identifier that is not unique to the consumer and that the person uses solely for the purpose of verifying the identity of the consumer.

# CFPB Consumer
# Laws and Regulations                                    **FCRA**

3.  Other information pertaining to a consumer that does not identify the relationship or
    experience of the consumer with respect to a particular creditor or other entity.

Each name appearing on the list is considered an individual consumer report. In order to obtain
and use these lists, persons, such as financial institutions, must make a "firm offer of credit or
insurance" as defined in Section 603(l) to each person on the list. A person is not required to
grant credit or insurance if the consumer is not creditworthy or insurable, or cannot furnish
required collateral, provided that the person determines the underwriting criteria in advance, and
applies it consistently.

Example 1: Assume a home mortgage lender obtains a list from a consumer reporting agency of
everyone in County X, with a current home mortgage loan and a credit score of 700. The lender
will use this list to market a second lien home equity loan product. The lender's other non-
consumer report criteria, in addition to those used in the prescreened list for this product, include
a maximum total debt-to-income ratio (DTI) of 50 percent or less. The consumer reporting
agency can screen some of the criteria but the lender must determine other criteria individually,
such as the DTI, when consumers respond to the offer. If a consumer responds to the offer, but
already has a DTI of 60 percent, the lender does not have to grant the loan.

In addition, the person is allowed to obtain a full consumer report on anyone responding to the
offer to verify that the consumer continues to meet the creditworthiness criteria. If the consumer
no longer meets those criteria, the person does not have to grant the loan.

Example 2: On January 1, a credit card lender obtains a list from a consumer reporting agency of
consumers in County Y who have credit scores of 720, and no previous bankruptcy records. The
lender mails solicitations offering a pre-approved credit card to everyone on the list on January 2.
On January 31, a consumer responds to the offer and the lender obtains and reviews a full
consumer report that shows a bankruptcy record was added on January 15. Since this consumer no
longer meets the lender's predetermined criteria, the lender is not required to issue the credit card.

These basic requirements help prevent a person from obtaining prescreened lists without
following through with an offer of credit or insurance. The person must maintain the criteria used
for the product (including the criteria used to generate the prescreened report and any other
criteria such as collateral requirements) on file for a period of three years, beginning on the date
that the person made the offer to the consumer.

### Technical Notice and Opt-Out Requirements – Section 615(d)

Section 615(d) contains consumer protections and technical notice requirements concerning
prescreened offers of credit or insurance. The FCRA requires nationwide consumer reporting
agencies to jointly operate an "opt-out" system, whereby consumers can elect to be excluded
from prescreened lists by calling a toll-free number.

When a person, such as a financial institution, obtains and uses these lists, it must provide
consumers with a Prescreened Opt-Out Notice with the offer of credit or insurance. This notice
alerts consumers that they are receiving the offer because they meet certain creditworthiness

# CFPB Consumer
# Laws and Regulations                                    FCRA

criteria. The notice must also provide the toll-free telephone number operated by the nationwide consumer reporting agencies for consumers to call to opt out of prescreened lists.

The FCRA contains the basic requirement to provide notices to consumers at the time the prescreened offers are made. The implementing regulation, 12 CFR 1022.54, contains the technical requirements of the notice. This regulation is applicable to anyone, including banks, credit unions, and saving associations, that obtains and uses prescreened consumer reports.

### Short and Long Notice – 12 CFR 1022.54(c)

Entities must provide a "short" notice and a "long" notice of the prescreened opt-out information with each written solicitation made to consumers using prescreened consumer reports. They must also comply with specific requirements concerning the content and appearance of these notices.

The short notice must be a clear and conspicuous, simple, and easy-to-understand statement as follows:

1. <u>Content</u>. The short notice must state that the consumer has the right to opt out of receiving prescreened solicitations. It must provide the toll-free number and direct consumers to the existence and location of the long notice. It should also state the title of the long notice. The short notice may not contain any other information.

2. <u>Form</u>. The short notice must be in a type size larger than the principal text on the same page, but it may not be smaller than 12-point type. If a person, such as a financial institution, provides the notice by electronic means, it must be larger than the type size of the principal text on the same page.

3. <u>Location</u>. The short form must be on the front side of the first page of the principal promotional document in the solicitation. If provided electronically, it must be on the same page and in close proximity to the principal marketing message. The statement must be located so that it is distinct from other information, such as inside a border, and must be in a distinct type style, such as bolded, italicized, underlined, and/or in a color that contrasts with the principal text on the page, if the solicitation is provided in more than one color.

The long notice must also be a clear and conspicuous, simple, and easy-to-understand statement as follows:

1. <u>Content</u>. The long notice must state the information required by Section 615(d) of the FCRA and may not include any other information that interferes with, detracts from, contradicts, or otherwise undermines the purpose of the notice.

2. <u>Form</u>. The notice must appear in the solicitation, be in a type size that is no smaller than the type size of the principal text on the same page, and, for solicitations provided other than by electronic means, the type size may not be smaller than 8-point type. The notice must begin with a heading in capital letters, underlined, and identifying the long notice as the "PRESCREEN & OPT-OUT NOTICE." It must be in a type style that is distinct

# CFPB Consumer
# Laws and Regulations                                    **FCRA**

from the principal type style used on the same page, such as bolded, italicized, underlined, and/or in a color that contrasts from the principal text, if the solicitation is in more than one color. The notice must be set apart from other text on the page, such as by including a blank line above and below the statement, and by indenting both the left and right margins from other text on the page.

The model prescreened opt-out notices are contained in Appendix D to 12 CFR Part 1022. Appendix D contains complete sample solicitations for context. The model prescreen notice text is contained below:

*Sample Short Notice:*

> **You can choose to stop receiving "prescreened" offers of (credit or insurance) from this and other companies by calling toll-free (toll-free number). See <u>PRESCREEN & OPT-OUT NOTICE</u> on other side (or other location) for more information about prescreened offers.**

*Sample Long Notice:*

> **<u>PRESCREEN & OPT-OUT NOTICE</u>: This "prescreened" offer of (credit or insurance) is based on information in your credit report indicating that you meet certain criteria. This offer is not guaranteed if you do <u>not</u> meet our criteria (including providing acceptable property as collateral). If you do not want to receive prescreened offers of (credit or insurance) from this and other companies, call the consumer reporting agencies (or name of consumer reporting agency) toll-free, (toll-free number); or write: (consumer reporting agency name and mailing address).**

## Truncation of Credit and Debit Card Account Numbers — Section 605(g); 15 U.S.C. 1681c(g)

Section 605(g) provides that persons, including financial institutions, that accept debit and credit cards for the transaction of business will be prohibited from issuing electronic receipts that contain more than the last five digits of the card number, or the card expiration date, at the point of sale or transaction. This requirement applies only to electronically developed receipts and does not apply to hand-written receipts or those developed with an imprint of the card.

## Disclosure of Credit Scores by Certain Mortgage Lenders — Section 609(g); 15 U.S.C. 1681g(g)

Section 609(g) requires creditors, such as financial institutions, that make or arrange mortgage loans using credit scores to provide the score with accompanying information to the applicants.

*Credit score*

For purposes of this section, the term "credit score" is defined as a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default (and the

# CFPB Consumer
# Laws and Regulations                                    FCRA

numerical value or the categorization derived from such analysis may also be referred to as a "risk predictor" or "risk score"). The credit score does not include either of the following:

1. Any mortgage score or rating by an automated underwriting system that considers one or more factors in addition to credit information, such as the loan-to-value ratio, the amount of down payment, or the financial assets of a consumer.

2. Any other elements of the underwriting process or underwriting decision.

### Covered transactions

The disclosure requirement applies to both closed-end and open-end loans that are for consumer purposes and are secured by one- to four-family residential real properties, including purchase and refinance transactions. This requirement will not apply in circumstances that do not involve a consumer purpose, such as when a borrower obtains a loan secured by his or her residence to finance his or her small business.

### Specific required notice

Financial institutions in covered transactions that use credit scores must provide a disclosure containing the following specific language, which is contained in 609(g)(1)(D):

---

Notice to The Home Loan Applicant

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit scores.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

If you have questions concerning the terms of the loan, contact the lender.

---

# CFPB Consumer
# Laws and Regulations                                    FCRA

The notice must include the name, address, and telephone number of each consumer reporting agency that provided a credit score that was used.

### Credit score and key factors disclosed

In addition to the notice, a creditor, such as a financial institution, must also disclose the credit score, the range of possible scores, the date that the score was created, and the "key factors" used in the score calculation. "Key factors" are all relevant elements or reasons adversely affecting the credit score for the particular individual, listed in the order of their importance, and based on their effect on the credit score. The total number of factors to be disclosed must not exceed four. However, if one of the key factors is the number of inquiries into a consumer's credit information, then the total number of factors must not exceed five. These key factors come from information the consumer reporting agencies supplied with any consumer report that was furnished containing a credit score (Section 605(d)(2)).

This disclosure requirement applies in any application for a covered transaction, regardless of the final action the lender takes on the application. The FCRA requires a creditor to disclose all of the credit scores used in these transactions. For example, if two joint applicants apply for a mortgage loan to purchase a single-family residence and the lender uses both credit scores, then the creditor needs to disclose both. The statute specifically does not require more than one disclosure per loan. Therefore, if the creditor uses multiple scores, it can include all of them in one disclosure containing the Notice to the Home Loan Applicant.

If a creditor uses a credit score that it did not obtain directly from a consumer reporting agency, but may contain some information from a consumer reporting agency, the creditor may satisfy this disclosure requirement by providing a score and associated key factor information that a consumer reporting agency supplied. For example, certain automated underwriting systems generate a score used in a credit decision. These systems are often populated by data obtained from a consumer reporting agency. If a creditor uses this automated system, it may satisfy the disclosure requirement by providing the applicants with a score and key factors a consumer reporting agency supplied based on the data, including credit score(s) imported into the automated underwriting system. This will provide applicants with information about their credit history and its role in the credit decision, in the spirit of this section of the statute.

### Timing

With regard to the timing of the disclosure, the statute requires that the creditor provide it as soon as is reasonably practicable after using a credit score.

# CFPB Consumer
# Laws and Regulations                                     FCRA

**Adverse Action Disclosures – Section 615(a) and (b);
15 U.S.C. 1681m(a) and (b)**

Section 615(a)-(b) requires users of consumer reports, such as creditors, to make certain disclosures when they:

1. take adverse actions with respect to consumers, based in whole or in part on information contained in a consumer report;

2. deny credit for personal, family, or household purposes or increase the charge for such credit based in whole or in part on information obtained from a person other than a consumer reporting agency bearing upon the consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living or

3. take certain adverse action based in whole or in part on information from an affiliate.

The disclosure requirements are discussed separately below.

### *Information Obtained From a Consumer Reporting Agency*

Section 615(a), Duties of Users Taking Adverse Actions on the Basis of Information Contained in Consumer Reports, provides that when adverse action is taken with respect to any consumer based in whole or in part on any information contained in a consumer report, the person, such as a financial institution, must:

1. provide oral, written, or electronic notice of the adverse action to the consumer.

2. provide to the consumer written or electronic disclosures of a numerical credit score used by such person in taking any adverse action based in whole or in part on any information in a consumer report and the following information:

    a. the range of possible credit scores under the model used;

    b. all of the key factors that adversely affected the credit score, which shall not exceed four key factors, except that if one of the key factors is the number of enquiries made with respect to the consumer report, the number of key factors shall not exceed five;

    c. the date on which the credit score was created; and

    d. the name of the person or entity that provided the credit score or credit file upon which the credit score was created;

3. provide to the consumer orally, in writing, or electronically:

    a. the name, address, and telephone number of the consumer reporting agency from which it received the information (including a toll-free telephone number

# CFPB Consumer
# Laws and Regulations                                    FCRA

established by the agency, if the consumer reporting agency maintains files on a nationwide basis); and

    b. a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken;

4. provide to the consumer an oral, written, or electronic notice of the consumer's right to obtain a free copy of the consumer report from the consumer reporting agency within 60 days of receiving notice of the adverse action, and the consumer's right to dispute the accuracy or completeness of any information in the consumer report with the consumer reporting agency.

**Information Obtained from Third Parties Other than Consumer Reporting Agencies (Including Affiliates)**

Section 615(b), Adverse Action Based on Information Obtained from Third Parties Other than Consumer Reporting Agencies, provides that, in general, whenever credit for personal, family, or household purposes involving a consumer is denied or the charge for such credit is increased either wholly or partly because of information obtained from a person other than a consumer reporting agency bearing upon the consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, the user of such information shall:

1. At the time such adverse action is communicated, clearly and accurately disclose to the consumer his right to make a written request for the reasons for such adverse action within 60 days after learning of such adverse action; and

2. Within a reasonable period of time after receipt of such written request from the consumer, disclose the nature of the information to the consumer.

If the adverse action described in 615(b)(2)(B) is (i) taken based in whole or in part on information from a person related by common ownership or affiliated by common corporate control to the person taking the action, and (ii) bears on the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the consumer, and (iii) does not include information solely as to transactions or experiences between the consumer and the person furnishing the information or information in a consumer report, then the person taking the adverse action shall:

1. Notify the consumer of the action, including a statement that the consumer may obtain the information upon written request from the consumer received within 60 days after transmittal of the notice required; and

2. Not later than 30 days after receipt of such written request from the consumer, disclose to the consumer the nature of the information upon which the action is based.

# CFPB Consumer
# Laws and Regulations

# FCRA

**Debt Collector Communications Concerning Identity Theft —
Section 615(g); 15 U.S.C. 1681m(g)**

Section 615(g) has specific requirements for persons, such as financial institutions, that act as debt collectors, whereby they collect debts on behalf of a third party that is a creditor or other user of a consumer report. The requirements do not apply when a person is collecting its own loans. When a person is notified that any information relating to a debt that it is attempting to collect may be fraudulent or may be the result of identity theft, the person must notify the third party of this fact. In addition, if the consumer, to whom the debt purportedly relates, requests information about the transaction, the person must provide all of the information the consumer would otherwise be entitled to if the consumer wished to dispute the debt under other provisions of law applicable to the person.

**Risk-Based Pricing Notice — Section 615(h); 15 U.S.C. 1681m(h);
12 CFR 1022, Subpart H**

Section 615(h) of the Fair Credit Reporting Act (FCRA) generally requires a user of consumer reports, such as a creditor, to provide a risk-based pricing notice to a consumer when the creditor, based on a consumer report, extends credit to the consumer on terms that are "materially less favorable" than the terms the creditor has extended to other consumers. On January 15, 2010, the Federal Reserve and the Federal Trade Commission (FTC) published final rules in the *Federal Register* (75 Fed. Reg. 2724) implementing this section of the FCRA.

The risk-based pricing notice requirement is designed primarily to improve the accuracy of consumer reports by alerting consumers to the existence of negative information in their consumer reports so that the consumers can, if they choose, check their consumer reports for accuracy and correct any inaccurate information. This notice provision is meant to complement an existing provision of the FCRA, Section 615(a), whereby a creditor that denies a consumer's application for credit, based in whole or in part on information in a consumer's report, must provide an adverse action notice. Section 615(h), covers the situation where credit is offered on "materially less favorable terms," rather than being denied.

The Dodd-Frank Act amended Section 615(h) of the FCRA to require a person to disclose a consumer's credit score and certain information relating to the credit score, if a credit score is used in making the credit decision. On July 15, 2011, the Federal Reserve Board and the FTC published final rules (effective August 15, 2011) amending the risk-based pricing regulation to effect the Dodd-Frank Act changes (76 FR 41602). On December 21, 2011, the CFPB restated the FCRA regulations at 12 CFR Part 1022. (76 Fed. Reg. 79308)

### Key Definitions — 12 CFR 1022.71

The following definitions pertain to the rules governing the risk-based pricing regulation:

*Material terms* means in general:

    a.  for open-end credit (except as provided in (b) and (d) below), the annual percentage rate (APR) required to be disclosed in the account opening disclosures required under

# CFPB Consumer
# Laws and Regulations                                    FCRA

Regulation Z. This does not include a temporary initial rate that is lower than the rate that will apply when the temporary rate expires, any penalty rate that applies upon the occurrence of specific events (such as a late payment), or any fixed APR option for a home equity line of credit;

b. for credit cards (other than a credit card used to access a home equity line of credit or a charge card), the APR that applies for purchases. For credit cards without a purchase APR, "material terms" means the APR that varies based on consumer report information and that has the most significant financial impact on consumers;

c. for closed-end credit, the APR required to be disclosed prior to consummation under the closed-end provisions of Regulation Z; and

d. for credit that does not have an APR, the financial term that varies based on consumer report information and that has the most significant financial impact on consumers, such as an annual membership fee for a charge card.

***Materially less favorable*** means, generally, that the terms granted, extended, or otherwise provided to a consumer differ from the terms granted, extended, or otherwise provided to another consumer such that the cost of credit to a consumer would be significantly greater than the cost of credit granted, extended, or otherwise provided to the other consumer. Relevant factors in determining the significance of a difference in cost include the type of credit product, the term of the credit extension, and the extent of the difference between the material terms granted, extended, or otherwise provided to the two consumers.

### General requirements – 12 CFR 1022.72-73

A person must provide to a consumer a notice ("risk-based pricing notice") in the form and manner prescribed by the regulation if:

1. The person uses a consumer report in connection with an application for, or a grant, extension, or other provision of, credit to a consumer for personal, family, or household purposes; <u>and</u>

2. Based in whole or in part on the consumer report, the person grants, extends, or otherwise provides credit to that consumer on material terms that are materially less favorable than the most favorable material terms available to a substantial proportion of consumers from that person.

The obligation to provide the notice applies to the creditor to whom the obligation is initially payable, i.e., the original creditor. This interpretation excludes brokers and other intermediaries who do not themselves grant, extend, or provide credit to consumers. See preamble to the final regulation (75 FR 2730)(January 15, 2010).

*Determination of which consumers must receive notice (12 CFR 1022.72(b)).* A person may determine, on a case-by-case basis, whether a consumer has received material terms that are

# CFPB Consumer
# Laws and Regulations                                    FCRA

materially less favorable by comparing the material terms offered to the consumer to the
material terms offered to other consumers for a specific type of credit product. A "specific type
of credit product" means one or more credit products with similar features that are designed for
similar purposes. Examples include student loans, unsecured credit cards, secured credit cards,
new automobile loans, used automobile loans, fixed-rate mortgage loans, and variable-rate
mortgage loans.

Because making such a direct comparison between consumers may not be operationally feasible,
the rules provide two alternative methods, a credit score proxy method and a tiered pricing
method, both of which are described as follows:

1. Credit score proxy method (12 CFR 1022.72(b)(1)). If a person uses credit scores to
   set the material terms of credit, the person may determine a cutoff score that
   represents the point at which approximately 40 percent of its consumers have higher
   credit scores and 60 percent of its consumers have lower credit scores. The person
   may then provide a risk-based pricing notice to each consumer who has a credit score
   lower than the cutoff score.

| Credit Score Proxy Example | |
|---|---|
| The number of all, or a representative sample of, consumers to whom the person granted credit for a specific type of credit product | 10,000 |
| 40 percent of consumers | 4,000 |
| Credit scores of the 4,000 consumers with the highest credit scores | 700 or higher |
| Cutoff score | 700 |
| **Credit scores of those consumers to whom the person must provide a risk-based pricing notice, because the consumers' scores are lower than cutoff score** | 699 or lower |

<u>Alternative to 40/60 cutoff</u>. The regulation provides an alternative to the 40/60 cutoff
discussed above for situations where more than 40 percent of consumers (e.g., 80
percent) receive the most favorable material terms. In such situations, the person may set
a different cutoff score based on its historical experience. The cutoff score would be set at
a point at which the approximate percentage of consumers who historically have received
the most favorable material terms based on their credit score would not receive a notice
in the future. Under this alternative, the risk-based pricing notices would be provided to
the approximate percentage of consumers who historically have been granted credit on
material terms other than the most favorable terms.

For example, based on a sample of credit extended in the past six months, a creditor may
determine that approximately 80 percent of its consumers received credit at its lowest
APR (i.e., the most favorable material terms), and 20 percent of its consumers received
credit at a higher APR (i.e., material terms other than the most favorable). Approximately
80 percent of the sampled consumers had a credit score at or above 750, and 20 percent
had a credit score below 750. As a result, the card issuer could select 750 as its cutoff

# CFPB Consumer
# Laws and Regulations                                    FCRA

score. Consumers who have credit scores lower than 750 would receive the risk-based pricing notice. See preamble to the final regulation (75 FR at 2733)(January 15, 2010).

Recalculation. A person must recalculate the score no less than every two years.

Specific type of product (sampling approach). A person must calculate the cutoff score by considering the credit scores of all, or a representative sample of, the consumers who have received credit for a specific type of credit product.

New entrants or new products (secondary approach in limited circumstances). For new entrants into the credit business or for new products subject to risk-based pricing, a person may determine the cutoff score based on information from market research or other third-party sources for a specific type of credit product. For a newly acquired credit portfolio, a person may determine the cutoff score from information obtained from the party from which it acquired the portfolio. The person must recalculate the cutoff score using the scores of its own consumers within one year after it begins using a score derived from market research, third-party data, or the party from which it acquired the portfolio. If, within that one year, it has not granted credit to a sufficient number of new consumers, thus preventing it from having sufficient data with which to recalculate a cut-off score based on the credit scores of its own consumers, it may continue to use the original cutoff score until it obtains sufficient data on which to base the calculation. However, within two years, it must calculate its own cutoff score if it has granted credit to some new consumers within those two years.

Use of multiple credit scores. For a person that generally uses two or more credit scores to set material credit terms, the person must determine the cutoff score using the same method used to evaluate multiple scores when making credit decisions (for example, using an average credit score). If the person does not consistently use the same method for evaluating multiple scores, the person must use a reasonable means. For example, the person may use any one of the methods that the person ordinarily uses or the average credit score of each consumer to calculate the credit score by a reasonable means.

No credit score available for a consumer. If no credit score is available for a consumer, a person must assume that it is granting credit on materially less favorable terms and thus must provide a risk-based pricing notice to the consumer.

2.  *Tiered pricing method (12 CFR 1022.72(b)(2)).* If a person sets the material terms of credit by assigning each consumer to one of a discrete number of pricing tiers for a specific type of credit product, based in whole or in part on a consumer report, the person may provide a risk-based pricing notice to each consumer who is not assigned to the top pricing tier or tiers.

If the person uses four or fewer pricing tiers, it complies by providing risk-based pricing notices to all consumers who do not qualify for the top, best-priced tier. If the person uses five or more pricing tiers, it complies by providing the notices to all consumers who do not qualify for the two top, best-priced tiers and any other tier that, combined with the top

# CFPB Consumer Laws and Regulations

**FCRA**

two tiers, equals no less than the top 30 percent and no more than the top 40 percent of the total number of tiers.

| Tiered Pricing Example | | |
|---|---|---|
| **Four or fewer tiers** | | |
| **Top tier = best rate** | **APR** | **Notice requirements.** |
| Tier 1 (top) | 8% | No risk-based pricing notice required. |
| Tier 2 | 10% | **Risk-based pricing notice required for Tiers 2, 3, and 4.** |
| Tier 3 | 12% | |
| Tier 4 | 14% | |

| Five or more tiers (5 tiers) | | |
|---|---|---|
| **Top tier = best rate** | **APR** | |
| Tier 1 (top) | 8% | No risk-based pricing notice required for top 30% to 40% of tiers. |
| Tier 2 | 10% | Top two tiers comprise 2 out of 5 (40%) of the number of tiers. |
| Tier 3 | 12% | **Risk-based notices required for Tiers 3-5.** |
| Tier 4 | 14% | |
| Tier 5 | 16% | |

| Five or more tiers (9 tiers) | | |
|---|---|---|
| **Top tier = best rate** | **APR** | |
| Tier 1 (top) | 8% | No risk-based pricing notice required for top 30% to 40% of tiers. |
| Tier 2 | 10% | |
| Tier 3 | 12% | Top three tiers comprise 3 out of 9 (33%) of the number of tiers. |
| Tier 4 | 14% | **Risk-based notices required for Tiers 4-9.** |
| Tier 5 | 16% | |
| Tier 6 | 18% | |
| Tier 7 | 20% | |
| Tier 8 | 22% | |
| Tier 9 | 24% | |

JA0632

# CFPB Consumer
# Laws and Regulations                                      **FCRA**

*Application to credit card issuers (12 CFR 1022.72(c)).* A credit card issuer may use any of the methods in 12 CFR 1022.72(b) to identify consumers to whom it must provide a risk-based pricing notice. Alternatively, the card issuer may provide the notice when:

1. a consumer applies for a credit card in connection with an application program or in response to a solicitation, and more than one purchase APR may apply under the program or solicitation, and

2. based in whole or in part on a consumer report, the credit card is issued to a consumer with an APR that is higher than the lowest APR available in connection with the application or solicitation.

The risk-based pricing requirements do not apply to a card issuer if the credit card program offers only a single annual APR (other than temporary initial rates or penalty rates) or if the issuer offers the consumer the lowest possible APR under the credit card program.

*Content of the notice (12 CFR 1022.73(a)(1)).* The risk-based pricing notice must include:

1. a statement that a consumer report (or credit report) includes information about the consumer's credit history and the type of information included in that history;

2. a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the report;

3. the identity of each consumer reporting agency that furnished a consumer report used in the credit decision;

4. a statement that federal law gives the consumer the right to obtain a copy of a consumer report from the consumer reporting agency or agencies identified in the notice without charge for 60 days after receipt of the notice;

5. a statement informing the consumer how to obtain a consumer report from the consumer reporting agency or agencies identified in the notice and providing contact information (including a toll-free telephone number, where applicable) specified by the consumer reporting agency or agencies;

6. a statement directing consumers to the website of the CFPB to obtain more information about consumer reports;

7. if a credit score of the consumer to whom a person grants, extends, or otherwise provides credit is used in setting the material terms of credit:

   a. a statement that a credit score is a number that takes into account information in a consumer report, that the consumer's credit score was used to set the terms of credit offered, and that a credit score can change over time to reflect changes in the consumer's credit history;

# CFPB Consumer
# Laws and Regulations                              FCRA

    b.   the credit score used by the person in making the credit decision;

    c.   the range of possible credit scores under the model used to generate the credit score;

    d.   all of the key factors that adversely affected the credit score, which shall not exceed four key factors, except that if one of the key factors is the number of enquiries made with respect to the consumer report, the number of key factors shall not exceed five;

    e.   the date on which the credit score was created; and

    f.   the name of the consumer reporting agency or other person that provided the credit score.

8. A statement that the terms offered, such as the APR, have been set based on information from a consumer report; and

9. A statement that the terms offered may be less favorable than the terms offered to consumers with better credit histories.

See Appendix H-1 and H-6 of the regulation for model forms for the risk-based pricing notice.

*Account Review (12 CFR 1022.72(d)).* Generally, a person must provide an account review risk-based pricing notice to the consumer if the person, based in whole or in part on a consumer report, increases the consumer's APR after a review of the consumer's account, unless one of the exceptions in 12 CFR 1022.74 applies (for example, the creditor provides an adverse action notice).

*Content of account review risk-based pricing notice (12 CFR 1022.73(a)(2)).* The account review risk-based pricing notice must include:

1. a statement that a consumer report (or credit report) includes information about the consumer's credit history and the type of information included in that history;

2. a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the report;

3. the identity of each consumer reporting agency that furnished a consumer report used in the account review;

4. a statement that federal law gives the consumer the right to obtain a copy of a consumer report from the consumer reporting agency or agencies identified in the notice without charge for 60 days after receipt of the notice;

# CFPB Consumer
# Laws and Regulations                                    **FCRA**

5.  a statement informing the consumer how to obtain a consumer report from the consumer reporting agency or agencies identified in the notice and providing contact information (including a toll-free telephone number, where applicable) specified by the consumer reporting agency or agencies;

6.  a statement directing consumers to the website of the CFPB to obtain more information about consumer reports;

7.  if a credit score of the consumer whose extension of credit is under review is used in increasing the APR:

    a.  a statement that a credit score is a number that takes into account information in a consumer report, that the consumer's credit score was used to set the terms of credit offered, and that a credit score can change over time to reflect changes in the consumer's credit history;

    b.  the credit score used by the person in making the credit decision;

    c.  the range of possible credit scores under the model used to generate the credit score;

    d.  all of the key factors that adversely affected the credit score, which shall not exceed four key factors, except that if one of the key factors is the number of enquires made with respect to the consumer report, the number of key factors shall not exceed five;

    e.  the date on which the credit score was created; and

    f.  the name of the consumer reporting agency or other person that provided the credit score.

8.  a statement that the person has conducted a review of the account using information from a consumer report; and

9.  a statement that as a result of the review, the APR on the account has been increased based on information from a consumer report.

NOTE: Items 1 through 7 for the account review risk-based pricing notice are substantially the same as items 1 through 7 for the risk-based pricing notice. Only the last two items in each list are different.

See Appendix H-2 and H-7 of the regulation for model forms for the account review risk-based pricing notice.

*Form of the notice (12 CFR 1022.73(b)).* The risk-based pricing notices and the account review risk-based pricing notices must be clear and conspicuous and provided to the consumer in oral, written, or electronic form. Persons, such as creditors, are deemed to be in compliance with the

# CFPB Consumer
# Laws and Regulations                                    FCRA

disclosure requirements through use of the optional, applicable model forms, found in Appendix H of the regulation.

*Timing (12 CFR 1022.73(c)).* The timing requirement depends on the specific type of credit transaction as specified below.

1. For closed-end credit, a risk-based pricing notice must be provided to the consumer after the decision to approve a credit request is communicated to the consumer, but before consummation of the transaction.

2. For open-end credit, the notice must be provided after the decision to grant credit is communicated to the consumer, but before the first transaction under the plan has been made.

3. For account reviews, the notice must be provided at the time that the decision to increase the APR is communicated to the consumer. If no notice of the increase in the APR is provided to the consumer prior to the effective date of the APR change, the notice must be provided no later than five days after the effective date of the APR change.

4. For automobile lending transactions made through an auto dealer or other party that is unaffiliated with the creditor, the creditor may provide a risk-based pricing notice in the time periods described above for closed-end credit. Alternatively, the creditor may arrange to have the auto dealer or other party provide a risk-based pricing notice to the consumer on its behalf within these time periods and maintain reasonable policies and procedures to verify that the auto dealer provides the notices to consumers within the applicable time periods. If the creditor arranges to have the auto dealer or other party provide a credit score disclosure exception notice, the creditor complies if the consumer receives a notice containing a credit score obtained by the dealer or other party, even if a different credit score is obtained and used by the creditor. (12 CFR 1022.73(c)(2))

5. For credit that is granted under an open-end credit plan to a consumer in person or by telephone for contemporaneous purchase of goods or services, the risk-based pricing notice may be provided at the earlier of:

   a. The time of the first mailing to the consumer after the decision is made to approve the credit, such as in a mailing containing the account agreement or a credit card; or

   b. Within 30 days after the decision to approve the credit.

*Multiple credit scores (12 CFR 1022.73(d)).* When a person obtains or creates two or more credit scores and uses one of those credit scores in setting the material terms of credit (e.g., by using the low, middle, high, or most recent score), the risk-based pricing notice and the account review notice must include that credit score and the information about the credit score described in the notice content requirements above.

# CFPB Consumer
# Laws and Regulations                                    FCRA

When a person obtains or creates two or more credit scores and uses multiple credit scores in setting the material terms of credit (e.g., by computing the average of all the credit scores obtained or created), the risk-based pricing notice and the account review notice must include one of those credit scores and the information about the credit score described previously in the notice content requirements. The notice may, at the person's option, include more than one credit score and the related information for each credit score disclosed.

Examples.

1. A person that uses consumer reports to set the material terms of credit cards granted, extended, or provided to consumers regularly requests credit scores from several consumer reporting agencies and uses the low score when determining the material terms it will offer to the consumer. That person must disclose the low score in the risk-based pricing notice and the account review notice.

2. A person that uses consumer reports to set the material terms of automobile loans granted, extended, or provided to consumers regularly requests credit scores from several consumer reporting agencies, each of which it uses in an underwriting program in order to determine the material terms it will offer to the consumer. That person may choose one of these scores to include in the risk-based pricing notice and the account review notice.

### Exceptions – 12 CFR 1022.74

The rules contain a number of exceptions to the risk-based pricing notice requirement, as follows:

1. when a consumer applies for specific material terms of credit (e.g., a specific APR), and receives them, unless those terms were specified by the creditor using a consumer report after the consumer applied for the credit and after the creditor obtained the consumer report (12 CFR 1022.74(a));

2. when a person such as a creditor provides a notice of adverse action (12 CFR 1022.74(b));

3. when a person makes a firm offer of credit in a prescreened solicitation even if the person makes other firm offers of credit to other consumers on more favorable material terms (12 CFR 1022.74(c));

4. when a person generally provides a credit score disclosure to each consumer that requests a loan that is or will be secured by residential real property (12 CFR 1022.74(d));

5. when a person generally provides a credit score disclosure to each consumer that requests a loan that is not or will not be secured by residential real property (12 CFR 1022.74(e));

# CFPB Consumer
# Laws and Regulations                                    FCRA

6.  when a person who otherwise provides credit score disclosures to consumers that request loans, provides a disclosure about credit scores when no credit score is available (12 CFR 1022.74(f)).

The specific disclosure requirements for exceptions in 12 CFR 1022.74(d)-(f) are described below.

*Section 1022.74(d) exception - credit score disclosure for loans secured by residential real property.* An person is not required to provide a risk-based pricing notice to a consumer under 12 CFR 1022.72(a) or (c) if:

1.  The consumer requests from an person an extension of credit that is or will be secured by one to four units of residential real property; and

2.  The person generally provides to each consumer that requests such an extension of credit a notice that contains the following:

    a.  a statement that a consumer report (or credit report) is a record of the consumer's credit history and includes information about whether the consumer pays his or her obligations on time and how much the consumer owes to creditors;

    b.  a statement that a credit score is a number that takes into account information in a consumer report and that a credit score can change over time to reflect changes in the consumer's credit history;

    c.  a statement that the consumer's credit score can affect whether the consumer can obtain credit and what the cost of that credit will be;

    d.  a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the report;

    e.  a statement that federal law gives the consumer the right to obtain copies of his or her consumer reports directly from the consumer reporting agencies, including a free report from each of the nationwide consumer reporting agencies once during any 12-month period;

    f.  contact information for the centralized source from which consumers may obtain their free annual consumer reports;

    g.  a statement directing consumers to the website of the CFPB to obtain more information about consumer reports;

    h.  the information required to be disclosed to the consumer in Section 609(g) of the FCRA, and as described in Module 3 of these examination procedures, under "Disclosure of Credit Scores by Certain Mortgage Lenders (FCRA), Section 609(g);" and

# CFPB Consumer
# Laws and Regulations                                    FCRA

   i.  the distribution of credit scores among consumers who are scored under the same scoring model that is used to generate the consumer's credit score. The distribution must:

   i.  use the same scale as that of the credit score provided to the consumer, and

   ii. be presented:

   - in the form of a bar graph containing a minimum of six bars that illustrates the percentage of consumers with credit scores within the range of scores reflected in each bar,

   - by other clear and readily understandable graphical means, or

   - in a clear and readily understandable statement informing the consumer how his or her credit score compares to the scores of other consumers.

   The presentation may use a graph or statement obtained from the entity providing the credit score if it meets these requirements.

Form of the notice. The 12 CFR 1022.74(d) notice must be:

   1. clear and conspicuous;

   2. provided on or with the notice required by Section 609(g) of the FCRA;

   3. segregated from other information provided to the consumer, except for the notice required by Section 609(g) of the FCRA; and

   4. provided to the consumer in writing and in a form that the consumer may keep.

Timing. The 12 CFR 1022.74(d) notice must be provided to the consumer at the same time as the disclosure required by Section 609(g) of the FCRA is provided to the consumer, which must be provided as soon as reasonably practicable after the credit score has been obtained. In any event, the 12 CFR 1022.74(d) notice must be provided at or before consummation in the case of closed-end credit or before the first transaction is made under an open-end credit plan.

Content of the notice when using multiple credit scores. When a person obtains two or more credit scores from consumer reporting agencies in setting material terms of credit, the content of the 12 CFR 1022.74(d) notice varies depending upon whether the person only relies upon *one* of the credit scores or relies upon *multiple* credit scores.

   1. If a person only relies upon one of those credit scores in setting the material terms of credit granted, extended, or otherwise provided to a consumer (for example, by using the low, middle, high, or most recent score), the notice must include that credit score and the other information required by 12 CFR 1022.74(d).

# CFPB Consumer
# Laws and Regulations                                      FCRA

2. If a person relies upon multiple credit scores in setting the material terms of credit
   granted, extended, or otherwise provided to a consumer (for example, by computing
   the average of all the credit scores obtained), the notice must include one of those
   credit scores and the other information required by 12 CFR 1022.74(d).

At the person's option, the notice may include more than one credit score, along with the
additional information required by 12 CFR 1022.74(d) for each credit score disclosed.

Examples.

1. A person uses consumer reports to set the material terms of mortgage credit granted,
   extended, or provided to consumers and regularly requests credit scores from several
   consumer reporting agencies. It relies upon the low score when determining the
   material terms it will offer to the consumer. The person must disclose the low score in
   the 12 CFR 1022.74(d) notice.

2. A person uses consumer reports to set the material terms of mortgage credit granted,
   extended, or provided to consumers and regularly requests credit scores from several
   consumer reporting agencies. The person takes an average of all of the credit scores
   obtained in order to determine the material terms it will offer to the consumer, and
   thus relies upon all of the credit scores that it receives. The person may choose one of
   these scores to include in the 12 CFR 1022.74(d) notice.

Model form. Appendix H-3 of the regulation contains a model form of the 12 CFR 1022.74(d)
notice that is consolidated with the notice required by Section 609(g) of the FCRA. While use of
the model form is optional, appropriate use of Model Form H-3 is deemed to comply with the
requirements of 12 CFR 1022.74(d).

*Section 1022.74(e) exception - credit score disclosure for loans not secured by residential real
property.* A person is not required to provide a risk-based pricing notice to a consumer under 12
CFR 1022.72(a) or (c) if:

1. the consumer requests from a person an extension of credit that is not or will not be
   secured by one to four units of residential real property; and

2. the person provides to each consumer that requests such an extension of credit a
   notice that contains the following:

   a. a statement that a consumer report (or credit report) is a record of the consumer's
      credit history and includes information about whether the consumer pays his or
      her obligations on time and how much the consumer owes to creditors;

   b. a statement that a credit score is a number that takes into account information in a
      consumer report and that a credit score can change over time to reflect changes in
      the consumer's credit history;

# CFPB Consumer
# Laws and Regulations                                    FCRA

c.  a statement that the consumer's credit score can affect whether the consumer can obtain credit and what the cost of that credit will be;

d.  a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the report;

e.  a statement that federal law gives the consumer the right to obtain copies of his or her consumer reports directly from the consumer reporting agencies, including a free report from each of the nationwide consumer reporting agencies once during any 12-month period;

f.  contact information for the centralized source from which consumers may obtain their free annual consumer reports;

g.  a statement directing consumers to the website of the CFPB to obtain more information about consumer reports;

h.  the current credit score of the consumer or the most recent credit score of the consumer that was previously calculated by the consumer reporting agency for a purpose related to the extension of credit;

i.  the distribution of credit scores among consumers who are scored under the same scoring model that is used to generate the consumer's credit score. The distribution must:

    i.  use the same scale as that of the credit score provided to the consumer; and

    ii.  be presented:

    - in the form of a bar graph containing a minimum of six bars that illustrates the percentage of consumers with credit scores within the range of scores reflected in each bar;

    - by other clear and readily understandable graphical means; or

    - in a clear and readily understandable statement informing the consumer how his or her credit score compares to the scores of other consumers.

    The presentation may use a graph or statement obtained from the entity providing the credit score if it meets these requirements.

j.  the range of possible credit scores under the model used to generate the credit score;

k.  the date on which the credit score was created; and

    the name of the consumer reporting agency or other person that provided the credit score.

# CFPB Consumer
# Laws and Regulations                                    FCRA

NOTE: Items a, b, c, d, e, f, g, and i for the 12 CFR 1022.74(e) notice are the same as items a, b, c, d, e, f, g, and i for the 12 CFR 1022.74(d) notice.

Form of the notice. The 12 CFR 1022.74(e) notice must be:

a.  clear and conspicuous;

b.  segregated from other information provided to the consumer; and

c.  provided to the consumer in writing and in a form that the consumer may keep.

Timing. The 12 CFR 1022.74(e) notice generally must be provided to the consumer as soon as reasonably practicable after the credit score has been obtained, but in any event at or before consummation in the case of closed-end credit or before the first transaction is made under an open-end credit plan. The notice may alternatively be provided in the following manner:

a.  For automobile lending transactions made through an auto dealer or other party that is unaffiliated with the person, such as a creditor, the person may provide a 12 CFR 1022.74(e) notice in the time periods described above. Alternatively, the creditor may arrange to have the auto dealer or other party provide a 12 CFR 1022.74(e) notice to the consumer on its behalf within these time periods and maintain reasonable policies and procedures to verify that the auto dealer provides the notice to the consumer within the applicable time periods. If the creditor arranges to have the auto dealer or other party provide a credit score disclosure exception notice, the creditor complies if the consumer receives a notice containing a credit score obtained by the dealer or other party, even if a different credit score is obtained and used by the creditor. 12 CFR 1022.73(c)(2))

b.  For credit that is granted under an open-end credit plan to a consumer in person or by telephone for contemporaneous purchase of goods or services, the 12 CFR 1022.74(e) notice may be provided at the earlier of:

   i.   the time of the first mailing to the consumer after the decision is made to approve the credit, such as in a mailing containing the account agreement or a credit card; or

   ii.  within 30 days after the decision to approve the credit

   (12 CFR 1022.73(c)(3)).

Multiple credit scores. When a person obtains two or more credit scores from consumer reporting agencies in setting material terms of credit, the content of the 12 CFR 1022.74(e) notice varies depending if the person relies upon only *one* of the credit scores or relies upon *multiple* credit scores. These disclosures requirements are the same as those for the 12 CFR 1022.74(d) notices, as described previously.

# CFPB Consumer
# Laws and Regulations                                        FCRA

Model form. Appendix H-4 of the regulation contains a model form of the 12 CFR 1022.74(e) notice. While use of the model form is optional, appropriate use of Model Form H-4 is deemed to comply with the requirements of 12 CFR 1022.74(e).

*Section 1022.74(f) exception - credit score not available.* A person is not required to provide a risk-based pricing notice to a consumer under 12 CFR 1022.72(a) or (c) if the person:

1.  regularly obtains credit scores from a consumer reporting agency and provides credit score disclosures to consumers in accordance with 12 CFR 1022.74(d) or (e), but a credit score is not available from the consumer reporting agency from which the person regularly obtains credit scores for a consumer to whom the person grants, extends, or provides credit;

2.  does not obtain a credit score from another consumer reporting agency in connection with granting, extending, or providing credit to the consumer; and

3.  provides to the consumer a notice that contains the following:

    a.  a statement that a consumer report (or credit report) includes information about the consumer's credit history and the type of information included in that history;

    b.  a statement that a credit score is a number that takes into account information in a consumer report and that a credit score can change over time in response to changes in the consumer's credit history;

    c.  a statement that credit scores are important because consumers with higher credit scores generally obtain more favorable credit terms;

    d.  a statement that not having a credit score can affect whether the consumer can obtain credit and what the cost of that credit will be;

    e.  a statement that a credit score about the consumer was not available from a consumer reporting agency, which must be identified by name, generally due to insufficient information regarding the consumer's credit history;

    f.  a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the consumer report;

    g.  a statement that federal law gives the consumer the right to obtain copies of his or her consumer reports directly from the consumer reporting agencies, including a free consumer report from each of the nationwide consumer reporting agencies once during any 12-month period;

    h.  the contact information for the centralized source from which consumers may obtain their free annual consumer reports; and

# CFPB Consumer
# Laws and Regulations                                    FCRA

i.  a statement directing consumers to the website of the CFPB to obtain more information about consumer reports.

NOTE: Items b, f, g, h, and i for the 12 CFR 1022.74(f) notice are the same as items b, f, g, h, and i for the 12 CFR 1022.74(d) and (e) notices.

Example. A person, such as a creditor, uses consumer reports to set the material terms of non-mortgage credit granted, extended, or provided to consumers and regularly requests credit scores from a particular consumer reporting agency. As required by 12 CFR 1022.74(e), the creditor provides those credit scores and additional information to consumers. The consumer reporting agency provides to the creditor a consumer report on a particular consumer that contains one trade line, but does _not_ provide the creditor with a credit score on that consumer. If the creditor does not obtain a credit score from _another_ consumer reporting agency and, based in whole or in part on information in a consumer report, grants, extends, or provides credit to the consumer, the creditor may provide the 12 CFR 1022.74(f) notice. If, however, the creditor obtains a credit score from another consumer reporting agency, the creditor may not rely upon the 12 CFR 1022.74(f) exception, but must satisfy the requirements of 12 CFR 1022.74(e).

Form of the notice. The 12 CFR 1022.74(f) notice must be:

1.  clear and conspicuous;

2.  segregated from other information provided to the consumer; and

3.  provided to the consumer in writing and in a form that the consumer may keep.

Timing. The 12 CFR 1022.74(f) notice generally must be provided to the consumer as soon as reasonably practicable after the person has requested the credit score, but in any event not later than consummation of a transaction in the case of closed-end credit or when the first transaction is made under an open-end credit plan. The notice may alternatively be provided in the following manner:

1.  For automobile lending transactions made through an auto dealer or other party that is unaffiliated with the person, such as a creditor, the creditor may provide a 12 CFR 1022.74(f) notice in the time periods described above. Alternatively, the creditor may arrange to have the auto dealer or other party provide a 12 CFR 1022.74(f) notice to the consumer on its behalf within these time periods and maintain reasonable policies and procedures to verify that the auto dealer provides the notice to the consumer within the applicable time periods.

2.  For credit that is granted under an open-end credit plan to a consumer in person or by telephone for contemporaneous purchase of goods or services, the Section 1022.74(f) notice may be provided at the earlier of:

# CFPB Consumer Laws and Regulations                    FCRA

a.  the time of the first mailing to the consumer after the decision is made to approve the credit, such as in a mailing containing the account agreement or a credit card; or

b.  within 30 days after the decision to approve the credit (12 CFR 1022.73(c)(3)).

Model form. Appendix H-5 of the regulation contains a model form of the 12 CFR 1022.74(f) notice. While use of the model form is optional, appropriate use of Model Form H-5 is deemed to comply with the requirements of 12 CFR 1022.74(f).

### Rules of Construction – 12 CFR 1022.75

The rules clarify that, in general, only one risk-based pricing notice or one credit score disclosure exception notice is required to be provided per credit extension (however, an account review would still be required, if applicable).

In a transaction involving two or more consumers who are granted, extended, or otherwise provided credit, a person must provide a risk-based pricing notice to each consumer. If the consumers have the same address, and the notice does not include a credit score(s), a person may satisfy the requirements by providing a single notice addressed to both consumers. However, if a notice includes a credit score(s), the person must provide a separate notice to each consumer whether the consumers have the same address or not. Each separate notice that includes a credit score(s) must contain only the credit score(s) of the consumer to whom the notice is provided, and not the credit score(s) of the other consumer. Similarly, for credit score disclosure exception notices, whether the consumers have the same address or not, the person must provide a separate notice to each consumer and each separate notice that includes a credit score(s) must contain only the credit score(s) of the consumer to whom the notice is provided.

A purchaser or assignee of a credit contract with a consumer is not subject to the risk-based pricing notice requirements.

### Appendix H

Appendix H contains seven optional model forms that may be used to comply with the regulatory requirements. The seven model forms are:

1.  H-1 Model form for risk-based pricing notice

2.  H-2 Model form for account review risk-based pricing notice

3.  H-3 Model form for credit score disclosure exception for credit secured by one to four units of residential real property

4.  H-4 Model form for credit score disclosure exception for loans not secured by residential real property

# CFPB Consumer
# Laws and Regulations                    FCRA

5.  H-5 Model form for credit score disclosure exception for loans where credit score is not available

6.  H-6 Model form for risk-based pricing notice with credit score information

7.  H-7 Model form for account review risk-based pricing notice with credit score information

Use of the model forms is not required. A person may change the forms by rearranging the format or by making technical modifications to the language of the forms. However, any change may not be so extensive as to materially affect the substance, clarity, comprehensibility, or meaningful sequence of the forms. Persons making such extensive revisions would lose the "safe harbor" that Appendix H provides. Examples of acceptable changes are provided in Appendix H to the regulation.

# CFPB Consumer Laws and Regulations                    FCRA

## Module 4 – Duties of Users of Consumer Reports and Furnishers of Consumer Report Information

### Overview

The FCRA contains many responsibilities for persons, such as financial institutions, that furnish information to consumer reporting agencies. These requirements generally involve ensuring the accuracy of the data that is placed in the consumer reporting system. This examination module includes reviews of the various areas associated with furnishers of information. This module will not apply to persons that do not furnish any information to consumer reporting agencies.

### Duties of Users of Credit Reports Regarding Address Discrepancies – Section 605(h); 15 U.S.C. 1681c(h); 12 CFR 1022.82

Section 605(h)(1) requires that, when providing a consumer report to a person that requests the report (a user), a nationwide consumer reporting agency (NCRA) must provide a notice of address discrepancy to the user if the address provided by the user in its request "substantially differs" from the address the NCRA has in the consumer's file. Section 605(h)(2) requires the federal banking agencies and the NCUA (the Agencies), and the FTC to prescribe regulations providing guidance regarding reasonable policies and procedures that a user of a consumer report should employ when such user has received a notice of address discrepancy. On November 9, 2007, the Agencies and the FTC published final rules in the Federal Register implementing this section (72 FR 63718). On December 21, 2011, the CFPB restated the FCRA regulations at 12 CFR Part 1022. (76 Fed. Reg. 79308).

### *Key Definitions*

***Nationwide consumer reporting agency (NCRA).*** Section 603(p) defines an NCRA as one that compiles and maintains files on consumers on a nationwide basis and regularly engages in the practice of assembling or evaluating and maintaining the following two pieces of information about consumers residing nationwide for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity:

1. public record information.

2. credit account information from persons who furnish that information regularly and in the ordinary course of business.

***Notice of address discrepancy (12 CFR 1022.82(b)).*** A "notice of address discrepancy" is a notice sent to a user by an NCRA (Section 603(p)) that informs the user of a substantial difference between the address for the consumer that the user provided to request the consumer report and the address(es) in the NCRA's file for the consumer.

# CFPB Consumer
# Laws and Regulations                                        **FCRA**

***Requirement to form a reasonable belief – 12 CFR 1022.82(c)***

A user must develop and implement reasonable policies and procedures designed to enable the user to form a reasonable belief that the consumer report relates to the consumer whose report was requested, when the user receives a notice of address discrepancy in connection with a new or existing account.

The rules provide the following examples of reasonable policies and procedures for forming a reasonable belief that a consumer report relates to the consumer whose report was requested:

1. comparing information in the consumer report with information the user:

   a. has obtained and used to verify the consumer's identity as required by the Customer Identification Program rules (31 CFR 1020.220);

   b. maintains in its records; or

   c. obtains from a third party; or

2. verifying the information in the consumer report with the consumer.

***Requirement to furnish a consumer's address to an NCRA – 12 CFR 1022.82(d)***

A user must develop and implement reasonable policies and procedures for furnishing to the NCRA an address for the consumer that the user has reasonably confirmed is accurate when the user does the following:

1. forms a reasonable belief that the report relates to the consumer whose report was requested;

2. establishes a continuing relationship with the consumer (i.e., in connection with a new account); and

3. regularly, and in the ordinary course of business, furnishes information to the NCRA that provided the notice of address discrepancy.

A user's policies and procedures for furnishing a consumer's address to an NCRA must require the user to furnish the confirmed address as part of the information it regularly furnishes to the NCRA during the reporting period when it establishes a continuing relationship with the consumer.

# CFPB Consumer
# Laws and Regulations                                    FCRA

The rules also provide the following examples of how a user may reasonably confirm an address is accurate:

1.  verifying the address with the consumer whose report was requested;

2.  reviewing its own records;

3.  verifying the address through third-party sources; or

4.  using other reasonable means.

## Furnishers of Information: General — Section 623(e); 15 U.S.C. 1681s-2; 12 CFR 1022, Subpart E

Section 623(e) required the Agencies and the Federal Trade Commission (FTC) to:

1.  issue guidelines for use by furnishers regarding the accuracy and integrity of the information about consumers that they furnish to consumer reporting agencies;

2.  prescribe regulations requiring furnishers to establish reasonable policies and procedures for implementing the guidelines; and

3.  issue regulations identifying the circumstances under which a furnisher must reinvestigate disputes concerning the accuracy of information contained in a consumer report based on a direct request from a consumer.

The Agencies and the FTC published final rules in the Federal Register (74 FR 31484) implementing this section of FCRA. These rules took effect July 1, 2010. On December 21, 2011, the CFPB restated the FCRA regulations at 12 CFR Part 1022. (76 Fed Reg 79308).

### Key Definitions — 12 CFR 1022.41

The following definitions pertain to the rules governing the furnishers of information to a consumer reporting agency:

*Accuracy* means that the information a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly:

1.  reflects the terms of and liability for the account or other relationship;

2.  reflects the consumer's performance and other conduct with respect to the account or other relationship; and

3.  identifies the appropriate consumer.

*Direct dispute* means a dispute submitted by a consumer directly to a furnisher (including a furnisher that is a debt collector) concerning the accuracy of any information contained in a consumer report and pertaining to an account or other relationship that the furnisher has or had with the consumer.

# CFPB Consumer
# Laws and Regulations                                                   FCRA

*Furnisher* means an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. An entity is not a furnisher when it:

1. provides information to a consumer reporting agency solely to obtain a consumer report in accordance with the permissible purposes outlined in Sections 604(a) and (f) of the FCRA;

2. is acting as a "consumer reporting agency" as defined in Section 603(f) of the FCRA;

3. is a consumer to whom the furnished information pertains; or

4. is a neighbor, friend, or associate of the consumer, or another individual with whom the consumer is acquainted or who may have knowledge about the consumer, and who provides information about the consumer's character, general reputation, personal characteristics, or mode of living in response to a specific request from a consumer reporting agency.

*Identifying information* means any name or number that may be used alone or in conjunction with any other information to identify a specific person.

*Identity theft* means a fraud committed or attempted using the identifying information of another person without authority.

*Integrity* means that the information a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer:

1. is substantiated by the furnisher's records at the time it is furnished;

2. is furnished in a form and manner that is designed to minimize the likelihood that the information may be incorrectly reflected in a consumer report; and

3. includes the information in the furnisher's possession about the account or other relationship that:

   a. the relevant Agency has determined that the absence of which would likely be materially misleading in evaluating a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living; and

   b. is specified in the Interagency Guidelines Concerning the Accuracy and Integrity of Information Furnished to Consumer Reporting Agencies (FCRA rule, Appendix E). Currently, the Guidelines specify the credit limit, if applicable and in the furnisher's possession.

# CFPB Consumer
# Laws and Regulations                                    FCRA

*Duties of Furnishers to Provide Accurate Information –*
*Section 623(a); 15 U.S.C. 1681s-2(a)*

Section 623(a) states that a person, including a financial institution, may, but need not, specify an address for receipt of notices from consumers concerning inaccurate information. If the person specifies such an address, then it may not furnish information relating to a consumer to any consumer reporting agency, if (a) the consumer notified the person, at the specified address, that the information is inaccurate, and (b) the information is inaccurate. If the person does not specify an address, then it may not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.

When a person that (regularly and in the ordinary course of business) furnishes information to one or more consumer reporting agencies about its transactions or experiences with any consumer determines that any such information is not complete or accurate, the person must promptly notify the consumer reporting agency of that determination. The person must provide corrections to that information or any additional information necessary to make the information complete and accurate to the consumer reporting agency. Further, the person thereafter must not furnish any information that remains incomplete or inaccurate to the consumer reporting agency.

If a consumer disputes the completeness or accuracy of any information a person furnishes to a consumer reporting agency, that person may not furnish the information to any consumer reporting agency without notice that the consumer disputes the information.

*Reasonable policies and procedures concerning the accuracy and integrity of*
*furnished information (12 CFR 1022.42) and Interagency Guidelines (Appendix E)*

Each furnisher must establish and implement reasonable written policies and procedures regarding the accuracy and integrity of consumer information that it furnishes to a consumer reporting agency. The policies and procedures must be appropriate to the nature, size, complexity, and scope of each furnisher's activities. In developing its policies and procedures, a furnisher must consider the Interagency Guidelines and may include its existing policies and procedures that are relevant and appropriate. Each furnisher must also review its policies and procedures periodically and update them as necessary to ensure their continued effectiveness. The guideline's recommendations include the following:

1. using standard data reporting formats and standard procedures for compiling and furnishing data, where feasible, such as electronic transmission of information about consumers to consumer reporting agencies;

2. maintaining records for a reasonable period of time, not less than any applicable recordkeeping requirement, in order to substantiate the accuracy of any information furnished about consumers to consumer reporting agencies that is subject to a direct disputer; and

3. training staff that participates in activities related to the furnishing of information about consumers to consumer reporting agencies.

# CFPB Consumer
# Laws and Regulations                                    **FCRA**

## Voluntary closures of accounts – Section 623(a)(4); 15 U.S.C. 1681s-2(a)(4)

This section requires a person, including a financial institution, who regularly and in the ordinary course of business furnishes information to a consumer reporting agency regarding one of its consumer credit accountholders, to notify the consumer reporting agency of the consumer's voluntary account closure. This notice is to be furnished to the consumer reporting agency as part of the regularly furnished information for the period in which the account is closed.

## Notice involving delinquent accounts – Section 623(a)(5); 15 U.S.C. 1681s-2(a)(5)

This section requires that a person, including a financial institution, that furnishes information to a consumer reporting agency about a delinquent account placed for collection, charged off, or subjected to any similar action, must, not later than 90 days after furnishing the information to the consumer reporting agency, notify the consumer reporting agency of the month and year of the commencement of the delinquency that immediately preceded the action.

## Duties upon notice of dispute from a consumer reporting agency – Section 623(b); 15 U.S.C. 1681s-2(b)

This section requires that whenever a person, such as a financial institution, receives a notice of dispute from a consumer reporting agency regarding the accuracy or completeness of any information the person provided to a consumer reporting agency pursuant to Section 611 (Procedure in Case of Disputed Accuracy), that person must, pursuant to Section 623(b):

1. conduct an investigation regarding the disputed information;

2. review all relevant information the consumer reporting agency provided along with the notice;

3. report the results of the investigation to the consumer reporting agency;

4. if the investigation finds the information is incomplete or inaccurate, report those results to all nationwide consumer reporting agencies to which the financial institution previously provided the information; and

5. if the disputed information is incomplete, inaccurate, or not verifiable by the person, it must promptly, for purposes of reporting to the consumer reporting agency do one of the following:

   a. modify the item of information.

   b. delete the item of information.

   c. permanently block the reporting of that item of information.

# CFPB Consumer
# Laws and Regulations

**FCRA**

The person must complete the required investigations, reviews, and reports within 30 days. The person may extend the time period for 15 days if a consumer reporting agency receives additional relevant information from the consumer.

## Duties upon notice of dispute from a consumer (direct disputes) — Section 623(a)(8); 15 U.S.C. 1681s-2(a)(8); 12 CFR 1022.43

*General rule.* A furnisher must conduct a reasonable investigation of a direct dispute (unless exceptions, described later, apply) if the dispute relates to:

1. the consumer's liability for a credit account or other debt with the furnisher, such as direct disputes relating to whether there is or has been identity theft or fraud against the consumer, whether there is individual or joint liability on an account, or whether the consumer is an authorized user of a credit account;

2. the terms of a credit account or other debt with the furnisher, such as, direct disputes relating to the type of account, principal balance, scheduled payment amount on an account, or the amount of the credit limit on an open-end account;

3. the consumer's performance or other conduct concerning an account or other relationship with the furnisher such as, direct disputes relating to the current payment status, high balance, payment date, the payment amount, or the date an account was opened or closed; or

4. any other information contained in a consumer report regarding an account or other relationship with the furnisher that bears on the consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.

*Exceptions.* The direct dispute requirements do <u>not</u> apply to a furnisher if the direct dispute relates to:

1. the consumer's identifying information such as name(s), date of birth, Social Security number, telephone number(s), or address(es);

2. the identity of past or present employers;

3. inquiries or requests for a consumer report;

4. information derived from public records, such as judgments, bankruptcies, liens, and other legal matters (unless the information was provided by a furnisher with an account or other relationship with the consumer);

5. information related to fraud alerts or active duty alerts; or

6. information provided to a consumer reporting agency by another furnisher.

# CFPB Consumer
# Laws and Regulations                                    FCRA

The direct dispute requirements also do not apply if the furnisher has a reasonable belief that the direct dispute is:

1. submitted by a credit repair organization;

2. is prepared on behalf of the consumer by a credit repair organization; or

3. is submitted on a form supplied to the consumer by a credit repair organization.

*Direct Dispute Address.* A furnisher is required to investigate a direct dispute <u>only</u> if a consumer submits a dispute notice to the furnisher at:

1. the address provided by a furnisher and listed on a consumer report relating to the consumer;

2. an address clearly and conspicuously specified by the furnisher that is provided to the consumer in writing or electronically (if the consumer has agreed to the electronic delivery of information from the furnisher); or

3. any business address of the furnisher if the furnisher has not provided a specific address for submitting direct disputes.

*Direct Dispute Notice Contents.* A dispute notice from a consumer must include:

1. sufficient information to identify the account or other relationship that is in dispute, such as an account number and the name, address, and telephone number of the consumer;

2. the specific information that the consumer is disputing and an explanation of the basis for the dispute; and

3. all supporting documentation or other information reasonably required by the furnisher to substantiate the basis of the dispute. This documentation may include, for example, a copy of the relevant portion of the consumer report that contains the allegedly inaccurate information; a police report; a fraud or identity theft affidavit; a court order; or account statements.

*Duties of a Furnisher after Receiving a Direct Dispute Notice from a Consumer.* After receiving a dispute notice from a consumer, the furnisher must:

1. conduct a reasonable investigation with respect to the disputed information;

2. review all relevant information provided by the consumer with the dispute notice;

3. complete its investigation of the dispute and report the results of the investigation to the consumer before the expiration of the period under Section 611(a)(1) of the FCRA (15 U.S.C. 1681i(a)(1)) within which a consumer reporting agency would be

# CFPB Consumer
# Laws and Regulations                                    **FCRA**

required to complete its action if the consumer had elected to dispute the information under that section; and

4. if the investigation finds that the information reported was inaccurate, promptly notify each consumer reporting agency to which the furnisher provided inaccurate information of investigation findings and provide to the consumer reporting agency any correction to that information that is necessary to make the information provided by the furnisher accurate.

*Frivolous or Irrelevant Disputes.* A furnisher is <u>not</u> required to investigate a direct dispute if the furnisher has reasonably determined that the dispute is frivolous or irrelevant. A dispute qualifies as frivolous or irrelevant if:

1. the consumer did not provide sufficient information to investigate the disputed information;

2. the direct dispute is substantially the same as a dispute previously submitted by or on behalf of the consumer and the dispute is one with respect to which the furnisher has already complied with the statutory or regulatory requirements. However, a direct dispute would not be "substantially the same" as the one previously submitted if the dispute includes new information required by the regulation to be provided to the furnisher, but that had not previously been provided to the furnisher; or

3. the furnisher is not required to investigate the direct dispute because one or more of the exceptions listed in 12 CFR 1022.43(b) applies.

Upon making a determination that a dispute is frivolous or irrelevant, the furnisher must notify the consumer of the determination not later than five business days after making the determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the furnisher. The furnisher's notice that a dispute is frivolous or irrelevant must include the reasons for such determination and identify any information required to investigate the disputed information. The notice may consist of a standardized form describing the general nature of such information.

## Prevention of Re-Pollution of Consumer Reports — Section 623(a)(6); 15 U.S.C. 1681s-2(a)(6)

Section 623(a) has specific requirements for furnishers of information, including financial institutions, to a consumer reporting agency that received notice from a consumer reporting agency that furnished information may be fraudulent as a result of identity theft. Section 605B, Block of Information Resulting From Identity Theft, requires consumer reporting agencies to notify furnishers of information, including financial institutions, that the information may be the result of identity theft, an identity theft report has been filed, and that a block has been requested. Upon receiving such notice, Section 623(a)(6) requires furnishers to establish and follow reasonable procedures to ensure that it does not re-report this information to the consumer reporting agency, thus "re-polluting" the victim's consumer report.

# CFPB Consumer
# Laws and Regulations                                    FCRA

Section 615(f), Prohibition on Sale or Transfer of Debt Caused by Identity Theft, also prohibits a furnisher from selling or transferring debt caused by an alleged identity theft.

## Negative Information Notice – Section 623(a)(7); 15 U.S.C. 1681s-2(a)(7); 12 CFR 1022.1(b)(2)(ii)

Section 623(a)(7) requires a financial institution to provide consumers with a notice either before it provides negative information to a nationwide consumer reporting agency, or within 30 days after reporting the negative information.

Institutions may provide this disclosure on or with any notice of default, any billing statement, or any other materials provided to the customer, as long as the notice is clear and conspicuous. Institutions may also choose to provide this notice to all customers as an abundance of caution. However, financial institutions may not include this notice in the initial disclosures provided under Section 127(a) of the Truth in Lending Act.

### Key Definitions

***Negative information.*** For these purposes, "negative information" means any information concerning a customer's delinquencies, late payments, insolvency, or any form of default.

***Nationwide consumer reporting agency.*** Section 603(p) of the FCRA defines a "nationwide consumer reporting agency" as a:

> consumer reporting agency that compiles and maintains files on consumers on a nationwide basis.

It defines this type of consumer reporting agency as one that regularly assembles or evaluates, and maintains, each of the following regarding consumers residing nationwide for the purpose of furnishing consumer reports to third parties bearing on a consumer's creditworthiness, credit standing, or credit capacity:

1. public record information.

2. credit account information from persons who furnish that information regularly and in the ordinary course of business.

# CFPB Consumer
# Laws and Regulations                                    FCRA

---

*Model text*

Institutions may use the following model text to comply with these requirements. The first model contains text an institution can use when it provides a notice before furnishing negative information. The second model form contains text to use when an institution provides notice within 30 days after reporting negative information:

- *Notice prior to communicating negative information (Model B-1):*

    "We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report."

- *Notice within 30 days after communicating negative information (Model B-2):*

    "We have told a credit bureau about a late payment, missed payment, or other default on your account. This information may be reflected in your credit report."

Use of the model form(s) is not required; however, proper use of the model forms provides a financial institution with a safe harbor from liability. A financial institution may make certain changes to the language or format of the model notices without losing the safe harbor from liability provided by the model notices. The changes to the model notices may not be so extensive as to affect the substance, clarity, or meaningful sequence of the language in the model notices. A financial institution making extensive revisions will lose the safe harbor from liability that the model notices provide. Acceptable changes include:

1. rearranging the order of the references to "late payment(s)," or "missed payment(s)."

2. pluralizing the terms "credit bureau," "credit report," and "account."

3. specifying the particular type of account on which it may furnish information, such as "credit card account."

4. rearranging in Model Notice B-1 the phrases "information about your account" and "to credit bureaus" such that it would read, "We may report to credit bureaus information about your account."

---

# CFPB Consumer Laws and Regulations

# FCRA

## Module 5 – Consumer Alerts and Identity Theft Protections

### Overview

The FCRA contains several provisions for both consumer reporting agencies and users of consumer reports, including financial institutions, that are designed to help combat identity theft. This module applies to persons that are not consumer reporting agencies, but are users of consumer reports.

Two primary requirements exist for users of consumer reports: first, a user of a consumer report that contains a fraud or active duty alert must take steps to verify the identity of an individual to whom the consumer report relates, and second, a person must disclose certain information when consumers allege that they are the victims of identity theft.

### Fraud and Active Duty Alerts – Section 605A(h); 15 U.S.C. 1681c-1(h)

#### Initial Fraud and Active Duty Alerts

Consumers who suspect that they may be the victims of fraud including identity theft may request nationwide consumer reporting agencies to place initial fraud alerts in their consumer reports. These alerts must remain in a consumer's report for no less than 90 days. In addition, members of the armed services who are called to active duty may also request that active duty alerts be placed in their consumer reports. Active duty alerts must remain in these service members' files for no less than 12 months.

Section 605A(h)(1)(B), Limitations on Use of Information for Credit Extensions, requires users of consumer reports, including financial institutions, to verify a consumer's identity if a consumer report includes a fraud or active duty alert. Unless the user of the consumer report uses reasonable policies and procedures to form a reasonable belief that it knows the identity of the person making the request, the user may not:

1. establish a new credit plan or extension credit (other than under an open-end credit plan) in the name of the consumer;

2. issue an additional card on an existing account; or

3. increase a credit limit.

#### Extended Alerts

Consumers who allege that they are the victim of an identity theft may also place an extended alert, which lasts seven years, on their consumer report. Extended alerts require consumers to submit identity theft reports and appropriate proof of identity to the nationwide consumer reporting agencies.

Section 605A(h)(2)(B), Limitation on Users, requires a user that obtains a consumer report that contains an extended alert to contact the consumer in person or by the method the consumer lists in the alert prior to performing any of the three actions listed above.

# CFPB Consumer Laws and Regulations

# FCRA

## Information Available to Victims – Section 609(e); 15 U.S.C. 1681g(e)

Section 609(e) requires a person, such as a financial institution, to provide records of fraudulent transactions to victims of identity theft within 30 days after the receipt of a request for the records. These records include the application and business transaction records under the control of the person whether maintained by the person itself or another person on behalf of the institution (such as a service provider).

The person should provide this information to any of the following:

1. the victim;

2. any federal, state, or local government law enforcement agency or officer specified by the victim in the request; or

3. any law enforcement agency investigating the identity theft that was authorized by the victim to take receipt of these records.

The victim must make the request for the records in writing and send it to the person at the address specified by the person for this purpose. The person may ask the victim to provide information, if known, regarding the date of the transaction or application, and any other identifying information such as an account or transaction number.

Unless the person has a high degree of confidence that it knows the identity of the victim making the request for information, the person must take prudent steps to positively identify the person before disclosing any information. Proof of identity can include any of the following:

1. a government-issued identification card;

2. personally identifying information of the same type that was provided to the person by the unauthorized person; or

3. personally identifying information that the person typically requests from new applicants or for new transactions.

At the election of the person, the victim must also provide the person with proof of an identity theft complaint, which may consist of a copy of a police report evidencing the claim of identity theft and a copy of a properly completed affidavit. The CFPB's Identity Theft Affidavit is available on the CFPB's website (consumerfinance.gov/learnmore). The version of this form developed by the FTC and available on the FTC's Website (ftc.gov/idtheft) remains valid and sufficient for this purpose (12 CFR 1022.3(i)(3)(ii)).

# CFPB Consumer
# Laws and Regulations                                    FCRA

When these conditions are met, the person must provide the information at no charge to the victim. However, the person is not required to provide any information if, acting in good faith, the person determines any of the following:

1. section 609(e) does not require disclosure of the information;

2. the person does not have a high degree of confidence in knowing the true identity of the requestor, based on the identification and/or proof provided;

3. the request for information is based on a misrepresentation of fact by the requestor; or

4. the information requested is Internet navigational data or similar information about a person's visit to a website or online service.

## Duties Regarding the Detection, Prevention, and Mitigation of Identity Theft — Section 615(e); 15 U.S.C. 1681m(e)

Section 615(e) requires the federal banking agencies and the NCUA (the Agencies) as well as the FTC to prescribe regulations and guidelines for entities under their enforcement authority regarding the detection, prevention, and mitigation of identity theft. On November 9, 2007, the Agencies published final rules and guidelines in the Federal Register implementing this section (72 FR 63718). The Agencies also have issued examination procedures for the implementing regulations. CFPB examiners are not expected to examine for compliance with Section 615(e)). If CFPB examiners become aware of potential issues in this area, the appropriate federal regulator should be notified.

## Duties of Card Issuers Regarding Changes of Address — Section 615(e); 15 U.S.C. 1681m(e)

Section 615(e)(1)(C) requires the Agencies and the FTC to prescribe regulations for debit and credit card issuers regarding the assessment of the validity of address changes for existing accounts. On November 9, 2007, the Agencies and the FTC published final rules in the Federal Register implementing this section (72 FR 63718). The regulations require card issuers to have procedures to assess the validity of an address change if the card issuer receives a notice of change of address for an existing account, and within a short period of time (during at least the first 30 days), receives a request for an additional or replacement card for the same account. The Agencies also have issued examination procedures for the implementing regulations. CFPB examiners are not expected to examine for compliance with Section 615(e)). If CFPB examiners become aware of potential issues in this area, the appropriate federal regulator should be notified.

## Disposal of Consumer Information — Section 628; 15 U.S.C. 1681w

Section 628 requires the federal banking agencies to prescribe regulations for entities under their enforcement authority regarding the proper disposal of consumer information. On December 28, 2004, the federal banking agencies published final rules and guidelines in the Federal Register implementing this section (69 FR 77610). The agencies also have issued examination procedures for the implementing regulations. CFPB examiners are not expected to examine for compliance

# CFPB Consumer
# Laws and Regulations                                     FCRA

with Section 628. If CFPB examiners become aware of potential issues in this area, the appropriate federal regulator should be notified.


# REFERENCES

## Laws

15 U.S.C. 1681 et seq.          Fair Credit Reporting Act

## Regulations

### Consumer Financial Protection Bureau Regulation (12 CFR)

Part 1022                        Fair Credit Reporting (Regulation V)

**CFPB**

## Examination Procedures                                    **FCRA**

# Fair Credit Reporting Act

## Examination Objectives[1] [2]

- To determine the covered entity's compliance with the Fair Credit Reporting Act (FCRA) and implementing regulations.

- To assess the quality of the covered entity's compliance risk management system to ensure compliance with the FCRA, as amended.

- To determine the reliance that can be placed on the covered entity's internal controls and procedures for monitoring the entity's compliance with the FCRA.

- To direct corrective action when violations of law are identified, or when the covered entity's policies or internal controls are deficient.

## Initial Examination Procedures

The initial examination procedures are designed to acquaint examiners with the operations and processes of the entity being examined. They focus on the entity's systems, controls, policies, and procedures, including audits and previous examination findings.

The applicability of the various sections of the FCRA and the implementing regulations depends on an entity's unique operations. The functional examination requirements are presented topically in modules 1 through 5.

Initially, examiners should:

1. Through discussions with management and review of available information, determine if the entity's internal controls are adequate to ensure compliance in the FCRA area under review. Consider the following:

   a. organization charts;

   b. process flowcharts;

   c. policies and procedures;

   d. loan documentation;

   e. checklists;

---

[1] These reflect FFIEC-approved procedures.

[2] These procedures do not currently contain a module on the requirements for consumer reporting agencies.

**CFPB**

**Examination Procedures**                                                    **FCRA**

---

    f.  computer program documentation (for example, records illustrating the fields and types of data reported to consumer reporting agencies; automated records tracking customer opt-outs for FCRA affiliate information sharing; etc.).

2.  Review any compliance audit material, including workpapers and reports, to determine whether:

    a.  the scope of the audit addresses all provisions as applicable;

    b.  corrective actions were taken to follow up on previously identified deficiencies;

    c.  the testing includes samples covering all product types and decision centers;

    d.  the work performed is accurate;

    e.  significant deficiencies and their causes are included in reports to management and/or to the board of directors; and

    f.  the frequency of review is appropriate.

3.  Review the entity's training materials to determine whether:

    a.  appropriate training is provided to individuals responsible for FCRA compliance and operational procedures; and

    b.  the training is comprehensive and covers the various aspects of the FCRA that apply to the individual entity's operations.

4.  Through discussions with management, determine which portions of the examination modules will apply.

5.  Complete appropriate examination modules; document and form conclusions regarding the quality of the entity's compliance management systems and compliance with FCRA.

---

# CFPB
# Examination Procedures                                    FCRA

## Module 1 – Obtaining Consumer Reports

**Permissible Purposes of Consumer Reports – Section 604; 15 U.S.C. 1681b**
**Investigative Consumer Reports – Section 606; 15 U.S.C. 1681d**

1.  Determine whether the entity obtains consumer reports.

2.  Determine whether the entity obtains prescreened consumer reports and/or reports for employment purposes. If so, complete the appropriate sections of Module 3.

3.  Determine whether the entity procures or causes an investigative consumer report to be prepared. If so, ensure that the appropriate disclosure is given to the consumer within the required time period. In addition, ensure that the entity certified compliance with the disclosure requirements to the consumer reporting agency.

4.  Ensure that the entity obtains consumer reports only for permissible purposes. Confirm that the entity certifies to the consumer reporting agency the purposes for which it will obtain reports. (The certification is usually contained in an entity's contract with the consumer reporting agency.)

5.  If procedural weaknesses are noted or other risks requiring further investigation are noted, such as the receipt of several consumer complaints, review a sample of consumer reports obtained from a consumer reporting agency and determine whether the entity had permissible purposes to obtain the reports.  For example,

    - obtain a copy of a billing statement or other list of consumer reports obtained by the entity from the consumer reporting agency for a period of time; and

    - compare this list, or a sample from this list to the entity's records to ensure that there is a permissible purpose for the report(s) obtained. This could include any permissible purpose, such as the consumer applied for credit, insurance, or employment, etc. The entity may also obtain a report in connection with the review of an existing account.

CFPB

**Examination Procedures**                                          **FCRA**

## Module 2 – Obtaining Information and Sharing Among Affiliates

**Consumer Report and Information Sharing – Section 603(d); 15 U.S.C. 1681a(d)**

1. Review the entity's policies, procedures, and practices concerning the sharing of consumer information with third parties, including both affiliated and nonaffiliated third parties. Determine the type of information shared and with whom the information is shared. (This portion of the examination process may overlap with a review of the entity's compliance with the Privacy of Consumer Financial Information Regulations that implement the Gramm-Leach-Bliley Act (GLBA).

2. Determine whether the entity's information sharing practices fall within the exceptions to the definition of a consumer report. If they do not, the entity could be considered a consumer reporting agency and subject to the FCRA requirements for consumer reporting agencies.

3. If the entity shares information other than transaction and experience information with affiliates subject to opt-out provisions, determine whether the entity's GLBA privacy notice contains tinformation regarding how to opt out, as required by the Privacy of Consumer Financial Information regulations.

4. If procedural weaknesses or other risks requiring further investigation are noted, obtain a sample of opt-out rights exercised by consumers and determine if the entity honored the opt-out requests by not sharing "other information" about the consumers with the entity's affiliates subsequent to receiving a consumer's opt-out direction.

**Protection of Medical Information – Section 604(g); 15 U.S.C. 1681b(g); 12 CFR 1022, Subpart D**

1. Review the entity's policies, procedures, and practices concerning the collection and use of consumer medical information in connection with any determination of the consumer's eligibility, or continued eligibility for credit.

2. If the entity's policies, procedures, and practices allow for obtaining and using consumer medical information in the context of a credit transaction, determine whether there are adequate controls in place to ensure that the information is only used subject to the financial information exception in the rules, or under a specific exception within the rules.

3. If procedural weaknesses or other risks requiring further investigation are noted, obtain samples of credit transactions to determine whether the use of medical information pertaining to a consumer was done strictly under the financial information exception or the specific exceptions under the regulation.

4. Determine whether the entity has adequate policies and procedures in place to limit the redisclosure of consumer medical information that was received from a consumer reporting agency or an affiliate.

**CFPB**

**Examination Procedures** **FCRA**

5. Determine whether the entity shares medical information about a consumer with affiliates. If it does, determine whether the sharing occurred in accordance with an exception in the rules that enables the entity to share the information without becoming a consumer reporting agency.

### Affiliate Marketing Opt Out — Section 624; 15 U.S.C. 1681s-3; 12 CFR 1022 Subpart C

1. Determine whether the entity receives consumer eligibility information from an affiliate. Stop here if it does not because Subpart C of 12 CFR 1022 does not apply.

2. Determine whether the entity uses consumer eligibility information received from an affiliate to make a solicitation for marketing purposes that is subject to the notice and opt-out requirements. If it does not, stop here.

3. Evaluate the entity's policies, procedures, practices and internal controls to ensure that, where applicable, the consumer is provided with an appropriate notice, a reasonable opportunity, and a reasonable and simple method to opt out of the entity's using eligibility information to make solicitations for marketing purposes to the consumer, and that the entity is honoring the consumer's opt-outs.

4. If compliance risk management weaknesses or other risks requiring further investigation are noted, obtain and review a sample of notices to ensure technical compliance and a sample of opt-out requests from consumers to determine if the entity is honoring the opt-out requests.

    a. Determine whether the opt-out notices are clear, conspicuous, and concise and contain the required information, including the name of the affiliate(s) providing the notice, a general description of the types of eligibility information that may be used to make solicitations to the consumer, and the duration of the opt out (12 CFR 1022.23(a)).

    b. Review opt-out notices that are coordinated and consolidated with any other notice or disclosure that is required under other provisions of law for compliance with the affiliate marketing regulation (12 CFR 1022.23(b)).

    c. Determine whether the opt-out notices and renewal notices provide the consumer a reasonable opportunity to opt out and a reasonable and simple method to opt out (12 CFR 1022.24 and .25).

    d. Determine whether the opt-out notice and renewal notice are provided (by mail, delivery or electronically) so that a consumer can reasonably be expected to receive that actual notice (12 CFR 1022.26).

    e. Determine whether, after an opt-out period expires, an entity provides a consumer a renewal notice prior to making solicitations based on eligibility information received from an affiliate (12 CFR 1022.27).

**CFPB**

**Examination Procedures**                                            **FCRA**

## Module 3 – Disclosures to Consumers and Miscellaneous Requirements

### Use of Consumer Reports for Employment Purposes – Section 604(b); 15 U.S.C. 1681b(b)

1. Determine if the entity obtains consumer reports on current or prospective employees.

2. Assess the entity's policies and procedures to determine if appropriate disclosures are provided to current and prospective employees when an entity obtains consumer reports for employment purposes, including situations where the entity takes adverse actions based on consumer report information.

3. If procedural weaknesses or other risks requiring further investigation are noted, review a sample of the disclosures to determine if they are accurate and in compliance with the technical FCRA requirements.

### Prescreened Consumer Reports and Opt-Out Notice – Sections 604(c) and 615(d); 15 U.S.C. 1681b(c) and 15 U.S.C. 1681m(d) 12 CFR 1022.54

1. Determine whether the entity obtained and used prescreened consumer reports in connection with offers of credit and/or insurance.

2. Evaluate the entity's policies and procedures to determine if a list of the criteria used for prescreened offers, including all post-application criteria, is maintained in the entity's files and the criteria are applied consistently when consumers respond to the offers.

3. Determine if written solicitations contain the required disclosures of the consumers' right to opt-out of prescreened solicitations and comply with all requirements applicable at the time of the offer.

4. If procedural weaknesses or other risks requiring further investigation are noted, obtain and review a sample of approved and denied responses to the offers to ensure that criteria were appropriately followed.

### Truncation of Credit and Debit Card Account Numbers – Sections 605(g); 15 U.S.C. 1681c(g)

1. Determine whether the entity's policies and procedures ensure that electronically generated receipts from automated teller machines and point-of-sale terminals or other machines do not contain more than the last five digits of the card number and do not contain the expiration dates.

2. If procedural weaknesses or other risks requiring further investigation are noted, review samples of actual receipts to ensure compliance.

**CFPB**

**Examination Procedures**                                    **FCRA**

---

### Disclosure of Credit Scores by Certain Mortgage Lenders — Sections 609(g); 15 U.S.C. 1681g(g)

1. Determine if the entity uses credit scores in connection with applications for closed-end or open-end loans secured by one- to four-family residential real property.

2. Evaluate the entity's policies and procedures to determine whether accurate disclosures are provided to applicants as soon as is reasonably practicable after using credit scores.

3. If procedural weaknesses or other risks requiring further investigation are noted, review a sample of disclosures given to home loan applicants to determine technical compliance with the requirements.

### Adverse Action Disclosures — Sections 615(a) and (b); 15 U.S.C. 1681m(a) and (b)

1. Determine whether the policies and procedures adequately ensure that the creditor or other person provides the appropriate disclosures, including the consumer's credit score as appropriate, when it takes adverse action against consumers based in whole or in part on information contained in a consumer report or specified information received from third parties, including affiliates.

2. Review the policies and procedures of the creditor or other person for responding to requests for information in response to these adverse action notices.

3. If procedural weaknesses or other risks requiring further investigation are noted, review a sample of adverse action notices to determine if they are accurate and in technical compliance.

### Debt Collector Communications Concerning Identity Theft — Sections 615(g); 15 U.S.C. 1681m(g)

1. Determine whether the entity collects debts for third parties.

2. Determine whether the entity has policies and procedures to ensure that the third parties are notified if the entity obtains any information that may indicate that the debt in question is the result of fraud or identity theft.

3. Determine if the entity has effective policies and procedures for providing information to consumers to whom the fraudulent debts relate.

4. If procedural weaknesses or other risks requiring further investigation are noted, review a sample of instances where consumers have alleged identity theft and requested information related to transactions to determine if all of the appropriate information was provided to the consumer.

---

# CFPB
# Examination Procedures                                    FCRA

**Risk-Based Pricing Notice – Section 615(h); 15 U.S.C. 1681m(h); 12 CFR 1022, Subpart H**

1. Determine whether the creditor (or other person) uses consumer report information in consumer credit decisions.

   If yes, determine whether the creditor uses such information to provide credit on terms that are "materially less favorable" than the most favorable material terms available to a substantial proportion of its consumers. Relevant factors in determining the significance of differences in the cost of credit include the type of credit product, the term of the credit extension, and the extent of the difference.

   If "yes," the creditor is subject to the risk-based pricing regulations.

2. Determine the method the creditor uses to identify consumers who must receive a risk-based pricing notice and whether the method complies with the regulation (12 CFR 1022.72(b)).

   a. For creditors that use the direct comparison method (12 CFR 1022.72(b)), determine whether the creditor directly compares the material terms offered to each consumer and the material terms offer to other consumers for a specific type of credit product.

   b. For creditors that use the credit score proxy method (12 CFR 1022.72(b)(1)):

      i. determine whether the creditor calculates the cutoff score by considering the credit scores of all, or a representative sample, of consumers who have received credit for a specific type of credit product;

      ii. determine whether the creditor recalculates the cutoff score no less than every two years;

      iii. for new entrants into the credit business, for new products subject to risk-based pricing, or for acquired credit portfolios, determine whether the creditor recalculates the cutoff scores within time periods specified in the regulation;

      iv. for creditors using more than one credit score to set material terms, determine whether the creditor establishes a cutoff score according to the methods specified in the regulation; and

      v. if no credit score is available for a consumer, determine whether the creditor provides the consumer a risk-based pricing notice.

   c. For creditors that use the tiered pricing method (12 CFR 1022.72(b)(2)):

      i. when four or fewer pricing tiers are used, determine if the creditor sends risk-based pricing notices to consumers who do not qualify for the top, best-priced tier; or

      ii. when five or more pricing tiers are used, determine if the creditor provides risk-based pricing notices to consumers who do not qualify for the two top, best-priced tiers and

# CFPB
# Examination Procedures                                    FCRA

any other tier that, combined with the top two tiers, equal no less than the top 30 percent and no more than the top 40 percent of the total number of tiers.

d.  For credit card issuers:

   i.   Determine whether the card issuer uses the direct comparison method, the credit score proxy method, or the tiered pricing method to identify consumers to whom it must provide a risk-based pricing notice.

   ii.  If the creditor does not use the direct comparison method, the credit score proxy method, or the tiered pricing method, determine whether the card issuer uses the following method as permitted by 12 CFR 1022.72(c) to identify consumers to whom it must provide a risk-based pricing notice:

       a)  a consumer applies for a credit card either in connection with an application program, such as a direct-mail offer or a take-one application, or in response to a solicitation under 12 CFR 1026.60, and more than a single possible purchase annual percentage rate (APR) may apply under the program or solicitation; and

       b)  based in whole or in part on a consumer report, the credit card issuer provides a credit card to the consumer with a purchase APR that is greater than the lowest purchase APR available in connection with the application or solicitation.

   iii. Determine whether the card issuer provides a risk-based pricing notice to each consumer that is provided a credit card with a purchase APR greater than the lowest purchase APR available under the program or solicitation.

3.  Determine whether the creditor provides a risk-based pricing notice to a consumer (12 CFR 1022.72(a)).  For creditors that provide the notice, proceed to step #4.  If the creditor does not provide a risk-based pricing notice, proceed to step #5 to determine whether an exception applies (12 CFR 1022.74).

4.  Determine whether the risk based pricing notice contains (12 CFR 1022.73(a)(1)):

a.  a statement that a consumer report (or credit report) includes information about the consumer's credit history and the type of information included in that history;

b.  a statement that the terms offered, such as the APR, have been set based on information from a consumer report;

c.  statement that the terms offered may be less favorable than the terms offered to consumers with better credit histories;

d.  a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the report;

# CFPB
# Examination Procedures                                    FCRA

---

e.   the identity of each consumer reporting agency that furnished a consumer report used in the credit decision;

f.   a statement that federal law gives the consumer the right to obtain a copy of a consumer report from the consumer reporting agency or agencies identified in the notice without charge for 60 days after receipt of the notice;

g.   a statement informing the consumer how to obtain a consumer report from the consumer reporting agency or agencies identified in the notice and providing contact information (including a toll-free telephone number, where applicable) specified by the consumer reporting agency or agencies;

h.   a statement directing consumers to the website of the Consumer Financial Protection Bureau (CFPB) to obtain more information about consumer reports; and

i.   if a credit score of the consumer to whom a person grants, extends, or otherwise provides credit is used in setting the material terms of credit:

  i.   a statement that a credit score is a number that takes into account information in a consumer report, that the consumer's credit score was used to set the terms of credit offered, and that a credit score can change over time to reflect changes in the consumer's credit history;

  ii.   the credit score used by the person in making the credit decision;

  iii.   the range of possible credit scores under the model used to generate the credit score;

  iv.   all of the key factors that adversely affected the credit score, which shall not exceed four key factors, except that if one of the key factors is the number of enquiries made with respect to the consumer report, the number of key factors shall not exceed five;

  v.   the date on which the credit score was created; and

  vi.   the name of the consumer reporting agency or other person that provided the credit score.

Proceed to step #10.

5.   If the creditor does not provide a risk-based pricing notice, determine if one of the following situations that qualify for a regulatory exception applies (12 CFR 1022.74(a)-(f)):

a.   a consumer applies for specific terms of credit, and receives them, unless those terms were specified by the creditor using a consumer report after the consumer applied for the credit and after the creditor obtained the consumer report;

b.   a creditor provides a notice of adverse action;

---

# CFPB
# Examination Procedures                                    FCRA

    c.  a creditor makes a firm offer of credit in a prescreened solicitation (even if the person makes other firm offers of credit to other consumers on more favorable material terms);

    d.  a creditor generally provides a credit score disclosure to each consumer that requests a loan that is or will be secured by residential real property (if so, proceed to step #6);

    e.  a creditor generally provides a credit score disclosure to each consumer that requests a loan that is not or will not be secured by residential real property (if so, proceed to step #7); or

    f.  a creditor, which otherwise provides credit score disclosures to consumers that request loans, provides a disclosure for when no credit score is available (if so, proceed to step #8).

6.  For creditors that choose to provide a credit score disclosure to consumers that request a loan that is or will be secured by residential real property, determine whether the 12 CFR 1022.74(d) notice generally is provided to each consumer that requests such an extension of credit and that each notice contains:

    a.  a statement that a consumer report (or credit report) is a record of the consumer's credit history and includes information about whether the consumer pays his or her obligations on time and how much the consumer owes to creditors;

    b.  a statement that a credit score is a number that takes into account information in a consumer report and that a credit score can change over time to reflect changes in the consumer's credit history;

    c.  a statement that the consumer's credit score can affect whether the consumer can obtain credit and what the cost of that credit will be;

    d.  a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the report;

    e.  a statement that federal law gives the consumer the right to obtain copies of his or her consumer reports directly from the consumer reporting agencies, including a free report from each of the nationwide consumer reporting agencies once during any 12-month period;

    f.  contact information for the centralized source from which consumers may obtain their free annual consumer reports;

    g.  a statement directing consumers to the website of the CFPB to obtain more information about consumer reports;

    h.  the information required to be disclosed to the consumer in Section 609(g) of the FCRA, and as described in Module 3 of these examination procedures, under "Disclosure of Credit Scores by Certain Mortgage Lenders (FCRA), Section 609(g)"; and

# CFPB
# Examination Procedures                                    FCRA

i.   the distribution of credit scores among consumers who are scored under the same scoring model that is used to generate the consumer's credit score. The distribution must:

   i.   use the same scale as that of the credit score provided to the consumer; and

   ii.   be presented:

      a)   in the form of a bar graph containing a minimum of six bars that illustrates the percentage of consumers with credit scores within the range of scores reflected in each bar;

      b)   by other clear and readily understandable graphical means; or

      c)   in a clear and readily understandable statement informing the consumer how his or her credit score compares to the scores of other consumers.

The presentation may use a graph or statement obtained from the entity providing the credit score if it meets these requirements.

7.   For creditors that choose to provide a credit score disclosure to consumers that request a loan that is not or will not be secured by residential real property, determine whether the 12 CFR 1022.74(e) notice generally is provided to each consumer that requests such an extension of credit and that each notice contains:

a.   a statement that a consumer report (or credit report) is a record of the consumer's credit history and includes information about whether the consumer pays his or her obligations on time and how much the consumer owes to creditors;

b.   a statement that a credit score is a number that takes into account information in a consumer report and that a credit score can change over time to reflect changes in the consumer's credit history;

c.   a statement that the consumer's credit score can affect whether the consumer can obtain credit and what the cost of that credit will be;

d.   a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the report;

e.   a statement that federal law gives the consumer the right to obtain copies of his or her consumer reports directly from the consumer reporting agencies, including a free report from each of the nationwide consumer reporting agencies once during any 12-month period;

f.   contact information for the centralized source from which consumers may obtain their free annual consumer reports;

**CFPB**

**Examination Procedures**                                    **FCRA**

g.  a statement directing consumers to the website of CFPB to obtain more information about consumer reports;

h.  the current credit score of the consumer or the most recent credit score of the consumer that was previously calculated by the consumer reporting agency for a purpose related to the extension of credit;

i.  the distribution of credit scores among consumers who are scored under the same scoring model that is used to generate the consumer's credit score. The distribution must:

    i.  use the same scale as that of the credit score provided to the consumer; and

    ii.  be presented:

        a)  in the form of a bar graph containing a minimum of six bars that illustrates the percentage of consumers with credit scores within the range of scores reflected in each bar;

        b)  by other clear and readily understandable graphical means; or

        c)  in a clear and readily understandable statement informing the consumer how his or her credit score compares to the scores of other consumers. The presentation may use a graph or statement obtained from the entity providing the credit score if it meets these requirements;

j.  the range of possible credit scores under the model used to generate the credit score;

k.  the date on which the credit score was created; and

l.  the name of the consumer reporting agency or other person that provided the credit score.

8.  For creditors that otherwise provide credit score disclosures to consumers that request loans, determine whether the 12 CFR 1022.74(f) notice is provided to the applicable consumers in situations where no credit score is available for the consumer, as required by 12 CFR 1022.74(f). Determine whether each notice contains:

    a.  a statement that a consumer report (or credit report) includes information about the consumer's credit history and the type of information included in that history;

    b.  a statement that a credit score is a number that takes into account information in a consumer report and that a credit score can change over time in response to changes in the consumer's credit history;

    c.  a statement that credit scores are important because consumers with higher credit scores generally obtain more favorable credit terms;

    d.  a statement that not having a credit score can affect whether the consumer can obtain credit and what the cost of that credit will be;

**CFPB**

**Examination Procedures**                                        **FCRA**

---

e.  a statement that a credit score about the consumer was not available from a consumer reporting agency, which must be identified by name, generally due to insufficient information regarding the consumer's credit history;

f.  a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the consumer report;

g.  a statement that federal law gives the consumer the right to obtain copies of his or her consumer reports directly from the consumer reporting agencies, including a free consumer report from each of the nationwide consumer reporting agencies once during any 12-month period;

h.  the contact information for the centralized source from which consumers may obtain their free annual consumer reports; and

i.  a statement directing consumers to the website of the CFPB to obtain more information about consumer reports.

9.  For creditors that provide credit score exception notices and that obtain multiple credit scores in setting material terms of credit, determine whether the score(s) is disclosed in a manner consistent with the regulation (12 CFR 1022.74(d)(4) and .74(e)(4)):

a.  if a creditor only relies upon one of those credit scores in setting the material terms of credit granted, extended, or otherwise provided to a consumer (for example, by using the low, middle, high, or most recent score), determine whether the notice includes that credit score and the other information required by 12 CFR 1022.74(d).

b.  if a creditor relies upon multiple credit scores in setting the material terms of credit granted, extended, or otherwise provided to a consumer (for example, by computing the average of all the credit scores obtained), determine whether the notice includes one of those credit scores and the other information required by 12 CFR 1022.74(d).

10. *Regardless of whether the creditor provides risk-based pricing notices or credit score disclosure exception notices*, if the creditor increases the consumer's APR as the result of a review of a consumer's account, determine whether the creditor provided the consumer with an account review risk-based pricing notice (12 CFR 1022.72(d)) if an adverse action notice was not already provided.

11. Determine whether the account review risk-based pricing notice contains (12 CFR 1022.73(a)(2)):

a.  a statement that a consumer report (or credit report) includes information about the consumer's credit history and the type of information included in that history;

---

b.  a statement that the consumer is encouraged to verify the accuracy of the information contained in the consumer report and has the right to dispute any inaccurate information in the report;

c.  the identity of each consumer reporting agency that furnished a consumer report used in the credit decision;

d.  a statement that federal law gives the consumer the right to obtain a copy of a consumer report from the consumer reporting agency or agencies identified in the notice without charge for 60 days after receipt of the notice;

e.  a statement that informs the consumer how to obtain a consumer report from the consumer reporting agency or agencies identified in the notice and provides contact information (including a toll-free telephone number, where applicable) specified by the consumer reporting agency or agencies;

f.  a statement that directs consumers to the website of the CFPB to obtain more information about consumer reports;

g.  a statement that the creditor has conducted a review of the account using information from a consumer report;

h.  a statement that, as a result of the review, the APR on the account has been increased based on information from a consumer report; and

i.  if a credit score of the consumer whose extension of credit is under review is used in increasing the APR:

    i.  a statement that a credit score is a number that takes into account information in a consumer report, that the consumer's credit score was used to set the terms of credit offered, and that a credit score can change over time to reflect changes in the consumer's credit history;

    ii.  the credit score used by the person in making the credit decision;

    iii.  the range of possible credit scores under the model used to generate the credit score;

    iv.  all of the key factors that adversely affected the credit score, which shall not exceed four key factors, except that if one of the key factors is the number of enquiries made with respect to the consumer report, the number of key factors shall not exceed five;

    v.  the date on which the credit score was created; and

    vi.  the name of the consumer reporting agency or other person that provided the credit score.

**CFPB**

**Examination Procedures** FCRA

12. For all notices, determine whether the notices are clear and conspicuous and comply with the specific format requirements for the notices (12 CFR 1022.73(b), .74(d)(2), .74(e)(2), and .74(f)(3)).

13. For all notices, determine whether the notices are provided within the required time frames (12 CFR 1022.73(c), .74(d)(3), .74(e)(3), and .74(f)(4)), as set out as follows:

***Risk-based pricing notices and account review risk-based pricing notices***

- For closed-end credit, the notice generally must be provided to the consumer after the decision to approve a credit request is communicated to the consumer, but before consummation of the transaction.

- For open-end credit, the notice generally must be provided after the decision to grant credit is communicated to the consumer, but before the first transaction under the plan has been made.

- For account reviews, the notice generally must be provided at the time that the decision to increase the APR is communicated to the consumer or no later than five days after the effective date of the change in the APR.

***Credit score disclosures for loans secured by residential real property***

- The credit score disclosure for loans secured by residential real property must be provided to the consumer at the same time as the disclosure required by Section 609(g) of the FCRA is provided to the consumer. The Section 609(g) notice must be provided as soon as reasonably practicable after the credit score has been obtained. In any event, the credit score disclosure for loans secured by residential real property must be provided at or before consummation in the case of closed-end credit or before the first transaction is made under an open-end credit plan.

***Credit score disclosures for loans <u>not</u> secured by residential real property***

- The notice generally must be provided to the consumer as soon as reasonably practicable after the credit score has been obtained, but in any event at or before consummation in the case of closed-end credit or before the first transaction is made under an open-end credit plan.

***Credit score exception notices when no credit score is available***

- The notice generally must be provided to the consumer as soon as reasonably practicable after the creditor has requested the credit score, but in any event not later than consummation of a transaction in the case of closed-end credit or when the first transaction is made under an open-end credit plan.

***Application to certain automobile lending transactions***

**CFPB**

**Examination Procedures**                                      **FCRA**

- For automobile lending transactions made through an auto dealer that is unaffiliated with the creditor, the creditor may provide a notice in the time periods described above. Alternatively, the creditor may arrange to have the auto dealer provide a notice to the consumer on its behalf within these time periods and maintain reasonable policies and procedures to verify that the auto dealer provides the notice to the consumer within the applicable time periods. If the creditor arranges to have the auto dealer provide a credit score disclosure for loans <u>not</u> secured by residential real property, the creditor complies if the consumer receives a notice containing a credit score obtained by the auto dealer with these time periods, even if a different credit score is obtained and used by the creditor.

- For credit that is granted under an open-end credit plan to a consumer in person or by telephone for contemporaneous purchase of goods or services, the notice may be provided at the <u>earlier of</u>:

    o  the time of the first mailing to the consumer after the decision is made to approve the credit, such as in a mailing containing the account agreement or a credit card; or

    o  within 30 days after the decision to approve the credit.

14. For all notices, determine whether the creditor follows the rules of construction pertaining to the number of notices provided to the consumer(s) (12 CFR 1022.75). In a transaction involving two or more consumers, a creditor must provide a risk-based notice to each consumer.  If the consumers have the same address, and the notice does not include a credit score(s), a person may satisfy the requirements by providing a single notice addressed to both consumers.  However, if a notice includes a credit score(s), the person must provide a separate notice to each consumer whether the consumers have the same address or not.  Each separate notice that includes a credit score(s) must contain only the credit score(s) of the consumer to whom the notice is provided, and not the credit score(s) of the other consumer. Similarly, for credit score disclosure exception notices, whether the consumers have the same address or not, the creditor must provide a separate notice to each consumer and each separate notice that includes a credit score(s) must contain only the credit score(s) of the consumer to whom the notices is provided.

15. For all notices, determine whether the creditor uses the model forms in Appendix H of the regulation. If yes, determine that it does not modify the model form so extensively as to affect the substance, clarity, comprehensibility, or meaningful sequence of the forms (Appendix H).

**CFPB**

**Examination Procedures**                                                **FCRA**

## Module 4 — Duties of Users of Consumer Reports and Furnishers of Consumer Report Information

### Duties of Users of Credit Reports Regarding Address Discrepancies — Section 605(h); 15 U.S.C. 1681c(h); 12 CFR 1022.82

1.  Determine whether a user of consumer reports has policies and procedures to recognize notices of address discrepancy that it receives from a nationwide consumer reporting agency (NCRA)[3] in connection with consumer reports.

2.  Determine whether a user that receives notices of address discrepancy has policies and procedures to form a reasonable belief that the consumer report relates to the consumer whose report was requested (12 CFR 1022.82(c)).

    See examples of reasonable policies and procedures "to form a reasonable belief" in 12 CFR 1022.82(c)(2).

3.  Determine whether a user that receives notices of address discrepancy has policies and procedures to furnish to the NCRA an address for the consumer that the user has reasonably confirmed is accurate, if the user does the following:

    a.  forms a reasonable belief that the report relates to the consumer;

    b.  establishes a continuing relationship with the consumer; and

    c.  regularly, and in the ordinary course of business, furnishes information to the NCRA (12 CFR 1022.82(d)(1)).

    See examples of reasonable confirmation methods in 12 CFR 1022.82(d)(2).

4.  Determine whether the user's policies and procedures require it to furnish the confirmed address as part of the information it regularly furnishes to an NCRA during the reporting period when it establishes a relationship with the consumer (12 CFR 1022.82(d)(3)).

5.  If procedural weaknesses or other risks requiring further information are noted, obtain a sample of consumer reports requested by the user from an NCRA that included notices of address discrepancy and determine:

    a.  how the user established a reasonable belief that the consumer reports related to the consumers whose reports were requested; and

    b.  if a consumer relationship was established:

---

[3] A NCRA compiles and maintains files on consumers on a nationwide basis.

    i.     whether the user furnished a consumer's address that it reasonably confirmed to the NCRA from which it received the notice of address discrepancy; and

    ii.    whether it furnished the address in the reporting period during which it established the relationship.

6.    On the basis of examination procedures completed, form a conclusion about the ability of user's policies and procedures to meet regulatory requirements for the proper handling of address discrepancies reported by an NCRA.

**Furnishers of Information to Consumer Reporting Agencies:
General – Section 623(e); 15 U.S.C. 1681s-2; 12 CFR 1022, Subpart E**

- **Notices of Disputes from a Consumer Reporting Agency – Section 623(b);
  15 U.S.C. 1681s-2(b)**
- **Direct Disputes from Consumers – Section 623(a)(8); 15 U.S.C. 1681s-2(a)(8);
  12 CFR 1022.43**

1.    Determine whether the entity furnishes consumer information to a consumer reporting agency about an account or other relationship with a consumer.  If so, the entity is subject to 12 CFR 1022.40-1022.43.

2.    Determine whether the entity has established and implemented reasonable policies and procedures regarding the accuracy and integrity of information furnished to a consumer reporting agency (12 CFR 1022.42(a)).

3.    Determine whether the entity considered the Interagency Guidelines in Appendix E of the regulation when developing its policies and procedures, and incorporated the guidelines as appropriate (12 CFR 1022.42(b)).

4.    Determine whether the entity reviews its policies and procedures periodically and updates them as necessary to ensure their effectiveness (12 CFR 1022.42(c)).

5.    If procedural weaknesses are noted or other risks requiring further investigation are noted, such as a high number of consumer complaints regarding the accuracy of their consumer report information from the entity, select a sample of reported items and the corresponding loan or collection file to determine that the entity:

    a.    did not report information that it knew, or had reasonable cause to believe, was inaccurate. Section 623(a)(1)(A) [15 U.S.C. 1681s-2(a)(1)(A)];

    b.    did not report information to a consumer reporting agency if it was notified by the consumer that the information was inaccurate and the information was, in fact, inaccurate. Section 623(a)(1)(B) [15 U.S.C. 1681s-2(a)(1)(B)];

**CFPB**

**Examination Procedures**                                                    **FCRA**

---

c.  provided the consumer reporting agency with corrections or additional information to make information complete and accurate, and thereafter did not send the consumer reporting agency any information that remained incomplete or inaccurate. Section 623(a)(2) [15 U.S.C. 1681s-2(a)(2)];

d.  furnished a notice to a consumer reporting agency of a dispute in situations where a consumer disputed the completeness or accuracy of any information the entity furnished, and the entity continued furnishing the information to a consumer reporting agency. Section 623(a)(3) [15 U.S.C. 1681s-2(a)(3)];

e.  notified the consumer reporting agency of a voluntary account-closing by the consumer, and did so as part of the information regularly furnished for the period in which the account was closed. Section 623(a)(4) [15 U.S.C. 1681s-2(a)(4)]; and

f.  notified the consumer reporting agency of the month and year of commencement of a delinquency that immediately preceded the action. The notification to the consumer reporting agency must be made within 90 days of furnishing information about a delinquent account that was being placed for collection, charged-off, or subjected to any similar action. Section 623(a)(5) [15 U.S.C. 1681s-2(a)(5)].

6.  If weakness within the entity's procedures for investigating errors are revealed, review a sample of notices of disputes received from a consumer reporting agency and determine whether the entity did the following:

a.  conducted an investigation with respect to the disputed information (Section 623(b)(1)(A) [15 U.S.C. 1681s-2(b)(1)(A)];

b.  reviewed all relevant information provided by the consumer reporting agency (Section 623(b)(1)(B) [15 U.S.C. 1681s-2(b)(1)(B)];

c.  reported the results of the investigation to the consumer reporting agency (Section 623(b)(1)(C)) [15 U.S.C. 1681s-2(b)(1)(C)];

d.  reported the results of the investigation to all other nationwide consumer reporting agencies to which the information was furnished if the investigation found that the reported information was inaccurate or incomplete (Section 623(b)(1)(D)) [15 U.S.C. 1681s-2(b)(1)(D)]; and

e.  modified, deleted, or blocked the reporting of information that could not be verified.

7.  Determine whether the entity conducts reasonable investigations of direct disputes from consumers, including a review of all relevant information provided by the consumer (12 CFR 1022.43(e)(1) and (2)).

a.  Determine whether the entity completes the investigation and reports the results to the consumer within the required time frame (12 CFR 1022.43(e)(3)).

---

# CFPB
# Examination Procedures                    FCRA

---

b. Determine whether the entity notifies and provides corrected information to the consumer reporting agencies when the results of its investigation finds that inaccurate information was furnished to the consumer reporting agencies (12 CFR 1022.43(e)(4)).

c. When the entity finds that a dispute is frivolous or irrelevant, determine whether the entity:

  i. notifies the consumer within five days after finding the dispute frivolous or irrelevant (12 CFR 1022.43(f)(2)); and

  ii. includes in the consumer notification the reasons for the findings and the information necessary to investigate the disputed information (12 CFR 1022.43(f)(3)).

## Prevention of Re-Pollution of Consumer Reports – Section 623(a)(6); 15 U.S.C. 1681s-2(a)(6)

1. If the entity provides information to a consumer reporting agency, review the entity's policies and procedures for ensuring that items of information blocked because of an alleged identity theft are not re-reported to the consumer reporting agency.

2. If weaknesses are noted within the entity's policies and procedures, review a sample of notices from a consumer reporting agency of allegedly fraudulent information due to identity theft furnished by the entity, to determine whether the entity does not re-report the item to a consumer reporting agency.

3. If procedural weaknesses or other risks requiring further investigation are noted, verify that the entity has not sold or transferred a debt that resulted from an alleged identity theft.

## Negative Information Notice – Section 623(a)(7); 15 U.S.C. 1681s-2(a)(7); 12 CFR 1022.1(b)(1)(ii)

1. If the entity provides negative information to a nationwide consumer reporting agency, verify that the entity's policies and procedures ensure tht the approriate notices are provided to consumers.

2. If procedural weaknesses or other risks requiring further investigation are noted, review a sample of notices provided to consumers to determine compliance with the technical content and timing requirements.

**CFPB**

**Examination Procedures**                                    **FCRA**

## Module 5 – Consumer Alerts and Identity Theft Protections

### Fraud and Active Duty Alerts – Section 605A(h); 15 U.S.C. 1681c-1(h)

1. Determine whether the entity has effective policies and procedures in place to verify the identity of consumers in situations in which consumer reports include fraud and/or active duty military alerts.

2. Determine if the entity has effective policies and procedures in place to contact consumers in situations where consumer reports include extended alerts.

3. If procedural weaknesses or other risks requiring further investigation are noted, review a sample of transactions in which consumer reports including these types of alerts were obtained. Verify that the entity complied with the identity verification and/or consumer contact requirements.

### Information Available to Victims – Section 609(e); 15 U.S.C. 1681g(e)

1. Review the entity's policies, procedures, and/or practices to determine whether identities and claims of fruadulent transactions are verified and whether information is properly disclosed to victims of identity theft and/or appropriately authorized law enforcement agents.

2. If procedural weaknesses or other risks requiring further investigation are noted, review a sample of these types of requests to endetermine whether the entity properly verified the requestor's identity prior to disclosing the information.

# CFPB Consumer
# Laws and Regulations                                    FDCPA

# Fair Debt Collection Practices Act[1]

The Fair Debt Collection Practices Act (FDCPA)(15 U.S.C. 1692 et seq.), which became effective March 20, 1978, was designed to eliminate abusive, deceptive, and unfair debt collection practices. In addition, the federal law (15 U.S.C. 1692 et seq.) protects reputable debt collectors from unfair competition and encourages consistent state action to protect consumers from abuses in debt collection. The Dodd-Frank Act granted rulemaking authority under the FDCPA to the Consumer Financial Protection Bureau (CFPB)[2] and, with respect to entities under its jurisdiction, granted authority to the CFPB to supervise for and enforce compliance with the FDCPA.[3]

## Debt That Is Covered

The FDCPA applies only to the collection of debt incurred by a consumer primarily for personal, family, or household purposes. It does not apply to the collection of corporate debt or to debt owed for business or agricultural purposes.

## Debt Collectors That Are Covered

Under FDCPA, a "debt collector" is defined as any person who regularly collects, or attempts to collect, consumer debts for another person or institution or uses some name other than its own when collecting its own consumer debts. That definition would include, for example, an institution that regularly collects debts for an unrelated institution. This includes reciprocal service arrangements where one institution solicits the help of another in collecting a defaulted debt from a customer who has moved.

## Debt Collectors That Are Not Covered

An institution is not a debt collector under the FDCPA when it collects:

- Another's debts in isolated instances.

- Its own debts it originated under its own name.

- Debts it originated and then sold, but continues to service (for example, mortgage and student loans).

- Debts that were not in default when they were obtained.

- Debts that were obtained as security for a commercial credit transaction (for example, accounts receivable financing).

---

[1] These reflect FFIEC-approved procedures.

[2] In December 2011, the CFPB restated the Federal Trade Commission's implementing regulation at 12 CFR Part 1006 (76 Fed. Reg. 78121)(December 16, 2011). The regulation only addresses the procedures for state application for exemption from the provisions of the Act.

[3] Dodd-Frank Act Secs. 1002(12)(H), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. Secs. 5481(12)(H), 5514(c), and 5515(c).

# CFPB Consumer
# Laws and Regulations                                    FDCPA

- Debts incidental to a bona fide fiduciary relationship or escrow arrangement (for example, a debt held in the institution's trust department or mortgage loan escrow for taxes and insurance).

- Debts regularly for other institutions to which it is related by common ownership or corporate control.

Debt collectors that are not covered also include:

- Officers or employees of an institution who collect debts owed to the institution in the institution's name.

- Legal process servers.

## Communications Connected with Debt Collection — 15 U.S.C. 1692b and c

For communications with a consumer or third party with the collection of a debt, the term "consumer" is defined to include the borrower's spouse, parent (if the borrower is a minor), guardian, executor, or administrator.

### When, Where, and With Whom Communication is Permitted

#### Communicating with the Consumer

A debt collector may not communicate with a consumer at any unusual time (generally before 8 a.m. or after 9 p.m. in the consumer's time zone) or at any place that is inconvenient to the consumer, unless the consumer or a court of competent jurisdiction has already given permission for such contacts. A debt collector may not contact the consumer at his or her place of employment if the collector has reason to believe the employer prohibits such communications.

If the debt collector knows the consumer has retained an attorney to handle the debt, and can easily ascertain the attorney's name and address, all contacts must be with that attorney, unless the attorney is unresponsive or agrees to allow direct communication with the consumer.

#### Ceasing Communication with the Consumer

When a consumer refuses, in writing, to pay a debt or requests that the debt collector cease further communication, the collector must cease all further communication, except to advise the consumer that:

- The collection effort is being stopped.

- Certain specified remedies ordinarily invoked may be pursued or, if appropriate, that a specific remedy will be pursued.

Mailed notices from the consumer are official when they are received by the debt collector.

# CFPB Consumer
# Laws and Regulations                    FDCPA

### Communicating with Third Parties

The only third parties that a debt collector may contact when trying to collect a debt are:

- The consumer.

- The consumer's attorney.

- A consumer reporting agency (if permitted by local law).

- The creditor.

- The creditor's attorney.

- The debt collector's attorney.

The consumer or a court of competent jurisdiction may, however, give the debt collector specific permission to contact other third parties. In addition, a debt collector who is unable to locate a consumer may ask a third party for the consumer's home address, telephone number and place of employment (location information). The debt collector must give his or her name and state that he or she is confirming or correcting location information about the consumer. Unless specifically asked, the debt collector may not name the collection firm or agency or reveal that the consumer owes any debt.

No third party may be contacted more than once unless the collector believes that the information from the first contact was wrong or incomplete and that the third party has since received better information, or unless the third party specifically requests additional contact.

Contact with any third party by postcard, letter or telegram is allowed only if the envelope or content of the communication does not indicate the nature of the collector's business.

## Validation of Debts — 15 U.S.C. 1692g

The debt collector must provide the consumer with certain basic information. If that information was not in the initial communication and if the consumer has not paid the debt five days after the initial communication, the following information must be sent to the consumer in written form:

- The amount of the debt;

- The name of the creditor to whom the debt is owed;

- Notice that the consumer has 30 days to dispute the debt before it is assumed to be valid;

- Notice that upon such written dispute, the debt collector will send the consumer a verification of the debt or a copy of any judgment; and

# CFPB Consumer
# Laws and Regulations                                    FDCPA

- Notice that if, within the 30-day period, the consumer makes a written request for the name and address of the original creditor, if it is different from the current creditor, the debt collector will provide that information.

If, within the 30-day period, the consumer disputes in writing any portion of the debt or requests the name and address of the original creditor, the collector must stop all collection efforts until he or she mails the consumer a copy of a judgment or verification of the debt, or the name and address of the original creditor, as applicable.

## Prohibited Practices

## Harassing or Abusive Practices — 15 U.S.C. 1692d

A debt collector in collecting a debt, may not harass, oppress, or abuse any person. For example, a debt collector may not:

- Use or threaten to use violence or other criminal means to harm the physical person, reputation, or property of any person.

- Use obscene, profane, or other language that abuses the hearer or reader.

- Publish a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of Section 603(f) or 604(3) of the Act.

- Advertise a debt for sale to coerce payment.

- Annoy, abuse, or harass persons by calling repeatedly their telephone number or allowing their telephones to ring continually.

- Make telephone calls without properly identifying oneself, except as allowed to obtain location information.

## False or Misleading Representations — 15 U.S.C. 1692e

A debt collector, in collecting a debt, may not use any false, deceptive, or misleading representation. For example, a debt collector may not:

- Falsely represent or imply that he or she is vouched for, bonded by, or affiliated with the United States or any state, including the use of any badge, uniform, or similar identification.

- Falsely represent the character, amount, or legal status of the debt, or of any services rendered, or compensation he or she may receive for collecting the debt.

- Falsely represent or imply that he or she is an attorney or that communications are from an attorney.

# CFPB Consumer
# Laws and Regulations                              FDCPA

- Threaten to take any action which is not legal or intended.

- Falsely represent or imply that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person, unless such action is lawful and intended by the debt collector or creditor.

- Falsely represent or imply that the sale, referral, or other transfer of the debt will cause the consumer to lose a claim or a defense to payment, or become subject to any practice prohibited by the FDCPA.

- Falsely represent or imply that the consumer committed a crime or other conduct to disgrace the consumer.

- Communicate, or threaten to communicate, false credit information or information which should be known to be false, including not identifying disputed debts as such.

- Use or distribute written communications made to look like or falsely represented to be documents authorized, issued, or approved by any court, official, or agency of the United States or any state if it would give a false impression of its source, authorization, or approval.

- Use any false representation or deceptive means to collect or attempt to collect a debt or to obtain information about a consumer.

- Fail to disclose in the initial written communication with the consumer, and the initial oral communication if it precedes the initial written communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose. In addition, the debt collector must disclose in subsequent communications that the communication is from a debt collector. (These disclosures do not apply to a formal pleading made in connection with a legal action.)

- Falsely represent or imply that accounts have been sold to innocent purchasers.

- Falsely represent or imply that documents are legal process.

- Use any name other than the true name of the debt collector's business, company, or organization.

- Falsely represent or imply that documents are not legal process or do not require action by the consumer.

- Falsely represent or imply that he or she operates or is employed by a consumer reporting agency.

# CFPB Consumer
# Laws and Regulations                    FDCPA

## Unfair Practices — 15 U.S.C. 1692f

A debt collector may not use unfair or unconscionable means to collect or attempt to collect a debt. For example, a debt collector may not:

- Collect any interest, fee, charge, or expense incidental to the principal obligation unless it was authorized by the original debt agreement or is otherwise permitted by law.

- Accept a check or other instrument post-dated by more than five days, unless he or she notifies the consumer, in writing, of any intention to deposit the check or instrument. That notice must be made not more than ten or less than three business days before the date of deposit.

- Solicit a post-dated check or other post-dated payment instrument to use as a threat or to institute criminal prosecution.

- Deposit or threaten to deposit a post-dated check or other post-dated payment instrument before the date on the check or instrument.

- Cause communication charges, such as those for collect telephone calls and telegrams, to be made to any person by concealing the true purpose of the communication.

- Take or threaten to repossess or disable property when the creditor has no enforceable right to the property or does not intend to do so, or if, under law, the property cannot be taken, repossessed, or disabled.

- Use a postcard to contact a consumer about a debt.

- Use any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer; a debt collector may use its business name if such name does not indicate it is in the debt collection business.

## Multiple Debts — 15 U.S.C. 1692h

If a consumer owes several debts that are being collected by the same debt collector, payments must be applied according to the consumer's instructions. No payment may be applied to a disputed debt.

## Legal Actions By Debt Collectors — 15 U.S.C. 1692i

A debt collector may file a lawsuit to enforce a security interest in real property only in the judicial district in which the real property is located. Other legal actions may be brought only in the judicial district in which the consumer lives or in which the original contract creating the debt was signed.

## Furnishing Certain Deceptive Forms — 15 U.S.C. 1692j

No one may design, compile and/or furnish any form that creates the false impression that someone other than the creditor (for example, a debt collector) is participating in the collection of a debt.

# CFPB Consumer Laws and Regulations                      FDCPA

## Civil Liability

A debt collector who fails to comply with any provision of the FDCPA is liable for:

- Any actual damages sustained as a result of that failure;

- Punitive damages as allowed by the court:

    ○ in an individual action, up to $1,000; or

    ○ in a class action, up to $1,000 for each named plaintiff and an award to be divided among all members of the class of an amount up to $500,000 or 1 percent of the debt collector's net worth, whichever is less;

- Costs and a reasonable attorney's fee in any such action.

In determining punitive damages, the court must consider the nature, frequency and persistency of the violations and the extent to which they were intentional. In a class action, the court must also consider the resources of the debt collector and the number of persons adversely affected.

### Defenses

A debt collector is not liable for a violation if a preponderance of the evidence shows it was not intentional and was the result of a bona fide error that arose despite procedures reasonably designed to avoid any such error. The collector is also not liable if he or she, in good faith, relied on an advisory opinion of the CFPB or on prior advisory opinions of the Federal Trade Commission, even if the ruling is later amended, rescinded, or determined to be invalid for any reason.

### Jurisdiction and Statute of Limitations

Action against debt collectors for violations of the FDCPA may be brought in any appropriate U.S. district court or other court of competent jurisdiction. The consumer has one year from the date on which the violation occurred to start such as action.

### Relation to State Law

The FDCPA preempts state law only to the extent that a state law is inconsistent with the FDCPA. A state law that is more protective of the consumer is not considered inconsistent with the FDCPA.

### Exemption for State Regulation

The CFPB may exempt certain classes of debt collection practices from the requirements of the FDCPA if it has determined that state laws impose substantially similar requirements and that there is adequate provision for enforcement.

# CFPB Consumer
# Laws and Regulations                    FDCPA

## REFERENCES

### Laws

15 U.S.C. 1692 et seq.                Fair Debt Collection Practices Act

# CFPB
# Examination Procedures                                  FDCPA

## Fair Debt Collection Practices Act[1]

| | |
|---|---|
| Exam Date: | [Click&type] |
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

## Examination Objectives

- To determine the adequacy of the institution's internal procedures and controls to assure consistent compliance with FDCPA.

- To determine if the institution complies with the requirements of the FDCPA in collecting or attempting to collect third-party consumer debts.

## Examination Procedures

The following procedures are to be completed through interviews with personnel knowledgeable about and directly engaged in the institution's collection activities and through reviews of any written collection procedures, reciprocal collection agreements, collection letters, dunning notices, envelopes, scripts used by collection personnel, validation notices, individual collection files, complaint files, and other relevant records.

1. Determine if the institution is a debt collector under FDCPA.

   **[Click&type]**

2. Determine if the institution has established internal procedures and controls to ensure compliance with the FDCPA.

   **[Click&type]**

---

[1] These reflect FFIEC-approved procedures.

# CFPB

# Examination Procedures                                      FDCPA

3.  If the institution has acted or is acting as a debt collector under the FDCPA, determine if the institution has:

   a.  Communicated with the consumer or third parties in any prohibited manner (15 U.S.C. 1692b and c);

   b.  Furnished the written validation notice within the required time period and otherwise complied with applicable validation requirements (15 U.S.C. 1692g);

   c.  Used any harassing, abusive, unfair, or deceptive collection practice prohibited by FDCPA (15 U.S.C. 1692d, 1692e, 1692f, and 1692j);

   d.  Collected any amount not expressly authorized by the debt instrument creating the debt or by state law (15 U.S.C. 1692f(1));

   e.  Applied all payments received as instructed and, where no instruction was given, applied payments only to undisputed debts (15 U.S.C. 1692h);

   f.  Filed suit in an authorized forum if the institution sued to collect the debt (15 U.S.C. 1692i).

   **[Click&type]**

## Examiner's Summary, Recommendations, and Comments

**[Click&type]**

# CFPB Consumer Laws and Regulations

**EFTA**

# Electronic Fund Transfer Act[1]

The Electronic Fund Transfer Act (EFTA) (15 U.S.C. 1693 et seq.) of 1978 is intended to protect individual consumers engaging in electronic fund transfers (EFTs). EFT services include transfers through automated teller machines, point-of-sale terminals, automated clearinghouse systems, telephone bill-payment plans in which periodic or recurring transfers are contemplated, and remote banking programs. The EFTA is implemented through Regulation E, which includes an official staff commentary.

In 2009, the Federal Reserve Board amended Regulation E to prohibit institutions from charging overdraft fees for ATM and point of sale (POS) transactions unless the consumer affirmatively consents (74 Fed. Reg. 59033 (Nov. 17, 2009) and 75 Fed. Reg. 31665 (June 4, 2010)). The Board also amended Regulation E to restrict fees and expiration dates on gift cards, and to require that gift card terms be clearly stated. (75 Fed. Reg. 16580 (April 1, 2010)).[2]

The Dodd-Frank Act transferred rule-making authority under the EFTA from the Federal Reserve Board to the Consumer Financial Protection Bureau (CFPB) and, with respect to entities under its jurisdiction, granted authority to the CFPB to supervise and enforce compliance with EFTA and its implementing regulations.[3] In December 2011, the CFPB restated the Federal Reserve's implementing regulation at 12 CFR Part 1005 (76 Fed. Reg. 81020) (December 27, 2011). In February 2012, the CFPB amended Regulation E to provide protections, including disclosures and error resolution and cancellation rights, to consumers who send remittance transfers to other consumers or businesses in a foreign country (77 Fed. Reg. 6194 (Feb. 7, 2012)).[4] These amendments implement statutory requirements of the Dodd-Frank Act.

---

[1] These reflect FFIEC-approved procedures.

[2] The Board also implemented a legislative extension of time for complying with the gift card disclosure requirements until January 31, 2011. 75 Fed. Reg. 50683 (August 17, 2010).

[3] Dodd-Frank Act Secs. 1002(12)(C), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. Secs. 5481(12)(C), 5514(c), and 5515(c). Section 1029 of the Dodd-Frank Act generally excludes from this transfer of authority, subject to certain exceptions, any rulemaking authority over a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. The transfer of authority also did not include section 920 of EFTA, which concerns debit card interchange fees charged to merchants. Section 920 of EFTA is implemented by Board regulations at 12 CFR Part 235. Section 920 is not addressed here or in the accompanying examination procedures and checklist.

[4] The CFPB is working with the prudential regulators to update the examination procedures to reflect these rules, which take effect February 7, 2013, in a uniform manner as appropriate.

# CFPB Consumer
# Laws and Regulations                                              EFTA

To help clarify the requirements of Regulation E, the following background information does not strictly follow the order of the regulatory text, but rather it is presented in the following order:

I.      Scope and Key Definitions (12 CFR 1005.2, 1005.3, 1005.17, 1005.20)

II.     Disclosures (12 CFR 1005.4, 1005.7, 1005.8, 1005.16, 1005.17, 1005.20)

III.    Electronic Transaction Overdraft Service Opt In (12 CFR 1005.17)

IV.     Issuance of Access Devices (12 CFR 1005.5, 1005.18)

V.      Consumer Liability and Error Resolution (12 CFR 1005.6, 1005.11)

VI.     Receipts and Periodic Statements (12 CFR 1005.9, 1005.18)

VII.    Gift Cards (12 CFR 1005.20)

VIII.   Other Requirements (12 CFR 1005.10, 1005.14, 1005.15)

IX.     Relation to Other Laws (12 CFR 1005.12)

X.      Administrative Enforcement and Record Retention (12 CFR 1005.13)

XI.     Miscellaneous (EFTA provisions not reflected in Regulation E)

For ease of use by the examiner, however, the examination procedures and checklist follow the order of the regulation.

# I.      Scope

## Key Definitions

***Access device*** is a card, code, or other means of access to a consumer's account or a combination of these used by the consumer to initiate EFTs. Access devices include debit cards, personal identification numbers (PINs), telephone transfer and telephone bill payment codes, and other means to initiate an EFT to or from a consumer account (12 CFR 1005.2(a)(1) and 12 CFR Part 1005, Supp.1, Comment 1005.2(a)-1).

Access devices do not include either of the following:

- Magnetic tape or other devices used internally by a financial institution to initiate electronic transfers.

- A check or draft used to capture the MICR (Magnetic Ink Character Recognition) encoding or routing, account, and serial numbers to initiate a one-time ACH debit (Comments 1005.2(a)-1 and -2).

***Accepted access device*** is an access device that a consumer:

- Requests and receives, signs, or uses (or authorizes another to use) to transfer money between accounts or to obtain money, property, or services.

- Requests to be validated even if it was issued on an unsolicited basis.

# CFPB Consumer
# Laws and Regulations                                    EFTA

- Receives as a renewal or substitute for an accepted access device from either the financial institution that initially issued the device or a successor (12 CFR 1005.2(a)(2)).

*Account* includes the following:

- Checking, savings, or other consumer asset account held by a financial institution (directly or indirectly), including certain club accounts, established primarily for personal, family, or household purposes.

- **Payroll card account,** established through an employer (directly or indirectly), to which EFTs of the consumer's wages, salary, or other employee compensation (such as commissions), are made on a recurring basis. The payroll card account can be operated or managed by the employer, a third-party processor, a depository institution, or any other person. All transactions involving the transfer of funds to or from a payroll card account are covered by the regulation (12 CFR 1005.2(b)(2) and Comment 1005.2(b)-2).

An account does not include:

- An account held by a financial institution under a bona fide trust agreement.

- An occasional or incidental credit balance in a credit plan.

- Profit-sharing and pension accounts established under a bona fide trust agreement.

- Escrow accounts such as for payments of real estate taxes, insurance premiums, or completion of repairs.

- Accounts for purchasing U.S. savings bonds (12 CFR 1005.2(b)(3) and Comment1005.2(b)-3).

A *payroll card account* does not include a card used:

- Solely to disburse incentive-based payments (other than commissions when they represent the primary means through which a consumer is paid) that are unlikely to be a consumer's primary source of salary or other compensation;

- Solely to make disbursements unrelated to compensation, such as petty cash reimbursements or travel per diem payments; or

- In isolated instances to which an employer typically does not make recurring payments (Comment 1005.2(b)-2).

*Activity* means any action that results in an increase or decrease of the funds underlying a certificate or card, other than the imposition of a fee, or an adjustment due to an error or a reversal of a prior transaction. (12 CFR 1005.20(a)(7)).

*ATM operator* is any person that operates an ATM at which a consumer initiates an EFT or a balance inquiry and that does not hold the account to or from which the transfer is made or about which the inquiry is made (12 CFR 1005.16(a)).

# CFPB Consumer
# Laws and Regulations                                    EFTA

*Dormancy fee and inactivity fee* mean a fee for non-use of or inactivity on a gift certificate, store gift card, or general-use prepaid card. (12 CFR 1005.20(a)(5)).

*Electronic check conversion (ECK) transactions* are transactions where a check, draft, or similar paper instrument is used as a source of information to initiate a one-time electronic fund transfer from a consumer's account. The consumer must authorize the transfer. (12 CFR 1005.3(b)(2))

*Electronic fund transfer (EFT)* is a transfer of funds initiated through an electronic terminal, telephone, computer (including on-line banking) or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. EFTs include, but are not limited to, point-of-sale (POS) transfers; automated teller machine (ATM) transfers; direct deposits or withdrawals of funds; transfers initiated by telephone; and transfers resulting from debit card transactions, whether or not initiated through an electronic terminal (12 CFR 1005.3(b)).

*Electronic terminal* is an electronic device, other than a telephone call by a consumer, through which a consumer may initiate an EFT. The term includes, but is not limited to, point-of-sale terminals, automated teller machines, and cash-dispensing machines (12 CFR 1005.2(h)).

*Exclusions from gift card definition.* The following cards, codes, or other devices are excluded and not subject to the substantive restrictions on imposing dormancy, inactivity, or service fees, or on expiration dates if they are: (12 CFR 1005.20(b))

- Useable solely for telephone services;

- Reloadable and not marketed or labeled as a gift card or gift certificate. For purposes of this exception, the term "reloadable" includes a temporary non-reloadable card issued solely in connection with a reloadable card, code, or other device;

- A loyalty, award, or promotional gift card (except that these must disclose on the card or device itself, information such as the date the funds expire, fee information and a toll-free number) (12 CFR 1005.20(a)(4) and (c)(4));

- Not marketed to the general public;

- Issued in paper form only; or

- Redeemable solely for admission to events or venues at a particular location or group of affiliated locations, or to obtain goods or services in conjunction with admission to such events or venues, at the event or venue or at specific locations affiliated with and in geographic proximity to the event or venue.

# CFPB Consumer
# Laws and Regulations                                    EFTA

***General-use prepaid card*** is a card, code, or other device:

- Issued on a prepaid basis primarily for personal, family, or household purposes to a consumer in a specified amount, whether or not that amount may be increased or reloaded, in exchange for payment; and

- That is redeemable upon presentation at multiple, unaffiliated merchants for goods or services, or that may be usable at automated teller machines. (12 CFR 1005.20(a)(3)). See *"Exclusions from gift card definition."*

***Gift certificate*** is a card, code, or other device issued on a prepaid basis primarily for personal, family, or household purposes to a consumer in a specified amount that may not be increased or reloaded in exchange for payment and redeemable upon presentation at a single merchant or an affiliated group of merchants for goods or services. (12 CFR 1005.20(a)(1)). See "*Exclusions from gift card definition*."

***Loyalty, award, or promotional gift card*** is a card, code, or other device (1) issued on a prepaid basis primarily for personal, family, or household purposes to a consumer in connection with a loyalty, award, or promotional program; (2) that is redeemable upon presentation at one or more merchants for goods or services, or usable at automated teller machines; and (3) that sets forth certain disclosures, including a statement indicating that the card, code, or other device is issued for loyalty, award, or promotional purposes. (12 CFR 1005.20(a)(4)) See "*Exclusions from gift card definition*."

***Overdraft Services.*** A financial institution provides an overdraft service if it assesses a fee or charge for paying a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account to pay the transaction. However, an overdraft service does not include payments made from the following:

- A line of credit subject to Regulation Z, such as a credit card account, a home equity line of credit, or an overdraft line of credit;

- Funds transferred from another account held individually or jointly by the consumer; or

- A line of credit or other transaction from a securities or commodities account held by a broker-dealer registered with the Securities Exchange Commission (SEC) or the Commodity Futures Trading Commission (CFTC). (12 CFR 1005.17(a))

***Preauthorized electronic fund transfer*** is an EFT authorized in advance to recur at substantially regular intervals (12 CFR 1005.2(k)).

***Service fee*** means a periodic fee for holding or use of a gift certificate, store gift card, or general-use prepaid card. A periodic fee includes any fee that may be imposed on a gift certificate, store gift card, or general-use prepaid card from time to time for holding or using the certificate or card. (12 CFR 1005.20(a)(6)). For example, a service fee may include a monthly maintenance fee, a transaction fee, an ATM fee, a reload fee, a foreign currency transaction fee, or a balance inquiry fee, whether or not the fee is waived for a certain period of time or is only imposed after

# CFPB Consumer Laws and Regulations

# EFTA

a certain period of time. However, a service fee does not include a one-time fee or a fee that is unlikely to be imposed more than once while the underlying funds are still valid, such as an initial issuance fee, a cash-out fee, a supplemental card fee, or a lost or stolen certificate or card replacement fee. (Comment 1005.20(a)(6)-1)

**Store gift card** is a card, code, or other device issued on a prepaid basis primarily for personal, family, or household purposes to a consumer in a specified amount, whether or not that amount may be increased or reloaded, in exchange for payment, and redeemable upon presentation at a single merchant or an affiliated group of merchants for goods or services. (12 CFR 1005.20(a)(2)). See *"Exclusions from gift card definition."*

**Unauthorized electronic fund transfer** is an EFT from a consumer's account initiated by a person other than the consumer without authority to initiate the transfer and from which the consumer receives no benefit. This does not include an EFT initiated in any of the following ways:

- By a person who was furnished the access device to the consumer's account by the consumer, unless the consumer has notified the financial institution that transfers by that person are no longer authorized;

- With fraudulent intent by the consumer or any person acting in concert with the consumer; or

- By the financial institution or its employee (12 CFR 1005.2(m)).

## Coverage – 12 CFR 1005.3

The requirements of Regulation E apply only to accounts for which there is an agreement for EFT services to or from the account between (i) the consumer and the financial institution or (ii) the consumer and a third party, when the account-holding financial institution has received notice of the agreement and the fund transfers have begun (Comment 1005.3(a)-1).

Regulation E applies to all persons, including offices of foreign financial institutions in the United States, that offer EFT services to residents of any state[5] and covers any account located in the United States through which EFTs are offered to a resident of a state, no matter where a particular transfer occurs or where the financial institution is chartered (Comment 1005.3(a)-3). Regulation E does not apply to a foreign branch of a U.S. financial institution unless the EFT services are offered in connection with an account in a state, as defined in 12 CFR 1005.2(l) (Comment 1005.3(a)-3).

---

[5] *State* means any state, territory, or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico; or any of their political subdivisions. 12 CFR 1005.2(l).

# CFPB Consumer
# Laws and Regulations                                    EFTA

**Exclusions from Coverage.** Section 1005.3(c) of Regulation E describes transfers that are not EFTs and are therefore not covered by the EFTA and Regulation E:

- Transfers of funds originated by check, draft, or similar paper instrument;

- Check guarantee or authorization services that do not directly result in a debit or credit to a consumer's account;

- Any transfer of funds for a consumer within a system that is used primarily to transfer funds between financial institutions or businesses, e.g., Fedwire or other similar network;

- Any transfer of funds which has as its primary purpose the purchase or sale of securities or commodities regulated by the SEC or the CFTC, purchased or sold through a broker-dealer regulated by the SEC or through a futures commission merchant regulated by the CFTC, or held in book-entry form by a Federal Reserve Bank or federal agency;

- Intra-institutional automatic transfers under an agreement between a consumer and a financial institution;

- Transfers initiated by telephone between a consumer and a financial institution provided the transfer is not a function of a written plan contemplating periodic or recurring transfers. A written statement available to the public, such as a brochure, that describes a service allowing a consumer to initiate transfers by telephone constitutes a written plan; or

- Preauthorized transfers to or from accounts at financial institutions with assets of less than $100 million on the preceding December 31. Such preauthorized transfers, however, remain subject to the compulsory use prohibition under Section 913 of the EFTA and 12 CFR 1005.10(e), as well as the civil and criminal liability provisions of Sections 915 and 916 of the EFTA. A small financial institution that provides EFT services besides preauthorized transfers must comply with the Regulation E requirements for those *other* services (Comment 1005.3(c)(7)-1). For example, a small financial institution that offers ATM services must comply with Regulation E in regard to the issuance of debit cards, terminal receipts, periodic statements, and other requirements.

**Electronic Check Conversion (ECK) and Collection of Returned-Item Fees.**
Regulation E covers electronic check conversion (ECK) transactions. In an ECK transaction, a consumer provides a check to a payee and information from the check is used to initiate a one-time EFT from the consumer's account. Although transfers originated by checks are not covered by Regulation E, an ECK is treated as an EFT and not a payment originated by check. Payees must obtain the consumer's authorization for each ECK transaction. A consumer authorizes a one-time EFT for an ECK transaction when the consumer receives notice that the transaction will

# CFPB Consumer
# Laws and Regulations                                              EFTA

or may be processed as an EFT and goes forward with the underlying transaction[6] (12 CFR 1005.3(b)(2)(i) and (ii) and Comment 1005.3(b)(2)-3).

If a payee re-presents electronically a check that has been returned unpaid, the transaction is not an EFT, and Regulation E does not apply because the transaction originated by check (Comment 1005.3(c)(1)-1)).

However, Regulation E applies to a fee collected electronically from a consumer's account for a check or EFT returned unpaid. A consumer authorizes a one-time EFT from the consumer's account to pay the fee for the returned item or transfer if the person collecting the fee provides notice to the consumer stating the amount of the fee and that the person may electronically collect the fee, and the consumer goes forward with the underlying transaction[7] (12 CFR 1005.3(b)(3))). These authorization requirements do not apply to fees imposed by the account-holding financial institution for returning the check or EFT or paying the amount of an overdraft (Comment 1005.3(b)(3)-1)).

# II.    Disclosures

## Disclosures Generally – 12 CFR 1005.4

Required disclosures must be clear and readily understandable, in writing, and in a form the consumer may keep. The required disclosures may be provided to the consumer in electronic form, if the consumer affirmatively consents after receiving a notice that complies with the E-Sign Act (12 CFR 1005.4(a)(1)).

Disclosures may be made in a language other than English, if the disclosures are made available in English upon the consumer's request (12 CFR 1005.4(a)(2)).

A financial institution has the option of disclosing additional information and combining disclosures required by other laws (for example, Truth in Lending disclosures) with Regulation E disclosures (12 CFR 1005.4(b)).

A financial institution may combine required disclosures into a single statement if a consumer holds two or more accounts at the financial institution. Thus, a single periodic statement or error resolution notice is sufficient for multiple accounts. In addition, it is only necessary for a financial institution to provide one set of disclosures for a joint account (12 CFR 1005.4(c)(l) and (2)).

Two or more financial institutions that jointly provide EFT services may contract among themselves to meet the requirements that the regulation imposes on any or all of them. When making initial disclosures (see 12 CFR 1005.7) and disclosures of a change in terms or an error

---

[6] For POS transactions, the notice must be posted in a prominent and conspicuous location and a copy of the notice must be provided to the consumer at the time of the transaction (12 CFR 1005.3(b)(2)(i) and (ii) and Comment 1005.3(b)(2)-3).

[7] For POS transactions, the notice must be posted in a prominent and conspicuous location and a copy of the notice must either be provided to the consumer at the time of the transaction or mailed to the consumer's address as soon as reasonably practicable after the person initiates the EFT to collect the fee (12 CFR 1005.3(b)(3)).

# CFPB Consumer
# Laws and Regulations                                     EFTA

resolution notice (see 12 CFR 1005.8), a financial institution in a shared system only needs to make disclosures that are within its knowledge and apply to its relationship with the consumer for whom it holds an account (12 CFR 1005.4(d)).

## Initial Disclosure of Terms and Conditions – 12 CFR 1005.7

Financial institutions must provide initial disclosures of the terms and conditions of EFT services before the first EFT is made or at the time the consumer contracts for an EFT service. They must give a summary of various consumer rights under the regulation, including the consumer's liability for unauthorized EFTs, the types of EFTs the consumer may make, limits on the frequency or dollar amount, fees charged by the financial institution, and the error-resolution procedures. Appendix A to 12 CFR Part 1005 provides model clauses that financial institutions may use to provide the disclosures.

**Timing of Disclosures**. Financial institutions must make the required disclosures at the time a consumer contracts for an electronic fund transfer service or before the first electronic fund transfer is made involving the consumer's account (12 CFR 1005.7(a)).

Disclosures given by a financial institution earlier than the regulation requires (for example, when the consumer opens a checking account) need not be repeated when the consumer later authorizes an electronic check conversion or agrees with a third party to initiate preauthorized transfers to or from the consumer's account, unless the terms and conditions differ from the previously disclosed term. This interpretation also applies to any notice provided about one-time EFTs from a consumer's account initiated using information from the consumer's check. On the other hand, if an agreement for EFT services to be provided by an account-holding financial institution is directly between the consumer and the account-holding financial institution, disclosures must be given in close proximity to the event requiring disclosure, for example, when the consumer contracts for a new service (Comment 1005.7(a)-1).

Where a consumer authorizes a third party to debit or credit the consumer's account, an account-holding financial institution that has not received advance notice of the transfer or transfers must provide the required disclosures as soon as reasonably possible after the first debit or credit is made, unless the financial institution has previously given the disclosures (Comment 1005.7(a)-2).

If a consumer opens a new account permitting EFTs at a financial institution, and the consumer has already received Regulation E disclosures for another account at that financial institution, the financial institution need only disclose terms and conditions that differ from those previously given (Comment 1005.7(a)-3).

If a financial institution joins an interchange or shared network system (which provides access to terminals operated by other financial institutions), disclosures are required for additional EFT services not previously available to consumers if the terms and conditions differ from those previously disclosed (Comment 1005.7(a)-4).

A financial institution may provide disclosures covering all EFT services that it offers, even if some consumers have not arranged to use all services (Comment 1005.7(a)-5).

# CFPB Consumer
# Laws and Regulations                                    EFTA

**Addition of EFT Services.** A financial institution must make disclosures for any new EFT service added to a consumer's account if the terms and conditions are different from those described in the initial disclosures. ECK transactions may be a new type of transfer requiring new disclosures (See Appendix A-2 and Comment 1005.7(c)-1).

**Content of Disclosures.** 12 CFR 1005.7(b) requires a financial institution to provide the following disclosures as they apply:

- **Liability of consumers for unauthorized electronic fund transfers.** The financial institution must include a summary of the consumer's liability (under 12 CFR 1005.6, state law, or other applicable law or agreement) for unauthorized transfers (12 CFR 1005.7(b)(1)). A financial institution does not need to provide the liability disclosures if it imposes no liability. If it later decides to impose liability, it must first provide the disclosures (Comment 1005.7(b)(1)-1). The financial institution can choose to include advice on promptly reporting unauthorized transfers or the loss or theft of the access device (Comment 1005.7(b)(1)-3).

- **Telephone number and address.** A financial institution must provide a specific telephone number and address, on or with the disclosure statement, for reporting a lost or stolen access device or a possible unauthorized transfer (Comment 1005.7(b)(2)-2). Except for the telephone number and address for reporting a lost or stolen access device or a possible unauthorized transfer, the disclosure may insert a reference to a telephone number that is readily available to the consumer, such as "Call your branch office. The number is shown on your periodic statement." (Comment1005.7(b)(2)-2).

- **Business days.** The financial institution's business days (12 CFR 1005.7(b)(3)).

- **Types of transfers; limitations on frequency or dollar amount.** Limitations on the frequency and dollar amount of transfers generally must be disclosed in detail (12 CFR 1005.7(b)(4)). If the confidentiality of certain details is essential to the security of an account or system, these details may be withheld (but the fact that limitations exist must still be disclosed).[8] A limitation on account activity that restricts the consumer's ability to make EFTs must be disclosed even if the restriction also applies to transfers made by non-electronic means.[9] Financial institutions are not required to list preauthorized transfers among the types of transfers that a consumer can make (Comment 1005.7(b)(4)-3). Financial institutions must disclose the fact that one-time EFTs initiated using information from a consumer's check are among the types of transfers that a consumer can make (See Appendix A-2 and Comment 1005.7(b)(4)-4).

---

[8] For example, if a financial institution limits cash ATM withdrawals to $100 per day, the financial institution may disclose that daily withdrawal limitations apply and need not disclose that the limitations may not always be in force (such as during periods when its ATMs are off-line) (Comment 1005.7(b)(4)-1).

[9] For example, Regulation D (12 CFR 204) restricts the number of payments to third parties that may be made from a money market deposit account; a financial institution that does not execute fund transfers in excess of those limits must disclose the restriction as a limitation on the frequency of EFTs (Comment 1005.7(b)(4)-2).

# CFPB Consumer
# Laws and Regulations                                    EFTA

- **Fees.** A financial institution must disclose all fees for EFTs or for the right to make EFTs (12 CFR 1005.7(b)(5)). Other fees, for example, minimum-balance fees, stop-payment fees, account overdrafts, or ATM inquiry fees, may, but need not, be disclosed under Regulation E (see Regulation DD, 12 CFR Part 1030) (Comment 1005.7(b)(5)-1). A per-item fee for EFTs must be disclosed even if the same fee is imposed on non-electronic transfers. If a per-item fee is imposed only under certain conditions, such as when the transactions in the cycle exceed a certain number, those conditions must be disclosed. Itemization of the various fees may be on the disclosure statement or on an accompanying document referenced in the statement (Comment 1005.7(b)(5)-2).

  A financial institution must disclose that networks used to complete the EFT as well as an ATM operator, may charge a fee for an EFT or for balance inquiries (12 CFR 1005.7(b)(11)).

- **Documentation.** A summary of the consumer's right to receipts and periodic statements, as provided in 12 CFR 1005.9, and notices regarding preauthorized transfers as provided in 12 CFR 1005.10(a) and 1005.10(d) (12 CFR 1005.7(b)(6)).

- **Stop payment.** A summary of the consumer's right to stop payment of a preauthorized electronic fund transfer and the procedure for placing a stop-payment order, as provided in 12 CFR 1005.10(c) (12 CFR 1005.7(b)(7)).

- **Liability of institution.** A summary of the financial institution's liability to the consumer under Section 910 of the EFTA for failure to make or to stop certain transfers (12 CFR 1005.7(b)(8)).

- **Confidentiality.** The circumstances under which, in the ordinary course of business, the financial institution may provide information concerning the consumer's account to third parties (12 CFR 1005.7(b)(9)). A financial institution must describe the circumstances under which any information relating to an account to or from which EFTs are permitted will be made available to third parties, not just information concerning those EFTs. Third parties include other subsidiaries of the same holding company (Comment 1005.7(b)(9)-1).

- **Error Resolution.** The error-resolution notice must be substantially similar to Model Form A-3 in Appendix A of Part 1005. A financial institution may use different wording so long as the substance of the notice remains the same, may delete inapplicable provisions (for example, the requirement for written confirmation of an oral notification), and may substitute substantive state law requirements affording greater consumer protection than Regulation E (Comment 1005.7(b)(10)-1). To take advantage of the longer time periods for resolving errors under 12 CFR 1005.11(c)(3) (for new accounts as defined in Regulation CC, transfers initiated outside the United States, or transfers resulting from POS debit card transactions), a financial institution must have disclosed these longer time periods. Similarly, a financial institution relying on the exception from provisional crediting in 12 CFR 1005.11(c)(2) for accounts relating to extensions of credit by securities brokers and dealers (Regulation T, 12 CFR Part 220) must disclose accordingly (Comment 1005.7(b)(10)-2).

# CFPB Consumer
# Laws and Regulations                                    EFTA

## Change in Terms; Error Resolution Notice — 12 CFR 1005.8

If a financial institution contemplates a change in terms, it must mail or deliver a written or electronic notice to the consumer at least 21 days before the effective date of any change in a term or condition required to be disclosed under 12 CFR 1005.7(b) if the change would result in any of the following:

- Increased fees or charges;

- Increased liability for the consumer;

- Fewer types of available EFTs; or

- Stricter limitations on the frequency or dollar amounts of transfers. (12 CFR 1005.8(a)(1)).

If an immediate change in terms or conditions is necessary to maintain or restore the security of an EFT system or account, the financial institution does not need to give prior notice. However, if the change is to be permanent, the financial institution must provide notice in writing of the change to the consumer on or with the next regularly scheduled periodic statement or within 30 days, unless disclosures would jeopardize the security of the system or account. (12 CFR 1005.8(a)(2)).

For accounts to or from which EFTs can be made, the financial institution must mail, deliver, or provide electronically to the consumer at least once each calendar year, the error resolution notice in 12 CFR 1005 Appendix A–Model Form A-3, or one substantially similar. Alternatively, the financial institution may include an abbreviated error resolution notice substantially similar to the notice set out in Appendix A (Model Form A-3) with each periodic statement (12 CFR 1005.8(b)).

## Disclosures at Automated Teller Machines — 12 CFR 1005.16

An ATM operator that charges a fee is required to post notice that a fee will be imposed and disclose the amount of the fee. (12 CFR 1005.16(b)). Notices must be posted both (1) in a prominent and conspicuous location on or at the machine, and (2) on the screen or on a paper notice before the consumer is committed to paying a fee (12 CFR 1005.16(c)(1) and (2)). The fee may be imposed by the ATM operator only if: (1) the consumer is provided the required notices, and (2) the consumer elects to continue the transaction (12 CFR 1005.16(d)).

The "prominent and conspicuous notice" standard applies to notice posted on or at the ATM. The "clear and readily understandable standard" applies to the content of the notice. The requirement that the notice be in a retainable format only applies to printed notices (not those on the ATM screen) (12 CFR 1005.16(c)).

# CFPB Consumer
# Laws and Regulations                                    EFTA

These fee disclosures are not required where a network owner is not charging a fee directly to the consumer (i.e., some network owners charge an interchange fee to financial institutions whose customers use the network) (Comment 1005.7(b)(5)-3). If the network practices change such that the network charges the consumer directly, these fee disclosure requirements would apply to the network. (12 CFR 1005.7(c)).

## Overdraft Service Disclosures – 12 CFR 1005.17

Disclosure requirements for overdraft services are addressed in Section III of this document.

## Gift Card Disclosures – 12 CFR 1005.20(c)

Disclosures must be clear and conspicuous and generally in a written or electronic form (except for certain pre-purchase disclosures, which may be given orally) that the consumer may retain. The fees and terms and conditions of expiration that are required to be disclosed prior to purchase may not be changed after purchase.

A number of disclosures must be made on the actual card. Making such disclosures in an accompanying terms and conditions document, on packaging surrounding a certificate or card, or on a sticker or other label affixed to the certificate or card does not constitute a disclosure on the certificate or card. Those disclosures include the following:

- The existence, amount, and frequency of any dormancy, inactivity, or service fee;

- The expiration date for the underlying funds (or the fact that the funds do not expire);

- A toll-free telephone number and (if any) a website that the consumer may use to obtain a replacement certificate or card if the certificate or card expires while underlying funds are still available;

- A statement that the certificate or card expires, but the underlying funds do not expire or expire later than the certificate or card, as well as a statement that the consumer may contact the issuer for a replacement card;[10] and

- A toll-free telephone number and (if any) a website that the consumer may use to obtain information about fees.

**Additional Disclosure Requirements Regarding Fees.** In addition to the disclosure requirements related to dormancy, inactivity, or service fees, all other fees must be disclosed as well. These disclosures must be provided on or with the certificate or card and disclosed prior to purchase. The certificate or card must also disclose a toll-free telephone number and website, if one is maintained, that a consumer may use to obtain fee information or replacement certificates or cards. (12 CFR 1005.20(f))

---

[10] This requirement does not apply to non-reloadable certificates or cards that expire seven years or more after the date of manufacture.

---

# CFPB Consumer Laws and Regulations

**EFTA**

**Disclosure Requirements for Loyalty, Award, or Promotional Gift Cards (12 CFR 1005.20(a)(4)).** To qualify for the exclusion for loyalty, award, or promotional gift cards, the following must be disclosed:

- A statement indicating that the card, code, or other device is issued for loyalty, award, or promotional purposes, which must be included on the front of the card, code, or other device;

- The expiration date for the underlying funds, which must be included on the front of the card, code, or other device;

- The amount of any fees that may be imposed in connection with the card, code, or other device, and the conditions under which they may be imposed, which must be provided on or with the card, code, or other device; and

- A toll-free telephone number and, if one is maintained, a website, that a consumer may use to obtain fee information, which must be included on the card, code, or other device.

Amendments to Regulation E were issued on August 11, 2010. The amendments implemented legislation that modified the effective date of certain disclosure and card expiration requirements in the gift card provisions of the Credit Card Accountability Responsibility and Disclosure Act of 2009 for cards produced prior to April 1, 2010.

The disclosures and card expiration requirements are:

1) Disclosures required to be made prior to purchase (see 12 CFR 1005.20(c)(3));

2) Disclosures that must be stated on the certificate or card regarding the fees and expiration dates (see 12 CFR 1005.20(d)(2), (e)(1) & (e)(3)); and

3) Disclosures that may be provided on or with the certificate or card (see 12 CFR 1005.20(f)).

Gift cards must comply with all other provisions of the gift card rule.

Issuers must make the following disclosures on in-store signs, messages during customer service calls, websites, and general advertising:

- The funds underlying the gift card do not expire;

- Consumers have the right to receive a free replacement card, along with the packaging and materials that typically accompany the gift card; and

- The issuer will charge dormancy, inactivity, or service fees only if the fee is permitted by the gift card rule.

The issuer must make the disclosures via customer service call center and website until January 31, 2013. See 12 CFR 1005.20(h).

**CFPB Consumer
Laws and Regulations**                                    **EFTA**

## III.    Electronic Transaction Overdraft Services Opt In – 12 CFR 1005.17

In recent years overdraft protection services have been extended to cover overdrafts resulting from non-check transactions, including ATM withdrawals, debit card transactions at point of sale, on-line transactions, preauthorized transfers, and ACH transactions. Generally, institutions charge a flat fee each time an overdraft is paid, although some institutions have a tiered fee structure and charge higher fees based on the amount of the negative balance at the end of the day or as the number of overdrafts increases. Institutions commonly charge the same amount for paying check and ACH overdrafts as they would if they returned the item unpaid. Some institutions also impose a fee for each day the account remains overdrawn. For debit card overdrafts, the dollar amount of the fee and multiple assessments can exceed the dollar amount of the overdrafts.

In 2005, the agencies issued guidance concerning the marketing, disclosure, and implementation of overdraft programs.[11] The guidance also covers safety and soundness considerations, and establishes a number of best practices financial institutions should incorporate into their overdraft programs. The 2009 revisions to Regulation E supersede portions of the guidance related to ATM and one-time debit card overdraft transactions. However, in addition to the revised Regulation E requirements, an institution is advised to incorporate into its overdraft protection programs any guidance issued by its agency.

Section 1005.17 was added in the 2009 revision to Regulation E.[12] It provides consumers with a choice to opt into their institution's overdraft protection program and be charged a fee for overdrafts for ATM and one-time debit card transactions. It also requires disclosure of the fees and terms associated with the institution's overdraft service. Before an institution may assess overdraft fees, the consumer must opt in, or affirmatively consent, to the overdraft service for ATM and one-time debit card transactions, and the consumer has an ongoing right to revoke consent. Institutions may not require an opt in for ATM and one-time debit transactions as a condition to the payment of overdrafts for checks and other transactions. The account terms, conditions and features must be the same for consumers who opt in and for those who do not.

**Opt-In Requirement for Overdraft Services.** The financial institution may assess a fee for paying an ATM or one-time debit card transaction pursuant to an overdraft service only if it has met the following requirements:

- The financial institution has provided the consumer with a written (or, if the consumer agrees, electronic) notice, segregated from all other information, describing the overdraft service;

---

[11] The agencies were the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration. *See* Interagency Guidance on Overdraft Protection Program (70 Fed. Reg. 9127, February 24, 2005).

[12] 74 Fed. Reg. 59033 (Nov. 17, 2009); 75 Fed. Reg. 31665 (June 4, 2010).

# CFPB Consumer
# Laws and Regulations                                    EFTA

- The financial institution has provided a reasonable opportunity for the consumer to affirmatively consent (opt in) to the overdraft service for ATM and one-time debit card transactions;

- The financial institution has obtained the consumer's affirmative consent (opt in) for ATM and one-time debit card transactions; and

- The financial institution has mailed or delivered written (or, if the consumer agrees, electronic) confirmation of the consent, including a statement informing the consumer of the right to revoke consent. An institution complies if it adopts reasonable procedures to ensure that it assesses overdraft fees only for transactions paid after mailing or delivering the confirmation to the consumer. (12 CFR 1005.17(b)(1); Comment 1005.17(b)-7))

**Fee Prohibitions.** As a general rule, an institution may not charge overdraft fees for paying an ATM or one-time debit card transaction unless the consumer has opted in. The fee prohibition also applies to an institution that has a policy and practice of not paying an ATM or one-time debit card overdraft when it reasonably believes at the time of the authorization request that the consumer does not have sufficient funds available to pay the transaction, although the institution does not have to comply with the notice and opt-in requirements. (Comment 1005.17(b)-1(iv))

Lack of consent does not prohibit the financial institution from paying ATM or one-time debit card overdrafts. However, the financial institution may charge a fee only if the consumer has consented to the institution's overdraft service for ATM and one-time debit card transactions. (Comment 1005.17(b)-2) Conversely, the financial institution is not required to pay an ATM or one-time debit card overdraft even if the consumer has consented to pay a fee. (Comment 1005.17(b)-3)

For a consumer who has not opted in, if a fee or charge is based on the amount of the outstanding negative balance, an institution may not charge a fee for a negative balance that is solely attributable to an ATM or one-time debit card transaction. However, an institution may assess a fee if the negative balance is attributable in whole or in part to a check, ACH transaction or other type of transaction not subject to the prohibition on assessing overdraft fees. (Comment 1005.17(b)-8)

For a consumer who has not opted in, the institution may not assess daily or sustained negative balance, overdraft, or similar fees for a negative balance, based solely on ATM or one-time debit card transactions. However, if the negative balance is attributable in part to a check, ACH transaction or other type of transaction not subject to the prohibition on assessing overdraft fees, the institution may charge a daily or sustained overdraft or similar fee, even if the consumer has not opted in. The date the fee may be charged is based on the date on which the check, ACH, or other type of transaction is paid into overdraft. (Comment 1005.17(b)-9)

# CFPB Consumer
# Laws and Regulations                                    EFTA

**Contents and Format of Notice.** The notice describing the overdraft service must be substantially similar to Model Form A-9. The notice must include all of the following items, and may not contain any other information not expressly specified or otherwise permitted:

- A brief description of the overdraft service and the types of transactions for which the financial institution may charge a fee;

- The dollar amount of any fee that may be charged for an ATM or one-time debit card transaction, including any daily or other overdraft fees;[13]

- The maximum number of fees that may be charged per day, or, if applicable, that there is no limit;

- An explanation of the right to affirmatively consent to the overdraft service, including the methods by which the consumer may consent;[14] and

- The availability of a line of credit or a service that transfers funds from another account to cover overdrafts, if the financial institution offers those alternatives.[15] (12 CFR 1005.17(d)(1) through (d)(5))

The financial institution also may (but is not required to) include the following information, to the extent applicable:

- Disclosure of the right to opt into, or out of, the payment of overdrafts for other types of transactions (e.g., checks, ACH transactions, or automatic bill payments) and a means for the consumer to exercise such choices;

- Disclosure of the financial institution's returned item fee, as well as the fact that merchants may charge additional fees; and

- Disclosure of the right to revoke consent. (12 CFR 1005.17(d)(6))

**Reasonable opportunity to consent.** The financial institution must provide a reasonable opportunity to consent. Reasonable methods of consent include mail - if the financial institution provides a form for the consumer to fill out and mail, telephone - if the financial institution provides a readily-available telephone line that the consumer may call, electronic means - if the

---

[13] If the amount of the fee may vary based on the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the financial institution must disclose the maximum fee.

[14] Institutions may tailor the response portion of Model Form A-9 to the methods offered. For example, a tear-off portion of Model Form A-9 is not necessary if consumers may only opt-in by telephone or electronically. (Comment 1005.17(d)-3).

[15] If the institution offers both a line of credit subject to Regulation Z (12 CFR Part 1026) and a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state in its opt-in notice that both alternative plans are offered. If the institution offers one, but not the other, it must state in its opt-in notice the alternative plan that it offers. If the institution does not offer either plan, it should omit the reference to the alternative plans. (Comment 1005.17(d)-5). If the financial institution offers additional alternatives for paying overdrafts, it may (but is not required to) disclose those alternatives. 12 CFR 1005.17(d)(5).

# CFPB Consumer
# Laws and Regulations                                    **EFTA**

financial institution provides a form that can be accessed and processed at its website, where the consumer may click on a box to consent and click on a button to affirm consent, or in person - if the financial institution provides a form for the consumer to complete and present at a branch or office. (Comment 1005.17(b)-4) The financial institution may provide the opportunity to consent and require the consumer to make a choice as a step to opening an account. (Comment 1005.17(b)-5)

**Affirmative consent is necessary.** An important feature of the opt in is that the consumer's affirmative consent is necessary before the institution may charge overdraft fees for paying an ATM or one-time debit card transaction. (12 CFR 1005.17(b)(iii)) The consent must be separate from other consents or acknowledgments (including a consent to receive disclosures electronically). Check boxes are allowed, but the check box and the consumer's signature may only apply to the consumer's consent to opt in. Preprinted disclosures about the overdraft service provided with a signature card or contract do not constitute affirmative consent. (Comment 1005.17(b)-6)

**Confirmation and consumer's right to revoke.** Not only must the consumer affirmatively consent, but the institution must mail or deliver to the consumer a written confirmation (or electronic, if the consumer agrees) that the consumer has consented, along with a statement informing the consumer of the right to revoke the consent at any time. (12 CFR 1005.17(b)(iv) and Comment 1005.17(b)-7) An institution complies with the confirmation requirement if it has adopted reasonable procedures to ensure that overdraft fees are assessed only on transactions paid after the confirmation is mailed or delivered to the consumer. (Comment 1005.17(b)-7))

**Assessing fees.** For consumers who have not opted in, institutions are prohibited from charging overdraft fees for paying those transactions. This prohibition applies to daily or sustained overdraft, negative balance, or similar fees. However, the rule does not prohibit an institution from assessing these fees if the negative balance is attributable, in whole or part, to a check, ACH or other transaction not subject to the fee prohibition. However, if the negative balance is attributable in part to an ATM transaction, for example, and in part to a check, a fee may be assessed based on the date when the check is paid into overdraft, not the date of the ATM or one-time debit transaction.

**Conditioning payment of other overdrafts.** The financial institution may not condition the payment of other types of overdraft transactions on the consumer's affirmative consent, and the financial institution may not decline to pay other types of overdraft transactions because the consumer has not affirmatively consented to the payment of ATM and one-time debit card overdrafts. (12 CFR 1005.17(b)(2)) In other words, the financial institution may not use different criteria for paying other types of overdraft transactions for consumers who have consented and for consumers who have not consented. (Comment 1005.17(b)(2)-1)

# CFPB Consumer
# Laws and Regulations                                    EFTA

**Same account terms, conditions, and features.** In addition, the financial institution must provide to consumers who do not affirmatively consent the same account terms, conditions, and features (except the payment of ATM and one-time debit overdrafts) that are available to consumers who do affirmatively consent. (12 CFR 1005.17(b)(3)) That requirement includes, but is not limited to:

- Interest rates paid;

- Fees assessed;

- The type of ATM or debit card provided to the depositor;[16]

- Minimum balance requirements; and

- On-line bill payment services. (Comment 1005.17(b)(3)-1)

**Joint Accounts.** Any consumer may consent, or revoke consent, for payment of ATM or one-time debit card transactions from a joint account. (12 CFR 1005.17(e))

**Continuing Right to Consent or Revoke.** A consumer may consent to the payment of ATM and one-time debit card overdrafts at any time. A consumer may also revoke consent at any time. The financial institution must implement a revocation as soon as reasonably practicable. (12 CFR 1005.17(f)) The financial institution need not waive overdraft fees assessed before it implements the consumer's revocation. (Comment 1005.17(f)-1)

**Duration of Consent.** Consent remains effective until the consumer revokes it, unless the financial institution terminates the overdraft service. (12 CFR 1005.17(g)) The financial institution may terminate the overdraft service, for example, if the consumer makes excessive use of the service. (Comment 1005.17(g)-1)

**Effective Date.** The overdraft services rule became effective on January 19, 2010, and compliance became mandatory on July 1, 2010. For accounts opened on or after July 1, 2010, the financial institution must obtain consent before charging a fee for payment of any ATM or one-time debit overdraft. However, for accounts opened before July 1, 2010, the financial institution may not charge a fee for paying any ATM or one-time debit overdraft on or after August 15, 2010, unless it has obtained consent. (See 12 CFR 1005.17(c))

---

[16] For example, the financial institution may not provide a PIN-only debit card to consumers who do not opt in, and a debit card with both PIN and signature-debit features to consumers who do opt in.

# CFPB Consumer Laws and Regulations

**EFTA**

## IV.    Issuance of Access Devices – 12 CFR 1005.5 and 1005.18

In general, a financial institution may issue an access device to a consumer only in the following cases:

- The consumer requested it in writing or orally.[17]

- It is a renewal of, or a substitute for, an accepted access device (as defined in 12 CFR 1005.2(a)). (12 CFR 1005.5(a)).

Only one renewal or substitute device may replace a previously issued device. A financial institution may provide additional devices at the time it issues the renewal or substitute access device provided the institution complies with the requirements for issuing unsolicited access devices for the additional devices (Comments 1005.5(a)(2)-1 and 1005.5(b)-5).

A financial institution may issue an unsolicited access device only if the access device meets all of the following criteria. The access device is:

- Not validated - that is, it cannot be used to initiate an EFT.

- Accompanied by the explanation that it is not validated and how the consumer may dispose of it if the consumer does not wish to validate it.

- Accompanied by a complete disclosure, in accordance with 12 CFR 1005.7, of the consumer's rights and liabilities that will apply if the access device is validated.

- Validated only upon oral or written request from the consumer and after a verification of the consumer's identity by some reasonable means (12 CFR 1005.5(b)).

The financial institution may use any reasonable means of verifying the consumer's identity, but the consumer is not liable for any unauthorized transfers if an imposter succeeds in validating the access device (Comment 1005.5(b)-4).

**Payroll Card Access Devices.** Consistent with 12 CFR 1005.5(a), a financial institution may issue a payroll card access device only in response to an oral or written request for the device or as a renewal or substitute for an accepted access device. A consumer is deemed to request an access device for a payroll account when the consumer chooses to receive salary or other compensation through a payroll card account (Comment 1005.18(a)-1).

**EFT added to credit card.** The EFTA and Regulation E apply when the capability to initiate EFTs is added to an accepted credit card (as defined under Regulation Z). The EFTA and Regulation E also apply to the issuance of an access device that permits credit extensions under a

---

[17] For a joint account, a financial institution may issue an access device to each account holder for whom the requesting holder specifically requests an access device (Comment 1005.5(a)(1)-1).

# CFPB Consumer
# Laws and Regulations                                            EFTA

preexisting agreement between the consumer and a financial institution to extend credit only to cover overdrafts (or to maintain a specified minimum balance). The Truth in Lending Act and Regulation Z govern the addition of a credit feature to an accepted access device, and except as discussed above, the issuance of a credit card that is also an access device. For information on Regulation E's relationship to other laws, including Truth in Lending, see 12 CFR 1005.12.

# V.        Consumer Liability and Error Resolution

## Liability of Consumers for Unauthorized Transfers –
## 12 CFR 1005.6

A consumer may be liable for an unauthorized EFT (defined in 12 CFR 1005.2(m)) depending on when the consumer notifies the financial institution and whether an access device was used to conduct the transaction. Under the EFTA, there is no bright-line time limit within which consumers must report unauthorized EFTs (71 Fed. Reg. 1638, 1653 (Jan. 10, 2006)).

The extent of the consumer's liability is determined solely by the consumer's promptness in notifying the financial institution (Comment 1005.6(b)-3). Other factors **may not** be used as a basis to hold consumers liable. Regulation E expressly prohibits the following factors as the basis for imposing greater liability than is permissible under Regulation E: the consumer was negligent (e.g., wrote a PIN on an ATM card); an agreement between the consumer and the financial institution provides for greater liability; or the consumer is liable for a greater amount under state law (Comments 1005.6(b)-2 and 1005.6(b)-3).

A consumer may only be held liable for an unauthorized transaction, within the limitations set forth in 12 CFR 1005.6(b), if:

- The financial institution has provided all of the following written disclosures to the consumer:

    o   A summary of the consumer's liability for unauthorized EFTs.

    o   The telephone number and address for reporting that an unauthorized EFT has been or may be made.

    o   The financial institution's business days.

- Any access device used to affect the EFT was an accepted access device (as defined in 12 CFR 1005.2(a)).

- The financial institution has provided a means to identify the consumer to whom the access device was issued (12 CFR 1005.6(a)).

Regulation E allows, but does not require, the financial institution to provide a separate means to identify each consumer of a multiple-user account (Comment 1005.6(a)-2).

The limitations on the amount of consumer liability for unauthorized EFTs, the time limits within which consumers must report unauthorized EFTs, and the liability for failing to adhere to

# CFPB Consumer
# Laws and Regulations                                    EFTA

those time limits, are listed in the chart below. The financial institution may impose <u>less</u> consumer liability than is provided by 12 CFR 1005.6 based on state law or the deposit agreement (12 CFR 1005.6(b)(6)).

**Consumer Liability for Unauthorized Transfers**

| Event | Timing of Consumer Notice to Financial Institution | Maximum liability |
|---|---|---|
| Loss or theft of access device[18] | Within two business days after learning of loss or theft | Lesser of $50, OR total amount of unauthorized transfers. |
| Loss or theft of access device | More than two business days after learning of loss or theft up to 60 calendar days after transmittal of statement showing first unauthorized transfer made with access device. | Lesser of $500, OR the sum of: <br> (a) $50 or the total amount of unauthorized transfers occurring in the first two business days, whichever is less; AND <br> (b) The amount of unauthorized transfers occurring after two business days and before notice to the financial institution.[19] |
| Loss or theft of access device | More than 60 calendar days after transmittal of statement showing first unauthorized transfer made with access device. | For transfers occurring within the 60-day period, the lesser of $500, OR the sum of <br> (a) Lesser of $50 or the amount of unauthorized transfers in first two business days; AND <br> (b) The amount of unauthorized transfers occurring after two business days. <br> For transfers occurring after the 60-day period, unlimited liability (until the financial institution is notified)[20] |
| Unauthorized transfer(s) not involving loss or theft of an access device | Within 60 calendar days after transmittal of the periodic statement on which the unauthorized transfer first appears. | No liability. |
| Unauthorized transfer(s) not involving loss or theft of an access device | More than 60 calendar days after transmittal of the periodic statement on which the unauthorized transfer first appears. | Unlimited liability for unauthorized transfers occurring 60 calendar days after the periodic statement and before notice to the financial institution. |

**Knowledge of Loss or Theft.** The fact that a consumer has received a periodic statement reflecting an unauthorized transaction is a factor, but not conclusive evidence, in determining whether the consumer had knowledge of a loss or theft of the access device (Comment 1005.6(b)(1)-2).

---

[18] Includes a personal identification number (PIN) if used without a card in a telephone transaction, for example.

[19] Provided the financial institution demonstrates that these transfers would not have occurred had notice been given within the two-business-day period.

[20] Provided the financial institution demonstrates that these transfers would not have occurred had notice been given within the 60-day period.

# CFPB Consumer
# Laws and Regulations                                            EFTA

**Timing of Notice.** If a consumer's delay in notifying a financial institution was due to extenuating circumstances, such as extended travel or hospitalization, the time periods for notification specified above must be extended to a reasonable time (12 CFR 1005.6(b)(4); Comment 1005.6(b)(4)-1).

**Notice to the Financial Institution.** A consumer gives notice to a financial institution about unauthorized use when the consumer takes reasonable steps to provide the financial institution with the pertinent information, whether or not a particular employee actually receives the information (12 CFR 1005.6(b)(5)(i)). Even if the consumer is unable to provide the account number or the card number, the notice effectively limits the consumer's liability if the consumer sufficiently identifies the account in question, for example, by giving the name on the account and the type of account (Comment 1005.6(b)(5)-3). At the consumer's option, notice may be given in person, by telephone, or in writing (12 CFR 1005.6(b)(5)(ii)). Notice in writing is considered given at the time the consumer mails the notice or delivers the notice for transmission by any other usual means to the financial institution. Notice may also be considered given when the financial institution becomes aware of circumstances leading to the reasonable belief that an unauthorized transfer has been or may be made (12 CFR 1005.6(b)(5)(iii)).

**Relation of Error Resolution to Truth in Lending.** Regulation E's liability and error resolution provisions apply to an extension of credit that occurs under an agreement between the consumer and a financial institution to extend credit when the consumer's account is overdrawn, to maintain a specified minimum balance in the consumer's account, or under an overdraft service (12 CFR 1005.12(a)(1)(ii)). As provided in 12 CFR 1005.12 and related commentary, for transactions involving access devices that also function as credit cards, the liability and error resolution provisions of Regulation E or Regulation Z will apply depending on the nature of the transaction:

- If the unauthorized use of a combined access device-credit card solely involves an extension of credit, other than an extension of credit described under 12 CFR 1005.12(a)(1)(iii), and does not involve an EFT, for example, when the card is used to draw cash advances directly from a credit line, only the error resolution provisions of Regulation Z will apply.

- If the unauthorized use of a combined access device-credit card involves only an EFT, for example, debit card purchases or cash withdrawals at an ATM from a checking account, only the error resolution provisions of Regulation E will apply.

- If a combined access device-credit card is stolen and unauthorized transactions are made by using the card as both a debit card and a credit card, Regulation E will apply to the unauthorized transactions in which the card was used as a debit card, and Regulation Z will apply to the unauthorized transactions in which the card was used as a credit card.

## Procedures for Resolving Errors — 12 CFR 1005.11

This section defines the term *error* and describes the steps the consumer must take when asserting an error in order to receive the protection of the EFTA and Regulation E, and the procedures that a financial institution must follow to resolve an alleged error.

# CFPB Consumer
# Laws and Regulations                                          EFTA

An *error* includes any of the following:

- An unauthorized EFT.

- An incorrect EFT to or from the consumer's account.

- The omission from a periodic statement of an EFT to or from the consumer's account that should have been included.

- A computational or bookkeeping error made by the financial institution relating to an EFT.

- The consumer's receipt of an incorrect amount of money from an electronic terminal.

- An EFT not identified in accordance with the requirements of 12 CFR 1005.9 or 1005.10(a).

- A consumer's request for any documentation required by 12 CFR 1005.9 or 1005.10(a) or for additional information or clarification concerning an EFT (12 CFR 1005.11(a)(1)).

The term *error* does not include:

- A routine inquiry about the balance in the consumer's account or a request for duplicate copies of documentation or other information that is made only for tax or other record-keeping purposes (12 CFR 1005.11(a)(2)(i), (ii), and (iii)).

- The fact that a financial institution does not make a terminal receipt available for a transfer of $15 or less in accordance with 1005.9(e) (Comment 1005.11(a)-6).

A financial institution must comply with the error resolution procedures in 12 CFR 1005.11 with respect to any oral or written notice of error from the consumer that:

- The financial institution receives not later than 60 days after sending a periodic statement or other documentation first reflecting the alleged error (see 12 CFR 1005.14 and 1005.18).

- Enables the financial institution to identify the consumer's name and account number.

- Indicates why the consumer believes the error exists and, to the extent possible, the type, date, and amount of the error (12 CFR 1005.11(b)(1)).

A financial institution may require a consumer to give written confirmation of an error within 10 business days of giving oral notice. The financial institution must provide the address where confirmation must be sent (12 CFR 1005.11(b)(2)).

**Error Resolution Procedures.** After receiving a notice of error, the financial institution must do all of the following:

- Promptly investigate the oral or written allegation of error.

- Complete its investigation within 10 business days (12 CFR 1005.11(c)(1)).

# CFPB Consumer
# Laws and Regulations                                                      EFTA

- Report the results of its investigation within three business days after completing its investigation.

- Correct the error within one business day after determining that an error has occurred.

The financial institution may take up to 45 calendar days (12 CFR 1005.11(c)(2)) to complete its investigation provided it:

- Provisionally credits the funds (including interest, where applicable) to the consumer's account within the 10 business-day period.

- Advises the consumer within two business days of the provisional crediting.

- Gives the consumer full use of the funds during the investigation.

A financial institution need not provisionally credit the account to take up to 45 calendar days to complete its investigation if the consumer fails to provide the required written confirmation of an oral notice of error, or if the notice of error involves an account subject to the margin requirements or other aspects of Regulation T (Securities Credit by Brokers and Dealers, 12 CFR Part 220) (12 CFR 1005.11(c)(2)(i)(B)).

However, where an error involves an unauthorized EFT, the financial institution must comply with the requirements of the provisions relating to unauthorized EFTs before holding the consumer liable, even if the consumer does not provide a notice of error within the time limits in 12 CFR 1005.11(b) (Comment 1005.11(b)(1)-7).

When investigating a claim of error, the financial institution need only review its own records if the alleged error concerns a transfer to or from a third party, and there is no agreement between the financial institution and the third party for the type of EFT involved (12 CFR 1005.11(c)(4)). However, the financial institution may not limit its investigation solely to the payment instructions where other information within the financial institution's records pertaining to a particular account may help to resolve a consumer's claim (Comment 1005.11(c)(4)-5).

If, after investigating the alleged error, the financial institution determines that an error has occurred, it must promptly (within one business day after such determination) correct the error, including the crediting of interest if applicable. The financial institution must provide within three business days of the completed investigation an oral or written report of the correction to the consumer and, as applicable, notify the consumer that the provisional credit has been made final (12 CFR 1005.11(c)(2)(iii) and (iv)).

If the financial institution determines that no error occurred or that an error occurred in a different manner or amount from that described by the consumer, the financial institution must mail or deliver a written explanation of its findings within three business days after concluding its investigation. The explanation must include a notice of the consumer's rights to request the documents upon which the financial institution relied in making its determination (12 CFR 1005.11(d)).

# CFPB Consumer
# Laws and Regulations                                    EFTA

Upon debiting a provisionally credited amount, the financial institution must notify the consumer of the date and amount of the debit and of the fact that the financial institution will honor (without charge) checks, drafts, or similar paper instruments payable to third parties and preauthorized debits for five business days after transmittal of the notice. The financial institution need honor only items that it would have paid if the provisionally credited funds had not been debited. Upon request from the consumer, the financial institution must promptly mail or deliver to the consumer copies of documents upon which it relied in making its determination (12 CFR 1005.11(d)(2)).

If a notice involves an error that occurred within 30 days after the first deposit to the account was made, the time periods are extended from 10 and 45 days, to 20 and 90 days, respectively. If the notice of error involves a transaction that was not initiated in a state or resulted from a point-of-sale debit card transaction, the 45-day period is extended to 90 days (12 CFR 1005.11(c)(3)).

If a financial institution has fully complied with the investigation requirements, it generally does not need to reinvestigate if a consumer later reasserts the same error. However, it must investigate a claim of error asserted by a consumer following receipt of information provided pursuant to 12 CFR 1005.11(a)(1)(vii) (12 CFR 1005.11(e)).

# VI.    Receipts and Periodic Statements

## Documentation of Transfers – 12 CFR 1005.9

**Electronic terminal receipts.** Receipts must be made available at the time a consumer initiates an EFT at an electronic terminal (12 CFR 1005.9(a)). Financial institutions may provide receipts only to consumers who request one (Comment 1005.9(a)-1). The receipt must include, as applicable:

- **Amount of the transfer.** A charge for making the transfer may be included in the amount, provided the charge is disclosed on the receipt and on a sign posted on or at the terminal.

- **Date**.  The date the consumer initiates the transfer.

- **Type of transfer and type of account**. Descriptions such as "withdrawal from checking" or "transfer from savings to checking" are appropriate. This is true even if the accounts are only similar in function to a checking account (such as a share draft or NOW account) or a savings account (such as a share account). If the access device used can only access one account, the type of account may be omitted (Comments 1005.9(a)(3)-1; 1005.9(3)-2; 1005.9(3)-4; and 1005.9(3)-5).

- **Identifying number or code**. Number or code identifying the consumer's account(s) or the access device used to initiate the transfer – the number and code need not exceed four digits or letters.

- **Location of the terminal**. The location of the terminal where the transfer is initiated or an identification, such as a code or terminal number. If the location is disclosed, except in

# CFPB Consumer
# Laws and Regulations                                    **EFTA**

limited circumstances where all terminals are located in the same city or state, the receipt must include the city and state or foreign country and one of the following:

○ Street address of the terminal;

○ Generally accepted name for the location of the terminal (such as an airport, shopping center, or branch of a financial institution); or

○ Name of the entity (if other than the financial institution providing the statement) at whose place of business the terminal is located, such as a store, and the city, state, or foreign country (12 CFR 1005.9(a)(5)).

**Third party.** Name of any third party to or from whom funds are transferred — a code may be used to identify the party if the code is explained on the receipt. This requirement does not apply if the name of the party is provided by the consumer in a manner the terminal cannot duplicate on the receipt, such as on a payment stub (12 CFR 1005.9(a)(6) and Comment 1005.9(a)(6)-1).

Receipts are not required for electronic EFTs of $15 or less (12 CFR 1005.9(e)).

**Periodic statements.** Periodic statements must be sent for each monthly cycle in which an EFT has occurred, and at least quarterly if no EFT has occurred (12 CFR 1005.9(b)). For each EFT made during the cycle, the statement must include, as applicable:

• Amount of the transfer – if a charge was imposed at an electronic terminal by the owner or operator of the terminal, that charge may be included in the amount.

• Date the transfer was posted to the account.

• Type of transfer(s) and type of account(s) to or from which funds were transferred.

• For each transfer (except deposits of cash, or a check, draft or similar paper instrument to the consumer's account) initiated at an electronic terminal, the terminal location as required for the receipt under 12 CFR 1005.9(a)(5).

• Name of any third party payee or payor.

• Account number(s).

• Total amount of any fees and charges, other than a finance charge as defined by Regulation Z, assessed during the period for making EFTs, the right to make EFTs, or for account maintenance.

• Balance in the account at the beginning and close of the statement period.

• Address and telephone number to be used by the consumer for inquiries or notice of errors. If the financial institution has elected to send the abbreviated error notice with every periodic statement, the address and telephone number may appear on that document.

# CFPB Consumer
# Laws and Regulations                                    **EFTA**

- If the financial institution has provided a telephone number which the consumer can use to find out whether or not a preauthorized transfer has taken place, that telephone number.

## Exceptions to the Periodic Statement Requirement for Certain Accounts

- **Passbook accounts.** Where a consumer's passbook may not be accessed by an EFT other than preauthorized transfers to the account, a periodic statement need not be sent, provided that the financial institution updates the consumer's passbook or provides the required information on a separate document at the consumer's request. To update the passbook, the amount and date of each EFT made since the passbook was last presented must be listed (12 CFR 1005.9(c)(1)(i)). For other accounts that may be accessed only by preauthorized transfers to the account, the financial institution must send a periodic statement at least quarterly (12 CFR 1005.9(c)(1)(ii)).

- **Transfers between accounts.** If a transfer occurs between two accounts of the consumer at the same financial institution, the transfer need only be documented for one of the two accounts (12 CFR 1005.9(c)(2)). A preauthorized transfer between two accounts of the consumer at the same financial institution is subject to the 12 CFR 1005.9(c)(1) rule on preauthorized transfers and not the 12 CFR 1005.9(c)(2) rule on intra-institutional transfers (12 CFR 1005.9(c)(3)).

- **Documentation for Foreign-initiated transfers.** If an EFT is initiated outside the United States, the financial institution need not provide a receipt or a periodic statement reflecting the transfer if it treats an inquiry for clarification or documentation as a notice of error (12 CFR 1005.9(d)).

# Alternatives to Periodic Statements for Financial Institutions Offering Payroll Card Accounts – 12 CFR 1005.18

This section provides an alternative to providing periodic statements for payroll card accounts if financial institutions make the account information available to consumers by specific means. In addition, this section clarifies how financial institutions that do not provide periodic statements for payroll card accounts can comply with the Regulation E requirements relating to initial disclosures, the annual error resolution notice, liability limits, and the error resolution procedures.

Typically, employers and third-party service providers do not meet the definition of a "financial institution" subject to the regulation because they neither (i) hold payroll card accounts nor (ii) issue payroll cards and agree with consumers to provide EFT services in connection with payroll card accounts. However, to the extent an employer or a service provider undertakes either of these functions, it would be deemed a financial institution under the regulation (Comment 1005.18(a)-2).

*Alternative to Periodic Statements.* A financial institution does not need to furnish periodic statements required by 12 CFR 1005.9(b) if the financial institution makes available to the consumer the following:

# CFPB Consumer
# Laws and Regulations                                   EFTA

- The account balance, through a readily available telephone line.

- An electronic history of account transactions covering at least 60 days preceding the date the consumer electronically accesses the account.

- A written history of the account transactions provided promptly in response to an oral or written request and covering at least 60 days preceding the date the financial institution receives the consumer's request (12 CFR 1005.18(b)(1)).

The history of account transactions must include the same type of information required on periodic statements under 12 CFR 1005.9(b) (12 CFR 1005.18(b)(2)).

**Requirements to Comply with Regulation E.** If a financial institution provides an alternative to periodic statements under 12 CFR 1005.18(b), it must comply with the following:

- Modify the initial disclosures under 12 CFR 1005.7(b) by disclosing:

  o A telephone number that the consumer may call to obtain the account balance; the means by which the consumer can obtain an electronic account history, such as the address of an Internet website; and a summary of the consumer's right to receive a written account history upon request (in place of the summary of the right to receive a periodic statement required by 12 CFR 1005.7(b)(6)), including a telephone number to call to request a history. The disclosure required by 12 CFR 1005.18(c)(1)(i) may be made by providing a notice substantially similar to the notice contained in paragraph A-7(a) in Appendix A of Part 1005.

  o A notice concerning error resolution that is substantially similar to the notice contained in paragraph A-7(b) in Appendix A, in place of the notice required by 12 CFR 1005.7(b)(10).

- Provide an annual error resolution notice that is substantially similar to the notice contained in paragraph (b) to A-7 - Model Clauses for Financial Institutions Offering Payroll Card Accounts in Appendix A of 12 CFR Part 1005, in place of the notice required by 12 CFR 1005.8(b). Alternatively, a financial institution may include on or with each electronic and written history provided in accordance with 12 CFR 1005.18(b)(1), a notice substantially similar to the abbreviated notice for periodic statements contained in paragraph A-3(b) in Appendix A, modified as necessary to reflect the error-resolution provisions set forth in this section.

- Limits on consumer liability.

  o For purposes of 12 CFR 1005.6(b)(3), the 60-day period for reporting any unauthorized transfer begins on the earlier of:

    ▪ The date the consumer electronically accesses the consumer's account under 12 CFR 1005.18(b)(1)(ii), provided that the electronic history made available to the consumer reflects the transfer; or

# CFPB Consumer
# Laws and Regulations                                    EFTA

- ▪ The date the financial institution sends a written history of the consumer's account transactions requested by the consumer under 12 CFR 1005.18(b)(1)(iii) in which the unauthorized transfer is first reflected.

- ○ A financial institution may limit the consumer's liability for an unauthorized transfer as provided under 12 CFR 1005.6(b)(3) for transfers reported by the consumer within 120 days after the transfer was credited or debited to the consumer's account.

- Comply with error resolution requirements.

- ○ An error notice is considered timely, and the financial institution must comply with the requirements of 12 CFR 1005.11, if the financial institution receives notice from the consumer no later than the earlier of:

  - ▪ 60 days after the date the consumer electronically accesses the consumer's account under 12 CFR 1005.18(b)(1)(ii), provided that the electronic history made available to the consumer reflects the alleged error; or

  - ▪ 60 days after the date the financial institution sends a written history of the consumer's account transactions requested by the consumer under 12 CFR 1005.18(b)(1)(iii) in which the alleged error is first reflected.

- ○ Alternatively, a financial institution complies with the error resolution requirements in 12 CFR 1005.11 if it investigates any oral or written notice of an error from the consumer that is received by the financial institution within 120 days after the transfer allegedly in error was credited or debited to the consumer's account.

# VII.   Gift Cards – 12 CFR 1005.20

A gift card is a type of prepaid card that is designed to be purchased by one consumer and given to another consumer as a present or expression of appreciation or recognition. When provided in the form of a plastic card, a user of a gift card is able to access and spend the value associated with the device by swiping the card at a POS terminal, much as a person would use a debit card. There are two distinct types of gift cards: closed-loop cards and open-loop cards. Closed-loop gift cards constitute the majority of the gift card market, are typically issued by a merchant, not by a financial institution, and generally can only be used to make purchases at the merchant or group of merchants. Open-loop gift cards are generally issued by financial institutions, typically carry a card network brand logo, can be used at a wide variety of merchants and are more likely to carry fees compared to closed-loop gift cards, including card issuance and transaction-based fees. Open-loop gift cards are more likely to offer the capability of being reloaded with additional value (reloadable) than are closed-loop gift cards.

Concerns have been raised regarding the amount of fees associated with gift cards, the expiration dates of gift cards, and the adequacy of disclosures. Consumers who do not use the value of the card within a short period of time may be surprised to find that the card has expired or that dormancy or service fees have reduced the value of the card. Even where fees or terms are

# CFPB Consumer
# Laws and Regulations                                          **EFTA**

disclosed on or with the card, the disclosures may not be clear and conspicuous. This rule contains restrictions on dormancy, inactivity and service fees and expiration dates.

**Scope of the gift card rule.** The rule is generally limited to gift certificates, store gift cards, or general-use prepaid cards sold or issued to consumers primarily for personal, family, or household purposes. It generally does not apply to cards, codes, or other devices that are reloadable and not marketed or labeled as a gift card or gift certificate and loyalty, award, and promotional gift cards. See also the exclusions from the gift card definitions, described above.

**Restrictions on Dormancy, Inactivity, or Service Fees – 12 CFR 1005.20(d).**
No person may impose a dormancy, inactivity, or service fee with respect to a gift certificate, store gift card, or general-use prepaid card, unless three conditions are satisfied:

- There has been no activity with respect to the certificate or card within the one-year period prior to the imposition of the fee;

- Only one such fee is assessed in a given calendar month; and

- Disclosures regarding dormancy, inactivity, or service fees are clearly and conspicuously stated on the certificate or card, and the person issuing or selling the certificate or card has provided these disclosures to the purchaser before the certificate or card is purchased. See the disclosure section, above, for additional information.

**Expiration Date Restrictions – 12 CFR 1005.20(e).** A gift certificate, store gift card, or general-use prepaid card may not be sold or issued unless the expiration date of the funds underlying the certificate or card is no less than five years after the date of issuance (in the case of a gift certificate) or five years after the date of last load of funds (in the case of a store gift card or general-use prepaid card). In addition, information regarding whether funds underlying a certificate or card may expire must be clearly and conspicuously stated on the certificate or card and disclosed prior to purchase.

No person may sell or issue a certificate or card with an expiration date unless the person has established policies and procedures to provide consumers with a reasonable opportunity to purchase a certificate or card that has an expiration date that is at least five years from the date of purchase. A person who has established policies and procedures to prevent the sale of a certificate or card with less than five years from the date of purchase satisfies this requirement.

A certificate or card generally must include a disclosure alerting consumers to the difference between the certificate or card expiration date and the funds expiration date, if any, and that the consumer may contact the issuer for a replacement card. This disclosure must be stated with equal prominence and in close proximity to the certificate or card expiration date. Non-reloadable certificates or cards that bear an expiration date on the certificate or card that is at least seven years from the date of manufacture need not include this disclosure. See the disclosure section, above, for additional information.

To ensure that consumers are able to access the underlying funds for the full five-year period, fees may not be imposed for replacing an expired certificate or card if the underlying funds

# CFPB Consumer
# Laws and Regulations                                    EFTA

remain valid (unless the card has been lost or stolen). In lieu of sending a replacement certificate or card, issuers may remit, without charge, the remaining balance of funds to the consumer.

**Effective Date.** The requirements of this section apply to any gift certificate, store gift card, or general-use prepaid card sold to a consumer on or after August 22, 2010, or provided to the consumer as a replacement for such certificate or card.[21]

# VIII.  Other Requirements

## Preauthorized Transfers — 12 CFR 1005.10

A preauthorized transfer may be either a credit to, or a debit from, an account.

**Preauthorized transfers to a consumer's account.** When an account is scheduled to be credited by a preauthorized EFT from the same payor at least once every 60 days, the financial institution must provide some form of notice to the consumer so that the consumer can find out whether or not the transfer occurred (12 CFR 1005.10(a)). The notice requirement will be satisfied if the payor provides notice to the consumer that the transfer has been initiated. If the payor does not provide notice, the financial institution must adopt one of three alternative procedures for giving notice.

- The financial institution may give the consumer oral or written notice within two business days after a preauthorized transfer occurs.

- The financial institution may give the consumer oral or written notice, within two business days after the preauthorized transfer was scheduled to occur, that the transfer did not occur.

- The financial institution may establish a readily available telephone line[22] that the consumer may call to find out whether a preauthorized transfer has occurred. If the financial institution selects this option, the telephone number must be disclosed on the initial disclosures and on each periodic statement.

The financial institution need not use any specific language to give notice but may not simply provide the current account balance (Comment 1005.10(a)(1)-1). The financial institution may use different methods of notice for different types of preauthorized transfers and need not offer consumers a choice of notice methods (Comment 1005.10(a)(1)-2).

---

[21] For gift cards produced before April 1, 2010, the mandatory compliance date was extended to January 31, 2011, for several disclosures on the card. 12 CFR 1005.20(h).

[22] The telephone line must be "readily available" so that consumers calling to inquire about transfers are able to have their calls answered reasonably promptly during normal business hours. During the initial call in most cases and within two business days after the initial call in all cases, the financial institution should be able to verify whether the transfer was received (Comment 1005.10(a)(1)-5). Within its primary service area, a financial institution must provide a local or toll-free telephone number (Comment 1005.10(a)(1)-7).

# CFPB Consumer
# Laws and Regulations                                    EFTA

The financial institution that receives a preauthorized transfer must credit the consumer's account as of the day the funds are received (12 CFR 1005.10(a)(3)).

**Preauthorized transfers from a customer's account.** Preauthorized transfers from a consumer's account may only be authorized by the consumer in writing and signed or similarly authenticated by the consumer (12 CFR 1005.10(b)). Signed, written authorizations may be provided electronically, subject to the E-Sign Act (Comment 1005.10(b)-5). In all cases, the party that obtains the authorization from the consumer must provide a copy to the consumer. If a third party payee fails to obtain an authorization in writing or fails to provide a copy to the consumer, the third party payee and not the financial institution has violated Regulation E (Comment 1005.10(b)-2).

**Stop payments.** Consumers have the right to stop payment of preauthorized transfers from accounts. The consumer must notify the financial institution orally or in writing at any time up to three business days before the scheduled date of the transfer (12 CFR 1005.10(c)(1)). If the debit item is resubmitted, the institution must continue to honor the stop-payment order. (Comment 1005.10(c)-1) The financial institution may require written confirmation of an oral stop payment order to be made within 14 days of the consumer's oral notification. If the financial institution requires a written confirmation, it must inform the consumer at the time of the oral stop payment order that written confirmation is required and provide the address to which the confirmation should be sent. If the consumer fails to provide written confirmation, the oral stop payment order ceases to be binding after 14 days (12 CFR 1005.10(c)(2)).

**Notice of transfers varying in amount.** If a preauthorized transfer from a consumer's account varies in amount from the previous transfer under the same authorization or the preauthorized amount, either the financial institution or the designated payee must send to the consumer a written notice, at least 10 days before the scheduled transfer date, of the amount and scheduled date of the transfer (12 CFR 1005.10(d)(1)). The consumer may elect to receive notice only when the amount varies by more than an agreed amount or falls outside a specified range (12 CFR 1005.10(d)(2)). The range must be an acceptable range that the consumer could reasonably anticipate (Comment 1005.10(d)(2)-1). The financial institution does not violate Regulation E if the payee fails to provide sufficient notice (Comment 1005.10(d)-1).

**Compulsory use.** The financial institution may not make it a condition for an extension of credit that repayment will be by means of preauthorized EFT, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account (12 CFR 1005.10(e)(1)). The financial institution may offer a reduced APR or other cost-related incentive for an automatic payment feature as long as the creditor offers other loan programs for the type of credit involved (Comment 1005.10(e)(1)-1).[23]

---

[23] This section also prohibits anyone from requiring the establishment of an account for receipt of EFTs with a particular financial institution either as a condition of employment or the receipt of a government benefit (12 CFR 1005.10(e)(2)). However, the employer may require direct deposit of salary, as long as the employee may choose the financial institution that will accept the direct deposit, or limit direct deposits to one financial institution as long as the employee may choose to receive salary by other means (e.g., check or cash). (Comment 1005.10(e)(2)-1).

# CFPB Consumer
# Laws and Regulations                              EFTA

## Services Offered by Provider Not Holding Consumer's Account — 12 CFR 1005.14

A person who provides EFT services to a consumer but does not hold the consumer's account is a service provider subject to 12 CFR 1005.14 if the person issues an access device that the consumer can use to access the account and no agreement exists between the person and the account-holding financial institution. Transfers initiated by a service provider are often cleared through an automated clearinghouse (ACH).

The responsibilities of the service provider are set forth in 12 CFR 1005.14(b)(l) and (2). The duties of the account-holding financial institution with respect to the service provider are found in 12 CFR 1005.14(c)(l) and (2).

## Electronic Fund Transfer of Government Benefits — 12 CFR 1005.15

12 CFR 1005.15 contains the rules that apply to electronic benefit transfer (EBT) programs. It provides that government agencies must comply with modified rules on the issuance of access devices, periodic statements, initial disclosures, liability for unauthorized use, and error resolution notices.

# IX.    Relation to Other Laws — 12 CFR 1005.12

This section describes the relationship between the EFTA and the Truth in Lending Act (TILA). The section also provides procedures for states to apply for exemptions from the requirements of the EFTA or Regulation E for any class of EFTs within the state.

The EFTA governs the following:

- The issuance of debit cards and other access devices with EFT capabilities.

- The addition of EFT features to credit cards.

- The issuance of access devices whose only credit feature is a pre-existing agreement to extend credit to cover account overdrafts or to maintain a minimum account balance, or is an overdraft service.

# CFPB Consumer
# Laws and Regulations                                    EFTA

The TILA governs all of the following:

- The issuance of credit cards as defined in Regulation Z.

- The addition of a credit feature to a debit card or other access device, other than an overdraft service.

- The issuance of dual debit/credit cards, except for access devices whose only credit feature is a pre-existing agreement to cover account overdrafts or to maintain a minimum account balance, or is an overdraft service.

The EFTA and Regulation E preempt inconsistent state laws, but only to the extent of the inconsistency. The CFPB is given the authority to determine whether or not a state law is inconsistent. A financial institution, state, or other interested party may request the CFPB to make such a determination. A state law will not be deemed inconsistent if it is more protective of the consumer than the EFTA or Regulation E. Upon application, the CFPB has the authority to exempt any state from the requirements of the Act or the regulation for any class of EFTs within a state, with the exception of the civil liability provision.

# X.    Administrative Enforcement and Record Retention — 12 CFR 1005.13

Section 917 of the EFTA sets forth the federal agencies responsible for enforcing compliance with the provisions of the Act.

**Record retention.** Financial institutions must maintain evidence of compliance with the EFTA and Regulation E for at least two years. The agency supervising the financial institution may extend this period. The period may also be extended if the financial institution is subject to an action filed under Sections 910, 915 or 916(a) of the EFTA, which generally apply to the financial institution's liability under the EFTA and Regulation E. Persons subject to the EFTA who have actual notice that they are being investigated or subject to an enforcement proceeding must retain records until disposition of the proceeding.

Records may be stored on microfiche, microfilm, magnetic tape, or in any other manner capable of accurately retaining and reproducing the information.

# XI.    Miscellaneous

EFTA contains several additional provisions that are not directly reflected in the language of Regulation E. Most significantly, 15 U.S.C. 1693*l* provides that the consumer may not waive by agreement any right conferred, or cause of action created, by the EFTA. However, the consumer and another person may provide by agreement greater consumer protections or additional rights or remedies than those provided by EFTA. In addition, the consumer may sign a waiver in settlement of a dispute.

# CFPB Consumer
# Laws and Regulations                                    **EFTA**

If a third party payee has agreed to accept payment by EFT, the consumer's obligation to pay is suspended during any period in which a system malfunction prevents an EFT from occurring (15 U.S.C. 1693j). However, the payee may avoid that suspension by making a written request for payment by means other than EFT.

Failure to comply with the requirements of EFTA can result in civil and criminal liability, as outlined in 15 U.S.C. 1693m and 15 U.S.C. 1693n. Financial institutions may also be liable for damages under 15 U.S.C. 1693h due to failure to complete an EFT or failure to stop a preauthorized transfer when instructed to do so.

## Model disclosure clauses and forms — 12 CFR 1005, Appendix A

Appendix A of Regulation E contains model clauses and forms that financial institutions may use to comply with the requirement disclosure requirements of Regulation E. Use of the model forms is optional and a financial institution may make certain changes to the language or format of the model forms without losing the protection from civil and criminal liability under Sections 915 and 916 of the EFTA. The model forms are:

A-1    Model Clauses for Unsolicited Issuance (12 CFR 1005.5(b)(2))

A-2    Model Clauses for Initial Disclosures (12 CFR 1005.7(b))

A-3    Model Forms for Error Resolution Notice (12 CFR 1005.7(b)(10) and 1005.8(b))

A-4    Model Form for Service-Providing Institutions (12 CFR 1005.14(b)(1)(ii))

A-5    Model Forms for Government Agencies (12 CFR 1005.15(d)(1) and(2))

A-6    Model Clauses for Authorizing One-Time Electronic Fund Transfers Using Information from a Check (12 CFR 1005.3(b)(2))

A-7    Model Clauses for Financial Institutions Offering Payroll Card Accounts (12 CFR 1005.18(c))

A-8    Model Clause for Electronic Collection of Returned Item Fees (12 CFR 1005.3(b)(3))

A-9    Model Consent Form for Overdraft Services (12 CFR 1005.17)

# CFPB Consumer
# Laws and Regulations                                    EFTA

## REFERENCES

### Laws

| | |
|---|---|
| 15 U.S.C. 1693 et seq. | Electronic Fund Transfer Act |
| 15 U.S.C. 7001 et seq. | Electronic Signatures in Global and National Commerce |

### Regulations

**Consumer Financial Protection Bureau Regulation (12 CFR)**

| | |
|---|---|
| Part 1005 | Electronic Fund Transfers (Regulation E) |

# CFPB
# Examination Procedures                                    EFTA

## Electronic Fund Transfer Act[1]

| | |
|---|---|
| Exam Date: | [Click&type] |
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

## Examination Objectives

- To determine the financial institution's compliance with Regulation E.

- To assess the quality of the financial institution's compliance risk management systems and its policies and procedures for implementing Regulation E.

- To determine the reliance that can be placed on the financial institution's internal controls and procedures for monitoring the financial institution's compliance with Regulation E.

- To direct corrective action when violations of law are identified or when the financial institution's policies or internal controls are deficient.

## Examination Procedures

### Management and Policy-Related Examination Procedures

1. Through a review of all written policies and procedures, management's self-assessments, customer complaints, prior examination reports, and any compliance audit material, including work papers and reports, determine whether:

   a. The scope of the audit addresses all provisions as applicable.

   b. Management has taken corrective actions to follow-up on previously identified deficiencies.

   c. The testing includes samples covering all product types and decision centers.

   d. The work performed is accurate.

   e. Significant deficiencies and their causes are included in reports to management and/or to the Board of Directors.

   f. The frequency of review is appropriate.

   **[Click&type]**

---

[1] These reflect FFIEC-approved procedures.

JA0731

**CFPB**

**Examination Procedures**                                              **EFTA**

2.  Through discussions with management and review of available information, determine whether the financial institution's internal controls are adequate to ensure compliance in Regulation E area under review. Consider the following:

    a.  Organization charts;

    b.  Process flowcharts;

    c.  Policies and procedures;

    d.  Account documentation;

    e.  Checklists; and

    f.  Computer program documentation.

**[Click&type]**

3.  Through a review of the financial institution's training materials, determine whether:

    a.  The financial institution provides appropriate training to individuals responsible for Regulation E compliance and operational procedures.

    b.  The training is comprehensive and covers the various aspects of Regulation E that apply to the individual financial institution's product offerings and operations.

**[Click&type]**

4.  Through discussions with management and review of available information, determine whether the financial institution's Overdraft Protection Program has incorporated any guidance issued by its agency, as applicable.  In addition to ATM and one time debit card transactions, consider other types of transactions as well.  Consider the institution's contravention of the guidance when assessing the institution's compliance management system and in determining the overall compliance rating.

**[Click&type]**

# CFPB
# Examination Procedures                                    EFTA

## Transaction-Related Examination Procedures

If upon conclusion of the management and policy-related examination procedures, you note procedural weaknesses or other risks requiring further investigation, conduct transaction testing, as necessary, using the following examination procedures. Use your judgment in deciding the size of each sample of deposit account disclosures, notices, and advertisements. Increase the sample size until you are confident you have sufficiently reviewed all aspects of the financial institution's activities and policies subject to the regulation.

1. Obtain and review copies of the following:
   a. Disclosure forms;
   b. Advertising and scripts for overdraft opt-ins;
   c. Account agreements;
   d. Procedural manuals and written policies;
   e. Merchant agreements;
   f. Automated teller machine receipts and periodic statements;
   g. Error resolution statements/files;
   h. Form letters used in case of errors or questions concerning an account;
   i. Any agreements with third parties allocating compliance responsibilities; and
   j. Consumer complaint files.

   **[Click&type]**

2. Determine the extent and adequacy of the financial institution's policies, procedures, and practices for ensuring compliance with the regulation. In particular, verify that:
   a. Access devices are issued in compliance with the regulation (12 CFR 1005.5(b)).
   b. Required disclosures are given at time the account is opened or prior to the first EFT (12 CFR 1005.4 and 1005.7(c)).
   c. Unauthorized transfer claims are processed in compliance with the regulation (12 CFR 1005.6 and 1005.11).
   d. Liability for unauthorized transfer claims is assessed in compliance with the regulation (12 CFR 1005.6).
   e. Negligence is not a factor in determining customer liability. The deposit agreement may not impose greater liability than Regulation E provides but may provide for less consumer liability (12 CFR 1005.6).
   f. Preauthorized debits and credits comply with the regulation (12 CFR 1005.10).

   **[Click&type]**

# CFPB
# Examination Procedures                                    EFTA

3.  If the financial institution has changed the terms or conditions since the last examination that required a written notice to the customer, determine that the institution provided the proper notice in a timely manner (12 CFR 1005.8(a)).

    **[Click&type]**

4.  Review a sample of periodic statements to determine that they contain sufficient information for the consumer to identify transactions adequately and that they otherwise comply with regulatory requirements (12 CFR 1005.9).

    **[Click&type]**

5.  Verify that the financial institution does not require compulsory use of EFTs, except as authorized (12 CFR 1005.10(e)).

    **[Click&type]**

6.  Review documents relating to a sample of unauthorized transfers, lost or stolen ATM cards, and EFT consumer complaints, and their respective periodic statements. During this review:

    a.  Evaluate the financial institution's compliance with its error resolution procedures to isolate any apparent deficiencies in the financial institution's operations and to ensure that the institution follows its policies for unauthorized transfers (12 CFR 1005.6 and 1005.11).

    b.  Determine whether the financial institution investigates alleged errors and notifies consumers of the results within allotted time frames and, when appropriate, provisionally re-credits the account (12 CFR 1005.11(c)).

    c.  Verify that the financial institution follows regulatory procedures after it completes its investigation and determines either that an error occurred (12 CFR 1005.11(c)(1)) or that no error occurred (12 CFR 1005.11(d)).

    **[Click&type]**

7.  Review a periodic statement for *each* type of account in which electronic fund transfers occur to make sure that the statements comply with the requirements of the regulation (12 CFR 1005.9(b)).

    **[Click&type]**

8.  Review ATM and point-of-sale transfer receipts to determine whether they provide a clear description of the transaction (12 CFR 1005.9(a)).

    **[Click&type]**

9.  Determine that the financial institution is maintaining records of compliance for a period of not less than two years from the date disclosures are required to be made or action is required to be taken (12 CFR 1005.13(b)).

    **[Click&type]**

**CFPB**

**Examination Procedures**                                             **EFTA**

10. If the financial institution maintains payroll card accounts, review a sample of the payroll card accounts. If the financial institution does not provide periodic statements under 12 CFR 1005.9(b) for these accounts, verify that the institution makes available the account balance by telephone, an electronic history of account transactions, and (upon request) a written history of account transactions (12 CFR 1005.18(b)).

   **[Click&type]**

11. If the financial institution maintains payroll card accounts, verify that the financial institution complies with the modified requirements with respect to the required initial disclosures, error resolution notices, limitations on liability, and error resolution procedures (12 CFR 1005.18(c)).

   **[Click&type]**

12. If the financial institution operates one or more ATMs for which it charges a fee for use, determine that the financial institution provides notice of the fee and the amount of the fee both on the machine and on the screen or paper before the consumer is committed to paying the fee (12 CFR 1005.16).

   **[Click&type]**

13. Determine that the financial institution holding a consumer's account does not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service,[2] unless the institution: 12 CFR 1005.17(b)(1)

   - Provides the consumer with a notice in writing (or if the consumer agrees, electronically), that is segregated from all other information and describes the institution's overdraft service;

   - Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card transactions;

   - Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and

   - Provides the consumer with confirmation of the consumer's consent in writing (or if the consumer agrees, electronically), which includes a statement informing the consumer of the right to revoke such consent.

   An institution does not have to meet the notice requirements described above if it has a policy and practice of declining to authorize and pay any ATM or one-time debit card transactions when it has a reasonable belief at the time of

---

[2] The term "overdraft service" means a service under which a financial institution assesses a fee or charge on a consumer's account held by the institution for paying a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account. 12 CFR 1005.17(a). "Overdraft service" does not include a service that transfers funds from another account held by a consumer or a line of credit.

# CFPB
# Examination Procedures                                    EFTA

the authorization request that the consumer does not have sufficient funds available to cover the transaction. However, it is still prohibited from charging fees for paying an ATM or one-time debit transaction overdraft. (12 CFR Part 1005, Supp. I, Comment 1005.17(b)-1(iv)).

NOTE: This section became mandatory on July 1, 2010. However, for accounts opened before July 1, the section became mandatory on August 15, 2010. (12 CFR 1005.17(c)).

**[Click&type]**

13A.   Determine that in assessing overdraft fees for consumers who have not opted in, the institution charges fees only for negative balances, daily, or sustained overdraft, or similar fees, when the negative balance is attributable in whole or in part to checks, ACH or other transactions not subject to the fee prohibition, and the fee is assessed based on the date when the check is paid into overdraft, not the date of the ATM or one-time debit transaction. (Comment 1005.17(b)-9).

**[Click&type]**

14.   Determine that the financial institution does not:
12 CFR 1005.17(b)(2)

- Condition the payment of any overdrafts for checks, ACH transactions, and other types of transactions on the consumer affirmatively consenting to the institution's payment of ATM and one-time debit card transactions pursuant to the institution's overdraft service; or

- Decline to pay checks, ACH transactions, and other types of transactions that overdraw the consumer's account because the consumer has not affirmatively consented to the institution's overdraft service for ATM and one-time debit card transactions.

**[Click&type]**

15.   Determine that the financial institution provides to consumers who do not affirmatively consent to the institution's overdraft service for ATM and one-time debit card transactions the same account terms, conditions, and features that it provides to consumers who affirmatively consent, except for the overdraft service for ATM and one-time debit card transactions. 12 CFR 1005.17(b)(3).

**[Click&type]**

16.   Ensure that the notice required by 12 CFR 1005.17(b)(1)(i) is substantially similar to Model Form A–9, includes all applicable items in the following list, and does not contain any additional information: 12 CFR 1005.17(d) and Comments 1005.17(d)-1 through 1005.17(d)-5.

**CFPB**

**Examination Procedures**                                              **EFTA**

*Overdraft service.* A brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions.

*Fees imposed.* The dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, including any daily or other overdraft fees.  If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed.

*Limits on fees charged.* The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit.

*Disclosure of opt-in right.* An explanation of the consumer's right to affirmatively consent to the financial institution's payment of overdrafts for ATM and one-time debit card transactions pursuant to the institution's overdraft service, including the methods by which the consumer may consent to the service; and

*Alternative plans for covering overdrafts.* If the institution offers both a line of credit subject to Regulation Z (12 CFR Part 1026) and a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state in its opt-in notice that both alternative plans are offered.  If the institution offers one, but not the other, it must state in its opt-in notice the alternative plan that it offers.  If the institution does not offer either plan, it should omit the reference to the alternative plans.  If the financial institution offers additional alternatives for paying overdrafts, it may (but is not required to) disclose those alternatives.

*Permitted modifications and additional content.* If applicable, the institution may modify the content required by 12 CFR 1005.17(d) to indicate that the consumer has the right to opt into, or opt out of, the payment of overdrafts under the institution's overdraft service for other types of transactions, such as checks, ACH transactions, or automatic bill payments; to provide a means for the consumer to exercise this choice; and to disclose the associated returned item fee and that additional merchant fees may apply. The institution may also disclose the consumer's right to revoke consent. The response portion of Model Form A-9 may be tailored to the methods offered for opting in, and may include reasonable methods to identify the account, such as a bar code. For notices provided to consumers who opened accounts prior to July 1, 2010, the financial institution may describe the institution's overdraft service with respect to ATM and one-time debit card transactions with a statement such as "After August 15, 2010, we will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below)."

**CFPB**

**Examination Procedures**                                              **EFTA**

**[Click&type]**

17.    Determine that, when two or more consumers jointly hold an account, the financial institution treats the affirmative consent of any of the joint consumers as affirmative consent for that account, and treats a revocation of affirmative consent by any of the joint consumers as revocation of consent for that account. 12 CFR 1005.17(e).

**[Click&type]**

18.    Ensure that a consumer may affirmatively consent to the financial institution's overdraft service at any time in the manner described in the institution's (12 CFR 1005.17(b)(1)(i)) notice, and that a consumer may also revoke consent at any time in the manner made available to the consumer for providing consent. 12 CFR 1005.17(f).

**[Click&type]**

19.    Determine that the financial institution implements a consumer's revocation of consent as soon as reasonably practicable. 12 CFR 1005(17)(f).

**[Click&type]**

20.    Determine that a consumer's affirmative consent to the institution's overdraft service is effective until revoked by the consumer, or until the financial institution terminates the service.12 CFR 1005.17(g).

**[Click&type]**

21.    Determine that gift card disclosures (made under 12 CFR 1005.20 of Regulation E) are clear and conspicuous. 12 CFR 1005.20(c)(1) Further determine that the disclosures are provided to the consumer in a retainable written or electronic form.  Only disclosures provided under 12 CFR 1005.20(c)(3) (prior to purchase of a gift certificate, store gift card or general-use prepaid card) [or 12 CFR 1005.20(h)(2), if applicable[3]] may be given orally. 12 CFR 1005.20(c)(2).

NOTE: as explained by the rulemaking's prefatory material, permitting oral disclosures is necessary in limited circumstances where disclosures cannot be made prior to purchase unless made orally, such as when a certificate or card is purchased by telephone.  Though disclosures required to be made prior to purchase can be made orally, the rule still requires written or electronic disclosures to be provided on or with the certificate or card.

**[Click&type]**

---

[3] Section 1005.20(h)(2) allows a delayed effective date – until January 31, 2011 – for disclosures on the card for gift cards that were produced before April 1, 2010.  Throughout the remainder of the examination procedures, such sections are denoted by a triple asterisk ***.

**CFPB**

**Examination Procedures**                                              **EFTA**

22.    Determine that the disclosures required by:

- 12 CFR 1005.20(a)(4)(iii) (loyalty, award, or promotional gift card);
- 12 CFR 1005.20(d)(2) (dormancy, inactivity, or service fees);
- 12 CFR 1005.20(e)(3) (expiration date or phone and web regarding replacement); and
- 12 CFR 1005.20(f)(2) (phone and web regarding fees),

are made on the certificate or card, or in the case of a loyalty, award, or promotional gift card, on the card, code, or other device.***

NOTE: A disclosure made in an accompanying terms and conditions document, on packaging surrounding a certificate or card, or on a sticker or other label affixed to the certificate or card does not constitute a disclosure on the certificate or card.

If the certificate or card is electronic, determine that disclosures are provided electronically on the certificate or card provided to the consumer.

If an issuer provides a code or confirmation to a consumer orally, determine that the issuer provides to the consumer a written or electronic copy of the code or confirmation promptly, and the applicable disclosures are provided on the written copy of the code or confirmation. 12 CFR 1005.20(c)(4).

**[Click&type]**

23.    Determine that the following are stated, as applicable, clearly and conspicuously on the gift certificate, store gift card, or general-use prepaid card:***

- The amount of any dormancy, inactivity, or service fee that may be charged;
- How often such fee may be assessed; and
- That such fee may be assessed for inactivity. 12 CFR 1005.20(d)(2).

**[Click&type]**

24.    Determine that the following disclosures are provided in connection with a gift certificate, store gift card, or general-use prepaid card as applicable: ***

- For each type of fee that may be imposed in connection with the certificate or card (other than a dormancy, inactivity, or service fee, which are discussed above) the following information must be provided on or with the certificate or card: 12 CFR 1005.20(f)(1).
  - The type of fee;
  - The amount of the fee (or an explanation of how the fee will be determined); and
  - The conditions under which the fee may be imposed.
- A toll-free telephone number and, if one is maintained, a website, that a

**CFPB**

**Examination Procedures**                                                    **EFTA**

consumer may use to obtain information about fees described in paragraphs 12 CFR 1005.20(d)(2) and 12 CFR 1005.20(f)(1) (described immediately above) of this section must be disclosed on the certificate or card.  12 CFR 1005.20(f)(2).

**[Click&type]**

25. If an expiration date applies to a certificate or card, determine that the following disclosures are provided on the certificate or card, as applicable: \*\*\*

- The expiration date for the underlying funds or, if the underlying funds do not expire, that fact;

- A toll-free telephone number and, if one is maintained, a website that a consumer may use to obtain a replacement certificate or card after the certificate or card expires if the underlying funds may be available; and

- Except where a non-reloadable certificate or card bears an expiration date that is at least seven years from the date of manufacture, a statement, disclosed with equal prominence and in close proximity to the certificate or card expiration date, that:
  - o The certificate or card expires, but the underlying funds either do not expire or expire later than the certificate or card, and

- The consumer may contact the issuer for a replacement card.  12 CFR 1005.20(e)(3).

**[Click&type]**

26. Determine that a loyalty, award, or promotional gift card sold or issued by the examined institution sets forth the following disclosures, as applicable: 12 CFR 1005.20(a)(4)(iii)

- A statement on the front of the card, code, or other device, indicating that the card, code, or other device is issued for loyalty, award, or promotional purposes;

- The expiration date for the underlying funds on the front of the card, code, or other device;

- The amount of any fees that may be imposed in connection with the card, code, or other device, and the conditions under which they may be imposed. This disclosure must be provided on or with the card, code, or other device; and

- A toll-free telephone number and, if one is maintained, a website that a consumer may use to obtain fee information on the card, code, or other device.

**[Click&type]**

# CFPB

# Examination Procedures                                    EFTA

27. Determine that a person (examined institution) that issues or sells a gift certificate, store gift card, or general-use prepaid card discloses to the consumer, prior to purchase, the information required by 12 CFR 1005.20(d)(2) (dormancy, inactivity, or service fees), 12 CFR 1005.20(e)(3) (expiration date or phone and web regarding replacement), and 12 CFR 1005.20(f)(1) (other fees). 12 CFR 1005.20(c)(3).

   **[Click&type]**

28. Determine that the fees and terms and conditions of expiration that are required to be disclosed prior to purchase are not changed after purchase. 12 CFR 1005.20(c)(3). ***

   **[Click&type]**

29. Determine that no person(examined institution) imposes a dormancy, inactivity, or service fee with respect to a gift certificate, store gift card, or general-use prepaid card, unless: 12 CFR 1005.20(d).

   - There has been no activity with respect to the certificate or card, in the one year period ending on the date on which the fee is imposed;

   - Required disclosures are provided;

   - Not more than one dormancy, inactivity, or service fee is imposed in any given calendar month.

   **[Click&type]**

30. Determine that the person (examined institution) does not sell or issue a gift certificate, store gift card, or general-use prepaid card with an expiration date unless: 12 CFR 1005.20(e). ***

   - Required expiration date disclosures are provided on the certificate or card, as applicable;

   - It has established policies and procedures to provide consumers with a reasonable opportunity to purchase a certificate or card with at least five years remaining until the certificate or card expiration date;

   - The expiration date for the underlying funds is at least the later of:

     o Five years after the date the gift certificate was initially issued, or the date on which funds were last loaded to a store gift card or general-use prepaid card; or

     o The certificate or card expiration date, if any; and

   - No fee or charge is imposed on the cardholder for replacing the gift certificate, store gift card, or general-use prepaid card or for providing the certificate or card holder with the remaining balance in some other manner prior to the funds expiration date, unless such certificate or card has been lost or stolen.

# CFPB
# Examination Procedures                                    EFTA

[Click&type]

31.  For cards produced prior to April 1, 2010, 12 CFR 1005.20 (c)(3), (d)(2), (e)(1), (e)(3), and (f) did not apply until January 31, 2011, if certain conditions were met. If applicable, determine that the issuer:

- Complies with all other non-suspended provisions of the gift card rules;

- Does not impose an expiration date with respect to the funds underlying such certificate or card and, at the consumer's request, replaces such certificate or card if it has funds remaining, at no cost to the consumer;

- Discloses through in-store signage, messages during customer service calls, websites, and general advertising, that:

  o The underlying funds of such certificate or card do not expire;

  o Consumers holding such certificate or card have a right to a free replacement certificate or card, accompanied by the packaging and materials typically associated with such certificate or card; and

  o Any dormancy, inactivity, or service fee for such certificate or card that might otherwise be charged will not be charged if such fees do not comply with Section 915 of the Electronic Fund Transfer Act.

Determine that the above disclosures (i) were provided until January 31, 2011, with respect to in-store signage and general advertising, (ii) and are provided until January 31, 2013, with respect to messages during customer service calls and websites.

[Click&Type]

## Examiner's Summary, Recommendations, and Comments

[Click&Type]

# CFPB
# Examination Checklist                                    EFTA

## Electronic Fund Transfer Act[1] (Regulation E)

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

This questionnaire can be used to review audit workpapers, to evaluate financial institution policies, to perform transaction testing, and to train as appropriate. Complete only those aspects of the checklist that specifically relate to the issue being reviewed, evaluated, or tested, and retain those completed sections in the workpapers.

When reviewing audit, evaluating financial institution policies, or performing transaction testing, a "No" answer indicates a possible exception/deficiency and you should explain it in the workpapers. If a line item is not applicable within the area you are reviewing, indicate by using "NA."

Check the applicable use:

☐ **Audit**             ☐**Financial Institution Policies**             ☐**Transaction Testing**

|  | Yes | No | NA |
|---|---|---|---|

## Issuance of Access Devices – 12 CFR 1005.5

1.  Do the financial institution's policies, practices, and procedures allow that validated access devices are issued only:

    - In response to oral or written requests (12 CFR 1005.5(a)(1)) or    ☐ ☐ ☐

    - As a renewal or substitution for an accepted access device? (12 CFR 1005.5(a)(2))    ☐ ☐ ☐

2.  Do the financial institution's policies, practices, and procedures allow that unsolicited access devices are issued only when the devices are:

    - Not validated? (12 CFR 1005.5(b)(1))    ☐ ☐ ☐

    - Accompanied by a clear explanation that they are not validated and how they may be disposed of if validation is not desired? (12 CFR 1005.5(b)(2))    ☐ ☐ ☐

    - Accompanied by the initial disclosures required by 12 CFR 1005.7? (12 CFR 1005.5(b)(3))    ☐ ☐ ☐

---

[1] These reflect FFIEC-approved procedures.

# CFPB
# Examination Checklist                                        **EFTA**

|  | Yes | No | NA |
|---|---|---|---|

- Validated only in response to a consumer's request and after the financial institution has verified the consumer's identity by reasonable means (e.g., photograph, fingerprint, personal visit, signature)? (12 CFR 1005.5(b)(4) and Staff Commentary)   ☐ ☐ ☐

## Consumer Liability for Unauthorized Electronic Fund Transfers — 12 CFR 1005.6

3. Does the financial institution impose liability on the consumer for unauthorized transfers only if: (12 CFR 1005.6(a))

- Any access device that was used was an accepted access device?   ☐ ☐ ☐

- The institution has provided a means to identify the consumer to whom it was issued?   ☐ ☐ ☐

- The institution has provided the disclosures required by 12 CFR 1005.7(b)(l), (2), and (3)?   ☐ ☐ ☐

4. Does the financial institution **not** rely on consumer negligence or the deposit agreement to impose greater consumer liability for unauthorized EFTs than is permitted under Regulation E? (12 CFR Part 1005, Supp. 1, Comments 1005.6(b)-1 and -2)   ☐ ☐ ☐

5. If a consumer notifies the financial institution within two business days after learning of the loss or theft of an access device, does the financial institution limit the consumer's liability for unauthorized EFTs to the lesser of $50 or actual loss? (12 CFR 1005.6(b)(1))   ☐ ☐ ☐

6. If a consumer does not notify the financial institution within two business days after learning of the loss or theft of an access device, does the institution limit the consumer's liability for unauthorized EFTs to the lesser of $500 or the sum of (12 CFR 1005.6(b)(2)):

- $50 or the amount of unauthorized EFTs that occurred within the two business days, whichever is less;   ☐ ☐ ☐

**plus**

- The amount of unauthorized EFTs that occurred after the close of two business days and before notice to the financial institution (provided the financial institution establishes that these transfers would not have occurred had the consumer notified the financial institution within that two-day period)?   ☐ ☐ ☐

# CFPB
# Examination Checklist                                    EFTA

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 7. | If a consumer notifies the financial institution of an unauthorized EFT within 60 calendar days of transmittal of the periodic statement upon which the unauthorized EFT appears, does the financial institution not hold the consumer liable for the unauthorized transfers that occur after the 60-day period? (12 CFR 1005.6(b)(3)) | ☐ | ☐ | ☐ |
| 8. | If a consumer does not notify the financial institution of an unauthorized EFT within 60 calendar days of transmittal of the periodic statement upon which the unauthorized EFT appears, does the financial institution ensure that the consumer's liability does not exceed the amount of the unauthorized transfers that occur after the close of the 60 days and before notice to the financial institution, if the financial institution establishes that the transfers would not have occurred had timely notice been given? (12 CFR 1005.6(b)(3)) | ☐ | ☐ | ☐ |
| 9. | If a consumer notifies the financial institution of an unauthorized EFT within the timeframes discussed in questions 7 or 8 and the consumer's access device is involved in the unauthorized transfer, does the financial institution hold the consumer liable for amounts as set forth in 12 CFR 1005.6(b)(1) or (2) (discussed in questions 5 and 6)? (12 CFR 1005.6(b)(3))<br><br>NOTE: The first two tiers of liability (as set forth in 12 CFR 1005.6(b)(1) and (2) and discussed in questions 5 and 6) do not apply to unauthorized transfers from a consumer's account made without an access device. (Comment 1005.6(b)(3)-2) | ☐ | ☐ | ☐ |
| 10. | Does the financial institution extend the 60-day time period by a reasonable amount, if the consumer's delay in notification was due to an extenuating circumstance? (12 CFR 1005.6(b)(4)) | ☐ | ☐ | ☐ |
| 11. | Does the financial institution consider notice to be made when the consumer takes steps reasonably necessary to provide the institution with pertinent information, whether or not a particular employee or agent of the institution actually received the information? (12 CFR 1005.6(b)(5)(i)) | ☐ | ☐ | ☐ |
| 12. | Does the financial institution allow the consumer to provide notice in person, by telephone, or in writing? (12 CFR 1005.6(b)(5)(ii)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    EFTA

|  | Yes | No | NA |
|---|---|---|---|
| 13. Does the financial institution consider written notice to be given at the time the consumer mails or delivers the notice for transmission to the institution by any other usual means? (12 CFR 1005.6(b)(5)(iii)) | ☐ | ☐ | ☐ |
| 14. Does the financial institution consider notice given when it becomes aware of circumstances leading to the reasonable belief that an unauthorized transfer to or from the consumer's account has been or may be made?  (12 CFR 1005.6(b)(5)(iii)) | ☐ | ☐ | ☐ |
| 15. Does the financial institution limit the consumer's liability to a lesser amount than provided by 12 CFR 1005.6, when state law or an agreement between the consumer and the financial institution provide for such an amount? (12 CFR 1005.6(b)(6)) | ☐ | ☐ | ☐ |

## Initial Disclosures – 12 CFR 1005.7

| | Yes | No | NA |
|---|---|---|---|
| 16. Does the financial institution provide the initial disclosures at the time a consumer contracts for an EFT service or before the first EFT is made involving the consumer's account? (12 CFR 1005.7(a)) | ☐ | ☐ | ☐ |
| 17. Do the financial institution's initial disclosures provide the following information, as applicable: | | | |
| • A summary of the consumer's liability for unauthorized transfers under 12 CFR 1005.6 or under state or other applicable law or agreement? (12 CFR 1005.7(b)(1)) | ☐ | ☐ | ☐ |
| • The telephone number and address of the person or office to be notified when the consumer believes that an unauthorized EFT has been or may be made? (12 CFR 1005.7(b)(2)) | ☐ | ☐ | ☐ |
| • The financial institution's business days? (12 CFR 1005.7(b)(3)) | ☐ | ☐ | ☐ |
| • The type of EFTs the consumer may make and any limits on the frequency and dollar amount of transfers? (If details on the limits on frequency and dollar amount are essential to maintain the security of the system, they need not be disclosed.) (12 CFR 1005.7(b)(4)) | ☐ | ☐ | ☐ |
| • Any fees imposed by the financial institution for EFTs or for the right to make transfers? (12 CFR 1005.7(b)(5)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    EFTA

|  | Yes | No | NA |
|---|---|---|---|
| • A summary of the consumer's right to receive receipts and periodic statements, as provided in 12 CFR 1005.9, and notices regarding preauthorized transfers as provided in 12 CFR 1005.10(a) and 1005.10(d)? (12 CFR 1005.7(b)(6)) | ☐ | ☐ | ☐ |
| • A summary of the consumer's right to stop payment of a preauthorized EFT and the procedure for placing a stop payment order, as provided in 12 CFR 1005.10(c)? (12 CFR 1005.7(b)(7)) | ☐ | ☐ | ☐ |
| • A summary of the financial institution's liability to the consumer for its failure to make or to stop certain transfers under the EFTA? (12 CFR 1005.7(b)(8)) | ☐ | ☐ | ☐ |
| • The circumstances under which the financial institution, in the ordinary course of business, may disclose information to third parties concerning the consumer's account? (12 CFR 1005.7(b)(9)) | ☐ | ☐ | ☐ |
| • An error resolution notice that is substantially similar to the Model Form A-3 in appendix A? (12 CFR 1005.7(b)(10)) | ☐ | ☐ | ☐ |
| • A notice that a fee may be imposed by an ATM operator (as defined in 12 CFR 1005.16(a)) when the consumer initiates an EFT or makes a balance inquiry and by any network used to complete the transaction? (12 CFR 1005.7(b)(11)) | ☐ | ☐ | ☐ |
| 18. Does the financial institution provide disclosures at the time a new EFT service is added, if the terms and conditions of the service are different than those initially disclosed? (12 CFR 1005.7(c)) | ☐ | ☐ | ☐ |

## Change-in-Terms Notice;
## Error Resolution Notice — 12 CFR 1005.8

|  | Yes | No | NA |
|---|---|---|---|
| 19. If the financial institution made any changes in terms or conditions required to be disclosed under 12 CFR 1005.7(b) that would result in increased fees, increased liability, fewer types of available EFTs, or stricter limits on the frequency or dollar amount of transfers, did the financial institution provide a written notice to consumers at least 21 days prior to the effective date of such change? (12 CFR 1005.8(a)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    **EFTA**

|  | Yes | No | NA |
|---|---|---|---|
| 20. Does the financial institution provide either the long form error resolution notice at least once every calendar year or the short form error resolution notice on each periodic statement? (12 CFR 1005.8(b)) | ☐ | ☐ | ☐ |

## Receipts at Electronic Terminals; Periodic Statements – 12 CFR 1005.9

| | Yes | No | NA |
|---|---|---|---|
| 21. Does the financial institution make receipts available to the consumer at the time the consumer initiates an EFT at an electronic terminal? The financial institution is exempt from this requirement for EFTs of $15 or less. (12 CFR 1005.9(a) and (e)) | ☐ | ☐ | ☐ |
| 22. Do the receipts contain the following information, as applicable: | | | |
| • The amount of the transfer? (12 CFR 1005.9(a)(1)) | ☐ | ☐ | ☐ |
| • The date the transfer was initiated? (12 CFR 1005.9(a)(2)) | ☐ | ☐ | ☐ |
| • The type of transfer and the type of account to or from which funds were transferred? (12 CFR 1005.9(a)(3)) | ☐ | ☐ | ☐ |
| • A number or code that identifies the consumer's account or the access device used to initiate the transfer? (12 CFR 1005.9(a)(4)) | ☐ | ☐ | ☐ |
| • The terminal location where the transfer is initiated? (12 CFR 1005.9(a)(5)) | ☐ | ☐ | ☐ |
| • The name or other identifying information of any third party to or from whom funds are transferred? (12 CFR 1005.9(a)(6)) | ☐ | ☐ | ☐ |
| 23. Does the financial institution send a periodic statement for each monthly cycle in which an EFT has occurred? If no EFT occurred, does the financial institution send a periodic statement at least quarterly? (12 CFR 1005.9(b)) | ☐ | ☐ | ☐ |
| 24. Does the periodic statement contain the following information, as applicable: | | | |
| • Transaction information for each EFT occurring during the cycle, including the amount of transfer, date of transfer, type of transfer, terminal location, and name of any third-party transferor or transferee? (12 CFR 1005.9(b)(1)) | ☐ | ☐ | ☐ |
| • Account number? (12 CFR 1005.9(b)(2)) | ☐ | ☐ | ☐ |
| • Fees? (12 CFR 1005.9(b)(3)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                  EFTA

|  | Yes | No | NA |
|---|:---:|:---:|:---:|
| • Account balances? (12 CFR 1005.9(b)(4)) | ☐ | ☐ | ☐ |
| • Address and telephone number for inquiries? (12 CFR 1005.9(b)(5)) | ☐ | ☐ | ☐ |
| • Telephone number to ascertain preauthorized transfers, if the financial institution provides telephone notice under 12 CFR 1005.10(a)(1)(iii)? (12 CFR 1005.9(b)(6)) | ☐ | ☐ | ☐ |

## Preauthorized Transfers – 12 CFR 1005.10

| | | Yes | No | NA |
|---|---|:---:|:---:|:---:|
| 25. | If a consumer's account is to be credited by a preauthorized EFT from the same payor at least once every 60 days (and the payor does not already provide notice to the consumer that the transfer has been initiated) (12 CFR 1005.10(a)(2)), does the financial institution do one of the following: | | | |
| | • Provide oral or written notice, within two business days, after the transfer occurs? (12 CFR 1005.10(a)(1)(i)) | ☐ | ☐ | ☐ |
| | • Provide oral or written notice, within two business days after the transfer was scheduled to occur, that the transfer did or did not occur? (12 CFR 1005.10(a)(1)(ii)) | ☐ | ☐ | ☐ |
| | • Provide a readily available telephone line that the consumer can call to determine if the transfer occurred and that telephone number is disclosed on the initial disclosure of account terms and on each periodic statement?  (12 CFR 1005.10(a)(1)(iii)) | ☐ | ☐ | ☐ |
| 26. | Does the financial institution credit the amount of a preauthorized transfer as of the date the funds for the transfer are received? (12 CFR 1005.10(a)(3)) | ☐ | ☐ | ☐ |
| 27. | Does the financial institution ensure that an authorization is obtained for preauthorized transfers from a consumer's account by a written, signed or similarly authenticated authorization, and is a copy of the authorization provided to the consumer? (12 CFR 1005.10(b)) | ☐ | ☐ | ☐ |
| 28. | Does the financial institution allow the consumer to stop payment on a preauthorized EFT by oral or written notice at least three business days before the scheduled date of the transfer? (12 CFR 1005.10(c)(1)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    EFTA

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 29. | If the financial institution requires that the consumer give written confirmation of an oral stop-payment order within 14 days, does the financial institution inform the consumer, at the time they give oral notification, of the requirement and provide the address where they must send the written confirmation? | ☐ | ☐ | ☐ |
|  | NOTE:  An oral stop-payment order ceases to be binding after 14 days if the consumer fails to provide the required written confirmation. (12 CFR 1005.10(c)(2)) | | | |
| 30. | Does the financial institution inform, or ensure that third-party payees inform, the consumer of the right to receive notice of all varying transfers? | ☐ | ☐ | ☐ |
|  | **or** | | | |
|  | Does the financial institution give the consumer the option of receiving notice only when a transfer falls outside a specified range of amounts or differs from the most recent transfer by an agreed-upon amount? (12 CFR 1005.10(d)(2)) | ☐ | ☐ | ☐ |
| 31. | If the financial institution or third-party payee is obligated to send the consumer written notice of the EFT of a varying amount, does the financial institution ensure that: | | | |
|  | • The notice contains the amount and date of transfer? | ☐ | ☐ | ☐ |
|  | • The notice is sent at least 10 days before the scheduled date of transfer? (12 CFR 1005.10(d)(1)) | ☐ | ☐ | ☐ |
| 32. | Does the financial institution not condition an extension of credit to a consumer on the repayment of loans by preauthorized EFT, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account? (12 CFR 1005.10(e)(1)) | ☐ | ☐ | ☐ |
| 33. | Does the financial institution not require a consumer to establish an account for EFTs with a particular institution as a condition of employment or receipt of government benefits? (12 CFR 1005.10(e)(2)) | ☐ | ☐ | ☐ |

## Procedures for Resolving Errors – 12 CFR 1005.11

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 34. | Does the financial institution have procedures to investigate and resolve all oral or written notices of error received no later than 60 days after the institution sends the periodic statement or provides passbook documentation? (12 CFR 1005.11(b)(2)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                   EFTA

| | Yes | No | NA |
|---|---|---|---|
| 35. If the financial institution requires written confirmation of an error within 10 business days of an oral notice, does the financial institution inform the consumer of this requirement and provide the address where the written confirmation must be sent? (12 CFR 1005.11(b)(2)) | ☐ | ☐ | ☐ |
| 36. Does the financial institution have procedures to investigate and resolve alleged errors within 10 business days, except as otherwise provided in 12 CFR 1005.11(c)? (12 CFR 1005.11(c)(1)) <br><br> NOTE:  The time period is extended in certain circumstances. (12 CFR 1005.11(c)(3)) | ☐ | ☐ | ☐ |
| 37. Does the financial institution report investigation results to the consumer within three business days after completing its investigation and correct any error within one business day after determining that an error occurred? (12 CFR 1005.11(c)(1)) | ☐ | ☐ | ☐ |
| 38. If the financial institution is unable to complete its investigation within 10 business days, does the financial institution have procedures to investigate and resolve alleged errors within 45 calendar days of receipt of a notice of error; and: | | | |
| • Does the financial institution provisionally credit the consumer's account in the amount of the alleged error (including interest, if applicable) within 10 business days of receiving the error notice (however, if the financial institution requires, but does not receive, written confirmation within 10 business days, the financial institution is not required to provisionally credit the consumer's account)? | ☐ | ☐ | ☐ |
| • Within two business days after granting any provisional credit, does the financial institution inform the consumer of the amount and date of the provisional credit and gives the consumer full use of the funds during the investigation? | ☐ | ☐ | ☐ |
| • Within one business day after determining that an error occurred, does the financial institution correct the error? and | ☐ | ☐ | ☐ |
| • Does the financial institution report the results to the consumer within three business days after completing its investigation including, if applicable, notice that a provisional credit has been made final? (12 CFR 1005.11(c)) <br><br> NOTE: The time period is extended in certain circumstances (12 CFR 1005.11(c)(3)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    EFTA

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 39. | If a billing error occurred, does the financial institution not impose a charge related to any aspect of the error-resolution process? (Comment 1005.11(c)-3) | ☐ | ☐ | ☐ |
| 40. | If the financial institution determines that no error occurred (or that an error occurred in a manner or amount different from that described by the consumer), does the financial institution send a written explanation of its findings to the consumer and note the consumer's right to request the documents the financial institution used in making its determination? (12 CFR 1005.11(d)(1)) | ☐ | ☐ | ☐ |
| 41. | When the financial institution determines that no error (or a different error) occurred, does the financial institution notify the consumer of the date and amount of the debiting of the provisionally credited amount and the fact that the financial institution will continue to honor checks and drafts to third parties and preauthorized transfers for five business days (to the extent that they would have been paid if the provisionally credited funds had not been debited)? (12 CFR 1005.11(d)(2)) | ☐ | ☐ | ☐ |

## Record Retention — 12 CFR 1005.13

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 42. | Does the financial institution maintain evidence of compliance with the requirements of the EFTA and Regulation E for a period of two years? (12 CFR 1005.13(b)) | ☐ | ☐ | ☐ |

## Disclosures at Automated Teller Machines (ATM) — 12 CFR 1005.16

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 43. | If the financial institution operates an ATM and imposes a fee on a consumer for initiating an EFT or balance inquiry, does the financial institution provide notice that a fee will be imposed and disclose the amount of the fee?  (12 CFR 1005.16(b)) | ☐ | ☐ | ☐ |
| 44. | Does the financial institution post the notice required by 12 CFR 1005.16(b) in a prominent and conspicuous location on or at the ATM? (12 CFR 1005.16(c)(1)) | ☐ | ☐ | ☐ |
| 45. | Does the financial institution provide the notice required by 12 CFR 1005.16(b) either by showing it on the ATM screen or by providing it on paper before the consumer is committed to paying a fee? (12 CFR 1005.16(c)(2)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                        EFTA

|  | Yes | No | NA |
|---|---|---|---|

## Requirements for Overdraft Services – 12 CFR 1005.17

46. Does the financial institution's Overdraft Protection Program incorporate any guidance issued by its agency, as applicable? ☐ ☐ ☐

47. Does the financial institution's Overdraft Protection Program provide "overdraft services," i.e., charge fees for paying ATM and one-time debit overdrafts? (12 CFR 1005.17(a)) <u>If no, do not complete this section.</u> ☐ ☐ ☐

48. If the financial institution assesses a fee or charge (NOTE: fees or charges may generally be assessed only on transactions paid after the confirmation has been mailed or delivered) on the consumer's account for paying an ATM or one-time debit card transaction pursuant to the financial institutions overdraft service, does the financial institution first (12 CFR 1005.17(b)(1)):

- Provide the consumer with a notice in writing, or if the consumer agrees, electronically, that is segregated from all other information and describes the institution's overdraft service (12 CFR 1005.17(b)(1)(i)); ☐ ☐ ☐

- Provide a reasonable opportunity for the consumer to affirmatively consent, or opt-in, to the institution's payment of ATM and one-time debit card transactions (12 CFR 1005.17(b)(1)(ii)); ☐ ☐ ☐

- Obtain the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions (12 CFR 1005.17(b)(1)(iii)); and ☐ ☐ ☐

- Provide the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent? (12 CFR 1005.17(b)(1)(iv)) ☐ ☐ ☐

49. Does the financial institution ensure that it does not condition the payment of any overdrafts for checks, ACH transactions, and other types of transactions on the consumer affirmatively consenting to the institution's payment of ATM and one-time debit card transactions pursuant to the institution's "overdraft services"? (12 CFR 1005.17(b)(2)(i)) ☐ ☐ ☐

# CFPB
# Examination Checklist                                    EFTA

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 50. | Does the financial institution pay checks, ACH transactions, and other types of transactions that overdraw the consumer's account regardless of whether the consumer has affirmatively consented to the institution's overdraft protection service for ATM and one-time debit card transactions? (12 CFR 1005.17(b)(2)(ii)) | ☐ | ☐ | ☐ |
| 51 | For consumers who have **not** opted in, and if an overdraft fee or charge is based on the amount of the outstanding negative balance, does the institution only assess fees where the negative balance is attributable in whole or in part to a check, ACH, or other type of transaction not subject to the prohibition on assessment of overdraft fees? | ☐ | ☐ | ☐ |
|  | For consumers who have **not** opted in, does the financial institution only assess daily or sustained overdraft, negative balance, or similar fees or charges where the negative balance is attributable in whole or in part to a check, ACH, or other type of transaction not subject to the prohibition on assessment of overdraft fees? | ☐ | ☐ | ☐ |
|  | Does the institution base the date on which such a daily or sustained overdraft, negative balance, or similar fee or charge is assessed on the date on which the check, ACH, or other type of transaction was paid into overdraft?  (Comment 1005.17(b)-9) | ☐ | ☐ | ☐ |
| 52. | Does the financial institution provide consumers who do not affirmatively consent to the institution's overdraft service for ATM and one-time debit card transactions the same account terms, conditions, and features that it provides to consumers who affirmatively consent, except for the overdraft service for ATM and one-time debit card transactions? (12 CFR 1005.17(b)(3)) | ☐ | ☐ | ☐ |
| 53. | Is the notice required by (12 CFR 1005.17(b)(1)(i)) substantially similar to Model Form A-9 set forth in Appendix A of (12 CFR 1005.17), including applicable items from the list below, and does it not contain any additional information? (12 CFR 1005.17(d)) | ☐ | ☐ | ☐ |
|  | • Overdraft Service – Does the notice provide a brief description of the overdraft service and the types of transactions for which a fee or charge off paying an overdraft may be imposed, including ATM and one-time debit card transactions? (12 CFR 1005.17(d)(1)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    EFTA

|  | Yes | No | NA |
|---|---|---|---|
| • **Fees imposed** – Does the notice contain the dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the financial institution's overdraft service, including any daily or other overdraft fees?<br><br>NOTE: If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed. (12 CFR 1005.17(d)(2)) | ☐ | ☐ | ☐ |
| • **Limits on Fees Charged** – Does the notice disclose the maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit? (12 CFR 1005.17(d)(3)) | ☐ | ☐ | ☐ |
| • **Disclosure of opt-in right** – Does the notice explain the consumer's right to affirmatively consent to the financial institution's payment of overdrafts for ATM and one-time debit card transactions pursuant to the institution's overdraft service, including the methods by which the consumer may consent to the service? (12 CFR 1005.17(d)(4)) | ☐ | ☐ | ☐ |
| • **Alternative Plans for Covering Overdrafts** – As applicable, does the institution's opt-in notice appropriately address the alternative methods for covering overdrafts? | ☐ | ☐ | ☐ |
| • If the institution offers both a line of credit subject to Regulation Z (12 CFR Part 1026) and a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, does the notice state that both alternative plans are offered? | ☐ | ☐ | ☐ |
| • If the institution offers one, but not the other, does the notice state which of the alternative plan it offers. If the institution does not offer either a line of credit subject to Regulation Z (12 CFR Part 1026) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts plan, does the notice exclude information regarding either of these plans. | ☐ | ☐ | ☐ |
| • If the financial institution offers additional alternatives for paying overdrafts, at its option the institution may (but is not required to) disclose those alternatives. Does its notice describe those alternatives? | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                      EFTA

|  |  | Yes | No | NA |
|---|---|---|---|---|
| | • Permitted Modifications and Additional Content – If  the institution modifies the notice, are the modifications permitted:  to indicate that the consumer has the right to opt into, or out of, the payment of overdrafts under the institution's overdraft service for other types of transactions, such as checks, ACH transactions, or automatic bill payments; to provide a means for the consumer to exercise this choice; and to disclose the associated returned item fee and that additional merchant fees may apply?  The institution may also disclose the consumer's right to revoke consent. The response portion of Model Form A-9 may be tailored to the methods offered for opting in, and may include reasonable methods to identify the account, such as a bar code. For notices provided to consumers who opened accounts prior to July 1, 2010, the financial institution may describe the institution's overdraft service with respect to ATM and one-time debit card transactions with a statement such as "After August 15, 2010, we will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below)." (12 CFR 1005.17(d)(6) and Comments 1005.17(d)-1 through -5)) | ☐ | ☐ | ☐ |
| 54. | Joint Accounts – When two or more consumers jointly hold an account, does the financial institution treat the affirmative consent of any of the joint consumers as affirmative consent for that account, and treat the revocation of affirmative consent by any of the joint consumers as revocation of consent for that account? (12 CFR 1005.17(e)) | ☐ | ☐ | ☐ |
| 55. | Continuing Right to Opt-In or to Revoke Opt-In – Does the financial institution allow the consumer to affirmatively consent to the financial institution's overdraft service at any time in the manner described in the notice required (12 CFR 1005.17(b)(1)(i)) and allow a consumer to revoke consent at any time in the manner made available to the consumer for providing consent? (12 CFR 1005.17(f)) | ☐ | ☐ | ☐ |
| 56. | Does the financial institution implement a consumer's revocation of consent as soon as reasonably practicable? (12 CFR 1005.17(f)) | ☐ | ☐ | ☐ |
| 57. | Is the consumer's affirmative consent to the overdraft service effective until revoked by the consumer, or unless the financial institution terminates the service? (12 CFR 1005.17(g)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    EFTA

|  | Yes | No | NA |
|---|---|---|---|

## Payroll Card Accounts — 12 CFR 1005.18

58.  If the financial institution offers payroll card accounts, does the financial institution **either** provide periodic statements as required by 12 CFR 1005.9(b) **or** make available to the consumer:

- The account balance, through a readily available telephone line, **and**  ☐ ☐ ☐

- An electronic history of the consumer's account transactions, such as through an Internet website, that covers at least 60 days preceding the date the consumer electronically accesses the account, **and**  ☐ ☐ ☐

- A written history of the consumer's account transactions that is provided promptly in response to an oral or written request and that covers at least 60 days preceding the date the financial institution receives the consumer's request? (12 CFR 1005.18(b))  ☐ ☐ ☐

  NOTE:  The history of account transactions must include the information set forth in 12 CFR 1005.9(b).

59.  Does the financial institution provide initial disclosures that include, at a minimum:

- A telephone number that the consumer may call to obtain the account balance, the means by which the consumer can obtain an electronic account history, such as the address of a website, and a summary of the consumer's right to receive a written account history upon request, including a telephone number to call to request a history, and  ☐ ☐ ☐

- A notice concerning error resolution? (12 CFR 1005.18(c)(1))  ☐ ☐ ☐

60.  Does the financial institution provide an annual notice concerning error resolution or, alternatively, an abbreviated notice with each electronic and written history? (12 CFR 1005.18(c)(2))  ☐ ☐ ☐

# CFPB
# Examination Checklist                                    EFTA

|  | Yes | No | NA |
|---|---|---|---|
| 61. Does the financial institution begin the 60-day period for reporting any unauthorized transfer under 12 CFR 1005.6(b)(3) on the earlier of the date the consumer electronically accesses the consumer's account after the electronic history made available to the consumer reflects the transfer; or the date the financial institution sends a written history of the consumer's account transactions requested by the consumer in which the unauthorized transfer is first reflected? (12 CFR 1005.18(c)(3)) | ☐ | ☐ | ☐ |

NOTE:  A financial institution may comply with the provision above by limiting the consumer's liability for an unauthorized transfer as provided under 12 CFR 1005.6(b)(3) for any transfer reported by the consumer within 120 days after the transfer was credited or debited to the consumer's account.

|  | Yes | No | NA |
|---|---|---|---|
| 62. Does the financial institution comply with the error resolution requirements in response to an oral or written notice of an error from the consumer that is received by the earlier of 60 days after the date the consumer electronically accesses the consumer's account after the electronic history made available to the consumer reflects the alleged error; or 60 days after the date the financial institution sends a written history of the consumer's account transactions requested by the consumer in which the alleged error is first reflected? (12 CFR 1005.18(c)(4)) | ☐ | ☐ | ☐ |

NOTE:  The financial institution may comply with the requirements for resolving errors by investigating any oral or written notice of an error from the consumer that is received by the institution within 120 days after the transfer allegedly in error was credited or debited to the consumer's account.

## Requirements for Gift Cards and Gift Certificates – 12 CFR 1005.20

|  | Yes | No | NA |
|---|---|---|---|
| 63. Does the institution offer gift certificates, store gift cards, general-use prepaid cards, loyalty, award, or promotional gift cards? If no, do not complete this section. | ☐ | ☐ | ☐ |
| 64. Determine if the institution offers consumers, primarily for personal, family, or household purposes, in a specified amount, a card, code, or other device on a prepaid basis, the following: |  |  |  |
| • Gift certificates – which may not be increased or reloaded in exchange for payment; and are redeemable upon presentation at a single merchant or an affiliated group of merchants for goods and services? (12 CFR 1005.20(a)(1)) | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    EFTA

|  | Yes | No | NA |
|---|---|---|---|
| • Store gift cards – which may be increased or reloaded, in exchange for payment; and are redeemable upon presentation at a single merchant or an affiliated group of merchants for goods and services? (12 CFR 1005.20(a)(2)) | ☐ | ☐ | ☐ |
| • General-use prepaid cards – which may be increased or reloaded, in exchange for payment; and are redeemable upon presentation at multiple, unaffiliated merchants for goods or services, or useable at automated teller machines? (12 CFR 1005.20(a)(3)) | ☐ | ☐ | ☐ |
| 65. Do loyalty, award, or promotional gift cards as defined by (12 CFR 1005.20(a)(4)) contain the following disclosures as applicable? | | | |
| • A statement indicating that the card, code, or other device is issued for loyalty, award, or promotional purposes, which must be included on the front of the card, code, or other device (12 CFR 1005.20(a)(4)(iii)(A)); | ☐ | ☐ | ☐ |
| • The expiration date for the underlying funds, which must be included on the front of the card, code, or other device (12 CFR 1005.20(a)(4)(iii)(B)); | ☐ | ☐ | ☐ |
| • The amount of fees that may be imposed in connection with the card, code, or other device, and the conditions under which they may be imposed, which must be provided with the card, code, or other device (12 CFR 1005.20(a)(4)(iii)(C)); and | ☐ | ☐ | ☐ |
| • A toll-free telephone number and, if one is maintained, a website, that a consumer may use to obtain fee information, which must be included on or with the card, code, or other device (12 CFR 1005.20(a)(4)(iii)(D))? | ☐ | ☐ | ☐ |
| 66. If the terms of the gift certificate, store gift card, or general-use prepaid card impose a dormancy, inactivity, or service fee as defined under (12 CFR 1005.20(a)), please answer the following: | | | |
| • Has there been activity with respect to the certificate or card, in the one-year period ending on the date on which the fee was imposed (12 CFR 1005.20(d)(1)); | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    EFTA

|  | Yes | No | NA |
|---|---|---|---|
| • As applicable, are the following, clearly and conspicuously stated on the gift certificate, store gift card, or general-use prepaid card***[2]: | ☐ | ☐ | ☐ |
| ○ The amount of any dormancy, inactivity, or service fee that may be charged (12 CFR 1005.20(d)(2)(i)); | ☐ | ☐ | ☐ |
| ○ How often such a fee may be assessed (12 CFR 1005.20(d)(2)(ii)); and | ☐ | ☐ | ☐ |
| ○ That such fee may be assessed for inactivity (12 CFR 1005.20(d)(2)(iii))? | ☐ | ☐ | ☐ |
| • Is the dormancy, inactivity, or service fee imposed limited to one in any given calendar month (12 CFR 1005.20(d)(3))? | ☐ | ☐ | ☐ |

67.  If the financial institution sells or issues a gift certificate, store gift card, or general-use prepaid card with an expiration date, please answer the following:

|  | Yes | No | NA |
|---|---|---|---|
| • Has the financial institution established policies and procedures to provide consumers with a reasonable opportunity to purchase a certificate or card with at least five years remaining until the certificate or card expiration date (12 CFR 1005.20(e)(1))? *** | ☐ | ☐ | ☐ |
| • The expiration date for the underlying funds is at least the later of five years after the date the gift certificate was initially issued, or the date on which funds were last loaded to a store gift card or general-use prepaid card; or the certificate or card expiration date, if any (12 CFR 1005.20(e)(2))? | ☐ | ☐ | ☐ |

68.  If the financial institution sells or issues a gift certificate, store gift card, or general-use prepaid card with an expiration date, then are the following disclosures provided on the certificate or card, as applicable: ***

|  | Yes | No | NA |
|---|---|---|---|
| • The expiration date for the underlying funds, or if the underlying funds do not expire, the fact that the funds do not expire  (12 CFR 1005.20(e)(3)(i)); | ☐ | ☐ | ☐ |

---

[2] Section 1005.20(h)(2) allows a delayed effective date – until January 31, 2011 – for disclosures on the card for gift cards that were produced before April 1, 2010.  Throughout the remainder of the examination procedures, such sections are denoted by a triple asterisk ***.

# CFPB
# Examination Checklist                                              **EFTA**

|  | Yes | No | NA |
|---|---|---|---|

- A toll-free number and, if one is maintained, a website that a consumer may use to obtain a replacement certificate or card after the certificate or card expires if the underlying funds may be available (12 CFR 1005.20(e)(3)(ii)); and ☐ ☐ ☐

- Except where a non-reloadable certificate or card bears an expiration date that is at least seven years from the date of manufacture, a statement, disclosed with equal prominence and in close proximity to the certificate or card expiration date, that: ☐ ☐ ☐

  o The certificate or card expires, but the underlying funds either do not expire or expire later than the certificate or card (12 CFR 1005.20(e)(3)(iii)(A)); ☐ ☐ ☐

  o The consumer may contact the issuer for a replacement card (12 CFR 1005.20(e)(3)(iii)(B)); and ☐ ☐ ☐

  o No fee or charge is imposed on the cardholder for replacing the gift certificate, store gift card, or general-use prepaid card or for providing the certificate or card holder with the remaining balance in some manner prior to the funds expiration date unless such certificate or card has been lost or stolen. (12 CFR 1005.20(e)(4)). ☐ ☐ ☐

69. Are the following disclosures provided in connection with a gift certificate, store gift card, or general-use prepaid card, as applicable: \*\*\*

- For each type of fee that may be imposed in connection with the gift certificate or card (other than a dormancy, inactivity, or service fee subject to the disclosure requirements under (12 CFR 1005.20(d)(2)), the following information must be provided on or with the certificate or card:

  o The type of fee (12 CFR 1005.20(f)(1)(i)); ☐ ☐ ☐

  o The amount of the fee (or an explanation of how the fee will be determined) (12 CFR 1005.20(f)(1)(ii)); and ☐ ☐ ☐

  o The conditions under which the fee may be imposed (12 CFR 1005.20(f)(1)(iii)). ☐ ☐ ☐

- A toll-free telephone number and, if one is maintained, a website, that a consumer may use to obtain information about dormancy, inactivity, service, or each type of fee that may be imposed in connection with the certificate or card (12 CFR 1005.20(f)(2)). ☐ ☐ ☐

# CFPB
# Examination Checklist                                    **EFTA**

|  | | **Yes** | **No** | **NA** |
|---|---|---|---|---|

70. For cards issued prior to April 1, 2010, 12 CFR 1005.20(c)(3), (d)(2), (e)(1), (e)(3), and (f) did not apply until January 31, 2011, if certain conditions were met. If applicable, determine that the issuer:

- Complies with all other non-suspended provisions of the gift card rules; ☐ ☐ ☐

- Does not impose an expiration date with respect to the funds underlying such certificate or card and, at the consumer's request, replaces such certificate or card if it has funds remaining, at no cost to the consumer; ☐ ☐ ☐

- Discloses through in-store signage, messages during customer service calls, websites, and general advertising, that: ☐ ☐ ☐

  - o The underlying funds of such certificate or card do not expire; ☐ ☐ ☐

  - o Consumers holding such certificate or card have a right to a free replacement certificate or card, accompanied by the packaging and materials typically associated with such certificate or card; and ☐ ☐ ☐

  - o Any dormancy, inactivity, or service fee for such certificate or card that might otherwise be charged will not be charged if such fees do not comply with Section 915 of the Electronic Fund Transfer Act. ☐ ☐ ☐

- Determine that the above disclosures (i) were provided until January 31, 2011, with respect to in-store signage and general advertising and (ii) are provided until January 31, 2013, with respect to messages during customer service calls and websites. ☐ ☐ ☐

# Comments

**[Click&type]**

# CFPB Consumer
# Laws and Regulations                                    TISA

## Truth in Savings Act[1]

Regulation DD (12 CFR Part 1030), which implements the Truth in Savings Act (TISA), became effective in June 1993. An official staff commentary interprets the requirements of Regulation DD (12 CFR 1030 (Supplement I)). Since then, several amendments have been made to Regulation DD and the Staff Commentary, including changes effective January 1, 2010, concerning disclosures of aggregate overdraft and returned item fees on periodic statements and balance disclosures provided to consumers through automated systems. In addition, effective July 6, 2010, clarifications were made to the provisions related to overdraft services (NOTE: The effective date for the clarification to 12 CFR 1030.11(a)(1)(i), requiring the term "Total Overdraft Fees" to be used, was October 1, 2010) (75Fed. Reg. 31673).

The Dodd-Frank Act granted rulemaking authority under the Truth in Savings Act to the Consumer Financial Protection Bureau (CFPB) and, with respect to entities under its jurisdiction, granted authority to the CFPB to supervise for and enforce compliance with the Truth in Savings Act and its implementing regulations.[2] In December 2011, the CFPB restated the Federal Reserve's implementing regulation at 12 CFR Part 1030 (76 Fed. Reg. 79276) (December 21, 2011).

The purpose of Regulation DD is to enable consumers to make informed decisions about their accounts at depository institutions through the use of uniform disclosures. The disclosures aid comparison shopping by informing consumers about the fees, annual percentage yield, interest rate, and other terms for deposit accounts. A consumer is entitled to receive disclosures under all of the following circumstances:

- When an account is opened.

- Upon request.

- When the terms of the account are changed.

- When a periodic statement is sent.

- For most time accounts, before the account matures.

---

[1] These reflect FFIEC-approved procedures.

[2] Dodd-Frank Act Secs. 1002(12)(P), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. Secs. 5481(12)(P), 5514(b)-(c), and 5515(b)-(c). Section 1100B of the Dodd-Frank Act did not grant the CFPB Truth in Savings Act rulemaking authority over credit unions or repeal the National Credit Union Administration (NCUA)'s rulemaking authority over credit unions under 12 U.S.C. 4311. The NCUA's rule can be found at 12 CFR Part 707.

# CFPB Consumer
# Laws and Regulations                                    TISA

The regulation also includes requirements on the payment of interest, the methods of calculating the balance on which interest is paid, the calculation of the annual-percentage yield, and advertising.

## Coverage — 12 CFR 1030.1

Regulation DD applies to all depository institutions, except credit unions, that offer deposit accounts to residents of any state. Branches of foreign institutions located in the United States are subject to Regulation DD if they offer deposit accounts to consumers. Edge Act and agreement corporations, and agencies of foreign institutions, are not depository institutions for purposes of Regulation DD.

In addition, persons who advertise accounts are subject to the advertising rules. For example, if a deposit broker places an advertisement offering consumers an account at a depository institution, the advertising rules apply to the advertisement, whether the account is to be held by the broker or directly by the consumer.

## Definitions — 12 CFR 1030.2

Section 1030.2 defines key terms used in Regulation DD. Among those definitions are the following:

### Account — 12 CFR 1030.2(a)

An **account** is a deposit account at a depository institution that is held by or offered to a consumer. It includes time, demand, savings, and negotiable order of withdrawal accounts. Regulation DD covers interest-bearing as well as noninterest-bearing accounts.

### Advertisement — 12 CFR 1030.2(b)

An **advertisement** is a commercial message, appearing in any medium, that promotes directly or indirectly

- the availability or terms of, or a deposit in, a new account; and

- for purposes of 12 CFR 1030.8(a) (misleading or inaccurate advertisements) and 1030.11 (additional disclosure requirements for institutions advertising the payment of overdrafts), the terms of, or a deposit in, a new or existing account.

An advertisement includes a commercial message in visual, oral, or print media that invites, offers, or otherwise announces generally to prospective customers the availability or terms of, or a deposit in, a consumer account. Examples of advertisements include telephone solicitations and messages on automated teller machine screens.

# CFPB Consumer
# Laws and Regulations

**TISA**

### Annual Percentage Yield — 12 CFR 1030.2(c)

An **annual percentage yield** is a percentage rate reflecting the total amount of interest paid on an account, based on the interest rate and the frequency of compounding for a 365-day period, or 366-day period during leap years, and calculated according to the rules in Appendix A of Regulation DD. Interest or other earnings are not to be included in the annual percentage yield if the circumstances for determining the interest and other earnings may or may not occur in the future (see Appendix A, footnote 1).

### Average Daily Balance Method — 12 CFR 1030.2(d)

The **average daily balance method** is the application of a periodic rate to the average daily balance in the account for the period. The average daily balance is determined by adding the full amount of principal in the account for each day of the period and dividing that figure by the number of days in the period.

### Bonus — 12 CFR 1030.2(f)

A **bonus** is a premium, gift, award, or other consideration worth more than $10 (whether in the form of cash, credit, merchandise, or any equivalent) given or offered to a consumer during a year in exchange for opening, maintaining, renewing, or increasing an account balance. The term does not include interest, other consideration worth $10 or less given during a year, the waiver or reduction of a fee, or the absorption of expenses.

### Business Day — 12 CFR 1030.2(g)

A **business day** is a calendar day other than a Saturday, a Sunday, or any of the legal public holidays specified in 5 U.S.C. Section 6103(a).

### Consumer — 12 CFR 1030.2(h)

A **consumer** is a natural person who holds an account primarily for personal, family, or household purposes, or to whom such an account is offered. The term does not include accounts held by a natural person on behalf of another in a professional capacity or accounts held by individuals as sole proprietors.

### Daily Balance Method — 12 CFR 1030.2(i)

The **daily balance method** is the application of a daily periodic rate to the full amount of principal in the account each day.

### Depository Institution — 12 CFR 1030.2(j)

The terms **depository institution** and **institution** are defined in Section 19(b)(1)(A)(i)-(vi) of the Federal Reserve Act (12 U.S.C. Section 461). Credit unions are defined in Section

# CFPB Consumer
# Laws and Regulations                                TISA

19(b)(1)(A)(iv). Branches of foreign institutions located in the United States are subject to the regulation if they offer deposit accounts to consumers. Edge Act and agreement corporations, and agencies of foreign institutions, are not depository institutions for purposes of this regulation.

## Deposit Broker – 12 CFR 1030.2(k)

A **deposit broker** is a person who is in the business of placing or facilitating the placement of deposits in an institution, as defined by Section 29(g) of the Federal Deposit Insurance Act (12 U.S.C. Section 1831f(g)).

## Fixed-Rate Account – 12 CFR 1030.2(l)

A **fixed-rate account** is an account for which the institution contracts to give at least 30 calendar days' advance written notice of decreases in the interest rate.

## Grace Period – 12 CFR 1030.2(m)

A **grace period** is a period following the maturity of an automatically renewing time account during which the consumer may withdraw funds without being assessed a penalty.

## Interest – 12 CFR 1030.2(n)

**Interest** is any payment to a consumer or to an account for the use of funds in an account, calculated by applying a periodic rate to the balance. Interest does not include the payment of a bonus or other consideration worth $10 or less during a year, the waiver or reduction of a fee, or the absorption of expenses.

## Interest Rate – 12 CFR 1030.2(o)

An **interest rate** is the annual rate of interest paid on an account and does not reflect compounding. For purposes of the account disclosures in 12 CFR 1030.4(b)(1)(i), the interest rate may, but need not, be referred to as the "annual percentage rate" in addition to being referred to as the "interest rate."

## Passbook Savings Account – 12 CFR 1030.2(p)

A **passbook savings account** is a savings account in which the consumer retains a book or other document in which the institution records transactions on the account. Passbook savings accounts include accounts accessed by preauthorized electronic fund transfers to the account. As defined in Regulation E, a preauthorized electronic fund transfer is an electronic fund transfer authorized in advance to recur at substantially regular intervals. Examples include an account that receives direct deposit of Social Security payments. Accounts permitting access by other electronic means are not passbook savings accounts and must comply with the requirements of 12 CFR 1030.6 if statements are sent four or more times a year.

# CFPB Consumer
# Laws and Regulations                              TISA

---

### Periodic Statement – 12 CFR 1030.2(q)

A **periodic statement** is a statement setting forth information about an account (other than a time account or passbook savings account) that is provided to a consumer on a regular basis four or more times a year.

### State – 12 CFR 1030.2(r)

A **state** is a state, the District of Columbia, the commonwealth of Puerto Rico, and any territory or possession of the United States.

### Stepped-Rate Account – 12 CFR 1030.2(s)

A **stepped-rate account** is an account that has two or more interest rates that take effect in succeeding periods and are known when the account is opened.

### Tiered-Rate Account – 12 CFR 1030.2(t)

A **tiered-rate account** is an account that has two or more interest rates that are applicable to specified balance levels. A requirement to maintain a minimum balance to earn interest does not make an account a tiered-rate account.

### Time Account – 12 CFR 1030.2(u)

A **time account** is an account with a maturity of at least seven days in which the consumer generally does not have a right to make withdrawals for six days after the account is opened, unless the deposit is subject to an early withdrawal penalty of at least seven days' interest on the amount withdrawn.

### Variable-Rate Account – 12 CFR 1030.2(v)

A **variable-rate account** is an account in which the interest rate may change after the account is opened, unless the institution contracts to give at least 30 calendar days' advance written notice of rate decreases.

## General Disclosure Requirements – 12 CFR 1030.3

### General Requirements – 12 CFR 1030.3(a) and (b)

Section 1030.3 outlines the general requirements for account disclosures and periodic-statement disclosures. Such disclosures are required to be:

- Clear and conspicuous;

- In writing;

---

# CFPB Consumer
# Laws and Regulations                              **TISA**

- In a form the consumer may keep;

- Clearly identifiable for different accounts, if disclosures for different accounts are combined;

- Reflective of the terms of the legal obligation of the account agreement between the consumer and the depository institution;

- Available in English upon request if the disclosures are made in languages other than English; and

- Consistent in terminology when describing terms or features that are required to be disclosed.

## Electronic Disclosures

Regulation DD disclosures may be provided to the consumer in electronic form, subject to compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. Section 7001 et seq.).

The E-Sign Act does not mandate that institutions or consumers use or accept electronic records or signatures. It does, however, permit institutions to satisfy any statutory or regulatory requirements that information, such as Regulation DD disclosures, be provided in writing to a consumer by providing the information electronically after obtaining the consumer's affirmative consent.

But before the consumer can give consent, the institution must provide the consumer with a clear and conspicuous statement, informing the consumer of:

- Any right or option to have the information provided in paper or non-electronic form.

- The right to withdraw the consent to receive information electronically and the consequences, including fees, of doing so.

- The scope of the consent (whether the consent applies only to a particular transaction or to identified categories of records that may be provided during the course of the parties' relationship).

- The procedures to withdraw consent and to update information needed to contact the consumer electronically.

- The methods by which a consumer may obtain, upon request, a paper copy of an electronic record after having given consent to receive the information electronically and whether any fee will be charged.

Prior to consenting, the institution must provide the consumer with a statement of the hardware and software requirements for access to and retention of the electronic information. The

# CFPB Consumer
# Laws and Regulations                                    TISA

consumer must consent electronically or confirm consent electronically in a manner that "reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent."

After the consent, if an institution changes the hardware or software requirements such that a consumer may be prevented from accessing and retaining information electronically, the institution must notify the consumer of the new requirements and must allow the consumer to withdraw consent without charge.

Under 12 CFR 1030.3(a), the disclosures required by 12 CFR 1030.4(a)(2) (Disclosures Upon Request) and 1030.8 (Advertising) may be provided to the consumer in electronic form without regard to the consumer consent or other provisions of the E-Sign Act, as set forth in those sections of Regulation DD. For example, under 12 CFR 1030.4(a)(2) (Disclosures Upon Request), if a consumer who is not present at the institution makes a request for disclosures, the institution may provide the disclosures electronically if the consumer agrees without regard to the consumer consent or other provisions of the E-Sign Act.

## Relation to Regulation E – 12 CFR 1030.3(c)

Disclosures required by and provided in accordance with the Electronic Fund Transfer Act (15 U.S.C. Section 1693 et seq.) and its implementing Regulation E (12 CFR Part 1005), that are also required by Regulation DD, may be substituted for the disclosures required by this regulation. Compliance with Regulation E is deemed to satisfy the disclosure requirements of Regulation DD, such as when:

- An institution changes a term that triggers a notice under Regulation E, and uses the timing and disclosure rules of Regulation E for sending change-in-term notices.

- Consumers add an ATM access feature to an account, and the institution provides disclosures pursuant to Regulation E, including disclosure of fees (see 12 CFR 1005.7).

- An institution, complying with the timing rules of Regulation E, discloses at the same time fees for electronic services (such as for balance inquiry fees at ATMs) required to be disclosed by this regulation but not by Regulation E.

- An institution relies on Regulation E's rules regarding disclosure of limitations on the frequency and amount of electronic fund transfers, including security-related exceptions. But any limitations on intra-institutional transfers to or from the consumer's other accounts during a given time period must be disclosed, even though intra-institutional transfers are exempt from Regulation E.

Other general disclosure requirements include the following:

# CFPB Consumer
# Laws and Regulations                                    TISA

## Multiple Consumers – 12 CFR 1030.3(d)

If an account is held by more than one consumer, the institution may make disclosures to any one of the consumers.

## Oral Response to Inquiries – 12 CFR 1030.3(e)

If an institution chooses to provide rate information orally, it must state the annual percentage yield and may state the interest rate. However, the institution may not state any other rate. The advertising rules do not cover an oral response to a rate inquiry.

## Rounding and Accuracy Rules for Rates and Yields – 12 CFR 1030.3(f)

The rounding and accuracy requirements are as follows:

- **Rounding** – The annual percentage yield, the annual percentage yield earned, and the interest rate must be rounded to the nearest one-hundredth of one percentage point (.01%) and expressed to two decimal places. (For account disclosures, the interest rate may be expressed to more than two decimal places.) For example, if an annual percentage yield is calculated at 5.644 percent, it must be rounded down and disclosed as 5.64 percent, or if annual percentage yield is calculated at 5.645 percent, it must be rounded up and disclosed as 5.65 percent.

- **Accuracy** – The annual percentage yield (and the annual percentage yield earned) will be considered accurate if it is not more that one-twentieth of one percentage point (.05 percent) above or below the annual percentage yield (and the annual percentage yield earned) that are calculated in accordance with Appendix A of Regulation DD.

# Account Disclosures – 12 CFR 1030.4

Section 1030.4 covers the delivery and content of account disclosures both at the time an account is open and when requested by a consumer.

## Delivery of Account Disclosures – 12 CFR 1030.4(a)

### Disclosures at Account Opening – 12 CFR 1030.4(a)(1)

A depository institution must provide account disclosures to a consumer before an account is opened or a service is provided, whichever is earlier. (An institution is deemed to have provided a service when a fee, required to be disclosed, is assessed.) An institution must mail or deliver the account opening disclosures no later than ten business days after the account is opened or the service is provided, whichever is earlier, if the consumer:

- Is not present when the account is opened or the service is provided, and

- Has not received the disclosures.

# CFPB Consumer
# Laws and Regulations                                    TISA

If a consumer who is not present at the institution uses electronic means (for example, an Internet website) to apply to open an account or to request a service, the institutions must provide the disclosures before opening the account or providing the service.

### Disclosures Upon Request – 12 CFR 1030.4(a)(2)

A depository institution must provide full account disclosures, including complete fee schedules, to a consumer upon request. Institutions must comply with all requests for this information, whether or not the requester is an existing customer or a prospective customer. A response to an oral inquiry (by telephone or in person) about rates and yields or fees does not trigger the duty to provide account disclosures. However, when consumers ask for written information about an account (whether by telephone, in person, or by other means), the institution must provide disclosures, unless the account is no longer offered to the public.

If the consumer makes the request in person, the institution must provide the disclosures at that time. If a consumer is not present when the request is made, the institution must mail or deliver the disclosures within a reasonable time after it receives the request. Ten business days is considered a reasonable time for responding to requests for account information that a consumer does not make in person, including requests made by electronic means (such as by electronic mail).

If a consumer who is not present at the institution makes a request for account disclosures, including a request made by telephone, email, or via the institution's website, the institution may send the disclosures in paper form or, if the consumer agrees, may provide the disclosures electronically, such as to an email address that the consumer provides for that purpose, or on the institution's website, without regard to the consumer consent or other provisions of the E-Sign Act. The institution is not required to provide, nor is the consumer required to agree to receive, the disclosures required by 12 CFR 1030.4(a)(2) in electronic form.

When providing disclosures upon the request of a consumer, the institution has several choices of how to specify the interest rate and annual percentage yield. The institution may disclose the rate and yield offered:

- Within the most recent seven calendar days;

- As of an identified date; or

- Currently by providing a telephone number for consumers to call.

Further, when providing disclosures upon the request of a consumer, the institution may state the maturity of a time account as a term rather than a date. Describing the maturity of a time account as "1 year" or "6 months," for example, illustrates a statement of the maturity as a term rather than a date ("January 10, 2010").

# CFPB Consumer Laws and Regulations

# TISA

**Content of Account Disclosures – 12 CFR 1030.4(b)**

Account disclosures must include, as applicable, information on the following (see Appendix A and B of Regulation DD for information on the annual percentage yield calculation and for model clauses for account disclosures and sample forms):

### Rate Information – 12 CFR 1030.4(b)(1)

An institution must disclose both the "annual percentage yield" and the "interest rate," using those terms.

For fixed-rate accounts, an institution must disclose the period of time that the interest rate will be in effect.

For variable-rate accounts, an institution must disclose all of the following:

- The fact that the interest rate and annual percentage yield may change.

- How the interest rate is determined.

- The frequency with which the interest rate may change.

- Any limitation on the amount the interest rate may change.

### Compounding and Crediting – 12 CFR 1030.4(b)(2)

An institution must disclose the frequency with which interest is compounded and credited. In cases where consumers will forfeit interest if they close an account before accrued interest is credited, an institution must state that interest will not be paid.

### Balance Information – 12 CFR 1030.4(b)(3)

An institution must disclose the following information about account balances:

- **Minimum balance requirements** – An institution must disclose any minimum balance requirement to:

  o Open the account;

  o Avoid the imposition of a fee; or

  o Obtain the annual percentage yield disclosed.

  In addition, the institution must disclose how the balance is determined to avoid the imposition of a fee or to obtain the annual percentage yield.

# CFPB Consumer
# Laws and Regulations                                    **TISA**

- **Balance computation method** – An explanation of the balance-computation method, specified in 12 CFR 1030.7 of Regulation DD, that is used to calculate interest on the account. An institution may use different methods or periods to calculate minimum balances for purposes of imposing a fee and accruing interest. The institution must disclose each method and corresponding period.

- **When interest begins to accrue** – An institution must state when interest begins to accrue on noncash deposits.

### Fees – 12 CFR 1030.4(b)(4)

An institution must disclose the amount of any fee that may be imposed in connection with the account (or an explanation of how the fee will be determined) and the conditions under which the fee may be imposed. Examples of fees that must be disclosed are:

- Maintenance fees, such as monthly service fees.

- Fees to open or to close an account.

- Fees related to deposits or withdrawals, such as fees for use of the institution's ATMs.

- Fees for special services, such as stop-payment fees.

Institutions must state if fees that may be assessed against an account are tied to other accounts at the institution. For example, if an institution ties the fees payable on a NOW account to balances held in the NOW account and a savings account, the NOW account disclosures must state that fact and explain how the fee is determined.

An institution must specify the categories of transactions for which an overdraft fee may be imposed. For example, it is sufficient to state that the fee applies to overdrafts "created by check, in-person withdrawal, ATM withdrawal, or other electronic means." However, it is insufficient to state that a fee applies "for overdraft items."

### Transaction Limitations – 12 CFR 1030.4(b)(5)

An institution must disclose any limitations on the number or dollar amount of withdrawals or deposits. Examples of such limitations include:

- Limits on the number of checks that may be written on an account within a given time period.

- Limits on withdrawals or deposits during the term of a time account.

# CFPB Consumer
# Laws and Regulations                                    TISA

- Limits under Regulation D (Reserve Requirements on Depository Institutions) on the number of withdrawals permitted from money market deposit accounts by check to third parties each month.

**Features of Time Accounts – 12 CFR 1030.4(b)(6)**

For time accounts, an institution must disclose information about the following features:

- **Time requirements** – An institution must state the maturity date and, for "callable" time accounts, the date or circumstances under which an institution may redeem a time account at the institution's option.

- **Early withdrawal penalties** – An institution must state the following:

  o If a penalty will or may be imposed for early withdrawal.

  o How it is calculated.

  o The conditions for its assessment.

  An institution may, but does not need to, use the term "penalty" to describe the loss of interest that consumers may incur for early withdrawal of funds from an account.

  Examples of early withdrawal penalties include:

  o Monetary penalties, such as "$10.00" or "seven days' interest plus accrued but uncredited interest."

  o Adverse changes to terms such as a lowering of the interest rate, annual percentage yield, or compounding frequency for funds remaining on deposit.

  o Reclamation of bonuses.

- **Withdrawal of interest prior to maturity** – An institution must disclose the following, as applicable:

  o A statement that the annual percentage yield assumes interest remains on deposit until maturity and that a withdrawal will reduce earnings for accounts where:

    ▪ Compounding occurs during the term; and

    ▪ Interest may be withdrawn prior to maturity; or

  o A statement that interest cannot remain on deposit and that payout of interest is mandatory for accounts where:

# CFPB Consumer
# Laws and Regulations                    TISA

■ The stated maturity is greater than one year;

■ Interest is not compounded on an annual or more frequent basis;

■ Interest is required to be paid out at least annually; and

■ The annual percentage yield is determined in accordance with Section E of Appendix A of Regulation DD.

- **Renewal policies** – An institution must state whether an account will, or will not, renew automatically at maturity. If it will, the statement must indicate whether a grace period will be provided and, if so, must indicate the length of that period. For accounts that do not renew automatically, the statement must indicate whether interest will be paid after maturity if the consumer does not renew the account.

### Bonuses – 12 CFR 1030.4(b)(7)

For bonuses, an institution must disclose:

- The amount or type of any bonus.

- When the bonus will be provided.

- Any minimum balance and time requirements to obtain the bonus.

## Subsequent Disclosures – 12 CFR 1030.5

Section 1030.5 covers the required disclosures when the terms of an account change, resulting in a negative effect on the consumer. In addition, this section covers the required disclosures for both time accounts that automatically renew and have a maturity longer than one month and time accounts that do not renew automatically and have a maturity of longer than one year.

### Change in Terms – 12 CFR 1030.5(a)

### Advance Notice Required – 12 CFR 1030.5(a)(1)

An institution must give advance notice to affected consumers of any change in a term that is required to be disclosed if the change may reduce the annual percentage yield or adversely affect the consumer. The notice must include the effective date of the change and must be mailed or delivered at least 30 calendar days before the effective date of the change.

### No Notice Required – 12 CFR 1030.5(a)(2)

An institution is not required to provide a notice for any of the following changes:

# CFPB Consumer
# Laws and Regulations                                    TISA

- For variable-rate accounts, any change in the interest rate and corresponding changes in the annual percentage yield.

- Any changes in fees assessed for check printing.

- For short-term time accounts, any changes in any term for accounts with maturities of one month or less.

- The imposition of account maintenance or activity fees that previously had been waived for a consumer when the consumer was employed by the depository institution, but who is no longer employed there.

- The expiration of a one-year period that was part of a promotion, described in the account opening disclosures, for example, to "waive $4.00 monthly service charges for one year."

## Notice for Time Accounts Longer Than One Month That Renew Automatically — 12 CFR 1030.5(b)

For automatically renewing time accounts with maturities longer than one month, an institution must provide different disclosures depending on whether the maturity is longer than one year or whether the maturity is one year or less. The institution must provide all disclosures before maturity. The requirements are summarized in the following pages, including in Table 1.

# CFPB Consumer Laws and Regulations

**TISA**

**Table 1**

| Subsequent Notice Requirements for Time Accounts | | |
|---|---|---|
| **Maturity** | **Automatically Renewable (Rollover)** | **Non-automatically Renewable (Non-rollover)** |
| > One Year | *Timing*<br><br>(a)  30 calendar days before maturity,<br><br>or<br><br>(b)  20 calendar days before end of grace period, if a grace period is at least 5 calendar days<br><br>*Content*<br><br>(a)  Date existing account matures<br><br>(b)  Disclosures for a new account (12 CFR 1030.4(b))<br><br>If terms have not been determined, indicate this fact, state the date when they will be determined, and provide a telephone number to obtain the terms (12 CFR 1030.5(b)(1)). | *Timing*<br><br>10 calendar days before maturity<br><br>*Content*<br><br>Maturity date, and whether or not interest will be paid after maturity (12 CFR 1030.5(c)) |
| > One Month and < One Year | *Timing*<br><br>(a)  30 calendar days before maturity,<br><br>or<br><br>(b)  20 calendar days before end of grace period, if a grace period is at least 5 calendar days<br><br>*Content*<br><br>(a)  Disclosures required under 12 CFR 1030.5(b)(1),<br><br>or<br><br>(b)  Date of maturities of existing and new account, any change in terms, and a difference in terms between new account and ones of existing account.<br><br>If terms have not been determined, indicate this fact, state the date when they will be determined, and provide a telephone number to obtain the terms (12 CFR 1030.5(b)(2)). | No subsequent notice required |

# CFPB Consumer
# Laws and Regulations

# TISA

*Maturities Longer Than One Year – 12 CFR 1030.5(b)(1)*

If the maturity is longer than one year, the institution must provide the date the existing account matures and the required account disclosures for a new account, as described in 12 CFR 1030.4(b). If the interest rate and annual percentage yield that will be paid for the new account are unknown when disclosures are provided, the institution must state the following:

- That those rates have not yet been determined.

- The date when they will be determined.

- A telephone number for consumers to call to obtain the interest rate and the annual percentage yield for the new account.

*Maturities Longer Than One Month but No More Than One Year*
*– 12 CFR 1030.5(b)(2)*

If the maturity is longer than one month but less than or equal to one year, the institution must either:

- Provide the disclosures required in 12 CFR 1030.5(b)(1) for accounts longer than one year; or

- Disclose to the consumer:

  o The date the existing account matures and the new maturity date if the account is renewed;

  o The interest rate and the annual percentage yield for the new account if they are known. If the rates have not yet been determined, the institution must disclose:

    - The date when they will be determined; and

    - A telephone number the consumer may call to obtain the interest rate and the annual percentage yield for the new account; and

  o Any difference in the terms of the new account as compared to the terms required to be disclosed for the existing account.

## Delivery – 12 CFR 1030.5(b)

The institution must mail or deliver all disclosures at least 30 calendar days before maturity of the existing account. Alternatively, the institution may mail or deliver the disclosures at least 20 calendar days before the end of the grace period on the existing account, provided a grace period of at least five calendar days is allowed.

# CFPB Consumer
# Laws and Regulations                                    TISA

### Notice for Time Accounts Longer Than One Year That Do Not Renew Automatically — 12 CFR 1030.5(c)

For time accounts with maturity longer than one year that do not renew automatically at maturity, an institution must disclose to consumers the maturity date and whether interest will be paid after maturity. The institution must mail or deliver the disclosures at least 10 calendar days before maturity of the existing account. The requirements are summarized in Table 1.

## Periodic Statement Disclosures — 12 CFR 1030.6

Regulation DD does not require institutions to provide periodic statements. However, for institutions that mail or deliver periodic statements, 12 CFR 1030.6 sets forth specific information that must be included in a periodic statement.

### General Requirements — 12 CFR 1030.6(a)

The statement must include the following disclosures:

#### Annual Percentage Yield Earned — 12 CFR 1030.6(a)(1)

An institution must state the *annual percentage yield* earned during the statement period, using that term, and calculated according to Appendix A of Regulation DD.

#### Amount of Interest — 12 CFR 1030.6(a)(2)

An institution must state the dollar amount of interest earned during the statement period, whether or not it was credited. In disclosing interest earned for the period, an institution must use the term "interest" or terminology such as:

- "Interest paid," to describe interest that has been credited; or

- "Interest accrued" or "interest earned," to indicate that interest is not yet credited.

#### Fees Imposed — 12 CFR 1030.6(a)(3)

An institution must report any fees that are required to be disclosed and that were debited to the account during the statement period, even if assessed for an earlier period. The fees must be itemized by type and dollar amounts. When fees of the same type are imposed more than once in a statement period, an institution may itemize each fee separately or group the fees together and disclose a total dollar amount for all fees of that type. When fees of the same type are grouped together, the description must make clear that the dollar figure represents more than a single fee, for example, "total fees for checks written this period." The Staff Commentary provides examples of fees that may not be grouped together. For example, an institution must separately identify whether a fee was for the payment of an overdraft or for returning the item unpaid.

# CFPB Consumer
# Laws and Regulations                                    TISA

Total overdraft and returned item fees, if any, must also be disclosed on the periodic statement. An institution must provide totals for fees for the payment of overdrafts and totals for items returned unpaid, both for the statement period and for the calendar year to date. See 12 CFR 1030.11(a)(1) and (2). (The institution may, however, continue to itemize overdraft and returned item fees.)

### Length of Period – 12 CFR 1030.6(a)(4)

An institution must indicate the total number of days in the statement period, or the beginning and ending dates of the period. Institutions providing the beginning and ending dates of the period must make clear whether both dates are included in the period.

### Combined Statements (Staff Commentary 12 CFR 1030.6(a)-3)

Institutions may provide information about an account (for example, a Money Market Deposit Account) on the periodic statement for another account (such as a Negotiable Order of Withdrawal account) without triggering the disclosures required by this section, as long as:

- The information is limited to the account number, the type of account, or balance information; and

- The institution also provides a periodic statement complying with this section for each account.

### Aggregate Fee Disclosure – 12 CFR 1030.6(a)(5)

- If an institution charges a consumer overdraft and returned item fees, it must disclose them on the consumer's periodic statement as required by 12 CFR 1030.11(a).

## Special Rule for Average Daily Balance Method – 12 CFR 1030.6(b)

Section 1030.6 has special periodic statement requirements for an institution using the average daily balance method and calculating interest for a period other than the statement period. In these situations, an institution must calculate and disclose the annual percentage yield earned and amount of interest earned based on the time period used rather than the statement period. In addition, when disclosing the length of period requirement on the periodic statement, an institution must state this information for the statement period as well as the interest-calculation period. See Staff Commentary for examples.

## Payment of Interest – 12 CFR 1030.7

Section 1030.7 covers the payment of interest, including how to determine the balance on which to pay interest, the daily periodic rate to use, and the date interest begins to accrue.

# CFPB Consumer Laws and Regulations

# TISA

***Permissible Methods to Determine Balance to Calculate Interest – 12 CFR 1030.7(a)(1)***

An institution must calculate interest on the full amount of principal in an account for each day by using one of the following methods:

- **Daily balance method**, where the daily periodic rate is applied to the full amount of principal in the account each day.

- **Average daily balance method**, where a periodic rate is applied to the average daily balance in the account for the period. The average daily balance is determined by adding the full amount of principal in the account for each day of the period and dividing that figure by the number of days in the period.

The following are prohibited calculation methods:

- **Ending-balance method**, where interest is paid on the balance in the account at the end of the period.

- **Low-balance method**, where interest is paid based on the lowest balance in the account for any day in that period.

- **Investable-balance method**, where interest is paid on a percentage of the balance, excluding the amount set aside for reserve requirements.

***Use of 365-day basis (Staff Commentary 12 CFR 1030.7(a)(1)-2)***

Institutions may apply a daily periodic rate greater than 1/365 of the interest rate – such as 1/360 of the interest rate – as long as it is applied 365 days a year.

***Leap Year (Staff Commentary 12 CFR 1030.7(a)(1)-4)***

Institutions may apply a daily rate of 1/366 or 1/365 of the interest rate for 366 days in a leap year, if the account will earn interest for February 29.

***Maturity of Time Accounts (Staff Commentary 12 CFR 1030.7(a)(1)-5)***

Institutions are not required to pay interest after time accounts mature.

***Dormant Accounts (Staff Commentary 12 CFR 1030.7(a)(1)-6)***

Institutions must pay interest on funds in an account, even if inactivity or the infrequency of transactions would permit the institution to consider the account to be "inactive" or "dormant" (or similar status) as defined by state, other laws, or the account contract.

# CFPB Consumer Laws and Regulations

# TISA

## Permissible Methods to Determine Minimum Balance to Earn Interest – 12 CFR 1030.7(a)(2)

If an institution requires a minimum balance to earn interest, it must use the same method to determine the required minimum balance as it uses to determine the balance on which interest is calculated. For example, if an institution requires a $300 minimum balance that would be determined by using the average daily balance method, then it must calculate interest based on the average daily balance method. Further, an institution may use an additional method that is unequivocally beneficial to the consumer.

### Balances Below the Minimum (Staff Commentary 12 CFR 1030.7(a)(2)-1 and 2)

An institution that requires a minimum balance may choose not to pay interest for days or period when the balance drops below the required minimum, whether they use the daily-balance method or the average daily balance method to calculate interest.

### Paying on Full Balance (Staff Commentary 12 CFR 1030.7(a)(2)-4)

Institutions must pay interest on the full balance in the account that meets the required minimum balance. For example, if $300 is the minimum daily balance required to earn interest, and a consumer deposits $500, the institution must pay the stated interest rate on the full $500 and not just on $200.

### Minimum Balance Not Affecting Interest (Staff Commentary 12 CFR 1030.7(a)(2)-7)

Institutions may use the daily balance, average daily balance, or any other computation method to calculate minimum-balance requirements that do not involve the payment of interest. For example, an institution may use any computation method to compute minimum balances for assessing fees.

## Compounding and Crediting Policies – 12 CFR 1030.7(b)

This section does not require institutions to compound or credit interest at any particular frequency. Institutions choosing to compound interest may compound or credit interest annually, semi-annually, quarterly, monthly, daily, continuously, or on any other basis.

An institution may choose not to pay accrued interest if consumers close an account prior to the date accrued interest is credited, as long as the institution has disclosed this practice in the initial account disclosures.

## Date Interest Begins to Accrue – 12 CFR 1030.7(c)

Interest shall begin to accrue not later than the business day specified for interest-bearing accounts in Section 606 of the Expedited Funds Availability Act, which states:

# CFPB Consumer Laws and Regulations

**TISA**

> "… interest shall accrue on funds deposited in an interest-bearing account at a depository institution beginning not later than the business day on which the depository institution receives provisional credit for such funds."

Interest shall accrue until the day funds are withdrawn.

## Advertising — 12 CFR 1030.8

Section 1030.8 contains account advertising requirements, including overall general rules and rules for special account features. In addition, the section describes advertising involving certain types of media and in-house posters that are exempt from Regulation DD's advertising requirements.

### General Advertising Rules — 12 CFR 1030.8(a) and (b)

### Misleading or Inaccurate Advertising — 12 CFR 1030.8(a)

An institution may not advertise in a way that is misleading or inaccurate or misrepresents its deposit contract. In addition, an advertisement may not use the word "profit" in referring to interest paid on an account.

An institution's advertisement may not refer to or describe an account as "free" or "no cost" (or contain a similar term such as "fees waived") if a maintenance or activity fee may be imposed on the account. Examples of such maintenance or activity fees include:

- Any fee imposed when a minimum-balance requirement is not met, or when consumers exceed a specified number of transactions.

- Transaction and service fees that consumers reasonably expect to be imposed on a regular basis.

- A flat fee, such as a monthly service fee.

- Fees imposed to deposit, withdraw, or transfer funds, including per-check or per-transaction charges (for example, 25 cents for each withdrawal, whether by check or in person).

Examples of fees that are not maintenance or activity fees include:

- Fees not required to be disclosed under 12 CFR 1030.4(b)(4).

- Check-printing fees.

- Balance-inquiry fees.

- Stop-payment fees and fees associated with checks returned unpaid.

# CFPB Consumer
# Laws and Regulations                                    TISA

- Fees assessed against a dormant account.

- Fees for ATM or electronic transfer services (such as preauthorized transfers or home banking services) not required to obtain an account.

If an account (or a specific account service) is free only for a limited period of time (for example, for one year following the account opening) the account (or service) may be advertised as free if the time period is also stated.

If an electronic advertisement (such as an advertisement appearing on a website) displays a triggering term (such as a bonus or annual percentage yield), described elsewhere in 12 CFR 1030.8, the advertisement must clearly refer the consumer to the location where the additional required information begins. For example, an advertisement that includes a bonus or annual percentage yield may be accompanied by a link that directly takes the consumer to the additional information. As discussed in 12 CFR 1030.3(a), electronic advertising disclosures may be provided to the consumer in electronic form without regard to the consumer consent or other provisions of the E-Sign Act.

The Staff Commentary provides the following examples of advertisements that would ordinarily be misleading, inaccurate, or misrepresent the deposit contract:

- Representing an overdraft service as a "line of credit," unless the service is subject to Regulation Z, 12 CFR Part 1026.

- Representing that the institution will honor all checks or authorize payment of all transactions that overdraw an account, with or without a specified dollar limit, when the institution retains discretion at any time not to honor checks or authorize transactions.

- Representing that consumers with an overdrawn account are allowed to maintain a negative balance when the terms of the account's overdraft service require consumers promptly to return the deposit account to a positive balance.

- Describing an institution's overdraft service solely as protection against bounced checks when the institution also permits overdrafts for a fee for overdrawing accounts by other means, such as ATM withdrawals, debit card transactions, or other electronic fund transfers.

- Advertising an account-related service for which the institution charges a fee in an advertisement that also uses the word "free" or "no cost" (or a similar term) to describe the account, unless the advertisement clearly and conspicuously indicates that there is a cost associated with the service. If the fee is a maintenance or activity fee under 12 CFR 1030.8(a)(2), however, an advertisement may not describe the account as "free" or "no cost" (or contain a similar term) even if the fee is disclosed in the advertisement.

# CFPB Consumer Laws and Regulations

# TISA

## Advertising Rate Information – 12 CFR 1030.8(b)

When an institution states a rate of return in an advertisement, it must do the following:

- State the rate as an "annual percentage yield," using that term.

- If the advertisement uses the abbreviation "APY," state the term "annual percentage yield" at least once in the advertisement.

- If the advertisement uses the term "interest rate," use the term in conjunction with, but not more conspicuously than, the related annual percentage yield.

- It may not state any other rate except "annual percentage yield" or "interest rate".

- Round the annual percentage yield, the annual percentage yield earned, and the interest rate to the nearest one-hundredth of one percentage point (.01%) and express them to two decimal places.

An advertisement for a tiered-rate account that states an annual percentage yield must also state the annual percentage yield for each tier, along with corresponding minimum-balance requirements.

An advertisement for a stepped-rate account that states an interest rate must state all the interest rates and the time period that each rate is in effect.

## Required Advertising for Special Account Features – 12 CFR 1030.8(c)

If an institution advertises an annual percentage yield for a product and the product includes one of the features listed in 12 CFR 1030.8(c)(1)-(6), then the institution must clearly and conspicuously disclose the information outlined in 12 CFR 1030.8(c)(1)-(6) as noted below. However, these requirements do not necessarily apply if the situation falls under the exemptions of 12 CFR 1030.8(e).

### Variable Rates – 12 CFR 1030.8(c)(1)

For variable-rate accounts, the advertisement must state that the rate may change after the account is opened.

### Time Annual Percentage Yield (APY) is Offered – 12 CFR 1030.8(c)(2)

The advertisement must include the period of time during which the annual percentage yield will be offered. Alternatively, the advertisement may state that the annual percentage yield is accurate as of a specified date. The date must be recent in relation to the publication or media broadcast used for the advertisement, taking into account the particular circumstances or production

# CFPB Consumer
# Laws and Regulations                                    TISA

deadlines involved. An advertisement may refer to the annual percentage yield as being accurate as of the date of publication, if the date is on the publication itself.

### Minimum Balance – 12 CFR 1030.8(c)(3)

For accounts that have a required minimum balance, the advertisement must state the minimum balance required to obtain the advertised annual percentage yield. For tiered-rate accounts, the advertisement must state the minimum balance required for each tier in close proximity and with equal prominence to the applicable annual percentage yield.

### Minimum Opening Deposit – 12 CFR 1030.8(c)(4)

For an account that requires a minimum deposit to open the account, the advertisement must state the minimum deposit required to open the account, if it is greater than the minimum balance necessary to obtain the advertised annual percentage yield.

### Effect of Fees – 12 CFR 1030.8(c)(5)

An advertisement must state that fees could reduce the earnings on the account. This requirement only applies to maintenance or activity fees.

### Features of Time Accounts – 12 CFR 1030.8(c)(6)

For time accounts, the advertisement must include:

- Term of the account.

- Early withdrawal penalties – a statement that a penalty will or may be imposed for early withdrawal.

- Required interest payouts – a statement that interest cannot remain on deposit and that payout of interest is mandatory for non-compounding time accounts with the following features:

  o The stated maturity is greater than one year.

  o Interest is not compounded on an annual or more frequent basis.

  o Interest is required to be paid out at least annually.

  o The annual percentage yield is determined in accordance with Section E of Appendix A of Regulation DD.

## Bonuses – 12 CFR 1030.8(d)

If an institution states a bonus in an advertisement, the advertisement must state clearly and conspicuously the following information, if applicable to the advertised product:

# CFPB Consumer Laws and Regulations

# TISA

- "Annual percentage yield," using that term.

- Time requirement to obtain the bonus.

- Minimum balance required to obtain the bonus.

- Minimum balance required to open the account, if it is greater than the minimum balance necessary to obtain the bonus.

- Time when the bonus will be provided.

However, these requirements do not necessarily apply if the situation falls under the exemptions of 12 CFR 1030.8(e). In addition, general statements such as "bonus checking" or "get a bonus when you open a checking account" do not trigger the bonus disclosures.

## Exemption for Certain Advertisements – 12 CFR 1030.8(e)

Section 1030.8(e) exempts certain types of media and certain indoor signs from some of the section's advertising rules.

### Media Exemptions – 12 CFR 1030.8(e)(1)

If an institution advertises through one of the following media, the advertisement does not need to include information required under certain 12 CFR 1030.8 rules, as outlined below:

- Exempted media

  - Broadcast or electronic media, such as television or radio. However, the exemption does not extend to Internet and email advertisements.

  - Outdoor media, such as billboards.

  - Telephone response machines. However, solicitations for a tiered-rate account made through telephone-response machines must provide the annual percentage yields and the balance requirements applicable to each tier.

- Exempted advertising requirements

  - Information required for special account features involving variable rates, time an annual percentage yield is offered, minimum opening deposit, effect of fees, and early withdrawal penalties for time accounts.

  - When bonuses are advertised, information required related to a minimum balance to open an account (if it is greater than the minimum balance necessary to obtain the bonus) and related to when a time the bonus will be provided.

# CFPB Consumer
# Laws and Regulations                                    TISA

---

### *Indoor Signs — 12 CFR 1030.8(e)(2)*

If an institution posts account information on signs inside its premises (or the premises of a deposit broker), the postings are exempt from the advertising requirements for:

- Permissible rates;

- When additional disclosures are required;

- Bonuses; and

- Certain media exemption.

If a sign, falling under this exemption, states a rate of return, it must:

- State the rate as an "annual percentage yield," using that term or the term "APY." The sign must not state any other rate, although the related interest rate may be stated.

- Contain a statement advising consumers to contact an employee for further information about applicable fees and terms.

Indoor signs include advertisements displayed on computer screens, banners, preprinted posters, and chalk or peg boards. Any advertisement inside the premises that can be retained by a consumer (such as a brochure or a printout from a computer) is not an indoor sign.

### Additional Disclosures in Connection With the Payment of Overdrafts — 12 CFR 1030.8(f)

In addition to the general requirement that advertisements not be misleading, an institution that promotes the payment of overdrafts in an advertisement must also include in the advertisement the disclosures required under 12 CFR 1030.11(b).

## Record Retention — 12 CFR 1030.9(c)

Section 1030.9(c) covers the record retention requirements in order for an institution to demonstrate compliance with Regulation DD, including rate information, advertising, and providing disclosures to consumers at the appropriate time (including upon a consumer's request).

### *Timing*

Under Regulation DD, an institution must retain records that evidence compliance for a minimum of two years after the date that disclosures are required to be made or an action is required to be taken. In addition, if required by its supervising agency, an institution may need to retain records for a longer time period.

---

# CFPB Consumer
# Laws and Regulations                                          TISA

An institution may demonstrate its compliance by:

- Establishing and maintaining procedures for paying interest and providing timely disclosures.

- Retaining sample disclosures for each type of account offered to consumers such as account-opening disclosures, copies of advertisements, and change-in-term notices; and information regarding the interest rates and annual percentage yields offered.

### Methods of Retaining Evidence

An institution must be able to reconstruct the required disclosures and other required actions, but does not need to maintain hard copies of disclosures and other records. It may keep records evidencing compliance in microfilm, microfiche, or other methods that reproduce records accurately (including computer files).

### Payment of Interest

An institution must retain sufficient rate and balance information to permit the verification of interest paid on an account, including the payment of interest on the full principal balance.

## 12 CFR 1030.10 — [Reserved]

## Additional Disclosure Requirements for Overdraft Services — 12 CFR 1030.11

Section 1030.11 contains periodic statement and advertising requirements for certain discretionary overdraft services. The requirements address concerns about the uniformity and adequacy of information provided to consumers when they overdraw their deposit accounts. Specifically, they address certain types of services – sometimes referred to as "bounced-check protection" or "courtesy overdraft protection" – which institutions offer to pay consumers' checks and other items when there are insufficient funds in the account. The requirements apply to all depository institutions, regardless of whether they promote their overdraft services.

### Periodic Statement Disclosures — 12 CFR 1030.11(a)

#### Disclosure of Total Fees — 12 CFR 1030.11(a)(1)

The institution must disclose on its periodic statements (if it provides periodic statements) separate totals for the statement period and for the calendar year to date for:

- The total dollar amount for all fees or charges imposed on the account for paying checks or other items when there are insufficient or unavailable funds and the account becomes overdrawn, using the term "Total Overdraft Fees" (the requirement to use the term "Total Overdraft Fees" is effective October 1, 2010); and

# CFPB Consumer
# Laws and Regulations                                    **TISA**

- The total dollar amount for all fees or charges imposed on the account for returning items unpaid.

The aggregate fee disclosures must be placed in close proximity to the disclosure of any fee(s) that may be imposed in connection with the account and must use a substantially similar format as shown below:  (see Appendix B of the regulation). The table must contain lines (or similar markings such as asterisks) inside the table to divide the columns and rows.

|  | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | $60.00 | $150.00 |
| Total Returned Item Fees | 0.00 | 30.00 |

The total dollar amount for paying overdrafts includes per-item fees as well as interest charges, daily or other periodic fees, or fees charged for maintaining an account in overdraft status, whether the overdraft is by check, debit card transaction, or by other transaction type. It also includes fees charged when there are insufficient funds because previously deposited funds are subject to a hold or are uncollected. It does not include fees for transferring funds from another account of the consumer to avoid an overdraft, or fees charged under a service subject to Regulation Z, 12 CFR 1026.

The total dollar amount for all fees for returning items unpaid must include all fees charged to the account for dishonoring or returning checks or other items drawn on the account. The institution must disclose separate totals for the statement period and for the calendar year-to-date. Fees imposed when deposited items are returned are not included. Institutions may use terminology such as ''returned item fee'' or ''NSF fee'' to describe fees for returning items unpaid.

In the case of waived fees, an institution may provide a statement for the current period reflecting that fees imposed during a previous period were waived and credited to the account. Institutions may, but are not required to, reflect the adjustment in the total for the calendar year-to-date and in the applicable statement period. For example, if an institution assesses a fee in January and refunds the fee in February, the institution could disclose a year-to-date total reflecting the amount credited, but it should not affect the total disclosed for the February statement period, because the fee was not assessed in the February statement period. If an institution assesses and then waives and credits a fee within the same cycle, the institution may, at its option, reflect the adjustment in the total disclosed for fees imposed during the current statement period and for the total for the calendar year-to-date. Thus, if the institution assesses and waives the fee in the February statement period, the February fee total could reflect a total net of the waived fee.

The disclosures under this section must be included on periodic statements provided by an institution starting the first statement period that began after January 1, 2010. For example, if a consumer's statement period typically closes on the 15th of each month, an institution must provide the disclosures required by this section on subsequent periodic statements for that

# CFPB Consumer
# Laws and Regulations                                      **TISA**

consumer beginning with the statement reflecting the period from January 16, 2010, to
February 15, 2010.

## Advertising Disclosures for Overdraft Services – 12 CFR 1030.11(b)

### *Disclosures – 12 CFR 1030.11(b)(1)*

Unless an exception in 12 CFR 1030.11(b)(2)-(4) applies, any advertisement promoting the
payment of overdrafts must disclose in a clear and conspicuous manner all of the following:

- The fee(s) for the payment of each overdraft.

- The categories of transactions for which a fee may be imposed for paying an overdraft.

- The time period by which the consumer must repay or cover any overdraft.

- The circumstances under which the institution will not pay an overdraft. It is sufficient to
  state, as applicable, "Whether your overdrafts will be paid is discretionary, and we reserve
  the right not to pay. For example, we typically do not pay overdrafts if your account is not in
  good standing, or you are not making regular deposits, or you have too many overdrafts."

### *Communications Not Subject to Additional Advertising Disclosures*
### *– 12 CFR 1030.11(b)(2)*

The advertising disclosure rules for overdraft services do not apply in the following
circumstances:

- An advertisement promoting a service where the institution's payment of overdrafts would be
  agreed upon in writing and subject to Regulation Z (12 CFR Part 1026).

- A communication by an institution about the payment of overdrafts in response to a
  consumer-initiated inquiry about deposit accounts or overdrafts. However, providing
  information about the payment of overdrafts in response to a balance inquiry made through
  an automated system, such as a telephone response machine, ATM, or an institution's
  Internet site, is not a response to a consumer-initiated inquiry that is exempt from the
  advertising disclosures.

- An advertisement made through broadcast or electronic media, such as television or radio.
  However, this exception does not apply to advertisements posted on an institution's Internet
  site, on an ATM screen, provided on telephone-response machines, or sent by electronic mail.

- An advertisement made on outdoor media, such as billboards.

- An ATM receipt.

# CFPB Consumer
# Laws and Regulations                    TISA

- An in-person discussion with a consumer.

- Disclosures required by federal or other applicable law.

- Information included on a periodic statement or on a notice informing a consumer about a specific overdrawn item or the amount the account is overdrawn.

- A term in a deposit account agreement discussing the institution's right to pay overdrafts.

- A notice provided to a consumer, such as at an ATM, that completing a requested transaction may trigger a fee for overdrawing an account, or a general notice that items overdrawing an account may trigger a fee.

- Informational or educational materials concerning the payment of overdrafts if the materials do not specifically describe the institution's overdraft service.

- An opt-out or opt-in notice regarding the institution's payment of overdrafts or provision of discretionary overdraft services.

### Exception for ATM Screens and Telephone Response Machines – 12 CFR 1030.11(b)(3)

Any advertisement made on an ATM screen or using a telephone response machine is not required to include the following:

- The categories of transactions for which a fee may be imposed for paying an overdraft.

- The circumstances under which the institution will not pay an overdraft.

### Exception for Indoor Signs – 12 CFR 1030.11(b)(4)

The advertising requirement to disclose fees for the payment of each overdraft does not apply to advertisements for the payment of overdrafts on indoor signs, if the indoor sign contains a clear and conspicuous statement that:

- Fees may apply; and

- Consumers should contact an employee for further information about applicable fees and terms.

An indoor sign covered under this exception is one described in 12 CFR 1030.8(e)(2) and the accompanying Staff Commentary. In addition to the Staff Commentary's examples of advertisements that are not considered indoor signs, an ATM screen is not considered an indoor sign for purposes of the overdraft disclosure requirements.

# CFPB Consumer
# Laws and Regulations                                    TISA

## Account Balance Disclosures – 12 CFR 1030.11(c)

In general, 12 CFR 1030.11(c) covers how an institution displays a consumer's account balance information on automated systems, such as an ATM, when the institution will advance additional funds to cover insufficient or unavailable funds in a consumer's account. Specifically, if an institution discloses balance information to a consumer through an automated system, the disclosed balance may not include additional amounts that the institution may provide to cover an item when there are insufficient or unavailable funds in the consumer's account. This requirement covers additional funds that an institution may provide under a service provided at the institution's own discretion, a service subject to Regulation Z (12 CFR 1026), or a service to transfer funds from another account of the consumer. However, the institution may, at its option, disclose an additional, second account balance that would include funds provided by the institution, if the institution prominently states that any such second balance includes funds that the institution may provide to cover insufficient or unavailable funds in the consumer's account and, if applicable, that additional funds are not available for all transactions.

**Additional amounts that may be included in balance**. The balance may, but need not, include funds that are deposited in the consumer's account, such as from a check, that are not yet made available for withdrawal in accordance with the funds availability rules under Regulation CC (12 CFR 229). In addition, the balance may, but need not, include funds that are held by the institution to satisfy a prior obligation of the consumer (for example, to cover a hold for an ATM or debit card transaction that has been authorized but for which the bank has not settled).

**Retail sweep programs**. When disclosing a transaction account balance, an institution is not required to exclude funds from the consumer's balance that may be transferred from another account pursuant to a retail sweep account. In a retail sweep program, an institution establishes two legally distinct subaccounts, a transaction subaccount and a savings subaccount. These two accounts together make up the consumer's account. Retail sweep account programs typically:

- Comply with the Federal Reserve Board's Regulation D,

- Prevent direct access by the consumer to the non-transaction subaccount that is part of the retail sweep program, and

- Document on the consumer's periodic statements the account balance as the combined balance in the subaccounts.

**Disclosure of second balance**. If an institution discloses additional balances that include funds that may be provided to cover an overdraft, the institution must prominently state that the additional balance(s) includes additional overdraft funds. The institution may not simply state, for instance, that the second balance is the consumer's ''available balance,'' or contains ''available funds.''  Rather, the institution should provide enough information to convey that the second balance includes funds that the institution may provide to cover insufficient or unavailable funds. For example, the institution may state that the balance includes ''overdraft funds.''  Where a consumer has not opted into (or as applicable, has opted out of) the

# CFPB Consumer
# Laws and Regulations

**TISA**

institution's discretionary overdraft service, any additional balance disclosed should not include funds that otherwise might be available under that service. Where a consumer has not opted into (or as applicable, has opted out of) the institution's discretionary overdraft service for some, but not all transactions (e.g., the consumer has not opted into overdraft services for ATM and one-time debit card transactions), an institution that includes funds from its discretionary overdraft service in the balance should convey that the overdraft funds are not available for all transactions. For example, the institution could state that overdraft funds are not available for ATM and one-time debit card transactions. Similarly, if funds are not available for all transactions pursuant to a service subject to Regulation Z (12 CFR 1026) or a service that transfers funds from another account, a second balance that includes such funds should also indicate this fact.

**Automated systems.** The balance disclosure requirement applies to any automated system through which the consumer requests a balance, including, but not limited to, a telephone response system, the institution's Internet site, or an ATM. The requirement applies whether the institution discloses a balance through an ATM owned or operated by the institution or through an ATM not owned or operated by the institution (including an ATM operated by a non-depository institution). If the balance is obtained at an ATM, the requirement also applies whether the balance is disclosed on the ATM screen or on a paper receipt.

## Effect on State Laws (Regulation DD - Appendix C)

Regulation DD preempts state law requirements that are inconsistent with the requirements of the Truth in Savings Act (TISA) or Regulation DD. A state law is inconsistent if it contradicts the definitions, disclosure requirements, or interest-calculation methods outlined in the act or the regulation. The regulation also provides that interested parties may request the Consumer Financial Protection Bureau to determine whether a state law is inconsistent with the TISA.

# CFPB Consumer
# Laws and Regulations                    TISA

## REFERENCES

## Laws

| | |
|---|---|
| 12 U.S.C. 4301 et seq. | Truth in Savings Act |
| 12 U.S.C. 4005 et seq. | Expedited Funds Availability Act |
| 15 U.S.C. 7001 et seq. | Electronic Signatures in Global and National Commerce Act (E-Sign Act) |

## Regulations

### Consumer Financial Protection Bureau Regulations (12 CFR)

| | |
|---|---|
| Part 1005 | Electronic Fund Transfer (Regulation E) |
| Part 1026 | Truth in Lending (Regulation Z) |
| Part 1030 | Truth in Savings (Regulation DD) |

### Federal Reserve Board Regulations (12 CFR)

| | |
|---|---|
| Part 204 | Reserve Requirements of Depository Institutions (Regulation D) |
| Part 229 | Availability of Funds and Collection of Checks (Regulation CC) |

### National Credit Union Administration Regulation (12 CFR)

| | |
|---|---|
| Part 707 | Truth in Savings |

**CFPB**

**Examination Procedures**                                                    **TISA**

# Truth in Savings Act[1] [2]

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

## Examination Objectives

• To determine the institution's compliance with Regulation DD, including the requirements to provide full account disclosures (for example, fee schedules) to consumers to open an account and upon request and including the requirements covering overdraft payment disclosures and advertising.

• To assess the quality of the institution's compliance risk management systems and its policies and procedures for implementing Regulation DD.

• To determine the reliance that can be placed on the institution's internal controls and procedures for monitoring the institution's compliance with Regulation DD.

• To direct corrective action when violations of law are identified or when the institution's policies or internal controls are deficient.

## Management- and Policy-Related Examination Procedures

1. Determine the types of deposit accounts offered by the institution to consumers (including accounts usually offered to commercial customers that may occasionally be offered to consumers) as well as the characteristics of each type of deposit account (for example, bonuses offered, minimum balances, balance-computation method, frequency of interest crediting, fixed or variable rates, fees imposed, and frequency of periodic statements).

   **[Click&type]**

2. Review relevant written policies and procedures, management's self-assessments, consumer complaints, and any compliance audit material including work papers and reports to determine whether:

   • The scope of the audit addresses all provisions as applicable.

   • Management has taken corrective actions to followup on previously identified deficiencies.

   • The testing includes samples covering all product types and decision centers.

   • The work performed is accurate.

---

[1] These reflect FFIEC-approved procedures.

[2] The Consumer Financial Protection Bureau's implementing regulation is cited in these procedures. However, if examiners cite violations by a credit union, examiners should cite violations of the National Credit Union Administration's implementing regulation, 12 CFR Part 707.

# CFPB

## Examination Procedures                                    TISA

- Significant deficiencies and their causes are included in reports to management and to the Board of Directors, as appropriate.

- The frequency of review is appropriate.

**[Click&type]**

3. Through discussions with management and review of available information, determine whether the institution's internal controls are adequate to ensure compliance in Regulation DD area under review. Consider the following:

- Organization charts;

- Process flowcharts;

- Policies and procedures;

- Account documentation;

- Checklists; and

- Computer program documentation.

**[Click&type]**

4. Through a review of the institution's training materials, determine whether:

- The institution provides appropriate training to individuals responsible for Regulation DD compliance and operational procedures.

- The training is comprehensive and covers the various aspects of Regulation DD that apply to the individual institution's product offerings and operations.

- The training includes the timing requirements of 12 CFR 1030.4(a)(2) to provide disclosure information (e.g., terms, conditions, and fees) to a consumer upon a request, whether or not the consumer is an existing or a prospective customer. Review whether the training instructs all employees, including branch employees, to provide such disclosures at the time of the request if the consumer makes the request in person or within ten business days if the consumer is not present when making the request.

**[Click&type]**

5. Determine the extent and adequacy of the institution's policies, procedures, and practices for ensuring compliance with the regulation. In particular, verify that:

- Account disclosure information is available to be provided to all consumers within the appropriate time frames. This requirement pertains to all consumer requesters whether or not the consumer is an existing customer or a prospective customer.

**CFPB**

**Examination Procedures**                                          **TISA**

- Advance notice is given for any changes in terms required to be disclosed under 12 CFR 1030.4 and that exceptions to the advance notice requirements are limited to those set forth in 12 CFR 1030.5(a)(2).

- If periodic statements are given, the statements disclose the required information, including the annual percentage yield earned, the amount of interest, fees imposed, and the statement's covered time period.

- The institution's methods of paying interest are permissible. Review the dates on which interest begins to accrue on deposits to accounts, and determine whether hold times comply with the Expedited Funds Availability Act.

- The institution's advertising policies are consistent with the requirements of the regulation, including advertising requirements for overdraft services.

- Evidence of compliance is retained for a minimum of two years after the date disclosures are required to be made or action is required to be taken.

- The periodic statements separately disclose the total fees and charges for payment of items that overdraw the account and for returning items unpaid.These disclosures must be provided for the statement period and the calendar year-to-date.

**[Click&type]**

## Transaction-Related Examination Procedures

If upon conclusion of the management and policy-related examination procedures, procedural weaknesses or other risks requiring further investigation are noted, conduct the transaction testing, as necessary, using the following examination procedures. Use examiner judgment in deciding the size of each sample of deposit account disclosures, notices, and advertisements. Increase the sample size until you are confident that all aspects of the institution's activities and policies that are subject to the regulation are reviewed.

## General Disclosure Requirements – 12 CFR 1030.3

1. Determine whether the institution makes disclosures clearly and conspicuously in writing and in a form the consumer may keep (12 CFR 1030.3(a)).

   **[Click&type]**

2. If the disclosures are combined with other account disclosures, determine whether it is clear which disclosures are applicable to the consumer's account (12 CFR 1030.3(a)).

   **[Click&type]**

3. If the institution provides a consumer disclosure in electronic form,

**CFPB**

**Examination Procedures**                                    **TISA**

determine whether the institution has obtained the consumer's consent, where required, and complies with the other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act)(15 U.S.C. § 7001 et seq.) (12 CFR 1030.3(a)).

**[Click&type]**

4.  Determine whether the disclosures reflect the legal obligation of the account agreement between the consumer and the institution (12 CFR 1030.3(b)).

    **[Click&type]**

5.  If the institution provides disclosures in a language other than English, verify whether the disclosures are available in English upon request (12 CFR 1030.3(b)).

    **[Click&type]**

6.  Determine whether disclosures use consistent terminology when describing terms or features that are required to be disclosed (Staff Commentary 1030.3(a)-2).

    **[Click&type]**

7.  Determine whether the institution substitutes disclosures required by Regulation E for disclosures required by Regulation DD (12 CFR 1030.3(c)).

    **[Click&type]**

8.  Determine whether the institution provides required disclosures to at least one account holder if there are multiple holders (12 CFR 1030.3(d)).

    **[Click&type]**

9.  Determine whether the institution's oral response to a consumer's inquiry about interest rates payable on accounts state the annual percentage yield (APY) by reviewing the institution's policies and procedures. If the institution chooses, it may also state the interest rate, but no other rate (12 CFR 1030.3(e)).

    **[Click&type]**

10. Determine whether the APY, the annual percentage earned (APYE) and the interest rate are rounded to the nearest one-hundredth of one percentage point (.01%).
    NOTE: For account disclosures, the interest rate may be expressed to more than two decimal places (12 CFR 1030.3(f)(1)).

    **[Click&type]**

11. Determine whether the APYs and APYEs are not more than one-twentieth

# CFPB

# Examination Procedures                                    TISA

of one percentage point (.05%) above or below the APY (and APYE) as determined in accordance with Appendix A of Regulation DD (12 CFR 1030.3(f)(2)).

**[Click&type]**

# Account Disclosures – 12 CFR 1030.4

## Delivery of Account Disclosures

### *Account Opening*

12. Determine whether the institution provides account disclosures to consumers before an account is opened or a service is provided, whichever is earlier (12 CFR 1030.4(a)(1)(i)).

    - If the consumer is not present when the account is opened or a service is provided (and has not already received the disclosures), the institution should mail or deliver the disclosures no later than 10 business days after the account is opened or the service is provided, whichever is earlier (12 CFR 1030.4(a)(1)(i)).

    - If the consumer who is not present at the institution uses electronic means to open an account or request a service, the institution must provide the disclosures before the account is open or the service is provided (12 CFR 1030.4(a)(1)(ii)).

**[Click&type]**

# Consumer Request

13. Determine whether the institution has available full account disclosures, including complete fee schedules, to provide to a consumer upon request.This requirement pertains to all consumer requests, whether or not the consumer is an existing customer or a prospective customer.

    - If the request is made in person, determine whether the institution has disclosures available to provide upon the consumer's request.

    - If the consumer is not present, the institution must mail or deliver the disclosures within a reasonable period of time after it receives the request (generally no more than 10 days) (12 CFR 1030.4(a)(2)(i)).

**[Click&type]**

14. Determine whether the institution chooses one of the following options when providing rate information (12 CFR 1030.4(a)(2)(ii)(A)).

    - Specifies an interest rate and APY that were offered within the most recent seven calendar days.

**CFPB**

**Examination Procedures**                                                **TISA**

- States that the rate and yield are accurate as of an identified date.
- Provides a telephone number that consumers may call to obtain current rate information.

   **[Click&type]**

15. For a time deposit account, the institution may state the maturity as a term rather than a date (12 CFR 1030.4(a)(2)(ii)(B)).

   **[Click&type]**

## Content of Disclosures

*Rate information*

16. Determine whether account disclosures include, as applicable:
    - The "annual percentage yield" and the "interest rate" using those terms.
    - For fixed-rate accounts the period of time the interest rate will be in effect (12 CFR 1030.4(b)(1)(i)).

   **[Click&type]**

17. For variable-rate accounts, determine whether account disclosures include all of the following information (12 CFR 1030.4(b)(1)(ii)):
    - The fact that the interest rate and APY may change.
    - How the interest rate is determined.
    - The frequency with which the interest rate may change.
    - Any limitations on the amount the interest rate may change.

   **[Click&type]**

*Compounding and crediting*

18. Determine whether account disclosures describe the frequency with which interest is compounded or credited (12 CFR 1030.4(b)(2)(i)).

   **[Click&type]**

19. If the consumer will forfeit interest if the consumer closes an account before accrued interest is credited, determine whether account disclosures include a statement that interest will not be paid in such cases (12 CFR 1030.4(b)(2)(ii)).

   **[Click&type]**

*Balance information*

20. As applicable, determine whether account disclosures:

**CFPB**

**Examination Procedures**                                        **TISA**

- Describe the minimum balance required to (12 CFR 1030.4(b)(3)(i)):
  - Open an account;
  - Avoid the imposition of a fee; or
  - Obtain the APY disclosed.
- Describe how the minimum balance requirement is determined to avoid the imposition of a fee or to obtain the APY disclosed (12 CFR 1030.4(b)(3)(i)).
- Explain the balance computation method (specified in 12 CFR 1030.7) used to calculate interest on the account (12 CFR 1030.4(b)(3)(ii)).
- State when interest begins to accrue on noncash deposits (12 CFR 1030.4(b)(3)(iii)).

**[Click&type]**

*Fees*

21. Determine whether account disclosures state the amount of any fee that may be imposed in connection with the account (or an explanation of how the fee will be determined) and the conditions under which the fee may be imposed (12 CFR 1030.4(b)(4)).

- Determine whether the institution has specified the categories of trans-actions for which an overdraft fee may be imposed (Staff Commentary 12 CFR 1030.4(b)(4)-5).

**[Click&type]**

*Transaction Limitations*

22. Determine whether the account disclosures state any limits on the number or dollar amount of withdrawals or deposits (12 CFR 1030.4(b)(5)).

**[Click&type]**

*Features of time accounts*

23. For time accounts, determine whether account disclosures include, as applicable:

- The maturity date (12 CFR 1030.4(b)(6)(i)).
- A statement that a penalty will or may be imposed for early withdrawal, how it is calculated, and the conditions for its assessment (12 CFR 1030.4(b)(6)(ii)).
- If compounding occurs during the term and the interest may be with-drawn prior to maturity, a statement that the APY assumes interest remains on deposit until maturity and that a withdrawal will reduce earnings (12 CFR 1030.4(b)(6)(iii)).

# CFPB
# Examination Procedures                                              TISA

- A statement that interest cannot remain on deposit and that payout of interest is mandatory for accounts (12 CFR 1030.4(b)(6)(iii)):
  - With a stated maturity greater than one year;
  - That do not compound interest on an annual or more frequent basis;
  - That require interest payouts at least annually; and
  - That disclose an APY determined in accordance with Section E of Appendix A of Regulation DD.
- A statement of whether or not the account will renew automatically at maturity (12 CFR 1030.4(b)(6)(iv)):
  - If it will renew automatically at maturity, a statement whether or not a grace period will be provided and, if so, the length of the grace period.
  - If it will not renew automatically, a statement of whether interest will be paid after maturity if the consumer does not renew the account.

**[Click&type]**

## Bonuses

24. Determine whether the account disclosures state the amount or type of any bonus, when the bonus will be provided, and any minimum balance and time requirements to obtain the bonus (12 CFR 1030.4(b)(7)).

**[Click&type]**

# Subsequent Disclosures – 12 CFR 1030.5

## Change in Terms Notice

25. Determine whether the institution sends out advance change in terms notices to consumers of any change in a term, required to be disclosed under 12 CFR 1030.4(b), that may reduce the annual percentage yield (APY) or that otherwise adversely affects consumers. Verify that the notice (12 CFR 1030.5(a)(1)):

- Includes the effective date of the change.
- Is mailed or delivered at least 30 days before the effective date of the change.

**[Click&type]**

26. Determine whether exceptions to the notice requirements are limited to (12 CFR 1030.5(a)(2)):

- Variable-rate changes;
- Check-printing fees; and

**CFPB**

**Examination Procedures**                                          **TISA**

---

- Short-term time accounts (one month or less).

**[Click&type]**

## Pre-Maturity Notices – Renewable Accounts

27. For time accounts with a maturity longer than one month and that renew automatically, determine whether the proper subsequent disclosures (12 CFR 1030.5(b)):

- Are mailed or delivered at least 30 days before maturity of the existing account. Alternatively, the institution may mail or deliver the disclosures at least 20 calendar days before the end of the grace period on the existing account, if a grace period of at least five days is allowed (12 CFR 1030.5(b)).

- For accounts with maturities of more than one year, include the following information (12 CFR 1030.5(b)(1)):

  o The account disclosures required in 12 CFR 1030.4(b) for new accounts;

  o The date the existing account matures;

  o If the interest rate and APY are not known, include the following:

    ▪ The fact that the rates are unknown;

    ▪ The date that the rates will be determined;

    ▪ A telephone number to call to obtain the rates that will be paid on the new account.

- For accounts with maturities of one year or less, include the following information (12 CFR 1030.5(b)(2)):

  o The same account disclosures as required in 12 CFR 1030.5(b)(1) for accounts with maturities of more than one year;

    ▪ Or disclose to the consumer:

  o The date the existing account matures and the new maturity date if the account is renewed; and

  o The interest and APY, if known.

  o If the rates are not known, include the following:

    ▪ The fact that the rates are unknown;

    ▪ The date they will be determined;

    ▪ A telephone number to call to obtain the rates that will be paid on the new account; and

  o The difference in the terms of the new account, as compared to the existing account.

**[Click&type]**

---

# CFPB
# Examination Procedures                                    TISA

*Pre-Maturity Notices — Nonrenewable Accounts*

28.  For time accounts with a maturity longer than one year and that do not renew automatically, determine whether the institution (12 CFR 1030.5(c)):

  •  Discloses the maturity date.

  •  Discloses whether interest will be paid after maturity.

  •  Mails or delivers the disclosures at least 10 calendar days before maturity of the existing account.

  **[Click&type]**

# Periodic Statement Disclosures — 12 CFR 1030.6

29.  If an institution mails or delivers a periodic statement, determine whether the statements include the following (12 CFR 1030.6(a)):

  •  The "annual percentage yield earned" during the statement period, using that term and calculated in accordance to Appendix A of Regulation DD (12 CFR 1030.6(a)(1)).

  •  The amount of interest earned during the statement period (12 CFR 1030.6(a)(2)).

  •  Any debited fees required to be disclosed under 12 CFR 1030.4(b)(4) itemized by dollar amount and type (12 CFR 1030.6(a)(3)).

  NOTE: Except as required in 12 CFR 1030.11(a)(1) for overdraft payment fees, if fees of the same type are imposed more than once in a statement period, an institution may itemize fees separately or group them together and disclose a total dollar amount for all fees of the same type. Fees for paying overdrafts and for returning items unpaid are not fees of the same type and must be separately distinguished (Staff Commentary 12 CFR 1030.6(a)(3)-2(iv)).

  •  The total number of days in the statement period or the beginning and ending dates of the period (12 CFR 1030.6(a)(4)).

  •  If applicable, the total overdraft and returned item fees required to be disclosed by 12 CFR 1030.11(a) (12 CFR 1030.6(a)(5)).

  **[Click&type]**

30.  If the institution uses the average daily balance method and calculates interest for a period other than the statement period, determine whether the institution 12 CFR 1030.6(b)):

  •  Calculates and discloses the APY earned and the amount of interest earned based on the other period rather than the statement period; and

  •  States the information required in 12 CFR 1030.6(a)(4), specifying the

**CFPB**

**Examination Procedures**                                    **TISA**

period length for the other period as well as for the statement period.

**[Click&type]**

# Payment of Interest – 12 CFR 1030.7

31. Determine whether the institution calculates interest based on the full amount of principal in an account for each day by use of either the daily balance method or the average daily balance method 12 CFR 1030.7(a)(1)).

**[Click&type]**

32. For deposit accounts that require a minimum balance to earn interest, determine whether the institution is using the same method to determine the minimum balance as it uses to determine the balance on which interest is calculated 12 CFR 1030.7(a)(2)).

    NOTE: An institution may use an additional method that is unequivocally beneficial to the consumer 12 CFR 1030.7(a)(2)).

**[Click&type]**

33. If an institution chooses not to pay accrued interest if the consumer closes an account prior to the date accrued interest is credited, determine whether the institution disclosed this practice in the initial account disclosures (Staff Commentary 12 CFR 1030.7(b)-3).

    NOTE: An institution is not required to compound or credit interest at any particular frequency but, if it does, it may compound or credit interest annually, semi-annually, quarterly, monthly, daily, continuously, or on any other basis (12 CFR 1030.7(b) and Staff Commentary 12 CFR 1030.7(b)-1).

**[Click&type]**

34. Determine whether interest begins to accrue no later than the business day on which the depository institution receives provisional credit for the funds, in accordance with Section 606 of the Expedited Funds Availability Act and the implementing Regulation CC, Section 229.14 (12 CFR 1030.7(c)).

**[Click&type]**

35. Determine whether interest accrues until the day funds are withdrawn (12 CFR 1030.7(c)).

**[Click&type]**

# CFPB
# Examination Procedures                    TISA

## Advertising – 12 CFR 1030.8

**General**

36. Determine the types of advertising the institution uses, including visual, oral, or print, that meet the regulatory definition of an advertisement.

    **[Click&type]**

37. Determine that all types of advertisements do not contain misleading or inaccurate statements and do not misrepresent deposit contracts (12 CFR 1030.8(a)(1)).

    **[Click&type]**

38. Determine that advertisements of accounts do not:

    - Refer to or describe an account as "free" or "no cost" (or contain a similar term) if any maintenance or activity fee is charged;

    - Use the word profit to refer to interest paid on the account;

    - Use the term "fees waived" if a maintenance or activity fee can be imposed (12 CFR 1030.8(a)(2) and Staff Commentary 12 CFR 1030.8(a)-5).

    **[Click&type]**

39. If an electronic advertisement displays a triggering term, determine whether the advertisement clearly refers the consumer to the location where the additional required information begins (Staff Commentary 12 CFR 1030.8(a)-9).

    **[Click&type]**

40. For institutions that promote the payment of overdrafts in an advertisement, determine whether the advertisement includes the disclosures required by 12 CFR 1030.11(b) (12 CFR 1030.8(f)).

    **[Click&type]**

### *Permissible Advertisement Rates*

41. For advertisements that state a rate of return, determine whether (12 CFR 1030.8(b)):

    - The rate is stated as an "annual percentage yield" using that term and that no other rate is stated except "interest rate."

    - If the advertisement uses the abbreviation "APY," the term "annual percentage yield" is stated at least once in the advertisement.

    - If the advertisement states the interest rate, it uses the term "interest rate" in conjunction with, but not be more conspicuous than, the annual

# CFPB

# Examination Procedures                                    TISA

percentage yield to which it relates.

- Rates are rounded to the nearest one-hundredth of one percentage point (.01%) and expressed to two decimal places.

**[Click&type]**

42.  For tiered-rate accounts, determine whether an annual percentage yield is stated for each tier, along with corresponding minimum balance requirements (Staff Commentary 12 CFR 1030.8(b)-1).

**[Click&type]**

43.  For stepped-rate accounts, determine whether all interest rates and the time period that each rate is in effect are stated (Staff Commentary 12 CFR 1030.8(b)-2).

**[Click&type]**

## Required Additional Disclosures

44.  With the exception of broadcast, electronic, or outdoor media, telephone-response machines, and indoor signs, if the annual percentage yield is stated in the advertisement, determine whether it includes the following information, as applicable, clearly and conspicuously:

- For a variable rate account, that the rate may change after account opening (12 CFR 1030.8(c)(1)).

- The time period that the annual percentage yield will be offered or a statement that it is accurate as of a specified date (12 CFR 1030.8(c)(2)).

- The minimum balance required to earn the advertised annual percentage yield (12 CFR 1030.8(c)(3)).

- For tiered accounts, the minimum balance required for each tier stated in close proximity and with equal prominence to the applicable APY, if applicable (12 CFR 1030.8(c)(3)).

- The minimum deposit to open the account, if it is greater than the minimum balance necessary to obtain the advertised annual percentage yield (12 CFR 1030.8(c)(4)).

- A statement that maintenance or activity fees could reduce the earnings on the account(12 CFR 1030.8(c)(5) and Staff Commentary 12 CFR 1030.8(c)(5)-1).

- For time accounts:

  o  Term of the account (12 CFR 1030.8(c)(6)(i)).

  o  A statement that a penalty will or may be imposed for early withdrawal (12 CFR 1030.8(c)(6)(ii)).

  o  A statement that interest cannot remain on deposit and that payout

# CFPB

# Examination Procedures                                    TISA

of interest is mandatory for noncompounding time accounts with the following features (12 CFR 1030.8(c)(6)(iii)):

- Stated maturity greater than one year.
- Interest is not compounded annually or more frequently.
- Interest is required to be paid out at least annually.
- The APY is determined in accordance with Section E of Appendix A of Regulation DD.

**[Click&type]**

## Bonuses

45.  For advertisements that state a bonus (a premium, gift, award or other consideration worth more than $10), determine whether they state all of the following:

- The "annual percentage yield," using that term (12 CFR 1030.8(d)(1)).
- The time requirement to obtain the bonus (12 CFR 1030.8(d)(2)).
- The minimum balance required to obtain the bonus (12 CFR 1030.8(d)(3)).
- The minimum balance required to open the account, if it is greater than the minimum balance required to obtain the bonus (12 CFR 1030.8(d)(4)).
- When the bonus will be provided (12 CFR 1030.8(d)(5)).

**[Click&type]**

## Exemptions for certain advertisements

46.  Advertisements made through broadcast, electronic, or outdoor media, and telephone-response machines are exempted from some of the Regulation DD advertising requirements and are only required to contain certain information. (This exemption does not apply to Internet or email advertisements.) Determine whether advertisements made in these media contain the following information as applicable, clearly and conspicuously (12 CFR 1030.8(e)(1) and Staff Commentary 12 CFR 1030.8(e)(1)(i)-1):

- The minimum balance required to earn the advertised annual percentage yield. For tiered accounts, the minimum balance required for each tier stated in close proximity and with equal prominence to the applicable APY, if applicable (12 CFR 1030.8(c)(3)).
- For time accounts:
  - Term of the account (12 CFR 1030.8(c)(6)(i)).
  - A statement that interest cannot remain on deposit and that payout of interest is mandatory for noncompounding time accounts with

**CFPB**

**Examination Procedures**                                                      **TISA**

the following features(12 CFR 1030.8(c)(6)(iii)):

- Stated maturity greater than one year.
- Interest is not compounded annually or more frequently.
- Interest is required to be paid out at least annually.
- The APY is determined in accordance with Section E of Appendix A of Regulation DD.

o For advertisements that state a bonus (a premium, gift, award or other consideration worth more than $10):

- The "annual percentage yield," using that term 12 CFR 1030.8(d)(1)).
- The time requirement to obtain the bonus (12 CFR 1030.8(d)(2)).
- The minimum balance required to obtain the bonus (12 CFR 1030.8(d)(3)).

**[Click&type]**

47. Indoor signs are exempted from most of the Regulation DD advertising requirements. Determine that indoor signs:

- Do not:
  - o Contain misleading or inaccurate statements and do not misrepresent deposit contracts (12 CFR 1030.8(a)(1)).
  - o Refer to or describe an account as "free" or "no cost" (or contain a similar term) if any maintenance or activity fee is charged (12 CFR 1030.8(a)(2)).
  - o Use the word profit to refer to interest paid on the account (12 CFR 1030.8(a)(2)).
  - o Use the term "fees waived" if a maintenance or activity fee can be imposed (Staff Commentary 12 CFR 1030.8(a)-5).

- If a rate of return is stated, determine whether the indoor sign:
  - o States the rate as "annual percentage yield" or "APY." No other rate may be stated except for the interest rate in conjunction with the APY to which it relates (12 CFR 1030.8(e)(2)(ii)(A)).
  - o Contains a statement advising consumers to contact an employee for further information about applicable fees and terms (12 CFR 1030.8(e)(2)(ii)(B)).

**[Click&type]**

**CFPB**

# Examination Procedures                                    TISA

---

# Record Retention Requirements — 12 CFR 1030.9

48    Determine whether the institution has maintained evidence of compliance with Regulation DD, including rate information, advertising, and providing consumers disclosures at the appropriate time (including upon a consumer's request), for a minimum of two years after disclosures are required to be made or action is required to be taken. For example, review samples of advertising and disclosures, policies and procedures, and training activities, as appropriate (12 CFR 1030.9(c)).

   **[Click&type]**

# 12 CFR 1030.10 — [Reserved]

# Additional Disclosure Requirements for Overdraft Services — 12 CFR 1030.11

## Periodic Statement Disclosures

49.   Determine whether the institution discloses on each periodic statement (if a statement is provided) separate totals, for both the statement period and for the calendar year-to-date, for both of the following (12 CFR 1030.11(a)(1) and (a)(2)):

   - The total amount for all fees or charges imposed on the account for paying checks or other items when there are insufficient or unavailable funds and the account becomes overdrawn, using the term "Total Overdraft Fees" (the requirement to use the term "Total Overdraft Fees" is effective October 1, 2010) (12 CFR 1030.11(a)(1)(i));

   - The total amount for all fees or charges imposed on the account for re-turning items unpaid (12 CFR 1030.11(a)(1)(ii).

   **[Click&type]**

50.   Determine if the aggregate fee disclosures are in a format that is substantially similar to the sample form in Appendix B of Regulation DD and that the disclosures are in close proximity to any fee identified in 12 CFR 1030.6(a)(3) (12 CFR 1030.11(a)(3)). NOTE:  The table must contain lines (or similar markings such as asterisks) inside the table to divide the columns and rows.

   **[Click&type]**

### *Advertisement Requirements*

51.   Unless an exception under 12 CFR 1030.11(b)(2)-(4) applies, when an institution advertises the payment of overdrafts, determine whether the institution clearly and conspicuously discloses in advertisements all of the

---

# CFPB
# Examination Procedures                                TISA

following:

- The fee(s) for the payment of each overdraft (12 CFR 1030.11(b)(1)(i)).
- The categories of transactions for which a fee may be imposed for paying an overdraft (12 CFR 1030.11(b)(1)(ii)).
- The time period by which the consumer must repay or cover any overdraft (12 CFR 1030.11(b)(1)(iii)).
- The circumstances under which the institution will not pay an overdraft (12 CFR 1030.11(b)(1)(iv)).

**[Click&type]**

52. <u>Disclosure of Account Balances</u>

- If the institution discloses account balance information through automated systems, determine whether:

  o The balance excludes additional amounts that the institution may provide to cover items when there are insufficient or unavailable funds (12 CFR 1030.11(c)).

  o The institution, if it discloses at its option additional account balances that include additional amounts, prominently states that any such balance includes additional amounts and, if applicable, that those additional amounts are not available for all transactions (12 CFR 1030.11(c)).

  NOTE:  Regulation DD does not require an institution to exclude funds from the consumer's balance that may be transferred from another account pursuant to a retail sweep program (Staff Commentary 12 CFR 1030.11(c)-2).

**[Click&type]**

# Examiner's Summary, Recommendations, and Comments

**[Click&type]**

# CFPB
# Examination Checklist                                      TISA

---

## Truth in Savings Act[1]
### General Disclosure Requirements – 12 CFR 1030.3[2]

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 1. | Does the institution make the required disclosures clearly and conspicuously in writing and in a form the consumer may keep (12 CFR 1030.3(a))? | ☐ | ☐ | ☐ |
| 2. | If the disclosures are combined with other account disclosures, is it clear which disclosures are applicable to the consumer's account (12 CFR 1030.3(a))? | ☐ | ☐ | ☐ |
| 3. | Do the disclosures reflect the terms of the legal obligation of the account agreement between the consumer and the institution (12 CFR 1030.3(b))? | ☐ | ☐ | ☐ |
| 4. | If the disclosures are provided in a language other than English, are disclosures also available in English upon request (12 CFR 1030.3(b))? | ☐ | ☐ | ☐ |
| 5. | Do the disclosures use consistent terminology when describing terms or features that are required to be disclosed (Staff Commentary 12 CFR 1030.3(a)-2)? | ☐ | ☐ | ☐ |
| 6. | Does the institution substitute disclosures required by Regulation E for disclosures required by this regulation (12 CFR 1030.3(c))? | ☐ | ☐ | ☐ |
| 7. | Does the institution provide disclosures to at least one account holder if there are multiple holders (12 CFR 1030.3(d))? | ☐ | ☐ | ☐ |
| 8. | Do the institution's oral responses to a consumer's inquiry about interest rates payable on accounts state the annual percentage yield (APY)? If the institution chooses, it may state the interest rate, but no other rate (12 CFR 1030.3(e)). | ☐ | ☐ | ☐ |
| 9. | Are the APY, annual percentage yield earned (APYE), and the interest rate rounded to the nearest one-hundredth of one percentage point (.01%) and expressed to two decimal places (12 CFR 1030.3(f)(1))? | ☐ | ☐ | ☐ |

---

[1] These reflect FFIEC-approved procedures.

[2] The Consumer Financial Protection Bureau's implementing regulation is cited in these procedures.  However, if examiners cite violations by a credit union, examiners should cite violations of the National Credit Union Administration's implementing regulation, 12 CFR Part 707.

# CFPB
# Examination Checklist                                    **TISA**

|  | Yes | No | NA |
|---|---|---|---|
| • For account disclosures, is the interest rate expressed to two or more decimal places (12 CFR 1030.3(f)(1))? | ☐ | ☐ | ☐ |
| 10. Are the APY and APYE not more than one-twentieth of one percentage point (.05%) above or below the APY and APYE determined in accordance with appendix A of Regulation DD (12 CFR 1030.3(f)(2))? | ☐ | ☐ | ☐ |

## Account Disclosures – 12 CFR 1030.4

### Delivery of Account Disclosures

#### *Account Opening*

|  | Yes | No | NA |
|---|---|---|---|
| 1. Does the institution provide initial disclosures before an account is opened or a service provided, whichever is earlier (12 CFR 1030.4(a)(1))? | ☐ | ☐ | ☐ |
| • If the consumer is not present when the account is open or a service is provided (and has not already received the disclosures), does the institution mail or deliver the disclosures no later than ten business days after the account is opened or the service is provided, whichever is earlier (12 CFR 1030.4(a)(1)(i))? | ☐ | ☐ | ☐ |
| • If the consumer who is not present at the institution uses electronic means to open an account or request a service, does the institution provide the disclosures before the account is open or the service is provided (12 CFR 1030.4(a)(1)(ii))? | ☐ | ☐ | ☐ |

#### *Consumer Request*

|  | Yes | No | NA |
|---|---|---|---|
| 2. Does the institution have full account disclosures, including complete fee schedules, available to provide to consumers upon request? This requirement pertains to all consumer requests, whether or not the consumer is an existing customer or a prospective customer (12 CFR 1030.4(a)(2)(i)). | ☐ | ☐ | ☐ |
| • If the consumer makes the request in person, does the institution have disclosures available to provide upon request? | ☐ | ☐ | ☐ |
| • If the consumer who is not present at the institution makes a request, does the institution mail or deliver the account disclosures within a reasonable time after it receives the request (generally no more than 10 days) (12 CFR 1030.4(a)(2)(i))? | ☐ | ☐ | ☐ |

3. In providing disclosures upon request, does the institution choose **one of the following options** when providing rate information (12 CFR 1030.4(a)(2)(ii)):

# CFPB
# Examination Checklist                                    TISA

|  | Yes | No | NA |
|---|---|---|---|
| • Specify an interest rate and APY that were offered within the most recent seven calendar days (12 CFR 1030.4(a)(2)(ii)(A))? | ☐ | ☐ | ☐ |
| • State that the rate and yield are accurate as of an identified date (12 CFR 1030.4(a)(2)(ii)(A))? | ☐ | ☐ | ☐ |
| • Provide a telephone number that consumers may call to obtain current rate information (12 CFR 1030.4(a)(2)(ii)(A))? | ☐ | ☐ | ☐ |
| 4. For a time deposit account, does the institution choose to state the maturity of the time account as a term rather than a date (12 CFR 1030.4(a)(2)(ii)(B))? | ☐ | ☐ | ☐ |

## Content of Disclosures

### *Rate Information*

5. Do account disclosures include, as applicable (12 CFR 1030.4(b)):

|  | Yes | No | NA |
|---|---|---|---|
| • The "annual percentage yield" and interest rate, using those terms (12 CFR 1030.4(b)(1)(i))? | ☐ | ☐ | ☐ |
| • For fixed-rate accounts, the period of time the interest rate will be in effect (12 CFR 1030.4(b)(1)(i))? | ☐ | ☐ | ☐ |

6. For variable-rate accounts, do account disclosures include all of the following information (12 CFR 1030.4(b)(1)(ii)):

|  | Yes | No | NA |
|---|---|---|---|
| • The fact that the interest rate and APY may change (12 CFR 1030.4(b)(1)(ii)(A))? | ☐ | ☐ | ☐ |
| • How the interest rate is determined (12 CFR 1030.4(b)(1)(ii)(B))? | ☐ | ☐ | ☐ |
| • The frequency with which the interest rate may change 12 CFR 1030.4(b)(1)(ii)(C))? | ☐ | ☐ | ☐ |
| • Any limitation on the amount the interest rate may change 12 CFR 1030.4(b)(1)(ii)(D))? | ☐ | ☐ | ☐ |

### *Compounding and Crediting*

|  | Yes | No | NA |
|---|---|---|---|
| 7. Do the account disclosures describe the frequency with which interest is compounded and credited (12 CFR 1030.4(b)(2)(i))? | ☐ | ☐ | ☐ |
| 8. If consumers will forfeit interest if they close the account before accrued interest is credited, do the account disclosures include a statement that interest will not be paid in such cases (12 CFR 1030.4(b)(2)(ii))? | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    **TISA**

|  | Yes | No | NA |
|---|---|---|---|

*Balance Information*

9.    As applicable, do the account disclosures (12 CFR 1030.4(b)(3)(i)):

   • Describe the minimum balance required to:

     o  Open an account (12 CFR 1030.4(b)(3)(i)(A)(1))? ☐ ☐ ☐

     o  Avoid the imposition of a fee (12 CFR 1030.4(b)(3)(i)(A)(2))? ☐ ☐ ☐

     o  Obtain the APY disclosed (12 CFR 1030.4(b)(3)(i)(A)(3))? ☐ ☐ ☐

   • Explain the balance computation method used to calculate interest on the account (12 CFR 1030.4(b)(3)(ii))? ☐ ☐ ☐

   • State when interest begins to accrue on noncash deposits (12 CFR 1030.4(b)(3)(iii))? ☐ ☐ ☐

*Fees*

10.   Do the account disclosures state the amount of any fee that may be imposed in connection with the account (or an explanation of how the fee will be determined) and the conditions under which the fee may be imposed (12 CFR 1030.4(b)(4))? ☐ ☐ ☐

   • Regardless of whether the institution promotes overdraft payment, does it disclose specific categories of transactions that may cause an overdraft fee to be imposed on the accountholder (Staff Commentary 12 CFR 1030.4(b)(4)-5)? ☐ ☐ ☐

*Transaction Limitations*

11.   Do the account disclosures state any limits on the number or dollar amount of withdrawals or deposits (12 CFR 1030.4(b)(5))? ☐ ☐ ☐

*Features of Time Accounts*

12.   For time accounts, do the account disclosures also include the following, as applicable (12 CFR 1030.4(b)(6)):

   • The maturity date (12 CFR 1030.4(b)(6)(i))? ☐ ☐ ☐

   • A statement that a penalty will or may be imposed for early withdrawal, how it is calculated, and the conditions for its assessment (12 CFR 1030.4(b)(6)(ii))? ☐ ☐ ☐

# CFPB
# Examination Checklist                                    TISA

|  | Yes | No | NA |
|---|---|---|---|
| • If compounding occurs during the term and the interest may be withdrawn prior to maturity, a statement that the APY assumes that interest remains on deposit until maturity and that a withdrawal will reduce earnings (12 CFR 1030.4(b)(6)(iii))? | ☐ | ☐ | ☐ |
| • A statement that interest cannot remain on deposit and that payout of interest is mandatory for accounts with the following features (12 CFR 1030.4(b)(6)(iii)): | ☐ | ☐ | ☐ |
|     ○ With a stated maturity greater than one year; | | | |
|     ○ That do not compound interest on an annual or more frequent basis; | | | |
|     ○ That require interest payouts at least annually; and | | | |
|     ○ That disclose an APY determined in accordance with Section E of Appendix A of Regulation DD? | | | |
| • A statement of whether or not the account will renew automatically at maturity (12 CFR 1030.4(b)(6)(iv))? | ☐ | ☐ | ☐ |
|     ○ If the account will renew automatically at maturity, a statement of whether or not a grace period is provided, and if so, the length of the grace period? | ☐ | ☐ | ☐ |
|     ○ If the account does not renew automatically, a statement of whether interest will be paid after maturity if the consumer does not renew the account? | ☐ | ☐ | ☐ |

### Bonuses

| | Yes | No | NA |
|---|---|---|---|
| 13. Do account disclosures state the amount or type of any bonus, when the bonus will be provided, and any minimum balance and time requirements to obtain the bonus (12 CFR 1030.4(b)(7))? | ☐ | ☐ | ☐ |

## Subsequent Disclosures – 12 CFR 1030.5

### Change in Terms Notice

| | Yes | No | NA |
|---|---|---|---|
| 1. Does the institution provide advance change in terms notices to consumers of any change to a term, required to be disclosed under 12 CFR 1030.4(b), that may reduce the annual percentage yield or that otherwise adversely affects the consumer? (12 CFR 1030.5(a)(1)) | ☐ | ☐ | ☐ |
| • Does the notice include the effective date of the change (12 CFR 1030.5(a)(1))? | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    TISA

|  | Yes | No | NA |
|---|---|---|---|
| • Is the notice mailed or delivered at least 30 days before the effective date of the change (12 CFR 1030.5(a)(1))? | ☐ | ☐ | ☐ |

2.  Are exceptions to the notice requirements limited to the following (12 CFR 1030.5(a)(2))?

| | Yes | No | NA |
|---|---|---|---|
| • Variable-rate changes (12 CFR 1030.5(a)(2)(i))? | ☐ | ☐ | ☐ |
| • Check-printing fees (12 CFR 1030.5(a)(2)(ii))? | ☐ | ☐ | ☐ |
| • Short-term time accounts (one month or less) (12 CFR 1030.5(a)(2)(iii))? | ☐ | ☐ | ☐ |

***Pre-Maturity Notices – Renewable Accounts***

3.  For time accounts with maturities longer than one month and that automatically renew, does the institution (12 CFR 1030.5(b)):

| | Yes | No | NA |
|---|---|---|---|
| • Mail or deliver subsequent disclosures at least 30 calendar days before maturity of existing account (12 CFR 1030.5(b))? (Alternatively, if grace period of at least five calendar days is allowed, the institution may mail or deliver disclosures at least 20 calendar days before the end of the grace period.) | ☐ | ☐ | ☐ |
| • For accounts with maturities longer than one year, include in the disclosures (12 CFR 1030.5(b)(1)): | | | |
| o The account disclosures outlined in 12 CFR 1030.4(b) for the new account? | ☐ | ☐ | ☐ |
| o The date the existing account matures? | ☐ | ☐ | ☐ |
| o If the interest rate and APY for the new account have not been determined: | | | |
| ▪ The fact that the rates have not yet been determined? | ☐ | ☐ | ☐ |
| ▪ The date that the rates will be determined? | ☐ | ☐ | ☐ |
| ▪ A telephone number to call for the interest rate and APY that will be paid on the new account? | ☐ | ☐ | ☐ |
| • For accounts with maturities of one year or less, include in the disclosures (12 CFR 1030.5(b)(2)): | | | |
| o The same account disclosures as required under 12 CFR 1030.5(b)(1) for accounts with maturities of more than one year (12 CFR 1030.5(b)(2)(i)): | ☐ | ☐ | ☐ |

**Or include:**

# CFPB
# Examination Checklist                               TISA

|  | Yes | No | NA |
|---|---|---|---|
| o The date the existing account matures and the new maturity date if the account is renewed (12 CFR 1030.5(b)(2)(ii)(A))? | ☐ | ☐ | ☐ |
| o The interest rate and APY for the new account, if known (12 CFR 1030.5(b)(2)(ii)(B))? | ☐ | ☐ | ☐ |
| o If the rates are not known (12 CFR 1030.5(b)(2)(ii)(B)): | | | |
| ▪ The fact that the rates have not yet been determined? | ☐ | ☐ | ☐ |
| ▪ The date they will be determined? | ☐ | ☐ | ☐ |
| ▪ A telephone number to call for the interest rate and APY that will be paid on the new account? | ☐ | ☐ | ☐ |
| o Any difference in the terms of the new account, compared to the existing account (12 CFR 1030.5(b)(2)(ii)(C))? | ☐ | ☐ | ☐ |

***Pre-Maturity Notices – Nonrenewable Accounts***

4.   For time accounts with maturities longer than one year and that do not automatically renew, does the institution (12 CFR 1030.5(c)):

| | Yes | No | NA |
|---|---|---|---|
| • Disclose the maturity date? | ☐ | ☐ | ☐ |
| • Disclose whether interest will be paid after maturity? | ☐ | ☐ | ☐ |
| • Mail or deliver the disclosures at least 10 calendar days before the maturity of the existing account? | ☐ | ☐ | ☐ |

# Periodic Statement Disclosures – 12 CFR 1030.6

1.   If an institution mails or delivers a periodic statement, do the statements include the following (12 CFR 1030.6(a)):

| | Yes | No | NA |
|---|---|---|---|
| • The "annual percentage yield earned" during the statement period, using that term and calculated in accordance to Appendix A of Regulation DD (12 CFR 1030.6(a)(1))? | ☐ | ☐ | ☐ |
| • The amount of interest earned during the statement period (12 CFR 1030.6(a)(2))? | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    TISA

|  | Yes | No | NA |
|---|---|---|---|

- Any debited fees required to be disclosed under 12 CFR 1030.4(b)(4), itemized by dollar amount and type (12 CFR 1030.6(a)(3))?  ☐ ☐ ☐

  NOTE: Except as required in 12 CFR 1030.11(a)(1) for overdraft payment fees, if fees of the same type are imposed more than once in a statement period, an institution may itemize fees separately or group them together and disclose a total dollar amount for all fees of the same type. Fees for paying overdrafts and for returning items unpaid are not fees of the same type and must be separately distinguished.

- The total number of days in the statement period or the beginning and ending dates of the period (12 CFR 1030.6(a)(4))?  ☐ ☐ ☐

2. If the institution uses the average daily balance method and calculates interest for a period other than the statement period, does the institution (12 CFR 1030.6(b)):

- Calculate and disclose the APYE and the amount of interest earned based on the other period rather than the statement period?  ☐ ☐ ☐

- State the information required in 12 CFR 1030.6(a)(4), specifying the period length for the other period as well as for the statement period?  ☐ ☐ ☐

## Payment of Interest – 12 CFR 1030.7

1. Does the institution calculate interest on the full amount of principal in the account each day by use of either the daily balance method or the average daily balance method (12 CFR 1030.7(a)(1))?  ☐ ☐ ☐

2. For deposit accounts that require a minimum balance to earn interest, does the institution use the same method to determine any minimum balance as it uses to determine the balance on which interest is calculated?  ☐ ☐ ☐

   NOTE: An institution may use an additional method that is unequivocally beneficial to the consumer (12 CFR 1030.7(a)(2)).

# CFPB
# Examination Checklist                    TISA

|  | Yes | No | NA |
|---|---|---|---|

3.   If an institution chooses not to pay accrued interest if the consumer closes an account prior to the date accrued interest is credited, does the institution disclose this practice in the initial account disclosures (Staff Commentary 12 CFR 1030.7(b)-3)?   ☐ ☐ ☐

NOTE: An institution is not required to compound or credit interest at any particular frequency but, if it does, it may compound or credit interest annually, semi-annually, quarterly, monthly, daily, continuously, or on any other basis (12 CFR 1030.7(b) and Staff Commentary 12 CFR 1030.7(b)-1).

4.   Does interest begin to accrue no later than the business day specified for interest-bearing accounts in Section 606 of the Expedited Funds Availability Act and implementing Regulation CC (12 CFR 1030.7(c))?   ☐ ☐ ☐

5.   Does interest accrue until the day the funds are withdrawn (12 CFR 1030.7(c))?   ☐ ☐ ☐

## Advertising Requirements – 12 CFR 1030.8

### General

1.   Do the types of advertising that the institution uses, including visual, oral, or print, meet the regulatory definition of an advertisement?   ☐ ☐ ☐

2.   Do the advertisements refrain from misleading or inaccurate statements, and from misrepresenting the institution's deposit contract (12 CFR 1030.8(a)(1))?   ☐ ☐ ☐

3.   Do the advertisements refrain from using (12 CFR 1030.8(a)(2) and Staff Commentary 12 CFR 1030.8(a)-5):

- The terms "free" or "no cost" (or similar term) if any maintenance or activity fee may be imposed?   ☐ ☐ ☐

- The word "profit" when referring to interest paid on an account?   ☐ ☐ ☐

- The term "fees waived" if a maintenance or activity fee can be imposed?   ☐ ☐ ☐

4.   If an electronic advertisement displays a triggering term, does the advertisement clearly refer the consumer to the location where the additional required information begins (Staff Commentary 12 CFR 1030.8(a)-9)?   ☐ ☐ ☐

# CFPB
# Examination Checklist                                    TISA

|  | Yes | No | NA |
|---|---|---|---|
| 5. For an institution that promotes the payment of overdrafts in an advertisement, does the advertisement include the disclosures required by 12 CFR 1030.11(b) (12 CFR 1030.8(f))? | ☐ | ☐ | ☐ |

*Permissible Advertisement Rates*

6. If the institution advertises a rate of return (12 CFR 1030.8(b)):

|  | Yes | No | NA |
|---|---|---|---|
| • Is the rate stated as "annual percentage yield," using that term, and no other rate except "interest rate"? | ☐ | ☐ | ☐ |
| • If the advertisement uses the abbreviation "APY," has the term "annual percentage yield" been stated at least once in the advertisement? | ☐ | ☐ | ☐ |
| • If the advertisement states the interest rate, using that term, is it stated in conjunction with, but not more conspicuous than, the annual percentage yield to which it relates? | ☐ | ☐ | ☐ |
| • Are the annual percentage yields and interest rates rounded to the nearest one-hundredth of one percentage point (.01%) and expressed to two decimal places? | ☐ | ☐ | ☐ |
| 7. If the institution advertises tiered-rate accounts, does the advertisement state an annual percentage yield for each tier, along with corresponding minimum-balance requirements (Staff Commentary 12 CFR 1030.8(b)-1)? | ☐ | ☐ | ☐ |
| 8. If the institution advertises stepped-rate accounts, does the advertisement state all the interest rates and the time period that each rate is in effect (Staff Commentary 12 CFR 1030.8(b)-2)? | ☐ | ☐ | ☐ |

## Required Additional Disclosures

9. With the exception of broadcast, electronic, or outdoor media, telephone-response machines, and indoor signs, if the annual percentage yield is stated in the advertisement, is the following information, as applicable, stated clearly and conspicuously (12 CFR 1030.8(c)):

|  | Yes | No | NA |
|---|---|---|---|
| • For a variable rate account, that the rate may change after account opening (12 CFR 1030.8(c)(1))? | ☐ | ☐ | ☐ |
| • The time period that the annual percentage yield will be offered or a statement that it is accurate as of a specified date (12 CFR1030.8(c)(2))? | ☐ | ☐ | ☐ |

# CFPB
# Examination Checklist                                    TISA

|  | Yes | No | NA |
|---|---|---|---|

- The minimum balance required to earn the advertised annual percentage yield (12 CFR 1030.8(c)(3))? ☐ ☐ ☐

- For tiered-rate accounts, the minimum balance required for each tier stated in close proximity and with equal prominence to the applicable APY, if applicable (12 CFR 1030.8(c)(3))? ☐ ☐ ☐

- The minimum deposit to open the account, if it is greater than the minimum balance necessary to obtain the advertised annual percentage yield (12 CFR 1030.8(c)(4))? ☐ ☐ ☐

- A statement that maintenance or activity fees could reduce the earnings on the account (12 CFR 1030.8(c)(5) and Staff Commentary 12 CFR 1030.8(c)(5)-1)? ☐ ☐ ☐

- For time accounts, the following features (12 CFR 1030.8(c)(6)):

  ○ Term of the account (12 CFR 1030.8(c)(6)(i))? ☐ ☐ ☐

  ○ A statement that a penalty will or may be imposed for early withdrawal (12 CFR 1030.8(c)(6)(ii))? ☐ ☐ ☐

  ○ A statement that interest cannot remain on deposit and that payout of interest is mandatory for noncompounding time accounts with the following features (12 CFR 1030.8(c)(6)(iii))? ☐ ☐ ☐

    ▪ A stated maturity greater than one year.

    ▪ Interest is not compounded on an annual or more frequent basis.

    ▪ Interest is required to be paid out at least annually.

    ▪ The APY is determined in accordance with Section E of Appendix A.

## Bonuses

10. Unless an exception applies in 12 CFR 1030.8(e), if a bonus is stated in an advertisement, does the advertisement state the following information, as applicable, clearly and conspicuously (12 CFR 1030.8(d)):

- The "annual percentage yield," using that term (12 CFR 1030.8(d)(1))? ☐ ☐ ☐

- The time requirement to obtain the bonus (12 CFR 1030.8(d)(2))? ☐ ☐ ☐

# CFPB
# Examination Checklist                                        TISA

|  | Yes | No | NA |
|---|---|---|---|

- The minimum balance required to obtain the bonus (12 CFR 1030.8(d)(3))?  ☐ ☐ ☐

- The minimum balance required to open the account, if it is greater than the minimum balance necessary to obtain the bonus) (12 CFR 1030.8(d)(4))?  ☐ ☐ ☐

- When the bonus will be provided (12 CFR 1030.8(d)(5))?  ☐ ☐ ☐

## Exemptions for Certain Advertisements

11. Do advertisements made through broadcast, electronic, or outdoor media, and telephone-response machines contain the following information, as applicable, clearly and conspicuously (12 CFR 1030.8(e)(1) and Staff Commentary 12 CFR 1030.8(e)(1)(i)-1:

   - The minimum balance required to earn the advertised annual percentage yield? For tiered accounts, the minimum balance required for each tier stated in close proximity and with equal prominence to the applicable APY, if applicable (12 CFR 1030.8(c)(3))?  ☐ ☐ ☐

   - For time accounts:

     ○ Term of the account (12 CFR1030.8(c)(6)(i))?  ☐ ☐ ☐

     ○ A statement that interest cannot remain on deposit and that payout of interest is mandatory for noncompounding time accounts with the following features (12 CFR 1030.8(c)(6)(iii)):  ☐ ☐ ☐

       ▪ A stated maturity greater than one year.

       ▪ Interest is not compounded on an annual or more frequent basis.

       ▪ Interest is required to be paid out at least annually.

       ▪ The APY is determined in accordance with Section E of Appendix A of Regulation DD.

   - If an advertisement states a bonus:

     ○ The "annual percentage yield," using that term (12 CFR 1030.8(d)(1))?  ☐ ☐ ☐

     ○ The time requirement to obtain the bonus (12 CFR 1030.8(d)(2))?  ☐ ☐ ☐

# CFPB
# Examination Checklist                                    TISA

|  | Yes | No | NA |
|---|---|---|---|

   ○ The minimum balance required to obtain the bonus (12 CFR 1030.8(d)(3))? ☐ ☐ ☐

12. Do indoor signs:

 • Refrain from:

  ○ Containing misleading or inaccurate statements, and misrepresenting deposit contracts (12 CFR 1030.8(a)(1))? ☐ ☐ ☐

  ○ Referring to or describe an account as "free" or "no cost" (or contain a similar term) if any maintenance or activity fee is charged? ☐ ☐ ☐

  ○ Using the word profit to refer to interest paid on the account? ☐ ☐ ☐

  ○ Using the term "fees waived" if a maintenance or activity fee can be imposed (12 CFR 1030.8(a)(2) and Staff Commentary 12 CFR 1030.8(a)-5)? ☐ ☐ ☐

 • If a rate of return is stated:

  ○ State the rate as "annual percentage yield" or "APY"? No other rate may be stated except for the interest rate in conjunction with the APY to which it relates. ☐ ☐ ☐

  ○ Contain a statement advising consumers to contact an employee for further information about applicable fees and terms (12 CFR 1030.8(e)(2))? ☐ ☐ ☐

## Record Retention Requirements – 12 CFR 1030.9

13. Has the institution retained evidence of compliance with Regulation DD, including rate information, advertising, and providing consumers disclosures at the appropriate time (including upon a consumer's request), for a minimum of two years after disclosures are required to be made or action is required to be taken? For example, review samples of advertising and disclosures, policies and procedures, and training activities, as appropriate (12 CFR 1030.9(c)). ☐ ☐ ☐

CFPB       Manual V.2 (October 2012)       Checklist 13

JA0825

# CFPB
# Examination Checklist                    TISA

|  | Yes | No | NA |
|---|---|---|---|

## [Reserved] – 12 CFR 1030.10

## Overdraft Payment Disclosure and Advertising Requirements – 12 CFR 1030.11

### Periodic Statement Disclosures

1. Does the institution disclose on each periodic statement (if it provides a statement, and if a consumer is charged such fees) separate totals, for both the statement period and the calendar year-to-date, for both of the following (12 CFR 1030.11(a)(1) and (2)):

   - The total amount of fees and charges imposed for paying checks or other items when there are insufficient or unavailable funds and the account becomes overdrawn, using the term "Total Overdraft Fees" (12 CFR 1030.11(a)(1)(i))?  (NOTE: The requirement to use the term "Total Overdraft Fees" is effective October 1, 2010) **AND**   ☐ ☐ ☐

   - The total amount of fees imposed on an account for returning items unpaid (12 CFR 1030.11(a)(1)(ii))?   ☐ ☐ ☐

2. Does the institution disclose the fees in close proximity to any fee identified in 12 CFR 1030.6(a)(3) that may be imposed in connection with the account and in a substantially similar format as found in Appendix B of Regulation DD?  NOTE: The table must contain lines (or similar markings such as asterisks) inside the table to divide the columns and rows.   ☐ ☐ ☐

### Advertisement Requirements

3. Unless an exception under 12 CFR 1030.11(b)(2)-(4) applies, when an institution advertises the payment of overdrafts, are all of the following disclosed clearly and conspicuously in the advertisement:

   - The fee(s) for the payment of each overdraft (12 CFR 1030.11(b)(1)(i))?   ☐ ☐ ☐

   - The categories of transactions for which a fee may be imposed for paying an overdraft (12 CFR 1030.11(b)(1)(ii))?   ☐ ☐ ☐

   - The time period by which the consumer must repay or cover any overdraft (12 CFR 1030.11(b)(1)(iii))?   ☐ ☐ ☐

   - The circumstances under which the institution will not pay an overdraft (12 CFR 1030.11(b)(1)(iv))?   ☐ ☐ ☐

# CFPB

# Examination Checklist                                         **TISA**

|  | Yes | No | NA |
|---|---|---|---|

### Disclosure of Account Balances

4.   If the institution discloses account balance information to a consumer through an automated system, does:

- The balance exclude additional amounts that the institution may provide to cover an item when there are insufficient or unavailable funds in the consumer's account (12 CFR 1030.11(c))? NOTE: The regulation does not require an institution to exclude funds from the consumer's balance that may be transferred from another account pursuant to a retail sweep program (Staff Commentary ((12 CFR 1030.11(c)-2)).     ☐ ☐ ☐

- The institution, if it discloses at its option additional account balances that include such additional amounts, prominently state that the balance includes such additional amounts, and if applicable, that the additional amounts are not available for all transactions (12 CFR 1030.11(c))?     ☐ ☐ ☐

## Comments

**[Click&type]**

# CFPB
# Laws and Regulations                                    GLBA Privacy

## Gramm-Leach-Bliley Act (GLBA)

### Privacy of Consumer Financial Information[1]

Title V, Subtitle A of the Gramm-Leach-Bliley Act ("GLB") governs the treatment of nonpublic personal information about consumers by financial institutions. Section 502 of the Subtitle, subject to certain exceptions, prohibits a financial institution from disclosing nonpublic personal information about a consumer to nonaffiliated third parties, unless the institution satisfies various notice and opt-out requirements, and provided that the consumer has not elected to opt out of the disclosure. Section 503 requires the institution to provide notice of its privacy policies and practices to its customers. Section 504 authorizes the issuance of regulations to implement these provisions.

In 2000, the four federal banking agencies and the National Credit Union Administration ("NCUA") published regulations implementing provisions of the GLBA governing the treatment of nonpublic personal information about consumers by financial institutions.[2] The regulations establish rules governing duties of a financial institution to provide particular notices and limitations on its disclosure of nonpublic personal information, as summarized below.

The Dodd-Frank Act granted rule-making authority for most of Subtitle A of Title V of the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6802-6809) with respect to many financial institutions to the Consumer Financial Protection Bureau (CFPB) and, with respect to entities under its jurisdiction, granted authority to the CFPB to supervise for and enforce compliance with these statutory provisions and their implementing regulations.[3]  In December 2011 the CFPB restated the regulations of transferor agencies at 12 CFR Part 1016 (76 Fed. Reg. 79025) (December 21, 2011).[4]

The regulations establish rules governing duties of a financial institution to provide particular notices and limitations on its disclosure of nonpublic personal information as summarized below.

A financial institution must provide a notice of its privacy policies and allow the consumer to opt out of the disclosure of the consumer's nonpublic personal information to a nonaffiliated third party if the disclosure is outside of the exceptions in Sections 13, 14, or 15 of the regulations.

---

[1] These reflect FFIEC-approved procedures.

[2] The NCUA published its final rule in the *Federal Register* on May 18, 2000 (65 Fed. Reg. 31722). The Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision jointly published their final rules on June 1, 2000 (65 Fed. Reg.35162).

[3] Dodd-Frank Act §§ 1002(12)(J), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. §§ 5481(12)(J), 5514(b)-(c), and 5515(b)-(c). Under Sec. 1002(12)(J), the Dodd-Frank Act excepted from CFPB authority Sec. 505 as it applies to Sec. 501(b) – related to financial institution security safeguards.

[4] The transferor agencies are the Federal Reserve Board, the Federal Deposit Insurance Corporation, the Federal Trade Commission, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision.

# CFPB
# Laws and Regulations                                    GLBA Privacy

Regardless of whether a financial institution shares nonpublic personal information, the institution must provide notices of its privacy policies to its customers.

A financial institution generally may not disclose customer account numbers to any nonaffiliated third party for marketing purposes.

A financial institution must follow reuse and redisclosure limitations on any nonpublic personal information it receives from a nonaffiliated financial institution.

In general, the privacy notice must describe a financial institution's policies and practices with respect to disclosing nonpublic personal information about a consumer to both affiliated and nonaffiliated third parties. Also, the notice must provide a consumer a reasonable opportunity to direct the institution generally not to share nonpublic personal information about the consumer (that is, to ''opt out'') with nonaffiliated third parties other than as permitted by the statute (for example, sharing for everyday business purposes, such as processing transactions and maintaining customers' accounts, and in response to properly executed governmental requests). The privacy notice must also provide, where applicable under the Fair Credit Reporting Act ("FCRA"), a notice and an opportunity for a consumer to opt out of certain information sharing among affiliates.

Section 728 of the Financial Services Regulatory Relief Act of 2006 ("Regulatory Relief Act" or "Act") required the Agencies to develop a model privacy form that financial institutions may rely on as a safe harbor to provide disclosures under the privacy rules.

On December 1, 2009, the four federal banking agencies and four additional federal regulatory agencies[5] jointly released a voluntary model privacy notice form designed to make it easier for consumers to understand how financial institutions collect and share nonpublic personal information (74 Fed. Reg. 62890). The final rule adopting the model privacy form was effective on December 31, 2009, except that notices that were provided on or before December 31, 2010, using sample clauses contained in Appendix B to the 2000 rule continued to receive the safe harbor for compliance with the notice requirements of the regulation for one year. Appendix B and the sample clauses were deleted from the agencies' rules effective January 1, 2012.[6]

## Definitions and Key Concepts

In discussing the duties and limitations imposed by the regulations, a number of key concepts are used. These concepts include "financial institution"; "nonpublic personal information"; "nonaffiliated third party"; the "opt-out" right and the exceptions to that right; and "consumer" and "customer." Each concept is briefly discussed below. A more complete explanation of each appears in the regulations.

---

[5] The four additional federal regulators are the NCUA, the Commodity Futures Trading Commission, the Federal Trade Commission, and the Securities and Exchange Commission.

[6] In restating the regulations from transferor agencies, the CFPB removed Appendix B from its regulation.

**CFPB**

**Laws and Regulations**                    **GLBA Privacy**

**Financial Institution:**

A "financial institution" is any institution the business of which is engaging in activities that are financial in nature or incidental to such financial activities, as determined by Section 4(k) of the Bank Holding Company Act of 1956. Financial institutions can include banks, securities brokers and dealers, insurance underwriters and agents, finance companies, mortgage bankers, and travel agents.[7]

***Nonpublic Personal Information:***

"Nonpublic personal information" generally is any information that is not publicly available and that:

- A consumer provides to a financial institution to obtain a financial product or service from the institution;

- Results from a transaction between the consumer and the institution involving a financial product or service; or

- A financial institution otherwise obtains about a consumer in connection with providing a financial product or service.

Information is publicly available if an institution has a reasonable basis to believe that the information is lawfully made available to the general public from government records, widely distributed media, or legally required disclosures to the general public. Examples include information in a telephone book or a publicly recorded document, such as a mortgage or securities filing.

Nonpublic personal information may include individual items of information as well as lists of information. For example, nonpublic personal information may include names, addresses, phone numbers, social security numbers, income, credit score, and information obtained through Internet collection devices (i.e., cookies).

There are special rules regarding lists. Publicly available information would be treated as nonpublic if it were included on a list of consumers derived from nonpublic personal information. For example, a list of the names and addresses of a financial institution's depositors would be nonpublic personal information even though the names and addresses might be published in local telephone directories because the list is derived from the fact that a person has a deposit account with an institution, which is not publicly available information.

However, if the financial institution has a reasonable basis to believe that certain customer relationships are a matter of public record, then any list of these relationships would be

---

[7] Certain functionally regulated subsidiaries, such as brokers, dealers, and investment advisers are subject to privacy regulations issued by the Securities and Exchange Commission. Other functionally regulated subsidiaries, such as futures commission merchants, commodity trading advisors, commodity pool operators, and introducing brokers in commodities, are subject to privacy regulations issued by the Commodity Futures Trading Commission. Insurance entities may be subject to privacy regulations issued by their respective state insurance authorities.

# CFPB
# Laws and Regulations                           GLBA Privacy

considered publicly available information. For instance, a list of mortgage customers where the mortgages are recorded in public records would be considered publicly available information. The institution could provide a list of such customers, and include on that list any other publicly available information it has about the customers on that list without having to provide notice or opt out.

### Nonaffiliated Third Party:

A "nonaffiliated third party" is any person except a financial institution's affiliate or a person employed jointly by a financial institution and a company that is not the institution's affiliate. An "affiliate" of a financial institution is any company that controls, is controlled by, or is under common control with the financial institution.

### Opt-out Right and Exceptions:

### The Right

Consumers must be given the right to "opt out" of, or prevent, a financial institution from disclosing nonpublic personal information about them to a nonaffiliated third party, unless an exception to that right applies. The exceptions are detailed in Sections 13, 14, and 15 of the regulations and described below.

As part of the opt-out right, consumers must be given a reasonable opportunity and a reasonable means to opt out. What constitutes a *reasonable opportunity to opt out* depends on the circumstances surrounding the consumer's transaction, but a consumer must be provided a reasonable amount of time to exercise the opt-out right. For example, it would be reasonable if the financial institution allows 30 days from the date of mailing a notice or 30 days after customer acknowledgement of an electronic notice for an opt-out direction to be returned. What constitutes a *reasonable means to opt out* may include check-off boxes, a reply form, or a toll-free telephone number, again depending on the circumstances surrounding the consumer's transaction. It is not reasonable to require a consumer to write his or her own letter as the only means to opt out.

### The Exceptions

Exceptions to the opt-out right are detailed in Sections 13, 14, and 15 of the regulations. Financial institutions need not comply with opt-out requirements if they limit disclosure of nonpublic personal information:

To a nonaffiliated third party to perform services for the financial institution or to function on its behalf, including marketing the institution's own products or services or those offered jointly by the institution and another financial institution. The exception is permitted only if the financial institution provides notice of these arrangements and by contract prohibits the third party from disclosing or using the information for other than the specified purposes. The contract must provide that the parties to the agreement are jointly offering, sponsoring, or endorsing a financial product or service. However, if the service or function is covered by the exceptions in Section 14 or 15 (discussed below), the financial institution does not have to comply with the additional

# CFPB
# Laws and Regulations                    GLBA Privacy

disclosure and confidentiality requirements of Section 13. Disclosure under this exception could include the outsourcing of marketing to an advertising company. (Section 13)

As necessary to effect, administer, or enforce a transaction that a consumer requests or authorizes, or under certain other circumstances relating to existing relationships with customers. Disclosures under this exception could be in connection with the audit of credit information, administration of a rewards program, or to provide an account statement. (Section 14)

For specified other disclosures that a financial institution normally makes, such as to protect against or prevent actual or potential fraud; to the financial institution's attorneys, accountants, and auditors; or to comply with applicable legal requirements, such as the disclosure of information to regulators. (Section 15)

*Consumer and Customer:*

The distinction between consumers and customers is significant because financial institutions have additional disclosure duties with respect to customers. All customers covered under the regulation are consumers, but not all consumers are customers.

A "consumer" is an individual, or that individual's legal representative, who obtains or has obtained a financial product or service from a financial institution that, is to be used primarily for personal, family, or household purposes.

A "financial service" includes, among other things, a financial institution's evaluation or brokerage of information that the institution collects in connection with a request or an application from a consumer for a financial product or service. For example, a financial service includes a lender's evaluation of an application for a consumer loan or for opening a deposit account even if the application is ultimately rejected or withdrawn.

Consumers who are not customers are entitled to an initial privacy and opt-out notice only if their financial institution wants to share their nonpublic personal information with nonaffiliated third parties outside of the exceptions.

A "customer" is a consumer who has a "customer relationship" with a financial institution. A "customer relationship" is a continuing relationship between a consumer and a financial institution under which the institution provides one or more financial products or services to the consumer that are to be used primarily for personal, family, or household purposes.

- For example, a customer relationship may be established when a consumer engages in one of the following activities with a financial institution:

- Maintains a deposit or investment account;

- Obtains a loan;

- Enters into a lease of personal property; or

- Obtains financial, investment, or economic advisory services for a fee.

# CFPB
# Laws and Regulations                    GLBA Privacy

Customers are entitled to initial and annual privacy notices regardless of the information disclosure practices of their financial institution.

There is a special rule for loans. When a financial institution sells the servicing rights to a loan to another financial institution, the customer relationship transfers with the servicing rights. However, any information on the borrower retained by the institution that sells the servicing rights must be accorded the protections due any consumer.

- Note that isolated transactions alone will not cause a consumer to be treated as a customer. For example, if an individual purchases a bank check from a financial institution where the person has no account, the individual will be a consumer but not a customer of that institution because he or she has not established a customer relationship. Likewise, if an individual uses the ATM of a financial institution where the individual has no account, even repeatedly, the individual will be a consumer, but not a customer of that institution.

## Financial Institution Duties

The regulations establish specific duties and limitations for a financial institution based on its activities. Financial institutions that intend to disclose nonpublic personal information outside the exceptions will have to provide opt-out rights to their customers and to consumers who are not customers. All financial institutions have an obligation to provide an initial and annual notice of their privacy policies to their customers. All financial institutions must abide by the regulatory limits on the disclosure of account numbers to nonaffiliated third parties and on the redisclosure and reuse of nonpublic personal information received from nonaffiliated financial institutions.

A brief summary of financial institution duties and limitations appears below. A more complete explanation of each appears in the regulations.

### Notice and Opt-out Duties to Consumers:

If a financial institution intends to disclose nonpublic personal information about any of its consumers (whether or not they are customers) to a nonaffiliated third party, and an exception does not apply, then the financial institution must provide to the consumer:

- An initial notice of its privacy policies;

- An opt-out notice (including, among other things, a reasonable means to opt out); and

- A reasonable opportunity, before the financial institution discloses the information to the nonaffiliated third party, to opt out.

The financial institution may not disclose any nonpublic personal information to nonaffiliated third parties except under the enumerated exceptions unless these notices have been provided and the consumer has not opted out. Additionally, the institution must provide a *revised notice* before the financial institution begins to share a new category of nonpublic personal information or shares information with a new category of nonaffiliated third party in a manner that was not described in the previous notice.

**CFPB**

**Laws and Regulations**                              **GLBA Privacy**

Note that a financial institution need not comply with the initial and opt-out notice requirements for consumers who are not customers if the institution limits disclosure of nonpublic personal information to the exceptions.

*Notice Duties to Customers:*

In addition to the duties described above, there are several duties unique to customers. In particular, regardless of whether the institution discloses or intends to disclose nonpublic personal information, a financial institution must provide notice to its customers of its privacy policies and practices at various times.

- A financial institution must provide an initial notice of its privacy policies and practices to each customer, not later than the time a customer relationship is established. Section 4(e) of the regulations describes the exceptional cases in which delivery of the notice is allowed subsequent to the establishment of the customer relationship.

- A financial institution must provide an annual notice at least once in any period of 12 consecutive months during the continuation of the customer relationship.

- Generally, new privacy notices are not required for each new product or service. However, a financial institution must provide a new notice to an existing customer when the customer obtains a new financial product or service from the institution, if the initial or annual notice most recently provided to the customer was not accurate with respect to the new financial product or service.

- When a financial institution does not disclose nonpublic personal information (other than as permitted under Section 14 and Section 15 exceptions) and does not reserve the right to do so, the institution has the option of providing a simplified notice.

**Requirements for Notices**

*Clear and Conspicuous.* Privacy notices must be clear and conspicuous, meaning they must be reasonably understandable and designed to call attention to the nature and significance of the information contained in the notice. The regulations do not prescribe specific methods for making a notice clear and conspicuous, but do provide examples of ways in which to achieve the standard, such as the use of short explanatory sentences or bullet lists, and the use of plain-language headings and easily readable typeface and type size. Privacy notices also must accurately reflect the institution's privacy practices.

*Delivery Rules.* Privacy notices must be provided so that each recipient can reasonably be expected to receive actual notice in writing, or if the consumer agrees, electronically. To meet this standard, a financial institution could, for example, (1) hand-deliver a printed copy of the notice to its consumers, (2) mail a printed copy of the notice to a consumer's last known address, or (3) for the consumer who conducts transactions electronically, post the notice on the institution's website and require the consumer to acknowledge receipt of the notice as a necessary step to completing the transaction.

**CFPB**

# Laws and Regulations                          GLBA Privacy

For customers only, a financial institution must provide the initial notice (as well as the annual notice and any revised notice) so that a customer may be able to retain or subsequently access the notice. A written notice satisfies this requirement. For customers who obtain financial products or services electronically, and agree to receive their notices on the institution's website, the institution may provide the current version of its privacy notice on its website.

*Notice Content.* A privacy notice must contain specific disclosures. However, a financial institution may provide to consumers who are not customers a "short form" initial notice together with an opt-out notice stating that the institution's privacy notice is available upon request and explaining a reasonable means for the consumer to obtain it. The following is a list of disclosures regarding nonpublic personal information that institutions must provide in their privacy notices, as applicable:

1. Categories of information collected;

2. Categories of information disclosed;

3. Categories of affiliates and nonaffiliated third parties to whom the institution may disclose information;

4. Policies with respect to the treatment of former customers' information;

5. Information disclosed to service providers and joint marketers (Section 13);

6. An explanation of the opt-out right and methods for opting out;

7. Any opt-out notices the institution must provide under the Fair Credit Reporting Act with respect to affiliate information sharing;

8. Policies for protecting the security and confidentiality of information; and

9. A statement that the institution makes disclosures to other nonaffiliated third parties as permitted by law (Sections 14 and 15).

**Model Privacy Notice Form.**  The Appendix to 12 CFR Part 1016 contains the model privacy notice form. A financial institution can use the model form to obtain a "safe harbor" for compliance with the content requirements for notifying consumers of its information-sharing practices and their right to opt out of certain sharing practices. To obtain the safe harbor, the institution must provide a model form in accordance with the instructions set forth in the Appendix. The final rule adopting the model privacy form and accompanying safe harbor became effective on December 31, 2009.

**Limitations on Disclosure of Account Numbers:**

A financial institution must not disclose an account number or similar form of access number or access code for a credit card, deposit, or transaction account to any nonaffiliated third party (other than a consumer reporting agency) for use in telemarketing, direct mail marketing, or other marketing through electronic mail to the consumer.

# CFPB
# Laws and Regulations                                    GLBA Privacy

The disclosure of encrypted account numbers without an accompanying means of decryption, however, is not subject to this prohibition. The regulation also expressly allows disclosures by a financial institution to its agent to market the institution's own products or services (although the financial institution must not authorize the agent to directly initiate charges to the customer's account). Also not barred are disclosures to participants in private-label or affinity card programs, where the participants are identified to the customer when the customer enters the program.

### *Redisclosure and Reuse Limitations on Nonpublic Personal Information Received:*

If a financial institution receives nonpublic personal information from a nonaffiliated financial institution, its disclosure and use of the information is limited.

- For nonpublic personal information received under a Section 14 or 15 exception, the financial institution is limited to:

  o Disclosing the information to the affiliates of the financial institution from which it received the information;

  o Disclosing the information to its own affiliates, who may, in turn, disclose and use the information only to the extent that the financial institution can do so; and

  o Disclosing and using the information pursuant to a Section 14 or 15 exception (for example, an institution receiving information for account processing could disclose the information to its auditors).

- For nonpublic personal information received other than under a Section 14 or 15 exception, the recipient's use of the information is unlimited, but its disclosure of the information is limited to:

  o Disclosing the information to the affiliates of the financial institution from which it received the information;

  o Disclosing the information to its own affiliates, who may, in turn disclose the information only to the extent that the financial institution can do so; and

  o Disclosing the information to any other person, if the disclosure would be lawful if made directly to that person by the financial institution from which it received the information. For example, an institution that received a customer list from another financial institution could disclose the list (1) in accordance with the privacy policy of the financial institution that provided the list, (2) subject to any opt-out election or revocation by the consumers on the list, and (3) in accordance with appropriate exceptions under Sections 14 and 15.

## Other Matters

### *Fair Credit Reporting Act*

The regulations do not modify, limit, or supersede the operation of the Fair Credit Reporting Act.

# CFPB
# Laws and Regulations                          GLBA Privacy

### State Law

The regulations do not supersede, alter, or affect any state statute, regulation, order, or interpretation, except to the extent that it is inconsistent with the regulations. A state statute, regulation, order, etc. is consistent with the regulations if the protection it affords any consumer is greater than the protection provided under the regulations, as determined by the FTC.

### Guidelines Regarding Protecting Customer Information

The regulations require a financial institution to disclose its policies and practices for protecting the confidentiality, security, and integrity of nonpublic personal information about consumers (whether or not they are customers). The disclosure need not describe these policies and practices in detail, but instead may describe in general terms who is authorized to have access to the information and whether the institution has security practices and procedures in place to ensure the confidentiality of the information in accordance with the institution's policies.

The four federal banking agencies published guidelines, pursuant to Section 501(b) of the Gramm-Leach-Bliley Act, that address steps a financial institution should take in order to protect customer information. The guidelines relate only to information about customers, rather than all consumers. Compliance examiners should consider the findings of a 501(b) inspection during the compliance examination of a financial institution for purposes of evaluating the accuracy of the institution's disclosure regarding data security.

# REFERENCES

## Laws

15 U.S.C. § 6801 et seq.              Title V of the Gramm-Leach-Bliley Act

## Regulations

### Consumer Financial Protection Bureau Regulation (12 CFR)

Part 1016                              Privacy of Consumer Financial Information (Regulation P)

# CFPB
# Examination Procedures                    GLBA Privacy

## Gramm-Leach-Bliley Act (GLBA)

| | |
|---|---|
| Exam Date: | [Click&type] |
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

### Privacy of Consumer Financial Information

## Examination Objectives[1]

- To assess the quality of a financial institution's compliance management policies and procedures for implementing the privacy regulation, specifically ensuring consistency between what the financial institution tells consumers in its notices about its policies and practices and what it actually does.

- To determine the reliance that can be placed on a financial institution's internal controls and procedures for monitoring the institution's compliance with the privacy regulation.

- To determine a financial institution's compliance with the privacy regulation, specifically in meeting the following requirements:

  o Providing to customers notices of its privacy policies and practices that are timely, accurate, clear and conspicuous, and delivered so that each customer can reasonably be expected to receive actual notice;

  o Disclosing nonpublic personal information to nonaffiliated third parties, other than under an exception, after first meeting the applicable requirements for giving consumers notice and the right to opt out;

  o Appropriately honoring consumer opt-out directions;

  o Lawfully using or disclosing nonpublic personal information received from a nonaffiliated financial institution; and

  o Disclosing account numbers only according to the limits in the regulations.

- To initiate effective corrective actions when violations of law are identified, or when policies or internal controls are deficient.

---

[1] These reflect FFIEC-approved procedures.

**CFPB**

**Examination Procedures**                    **GLBA Privacy**

## Initial Procedures

1.  Through discussions with management and review of available information, identify the institution's information sharing practices (and changes to those practices) with affiliates and nonaffiliated third parties; how it treats nonpublic personal information; and how it administers opt outs. Consider the following as appropriate:

    - Notices (initial, annual, revised, opt-out, short-form, and simplified);

    - Institutional privacy policies and procedures, including those to:
        - o process requests for nonpublic personal information, including requests for aggregated data;
        - o deliver notices to consumers;
        - o manage consumer opt-out directions (e.g., designating files, allowing a reasonable time to opt out, providing new opt-out and privacy notices when necessary, receiving opt-out directions, handling joint account holders);
        - o prevent the unlawful disclosure and use of the information received from nonaffiliated financial institutions; and
        - o prevent the unlawful disclosure of account numbers.

    - Information-sharing agreements between the institution and affiliates and service agreements or contracts between the institution and nonaffiliated third parties either to obtain or provide information or services;

    - Complaint logs, telemarketing scripts, and any other information obtained from nonaffiliated third parties (NOTE: Review telemarketing scripts to determine whether the contractual terms set forth under Section 13 are met and whether the institution is disclosing account number information in violation of Section 12);

    - Categories of nonpublic personal information collected from or about consumers in obtaining a financial product or service (e.g., in the application process for deposit, loan, or investment products; for an over-the-counter purchase of a bank check; from E-banking products or services, including the data collected electronically through Internet cookies; or through ATM transactions);

    - Categories of nonpublic personal information shared with, or received from, each nonaffiliated third party;

    - Consumer complaints regarding the treatment of nonpublic personal information, including those received electronically;

    - Records that reflect the bank's categorization of its information sharing practices under Sections 13, 14, 15, and outside of these exceptions; and

    - Results of a 501(b) inspection (used to determine the accuracy of the

# CFPB
# Examination Procedures                     GLBA Privacy

institution's privacy disclosures regarding data security).

**[Click&type]**

2.  Use the information gathered from step 1 to work through the "Privacy Notice and Opt-Out Decision Tree" (Attachment A).  Identify which module(s) of procedures is (are) applicable.

**[Click&type]**

3.  Use the information gathered from step 1 to work through the Reuse and Redisclosure and Account Number Sharing Decision Trees, as necessary (Attachments B & C).  Identify which module is applicable.

**[Click&type]**

4.  Determine the adequacy of the financial institution's internal controls and procedures to ensure compliance with the privacy regulation as applicable. Consider the following:

    - Sufficiency of internal policies and procedures, and controls, including review of new products and services and controls over servicing arrangements and marketing arrangements;

    - Effectiveness of management information systems, including the use of technology for monitoring, exception reports, and standardization of forms and procedures;

    - Frequency and effectiveness of monitoring procedures;

    - Adequacy and regularity of the institution's training program;

    - Suitability of the compliance audit program for ensuring that:
        - the procedures address all regulatory provisions as applicable;
        - the work is accurate and comprehensive with respect to the institution's information sharing practices;
        - the frequency is appropriate;
        - conclusions are appropriately reached and presented to responsible parties;
        - steps are taken to correct deficiencies and to follow-up on previously identified deficiencies; and

    - Knowledge level of management and personnel.

**[Click&type]**

5.  Ascertain areas of risk associated with the financial institution's sharing practices (especially those within Section 13 and those that fall outside of the exceptions) and any weaknesses found within the compliance management program.  Keep in mind any outstanding deficiencies identified in the audit for follow-up when completing the modules.

# CFPB
# Examination Procedures                    GLBA Privacy

---

**[Click&type]**

6.  Based on the results of the foregoing initial procedures and discussions with management, determine which procedures if any should be completed in the applicable module, focusing on areas of particular risk. The selection of procedures to be employed depends upon the adequacy of the institution's compliance management system and level of risk identified. Each module contains a series of general instructions to verify compliance, cross-referenced to cites within the regulation.  Additionally, there are cross-references to a more comprehensive checklist, which the examiner may use if needed to evaluate compliance in more detail.

**[Click&type]**

7.  Evaluate any additional information or documentation discovered during the course of the examination according to these procedures.  Note that this may reveal new or different sharing practices necessitating reapplication of the Decision Trees and completion of additional or different modules.

**[Click&type]**

8.  Formulate conclusions.

   - Summarize all findings.
   - For violation(s) noted, determine the cause by identifying weaknesses in internal controls, compliance review, training, management over-sight, or other areas.
   - Identify action needed to correct violations and weaknesses in the institution's compliance system, as appropriate.
   - Discuss findings with management and obtain a commitment for corrective action.

**[Click&type]**

## Examiner's Summary, Recommendations, and Comments

**[Click&type]**

---

# CFPB
# Examination Procedures

# GLBA Privacy
# Attachment A

## Decision Tree: Privacy Notice and Opt-Out[1]

| Exam Date: | [Click&type] |
|---|---|
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |



Yes

**Module 1**

Privacy notice (presentation, content, and delivery) (with or without Section 13 notice & contracting) Short-form notice (optional for consumers) Customer notice delivery rules Opt-out rules

No

Does the financial institution share nonpublic personal information with nonaffiliated third parties under sections 13, and 14 and/or 15 but not outside the exceptions?

Yes

**Module 2**

Privacy notice Customer notice delivery rules Section 13 notice & contracting

Does the financial institution share nonpublic personal information with nonaffiliated third parties only under Sections 14 and/or 15?

Yes

**Module 3**

Privacy notice Simplified notice (if applicable) Customer notice delivery rules

---

[1] These reflect FFIEC-approved procedures.

# CFPB
# Examination Procedures

# GLBA Privacy
# Attachment B

## Decision Tree: Reuse and Redisclosure of Nonpublic Personal Information Received from Nonaffiliated Financial Institutions (Sections 11(A) and 11(B))



# CFPB
# Examination Procedures

# GLBA Privacy
# Attachment C

## Decision Tree: Account Number Sharing (Section 12)



* This may include sharing of encrypted account numbers, but not the decryption key.

# Module 1: Sharing nonpublic personal information with nonaffiliated third parties under Sections 14 and/or 15 and outside of the exceptions (with or without also sharing under Section 13)

NOTE: Financial institutions whose practices fall within this category engage in the most expansive degree of information sharing permissible. Consequently, these institutions are held to the most comprehensive compliance standards imposed by the Privacy regulation.

A. Disclosure of Nonpublic Personal Information

1. Select a sample of third-party relationships with nonaffiliated third parties and obtain a sample of data shared between the institution and the third party both inside and outside of the exceptions. The sample should include a cross-section of relationships but should emphasize those that are higher risk in nature as determined by the initial procedures. Perform the following comparisons to evaluate the financial institution's compliance with disclosure limitations.

   a. Compare the categories of data shared and with whom the data were shared to those stated in the privacy notice and verify that what the institution tells consumers (customers and those who are not customers) in its notices about its policies and practices in this regard and what the institution actually does are consistent (§§10, 6).

   b. Compare the data shared to a sample of opt-out directions and verify that only nonpublic personal information covered under the exceptions or from consumers (customers and those who are not customers) who chose not to opt out is shared (§10).

   **[Click&type]**

2. If the financial institution also shares information under Section 13, obtain and review contracts with nonaffiliated third parties that perform services for the financial institution not covered by the exceptions in Section 14 or 15. Determine whether the contracts prohibit the third party from disclosing or using the information other than to carry out the purposes for which the information was disclosed.

   **[Click&type]**

B. Presentation, Content, and Delivery of Privacy Notices

1. Review the financial institution's initial, annual and revised notices, as well as any short-form notices that the institution may use for consumers who are not customers. Determine whether or not these notices:

   a. Are clear and conspicuous (§§3(b), 4(a), 5(a)(1), 7(a)(1), 8(a)(1));

   b. Accurately reflect the policies and practices used by the institution (§§4(a), 5(a)(1), 8(a)(1)). Note, this includes practices disclosed in the notices that exceed regulatory requirements; and

c.  Include, and adequately describe, all required items of information and contain examples as applicable (§6). Note that if the institution shares under Section 13 the notice provisions for that section shall also apply.

d.  If the model privacy form is used, determine that it reflects the institution's policies and practices. For institutions seeking a safe harbor for compliance with the content requirements of the regulation, verify that the notice has the proper content and is in the proper format as specified in the Appendix to the regulation.

**[Click&type]**

2.  Through discussions with management, review of the institution's policies and procedures, and a sample of electronic or written consumer records where available, determine if the institution has adequate procedures in place to provide notices to consumers, as appropriate. Assess the following:

a.  Timeliness of delivery (§§4(a), 7(c), 8(a));

b.  Reasonableness of the method of delivery (e.g., by hand; by mail; electronically, if the consumer agrees; or as a necessary step of a transaction) (§9); and

c.  For customers only, review the timeliness of delivery (§§4(d), 4(e), 5(a)), means of delivery of annual notice (§9(c)), and accessibility of or ability to retain the notice (§9(e)).

**[Click&type]**

C.  Opt-Out Right

1.  Review the financial institution's opt-out notices. An opt-out notice may be combined with the institution's privacy notices. Regardless, determine whether the opt-out notices:

a.  Are clear and conspicuous (§§3(b) and 7(a)(1));

b.  Accurately explain the right to opt out (§7(a)(1));

c.  Include and adequately describe the three required items of information (the institution's policy regarding disclosure of nonpublic personal information, the consumer's opt-out right, and the means to opt out) (§7(a)(1)); and

d.  Describe how the institution treats joint consumers (customers and those who are not customers), as applicable (§7(d)).

**[Click&type]**

2.  Through discussions with management, review of the institution's policies and procedures, and a sample of electronic or written records where available, determine if the institution has adequate procedures in place to provide the opt-out notice and comply with opt-out directions of consumers (customers and those who are not customers), as appropriate. Assess the following:

a.  Timeliness of delivery (§10(a)(1));

**CFPB**                                                    **GLBA Privacy**

**Examination Procedures**                                **Module 1**

b. Reasonableness of the method of delivery (e.g., by hand; by mail; electronically, if the consumer agrees; or as a necessary step of a transaction) (§9);

c. Reasonableness of the opportunity to opt out (the time allowed to and the means by which the consumer may opt out) (§§10(a)(1)(iii), 10(a)(3)); and

d. Adequacy of procedures to implement and track the status of a consumer's (customers and those who are not customers) opt-out direction, including those of former customers (§7(e), (f), (g)).

**[Click&type]**

D. Checklist Cross References

| Regulation Section | Subject | Checklist Questions |
|---|---|---|
| 4(a); 6(a, b, c, e); and 9(a, b, g) | Privacy notices (presentation, content, and delivery) | 2, 8-11, 14, 18, 35, 36, 40 |
| 4(a, c, d, e); 5; and 9(c, e) | Customer notice delivery rules | 1, 3-7, 37, 38 |
| 13 | Section 13 notice and contracting rules (as applicable) | 12, 47 |
| 6(d) | Short form notice rules (optional for consumers only) | 15-17 |
| 7; 8; and 10 | Opt-out rules | 19-34, 41-43 |
| 14, 15 | Exceptions | 48, 49, 50 |

**CFPB**

**Examination Procedures**

**GLBA Privacy**

**Module 2**

# Module 2: Sharing nonpublic personal information with nonaffiliated third parties under Sections 13, and 14 and/or 15, but not outside of these exceptions

A.  Disclosure of Nonpublic Personal Information

1.  Select a sample of third-party relationships with nonaffiliated third parties and obtain a sample of data shared between the institution and the third party. The sample should include a cross-section of relationships but should emphasize those that are higher risk in nature as determined by the initial procedures. Perform the following comparisons to evaluate the financial institution's compliance with disclosure limitations.

    a.  Compare the data shared and with whom the data were shared to ensure that the institution accurately categorized its information sharing practices and is not sharing nonpublic personal information outside the exceptions (§§13, 14, 15).

    b.  Compare the categories of data shared and with whom the data were shared to those stated in the privacy notice and verify that what the institution tells consumers in its notices about its policies and practices in this regard and what the institution actually does are consistent (§§10, 6).

    c.  If the model privacy form is used, determine that it reflects the institution's policies and practices. For institutions seeking a safe harbor for compliance with the content requirements of the regulation, verify that the notice has the proper content and is in the proper format as specified in the Appendix to the regulation.

    **[Click&type]**

2.  Review contracts with nonaffiliated third parties that perform services for the financial institution not covered by the exceptions in Section 14 or 15. Determine whether the contracts adequately prohibit the third party from disclosing or using the information other than to carry out the purposes for which the information was disclosed.

    **[Click&type]**

B.  Presentation, Content, and Delivery of Privacy Notices

1.  Review the financial institution's initial and annual privacy notices. Determine whether or not they:

    a.  Are clear and conspicuous (§§3(b), 4(a), 5(a)(1));

    b.  Accurately reflect the policies and practices used by the institution (§§4(a), 5(a)(1)). Note, this includes practices disclosed in the notices that exceed regulatory requirements; and

    c.  Include, and adequately describe, all required items of information and contain examples as applicable (§§6, 13).

**[Click&type]**

2. Through discussions with management, review of the institution's policies and procedures, and a sample of electronic or written consumer records where available, determine if the institution has adequate procedures in place to provide notices to consumers, as appropriate. Assess the following:

   a. Timeliness of delivery (§4(a));

   b. Reasonableness of the method of delivery (e.g., by hand; by mail; electronically, if the consumer agrees; or as a necessary step of a transaction) (§9); and

   c. For customers only, review the timeliness of delivery (§§4(d), 4(e), and 5(a)), means of delivery of annual notice §9(c)), and accessibility of or ability to retain the notice (§9(e)).

**[Click&type]**

C. Checklist Cross References

| Regulation Section | Subject | Checklist Questions |
|---|---|---|
| 4(a); 6(a, b, c, e); and 9(a, b, g) | Privacy notices (presentation, content, and delivery) | 2, 8-11, 14, 18, 35, 36, 40 |
| 13 | Section 13 notice and contracting rules | 12, 47 |
| 4(a, c, d, e); 5; and 9(c, e) | Customer notice delivery rules | 1, 3-7, 37, 38 |
| 14, 15 | Exceptions | 48, 49, 50 |

# Module 3: Sharing nonpublic personal information with nonaffiliated third parties only under Sections 14 and/or 15

NOTE: This module applies only to customers.

A. Disclosure of Nonpublic Personal Information

    1. Select a sample of third-party relationships with nonaffiliated third parties and obtain a sample of data shared between the institution and the third party.

        a. Compare the data shared and with whom the data were shared to ensure that the institution accurately states its information sharing practices and is not sharing nonpublic personal information outside the exceptions.

    **[Click&type]**

B. Presentation, Content, and Delivery of Privacy Notices

    1. Obtain and review the financial institution's initial and annual notices, as well as any simplified notice that the institution may use. Note that the institution may only use the simplified notice when it does not also share nonpublic personal information with affiliates outside of Section 14 and 15 exceptions. Determine whether or not these notices:

        a. Are clear and conspicuous (§§3(b), 4(a), 5(a)(1));

        b. Accurately reflect the policies and practices used by the institution (§§4(a), 5(a)(1)). Note, this includes practices disclosed in the notices that exceed regulatory requirements; and

        c. Include, and adequately describe, all required items of information (§6).

        d. If the model privacy form is used, determine that it reflects the institution's policies and practices. For institutions seeking a safe harbor for compliance with the content requirements of the regulation, verify that the notice has the proper content and is in the proper format as specified in the Appendix to the regulation.

    **[Click&type]**

    2. Through discussions with management, review of the institution's policies and procedures, and a sample of electronic or written customer records where available, determine if the institution has adequate procedures in place to provide notices to customers, as appropriate. Assess the following:

        a. Timeliness of delivery (§§4(a), 4(d), 4(e), 5(a)); and

        b. Reasonableness of the method of delivery (e.g., by hand; by mail; electronically, if the customer agrees; or as a necessary step of a transaction) (§9) and accessibility of or ability to retain the notice (§9(e)).

    **[Click&type]**

**CFPB**

**Examination Procedures**

**GLBA Privacy**

**Module 3**

C.  Checklist Cross References

| Regulation Section | Subject | Checklist Questions |
|---|---|---|
| 6 | Customer notice content and presentation | 8-11, 14, 18 |
| 6 (c)(5) | Simplified notice content (optional) | 13 |
| 4 (a, d, e); 5; and 9 | Customer notice delivery process | 1, 3-7, 35-40 |
| 14, 15 | Exceptions | 48, 49, 50 |

# Module 4: Reuse and rediclosure of nonpublic personal information received from a nonaffiliated financial institution under Sections 14 and/or 15

A. Through discussions with management and review of the institution's procedures, determine whether the institution has adequate practices to prevent the unlawful rediclosure and reuse of the information where the institution is the recipient of nonpublic personal information (§11(a)).

   **[Click&type]**

B. Select a sample of data received from nonaffiliated financial institutions, to evaluate the financial institution's compliance with reuse and rediclosure limitations.

   1. Verify that the institution's rediclosure of the information was only to affiliates of the financial institution from which the information was obtained or to the institution's own affiliates, except as otherwise allowed in step 2 below (§11(a)(1)(i) and (ii)).

      **[Click&type]**

   2. Verify that the institution only uses and shares the data pursuant to an exception in Sections 14 and 15 (§11(a)(1)(iii)).

      **[Click&type]**

C. Checklist Cross References

| Regulation Section | Subject | Checklist Question |
|---|---|---|
| 11(a) | Reuse and rediclosure | 44 |

**CFPB**

**Examination Procedures**

**GLBA Privacy**

**Module 5**

# Module 5: Redisclosure of nonpublic personal information received from a nonaffiliated financial institution outside of Sections 14 and 15

A. Through discussions with management and review of the institution's procedures, determine whether the institution has adequate practices to prevent the unlawful redisclosure of the information where the institution is the recipient of nonpublic personal information (§11(b)).

**[Click&type]**

B. Select a sample of data received from nonaffiliated financial institutions and shared with others to evaluate the financial institution's compliance with redisclosure limitations.

1. Verify that the institution's redisclosure of the information was only to affiliates of the financial institution from which the information was obtained or to the institution's own affiliates, except as otherwise allowed in the step b below (§11(b)(1)(i) and (ii)).

   **[Click&type]**

2. If the institution shares information with entities other than those under step a above, verify that the institution's information sharing practices conform to those in the nonaffiliated financial institution's privacy notice (§11(b)(1)(iii)).

   **[Click&type]**

3. Also, review the procedures used by the institution to ensure that the information sharing reflects the opt-out status of the consumers of the nonaffiliated financial institution (§§10, 11(b)(1)(iii)).

   **[Click&type]**

C. Checklist Cross References

| Regulation Section | Subject | Checklist Question |
|---|---|---|
| 11(b) | Reuse and redisclosure | 45 |

## Module 6: Account number sharing

A. If available, review a sample of telemarketer scripts used when making sales calls to determine whether the scripts indicate that the telemarketers have the account numbers of the institution's consumers (§12).

   **[Click&type]**

B. Obtain and review a sample of contracts with agents or service providers to whom the financial institution discloses account numbers for use in connection with marketing the institution's own products or services. Determine whether the institution shares account numbers with nonaffiliated third parties only to perform marketing for the institution's own products and services. Ensure that the contracts do not authorize these nonaffiliated third parties to directly initiate charges to customer's accounts (§12(b)(1)).

   **[Click&type]**

C. Obtain a sample of materials and information provided to the consumer upon entering a private label or affinity credit card program. Determine if the participants in each program are identified to the customer when the customer enters into the program (§12(b)(2)).

   **[Click&type]**

D. Checklist Cross References

| Regulation Section | Subject | Checklist Question |
|---|---|---|
| 12 | Account number sharing | 46 |

# CFPB
# Examination Checklist                GLBA Privacy

## Gramm-Leach-Bliley Act (GLBA)

## Privacy of Consumer
## Financial Information[1]

| | |
|---|---|
| Exam Date: | [Click&type] |
| Prepared By: | [Click&type] |
| Reviewer: | [Click&type] |
| Docket #: | [Click&type] |
| Entity Name: | [Click&type] |

### SUBPART A

**Initial Privacy Notice**

|  | Yes | No |
|---|---|---|

NOTE: No notice is required if nonpublic personal information is disclosed to nonaffiliated third parties only under an exception in Sections 14 and 15, and there is no customer relationship. [§4(b)]  With respect to credit relationships, an institution establishes a customer relationship when it originates a consumer loan. If the institution subsequently sells the servicing rights to the loan to another financial institution, the customer relationship transfers with the servicing rights. [§4(c)]

1.  Does the institution provide a clear and conspicuous notice that accurately reflects its privacy policies and practices to **all customers** not later than when the customer relationship is established, other than as allowed in paragraph (e) of Section four (4) of the regulation [§4(a)(1))]?        ☐   ☐

2.  Does the institution provide a clear and conspicuous notice that accurately reflects its privacy policies and practices to **all consumers**, who are not customers, before any nonpublic personal information about the consumer is disclosed to a nonaffiliated third party, other than under an exception in Sections 14 or 15 [§4(a)(2)]?        ☐   ☐

3.  Does the institution provide to **existing customers**, who obtain a new financial product or service, an initial privacy notice that covers the customer's new financial product or service, if the most recent notice provided to the customer was not accurate with respect to the new financial product or service [§4(d)(1)] ?        ☐   ☐

4.  Does the institution provide initial notice **after establishing a customer relationship** only if:

    •  The customer relationship is not established at the customer's election [§4(e)(1)(i)] or        ☐   ☐

    •  To do otherwise would substantially delay the customer's transaction (e.g. in the case of a telephone application), and the customer agrees to the subsequent delivery [§4 (e)(1)(ii)]?        ☐   ☐

---

[1] These reflect FFIEC-approved procedures.

# CFPB
# Examination Checklist

# GLBA Privacy

|  | Yes | No |
|---|---|---|

**5.** When the subsequent delivery of a privacy notice is permitted, does the institution provide notice after establishing a customer relationship within a reasonable time [§4(e)]? ☐ ☐

## Annual Privacy Notice

**6.** Does the institution provide a clear and conspicuous notice that accurately reflects its privacy policies and practices at least annually (that is, at least once in any period of 12 consecutive months) to all customers, throughout the customer relationship? [§5(a)(1)and (2)] ☐ ☐

NOTE: Annual notices are not required for former customers [§5(b)(1)and (2)].

**7.** Does the institution provide an annual privacy notice to each customer whose loan the institution owns the right to service [§§5(c), 4(c)(2)]? ☐ ☐

## Content of Privacy Notices

**8.** Do the initial, annual, and revised privacy notices include each of the following, as applicable:

- The categories of nonpublic personal information that the institution collects [§6(a)(1)]; ☐ ☐

- The categories of nonpublic personal information that the institution discloses [§6(a)(2)]; ☐ ☐

- The categories of affiliates and nonaffiliated third parties to whom the institution discloses nonpublic personal information, other than parties to whom information is disclosed under an exception in Section14 or 15 [§6(a)(3)]; ☐ ☐

- The categories of nonpublic personal information disclosed about former customers, and the categories of affiliates and nonaffiliated third parties to whom the institution discloses that information, other than those parties to whom the institution discloses information under an exception in Section 14 or 15 [§6(a)(4)]; ☐ ☐

- If the institution discloses nonpublic personal information to a nonaffiliated third party under Section13, and no exception under Section 14 or 15 applies, a separate statement of the categories of information the institution discloses and the categories of third parties with whom the institution has contracted [§6(a)(5)]; ☐ ☐

- An explanation of the opt-out right, including the method(s) of opt out that the consumer can use at the time of the notice [§6(a)(6)]; ☐ ☐

- Any disclosures that the institution makes under Section603(d)(2)(A)(iii) of the Fair Credit Reporting Act (FCRA) [§6(a)(7)]; ☐ ☐

# CFPB
# Examination Checklist                    GLBA Privacy

|  | Yes | No |
|---|---|---|

- The institution's policies and practices with respect to protecting the confidentiality and security of nonpublic personal information [§6(a)(8)]; and ☐ ☐

- A general statement—with no specific reference to the third parties—that the institution makes disclosures to other nonaffiliated third parties for everyday business purposes, such as (with the institution including all that are applicable) to process transactions, maintain accounts, respond to court orders and legal investigations, or report to credit bureaus, or as otherwise permitted by law [§6(a)(9),(b)(1) and (2)]? ☐ ☐

NOTE: Institutions that provide a model privacy form in accordance with the instructions in the Appendix to the  regulation will receive a safe harbor for compliance with the content requirements of the regulation.

9.  Does the institution list the following categories of nonpublic personal information that it collects, as applicable:

- Information from the consumer [§6(c)(1)(i)]; ☐ ☐

- Information about the consumer's transactions with the institution or its affiliates [§6(c)(1)(ii)]; ☐ ☐

- Information about the consumer's transactions with nonaffiliated third parties [§6(c)(1)(iii)]; and ☐ ☐

- Information from a consumer reporting agency [§6(c)(1)(iv)]? ☐ ☐

10.  Does the institution list the following categories of nonpublic personal information that it discloses, as applicable, and a few examples of each, or alternatively state that it reserves the right to disclose all the nonpublic personal information that it collects:

- Information from the consumer; ☐ ☐

- Information about the consumer's transactions with the institution or its affiliates; ☐ ☐

- Information about the consumer's transactions with nonaffiliated third parties; and ☐ ☐

- Information from a consumer reporting agency [§6(c)(2)]? ☐ ☐

NOTE: Examples are recommended under Section 6(c)(2) although not under Section 6(c)(1). ☐ ☐

# CFPB
# Examination Checklist                    GLBA Privacy

Yes    No

11.  Does the institution list the following categories of affiliates and nonaffiliated third parties to whom it discloses information, as applicable, and a few examples to illustrate the types of the third parties in each category:

- Financial service providers [§6(c)(3)(i)]; ☐ ☐

- Non-financial companies [§6(c)(3)(ii)]; and ☐ ☐

- Others [§6(c)(3)(iii)]? ☐ ☐

12.  Does the institution make the following disclosures regarding service providers and joint marketers to whom it discloses nonpublic personal information under Section 13:

- As applicable, the same categories and examples of nonpublic personal information disclosed as described in paragraphs (a)(2) and (c)(2) of Section six (6) (see questions 8b and 10)and [§6(c)(4)(i)]; ☐ ☐

- That the third party is a service provider that performs marketing on the institution's behalf or on behalf of the institution and another financial institution[§6(c)(4)(ii)(A)]; or ☐ ☐

- That the third party is a financial institution with which the institution has a joint marketing agreement [§6(c)(4)(ii)(B)]? ☐ ☐

13.  If the institution does not disclose nonpublic personal information, and does not reserve the right to do so, other than under exceptions in Sections 14 and 15, does the institution provide a simplified privacy notice that contains at a minimum:

- A statement to this effect; ☐ ☐

- The categories of nonpublic personal information it collects; ☐ ☐

- The policies and practices the institution uses to protect the confidentiality and security of nonpublic personal information; and ☐ ☐

- A general statement that the institution makes disclosures to other nonaffiliated third parties as permitted by law  [§6(c)(5)]? ☐ ☐

NOTE: Use of this type of simplified notice is optional; an institution may always use a full notice.

14.  Does the institution describe the following about its policies and practices with respect to protecting the confidentiality and security of nonpublic personal information:

- Who is authorized to have access to the information[§6(c)(6)(i)]; and ☐ ☐

**CFPB**

**Examination Checklist**                    **GLBA Privacy**

|  | | Yes | No |
|---|---|---|---|

- Whether security practices and policies are in place to ensure the confidentiality of the information in accordance with the institution's policy [§6(c)(6)(ii)]?   ☐ ☐

  NOTE: The institution is not required to describe technical information about the safeguards used in this respect.

15. If the institution provides a short-form initial privacy notice with the opt-out notice, does the institution do so only to consumers with whom the institution does not have a customer relationship [§6(d)(1)]?   ☐ ☐

16. If the institution provides a short-form initial privacy notice according to Section 6(d)(1), does the short-form initial notice:

    - Conform to the definition of "clear and conspicuous" [§6(d)(2)(i)];   ☐ ☐

    - State that the institution's full privacy notice is available upon request [§6(d)(2)(ii)]; and   ☐ ☐

    - Explain a reasonable means by which the consumer may obtain the notice [§6(d)(2)(iii)]?   ☐ ☐

    NOTE: The institution is not required to deliver the full privacy notice with the short-form initial notice.  [§6(d)(3)])

17. Does the institution provide consumers who receive the short-form initial notice with a reasonable means of obtaining the longer initial notice, such as:

    - A toll-free telephone number that the consumer may call to request the notice [§6(d)(4)(i)]; or   ☐ ☐

    - For the consumer who conducts business in person at the institution's office, having copies available to provide immediately by hand-delivery [§6(d)(4)(ii)]?   ☐ ☐

18. If the institution, in its privacy policies, reserves the right to disclose nonpublic personal information to nonaffiliated third parties in the future, does the privacy notice include, as applicable, the:

    - Categories of nonpublic personal information that the financial institution reserves the right to disclose in the future, but does not currently disclose; [§6(e)(1)] and   ☐ ☐

    - Categories of affiliates or nonaffiliated third parties to whom the financial institution reserves the right in the future to disclose, but to whom it does not currently disclose, nonpublic personal information [§6(e)(2)]?   ☐ ☐

# CFPB
# Examination Checklist                                  GLBA Privacy

|  | Yes | No |
|---|---|---|

### Opt-Out Notice

19.  If the institution discloses nonpublic personal information about a consumer to a nonaffiliated third party, and the exceptions under Sections 13-15 do not apply, does the institution provide the consumer with a clear and conspicuous opt-out notice that accurately explains the right to opt out [§7(a)(1)]?  ☐  ☐

20.  Does the opt-out notice state:

- That the institution discloses or reserves the right to disclose nonpublic personal information about the consumer to a nonaffiliated third party [§7(a)(1)(i)];  ☐  ☐

- That the consumer has the right to opt out of that disclosure [§7(a)(1)(ii)]; and  ☐  ☐

- A reasonable means by which the consumer may opt out [§7(a)(1)(iii)]?  ☐  ☐

21.  Does the institution provide the consumer with the following information about the right to opt out:

- All the categories of nonpublic personal information that the institution discloses or reserves the right to disclose [§7(a)(2)(i)(A)];  ☐  ☐

- All the categories of nonaffiliated third parties to whom the information is disclosed [§7(a)(2)(i)(A)];  ☐  ☐

- That the consumer has the right to opt out of the disclosure of that information [§7(a)(2)(i)(A)]; and  ☐  ☐

- The financial products or services that the consumer obtains to which the opt-out direction would apply [§7(a)(2)(i)(B)]?  ☐  ☐

22.  Does the institution provide the consumer with at least one of the following reasonable means of opting out, or with another reasonable means:

- Check-off boxes prominently displayed on the relevant forms with the opt-out notice [§7(a)(2)(ii)(A)];  ☐  ☐

- A reply form included with the opt-out notice [§7(a)(2)(ii)(B)];  ☐  ☐

- An electronic means to opt out, such as a form that can be sent via electronic mail or a process at the institution's website, if the consumer agrees to the electronic delivery of information [§7(a)(2)(ii)(C)]; or  ☐  ☐

- A toll-free telephone number [§7(a)(2)(ii)(D)]?  ☐  ☐

NOTE: The institution may require the consumer to use one specific means, as long as that means is reasonable for that consumer  [§7(a)(iv)].

# CFPB
# Examination Checklist                        GLBA Privacy

|  | | Yes | No |
|---|---|---|---|
| 23. | If the institution delivers the opt-out notice after the initial notice, does the institution provide the initial notice once again with the opt-out notice [§7(c)]? | ☐ | ☐ |
| 24. | Does the institution provide an opt-out notice, explaining how the institution will treat opt-out directions by the joint consumers, to at least one party in a joint consumer relationship [§7(d)(1)]? | ☐ | ☐ |
| 25. | Does the institution permit each of the joint consumers in a joint relationship to opt out [§7(d)(2)]? | ☐ | ☐ |
| 26. | Does the opt-out notice to joint consumers state that either: | | |
| | • The institution will consider an opt out by a joint consumer as applying to all associated joint consumers [§7(d)(2)(i)]; or | ☐ | ☐ |
| | • Each joint consumer is permitted to opt out separately  [§7(d)(2)(ii)]? | ☐ | ☐ |
| 27. | If each joint consumer may opt out separately, does the institution permit: | | |
| | • One joint consumer to opt out on behalf of all of the joint consumers [§7(d)(3)]; | ☐ | ☐ |
| | • The joint consumers to notify the institution in a single response [§7(d)(5)]; and | ☐ | ☐ |
| | • Each joint consumer to opt out either for himself or herself and/or for another joint consumer [§7(d)(5)]? | ☐ | ☐ |
| 28. | Does the institution refrain from requiring all joint consumers to opt out before implementing any opt-out direction with respect to the joint account [§7(d)(4)]? | ☐ | ☐ |
| 29. | Does the institution comply with a consumer's direction to opt out as soon as is reasonably practicable after receiving it [§7(e)]? | ☐ | ☐ |
| 30. | Does the institution allow the consumer to opt out at any time [§7(f)]? | ☐ | ☐ |
| 31. | Does the institution continue to honor the consumer's opt-out direction until revoked by the consumer in writing, or, if the consumer agrees, electronically [§7(g)(1)]? | ☐ | ☐ |
| 32. | When a customer relationship ends, does the institution continue to apply the customer's opt-out direction to the nonpublic personal information collected during, or related to, that specific customer relationship (but not to new relationships, if any, subsequently established by that customer) [§7(g)(2)]? | ☐ | ☐ |

**CFPB**

# Examination Checklist                    GLBA Privacy

|                                                                                                                                                                                                                              | Yes | No |
|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----|----|

**Revised Notices**

33. Except as permitted by Sections 13-15, does the institution refrain from disclosing any nonpublic personal information about a consumer to a nonaffiliated third party, other than as described in the initial privacy notice provided to the consumer, unless:

   - The institution has provided the consumer with a clear and conspicuous revised notice that accurately describes the institution's privacy policies and practices [§8(a)(1)]; ☐ ☐

   - The institution has provided the consumer with a new opt-out notice [§8(a)(2)]; ☐ ☐

   - The institution has given the consumer a reasonable opportunity to opt out of the disclosure, before disclosing any information [§8(a)(3)]; and ☐ ☐

   - The consumer has not opted out [§8(a)(4)]? ☐ ☐

34. Does the institution deliver a revised privacy notice when it:

   - Discloses a new category of nonpublic personal information to a nonaffiliated third party [§8(b)(1)(i)]; ☐ ☐

   - Discloses nonpublic personal information to a new category of nonaffiliated third party [§8(b)(1)(ii)]; or ☐ ☐

   - Discloses nonpublic personal information about a former customer to a nonaffiliated third party, if that former customer has not had the opportunity to exercise an opt-out right regarding that disclosure [§8(b)(1)(iii)]? ☐ ☐

   NOTE: A revised notice is not required if the institution adequately described the nonaffiliated third party or information to be disclosed in the prior privacy notice [§8(b)(2).

## Delivery Methods

35. Does the institution deliver the privacy and opt-out notices, including the short-form notice, so that the consumer can reasonably be expected to receive actual notice in writing or, if the consumer agrees, electronically [§9(a)]? ☐ ☐

36. Does the institution use a reasonable means for delivering the notices, such as:

   - Hand-delivery of a printed copy [§9(b)(1)(i)]; ☐ ☐

   - Mailing a printed copy to the last known address of the consumer [§9(b)(1)(ii)]; ☐ ☐

# CFPB
# Examination Checklist                    GLBA Privacy

|  | Yes | No |
|---|---|---|

- For the consumer who conducts transactions electronically, clearly and conspicuously posting the notice on the institution's electronic site and requiring the consumer to acknowledge receipt as a necessary step to obtaining a financial product or service [§9(b)(1)(iii)]; or  ☐ ☐

- For isolated transactions, such as ATM transactions, posting the notice on the screen and requiring the consumer to acknowledge receipt as a necessary step to obtaining the financial product or service [§9(b)(1)(iv)]?  ☐ ☐

NOTE: Insufficient or unreasonable means of delivery include: exclusively oral notice, in person or by telephone; branch or office signs or generally published advertisements; and electronic mail to a customer who does not obtain products or services electronically  [§9 (b)(2)(i) and (ii), and (d)].

37. For annual notices only, if the institution does not employ one of the methods described in question 36, does the institution employ one of the following reasonable means of delivering the notice such as:

- For the customer who uses the institution's website to access products and services electronically and who agrees to receive notices at the website, continuously posting the current privacy notice on the website in a clear and conspicuous manner  [§9(c)(1)]; or  ☐ ☐

- For the customer who has requested the institution refrain from sending any information about the customer relationship, making copies of the current privacy notice available upon customer request [§9(c)(2)]?  ☐ ☐

38. For customers only, does the institution ensure that the initial, annual, and revised notices may be retained or obtained later by the customer in writing, or if the customer agrees, electronically  [§9(e)(1)]?  ☐ ☐

39. Does the institution use an appropriate means to ensure that notices may be retained or obtained later, such as:

- Hand-delivery of a printed copy of the notice [§9(e)(2)(i)];  ☐ ☐

- Mailing a printed copy to the last known address of the customer [§9(e)(2)(ii)]; or  ☐ ☐

- Making the current privacy notice available on the institution's website (or via a link to the notice at another site) for the customer who agrees to receive the notice at the website [§9(e)(2)(iii)]?  ☐ ☐

40. Does the institution provide at least one initial, annual, and revised notice, as applicable, to joint consumers [§9(g)]?  ☐ ☐

# CFPB
# Examination Checklist                    **GLBA Privacy**

Yes    No

## SUBPART B

### Limits on Disclosure to Nonaffiliated Third Parties

41. Does the institution refrain from disclosing any nonpublic personal information about a consumer to a nonaffiliated third party, other than as permitted under Sections 13-15, unless:

- It has provided the consumer with an initial notice [§10(a)(1)(i)];    ☐  ☐

- It has provided the consumer with an opt-out notice [§10(a)(1)(ii)];    ☐  ☐

- It has given the consumer a reasonable opportunity to opt out before the disclosure [§10(a)(1)(iii)]; and    ☐  ☐

- The consumer has not opted out [§10(a)(1)(iv)]?    ☐  ☐

    NOTE: This disclosure limitation applies to consumers as well as to customers [§10(b)(1)], and to all nonpublic personal information regardless of whether collected before or after receiving an opt-out direction  [§10(b)(2)].

42. Does the institution provide the consumer with a reasonable opportunity to opt out such as by:

- Mailing the notices required by Section 10 and allowing the consumer to respond by toll-free telephone number, return mail, or other reasonable means (see question 22) within 30 days from the date mailed [§10(a)(3)(i)];    ☐  ☐

- Where the consumer opens an on-line account with the institution and agrees to receive the notices required by Section 10 electronically, allowing the consumer to opt out by any reasonable means (see question 22) within 30 days from consumer acknowledgement of receipt of the notice in conjunction with opening the account [§10(a)(3)(ii)]; or    ☐  ☐

- For isolated transactions, providing the notices required by Section 10 at the time of the transaction and requesting that the consumer decide, as a necessary part of the transaction, whether to opt out before the completion of the transaction  [§10(a)(3)(iii)]?    ☐  ☐

43.  Does the institution allow the consumer to select certain nonpublic personal information or certain nonaffiliated third parties with respect to which the consumer wishes to opt out [§10(c)]?    ☐  ☐

    NOTE: An institution may allow partial opt outs in addition to, but may not allow them instead of, a comprehensive opt out.

# CFPB
# Examination Checklist                           GLBA Privacy

---

|                                                                              | Yes | No |

## Limits on Redisclosure and Reuse of Information

44. If the institution receives information from a nonaffiliated financial institution under an exception in Sections 14 or 15, does the institution refrain from using or disclosing the information except:

- To disclose the information to the affiliates of the financial institution from which it received the information [§11(a)(1)(i)]; ☐ ☐

- To disclose the information to its own affiliates, which are in turn limited by the same disclosure and use restrictions as the recipient institution [§11(a)(1)(ii)]; and ☐ ☐

- To disclose and use the information pursuant to an exception in Sections 14 or 15 in the ordinary course of business to carry out the activity covered by the exception under which the information was received [§11(a)(1)(iii)]? ☐ ☐

NOTE: The disclosure or use described in section c of this question need not be directly related to the activity covered by the applicable exception.  For instance, an institution receiving information for fraud-prevention purposes could provide the information to its auditors.  But "in the ordinary course of business" does not include marketing  [§11(a)(2)].

45. If the institution receives information from a nonaffiliated financial institution other than under an exception in Section 14 or 15, does the institution refrain from disclosing the information except:

- To the affiliates of the financial institution from which it received the information [§11(b)(1)(i)]; ☐ ☐

- To its own affiliates, which are in turn limited by the same disclosure restrictions as the recipient institution [§11(b)(1)(ii)]; and ☐ ☐

- To any other person, if the disclosure would be lawful if made directly to that person by the institution from which the recipient institution received the information [§11(b)(1)(iii)]? ☐ ☐

## Limits on Sharing Account Number Information for Marketing Purposes

46. Does the institution refrain from disclosing, directly or through affiliates, account numbers or similar forms of access numbers or access codes for a consumer's credit card account, deposit account, or transaction account to any nonaffiliated third party (other than to a consumer reporting agency) for telemarketing, direct mail or electronic mail marketing to the consumer, except:

- To the institution's agents or service providers solely to market the institution's own products or services, as long as the agent or service provider is not authorized to directly initiate charges to the account [§12(b)(1)]; or ☐ ☐

---

# CFPB
# Examination Checklist                    **GLBA Privacy**

<div style="text-align: right">Yes    No</div>

- To a participant in a private label credit card program or an affinity or similar program where the participants in the program are identified to the customer when the customer enters into the program  [§12(b)(2)]?  ☐ ☐

NOTE: An "account number or similar form of access number or access code" does not include numbers in encrypted form, so long as the institution does not provide the recipient with a means of decryption.  [§12(c)(1)]  A transaction account does not include an account to which third parties <u>cannot</u> initiate charges [§12(c)(2)].

## SUBPART C

### Exception to Opt-Out Requirements for Service Providers and Joint Marketing

47.  If the institution discloses nonpublic personal information to a nonaffiliated third party without permitting the consumer to opt out, do the opt-out requirements of Sections 7 and 10 and the revised notice requirements in Section 8 not apply because:

- The institution disclosed the information to a nonaffiliated third party who performs services for or functions on behalf of the institution (including joint marketing of financial products and services offered pursuant to a joint agreement as defined in paragraph (b) of §13) [§13(a)(1)];  ☐ ☐

- The institution has provided consumers with the initial notice [§13(a)(1)(i)]; and  ☐ ☐

- The institution has entered into a contract with that party prohibiting the party from disclosing or using the information except to carry out the purposes for which the information was disclosed, including use under an exception in Sections 14 or 15 in the ordinary course of business to carry out those purposes [§13(a)(1)(ii)]?  ☐ ☐

### Exceptions to Notice and Opt-Out Requirements for Processing and Servicing Transactions

48.  If the institution discloses nonpublic personal information to nonaffiliated third parties, do the requirements for initial notice in Section4(a)(2), opt out in Sections 7 and 10, revised notice in Section 8, and for service providers and joint marketing in Section 13, not apply because the information is disclosed as necessary to effect, administer, or enforce a transaction that the consumer requests or authorizes, or in connection with:

- Servicing or processing a financial product or service requested or authorized by the consumer [§14(a)(1)];  ☐ ☐

# CFPB
# Examination Checklist                    GLBA Privacy

|  | Yes | No |
|---|---|---|

- Maintaining or servicing the consumer's account with the institution or with another entity as part of a private label credit card program or other credit extension on behalf of the entity or [§14(a)(2)]; ☐ ☐

- A proposed or actual securitization, secondary market sale (including sale of servicing rights) or other similar transaction related to a transaction of the consumer  [§14(a)(3)]? ☐ ☐

49.  If the institution uses a Section 14 exception as necessary to effect, administer, or enforce a transaction, is it :

- Required, or is one of the lawful or appropriate methods to enforce the rights of the institution or other persons engaged in carrying out the transaction or providing the product or service [§14(b)(1)]; or ☐ ☐

- Required, or is a usual, appropriate, or acceptable method to[§14(b)(2)]:

  o  carry out the transaction or the product or service business of which the transaction is a part, including recording, servicing, or maintaining  the consumer's account in the ordinary course of business [§14(b)(2)(i)]; ☐ ☐

  o  administer or service benefits or claims [§14(b)(2)(ii)]; ☐ ☐

  o  confirm or provide a statement or other record of the transaction or information on the status or value of the financial service or financial product to the consumer or the consumer's agent or broker [§14(b)(2)(iii)]; ☐ ☐

  o  accrue or recognize incentives or bonuses [§14(b)(2)(iv)]; ☐ ☐

  o  underwrite insurance or for reinsurance or for certain other purposes related to a consumer's insurance [§14(b)(2)(v)]; or ☐ ☐

  o  in connection with:

    ▪  the authorization, settlement, billing, processing, clearing, transferring, reconciling, or collection of amounts charged, debited, or otherwise paid by using a debit, credit, or other payment card, check, or account number, or by other payment means [§14(b)(2)(vi)(A)]; ☐ ☐

    ▪  the transfer of receivables, accounts or interests therein [§14(b)(2)(vi)(B)]; or ☐ ☐

    ▪  the audit of debit, credit, or other payment information [§14(b)(2)(vi)(C)]? ☐ ☐

# CFPB
# Examination Checklist                          GLBA Privacy

|  | Yes | No |
|---|---|---|

### Other Exceptions to Notice and Opt-Out Requirements

50.   If the institution discloses nonpublic personal information to nonaffiliated third parties, do the requirements for initial notice in Section 4(a)(2), opt out in Sections 7 and 10, revised notice in Section 8, and for service providers and joint marketers in Section 13, not apply because the institution makes the disclosure:

- With the consent or at the direction of the consumer [§15(a)(1)]:  ☐ ☐
  - to protect the confidentiality or security of records [§15(a)(2)(i)];  ☐ ☐
  - to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability [§15(a)(2)(ii)];  ☐ ☐
  - for required institutional risk control or for resolving consumer disputes or inquiries [§15(a)(2)(iii)];  ☐ ☐
  - to persons holding a legal or beneficial interest relating to the consumer [§15(a)(2)(iv)]; or  ☐ ☐
  - to persons acting in a fiduciary or representative capacity on behalf of the consumer [§15(a)(2)(v)].  ☐ ☐
- To insurance rate advisory organizations, guaranty funds or agencies, agencies rating the institution, persons assessing compliance, and the institution's attorneys, accountants, and auditors [§15(a)(3)];  ☐ ☐
- In compliance with the Right to Financial Privacy Act or to law enforcement agencies [§15(a)(4)];  ☐ ☐
- To a consumer reporting agency in accordance with the FCRA or from a consumer report reported by a consumer reporting agency [§15(a)(5)];  ☐ ☐
- In connection with a proposed or actual sale, merger, transfer, or exchange of all or a portion of a business or operating unit, if the disclosure of nonpublic personal information concerns solely consumers of such business or unit [§15(a)(6)];  ☐ ☐
- To comply with Federal, state, or local laws, rules, or legal requirements [§15(a)(7)(i)];  ☐ ☐
- To comply with a properly authorized civil, criminal, or regulatory investigation, or subpoena or summons by Federal, state, or local authorities [§15(a)(7)(ii)]; or  ☐ ☐
- To respond to judicial process or government regulatory authorities having jurisdiction over the institution for examination, compliance, or other purposes as authorized by law [§15(a)(7)(iii)]?  ☐ ☐

# CFPB
# Examination Checklist
# GLBA Privacy

**Yes    No**

NOTE: The regulation gives the following as an example of the exception described in section A of this question: "A consumer may specifically consent to [an institution's] disclosure to a nonaffiliated insurance company of the fact that the consumer has applied to [the institution] for a mortgage so that the insurance company can offer homeowner's insurance to the consumer."

## Comments

**[Click&Type]**

# CFPB

# Entity Profile

**Entity Name:**                                    **Prepared by:**
**Docket Number:**                                  **Date:**

| | |
|---|---|
| **Docket Number:** | Click here to enter text. |
| **Entity Name** | Click here to enter text. |
| **City** | Click here to enter text. |
| **State** | Click here to enter text. |
| **Prudential and/or State Regulator(s)** | Click here to enter text. |
| **Contact Name** | Click here to enter text. |
| **Contact Information** | Click here to enter text. |
| **Work City** | Click here to enter text. |
| **Work State** | Click here to enter text. |
| **Top Tier Entity** | Click here to enter text. |
| **Affiliated DIs (RSSD)** | Click here to enter text. |
| **Principal products or lines of business** | Click here to enter text. |
| **CFPB Region** | Click here to enter text. |
| **Total Assets (000)** | Click here to enter text. |
| **Assets as-of date** | Click here to enter text. |
| **Attach current Risk Assessment results** | Click here to enter text. |
| **Current Compliance Rating** | Click here to enter text. |
| **Last Compliance Exam Started** | Click here to enter text. |
| **Next Compliance Exam Scheduled** | Click here to enter text. |
| **Current CAMELS** | Click here to enter text. |
| **CAMELS as-of date** | Click here to enter text. |
| **Formal Action in Place** | Click here to enter text. |
| **Formal Action in Process** | Click here to enter text. |

**CFPB**                                                      **Entity Profile**

**Entity Name:**                        **Prepared by:**
**Docket Number:**                      **Date:**

| | |
|---|---|
| **Enforcement Attorney Name** | Click here to enter text. |
| **Contact Information** | Click here to enter text. |
| **Informal Agreement in Place** | Click here to enter text. |
| **Informal Agreement in Process** | Click here to enter text. |
| **Safety and Soundness Action(s)** | Click here to enter text. |
| **Fair Lending Issues** | Click here to enter text. |
| **Fair Lending Data Analysis Results** | Click here to enter text. |
| **HMDA Outlier (Y/N)** | Click here to enter text. |
| **Previous Outlier Years** | Click here to enter text. |
| **# Discrimination Complaints** | Click here to enter text. |
| **OFLEO Contact** | Click here to enter text. |
| **Contact Information** | Click here to enter text. |
| **UDAAP Issues** | Click here to enter text. |
| **Other Significant Regulatory Issues** | Click here to enter text. |
| **Complaint Analysis** | Click here to enter text. |
| **Other Noteworthy Information** | Click here to enter text. |

# CFPB                                              Risk Assessment

**Entity Name:**                                **Prepared by:**
**Docket Number:**                              **Date:**

## Consumer Risk Assessment

CFPB's Risk Assessment process is designed to evaluate on a consistent basis the extent of risk to consumers arising from the activities of a particular supervised entity and to identify the sources of that risk. "Risk to consumers" for the purpose of the CFPB Risk Assessment is the potential for consumers to suffer economic loss or other legally-cognizable injury as a result of a violation of Federal consumer financial law. To determine risk to consumers, the Risk Assessment considers the interaction of two broad sets of factors: the inherent risks in a particular line of business or the entity as a whole and the quality of controls implemented by the entity to manage and mitigate those risks. As noted below, the Risk Assessment will be used during CFPB's supervision planning process to set priorities and focus examination and supervision activities.

Inherent risk includes factors that increase the potential for unfair, deceptive or abusive acts or practices, for discrimination, or for violations of other Federal consumer financial laws. It also includes factors that increase the compliance management challenges of a business and thereby increase the risk of such violations. The quality of risk controls includes factors related to both managing and mitigating specific inherent risks as well as the strength of an entity's overall system of compliance management.

The questions and considerations in this template may be used to conduct risk assessments of individual lines of business, supervised entities as a whole, and groups of affiliated entities when feasible and applicable. Assessments of individual lines of business in large complex entities may be considered together to reach conclusions about the entity as a whole.

***The risk assessment is not a determination of whether a violation of law exists.***

## Using the Risk Assessment Template

The template provides a series of factors that bear on inherent risk and relevant risk controls. Examiners conducting the assessment should rate each relevant factor (low, moderate, or high inherent risk; strong, adequate, or weak risk controls and mitigation), and comment briefly on the basis for each rating and issues to consider during the examination. The factor ratings, taken as a whole, result in the Risk Summary, which is a conclusion about whether the overall risk to consumers is low, moderate, or high. The Risk Summary also includes a judgment about the expected change in the overall risk (decreasing, increasing, or stable/unchanged), and when that direction last changed. The Risk Summary, and the basis for it, will be included with the Examination Report.

The factor ratings and comments should be used to inform the Examination Scope. For example, if the nature and structure of certain products point to high inherent risk and the quality of risk controls is only adequate, then the examination scope should likely include a review of those products and the related compliance controls. The magnitude and severity of potential consumer harm arising from particular risks should be considered when setting priorities for review.

There may be other institution or industry-specific risk factors beyond those included in the template that should be considered when assessing risk to consumers. Examiners should use their

# CFPB                                    # Risk Assessment

**Entity Name:**                          **Prepared by:**
**Docket Number:**                        **Date:**

knowledge and judgment to identify risks that are unique to a particular entity or its specialized business focus.

# CFPB

# Risk Assessment

**Entity Name:**

**Prepared by:**

**Docket Number:**

**Date:**

The sections below include (1) factors that specifically increase the risk that unfair, deceptive, abusive acts or practices, discrimination, or other violations of Federal consumer financial law will occur and (2) factors that generally increase the difficulty of managing compliance in an organization.

| Inherent Risk |
|---|
| Comments in each section should identify any specific factors present in the line of business or entity being assessed, note the potential UDAAP, discrimination, or other regulatory issues to review during an examination, and comment briefly on the basis for the rating assigned to that factor. The rating should reflect the degree of risk. |

| Nature and Structure of Products | Comments |
|---|---|
| The profitability of a product is dependent upon penalty fees (e.g., fees for a late payment, for exceeding a credit limit, or for overdrawing deposited funds). | [Click&type] |
| The terms of the product are subject to change at the discretion of the entity, and the entity has frequently made changes in the terms. | |
| The entity reverses fees at a significantly higher rate than other entities of similar size offering similar products. | |
| Pricing structure (interest rate, points, fees) and other features and terms are combined in a manner that is likely to make the total costs of the product difficult for consumers to understand. | |
| Products are bundled in a way that may obscure relative costs. | |
| Consumers pay penalties to terminate a relationship, including forgoing money or benefits they would otherwise earn. | |

# CFPB                                                    **Risk Assessment**

**Entity Name:**                                          **Prepared by:**
**Docket Number:**                                        **Date:**

| | |
|---|---|
| Consumers face barriers to information, such as costs to access customer service or information about their account. | |
| Credit decision-makers have wide discretion over setting terms and features of products with inadequate policies and procedures addressing appropriate exercise of that discretion. | |
| Credit products are not underwritten based upon the likely ability of the consumer to make the required (or, in the case of adjustable rate products, potentially required) payments over the term of the loan. | |
| **RATING – Nature and Structure of Products** | ☐ **Low** ☐ **Moderate** ☐ **High** |

| **Consumers to whom products are marketed** | **Comments** |
|---|---|
| Consider the extent to which the marketing of a product or service is targeted to particular populations including:<br><br>• Students or young adults;<br><br>• Elderly;<br><br>• Minorities;<br><br>• Immigrants;<br><br>• Consumers of certain national origins;<br><br>• Members of specific religious groups or denominations;<br><br>• Military service members or former service members;<br><br>• Consumers with limited education; | [Click&type] |

**CFPB**                                                                    **Risk Assessment**

**Entity Name:**                                                           **Prepared by:**
**Docket Number:**                                                         **Date:**

| | |
|---|---|
| • Consumers with limited English proficiency; <br><br> • Low-income consumers or consumers on limited fixed incomes; <br><br> • Consumers receiving any type of public assistance; <br><br> • Consumers with limited experience with financial products or services; <br><br> • Consumers in or who have recently experienced financial distress; <br><br> • Consumers with low credit scores (e.g., FICO below 620); or <br><br> • Consumers of a certain gender or marital status. <br><br> Products targeted to consumers who fall in multiple categories may be of particular concern. <br><br> Consider whether any particular populations are missing or excluded from the entity's advertising. | |
| **RATING – Consumers to whom products are marketed** | ☐ **Low** ☐ **Moderate** ☐ **High** |

**CFPB**                                                            **Risk Assessment**

**Entity Name:**                                                   **Prepared by:**
**Docket Number:**                                                 **Date:**

| Marketing methods and sales organizations | Comments |
|---|---|
| ***Incentives and Compensation*** | [Click&type] |
| Incentives encourage the sale of high-cost products regardless of consumer's request or situation. | |
| Compensation or performance evaluation of person-to-person sales staff (telephone, face-to-face)is based on:<br>• The number of sales made;<br>• The size of the sales made (for example, average loan size) or the volume of sales;<br>• The price of the product sold; or<br>• The particular product sold<br>without consideration of product outcomes or performance(for example, default or attrition rates, etc.). | |
| Person-to-person sales staff has discretion to set prices (interest rate, points, fees) with inadequate policies and procedures addressing exercise of that discretion. | |
| Person-to-person sales staff is not accountable for product outcomes or performance (default rates, attrition rates, etc.). | |
| ***Marketing and Advertising*** | |
| Marketing materials are not written in a language or at a level understandable by targeted consumers. | |
| Key product terms or features are not readily available to consumers. | |
| Targeted consumers would not likely qualify for advertised products or terms. | |

# CFPB

# Risk Assessment

**Entity Name:**

**Docket Number:**

**Prepared by:**

**Date:**

| | |
|---|---|
| Advertising includes teaser rates or low fees with little or no information about important conditions (such as periodic or exit charges). | |
| Complex products are marketed to consumers not likely to benefit from them or who may likely be harmed by them. | |
| Product marketing and sales, including branch locations, are targeted in a manner that may be discriminatory. | |
| Advertising utilizes media outlets targeted to particular populations only to advertise its higher-cost products and not its full range of products. | |
| **RATING – Marketing Methods and Sales Organization** | ☐ **Low** ☐ **Moderate** ☐ **High** |

# CFPB

# Risk Assessment

**Entity Name:**                                                          **Prepared by:**
**Docket Number:**                                                        **Date:**

| Ongoing customer relationship management | Comments |
|---|---|
| Employees with customer service responsibilities, including collections, are not evaluated or compensated based on the quality of service or level of customer satisfaction. | [Click&type] |
| The compensation of customer service representatives with discretion to adjust prices or modify other terms is impacted by the frequency and/or size of such adjustments. | |
| Customer service representatives with discretion to adjust prices or modify other terms operate with inadequate policies and procedures addressing exercise of that discretion. | |
| Vendors with customer service responsibilities, including collections, are not evaluated based on quality of service or level of customer satisfaction. | |
| The compensation of vendors that provide customer service representatives with discretion to adjust prices or modify other terms is impacted by the frequency and/or size of such adjustments. | |
| Vendors that provide customer service representatives with discretion in pricing operate with inadequate policies and procedures addressing exercise of that discretion. | |
| The number of customer service staff is insufficient to provide timely service. | |
| Customer service information systems do not have sufficient capacity to support the number of customers. | |
| **RATING – Ongoing customer relationship management** | ☐ **Low** ☐ **Moderate** ☐ **High** |

**CFPB**                                                        **Risk Assessment**

**Entity Name:**                                               **Prepared by:**
**Docket Number:**                                             **Date:**

| Compliance management challenges | Comments |
|---|---|
| The entity maintains multiple, discrete un-integrated information systems to originate and service product relationships, including new product relationships with existing customers. | [Click&type] |
| Solicitation is conducted through active cross-selling, outbound telemarketing, or use of third parties for direct marketing. | |
| The entity uses internet advertising or a wide variety of other mass media. | |
| The entity has an extensive or decentralized retail network. | |
| Numerous subsidiaries or affiliates provide consumer financial products and services on behalf of the entity. | |
| The entity relies heavily on third parties other than subsidiaries or other affiliates to provide products and services to consumers. | |
| **RATING – Compliance Management Challenges** | ☐ **Low** ☐ **Moderate** ☐ **High** |

| Other factors that point to heightened consumer risk | Comments |
|---|---|
| DESCRIBE FACTOR | [Click&type] |
| **RATING – Other factors** | ☐ **Low** ☐ **Moderate** ☐ **High** |

**CFPB**                                                    **Risk Assessment**

**Entity Name:**                                            **Prepared by:**
**Docket Number:**                                          **Date:**

The considerations below bear on both the general quality of an entity's consumer compliance risk management and specifically on controlling the risks of unfair, deceptive or abusive acts or practices, discrimination, or other violations of Federal consumer financial law. The specific factors indicate strong compliance management.

| QUALITY OF CONSUMER COMPLIANCE RISK CONTROLS AND MITIGATION |
|---|
| Comments in each section should identify any factors of concern in the line of business or entity being assessed, note particular compliance management issues to review during an examination, and comment briefly on the basis for the rating assigned to that factor. The rating should reflect the strength of compliance management. |

| Board of Directors and Management | Comments |
|---|---|
| The board of directors has adopted comprehensive policies that establish clear standards for compliance with applicable laws, including laws prohibiting unfair, deceptive or abusive acts or practices, and discrimination:<br><br>• Policies and procedures are comprehensive and thorough.<br>• Policies are current and consistent with consumer business activities, and reflect current laws and regulations.<br>• A clear process exists for aligning compliance policies with changing business activities. | [Click&type] |
| Management's commitment to consumer compliance has been communicated throughout the regulated entity. | |
| The board and management receive regular and meaningful reporting with respect to consumer protection issues, consumer compliance, or complaints. | |

**CFPB**                                                    **Risk Assessment**

**Entity Name:**                                    **Prepared by:**
**Docket Number:**                                  **Date:**

| | |
|---|---|
| The board and management follow up on a timely basis on issues identified with respect to consumer compliance. | |
| Management anticipates, plans, and reacts promptly to changes in markets, technology, regulations, or consumer need. | |
| **RATING – Board of Directors and Management** | ☐ **Strong** ☐ **Adequate** ☐ **Weak** |

| Authority and accountability for compliance | Comments |
|---|---|
| Sufficient resources have been allocated to compliance, including monitoring of compliance throughout the organization and monitoring third parties that perform activities involving consumers. | [Click&type] |
| Management and staff responsible for compliance with consumer protection laws are independent from the business line when appropriate given the size, nature, and complexity of the entity and have clear authority to identify and resolve consumer compliance issues. | |
| Unit or individual performance expectations include responsibility for compliance. | |
| Units or individuals have sufficient authority to effect a strong compliance program. | |
| **RATING – Authority and accountability for compliance** | ☐ **Strong** ☐ **Adequate** ☐ **Weak** |

# CFPB                                             Risk Assessment

**Entity Name:**                                  **Prepared by:**
**Docket Number:**                                **Date:**

| Compliance risk management program and oversight | Comments |
|---|---|
| The compliance risk management program is well tailored to the size, nature, and complexity of the entity. | [Click&type] |
| The compliance program is independent from the business line when appropriate given the size, nature, and complexity of the entity and provides sufficient oversight of the entity. | |
| The compliance program provides sufficient oversight of third parties interacting with consumers on behalf of the entity in relation to consumer compliance risk. | |
| Regular compliance testing is conducted and includes samples of sufficient size covering all relevant product types, decision centers, customer points of contact, and customer communications. | |
| Compliance testing includes regular and comprehensive self-assessments for compliance with consumer laws and regulations including fair lending. | |
| The compliance management program promptly addresses issues of potential unfairness, deception, abuse, or discrimination. | |
| The compliance risk management program includes comprehensive controls and systems to assure prompt and thorough corrective action when problems are found. | |
| **RATING – Compliance risk management program and oversight** | ☐ **Strong** ☐ **Adequate** ☐ **Weak** |

# CFPB                                                    Risk Assessment

**Entity Name:**                                         **Prepared by:**
**Docket Number:**                                       **Date:**

| Product and system development and modification | Comments |
|---|---|
| Consumer compliance risks are considered throughout the product and system lifecycle. | [Click&type] |
| Management and staff responsible for consumer compliance are involved in the product life cycle, including product development and changes, marketing, product delivery, and customer service. | |
| Possible unfair, deceptive, abusive, or discriminatory effects of product design or delivery are considered and resolved at an early stage. | |
| Management and staff responsible for consumer compliance are involved in the structuring of incentives, including those for employees and third-party vendors and their employees who interact with consumers. | |
| **RATING – Product and system development and modification** | ☐ **Strong** ☐ **Adequate** ☐ **Weak** |

# CFPB

# Risk Assessment

**Entity Name:**                                          **Prepared by:**
**Docket Number:**                                        **Date:**

| Training | Comments |
|---|---|
| Appropriate training is provided to all staff, including those responsible for product development, marketing, and customer service and covers consumer protection laws and the obligation to avoid unfair, deceptive, abusive, or discriminatory practices. | [Click&type] |
| Training is timely, repeated as necessary, and tailored to the particular responsibilities of the staff receiving it. | |
| Training encourages all employees to take responsibility for consumer compliance and to identify and correct issues. | |
| Policies and procedures and oversight mechanisms are designed to ensure that appropriate and current training is provided to employees of third parties who interact with consumers. | |
| **RATING – Training** | ☐ **Strong** ☐ **Adequate** ☐ **Weak** |

# CFPB

# Risk Assessment

**Entity Name:**

**Docket Number:**

**Prepared by:**

**Date:**

| Complaint Management | Comments |
|---|---|
| The entity provides consumers with the opportunity to submit complaints through channels of the customer's choice, including mail, email, or phone. | [Click&type] |
| The entity provides complete and timely responses to complaints received either directly from consumers or indirectly through regulators or other third parties that process complaints. | |
| Third parties that provide services involving consumers have an established complaint process that is appropriately monitored by the supervised entity. | |
| The entity tracks all types of complaints. | |
| The entity actively monitors complaints to identify issues that may require changes in products, procedures, and/or training. | |
| The entity tracks the time to final resolution of consumer complaints. | |
| Complaints are resolved without requiring the direction or involvement of executives, regulators, or third parties (such as the Better Business Bureau), or the prospect of litigation or enforcement actions. | |
| **RATING – Complaint Management** | ☐ **Strong** ☐ **Adequate** ☐ **Weak** |

**CFPB**                                                              **Risk Assessment**

**Entity Name:**                                                      **Prepared by:**
**Docket Number:**                                                    **Date:**

| Other factors that point to potential lack of controls or mitigation | Comments |
|---|---|
| \<DESCRIBE FACTOR\> | [Click&type] |
| RATING – Other factors | ☐ **Strong** ☐ **Adequate** ☐ **Weak** |

| Magnitude and Severity of Potential Harm – | |
|---|---|
| *This factor should be considered when setting priorities for examination activities based on potential risks identified in particular products, lines of business, or the entity overall. Comments should discuss and compare the likely magnitude and severity of potential harm from any identified sources of risk.* | **Comments** |
| The magnitude and severity of potential harm to consumers will vary based upon the number of consumers who may be directly impacted and the risks identified. For example, a smaller entity, or smaller line of business within an entity, may pose a greater risk to consumers than a larger one if the consumers potentially impacted by the smaller entity or line of business face much larger harmful consequences than those of the larger entity. | [Click&type] |
| RATING – Magnitude and Severity of Potential Harm | ☐ **Low** ☐ **Moderate** ☐ **High** |

# CFPB                                          Risk Assessment

**Entity Name:**                                **Prepared by:**
**Docket Number:**                              **Date:**

---

| **Background Considerations – these factors indicate a likelihood of existing weaknesses and may bear on the direction of risk** |
|---|

| **Supervisory History – Regulatory violations and Matters Requiring Attention identified in previous examinations; consumer compliance rating** | **Comments** |
|---|---|
| Violations involve prohibited kickbacks, discrimination, unfair, deceptive or abusive acts or practices, need for reimbursements, or other harm to consumers. | [Click&type] |
| Violations are repeated or continuing. | |
| Violations result from systemic causes. | |
| Violations and Matters Requiring Attention reflect compliance management weaknesses. | |
| Consumer compliance rating of 3, 4 or 5. | |
| **RATING – Supervisory History** | ☐ **Low** ☐ **Moderate** ☐ **High** |

**CFPB**                                                        **Risk Assessment**

**Entity Name:**                                               **Prepared by:**
**Docket Number:**                                             **Date:**

| **Consumer complaints** | **Comments** |
|---|---|
| Numerous complaints from consumers are filed against the entity, or its third-party vendors that interact with consumers, relative to the size of the customer base or in comparison to other entities of similar size offering similar products. | [Click&type] |
| Complaints allege or involve:<br><br>• Misleading or false statements;<br>• Lack of disclosure of information about material terms of a product or service;<br>• Unauthorized fees, fees for services not provided, or duplicative fees;<br>• Previously undisclosed charges;<br>• Customer service; or<br>• Loan servicing and collections. | |
| Complaints evidence non-compliance with consumer protection laws. | |
| Complaints raise issues of discrimination. | |
| Complaints raise issues of potential unfair, deceptive, or abusive acts or practices. | |
| **RATING – Consumer Complaints** | ☐ **Low** ☐ **Moderate** ☐ **High** |

**CFPB**                                                         **Risk Assessment**

**Entity Name:**                                    **Prepared by:**
**Docket Number:**                                  **Date:**

| SUMMARY WORKSHEET | | |
|---|---|---|
| *Use this worksheet for an overall view of the Risk Assessment findings.* | | |
| ***Enter the rating for the different risk factors reviewed on the previous pages and note the priorities for examination review.*** | | |
| **Risk Factors** | **Rating** | **Review Priorities** |
| **INHERENT RISK** | | [Click&type] |
| Nature and structure of products | [Click&type] | |
| Consumers to whom products are marketed | [Click&type] | |
| Marketing methods and sales organization | [Click&type] | |
| Ongoing customer relationship management | [Click&type] | |
| Complexity of organization | [Click&type] | |
| Other factors | [Click&type] | |
| | | |
| **RISK CONTROLS AND MITIGATION** | | |
| Board of directors and management | [Click&type] | |
| Authority and accountability for compliance | [Click&type] | |
| Compliance risk management program and oversight | [Click&type] | |

**CFPB**                                                          **Risk Assessment**

**Entity Name:**                                          **Prepared by:**
**Docket Number:**                                        **Date:**

| | |
|---|---|
| Product and system development and modification | [Click&type] |
| Training | [Click&type] |
| Complaint management | [Click&type] |
| Other factors | [Click&type] |
| | |
| **Magnitude and severity of potential harm** | [Click&type] |
| | |
| **BACKGROUND CONSIDERATIONS** | |
| Supervisory history – regulatory violations, Matters Requiring Attention, rating | [Click&type] |
| Consumer complaints | [Click&type] |

**CFPB**                                    **Risk Assessment**

**Entity Name:**                          **Prepared by:**
**Docket Number:**                        **Date:**

## RISK ASSESSMENT CONCLUSIONS

### Risk Summary

Supervised entity or line of business reviewed: [Click&type]

| Element | Current MM/DD/YYYY | Preceding MM/DD/YYYY |
|---|---|---|
| Inherent Risk | [Click&type] | [Click&type] |
| Quality of Risk Controls and Mitigation | [Click&type] | [Click&type] |
| | | |
| Overall Risk to Consumers* | [Click&type] | [Click&type] |

| | |
|---|---|
| Expected Change/Direction of Risk | ☐ Increasing ☐ Decreasing ☐ Stable |
| Last Change in Direction | MM/DD/YYYY <br> ☐ Increasing ☐ Decreasing ☐ Stable |

# CFPB                                    # Risk Assessment

**Entity Name:**                          **Prepared by:**
**Docket Number:**                        **Date:**

*Overall Risk to Consumers:*

The overall risk is the inherent risk identified in a particular business line or supervised entity, mitigated or amplified by the strength or weakness of the controls to address those risks. The following chart is a general guide to assessing the overall risk to consumers. Examiners must apply their judgment in making this determination; however, a risk controls conclusion of "Weak" should result in an overall risk conclusion that is no more favorable than "Moderate," even if the degree of risk is concluded to be "Low."

| Overall Risk to Consumers | | | | |
|---|---|---|---|---|
| | | **Quality of Risk Controls** | | |
| | | Strong | Adequate | Weak |
| **Inherent Risk** | High | Moderate | High | High |
| | Moderate | Low | Moderate | High |
| | Low | Low | Low | Moderate |

**Summarize the primary bases for the summary conclusions:**

[Click&type]

**CFPB**                                                    **Supervision Plan**

| | |
|---|---|
| **Entity Name:** | **Prepared by:** |
| **Docket Number:** | **Date:** |

## Supervision Plan for
## Depository Institutions and Affiliates

| Data Section | |
|---|---|
| **CFPB Docket #** | [Click&type] |
| **Entity Name** | [Click&type] |
| **City, State** | [Click&type] |
| **Affiliated Entity Name(s)** | [Click&type] |

| Narrative Section |
|---|
| **Institution Profile**<br>*Summarize the current Profile of the lead institution and any affiliate(s).* |
| [Click&type] |

| |
|---|
| **Risk Assessment**<br>*Summarize the results of the current Risk Assessment(s).* |
| [Click&type] |

| |
|---|
| **Supervision Plan**<br>*Based on the Profile and Risk Assessment, summarize the plan for supervising the institution and its affiliates.  Identify the purpose of particular activities, and note any that require particularly close coordination with Enforcement or Fair Lending.* |
| [Click&type] |
| *Priorities:  Describe the priorities for CFPB supervision activities, which should relate to the risks present in the institution and its affiliates.  Clarifying priorities will assist in scheduling examiner resources.* |
| [Click&type] |
| *Monitoring:  Describe the plan and timeline for monitoring the institution and affiliates, including any follow-up for Matters Requiring Attention or Enforcement Actions.* |
| [Click&type] |

**CFPB**                                                      **Supervision Plan**

**Entity Name:**                          **Prepared by:**
**Docket Number:**                        **Date:**

| |
|---|
| *Examination(s): Describe the proposed focus, scope,and schedule of examination activities during the year (either in a full examination or a series of limited examinations). Note the location of proposed activities.  Include information about coordination with the prudential or state regulator(s), including examination schedule(s) if known.  If an examination is not scheduled during the current year, note why.* |
| [Click&type] |
| *Examination Resource Requirements:  Proposed number of examiners, any special skills or knowledge needed, and projected number of examiner work weeks.* |
| [Click&type] |
| *Additional Notes* |
| [Click&type] |

**CFPB**                                             # Scope Summary

**Entity Name:**                                      **Prepared by:**
**Docket Number:**                                    **Date:**

| EXAMINATION SCOPE SUMMARY | |
|---|---|
| **CFPB Docket #** | [Click&type] |
| **Name of Supervised Entity:** | [Click&type] |
| **City, State:** | [Click&type] |
| **Entity website:** | [Click&type] |
| **Organization chart** | [Insert or attach as pdf if available] |
| **Number of Open Offices/Branches (including Main Office):** | [Click&type] |
| **Number of Agents (where applicable):** | [Click&type] |
| **Total Assets (where applicable)** | $ [Click&type] |
| **Date (xx/xx/xxxx)** | [Click&type] |

| EXAMINATION DATES | |
|---|---|
| **Examination Start Date** | [Click&type] |
| **Completion Date** | [Click&type] |
| **Examination Period** | [Click&type] |
| **Anticipated Hours** | [Click&type] |

| EXAMINATION TEAM | | |
|---|---|---|
| **Lead Regional Office** | [Click&type] | |
| **Regional Office(s) Performing Examination:** | [Click&type] | |
| **Name** | **Role** | **Specialty** |
| [Click&type] | Examiner-In-Charge | |
| [Click&type] | Lead Examiner (if applicable) | |
| [Click&type] | [Click&type] | [Click&type] |
| [Click&type] | [Click&type] | [Click&type] |
| [Click&type] | OFLEO contact | [Click&type] |
| [Click&type] | Enforcement contact | [Click&type] |

# CFPB                                    Scope Summary

**Entity Name:**                         **Prepared by:**
**Docket Number:**                       **Date:**

| PRUDENTIAL AND/OR STATE REGULATOR(S) | |
|---|---|
| **Prudential and/or State Regulator(s)** | [Click&type] |
| **Regulator Contact(s)** | [Click&type] |
| **Contact phone #** | [Click&type] |
| **Contact email** | [Click&type] |

| COMMUNICATION PLAN |
|---|
| • Who is responsible for communicating with the entity? <br> • List any expected or scheduled meetings. |
| [Click&Type] |

| COMPLAINTS |
|---|
| **Consumer Complaints received by CFPB since the previous examination** |
| [Click&type] |

| OUTSTANDING ENFORCEMENT ACTIONS | | | |
|---|---|---|---|
| **EA Type** | **Issue Date** | **Agency** | **Comments** |
| [Click&type] | [Click&type] | [Click&type] | [Click&type] |

| OUTSTANDING MATTERS REQUIRING ATTENTION | | | | |
|---|---|---|---|---|
| **Matter Requiring Attention** | **Status** | **Due Date** | **Required Response** | **Comments** |
| [Click&type] | [Click&type] | [Click&type] | [Click&type] | [Click&type] |

| BREAKDOWN OF LOAN ORIGINATION AND PORTFOLIO | | | |
|---|---|---|---|
| **(xx/xx/xxxx – xx/xx/xxxx)** | | | |
| **Loan Type** | **Dollar Volume Originated During Period** | **% of All Loans Originated During Period & Kept in Portfolio** | **Loan Type as a % of Total Portfolio at End of Period** |
| **Residential Loans** | [Click&type] | [Click&type] | [Click&type] |
| **Consumer Loans** | [Click&type] | [Click&type] | [Click&type] |
| **Small Business Loans** | [Click&type] | [Click&type] | [Click&type] |
| **Other** | [Click&type] | [Click&type] | [Click&type] |
| | | | |

**CFPB**                                                      **Scope Summary**

**Entity Name:**                              **Prepared by:**
**Docket Number:**                            **Date:**

| HMDA | | |
|---|---|---|
| **Is HMDA Applicable?** | ☐Yes<br>(If yes, must consult Fair Lending) | ☐No |

| ASSET VOLUME CHANGE | |
|---|---|
| **Date:** | xx/xx/xxxx | xx/xx/xxxx |
| **Total Assets:** | $ (000,000) | $ (000,000) |
| **Source:** | ☐Call Report<br>☐Public Filing<br>☐Other (specify) [Click&type] | ☐Call Report<br>☐Public Filing<br>☐Other (specify) [Click&type] |

| CHANGE IN OTHER FINANCIAL INFORMATION<br>(as applicable) | | |
|---|---|---|
| **Date:** | xx/xx/xxxx | xx/xx/xxxx |
| **Total Deposits** | $[Click&type] | $[Click&type] |
| **Total Consumer Deposits** | $[Click&type] | $[Click&type] |
| | ($ volume) | ($ volume) |
| **Money Transmission** | $[Click&type] | $[Click&type] |
| **Check Cashing** | $[Click&type] | $[Click&type] |
| **Debt Collection** | $[Click&type] | $[Click&type] |
| **Other (Add additional lines for areas applicable to the entity being examined)** | $[Click&type] | $[Click&type] |

**CFPB**

# Scope Summary

**Entity Name:**                                **Prepared by:**
**Docket Number:**                              **Date:**

## ENTITY ASSESSMENT SUMMARY
### (Prior to onsite portion of examination)

### Risk Summary:
[Copy from Risk Assessment.]

| Element | Current MM/DD/YYYY | Preceding MM/DD/YYYY |
|---|---|---|
| Inherent Risk | [Click&type] | [Click&type] |
| Quality of Risk Controls and Mitigation | [Click&type] | [Click&type] |
| | | |
| Overall Risk to Consumers | [Click&type] | [Click&type] |

| | |
|---|---|
| Expected Change/Direction of Risk | ☐ Increasing ☐ Decreasing ☐ Stable |
| Last Change in Direction | MM/DD/YYYY<br>☐ Increasing ☐ Decreasing ☐ Stable |

**Narrative description of primary basis for Risk Assessment.**
[Copy from Risk Assessment.]

[Click&type]

## SCOPE OF THE EXAMINATION
### (Completed prior to onsite portion of examination)
**Narrative description of related examination activities**

**COMPLIANCE MANAGEMENT SYSTEM**

[Click&type]

**UDAAP**

[Click&type]

**FAIR LENDING REVIEW**

[Click&type]

**COMPLAINTS**

[Click&type]

# CFPB

# Scope Summary

**Entity Name:**                                    **Prepared by:**
**Docket Number:**                                  **Date:**

| PRODUCT OR BUSINESS LINE REVIEW | | | |
|---|---|---|---|
| **AREA** | **Review** Yes \| | **NA** | **Comments** |
| Mortgage Origination | ☐ | ☐ | [Click&type] |
| Mortgage Servicing | ☐ | ☐ | [Click&type] |
| Short-Term, Small-Dollar Lending | ☐ | ☐ | [Click&type] |

| REGULATION(S) REVIEW | | | |
|---|---|---|---|
| **Indicate the specific regulations that will be subject to transactional testing, noting the relationship with activities in the previous sections.** | | | |
| **AREA** | **Review** Yes \| | **NA** | **Comments** |
| LENDING | | | |
| Truth In Lending Act | ☐ | ☐ | [Click&type] |
| Real Estate Settlement Procedures Act | ☐ | ☐ | [Click&type] |
| Homeowners Protection Act | ☐ | ☐ | [Click&type] |
| Equal Credit Opportunity Act | ☐ | ☐ | [Click&type] |
| Home Mortgage Disclosure Act | ☐ | ☐ | [Click&type] |
| Fair Credit Reporting Act | ☐ | ☐ | [Click&type] |
| Consumer Leasing Act | ☐ | ☐ | [Click&type] |
| S.A.F.E. Mortgage Licensing Act | ☐ | ☐ | [Click&type] |
| Fair Debt Collection Practices Act | ☐ | ☐ | [Click&type] |

# CFPB                                    Scope Summary

**Entity Name:**                          **Prepared by:**
**Docket Number:**                        **Date:**

| DEPOSITS | | | |
|---|---|---|---|
| **AREA** | **Review** | | **Comments** |
| | **Yes** | **NA** | |
| Truth In Savings Act | ☐ | ☐ | [Click&type] |
| Electronic Fund Transfer Act | ☐ | ☐ | [Click&type] |
| **PRIVACY** | | | |
| **AREA** | **Review** | | **Comments** |
| | **Yes** | **NA** | |
| Sections 502-509 of the Gramm Leach Bliley Act (Privacy provisions, but not information security) | ☐ | ☐ | [Click&type] |

| FINAL SCOPE SUMMARY |
|---|
| **Describe changes to the scope of the examination that occurred during the examination, including changes to the Risk Summary.** |
| [Click&type] |
| **Note considerations for the scope of the next examination.** |
| [Click&type] |

# CFPB                                  Compliance Management Review

**Entity Name:**                                        **Prepared by:**
**Docket Number:**                                      **Date:**

Examiners should use this template to evaluate the entity's compliance management system. The review should cover the items listed below (and detailed on the following pages) that are the common elements of an effective compliance management program.

I.      Board of Directors and Management Oversight ................................................................ 2

II.     Policies and Procedures ................................................................................................ 4

III.    Training .......................................................................................................................... 7

IV.     Monitoring and Corrective Action ................................................................................. 9

V.      Consumer Complaint Response ................................................................................... 11

VI.     Compliance Audit ......................................................................................................... 13

# CFPB                          Compliance Management Review

**Entity Name:**                                    **Prepared by:**
**Docket Number:**                                  **Date:**

| I.    Examination Procedures - Board of Directors and Management Oversight ||
|---|---|
| *To evaluate board's and senior management's oversight of the compliance management system, examiners should:* | Comments |
| 1.  Review board meeting minutes and supporting materials during the period under review for coverage of compliance matters. | |
| 2.  Determine board committee structures and delegated responsibility for compliance matters, such as to an audit committee or risk committee, and review the meeting minutes and supporting materials of those committees for coverage of compliance matters. | |
| 3.  Determine any management committees with delegated authority and accountability for compliance matters, including fair lending, and review their composition, functions, and reporting to committees of the board or to the board. | |
| 4.  Determine the authority and accountability for compliance matters of regional or business unit governance bodies; and review their composition, functions, and reporting. | |
| 5.  Review policies for:<br>   a.  Clarity, comprehensiveness, and currency; and<br>   b.  Appropriate reflection of risks to consumers posed by the organization's practices, including compliance issues and risks facing the organization. | |
| 6.  Review the formal written compliance function document adopted by the board of directors or an appropriate committee of the board, and determine the resource allocation to compliance as part of the entity's budget and planning process. | |

**CFPB**                                    **Compliance Management Review**

**Entity Name:**                                    **Prepared by:**
**Docket Number:**                                  **Date:**

| | |
|---|---|
| 7. Identify the chief compliance officer and other responsible individuals. | |
| 8. Review the role of the chief compliance officer for authority to lead a compliance program and independence from business units. | |
| 9. Review board and board committee records for evidence of the chief compliance officer's independent access to board members and governance bodies. | |
| 10. Review processes for the identification of new regulatory requirements, changes in requirements, and planning for implementation. | |
| 11. Review processes for development and implementation of new consumer financial products or services, distribution channels or strategies to determine degree of compliance function participation.   Determine whether these processes consider fair lending compliance risk. | |
| 12. Determine degree of compliance review of draft marketing material (including scripts) and their implementation. | |
| 13. Review reporting for the identification and resolution of issues and the timeliness and completeness of such actions. | |
| 14. Review board or committee consideration of compliance audit matters for coverage of key risks, independence from business functions, and resolution of identified issues. | |

## Conclusions - Board of Directors and Management Oversight

Draw preliminary conclusions about the strength, adequacy, or weakness of board and senior management oversight.  Consider whether the board and management has:

   a.  Demonstrated clear expectations about compliance within the entity and to service providers;
   b.  Adopted clear policy statements regarding consumer compliance;
   c.  Appointed an appropriately qualified and experienced chief compliance officer;

# CFPB                                    Compliance Management Review

**Entity Name:**                                      **Prepared by:**
**Docket Number:**                                    **Date:**

---

    d.   Provided for other compliance officers with authority and accountability;

    e.   Established a compliance function to set policies, procedures, and standards;

    f.   Allocated resources to the compliance function commensurate with the size and complexity of the entity's operations and practices and the Federal consumer financial laws and regulations to which the entity is subject;

    g.   Addressed consumer compliance risks of harm to consumers throughout product development, marketing, and account administration;

    h.   Addressed consumer compliance risks of harm to consumers through the entity's handling of consumer complaints and inquiries;

    i.   Required audit coverage of compliance matters and reviewed the results of periodic compliance audits; and

    j.   Provided for recurring reports of compliance risks, issues, and resolution through a committee structure or to the board.

Confirm the preliminary conclusions through a risk-focused review of the compliance management system.

[Click& Type]

---

| II.    Examination Procedures - Policies and Procedures | |
|---|---|
| *To determine the strength, adequacy, or weakness of policies and procedures, examiners should:* | Comments |
| 1.  Request and review policies and procedures related to consumer compliance, including fair lending and other Federal consumer financial laws, and policies and procedures related to offering consumer financial products and services. | |
| 2.  Review policies and procedures for changes management committed to make following recent monitoring, audit, and examination findings and recommendations. | |
| 3.  Review policies and procedures to determine whether and how they address new or amended Federal consumer financial laws and regulations since the preceding examination by the CFPB, state, or prudential regulator, as | |

# CFPB                                    Compliance Management Review

**Entity Name:**                                    **Prepared by:**
**Docket Number:**                                   **Date:**

| | |
|---|---|
| applicable. | |
| 4. Request and review policies and procedures to determine whether they cover consumer financial products or services introduced since the preceding examination by the CFPB, state, or prudential regulator, as applicable. | |
| 5. Review policies and procedures relating to compliance with specific regulatory requirements (such as fair lending or the privacy of consumer financial information) and their implementing procedures. | |
| 6. Review for outdated content, the names of unaffiliated entities, or other indicators that policies are overly general or not tailored to the needs and actual practices of the supervised entity being examined. | |
| 7. Review policies and procedures for products with features that may inhibit consumer understanding or otherwise pose heightened risks of (a) unfair, deceptive, or abusive practices, or (b) fair lending concerns. | |
| 8. Review policies and procedures for products containing features that may pose heightened risk of unlawful discrimination.  Such features may include:<br>a.  particular incentives created by employee compensation structures;<br>b.  discretion over product selection, underwriting, or pricing; or<br>c.  distinctions related to geography or prohibited bases (such as age or marital status). | |
| 9. Review policies and procedures designed to ensure that the entity's service providers comply with legal obligations applicable to the product or service of the examined entity and the provider. | |

# CFPB                                    # Compliance Management Review

**Entity Name:**                                    **Prepared by:**
**Docket Number:**                                  **Date:**

| | |
|---|---|
| 10. Review policies and procedures maintained by different regional, business unit, or legal entities subject to the same corporate or board-level policies for consistency. | |
| 11. Review policies and procedures for record retention and destruction timeframes to ensure compliance with legal requirements. | |
| 12. If compliance procedures are embedded in automated tools or business unit procedures, determine that a qualified compliance officer or contractor reviewed these tools for consistency with policies and procedures and compliance with applicable Federal consumer laws and approved them for the purpose for which they are utilized. | |

**Conclusions - Policies and Procedures**

Draw preliminary conclusions regarding the strength, adequacy, or weakness of policies and procedures.   Consider whether policies and procedures:

    a.   Are consistent with board-approved policies;
    b.   Address compliance with applicable Federal consumer financial laws;
    c.   Cover product or service lifecycles; and
    d.   Are maintained and modified to remain current and to serve as a reference for employees in their day-to-day activities.

Confirm the preliminary conclusions by identifying business units, delivery channels, or offices for transaction testing.  Test to confirm that actual practices are consistent with strong or adequate written policies and procedures.  Test to determine the impact of apparently weak procedures.

[Click& Type]

# CFPB                                                    Compliance Management Review

**Entity Name:**                                          **Prepared by:**
**Docket Number:**                                        **Date:**

| III.  Examination Procedures - Training | |
|---|---|
| *To evaluate the quality of the entity's compliance training program, examiners should:* | *Comments* |
| 1.  Request and review the schedule, record of completion, and materials for recent compliance training of board members and executive officers. | |
| 2.  Determine the involvement of compliance officer(s) in selecting, reviewing, or delivering training content. | |
| 3.  Request and review policies, standards, schedules, and records of completion for compliance-specific training of compliance professionals, managers, and staff, and documents demonstrating that service providers who have consumer contact or compliance responsibilities are appropriately trained. | |
| 4.  Request and review samples of the content of training materials and comprehension tests, including training related to fair lending, new regulatory requirements, new products or channels of distribution, and marketing (including scripts). | |
| 5.  Request and review training developed as a result of management commitments to address monitoring, audit, or examination findings and recommendations or issues raised in consumer complaints and inquiries. | |
| 6.  Determine whether the program is designed to provide training about the specific regulatory requirements relevant to the functions of particular positions for loan officers, such as the Truth in Lending Act and the Equal Credit Opportunity Act. | |
| 7.  Review records of follow-up, escalation, and enforcement for units with training completion rates that do not meet the | |

**CFPB**                                   **Compliance Management Review**

**Entity Name:**                                        **Prepared by:**
**Docket Number:**                                      **Date:**

| | |
|---|---|
| supervised entity's standards or deadlines. | |
| 8.  Request and review the supervised entity's plans for additions, deletions, or modifications to compliance training over the next 12 months and any plans for changes to the overall training resources and compare actual training activities to prior plans. | |

**Conclusion - Training**

Draw preliminary conclusions about the strength, adequacy, or weakness of the compliance training program.  Consider whether:

  a.  Compliance training is current, complete, directed to appropriate individuals based on their roles;
  b.  Training is effective, and commensurate with the size of the entity and nature and risks to consumers presented by its activities;
  c.  Training is consistent with policies and procedures and designed to reinforce those policies and procedures; and
  d.  Compliance professionals have access to training that is necessary to administer a compliance program.

Confirm the preliminary conclusions through a risk-focused review of the compliance training program.

[Click& Type]

# CFPB

# Compliance Management Review

**Entity Name:**                                                    **Prepared by:**
**Docket Number:**                                                 **Date:**

| IV.   Examination Procedures - Monitoring and Corrective Action | |
|---|---|
| *To evaluation whether monitoring and audit programs are adequate and comprehensive, examiners should:* | *Comments* |
| 1.  Determine the chief compliance officer's role in the compliance monitoring element of the compliance program. | |
| 2.  Request and review the monitoring and testing schedule for the current year or next 12 months and review the currency of reviews in process against the current schedule. | |
| 3.  Request and review the risk assessments or other documents that led to the monitoring and testing program plan, including any fair lending risk assessments. | |
| 4.  Discuss with the compliance officer or monitoring manager the coverage of service providers that have contact with consumers. | |
| 5.  Determine whether and to what extent monitoring includes calculation tools, the content of consumer disclosures and notices, marketing materials, and scripts or guides for employee contacts with consumers. | |
| 6.  Request and review all compliance monitoring, testing, and corrective action reports completed during a specific period of time. Include reports related to fair lending compliance, such as fair lending "self-evaluations." (But do not request reports of fair lending "self-tests" that meet the strict requirements set forth in 12 CFR 1002.15.) | |
| 7.  Review reports for indications of systemic weaknesses, repeat violations of law and resulting risks or harms to consumers, or other matters of significant concern such as potential discriminatory effects of policies or procedures or particular business units with continuing or high levels of | |

# CFPB                                     Compliance Management Review

**Entity Name:**                                          **Prepared by:**
**Docket Number:**                                        **Date:**

| | |
|---|---|
| non-compliance. | |
| 8. Review a sample of reports and supporting documents covering potential unfair, deceptive, or discriminatory practices or related matters that pose heightened risks to consumers for thoroughness of review, accuracy of findings, and appropriateness of recommendations. | |
| 9. Determine whether monitoring results in corrective action that is timely and appropriate in size and scope. | |

## Conclusions - Monitoring and Corrective Action

Draw a preliminary conclusion regarding the strength, adequacy, or weakness of the compliance monitoring and corrective action program. Consider whether:

    a.  Monitoring is scheduled and completed and leads to timely corrective actions where appropriate;

    b.  Monitoring confirms that transactions and other consumer contacts are handled according to the entity's policies and procedures;

    c.  Monitoring and testing consider the results of risk assessments or other guides for prioritizing reviews;

    d.  Monitoring addresses deficiencies identified in internal or external audits and the board's or management's directives on resolving the deficiencies; and

    e.  Findings are escalated to management and to the board of directors if appropriate.

Confirm the preliminary conclusions by selecting areas for further review either because of lack of coverage by the monitoring program or to confirm monitoring or corrective action findings.

[Click& Type]

**CFPB**                    **Compliance Management Review**

Entity Name:                                    Prepared by:
Docket Number:                                  Date:

| V.      Examination Procedures - Consumer Complaint Response | |
|---|---|
| **To evaluate the adequacy of the consumer complaint responses, examiners should:** | **Comments** |
| 1. Obtain and review records of recent consumer complaints and inquiries received by CFPB about the entity and its service providers. | |
| 2. Review industry or other benchmarking complaint data collected by CFPB. | |
| 3. To the extent available, obtain and review records of recent consumer complaints against the institution from: <br> a. The prudential regulator; <br> b. State regulators; <br> c. State attorneys general offices or licensing and registration agencies; and <br> d. Private or other industry sources. | |
| 4. Request and review the institution's policies and procedures for receiving, escalating, and resolving consumer complaints and inquiries. | |
| 5. Request and review the record of consumer complaints and inquiries received by the institution for a specific recent period of time. | |
| 6. Identify complaints alleging deception, unfair treatment, unlawful discrimination, or other significant consumer injury and review some or all of those complaints for handling, timeliness, disposition, and any prospective and retrospective corrective actions. | |
| 7. Determine whether corrective action is offered or taken for | |

# CFPB                                    Compliance Management Review

**Entity Name:**                                   **Prepared by:**
**Docket Number:**                                 **Date:**

| | |
|---|---|
| any complaint resulting in a conclusion of violation of law or regulation. | |
| 8. Determine whether complaints involving service providers or other third parties referring business to the supervised entity receive prompt and appropriate handling and follow-up by the entity. | |
| 9. If a supervised entity maintains multiple consumer response centers or units, determine whether it employs a common set of best practices as applicable. | |
| 10. Determine whether evaluations of consumer contacts are shared within the supervised entity and included in compliance management reporting to the Board and senior management and whether such information is used in modifying policies, procedures, training, and monitoring. | |

## Conclusions - Consumer Complaint Response

Draw preliminary conclusions regarding the strength, adequacy, or weakness of the entity's response to consumer issues and concerns. Consider whether:

a. Consumer complaints and inquiries are appropriately recorded and categorized;
b. Complaints and inquiries regarding the entity or its service providers are addressed and resolved promptly;
c. Complaints that raise legal issues involving potential consumer harm from unfair treatment or discrimination, or other regulatory compliance issues, are appropriately escalated;
d. Complaint data and individual cases drive adjustments to business practices as appropriate;
e. Consumer complaints result in retrospective corrective action when appropriate; and
f. Weaknesses in the compliance management system exist, based on the nature or number of substantive complaints from consumers.

Confirm the preliminary conclusions by identifying business conduct areas, specific regulations, or organizational units for more detailed review.

[Click& Type]

**CFPB**                          # Compliance Management Review

Entity Name:                                          Prepared by:
Docket Number:                                        Date:

| |
|---|

| VI.    Examination Procedures - Compliance Audit | |
|---|---|
| *To determine the adequacy of the compliance audit program, examiners should:* | **Comments** |
| 1.  Request the supervised entity's audit plans and schedules for the prior year, current year, and the following year. | |
| 2.  If compliance audit is performed by a third party, request and review the engagement letters or contracts covering the prior year and the current year. | |
| 3.  Determine the basis for the audit plan and schedule and whether reporting is to the board of directors or to an audit committee or other committee of the board. | |
| 4.  Request and review all compliance audit reports for a specified period of time, including any fair lending audit reports. | |
| 5.  Determine whether written audit reports identify the scope, sampling techniques, findings/deficiencies, recommendations for corrective action, and management responses with time frames for corrective action. | |
| 6.  Determine whether audit scopes include previous audit and examination findings, new requirements, new products and channels, and self-identified higher risk areas of the supervised entity's operations. | |
| 7.  Request and review audit workpapers for a sample of audits covering fair lending laws and regulations; potential unfair, deceptive, or abusive practices; or other areas that may pose heightened risks to consumers. | |
| 8.  Determine whether corrective actions are tracked and any delay in appropriate management response or lack of | |

**CFPB**                                    **Compliance Management Review**

| Entity Name: | Prepared by: |
|---|---|
| Docket Number: | Date: |

| | |
|---|---|
| corrective action is escalated. | |
| 9.  Determine whether the supervised entity's chief compliance officer and appropriate business unit head(s) receive copies of audit reports, so that adjustments can be made to compliance program elements in a timely manner. | |
| 10. Review audit function structure and policies and procedures to ensure that the audit function, whether internal or external, is sufficiently independent of the business line and compliance management function. | |

**Conclusion - Compliance Audit**

Draw preliminary conclusions about the strength, adequacy, or weakness of the compliance audit. Consider whether:

    a.   The audit program is sufficiently independent and reports to the board or a committee of the board;

    b.   The audit program addresses compliance with all applicable Federal consumer financial laws;

    c.   The schedule and coverage of audit activities is appropriate to the size of the entity, its consumer financial product offerings, and its manner of conducting its consumer financial products business;

    d.   All appropriate compliance and business unit managers receive copies of audit reports in a timely manner; and

    e.   Audit results lead to appropriate, timely corrective action.

Confirm the preliminary conclusions by identifying areas for further review based on gaps in audit coverage or to confirm the accuracy of audit findings and reporting.

[Click& Type]



*<office>Region*
*<Address>*
*<Phone Number>*

<Date>

[BOARD OF DIRECTORS / Principal(s)]
<Entity name>
<street address>
<city state zip>

Dear [Directors/Principal(s)]:

Pursuant to the authority of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Consumer Financial Protection Bureau (CFPB) performed a risk-focused examination of <entity name>. The examination began on <Month XX, 20XX>.

The following report summarizes the findings of our examination.  Any matters of criticism, violations of laws or regulations, and other matters of concern identified within this Examination Report require the [Board of Directors'/principal's] and management's prompt attention and corrective action.

The comments and conclusions in this report are based on an analysis of information obtained from the entity's records and from other authoritative sources. CFPB prepared this report for supervisory purposes, and you should not consider it an audit report.

*<Select one of the following paragraphs and delete the other two paragraphs. If you select the third paragraph, indicate when a reply is due. >*

[Please review the entire report at your next meeting and note your review in the minutes of that meeting. *or* Please review the entire report and retain written documentation confirming your review.] You need not prepare or send CFPB a written response to the report.

[Please review the entire report at your next meeting, adopt any corrective actions called for, and note your review and actions in the minutes of that meeting. *or*  Please review the entire report, adopt any corrective actions called for, and retain written confirmation confirming your review.] You need not prepare or send CFPB a written response to the report.

[Please review the entire report at your next meeting. Please send us a certified copy of excerpts from your minutes stating that you reviewed the report, *or* Please review the entire report and send us written confirmation of your review,] and advise us of what action you took, or will take, regarding each point discussed in the Matters Requiring Attention section of this report. Please reply within [Click and Type Number of Days] days from the date of this letter.

If you have any questions, please call me at [Click and Type phone number]. If I am unavailable, please call [Click and Type Name and Title of Alternate], at [Click and Type phone number].

/s/

[Click and Type: name title]

cc: <prudential regulator>

**consumerfinance.gov**



*\<office\>Region*
*\<Address\>*
*\<Phone Number\>*

\<Date\>

[BOARD OF DIRECTORS / Principal(s)]

\<Entity name\>

\<street address\>

\<city state zip\>

Dear [Directors/Principal(s)]:

Pursuant to the authority of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Consumer Financial Protection Bureau (CFPB) performed a risk-focused examination of \<entity name\>. The examination began on \<Month XX, 20XX\>.

The following report summarizes the findings of our examination.  Any matters of criticism, violations of laws or regulations, and other matters of concern identified within this Examination Report require the [Board of Directors'/principal's] and management's prompt attention and corrective action.

The comments and conclusions in this report are based on an analysis of information obtained from the entity's records and from other authoritative sources. CFPB prepared this report for supervisory purposes, and you should not consider it an audit report.

*\<Select one of the following paragraphs and delete the other two paragraphs. If you select the third paragraph, indicate when a reply is due. \>*

[Please review the entire report at your next meeting and note your review in the minutes of that meeting. *or* Please review the entire report and retain written documentation confirming your review.] You need not prepare or send CFPB a written response to the report.

[Please review the entire report at your next meeting, adopt any corrective actions called for, and note your review and actions in the minutes of that meeting. *or*  Please review the entire report, adopt any corrective actions called for, and retain written confirmation confirming your review.] You need not prepare or send CFPB a written response to the report.

[Please review the entire report at your next meeting. Please send us a certified copy of excerpts from your minutes stating that you reviewed the report, *or* Please review the entire report and send us written confirmation of your review,] and advise us of what action you took, or will take, regarding each point discussed in the Matters Requiring Attention section of this report. Please reply within [Click and Type Number of Days] days from the date of this letter.

If you have any questions, please call me at [Click and Type phone number]. If I am unavailable, please call [Click and Type Name and Title of Alternate], at [Click and Type phone number].

/s/

[Click and Type: name title]

cc: \<prudential regulator\>

**consumerfinance.gov**

---



# EXAMINATION REPORT

**Examination Start Date:**                [Click&type]
**Examination Cycle Ending Date:**     [Click&type]

**Entity name:**                              [Click&type]
**City, State:**                                 [Click&type]

**CFPB Docket Number**:                [Click&type]
**CFPB Region:**                             [Click&type]

---

**Entity Type:**                              [Click&type]

**Examination Type:**                       [Click&type]

**Subordinate and**                          [Click&type]
**Affiliated Organizations Reviewed:**

---

## Prohibition of Disclosure or Release

This document is the property of the Consumer Financial Protection Bureau (CFPB), and the CFPB furnishes this document to the entity for its confidential use. Except as provided in 12 CFR 1070.42, the entity's directors, officers, or employees may not disclose the report or any portion of it to unauthorized persons or organizations. Unauthorized persons or organizations include anyone not officially connected with the entity as an officer, director, employee, attorney, auditor, independent auditor, or parent holding company.

If the entity receives a subpoena or other legal process calling for production of this document, notify the Regional Director and the CFPB General Counsel immediately. Advise the attorney issuing the subpoena and, if necessary, the court of the above prohibition and refer them to 12 CFR Part 1070.

# &lt;Examination Report Template&gt;

**&lt;Throughout this template, you will find instructions within angled brackets, "&lt;" and "&gt;."  Please delete the angled brackets and instructions before completing the report.**

## General Instructions:

*The primary purpose of the report is to communicate examination findings to a supervised entity's management, board of directors, or principals. The report must emphasize significant matters and avoid issues that do not affect or support a rating.  Throughout the report, present information under Comments and Supporting Analysis in a well-organized and logical manner. Report comments should be concise, discussing major strengths and/or weaknesses to support the examiners' conclusions.  Limit supporting analysis to information that clearly and succinctly demonstrates the conclusions, and avoid including material for informational purposes that does not provide support for the rating or risk assessment.*

## Plain Language

*Reports should follow "plain language" principles:*

- *Identify your audience.*
- *Write in active voice (e.g., "identify the doer").*
- *Use strong verbs and the simplest tense possible.*
- *Use simple everyday words except for necessary technical terms.*
- *Avoid jargon, excessive acronyms and abbreviations, multiple negatives, unnecessary qualifiers, and redundancies.*
- *Construct short, concise sentences.*
- *Express parallel ideas in parallel constructions (e.g., the bullets listed here each begin with a verb).*

## Definition of Dates used in Examinations

*The following definitions ensure accurate and consistent presentation of financial data in the report and consistent records of examination activities. The Federal financial institution regulatory agencies use similar definitions.*

*Examination (As Of) Date – The date of the data presented in the report. Generally, this is the most recent quarterly information that is available. Significant subsequent events may result in the presentation of more recent data.*

*Examination Start Date (Examination Commenced) – The date the examination activity commenced. For all examinations, use the date that time was first charged to the examination.*

*Examination Completion Date (Examination Concluded) – The last day of examination activities.*

*Close (Examination Report Mail) Date – The day that CFPB mails the final report to the entity.*

*Previous Examination Date – The examination start date of the prior examination. &gt;*

**CFPB**

**Examination Report**                                    **<Entity Name>**

# Table of Contents

EXAMINATION CONCLUSIONS                                                4

    SCOPE
    CONCLUSIONS AND COMMENTS
    RISK ASSESSMENT
    CONSUMER COMPLIANCE RATING
    MATTERS REQUIRING ATTENTION

REVIEW AND FINDINGS                                                    9

    ASSESSMENT OF RISKS
    COMPLIANCE MANAGEMENT REVIEW
    AREA(S) REVIEWED:  <insert name or description>
            <repeat "Area(s) Reviewed"  for each additional area
            reviewed>
    RECOMMENDATIONS

COMPLIANCE WITH ENFORCEMENT ACTIONS                                   11

APPENDIX                                                              12
    EXAMINATION TEAM MEMBERS

JA0920

**CFPB**
**Examination Report**            **<Entity Name>**

# Examination Conclusions

*Conclusions on the findings of this examination and the results of interim monitoring and reviews.*

## Scope

*<The scope should include a brief explanation of the examination activities undertaken, including, as applicable, the Risk Assessment, reviews for potential violations of Federal consumer financial law (particularly unfair, deceptive or abusive acts or practices, and discrimination), review of the entity's compliance management system, or review of complaints. Identify the products/services and regulatory issues reviewed. Examples of Products/Services Reviewed: [credit cards, mortgage origination, mortgage servicing, private student lending, auto lending, payday lending, unsecured consumer lending, deposit-related, financial advisory services].>*

[Click & Type]

## Conclusions and Comments

*<The Conclusion must contain an overall conclusion, followed by a concise summary of the findings. The conclusion should match the tone and language of the rating definition. This section should include summary details or facts supporting the conclusion, including a summary of material deficiencies that support 3, 4, and 5 ratings. The narrative should include both positive and negative conclusions and be concise, constructive, and direct. The narrative comments do not need to cover every area reviewed during an examination. Rather, the comments should focus on those matters that support the overall conclusion and rating. >*

[Click & Type]

**CFPB**
**Examination Report**                                        **<Entity Name>**

## Risk Assessment

*<The results of the final Risk Assessment should be included in this section. A narrative explanation should be provided in the Review and Findings section of the report. The supporting documentation and analysis for the risk assessment findings entered below should be documented in the Risk Assessment template and included in the examination workpapers. The date used for the current examination should be the date the examination activity commenced (Examination Start Date). The date used for previous examinations should be the examination start date of the prior examination.>*

| Element | Current <br> <MM/DD/YYYY> | Preceding <br> <MM/DD/YYYY> |
|---|---|---|
| Inherent Risk | <low, moderate, high> | <low, moderate, high> |
| Quality of Risk Controls and Mitigation | <strong, adequate, weak> | <strong, adequate, weak> |
|  |  |  |
| Overall Risk to Consumers* | <low, moderate, high> | <low, moderate, high> |

| | |
|---|---|
| Expected Change/Direction of Risk | <increasing/decreasing/stable> |
| Last Change in Direction | <MM/DD/YYYY> <br> <increasing/decreasing/stable> |

*\* The inherent risk identified in a particular business line or supervised entity, mitigated or amplified by the strength or weakness of the controls to address those risks.*

| CFPB | |
|---|---|
| **Examination Report** | **<Entity Name>** |

## Consumer Protection Compliance Rating

*<Insert the current examination rating for the regulated entity and choose the correct rating definition below.  Ensure that the examination rating is supported in the workpapers and the Final Scope Summary.  The procedures for determining the examination rating as well as the definitions for each rating are located in the "Close the Examination" section of the Examination Manual. The dates are the examination start dates.  In the table below, if the previous consumer compliance examinations were conducted by other agencies, note the agency's name under the rating.>*

| | Current Examination | Previous Examinations (if applicable) | |
|---|---|---|---|
| | <MM/DD/YYYY> | <MM/DD/YYYY> | <MM/DD/YYYY> |
| **Compliance Rating** | **<1-5>** | **<1-5>** | **<1-5>** |

A supervised entity with this rating *<Insert rating here and choose the appropriate definition language below. Then delete the other ratings and definition language below.  **NOTE:  THE CFPB ADOPTED THESE FFIEC-APPROVED DEFINITIONS; THEY MAY NOT BE EDITED**.>*

**"1"**

*Is in a strong compliance position.*  Management is capable of and staff is sufficient for effectuating compliance. An effective compliance program, including an efficient system of internal procedures and controls, has been established. Changes in consumer statutes and regulations are promptly reflected in the institution's policies, procedures, and compliance training. The institution provides adequate training for its employees. If any violations are noted, they relate to relatively minor deficiencies in forms or practices that are easily corrected. There is no evidence of discriminatory acts or practices, reimbursable violations, or practices resulting in repeat violations. Violations and deficiencies are promptly corrected by management. As a result, the institution gives no cause for supervisory concern.

**"2"**

*Is in a generally strong compliance position.*  Management is capable of administering an effective compliance program. Although a system of internal operating procedures and controls has been established to ensure compliance, violations have nonetheless occurred. These violations, however, involve technical aspects of the law or result from oversight on the part of operating personnel. Modification in the institution's compliance program and/or the establishment of additional review/audit procedures may eliminate many of the violations. Compliance training is satisfactory. There is no evidence of discriminatory acts or practices, reimbursable violations, or practices resulting in repeat violations.

**"3"**

*Is in a less than satisfactory compliance position.*  It is a cause for supervisory concern and requires more than normal supervision to remedy deficiencies. Violations may be numerous. In addition, previously identified practices resulting in violations may remain uncorrected.

**CFPB**

**Examination Report**                                      **<Entity Name>**

Overcharges, if present, involve a few consumers and are minimal in amount. There is no evidence of discriminatory acts or practices. Although management may have the ability to effectuate compliance, increased efforts are necessary. The numerous violations discovered are an indication that management has not devoted sufficient time and attention to consumer compliance. Operating procedures and controls have not proven effective and require strengthening. This may be accomplished by, among other things, designating a compliance officer and developing and implementing a comprehensive and effective compliance program. By identifying an institution with marginal compliance early, additional supervisory measures may be employed to eliminate violations and prevent further deterioration in the institution's less-than-satisfactory compliance position.

**"4"**

*Requires close supervisory attention and monitoring to promptly correct the serious compliance problems disclosed.* Numerous violations are present. Overcharges, if any, affect a significant number of consumers and involve a substantial amount of money. Often practices resulting in violations and cited at previous examinations remain uncorrected. Discriminatory acts or practices may be in evidence. Clearly, management has not exerted sufficient effort to ensure compliance. Its attitude may indicate a lack of interest in administering an effective compliance program, which may have contributed to the seriousness of the institution's compliance problems. Internal procedures and controls have not proven effective and are seriously deficient. Prompt action on the part of the supervisory agency may enable the institution to correct its deficiencies and improve its compliance position.

**"5"**

*Is in need of the strongest supervisory attention and monitoring.*  It is substantially in non-compliance with the consumer statutes and regulations. Management has demonstrated its unwillingness or inability to operate within the scope of consumer statutes and regulations. Previous efforts on the part of the regulatory authority to obtain voluntary compliance have been unproductive. Discrimination, substantial overcharges, or practices resulting in serious repeat violations are present.

*<The Examiner-in-Charge (EIC) will sign the examination report.  If an examiner is acting as the EIC for professional development purposes (EIC in training), a commissioned examiner must review the EIC in training's work and sign the report.>*

/s/    <u><EIC signature></u>

Examiner-in-Charge

**CFPB**

**Examination Report**                                   **<Entity Name>**

## Matters Requiring Attention

| *Specific expectations and time frames for actions requiring prompt response and corrective action.* |
|---|

*<This section should include significant matters requiring prompt board or principal and management attention, corrective action, and a written response to the CFPB.  There may be other corrective actions that do not get incorporated here because they do not require attention from the Board or Principal(s) nor do they require a written response to the CFPB.  Those corrective actions should be included under Required Corrective Actions in the Review and Findings section.*

*Communicate specific expected actions and time frames. Do not use of the term "should" when you require the board or principal(s) and management to take corrective action; instead, use "must.">*

*<Select one of the following paragraphs and delete the other.>*

This examination found no matters requiring a written response from the <board of directors or principals>; however, <the board or principal(s)> is responsible for the adoption and implementation of any corrective actions discussed in other sections of this report.

<or>

This examination found the following matters that the <board of directors or principals> must specifically address in their written response to this examination report. The <board of directors or principals> is also responsible for the adoption and implementation of any corrective actions discussed in other sections of this report.

| Matter Requiring Attention | Due Date | Required Response |
|---|---|---|
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |

**CFPB**
**Examination Report**                                    **<Entity Name>**

# Review and Findings

## Assessment of Risks

*Aspects of a supervised entity's products or operations that increase the risk of unfair, deceptive, or abusive acts or practices; of discrimination; or of violations of other Federal consumer financial laws (inherent risks).*

*<The conclusion must contain an overall Conclusion about the Inherent Risk findings from the CFPB Risk Assessment and should include summary details or facts supporting the conclusion. Include details supporting the conclusion in the Comments and Supporting Analysis section.>*

### Conclusion

[Click&type]

### Comments and Supporting Analysis

[Click&type]

## Compliance Management Review

*The effectiveness of the supervised entity's strategy for identifying and managing inherent risks and the strength of the entity's overall system of compliance management.*

*<The conclusion must contain an overall Conclusion about the effectiveness of the supervised entity's strategy for identifying and managing inherent risks to consumers and managing its consumer compliance responsibilities. The Conclusion section should include summary details or facts supporting the conclusion, including a summary of material deficiencies. Provide details supporting the conclusion in the Comments and Supporting Analysis section.>*

### Conclusion

[Click&type]

### Comments and Supporting Analysis

[Click&type]

### Required Corrective Actions

*To address weaknesses in managing risks of potential unfair, deceptive, or abusive acts or practices; of discrimination; or of other violations of Federal consumer financial law.*

*<This section identifies specific actions that management must take to resolve supervisory concerns, including specific time frames for completion. If there are no corrective actions for a particular area, just insert "N/A." Actions requiring board or principal attention, including repeat deficiencies, should be included under Matters Requiring Attention in the Examination Conclusions section. Recommendations or ideas for management to consider should be provided in the Recommendations section; they should not be included under Required Corrective Actions.>*

[Click&type]

## Area Reviewed **[insert name or description]**

*<The area reviewed should include findings for each specific product or service that was reviewed.  For example, the area reviewed may be Mortgage Origination.  The Conclusion, Comments and Supporting Analysis, and Required Corrective Actions should focus on mortgage origination and any statutory or regulatory issues identified for the area reviewed.  The conclusion must contain an overall conclusion on the area reviewed and summary details or facts supporting the conclusion, including a summary of material deficiencies. Include details supporting the conclusion in the Comments and Supporting Analysis section. If no deficiencies exist, it should be stated and the Required Corrective Actions section should state "N/A."  This section (Area Reviewed, Conclusion, Comments and Supporting Analysis, and Required Corrective Actions) should be repeated as many times as necessary to cover the different reviews conducted during the examination.>*

[Click&type]

### *Conclusion*

[Click&type]

### *Comments and Supporting Analysis*

*<If a regulatory violation is identified, include the citation for the violation, consistent with the format from the Supervision and Examination System.>*

[Click&type]

### *Required Corrective Actions*

*<This section identifies specific actions that management must take to resolve supervisory concerns, including specific time frames for completion. If there are no required corrective actions for a particular area, state "N/A". Actions requiring board or principal attention, including repeat deficiencies, should be included under Matters Requiring Attention in the Examination Conclusions section.  Recommendations or ideas for management to consider should be provided under the Recommendations section; they should not be included under Required Corrective Actions.>*

[Click&type]

## Recommendation(s)

| *Suggestions to improve or strengthen currently satisfactory entity practices.* |
|---|

*<The section is an optional section to provide recommendations to improve or strengthen entity practices that are currently found to be satisfactory.>*

[Click&type]

**CFPB**

**Examination Report**                                         **<Entity Name>**

# Compliance with Supervisory or Enforcement Actions

*The status of the supervised entity's compliance with consumer financial protection-related supervisory or enforcement actions, including any areas of non-compliance or partial compliance.*

*<This section should be completed if the supervised entity has existing consumer financial protection-related supervisory or enforcement action(s) in place from the CFPB or the entity's prudential regulator. Supervisory actions are non-public agreements such as Memoranda of Understanding. Enforcement Actions include public orders to Cease and Desist or to pay Civil Money Penalties. Use this section to document conclusions and supporting analysis as well as required corrective actions concerning the supervised entity's compliance with any such actions. Generally, if the supervised entity has failed to comply with any requirements, this should be addressed as a Matter Requiring Attention.*

*If there are no existing or previous consumer financial protection-related supervisory or enforcement action(s), insert "N/A." >*

### Conclusion

[Click&type]

### Comments and Supporting Analysis

[Click&type]

### Corrective Actions

[Click&type]

**CFPB**

**Examination Report**                                    **\<Entity Name\>**

# Appendix

## CFPB Examination Team Members

*\<Use this section of the report to identify all CFPB examiners who participated in the examination of the regulated entity.\>*

The following individuals participated in this examination:

[Click&type]



*<office>Region*
*<Address>*
*<Phone Number>*

<Date>

[BOARD OF DIRECTORS / Sr. Manager/Principal(s)]
<Entity name>
<street address>
<city state zip>

Dear [Directors/Manager/Principal(s)]:

Pursuant to the authority of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Consumer Financial Protection Bureau (CFPB) performed a review of certain activities at <entity name>. The review began on <Month XX, 20XX>.

The following summarizes the findings of our review.  Any matters of criticism, violations of laws or regulations, and other matters of concern identified within this Supervisory Letter (Letter) require the [Board of Directors'/principal's *if appropriate*] and management's prompt attention and corrective action.

The comments and conclusions in this Letter are based on an analysis of information obtained from the entity's records and from other authoritative sources. CFPB prepared this Letter for supervisory purposes, and you should not consider it an audit report.

*<Select one of the following and delete the others . If you select an option from the third paragraph, indicate when a reply is due. >*

[Please review the entire Letter at your next meeting and note your review in the minutes of that meeting. *or* Please review the entire Letter and retain written documentation confirming your review.] You need not prepare or send CFPB a written response to the Letter.

Please review the entire Letter at your next meeting, adopt any corrective actions called for, and note your review and actions in the minutes of that meeting. *or* Please review the entire Letter, adopt any corrective actions called for, and retain written confirmation confirming your review.] You need not prepare or send CFPB a written response to the Letter.

Please review the entire Letter at your next meeting. Please send us a certified copy of excerpts from your minutes stating that you reviewed the Letter, *or* Please review the entire Letter and send us written confirmation of your review,] and advise us of what action you took, or will take, regarding each point discussed in the Matters Requiring Attention section of this Letter. Please reply within [Click and Type Number of Days] days from the date of this Letter.

If you have any questions, please call me at [Click and Type phone number]. If I am unavailable, please call [Click and Type Name and Title of Alternate], at [Click and Type phone number].

/s/

[Click and Type: name title]

cc: <prudential regulator> and or <state regulator>

consumerfinance.gov

---



*<office>Region*
*<Address>*
*<Phone Number>*

<Date>

[BOARD OF DIRECTORS / Sr. Manager/Principal(s)]

<Entity name>

<street address>

<city state zip>

Dear [Directors/Manager/Principal(s)]:

Pursuant to the authority of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Consumer Financial Protection Bureau (CFPB) performed a review of certain activities at <entity name>. The review began on <Month XX, 20XX>.

The following summarizes the findings of our review.  Any matters of criticism, violations of laws or regulations, and other matters of concern identified within this Supervisory Letter (Letter) require the [Board of Directors'/principal's *if appropriate*] and management's prompt attention and corrective action.

The comments and conclusions in this Letter are based on an analysis of information obtained from the entity's records and from other authoritative sources. CFPB prepared this Letter for supervisory purposes, and you should not consider it an audit report.

*<Select one of the following and delete the others . If you select an option from the third paragraph, indicate when a reply is due. >*

[Please review the entire Letter at your next meeting and note your review in the minutes of that meeting. *or* Please review the entire Letter and retain written documentation confirming your review.] You need not prepare or send CFPB a written response to the Letter.

Please review the entire Letter at your next meeting, adopt any corrective actions called for, and note your review and actions in the minutes of that meeting. *or* Please review the entire Letter, adopt any corrective actions called for, and retain written confirmation confirming your review.] You need not prepare or send CFPB a written response to the Letter.

Please review the entire Letter at your next meeting. Please send us a certified copy of excerpts from your minutes stating that you reviewed the Letter, *or* Please review the entire Letter and send us written confirmation of your review,] and advise us of what action you took, or will take, regarding each point discussed in the Matters Requiring Attention section of this Letter. Please reply within [Click and Type Number of Days] days from the date of this Letter.

If you have any questions, please call me at [Click and Type phone number]. If I am unavailable, please call [Click and Type Name and Title of Alternate], at [Click and Type phone number].

/s/

[Click and Type: name title]

cc: <prudential regulator> and or <state regulator>

consumerfinance.gov

---



# <u>Supervisory Letter</u>

**Review Start Date:**                    **[Click&type]**
**Examination Cycle Ending Date:**       **[Click&type]**

**Entity name:**                        **[Click&type]**
**City, State:**                            **[Click&type]**

**CFPB Docket Number**:               **[Click&type]**
**CFPB Region:**                     **[Click&type]**

---

**Entity Type:**                        **[Click&type]**

**Review Type:**                       **[Click&type: Target Review, Horizontal Review]**

**Subordinate and**                     **[Click&type]**
**Affiliated Organizations Reviewed:**

---

## Prohibition of Disclosure or Release

This document is the property of the Consumer Financial Protection Bureau (CFPB), and the CFPB furnishes this document to the entity for its confidential use. Except as provided in 12 CFR 1070.42, the entity's directors, officers, or employees may not disclose the report or any portion of it to unauthorized persons or organizations. Unauthorized persons or organizations include anyone not officially connected with the entity as an officer, director, employee, attorney, auditor, independent auditor, or parent holding company.

If the entity receives a subpoena or other legal process calling for production of this document, notify the Regional Director and the CFPB General Counsel immediately. Advise the attorney issuing the subpoena and, if necessary, the court of the above prohibition and refer them to 12 CFR Part 1070.

## &lt;Supervisory Letter Template&gt;

**&lt;Throughout this template, you will find instructions within angled brackets, "&lt;" and "&gt;."  Please delete the angled brackets and instructions before completing the report.**

### General Instructions:

*The primary purpose of the Supervisory Letter (Letter) is to communicate findings from a target review to a supervised entity's management, board of directors, or principals. The Letter must emphasize significant matters and avoid issues that do not affect the findings.  Throughout the Letter, present information under Comments and Supporting Analysis in a well-organized and logical manner.  Comments should be concise, discussing major strengths and/or weaknesses to support the examiners' conclusions.  Limit supporting analysis to information that clearly and succinctly demonstrates the conclusions, and avoid including material for informational purposes that does not provide support for the conclusion.*

***This template has sections that may or may not be applicable to specific target reviews. Exercise judgment to expand on, duplicate, or delete any section(s) as appropriate.***

### Plain Language

*The Letters should follow "plain language" principles:*

- *Identify your audience.*
- *Write in active voice (e.g., "identify the doer").*
- *Use strong verbs and the simplest tense possible.*
- *Use simple everyday words except for necessary technical terms.*
- *Avoid jargon, excessive acronyms and abbreviations, multiple negatives, unnecessary qualifiers, and redundancies.*
- *Construct short, concise sentences.*
- *Express parallel ideas in parallel constructions (e.g., the bullets listed here each begin with a verb).*

### Definition of Dates used in Examinations or Reviews

*The following definitions ensure accurate and consistent presentation of financial data in the Letter and consistent records of supervisory activities. The Federal financial institution regulatory agencies use similar definitions.*

*Review (As Of) Date – The date of the data presented in the Letter. Generally, this is the most recent quarterly information that is available. Significant subsequent events may result in the presentation of more recent data.*

*Review Start Date (Review Commenced) – The date the supervisory activity commenced.  Use the date that time was first charged to the supervisory activity.*

*Review Completion Date (Review Concluded) – The last day of review activities.*

*Close (Mail) Date – The day that CFPB mails the final Letter to the entity.*

*Previous Examination or Review Date – The start date of the prior examination or review.* **&gt;**

---

**CFPB**
**Supervisory Letter**                                          **<Entity Name>**

**<This Table of Contents should be customized to the review that was conducted and the content of the Letter.>**

# Table of Contents

REVIEW CONCLUSIONS                                                              4

    SCOPE
    CONCLUSIONS AND COMMENTS
    RISK ASSESSMENT
    MATTERS REQUIRING ATTENTION

REVIEW AND FINDINGS                                                             7

    ASSESSMENT OF RISKS
    COMPLIANCE MANAGEMENT REVIEW
    AREA(S) REVIEWED:  <insert name or description>
                 <repeat "Area(s) Reviewed"  for each additional area reviewed>

    RECOMMENDATIONS

COMPLIANCE WITH ENFORCEMENT ACTIONS                                            9

APPENDIX                                                                       10
    REVIEW TEAM MEMBERS

**CFPB**
**Supervisory Letter**                                        **<Entity Name>**

# Review Conclusions

> *Conclusions on the findings of this review.*

## Scope

*<The scope should include a brief explanation of the supervision activities undertaken, including, as applicable, the Risk Assessment, reviews for potential violations of Federal consumer financial law (particularly unfair, deceptive or abusive acts or practices, and discrimination), review of the entity's compliance management system, or review of complaints. Identify the products/services and regulatory issues reviewed.  Examples of Products/Services Reviewed:  [credit cards, mortgage origination, mortgage servicing, private student lending, auto lending, payday lending, unsecured consumer lending, deposit-related, and financial advisory services].>*

[Click & Type]

## Conclusions and Comments

*<The Conclusion must contain an overall conclusion, followed by a concise summary of the findings. This section should include summary details or facts supporting the conclusion, including a summary of any material deficiencies.  The narrative should include both positive and negative conclusions and be concise, constructive, and direct. The narrative comments do not need to cover every area reviewed, but should focus on those matters that support the overall conclusion. >*

[Click & Type]

**CFPB**

| | |
|---|---|
| **Supervisory Letter** | **\<Entity Name>** |

## Risk Assessment

*\<Including the results of a risk assessment is optional; include the results only if appropriate to the situation.  If it is, a narrative explanation should be provided in the Review and Findings section of the Letter.  The supporting documentation and analysis for the risk assessment findings entered below should be documented in the Risk Assessment template and included in the review workpapers.  The date used for the current review should be the date the supervisory activity commenced.  The date used for previous examinations or reviews should be the start date of the prior examination or review.>*

| Element | Current <br> \<MM/DD/YYYY> | Preceding <br> \<MM/DD/YYYY> |
|---|---|---|
| Inherent Risk | \<low, moderate, high> | \<low, moderate, high> |
| Quality of Risk Controls and Mitigation | \<strong, adequate, weak> | \<strong, adequate, weak> |
| | | |
| Overall Risk to Consumers* | \<low, moderate, high> | \<low, moderate, high> |

| | |
|---|---|
| Expected Change/Direction of Risk | \<increasing/decreasing/stable> |
| Last Change in Direction | \<MM/DD/YYYY> <br> \<increasing/decreasing/stable> |

*\* The inherent risk identified in a particular business line or supervised entity, mitigated or amplified by the strength or weakness of the controls to address those risks.*

*\<The Examiner-in-Charge (EIC) will sign the supervisory letter.  If an examiner is acting as the EIC for professional development purposes (EIC in training), a commissioned examiner must review the EIC in training's work and sign the letter.>*

/s/     <u>\<EIC signature></u>

Examiner-in-Charge

**CFPB**
**Supervisory Letter**                                          **<Entity Name>**

## Matters Requiring Attention

| |
|---|
| *Specific expectations and time frames for actions requiring prompt response and corrective action.* |

*<This section should include significant matters requiring prompt board or principal, and management attention, corrective action, and a written response to the CFPB.  There may be other corrective actions that do not get incorporated here because they do not require attention from the Board or Principal(s) nor do they require a written response to the CFPB.  Those corrective actions should be included under Required Corrective Actions in the Review and Findings section.*

*Communicate specific expected actions and time frames. Do not use of the term "should" when you require the board or principal(s) and management to take corrective action; instead, use "must.">*

*<Select one of the following paragraphs and delete the other.>*

This review found no matters requiring a written response from the <Board of Directors or principals>; however, <the Board or principal(s)> is responsible for the adoption and implementation of any corrective actions discussed in other sections of this Letter.

[or]

This review found the following matters that the <Board of Directors or principals> must specifically address in their written response to this Letter. The <Board of directors or principals> is also responsible for the adoption and implementation of any corrective actions discussed in other sections of this Letter.

| <u>Matter Requiring Attention</u> | <u>Due Date</u> | <u>Required Response</u> |
|---|---|---|
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |
| [Click&type] | [Click&type] | • [Click&type] |

# Review and Findings

## Assessment of Risks

> *Aspects of a supervised entity's products or operations that increase the risk of unfair, deceptive, or abusive acts or practice; of discrimination; or of violations of other Federal consumer financial laws (inherent risks).*

*<Include this section only if a CFPB Risk Assessment was developed as part of the review.  If it is included, provide an overall Conclusion about the Inherent Risk findings from the CFPB Risk Assessment with a brief summary of details or facts supporting the conclusion. Include details supporting the conclusion in the Comments and Supporting Analysis section.>*

***Conclusion***

[Click&type]

***Comments and Supporting Analysis***

[Click&type]


## Compliance Management Review

> *The effectiveness of the supervised entity's strategy for identifying and managing inherent risks and the strength of the entity's overall system of compliance management.*

*<Include this section only if applicable to the particular review undertaken.  If included, provide an overall Conclusion about the effectiveness of the supervised entity's strategy for identifying and managing inherent risks to consumers and managing its consumer compliance responsibilities.  The Conclusion section should include summary details or facts supporting the conclusion, including a summary of material deficiencies.  Provide details supporting the conclusion in the Comments and Supporting Analysis section.>*

***Conclusion***

[Click&type]

***Comments and Supporting Analysis***

[Click&type]

***Required Corrective Actions***

> *To address weaknesses in managing risks of potential unfair, deceptive, or abusive acts or practices; of discrimination; or of other violations of Federal consumer financial law.*

*<This section identifies specific actions that management must take to resolve supervisory concerns, including specific time frames for completion. If there are no corrective actions for a particular area, just insert "N/A." Actions requiring board or principal attention, including repeat deficiencies, should be included under Matters Requiring Attention in the Review Conclusions section.  Recommendations or ideas for management should be provided in the Recommendations section; they should not be included under Required Corrective Actions.>*

[Click&type]

**CFPB**

| | |
|---|---|
| **Supervisory Letter** | **<Entity Name>** |

## Area Reviewed: [insert name or description]

*<The area reviewed should include findings for each specific product or service that was reviewed.  For example, the area reviewed may be Mortgage Origination.  The Conclusion, Comments and Supporting Analysis, and Required Corrective Actions should focus on mortgage origination and any statutory or regulatory issues identified for the area reviewed.  The conclusion must contain an overall conclusion on the area reviewed and summary details or facts supporting the conclusion, including a summary of material deficiencies. Include details supporting the conclusion in the Comments and Supporting Analysis section. If no deficiencies exist, it should be stated and the Required Corrective Actions section should state "N/A."  This section (Area Reviewed, Conclusion, Comments and Supporting Analysis, and Required Corrective Actions) should be repeated as many times as necessary to cover the different reviews conducted during the supervisory activity.>*

[Click & Type]

### Conclusion

[Click & Type]

### Comments and Supporting Analysis

*<If a regulatory violation is identified, include the citation for the violation, consistent with the format from the Supervision and Examination System.>*

[Click & Type]

### Required Corrective Actions

*<This section identifies specific actions that management must take to resolve supervisory concerns, including specific time frames for completion. If there are no required corrective actions for a particular area, state "N/A".  Actions requiring board or principal attention, including repeat deficiencies, should be included under Matters Requiring Attention in the Review Conclusions section.  Recommendations or ideas for management to consider should be provided under the Recommendations section; they should not be included under Required Corrective Actions.>*

[Click & Type]

## Recommendation(s)

*Suggestions to improve or strengthen currently satisfactory entity practices.*

*<The section is an optional section to provide recommendations to improve or strengthen entity practices that are currently satisfactory.>*

[Click & Type]

# Compliance with Supervisory or Enforcement Actions

> *The status of the supervised entity's compliance with consumer financial protection-related supervisory or enforcement actions, including any areas of non-compliance or partial compliance.*

*<This section should be completed if the supervised entity has existing consumer financial protection-related supervisory or enforcement action(s) in place from the CFPB or the entity's prudential regulator, and compliance with the action(s) was reviewed during the supervisory activity that is the subject of the Letter.  Supervisory actions are non-public agreements such as Memoranda of Understanding.  Enforcement Actions include public orders to Cease and Desist or to pay Civil Money Penalties.  Use this section to document conclusions and supporting analysis as well as required corrective actions concerning the supervised entity's compliance with any such actions. Generally, if the supervised entity has failed to comply with any requirements, this should be addressed as a Matter Requiring Attention.*

*If there are outstanding consumer financial protection-related supervisory or enforcement action(s) but compliance with them was not reviewed, state that in the Conclusion section.*

*If there are no existing or previous consumer financial protection-related supervisory or enforcement action(s), insert "N/A."  >*

### Conclusion

[Click & Type]

### Comments and Supporting Analysis

[Click & Type]

### Corrective Actions

[Click & Type]

**CFPB**
**Supervisory Letter**                                    **<Entity Name>**

# Appendix

### CFPB Review Team Members

*<Use this section of the Letter to identify all CFPB examiners who participated in the review of the regulated entity.>*

The following individuals participated in this review:

[Click & Type]

BILLING CODE: 4810-AM-P

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**Statement Regarding the Provision of Financial Products and Services to Consumers with Limited English Proficiency**

**AGENCY:**  Bureau of Consumer Financial Protection.

**ACTION:**  Notice.

**SUMMARY:**  The Bureau of Consumer Financial Protection (Bureau) is issuing this Statement Regarding the Provision of Financial Products and Services to Consumers with Limited English Proficiency (Statement) to encourage financial institutions to better serve consumers with limited English proficiency (LEP) and to provide principles and guidelines to assist financial institutions in complying with the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), the Equal Credit Opportunity Act (ECOA), and other applicable laws.

**DATES:**  The Bureau released this Statement on its website on January 13, 2021.

**FOR FURTHER INFORMATION CONTACT:**  Ena P. Koukourinis, Senior Counsel, Office of Fair Lending and Equal Opportunity, at CFPB_FairLending@cfpb.gov or 202-435-7000.  If you require this document in an alternative electronic format, please contact CFPB_Accessibility@cfpb.gov.

**SUPPLEMENTARY INFORMATION:**

**I.   Statement Regarding the Provision of Financial Products and Services to Consumers with Limited English Proficiency**

*A.  Background*

The Bureau works to ensure a fair, transparent, and competitive consumer financial marketplace.  To that end, the Bureau seeks to promote access to financial products and services

for all consumers, including LEP consumers.[1]  Despite having considerable credit needs and representing a large segment of the U.S. population, LEP consumers often encounter significant barriers to participating in the consumer financial marketplace.[2]  Many of these challenges stem from language access issues—financial disclosures and written documents are generally not available in languages other than English and some financial institutions do not have bilingual employees or access to interpretation services.[3]

Recognizing the compliance risks and uncertainty that many financial institutions raise as challenges to better serving LEP consumers in non-English languages, the Bureau is issuing this Statement to outline compliance principles and guidelines that encourage financial institutions to expand access to products and services for LEP consumers.  In doing so, the Bureau seeks to: (1) promote access to financial products for all consumers; (2) facilitate compliance by providing clear rules of the road; and (3) educate and empower consumers to make better informed financial decisions.[4]  Financial institutions play an important role in building a more inclusive financial system and presenting opportunities for LEP consumers to build their financial capabilities.[5]  The effective and responsible integration of LEP consumers into the financial

---

[1] In this document, a consumer with "limited English proficiency" or a "limited English proficient" (LEP) consumer means a person who has a limited ability to read, write, speak, or understand English.

[2] *See* Consumer Financial Protection Bureau, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace, 6-7 (Nov. 2017), https://files.consumerfinance.gov/f/documents/cfpb_spotlight-serving-lep-consumers_112017.pdf.

[3] *Id*. at 12.

[4] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 (2010), sec. 1021 (Dodd-Frank Act); *see also* CFPB Director Kathleen Kraninger, *Kraninger Marks Second Year as Director of the Consumer Financial Protection Bureau* (Dec. 11, 2020), https://www.consumerfinance.gov/about-us/newsroom/kraninger-marks-second-year-director-consumer-financial-protection-bureau/.

[5] *Supra* note 2.

marketplace has the potential to create positive benefits for consumers and the financial services industry alike.[6]

The Dodd-Frank Act emphasizes the Bureau's role in ensuring "fair, equitable, and nondiscriminatory access to credit."[7]  Consistent with that purpose, the Bureau encourages financial institutions to promote access to financial products and services for all consumers by better serving LEP consumers.  In providing such assistance and serving LEP consumers, financial institutions must also comply with Dodd-Frank Act prohibitions against engaging in any unfair, deceptive, or abusive act or practice (UDAAP)[8] and the ECOA.[9]  This Statement provides guidance on how financial institutions can provide access to credit in languages other than English in a manner that is beneficial to consumers, while taking steps to ensure financial institutions' actions are compliant with the ECOA, the prohibitions against UDAAPs, and other applicable laws.

Approximately 22 percent of the U.S. population over the age of 5 (in all, 67.8 million people) speak a language other than English at home and, of these, 37.6 percent are LEP.[10]  LEP consumers face unique challenges in learning about and accessing financial products and services.[11]  For instance, limited English proficiency can hinder consumers' financial literacy and

---

[6] Consumer Financial Protection Bureau, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace, 6-7 (Nov. 2017), https://files.consumerfinance.gov/f/documents/cfpb_spotlight-serving-lep-consumers_112017.pdf.

[7] Dodd-Frank Act, sec. 1013(c)(2)(A), 124 Stat. 1376 (2010) (codified at 12 U.S.C. 5493(c)(2)(A)).

[8] *Id*. at sec. 1036 (codified as 12 U.S.C. 5536).

[9] 15 U.S.C 1691 *et seq*.

[10] U.S. CENSUS BUREAU, 2019 AMERICAN COMMUNITY SURVEY 1-YEAR ESTIMATES, TABLE S1601: LANGUAGE SPOKEN AT HOME (2019), https://data.census.gov/cedsci/table?q=speak%20language%20other%20than%20english&tid=ACSST1Y2019.S1601&hidePreview=false.

[11] *Supra* note 6; *see also* New York City Dept. of Consumer Aff., Lost in Translation (2019), https://www1.nyc.gov/assets/dca/downloads/pdf/partners/LEPDebtCollection_Report.pdf (documenting greater challenges faced by LEP consumers in navigating the consumer debt collection system); Americans for Financial

3

make it difficult to conduct everyday financial affairs, including understanding and completing key financial documents, managing bank accounts, resolving problems with financial products and institutions, and accessing financial education and money management tools.[12]  Attempts to address these challenges have led to myriad Federal and State statutes and regulations.[13]

Over the past several years, to gain insights to inform policy decisions, the Bureau has engaged with stakeholders on fair lending compliance topics and access to credit issues.  The Bureau participated in robust information-gathering activities, including meetings with consumer and civil rights advocacy organizations, other Federal agencies, policymakers, representatives from financial institutions of various sizes, and trade associations to obtain feedback on the provision of financial products and services to LEP consumers.  Bureau leadership and staff presented on LEP-related topics and gathered feedback from stakeholders at conferences and

---

Reform, Barriers to Language Access in the Housing Market: Stories from the Field (May 2016), https://ourfinancialsecurity.org/wp-content/uploads/2016/05/AFR_LEP_Narratives_05.26.2016.pdf; Edward Golding, Laurie Goodman, and Sarah Strochak, Urban Institute, Is Limited English Proficiency a Barrier to Homeownership? (2018), https://www.urban.org/research/publication/limited-english-proficiency-barrier-homeownership.

[12] CFPB, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace (Nov. 2017), https://www.consumerfinance.gov/data-research/research-reports/spotlight-serving-limited-english-proficient-consumers/; see also FDIC, 2013 FDIC NATIONAL SURVEY OF UNBANKED AND UNDERBANKED HOUSEHOLDS, 16-17 (Oct. 2014), https://www.fdic.gov/householdsurvey/2013report.pdf (finding that 34.9 percent of households where Spanish is the only language spoken are "unbanked," compared to just 7.1 percent of households where Spanish is not the only language spoken); U.S. GOVERNMENT ACCOUNTABILITY OFFICE, FACTORS AFFECTING THE FINANCIAL LITERACY OF INDIVIDUALS WITH LIMITED ENGLISH PROFICIENCY AT HIGHLIGHTS, GAO-10-518 (May 2010), http://www.gao.gov/assets/310/304561.pdf.

[13] See, e.g., 12 CFR 1005.31(g)(1)(i) (requiring disclosures in languages other than English in certain circumstances involving remittance transfers); 12 CFR 1026.24(i)(7) (addressing obligations relating to advertising and disclosures in languages other than English for closed-end credit); 12 CFR 1002.4(e) (providing that disclosures made in languages other than English must be available in English upon request); 12 CFR 1005.18(b)(9) (requiring financial institutions to provide pre-acquisition disclosures in a foreign language if the financial institution uses that same foreign language in connection with the acquisition of a prepaid account in certain circumstances); Cal. Civ. Code sec. 1632(b) (as amended Sept. 25, 2020) (requiring that certain agreements "primarily" negotiated in Spanish, Chinese, Tagalog, Vietnamese, or Korean must be translated to the language of the negotiation under certain circumstances); Or. Rev. Stat. sec. 86A.198 (requiring a mortgage banker, broker, or originator to provide translations of certain notices related to the mortgage transaction if the banker, broker, or originator advertises and negotiates in a language other than English under certain circumstances); Tex. Fin. Code Ann. sec. 341.502(a-1) (providing that for certain loan contracts negotiated in Spanish, a summary of the loan terms must be made available to the debtor in Spanish in a form identical to required TILA disclosures for closed-end credit); 6 RCNY sections 5-77 (imposing certain language-related requirements on debt collection entities).

other external and internal events.  In addition, the Bureau conducted research on complaints submitted to the Bureau reflecting LEP consumers' experience with financial institutions.  These efforts resulted in the Bureau's November 2017 publication, *Spotlight on serving limited English proficient consumers*.[14]  In addition, the Bureau's 2016 Fall edition of *Supervisory Highlights* provides supervisory observations regarding financial institutions' provision of non-English language services to LEP consumers.[15]

Since that time, the Bureau has continued its work on LEP-related issues.  In the Bureau's 2019 Fair Lending Report to Congress, the Director identified that "[o]ne particular fair lending issue ripe for innovative solutions is making financial products and services more accessible to consumers who are unbanked and underbanked, including those who are Limited English Proficient."[16]

In July 2020, the Director held an LEP Consumer and Industry Roundtable that convened representatives from consumer and civil rights advocacy organizations, policymakers, industry, and trade associations.  The Bureau has also received input through numerous stakeholder meetings, comments to rulemakings, and various Requests for Information (RFIs) regarding

---

[14] CFPB, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace (Nov. 2017), https://www.consumerfinance.gov/data-research/research-reports/spotlight-serving-limited-english-proficient-consumers/.

[15] *See* CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 21-26 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf; s*ee also* CFPB, ECOA Baseline Review Module 4, 13-14, 21-22 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (These modules are used by CFPB examination teams to conduct ECOA Baseline Reviews to evaluate how an institution's CMS identifies and manages fair lending risk under ECOA.  The observations described in the referenced LEP section of *Supervisory Highlights* resulted from, at least in part, Bureau examiners' review of financial institutions' fair lending risks and controls related to servicing options for LEP consumers).

[16] CFPB, FAIR LENDING REPORT OF THE BUREAU OF CONSUMER FINANCIAL PROTECTION (April 2020), 1, https://files.consumerfinance.gov/f/documents/cfpb_2019-fair-lending_report.pdf.

access to credit for LEP consumers.[17]  Many of these responsive comments and submissions urged the Bureau to provide additional guidance to institutions seeking to expand their offering of products and services to LEP consumers while maintaining compliance with applicable laws.[18]

Most recently, on August 3, 2020, the Bureau issued an RFI "to identify opportunities to prevent credit discrimination, encourage responsible innovation, promote fair, equitable, and nondiscriminatory access to credit, address potential regulatory uncertainty, and develop viable solutions to regulatory compliance challenges under the ECOA and Regulation B."[19]  Among the requests, the Bureau sought information that would enable it "to understand the challenges specific to serving LEP consumers and to find ways to encourage creditors to increase assistance to LEP consumers."[20]  Specifically, the RFI asked:

> Should the Bureau provide additional clarity under ECOA and/or Regulation B to further encourage creditors to provide assistance, products, and services in languages other than English to consumers with limited English proficiency?  If so, in what way(s)?[21]

---

[17] *See, e.g.*, CFPB, Request for Information on the Equal Credit Opportunity Act and Regulation B, 85 FR 46600-46603 (Aug. 3, 2020); CFPB, Request for Information to Assist the Taskforce on Federal Consumer Financial Law, 85 FR 18214–18217 (Apr. 1, 2020); CFPB, Request for Information Regarding the Bureau's Adopted Regulations and New Rulemaking Authorities, 83 FR 12286–12289 (Mar. 21, 2018).

[18] *See, e.g.*, U.S. Chamber of Com. Center for Capital Markets Competitiveness, Comment Letter on Request for Information Regarding the Bureau's Inherited Regulations and Inherited Rulemaking Authorities, Docket No. CFPB-2018-0012, 5-6 (June 25, 2018); Mortgage Bankers Association, Comment Letter on Request for Information Regarding the Bureau's Adopted Regulations and New Rulemaking Authorities, Docket No. CFPB-2018-0011, 27-28 (June 19, 2018); Americans for Financial Reform *et al.*, Comment to CFPB's Proposed Debt Collection Rule (Sept. 18, 2019), https://www.consumeradvocates.org/sites/default/files/2019.9.18%20Debt%20Collection%20-%20Language%20Access%20Comment%20Letter_0.pdf (comment of 43 consumer, civil and human rights, labor, community, housing, and legal services organizations recommending certain protections for LEP consumers in the Bureau's proposed debt collection rule).

[19] CFPB, Request for Information on the Equal Credit Opportunity Act and Regulation B, 85 FR 46600-46603 (Aug. 3, 2020), https://www.federalregister.gov/documents/2020/08/25/2020-18557/request-for-information-on-the-equal-credit-opportunity-act-and-regulation-b-extension-of-comment; CFPB, Request for Information on the Equal Credit Opportunity Act and Regulation B; Extension of Comment Period, 85 FR 165 (Aug. 25, 2020), https://beta.regulations.gov/document/CFPB-2020-0026-0032.

[20] *Id.* at 46601.

[21] *Id.* at 46601-02.

The Bureau received a wide variety of responses to this question from several stakeholder groups, including consumer and civil rights advocacy organizations, financial institutions, industry trade associations, other financial regulators, and individuals.[22]  Almost all commenters recognize the importance of providing products and services to LEP consumers.  Some consumer advocacy organizations request that changes to LEP-related legal requirements take place via notice-and-comment rulemaking.  They also suggest that the Bureau require institutions to develop a Language Access Plan, similar to guidance by other Federal agencies.[23]  Consumer advocacy organizations, financial institutions, and industry trade associations alike encourage the Bureau to provide more translated documents and notices.

Financial institutions and industry trade association commenters advocate for flexibility in serving LEP consumers, including allowing risk-based approaches to decision making related to the scope and support for non-English languages.  These commenters explained that, because

---

[22] *See, e.g.*, Americans for Financial Reform Education Fund Language Access Task Force, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0145; National Community Reinvestment Coalition, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0128; East Bay Community Law Center, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0131; Housing Policy Council, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0103; Consumer Bankers Association, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0147; National Association of Federal Credit Unions, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0135; Anonymous, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0067; National Fair Housing Alliance, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-133; American Financial Services Association, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0140; American Bankers Association, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0143; Center for Capital Markets, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0136; City of Houston City Controller, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0120.

[23] *See, e.g.*, U.S. Dept. of Justice, Language Access Plan (2012), https://www.justice.gov/civil/file/997661/download (noting that its LEP Access Plan is "not intended to create new services or obligations, but to eliminate or reduce limited English proficiency as a barrier or impediment to accessing the core programs and activities of the Civil Division").

there are over 350 languages spoken in the United States, it would be unrealistic and cost-prohibitive for any financial institution to fulfill all the credit needs of all customers in all languages. In addition, industry representatives express uncertainty regarding how to prioritize one language over others and what factors may be considered when institutions seek to provide services in one or more languages.[24] Some industry groups also request clarity regarding marketing in non-English languages, including whether a disclosure describing the extent of services in that language is sufficient on its own to dispel risks that the practice would be considered an unfair, deceptive, or abusive practice.[25]

A few trade associations also underscore the technical, operational, and compliance challenges specific to providing translated documents to LEP consumers. For example, the commenters point to the operational complexity of translating and disseminating documents and data through technology platforms designed to rely on standard English characters.[26] Moreover, if financial institutions do opt to translate documents, they cite uncertainty regarding which documents to translate, how to determine the accuracy of those translations, and how to defend the rationale for selecting particular forms or disclosures for translation.[27] As a result, some of these industry groups assert that providing verbal interpretation via telephone is a more effective short-term solution to improving services for LEP consumers.

---

[24] *See, e.g.*, Housing Policy Council, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0094, 2 (Dec. 1, 2020).

[25] *See, e.g.*, Mortgage Bankers Association, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0115, 4 (Dec. 1, 2020) (noting that some institutions forego providing marketing in non-English languages as a result of the regulatory uncertainty).

[26] *See, e.g.*, Housing Policy Council, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0094, 2 (Dec. 1, 2020).

[27] *See e.g.*, *id*. at 3.

In considering whether and how to offer services to LEP consumers in languages other than English, industry stakeholders express a willingness and desire to serve LEP consumers, but cite challenges related to balancing legal requirements and practical considerations, including resource and operational constraints.  Specifically, these challenges arise in making:

(1) Language selection(s): determining in which non-English language(s) to provide products and services; and

(2) Product and lifecycle selections: deciding (a) which products and services to offer in non-English language(s), and (b) where in the product lifecycle to provide services in non-English language(s).

Industry and trade association stakeholders are particularly concerned about potential fair lending risks under ECOA regarding making and implementing decisions about language selection for non-English language services.  These stakeholders are also concerned about potential UDAAP risks in determining how and in which languages to offer products and services, particularly where not all products and services are provided in languages other than English.  Some of these groups request Bureau clarification that: (1) an inability to offer support in languages other than English, unless specifically required by law, does not violate ECOA or Regulation B, and/or (2) offering support in a specific non-English language and not in other non-English languages is not considered an unfair, deceptive, abusive, or discriminatory practice. These groups also encourage the Bureau to clarify that collecting consumers' language preference information does not violate the ECOA or Regulation B.[28]

---

[28] *See, e.g.*, U.S. Bank, Comment Letter on Request for Information: Equal Credit Opportunity Act and Regulation B, Document No. CFPB-2020-0026-0110, 3 (Dec. 1, 2020).

9

These legal issues create some uncertainty and can impose costs, which may inhibit some financial institutions from serving LEP consumers.[29]  As a result, LEP consumers may not be able to easily access generally available credit, lower-priced credit, or creditor assistance (whether before or after credit is extended).  The Bureau is issuing this Statement to assist financial institutions seeking to increase access to fair and nondiscriminatory credit for LEP consumers.

B.  Statement

This Statement provides principles and guidelines to inform and assist financial institutions in their decision making related to serving LEP consumers.  Section B.1 provides general principles for financial institutions to consider in serving LEP consumers in languages other than English.  Section B.2 provides guidelines institutions can use to help implement those principles and develop compliance solutions, including key considerations to inform those decisions and specific information about common components of a compliance management system (CMS).

### 1.  *Guiding principles for serving LEP consumers*

**The Bureau encourages financial institutions to better serve LEP consumers while ensuring compliance with relevant Federal, State, and other legal requirements**.[30]  Industry stakeholders note that potential legal uncertainty discourages some financial institutions from serving LEP consumers in languages other than English.  The Bureau has also spoken to many

---

[29] The Bureau has a variety of tools that financial institutions can use to reduce legal uncertainty, including the No-Action Letter Policy, Compliance Assistance Sandbox Policy, and Policy to Encourage Trial Disclosure Programs. *See* CFPB, Innovation at the Bureau, https://www.consumerfinance.gov/rules-policy/innovation/ (last accessed 12/14/20).  Similarly, the Bureau's Advisory Opinion program provides written guidance to assist financial institutions in understanding their legal and regulatory obligations through advisory opinions; *see also* CFPB, Advisory Opinion program, https://www.consumerfinance.gov/compliance/advisory-opinion-program/ (last accessed 12/14/20) (published in the *Federal Register* at 85 FR 77987 (Dec. 3, 2020)).

[30] *See*, *e.g.*, *supra* note 13.

financial institutions that nevertheless choose to serve LEP consumers in myriad ways and to varying degrees.[31]  The Bureau encourages institutions to better serve LEP consumers by applying the principles and guidelines in this Statement.  The Bureau anticipates that if financial institutions do so, there will continue to be variations among financial institutions in the manner, and the extent to which, they provide products and services to LEP consumers.

**Financial institutions that wish to implement pilot programs or other phased approaches for rolling out LEP-consumer-focused products and services may consider doing so in a manner consistent with the guidelines in section B.2 of this Statement**.  Phased approaches may allow financial institutions to serve LEP consumers incrementally while managing risks and taking steps to ensure compliance with appliable laws.

**Financial institutions may consider developing a variety of compliance approaches related to the provision of products and services to LEP consumers consistent with the guidelines in section B.2 of this Statement**.  Factors relevant in the compliance context may vary depending on the size, complexity, and risk profile of an institution.[32]  Therefore, differences in financial institutions and the ways they choose to serve LEP consumers will likely require different compliance solutions.

---

[31] *See, e.g.*, CFPB, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace, 8-10 (Nov. 2017), https://www.consumerfinance.gov/data-research/research-reports/spotlight-serving-limited-english-proficient-consumers/ (providing insights from financial institutions about serving LEP consumers, including assessment of language needs, centralized point of contact for technical assistance, translation and interpretation systems, training and support for staff and contractors, and interactions with consumers).

[32] CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 25 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf; s*ee also* CFPB, ECOA Baseline Review Module 2, 6 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (providing instructions to Bureau examiners on evaluating a financial institution's fair lending CMS, including its approach to managing the fair lending risks posed by its service providers).

**Financial institutions may mitigate certain compliance risks by providing LEP consumers with clear and timely disclosures in non-English languages describing the extent and limits of any language services provided throughout the product lifecycle**.[33]  In those disclosures, financial institutions may provide information about the level of non-English language support as well as communication channels through which LEP consumers can obtain additional information and ask questions.

**Financial institutions may wish to consider extending credit pursuant to a legally compliant special purpose credit program (SPCP) to increase access to credit for certain underserved LEP consumers**.  Regulation B, which implements the ECOA, sets forth standards and general rules for SPCPs.[34]  By permitting the consideration of a prohibited basis such as race or national origin in connection with an SPCP, ECOA and Regulation B provide creditors with a tool to help meet the credit needs of underserved communities.  The Bureau recently issued an advisory opinion to provide stakeholders with guidance concerning how to develop and implement an SPCP.[35]  While SPCPs are a useful tool to further that goal, financial institutions may responsibly serve LEP consumers without the use of SPCPs.

---

[33] *See* CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 23 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf (referencing supervisory observations of fair lending risks related to marketing only some available credit card products to Spanish-speaking consumers, while marketing several additional credit card products to English-speaking consumers.  To mitigate any compliance risks related to these practices, one or more financial institutions revised their marketing materials to notify consumers in Spanish of the availability of other credit card products and included clear and timely disclosures to prospective consumers describing the extent and limits of any language services provided throughout the product lifecycle).

[34] 12 CFR 1002.8.

[35] CFPB, ADVISORY OPINION: EQUAL CREDIT OPPORTUNITY ACT (REGULATION B) SPECIAL PURPOSE CREDIT PROGRAMS (Dec. 2020), https://files.consumerfinance.gov/f/documents/cfpb_advisory-opinion_special-purpose-credit-program_2020-12.pdf.

### 2. *Guidelines for developing compliance solutions when serving LEP consumers*

Financial institutions may use the following key considerations and CMS guidelines to mitigate ECOA, UDAAP, and other legal risks when making threshold determinations and other decisions related to serving LEP consumers in languages other than English.[36]

### a. *Key considerations*

#### i. Language Selection

In determining whether to provide non-English language services to LEP consumers and in which language(s), financial institutions may consider documented and verifiable information (*e.g.*, the stated language preferences of its current customers[37] or U.S. Census Bureau demographic or language data[38]).  For example, the Bureau has previously noted that some nationwide institutions largely focus on serving Spanish-speaking consumers, while regional institutions typically align any language services with local demographics.[39]

---

[36] Although in a different context, other agencies have provided similar guidance in an attempt to increase access to services for LEP individuals.  *See, e.g.,* U.S. Dept. of Housing and Urban Dev., Office of General Counsel Guidance on Fair Housing Act Protections for Persons with Limited English Proficiency (2016), https://www.hud.gov/sites/documents/LEPMEMO091516.PDF ("This guidance discusses how the Fair Housing Act applies to a housing provider's consideration of a person's limited ability to read, write, speak or understand English.  Specifically, this guidance addresses how the disparate treatment and discriminatory effects methods of proof apply in Fair Housing Act cases in which a housing provider bases an adverse housing action–such as a refusal to rent or renew a lease–on an individual's limited ability to read, write, speak or understand English."); U.S. Dept. of Justice, Language Access Plan (2012), https://www.justice.gov/civil/file/997661/download ("This policy and the LEP Access Plan are not intended to create new services or obligations, but to eliminate or reduce limited English proficiency as a barrier or impediment to accessing the core programs and activities of the Civil Division."); U.S. Dept. of Justice, Common Language Access Questions, Technical Assistance, and Guidance for Federally Conducted and Federally Assisted Programs (Aug. 2011), https://www.lep.gov/sites/lep/files/resources/081511_Language_Access_CAQ_TA_Guidance.pdf.

[37] *See infra* section B.2.a.iii for additional information on language preference collection and tracking.

[38] *See* SUPERVISORY HIGHLIGHTS: FALL 2016, 21-22 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[39] CFPB, Spotlight on serving limited English proficient consumers: Language access in the consumer financial marketplace, 8 (Nov. 2017), https://files.consumerfinance.gov/f/documents/cfpb_spotlight-serving-lep-consumers_112017.pdf.

ii.    <u>Product and Service Selection</u>

In determining which products and services to offer in languages other than English, financial institutions may consider a variety of factors, including the extent to which LEP consumers use particular products and the availability of non-English language services.[40]

In determining when during the product lifecycle financial institutions can offer services in non-English languages and the extent of those services, financial institutions may consider activities and communications—whether verbal or written—that most significantly impact consumers.  To determine whether a verbal or written communication is one that significantly impacts consumers, financial institutions may consider whether the communication conveys essential information about credit terms and conditions (*e.g.*, loan pricing), or about borrower obligations and rights, including those related to delinquency and default servicing, loss mitigation, and debt collection.  Financial institutions may also consider existing customer data on what services LEP consumers use most frequently.[41]

In making product and service selections, financial institutions should review relevant policies, procedures, and practices for features that may pose heightened risk of unlawful discrimination, including distinctions in product offerings or terms related to prohibited bases (*e.g.*, national origin, age) or proxies for prohibited bases (*e.g.*, geography).[42]

---

[40] *See infra* section B.2.a.iii for additional information on language preference collection and tracking.

[41] *Id.*

[42] *See* 12 CFR 1002.4(a); *see also* CFPB, ECOA Baseline Review Module 2, 8 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (instructing examiners to review aspects of institutions' policies and procedures that may pose heightened fair lending risk); *In re American Express Centurion Bank*, No. 2017-CFPB-0016 (Aug. 23, 2017), https://files.consumerfinance.gov/f/documents/201708_cfpb_american-express_content-order.pdf (taking action against two American Express banking subsidiaries for discriminating against certain consumers with Spanish-language preferences, and consumers in Puerto Rico, the U.S. Virgin Islands, and other U.S. territories by charging them higher interest rates, imposing stricter credit cutoffs, and providing less debt forgiveness compared to consumers without Spanish-language preferences or addresses in Puerto Rico and the U.S. territories).

iii.    <u>Language Preference Collection and Tracking</u>

Financial institutions may collect and track customer language information in a variety of ways to facilitate communication with LEP consumers in non-English languages.[43]  For example, in 2017, the Bureau issued an official approval of the final redesigned Uniform Residential Loan Application (URLA) that was to include a question to collect mortgage applicants' language preference.[44]  Although the Federal Housing Finance Agency (FHFA) later opted to remove the language preference question from the URLA, the Bureau has not rescinded the approval, which confirms that financial institutions' use of the URLA containing the question identifying a mortgage applicant's language preference does not violate Regulation B sections 1002.5(b) – (d) or the ECOA.[45]  The Bureau specifically reviewed the language preference question with respect to Regulation B, section 1002.5(b) concerning requests for information about national origin and determined it to be compliant.  Financial institutions can use similar questions to collect customer language preference information outside of the mortgage context.  Financial

---

[43] CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 21 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[44] The URLA question stated:

**Language Preference – Your loan transaction is likely to be conducted in English**.  This question requests information to see if communications are available to assist you in your preferred language.  Please be aware that communications may NOT be available in your preferred language.

*Optional* – Mark the language you would prefer, if available:

O English O Chinese O Korean O Spanish O Tagalog O Vietnamese O Other: _____ O I do not wish to respond

Your answer will NOT negatively affect your mortgage application.  Your answer does not mean the Lender or Other Loan Participants agree to communicate or provide documents in your preferred language.  However, it may let them assist you or direct you to persons who can assist you.

Language assistance and resources may be available through housing counseling agencies approved by the U.S. Department of Housing and Urban Development.  To find a housing counseling agency, contact one of the following Federal government agencies:

• U.S. Department of Housing and Urban Development (HUD) at (800) 569-4287 or www.hud.gov/counseling.
• Consumer Financial Protection Bureau (CFPB) at (855) 411-2372 or www.consumerfinance.gov/find-a-housing-counselor.

[45] 82 FR 55810 (Nov. 20, 2017).

15

institutions do not violate the ECOA or Regulation B when they collect the language preference of an applicant or borrower in a credit transaction.

However, financial institutions should ensure that information collected about a consumer's language preference is not used in a way that violates applicable laws. For example, the Bureau has brought enforcement actions against institutions for violations that resulted, at least in part, from the exclusion of consumers with non-English language preferences from offers provided to similarly situated consumers without those language preferences.[46] Financial institutions choosing to collect and track customer language preferences should consider closely monitoring how that information is used within the institution to ensure compliance with applicable laws.[47]

<div align="center">

iv.    Translated Documents

</div>

Financial institutions must adhere to Federal and State laws requiring that they provide consumers with translated documents under certain circumstances.[48] Nothing in this Statement alters the applicability of those requirements.

If the translation of documents is not legally mandated, financial institutions may assess whether and to what extent to provide translated documents to consumers. Financial institutions may conduct these assessments and document the related decisions consistent with the guidelines

---

[46] *See, e.g.*, *In re Synchrony Bank*, No. 2014-CFPB-0007 (June 19, 2014), http://files.consumerfinance.gov/f/201406_cfpb_consent-order_synchrony-bank.pdf (citing violations of ECOA resulting from the exclusion of consumers from offers that would otherwise have been provided but for the Bank's language preference flag and/or the fact that the consumers had addresses in Puerto Rico or the U.S. territories*); In re American Express Centurion Bank*, No. 2017-CFPB-0016 (Aug. 23, 2017), https://files.consumerfinance.gov/f/documents/201708_cfpb_american-express_content-order.pdf (taking action against two American Express banking subsidiaries for discriminating against certain consumers with Spanish-language preferences, and consumers in Puerto Rico, the U.S. Virgin Islands, and other U.S. territories by charging them higher interest rates, imposing stricter credit cutoffs, and providing less debt forgiveness compared to consumers without Spanish-language preferences or addresses in Puerto Rico and the U.S. territories).

[47] *See infra* section B.2.b.ii on CMS-related monitoring.

[48] *See, e.g.*, *supra* note 13.

<div align="center">16</div>

provided in section B.2.b.i.  Financial institutions that choose to provide translated documents to LEP consumers, must ensure the accuracy of those translations[49] and should seek to prioritize communications and activities that most significantly impact consumers.[50]

In addition, financial institutions may wish to use translated documents provided by the Bureau and other government agencies.[51]  Links to the Bureau's LEP-related resources, including glossaries of financial terms, can be found on its website.[52]  The Bureau is committed to continuing to provide more translated documents in the future.

**b.** *Generally applicable CMS guidelines*

Financial institutions can mitigate fair lending and other risks associated with providing services in languages other than English by implementing a strong compliance management system that affirmatively considers how to serve LEP consumers in a compliant manner. Financial institutions serving LEP consumers may: (1) develop an LEP-specific CMS, or (2)

---

[49] Several Federal financial regulatory agencies have published translated forms, disclosures, and glossaries for use by financial institutions in ensuring the accuracy and consistency in translated terms.  *See, e.g.*, CFPB, Glossary of English-Spanish Financial Terms (Oct. 2018), https://files.consumerfinance.gov/f/documents/cfpb_adult_fin-ed_spanish-style-guide-glossary.pdf; CFPB, Glossary of English-Chinese Financial Terms (Feb. 2019), https://files.consumerfinance.gov/f/documents/cfpb_adult-fin-ed_chinese-style-guide-glossary.pdf; FHFA, Mortgage Translations Home, https://www.fhfa.gov/MortgageTranslations (includes Mortgage Translations clearinghouse, an easy-to-use collection of translated documents and tools to assist lenders, servicers, housing counselors, and others in helping LEP mortgage borrowers).

[50] *See supra* section B.2.a.ii on product and service selection, providing considerations for assessing whether written or verbal communications significantly impact consumers; *see, e.g.*, U.S. Dept. of Housing and Urban Development, Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 2736 (Jan. 2007), https://www.federalregister.gov/documents/2007/01/22/07-217/final-guidance-to-federal-financial-assistance-recipients-regarding-title-vi-prohibition-against (highlighting that "[t]he decision as to what program-related documents should be translated into languages other than English is a complex one" and describing factors that recipients of Federal financial assistance can consider in "deciding: (1) [w]hat documents should be translated; (2) what target languages other than English are appropriate; and (3) whether more effective alternatives exist").

[51] *See, e.g.*, CFPB, Loan estimate and closing disclosure forms and samples, https://www.consumerfinance.gov/policy-compliance/guidance/mortgage-resources/tila-respa-integrated-disclosures/forms-samples/ (linking to various Spanish versions of TRID model and sample forms); FHFA, Mortgage Translations Home, https://www.fhfa.gov/MortgageTranslations.

[52] CFPB, Helping newcomers and multilingual communities, https://www.consumerfinance.gov/language/.

integrate an LEP focus into the financial institution's broader fair lending, UDAAP, and/or consumer compliance CMS.  To be most effective, the CMS coverage should be comprehensive and commensurate with the financial institution's size, complexity, and risk profile.[53]

Common features of a well-developed CMS include: a compliance program (*i.e.*, policies and procedures, training, monitoring and/or audit, and consumer complaint response) and third-party service provider oversight.[54]  In the fair lending context, financial institutions should consider an in-depth review of policies and procedures for products containing features that may pose heightened risk of unlawful discrimination.[55]  The following subsections provide specific detail about components that can be included (or refined if existing) in a financial institution's CMS to mitigate fair lending and other risks associated with providing products and services in non-English languages.

i.    Documentation of decisions

A well-developed CMS will sufficiently document applicable policies, procedures, and decision making.[56] The Bureau strongly encourages financial institutions providing products and services in non-English languages to document decisions related to the selection of: (1)

---

[53] *Supra*, note 32.

[54] *See* CFPB, SUPERVISORY HIGHLIGHTS: SUMMER 2013, (Aug. 2013), https://files.consumerfinance.gov/f/201308_cfpb_supervisory-highlights_august.pdf (discussing the pillars of a well-functioning CMS); *see also* CFPB, ECOA Baseline Review Module 2, 6 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (providing instructions to Bureau examiners on evaluating a financial institution's fair lending CMS, including its approach to managing the fair lending risks posed by its service providers).

[55] *See* 12 CFR 1002.4(a); *see also* CFPB, ECOA Baseline Review Module 2, 8 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (instructing examiners to review aspects of institutions' policies and procedures that may pose heightened fair lending risk, including (1) particular incentives created by employee compensation or performance goal structures (both compensation and non-compensation based); (2) discretion over underwriting, pricing, or product selection (*e.g.*, steering risk); or (3) distinctions related to geography or prohibited bases).

[56] SUPERVISORY HIGHLIGHTS: FALL 2016, 24 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

18

language(s), (2) product(s), and (3) service(s).[57]  Documentation may include anything that a financial institution considers in making the language(s), product(s), or service(s) decision, including infrastructure, systems, or other operational limitations; cost estimates; or any other information that allows a regulator to understand the decision-making process.

For example, that documentation may include any information that the financial institution considered in selecting a particular language or languages in which to serve LEP consumers (*e.g.*, the stated language preferences of its current customers[58] or U.S. Census Bureau demographic or language data[59]).  In addition, the documentation may include the reasons for selecting particular products and services, including the extent of non-English language communications and other customer support resources.  The documentation may also include the financial institution's plan to phase-in additional languages, products, or services over time.

Financial institutions seeking to expand language, product, and/or service offerings, may document the existing offerings and decisions related to expanded offerings.  In determining whether to expand or discontinue particular products or services, financial institutions may consider documenting the extent of consumer use (or lack thereof) of those product and service offerings.

---

[57] *See id*. at 23 (underscoring that the lack of documentation describing how one or more institutions decided to exclude certain products from Spanish language marketing raised questions about the adequacy of the institution's fair lending-related CMS).

[58] *See supra* section B.2.a.iii for additional information on language preference collection and tracking.

[59] *See* Supervisory Highlights: Fall 2016, 21-22 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

ii.    Monitoring

Common features of a well-developed CMS include quality assurance testing and

monitoring of business transactions and processes.[60]  The Bureau encourages financial

institutions providing services in languages other than English to regularly monitor those

services, including changes in those services, for fair lending and UDAAP risks.[61] For example,

financial institutions should consider assessing the quality of customer assistance provided in

non-English languages, including by assessing whether personnel receive the same training,

convey the same information, and have the same authority as other customer service personnel.[62]

In addition, financial institutions should consider monitoring or conducting regular fair

lending and UDAAP-related assessments of their advertising, including promotional materials

and marketing scripts for new products.[63]  If institutions market products to particular

populations, including LEP consumers, they should consider the nature and extent of that

---

[60] *Id.* at 24.

[61] *See id.* at 24-25; *see also In re Synchrony Bank*, No. 2014-CFPB-0007 (June 19, 2014), http://files.consumerfinance.gov/f/201406_cfpb_consent-order_synchrony-bank.pdf (citing violations of ECOA resulting from the exclusion of consumers from offers that would otherwise have been provided but for the Bank's language preference flag and/or the fact that the consumers had addresses in Puerto Rico or the U.S. territories); *In re American Express Centurion Bank,* No. 2013-CFPB-0011 (Dec. 24, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent_amex_centurion_011.pdf (citing the institution for, among other things, deceptive acts or practices in telemarketing of a credit card add-on product to Spanish-speaking customers in Puerto Rico because the institution did not adequately alert consumers enrolling via Spanish-language telemarketing calls about the steps necessary to receive and access the full product benefits).

[62] CFPB, ECOA Baseline Review Module 4, 13-14, 21-22 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (instructing examiners to evaluate institutions' fair lending risk related to servicing options for LEP consumers).

[63] *See* CFPB, SUPERVISORY HIGHLIGHTS: FALL 2016, 25 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf; *see also* CFPB, Unfair, Deceptive, or Abusive Acts or Practices Examination Procedures, Management and Policy-Related Examination Procedures, 13-16 (Oct. 2012), https://files.consumerfinance.gov/f/documents/102012_cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf (The Bureau's examiners use UDAAP Examination Procedures to assess the quality of the financial institution's CMS, including internal controls and policies and procedures, for avoiding unfair, deceptive, or abusive acts or practices.  The Management and Policy-Related Examination Procedures, specifically, describe UDAAP-related transaction testing of (1) marketing and disclosures, (2) availability of terms and services as advertised, and (3) availability of actual credit to the consumer.).

marketing and whether any particular populations are missing or excluded.[64] Furthermore, institutions should consider reviewing new products, as well as changes in the terms and conditions of existing products, for potential UDAAP concerns to determine whether their internal controls are adequate.

Financial institutions should also ensure that marketing, disclosures, and other materials are appropriately designed to ensure accurate understanding by LEP consumers.[65]  In 2013, the Bureau brought an enforcement action against a financial institution for illegal credit card practices, including deceptive marketing with respect to credit card "add-on products" (*i.e.*, payment protection and credit monitoring).[66]  While sales calls to enroll the vast majority of Puerto Rico consumers in this product were conducted in Spanish, the institution did not provide uniform Spanish-language scripts for these enrollment calls, and all written materials provided to consumers were in English.[67]

---

[64] *See In re Synchrony Bank, No. 2014-CFPB-0007* (June 19, 2014), http://files.consumerfinance.gov/f/201406_cfpb_consent-order_synchrony-bank.pdf (citing violations of ECOA resulting from the exclusion of consumers from offers that would otherwise have been provided but for the Bank's language preference flag and/or the fact that the consumers had addresses in Puerto Rico or the U.S. territories).

[65] *See In re American Express Centurion Bank,* No. 2013-CFPB-0011 (Dec. 24, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent_amex_centurion_011.pdf (citing the institution for, among other things, deceptive acts or practices in telemarketing of a credit card add-on product to Spanish-speaking customers in Puerto Rico because the institution did not adequately alert consumers enrolling via Spanish-language telemarketing calls about the steps necessary to receive and access the full product benefits); *see also Federal Trade Commission v. Mortgages para Hispanos.com*, (Case No. 4:06-cv-00019 (E.D.Tex. 2006) (bringing an action against a company targeting Hispanic homeowners for a home refinance which was negotiated in Spanish but presented English-language closing documents with different, less favorable terms).  Several Federal and State financial regulatory agencies have published translated forms, disclosures, and glossaries for use by financial institutions in ensuring the accuracy and consistency in translated terms.  *See, e.g.*, CFPB, Glossary of English-Spanish Financial Terms (Oct. 2018), https://files.consumerfinance.gov/f/documents/cfpb_adult-fin-ed_spanish-style-guide-glossary.pdf; CFPB, Glossary of English-Chinese Financial Terms (Feb. 2019), https://files.consumerfinance.gov/f/documents/cfpb_adult-fin-ed_chinese-style-guide-glossary.pdf; FHFA, Mortgage Translations Home, https://www.fhfa.gov/MortgageTranslations (includes FHFA's Mortgage Translations Clearinghouse, an easy-to-use collection of translated documents and tools to assist lenders, servicers, housing counselors, and others in helping LEP mortgage borrowers.

[66] *See In re American Express Centurion Bank,* No. 2013-CFPB-0011 (Dec. 24, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent_amex_centurion_011.pdf.

[67] *Id.*

21

### iii.    Fair lending testing

Common features of a well-developed CMS include regular statistical analysis of loan-level data for potential disparities on a prohibited basis (*e.g.*, national origin) in underwriting, pricing, or other aspects of the credit transaction, including in mortgage and non-mortgage products (*e.g.*, credit cards, auto lending, small business lending, and student lending).[68]

### iv.    Third-party vendor oversight

If a financial institution contracts with service providers to offer any products or services to LEP consumers on behalf of the financial institution, it should ensure that the products and services provided to LEP consumers do not violate applicable laws or pose fair lending or UDAAP risks to LEP consumers.[69]  Those financial institutions should implement a service provider oversight program that incorporates a review of fair lending, UDAAP, and other applicable laws.[70]  While third-parties may offer a host of essential products and services to LEP consumers, some of which are provided in languages other than English,[71] financial institutions'

---

[68] CFPB, Supervisory Highlights: Fall 2016, 24-25 (Oct. 2016), https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[69] *See, e.g.*, *In re American Express Centurion Bank,* No. 2013-CFPB-0011 (Dec. 24, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent_amex_centurion_011.pdf (referring to marketing practices that involved three of the institution's subsidiaries and their vendors and telemarketers, who engaged in misleading and deceptive tactics to sell some of the company's credit card add-on products.  Pursuant to the Consent Order, American Express was required to continue to strengthen its management of third-party vendors who provided the subject add-on products).

[70] *See* CFPB, Supervisory Highlights: Summer 2013 (Aug. 2013), https://files.consumerfinance.gov/f/201308_cfpb_supervisory-highlights_august.pdf (providing findings related to service provider oversight reviews); *see also* CFPB Bulletin 2012-03 (April 12, 2012) http://files.consumerfinance.gov/f/201204_cfpb_bulletin_service-providers.pdf (providing the Bureau's expectations of service provider relationships).

[71] For example, the Bureau is aware that some of the National Credit Reporting Agencies provide Interactive Voice Response (IVR) phone support in Spanish.

22

service provider oversight programs should consider focusing particular attention on third parties who participate in underwriting or pricing decisions.[72]

### 3. *Conclusion*

Recognizing the compliance risks and uncertainty that many financial institutions raise as challenges to better serving LEP consumers in non-English languages, the Bureau is issuing this Statement to outline compliance principles and guidelines that encourage financial institutions to expand access to products and services for LEP consumers.

Nothing in this Statement should be interpreted to relieve institutions from their obligation to comply with laws applicable to providing financial products and services to LEP consumers.  Nor does this Statement mandate any particular approach to serving LEP consumers.[73]

## II.  Signing Authority

The Director of the Bureau, Kathleen L. Kraninger, having reviewed and approved this document, is delegating the authority to electronically sign this document to Grace Feola, a Bureau Federal Register Liaison, for purposes of publication in the *Federal Register*.

Dated:  January 13, 2021.

_____

**Grace Feola**,

*Federal Register Liaison, Bureau of Consumer Financial Protection.*

---

[72] *See* CFPB, ECOA Baseline Review Module 2, 9 (Apr. 2019), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf (instructing examiners to evaluate institutions' compliance program policies and procedures related to its third-party monitoring and audit functions).

[73] This Statement does not impose any legal requirements on external parties, nor does it create or confer any substantive rights on external parties that could be enforceable in any administrative or civil proceeding.

Case 6:22-cv-00381-JCB Document 31-1 Filed 01/30/23 Page 965 of 1199 PageID #: 2783

 **Federal Deposit Insurance Corporation**

     

Home > News & Events > Financial Institution Letters

## Financial Institution Letters

**Board of Governors of the Federal Reserve System**
**Federal Deposit Insurance Corporation**

## Unfair or Deceptive Acts or Practices by State-Chartered Banks
### March 11, 2004

### Purpose

The Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation (the "Board" and the "FDIC," or collectively, the "Agencies") are issuing this statement to outline the standards that will be considered by the Agencies as they carry out their responsibility to enforce the prohibitions against unfair or deceptive trade practices found in section 5 of the Federal Trade Commission Act ("FTC Act") as they apply to acts and practices of state-chartered banks. The Agencies will apply these standards when weighing the need to take supervisory and enforcement actions and when seeking to ensure that unfair or deceptive practices do not recur.

This statement also contains a section on managing risks relating to unfair or deceptive acts or practices, which includes best practices as well as general guidance on measures that state-chartered banks can take to avoid engaging in such acts or practices.

Although the majority of insured banks adhere to a high level of professional conduct, banks must remain vigilant against possible unfair or deceptive acts or practices both to protect consumers and to minimize their own risks.

### Coordination of Enforcement Efforts

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce," and applies to all persons engaged in commerce, including banks. The Agencies each have affirmed their authority under section 8 of the Federal Deposit Insurance Act to take appropriate action when unfair or deceptive acts or practices are discovered.

A number of agencies have authority to combat unfair or deceptive acts or practices. For example, the FTC has broad authority to enforce the requirements of section 5 of the FTC Act against many non-bank entities. In addition, state authorities have primary responsibility for enforcing state statutes against unfair or deceptive acts or practices. The Agencies intend to work with these other regulators as appropriate in investigating and responding to allegations of unfair or deceptive acts or practices that involve state banks and other entities supervised by the Agencies.

### Standards for Determining What is Unfair or Deceptive

The FTC Act prohibits unfair or deceptive acts or practices. Congress drafted this provision broadly in order to provide sufficient flexibility in the law to address changes in the market and unfair or deceptive practices that may emerge.

An act or practice may be found to be unfair where it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." A representation, omission, or practice is deceptive if it is likely to mislead a consumer acting reasonably under the circumstances and is likely to affect a consumer's conduct or decision regarding a product or service.

The standards for unfairness and deception are independent of each other. While a specific act or practice may be both unfair and deceptive, an act or practice is prohibited by the FTC Act if it is either unfair or deceptive. Whether an act or practice is unfair or deceptive will in each instance depend upon a careful analysis of the facts and circumstances. In analyzing a particular act or practice, the Agencies will be guided by the body of law and official interpretations for defining unfair or deceptive acts or practices developed by the courts and the FTC. The Agencies will also consider factually similar cases brought by the FTC and other agencies to ensure that these standards are applied consistently.

## Unfair Acts or Practices

### *Assessing whether an act or practice is unfair*

An act or practice is unfair where it (1) causes or is likely to cause substantial injury to consumers, (2) cannot be reasonably avoided by consumers, and (3) is not outweighed by countervailing benefits to consumers or to competition. Public policy may also be considered in the analysis of whether a particular act or practice is unfair. Each of these elements is discussed further below.

- The act or practice must cause or be likely to cause substantial injury to consumers.

To be unfair, an act or practice must cause or be likely to cause substantial injury to consumers. Substantial injury usually involves monetary harm. An act or practice that causes a small amount of harm to a large number of people may be deemed to cause substantial injury. An injury may be substantial if it raises a significant risk of concrete harm. Trivial or merely speculative harms are typically insufficient for a finding of substantial injury. Emotional impact and other more subjective types of harm will not ordinarily make a practice unfair.

- Consumers must not reasonably be able to avoid the injury.

A practice is not considered unfair if consumers may reasonably avoid injury. Consumers cannot reasonably avoid injury from an act or practice if it interferes with their ability to effectively make decisions. Withholding material price information until after the consumer has committed to purchase the product or service would be an example of preventing a consumer from making an informed decision. A practice may also be unfair where consumers are subject to undue influence or are coerced into purchasing unwanted products or services.

The Agencies will not second-guess the wisdom of particular consumer decisions. Instead, the Agencies will consider whether a bank's behavior unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision-making.

- The injury must not be outweighed by countervailing benefits to consumers or to competition.

To be unfair, the act or practice must be injurious in its net effects —that is, the injury must not be outweighed by any offsetting consumer or competitive benefits that are also produced by the act or practice. Offsetting benefits may include lower prices or a wider availability of products and services.

Costs that would be incurred for remedies or measures to prevent the injury are also taken into account in determining whether an act or practice is unfair. These costs may include the costs to the bank in taking preventive measures and the costs to society as a whole of any increased burden and similar matters.

- Public policy may be considered.

Public policy, as established by statute, regulation, or judicial decisions may be considered with all other evidence in determining whether an act or practice is unfair. For example, the fact that a particular lending practice violates a state law or a banking regulation may be considered as evidence in determining whether the act or practice is unfair. Conversely, the fact that a particular practice is affirmatively allowed by statute may be considered as evidence that the practice is not unfair. Public policy considerations by themselves, however, will not serve as the primary basis for determining that an act or practice is unfair.

## Deceptive Acts and Practices

Case 6:22-cv-00381-JCB Document 31-1 Filed 01/30/23 Page 967 of 1199 PageID #: 2785

## *Assessing whether an act or practice is deceptive*

A three-part test is used to determine whether a representation, omission, or practice is "deceptive." First, the representation, omission, or practice must mislead or be likely to mislead the consumer. Second, the consumer's interpretation of the representation, omission, or practice must be reasonable under the circumstances. Lastly, the misleading representation, omission, or practice must be material. Each of these elements is discussed below in greater detail.

- There must be a representation, omission, or practice that misleads or is likely to mislead the consumer.

An act or practice may be found to be deceptive if there is a representation, omission, or practice that misleads or is likely to mislead the consumer. Deception is not limited to situations in which a consumer has already been misled. Instead, an act or practice may be found to be deceptive if it is likely to mislead consumers. A representation may be in the form of express or implied claims or promises and may be written or oral. Omission of information may be deceptive if disclosure of the omitted information is necessary to prevent a consumer from being misled.

In determining whether an individual statement, representation, or omission is misleading, the statement, representation, or omission will not be evaluated in isolation. The Agencies will evaluate it in the context of the entire advertisement, transaction, or course of dealing to determine whether it constitutes deception. Acts or practices that have the potential to be deceptive include: making misleading cost or price claims; using bait-and-switch techniques; offering to provide a product or service that is not in fact available; omitting material limitations or conditions from an offer; selling a product unfit for the purposes for which it is sold; and failing to provide promised services.

- The act or practice must be considered from the perspective of the reasonable consumer.

In determining whether an act or practice is misleading, the consumer's interpretation of or reaction to the representation, omission, or practice must be reasonable under the circumstances. The test is whether the consumer's expectations or interpretation are reasonable in light of the claims made. When representations or marketing practices are targeted to a specific audience, such as the elderly or the financially unsophisticated, the standard is based upon the effects of the act or practice on a reasonable member of that group.

If a representation conveys two or more meanings to reasonable consumers and one meaning is misleading, the representation may be deceptive. Moreover, a consumer's interpretation or reaction may indicate that an act or practice is deceptive under the circumstances, even if the consumer's interpretation is not shared by a majority of the consumers in the relevant class, so long as a significant minority of such consumers is misled.

In evaluating whether a representation, omission or practice is deceptive, the Agencies will look at the entire advertisement, transaction, or course of dealing to determine how a reasonable consumer would respond. Written disclosures may be insufficient to correct a misleading statement or representation, particularly where the consumer is directed away from qualifying limitations in the text or is counseled that reading the disclosures is unnecessary. Likewise, oral disclosures or fine print may be insufficient to cure a misleading headline or prominent written representation.

- The representation, omission, or practice must be material.

A representation, omission, or practice is material if it is likely to affect a consumer's decision regarding a product or service. In general, information about costs, benefits, or restrictions on the use or availability of a product or service is material. When express claims are made with respect to a financial product or service, the claims will be presumed to be material. Similarly, the materiality of an implied claim will be presumed when it is demonstrated that the institution intended that the consumer draw certain conclusions based upon the claim.

Claims made with the knowledge that they are false will also be presumed to be material. Omissions will be presumed to be material when the financial institution knew or should have known that the consumer needed the omitted information to evaluate the product or service.

## Relationship to Other Laws

Acts or practices that are unfair or deceptive within the meaning of section 5 of the FTC Act may also violate other federal or state statutes. On the other hand, there may be circumstances in which an act or practice violates section 5 of the FTC Act even though the institution is in technical compliance with other applicable laws, such as consumer protection and fair lending laws. Banks should be mindful of both possibilities. The following laws warrant particular attention in this regard:

## *Truth in Lending and Truth in Savings Acts*

11/15/22, 10:28 AM
Case 6:22-cv-00381-JCB   Document 31-1   Filed 01/30/23   Page 968 of 1199 PageID
FDIC: FIL-26-2004: Unfair or Deceptive Acts or Practices by State-Chartered Banks (March 11, 2004)
#: 2786

Pursuant to the Truth in Lending Act (TILA), creditors must "clearly and conspicuously" disclose the costs and terms of credit. The Truth in Savings Act (TISA) requires depository institutions to provide interest and fee disclosures for deposit accounts so that consumers may compare deposit products. TISA also provides that advertisements shall not be misleading or inaccurate, and cannot misrepresent an institution's deposit contract. An act or practice that does not comply with these provisions of TILA or TISA may also violate the FTC Act. On the other hand, a transaction that is in technical compliance with TILA or TISA may nevertheless violate the FTC Act. For example, consumers could be misled by advertisements of "guaranteed" or "lifetime" interest rates when the creditor or depository institution intends to change the rates, whether or not the disclosures satisfy the technical requirements of TILA or TISA.

## Equal Credit Opportunity and Fair Housing Acts

The Equal Credit Opportunity Act (ECOA) prohibits discrimination in any aspect of a credit transaction against persons on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to contract), the fact that an applicant's income derives from any public assistance program, and the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. Similarly, the Fair Housing Act (FHA) prohibits creditors involved in residential real estate transactions from discriminating against any person on the basis of race, color, religion, sex, handicap, familial status, or national origin. Unfair or deceptive practices that target or have a disparate impact on consumers who are members of these protected classes may violate the ECOA or the FHA, as well as the FTC Act.

## Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act prohibits unfair, deceptive, and abusive practices related to the collection of consumer debts. Although this statute does not by its terms apply to banks that collect their own debts, failure to adhere to the standards set by this Act may support a claim of unfair or deceptive practices in violation of the FTC Act. Moreover, banks that either affirmatively or through lack of oversight, permit a third-party debt collector acting on their behalf to engage in deception, harassment, or threats in the collection of monies due may be exposed to liability for approving or assisting in an unfair or deceptive act or practice.

## Managing Risks Related to Unfair or Deceptive Acts or Practices

Since the release of the FDIC's statement and the Board's letter on unfair and deceptive practices in May 2002, bankers have asked for guidance on strategies for managing risk in this area. This section outlines guidance on best practices to address some areas with the greatest potential for unfair or deceptive acts and practices, including: advertising and solicitation; servicing and collections; and the management and monitoring of employees and third-party service providers. Banks also should monitor compliance with their own policies in these areas, and should have procedures for receiving and addressing consumer complaints and monitoring activities performed by third parties on behalf of the bank.

To avoid engaging in unfair or deceptive activity, the Agencies encourage use of the following practices, which have already been adopted by many institutions:

Review all promotional materials, marketing scripts, and customer agreements and disclosures to ensure that they fairly and adequately describe the terms, benefits, and material limitations of the product or service being offered, including any related or optional products or services, and that they do not misrepresent such terms either affirmatively or by omission. Ensure that these materials do not use fine print, separate statements or inconspicuous disclosures to correct potentially misleading headlines, and ensure that there is a reasonable factual basis for all representations made.

Draw the attention of customers to key terms, including limitations and conditions, that are important in enabling the customer to make an informed decision regarding whether the product or service meets the customer's needs.

Clearly disclose all material limitations or conditions on the terms or availability of products or services, such as a limitation that applies a special interest rate only to balance transfers; the expiration date for terms that apply only during an introductory period; material prerequisites for obtaining particular products, services or terms (e.g., minimum transaction amounts, introductory or other fees, or other qualifications); or conditions for canceling a service without charge when the service is offered on a free trial basis.

Inform consumers in a clear and timely manner about any fees, penalties, or other charges (including charges for any force-placed products) that have been imposed, and the reasons for their imposition.

Clearly inform customers of contract provisions that permit a change in the terms and conditions of an agreement.

When using terms such as "pre-approved" or "guaranteed," clearly disclose any limitations, conditions, or restrictions on the offer.

11/15/22, 10:28 AM
Case 6:22-cv-00381-JCB Document 31-1 Filed 01/30/23 Page 969 of 1199 Page ID #: 2787
FDIC: FIL-26-2004: Informal and Deceptive Acts or Practices by State-Chartered Banks March 11, 2004

Clearly inform consumers when the account terms approved by the bank for the consumer are less favorable than the advertised terms or terms previously disclosed.

Tailor advertisements, promotional materials, disclosures and scripts to take account of the sophistication and experience of the target audience. Do not make claims, representations or statements that mislead members of the target audience about the cost, value, availability, cost savings, benefits, or terms of the product or service.

Avoid advertising that a particular service will be provided in connection with an account if the bank does not intend or is not able to provide the service to accountholders. Clearly disclose when optional products and services — such as insurance, travel services, credit protection, and consumer report update services that are offered simultaneously with credit — are not required to obtain credit or considered in decisions to grant credit.

Ensure that costs and benefits of optional or related products and services are not misrepresented or presented in an incomplete manner.

When making claims about amounts of credit available to consumers, accurately and completely represent the amount of potential, approved, or useable credit that the consumer will receive.

Avoid advertising terms that are not available to most customers and using unrepresentative examples in advertising, marketing, and promotional materials.

Avoid making representations to consumers that they may pay less than the minimum amount due required by the account terms without adequately disclosing any late fees, overlimit fees, or other account fees that will result from the consumer paying such reduced amount.

Clearly disclose a telephone number or mailing address (and, as an addition, an email or website address if available) that consumers may use to contact the bank or its third-party servicers regarding any complaints they may have, and maintain appropriate procedures for resolving complaints. Consumer complaints should also be reviewed by banks to identify practices that have the potential to be misleading to customers.

Implement and maintain effective risk and supervisory controls to select and manage third-party servicers.

Ensure that employees and third parties who market or promote bank products, or service loans, are adequately trained to avoid making statements or taking actions that might be unfair or deceptive.

Review compensation arrangements for bank employees as well as third-party vendors and servicers to ensure that they do not create unintended incentives to engage in unfair or deceptive practices.

Ensure that the institution and its third party servicers have and follow procedures to credit consumer payments in a timely manner. Consumers should be clearly told when and if monthly payments are applied to fees, penalties, or other charges before being applied to regular principal and interest.

The need for clear and accurate disclosures that are sensitive to the sophistication of the target audience is heightened for products and services that have been associated with abusive practices. Accordingly, banks should take particular care in marketing credit and other products and services to the elderly, the financially vulnerable, and customers who are not financially sophisticated. In addition, creditors should pay particular attention to ensure that disclosures are clear and accurate with respect to: the points and other charges that will be financed as part of home-secured loans; the terms and conditions related to insurance offered in connection with loans; loans covered by the Home Ownership and Equity Protection Act; reverse mortgages; credit cards designed to rehabilitate the credit position of the cardholder; and loans with pre-payment penalties, temporary introductory terms, or terms that are not available as advertised to all consumers.

## Conclusion

The development and implementation of policies and procedures in these areas and the other steps outlined above will help banks assure that products and services are provided in a manner that is fair, allows informed customer choice, and is consistent with the FTC Act.

Last Updated 10/31/2011

communications@fdic.gov

Home    Contact Us    Search    Help    SiteMap    Forms    Transparency & Accountability    En Español

Website Policies    Accessibility Statement    Privacy Policy    Plain Writing Act of 2010    USA.gov    FDIC Office of Inspector General

Case 6:22-cv-00381-JCB Document 31-1 Filed 01/30/23 Page 970 of 1199 PageID #: 2788

JA0970



Policy » Policy Statements » FTC Policy Statement on Unfairness

# FTC Policy Statement on Unfairness

**TAGS:**  Alcohol  |  Appliances  |  Automobiles  |  Clothing and Textiles  |  Finance  |

Franchises, Business Opportunities, and Investments  |  Funerals  |  Jewelry  |  Real Estate and Mortgages  |

Advertising and Marketing  |  Advertising and Marketing Basics  |  Children  |  Endorsements  |  Environmental Marketing  |

Health Claims  |  Online Advertising and Marketing  |  Telemarketing

**DATE:** December 17, 1980

Appended to International Harvester Co., 104 F.T.C. 949, 1070 (1984). See 15 U.S.C. § 45(n).

The Honorable Wendell H. Ford
Chairman, Consumer Subcommittee
Committee on Commerce, Science, and Transportation
Room 130 Russell Office Building
Washington, D.C. 20510

The Honorable John C. Danforth
Ranking Minority Member, Consumer Subcommittee
Committee on Commerce, Science, and Transportation
Room 130 Russell Office Building
Washington, D.C. 20510

Dear Senators Ford and Danforth:

This is in response to your letter of June 13, 1980, concerning one aspect of this agency's jurisdiction over "unfair or deceptive acts or practices." You informed us that the Subcommittee was planning to hold oversight hearings on the concept of "unfairness" as it has been applied to consumer transactions. You further informed us that the views of other interested parties were solicited and compiled

in a Committee Print earlier this year.[1] Your letter specifically requested the Commission's views on cases under Section 5 "not involving the content of advertising," and its views as to "whether the Commission's authority should be limited to regulating false or deceptive commercial advertising." Our response addresses these and other questions related to the concept of consumer unfairness.

We are pleased to have this opportunity to discuss the future work of the agency. The subject that you have selected appears to be particularly timely. We recognize that the concept of consumer unfairness is one whose precise meaning is not immediately obvious, and also recognize that this uncertainty has been honestly troublesome for some businesses and some members of the legal profession. This result is understandable in light of the general nature of the statutory standard. At the same time, though, we believe we can respond to legitimate concerns of business and the Bar by attempting to delineate in this letter a concrete framework for future application of the Commission's unfairness authority. We are aided in this process by the cumulative decisions of this agency and the federal courts, which, in our opinion, have brought added clarity to the law. Although the administrative and judicial evolution of the consumer unfairness concept has still left some necessary flexibility in the statute, it is possible to provide a reasonable working sense of the conduct that is covered.

In response to your inquiry we have therefore undertaken a review of the decided cases and rules and have synthesized from them the most important principles of general applicability. Rather than merely reciting the law, we have attempted to provide the Committee with a concrete indication of the manner in which the Commission has enforced, and will continue to enforce, its unfairness mandate. In so doing we intend to address the concerns that have been raised about the meaning of consumer unfairness, and thereby attempt to provide a greater sense of certainty about what the Commission would regard as an unfair act or practice under Section 5.

This letter thus delineates the Commission's views of the boundaries of its consumer unfairness jurisdiction and is subscribed to by each Commissioner. In addition, we are enclosing a companion Commission statement that discusses the ways in which this body of law differs from, and supplements, the prohibition against consumer deception, and then considers and evaluates some specific criticisms that have been made of our enforcement of the law.[2] Since you have indicated a particular interest in the possible application of First Amendment principles to commercial advertising, the companion statement will include discussions relevant to that question. The companion statement is designed to respond to the key questions raised about the unfairness doctrine. However, individual Commissioners may not necessarily endorse particular arguments or particular examples of the Commission's exercise of its unfairness authority contained in the companion statement.

<div style="text-align:center">

Commission Statement of Policy on the Scope of the
Consumer Unfairness Jurisdiction

</div>

Section 5 of the FTC Act prohibits, in part, "unfair ... acts or practices in or affecting commerce."[3] This is commonly referred to as the Commission's consumer unfairness jurisdiction. The Commission's jurisdiction over "unfair methods of competition" is not discussed in this letter.[4] Although we cannot give an exhaustive treatment of the law of consumer unfairness in this short statement, some relatively concrete conclusions ran nonetheless be drawn.

The present understanding of the unfairness standard is the result of an evolutionary process. The statute was deliberately framed in general terms since Congress recognized the impossibility of drafting a complete list of unfair trade practices that would not quickly become outdated or leave loopholes for easy evasion.[5] The task of identifying unfair trade practices was therefore assigned to the Commission, subject to judicial review,[6] in the expectation that the underlying criteria would evolve and develop over time. As the Supreme Court observed as early as 1931, the ban on unfairness "belongs to that class of phrases which do not admit of precise definition, but the meaning and application of which must be arrived at by what this court elsewhere has called 'the gradual process of judicial inclusion and exclusion.'"[7]

By 1964 enough cases had been decided to enable the Commission to identify three factors that it considered when applying the prohibition against consumer unfairness. These were: (1) whether the practice injures consumers; (2) whether it violates established public policy; (3) whether it is unethical or unscrupulous.[8] These factors were later quoted with apparent approval by the Supreme Court in the 1972 case of *Sperry & Hutchinson*.[9] Since then the Commission has continued to refine the standard of unfairness in its cases and rules, and it has now reached a more detailed sense of both the definition and the limits of these criteria.[10]

## CONSUMER INJURY

Unjustified consumer injury is the primary focus of the FTC Act, and the most important of the three *S&H* criteria. By itself it can be sufficient to warrant a finding of unfairness. The Commission's ability to rely on an independent criterion of consumer injury is consistent with the intent of the statute, which was to "[make] the consumer who may be injured by an unfair trade practice of equal concern before the law with the merchant injured by the unfair methods of a dishonest competitor."[11]

The independent nature of the consumer injury criterion does not mean that every consumer injury is legally "unfair," however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.

First of all, the injury must be substantial. The Commission is not concerned with trivial or merely speculative harms.[12] In most cases a substantial injury involves monetary harm, as when sellers coerce consumers into purchasing unwanted goods or services[13] or when consumers buy defective goods or services on credit but are unable to assert against the creditor claims or defenses arising from the transaction. [14] Unwarranted health and safety risks may also support a finding of unfairness.[15] Emotional impact and other more subjective types of harm, on the other hand, will not ordinarily make a practice unfair. Thus, for example, the Commission will not seek to ban an advertisement merely because it offends the tastes or social beliefs of some viewers, as has been suggested in some of the comments.[16]

Second, the injury must not be outweighed by any offsetting consumer or competitive benefits that the sales practice also produces. Most business practices entail a mixture of economic and other costs and benefits for purchasers. A seller's failure to present complex technical data on his product may lessen a consumer's ability to choose, for example, but may also reduce the initial price he must pay for the article. The Commission is aware of these tradeoffs and will not find that a practice unfairly injures consumers unless it is injurious in its net effects.[17] The Commission also takes account of the various costs that a remedy would entail. These include not only the costs to the parties directly before the agency, but also the burdens on society in general in the form of increased paperwork, increased regulatory burdens on the flow of information, reduced incentives to innovation and capital formation, and similar matters.[18] Finally, the injury must be one which consumers could not reasonably have avoided.[19] Normally we expect the marketplace to be self-correcting, and we rely on consumer choice-the ability of individual consumers to make their own private purchasing decisions without regulatory intervention--to govern the market. We anticipate that consumers will survey the available alternatives, choose those that are most desirable, and avoid those that are inadequate or unsatisfactory. However, it has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions, and that corrective action may then become necessary. Most of the Commission's unfairness matters are brought under these circumstances. They are brought, not to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking.[20]

Sellers may adopt a number of practices that unjustifiably hinder such free market decisions. Some may withhold or fail to generate critical price or performance data, for example, leaving buyers with insufficient information for informed comparisons.[21] Some may engage in overt coercion, as by dismantling a home appliance for "inspection" and refusing to reassemble it until a service contract is signed.[22] And some may exercise undue influence over highly susceptible classes of purchasers, as by promoting fraudulent "cures" to seriously ill cancer patients.[23] Each of these practices undermines an essential precondition to a free and informed consumer transaction, and, in turn, to a well-functioning market. Each of them is therefore properly banned as an unfair practice under the FTC Act.[24]

## VIOLATION OF PUBLIC POLICY

The second *S&H* standard asks whether the conduct violates public policy as it has been established by statute, common law, industry practice, or otherwise. This criterion may be applied in two different ways. It may be used to test the validity and strength of the evidence of consumer injury, or, less often, it may be cited for a dispositive legislative or judicial determination that such injury is present.

Although public policy was listed by the *S&H* Court as a separate consideration, it is used most frequently by the Commission as a means of providing additional evidence on the degree of consumer injury caused by specific practices. To be sure, most Commission actions are brought to redress relatively clear-cut injuries, and those determinations are based, in large part, on objective economic analysis. As we have indicated before, the Commission believes that considerable attention should be devoted to the analysis of

whether substantial net harm has occurred, not only because that is part of the unfairness test, but also because the focus on injury is the best way to ensure that the Commission acts responsibly and uses its resources wisely. Nonetheless, the Commission wishes to emphasize the importance of examining outside statutory policies and established judicial principles for assistance in helping the agency ascertain whether a particular form of conduct does in fact tend to harm consumers. Thus the agency has referred to First Amendment decisions upholding consumers' rights to receive information, for example, to confirm that restrictions on advertising tend unfairly to hinder the informed exercise of consumer choice.[25]

Conversely, statutes or other sources of public policy may affirmatively allow for a practice that the Commission tentatively views as unfair. The existence of such policies will then give the agency reason to reconsider its assessment of whether the practice is actually injurious in its net effects.[26] In other situations there may be no clearly established public policies, or the policies may even be in conflict. While that does not necessarily preclude the Commission from taking action if there is strong evidence of net consumer injury, it does underscore the desirability of carefully examining public policies in all instances.[27] In any event, whenever objective evidence of consumer injury is difficult to obtain, the need to identify and assess all relevant public policies assumes increased importance.

Sometimes public policy will independently support a Commission action. This occurs when the policy is so clear that it will entirely determine the question of consumer injury, so there is little need for separate analysis by the Commission. In these cases the legislature or court, in announcing the policy, has already determined that such injury does exist and thus it need not be expressly proved in each instance. An example of this approach arose in a case involving a mail-order firm.[28] There the Commission was persuaded by an analogy to the due-process clause that it was unfair for the firm to bring collection suits in a forum that was unreasonably difficult for the defendants to reach. In a similar case the Commission applied the statutory policies of the Uniform Commercial Code to require that various automobile manufacturers and their distributors refund to their customers any surplus money that was realized after they repossessed and resold their customer's cars.[29] The Commission acts on such a basis only where the public policy is suitable for administrative enforcement by this agency, however. Thus it turned down a petition for a rule to require fuller disclosure of aerosol propellants, reasoning that the subject of fluorocarbon safety was currently under study by other scientific and legislative bodies with more appropriate expertise or jurisdiction over the subject.[30]

To the extent that the Commission relies heavily on public policy to support a finding of unfairness, the policy should be clear and well-established. In other words, the policy should be declared or embodied in formal sources such as statutes, judicial decisions, or the Constitution as interpreted by the courts, rather than being ascertained from the general sense of the national values. The policy should likewise be one that is widely shared, and not the isolated decision of a single state or a single court. If these two tests are not met the policy cannot be considered as an "established" public policy for purposes of the S&H criterion. The Commission would then act only on the basis of convincing independent evidence that the practice was distorting the operation of the market and thereby causing unjustified consumer injury.

## UNETHICAL OR UNSCRUPULOUS CONDUCT

Finally, the third *S&H* standard asks whether the conduct was immoral, unethical, oppressive, or unscrupulous. This test was presumably included in order to be sure of reaching all the purposes of the underlying statute, which forbids "unfair" acts or practices. It would therefore allow the Commission to reach conduct that violates generally recognized standards of business ethics. The test has proven, however, to be largely duplicative. Conduct that is truly unethical or unscrupulous will almost always injure consumers or violate public policy as well. The Commission has therefore never relied on the third element of *S&H* as an independent basis for a finding of unfairness, and it will act in the future only on the basis of the first two.

We hope this letter has given you the information that you require. Please do not hesitate to call if we can be of any further assistance. With best regards,

/s/Michael Pertschuk Chairman

/s/Paul Rand Dixon Commissioner

/s/David A. Clanton Commissioner

/s/Robert Pitofsky Commissioner

/s/Patricia P. Bailey Commissioner

---------

[1]Unfairness: Views on Unfair Acts and Practices in Violation of the Federal Trade Commission Act (1980) (hereinafter referred to as "Committee Print").

[2]Neither this letter nor the companion statement addresses ongoing proceedings, but the Commission is prepared to discuss those matters separately at an appropriate time.

[3]The operative sentence of Section 5 reads in full as follows: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." 15 U.S.C. 45(a)(1).

[4]In fulfilling its competition or antitrust mission the Commission looks to the purposes, policies, and spirit of the other antitrust laws and the FTC Act to determine whether a practice affecting competition or competitors is unfair. *See, e.g., FTC v. Brown Shoe Co.,* 384 U.S. 316 (1966). In making this determination the Commission is guided by the extensive legislative histories of those statutes and a considerable body of antitrust case law. The agency's jurisdiction over "deceptive acts or practices" is likewise not discussed in this letter.

[5]*See* H.R. Conf. Rep. No. 1142, 63d Cong., 2d Sess., at 19 (1914) (If Congress "were to adopt the method of definition, it would undertake an endless task"). In 1914 the statute was phrased only in terms of "unfair methods of competition," and the reference to "unfair acts or practices" was not added until the Wheeler-Lee Amendment in 1938. The initial language was still understood as reaching most of the conduct now characterized as consumer unfairness, however, and so the original legislative history remains relevant to the construction of that part of the statute.

[6]The Supreme Court has stated on many occasions that the definition of "unfairness" is ultimately one for judicial determination. *See, e.g., FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 249 (1972); *FTC v. R..F. Keppel & Bro.,* 291 U.S. 304, 314 (1934).

[7]*FTC v. Raladam Co.,* 283 U.S. 643, 648 (1931). *See also FTC v. R.F. Keppel & Bro.,* 291 U.S. 304, 310 (1934) ("Neither the language nor the history of the Act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories").

[8]The Commission's actual statement of the criteria was as follows:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common- law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Statement of Basis and Purpose, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (1964).

[9]*FTC v. Sperry & Hutchinson C..,* 405 U.S. 223, 244-45 n.5 (1972). The Circuit Courts have concluded that this quotation reflected the Supreme Court's own views. *See Spiegel, Inc. v. FTC,* 540 F.2d 287, 293 n.8 (7th Cir. 1976); *Heater v. FTC,* 503 F.2d 321, 323 (9th Cir. 1974). The application of these factors to antitrust matters is beyond the scope of this letter.

[10]These standards for unfairness are generally applicable to both advertising and non-advertising cases.

[11]83 Cong. Rec. 3255 (1938) (remarks of Senator Wheeler).

[12]An injury may be sufficiently substantial, however, if it does a small harm to a large number of people, or if it raises a significant risk of concrete harm.

[13]*See, e.g., Holland Furnace Co. v. FTC,* 295 F.2d 302 (7th Cir. 1961) (seller's servicemen dismantled home furnaces and then refused to reassemble them until the consumers had agreed to buy services or replacement parts).

[14] Statement of Basis and Purpose, Preservation of Consumers' Claims and Defenses, 40 Fed. Reg. 53,506, 53522-23 (1975).

[15] For an example *see Philip Morris, Inc.,* 82 F.T.C. 16 (1973) (respondent had distributed free-sample razor blades in such a way that they could come into the hands of small children) (consent agreement). Of course, if matters involving health and safety are within the primary jurisdiction of some other agency, Commission action might not be appropriate.

[16] *See, e.g.,* comments of Association of National Advertisers, Committee Print at 120. In an extreme case, however, where tangible injury could be clearly demonstrated, emotional effects might possibly be considered as the basis for a finding of unfairness. *Cf.* 15 U.S.C. 1692 *et seq.* (Fair Debt Collection Practices Act) (banning, eg., harassing late-night telephone calls).

[17] *See Pftzer, Inc.,* 81 F.T.C. 23, 62-63 n. 13 (1972); Statement of Basis and Purpose, Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 Fed. Reg. 59614, 59636 n.95 (1978).

When making this determination the Commission may refer to existing public policies for help in ascertaining the existence of consumer injury and the relative weights that should be assigned to various costs and benefits. The role of public policy in unfairness determinations will be discussed more generally below.

[18] For example, when the Commission promulgated the Holder Rule it anticipated an overall lowering of economic costs to society because the rule gave creditors the incentive to police sellers, thus increasing the likelihood that those selling defective goods or services would either improve their practices or leave the marketplace when they could not obtain financing. These benefits, in the Commission's judgment, outweighed any costs to creditors and sellers occasioned by the rule. See Statement of Basis and Purpose, Preservation of Consumers' Claims and Defenses, 40 Fed. Reg. 53506, 53522-23 (1975).

[19] In some senses any injury can be avoided--for example, by hiring independent experts to test all products in advance, or by private legal actions for damages-but these courses may be too expensive to be practicable for individual consumers to pursue.

[20] This emphasis on informed consumer choice has commonly been adopted in other statutes as well. *See, e.g.,* Declaration of Policy, Fair Packaging and Labeling Act, 15 U.S.C. 1451 ("Informed consumers are essential to the fair and efficient functioning of a free market economy".)

[21] *See, e.g.,* Statement of Basis and Purpose, Labeling and Advertising of Home Insulation, 44 Fed. Reg. 50218, 50222-23 (1979); Statement of Basis and Purpose, Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23871,23882 (1971). *See also Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* Inc., 425 U.S. 748 (1976).

[22] *See Holland Furnace Co. v. ETC,* 295 F.2d 302 (7th Cir. 1961); *cf Arthur Murray Studio, Inc. v.* EW, 458 F.2d 622 (5th Cir. 1972) (emotional high-pressure sales tactics, using teams of salesmen who refused to let the customer leave the room until a contract was signed). *See also* Statement of Basis and Purpose, Cooling-Off Period for Door-to-Door Sales, 37 Fed. Reg. 22934, 22937-38 (1972).

[23] *See, e.g., Travel King,* Inc., 86 F.T.C. 715, 774 (1975). The practices in this rase primarily involved deception, but the Commission noted the special susceptibilities of such patients as one reason for banning the ads entirely rather than relying on the remedy of fuller disclosure. The Commission recognizes that "undue influence" in advertising and promotion is difficult to define, and therefore exercises its authority here only with respect to substantial coercive-like practices and significant consumer injury.

[24] These few examples are not exhaustive, but the general direction they illustrate is clear. As the Commission stated in promulgating its Eyeglasses Rule, the inquiry should begin, at least, by asking "whether the acts or practices at issue inhibit the functioning of the competitive market and whether consumers are harmed thereby." Statement of Basis and Purpose, Advertising of 0phthalmic Goods and Services, 43 Fed. Reg. 23992,24001 (1978).

[25] *See* Statement of Basis and Purpose, Advertising of ophthalmic Goods and Services, 43 Fed. Reg. 23992,24001 (1978), *citing Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748 (1976).

[26] *Cf.* Statement of Basis and Purpose, Advertising of ophthalmic Goods and Services, *supra; see also n.17 supra.*

[27] The analysis of external public policies is extremely valuable but not always definitive. The legislative history of Section 5 recognizes

that new forms of unfair business practices may arise which, at the time of the Commission's involvement, have not yet been generally proscribed. See page 4, *supra.* Thus a review of public policies established independently of Commission action may not be conclusive in determining whether the challenged practices should be prohibited or otherwise restricted. At the same time, however, we emphasize the importance of examining public policies, since a thorough analysis can serve as an important check on the overall reasonableness of the Commission's actions.

[28] *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976). In this case the Commission did inquire into the extent of the resulting consumer injury, but under the rationale involved it presumably need not have done so. *See also FTC v. R.F. Keppel & Bro.,* 291 U.S. 304 (1934) (firm had gained a marketing advantage by selling goods through a lottery technique that violated state gambling policies); *cf. Simeon Management Corp.,* 87 F.T.C. 1184, 1231 (1976), *aff'd,* 579 F.2d 1137 (9th Cir. 1978) (firm advertised weight-loss program that used a drug which could not itself be advertised under FDA regulations) (alternative ground). Since these public-policy cases are based on legislative determinations, rather than on a judgment within the Commission's area of special economic expertise, it is appropriate that they can reach a relatively wider range of consumer injuries than just those associated with impaired consumer choice.

[29] A surplus occurs when a repossessed car is resold for more than the amount owed by the debtor plus the expenses of repossession and resale. The law of 49 states requires that creditors refund surpluses when they occur, but if creditors systematically refuse to honor this obligation, consumers have no practical way to discover that they have been deprived of money to which they are entitled. *See Ford Motor Co.,* 94 F.T.C. 564, 618 (1979) *appeal pending,* Nos. 79-7649 and 79-7654 (9th Cir.); *Ford Motor Co.,93* F.T.C. 402 (1979) (consent decree); *General Motors Corp.,* D. 9074 (Feb., 1980) (consent decree). By these latter two consent agreements the Commission, because of its unfairness jurisdiction, has been able to secure more than $2 million for consumers allegedly deprived of surpluses to which they were entitled.

[30] See Letter from John F. Dugan, Acting Secretary, to Action on Smoking and Health (January 13, 1977). *See* also letter from Charles A. Tobin, Secretary, to Prof. Page and Mr. Young (September 17,1973) (denying petition to exercise § 6(b) subpoena powers to obtain consumer complaint information from cosmetic fu-ms and then to transmit the data to FDA for that agency's enforcement purposes).

## Media Resources

Our Media Resources library provides one-stop collections of materials on numerous issues in which the FTC has been actively engaged. These pages are especially useful for members of the media.

**ABOUT THE FTC**

What We Do

Our History

Commissioners

Bureaus & Offices

Biographies

Budgets

Performance

Office of Inspector General

FOIA

Careers at the FTC

**NEWS & EVENTS**

Press Releases

Commission Actions

Media Resources

Events Calendar

Speeches

Audio/Video

Social Media

Blogs

Contests

**ENFORCEMENT**

Cases and Proceedings

Premerger Notification Program

Merger Review

Anticompetitive Practices

Rules

Statutes

Consumer Sentinel Network

Criminal Liaison Unit

**POLICY**

Advocacy

Advisory Opinions

Cooperation Agreements

Federal Register Notices

Reports

Studies

Testimony

Public Comments

Policy Statements

International

**TIPS & ADVICE**

For Consumers

Business Center

Competition Guidance

**I WOULD LIKE TO...**

Submit a Consumer Complaint to the FTC

Apply for a Refund in an FTC Case

Report Identity Theft

List a Number on the National Do Not Call Registry

Get a Free Copy of My Credit Report

File a Comment

Report An Antitrust Violation

File Documents in Adjudicative Proceedings

**SITE INFORMATION**

Privacy Policy

Website Policy

No FEAR Act

USA.gov

Accessibility

Digital Government Strategy

Open Government

**FEDERAL TRADE COMMISSION**

Headquarters:
600 Pennsylvania Avenue, NW
Washington, DC 20580
Contact Us

    

Stay Connected with the FTC

As of November 20, 2018, this guidance applies to federal savings associations in addition to national banks.*



**Comptroller of the Currency**
Administrator of National Banks

# Fair Lending

## Comptroller's Handbook

### January 2010

*References in this guidance to national banks or banks generally should be read to include federal savings associations (FSA). If statutes, regulations, or other OCC guidance is referenced herein, please consult those sources to determine applicability to FSAs. If you have questions about how to apply this guidance, please contact your OCC supervisory office.



Consumer Compliance Examination

# Fair Lending                    Table of Contents

**Introduction**                                                                    **1**

    GENERAL GUIDELINES                                                          1
    OVERVIEW OF FAIR LENDING LAWS AND REGULATIONS                               3
    TYPES OF LENDING DISCRIMINATION                                             6
        *Disparate Treatment*                                              6
        *Disparate Impact*                                                 *8*
    REFERRAL TO THE DOJ OR HUD                                                  9

**Examination Procedures for Setting the Examination Scope**         **10**

    BACKGROUND                                                                  10
    OBJECTIVE: GAIN AN UNDERSTANDING OF CREDIT OPERATIONS                        14
    OBJECTIVE: CONSIDER THE EFFECT OF LOW-VOLUME OR HIGH-VOLUME FOCAL
        POINTS                                                             17
    OBJECTIVE: EVALUATE THE POTENTIAL FOR DISCRIMINATORY CONDUCT                 20
    OBJECTIVE: DETERMINE THE RELIABILITY OF THE BANK'S COMPLIANCE
        MANAGEMENT PROCESS AND USE THE FINDINGS TO ADJUST THE EXAMINATION
        SCOPE.                                                             35
    OBJECTIVE: COMPLETE THE EXAMINATION SCOPING PROCESS                         36

**Examination Procedures for Assessing Fair Lending Performance**    **37**

    OBJECTIVE: VERIFY ACCURACY OF DATA                                          37
    OBJECTIVE: DOCUMENT REGULATION B COMPLIANCE CHECKLISTS                       37
    OBJECTIVE: CONDUCT AN UNDERWRITER INTERVIEW                                  38
    OBJECTIVE: DOCUMENT OVERT EVIDENCE OF DISPARATE TREATMENT                    39
    OBJECTIVE: CONDUCT TRANSACTIONAL UNDERWRITING ANALYSIS –
        RESIDENTIAL AND CONSUMER LOANS                                     40
    OBJECTIVE: ANALYZE POTENTIAL DISPARITIES IN PRICING AND OTHER TERMS AND
        CONDITIONS                                                         46
    OBJECTIVE: EVALUATE POTENTIAL FOR DISCRIMINATORY STEERING                    48
    OBJECTIVE: CONDUCT TRANSACTIONAL UNDERWRITING ANALYSIS —
        COMMERCIAL LOANS                                                   53
    OBJECTIVE: DETERMINE POTENTIAL FOR DISCRIMINATORY "REDLINING"                56
    OBJECTIVE: DETERMINE POTENTIAL FOR DISCRIMINATORY MARKETING PRACTICES        67
    OBJECTIVE: CONSIDER THE EFFECT OF CREDIT SCORING                             69
    OBJECTIVE: CONSIDER DISPARATE IMPACT ISSUES                                  69

**Concluding the Examination**                                       **70**

**Appendixes**

**Appendix A: Compliance Management Analysis Checklist**                    **73**
**Appendix B: Considering Automated Underwriting and Credit Scoring Risk Factors**                                                          **81**
**Appendix C: Evaluating Bank Responses to Evidence of Disparate Treatment**   **90**
**Appendix D: Fair Lending Sample Size Tables**                             **100**
**Appendix E: Identifying Marginal Transactions**                           **103**
**Appendix F: Potential Scoping Information**                               **105**
**Appendix G: Other Types of Discrimination Analyses**                      **110**
**Appendix H: Using Self-Tests and Self-Evaluations to Streamline the Examination**                                                       **116**
**Appendix I: Sample Fair Lending Section of Request Letter**               **121**
**Appendix J: Underwriter Interview Guide**                                 **123**
**Appendix K: Other Illegal Limitations on Credit Checklist**              **135**
**Appendix L: Technical Compliance Checklist**                              **139**
**Appendix M: Alternative Fair Lending Analyses**                           **148**
**Appendix N: Policy Statement on Enforcement of the Equal Credit Opportunity and Fair Housing Acts**                                     **153**
**Appendix O: Policy Statement on Discrimination in Lending (April 15, 1994)**   **155**

**References**                                                              **178**

# Introduction

Examiners use these procedures to evaluate a national bank's compliance with the Fair Housing Act (FH Act), Equal Credit Opportunity Act (ECOA), and the Federal Reserve Board's Regulation B. This booklet contains the Federal Financial Institutions Examination Council's (FFIEC) "Interagency Fair Lending Examination Procedures," and appropriate OCC supplemental material.

## General Guidelines

These procedures are intended to provide a flexible framework to be used in fair lending examinations conducted by the FFIEC agencies. They are also intended to guide examiner judgment, not to supplant it. The procedures may be augmented by each agency as necessary to ensure effective implementation. For example, the OCC uses statistical modeling and regression analysis in selected examinations to assist in determining whether race, national origin, or sex was a factor in credit decisions.

The OCC uses a risk-based approach to identify national banks and mortgage subsidiaries[1] for comprehensive fair lending examinations. During each supervisory cycle, examiners perform a fair lending risk assessment in each national bank. Based on the risk assessment, examiners may initiate full scope fair lending examinations or other appropriate supervisory activities to ensure compliance with fair lending laws and regulations.

To complement the supervisory office (SO) risk assessment process, the OCC also selects banks and mortgage subsidiaries for comprehensive fair lending examinations using a risk-based and random sample screening process that supplements the on-going supervisory office efforts. First, the OCC uses the Home Mortgage Disclosure Act (HMDA) data to select banks according to criteria related to the risk of fair lending violations. The examination scoping procedures typically are not applicable to such risk-based examinations since the screening process identifies a loan product(s) and a prohibited basis for review.

Second, the OCC randomly selects a sample of banks and mortgage subsidiaries to receive comprehensive fair lending examinations. For

---

[1] Throughout this booklet, bank or banks will include subsidiaries.

examinations of randomly selected banks, examiners use the examination scoping procedures in this booklet. If the supervisory office or OCC policy has designated certain banks, products, market areas, etc., as priorities to examine, OCC examiners make scoping decisions accordingly. Absent such guidance, OCC examiners who use the scoping procedures should treat them as a menu from which sections should be selected, not as a recipe to be followed entirely in every examination.

Specific to the OCC, this booklet:

- Directs examiners to take different approaches depending on whether a bank is selected based on risk, via the screening process, or randomly.
- Contains threshold procedures for determining whether the OCC should use statistical modeling for the comparative analysis.
- Contains procedures and supporting materials for determining whether banks are in compliance with:

  - **Requirements in Regulation B (12 CFR 202) Regarding Other Illegal Limitations on Access to Credit.** A number of provisions in Regulation B are intended to facilitate access to credit by providing consumers with certain rights (for example, the right to open a credit account in a birth given name) or by imposing on banks certain obligations (for example, not to alter terms of a credit account adversely because the account holder retires). Noncompliance can harm consumers. Some of Regulation B's consumer rights are not stated explicitly in terms of a prohibited basis (for example, discounting or excluding "protected income," in violation of 12 CFR 202.6(b)(5)).The OCC additionally evaluates the possible role of a prohibited basis in such violations. (In this booklet, only violations involving a prohibited basis are referred to as "discrimination.") There is a checklist in appendix K of this booklet for reviewing compliance with these provisions of Regulation B and guidance in the examination procedures for using the checklist.

  - **Technical Requirements in Regulation B (12 CFR 202).** Regulation B requires banks to use certain practices that do not directly relate to evaluating the applicant's creditworthiness (for example, retaining records of credit transactions). These requirements are important, in part, because they facilitate creation of records that support comparative file review and help consumers obtain their rights. Examiners evaluate compliance with these provisions when setting the

overall supervisory strategy for the bank. There is a checklist in appendix L of this booklet to assist in these reviews and guidance in the examination procedures for using the checklist.

The procedures emphasize racial and national origin discrimination in residential transactions, but the key principles are applicable to other prohibited bases and to nonresidential transactions. These procedures focus on analyzing bank compliance with the broad, anti-discriminatory requirements of the ECOA and the FH Act.

If there are pending administrative proceedings or government enforcement litigation involving the bank's fair lending compliance, generally a fair lending examination should not begin.

The OCC may conclude that a referral to the U.S. Department of Justice (DOJ), a referral to the U.S. Department of Housing and Urban Development (HUD), or an OCC enforcement action is appropriate to address possible illegal disparate treatment or some other fair lending violation, even if the OCC fails to follow any of this booklet's procedures or practices. Neither is such a failure sufficient by itself to rebut information suggesting that a violation occurred. The OCC will base its conclusions on the reliability and totality of the information and circumstances.

## Overview of Fair Lending Laws and Regulations

The ECOA prohibits discrimination in any aspect of a credit transaction. It applies to any extension of credit, including those to small businesses, corporations, partnerships, and trusts.

The ECOA prohibits discrimination based on:

- Race or color.
- Religion.
- National origin.
- Sex.
- Marital status.
- Age (provided the applicant has the capacity to contract). Although ECOA prohibits discrimination on the basis of age in the extension of credit, it permits banks to favor "elderly" applicants. Regulation B defines "elderly" as 62 years old or older.
- The applicant's receipt of income derived from any public assistance

program.
- The applicant's exercise, in good faith, of any right under the Consumer Credit Protection Act.

The Federal Reserve Board's Regulation B, found at 12 CFR 202, implements the ECOA. Regulation B describes lending acts and practices that are specifically prohibited, permitted, or required. Official staff interpretations of the regulation are found in supplement I to 12 CFR 202.

The FH Act prohibits discrimination in all aspects of "residential real-estate related transactions," including but not limited to:

- Making loans to buy, build, repair, or improve a dwelling.
- Purchasing real estate loans.
- Selling, brokering, or appraising residential real estate.
- Selling or renting a dwelling.

The FH Act prohibits discrimination based on:

- Race or color.
- National origin.
- Religion.
- Sex.
- Familial status (defined as children under the age of 18 living with a parent or legal custodian, pregnant women, and people securing custody of children under 18).
- Handicap.

HUD's regulations implementing the FH Act are found at 24 CFR 100. Because both the FH Act and the ECOA apply to mortgage lending, banks may not discriminate in mortgage lending based on any of the prohibited factors in either list.

Under the ECOA, it is unlawful for a bank to discriminate on a prohibited basis in any aspect of a credit transaction, and under both the ECOA and the FH Act, it is unlawful for a bank to discriminate on a prohibited basis in a residential real-estate-related transaction. Under one or both of these laws, a bank may not, because of a prohibited factor:

- Fail to provide information or services or provide different information or services regarding any aspect of the lending process, including credit availability, application procedures, or lending standards;
- Discourage or selectively encourage applicants in inquiries about or applications for credit;
- Refuse to extend credit or use different standards in determining whether to extend credit;
- Vary the terms of credit offered, including the amount, interest rate, duration, or type of loan;
- Use different standards to evaluate collateral;
- Treat a borrower differently in servicing a loan or invoking default remedies; or
- Use different standards for pooling or packaging a loan in the secondary market.

A bank may not express, orally or in writing, a preference based on prohibited factors or indicate that it will treat applicants differently on a prohibited basis. A violation may still exist even if a bank treated applicants equally.

A bank may not discriminate on a prohibited basis because of the characteristics of:

- An applicant, prospective applicant, or borrower;
- A person associated with an applicant, prospective applicant, or borrower (for example, a co-applicant, spouse, business partner, or live-in aide); or
- The present or prospective occupants of either the property to be financed or the characteristics of the neighborhood or other area where property to be financed is located.

The FH Act requires banks to make reasonable accommodations for a person with disabilities when such accommodations are necessary to afford the person an equal opportunity to apply for credit.

Additionally, when the OCC becomes aware of violations of state fair lending laws, the OCC will take appropriate supervisory or enforcement action.

# Types of Lending Discrimination

The courts have recognized three methods of proof of lending discrimination under the ECOA and the FH Act:

- Overt evidence of disparate treatment,
- Comparative evidence of disparate treatment, and
- Evidence of disparate impact.

### Disparate Treatment

The existence of illegal disparate treatment may be established either by statements revealing that a bank explicitly considered prohibited factors (overt evidence) or by differences in treatment that are not fully explained by legitimate nondiscriminatory factors (comparative evidence).

Overt Evidence of Disparate Treatment. There is overt evidence of discrimination when a bank openly discriminates on a prohibited basis:

> Example: A bank offered a credit card with a limit of up to $750 for applicants aged 21 through 30 and $1,500 for applicants over 30. This policy violated the ECOA's prohibition on discrimination based on age.

There is overt evidence of discrimination even when a bank expresses — but does not act on — a discriminatory preference:

> Example: A lending officer told a customer, "We do not like to make home mortgages to Native Americans, but the law says we cannot discriminate and we have to comply with the law." This statement violated the FH Act's prohibition on statements expressing a discriminatory preference as well as Section 202.4(b) of Regulation B, which prohibits discouraging applicants on a prohibited basis.

However, otherwise-prohibited overt language and distinctions are permissible in "Special-Purpose Credit Programs." For more information, refer to appendix C, section B.

<u>Comparative Evidence of Disparate Treatment</u>. Disparate treatment occurs when a bank treats a credit applicant differently based on one of the prohibited bases. It does not require any showing that the treatment was motivated by prejudice or a conscious intention to discriminate against a person beyond the difference in treatment itself.

Disparate treatment may more likely occur in the treatment of applicants who are neither clearly well qualified nor clearly unqualified. Discrimination may more readily affect applicants in this middle group for two reasons. First, if the applications are "close cases," there is more room and need for bank discretion. Second, whether or not an applicant qualifies may depend on the level of assistance the bank provides the applicant in completing an application. The bank may, for example, propose solutions to credit or other problems regarding an application, identify compensating factors, and provide encouragement to the applicant. Banks are under no obligation to provide such assistance, but to the extent that they do, the assistance must be provided in a nondiscriminatory way.

> Example: A control group couple applied for an automobile loan. The bank found adverse information in the couple's credit report. The bank discussed the credit report with them and determined that the adverse information, a judgment against the couple, was incorrect because the judgment had been vacated. The control group couple was granted their loan. A prohibited basis group couple applied for a similar loan with the same bank. Upon discovering adverse information in the prohibited basis group couple's credit report, the bank denied the loan application on the basis of the adverse information without allowing the couple to discuss the report.

The foregoing is an example of disparate treatment of similarly situated applicants, apparently based on a prohibited factor, in the amount of assistance and information the bank provided.

If a bank apparently has treated similar applicants differently on the basis of a prohibited factor, it must provide an explanation for the difference in treatment. If the bank's explanation is found to be not credible, the agency may find that the bank intentionally discriminated.

Illegal disparate treatment exists when applicants are "similarly situated," but are treated differently on a prohibited basis. Typically, a disfavored applicant who is "similarly situated" is as well or better qualified than a favored one, though factors other than qualifications may be relevant. In fair lending

examinations, examiners usually focus on whether the deficiency the bank cited to justify the unfavorable treatment of an applicant from a prohibited basis group also existed for any favorably treated control group applicant who was no better qualified. If not, such an inconsistency is termed "apparent disparate treatment," indicating that the situation may be discrimination or it may have an innocent explanation. "Apparent" is not a synonym for "obvious" or "blatant."

If the bank shows that, at the time of the credit decisions, it considered a legitimate difference between the applicants that justified treating one more favorably than the other, examiners conclude that the applicants were not actually "similarly situated," so no illegal disparate treatment occurred. There are numerous lawful reasons why an applicant from one race, gender, etc., might be treated less favorably than one from another group. The anti-discrimination laws do not require uniform treatment of all customers.

Redlining is a form of illegal disparate treatment in which a bank provides unequal access to credit, or unequal terms of credit, because of the race, color, national origin, or other prohibited characteristic(s) of the residents of the area in which the credit seeker resides or will reside or in which the residential property to be mortgaged is located. Redlining may violate both the FH Act and the ECOA.

## Disparate Impact

When a bank applies a racially or otherwise neutral policy or practice equally to all credit applicants, but the policy or practice disproportionately excludes or burdens certain persons on a prohibited basis, the policy or practice is described as having a "disparate impact."[2]

> Example: A bank's policy is not to extend loans for single family residences for less than $60,000.00. This policy has been in effect for 10 years. This minimum loan amount policy is shown to disproportionately exclude potential applicants based on race from consideration because of their income levels or the value of the houses in the areas in which they live.

---

[2] Disparate impact has been referred to more commonly by the OCC as "disproportionate adverse impact." It is also referred to as the "effects test."

The fact that a policy or practice creates a disparity on a prohibited basis is not by itself proof of a violation. When the OCC finds that a bank's policy or practice has a disparate impact, the OCC seeks to determine whether the policy or practice is justified by "business necessity." The justification must be manifest and may not be hypothetical or speculative. Factors that may be relevant to the justification could include cost and profitability. Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be in violation if an alternative policy or practice could serve the same purpose with less discriminatory effect. Finally, evidence of discriminatory intent is not necessary to establish that a bank's adoption or implementation of a policy or practice that has a disparate impact is in violation of the FH Act or ECOA.

These procedures do not call for examiners to plan examinations to identify or focus on potential disparate impact issues. The guidance in this introduction is intended to help examiners recognize fair lending issues that may have a potential disparate impact. Guidance in appendix G, "Other Types of Discrimination Analyses," provides details on how to obtain relevant information regarding such situations, and methods to evaluate and follow up, as appropriate.

## Referral to the DOJ or HUD

ECOA requires the OCC to refer matters to the DOJ "whenever the OCC has reason to believe that one or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of section 1691(a)" of ECOA, which states ECOA's basic prohibitions against discrimination. Additionally, ECOA requires the OCC to notify HUD whenever there is reason to believe that both ECOA and the FH Act have been violated and the suspected violations have not been referred to DOJ. Furthermore, Executive Order No. 12892 requires that HUD be notified "upon receipt of information . . . suggesting a violation" of the FH Act, and that such information also be forwarded to DOJ if it "indicate[s] a possible pattern or practice of discrimination in violation of the act. . ." The Concluding the Examination section of this booklet provides guidance to examiners and supervisory offices on how to respond to a bank's apparent violation of a fair lending law.

# Examination Procedures for Setting the Examination Scope

## Background

Establishing the proper scope for a fair lending examination is critical.

In setting the examination scope, examiners consider the loan product(s), market(s), decision center(s), time frame, and prohibited basis and control group(s) to be analyzed during the examination. These procedures refer to each potential combination of those elements as a "focal point." Examiners first identify all of the focal points that could be reviewed during an examination. Then, from among those, examiners select the focal point(s) to be examined based on risk factors, priorities established in these procedures or by OCC policy, the record from past examinations, and other relevant guidance. Examiners also consider the bank's compliance management system as it relates to fair lending.

Existing information may be used to expedite setting the scope. Also, scoping may disclose the existence of circumstances, such as a bank's use of credit scoring or a large amount of residential mortgage lending, when a different examination approach may be more efficient than the procedures set forth in this booklet. Statistical modeling, regression analysis, or other statistical techniques that the OCC has developed may be used in such circumstances.

When selecting focal points for review, examiners may determine that the bank has performed "self-tests" or "self-evaluations" related to specific lending products. The difference between "self-tests" and "self-evaluations" is discussed in appendix H, "Using Self-Tests and Self-Evaluations to Streamline the Examination." Banks must share all information regarding "self-evaluations." Regulation B at 12 CFR 202.15 and the FH Act at 24 CFR 100.140 cover self-tests and indicate that the report or results of a "self-test" is privileged and if such materials are shared with the OCC, the privilege would be waived. However, Section 607 of the Financial Services Regulatory Relief Act of 2006 (12 USC 1828(x)) allows banks to share such privileged information with its federal regulatory agency during supervisory activities without waiving, destroying, or otherwise affecting that privilege for other

third parties, such as private litigants.[3] Therefore examiners may request all relevant information related to "self-evaluations," and a bank may provide the report or results of a "self-test" that the bank has performed to examiners without waiving any privilege that attaches to such materials, except for the agency. Information from "self-evaluations" or "self-tests" may allow the examination to be streamlined. Refer to the aforementioned "Using Self-Tests and Self-Evaluations to Streamline the Examination" for additional details.

In determining the scope of an examination, examiners consider:

- The OCC's priorities and the supervisory office's long-term strategy for evaluating whether the bank's lending activities comply with the fair lending laws.
- The products, markets, and decision centers that are important to the bank.
- Availability of information that supports reliable results.
- Useful information that adds significantly to the cumulative picture of whether the bank complies with fair lending laws.
- Whether lending activities have undergone significant changes in personnel, operations, or underwriting standards.

The fair lending laws broadly prohibit discrimination on all the bases listed in the Introduction. The OCC enforces these laws to the fullest extent. However, the OCC places particular emphasis on evaluating whether there is discrimination against racial or national origin groups in residential lending. Scoping, for those examinations when the scope has not been selected in the screening process described on pages 1 and 2, should always consider whether there is a reasonable likelihood of obtaining a useful, reliable result by examining for racial or national origin discrimination in:

- Residential underwriting or
- The rates, terms, or conditions of residential loans made.

However, analysis of a nonresidential product (or of a prohibited basis group other than race or national origin) is appropriate when:

---

[3] 12 USC 1828(x), added as part of the Financial Services Regulatory Relief Act of 2006 provides that "(t)he submission by any person of any information to any Federal banking agency, State banking supervisor, or foreign banking authority for any purpose in the course of any supervisory or regulatory process of such agency, supervisor, or authority shall not be construed as waiving, destroying, or otherwise affecting any privilege such person may claim with respect to such information under Federal or State law as to any person or entity other than such agency, supervisor, or authority."

---

- The bank does not offer residential products or there are few racial or national origin group residents in the bank's market area;
- A comparative file review of any residential product (or of racial or national origin groups) would not be useful and reliable;
- Previous examinations of residential products (or of possible discrimination against racial or national origin groups) have not found any violations or weaknesses in the bank's compliance program; or
- Examiners suspect discrimination in a specific nonresidential product (or on a different prohibited basis).

Examiners should be alert for the presence of conditions that may make it appropriate or necessary to shift the scope or approach of the planned examination, including:

- Insufficient volume of applications to conduct a comparative analysis.
- Sufficient volume of applications to permit comparative analysis by statistical modeling.
- The credit decision maker's lack of knowledge of the prohibited basis identities of customers.

This booklet contains further guidance on these matters at appropriate points. Additionally, appendix M contains a description of alternative fair lending analyses that may be appropriate when reviewing credit card products or banks with an insufficient number of applications that render a comparative file review meaningless.

Key elements of scoping — for example, the prohibited basis, decision center, market, product, and review period — often are identified as part of the OCC's fair lending screening process. Therefore, the scoping procedures in this booklet typically are not applicable to the banks identified in the screening process. However, for examinations of randomly selected banks and banks identified by the supervisory office that are not on the screening lists, examiners should use the scoping procedures. If the supervisory office or OCC policy has designated certain banks, products, market areas, etc., as priorities to examine, OCC examiners should make scoping decisions accordingly.

Examiners typically plan to examine only one focal point. (In certain circumstances, it may be appropriate to examine more than one focal point.)

The focal point includes only one prohibited basis group and one control group at a time to isolate prohibited factors. (For example, compare "black" with "white," not "minority" with "white;" and compare "male" with "female," or "married" with "unmarried," not "married minority female" with "single white male.") The fact that one group outnumbers another in the population or customer pool is not a determinative factor.

After selecting the focal point(s) for review, examiners determine the breadth and depth of the analysis that will be conducted for the selected loan product(s). This process requires a more complete analysis of the bank's compliance risk management process, particularly as it relates to the selected products. Examiners decide on the number of files to review in any transactional analyses performed and whether certain aspects of the credit process deserve heightened scrutiny.

The compliance management process review objective on pages 35 and 36 of this booklet guides examiners in determining the breadth and depth of the examination. There is naturally some interdependence between setting the scope and determining the breadth and depth of the examination. Ultimately both determine the record of performance that serves as the foundation for the OCC's conclusions about bank compliance with fair lending obligations. Examiners employ these procedures and guidelines to arrive at a well-reasoned and practical approach for conducting the fair lending examination.

OCC information on priorities and risks for planning an upcoming examination may expedite the scoping process and make it unnecessary to carry out all of the following steps. For example, the report of the previous fair lending examination may have included recommendations for the focus of the next examination. However, examiners validate that the bank's operational structure, product offerings, and risks have remained the same before adjusting the scoping process.

Examiners use available information and guidance whenever possible to expedite planning and reduce burden on the bank. The OCC resources for determining the focal points worthwhile to examine include:

- Screening data and criteria.
- The OCC or supervisory office priorities.
- The supervisory strategy for the bank.
- Community Reinvestment Act (CRA) performance evaluations.
- Information from community contacts.

- Consumer complaints.
- Home Mortgage Disclosure Act (HMDA), or Fair Housing Home Loan Data System (FHHLDS) data analyses, and other demographic analyses (for example, CRA analyses).

The scoping process can be performed either off-site, onsite, or both, depending on what is most feasible. Any off-site information requests should be made in advance of the on-site examination to permit bank management adequate time to assemble necessary information and provide it to the examination team. (See appendix F, "Potential Scoping Information," for guidance on additional information that examiners might wish to consider, including in a request.)

Examiners select loan products for review and determine the extent of analysis based on:

- An understanding of the bank's credit operations.
- The risk that discriminatory conduct may occur in each area of those operations.
- The feasibility of developing a factually reliable record of a bank's performance and fair lending compliance in each area of those operations.
- Whether the bank has performed any self-evaluation or self-test that could streamline the examination.

## Objective: Gain an Understanding of Credit Operations

1. **Before evaluating the potential for discriminatory conduct, review sufficient information about the bank and its market(s) to understand its credit operations and the representation of prohibited basis groups within those markets. The level of detail to be obtained at this stage should be sufficient to identify whether any of the risk factors in the steps below are present. Relevant background information includes:**

- The types and terms of credit products offered, differentiating among broad categories of credit, such as residential, consumer, or commercial as well as product variations within such categories (fixed vs. variable, etc.).
- The volume of, or growth in, lending for each of the credit products offered.

---

- Whether the bank has a special purpose credit program or other program that is specially designed to assist certain underserved populations.
- The demographics (i.e., race and national origin) of the credit markets in which the bank is doing business.
- The bank's organization of its credit decision-making process, including identification of the delegation of separate lending authorities and the extent to which discretion in pricing or setting credit terms and conditions is delegated to various levels of managers, employees, or independent brokers or dealers.
- The bank's loan officer compensation program.
- The types of relevant documentation/data that are available for loan products and the relative quantity, quality, and accessibility of such information (i.e., for which loan product(s) will the information available be most likely to support a sound and reliable fair lending analysis).
- The extent to which information requests can be readily organized and coordinated with other compliance examination components to reduce undue burden on the bank. (Do not request more information than the examination team can be expected to use during the anticipated course of the examination.)

**2. Recognize that the bank's markets may or may not coincide with its Community Reinvestment Act (CRA) assessment area(s). When appropriate, review the demographics for a broader geographic area than the assessment area.**

**3. When a bank has multiple underwriting or loan processing centers or subsidiaries, each with fully independent credit-granting authority, consider evaluating each center and subsidiary separately, provided a sufficient number of applications or loans exist to support a meaningful analysis. In determining the scope of the examination for such banks, consider whether:**

- Subsidiaries should be examined. The OCC holds a bank responsible for violations by its direct subsidiaries, but not typically for those by its affiliates (unless the affiliate has acted as the agent for the bank or the violation by the affiliate was known or should have been known to the bank before it became involved in the transaction or purchased the affiliate's loans). When seeking to determine a bank's relationship with affiliates that are not supervised financial institutions, there is no legal impediment to seeking information from the affiliate to understand its relationship to the bank. However, if affiliate information appears necessary, discuss that possibility with the supervisory office.

- The underwriting standards and procedures used in the entity being reviewed are used in related entities not scheduled for the planned examination. This helps examiners to recognize the potential scope of policy-based violations.

- The portfolio consists of applications from a purchased institution. If so, for scoping purposes, consider the applications as if the purchasing bank made them. However, for comparison purposes, applications evaluated under the purchased institution's standards are not  compared with applications evaluated under the purchasing bank's standards.

- The portfolio includes purchased loans. If so, look for indications that the bank specified loans to purchase based on a prohibited factor or caused a prohibited factor to influence the origination process.

- A complete decision can be made at one of the several underwriting or loan processing centers, each with independent authority. In such a situation, it is best to conduct on-site a separate comparative analysis at each underwriting center. If covering multiple centers is not feasible during the planned examination, review one during the planned examination and review the bank's processes and internal controls to determine whether expanding the scope and/or length of the examination is justified.

- Decision-making responsibility for a single transaction may involve more than one underwriting center. For example, a bank may have authority to decline mortgage applicants, but only the mortgage company subsidiary may approve them. In such a situation, learn which standards are applied in each entity and the location of records needed for the planned comparisons.

- Applicants can be steered from the bank to a subsidiary or other lending channel and vice versa, and what policies and procedures exist to monitor this practice.

- Any third parties, such as brokers or contractors, are involved in the credit decision and how responsibility is allocated among them and the bank. The bank's familiarity with third-party actions may be important, for a

bank may be in violation if it participates in transactions in which it knew or reasonably ought to have known other parties were discriminating.

When assessing the bank's own lending operations, understand any dealings the bank has with affiliated and non-affiliated mortgage loan brokers and other third-party lenders.

These brokers may generate mortgage applications and originations solely for a specific bank or may broadly gather loan applications for local, regional, or national lenders. Recognize the impact of these mortgage brokers and other third-party lender actions and application processing operations on the lending operations of the bank. Evaluate broker activity and fair lending compliance related to underwriting, terms and conditions, redlining, and steering, each of which is covered in more depth in other sections of these procedures, regardless of whether the brokers are located in or out of the bank's primary lending or CRA assessment areas.

If the bank is large and geographically diverse, select only as many markets or underwriting centers as can be reviewed readily in depth, rather than selecting proportionally to cover every market. As needed, narrow the focus to the Metropolitan Statistical Area (MSA) or underwriting center(s) that are determined to present the highest discrimination risk. Use the Home Mortgage Disclosure Act Loan Application Register (HMDA-LAR) data organized by underwriting center, if available. After calculating denial rates between the control and prohibited basis groups for the underwriting centers, select the centers with the highest fair lending risk. This approach is also used when reviewing pricing or other terms and conditions of approved applicants from the prohibited basis and control groups. If underwriting centers have fewer than five racial or national origin group denials, do not examine for racial or national origin discrimination in underwriting. Instead, shift the focus to other loan products, prohibited bases, or examination types.

## Objective: Consider the Effect of Low-Volume or High-Volume Focal Points

The volume of prohibited basis group applications for the focal point serves as one general indicator of risk, because it represents the number of consumers potentially exposed to illegal discrimination. Other indicators of risk are the presence of the risk factors identified during scoping and the compliance management system review.

In most cases, do not attempt a comparative analysis for a focal point if the numbers of prohibited basis group or control group applications for that focal point during the 12-month period to be reviewed do not meet the minimums in the fair lending sample size tables in appendix D, as follows:

- At least five denied applications from the prohibited basis group and 20 approved applications from the control group for a comparison of approve/deny decisions.
- At least five approved applications from the prohibited basis group and 20 control group approvals for a comparison of pricing, terms, and/or conditions.

If the focal point first selected does not have such volume, a higher-volume focal point generally is chosen for review. When there are not enough applications for comparison by race, national origin, or gender, consider evaluating possible marital status discrimination by comparing married co-applicants with unmarried co-applicants.

When identifying other risk indicators that favor analyzing a prohibited basis group with fewer transactions than the minimum in the sample size tables, consult the supervisory office and, if appropriate, the Compliance Policy Division on possible alternative methods of analysis. For example, there is strong reason to examine a pattern in which almost all of 19 male borrowers received low rates but almost all of four female borrowers received high rates, even though the number of each group is fewer than the stated minimum. Similarly, there would be strong reason to examine a pattern in which almost all of 100 white applicants were approved but all four black applicants were not, even though the number of prohibited basis denials was fewer than five.

If the volume of applications is large, using the OCC's statistical modeling program for the comparative file analysis may be preferable to judgmental comparison and interpretation.

To determine whether the comparative file analysis should be conducted using statistical modeling, take the following steps before setting the scope of an examination.

**1. Determine whether:**

- The bank reports HMDA (or collects FHHLDS) data on any focal point being considered as the possible scope of the examination.
- The bank's HMDA-Loan Application Register (LAR) is automated and updated through the most recent quarter (as required by Regulation C).

**2. Determine whether there were at least 50 control group approvals, 50 control group denials, and 50 prohibited basis group approvals and 50 prohibited basis group denials from the same racial or national origin group during the most recent 12-month period for which the data in step 1 are available, for any single HMDA product in any one decision center of the bank to be examined.**

**3. If both conditions in step 1 and the condition in step 2 exist, consult the supervisory office and, if appropriate, the Compliance Policy Division about whether a statistical model might be used for the examination. If it is concluded that a statistical model is needed, the supervisory office should contact the Compliance Risk Analysis Division (Compliance RAD) for assistance.**

Compliance RAD may request examiners to:

- Obtain the bank's HMDA data in electronic form for all HMDA-reporting decision centers and subsidiaries and all products for the 12-month period for the institution to be examined. The bank's HMDA data and HMDA-LAR are preferable to the HMDA public access tapes, since they are likely to have more recent data.
- Determine how much, if any, of the additional application data (over and above that on the HMDA-LAR) evaluated by the bank's underwriters is maintained by the bank in electronic format for each HMDA product at each HMDA reporter (or other lending entity), and the process and time frame by which the bank might provide such data to the OCC.
- Determine whether the transactions recorded on the HMDA-LAR for the 12-month period include classes of transactions that were underwritten to different standards (for example, for different reporters/entities/decision centers, for different loan purchasers, for an affordable housing product, or according to the standards of an acquiring or acquired institution), and whether those classes can be sorted in the electronic database.

- Provide recommendations regarding how to aggregate, disaggregate, sort, or otherwise analyze the HMDA data (and any additional data), and about which decision centers, products, etc., might be of greatest interest.
- Determine whether and when underwriting standards changed during the 12-month period for any class of transactions.
- Identify bank staff that can interpret the data.
- Determine the dates of projected examination activity and address any other administrative planning issues.

## Objective: Evaluate the Potential for Discriminatory Conduct

### 1. Develop an Overview

No single examination can reasonably be expected to evaluate every prohibited basis, every product, or every underwriting center or subsidiary of a bank. In addition to information gained in the process detailed above, keep in mind the following factors when selecting products for the scoping review:

- The products and prohibited bases that were reviewed during the most recent prior examination(s) and, conversely, the products and prohibited bases that have not recently been reviewed.
- The prohibited basis groups that make up a significant portion of the bank's market for the different credit products offered.
- The products and prohibited basis groups the bank reviewed using either a self-test or a self-evaluation.

Based on consideration of the foregoing factors, request information for all residential and other loan products considered appropriate for scoping the examination. In addition, when feasible, conduct preliminary interviews with the bank's key underwriting personnel and those involved with establishing the bank's pricing policies and practices. Consider and evaluate:

- Underwriting guidelines, policies, and standards.
- Descriptions of credit scoring systems, including a list of factors scored, cutoff scores, extent of validation, and any guidance for handling overrides and exceptions. (Refer to part A of appendix B, "Considering Automated Underwriting and Credit Scoring Risk Factors," for guidance.)
- Applicable pricing policies, risk-based pricing models, and guidance for exercising discretion over loan terms and conditions.

---

- Descriptions of any compensation system, including whether compensation is related to loan production or pricing.
- The bank's formal and informal relationships with any finance companies, subprime mortgage or consumer lending entities, or similar institutions.
- Loan application forms.
- HMDA-LAR or loan registers and lists of declined applications.
- Description(s) of databases maintained for loan product(s) to be reviewed, especially any record of exceptions to underwriting guidelines.
- Records detailing policy exceptions or overrides, exception reporting, and monitoring processes.
- Copies of any consumer complaints alleging discrimination and related loan files. (Consumer complaints the OCC receives can be accessed via the OCC's CAGWizard.)
- Compliance program materials (particularly fair lending policies), training manuals, organization charts, as well as record keeping and any monitoring protocols, and internal controls.
- Copies of any available marketing materials, descriptions of current or previous marketing plans or programs, or pre-screened solicitations.

If the credit decision makers do not know whether the applicants are in the prohibited basis group or the control group, a comparative file review probably is not appropriate. Therefore, identify:

- The points in the application or underwriting process at which there are face-to-face meetings with applicants; and
- Which of the bank's participants in the credit decision process review or have access to documents with government monitoring information.

The OCC assumes that if any bank employee knows an applicant's race, gender, etc., the bank's credit decision makers have such knowledge, unless specific facts show otherwise.

### 2. Identify Compliance Program Discrimination Risk Factors

The bank's own compliance program and previous examination findings may indicate system weaknesses that could lead to discrimination. Therefore, review information from examination work papers, bank records, and any available discussions with management representatives in sufficient detail to understand the organization, staffing, training, record keeping, auditing, and policies and procedures of the bank's fair lending compliance systems. Review these systems and consider the following risk factors (factors are

numbered alphanumerically to coincide with the type of factor, e.g., "C" for compliance program, "O" for "overt," and "P" for "pricing".).

C1.  Overall bank compliance record is weak.
C2.  Prohibited basis monitoring information required by applicable law and regulation is nonexistent or incomplete.
C3.  Data and/or record keeping problems compromised reliability of previous examination reviews.
C4.  Fair lending problems were previously found in one or more bank products or in bank subsidiaries.
C5.  The size, scope, and quality of the compliance management program, including senior management's involvement, designation of a compliance officer, and staffing are materially inferior to those of programs customarily found in banks of similar size, market demographics, and credit complexity.
C6.  The bank has not updated compliance policies and procedures to reflect changes in law or in agency guidance.
C7.  Fair lending training is nonexistent or weak.

Consider these risk factors and their impact on particular lending products and practices as when conducting the product-specific risk review during the scoping steps that follow. When this review identifies fair lending compliance system deficiencies, consider them as part of the compliance management review.

## 3. Review Residential Loan Products

Although home mortgages may not be the ultimate subject of every fair lending examination, this product line is at least considered when scoping every bank that is engaged in the residential lending market.

Divide home mortgage loans into the following groupings: home purchase, home improvements, and refinancings. Subdivide those three groups further if a bank does a significant number of any of the following types or forms of residential lending, and consider them separately as follows:

• Government-insured loans.
• Mobile home or factory housing loans.
• Wholesale, indirect, and brokered loans.

- Portfolio lending (including portfolios of Fannie Mae/Freddie Mac rejections).

If no specific risk factors point toward selecting a particular loan type/purpose as defined in HMDA, conventional home purchase loans are the first priority, followed by conventional home-improvement loans, government-insured home purchase loans, government-insured home-improvement loans, conventional refinancings, government-insured refinancings, and multifamily loans.

In addition, determine whether the bank offers any conventional "affordable" housing loan programs, special purpose credit programs, or other programs specifically designed to assist certain applicants, such as underserved populations, and whether their terms and conditions make them incompatible with regular conventional loans for comparative purposes. If so, consider them separately.

If previous examinations have demonstrated the following, limit the focus of the current examination to underwriting or processing centers or to other residential products that have received less scrutiny in the past:

- A strong fair lending compliance program.
- No record of discriminatory transactions at particular decision centers or in particular residential products.
- No indication of a significant change in personnel, operations, underwriting standards, or pricing policies at those centers or in those residential products.
- No unresolved fair lending complaints, administrative proceedings, litigation, or similar factors.
- No discretion to set price or credit terms and conditions in particular decision centers or for particular residential products.

## 4. Identify Residential Lending Discrimination Risk Factors

- Review the lending policies, marketing plans, underwriting, appraisal and pricing guidelines, broker/agent agreements, and loan application forms for each residential loan product that represents an appreciable volume of, or displays noticeable growth in, the bank's residential lending.

Broker/agent agreements and other information about third parties are reviewed to learn the bank's degree of control over, and the level of

familiarity with, those activities, its potential legal liability, and any other supervisory risks. The facts of specific relationships will indicate whether the bank may be liable for any discrimination in such activities or in transactions that involve those third parties. Under Regulation B, a bank may be liable for violations committed by another creditor in connection with the same credit transaction if the bank knew or had reasonable notice of the violation before becoming involved in the credit transaction. Consult OCC district counsel to determine whether the bank may be held responsible for the transactions conducted by other creditors.

- Review any available data regarding the geographic distribution of the bank's loan originations with respect to the race and national origin percentages of the census tracts within its assessment area or, if different, its residential loan product lending area(s).

- Conduct interviews of loan officers and other employees or agents in the residential lending process concerning adherence to and understanding of the above policies and guidelines as well as any relevant operating practices. (See the "Underwriter Interview Guide" in appendix J.)

In conducting the foregoing, look for the following risk factors. If any of these risk factors are found, document them and follow-up as called for in the Examination Procedures for Assessing Fair Lending Performance.

**NOTE:** For risk factors below that are marked with an asterisk (*), examiners need not attempt to calculate the indicated ratios for racial or national origin characteristics when the bank is not a HMDA reporter. However, consider whether such calculations should be made based on sexual, racial, or ethnic surrogates.

OVERT indicators of discrimination, such as:

O1. Including explicit prohibited basis identifiers in the bank's written or oral policies and procedures (underwriting criteria, pricing standards, etc).
O2. Collecting information, conducting inquiries, or imposing conditions contrary to express requirements of Regulation B.
O3. Including variables in a credit scoring system that constitute a basis or factor prohibited by Regulation B or, for residential loan scoring systems, the FH Act. (If a credit scoring system scores age, refer to part E of

appendix B, "Considering Automated Underwriting and Credit Scoring Risk Factors."

O4.  Statements made by the bank's officers, employees, or agents which constitute an express or implicit indication that one or more such persons have engaged or do engage in discrimination on a prohibited basis in any aspect of a credit transaction.

O5.  Employee or bank statements that evidence attitudes based on prohibited basis prejudices or stereotypes.

Indicators of potential disparate treatment in UNDERWRITING, such as:

U1.  *Substantial disparities among the approval/denial rates for applicants by monitored prohibited basis characteristic (especially within income categories).

U2.  *Substantial disparities among the application processing times for applicants by monitored prohibited basis characteristic (especially within denial reason groups).

U3.  *Substantially higher proportion of withdrawn/incomplete applications from prohibited basis group applicants than from other applicants.

U4.  Vague or unduly subjective underwriting criteria.

U5.  Lack of clear guidance on making exceptions to underwriting criteria, including credit scoring overrides.

U6.  Lack of clear loan file documentation of reasons for any exceptions to standard underwriting criteria, including credit scoring overrides.

U7.  Relatively high percentages of either exceptions to underwriting criteria or overrides of credit score cutoffs.

U8.  Loan officer or broker compensation based on loan volume (especially loans approved per period of time).

U9.  Consumer complaints alleging discrimination in loan processing or in approving/denying residential loans.

Indicators of potential disparate treatment in PRICING (interest rates, fees, or points), such as:

P1.  Bank incentives for loan officers or brokers to charge higher prices (including interest rate, fees, and points). Special attention should be given to situations when financial incentives are accompanied by broad pricing discretion (as in P2), such as through the use of overages or yield spread premiums.

P2.  Presence of broad discretion in loan pricing (including interest rate, fees, and points), such as through overages, underages, or yield spread premiums. Such discretion may be present even when banks provide

rate sheets and fee schedules, if loan officers or brokers deviate from those rates and fees without clear and objective criteria.

P3. Use of risk-based pricing that is not based on objective criteria or applied consistently.

P4. *Substantial disparities among prices being quoted or charged to applicants who differ as to their monitored prohibited basis characteristics.

P5. Consumer complaints alleging discrimination in residential loan pricing.

P6. In mortgage pricing, disparities in the incidence of rate spreads of higher-priced loans by prohibited basis characteristics as reported in the HMDA data (Regulation C, 12 CFR 203.4(a)(12)).

P7. *A loan program that contains only borrowers from a prohibited basis group, or has significant differences in the percentages of prohibited basis groups, especially in the absence of a Special Purpose Credit Program under the ECOA.

Be alert for indications of risk related to other terms or conditions (such as co-signors, collateral, or length of term). For example, broad discretion and vague standards for collateral are viewed as risk factors if they exist for a focal point. Adapt transaction comparison techniques to examine such situations.

In addition, the following are abusive (or "predatory") lending practices that may involve violations of fair lending laws and that the OCC treats as risk factors:[4]

- Collateral or equity "stripping" — loans made in reliance on the liquidation value of the borrower's home or other collateral, rather than the borrower's independent ability to repay, with the possible or even intended result of foreclosure or the need to refinance under duress;
- Interest rates or fees that far exceed the true risk and cost of making the loan;
- Inadequate disclosure of the true costs and risks of loan transactions;
- Lending practices that are fraudulent, coercive, unfair, deceptive, or otherwise illegal;
- Loan terms and structures, such as negative amortization, when designed to make it more difficult or impossible for borrowers to reduce their indebtedness;

---

[4] Evidence of these factors may also represent noncompliance with the OCC Guidelines for Residential Mortgage Lending Practices, Appendix C of 12 CFR 30.

- "Padding" or "packing" — charging customers unearned, concealed, or unwarranted fees;
- "Balloon" payment loans that may conceal the true burden of the loan financing and may force borrowers into costly refinancing or foreclosure situations;
- "Flipping" — frequent and multiple refinancings, usually of mortgage loans, requiring additional fees which strip equity from the borrower;
- Collection of up-front single-premium credit insurance — for example, life, disability, or unemployment insurance — when the consumer does not receive a net tangible financial benefit.

Indicators of potential disparate treatment by STEERING, such as:

S1.  Lack of clear, objective, and consistently applied standards for (1) referring applicants to subsidiaries, affiliates, or lending channels within the bank, (2) classifying applicants as "prime" or "subprime" borrowers, or (3) deciding what kinds of alternative loan products should be offered or recommended to applicants (product placement).

S2.  Financial incentives for loan officers or brokers to place applicants in nontraditional products (i.e., negative amortization, interest only, or payment option adjustable rate mortgages) or higher cost products.

S3.  *For a bank that offers different products based on credit risk levels, any significant differences in percentages of prohibited basis groups in each of the alternative loan product categories.

S4.  *Significant differences in the percentage of prohibited basis group applicants in loan products or products with specific features relative to control group applicants. Special attention is given to products and features that have potentially negative consequences for applicants (i.e., non-traditional mortgages, prepayment penalties, lack of escrow requirements, or credit life insurance).

S5.  *For a bank that has one or more subprime mortgage subsidiaries or affiliates, any significant differences, by loan product, in the percentage of prohibited basis group applicants of the bank compared with the percentage of prohibited basis group applicants of the subsidiary(ies) or affiliate(s).

S6.  *For a bank that has one or more lending channels that originate the same loan product, any significant differences in the percentage of prohibited basis group applicants in one of the lending channels compared with the percentage of prohibited basis group applicants in the other lending channel.

S7.  Consumer complaints alleging discrimination in residential loan pricing or product placement.
S8.  *For a bank with subprime mortgage subsidiaries, a concentration of those subsidiaries' branches in particular racial or national origin geographic areas relative to its other branches.

In addition, the following may involve violations of fair lending laws, and the OCC treats them as risk factors:

- One-way referrals — for example, a prime lender refers subprime applicants to its subprime subsidiary but the subprime subsidiary does not refer prime applicants to the prime lender; or
- Significant differences in the proportion of loans made predominantly in particular racial or national origin geographic areas between a prime lender and its subprime subsidiary.

Indicators of potential **DISCRIMINATORY REDLINING,** such as:

R1.  *Significant differences, as revealed in HMDA data, in the number of applications received, withdrawn, approved not accepted, and closed for incompleteness or loans originated in those areas in the bank's market that have relatively high concentrations of residents of a particular racial or national origin group compared with areas with relatively low concentrations of residents of such racial or national origin group.
R2.  *Significant differences between approval/denial rates for all applicants in areas with relatively high concentrations of residents of a particular racial or national origin group compared with areas with relatively low concentrations of residents of such racial or national origin group.
R3.  *Significant differences between denial rates based on insufficient collateral for applicants from areas with relatively high concentrations of residents of a particular racial or national origin group and those areas with relatively low concentrations of residents of such racial or national origin group.
R4.  *Significant differences in the number of originations of higher-priced loans or loans with potentially negative consequences for borrowers (e.g., non-traditional mortgages, prepayment penalties, lack of escrow requirements) in areas with relatively high concentrations of residents of a particular racial or national origin group compared with areas with relatively low concentrations of residents of such racial or national origin group.

R5.  Other patterns of lending identified during the most recent CRA examination that differ by the concentration of residents of a particular racial or national origin group.

R6.  Explicit demarcation of credit product markets that excludes metropolitan statistical areas (MSAs), political subdivisions, census tracts, or other geographic areas within the bank's lending market or CRA assessment areas and having relatively high concentrations of residents of a particular racial or national origin group.

R7.  Difference in services available or hours of operation at branch offices located in areas with concentrations of residents of a particular racial or national origin group when compared with branch offices located in areas with low concentrations of residents of such racial or national origin group.

R8.  Policies on receipt and processing of applications, pricing, conditions, or appraisals and valuation or on any other aspect of providing residential credit that vary between areas with relatively high concentrations of residents of a particular racial or national origin group and those areas with relatively low concentrations of residents of such racial or national origin group.

R9.  The bank CRA assessment area(s) appears to have been drawn to exclude areas with relatively high concentrations of residents of a particular racial or national origin group.

R10. Employee statements that reflect an aversion to doing business in areas with relatively high concentrations of residents of a particular racial or national origin group.

R11. Complaints or other allegations by consumers or community representatives that the bank excludes or restricts access to credit for areas with relatively high concentrations of residents of a particular racial or national origin.

Review complaints against the bank filed with the OCC's Customer Assistance Group (CAG); the CRA public comment file; community contact forms; and responses to questions about redlining, discrimination, and discouragement of applications, and about meeting the needs of racial or national origin minorities, asked as part of "obtaining local perspectives on the performance of financial lenders" during prior CRA examinations.

> **NOTE**: Broad allegations or complaints are not, by themselves, sufficient justification to shift the focus of an examination from routine comparative review of applications to redlining analysis. Such a shift should be based on complaints or allegations of specific practices or

incidents that are consistent with redlining, along with the existence of other risk factors.

R12. A bank that has most of its branches in neighborhoods predominantly composed of a particular racial or national origin group at the same time that the bank's subprime mortgage subsidiary has branches located primarily in neighborhoods that are not predominantly composed of such racial or national origin group.

Indicators of potential **DISPARATE TREATMENT IN MARKETING** of residential products, such as:

M1. Advertising patterns or practices that a reasonable person would believe indicate prohibited basis customers are less desirable.

M2. Advertising only in media serving particular racial or national origin areas of the market.

M3. Marketing through brokers or other agents that the bank knows (or has reason to know) would serve only one racial or national origin group in the market.

M4. Use of marketing programs or procedures for residential loan products that exclude one or more regions or geographies within the bank's assessment or marketing area that have significantly higher percentages of residents of a particular racial or national origin group than does the remainder of the assessment or marketing area.

M5. Using mailing or other distribution lists or other marketing techniques for pre-screened or other offerings of residential loan products that exclude:

– Explicitly groups of prospective borrowers on a prohibited basis; or
– Geographies (e.g., census tracts and ZIP codes) within the bank's marketing area that have significantly higher percentages of residents of a particular racial or national origin group than does the remainder of the marketing area.

M6. *Proportion of monitored prohibited basis applicants is significantly lower than that group's representation in the total population of the market area.

M7. Consumer complaints alleging discrimination in advertising or marketing loans.

In addition, the following are lending practices that may involve violations of fair lending laws and that the OCC treats as risk factors:

- Targeting persons, such as the elderly, women, minorities, and persons living in low- or moderate-income areas, who are perceived to be less financially sophisticated or otherwise vulnerable to abusive loan practices;
- Aggressive marketing tactics that amount to deceptive or coercive conduct.

Indicators of potential disparate treatment in **LOAN SERVICING AND LOSS MITIGATION,** such as:

L1.  *Substantial disparities among loss mitigation servicing options by prohibited basis group characteristic.

L2.  *Substantial disparities in decision processing times by prohibited basis group characteristic.

L3.  *Significant disparities in the completion of foreclosure actions once legal process initiated by prohibited basis group characteristic.

L4.  Lack of clear loan file documentation for servicing or loss mitigation decisions, granting of policy exceptions, or reasons for fee waivers.

L5.  Weak or non-existent process and controls to ensure ongoing fair lending compliance, including that of third-party vendors.

L6.  Lack of clear guidance on determining appropriate loss mitigation options, making policy exceptions, or granting fee waivers.

L7.  Internal audits, compliance reviews, or monitoring reports identifying significant weaknesses or violations in handling exceptions, fee waivers, incorrect credit reporting agency reporting, or complying with bank policies and procedures.

L8.  Consumer complaints alleging discrimination in servicing or loss mitigation practices.

L9.  High volume of policy exceptions or fee waivers by prohibited basis group characteristic.

L10. Significant level of litigation alleging discrimination in loan servicing or loss mitigation practices.

L11. Broad employee discretion in determining loan servicing and loss mitigation actions.

L12. Employees collecting information, conducting inquiries, or imposing conditions inconsistent with express Regulation B or FH Act requirements.

L13. Collection practices not based on delinquency status.

L14. Employee compensation based on workout, loss mitigation, or foreclosure strategy adopted.

L15. Lack of clear consumer disclosures on loss mitigation options available, the costs of each option, and the risks involved.

L16. Lack of clear procedures for determining a borrower's ability to repay when selecting loss mitigation options.

L17. Vague or subjective criteria for property inspections, broker price offers, appraisals, or other valuations.

Indicators of potential disparate treatment in **HELOC MODIFICATIONS,** such as:

H1.  Significant value decline methodology not clearly supported, objectively determined, or consistently applied.

H2.  Process to establish that borrower's financial condition significantly deteriorated beyond ability to repay not reasonable, objectively supportable, or clearly documented.

H3.  Soft or deteriorating market determinations not based on reasonable economic criteria, supportable standards, consistently applied, or clearly documented.

H4.  Soft or deteriorating market or declining market value determinations not considering potential disparate impact/redlining implications.

H5.  Regulation Z, Regulation B, and FCRA adverse action disclosure process, as applicable, is not timely or does not exist.

H6.  Under Regulation B, limitations regarding change in marital status, age, or retirement or additional creditworthiness information not considered.

H7.  Market area determinations based on ZIP codes or census tracts rather than MSAs or larger geographical subdivisions.

H8.  Borrower appeal process on how to initiate an appeal not readily available, consistently provided, or clearly explained.

### 5. Organize and Focus Residential Risk Factors

Review the risk factors identified in step 4 and, for each loan product that displays risk factors, articulate the possible discriminatory effects encountered, and organize the examination of those loan products in accordance with the following guidance:

- When overt evidence of discrimination, as described in factors O1–O5, has been found in a product, document those findings as described on pages 40 and 41 and complete the remainder of the planned examination analysis.

- When any of the risk factors U1-U9 are present, consider conducting an underwriting comparative file analysis described on pages 41-46.
- When any of the risk factors P1-P7 are present, consider conducting a pricing comparative file analysis as described on pages 46-49.
- When any of the risk factors S1-S8 are present, consider conducting a steering analysis as described on pages 49-54.
- When any of the risk factors R1-R12 are present, consult the supervisory office and, if appropriate, the Compliance Policy Division about conducting an analysis for redlining as described on pages 57-68.
- When any of the risk factors M1-M7 are present, consult the supervisory office and, if appropriate, the Compliance Policy Division about conducting a marketing analysis as described on pages 68-70.
- When any of the risk factors L1-L17 are present, consider conducting a comparative file analysis similar to that described on pages 41-46 or a pricing comparative file review as described on pages 46-49, as appropriate.
- When any of the risk factors H1-H8 are present, consider conducting a comparative file analysis similar to that described on pages 41-46 or a redlining analysis as described on pages 57-68.
- When a bank uses age in any credit scoring system, consider conducting an examination analysis of that credit scoring system's compliance with the requirements of Regulation B as described on page 70.

If one or more compliance-related risk factors exist along with the other risk factors for a focal point, designate that focal point even more strongly for examination.

## 6. Identify Consumer Lending Discrimination Risk Factors

For any consumer loan products selected in step 1 for risk analysis in the current examination cycle, conduct a risk factor review similar to that conducted for residential lending products in steps 3 through 5, above. Consult the supervisory office and, if appropriate, the Compliance Policy Division about the potential use of surrogates to identify possible prohibited basis group persons.

**NOTE:** The term surrogate in this context refers to any factor related to a loan applicant that potentially identifies that applicant's race or other prohibited basis characteristic when no direct evidence of that characteristic is available. Thus, in consumer lending, when monitoring data is generally unavailable, a Hispanic or Asian surname could constitute a surrogate for an applicant's race

or national origin because examiners can assume that the bank (which can rebut the presumption) perceived the person to be Hispanic or Asian. Similarly, an applicant's given name could serve as a surrogate for his or her gender. A surrogate for a prohibited basis group characteristic may be used to set up a comparative analysis with control group applicants or borrowers.

Using decision rules in steps 3 through 5 above, for residential lending products, identify the possible discriminatory patterns encountered and consider examining those products determined to have sufficient risk of discriminatory conduct.

## 7. Identify Commercial Lending Discrimination Risk Factors

When a bank lends a substantial amount in the commercial lending market, most notably to small businesses, and the product has not recently been examined or the underwriting standards have changed since the last examination of the product, consider conducting a risk factor review similar to that performed for residential lending products, as feasible, given the limited information available. Such an analysis should generally be limited to determining risk potential based on risk factors U4-U8, P1-P3, R5-R7, and M1-M3.

Focus on small business credit (commercial loan applicants that had gross revenues of $1,000,000 or less in the preceding fiscal year), unless evidence that a concentration on other commercial products is more appropriate.

If the bank makes commercial loans insured by the Small Business Administration (SBA), consult the supervisory office and, if appropriate, the Compliance Policy Division to determine whether SBA loan data (which codes race and other factors) are available for the bank and whether an evaluation of the data is warranted.

For large banks reporting small business loans for CRA purposes and when the bank also voluntarily geocodes loan denials, look for material discrepancies in ratios of approval-to-denial rates for applications in areas with relatively high concentrations of residents of a particular racial or national origin group compared with areas with low concentrations of residents of such racial or national origin group.

Articulate the possible discriminatory patterns identified and consider further examining those products that have sufficient risk of discriminatory conduct in accordance with commercial lending procedures described on pages 54-57.

## Objective: Determine the reliability of the bank's compliance management process and use the findings to adjust the examination scope.

The quality of the bank's compliance management processes for ensuring compliance with fair lending laws and regulations and identifying fair lending problems affects how examiners sample and review individual loan decisions.

1. **Determine whether the bank's policies and procedures enable management to prevent, or to identify and self-correct, illegal disparate treatment in the transactions that relate to the products and issues identified for further analysis during the Examination Procedures for Setting the Examination Scope phase of these procedures.**

2. **Obtain a thorough understanding of the manner by which management addresses its fair lending responsibilities for (a) the bank's lending practices and standards, (b) training and other application-processing aids, (c) guidance to employees or agents in dealing with customers, and (d) its marketing or other promotion of products and services.**

3. **Consider bank records and interviews with appropriate management personnel in the lending, compliance, audit, and legal functions. Also refer to the "Compliance Management Analysis Checklist" in appendix A to evaluate the strength of the compliance programs in terms of their capacity to prevent, or to identify and self-correct, fair lending violations in the products or issues selected for analysis. Based on this evaluation:**

   - Minimize sample sizes within the guidelines established in the "Fair Lending Sample Size Tables" in appendix D, to the extent warranted by the strength and thoroughly of the compliance programs applicable to focal points selected for examination. For focal points at banks selected through the OCC's risk-based screening process, complete the checklist but select the largest sample sizes within the ranges corresponding to the volumes of applications for the focal point, unless the compliance

management review resolves concerns about the specific indications of risk that caused the bank to be selected for examination.

- Identify any compliance program or system deficiencies that merit correction or improvement and present these to management as part of concluding the examination.

When a bank performs a self-evaluation or a self-test of any product or issue that is within the examination scope, streamline the examination, consistent with the requirements set forth in appendix H, "Using Self-Tests and Self-Evaluations to Streamline the Examination."

## Objective: Complete the Examination Scoping Process

1. **Review the results of the preceding objectives and select those focal points that warrant examination, based on the relative risk levels identified above. Depending on the overall supervisory strategy and available resources, choose a smaller number of focal points from among all those selected on the basis of risk. In such instances, set the scope by first prioritizing focal points on the basis of (1) high number and/or relative severity of risk factors; (2) high data quality and other factors affecting the likelihood of obtaining reliable examination results; (3) high loan volume and the likelihood of widespread risk to applicants and borrowers; and (4) low quality of any compliance program. Then select for examination as many focal points as resources permit.**

When the judgment process among competing focal points is a close call, information learned in the phase of conducting the compliance management review can be used to further refine the examiner's choices.

2. **Once the scope has been set, send the bank a request letter (see sample fair lending section of request letter in appendix I). The letter should state that the examination may be streamlined if the bank conducted any self-evaluations on the transactions within the proposed scope of the examination. Evaluate these self-evaluations as called for in "Using Self-Tests and Self-Evaluations to Streamline the Examination" in appendix H.**

# Examination Procedures for Assessing Fair Lending Performance

Once the loan product(s) and the extent of file review for the examination have been determined, assess the bank's fair lending performance by applying the appropriate procedures that follow to each of the selected examination focal points.

If the bank was selected for examination through the OCC's risk-based screening process, proceed with the type of analysis identified as appropriate in the screening process. If the bank was selected for examination through the supervisory office risk assessment process or the OCC's random sample process, apply the appropriate analysis to the identified focal point. The analyses below will not apply if statistical modeling is used.

## Objective: Verify Accuracy of Data

Prior to any analysis and preferably before the scoping process, assess the accuracy of the data being reviewed. Data verification should follow specific procedures (sampling size, etc.) intended to ensure the validity of the review. For example, when a bank's HMDA-LAR data is relied upon, validate the accuracy of the bank's submitted data by selecting a sample of HMDA-LAR entries and verify that the information noted on the HMDA-LAR was reported according to instructions by comparing information contained in the loan file for each sampled loan. If the HMDA-LAR data are inconsistent with the information contained in the loan files, depending on the nature of the errors, a fair lending analysis may require postponement until the bank corrects the data on the HMDA-LAR. When inaccuracies impede the examination, direct the bank to take action to ensure data integrity (data scrubbing, monitoring, training, etc.).

NOTE: While the procedures refer to using HMDA data, consider other data sources, especially in the case of non-HMDA reporters or banks that originate loans, but are not required to report them on a HMDA-LAR.

## Objective: Document Regulation B Compliance Checklists

If the fair lending examination involves a review of transaction files, record information on two checklists as described below.

1. **Other Illegal Limitations on Credit Checklist.**

   Before reviewing files for the comparative treatment of applicants, review the "Other Illegal Limitations on Credit Checklist" in appendix K to identify possible violations. Note that the bank's policy or conduct does not have to treat applicants differently on a prohibited basis to violate one of those requirements; however, also report whether or not prohibited disparate treatment is indicated with apparent violations of this type. Maintain one master checklist with information about any apparent violations found during the file review. Identify any apparent violations (even isolated), then request explanations from the bank staff responsible for the transactions, evaluate each explanation, and verify any facts relied upon by the bank. If the explanations are not adequate, proceed as directed in procedures for "Concluding the Examination."

2. **Technical Compliance Checklist.**

   Use copies of the "Technical Compliance Checklist" in appendix L to review six files (an approved and a denied consumer, business, and residential real estate loan application file) and note any apparent violations. If violations exist in those six files, then, during the comparative file review for the focal point, observe and note on one master copy of the checklist whether the violations recur in the comparative file review.

## Objective: Conduct an Underwriter Interview

Every fair lending examination includes an interview of the decision-making underwriters (or equivalent bank staff, depending on the type of analysis). From these interviews, learn in detail how the credit criteria were applied and how the lending process operated. Use the "Underwriter Interview Guide" in appendix J. Use the underwriter's statements as a framework for the comparisons and for evaluating any explanations offered later by the bank if it is asked to account for potential disparate treatment between the prohibited basis group and control group.

The information obtained from the interview may make it necessary to change the scope or sample composition.

# Objective: **Document Overt Evidence of Disparate Treatment**

When the scoping process or any other examination activity identifies overt evidence of disparate treatment, assess the nature of the policy or statement and the extent of its impact on affected applicants by conducting the following analysis.

1. **When the indicator(s) of overt discrimination are found in, or based on, a written policy (for example, a credit scorecard) or communication, determine and document:**

   a. The precise language of the potentially discriminatory policy or communication and the nature of the fair lending concerns that it raises.
   b. The bank's stated purpose in adopting the policy or communication and the identity of the person on whose authority it was issued or adopted.
   c. How and when the policy or communication was put into effect.
   d. How widely the policy or communication was applied.
   e. Whether and to what extent applicants were adversely affected by the policy or communication.

2. **When any indicator of overt discrimination was an oral statement or unwritten practice, determine and document:**

   a. The precise nature of either the statement or practice and of the fair lending concerns that they raise.
   b. The identity of the persons making the statement or applying the practice and their descriptions of the reasons for it and the persons authorizing or directing the use of the statement or practice.
   c. How and when the statement or practice was disseminated or put into effect.
   d. How widely the statement or practice was disseminated or applied.
   e. Whether and to what extent applicants were adversely affected by the statement or practice.

After documenting those situations as called for here, request an explanation and evaluate that explanation in light of the guidance on overt evidence of discrimination in "Evaluating Bank Responses to Evidence of Disparate Treatment" in appendix C.

Assemble findings and supporting documentation for presentation to bank management when concluding the examination.

# Objective: Conduct Transactional Underwriting Analysis – Residential and Consumer Loans

Depending on the extent of the file review and the size of the applicant population reviewed, the analysis of underwriting decisions may involve a manual comparative file review, a statistical analysis, or other specialized techniques. Each examination process assesses a bank's credit-decision standards and whether decisions on pricing and other terms and conditions are applied to borrowers without regard to a prohibited basis.

1. **Set Sample Size**

   a. For each focal point being reviewed, select two samples: (1) prohibited basis group denials; and (2) control group approvals. Choose the samples either directly from monitoring information in residential loan applications or through application data and use of surrogates in consumer applications.

   b. Using table A in the "Fair Lending Sample Size Tables," appendix D, determine the initial sample sizes for each focal point, based on the number of prohibited basis group denials and the number of control group approvals during the 12-month (or calendar year) period preceding the examination. If the number of prohibited basis group denials and/or control group approvals during the preceding 12-month period substantially exceeds the maximum sample size shown in table A, reduce the time period from which the samples are selected to a shorter period. (In doing so, try to select a period in which the bank's underwriting standards are most representative of those in effect during the full 12-month period preceding the examination.)

   c. If the number of prohibited basis group denials or control group approvals for a given focal point during the 12-month period referenced in 1.b., above, does not meet the minimum standards set forth in the sample size table, do not conduct a transactional analysis for that focal point. If other risk factors favor analyzing such a focal point, consult the supervisory office and, if appropriate, the Compliance Policy Division on possible alternative methods of judgmental comparative analysis.

   See appendix D for additional guidance on using the sample size tables.

**NOTE:** Regardless of application volume or sample size, any clear instance of potential disparate treatment — even if the comparison consists of only two files — must be treated as an apparent violation.

2. **Determine Sample Composition**

a. To the extent the bank maintains records of loan outcomes resulting from exceptions to its credit underwriting standards or other policies (e.g., overrides to credit score cutoffs), request such records for both approvals and denials, sorted by loan product and branch or decision center, if the bank can do so. Include in the initial sample for each focal point all exceptions or overrides applicable to that focal point.

b. Using HMDA/LAR data or, for consumer loans, comparable loan register data to the extent available, choose approved and denied applications based on selection criteria that maximize the likelihood of finding marginal approved and denied applicants, as discussed below.

c. To the extent that the above factors are inapplicable or other selection criteria are unavailable or do not facilitate selection of the entire sample size of files, complete the initial sample selection by making random file selections from the appropriate sample categories in the sample size table.

If the sample size is much smaller than the total number of transactions in the period, select the sample based on the following features:

- Applications for residential loans other than "jumbo" loans.
- Approvals with the highest ratio of loan amount sought relative to income.
- Approvals with the longest processing times.
- Denials with the lowest ratio of loan amount sought to income.
- Denials involving questionable circumstances (for example, denial one day after application with the denial reason "unable to verify").

Transactions with the features above are more likely to be "marginal transactions," as defined in step 3 below.

3. **Compare Approved and Denied Applications**

Although a bank's written policies and procedures may appear to be nondiscriminatory, lending personnel may interpret or apply policies in a discriminatory manner. To detect any disparate treatment among applicants, first eliminate all but "marginal transactions" (see 3.b. below) from each selected focal point sample. Then, record on an applicant profile spreadsheet a detailed description of each marginal applicant's qualifications, the level of assistance received during the application process, the reasons for denial, the loan terms, and other information. Once profiled, compare the prohibited basis and control groups for evidence that similarly qualified applicants have been treated differently as to either the bank's credit decision or the quality of assistance provided.

a. Create Applicant Profile Spreadsheet

- Based upon the bank's written or articulated credit standards and loan policies, create a worksheet or computerized spreadsheet with each applicant's name and each data element to be reviewed. Always include in the spreadsheet certain data elements (income, loan amount, debt, etc.), while the other data selected will be tailored for each loan product and bank based on applicable underwriting criteria and such issues as branch location and underwriter. When credit bureau scores and/or application scores are an element of the bank's underwriting criteria (or when such information is regularly recorded in loan files, whether expressly used or not), include a data field for this information in the spreadsheet.

- To facilitate comparisons of the quality of assistance provided to prohibited basis group and control group applicants, respectively, provide a "comments" block on the worksheet to record observations from the file or interviews about how an applicant was, or was not, assisted in overcoming credit deficiencies or otherwise qualifying for approval.

**NOTE:** All examiners who review files meet prior to starting the file review to ensure that they have a uniform understanding of the file items to be identified and recorded (for example, how credit report codes will be

interpreted, debt ratios will be calculated, and income and monthly loan payments will be totaled).

b. Complete Applicant Profiles

From the application files sample for each focal point, complete applicant profiles for selected denied and approved applications as follows:

A principal goal is to identify when similarly qualified prohibited basis and control group applicants had different credit outcomes, because the agencies have found that discrimination, including differences in granting assistance during the approval process, is more likely to occur for applicants who are *not* either clearly qualified or unqualified, i.e., "marginal" applicants. The examiner-in-charge should, during the following steps, judgmentally select from the initial sample only those denied and approved applications that constitute marginal transactions**.** (See appendix E "Identifying Marginal Transactions" for guidance.)

- Review denied application files in the sample to eliminate any prohibited basis group applicants with qualifications so weak that there are not likely to be any approved applicants with similar qualifications. Record only the name and/or number of the application, the disposition, and the key facts justifying the credit decision.

- Similarly, review the approved control group application files to eliminate well-qualified control group applicants (those without flaws or with flaws too minor to serve as a basis for denial). Record only the name and/or number of the application, the disposition, and the key facts justifying the credit decision.

- If few marginal control group applicants are identified from the initial sample, review additional files of approved control group applicants. This will either increase the number of marginal approvals or confirm that marginal approvals are so infrequent that the marginal denials are unlikely to involve disparate treatment.

- Perform the judgmental selection of both marginal-denied and marginal-approved applicant loan files together, in a "back and forth" manner, to facilitate close matches and a more consistent definition of "marginal" between these two types of loan files.

- Once the "marginal" applicants are identified, record the applicant data elements for each "marginal" applicant on the worksheet or spreadsheet. When more than one reason for denial exists, but the applicant nearly met the bank's standard for each requirement, retain the denied file in the sample to use in comparisons for each reason.

- While conducting the preceding step, simultaneously look for and document on the spreadsheet any evidence found in marginal files regarding the extent:

  - Of any assistance, including both affirmative aid and waivers or partial waivers of credit policy provisions or requirements, that appears to have been provided to marginal-approved control group applicants which enabled them to overcome one or more credit deficiencies, such as excessive debt-to-income ratios.
  - To which marginal-denied prohibited basis group applicants with similar deficiencies were, or were not, provided similar affirmative aid, waivers, or other forms of assistance.

c.  Review and Compare Profiles

- For each focal point, review all marginal profiles to determine if the underwriter followed bank lending policies in denying applications and whether the reason(s) for denial were supported by facts documented in the loan file and properly disclosed to the applicant pursuant to Regulation B. If any (a) unexplained deviations from credit standards, (b) inaccurate reasons for denial, or (c) incorrect disclosures are noted (whether in a judgmental underwriting system, a scored system, or a mixed system), obtain an explanation from the underwriter and document the response on an appropriate work paper.

  **NOTE:** In constructing the applicant profiles to be compared, select the facts to compare so that assistance, waivers, or acts of discretion are treated consistently between applicants. For example, if a control group applicant's Debt To Income (DTI) ratio was lowered to 42 percent because the bank decided to include short-term overtime income, and a prohibited basis group applicant who was denied due to "insufficient income" would have had his ratio drop from 46 percent to 41 percent if his short-term overtime income had been considered, consider 41 percent, not 46 percent, in determining the benchmark.

- For each reason for denial identified within the target group, rank the denied prohibited basis group applicants, beginning with the applicant whose qualification(s) related to that reason for denial were **least deficient**. (The top-ranked denied applicant in each such ranking will be referred to below as the "benchmark" applicant.)

- Compare each marginal control group approval with the benchmark applicant in each reason-for-denial ranking developed in step (b), above. If there are no approvals who are equally or less qualified, then there are no instances of disparate treatment for the bank to explain. For all such approvals that appear no better qualified than the denied benchmark applicant:

   – Identify the approved applicant on the worksheet or spreadsheet as an "overlap approval," and
   – Compare that overlap approval with other marginal prohibited basis group denials in the ranking to determine whether additional overlaps exist. If so, identify all overlapping approvals and denials as above.

   **NOTE**: When the focal point involves use of a credit scoring system, the analysis for disparate treatment is similar to the procedures set forth above, and should focus primarily on scoring system overrides. For guidance on this type of analysis, refer to part C of the "Considering Automated Underwriting and Credit Scoring Risk Factors" (appendix B).

4. **Obtain explanations from the appropriate loan officer or other employee for any differences that exist and reanalyze the sample for evidence of discrimination.**

5. **If there is some evidence of violations in the underwriting process but not enough to clearly establish the existence of a pattern or practice, expand the sample as necessary to determine whether a pattern or practice exists. NOTE: A pattern or practice does not have to exist for there to be a violation and possible referral to an enforcement agency.**

6. **Discuss all findings resulting from the above comparisons with bank management and document both the findings and all conversations on an appropriate worksheet.**

# Objective: Analyze Potential Disparities in Pricing and Other Terms and Conditions

Depending on the extent of the file review and the size of the borrower population reviewed, the analysis of decisions on pricing and other terms and conditions may involve a manual comparative file review, a statistical analysis, or other specialized techniques. Each examination process assesses a bank's credit-decision standards and whether decisions on pricing and other terms and conditions are applied to borrowers without regard to a prohibited basis.

The procedures below encompass the examination steps for a comparative file review.

## 1. Set Sample Size

Review data in its entirety or restrict the analysis to a sample depending on the examination approach used and the quality of the bank's compliance management process.

a. For each focal point being reviewed, select two samples: (i) prohibited basis group approvals; and (ii) control group approvals, both identified either directly from monitoring information in residential loan applications or through application data or use of surrogates in consumer or commercial applications.

b. Using table B in the "Fair Lending Sample Size Tables," appendix D, determine the initial sample sizes for each focal point, based on the number of prohibited basis group approvals and the number of control group approvals during the 12-month (or calendar year) period preceding the examination. If the number of prohibited basis group approvals and/or control group approvals during the preceding 12-month period substantially exceeds the maximum sample size shown in table B, reduce the time period from which the samples are selected to a shorter period. (In doing so, select a period in which the bank's standards for the term or condition being reviewed are most representative of those in effect during the full 12-month period preceding the examination.)

**NOTE:** Regardless of application volume or sample size, any clear instance of potential disparate treatment — even if the comparison consists of only two files — must be treated as an apparent violation.

## 2. Determine Sample Composition and Create Applicant Profiles

**NOTE:** Sample composition for a comparison of price and other terms and conditions will initially focus on controlling for two nondiscriminatory variables that can have a significant impact on loan terms: whether the loan was sold and the loan closing date. Other variables, such as household income and loan amount, will be accounted for on a case-by-case basis during the file comparison process.

a. While the period for review should be 12 months, prohibited basis group and control group approvals should be grouped and reviewed around a range of dates during which the bank's practices for the term or condition being reviewed were the same. Generally, use the loan origination date or approval date for those not accepted by the applicant.

b. Tailor the sample and subsequent analysis to the specific factors that the bank considers when determining its pricing, terms, and conditions. For example, while decisions on pricing and other terms and conditions are part of the bank's underwriting process, general underwriting criteria should not be used in the analysis if they are not relevant to the term or condition to be reviewed. Additionally, consider only legitimate factors.

c. Identify data to be analyzed for each focal point to be reviewed and record this information for each approval on a worksheet or computerized spreadsheet to ensure a valid comparison of terms and conditions. For example, in certain cases, a bank may offer slightly differentiated products with significant pricing implications to borrowers. In these cases, group these products together for evaluation.

## 3. Compare Terms and Conditions with Applicant Outcomes

a. Review all loan terms and conditions (rates, points, fees, maturity variations, loan-to-value (LTV), collateral requirements, etc.), paying special attention to those that are left to the discretion of loan officers or underwriters. For each such term or condition, identify (a) any approved prohibited basis group applicants in the sample who appear to have been treated unfavorably for that term or condition and (b) any approved control group applicants who appear to have been treated favorably for

that term or condition. Thoroughly document this analysis in the work papers.

    b. Identify from the sample any control group approvals that appear to have been treated more favorably than one or more of the above-identified prohibited basis group approvals and that have negative pricing or creditworthiness factors (under the bank's standards) equal to or less favorable than the prohibited basis group approvals.

**4. Obtain explanations from the appropriate loan officer or other employee for any differences that exist and reanalyze the sample for evidence of discrimination.**

**5. If there is some evidence of violations in the imposition of terms and conditions but not enough to clearly establish the existence of a pattern or practice, expand the sample as necessary to determine whether a pattern or practice exists.**

    **NOTE:** There does not have to be a pattern or practice to justify a violation and possible referral to an enforcement agency.

**6. Discuss differences in comparable loans with the bank's management and document all conversations on an appropriate worksheet. For additional guidance on evaluating management's responses, refer to part A, 1 - 5, "Evaluating Bank Responses to Evidence of Disparate Treatment" in appendix C.**

## Objective: Evaluate Potential for Discriminatory Steering

A bank that offers lending products or product features, either through one channel or through multiple channels, may benefit consumers by offering greater choices and meeting the diverse needs of applicants. Greater product offerings and multiple channels, however, may also create a fair lending risk that applicants will be illegally steered to certain choices based on a prohibited basis.

The following examples illustrate potential fair lending risk:

- A bank that offers different lending products based on credit risk level may enable loan officers or brokers to illegally steer applicants to the higher-risk products.
- A bank that offers nontraditional loan products or loan products with potentially onerous terms (such as prepayment penalties) may enable loan officers or brokers to illegally steer applicants to certain products or features.
- A bank that offers subprime products through different channels may enable applicants to be illegally steered to the subprime channel.

The distinction between guiding consumers toward a specific product or feature and steering, illegal under the fair lending laws, centers on whether the bank did so on a prohibited basis, rather than based on an applicant's needs or other legitimate factors. Examiners need not demonstrate financial harm to a group that has been "steered," but only to demonstrate that that action was taken on a prohibited basis regardless of the financial outcome.

If the scoping analysis reveals the presence of one or more risk factors S1 through S8 for any selected focal point, consult the supervisory office and, if appropriate, the Compliance Policy Division about conducting a steering analysis, as described below.

1. **Clarify what options are available to applicants**

   a. Determine each focal point (product-alternative product pairing or grouping) to be reviewed.

   b. Through interviews with appropriate bank personnel and review of policy manuals, procedure guidelines, and other directives, obtain and verify the following information for each product-alternative product pairing or grouping identified:

   – All underwriting criteria for the product or feature and for their alternatives that the bank, subsidiary, or affiliate offered. Examples of products may include stated income, negative amortization, and option ARMs. Examples of terms and features include prepayment penalties and escrow requirements. The distinction between a product, term, and feature may vary from bank to bank. For example, some banks may consider a "stated income" loan a feature, while others may consider it a distinct product.

– Pricing or other costs applicable to the product and the alternative product(s), including interest rates, points, and all fees.

**2. Document the policies, conditions, or criteria that the bank has adopted for determining how referrals are to be made and choices presented to customers.**

a. Review any policies and procedures established by the bank and/or the subsidiary or affiliate for (1) referring a person who applies to the bank, but does not meet its criteria, to another internal lending channel, subsidiary, or affiliate; (2) offering one or more alternatives to a person who applies to the bank for a specific product or feature, but does not meet its criteria; (3) referring a person who applies to a subsidiary or affiliate for its product to the bank, when that person appears to be qualified for a loan from the bank; or (4) referring a person who applies for a product through one internal lending channel to another lending channel, when that person appears to be qualified for a loan through the lending channel to which he or she applied.

Review information about the product or feature offered by the bank and alternative products offered by subsidiaries or affiliates, and information on products and alternatives offered solely by the bank, e.g., conventional and FHA, secured and unsecured home improvement loans, and prime and subprime mortgages.

b. Obtain any information on a subsidiary of the bank directly from that entity, but seek information on an affiliate or holding company subsidiary only from the bank.

c. Obtain documentation and/or employee estimates on the volume of referrals made from or to the bank, for each product, during a relevant time period.

d. Determine whether loan personnel are encouraged, through financial incentives or otherwise, to make referrals, either from the bank to a subsidiary or affiliate or vice versa. Similarly, determine whether the bank provides financial incentives related to products and features.

e. After reviewing all appropriate documentation, prepare a written summary of all discussions with loan personnel and managers.

f.  Resolve to the extent possible any discrepancies between information found in the bank's documents and information obtained in discussions with loan personal and managers by conducting appropriate follow-up interviews.

3.  **Determine how referral decisions are made to another lending channel, subsidiary, or affiliate. Determine the reason(s) for referral and how they are documented.**

4.  **Determine if individual loan personnel can exercise personal discretion in deciding what loan products or other credit alternatives they will offer a given applicant.**

5.  **Determine whether individual decision makers in fact adhere to the bank's stated policies, conditions, or criteria. If not, determine whether different policies or practices are actually in effect.**

Using the worksheets or computerized spreadsheets developed in step 6 below, record data for the prohibited basis group sample and determine whether the bank is, in fact, applying its criteria as stated. For example, if one announced criterion for receiving a "more favorable" prime mortgage loan was a back-end debt ratio of no more than 38 percent, review the spreadsheets to determine whether that criteria was adhered to. If the bank's actual treatment of prohibited basis group applicants appears to differ from its stated criteria, document such differences for subsequent discussion with management.

6.  **To the extent that individual loan personnel have any discretion in deciding the credit products and features to offer applicants, conduct a comparative analysis to determine whether that discretion has been exercised in a nondiscriminatory manner.**

Compare the bank's, subsidiary's, or affiliate's treatment of control group and prohibited basis group applicants by adapting the "benchmark" and "overlap" technique discussed in these procedures. For purposes of this steering analysis, conduct that technique  as follows:

a.  For each focal point to be analyzed, select a sample of prohibited basis group applicants who received "less favorable" treatment (e.g., referral to a finance company or a subprime mortgage subsidiary or counteroffers of less favorable product alternatives).

---

**NOTE**: In selecting the sample, follow the guidance of table B in the "Fair Lending Sample Size Tables," appendix D, and select "marginal applicants" as instructed in the Objective: Conduct Transactional Underwriting Analysis – Residential and Consumer Loans.

b. Prepare a spreadsheet for the sample that contains data entry categories for those underwriting and referral criteria the bank identified in the above steps as used in reaching underwriting and referral decisions between the pairs of products.

c. Review the "less favorably" treated prohibited basis group sample and rank this sample from least qualified to best qualified applicant based on the criteria identified for the control group. The best qualified applicant becomes the "benchmark" applicant.

d. Select a sample of control group applicants. Identify those who were treated "more favorably" for the same product-alternative product pair as the prohibited basis group. (Again refer to table B, in the sample size tables and marginal applicant processes noted above in selecting the sample.)

e. Compare the qualifications of the benchmark applicant with those of the control group applicants, beginning with the least qualified member of that sample. Any control group applicant who appears less qualified than the benchmark applicant should be identified on the spreadsheet as a "control group overlap."

f. Compare all control group overlaps with other less qualified prohibited basis group applicants to determine whether additional overlaps exist.

g. Document all overlaps as possible disparities in treatment. Discuss all overlaps and related findings (e.g., any differences between stated and actual underwriting criteria) with management, documenting all such conversations.

7. **Consult the supervisory office and, if appropriate, the Compliance Policy Division if you need to contact control group or prohibited basis group applicants to substantiate the steering analysis.**

**NOTE:** A bank violates ECOA, the FH Act, or both if, on a prohibited basis, it attempts to discourage or deter a credit seeker from applying at all (commonly called "pre-application screening"). There is some additional guidance on pre-application screening in section B of the "Other Types of Discrimination Analyses" (appendix G). However, pre-application screening on a prohibited basis cannot usually be detected through the types of analysis that can be conducted during an examination. If examiners find any indication that either steering or pre-application screening may be occurring, they should suggest the OCC consider pre-application testing of the bank.

## Objective: Conduct Transactional Underwriting Analysis — Commercial Loans

Unlike consumer credit, when loan products and prices are generally homogenous and underwriting involves evaluating a limited number of credit variables, commercial loans are generally unique and underwriting methods and loan pricing may vary depending on a large number of credit variables. The additional credit analysis involved in underwriting commercial credit products will entail additional complexity in the sampling and discrimination analysis process. Although ECOA prohibits discrimination in all commercial credit activities of a covered bank, the agencies recognize that small businesses (sole proprietorships, partnerships, and small, closely-held corporations), including those operated by prohibited basis group members may have less experience in borrowing. Furthermore, small businesses may have fewer borrowing options, which may make them more vulnerable to discrimination. Therefore, in implementing these procedures, examinations should generally be focused on small business credit (commercial applicants that had gross revenues of $1,000,000 or less in the preceding fiscal year), absent some evidence that a focus on other commercial products would be more appropriate.

### 1.  Understand Commercial Loan Policies

For the commercial product line selected for analysis, review credit policy guidelines and interview appropriate commercial loan managers and officers to obtain written and articulated standards used by the bank in evaluating commercial loan applications. Select or adapt questions from the "Underwriter Interview Guide" (appendix J) for the interviews.

## 2. Conduct Comparative File Review

a. Select all (or a maximum of 10) denied applications that were acted on during the three-month period prior to the examination. To the extent feasible, include denied applications from businesses that are (1) located in particular racial or national origin group and integrated geographies or (2) appear to be owned by prohibited basis group members, based on the names of the principals shown on applications or related documents. (In the case of banks that do a significant volume of commercial lending, review more than 10 applications.)

b. For each of the denied commercial applications selected, record specific information from loan files and through interviews with the appropriate loan officer(s), about the principal owners, the purpose of the loan, and the specific, pertinent financial information about the commercial enterprise, including type of business (retail, manufacturing, service, etc.), that was used by the bank to evaluate the credit request. Maintenance or use of data that identifies prohibited basis characteristics of those involved with the business (either in approved or denied loan applications) should be evaluated as a potential violation of Regulation B.

c. Select 10 approved loans that appear to be similar for business type, purpose of loan, loan amount, loan terms, and type of collateral, as the denied loans sampled. For example, if the denied loan sample includes applications for lines of credit to cover inventory purchases for retail businesses, select approved applications for lines of credit from retail businesses.

d. For each approved commercial loan application selected, obtain and record information parallel to that obtained for denied applications.

e. Compare the credit criteria considered in the credit process for each of the approved and denied applications to established underwriting standards, rather than comparing files directly.

f. Identify any deviations from credit standards for both approved and denied credit requests and differences in loan terms granted for approved credit requests.

g. Discuss with the commercial credit underwriter when deviations from credit standards and terms are noted, but are not explained in the file. Each discussion should be documented on an appropriate worksheet.

## 3. Conduct Targeted Sampling

a. If deviations from credit standards or pricing are not sufficiently explained by other factors either documented in the credit file or the commercial underwriter was not able to provide a reasonable explanation, determine if deviations were detrimental to any applicants of a particular prohibited basis group.

b. Consider employing the same techniques for determining race and gender characteristics of commercial applicants as those outlined in the consumer loan sampling procedures.

c. If members of one or more prohibited basis groups exist among commercial credit requests that were not underwritten according to established standards or received less favorable terms, select additional commercial loans. Select applicants that are members of the same prohibited basis group and select similarly situated control group credit requests in order to determine whether there is a pattern or practice of discrimination. Select these additional files based on the specific applicant circumstance(s) that appeared to have been viewed differently by lending personnel on a prohibited basis.

d. If there are not enough similarly situated applicants for comparison in the original sample period to draw a reasonable conclusion, expand the sample period. The expanded sample period should generally not go beyond the date of the prior examination.

### Expanded Sampling Guidelines

a. Generally, the task of selecting an appropriate expanded sample of prohibited basis and control group applications for commercial loans will require examiner judgment. Select a sample that is large enough to draw a reasonable conclusion.

b. Select from the applications that were acted on during the initial sample period, but were not included in the initial sample, and select applications from prior time periods as necessary.

c. The expanded sample should include both approved and denied, prohibited basis and control group applications, when similar credit was requested by similar enterprises for similar purposes.

## Objective: Determine Potential for Discriminatory "Redlining"

Traditional "redlining" is a form of illegal disparate treatment in which a bank provides unequal access to credit, or unequal terms of credit, because of the race, color, national origin, or other prohibited characteristic(s) of the residents of the area in which the credit seeker resides or will reside or in which the residential property to be mortgaged is located. The practice of targeting certain applicants or areas with less advantageous products or services based on prohibited characteristics may also constitute redlining.

The redlining analysis may be applied to determine whether, on a prohibited basis:

- A bank fails or refuses to extend credit in such an area;
- A bank targets certain borrowers or certain areas with less advantageous products;
- A bank makes loans in such an area but at a restricted level or upon less-favorable terms or conditions as compared with contrasting areas; or
- A bank omits or excludes such an area from efforts to market residential loans or solicit customers for residential credit.

This guidance focuses on possible discrimination based on race or national origin. The same analysis could be adapted to evaluate relative access to credit for areas of geographical concentration on other prohibited bases — for example, age.

**NOTE:** Neither the Equal Credit Opportunity Act (ECOA) nor the Fair Housing Act (FH Act) specifically uses the term "redlining." However, federal courts as well as agencies that have enforcement responsibilities for the FH Act have interpreted redlining as prohibiting a bank from having different marketing or lending practices for certain geographic areas, compared with others, when the purpose or effect of such differences would be to discriminate on a prohibited basis. Similarly, the ECOA would prohibit treating applicants for credit differently on the basis of differences in the racial or ethnic composition of their respective neighborhoods.

Like other forms of disparate treatment, redlining can be proven by overt or comparative evidence. If any written or oral policy or bank statement (see redlining risk factors R6,- R10) suggests that the bank links the racial or national origin character of an area with any aspect of access to or terms of credit, refer to the procedures on documenting and evaluating overt evidence of discrimination.

Overt evidence includes not only explicit statements, but also any geographical terms used by the bank that would, to a reasonable person familiar with the community in question, connote a specific racial or national origin character. For example, if the principal information conveyed by the phrase "north of 110th Street" is that the indicated area is principally occupied by Hispanics, then a policy of not making credit available "north of 110th Street" is overt evidence of potential redlining on the basis of national origin.

Overt evidence is relatively uncommon. Consequently, the redlining analysis usually will focus on comparative evidence (similar to analyses of possible disparate treatment of individual customers) in which the bank's treatment of areas with contrasting racial or national origin characters is compared.

When the scoping process indicates that a redlining analysis should be initiated, consult the supervisory office and, if appropriate, the Compliance Policy Division before completing the following steps of comparative analysis:

- Identify and delineate any areas within the bank's CRA assessment area and reasonably expected market area for residential products that have a racial or national origin group character;
- Determine whether any area identified in step 1 appears to be excluded, under-served, selectively excluded from marketing efforts, or otherwise less-favorably treated in any way by the bank;
- Identify and delineate any areas within the bank's CRA assessment area and reasonably expected market area for residential products that are of a particular racial or national origin group character and that the bank appears to treat more favorably;
- Identify the location of any racial or national origin group areas located just outside the bank's CRA assessment area(s) and reasonably expected market area for residential products that may have been purposely excluded by the bank.

- Obtain the bank's explanation for the potential difference in treatment between the areas and evaluate whether it is credible and reasonable; and
- Obtain and evaluate other information that may support or contradict interpreting identified disparities to be the result of intentional illegal discrimination.

These steps are discussed as follows.

Although the six steps listed are presented below as examination steps in the order given above, recognize that a different order may be preferable in any given examination. For example, the bank's explanation (step 5) for one of the policies or patterns in question may already be documented in the CRA materials reviewed (step 1) and the CRA examiners may already have verified it, which may be sufficient for the redlining analysis.

As another example, as part of the scoping process, examiners may have reviewed an analysis of the geographic distribution of the bank's loan originations with respect to the racial and national origin composition of census tracts within its CRA assessment or residential market area. Such analysis might have documented the existence of significant discrepancies between areas, by degree of a particular racial or national origin group concentration, in loans originated (risk factor R1), approval/denial rates (risk factor R2) and/or rates of denials because of insufficient collateral (risk factor R3). In such a situation in which the scoping process has produced a reliable factual record, examiners could begin with step 5 (obtaining an explanation) of the redlining analysis below.

In contrast, when the scoping process only yields partial or questionable information, or when the risk factors on which the redlining analysis is based are complaints or allegations against the bank, steps 1 - 4 must be addressed.

1. **Identify and delineate any areas within the bank's CRA assessment area and reasonably expected market area for residential products that are of a racial or national origin group character.**

   **NOTE:** The CRA assessment area can be convenient for redlining analysis because information about it is typically already in hand. However, the CRA assessment area may be too limited. The redlining analysis focuses on the bank's decisions about how much access to credit to provide to different geographical areas. The areas for which those decisions can best be

compared are areas where the bank actually marketed and provided credit and where it could reasonably be expected to have marketed and provided credit. Some of those areas might be beyond or otherwise different from the CRA assessment area.

A redlining analysis is not appropriate for areas that can not be identified for their racial or national origin group character within the bank's CRA assessment area and reasonably expected market area for residential products, (If there is a substantial but dispersed minority population, potential disparate treatment can be evaluated by a routine comparative file review of applicants.)

This step may have been substantially completed during scoping, but unresolved matters may remain. For example, several community spokespersons may allege that the bank is redlining, but disagree in defining the area. In these situations:

a.  Describe as precisely as possible why a specific area is recognized in the community (perceptions of residents, etc.) and is objectively identifiable (based on census or other data) as having a particular racial or national origin group character.

  • The most obvious identifier is the predominant racial or national origin group residents of the area. Document the percentages of racial or national origin groups residing within the census tracts that make up the area. Analyzing racial and national origin group concentrations in quantities (such as 0 to $<=25\%$, $>25\%$ to $<=50\%$, $>50\%$ to $<=75\%$ and $>75\%$) or based on majority concentration (0 to $<=50\%$, and $>50\%$) may be helpful. However, remember that it is illegal for the bank to consider a prohibited factor in any way. For example, an area or neighborhood may only have a racial or national origin group population of 20%, but if the area's concentration appears related to lending practices, it would be appropriate to use that area's level of concentration in the analysis. Contacts with community groups can be helpful to learn whether such subtle features of racial or ethnic character exist within a particular neighborhood.

  • Geographical groupings that are convenient for CRA may obscure racial patterns. For example, an underserved, low-income, predominantly minority neighborhood that lies within a larger low-income area that primarily consisted of non-minority neighborhoods may seem adequately served when the entire low-income area is

analyzed as a unit. However, a pattern of under service to racial or national origin group areas might be revealed if the low-income minority neighborhood shared a border with an underserved, middle-income, minority area and those two minority areas were grouped together for purposes of analysis.

b. Describe how the racial or national origin character changes across the suspected redlining area's various boundaries.

c. Document or estimate the demand for credit within the racial or national origin area. This may include the applicable demographics of the area, including the percentage of homeowners, the median house value, median family income, or the number of small businesses, etc. Review the bank's non-originated loan applications from the suspected redlined areas and, if available, the aggregate bank data for loans originated and applications received from the suspected redlined areas. Community contacts may also be helpful in determining the demand for such credit. If the racial or national origin group area does not have a significant amount or demand for such credit, the area is not appropriate for a redlining analysis.

**2. Determine whether any racial or national origin group area identified in step 1 is excluded, underserved, selectively excluded from marketing efforts, or otherwise less-favorably treated in any way by the bank.**

Begin with the risk factors identified during the scoping process. The unfavorable treatment may have been substantially documented during scoping and only needs to be finished in this step. If not, this step verifies and measures the extent to which HMDA data show the racial or national origin group areas identified in step 1 to be underserved and how the bank's explicit policies treat them less favorably.

a. Review prior CRA lending test analyses to learn whether they have identified any excluded or otherwise underserved areas or other significant geographical disparities in the bank's lending. Determine whether any of those are the racial or national origin group areas identified in step 1.

b. Learn from the bank itself whether, as a matter of policy, it treats any separate or distinct geographical areas within its marketing or service area

differently from other areas. This may have been done completely or partially during scoping analysis related to risk factors R5 - R9. The differences in treatment can be in marketing, products offered, branch operations (including the services provided and the hours of operation), appraisal practices, application processing, approval requirements, pricing, loan conditions, evaluation of collateral, or any other policy or practice materially related to access to credit. Determine whether any of those less-favored areas are the racial or national origin group areas identified in step 1.

c.  Obtain from the bank: (1) its reasons for such differences in policy, (2) how the differences are implemented, and (3) any specific conditions that must exist in an area for it to receive the particular treatment (more favorable or less favorable) that the bank has indicated.

**3. Identify and delineate any areas within the bank's CRA assessment area and reasonably expected market area for residential products that have a particular racial or national origin character and that the bank appears to treat more favorably.**

To the extent not already completed during scoping:

a.  Document the percentages of control and prohibited basis groups residing within the census tract(s) that comprise(s) a particular racial or national origin group area.

b.  Document the nature of the housing stock in the area.

c.  Describe, to the extent known, how the bank's practices, policies, or its rate of lending change from less favorable to more favorable as one leaves the particular racial or national origin group area at its various boundaries. (Be particularly attentive to instances in which the boundaries between favored and disfavored areas deviate from boundaries the bank would reasonably be expected to follow, such as political boundaries or transportation barriers.)

d.  Consider whether, within a large area that is composed predominantly of households of a particular racial or national origin group, there are enclaves that are predominantly of a different racial or national origin group or whether, along the area's borders, there are irregularities where the different racial or national origin group is predominant. As part of the overall comparison, determine whether credit access within those small

areas of different racial or national groups differs from credit access in the larger racial or national origin group area.

4. **Identify the location of any racial or national origin group areas located just outside the bank's CRA assessment area(s) and reasonably expected market area for residential products, that may have been purposely excluded by the bank.**

Review the analysis from prior CRA examinations of whether the assessment area(s) appears to have been influenced by prohibited factors. If there are racial or national origin group areas that the bank excluded from the assessment area(s) improperly, consider whether they ought to be included in the redlining analysis. Analyze the bank's reasonably expected market area in the same manner.

5. **Obtain the bank's explanation for the potential difference in treatment between the areas and evaluate whether it is credible and reasonable.**

This step completes the comparative analysis by soliciting from the bank any additional information not yet considered that may demonstrate that a non-discriminatory explanation for the potential disparate treatment based on race or ethnicity does exist.

For each matter that requires explanation, provide the bank full information about what differences appear to exist in how the bank treats areas with particular racial or national origin group characteristics, and how examiners reached their preliminary conclusions at this stage of the analysis.

a. Evaluate whether the conditions identified by the bank in step 2 as justifying more favorable treatment pursuant to bank policy existed in racial or national origin group neighborhoods that did not receive the favorable treatment called for by bank policy. If there are racial or national origin group areas for which those conditions existed, ask the bank to explain why the areas were treated differently despite the similar conditions.

b. Evaluate whether the conditions identified by the bank in step 2 as justifying less favorable treatment pursuant to bank policy existed in neighborhoods with particular racial or national origin characteristics that received favorable treatment nevertheless. If there are areas with particular

racial or national origin group characteristics for which those conditions existed, ask the bank to explain why those areas were treated differently, despite the similar conditions.

c. Obtain explanations from the bank for any potential differences in treatment observed that were not called for by the bank's policies.

- If the bank's explanation cites any specific conditions in areas with particular racial or national origin group characteristics to justify more favorable treatment, determine whether the areas with particular racial or national origin group characteristics identified in step 1 satisfied those conditions. If there are areas with particular racial or national origin group characteristics for which those conditions existed, ask the bank to explain why the areas were treated differently despite the similar conditions.

- If the bank's explanation cites any specific conditions in areas with particular racial or national origin group characteristics to justify less favorable treatment, determine whether the non-minority area(s) had those conditions. If there are areas with particular racial or national origin characteristics for which those conditions existed, ask the bank to explain why those areas were treated differently, despite the similar conditions.

d. Evaluate the bank's responses by applying appropriate principles selected from appendix C, "Evaluating Bank Responses to Evidence of Disparate Treatment."

6. **Obtain and evaluate specific types of other information that may support or contradict a finding of redlining.**

As a legal matter, discriminatory intent can be inferred merely from the lack of a legitimate explanation for clearly less-favorable treatment of particular racial or national origin groups. That might be the situation after step 4.Nevertheless, if the bank's explanations do not adequately account for a documented difference in treatment, consider additional information that might support or contradict the interpretation that the difference in treatment constituted redlining.

a. **Comparative file review.** Review the results of a comparative file review conducted with the redlining examination; or, clarify the appearance of discriminatory redlining, by comparing denied applications from within

the suspected redlined area with approved applications from the contrasting area:

- Learn whether there were any denials of fully qualified applicants from the suspected redlined area. If so, that may support the view that the bank wanted to avoid doing business in the area.

- Learn whether the file review identified instances of illegal disparate treatment against applicants of the same race or national origin as the suspected redlined area. If so, that may support the view that the bank was avoiding doing business with applicants of that group, such as the residents of the suspected redlined area. Learn whether any such identified victims applied for transactions in the suspected redlined area.

- If there are instances of either of the above, identify denied residents of other racial or national origin groups, if any, of the suspected redlined area and review their application files to learn whether they appear to have been treated in an irregular or less favorable way. If so, that may support the view that the character of the area rather than of the applicants themselves appears to have influenced the credit decisions.

- Review withdrawn and incomplete applications for the suspected redlined area, if those can readily be identified from the HMDA-LAR, and learn whether there are reliable indications that the bank discouraged those applicants from applying. If so, that may support the view that the bank was avoiding conducting business in the area and may constitute evidence of a violation of section 202.4(b) of Regulation B.

Conversely, if the comparisons of individual transactions show that the bank treated all racial and national origin group applicants within and outside the suspected redlined area similarly, that tends to contradict the conclusion that the bank avoided the areas because it had racial and national origin group residents.

b. **Interviews of third parties.** The perspectives of third parties are taken into account by reviewing available materials during scoping. Later in the examination, information from third parties may help determine whether

the bank's potential differences in treatment of areas with particular racial or national origin characteristics constitutes redlining.

- Identify persons (such as housing or credit counselors, home improvement contractors, or real estate and mortgage brokers) who may have extensive experience dealing with credit applicants from the suspected redlined area.

- After obtaining appropriate authorization and guidance from your supervisory office and, if appropriate, the Compliance Policy Division, interview those persons to learn of their first-hand experiences related to:

    – Oral statements or written indications by a bank's representatives that loan applications from a suspected redlined area were discouraged;

    – Whether the bank treated applicants from the suspected redlined area as called for in its own procedures (as examiners understand them) and/or whether it treated them similarly to applicants from areas with other racial or national origin group characteristics (as the examiners are familiar with those transactions);

    – Any unusual delays or irregularities in loan processing for transactions in the suspected redlined area; and

    – Differences in the bank's pricing, loan conditions, property valuation practices, etc., in the suspected redlined area compared with contrasting areas.

Also, gather from the third parties the names of any consumers they described as having experienced the questionable behavior recounted by the third party and consider contacting those consumers after consultation with the Compliance Policy Division.

If third parties witnessed specific conduct by the bank that indicates the bank wanted to avoid business from the area or prohibited basis group in question, this would tend to support interpreting the difference in treatment as intended. Conversely, if third parties report proper treatment or positive actions toward such area or prohibited basis group, this would tend to contradict the view that the bank intended to discriminate.

The work papers should describe whether and why examiners believe this information from third parties is reliable.

c. **Marketing**. A clear exclusion of the suspected redlined area from the bank's marketing of residential loan products supports the view that the bank did not want to do business in the area. Marketing decisions are affirmative acts to include or exclude areas. Disparities in marketing between two areas may reveal that the bank prefers one to the other. If sufficiently stark and supported by other evidence, a difference in marketing to racially different areas could itself be treated as a redlining violation of the Fair Housing Act. Even below that level of difference, marketing patterns can support or contradict the view that disparities in lending practices were intentional. Consequently:

- Review materials that show how the bank has marketed in the suspected redlined area and in areas with other racial or national origin group characteristics. Begin with available CRA materials and discuss the issues with CRA examiners, then review other materials, as appropriate. The materials may include, for example, the bank's guidance for the geographical distribution of pre-approved solicitations for credit cards or home equity lines of credit, advertisements in local media or business or telephone directories, business development calls to real estate brokers, and calls by telemarketers.

- Even if differences in marketing practices are not violations themselves, consider whether they are part of a pattern of evidence leading toward the conclusion that the bank intended to deal with groups selectively on a prohibited basis.

d. **Peer performance.** Market share analysis and other comparisons to competitors are insufficient by themselves to prove that a bank engaged in illegal redlining. By the same token, a bank cannot justify its own failure to market or lend in an area by citing other banks' failures to lend or market there.

However, a bank's inactivity in an underserved area where its acknowledged competitors are active would tend to support the interpretation that it intends to avoid doing business in the area. Conversely, if it is as active as other lenders that would suggest that it intends to compete for, rather than avoid, business in the area. Consequently:

- Develop a list of the bank's competitors.
- Learn the level of lending in the suspected redlining area by competitors. Check any public evaluations of similarly situated competitors obtained by the CRA examiners as part of evaluating the performance context or obtain such evaluations independently.

e. **Bank's record.** Request from the bank information about its overall record of serving or attempting to serve the racial or national origin groups with which the suspected redlined area is identified. The record may reveal intent to serve that group that tends to contradict the view that the bank intends to discriminate against the group.

7. **For any information that supports interpreting the situation as illegal discrimination, obtain and evaluate an explanation from the bank.**

   **NOTE:** If the bank's explanation is that the disparate results are the consequence of a specific, neutral policy or practice that the bank applies broadly, such as not making loans on homes below a certain value, review the guidance in appendix G, "Disproportionate Adverse Impact," and consult the supervisory office and, if appropriate, the Compliance Policy Division.

## Objective: Determine Potential for Discriminatory Marketing Practices

When scoping identifies significant risk factors (M1-M7) related to marketing, consult the supervisory office and, if appropriate, the Compliance Policy Division about a possible marketing discrimination analysis. If the supervisory office agrees to proceed, collect information as follows:

1. **Identify the bank's marketing initiatives**

   a. **Pre-approved solicitations**

   - Determine whether the bank sends out pre-approved solicitations:
     – For home purchase loans.
     – For home improvement loans.
     – For refinance loans.
   - Determine how the bank selects recipients for such solicitations.
     – Learn from the bank its criteria for such selections.
     – Review any guidance or other information the bank provided credit reporting companies or other companies that supply such lists.

b. **Media Usage**

- Determine in which newspapers and broadcast media the bank advertises.
  - Identify any racial or national origin identity associated with those media.
  - Determine whether those media focus on geographical communities of a particular racial or national origin character.
- Learn the bank's strategies for geographic and demographic distribution of advertisements.
- Obtain and review copies of the bank's printed advertising and promotional materials.
- Determine what criteria the bank communicates to media about what is an attractive customer or an attractive area to cultivate business.
- Determine whether advertising and marketing are the same regardless of the racial or national origin character of the area.

c. **Self-produced promotional materials**

- Learn how the bank distributes its own promotional materials, both methods and geographical distribution.
- Learn what the bank regards as the target audience(s) for those materials.

d. **Realtors, brokers, contractors, and other intermediaries**

- Determine whether the bank solicits business from specific realtors, brokers, home improvement contractors, and other conduits.
  - Learn how the bank decides which intermediaries it will solicit.
  - Identify the parties contacted and determine the distribution between different racial and ethnic areas.
  - Obtain and review the types of information the bank distributes to intermediaries.
  - Determine how often the bank contacts intermediaries.
- Determine what criteria the bank communicates to intermediaries about the type of customers it seeks or the nature of the geographic areas in which it wishes to do business.

e. **Telemarketers or predictive dialer programs**

- Learn how the bank identifies which customers to contact, and whether the bank sets any parameters on how the list of consumers is compiled.

2. **Decide whether the bank's activities show a significantly lower level of marketing effort toward racial or national origin group areas or toward media or intermediaries that tend to reach racial or national origin group areas.**

3. **If there is any such disparity, document the bank's explanation for it.**

For additional guidance on marketing, refer to part C of appendix G "Other Types of Discrimination Analyses."

## Objective: Consider the Effect of Credit Scoring

If the scoping process results in the selection of a focal point that includes a credit or mortgage scored loan product, refer to part C of the "Considering Automated Underwriting and Credit Scoring Risk Factors" (appendix B).

If the bank uses a credit scoring program that scores age for any loan product selected for review in the scoping stage, either as the sole underwriting determinant or only as a guide to making loan decisions, refer to part D of the "Considering Automated Underwriting and Credit Scoring Risk Factors" (appendix B).

## Objective: Consider Disparate Impact Issues

These procedures have thus far focused primarily on examining comparative evidence for possible unlawful disparate treatment. Disparate impact has been described briefly in the introduction. Whenever examiners believe that a particular bank policy or practice appears to have a disparate impact on a prohibited basis, refer to part A of the "Other Types of Discrimination Analyses" (appendix G) or consult the supervisory office and, if appropriate, the Compliance Policy Division for further guidance.

# Concluding the Examination

1. **Present to the bank's management for explanation:**

   a. Any overt evidence of disparate treatment on a prohibited basis.

   b. All instances of potential disparate treatment (e.g., overlaps) in either the underwriting of loans or in loan prices, terms, or conditions.

   c. All instances of potential disparate treatment in the form of discriminatory steering, redlining, or marketing policies or practices.

   d. All instances when a denied prohibited basis applicant was not afforded the same level of assistance or the same benefit of discretion as an approved control group applicant who was no better qualified with regard to the reason for denial.

   e. All instances when a prohibited basis applicant received conspicuously less favorable treatment by the bank than was customary from the bank or was required by the bank's policy.

   f. Any statistically significant average difference in either the frequency or amount of pricing disparities between control group and prohibited basis group applicants.

   g. Any evidence of neutral policies, procedures, or practices that appear to have a disparate effect on a prohibited basis.

2. **Explain that unless there are legitimate, nondiscriminatory explanations (or in the case of disparate impact, a compelling business justification) for each of the preliminary findings of discrimination identified in this part, the agency could conclude that the bank is in violation of the applicable fair lending laws.**

3. **Present to bank management any apparent violation (even isolated) from the "Other Illegal Limitations on Credit Checklist" (appendix K) that was not explained adequately by the bank's staff.**

4. **Review the information on the completed "Technical Compliance Checklist" (appendix L). Consult the supervisory office and, if appropriate, the Compliance Policy Division to determine whether any violations represent a pattern or practice. If so, determine the violations' root cause(s), inform management of the violations, and obtain commitment(s) for corrective action. (Referral of these violations to DOJ is not mandated by ECOA.)**

5. **Document all responses that have been provided by the bank, not just its "best" or "final" response. Document each discussion with dates, names, titles, questions, responses, any information that supports or undercuts the bank's credibility and any other information that bears on the issues raised in the discussion(s).**

6 **Evaluate whether the responses are consistent with previous statements, information obtained from file review, documents, reasonable banking practices, and other sources, and satisfy common-sense standards of logic and credibility.**

   a. Do not speculate or assume that the bank's decision-maker had specific intentions or considerations in mind when he or she took the actions being evaluated. Do not, for example, conclude that because you have noticed a legitimate, nondiscriminatory reason for a denial (such as an applicant's credit weakness) that no discrimination occurred unless it is clear that, at the time of the denial, the bank actually based the denial on that reason.

   b. Perform follow-up file reviews and comparative analyses, as necessary, to determine the accuracy and credibility of the bank's explanations.

   c. Refer to "Evaluating Bank Responses to Evidence of Disparate Treatment" (appendix C) for guidance as to common types of responses.

   d. Refer to the "Disproportionate Adverse Impact Violations" portion of the "Other Types of Discrimination Analyses" (appendix G) for guidance on evaluating the bank's responses to potential disparate impact.

7. **If, after completing steps 1 through 6, above, you conclude that the bank has failed to demonstrate adequately that one or more apparent violations had a legitimate nondiscriminatory basis or were otherwise lawful, prepare**

**a documented list or discussion of violations, or a draft examination report, as prescribed by OCC policy.**

8. **Consult the supervisory office and, if appropriate, the Compliance Policy Division, regarding whether (a) any violations should be referred to the Departments of Justice or Housing and Urban Development and (b) the OCC should undertake enforcement action.**

# Appendix A: Compliance Management Analysis Checklist

**This checklist used in conjunction with determining the reliability of the bank's compliance management process, pages 35 and 36 of the examination scope procedures, allows examiners to evaluate the bank's capacity to prevent, identify, and self-correct fair lending violations in connection with the products or issues selected for analysis. The checklist is not, however, intended to be an absolute test of a bank's compliance management program. Bank programs containing all or most of the features described in the list may nonetheless be flawed for other reasons; conversely, a compliance program which encompasses only a portion of the factors listed below may nonetheless adequately support a strong program under appropriate circumstances. In short, examiners must exercise their best judgment in using this list and in assessing the overall quality of a bank's efforts to ensure fair lending compliance.**

Use the checklist as follows:

- Complete relevant portions of the checklist when compliance information about the focal point to be examined is received in response to the Request Letter.

- Use the checklist to structure an interview of the compliance officer and record information obtained about the compliance management process.

- For banks selected in the random sample of banks to receive fair lending examinations, complete the checklist for the focal point selected for the scope of the examination. If the checklist documents that there are sound compliance measures for that focal point, the risk level is lower. Reduce the number of files reviewed during the examination commensurate with the lower risk level by using sample sizes lower in the ranges in the sample size tables.

- For focal points at banks identified through the OCC's risk-based screening process, complete the checklist, but select the largest sample sizes within the ranges corresponding to the volumes of applications for the focal point, unless the Compliance Management Process conclusions resolve concerns about the specific indications of risk that caused the bank to be selected for examination.

## A. Preventive Measures

Determine whether policies and procedures exist that tend to prevent illegal disparate treatment in the transactions to be examined. There is no legal or OCC requirement for banks to conduct the activities listed below. The absence of any of these policies and practices is never, by itself, a violation.

If the transactions within the proposed scope are covered by a listed preventive measure, check the box in the left column. Reduce the sample size of the planned comparative file review to the degree that the preventive measures cover transactions within the proposed scope. Document findings in sufficient detail to justify any resulting reduction of the file review sample.

Examiners are not required to learn whether preventive measures apply to specific products outside the proposed scope. However, if the information obtained shows that the self-compliance measure is a general practice of the bank, check the box in the right column in order to assist future examination planning.

### 1. Lending practices and standards:

a. Principal policy issues:

☐ ☐ Are underwriting practices clear, objective, and generally consistent with industry standards?

☐ ☐ Is pricing within reasonably confined ranges with guidance linking variations to risk and/or cost factors?

☐ ☐ Does management monitor the nature and frequency of exceptions to its standards?

☐ ☐ Are denial reasons accurately and promptly communicated to unsuccessful applicants?

☐ ☐ Are there clear and objective standards for referring applicants to (i) subsidiaries, affiliates, or other lending channels within the bank, (ii) classifying applicants as "prime" or "subprime" borrowers, or (iii) deciding what kinds of alternative loan products should be offered or recommended to applicants?

☐ ☐ Are loan officers required to document any deviation from the rate sheet?

☐ ☐   Does management monitor consumer complaints alleging discrimination in loan pricing or underwriting?

**NOTE:** The items above are not compliance measures, but they are fundamental features of lending that tend to work against disparate treatment.

  b.  Do training, application-processing aids, and other guidance correctly and adequately describe:

☐ ☐   Prohibited bases under ECOA, Regulation B, and the FH Act?
☐ ☐   Other Regulation B substantive credit access requirements (e.g., spousal signatures, improper inquiries, protected income)?

  c.  Is it specifically communicated to employees that they must not, on a prohibited basis**:**

☐ ☐   Refuse to deal with individuals inquiring about credit?
☐ ☐   Discourage inquiries or applicants by delays, discourtesy, or other means?
☐ ☐   Provide different, incomplete, or misleading information about the availability of loans, application requirements, and processing and approval standards or procedures (including selectively informing applicants about certain loan products while failing to inform them of alternatives)?
☐ ☐   Encourage or more vigorously assist only certain inquirers or applicants?
☐ ☐   Refer credit seekers to other lenders, more costly loan products, or loan products with potentially onerous features?
☐ ☐   Refer credit seekers to nontraditional products (i.e., negative amortization, interest only, or payment option adjustable rate mortgages) when they could have qualified for traditional mortgages?
☐ ☐   Waive or grant exceptions to application procedures or credit standards?
☐ ☐   State a willingness to negotiate?
☐ ☐   Use different procedures or standards to evaluate applications?
☐ ☐   Use different procedures to obtain and evaluate appraisals?
☐ ☐   Provide certain applicants opportunities to correct or explain adverse or inadequate information, or to provide additional information?
☐ ☐   Accept alternative proofs of creditworthiness?
☐ ☐   Require co-signers?

☐ ☐ Offer or authorize loan modifications?
☐ ☐ Suggest or permit loan assumptions?
☐ ☐ Impose late charges, reinstatement fees, etc.?
☐ ☐ Initiate collection or foreclosure?

d. Has the bank taken specific initiatives to prevent the following practices:

☐ ☐ Basing credit decisions on assumptions derived from racial, gender, and other stereotypes, rather than facts?
☐ ☐ Seeking consumers from a particular racial, ethnic, or religious group, or of a particular gender, to the exclusion of other types of consumers, on the basis of how "comfortable" the employee may feel in dealing with those different from him/her?
☐ ☐ Limiting the exchange of credit-related information or the bank's efforts to qualify an applicant from a prohibited basis group?
☐ ☐ Drawing the bank's CRA assessment area to unreasonably exclude particular racial or national origin group areas?
☐ ☐ Targeting certain borrowers or areas with less advantageous products?

e. Does the bank have procedures to ensure that it does not:

☐ ☐ State racial or ethnic limitations in advertisements?
☐ ☐ Employ code words or use photos in advertisements that convey racial or ethnic limitations or preferences?
☐ ☐ Place advertisements that a reasonable person would regard as indicating specific prohibited basis group consumers are less desirable?
☐ ☐ Advertise only in media serving areas of the market that are comprised of a particular racial or ethnic group?
☐ ☐ Conduct other forms of marketing differently in areas of particular racial or national origin group characteristics of the market?
☐ ☐ Market through brokers known to serve only one racial or ethnic group in the market?
☐ ☐ Use a prohibited basis in any pre-screened solicitation for residential credit?
☐ ☐ Provide financial incentives for loan officers to place applicants in nontraditional products or higher-risk products?

## 2. Compliance Audit Function: Does the Bank Attempt to Detect Prohibited Disparate Treatment by Self-test or Self-evaluation?

**NOTE**: A self-test is any program, practice, or study that is designed and specifically used to assess the bank's compliance with the ECOA and the FH Act. It creates data or factual information that is not otherwise available and cannot be derived from loan, application, or other records related to credit transactions (12 CFR 202.15(b)(1) and 24 CFR 100.141). Regulation B at 12 CFR 202.15 and the FH Act at 24 CFR 100.140 cover self-tests and indicate that the report or results of a "self-test" is privileged and if such material is shared with the OCC, the privilege would be waived. However, Section 607 of the Financial Services Regulatory Relief Act of 2006 (12 USC 1828(x)) allows banks to share such privileged information with its federal regulatory agency during supervisory activities without waiving, destroying, or otherwise affecting that privilege as to third parties, such as private litigants.

A self-evaluation, while generally having the same purpose as a self-test, does not create any new data or factual information, but uses data readily available in loan or application files and other records used in credit transactions and, therefore, does not meet the self-test definition.

See appendix H, "Using Self-Tests and Self-Evaluations to Streamline the Examination" for more information about self-tests and self-evaluations.

The following items are intended to obtain information about the bank's approach to self-testing and self-evaluation. Complete the checklist below for each self-evaluation and self-test that the bank performed. Evaluating the results of self-evaluations and self-tests is described in appendix H, "Using Self-Tests and Self-Evaluations to Streamline the Examination."

**Mark the box if the answer is "yes" for the transactions within the scope. Because the questions apply only to transactions within the scope of the examination, there is no second box to check.**

a.  Are the transactions reviewed by an independent analyst who:

☐   Is directed to report objective results?
☐   Has an adequate level of expertise?
☐   Produces written conclusions?

b.  Does the bank's approach for self-evaluations and self-tests call for:

☐  Attempting to explain major patterns shown in the HMDA data?

☐  Determining whether actual practices and standards differ from stated ones and basing the evaluation on the actual practices?

☐  Evaluating whether the reasons cited for denial are supported by facts relied on by the decision maker at the time of the decision?

☐  Comparing the treatment of prohibited basis group applicants to control group applicants?

☐  Obtaining explanations from decision makers for any unfavorable treatment of the prohibited basis group that departed from policy or customary practice?

☐  Covering significant decision points in the loan process where disparate treatment might occur, including:

  ☐  The approve/deny decision?
  ☐  Pricing?
  ☐  Other terms and conditions?

☐  Covering at least as many transactions as examiners would independently by using the "Fair Lending Sample Size Tables" (appendix D) for a product with the application volumes of the product to be evaluated?

☐  Maintaining information concerning personal characteristics collected as part of a self-test separately from application or loan files?

☐  Analyzing the data timely?

☐  Taking appropriate and timely corrective action?

c.  In the bank's plan for comparing the treatment of prohibited basis group applicants with that of control group applicants:

☐  Are control and prohibited basis groups based on a prohibited basis found in ECOA or the FH Act and defined clearly to isolate that prohibited basis for analysis?

☐  Are appropriate data to be obtained to document treatment of applicants and the relative qualifications vis-à-vis the requirement in question?

☐  Will the data to be obtained reflect data on which decisions were based, not later or irrelevant information?

☐  Will the denied applicants' qualifications related to the stated reason

for denial be compared with the corresponding qualifications for approved applicants?

☐ Are comparisons designed to identify instances in which prohibited basis group applicants were treated less favorably than control group applicants who were no better qualified?

☐ Is the evaluation designed to determine whether control and prohibited basis group applicants were treated differently in the processes by which the bank helped applicants overcome obstacles and by which their qualifications were enhanced?

☐ Will responses and explanations be sought for any apparent disparate treatment on a prohibited basis or other apparent violations of credit rights?

☐ Are reasons cited by credit decision makers to justify or explain instances of apparent disparate treatment to be verified?

d. For self-tests under ECOA that involved the collection of applicant personal characteristics, did the bank:

    1. Develop a written plan that describes or identifies the:

        ☐ Specific purpose of the self-test?
        ☐ Methodology to be used?
        ☐ Geographic area(s) to be covered?
        ☐ Type(s) of credit transactions to be reviewed?
        ☐ Entity that will conduct the test and analyze the data?
        ☐ Timing of the test, including start and end dates or the duration of the self-test?
        ☐ Other related self-test data that is not privileged?

    2. Disclose at the time applicant characteristic information is requested, that:

        ☐ The applicant will not be required to provide the information?
        ☐ The creditor is requesting the information to monitor its compliance with ECOA?
        ☐ Federal law prohibits the creditor from discriminating on the basis of this information or on the basis of an applicant's decision not to furnish the information?
        ☐ If applicable, certain information will be collected based on visual observation or surname if not provided by the applicant?

## B. Corrective Measures

---

1. Determine whether the bank has provisions to take appropriate corrective action and provide adequate relief to victims for any violations in the transactions you plan to review.

   - Who is to receive the results of a self-evaluation or self-test?
   - What decision process is supposed to follow delivery of the information?
   - Is feedback to be given to staff whose actions are reviewed?
   - What types of corrective action may occur?
   - Are consumers to be:
     - ☐ Offered credit if they were improperly denied?
     - ☐ Compensated for any damages, both out of pocket and compensatory?
     - ☐ Notified of their legal rights?

2. Other corrective action:

   - ☐ Are bank policies or procedures that may have contributed to the discrimination to be corrected?
   - ☐ Are employees involved to be trained and disciplined?
   - ☐ Is the need for community outreach programs and changes in marketing strategy or loan products to better serve areas of a particular racial or national origin group of the bank's market to be considered?
   - ☐ Are audit and oversight systems to be improved to ensure there is not a recurrence of any identified discrimination?

# Appendix B: Considering Automated Underwriting and Credit Scoring Risk Factors

These procedures are designed to help examiners draw and support lending conclusions for banks using automated underwriting or credit scoring risk factors.

## Background

Regulation B defines a "credit scoring system" as "a system that evaluates an applicant's creditworthiness mechanically based on key attributes of the applicant and aspects of the transaction, and that determines, alone or in conjunction with an evaluation of additional information about the applicant, whether the applicant is deemed creditworthy." The OCC also uses the terms "scoring models" and "scorecard" to describe a credit scoring system.

For the comparative analyses described here, learn how the score, underwriting policies and requirements for unscored factors, and human judgment influence the credit decision and interact in the bank's underwriting process.

In the planning phase of an examination, consider including economists from Compliance Risk Analysis Division (Compliance RAD) as consultants on the examination. Credit scoring models are statistical models. Compliance RAD economists can review a credit scoring model for potential disparate treatment or disparate impact. In addition, Compliance RAD economists can review scorecard development, monitoring, and validation materials to judge whether the scoring system meets the requirements in Regulation B that apply when age is scored (i.e., the requirements for empirically derived, demonstrably statistically sound systems).

## Objective: Gain an Understanding of the Structure and Organization of the Scoring System

1. **For each customized credit scoring model for any product, or for any credit scoring model used in connection with a product held in portfolio, identify and obtain:**

a. The number and inter-relationship of each model or scorecard applied to a particular product;

b. The purposes for which each scorecard is employed (e.g., approval decision, set credit limits, set pricing, determine processing requirements, etc.);

c. The developer of each scorecard (e.g., in-house department, affiliate, independent vendor name), the development process, and description of the development population used;

d. The types of monitoring reports, including data integrity checks, generated (including front-end, back-end, account management and any disparate impact analyses), the frequency of generation, and recent copies of each;

e. All policies applicable to the use of credit scoring;

f. Training materials and programs on credit scoring for employees, agents, and brokers involved in any aspect of retail lending;

g. Any action taken to revalidate or re-calibrate any model or scorecard used during the examination period and the reason(s) why;

h. The process, criteria, and authority for overrides, how override decisions are documented, what reports are available on override activity; and the number of all high-side and low-side overrides for each type of override occurring during the examination period and any guidance given to employees on their ability to override;

i. All cutoffs used for each scorecard throughout the examination period and the reasons for the cutoffs and any change made during the examination period;

j. All variables scored by each product's scorecard(s) and the values that each variable may take (**NOTE:** The variables themselves are not proprietary information, although how they are weighted may be);

k. The method used to select for disclosure those adverse action reasons arising from application of the model or scorecard;

l. Steps an application goes through before and after scoring;

m. How, and by whom, applicant data are obtained and characterized before being entered for credit scoring;

n. Whether assistance can be given to help applicants improve their qualification data; and

o. Any other way that intervention by the bank can affect the applicant's score or the outcome.

2. **For each judgmental underwriting system that includes as an underwriting criterion a standard credit bureau or secondary market credit score identify:**

---

a. The vendor of each credit score and any vendor recommendation or guidance on the usage of the score relied upon by the bank;

b. The bank's basis for using the particular bureau or secondary market score and the cutoff standards for each product's underwriting system and the reasons for the cutoffs and any changes to the same during the examination period;

c. The number of exceptions or overrides made to the credit score component of the underwriting criteria and the basis for those exceptions or overrides, including any guidance given to employees on their ability to depart from credit score underwriting standards; and

d. Types of monitoring reports generated on the judgmental system or its credit scoring component (including front-end, back-end, differential processing and disparate impact analysis), the frequency of generation and recent copies of each.

**NOTE:** For fair lending analysis, examiners typically need not inquire into the activities of credit bureaus or the accuracy of scores the bureaus calculated from consumers' credit histories. If a bank's policy is that a credit bureau score at a certain level is supposed to have certain consequences, determine whether control group and prohibited basis applicants at those levels received the same consequences.

## Objective: Determine Accuracy of Denial Reasons Based on Credit Scores Used in Adverse Action Notices

1. **Determine the methodology used to select the reasons why adverse action was taken on a credit application denied on the basis of the applicant's credit score.**

2. **Compare the methodology used in the examples cited in the Commentary to Regulation B and decide acceptability against that standard.**

3. **Identify any consumer requests for reconsideration of credit score denial reasons and review the action taken by management for consistency across applicant groups.**

4. **When a credit score is used to differentiate application processing, and an applicant is denied for failure to attain a judgmental underwriting standard that would not be applied if the applicant had received a better credit score (thereby being considered in a different — presumably less stringent —**

**application processing group), ensure that the adverse action notice also discloses the bases on which the applicant failed to attain the credit score required for consideration in the less stringent processing group.**

# Objective: Consider Disparate Treatment in the Application of Credit Scoring Programs

Scoring systems should be examined for both types of evidence of disparate treatment — overt and comparative. For any instances of apparent disparate treatment, the bank may respond in the same ways as discussed in Evaluating Responses to "Evaluating Bank Responses to Evidence of Disparate Treatment" (appendix C). Evaluate the responses in the same manner.

## Overt Evidence of Disparate Treatment

The only permissible consideration of a prohibited basis in a credit scoring system is provided in Regulation B, which permits banks to consider age, as long as:

- Persons over 62 are not treated less favorably than those under 62; and
- The scoring system is certified to be empirically derived and demonstrably and statistically sound (12 CFR 202.6 (b)(2)(ii)).

How to determine those two facts is further detailed in section D below.

Determine whether the system makes any other overt distinctions on a prohibited basis. For example, there would appear to be a violation if the scoring system assigns different credit limits depending on the marital status of the applicant(s) or uses a different cutoff score on a prohibited basis for applicants. The bank should know and disclose the factors included in any scoring system it uses in credit decisions. In that way, the bank and the OCC can be sure that no prohibited factors are scored and that age, when scored, is treated in conformity with Regulation B.

If there is overt evidence that applicants in a credit scoring system are treated less favorably, on a prohibited basis (other than age), ask the bank to respond in writing, and evaluate the response in the same way they would for any other overt evidence of disparate treatment.

## Comparative Evidence of Disparate Treatment

If credit scores are the sole basis for granting credit, the fact that two applicants have different scores means they are not "similarly situated." There is no disparate treatment if the different results are commensurate with the difference in scores, if those applicants have otherwise been treated similarly. Comparative analysis may be appropriate to evaluate possible disparate treatment for pre-scoring and post-scoring underwriting activity. This can be done by judgmental interpretation or statistical inferences from a statistical model.

1. **Determine what controls and policies management has implemented to ensure that the bank's credit scoring models or credit score criteria are not applied in a discriminatory manner, in particular:**

    a. Review bank guidance for using the credit scoring system, handling overrides, and processing applicants and determine how well that guidance is understood by employees and monitored by management.

    b. Review bank policies that permit overrides or that provide for different processing or underwriting requirements based on geographic identifiers or borrower score ranges to assure that these policies do not treat prohibited basis group applicants differently than other similarly situated applicants.

    Other override policies and practices that indicate the existence of broad discretion that might be applied discriminatorily are:

    - Excessive overrides.
    - Judgmental elements or subjective reviews that could reverse the result called for by the score.
    - Multiple judgmental criteria for overrides without explicit weighting or guidance as to which of these is most important.
    - Numerous rules that could lead underwriters to reverse the result called for by the score.
    - Overlays of the scorecard and underwriting policies (for example, income and debt were scored variables but there is also a maximum debt-to-income (DTI) requirement).
    - Frequent use of "other," "miscellaneous," etc., as the reason for override.

2. **As called for in steps 3 and 4 below, focus on judgmental decisions to approve or deny applications, that is, "overrides" of the result indicated by the score. "High-side" overrides are denials that have scores higher than the cutoff. "Low-side" overrides are approvals that have scores lower than the cutoff.**

Prior to initiating steps 2 and 3, consult the supervisory office and, if appropriate, the Compliance Policy Division about developing a preliminary statistical analysis to show whether overrides were:

- Used in similar proportions within the control and prohibited basis groups.
- Applied consistently to control and prohibited basis group applications with similar characteristics.

If the overall pattern of overrides raises concerns, the OCC will determine whether to use a statistical model. The volume of overrides must equal at least 50 from each of the four "quadrants" of favorably or unfavorably treated control group and prohibited basis group applicants.

The role and complexity of human judgment in the underwriting process influence whether a statistical model is appropriate: A manual comparative file review probably is sufficient if the underwriters' use of the score and other data is governed by straightforward guidelines, and decisions are well documented. Examiners may be directed to review files to determine whether legitimate, nondiscriminatory reasons exist for any differences identified through the preliminary statistical analysis. A statistical model may be appropriate if the use of the score and other criteria by the underwriters are vague, complex, subjective, and/or poorly documented.

3. **Evaluate whether any of the bases for granting credit to control group applicants who are low-side overrides are applicable to any prohibited basis group denials whose credit score was equal to or greater than the lowest score among the low-side overrides. If such cases are identified, obtain and evaluate management's conclusion that such different treatment is not a fair lending violation.**

4. **Evaluate whether any of the bases for denying credit to any prohibited basis group applicants who are high-side overrides are applicable to any control**

**group approvals whose credit score was equal to or less than the highest score among the prohibited basis high-side overrides. If such cases are identified, obtain and evaluate management's conclusion that such different treatment is not a fair lending violation.**

**5. If credit scores are used to segment applicants into groups that receive different processing or are required to meet additional underwriting requirements (e.g., tiered risk underwriting), perform a comparative file review or confirm the results and adequacy of management's comparative file review that evaluates whether all applicants within each group are treated equally.**

**6. Conduct pre-scoring comparative analysis. The analysis focuses on whether disparate treatment occurred in collecting, classifying, or documenting data before being entered for credit scoring, and whether assistance was given selectively to improve qualifications. This typically is conducted by manual file review and judgmental comparison. The scoring system's database may help to identify marginal applicants for such a comparison.**

- Select 50 denied applicants from the prohibited basis group that have scores marginally below the cutoff.
- Select 50 approved applicants from the control group that have scores marginally above the cutoff.
- Compare the two groups to determine whether qualifications were characterized and assistance was provided consistently.

If the volume of applications is large, consult the supervisory office and, if appropriate, the Compliance Policy Division about assistance in selecting the sample.

## Objective: Evaluate Disparate Impact and Credit Scoring Algorithms

Consult the supervisory office and, if appropriate, the Compliance Policy Division to assess potential disparate treatment issues relating to the credit scoring algorithms.

## Objective: Evaluate Credit Scoring Systems that Include an Applicant's Age

Regulation B expressly requires initial validation and periodic revalidation of a credit scoring system that considers an applicant's age. There are two ways a credit scoring system can consider age: 1) the system can be split into

different scorecards depending on the age of the applicant; and 2) age may be directly scored as a variable. Both features may be present in some systems. Regulation B requires credit scoring systems that use age to be empirically derived and demonstrably and statistically sound (EDDSS). This means that such systems must fulfill the requirements of section 202.2(p)(1)(i) - (iv).

Age-Split Scorecards: If a system is split into two cards only and one card covers a wide age range that encompasses elderly applicants (applicants aged 62 or older), the system is treated as considering, but not scoring, age. Typically, the younger scorecard in an age-split system is used for applicants under a specific age between 25 and 30. The scorecard de-emphasizes factors such as the number of trade lines and the length of employment, and increases the negative weight of any derogatory information on the credit report. Systems such as these do not raise the issue of assigning a negative factor or value to the age of an elderly applicant. However, if age is scored as a variable directly (whether or not the system is age-split), or if elderly applicants are included in a card with a narrow age range in an age-split system, the system is treated as scoring age.

Scorecards that Score Age: If a scorecard scores age directly, in addition to meeting the EDDSS requirement, the creditor must ensure that the age of an elderly applicant is not assigned a negative factor or value. (See the staff commentary at 12 CFR 202.2(p) and 202.6(b)(2)). A negative factor or value means using a factor, value, or weight that is less favorable than the creditor's experience warrants or is less favorable than the factor, value, or weight assigned to the most favored age group below the age of 62 (12 CFR 202.2(v)).

1. **Obtain documentation provided by the developer of the scoring system and consult the OCC's most recent guidance to determine empirical derivation and statistical soundness. The OCC has provided guidance to national banks on evaluating the soundness of credit scoring systems. (See OCC Bulletin 97-24, "Credit Scoring Models," May 20, 1997.)**

2. **Determine whether the bank has reviewed the performance of its credit scoring system periodically and whether the product scored has operated in a changing economic and customer environment. If so, it is even more important that the bank has performed a review. If the bank scores age, but has not conducted a review despite changes that call the predictive value of the system into question, consult the supervisory office and, if appropriate,**

**the Compliance Policy Division.**

If the scoring system does not use age as a factor and does not split scorecards by age, do not expect the bank to have reviewed the performance of the system or to have had it re-validated for fair lending compliance. (Remind the bank that it is prudent to review and re-validate the system so that it operates at optimal predictability, but that is not a fair lending issue.)

The OCC may evaluate the variables used in a validated credit scoring system to determine whether they have a disparate impact on any basis prohibited by the fair lending laws. However, the OCC will conclude that a variable is justified by business necessity and does not warrant further scrutiny if the variable is statistically related to loan performance and has an understandable relationship to an individual applicant's creditworthiness.

# Appendix C: Evaluating Bank Responses to Evidence of Disparate Treatment

This appendix discusses a bank's possible responses to comparative evidence of disparate treatment and overt evidence of disparate treatment.

## A. Bank Responses to Comparative Evidence of Disparate Treatment

The following are responses that a bank may offer — separately or in combination — in an attempt to explain that the appearance of illegal disparate treatment is misleading, and that no violation has occurred. The responses, if true, may rebut the appearance of disparate treatment. Evaluate the validity and credibility of the responses. Some of the types of responses include lists of responses of each type that examiners often encounter; the lists are examples only, and banks may offer explanations not on the lists.

1. The bank's personnel were unaware of the prohibited basis identity of the applicant(s).

   If the bank claims to have been unaware of the prohibited basis identity (e.g., race) of an applicant or neighborhood, ask the bank to show that the application in question was processed in such a way that the bank's staff, which made the decisions, could not have learned the prohibited basis identity of the applicant.

   If the product is one for which the bank maintains prohibited basis monitoring information, assume that all employees could have taken those facts into account. Assume the same when there was face-to-face contact between any employee and the consumer.

   If other facts exist about the application from which an ordinary person would have recognized the applicant's prohibited basis identity (for example, an easily recognizable surname such as an Hispanic one), assume that the bank's staff drew the same conclusions. If the racial character of a community is in question, ask the bank to provide persuasive evidence of what would prevent its staff from knowing the racial character of any community in its service area.

2. <u>The difference in treatment was justified by differences in the applicants (i.e. applicants not "similarly situated").</u>

Ask the bank to account for the difference in treatment by pointing out a specific difference between the applicants' qualifications, or some factor not captured in the application but that legitimately makes one applicant more or less attractive to the bank, or some nonprohibited factor related to the processing of their applications. The difference identified by the bank must be important enough to justify the difference in the treatment in question.

The factors commonly cited to show that applicants are not similarly situated fall into two groups: those that can be evaluated by how consistently they are handled in other transactions, and those that cannot.

a. Verifying "not similarly situated" explanations by consistency.

The appearance of disparate treatment remains if a factor cited by the bank to justify favorable treatment for a control group applicant also exists for an otherwise similar prohibited basis group applicant who was treated unfavorably. Similarly, the appearance of disparate treatment remains if a factor cited by the bank to justify unfavorable treatment for a prohibited basis group applicant also exists for a control group applicant that received favorable treatment. If this is not so, ask the bank to document that the factor cited in its explanation was used consistently for control group and prohibited basis group applicants.

Among the responses that should be evaluated this way are:

- **Customer relationship.** Ask the bank to document that a customer relationship was also sometimes considered to the benefit of prohibited basis group applicants and/or that its absence worked against control group customers.
- **Loan not saleable or insurable.** If file review is still in progress, be alert for loans approved despite the claimed fatal problem. At a minimum, ask the bank to produce the text of the secondary market or insurer's specific requirement.
- **Differences in standards or procedures between branches or underwriters.** Ask the bank to provide transactions documenting that each of the two branches or underwriters applied its standards or procedures consistently to both prohibited basis and control group applications it

processed, and that each served similar proportions of the prohibited basis group.

- **Differences in applying the same standard (differences in "strictness") between underwriters, branches, etc.** Ask the bank to provide transactions documenting that the stricter employee, branch, etc., was strict for both prohibited basis and control group applicants and that the other was lenient for both, and that each served similar proportions of the prohibited basis group. The best evidence of this would be prohibited basis group applicants who received favorable treatment from the lenient branch and control group applicants who received less favorable treatment from the "strict" branch.
- **Standards or procedures changed during review period.** Ask the bank to provide transactions documenting that during each period the standards were applied consistently to both prohibited basis and control group applicants.
- **Employee misunderstood standard or procedure.** Ask the bank to provide transactions documenting that the misunderstanding influenced both prohibited basis and control group applications. If such information is not available, find no violation if the misunderstanding is a reasonable mistake.

In all of those situations, the bank's best response would be to show that the treatment in question occurred for both groups in proportion to their representation among otherwise comparable applicants.

b. Evaluating "not similarly situated" explanations by other means.

If consistency cannot be evaluated, consider an explanation favorably even without examples of its consistent use if:

- The factor is documented to exist in (or be absent from) the transactions, as claimed by the bank;
- A prudent loan officer would consider the factor that is consistent with the bank's policies and procedures;
- File review found no evidence that the factor is applied selectively on a prohibited basis (in other words, the bank's explanation is "not inconsistent with available information"); and
- The bank's description of the transaction generally is consistent and reasonable.

Some factors that may be impossible to compare for consistency are:

- **Unusual underwriting standard.** Ask the bank to show that the standard is prudent. If it is prudent and is not inconsistent with other information, accept this explanation although no documentation demonstrating that it is used consistently exists.

- **"Close calls."** The bank may claim that underwriters' opposite decisions on similar applicants reflects legitimate discretion that examiners should not second guess. That is not an acceptable explanation for identical applicants with different results, but is acceptable when the applicants have differing strengths and weaknesses that different underwriters might reasonably weigh differently. However, do not accept the explanation if other files reveal that these "strengths" or "weaknesses" are counted or ignored selectively on a prohibited basis. If the number of "close calls" exceeds 30, contact the supervisory office and, if appropriate, the Compliance Policy Division about the potential to use statistical analysis to determine whether a pattern on a prohibited basis exists.

- **"Character loan."** Expect the bank to identify specific facts or a specific history that make the applicant who is treated favorably a better risk than those treated less favorably.

- **"Accommodation loan."** There are many legitimate reasons that may make a transaction appealing to a bank apart from the familiar qualifications demanded by the secondary market and insurers. For example, a consumer may be related to or referred by an important customer, be a celebrity who would bring prestige to the bank, be an employee of an important business customer, etc. Making a loan to an otherwise unqualified control group applicant with such attributes while denying a loan to an otherwise similar prohibited basis group applicant without those attributes is not illegal discrimination. However, be skeptical when the bank cites reasons for "accommodations" that an ordinary prudent loan officer would not value.

- **"Gut feeling."** Be skeptical when a bank justifies an approval or denial by a general perception or reaction to the consumer. Such a perception or reaction may be linked to a racial or other stereotype that legally must not influence credit decisions. Ask whether any specific event or fact generated the reaction. Often, the loan officer can cite something specific that made him or her confident or uncomfortable about the consumer. There is no discrimination if it is credible that the bank indeed considered such a factor and did not apply it selectively on a prohibited basis.

c. Follow up customer contacts

If the bank's explanation of the handling of a particular transaction is based on consumer traits, actions, or desires not evident from the file, consider obtaining supervisory office authorization to contact the consumer to verify the bank's description. Such contacts need not be limited to possible victims of discrimination, but can include control group applicants or other witnesses.

When authorized by the supervisory office in consultation with the Compliance Policy Division, examiners may contact bank customers to gather additional facts necessary to determine whether a violation exists or to verify an explanation that lacks documentation.

3.  <u>The different results stemmed from an inadvertent error</u>.

If the bank claims that an identified error such as a miscalculation or misunderstanding caused the favorable or unfavorable result in question, evaluate whether the facts support the assertion that such an event occurred.

If the bank claims that an "unidentified error" caused the favorable or unfavorable result in question, expect the bank to provide evidence that discrimination is inconsistent with its demonstrated conduct and, therefore, that discrimination is the less logical interpretation of the result. Consider the context (as described below).

Consider the context when evaluating isolated, ambiguous instances of apparent disparate treatment. They should find no violation when circumstances contradict the interpretation that the bank intended to treat applicants from the prohibited basis group less favorably. For example, discrimination is doubtful as the cause of an isolated, ambiguous lending decision or inconsistency when the bank clearly is receptive toward applicants from the prohibited basis group (as evidenced by, for example, frequent loans or aggressive advertising to the prohibited basis group) and has a record of training and other substantive efforts to comply with anti-discrimination laws.

4.  <u>The apparent disparate treatment on a prohibited basis is a misleading portion of a larger pattern of random inconsistencies</u>.

Ask the bank to provide evidence that the unfavorable treatment is not limited to the prohibited basis group and that the favorable treatment is not

---

limited to the control group. Without such examples, do not accept a bank's unsupported claim that otherwise inexplicable differences in treatment are distributed randomly.

If the bank can document that similarly situated prohibited basis group applicants received the favorable treatment in question approximately as frequently and in comparable degree as the control group applicants, conclude there is no violation.

**NOTE:** Transactions are relevant to "random inconsistency" only if they are "similarly situated" to those apparently treated unequally.

In examinations in which the OCC has access to a bank's detailed, automated database (such as for many credit-scored products), contact the supervisory office and, if appropriate, the Compliance Policy Division during the planning of the examination about involving the OCC's statistical experts to address random inconsistency issues. (Because the OCC's statistical modeling approach incorporates control group denials and prohibited basis group approvals and control group approvals and prohibited basis group denials, possible "random inconsistency" already is considered in the model's analysis.)

Although a bank may succeed in demonstrating that its treatment of applicants is random, inform the bank that its inconsistent practices create the risk of future disparate treatment and raise concerns about the adequacy of its controls.

5. <u>The differences in loan terms and conditions are the result of different borrower risks/costs</u>.

The same analyses described in the preceding sections with regard to decisions to approve or deny loans also apply to pricing differences. Risks and costs are legitimate considerations in setting prices and other terms and conditions of loan products. However, generalized reference by the bank to "cost factors" is insufficient to explain pricing differences.

If the bank claims that specific borrowers received different terms or conditions because of cost or risk considerations, ask the bank to identify specific risk or cost differences between those borrowers.

If the bank claims that specific borrowers received different terms or conditions because they were not similarly situated as negotiators, consider

---

whether application records might provide relevant evidence. If the records are not helpful, consider seeking authorization to contact consumers to learn whether the bank, in fact, behaved comparably toward prohibited basis and control group consumers. The contacts would be to learn such information as the bank's opening quote of terms to the consumer and the progress of the negotiations.

**NOTE:** This situation may be appropriate for consulting the supervisory office and, if appropriate, the Compliance Policy Division about the use of pre-application, matched-pair testing to document the bank's treatment of potential applicants.

If the bank responds that an average price difference between the control and prohibited basis groups is based on cost or risk factors, ask it to identify specific risk or cost differences between individual control group applicants with the lowest rates and prohibited basis group applicants with the highest rates that are significant enough to justify the pricing differences between them. If the distinguishing factors cited by the bank are legitimate and verifiable, as described in the sections above, remove those applications from the average price calculation. If the average prices for the remaining control group and prohibited basis group members still differ more than minimally, consult the supervisory office and, if appropriate, the Compliance Policy Division about obtaining an analysis of whether the difference is statistically significant. Find a violation only if (1) evidence of disparate treatment of similarly situated borrowers exists or (2) a particular risk factor exists that meets all the criteria for a disproportionate adverse impact violation.

## B. Bank Responses to Overt Evidence of Disparate Treatment

1. <u>Descriptive references vs. lending considerations</u>

   A reference to race, gender, etc., does not constitute a violation if it is merely descriptive — for example, "the applicant was young." In contrast, when the reference reveals that the prohibited factor influenced the bank's decisions and/or consumer behavior, treat the situation as an apparent violation to which the bank must respond.

2. <u>Personal opinions vs. lending considerations</u>

If an employee involved with credit availability states unfavorable views regarding a racial group, gender, etc., but does not explicitly relate those views to credit decisions, review that employee's credit decisions for possible disparate treatment of the prohibited basis group described unfavorably. If no instances of apparent disparate treatment exist, treat the employee's views as permissible private opinions. Inform the bank that such views create a risk of future violations.

3. Stereotypes related to credit decisions

An apparent violation may exist when a prohibited factor influences a credit decision through a stereotype related to creditworthiness, although the action based on the stereotype seems well-intended — for example, a loan denial because "a single woman could not maintain a large house." If the stereotyped beliefs are offered as "explanations" for unfavorable treatment, regard such unfavorable treatment as apparent illegal disparate treatment. If the stereotype is only a general observation unrelated to particular transactions, review that employee's credit decisions for possible disparate treatment of the prohibited basis group in question. Inform the bank that such views create a risk of future violations.

4. Indirect reference to a prohibited factor

If negative views related to creditworthiness are described in nonprohibited terms, consider whether the terms would be understood commonly as surrogates for prohibited terms. If so, treat the situation as if explicit prohibited basis terms were used. For example, a bank's statement that "It's too risky to lend north of 110th Street" might be reasonably interpreted as a refusal to lend because of race if that portion of the bank's lending area north of 110th Street were predominantly Black and the area south White.

5. Lawful use of a prohibited factor

a.  Special-Purpose Credit Program (SPCP)

If a bank claims that its use of a prohibited factor is lawful because it is operating an SPCP, ask the bank to document that its program conforms to the requirements of Regulation B. An SPCP must be defined in a written plan that existed before the bank made any decisions on loan applications under the program. The written plan must:

- Demonstrate that the program will benefit persons who would otherwise be denied credit or receive credit on less favorable terms; and
- State the date that the program will be in effect or when it will be re-evaluated.

No provision of a SPCP should deprive people who are not part of the target group of rights or opportunities they otherwise would have. Qualified programs operating on an otherwise-prohibited basis will not be cited as a violation.

**NOTE:** Inform the bank of a caveat that an OCC finding stating that "…a program is a lawful SPCP" is not absolute security against legal challenge by private parties. Suggest that a bank concerned about legal challenge from other quarters use exclusions or limitations that are not prohibited by ECOA or the FH Act, such as "first-time home buyer."

b.  Second review program

Second review programs are permissible if they do no more than ensure that lending standards are applied fairly and uniformly to all applicants. For example, it is permissible to review the proposed denial of applicants who are members of a prohibited basis group by comparing their applications to the approved applications of similarly qualified individuals who are in the control group to determine whether the applications were evaluated consistently.

Ask the bank to demonstrate that the program is a safety net that merely attempts to prevent discrimination, and does not involve underwriting terms or practices that are preferential on a prohibited basis.

Statements indicating that the mission of the program is to apply different standards or efforts on behalf of a particular racial or other group constitute overt evidence of disparate treatment. Similarly, an apparent violation exists if comparative analysis of applicants who are processed through the second review and those who are not discloses dual standards related to the prohibited basis.

c.  Affirmative marketing/advertising program

Affirmative advertising and marketing efforts that do not involve application
of different lending standards are permissible under both the ECOA and the
FH Act. For example, special outreach to a community of a particular racial
or national origin characteristic would be permissible. However, advertising
and marketing that suggests, on a prohibited basis, that applications are not
welcome may violate the FH Act, ECOA, or Regulation B's prohibitions
against discouraging applicants.

# Appendix D: Fair Lending Sample Size Tables

In banks selected as part of the OCC's random sample of banks to receive fair lending examinations, select a sample size within the appropriate range based on risk. For banks and focal points selected through the risk-based screening process, use the maximum sample size for the range unless the Compliance Management Review resolves concerns about the specific indications of risk that caused the bank to be selected for examination.

**NOTE:** Do not use these tables to evaluate focal points that involve credit scoring systems or the results of self-evaluations or of self-tests. Instead, see "Considering Automated Underwriting and Credit Scoring Risk Factors" (appendix B) and "Using Self-Tests and Self-Evaluations to Streamline the Examination" (appendix H). **Do not use these tables when conducting a pricing examination**. **See note #1 for sample sizes for pricing examinations**.

### Table A: Underwriting (Accept/Deny) Comparisons

| Sample 1 Prohibited Basis Group Denials | | | | Sample 2 Control Group Approvals | | |
|---|---|---|---|---|---|---|
| Number of Denials or Approvals | 5- 50 | 51 - 150 | > 150 | 20- 50 | 51 - 250 | > 250 |
| Minimum to review: | All | 51 | 75 | 20 | 51 | 100 |
| Maximum to review: | 50 | 100 | 150 | 5x prohibited basis group sample (up to 50) | 5x prohibited basis group sample (up to 125) | 5 x prohibited basis group sample (up to 300) |

### Table B: Terms and Conditions Comparisons

| Sample 1 Prohibited Basis Group Approvals | | | | Sample 2 Control Group Approvals | | |
|---|---|---|---|---|---|---|
| Number of Approvals | 5 - 25 | 26 - 100 | > 100 | 20 - 50 | 51 - 250 | > 250 |
| Minimum to review: | All | 26 | 50 | 20 | 40 | 60 |
| Maximum to review: | 25 | 50 | 75 | 5x prohibited basis group sample (up to 50) | 5x prohibited basis group sample (up to 75) | 5 x prohibited basis group sample (up to 100) |

**See explanatory notes on the following pages.**

**Explanatory Notes to Sample Size Tables**

1. When performing a pricing examination, conduct a full file review over a specific time range when the pricing criteria were constant. Do not just review loans that received a rate-spread, but all pricing decisions for the specific product being reviewed.

2. When performing both underwriting and terms and conditions comparisons (**NOTE:** OCC examinations typically should include only one of the comparisons), use the same control group approval sample for both tasks.

3. If there are fewer than five prohibited basis denials or 20 control group approvals, refer to "Sample Size" instructions in the procedures.

4. "Minimum" and "maximum" sample sizes: select a sample size between the minimum and maximum identified above. Base the size for the sample on the level of risk identified during scoping and the outcome of the compliance management system review. Once the sample size has been determined, select individual transactions judgmentally (refer to procedures). If the minimum number of approved files called for in a sample-size table exceeds the maximum (as calculated using the table), select the smaller number of files for the approved sample.

5. If two prohibited basis groups (e.g., Black and Native American) are being compared against one control group, select a control group that is five times greater than the larger prohibited basis group sample, up to the maximum.

6. If the bank's discrimination risk profile identifies significant discrepancies in withdrawal/incomplete activity between the control group and prohibited basis group, or if the number of marginal prohibited basis group files available for sampling is small, consider supplementing samples by applying the following rules:

   • If prohibited basis group withdrawals/incompletes occur after the applicant has received an offer of credit that includes pricing terms, this is a reporting error under Regulation C (the bank should have reported the application as approved but not accepted), and, therefore, these applications should be included as prohibited basis group approvals in a terms and conditions comparative file analysis.

---

- If prohibited basis group incompletes occur due to lack of an applicant response with respect to an item that would give rise to a denial reason, then include these incompletes as denials for that reason when conducting an underwriting comparative file analysis.

Whenever possible, select the sample from the 12-month period immediately preceding the examination, not from an earlier period. In addition, transactions or classes of transactions of particular interest may be identified to include in the sample. For banks and mortgage companies listed on the final fair lending screening lists each year, use the appropriate HMDA data as follows:

- For banks and mortgage companies listed on the final fair lending screens for Mortgage Lending Underwriting, Terms and Conditions, Rate-Spread Mortgages, and Fed Output Reports, use the HMDA data for the year used to develop the screening lists.

- For banks and mortgage companies listed on the final Redlining and Marketing screen, use the HMDA data and any other data useful for conducting a redlining and marketing analysis for the year used to develop the screening list.

- For banks on the Random Sample and Credit Card Banks final screens, use the most current data for the focal points identified.

For banks selected in the random sample of banks to be examined, set the sample size based on the estimated risk of discrimination. The more risk factors identified during examination scoping and the weaker the compliance management process, the larger the sample should be within the range.

If no HMDA-LAR for the product exists and the bank is not subject to the Fair Housing Home Loan Data System requirements, request that the bank estimate or count the numbers of racial and national origin group applications for home purchase, or refinance loans. Alternatively, examiners themselves may count them. (This is feasible because Regulation B requires monitoring information for home purchase and refinance applications.)

**Note**: Regardless of application volume or sample size, any clear instance of potential disparate treatment – even if the comparison consists of only two files – must be treated as an apparent violation.

# Appendix E: Identifying Marginal Transactions

This guidance is intended to help examiners identify denied and approved applications that were not either clearly qualified or unqualified, i.e., marginal transactions.

**Marginal Denials**

Denied applications with any or all the following characteristics are "marginal." Such denials are compared to marginal approved applications. Marginal denied applications include those that:

- Were close to satisfying the requirement that the adverse action notice said was the reason for denial;
- Were denied by the bank's rigid interpretation of inconsequential processing requirements;
- Were denied quickly for a reason that normally would take a longer time for an underwriter to evaluate;
- Involved an unfavorable subjective evaluation of facts that another person might reasonably have interpreted more favorably (for example, whether late payments actually showed a "pattern," or whether an explanation for a break in employment was "credible");
- Resulted from the bank's failure to take reasonable steps to obtain necessary information;
- Received unfavorable treatment as the result of a departure from customary practices or stated policies. For example, if it is the bank's stated policy to request an explanation of derogatory credit information, a failure to do so for a prohibited basis applicant would be a departure from customary practices or stated policies even if the derogatory information seems to be egregious;
- Were similar to an approved control group applicant who received unusual consideration or service, but were not provided such consideration or service;
- Received unfavorable treatment (for example, were denied or given various conditions or more processing obstacles) but appeared fully to meet the bank's stated requirements for favorable treatment (for example, approval on the terms sought);

- Received unfavorable treatment related to a policy or practice that was vague, and/or the file lacked documentation on the applicant's qualifications related to the reason for denial or other factor;
- Met common secondary market or industry standards although failing to meet the bank's more rigid standards;
- Had a strength that a prudent loan officer might believe outweighed the weaknesses cited as the basis for denial;
- Had a history of previously meeting a monthly housing obligation equivalent to or higher than the proposed debt; or
- Were denied for an apparently "serious" deficiency that may have been overcome easily. For example, an applicant's total debt ratio of 50 percent may appear to exceed grossly the banks guideline of 36 percent, but this may be easily corrected if the application lists assets to pay off sufficient nonhousing debts to reduce the ratio to the guideline, or if the bank were to count excluded part-time earnings described in the application.

**Marginal Approvals**

Approved applications with any or all of the following characteristics are "marginal." Such approvals are compared to marginal denied applications. Marginal approvals include those:

- Of which qualifications satisfied the bank's stated standard, but very narrowly;
- That bypassed stated processing requirements (such as verifications or deadlines);
- For which stated creditworthiness requirements were relaxed or waived;
- That, if the bank's own standards were not clear, fell short of common secondary market or industry lending standards;
- That a prudent conservative loan officer might have denied;
- Of which qualifications were raised to a qualifying level by assistance, proposals, counteroffers, favorable characterizations or questionable qualifications, etc.; or
- That, in any way, received unusual service or consideration that facilitated obtaining the credit.

# Appendix F: Potential Scoping Information

This appendix offers a full range of documentation and other information that might be useful in an examination. In that sense, it is a "menu" of resources to be considered and selected from, depending on the nature and scope of the examination being conducted. Any decision to select one or more particular items from this appendix for inclusion in a particular examination should, of course, include consideration of any burdens to the agency and bank in assembling and providing the selected item(s).

For examinations of banks identified through the OCC's risk-based screening process, the scope often will have been set as part of the screening process. The information request usually should be restricted to the focal point identified as part of the screening process. Be mindful that material already in hand can expedite scoping and reduce the amount of information requested.

## A. Internal Agency Documents and Records

1. Previous examination reports and related work papers for the most recent compliance/CRA and safety and soundness examinations.

2. Demographic data for the bank's assessment areas/markets.

3. Customer Assistance Group complaint data.

## B. Information from the Bank

Prior to beginning an examination, request the bank to provide the information outlined below. This request should be made far enough in advance of the on-site phase of the examination to facilitate compliance by the bank. In some banks, examiners may not be able to review certain parts of this information until the on-site examination. Generally, request only those items that correspond to the product(s) and time period(s) being examined.

1. **Bank's Compliance Program** (For examinations that will include analysis of the bank's compliance program.)

a. Organization charts identifying those persons who have lending responsibilities or compliance, HMDA or CRA responsibilities, together with job descriptions for each such position.

b. Lists of any pending litigation or administrative proceedings concerning fair lending matters.

c. Results of self-evaluations, copies of audit or compliance reviews of the bank's program for compliance with fair lending laws and regulations, including both internal and independent audits.

   **Note:** The request should advise the lender that Section 607 of the Financial Services Regulatory Relief Act of 2006 (12 USC 1828(x)) allows banks to share privileged information on self-tests with its federal regulatory agency during supervisory activities without waiving, destroying, or otherwise affecting that privilege for other third parties.

d. Complaint file.

e. Any written or printed statements describing the bank's fair lending policies and/or procedures.

f. Training materials related to fair lending issues including records of attendance.

g. Records detailing policy exceptions or overrides, exception reporting and monitoring processes.

h. Any major policy or institutional changes since the last supervisory cycle and policies covering counteroffers and assistance-provided applicants.

## 2. Lending Policies/Loan Volume

a. Internal underwriting guidelines and lending policies for all consumer and commercial loan products. If guidelines or policies differ by branch or other geographic location, request copies of each variation.

b. A description of any credit scoring system(s) in use now or during the exam period.

Inquire as to whether a vendor or in-house system is used; the date of the last verification; the factors relied on to construct any in-house system and, if applicable, any judgmental criteria used in conjunction with the scoring system.

c.  Pricing policies for each loan product and for both direct and indirect loans.

The bank should be specifically asked whether its pricing policies for any loan products include the use of "overages." The request should also ask whether the bank offers any "subprime" loan products for B, C, or D risk level customers or otherwise uses any form of risk-based pricing. A similar inquiry should be made regarding the use of any cost-based pricing. If any of these three forms are or have been in use since the last exam, the bank should provide pricing policy and practice details for each affected product, including the criteria for differentiating between each risk or cost level and any policies regarding overages. Regarding indirect lending, the bank should be asked to provide any forms of agreement (including compensation) with brokers/dealers, together with a description of the roles that both the bank and the dealer/broker play in each stage of the lending process.

d.  A description of each form of compensation plan for all lending personnel and managers.

The fair lending laws do not prescribe or prohibit particular compensation schemes. Consider whether the compensation scheme creates incentives for the originator or loan officer that might affect the consumer's access to credit or terms of credit. Evaluate whether a comparative analysis can be developed for such decisions.

e.  Advertising copy for all loan products.

f.  The most recent HMDA-LAR, including unreported data, if available. Information should be provided on diskette, CD, or DVD, if possible.

The integrity of the bank's HMDA-LAR data should be verified prior to the pre-examination analysis. Verification should take place approximately two to three months prior to the on-site phase of the examination.

g.  Any existing loan registers for each non-HMDA loan product.

Request loan registers for the three-month period preceding the date of the examination, together with any available lists of declined loan applicants for the same period. Registers/lists should contain, to the extent available, the complete name and address of loan applicants and applicable loan terms, including loan amount, interest rate, fees, repayment schedule, and collateral codes.

Even though banks are not required to maintain, for fair lending purposes, registers of lending activity other than the HMDA-LAR, ask whether such records exist for the focal point selected. This additional information may help in selecting samples, time periods, etc.

h. A description of any application or loan-level databases maintained for each loan product, including a description of all data fields within the database or data that can be linked at the loan level.

i. Forms used in the application and credit evaluation process for each loan product.

At a minimum, this request should include all types of credit applications, forms requesting financial information, underwriter worksheets, any form used for the collection of monitoring information, and any quality-control or second-review forms or worksheets.

j. Lists of service providers.

Service providers may include: brokers, realtors, real estate developers, appraisers, underwriters, home improvement contractors, and private mortgage insurance companies. Request the full name and address and geographic area served by each provider. Also, request documentation as to any fair lending requirements imposed on, or commitments required of, any of the bank's service providers.

The guidance in "c" above with regard to indirect lenders also applies to these third parties.

k. Addresses of any Internet site(s)

Internet home pages or similar sites that a bank may install on the Internet may provide information concerning the availability of credit, or the

means for obtaining it. All such information must comply with the anti-discrimination requirements of the fair lending laws. In view of the increasing capacity to conduct transactions on the Internet, review a bank's Internet sites to ensure that all of the information or procedures set forth therein are in compliance with any applicable provisions of the fair lending laws and regulations.

### 3. Community Information

a.  Demographic information prepared or used by the bank.

b.  Any fair lending complaints received through the OCC's Customer Assistance Group (CAG) or otherwise and bank responses thereto.

# Appendix G: Other Types of Discrimination Analyses

These procedures are intended to assist examiners who encounter indications of disproportionate adverse impact, discriminatory pre-application screening, and possible discriminatory marketing.

## A. Disproportionate Adverse Impact Violations

When examiners encounter possible disproportionate adverse impact, review the five conditions listed below. When all five conditions exist, consult the supervisory office and, if appropriate, the Compliance Policy Division to determine whether to present the situation to the bank and solicit an explanation of the bank's business justification for the policy or criterion that appears to cause the disproportionate adverse impact. Note that condition 5 can be satisfied by either of two alternatives.

The contacts between examiners and banks described in this section are information-gathering contacts within the context of the examination and are not intended to serve as the formal notices and opportunities for response that the OCC's enforcement process might provide.

Also, the five conditions are not intended as authoritative statements of the legal elements of a disproportionate adverse impact proof of discrimination; they are paraphrases intended to give practical guidance on situations that call for more scrutiny and on which additional information is relevant.

**NOTE:** If a policy or criterion causing a disproportionate adverse impact on a prohibited basis (condition 3) appears likely, consult the supervisory office and, if appropriate, the Compliance Policy Division. Consult these offices also, if the policy or criterion is obviously related to predicting creditworthiness and is used in a way that is commensurate with its relationship to creditworthiness or is obviously related to some other basic aspect of prudent lending, and no equally effective alternative for it appears to exist. Examples are reliance on credit reports or use of debt-to-income ratio in a way that appears consistent with industry standards and with a prudent evaluation of credit risk.

**Conditions**

1.  A specific policy or criterion is involved.

The policy or criterion suspected of producing a disproportionate adverse impact on a prohibited basis should be clear enough that the nature of action to correct the situation can be determined.

**NOTE:** Gross HMDA denial or approval rate disparities are not appropriate for disproportionate adverse impact analysis because they typically cannot be attributed to a specific policy or criterion. Similarly, a bank's policies of allowing employees to exercise discretion and to negotiate terms or conditions of credit can better be described as the absence of policies or criteria than as a situation in which a policy or criterion generates a disproportionate adverse impact. Broad discretion and vague standards raise concerns about discrimination, but examiners should focus on possible disparate treatment.

2.  The policy or criterion on its stated terms is neutral for prohibited bases.

3.  The policy or criterion disproportionately affects applicants or borrowers of a prohibited basis group.

The difference between the rate at which prohibited basis group members are harmed or excluded by the policy or criterion and the rate for control group members must be large enough that it is unlikely that it could have occurred by chance. If a reason to suspect a significant disproportionate adverse impact may exist, consult the supervisory office and, if appropriate, district counsel, and the Compliance Policy Division.

4.  There is a causal relationship between the policy or criterion and the adverse result.

The link between the policy or criterion and the harmful or exclusionary effect must not be speculative. It must be clear that changing or terminating the policy or criterion would reduce the disproportion in the adverse result.

5.  **Either a or b:**

    a.  The policy or criterion has no clear rationale, appears to exist merely for convenience or to avoid a minimal expense, is far removed from

common sense, or standard industry underwriting considerations or lending practices.

The legal doctrine of disproportionate adverse impact provides that the policy or criterion that causes the impact must be justified by "business necessity" if the bank is to avoid a violation. There is very little authoritative legal interpretation of that term with regard to lending, but that should not prevent examiners from making the preliminary inquiries called for in these procedures. For example, the rationale generally is not clear for basing credit decisions on factors such as location of residence, income level (per se, rather than relative to debt), and accounts with a finance company. If prohibited basis group applicants were denied loans significantly more frequently than control group applicants because they failed a bank's minimum income requirement, it would appear that the first four conditions plus 5a existed. Therefore, consult the supervisory office and, if appropriate, the Compliance Policy Division about obtaining the bank's response, as described in the following section.

    b. **Alternatively**, although a sound justification for the policy may exist, an equally effective alternative apparently exists as well for accomplishing the same objective with a smaller disproportionate adverse impact.

The law does not require a bank to abandon a policy or criterion that is clearly the most effective method of accomplishing a legitimate business objective. However, if an alternative that is approximately equally effective is available that would cause a less-severe adverse impact, the policy or criterion in question may constitute a violation.

At any stage of the analysis of possible disproportionate adverse impact, if such an alternative appears to exist, and the first four conditions exist, consult the supervisory office and, if appropriate, the Compliance Policy Division on how to evaluate whether the alternative would be equally effective and would cause a less-severe impact. If the conclusion is that it would, solicit a response from the bank, as described in the following section.

## Obtaining the bank's response

If the first four conditions plus either 5a or 5b appear to exist, consult the supervisory office and, if appropriate, the Compliance Policy Division about

whether and how to inform the bank of the situation, and solicit the bank's response. The communication with the bank may include:

- The specific neutral policy or criterion that appears to cause a disproportionate adverse impact.
- How examiners learned about the policy.
- How widely examiners understand it to be implemented.
- How strictly they understand it to be applied.
- The prohibited basis on which the impact occurs.
- The magnitude of the impact.
- The nature of the injury to consumers.
- The data from which the impact was computed.

The communication should request that the bank provide any information supporting the business justification for the policy and request that the bank describe any alternatives it considered before adopting the policy or criterion at issue.

### Evaluating and following up on the response

The analyses of "business necessity" and "less discriminatory alternative" tend to converge because of the close relationship of the questions of what purpose the policy or criterion serves and whether it is the most effective means to accomplish that purpose.

Evaluate whether the bank's response persuasively contradicts the existence of the significant disparity or establishes a business justification. Consult the supervisory office and, if appropriate, district counsel, and the Compliance Policy Division.

## B. Discriminatory Pre-application Screening

When examiners encounter possible discriminatory pre-application screening, obtain an explanation for any:

- Withdrawals by applicants in prohibited basis groups without documentation of consumer intent to withdraw;
- Denials of applicants in prohibited basis groups without any documentation of applicant qualifications; or
- On a prohibited basis, selectively quoting unfavorable terms (for example, high fees or down payment requirements) to prospective applicants, or

quoting unfavorable terms to all prospective applicants but waiving such terms for control group applicants. (Evidence of this might be found in withdrawn or incomplete files.)

- Delays between application and action dates on a prohibited basis.

If the bank cannot explain the situations, consider obtaining authorization to contact the consumers to verify the bank's description of the transactions. Information from the consumer may help determine whether a violation occurred.

In some instances, such as possible "prescreening" of applicants by bank personnel, the results of the procedures discussed so far, including interviews with consumers, may be inconclusive in determining whether a violation has occurred. In those cases, examiners should consult their supervisory office and, if appropriate, the Compliance Policy Division regarding the possible use of "testers" to pose as similarly situated applicants, differing only as to race or other applicable prohibited basis characteristic, to determine and compare how the bank treats them in the application process.

## C. Possible Discriminatory Marketing

**NOTE:** See also the objective in the examination procedure, "Determine potential for discriminatory marketing practices."

When encountering possible discriminatory marketing:

1. Obtain full documentation of the nature and extent, together with management's explanation, of any:

   - Prohibited basis limitations stated in advertisements;
   - Code words or photos in advertisements that convey prohibited limitations; or
   - Advertising patterns or practices that a reasonable person would believe indicate prohibited basis consumers are less desirable or are only eligible for certain products.

2. Obtain full documentation as to the nature and extent, together with management's explanation, for any situation in which the bank, despite the availability of other options in the market:

- Advertises only in media serving areas of a particular racial or national origin group within its market;
- Markets through brokers or other agents that the bank knows, or could reasonably be expected to know, to serve only one racial or ethnic group in the market; or
- Uses mailing or other distribution lists or other marketing techniques for pre-screened or other offerings of residential loan products* that:
  - Explicitly exclude groups of prospective borrowers on a prohibited basis; or
  - Exclude geographies (e.g., census tracts, ZIP codes) within the bank's marketing area that have demonstrably higher percentages of residents of a particular racial or national origin group than does the remainder of the marketing area, but which have income and other credit-related characteristics similar to the geographies that were targeted for marketing.
- Offers different products to such geographies, especially if subprime products are marketed primarily to racial or ethnic minorities.

**\*NOTE:** Pre-screened solicitation of potential applicants on a prohibited basis is covered by the FH Act. Consequently, analyses of this form of potential marketing discrimination should be limited to residential loan products subject to coverage under the FH Act.

3. Evaluate management's response particularly with regard to the credibility of any nondiscriminatory reasons offered as explanations for any of the foregoing practices. Refer to "Evaluating Bank Responses to Evidence of Disparate Treatment" (appendix C) for guidance.

# Appendix H: Using Self-Tests and Self-Evaluations to Streamline the Examination

The OCC classifies "self-assessments" by banks to determine the level and effectiveness of their fair lending performance into two types: "self-evaluations" of the bank's actual transactions and "self-tests." The term "self-evaluation" is not used in the fair lending legislation, but the OCC uses it to mean all types of self-assessments that do not fall within the statutory definition of self-test.

Banks may find it advantageous to conduct self-tests or self-evaluations to measure or monitor their compliance with ECOA and Regulation B. A self-test is any program, practice, or study that is designed and specifically used to assess the bank's compliance with fair lending laws, provided the self-test creates data not available or derived from loan, application or other records related to credit transactions (12 CFR 202.15(b)(1) and 24 CFR 100.140-100.148). For example, using testers to determine whether there is disparate treatment in the pre-application stage of credit shopping may constitute a self-test. A self-evaluation, while generally having the same purpose as a self-test, is not a self-test because it does not create any new data or factual information. Instead, it uses data readily available in loan or application files and other records used in credit transactions.

If the bank has performed any self-evaluations or self-tests, and examiners can confirm the reliability and appropriateness of the self-evaluations or the self-tests (or even parts of them), examiners need not repeat those tasks that the bank has performed appropriately.

**NOTE**: When the term self-evaluation is used below it is meant to include self-tests.

If a bank has performed a self-evaluation of any of the products selected for examination, obtain a copy thereof and follow the remaining procedures in this section.

Determine whether the research and analysis of the planned examination would duplicate the bank's own efforts. If the answers to questions A and B below are both "yes", each successive "yes" answer to questions C through L

indicates that the bank's work up to that point can serve as a basis for eliminating steps for the examiners.

If the answer to either question A or B is "no", the self-evaluation cannot serve as a basis for eliminating examination steps. However, examiners should still use the remaining questions to assess the self-evaluation and communicate the findings to the bank so that it can improve its self-evaluation process.

A. Did the transactions covered by the self-evaluation occur not longer ago than two years prior to the examination? If the self-evaluation covered more than two years prior to the examination, incorporate only results from transactions in the most recent two years.

B. Did it cover the same product, prohibited basis, decision center, and stage of the lending process (for example, underwriting, setting of loan terms) as the planned examination?

C. Did the self-evaluation include comparative file review?

   **NOTE:** One type of "comparative file review" is statistical modeling to determine whether control group and prohibited basis group applicants were treated similarly. If a bank offers self-evaluation results based on a statistical model, consult the supervisory office and, if appropriate, the Compliance Policy Division about how to proceed.

D. Were control and prohibited basis groups defined accurately and consistently with ECOA and/or the FH Act?

To answer questions E, F, and G below, for the bank's control group sample and each of its prohibited basis group samples, request to review 10 percent (but not more than 50 for each group) of the transactions covered by the self-evaluation. For example, if the bank's self-evaluation reviewed 250 control group and 75 prohibited basis group transactions, plan to verify the data for 25 control group and seven prohibited basis group transactions.

E. Were the transactions selected for the self-evaluation chosen so as to focus on marginal applicants or, in the alternative, selected randomly?

F. Were the data analyzed (whether abstracted from files or obtained from electronic databases) accurate? Were those data actually relied on by the credit decision makers at the time of the decisions?

G. Did the 10 percent sample reviewed for question F also show that customer assistance and bank judgment that assisted or enabled applicants to qualify were recorded systematically and accurately and were compared for differences on any prohibited bases?

H. Were prohibited basis group applicants' qualifications related to the underwriting factor in question compared to corresponding qualifications of control group approvals? Specifically, for self-evaluations of approve/deny decisions, were the denied applicants' qualifications related to the stated reason for denial compared to the corresponding qualifications for approved applicants?

I. Did the self-evaluation sample cover at least as many transactions at the initial stage of review as examiners would initially have reviewed using the sampling guidance in these procedures?

If the bank's samples are significantly smaller than those in the sampling guidance but its methodology otherwise is sound, review additional transactions until the numbers of reviewed control group and prohibited basis group transactions equal the minimums for the initial stage of review in the sampling guidance.

The sample size tables set the number of files that should be reviewed to separate transactions that are marginal from those that are not. Neither examiners nor the bank are expected to analyze in detail every file in the sample set from the tables. If examiners need to review additional transactions, they should follow the file review steps in these procedures; that is, a quick first review to select marginal transactions, identification of "benchmarks" and "overlaps" (encompassing both the bank's data and the supplemental data collected by the examiners), and abstracting of detailed data only from certain marginal files. If there were such instances, proceed to question J and evaluate how the bank handled them.

J. Did the self-evaluation identify instances in which prohibited basis group applicants were treated less favorably than control group applicants who were no better qualified?

If all the previous questions have been answered affirmatively, examiners should be able to tell from the bank's spread sheet or other work papers

whether applicants appear to have been treated inconsistently with their qualifications and whether there are differences in treatment between control and prohibited basis group applicants. If there were no such instances of apparent disparate treatment, incorporate the findings of the self-evaluation into the examination findings and indicate that those findings are based on verified data from the bank's self-evaluation.

K.  Were explanations solicited for such instances from the persons responsible for the decisions?

L.  Were the reasons cited by credit decision makers to justify or explain instances of apparent disparate treatment supported by legitimate, persuasive facts, or reasoning?

If the questions above are answered Yes, incorporate the findings of the self-evaluation (whether supporting compliance or violations) into the examination findings. Indicate that those findings are based on verified data from the bank's self-evaluation. In addition, consult the supervisory office and, if appropriate, the Compliance Policy Division regarding whether to conduct corroborative file analyses in addition to those performed by the bank.

If not all of the questions in the section above are answered "yes", resume the examination procedures at the point that the bank's reliable work would not be duplicated. In other words, use the reliable portion of the self-evaluation and correspondingly reduce independent comparative file review. For example, if the bank conducted a comparative file review that compared applicants' qualifications without taking into account the reasons they were denied, use the qualification data abstracted by the bank (if accurate) with the proviso of constructing independent comparisons structured around the reasons for denial.

**Self-evaluation by Statistical Model**

If a bank has self-evaluation results based on a statistical model, inform the supervisory office and confer with Compliance RAD. The OCC will assess the bank's self-evaluation and determine the reliability of the bank's statistical model.

**Evidence of Violations**

If the bank's self-evaluation identified apparent violations, attempt to verify whether they existed rather than relying on the bank's conclusions. If the violations are verified, document fully how the violations were identified and verified and prepare to forward the information to be considered for appropriate enforcement. The results of self-evaluations are not exempt from legal requirements that the OCC refer fair lending violations to DOJ and/or notify HUD. Confer with the supervisory office, district counsel and, if appropriate, the Compliance Policy Division in such cases.

Do not suggest corrective action to the bank or characterize its corrective actions to date as adequate or inadequate at this time. Rather document whether any bank corrective action alleviated the violations and particularly note whether the bank responded to any apparent violations it identified as called for in the "Policy Statement on Discrimination in Lending" (appendix O), question 6, including, but not limited to:

- Identifying customers whose applications may have been processed inappropriately, offering to extend credit to applicants who were improperly denied, compensating them for any damages (both out of pocket and compensatory), and notifying them of their legal rights.

- Correcting any bank policies or procedures that may have contributed to the discrimination.

- Identifying and training and/or disciplining the employees involved.

- Considering the need for community outreach programs and/or changes in marketing strategy or loan products to better serve segments of a particular racial or national origin group within the bank's market.

- Improving audit and oversight systems to ensure that the discrimination does not recur.

Consider whether the effectiveness of corrective action has been compromised by any bank delays in taking the corrective action.

# Appendix I: Sample Fair Lending Section of Request Letter

Dear [bank]:

A review of your bank's compliance with the anti-discrimination requirements of the Fair Housing Act, the Equal Credit Opportunity Act, and Regulation B is scheduled to commence **[DATE]**. Examiners plan to focus on possible disparate treatment of applicants from different **[RACIAL OR NATIONAL ORIGIN GROUPS, GENDERS, AGE GROUPS, OR OTHER]**. We plan to review **underwriting [OR SETTING OF LOAN RATES, TERMS, AND CONDITIONS OR POSSIBLE REDLINING OR STEERING OR MARKETING]** for **[CREDIT PRODUCT]** during the period from **[DATE]** to **[DATE]** at **[BRANCH OR UNDERWRITING CENTER]**.

This examination is being conducted under the authority of 12 USC 481. However, it also constitutes an investigation within the meaning of section 3413(h)(1)(A) of the Right to Financial Privacy Act (RFPA), 12 USC 3401, et seq. Therefore, in accordance with section 3403(b) of the RFPA, the undersigned hereby certifies that the OCC has complied with the RFPA. Section 3417(c) of the act provides that good faith reliance upon this certification relieves your bank and its employees and agents of any possible liability to the customer in connection with the disclosure of the requested information.

To ensure early, prompt, and clear communication on any fair lending matters that need explanation, please designate a bank representative to serve as the fair lending liaison.

Please provide to this office a copy of your fair lending risk assessment within one week after receiving this letter. Additionally, enclosed is a list of other materials that you should deliver to this office or have available for review at the bank. **[IF APPROPRIATE: THE HMDA-LAR YOU PROVIDED IN RESPONSE TO OUR PREVIOUS REQUEST IS ENCLOSED. THE FILES THAT WE REQUEST YOU TO HAVE AVAILABLE TO REVIEW ON-SITE ARE MARKED.]** [See the Compliance Management Systems Booklet, page 15, for sample request letter items. www.occ.treas.gov/handbook/cms.pdf]

We will ask you to explain any apparent inconsistencies in treatment of applicants from the groups compared and to explain any other apparent evidence of violations. In such situations, we will describe to you the sorts of information that would illustrate that the inconsistencies are not based on prohibited factors. Your bank is assumed to be in compliance with discrimination laws, unless evidence indicates otherwise.

Please inform us whether credit scoring was used to underwrite any of the transactions we plan to review. Also, please inform us of anything we may not be aware of that would make it inappropriate to compare certain transactions within the proposed scope of the examination to other transactions within the scope (such as a change in underwriting standards during the proposed review period).

We may be able to streamline the examination if your bank has conducted a self-evaluation or a self-test you conducted that included comparisons to detect prohibited differences in treatment of applications within the proposed scope of our examination. A "self-test" is any program, practice, or study that is designed and specifically used to assess the bank's compliance with fair lending laws, provided the procedure creates data not available or derived from loan, application or other records related to credit transactions. (Note: Regulation B at 12 CFR 202.15 and the FH Act at 24 CFR 100.140 cover self-tests and indicate that the report or results of a "self-test" is privileged and if such material is shared with the OCC, privilege is waived.. However, Section 607 of the Financial Services Regulatory Relief Act of 2006 (12 USC 1828(x)) allows banks to share such privileged information with its federal regulatory agency during supervisory activities without waiving, destroying, or otherwise affecting that privilege to other third parties such as private litigants.) A "self-evaluation" is an analysis you derived from loan or application files or other records related to credit transactions. Please provide to this office any self-evaluations you conducted during the period [_____ to _____]

Sincerely,


Name
Title

# Appendix J: Underwriter Interview Guide

Bank Name:                                  Examiner:
Exam Date:                                  Product:

As necessary, ask follow-up questions until it is clear how requirements or procedures apply to the files to be examined and until the rationales for unusual policies are understood. Items in **bold** are apparent violations if not carried out as prescribed in Regulation B. Examiners may conduct a second interview to discuss inconsistencies found during file reviews.

If the bank's standards are unclear or if loan files lack data on applicants' qualifications:

- Ask what specific problems were the basis for the reasons for denying applicants cited on the notices of adverse action.
- Using specific approved applicants, ask how the bank determined that they differed from the denied applicants.
- Use file comments (if any) that characterize qualifications as "good," "adequate," "weak," etc., as points of reference.

| GENERAL | |
|---|---|
| 1. Obtain from the chief underwriter an overview of the underwriting procedures and standards. Review written policies, procedures, standards, etc. | |
| 2. Do underwriting policies differ across the different loan products within the loan purpose categories of the focal points for this exam? If yes, how? | |
| 3. Do underwriting policies differ by lien status, occupancy, property type, loan purpose, or documentation type? | |
| 4. Does your bank apply different standards in any of the geographical areas within the proposed scope of the examination? If so, why? | |
| 5. Does your bank apply different standards based on the size of the loan or the value of the property securing the loan requested? | |
| 6. Does your bank apply different standards based on the amount of the applicant's income? | |
| 7. Are there any factors we have not addressed that might make it inappropriate to compare some transactions within the proposed scope to others? | |

| | |
|---|---|
| 8. Please provide all policy manuals and underwriting guidelines for the products included in the focal points for this examination. | |
| 9. Were there any policy changes during the period under review? If yes, are there changes that would preclude combining the data for the entire time period (i.e., prevent comparison over the entire time period)? Please provide a summary of all policy changes. | |
| 10. Are there any other reasons why any two applications in the focal point could not be compared? | |
| 11. If the focal point covers home improvement loans, are home improvement loans underwritten differently from home equity loans? | |
| 12. Are any of the 2nd lien Home Purchase or Refinance loans piggyback loans? If so, how are underwriting policies different if it is a piggyback loan vs. a stand-alone 2nd lien loan? | |
| 13. What creditworthiness factors does the bank consider when making underwriting decisions for these products? | |
| 14. How are creditworthiness factors used – for example, do you use ranges of values for the FICO score, or LTV and apply different underwriting policies based on tiers that applicants fall into? Or, do you use an absolute cutoff for values of the credit score, LTV, or DTI? | |
| 15. Obtain any exception reports maintained on loans approved despite failing to meet requirements. Learn who approves exceptions. | |
| **16. How does the bank ensure that all information related to an application for credit is retained for 25 months after notifying the applicant of action taken, pursuant to Section 202.12(b) of Regulation B?** | |
| 17. Find out if a credit-scoring system is used. If so, obtain information and follow guidance as called for in appendix B, "Considering Automated Underwriting and Credit Scoring Risk Factors." | |
| 18. Obtain copies of any consumer guidance on the loan process (such as: how to develop a viable application). | |
| 19. Obtain copies of any checklists, log sheets, or other loan-processing aids used by bank personnel. | |
| **BANK STRUCTURE** | |
| 1. Could you explain the bank's organization in terms of prime, subprime or near-prime units; or subsidiaries? Are there any differences in underwriting/pricing across units/subsidiaries? | |

| | |
|---|---|
| 2. Could you explain the bank's organization in terms of channels – wholesale, retail, Internet, correspondent banking, etc.? Are there any differences in underwriting/pricing across channels? | |
| 3. What are the bank's primary markets or geographic areas of operation? | |
| 4. Where are the service centers for each business unit and/or channel? | |
| 5. Could you explain how an applicant gets channeled to a particular business unit? | |
| 6. Could you explain the relationship the bank has with brokers? (Correspondent vs. broker lending) What kind of discretion do brokers have in underwriting/pricing? | |
| 7. Please provide a list of the specific products and loan programs within the loan purpose category of the focal point for this examination? | |
| **APPLICATION PROCESS** | |
| 1. Could you walk us through the application process for each of the relevant products in each channel and/or business unit? | |
| 2. Where are applications accepted? Who handles them? | |
| 3. Which bank or subsidiary staff meets face-to-face with applicants? | |
| 4. Which bank staff review or have access to the applications with completed monitoring information? | |
| **5. For a home purchase or refinance loan, how is government monitoring information obtained to comply with section 202.13 of Regulation B?** | |
| **6. For other loans, how are staff directed not to obtain prohibited information?** | |
| 7. If the product is covered by HMDA, when and how are data entered on the LAR? | |
| 8. What applicant information verifications are obtained? When and how? | |
| 9. What happens if there is a problem obtaining verifications or if they are inconsistent with the application data? | |
| 10. Is the applicant asked if assistance or explanation is needed? | |
| 11. Is there a "conditional approval" stage in the process? | |
| 12. Do files document conditions and attempts to resolve them? | |
| 13. How long are terms locked in by a written or oral agreement? | |
| 14. Under what circumstances are lock-ins extended? | |
| **15. How does the bank determine whether married applicants intend to apply jointly or** | |

| | |
|---|---|
| **individually?** | |
| 16. Do you discuss with applicants all loan products they qualify for, or only the product requested by the applicants? | |
| 17. What is the extent of automation in underwriting?<br>i.   How is the risk level of an applicant determined?<br>ii.  Are the products being analyzed here eligible for automated underwriting?<br>iii. Do you use the Desktop Underwriter, Loan Prospector or some customized system?<br>iv. If applications are auto-decisioned, would the loan officer only be involved to verify information? If information cannot be verified what is the next step?<br>v.  Who has discretion during the underwriting process?<br>vi. What controls are in place to monitor this discretion?<br>vii. What percent of applications are automatically "approved" or automatically "denied" – without additional manual review?<br>viii. If there are no automatic approvals or denials, what percent of applications that are on the path to approval after risk level determination are eventually denied, and what percent of applications on the path to denial are eventually approved?<br>ix. If there are no automatic approvals or denials, what is the nature of the manual review? Is it primarily verification of information?<br>x.  Are there second reviews for denials? Are there any second reviews for approvals? Please explain what factors are considered during these second reviews. | |
| 18. Are there any other aspects to the application process that we should keep in mind during our analysis? | |
| 19. If an applicant is denied a loan for the product he or she was applying for, does the lender make an effort to offer other loan products more suitable? Please explain this process. | |
| 20. Which loans are sold in the secondary market? Are different underwriting guidelines used for these loans? | |
| 21. Is there a certain time limit to receiving required documentation? After the time limit has elapsed would the application be denied automatically? | |

| | |
|---|---|
| 22. Is there guidance given to the applicant when there is documentation outstanding? If the loan officer follows up with the borrower, how many contacts would be made? | |

| **CREDIT HISTORY** | |
|---|---|
| 1. Which credit report is used? | |
| 2. When multiple credit scores are obtained, which score is used – lowest or middle? | |
| 3. Do you use any custom score – own or vendor product? Could you describe the elements used if it is a custom score? | |
| 4. Is the credit score of both primary applicant and co-applicant used in the credit decision? If yes, how? | |
| 5. Review with the underwriter a copy of each type of credit report used. Obtain copies of any code sheets or other guidance on using the credit report(s). | |
| 6. At what stage of the transaction is a credit report obtained? | |
| 7. Does the bureau send a copy of the report (or abstract) to consumers? Obtain a copy of the transmittal letter. | |
| 8. Do you look at details in the credit report – if so, for all or only marginal applicants? Could you give examples? | |
| 9. Do you consider compensating factors if creditworthiness factors are not satisfactory? Can you provide some examples? | |
| 10. Does the bank require that corrected information come from the bureau, or will it accept corrected information directly from the customer? | |
| 11. What constitutes a sufficient credit history on which to make a decision? | |
| 12. Is a minimum number of accounts reported required? | |
| 13. Is a minimum length of reported credit history required? | |
| 14. Has the bank made loans to persons who did not meet these standards? | |
| 15. In such a case, what evidence of creditworthiness substituted for the bureau report? | |
| **16. How does the bank evaluate additional information when an applicant seeks to correct or explain credit information from another source?** | |
| **17. How does the bank evaluate joint spousal accounts when a married person applies for individual credit?** | |
| **18. How does the bank treat unmarried joint applicants in terms of evaluating their creditworthiness?** | |

| | |
|---|---|
| **19. How does the bank evaluate accounts held jointly with a former spouse that an applicant for individual credit asks to be considered to show his or her own creditworthiness?** | |
| 20. What credit history deficiencies would cause denial? | |
| 21. Does a mortgage payment defect negate otherwise good credit? Does a good mortgage payment record offset other credit defects? | |
| 22. How far into the past is derogatory information relevant? | |
| 23. Does it matter if the debt has been paid? | |
| 24. Is minor derogatory information ignored? What kinds? | |
| 25. Does the bank solicit explanations? In what circumstances? Obtain the form letter to the applicant, if one exists. If the mode of contact is by phone rather than letter, are these noted in the file? | |
| 26. What constitutes a "good" explanation? | |
| 27. Is the failure to disclose serious derogatory information on the application fatal? | |
| 28. Is derogatory information associated with a medical problem in the applicant's household treated differently than other derogatory information? | |
| 29. How does the bank view judgments, repossessions, and collections? | |
| 30. Under what circumstances would the bank lend to a customer with a bankruptcy in his or her record? | |
| 31. How does the bank view inquiries? Would the bank ever deny a loan solely on the basis of inquiries? | |
| **FUNDS TO CLOSE** | |
| 1. What items must be covered by funds for closing? | |
| 2. How many months of cash reserves are needed? | |
| 3. When are funds from undocumented sources acceptable? | |
| 4. Are applicants with inadequate or marginal cash to close advised on how gift funds may be applied? | |
| 5. Are grants acceptable as gifts? From what sources? | |
| 6. How does the bank assure that applicants are advised uniformly regarding the use of grants? | |
| 7. May family or household cash be pooled for closing? | |

| | |
|---|---|
| 8. How are funds to close documented by the applicant? | |
| **EMPLOYMENT AND INCOME** | |
| 1. How many years on the job are required for income to be deemed stable? How many years in the line of work? | |
| 2. What length of gap or frequency of changes in employment is regarded as negative? Are explanations routinely requested for employment negatives? | |
| 3. How is stable income defined? | |
| 4. Do loan originators routinely ask for verifiable unstable sources of income, such as overtime and seasonal work? | |
| 5. Is rent paid by household members counted as income? | |
| 6. Do loan originators routinely ask about rent paid by household members? | |
| 7. Is any or all nontaxable income to be "grossed up"? | |
| 8. Are applicants routinely asked whether they expect their income to rise? What type of documentation is needed to establish a projected increase? | |
| 9. How is part-time income handled? | |
| **10. How is annuity, pension, or retirement income handled?** | |
| **11. How is income from alimony, child support, and separate maintenance handled? How is income from public assistance handled?** | |
| **PROJECTED HOUSING COSTS AND DEBTS** | |
| 1. What types of debts are included or excluded from ratio calculations? | |
| 2. Are certain types of accounts viewed more negatively than others, for example, revolving debt? | |
| 3. Under what circumstances would an applicant be advised to pay down debts? | |
| 4. Would the bank specify which debts should be paid off? | |
| **DEBT RATIOS** | |
| 1. What maximum housing debt and total debt ratios are used? | |
| 2. What is the source or rationale for them? | |
| 3. What would justify approving an application with a ratio higher than the requirement? | |
| 4. Are applicants with qualifying ratios ever refused because of debt considerations? | |
| **COLLATERAL/APPRAISALS** | |
| **1. Are applicants advised of their right to obtain** | |

| | |
|---|---|
| **a copy of the appraisal report on their property? Is a copy routinely provided? If the FHFA Code[5] applies, are applicants provided a copy of the appraisal upon completion or at least three days before closing unless they waive the right?** | |
| 2. Does the bank employ its own appraisers? If the FHFA Code applies, does the bank take appropriate steps to prevent the improper influencing of such in-house appraisers and affiliated appraisers, appraisal company, or appraisal management companies? | |
| 3. Review the guidance the bank provides appraisers, whether employed or independent. | |
| 4. What rules govern adjustments to initial appraised values? If the FHFA Code applies, ensure any such adjustments are consistent with the appraiser independence safeguard standards. | |
| 5. Who reviews appraisals? If the FHFA Code applies, does the bank quality control test a randomly selected 10 percent of appraisals? | |
| 6. When is PMI required? | |
| 7. What does the bank do if a PMI company refuses to insure the loan? | |
| 8. On adverse action notices and HMDA-LAR "reasons for denial," does the bank report PMI denials as "denied for PMI," or does it merely repeat the substantive reason that the PMI company cited? | |
| 9. Under what circumstances would a lender order a second appraisal? | |
| 10. If the FHFA Code applies, does the bank prohibit reliance on appraisals completed by mortgage brokers or other third parties? | |
| 11. What steps does the bank take to ensure appraiser independence and that the appraiser is not coerced or influenced? | |
| **GUARANTORS, ETC.** | |
| 1. Under what circumstances would a guarantor materially increase an applicant's likelihood of approval (e.g., if the applicant had bad ratios, poor credit history)? | |
| 2. Are applicants with such weak qualifications routinely told that a guarantor would increase the likelihood of approval? | |
| **DENIALS** | |
| 1. Obtain a list of the reasons for denial and review it with the interviewee. | |

---

[5] The FHFA Code will apply to all conventional, single-family loans originated on or after May 1, 2009, that are sold to the Federal National Mortgage Association (Fannie Mae) or the Federal Home Loan Mortgage Corporation (Freddie Mac).

| | |
|---|---|
| 2. How is the adverse action notice prepared? Review it with the interviewee. | |
| 3. How does the bank document the timely provision of adverse action notices? | |
| 4. Are all denied applicants given a second review? Describe the review process. | |
| **FATAL FLAWS AND DEROGATORIES** | |
| 1. Are there any "fatal" values for factors that would result in an automatic decline? Is there any written guidance for the same? | |
| 2. Would a bankruptcy in the last six months be fatal – if not, what would be a compensating factor? Are there any other fatal flaws – e.g., LTV >125 or DTI >100, etc.? | |
| 3. What is the time frame considered for derogatory factors? Is the magnitude of delinquencies considered as well? (e.g., x number of 30-day delinquencies compared to y number of 90-day delinquencies?) Also, within the time frame considered, would newer derogatories get more weight than older ones (e.g., if the time frame for bankruptcies is six months, would a bankruptcy which is one month old get more weight than a five- month-old bankruptcy?) | |
| 4. Are there any compensating factors that can make up for derogatory information – can you provide some examples? | |
| **SECONDARY MARKET CONSIDERATIONS** | |
| 1. To whom does the bank principally sell loans? | |
| 2. Arrange to have copies of the loan purchasers' guidance available during file review. | |
| 3. In what ways are bank standards different from those loan purchasers require? | |
| 4. What have been the lender's experiences in attempting to persuade loan purchasers to reconsider refusals to purchase? | |
| **PORTFOLIO LENDING** | |
| 1. Does the bank lend for its own portfolio? | |
| 2. How do the requirements for this differ from those for loans to be sold? | |
| 3. Does the bank hold loans to "season" them until sale? What features would cause a loan to be handled this way? | |
| 4. Does the bank purchase loans? | |
| **EXCEPTIONS/OVERRIDES** | |
| 1. Are there any exceptions to the bank's stated requirements? Can you provide examples? When would they be made? | |
| 2. Does the bank produce (for its management's use) an "exceptions" report that lists all residential loans made that do not meet the bank's stated requirements? Obtain any such report for the period being examined in the fair lending review. | |

| | |
|---|---|
| 3. At what level in the bank can loans be approved that fail to meet requirements? | |
| 4. Are there any overrides? Do you generate a report or list of overrides or flag them? | |
| 5. Is there written guidance on exceptions and overrides? If so, please provide. | |
| 6. Who authorizes exceptions and/or overrides? | |
| 7. Is any special consideration given based on customer relationship with the bank? If so, please explain. | |
| **COMPENSATING/OFFSETTING FACTORS** | |
| 1. Do strong qualifications in certain areas overcome an applicant's failure to meet requirements in others? | |
| 2. Describe specific factors that operate to overcome particular deficiencies (e.g., projected income compensates for excessive total debt ratio)? | |
| 3. Are compensating factors formal or informal? (Obtain any written guidance.) | |
| 4. What constitutes a "good customer relationship?" | |
| **LOAN TERMS AND CONDITIONS** | |
| 1. How are prices set? Is there a range? | |
| 2. Why would prices differ? Which aspects of pricing are fixed and which are discretionary? | |
| 3. How are loan terms set? Why would loan terms vary? | |
| 4. How is the down payment set? Why would requirements vary? | |
| 5. How are collateral requirements set? Why would requirements vary? | |
| 6. How are escrow amounts set? Why would they vary? | |
| 7. What fees are imposed for the product? Why would they vary? | |
| 8. Please provide a copy of each of the rate sheets you use? If rates change often, a set of rate sheets for one or a small number of dates would be sufficient. | |
| 9. Please provide all policy manuals and pricing guidelines for the products included in the focal points for this exam. | |
| 10. Does pricing policy differ across the different loan products within the loan purpose categories identified in the focal points? If yes, how? | |
| 11. Does pricing vary across channels and/or geography? If yes, how? Could you provide a list of all of the areas that have their own rate sheets? | |
| 12. Were there any policy changes in pricing during the period under review? If yes, would | |

| | |
|---|---|
| these changes preclude combining the data for the time period covered by this exam? Also, please provide a summary of these changes. | |
| 13. Were there any special promotions during the period under analysis? If yes, please explain. | |
| 14. Could you walk us through the pricing process for each of the relevant products in each channel and/or business unit? How do brokers price loans? Do they have different rate sheets? Are any rate sheets broker-specific? | |
| 15. What are the reasons why interest rates would be lower than or greater than what appears on the pricing sheets? | |
| 16. Please expand on the <u>discretionary</u> reasons for price differences?<br> i.   Can you provide some examples of these reasons?<br> ii.  How is pricing influenced by loan officers?<br> iii. Is loan officer compensation tied to pricing? If so, please explain.<br> iv.  How is pricing influenced by brokers?<br> v.   How are brokers compensated?<br> vi.  Are there caps for broker compensation?<br> vii. Who else has discretion during the pricing process?<br> viii. What controls are in place to monitor discretion in pricing?<br> ix.  Explain to what degree potential loan customers are allowed to negotiate a better interest rate/loan fees. Are loan officers or brokers allowed to deviate from the pricing sheets? If yes, to what degree, what are the criteria considered, and how are the pricing exceptions/pricing discretion documented? | |
| 17. What fees are charged? When and why would charged fees differ? Is there any discretion in charging fees? | |
| 18. Are there maximum and minimum fees? Any exceptions? | |
| 19. Do any fees vary by state due to state-specific laws? | |
| 20. Which fees affect the APR? | |
| 21. Are loan customers allowed to buy down the interest rates by paying more in discount points? If yes, explain the criteria and provide written guidance regarding this practice. | |
| 22. How are origination points, discount points, and YSP determined? Are there caps on each or caps on totals? | |
| 23. If any of the 2nd lien loans are piggyback loans,<br> i.  How are pricing policies different if a product is a piggyback loan vs. a stand-alone second lien loan? | |

| | |
|---|---|
| ii. How are pricing policies different if the corresponding first lien is held with another bank?<br>iii. Are first and second lien loans as part of a combo loan priced independently? | |
| **FILE DOCUMENTATION** | |
| 1. How are contacts with the customer documented? | |
| 2. How are in-bank conferences (or other face-to-face encounters) with the applicant documented? | |
| 3. What work sheets should be found in the typical file? | |
| **ELECTRONIC DATA** | |
| 1. Can automatic approvals and denials be identified in the electronic data? That is, are there identifiers for automated approvals and/or denials; or identifiers for the output from an automated system (such as DU/LP)? | |
| 2. Can "document type" be identified in the electronic data? | |
| 3. Is product name available in the electronic data? | |
| 4. Are applicant names and addresses available in the electronic data? | |
| 5. Can piggyback loans be identified in the electronic data? If yes, can one also identify if the 1st lien is from this bank or from another bank? | |
| 6. Can individual brokers be identified in the data? | |
| 7. Is there electronic information on any of the following: number of trade lines; number of 30-60- 90-day "lates" and the time period in which those "lates" occurred; incidence of bankruptcy and/or foreclosure; combined loan to value; combined debt to income; years in job; years in occupation; loan term; identifier for whether applicant uses ACH; override codes; collateral value; customer relationship; employment type (salaried or self-employed); any measure of "stable income"; indicator for first-time home buyer? | |
| 8. Is there electronic information on any additional pricing variables that can be incorporated into the dataset – overages; underages; broker fees; total broker compensation; YSP; any other points and fees; rate lock date or period (15-30-45-60 days, etc.)? | |
| 9. Could you also provide explanations for the variables provided in the electronic dataset? | |
| 10. If you update DTI, LTV, or other credit variables during the underwriting process, does the updated information appear in the data? | |

# Appendix K: Other Illegal Limitations on Credit Checklist

This checklist can be used for reviewing audit work papers, evaluating bank policies, performing transaction testing, and training, as appropriate. Only complete those aspects of the checklist that specifically relate to the issue being reviewed, evaluated, or tested, and retain those completed sections in the work papers.

Review compliance with these Regulation B provisions in all fair lending examinations that include review of files, and may elect to do so as part of a regular, scheduled supervisory activity during the supervisory cycle. Review the checklist before comparative file review to ensure that they recognize the listed violations. As the file review proceeds, note any violations observed on one master checklist (not checklists for individual transactions). If the examination does not include a comparative review of files, use the checklist to review in detail 10 diverse files (approvals and denials, different products, etc.).

Obtain explanations for any apparent violations from the bank staff responsible for the transactions.

Some violations on the checklist are not stated in terms of a prohibited basis. They are violations simply if the bank treated applicants other than as prescribed. Nevertheless, determine also whether the violations occurred selectively on a prohibited basis.

**NOTE:** Citations are to Regulation B, 12 CFR 202.1 et seq.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing transaction testing, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, just indicate "NA."

Underline the applicable use: Audit    Bank Policies    Transaction Testing

| Apparent Violation (if No) | Yes | No | Basis for Conclusion |
|---|---|---|---|
| **Rules Concerning Evaluation of Applications** | | | |
| 1. To the extent that a credit evaluation system directly considers the age of an applicant, is it empirically derived, demonstrably and statistically sound? (202.6(b)(2)(ii), .2(p)) | | | |
| 2. In an empirically derived, demonstrably and statistically sound credit scoring system is the age of an elderly applicant (62 or older) not assigned a negative factor or value? (202.6(b)(2)(ii)) | | | |
| 3. In a judgmental system, is the applicant's age or income derived from public assistance considered only for the purpose of determining a pertinent element of creditworthiness? (202.6(b)(2)(iii)) | | | |
| 4. In any system for evaluating creditworthiness is the age of an applicant 62 or older considered only to favor him or her? (202.6(b)(2)(iv)) | | | |
| 5. When evaluating the applicant's creditworthiness, does the bank not consider aggregate statistics or assumptions relative to the likelihood of bearing or rearing children? (202.6(b)(3)) | | | |
| 6. Does the bank count (and not discount or exclude) income derived from part-time employment or a retirement benefit? (202.6(b)(5)) | | | |
| 7. If an applicant relies on income from alimony, child support, or separate maintenance payments in applying for credit, does the bank consider such payments as income when they are likely to be consistently made? (202.6(b)(5)) | | | |
| 8. To the extent it considers credit history, does the bank consider: <br><br> a.  The credit history, when available, of accounts designated as accounts that the applicant and the applicant's spouse are permitted to use or for which both are contractually liable? (202.6(b)(6)(i)) <br><br> b.  At the applicant's request, information from the applicant indicating that past credit performance does not accurately reflect the applicant's creditworthiness? (202.6(b)(6)(ii)) | | | |

| Apparent Violation (if No) | Yes | No | Basis for Conclusion |
|---|---|---|---|
| c.  At the applicant's request, any credit history in the name of the applicant's spouse or former spouse that the applicant can demonstrate accurately reflects the applicant's creditworthiness? (202.6(b)(6)(iii)) | | | |
| 9. Are married and unmarried applicants evaluated by the same standards? (202.6(b)(8)) | | | |
| 10. Are joint applicants treated in the same manner regardless of existence, absence, or likelihood of a marital relationship? (202.6(b)(8)) | | | |
| **Rules Concerning Extensions of Credit** | | | |
| 11. Does the bank allow an applicant to open or maintain an account in birth-given names or combinations of birth-given and married names, if requested? (202.7(b)) | | | |
| 12. Does the bank permit holders of open-end accounts to retain the accounts and not change the terms despite the account-holder's retiring, or changes in age, name, or marital status?(202.7(c)(1)) | | | |
| 13. If the bank requires reapplication for an open-end account based on a change in marital status of the applicant when the original credit decision was based, in whole or in part, on the income of the spouse; did the bank have information available indicating that the applicant's income may not support the amount of credit currently available? (202.7(c)(2)) | | | |
| 14. If jointly owned property is relied on to satisfy the standards of creditworthiness in the case of unsecured credit, are nonapplicant joint owners required to sign only instruments related to collateral?(202.7(d)(2)) | | | |
| 15. Is an applicant who qualifies individually allowed to obtain credit without a spouse's or other person's signature (other than as a joint applicant), or if an additional party is needed to support the credit requested, is the applicant allowed to request a person other than the spouse to serve as the additional party?(202.7(d) (1) and (5)) | | | |
| 16. Does the bank grant credit even if credit life, health, accident, or disability insurance is not available because of the applicant's age? (202.7(e)) | | | |

| General Rule | | | |
|---|---|---|---|
| 17. Do the bank's marketing or advertising materials contain any information that would discourage, on a prohibited basis, a reasonable person from making or pursuing an application?(202.4(b)) | | | |

# Appendix L: Technical Compliance Checklist

This checklist can be used to review audit work papers, evaluate bank policies, perform transaction testing, and assess training as appropriate. Only complete those aspects of the checklist that specifically relate to the issue being reviewed, evaluated, or tested, and retain those completed sections in the work papers.

Review compliance with these Regulation B provisions in all fair lending examinations that include review of files, and, as appropriate do so as part of a regularly scheduled supervisory activity that includes a review of fair lending risk.

Use copies of this checklist to review in detail one approved and one denied consumer, business, and residential real estate file. If there appear to be any violations in those six files, maintain one master checklist during comparative file review (if there is one) to note any observed recurrence of the violations. If there are recurring violations, consult the supervisory office to determine whether any violations represent a pattern or practice. If so, the root causes must be determined, the violations must be presented to management, and commitments for corrective action must be obtained.

**NOTE:** Citations are to Regulation B, 12 CFR 202.1 et seq., unless indicated otherwise.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing transaction testing, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, simply indicate "NA."

Underline the applicable use: Audit    Bank Policies    Transaction Testing

| Apparent Violation (if No) | Yes | No | Basis for Conclusion |
|---|---|---|---|
| **Information for Monitoring Purposes** | | | |
| 1. Do files for purchase and refinance loans for primary residences that are secured by the dwelling show that the bank requested monitoring information (202.13(a) and (b)) and that it noted this information on the application form or on a separate form referring to the application (202.13(b)):<br>  a.  Ethnicity, using the categories "Hispanic or Latino," and "Not Hispanic or Latino"; and race, using the categories "American Indian or Alaska Native," "Asian," "Black or African American," "Native Hawaiian or Other Pacific Islander," and "White," and allowing applicants to select more than one racial designation (Comment 13(b)-1)?<br>  b.  Sex?<br>  c.  Marital status, using the categories married, unmarried, and separated?<br>  d.  Age? | | | |
| 2. Does the form used to collect monitoring information contain written notice that it is for federal government monitoring of compliance with federal statutes prohibiting discrimination on those bases, and that the bank must note ethnicity, race, and sex on the basis of sight and/or surname if the applicant chooses not to do so, or does the loan file indicate that the borrower was otherwise notified of this fact? (202.13(c)) | | | |
| 3. Does the bank note on the monitoring form applicant's refusals to disclose monitoring information? (202.13(b)) | | | |
| 4.<br>  a.  If the bank takes applications in person (including by electronic media that allows the bank to see the applicant), and if the applicant refuses to provide the monitoring information, does the bank, to the extent possible on the basis of sight or surname, note on the form the ethnicity, race, and sex of each applicant? (202.13(b), Comment 13(b)-4)<br>  b.  If the bank receives applications by mail, telephone, or electronic media and if it is not evident on the face of the application how it was received, does the bank indicate on the form or in the loan file how it was | | | |

| Apparent Violation (if No) | Yes | No | Basis for Conclusion |
|---|---|---|---|
| received?(Comments 13(b)-3, -4)? | | | |
| **General Rules** | | | |
| 5. Are written applications used for home purchase and refinance transactions? (202.4(c)) | | | |
| 6. Are written disclosures clear, conspicuous and except for those required by 202.5 and 202.13, in a form the applicant can retain? (202.4(d)-1)) | | | |
| 7.<br>a. If disclosures are provided electronically, were they provided in compliance with consumer consent, i.e., the bank obtained the applicant's affirmative consent, and other applicable provisions of the E-Sign Act? (202.4(d)(2))<br><br>b. If disclosures required by 202.5(b)(1), 202.5(b)(2), 202.5(d)(1), 202.5(d)(2), 202.13, and 202.14(a)(2)(i) accompany an application that is accessed by the applicant in electronic form, were the required application-related disclosures provided in electronic form on or with the application form? | | | |
| **Rules Concerning Requests for Information** | | | |
| 8. Do guidance and forms exclude requests for information relative to birth control practices, childbearing abilities, or childbearing or child-rearing intentions of the applicant, and does the loan file indicate that the bank did not otherwise inquire about these topics? (202.5(d)(3)) | | | |
| 9. Does the loan file indicate that the bank did not request information about spouses or former spouses except for transactions in which:<br>a. The spouse will be permitted to use the account,<br>b. The spouse will be contractually liable on the account,<br>c. The applicant is relying on the spouse's income as a basis for repayment of the credit requested,<br>d. The applicant resides in a community property state or is relying on property in such a state for repayment, or<br>e. The applicant relies on alimony, child support, or separate maintenance payments from the spouse or the former spouse to repay the debt? (202.5(c)) | | | |
| 10. In the case of individual unsecured credit, does the loan file indicate that the bank made inquiries about the marital status of the | | | |

| Apparent Violation (if No) | Yes | No | Basis for Conclusion |
|---|---|---|---|
| applicant only when the applicant resides in a community property state or when community property is a basis for repayment of the debt, and do guidance and forms for unsecured individual loans include these inquiries? (202.5(d)(1)) | | | |
| 11. For loans other than individual unsecured credit, are inquiries into marital status no more extensive than obtaining the applicant's status as "married," "unmarried," or "separated"?(202.5(d)(1)) | | | |
| 12. If the loan file indicates that information was requested regarding whether income on the application is derived from alimony, child support, or separate maintenance payments, do guidance and forms ensure that the applicant is informed that such income need not be revealed if the applicant does not want the bank to consider the information in determining the applicant's creditworthiness? (202.5(d)(2)) | | | |
| 13. Is any special purpose program established and administered so as to avoid discriminating on a prohibited basis?(202.5(a)(3), 202.8) | | | |
| 14. If the creditor collects information (in addition to required government monitoring information) on the race, color, religion, national origin, or sex of the applicant for purposes of a "self-test":   a.  Does the "self-test" meet the requirements of 202.15?   b.  Does the creditor disclose to the applicant, orally or in writing, when requesting the information that:     i. The applicant is not required to provide information?     ii. The bank is requesting information to monitor its compliance with ECOA?     iii. Federal law prohibits the bank from discriminating on the basis of this information, or on the basis of an applicant's decision not to furnish the information?     iv. If applicable, certain information will be collected based on visual observation or surname if not provided by the applicant or other person? (202.5(b)) | | | |
| 15. When a title, such as Ms., Miss, Mrs., or Mr., is requested on the application, does the form disclose that such designation is optional, and does the application form otherwise use | | | |

| Apparent Violation (if No) | Yes | No | Basis for Conclusion |
|---|---|---|---|
| only terms neutral as to sex? (202.5(b)(2)) | | | |
| **Rules Concerning Extensions of Credit** | | | |
| 16. For joint applications, do application files indicate an applicant's intent to apply for joint credit at the time of application? (202.7(d)(1)- 3) | | | |
| **Notifications** | | | |
| 17. If the bank received more than 150 applications in the preceding year, do files show that the bank notified noncommercial applicants in writing of:<br>　a. Action taken, whether approval, counteroffer, or adverse action (within 30 days of receipt of a completed application), unless the application is approved and the parties contemplate that the applicant who has yet to inquire about the status of the application, will do so within 30 days after applying? (202.9(a)(1)(i), 202.9(e))<br>　b. Adverse action because of incompleteness or a notice of missing information and that the information must be provided within a designated reasonable period for the application to be considered (within 30 days of receipt of the incomplete application)? (202.9(a)(1)(ii) and (c)(2))<br>　c. Adverse action (within 30 days of taking such action) on existing accounts? (202.9(a)(1)(iii))<br>　d. Adverse action (within 90 days after notifying the applicant of a counteroffer), if the applicant has not accepted the counteroffer (unless the notice of adverse action on the credit terms sought accompanied the counteroffer)? (202.9(a)(1)(iv)) | | | |
| 18. Do adverse action notices in denied files (as applicable) contain:<br>　a. A written statement of action taken and the name and address of the bank? (202.9(a)(2))<br>　b. A written statement substantially similar to that in section 202.9(b)(1)?<br>　c. A written statement of specific reasons for the action taken or written disclosure as specified in 202.9(a)(2)(ii) of the applicant's right to such a statement? (202.9(a)(2)(i) and (ii)) | | | |
| 19. In connection with credit other than an extension of trade credit, credit incident to a factoring agreement or other similar types of business credit, for businesses with revenues of $1 million or less in the preceding fiscal year, where the reasons were not given orally or in | | | |

| Apparent Violation (if No) | Yes | No | Basis for Conclusion |
|---|---|---|---|
| writing when adverse action was taken (under time frames in 202.9(a)(1)), was the disclosure of the right to a statement of reasons given in writing at the time of application in accordance with 202.9(a)(3)(i)(B)? | | | |
| 20. For businesses with revenues in excess of $1 million in the preceding fiscal year, or for extensions of trade credit, credit incident to a factoring agreement or other similar types of business credit, was the notification of action taken communicated within a reasonable time orally or in writing, and were reasons for denial and the ECOA notice provided in writing in response to a written request for the reasons by the applicant within 60 days of the bank's notification? (202.9(a)(3)(ii)(B)) | | | |
| 21. Does the statement of reason(s) for adverse action contain the principal and specific reason(s) for the action?(202.9(b)(2)) | | | |
| 22. When an application involves multiple applicants, does the bank provide notification of action to the primary applicant, when one is readily apparent? (202.9(f)) | | | |
| 23. When an application is made to multiple creditors by a third party, and no credit is offered or extended by any of the creditors, does the bank ensure that the applicant is properly informed of the action taken? (202.9(g)) | | | |
| **Furnishing Credit Information** | | | |
| 24. If the bank furnishes information,<br>  a.  Does the bank designate any new account to reflect the participation of both spouses if the applicant's spouse is permitted to use or is contractually liable on the account (other than as a guarantor, surety, endorser, or similar party) and any existing account within 90 days of the receipt of a request from one of the spouses for the designation? (202.10(a))<br>  b.  Does the bank furnish joint-account information to consumer reporting agencies in a manner that provides access to such information in the name of each spouse?(202.10(b)) | | | |
| 25. When the bank responds to an inquiry for credit information regarding a joint account, is the information furnished in the name of the spouse for whom the information is requested?(202.10(c)) | | | |

| Record Retention | | | |
|---|---|---|---|
| 26. Does the bank retain application files for 25 months (12 months for business credit applications from businesses with gross revenues of $1 million or less in the previous fiscal year, except an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit) after date of notice of action taken or notice of incompleteness the following (as applicable): <br>   a.  The application and all supporting material? (202.12(b)(1)(i)) <br>   b.  All information obtained for monitoring purposes? (202.12(b)(1)(i)) <br>   c.  The notification of action taken, if written, or any notation or memorandum by the bank, if made orally? (202.12(b)(1)(ii)(A)) <br>   d.  A statement of specific reasons for adverse action, if written, or any notation or memorandum by the bank, if made orally? (202.12(b)(1)(ii)(B)) <br>   e.  Any written statement submitted by the applicant alleging a violation of ECOA or Regulation B? (202.12(b)(1)(iii)) | | | |
| 27. Does the bank retain application files in connection with existing accounts for 25 months (12 months for business credit applications from businesses with gross revenues of $1 million or less in the previous fiscal year, except an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit) after date of notice of action taken containing: <br>   a.  Any written or recorded information concerning the adverse action? (202.12(b)(2)(i)) <br>   b.  Any written statement submitted by the applicant alleging a violation of ECOA or Regulation B?(202.12(b)(2)(ii)) | | | |
| 28. Does the bank retain application files for other applications for which section 202.9's notification requirements do not apply for 25 months (12 months for business credit applications from businesses with gross revenues of $1 million or less in the previous fiscal year, except an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit) after date the bank receives the application, containing all written or recorded information in its possession concerning the applicant, including any notation of action taken?(202.12(b)(3)) | | | |
| 29. For business credit applications from | | | |

| | | |
|---|---|---|
| businesses with gross revenues of more than $1 million in the previous fiscal year, or an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit, does the bank retain records for at least 60 days after notifying the applicant of the action taken, or for 12 months after notifying the applicant of the action taken if the applicant requests within the 60-day time period the reasons for denial or that the records for the denial be retained? | | |
| 30. For prescreened solicitations, does the bank retain for 25 months (12 months for business credit except for businesses with gross revenues of more than $1 million in the previous fiscal year, or an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit) after the offer of credit was made:<br>　a.  The text of any prescreened solicitation;<br>　b.  The list of criteria the bank used to select potential recipients of the solicitation; and<br>　c.  Any correspondence related to complaints (formal or informal) about the solicitation? (202.12(b)(7)) | | |
| 31. If the bank has notice of an investigation, enforcement proceeding, or civil action under ECOA, was information subject to record retention requirements retained until final disposition of the matter? (202.12(b)(4)) | | |
| 32. If the bank conducts a self-test pursuant to 202.15, does it, after completion of the test, retain all written and recorded information:<br>　a.  For 25 months?<br>　b.  Until final disposition if the self-test has actual notice that it is under investigation or subject to enforcement proceedings or a civil action? (202.12(b)(6)) | | |
| **Rules on Providing Appraisal Reports** | | |
| 33. Are applicants routinely given copies of appraisal reports used in connection with applications for credit secured by a lien on a dwelling, or are they provided with written notice (as specified in 202.14(a)(2)(i)), no later than when notified of the action taken under 202.9, of their right to obtain a copy of the appraisal report, and provided a copy of the appraisal report upon request in the manner specified in 202.14(a)(2)(ii)? | | |
| **Requirements for Electronic Communications** | | |
| **Note:** The Federal Reserve Board has not yet | | |

| | | | |
|---|---|---|---|
| mandated compliance with 202.16. Banks may follow 202.16 or their own policies as long as those policies comply with the requirements of the E-Sign Act, 15 USC 7001 et seq. | | | |
| 34. If the bank uses electronic communication to provide any of the disclosures required by ECOA and Regulation B to be in writing, are the disclosures clear and conspicuous and in a form the applicant may retain? (202.16(b)) | | | |
| 35. If the bank uses electronic communications to provide disclosures that are required to be in writing (other than disclosures under 202.9(a)(3)(i)(B), 202.13(a), and 202.14(a)(2)(i), if provided on or with the application) does the bank obtain the applicant's affirmative consent? (202.16(c)) | | | |
| 36. If the bank uses electronic communication to provide disclosures, does the bank either<br>  a. Send the disclosures to the applicant's electronic address; or<br>  b. Make the disclosure available at another location and so notify the applicant by sending a notice that identifies the account involved and the address of the Internet Web site or other location where the disclosure is available, and make the disclosure available for at least 90 days after it is first available or after it sends the notice of the other location, whichever is later? (202.16(d)) | | | |
| 37. If a disclosure provided by electronic communication is returned, does the bank takes reasonable steps to attempt redelivery using information that is in its files? (202.16(e)) | | | |

# Appendix M: Alternative Fair Lending Analyses

This appendix provides additional fair lending guidance for examining credit card banks (i.e., CEBA banks), high-volume credit card products at other national banks, and community banks that do not have enough lending activity to make comparative file review a meaningful examination strategy.

## Credit Card Banks or Credit Card Departments of Banks

This guidance provides an alternative to comparative file review that should be more effective in evaluating and examining fair lending risk in credit card banks or banks with high-volume credit card products. Examiners should discuss these areas of concern with those banks as a part of ongoing bank supervision activities. Any questions about this advice or its implementation should be directed to the supervisory office and, if appropriate, the Compliance Policy Division.

Because of the difficulty in conducting comparative file reviews without government monitoring information, that form of analysis in credit card portfolios generally does not provide meaningful results. While the guidance in this appendix should be more appropriate in most instances, be prepared to conduct a comparative file review if they have information indicating that a bank is engaging in non-overt disparate treatment (i.e., treatment not based on formal written policy or practice) of applicants on a prohibited basis in its underwriting of applications or in the terms and conditions it offers to applicants.

Commence credit card examinations by obtaining information and reviewing each credit card product the bank offers to determine whether any are targeted toward a particular group on a prohibited basis. This information should include:

- The name of each product (e.g., bank card name, co-branded card names); information about what population each product is targeted to (e.g., current customers, customers applying at certain retail outlets);

- Copies of application forms for each product;

- The marketing plan and any solicitation and advertising materials used for each product;

- The terms and conditions for each product;

- The underwriting guidelines for each product (including pertinent credit scoring system documentation); and

- Different language credit card applications (e.g., Spanish language application). While offering different language applications is not illegal, banks should not offer different terms or apply different underwriting criteria to applicants based on whether they apply using a different language application.

Review how the bank markets its credit card products to different customer groups. Determine whether any marketing materials or the dissemination of those materials show on a prohibited basis a preference for any group of potential or actual customers.

Next, be alert for bank credit card programs that the bank states are special purpose credit programs or that are applied to specific prohibited basis groups, such as second review and lower interest rate cards, etc. For a program to qualify as a special purpose credit program, it must meet the guidelines delineated in Regulation B (Sec. 202.8). Banks that fail to follow those guidelines may be violating Regulation B even if their stated intention is to provide credit to underserved groups (e.g., blacks and Hispanics).

The issue of special purpose credit programs is complicated. Examiners who identify such programs should contact their compliance lead expert and, if appropriate, the Compliance Policy Division and the Community and Consumer Law Division for guidance. However, examiners should know that Regulation B does not allow banks to designate retroactively a program that treats applicants differently on a prohibited basis as a special purpose credit program.

Lastly, review all of the variables that go into each credit scorecard that the bank uses for any prohibited bases. Be especially careful to ensure that some less routinely discussed prohibited bases are not used as variables. An example of this would be a bank treating applicants who receive public assistance income less favorably by assigning them fewer points than applicants who receive the same amount of income from wages.

Along with reviewing credit scoring system variables, look at peripheral systems that feed application information into the credit scoring systems (e.g., automated application system). Ascertain whether the bank separates or tags applicants on a prohibited basis in a manner that causes them to be processed differently by a particular scorecard (e.g., assigning them different cut-off scores or lower credit line assignments) or to be processed in a way that causes applications to be evaluated by a completely different and less favorable scorecard.

The following examples illustrate how banks might employ policies that could violate Regulation B, based on marital status:

- A bank initiates an apparent difference in treatment in its credit scoring system by characterizing joint applicants as either "wedded" or "individual" in its automated application system. Thus, it prompts its credit scoring system to treat applicants differently based on whether they were married or unmarried joint applicants.

- A bank offers "honeymoon accounts," whereby it gives all applicants for that credit product $1000 lines of credit, regardless of whether they have any credit history or a credit bureau score. The bank denies persons who do not apply under this program if they do not have a credit history or credit bureau score.

- A bank does not allow "unmarried, joint applicants" for credit cards but does allow "married, joint applicants."

For additional information related to credit scoring systems, refer to Appendix B, "Considering Automated Underwriting and Credit Scoring Risk Factors."

## Compliance with Substantive Provisions of Regulation B

This guidance covers situations in which the standard fair lending examination approach described in this booklet cannot be carried out or is not likely to yield meaningful results. Examiners should consult the supervisory office and, if appropriate, the Compliance Policy Division about the appropriateness of replacing the customary comparative file review with an analysis of the bank's compliance with certain substantive consumer

protections in Regulation B. As described below, these approaches either focus on prohibitive bases other than race or national origin or use an adaptation of appendix K, "Other Illegal Limitations on Credit Checklist."

Using other prohibited bases may be useful and appropriate if a bank does not have any products with at least five denials or at least five approvals from one prohibited basis group and at least 20 control group approvals. In other words, there are not enough denials and approvals for a comparative file review of either approve/deny decisions or rates/terms/conditions.

One alternative to consider is performing a comparative file review; comparing individual male to individual female applicants or to compare married joint applicants to unmarried joint applicants using the procedures in this booklet. However, if these analyses have been done in a recent fair lending examination with no problems discovered, contact the supervisory office and, if appropriate, the Compliance Policy Division to discuss whether other types of comparisons might be worthwhile.

If no worthwhile comparisons to review exist, a second alternative to consider is a review of the bank's loan policies. Select a sample based on the level of fair lending risk of at least 10 diverse applications (different products, underwriters, branches, etc.) and complete the "Other illegal Limitations on Credit Checklist" for each of the applications. Regulation B citations on the checklist are considered substantive violations for which the OCC may seek relief for persons whose credit rights were impaired.

Most of these consumer rights are not stated explicitly in terms of a prohibited basis (for example, the prohibition against discounting or excluding protected income, 12 CFR 202.6(b)(5)). Most do not require interpretation of the comparative treatment of applicants. Usually, analysis involves only whether the bank treated applicants as explicitly required by Regulation B. Obtain an explanation from the bank staff responsible for any transactions that appear to involve a violation on the checklist and evaluate each bank explanation and verify any facts that the bank cites.

A third alternative approach is for situations where obstacles exist because underwriting guidelines are unclear and/or file documentation is poor. Treat such a situation as a high-risk one for which a comparative file review should be attempted. If loan files lack data on applicants' qualifications or if the bank's standards are unclear:

1. Ask what specific factors formed the basis for the denial reasons cited on adverse action notices.

2. Using specific approved applicants, ask how the bank determined that they differed from denied applicants.

3. Use informal file comments (if any) that characterize qualifications as good, adequate, weak, etc., as points of reference.

4. Track whether credit decision makers evaluated the factor(s) identified in steps 1-3 consistently for the control and prohibited basis groups.

5. If an apparent violation is found using this alternative analysis, follow the steps delineated in this booklet for resolving potential fair lending violations (i.e., beginning with obtaining an explanation from the bank).

# Appendix N: Policy Statement on Enforcement of the Equal Credit Opportunity and Fair Housing Acts

The OCC believes it appropriate to remind national banks and theirsubsidiaries of their responsibilites under these laws and that the OCC will vigorously enforce them. National banks and their subsidiaries must institute procedures to assure that all violations of the acts, including those not cited in this policy statement, will not occur. In addition, the OCC has judged failure to comply with certain specific provisions of the acts to be particularly serious and potentially warranting retrospective action to correct the condition resulting from the violations.

## Enforcement Policy Statement on the Equal Credit Opportunity Act and the Fair Housing Act

This enforcement policy statement ensures that the rights of credit applicants are protected by requiring national banks to take corrective action for certain, more serious past violations of the Equal Credit Opportunity and Fair Housing acts and to be in compliance in the future. In an effort to achieve that objective, the OCC encourages voluntary correction and compliance with the acts. Whenever violations addressed by this policy statement are discovered, a national bank will be required to take action to ensure such violations will not recur and to correct the effects of those violations discovered.

The OCC generally will require national banks to take action to correct conditions resulting from violations occurring within 24 months previous to the OCC's discovery of the violations. An exception is violations concerning adverse action notices for which corrective action will be required for violations occurring within six months prior to discovery.

The OCC considers violations in the following areas serious, and will usually be subject to retrospective corrective action:

- Discouraging applicants on a prohibited basis in violation of the Fair Housing Act or sections 202.4(b) of Regulation B.
- Using credit criteria in a discriminatory manner in evaluating applications in violation of the Fair Housing Act or sections 202.4 through 202.7 of Regulation B.
- Imposing different terms on a prohibited basis in violation of the Fair

Housing Act or sections 202.4 or 202.6(b) of Regulation B.
- Requiring cosigners, guarantors, or the like on a prohibited basis in violation of section 202.7(d) of Regulation B.
- Failing to furnish separate credit histories as required by section 202.10 of Regulation B.
- Failing to provide an adequate notice of adverse action under section 202.9 of Regulation B.

**This policy statement does not:**

- Preclude the OCC from using any administrative authority it possesses to enforce these laws.
- Limit the OCC's discretion to take other action to correct conditions resulting from violations of these laws.
- Preclude the OCC from referring cases to the United States Attorney General.
- Foreclose a credit applicant's right to bring a civil action under the Equal Credit Opportunity Act or Fair Housing Act or to file a complaint with the Department of Justice or the Department of Housing and Urban Development for violations of housing laws.
- Supersede or substitute for any regulations or enforcement policies issued by the OCC or the Department of Housing and Urban Development under the Fair Housing Act.

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting
requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information
on rule, reporting and guidance changes.

# Appendix O: Policy Statement on Discrimination in Lending (April 15, 1994)

The Department of Housing and Urban Development ("HUD"), the Department of Justice ("DOJ"), the Office of the Comptroller of the Currency ("OCC"), the Office of Thrift Supervision ("OTS"), the Board of Governors of the Federal Reserve System (the "Board"), the Federal Deposit Insurance Corporation ("FDIC"), the Federal Housing Finance Board ("FHFB"), the Federal Trade Commission ("FTC"), the National Credit Union Administration ("NCUA"), and the Office of Federal Housing Enterprise Oversight ("OFHEO") (collectively, "the Agencies") are concerned that some prospective home buyers and other borrowers may be experiencing discriminatory treatment in their efforts to obtain loans. The 1992 Federal Reserve Bank of Boston study on lending discrimination, Congressional hearings, and agency investigations have indicated that race is a factor in some lending decisions. Discrimination in lending on the basis of race or other prohibited factors is destructive, morally repugnant, and against the law. It prevents those who are discriminated against from enjoying the benefits of access to credit. The Agencies will not tolerate lending discrimination in any form. Further, fair lending is not inconsistent with safe and sound operations. Lenders must continue to ensure that their lending practices are consistent with safe and sound operating policies.

This policy statement applies to all lenders, including mortgage brokers, issuers of credit cards, and any other person who extends credit of any type. The policy statement is being issued for several reasons, including:

- To provide guidance about what the agencies consider in determining if lending discrimination exists; and
- To provide a foundation for future interpretations and rulemakings by the Agencies.

A number of federal statutes seek to promote fair lending. For example, the Home Mortgage Disclosure Act ("HMDA"), 12 U.SC. 2801 et seq., seeks to prevent lending discrimination and redlining by requiring public disclosure of certain information about mortgage loan applications. The Community Reinvestment Act ("CRA"), 12 U.S.C. 2901 et seq., seeks affirmatively to encourage institutions to help to meet the credit needs of the entire community served by each institution covered by the statute, and CRA ratings

---

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

take into account lending discrimination by those institutions. The Americans with Disabilities Act, 42 U.S.C. 12101 et seq., prohibits discrimination against persons with disabilities in the provision of goods and services, including credit services. This policy statement, however, is based upon and addresses only the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. 1691 et seq., and the Fair Housing Act ("FH Act"), 42 U.S.C. 3601 et seq, the two statutes that specifically prohibit discrimination in lending.

This policy statement has been approved and adopted by the signatory Agencies listed above as a statement of the Agencies' general position on the ECOA and the FH Act for purposes of administrative enforcement of those statutes. It is intended to be consistent with those statutes and their implementing regulations and to provide guidance to lenders seeking to comply with them. It does not create or confer any substantive or procedural rights on third parties which could be enforceable in any administrative or civil proceeding.

This policy statement will discuss what constitutes lending discrimination under these statutes and answer questions about how the Agencies will respond to lending discrimination and what steps lenders might take to prevent discriminatory lending practices.

A. Lending Discrimination Statutes and Regulations

(1) The ECOA prohibits discrimination in any aspect of a credit transaction. The ECOA is not limited to consumer loans. It applies to any extension of credit, including extensions of credit to small businesses, corporations, partnerships, and trusts. The ECOA prohibits discrimination based on:

- Race or color;
- Religion;
- National origin;
- Sex;
- Marital status;
- Age (provided the applicant has the capacity to contract);
- The applicant's receipt of income derived from any public assistance program; and
- The applicant's exercise, in good faith, of any right under the Consumer Credit Protection Act.

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

The Federal Reserve Board's Regulation B, found at 12 CFR part 202, implements the ECOA. Regulation B describes lending acts and practices that are specifically prohibited, permitted, or required. Official interpretations of the regulation are found in Supplement I to 12 CFR part 202.

(2) The FH Act prohibits discrimination in all aspects of residential real- estate -related transactions, including, but not limited to:

- Making loans to buy, build, repair, or improve a dwelling;
- Purchasing real estate loans;
- Selling, brokering, or appraising residential real estate; and
- Selling or renting a dwelling.

The FH Act prohibits discrimination based on:

- Race or color;
- National origin;
- Religion;
- Sex;
- Familial status (defined as children under the age of 18 living with a parent or legal custodian, pregnant women, and people securing custody of children under 18); and
- Handicap.

HUD's regulations implementing the FH Act are found at 24 CFR Part 100.

Because both the FH Act and the ECOA apply to mortgage lending, lenders may not discriminate in mortgage lending based on any of the prohibited factors in either list.

Liability under these two statutes for discrimination on a prohibited basis is civil, not criminal. However, there is criminal liability under the FH Act for various forms of interference with efforts to enforce the FH Act, such as altering or withholding evidence or forcefully intimidating persons seeking to exercise their rights under the FH Act.

What is prohibited.. Under the ECOA, it is unlawful for a lender to discriminate on a prohibited basis in any aspect of a credit transaction and, under both the ECOA and the FH Act, it is unlawful for a lender to discriminate on a prohibited basis in a residential real estate related transaction. Under one or both of these laws, a lender may not, because of a

---

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

prohibited factor:

- Fail to provide information or services or provide different information or services regarding any aspect of the lending process, including credit availability, application procedures, or lending standards;
- Discourage or selectively encourage applicants with respect to inquiries about or applications for credit;
- Refuse to extend credit or use different standards in determining whether to extend credit;
- Vary the terms of credit offered, including the amount, interest rate, duration, or type of loan;
- Use different standards to evaluate collateral;
- Treat a borrower differently in servicing a loan or invoking default remedies; or
- Use different standards for pooling or packaging a loan in the secondary market.

A lender may not express, orally or in writing, a preference based on prohibited factors or indicate that it will treat applicants differently on a prohibited basis.

A lender may not discriminate on a prohibited basis because of the characteristics of:

- A person associated with a credit applicant (for example, a co-applicant, spouse, business partner, or live-in aide); or
- The present or prospective occupants of the area where property to be financed is located.

Finally, the FH Act requires lenders to make reasonable accommodations for a person with disabilities when such accommodations are necessary to afford the person an equal opportunity to apply for credit.

B. Types of Lending Discrimination

The courts have recognized three methods of proof of lending discrimination under the ECOA and the FH Act:

- "Overt evidence of discrimination," when a lender blatantly discriminates on a prohibited basis;

The OCC now supervises federal savings associations (FSA).³ References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

- Evidence of "disparate treatment," when a lender treats applicants differently based on one of the prohibited factors; and
- Evidence of "disparate impact," when a lender applies a practice uniformly to all applicants but the practice has a discriminatory effect on a prohibited basis and is not justified by business necessity.

## Overt Evidence of Discrimination.

There is overt evidence of discrimination when a lender openly discriminates on a prohibited basis.

**Example**: A lender offered a credit card with a limit of up to $750 for applicants aged 21-30 and $1500 for applicants over 30. This policy violated the ECOA's prohibition on discrimination based on age.

There is overt evidence of discrimination even when a lender expresses--but does not act on--a discriminatory preference:

**Example**: A lending officer told a customer, "We do not like to make home mortgages to Native Americans, but the law says we cannot discriminate and we have to comply with the law." This statement violated the FH Act's prohibition on statements expressing a discriminatory preference.

## Evidence of Disparate Treatment.

Disparate treatment occurs when a lender treats a credit applicant differently based on one of the prohibited bases. Disparate treatment ranges from overt discrimination to more subtle disparities in treatment. It does not require any showing that the treatment was motivated by prejudice or a conscious intention to discriminate against a person beyond the difference in treatment itself. It is considered by courts to be intentional discrimination because no credible, nondiscriminatory reason explains the difference in treatment on a prohibited basis.

**Example**: Two minority loan applicants were told that it would take several hours and require the payment of an application fee to determine whether they would qualify for a home mortgage loan. In contrast, a loan officer took financial information immediately from nonminority applicants and determined whether they qualified in minutes, without a fee being paid. The lender's differential treatment violated both the ECOA and the FH Act.

Redlining refers to the illegal practice of refusing to make residential loans or

---

The OCC now supervises federal savings associations (FSAs). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

imposing more onerous terms on any loans made because of the predominant race, national origin, etc., of the residents of the neighborhood in which the property is located. Redlining violates both the FH Act and the ECOA.

Disparate treatment may more likely occur in the treatment of applicants who are neither clearly well-qualified nor clearly unqualified. Discrimination may more readily affect applicants in this middle group for two reasons. First, because the applications are all "close cases," there is more room and need for lender discretion. Second, whether or not an applicant qualifies may depend on the level of assistance the lender provides the applicant in preparing an application. The lender may, for example, propose solutions to problems on an application, identify compensating factors, and provide encouragement to the applicant. Lenders are under no obligation to provide such assistance, but to the extent that they do, the assistance must be provided in a nondiscriminatory way.

**Example**: A nonminority couple applied for an automobile loan. The lender found adverse information in the couple's credit report. The lender discussed the credit report with them and determined that the adverse information, a judgment against the couple, was incorrect since the judgment had been vacated. The nonminority couple was granted their loan. A minority couple applied for a similar loan with the same lender. Upon discovering adverse information in the minority couple's credit report, the lender denied the loan application on the basis of the adverse information without giving the couple an opportunity to discuss the report.

**Example**: Two minority borrowers inquired with a lender about mortgage loans. They were given applications for fixed-rate loans only and were not offered assistance in completing the loan applications. They completed the applications on their own and ultimately failed to qualify. Two similarly situated nonminority borrowers made an identical inquiry about mortgage loans to the same lender. They were given information about both adjustable-rate and fixed-rate mortgages and were given assistance in preparing applications that the lender could accept.

Both of these are examples of disparate treatment of similarly situated applicants, apparently based on a prohibited factor, in the amount of assistance and information the lender provided. The lender might also generally exercise its discretion to disfavor some individuals or favor others in

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

a manner that results in a pattern or practice of disparate treatment that cannot be explained on grounds other than a prohibited basis.

If a lender has apparently treated similar applicants differently on the basis of a prohibited factor, it must provide an explanation for the difference in treatment. If the lender is unable to provide a credible and legitimate nondiscriminatory explanation, the agency may infer that the lender discriminated.

If an agency determines that a lender's explanation for treating some applicants differently is a pretext for discrimination, the agency may find that the lender discriminated, notwithstanding the lender's explanation.

**Example**: A lender rejected a loan application made by a female applicant with flaws in her credit report but accepted applications by male applicants with similar flaws. The lender offered the explanation that the rejected application had been processed by a new loan officer who was unfamiliar with the bank's policy to work with applicants to correct credit report problems. However, an investigation revealed that the same loan officer who processed the rejected application had accepted applications from males with similar credit problems after working with them to provide satisfactory explanations.

When a lender's treatment of two applicants is compared, even when there is an apparently valid explanation for a particular difference in treatment, further investigation may establish disparate treatment on a prohibited basis. For example, seemingly valid explanations for denying loans to minority applicants may have been applied consistently to minority applicants and inconsistently to nonminority applicants; or "offsetting" or "compensatory" factors cited as the reason for approving nonminority applicants may involve information that the lender usually failed to consider for minority applicants but usually considered for nonminority applicants.

A pattern or practice of disparate treatment on a prohibited basis may also be established through a valid statistical analysis of detailed loan file information, provided that the analysis controls for possible legitimate explanations for differences in treatment. Where a lender's underwriting decisions are the subject of a statistical analysis, detailed information must be collected from individual loan files about the applicants' qualifications for credit. Data reported by lenders under the HMDA do not, standing alone, provide sufficient information for such an analysis because they omit important variables, such as credit histories and debt ratios. HMDA data are

The OCC now supervises federal savings associations (FSA).³ References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

useful, though, for identifying lenders whose practices may warrant investigation for compliance with fair lending laws. HMDA data may also be relevant, in conjunction with other evidence, to the determination whether a lender has discriminated.

## Evidence of Disparate Impact

When a lender applies a policy or practice equally to credit applicants, but the policy or practice has a disproportionate adverse impact on applicants from a group protected against discrimination, the policy or practice is described as having a "disparate impact." Policies and practices that are neutral on their face and that are applied equally may still, on a prohibited basis, disproportionately and adversely affect a person's access to credit.

Although the precise contours of the law on disparate impact as it applies to lending discrimination are under development, it has been clearly established that proof of lending discrimination using a disparate impact analysis encompasses several steps. The single fact that a policy or practice creates a disparity on a prohibited basis is not alone proof of a violation. Where the policy or practice is justified by "business necessity" and there is no less discriminatory alternative, a violation of the FH Act or the ECOA will not exist.

The existence of a disparate impact may be established through review of how a particular practice, policy or standard operates with respect to those who are affected by it. The existence of disparate impact is not established by a mere assertion or general perception that a policy or practice disproportionately excludes or injures people on a prohibited basis. The existence of a disparate impact must be established by facts. Frequently this is done through a quantitative or statistical analysis. Sometimes the operation of the practice is reviewed by analyzing its effect on an applicant pool; sometimes it consists of an analysis of the practice's effect on possible applicants, or on the population in general. Not every member of the group must be adversely affected for the practice to have a disparate impact. Evidence of discriminatory intent is not necessary to establish that a policy or practice adopted or implemented by a lender that has a disparate impact is in violation of the FH Act or ECOA.

Identifying the existence of a disparate impact is only the first step in proving lending discrimination under this method of proof. When an Agency finds

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

that a lender's policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by "business necessity." The justification must be manifest and may not be hypothetical or speculative. Factors that may be relevant to the justification could include cost and profitability.

Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect.

**Example**: A lender's policy is not to extend loans for single family residences for less than $60,000.00. This policy has been in effect for ten years. This minimum loan amount policy is shown to disproportionately exclude potential minority applicants from consideration because of their income levels or the value of the houses in the areas in which they live. The lender will be required to justify the "business necessity" for the policy.

**Example**: In the past, lenders primarily considered net income in making underwriting decisions. In recent years, the trend has been to consider gross income. A lender decided to switch its practices to consider gross income rather than net income. However, in calculating gross income, the lender did not distinguish between taxable and nontaxable income even though nontaxable income is of more value than the equivalent amount of taxable income. The lender's policy may have a disparate impact on individuals with disabilities and the elderly, both of whom are more likely than the general applicant pool to receive substantial nontaxable income. The lender's policy is likely to be proven discriminatory. First, the lender is unlikely to be able to show that the policy is compelled by business necessity. Second, even if the lender could show business necessity, the lender could achieve the same purpose with less discriminatory effect by "grossing up" nontaxable income (i.e., making it equivalent to gross taxable income by using formulas related to the applicant's tax bracket).

Lenders will not have to justify every requirement and practice every time that they face a compliance examination. The Agencies recognize the relevance to credit decisions of factors related to the adequacy of the borrower's income to carry the loan, the likely continuation of that income, the adequacy of the collateral to secure the loan, the borrower's past performance in paying obligations, the availability of funds to close, and the existence of adequate reserves. While lenders should think critically about whether widespread, familiar requirements and practices have an

---

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

unjustifiable disparate impact, they should look especially carefully at requirements that are more stringent than customary. Lenders should also stay informed of developments in underwriting and portfolio performance evaluation so that they are well positioned to consider all options by which their business objectives can be achieved.

C. Answers to Questions Often Asked by Financial Institutions and the Public

Lending institutions and others often ask the Agencies questions about various aspects of lending discrimination. The Agencies have compiled this list of common questions, with answers, in order to provide further guidance.

**Q1**: Are disparities in application, approval, or denial rates revealed by HMDA data sufficient to establish lending discrimination?

**A**: HMDA data alone do not prove lending discrimination. The data do not contain enough information on major credit-related factors, such as employment and credit histories, to prove discrimination. Despite these limitations, the data can provide "red flags" that there may be problems at particular institutions. Therefore, regulatory and enforcement agencies may use HMDA data, along with other factors, to identify institutions whose lending practices warrant more scrutiny. Furthermore, HMDA data can be relevant, in conjunction with other data and information, to the determination whether a lender has discriminated.

**Q2**: Does a lending institution that submits inaccurate HMDA data violate lending discrimination laws?

**A**: An inaccurate HMDA data submission constitutes a violation of the HMDA, the Federal Reserve Board's Regulation C, and other applicable laws, and may subject the lending institution to an enforcement action, which could include civil money penalties, and, if the lender is a HUD-approved mortgagee, the sanctions of the HUD Mortgagee Review Board. An inaccurate HMDA data submission, however, is not in itself a violation of the ECOA or the FH Act. However, a person who intentionally submits incorrect or incomplete HMDA data in order to cover up a violation of the FH Act may be subject, under the FH Act and federal criminal statutes, to a fine or prison term or both. In addition, a failure to ensure accurate HMDA data may be considered as a relevant fact during a FH Act investigation or an examination of the institution's lending activities.

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

**Q3**: Does a second review program only for loan applicants who are members of a protected class violate laws prohibiting discrimination in lending?

**A**: Such programs are permissible if they do no more than ensure that lending standards are applied fairly and uniformly to all applicants. For example, it is permissible to review the proposed denial of applicants who are members of a protected class by comparing their applications to the approved applications of similarly qualified individuals who are not members of a protected class to determine if the applications were evaluated consistently. It is impermissible, however, to review the applications of members of a protected class in order to apply standards to those applications different from the standards used to evaluate other applications for the same credit program or to apply the same standards in a different manner, unless such actions are otherwise permitted by law, as described in Question 4.

Other types of second review programs are also permissible. For example, lenders could review the proposed denial of all applicants within a certain income range. Lenders also could review a sampling of all applications proposed for denial, or even review all such applications.

**Q4**: May a lender apply different lending standards to applicants who are members of a protected class in order to increase lending to that sector of its community?

**A**: Generally, a lender that applies different lending standards or offers different levels of assistance on a prohibited basis, regardless of its motivation, would be violating both the FH Act and the ECOA. There are exceptions to the general rule; thus, applying different lending standards or offering different levels of assistance to applicants who are members of a protected class is permissible in some circumstances. For example, the FH Act requires lenders to provide reasonable accommodation to people with disabilities. In addition, providing different treatment to applicants to address past discrimination would be permissible if done in response to a court order or otherwise in accord with applicable legal precedent. However, the law in this area is complex and developing. Before implementing programs of this sort, a lender should seek legal advice.

Of course, affirmative advertising and marketing efforts that do not involve application of different lending standards are permissible under both the ECOA and the FH Act. For example, special outreach to a minority

---

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

community would be permissible.

**Q5**: Should a lender engage in self-testing?

**A**: Principles of sound lending dictate that adequate policies and procedures be in place to ensure safe and sound lending practices and compliance with applicable laws and regulations, and that a lender adopt appropriate audit and control systems to determine whether the institution's policies and procedures are functioning adequately. This is as true in the area of fair lending as in other operations. Lenders should employ reliable measures for auditing fair lending compliance. A well-designed and implemented program of self-testing could be a valuable part of this process. Lenders should be aware, however, that data documenting lending discrimination discovered in a self-test generally will not be shielded from disclosure.

Corrective actions should always be taken by any lender that discovers discrimination. Self-testing and corrective actions do not expunge or extinguish legal liability for the violations of law, insulate a lender from private suits, or eliminate the primary regulatory agency's obligation to make the referrals required by law. However, they will be considered as a substantial mitigating factor by the primary regulatory agencies when contemplating possible enforcement actions. In addition, HUD and DOJ will consider as a substantial mitigating factor an institution's self-identification and self-correction when determining whether they will seek additional penalties or other relief under the FH Act and the ECOA. The Agencies strongly encourage self-testing and will consider further steps that might be taken to provide greater incentives for institutions to undertake self-assessment and self-correction.

**Q6**: What should a lender do if self-testing evidences lending discrimination?

**A**: If a lender discovers discriminatory practices, it should make all reasonable efforts to determine the full extent of the discrimination and its cause, e.g., determine whether the practices were grounded in defective policies, poor implementation or control of those policies, or isolated to a particular area of the lender's operations. The lender should take all appropriate corrective actions to address the discrimination, including, but not limited to:

- Identifying customers whose applications may have been inappropriately processed, offering to extend credit if they were improperly denied;

---

The OCC now supervises federal savings associations (FSAs). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

compensating them for any damages, both out-of-pocket and compensatory; and notifying them of their legal rights;

- Correcting any institutional policies or procedures that may have contributed to the discrimination;
- Identifying, and then training and/or disciplining, the employees involved;
- Considering the need for community outreach programs and/or changes in marketing strategy or loan products to better serve minority segments of the lender's market; and
- Improving audit and oversight systems in order to ensure there is no recurrence of the discrimination.

An institution is not required to report to the Agencies a lending discrimination problem it has discovered. However, a lender that reports its discovery can ensure that the corrective actions it develops are appropriate and complete and thereby minimize the damages to which it will be subject.

**Q7**: Will a lender be held responsible for discriminatory lending engaged in by a single loan officer where the lending institution has good policies and procedures in place, is otherwise in full compliance with all applicable laws and regulations, and neither knows nor reasonably could have known that the officer was engaged in illegal discriminatory conduct?

**A**: Fair lending violations can occur even in the most well-run lending institutions that have good policies in place to ensure compliance with fair lending laws and regulations. Of course, the chances that such violations will occur can be greatly reduced by backing up those policies with proper employee training and supervision and subjecting the lending process to proven systems of oversight and review. Self-testing can further reduce the likelihood that violations may occur. Notwithstanding these efforts, a single loan officer might still improperly apply policies or, worse yet, deliberately circumvent them and manage to conceal or disguise the true nature of his or her practices for a time. It may be particularly difficult to discover this type of behavior when it occurs in the pre-application process.

In any case where discriminatory lending by a lending institution is identified, the lender will be expected to identify and fairly compensate victims of discriminatory conduct just as it would be expected to compensate a customer if an employee's conduct resulted in physical injury to the customer. In addition, such a violation might constitute a "pattern or practice" that must be referred to DOJ or a violation that must be referred to HUD.

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

As in other cases of discriminatory behavior, where a lender takes self-initiated corrective actions, such actions will be considered as a substantial mitigating factor by the Agencies in determining the nature of any enforcement action and what penalties or other relief would be appropriate.

**Q8**: If a federal financial institutions regulatory agency has "reason to believe" that a lender has engaged in a pattern or practice of discrimination in violation of the ECOA, the ECOA requires the agency to refer the matter to DOJ. What constitutes a "reason to believe"?

**A**: A federal financial institutions regulatory agency has reason to believe that an ECOA violation has occurred when a reasonable person would conclude from an examination of all credible information available that discrimination has occurred. This determination requires weighing the available evidence and applicable law and determining whether an apparent violation has occurred. Information supporting a reason to believe finding may include loan files and other documents, credible observations by persons with direct knowledge, statistical analysis, and the financial institution's response to the preliminary examination findings.

Reason to believe is more than an unfounded suspicion. While the evidence of discrimination need not be definitive and need not include evidence of overt discrimination, it should be developed to the point that a reasonable person would conclude that a violation exists.

**Q9**: If a federal financial institutions regulatory agency has reason to believe that a lender has engaged in a "pattern or practice" of discrimination in violation of the ECOA, the agency will refer the matter to DOJ. What constitutes a "pattern or practice" of lending discrimination?

**A**: Determinations by federal financial institutions regulatory agencies regarding a pattern or practice of lending discrimination must be based on an analysis of the facts in a given case. Isolated, unrelated or accidental occurrences will not constitute a pattern or practice. However, repeated, intentional, regular, usual, deliberate, or institutionalized practices will almost always constitute a pattern or practice. The totality of the circumstances must be considered when assessing whether a pattern or practice is present. Considerations include, but are not limited to:

- Whether the conduct appears to be grounded in a written or unwritten

The OCC now supervises federal savings associations (FSA).³ References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

policy or established practice that is discriminatory in purpose or effect;

- Whether there is evidence of similar conduct by a financial institution toward more than one applicant. Note, however, that this is not a mathematical process, e.g., "more than one" does not necessarily constitute a pattern or practice;
- Whether the conduct has some common source or cause within the financial institution's control;
- The relationship of the instances of conduct to one another (e.g., whether they all occurred in the same area of the financial institution's operations); and
- The relationship of the number of instances of conduct to the financial institution's total lending activity. Note, however, that, depending on the circumstances, violations that involve only a small percentage of an institution's total lending activity could constitute a pattern or practice.

Depending on the egregiousness of the facts and circumstances involved, singly or in combination, these factors could provide evidence of a pattern or practice.

**Q10**: How does the employment of few minorities and individuals from other protected classes in lending positions--e.g., Account Executive, Underwriter, Loan Counselor, Loan Processor, Staff Appraiser, Assistant Branch Manager and Branch Manager--affect compliance with lending discrimination laws?

**A**: The employment of few minorities and others in protected classes, in itself, is not a violation of the FH Act or the ECOA. However, employment of few members of protected classes in lending positions can contribute to a climate in which lending discrimination could occur by affecting the delivery of services.

Therefore, lenders might consider the following steps, as appropriate to their institutions:

- Advertising lending job openings in local minority-oriented publications;
- Notifying predominantly minority organizations of such openings;
- Seeking employment referrals from current minority employees, minority real estate boards and local historically minority colleges and other institutions that serve minority groups in the community; and
- Seeking qualified independent fee appraisers from local minority appraisal organizations.

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

Similar outreach steps could be considered to recruit women, persons with disabilities, and other persons protected by the FH Act and the ECOA.

**Q11**: What is the role of the guidelines of secondary market purchasers and private and governmental loan insurers in determining whether primary lenders practice lending discrimination?

**A**: Many lenders make mortgage loans only when they can be sold on the secondary market, or they may place some loans in their own portfolios and sell others on the secondary market. The principal secondary market purchasers, Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"), publish underwriting guidelines to inform primary lenders of the conditions under which they will buy loans. For example, ability to repay the loan is measured by suggested ratios of monthly housing expense to income (28%) and total obligations to income (36%). However, these guidelines allow considerable discretion on the part of the primary lender. In addition, the secondary market guidelines have in some cases been made more flexible, for example, with respect to factors such as stability of income (rather than stability of employment) and use of nontraditional ways of establishing good credit and ability to pay (e.g., use of past rent and utility payment records). Lenders should ensure that their loan processors and underwriters are aware of the provisions of the secondary market guidelines that provide various alternative and flexible means by which applicants may demonstrate their ability and willingness to repay their loans. Fannie Mae and Freddie Mac not infrequently purchase mortgages exceeding the suggested ratios, and their guidelines contain detailed discussions of the compensating factors that can justify higher ratios (and which must be documented by the primary lender).

A lender who rejects an application from an applicant who is a member of a protected class and who has ratios above those of the guidelines and approves an application from another applicant with similar ratios should be prepared to show that the reason for the rejection was based on factors that are applied consistently without regard to any of the prohibited factors.

These same principles apply equally to the guidelines of private and governmental loan insurers.

**Q12**: What criteria will be employed in taking enforcement actions or seeking remedial measures when lending discrimination is discovered?

---

The OCC now supervises federal savings associations (FSA).³ References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

**A**: Enforcement sanctions and remedial measures for lending discrimination violations vary depending on whether such sanctions are sought by the appropriate federal financial institutions regulatory agencies, DOJ, HUD or other federal agencies charged with enforcing either the ECOA or the FH Act. The following discussion sets out the criteria typically employed by the federal banking agencies (i.e., OCC, OTS, the Board and FDIC), NCUA, DOJ, HUD, OFHEO, FHFB, and FTC in determining the nature and severity of sanctions that may be used to address discriminatory lending practices. As discussed in Questions 8 and 9, above, in certain situations, the primary regulatory agencies will also refer enforcement matters to HUD or DOJ.

The federal banking agencies:

The federal banking agencies are authorized to use the full range of their enforcement authority under 12 U.S.C. 1818 to address discriminatory lending practices. This includes the authority to seek:

- Enforcement actions that may require both prospective and retrospective relief; and
- Civil money penalties ("CMPs") in varying amounts against the financial institution or any institution-affiliated party ("IAP") within the meaning of 12 U.S.C. 1813(u), depending, among other things, on the nature of the violation and the degree of culpability.

In addition to the above actions, the federal banking agencies may also take removal and prohibition actions against any IAP where the statutory requirements for such actions are met.

The federal banking agencies will make determinations as to the appropriateness of any potential enforcement action after giving full consideration to a variety of factors. In making these determinations, the banking agencies will take into account:

- The number and duration of violations identified;
- The nature of the evidence of discrimination (i.e., overt discrimination, disparate treatment or disparate impact);
- Whether the discrimination was limited to a particular office or unit of the financial institution or was more pervasive in nature;
- The presence and effectiveness of any anti-discrimination policies; and
- Any history of discriminatory conduct; and

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

- Any corrective measures implemented or proposed by the financial institution.

The severity of the federal banking agencies' enforcement response will depend on the egregiousness of the financial institution's conduct. Voluntary identification and correction of violations disclosed through a self-testing program will be a substantial mitigating factor in considering whether to initiate an enforcement action.

In addition, the federal banking agencies may consider whether an institution has provided victims of discrimination with all the relief available to them under applicable civil rights laws.

The federal banking agencies may seek both prospective and retrospective relief for fair lending violations.

Prospective relief may include requiring the financial institution to:

- Adopt corrective policies and procedures and correct any financial institution policies or procedures that may have contributed to the discrimination;
- Train financial institution employees involved;
- Establish community outreach programs and change marketing strategy or loan products to better serve all sectors of the financial institution's service area;
- Improve internal audit controls and oversight systems in order to ensure there is no recurrence of discrimination; or
- Monitor compliance and provide periodic reports to the primary federal regulator.

Retrospective relief may include:

- Identifying customers who may have been subject to discrimination and offering to extend credit if the customers were improperly denied;
- Requiring the financial institution to make payments to injured parties;
- Restitution: This may include any out-of-pocket expenses incurred as a result of the violation to make the victim of discrimination whole, such as: fees or expenses in connection with the application; the difference between any greater fees or expenses of another loan granted elsewhere after denial by the discriminating lender; and, when loans were granted on

---

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting
requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information
on rule, reporting and guidance changes.

disparate terms, appropriate modification of those terms and refunds of any greater amounts paid.

- Other Affirmative Action As Appropriate to Correct Conditions Resulting From Discrimination: The federal banking agencies also have the authority to require a financial institution to take affirmative action to correct or remedy any conditions resulting from any violation or practice. The banking agencies will determine whether such affirmative action is appropriate in a given case and, if such action is appropriate, the type of remedy to order.

- Requiring the financial institution to pay CMPs:

The banking agencies have the authority to assess CMPs against financial institutions or individuals for violating fair lending laws or regulations. Each agency has the authority to assess CMPs of up to $5,000 per day for any violation of law, rule or regulation. Penalties of up to $25,000 per day are also permitted, but only if the violations represent a pattern of misconduct, cause more than minimal loss to the financial institution, or result in gain or benefit to the party involved. CMPs are paid to the U.S. Treasury and therefore do not compensate victims of discrimination.

National Credit Union Administration

For federal credit unions, NCUA will employ criteria comparable to those of the federal banking agencies, pursuant to its authority under 12 U.S.C. 1786.

The Department of Justice

The Department of Justice is authorized to use the full range of its enforcement authority under the FH Act and the ECOA. DOJ has authority to commence pattern or practice investigations of possible lending discrimination on its own initiative or through referrals from the federal financial institutions regulatory agencies, and to file lawsuits in federal court where there is reasonable cause to believe that such violations have occurred. DOJ is also authorized under the FH Act to bring suit based on individual complaints filed with HUD where one of the parties to the complaint elects to have the case heard in federal court.

The relief sought by DOJ in lending discrimination lawsuits may include:

- An injunction which may require both prospective and retrospective relief; and,

---

Comptroller's Handbook for Compliance                173                Fair Lending

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

- In enforcement actions under the FH Act, CMPs not to exceed $50,000 per defendant for a first violation and $100,000 for any subsequent violation.

Prospective injunctive relief may include:

A permanent injunction to insure against a recurrence of the unlawful practices;
Affirmative measures to correct past discriminatory policies, procedures, or practices, so long as consistent with safety and soundness, such as:

- Expansion of the lender's service areas to include previously excluded minority neighborhoods;
- Opening branches or other credit facilities in under-served minority neighborhoods;
- Targeted sales calls on real estate agents and builders active in minority neighborhoods;
- Advertising through minority-oriented media; Self-testing;
- Employee training;
- Changes to commission structures which tend to discourage lending in minority and low-income neighborhoods;
- Changes in loan processing and underwriting procedures (including second reviews of denied applications) to ensure equal treatment without regard to prohibited factors; and
- Record keeping and reporting requirements to monitor compliance with remedial obligations.

Retrospective injunctive relief may include relief for victims of past discrimination, actual and punitive damages, and offers or adjustments of credit or other forms of loan commitments.

The Department of Housing and Urban Development

The Department of Housing and Urban Development is fully authorized to investigate complaints alleging discrimination in lending in violation of the FH Act and has the authority to initiate complaints and investigations even when an individual complaint has not been received. HUD issues determinations on whether or not reasonable cause exists to believe that the FH Act has been violated. HUD also may authorize actions for temporary and preliminary injunctions to be brought by DOJ and has authority to issue

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

enforceable subpoenas for information related to investigations.

Following issuance of a determination of reasonable cause under the FH Act, HUD enforces the FH Act administratively unless one of the parties elects to have the case heard in federal court in a case brought by DOJ.

Relief under the FH Act that may be awarded by an administrative law judge ("ALJ") after a hearing, or by the Secretary on review of a decision by an ALJ, includes:

- Injunctive or other appropriate relief, including a variety of actions designed to correct discriminatory practices, such as changes in loan processes or procedures, modifications of loan service areas or branching actions, approval of previously denied loans to aggrieved persons, additional record-keeping and reporting on future activities or other affirmative relief;
- Actual damages suffered by persons who are aggrieved by any violation of the FH Act, including damages for mental distress and out-of-pocket losses attributable to a violation; and
- Civil penalties of up to $10,000 for each initial violation and up to $25,000 and $50,000 for successive violations within specific time frames.

HUD also is authorized to direct Fannie Mae and Freddie Mac to undertake various remedial actions, including suspension, probation, reprimand, or settlement, against lenders found to have engaged in discriminatory lending practices in violation of the FH Act or the ECOA.

The Office of Federal Housing Enterprise Oversight

The Office of Federal Housing Enterprise Oversight is authorized to use its enforcement authority under 12 U.S.C. 4631 and 4636, including cease and desist orders and CMPs for violations by Fannie Mae and Freddie Mac of the fair housing regulations promulgated by the Secretary of HUD pursuant to 12 U.S.C. Sec. 4545.

The Federal Housing Finance Board

While the Federal Housing Finance Board does not have enforcement authority under the ECOA or the FH Act, in reviewing the members of the Federal Home Loan Bank System for community support, it may restrict

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

access to long-term System advances to any member that, within two years prior to the due date of submission of a Community Support Statement, had a final administrative or judicial ruling against it based on violations of those statutes (or any similar state or local law prohibiting discrimination in lending). System members in this situation are asked to submit to the Finance Board an explanation of steps taken to remedy the violation or prevent a recurrence. See 12 U.S.C. 1430(g); 12 CFR 936.3 (b)(5).

The Federal Trade Commission

The Federal Trade Commission enforces the requirements of the ECOA and Regulation B for all lenders subject to the ECOA, except where enforcement is specifically committed to another agency. The FTC may exercise all of its functions and powers under the Federal Trade Commission Act ("FTC Act") to enforce the ECOA, and a violation of any requirement under the ECOA is deemed to be a violation of a requirement under the FTC Act. The FTC has the power to enforce Regulation B in the same manner as if a violation of Regulation B were a violation of an FTC trade regulation rule.

This means that the FTC has the power to investigate lenders suspected of lending discrimination and to use compulsory process in doing so. The Commission, through DOJ or on its own behalf where the Justice Department declines to act, may file suit in federal court against suspected violators and seek relief including:

- Injunctions against the violative practice;
- Civil penalties of up to $10,000 for each violation; and
- Redress to affected consumers.

In addition, the Commission routinely imposes recordkeeping and reporting requirements to monitor compliance.

**Q13**: Will a financial institution be subjected to multiple actions by DOJ or HUD and its primary regulator if discriminatory practices are discovered?

**A**: In all cases where referrals to other agencies are made, the appropriate federal financial institutions regulatory agency will engage in ongoing consultations with DOJ or HUD regarding coordination of each agency's actions. The Agencies will coordinate their enforcement actions and make every effort to eliminate unnecessarily duplicative actions. Where both a

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

federal financial institutions regulatory agency and either DOJ or HUD are contemplating taking actions under their own respective authorities, the Agencies will seek to coordinate their actions to ensure that each agency's action is consistent and complementary. The financial institutions regulatory agencies also will discuss referrals on a case-by-case basis with DOJ or HUD to determine whether multiple actions are necessary and appropriate.

# References

## Laws

42 USC 3601-3619      Civil Rights Act of 1968 (Fair Housing Act)

24 CFR 100-110        Fair Housing Regulation

15 USC 1691 et seq.   Equal Credit Opportunity Act

12 CFR 202            Equal Credit Opportunity Regulation (Regulation B)

## OCC Issuances

Advisory Letter 96-3, "Fair Lending: Pilot Testing Program"

Advisory Letter 98-9, "Access to Financing for Minority Small Businesses"

Banking Bulletin 92-17, "Guide to Fair Mortgage Lending"

Banking Bulletin 93-30, "Joint Statement on Fair Lending Expectations"

Banking Circular 263, "National Bank Fair Lending Efforts"

OCC Bulletin 97-24, "Credit Scoring Models"

| From: | Mike Pierce |
|---|---|
| To: | Hahn, Carolyn (CFPB); Hinkle, Austin (CFPB); Brown, Allison (CFPB); Evans, Kristen (CFPB); Chea, Keo (CFPB); Muniz, Brenda (CFPB); Cameron, Robert (CFPB); Shearer, Brian (CFPB); Thompson, Diane (CFPB); Matthews, Andrea (CFPB); Gasper, Susan (CFPB)(she/her/hers); Scherschel, Patricia (CFPB) |
| Cc: | Seth Frotman; Katherine Welbeck |
| Subject: | [NEW REPORT] Discrimination is "Unfair": Interpreting UDA(A)P to Prohibit Discrimination |
| Date: | Thursday, April 22, 2021 10:38:13 AM |

> **CAUTION:** This email originated from a non-government domain. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact Cybersecurity Incident Response Team (CSIRT) at 202-435-7200 or report a suspicious email.

CFPB Colleagues:

Today the SBPC released a new report, *Discrimination is "Unfair": Interpreting UDA(A)P to Prohibit Discrimination*.

The report, from the SBPC and Relman Colfax attorneys Stephen Hayes and Kali Schellenberg, examines how laws prohibiting unfair, deceptive (and sometimes abusive) acts and practices ("UDA(A)Ps") can be applied to combat discrimination in the student loan market and beyond.

Current enforcement strategies leave large swaths of the economy vulnerable to an array of discriminatory practices. For example, federal financial regulatory agencies, like the Consumer Financial Protection Bureau ("CFPB"), have focused on *credit* discrimination, but historically have not regulated or brought enforcement actions related to discrimination in other consumer financial activities like opening checking accounts, reporting credit information, or predatory financial "advising." The report lays out how federal and state regulators can leverage the full weight of existing UDAAP laws to bring greater accountability across the marketplace.

**Link to the report:** https://protectborrowers.org/discrimination-is-unfair

**Link to the blog:** https://protectborrowers.org/leveraging-udaap-in-the-fight-against-discrimination

The report calls on federal and state law enforcement agencies and regulators to take the following steps to advance an "unfairness-discrimination" application of UDA(A)P laws to combat discrimination:

- Agencies and states should pursue the unfairness-discrimination theory immediately through supervision or enforcement.

- The CFPB and FTC should adopt this construction in complementary guidance or

interpretive rules, which can be done reasonably quickly, without the need to undergo formal notice-and-comment rulemaking. Additionally, this type of clarification would pave the way for enforcement by states that might be reluctant to act without federal guidance.

- Agencies—particularly the CFPB—should subsequently issue notice-and-comment rules formalizing the unfairness-discrimination application. A notice-and-comment rulemaking would also afford the agencies the opportunity to articulate substantive standards and requirements for compliance, which may not be possible in less formal guidance.

Happy to discuss if you all have any questions!

Best,

Mike

--

Michael Justin Pierce
Policy Director & Managing Counsel
Student Borrower Protection Center
www.protectborrowers.org



# DISCRIMINATION IS "UNFAIR"

## Interpreting UDA(A)P to Prohibit Discrimination

April 2021

Prepared by:

Stephen Hayes
Partner

Kali Schellenberg
Attorney



# About the Authors

Stephen Hayes is a Partner at Relman Colfax. Stephen originally joined the firm in 2011 and returned in 2018 after several years at the Consumer Financial Protection Bureau (CFPB). His work focuses on designing best-in-class practices on a range of civil rights and consumer protection issues. Stephen has also represented individuals and organizations in numerous discrimination actions.

Kali Schellenberg is an Attorney at Relman Colfax. Her civil rights litigation practice includes cases involving discrimination in housing and public accommodations.

The views expressed in this article are the authors' alone.



Protect Borrowers

# Table of Contents

Executive Summary    04

Introduction    05

Legal Overview    07

Primer on UDA(A)P    07

Primer on Antidiscrimination Laws    08

Resulting Gaps in Antidiscrimination Coverage    10

Case Study: Student Financial Services    11

The Interpretive Case for Unfairness-Discrimination Claims    14

The Statutory Text and Interpretive Guardrails    14

Protected Classes    16

Disparate Impact-Specific Considerations    17

Assessing the Benefits Across Categories of Unfairness-Discrimination Claims    18

Opportunities for Agency Action    20

Conclusion    22

JA1165

# Executive Summary

This Article explores a theory that discrimination is a type of "unfair" practice covered by federal and state laws prohibiting unfair, deceptive (and sometimes abusive) acts and practices ("UDA(A)Ps"). An "unfair" practice is defined by statute as something "(1) likely to cause substantial injury to consumers; (2) which is not reasonably avoidable; and (3) that is not outweighed by countervailing benefits to consumers or competition." Discrimination fits neatly within this statutory language, and its incorporation as an unfair practice is consistent with the purposes and traditional guardrails around application of UDA(A)P law, as well as general principles in civil rights jurisprudence. Applying the "unfairness-discrimination" theory would fill important gaps in the existing patchwork of antidiscrimination laws, which currently leave large swaths of the economy unregulated and unprotected from a variety of discriminatory practices, including those with a disparate impact. By taking seriously the plain language of UDA(A)P law, federal entities like the CFPB and FTC, state attorneys general and agencies, and in some cases private individuals, could make great strides towards ensuring that entire markets and industries are not free to discriminate.

JA1166

# Introduction

The Biden administration has declared racial equity a top priority and directed agencies to work to end discrimination and lift barriers that restrict equal opportunities.[1] The Consumer Financial Protection Bureau ("CFPB"), for its part, has recognized that policies in the financial services industry have caused racial inequality and announced that it will "look more broadly, beyond fair lending"—its traditional antidiscrimination purview— "to identify and root out unlawful conduct that disproportionately impacts communities of color and other vulnerable populations."[2]

That statement of priorities elides (or perhaps alludes to) the reality that traditional interpretations of antidiscrimination laws leave significant gaps. Discrimination—or in some cases, certain forms of discrimination—are not expressly prohibited or regulated in large swaths of our nation's economy. The existing patchwork of antidiscrimination laws creates anomalies, even just within financial services markets. For example, financial regulatory agencies focus on *credit* discrimination but historically have not regulated discrimination related to other core consumer financial activities like opening checking accounts, credit reporting, or third-party debt collection. Moreover, while all antidiscrimination laws prohibit intentional discrimination (sometimes called "disparate treatment"), not all have been interpreted to prohibit "disparate impact" discrimination, which is an important tool for eliminating subtle forms of discrimination. Potential gaps are acute with respect to student financial services: there should be no room for doubt that discrimination is illegal and will be regulated with respect to predatory for-profit schools, exotic education-financing arrangements, fraudulent "financial advisory" services, student-specific consumer reporting, and third-party debt collection of student loans. Unfortunately, the current legal waters are muddy in some of these critical areas.

This Article offers a strategy for clarifying coverage and ensuring consistent enforcement—namely, confirming that discrimination is a type of "unfair" practice covered by federal and state laws prohibiting unfair, deceptive (and sometimes abusive) acts and practices ("UDA(A)Ps"). The CFPB and Federal Trade Commission ("FTC") both have authority to regulate "unfair" acts, defined as those that are: (1) likely to cause substantial injury to consumers; (2) which is not reasonably avoidable; and (3) that is not outweighed by countervailing benefits to consumers or competition.[3] FTC Commissioner Rohit Chopra—recently nominated to be the next Director of the CFPB—has advocated this theory, noting that "[d]iscriminatory practices often are three for three, causing grievous harm that cannot be avoided."[4] The current Acting Chair of the FTC, Rebecca Kelly Slaughter, agrees.[5] The Washington Attorney General also recently settled discrimination claims against Facebook under a similar unfairness theory, albeit under a state law that is not identical to federal unfairness laws.[6]

This "unfairness-discrimination" application of UDA(A)P laws is a straightforward legal interpretation. It would also ensure that entire markets and industries are not free to discriminate. Under this application, discrimination is prohibited not just for "creditors" explicitly covered by the Equal Credit Opportunity Act ("ECOA"), but also credit reporting agencies, predatory debt counseling companies, and even ridesharing companies or other entities engaged in interstate commerce.[7] It would bring regulating these discriminatory practices within the purview of federal agencies like the CFPB and FTC. It would also bolster enforcement by state attorneys general and regulatory agencies against discriminatory abuses by entities like predatory for-profit schools. And where permitted by state unfairness statutes, it would empower private enforcement. Finally, this application would ensure that disparate impact liability exists in these areas. In the markets where it has been applied (such as credit, employment, and housing), disparate-impact law has been a critical tool in uncovering hidden forms of discrimination and removing unnecessary barriers to equal access.

> **If the Biden administration and agencies like the CFPB and FTC are serious about racial equity and rooting out unlawful conduct that disproportionately impacts communities of color and other vulnerable populations, they cannot leave entire markets unregulated.**

If the Biden administration and agencies like the CFPB and FTC are serious about racial equity and rooting out unlawful conduct that disproportionately impacts communities of color and other vulnerable populations, they cannot leave entire markets unregulated. Federal and state agencies could pursue this theory in enforcement and supervision immediately. The CFPB and FTC could also engage in rulemaking, which is not necessary but offers additional benefits. Regardless of the vehicle, application of the unfairness-discrimination theory would be a major step toward combating discrimination and advancing equality.

6

# Legal Overview

## Primer on UDA(A)P

The Federal Trade Commission Act ("FTC Act"), enforced by the FTC, has prohibited unfair or deceptive acts or practices in commerce for almost 70 years. Section 5 of the FTC Act prohibits, in part, "unfair . . . acts or practices in or affecting commerce."[8] The CFPB has independent unfairness authority, granted by Title X of the Dodd-Frank Act. That authority is interpreted similarly to Section 5 of the FTC Act, and the FTC and CFPB have agreed to coordinate their rulemaking and enforcement activities to ensure consistency and avoid duplication.[9]

Both statutes prohibit "unfair" and "deceptive" practices, and the Dodd-Frank Act separately prohibits "abusive" practices.[10] We focus here on "unfairness" because it is an obvious fit for addressing common types of discriminatory conduct.[11] As noted, an "unfair practice" is one that: (1) causes or is likely to cause substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by countervailing benefits to consumers or to competition.[12] In determining whether a practice is unfair, the agencies may "consider established public policies as evidence to be considered with all other evidence," but "public policy considerations may not serve as a primary basis for such determination."[13]

Coverage under both statutes is particularly broad. The FTC Act applies to all persons engaged in interstate commerce.[14] Accordingly, it gives the FTC broad authority to take action against businesses that engage in unfair practices.[15] Certain entities, such as banks, savings associations, and credit unions are exempt from FTC authority, but the banking agencies—the Federal Deposit Insurance Corporation ("FDIC"), Office of the Comptroller of the Currency ("OCC"), the Federal Reserve Board ("Board"), and the National Credit Union Administration ("NCUA")—have authority to enforce Section 5 of the FTC Act for the institutions they supervise.[16]

The CFPB's UDAAP authority generally covers any person (or affiliate or service provider) that offers *any* consumer financial product or service, which is broadly defined. It includes not only credit transactions but also services related to leases, real estate settlements, deposit-taking, transmitting funds, stored value or payment instruments, check cashing, payment processing, financial advisory services like credit counseling and debt management, collecting and providing consumer report information, debt collection, and more.[17] This breadth was in part a congressional response to structural flaws in the financial system prior to Dodd-Frank, including that consumer financial protection was not the primary focus of any single agency and that diffuse responsibilities across agencies had led to regulatory arbitrage and lax regulation in certain areas.[18]

7

States also have important UDAP authority and can enforce unfairness laws in a variety of ways. First, state attorneys general have authority under Section 1042 of the Dodd-Frank Act to enforce the Act's UDAAP provisions against non-banks and state-chartered financial institutions under their jurisdiction.[19] Second, states have their own UDAP laws on the books, which state attorneys general can enforce. Some of these state UDAP statutes include private rights of action, which present opportunities to litigate emerging unfairness issues. However, state UDAP law varies, and may have significant gaps.[20] Section 1042 and the fact that many states interpret their statutes in light of federal law, can help fill some of those gaps.

# Primer on Antidiscrimination Laws

Unlike federal unfairness law, which reaches across most markets and entities, antidiscrimination law is a patchwork of statutes that often overlap and complement each other, but also leaves notable gaps. A complete survey of antidiscrimination law is beyond the scope of this Article, but the following provides an overview.

## Disparate Treatment and Disparate Impact

As an initial matter, the two traditional forms of discrimination liability are disparate treatment and disparate impact. Disparate treatment occurs when an entity explicitly or intentionally treats people differently based on prohibited factors, such as race, national origin, or sex. Unlike disparate treatment, disparate impact does not require any showing of intent to discriminate or that the protected characteristic was considered at all by the defendant. Instead, the focus of disparate impact is on effects and outcomes. Generally, unlawful disparate impact occurs when a (1) facially neutral policy or practice disproportionately harms members of protected classes, and either (2) the policy or practice does not advance a legitimate interest, or (3) is not the least discriminatory way to serve that interest.[21]

Disparate-impact law has been critical in reducing inequalities in the contexts where it has been applied. As explained below, however, not all antidiscrimination laws have been interpreted to prohibit disparate impact, which significantly limits their effectiveness in combating persistent discrimination.

## Survey of Antidiscrimination Laws

First, ECOA is the primary federal statute prohibiting credit discrimination. ECOA makes it unlawful for "any creditor" to "discriminate against any applicant, with respect to any aspect of a credit transaction" on the basis of membership in a protected class: race, color, religion, national origin, sex (including sexual orientation and gender identity), marital status, age, receipt of public assistance, or the good faith exercise of any right under the Consumer Credit Protection Act.[22] Regulation B, which implements ECOA, makes clear that the antidiscrimination protections also prohibit practices that could discourage "prospective applicants" from

8

applying for credit.[23] For a transaction to be covered by ECOA, then, it must include involvement of a "creditor," an "applicant" or "prospective applicant," and "credit" as defined by ECOA and Regulation B.[24] ECOA prohibits both disparate treatment and disparate impact.[25]

Second, the FHA, among other things, prohibits any person or other entity from discriminating in housing (including in residential real estate transactions) because of race, color, religion, sex, handicap, familial status, or national origin.[26] Similar to ECOA, the FHA prohibits discriminatory advertising.[27] Because some real estate-related transactions are also credit transactions (for example, home mortgages), certain transactions are covered by both the FHA and ECOA. Like ECOA, the FHA prohibits both disparate treatment and disparate impact.[28]

ECOA and the FHA are the two main antidiscrimination statutes enforced by federal regulatory agencies such as the CFPB, FTC, the Department of Housing and Urban Development ("HUD"), the Department of Justice ("DOJ"), and prudential financial regulatory agencies such as the OCC, FDIC, the Board, and the NCUA. Not all these agencies enforce both statutes (for example, the CFPB and FTC do not have authority over the FHA, while HUD does not have authority over ECOA), and their jurisdiction over matters falling under each varies significantly.

Third, sections of the Civil Rights Act of 1866 also prohibit discriminatory conduct. Section 1981 guarantees to "[a]ll persons within the jurisdiction of the United States" the same right as "white citizens" to "make and enforce contracts."[29] Section 1981 prohibits discrimination on the basis of race, alienage, ethnicity, ancestry, certain religions, and color.[30] Section 1982 has a similar scope, and prohibits intentional discrimination in real and personal property transactions.[31] Both statutes apply to credit and other financial arrangements.[32] These statutes often overlap with ECOA and the FHA (and other antidiscrimination statutes, such as Title VII), but are both broader and narrower in coverage. They are broader in that they are not limited to credit or housing. However, disparate impact is not cognizable under either statute. They also protect fewer classes, and they are not enforced or administered by federal regulatory agencies.

Fourth, some antidiscrimination laws apply only to entities that receive federal funds. For example, Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in programs or activities that receive federal funds.[33] Title IX of the Education Amendments of 1972, in turn, prohibits discrimination on the basis of sex in "any education program or activity receiving federal financial assistance."[34] Title IX is often interpreted similarly to Title VI.[35] Private parties seeking judicial enforcement of Title VI's nondiscrimination protections must prove intentional discrimination.[36] These laws, too, can overlap with other antidiscrimination laws. But they leave out all entities that do not receive such funds and establishing receipt of funds can be complicated.[37]

A collection of other federal antidiscrimination laws exists but are less relevant to the types of discrimination against consumers addressed in this Article.[38]

9

Finally, most states and localities have their own fair lending, fair housing, and public accommodations antidiscrimination statutes. Some state public accommodations laws are particularly broad, covering discriminatory conduct by nearly all business establishments.[39] These state and local laws often mirror the protections provided by federal law, but cover more protected classes. Some of the more common additional protected classes include familial status, explicit coverage of sexual orientation, creed, explicit coverage of gender identity or gender expression, military/veteran status, source of income, disability, and pregnancy. Some but not all these laws permit disparate impact claims,[40] and in most cases the question simply has not been authoritatively addressed.

## Resulting Gaps in Antidiscrimination Coverage

The patchwork of laws described above leaves notable gaps in coverage. Some are obvious: ECOA applies to credit transactions only; it does not apply, for example, to non-credit transactions like opening deposit accounts without credit components, cashing checks, or predatory scams related to deceptive financial advisory services.[41]

Other gaps are less obvious. Sticking with ECOA, questions inevitably arise when it comes to credit-adjacent and credit-like products, such as leases. Coverage questions also exist even when credit is clearly involved. ECOA broadly applies to "any aspect of a credit transaction."[42] At the same time, ECOA's prohibitions are limited to discrimination against "applicants" and "prospective applicants," which has created uncertainty about ECOA's reach. As one example, creditors are prohibited from discouraging "prospective applicants,"[43] but some regulatory materials have indicated that some marketing discrimination—such as pre-screened solicitations of potential applicants on a prohibited basis—may not violate ECOA.[44] Similarly, ECOA only prohibits conduct by "creditors." That term is defined broadly, including entities that regularly participate in a credit decision or regularly refer applicants or prospective applicants to creditors.[45] But some agency materials have suggested that potential assignees "who establish[] underwriting guidelines for [their] purchases but [do] not influence individual credit decisions" would *not* be creditors subject to ECOA liability—despite the fact that such entities could effectively dictate the substance of credit decisions in entire markets.[46]

To be sure, other existing antidiscrimination laws might apply where ECOA does not. For example, sections 1981 and 1982 prohibit discrimination in contracting and property transactions, respectively, which would cover deposit accounts and other non-credit products. But these laws have their own limitations: they are limited to intentional discrimination, they do not prohibit advertising or other representations that indicate discriminatory preferences, and they cover fewer protected classes.[47] Perhaps more importantly, they are not enforced by federal regulatory agencies like the CFPB, FTC, or DOJ. That means if discriminatory conduct falls outside certain statutes (like ECOA for the CFPB and FTC, and ECOA and the FHA for other banking agencies), it is unregulated by federal agencies. That limitation is crucial: a significant amount of discriminatory conduct is uncovered

through federal investigations and supervision. Many of these agencies have at their disposal extensive pre-suit mechanisms like civil investigative demands and examination authority, which are substantially more robust than the limited investigative tools available to private litigants, especially where a private suit has not been filed or not yet survived a motion to dismiss. These agencies also do not face procedural litigation hurdles related to standing, forced arbitration, or limits on collective relief that are commonly invoked to stymie private enforcement of civil rights.

Similar limitations are present in state and local law. States have varying laws, and even more varying practices for enforcement. As in the federal context, discriminatory conduct that falls outside existing state law and enforcement mechanisms can essentially go unregulated by the states.

## Case Study: Student Financial Services

Racial and national origin disparities are prevalent in financial markets related to higher education. Black and Latino student consumers—who are often less likely to rely on familial wealth to pay for their postsecondary education—take on student debt at a significantly higher rate than their white peers and face unique and substantial hardships in repayment; Black and Latino borrowers are more likely to struggle paying down balances and experience delinquency and default on their student loans.[48] In the six years after starting school, one-in-three Black borrowers and one-in-five Latino borrowers have defaulted on a student loan compared to roughly one-in-ten white borrowers.[49] Communities of color have also been targeted for abusive practices: there is evidence that private student loan companies target Black and Latino borrowers with high-cost, high risk products; debt collectors single out communities of color with illegal practices; loan servicers provide inferior service to borrowers of color, driving them into delinquency and default; and for-profit schools engage in reverse redlining practices that exploit students and communities of color.[50]

> [A]n unfairness discrimination theory would cut through potential coverage questions and ensure regulators, states, and private parties have the legal tools to address disparities in these markets.

The following examples illustrate where an unfairness-discrimination theory would cut through potential coverage questions and ensure regulators, states, and private parties have the legal tools to address disparities in these markets.

First, with respect to discriminatory conduct by schools themselves, there usually will be very strong arguments that these entities are "creditors" covered by ECOA.[51] Many for-profit schools originate their own private student loans, and, even if they do not originate loans, they assist students with the loan process, satisfying ECOA's requirement that a creditor "regularly arrange" for extensions of credit.[52] However, contrary (and in our view incorrect) authority exists.[53]

Second, some industry players have argued (again, in our view incorrectly) that newer higher education financing mechanisms, like income share agreements, are not "credit," and thus outside the purview of ECOA.[54] Similarly, schools could attempt to disguise credit as an account receivable, or otherwise attempt to obscure that amounts owed by students in bills or collections are in fact credit—practices similar to prior allegations against for-profit schools.[55] There is also a long history in consumer financial services of entities attempting to disguise credit transactions to evade regulatory coverage;[56] we can expect variations of these practices to continue, which will contribute to ambiguities.

Third are entities engaged in "financial advisory services." To illustrate: the CFPB brought UDAAP claims against Global Financial Support, alleging Global charged consumers for a generic "financial aid" guidebook, despite consumers believing they were paying for help in actually applying for financial aid or being matched with opportunities tailored to meet their backgrounds.[57] The court agreed with the CFPB that Global was a "covered person" subject to UDAAP because it provided "financial advisory services."[58] Had discrimination been at issue, it would have been less clear that Global was a "creditor," creating uncertainty as to whether ECOA would have applied.[59]

Fourth is third-party student loan debt collection, which might otherwise fall through cracks in antidiscrimination laws. Regulation B is clear that ECOA applies to post-origination conduct such as termination of credit and collection procedures.[60] Some courts, however, have declined to apply ECOA where a loan or debt was assigned by the "creditor" to another party, unless the assignee participated in the original credit decision or the applicant subsequently applied for credit with the assignee.[61] That limitation could leave discrimination by third-party student loan debt collectors unregulated, despite warning signs that potential discrimination in debt collection exists. For example, the CFPB has identified discrimination in debt settlement practices in other markets,[62] and a recent report issued by the Student Borrower Protection Center ("SBPC") and others found a striking pattern of debt collection lawsuits being filed disproportionately in communities of color.[63] Because engaging in debt collection related to any consumer financial product or service makes an entity a covered person subject to CFPB's UDAAP authority, such gaps would be covered.[64]

Fifth are organizations that maintain and sell information on college students, such as the National Student Clearinghouse ("NSC") and MeasureOne. Absent unique circumstances, these entities are unlikely to qualify as "creditors" under ECOA. However, the SBPC has urged the CFPB to supervise the NSC as a consumer reporting agency ("CRA"), similar to Equifax, TransUnion, and Experian.[65] Collecting, analyzing, maintaining, or providing consumer reporting information can qualify an entity as a "covered person" subject to UDAAP authority.[66] We are not aware of any existing discriminatory practices by such entities related to student information. But discriminatory practices, of course, could exist in these CRAs. For example, in a recent decision, Connecticut Fair Housing Center v. CoreLogic Rental Property Solutions, LLC, 478 F. Supp. 3d 259 (D. Conn. 2020), the court permitted FHA disparate impact and disparate treatment claims against a CRA to proceed past summary

12

judgment. There is no reason to believe discrimination does not occur in student-related markets or that relevant CRA-like entities that sell student information should be immune from antidiscrimination prohibitions.

13

# The Interpretive Case for Unfairness-Discrimination Claims

## The Statutory Text and Interpretive Guardrails

The most straightforward reading of a statute is often the best. As noted, under both the FTC and Dodd-Frank statutes, a practice is unfair if it is: (1) likely to cause substantial injury to consumers; (2) which is not reasonably avoidable; and (3) that is not outweighed by countervailing benefits to consumers or competition.[67] In the words of Commissioner Chopra: "[d]iscriminatory practices often are three for three."[68] It's hard to argue against that conclusion.

Beginning with the plain text, discrimination and unfairness are often synonymous. The term "unfair" has been used for decades to describe discrimination based on protected classes.[69] Foundational antidiscrimination laws like the "Fair Housing Act" and "Fair Lending" laws reflect this usage.[70] This is true for both disparate treatment and disparate impact: as the Supreme Court stated in *Griggs Duke Power Co.*, when it first approved disparate impact liability, the foundational employment discrimination statute "proscribes not only overt discrimination but also practices that are *fair* in form, but discriminatory in operation."[71] Courts use similar language today: "[I]n disparate-impact cases, effect, not motivation, is the touchstone because a thoughtless housing practice can be as *unfair* to minority rights as a willful scheme."[72] This relationship between discrimination and fairness is intuitive and ubiquitous; discrimination easily fits within the plain text of the operative term "unfair."

> Beginning with the plain text, discrimination and unfairness are often synonymous. The term "unfair" has been used for decades to describe discrimination based on protected classes. Foundational antidiscrimination laws like the "Fair Housing Act" and "Fair Lending" laws reflect this usage.

Of course, under the Dodd-Frank Act or the FTC Act, an act or practice cannot be considered "unfair" unless it satisfies the three statutory elements. Discrimination allegations will ordinarily readily do so. First, viable discrimination claims nearly always involve substantial injury to consumers. The FTC has interpreted this to mean not "trivial or merely speculative harms," but instead, generally, monetary harm.[73] Discrimination claims—whether disparate treatment or disparate impact—can easily satisfy this requirement. In most cases, the alleged

14

injury is not only the discrimination standing alone (although perhaps the case could be made for these injuries in certain cases), but rather the economic consequences of such discrimination (*e.g.*, paying higher fees, the opportunity costs associated with discriminatory credit denials, and the like). These harms fall neatly into the consumer injury prong, as interpreted by the FTC and CFPB.

Second, discriminatory harms are generally unavoidable by consumers. The requirement that the harm cannot be reasonably avoidable exists because the "marketplace is self-correcting; it is governed by consumer choice and the ability of individual consumers to make their own private decisions without regulatory intervention."[74] The CFPB therefore looks to whether the practice "interferes with [consumers'] ability to effectively make decisions or to take action to avoid injury."[75] This prong is essentially satisfied by definition in cases of discrimination. Where a product or service is denied entirely for discriminatory reasons, there is nothing a consumer can do to avoid the harm. Similarly, in cases of steering into an inferior product or service, a consumer will generally not even know of the discrimination. Accordingly, discrimination is an "obstacle to the free exercise of consumer decision-making,"[76] because consumers are almost never in a position to take action to avoid the injury.

> **Where a product or service is denied entirely for discriminatory reasons, there is nothing a consumer can do to avoid the harm. Similarly, in cases of steering into an inferior product or service, a consumer will generally not even know of the discrimination. Accordingly, discrimination is an "obstacle to the free exercise of consumer decision-making[.]"[1]**

The final prong of the unfairness standard looks at whether the injury is outweighed by countervailing benefits to consumers or competition. The FTC has explained that this analysis is conducted against the reality that business practices "entail a mixture of economic and other costs and benefits for purchasers. . . . The Commission is aware of these tradeoffs and will not find that a practice unfairly injures consumers unless it is injurious in its net effects."[77] This prong, too, dovetails neatly with discrimination claims. Most defendants would be reluctant even to articulate an argument that intentional discrimination against an historically protected class is justified by countervailing benefits to competition or consumers, let alone be able to make a compelling case.

Disparate impact claims, too, align with the third unfairness prong, because a practice that fails the three-step disparate impact analysis is unlikely to be outweighed by benefits to consumers or competition. The second step of the disparate impact analysis asks whether a practice with a disparate impact satisfies a legitimate business need. If not, disparate impact liability will lie. The third prong of the unfairness test would be satisfied as well because there likely is no reasonable argument that a discriminatory practice with no business justification

15

benefits consumers or competition. Along similar lines, the third step of the disparate impact analysis asks whether the legitimate business need could be achieved with a less discriminatory alternative practice. If a less discriminatory alternative exists, then disparate impact liability will lie because the discriminatory effect of the practice could have been avoided consistent with business needs.  That step encompasses a mix of economic and other costs and benefits, as does the third step of the unfairness analysis. A practice that meaningfully benefits consumers or competition can be a type of business need. However, if no benefits can be shown, both disparate impact and unfairness liability would flow. If there are meaningful benefits, in the form of lower prices, or wider availability of products, but the harms of the practice can be avoided, it would still be considered an unfair practice, and would likewise fail at the third prong of the disparate impact analysis.[78]

Finally, the FTC has explained that in evaluating unfairness, it also considers whether the conduct "violates public policy as it has been established by statute, common law, industry practice, or otherwise," because such information can provide "additional evidence on the degree of consumer injury caused by specific practices."[79] This consideration weighs heavily in favor of interpreting unfairness to encompass discrimination claims. The existence of antidiscrimination principles prohibiting discrimination on the basis of traditionally-protected classes such as race, national origin, religion, and sex have been engrained for decades in statutes and judicial decisions—precisely the sorts of formal sources noted by the FTC.[80] Few would question that the prohibitions against discrimination on at least these core grounds reflect established and widely-shared public policy. These rules are also easily administered and ascertainable: agencies and courts at the state and federal level already apply them under the existing antidiscrimination laws and there is no reason to think application would be more complicated in other contexts.

In short, the definition of unfairness, under UDA(A)P statutes, comfortably includes discrimination.

## Protected Classes

The unfairness-discrimination theory would require identifying protected classes because they are not enumerated in the FTC or Dodd-Frank Acts. This scenario, however, would not be unique; other antidiscrimination laws have been interpreted to apply to classifications not expressly enumerated.[81]

In federal law, not all existing antidiscrimination laws protect the same classes, but there is a strong argument that any federally-protected class should be covered by UDA(A)P laws as long as the three statutory unfairness prongs are met. For example, the FHA and ECOA both prohibit discrimination based on race, national origin, religion, and sex. At a minimum, these core protected classes—common across many federal antidiscrimination statutes—should be protected by the unfairness-discrimination theory. The FHA also prohibits disability and familial status discrimination. ECOA does not, but it does prohibit age, receipt of public assistance, and marital status discrimination (which the FHA does not). Discrimination based on characteristics that are not uniform but

commonly protected in federal law—for example disability and age—will also likely satisfy the three unfairness prongs, and so the default rule should be that these are protected as well. Entities should not be surprised that they are prohibited from discriminating against these historically-protected classes.[82]

Some state laws cover even more protected classes, such as military and veteran status. Assuming discrimination on these additional grounds would satisfy the three unfairness prongs (and in many cases there is good reason to think they would), whether additional classes should nonetheless be carved out from UDA(A)P protection likely depends on a range of considerations such as whether there are strong arguments that such discrimination would not violate public policy, existing protections under federal and state law, counter-arguments for legitimate reasons to discriminate on those grounds in certain contexts, and the like. At bottom, entities that *want* to discriminate on certain grounds already protected by federal or state law in other contexts should make the case why such discrimination should not also be prohibited by UDA(A)P laws. Those practical business-judgment arguments would best inform the public policy considerations in the unfairness analysis. If entities are not willing to (or cannot effectively) make that case, the classes should also be protected.

## Disparate Impact-Specific Considerations

While the plain text, and principles gleaned from historic applications of that text, are consistent with applying the unfairness-discrimination theory—and in this sense, at a minimum, prohibitions on unfairness are prohibitions against intentional discrimination—disparate impact warrants additional consideration. After all, not all explicit antidiscrimination statutes contemplate disparate impact claims. The best roadmap for whether a statute can encompass such claims is the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), in which the Court confirmed that the FHA permits disparate impact claims.[83]

The Court's analysis began with the statutory text. It instructed that antidiscrimination statutes "must be constructed to encompass disparate-impact claims when their text refers to the consequences of actions and not just the mindset of actors."[84] This type of language is sufficient on its own to indicate an antidiscrimination statute encompasses disparate impact. "Unfairness" claims do not include any scienter or intent requirements.[85] The statutory language defining an "unfair" practice is entirely focused on consumer injury, which is a quintessential effect; there is no reference to the mindset of actors.[86] This key prong, then, is satisfied.

This textual interpretation is "consistent with [the] statutory purpose[s]."[87] As discussed above, application of disparate impact fits well with the purposes of the FTC and Dodd-Frank Acts, as well as the unfairness guardrails and principles articulated by the implementing agencies. Provisions of the Dodd-Frank Act also strongly support the interpretation. In particular, the Dodd-Frank Act amended a section of the Truth in Lending Act, authorizing the CFPB to prescribe regulations to prohibit "abusive or unfair lending practices that *promote disparities* among

17

consumers of equal credit worthiness but *of different race, ethnicity, gender, or age*."[88] This is the classic language of disparate impact, demonstrating that practices can be unfair because they are discriminatory. Other sections of Dodd-Frank similarly support this interpretation. Dodd-Frank, for example, directed the CFPB to monitor for risks to support its rulemaking and other functions, including directing it to consider "the extent, if any, to which the risks of a consumer financial product or service may disproportionately affect traditionally underserved consumers."[89] That language, which is not limited to credit-related products or services, mirrors traditional disparate impact descriptions.[90]

In the end, we come back to where we began: the most straightforward reading of the statute is that it encompasses discrimination, including disparate impact. That interpretation is consistent with principles guiding historical application of unfairness claims, and it is supported by statutory context. Application of disparate impact principles is also consistent with Supreme Court guidance regarding when disparate impact is cognizable under antidiscrimination laws.

## Assessing the Benefits Across Categories of Unfairness-Discrimination Claims

This unfairness-discrimination application offers benefits in several scenarios. First, it extends protections to areas where challenged practices would *not* be unfair absent the discrimination. Consider, for example, a CRA with a policy of subjecting white students' complaints of inaccurate information to more robust investigation than the complaints of Black students. Or consider a bank that imposed more rigorous requirements for opening a deposit account or cashing a check for protected groups. In both cases, the discriminatory treatment creates substantial injury to the disfavored group. Nonetheless, absent a UDA(A)P-discrimination theory, the CFPB could be powerless to address either scenario because the challenged practices—the CRA's investigation procedures or the bank's account-opening requirements—might not be considered "unfair" if applied equally to all consumers. It is the discriminatory treatment, in combination with the resulting harm suffered by the disfavored group (*e.g.*, the inability to access credit because of inaccurate information or the denial of a deposit account), that defines the substantial injury.

This class of cases is particularly important for disparate impact allegations. For example, imagine a third-party student loan debt collector with a policy of settling for less payment with, or not pursuing, debtors in certain zip codes on the theory that residents in those areas would effectively negotiate for lower settlements anyway. Although the debt collector's policy is likely to disproportionately harm protected groups given patterns of residential segregation, it is not clear it would be considered an unfair practice absent the disparate-impact concern.[91]

18

Second, there may be circumstances in which a practice *would be* unfair (or otherwise a UDA(A)P) even absent the discrimination. Consider a recent suit by the CFPB, in partnership with Virginia, Massachusetts, and New York, against Libre by Nexus, Inc. The CFPB alleged that Libre engaged in deceptive and abusive acts by "prey[ing] on immigrants, primarily Hispanics, who speak little or no English and are being held in federal detention centers" by luring them "through a series of false and misleading statements about its programs, pressuring them to sign abusive, English-only contracts that bind the immigrants to years of exorbitant monthly payments."[92] The complaint does not include allegations of discrimination, although the language above alludes to potential discrimination against Hispanics. If those allegations were more explicit, the case might have also been pursued under a theory of "reverse redlining," which generally requires a showing that an entity: (1) offered a predatory or unfair product or practice; and (2) either the entity intentionally targeted that product or practice based on a protected class or that there was a disparate impact on that basis.[93] The alleged deceptive and abusive conduct by Libre would almost certainly trigger the first prong of that test.

What, though, would the discrimination piece add to such claims? Two things. First, there is crucial signaling and remediation value to treating civil rights violations *as* civil rights violations. Remedial and prospective policy responses that do not treat these abuses as civil rights issues will fall short of providing historically disadvantaged consumers and communities of color adequate redress and preventing future exploitative practices. At a minimum, entities— including state actors that have a more robust history of bringing unfairness actions than discrimination actions—should consider the discriminatory effects of unfair practices when framing and resolving cases. Over the past decade state and federal consumer protection officials have developed experience applying UDAP law to address a range of abuses by for-profit schools, including practices alleged to disproportionately harm Black, Latino, and female students. The application of an unfairness-discrimination theory to these firms and these practices would follow this path, while more explicitly acknowledging the discriminatory effects of these abuses.[94]

> [T]here is crucial signaling and remediation value to treating civil rights violations *as* civil rights violations. Remedial and prospective policy responses that do not treat these abuses as civil rights issues will fall short of providing historically disadvantaged consumers and communities of color adequate redress and preventing future exploitative practices.

Second, unfairness-discrimination should serve to enhance penalties, including civil money penalties ("CMPs"). Section 1055(c)(2) of the Dodd-Frank Act sets forth a three-tiered framework for maximum CMPs the CFPB may assess. Maximum daily CMPs are $25,000 where a person "recklessly" engages in a violation, and up to $1,000,000 a day when a person "knowingly" violates the law.[95] Evidence of intentional discrimination should

19

move defendants into those higher tiers. It should also serve to counter potential mitigating factors. The Dodd-Frank Act directs the CFPB to consider factors such as good faith, the gravity of the violation, severity of risks to consumers, and "such other matters as justice may require."[96] The existence of discrimination should weigh against favorable consideration of those criteria.

Finally, the unfairness-discrimination theory is not undermined by the fact that: (1) it would fill gaps left by more explicit existing laws; *or* (2) it would prohibit conduct already prohibited by those laws. It is well settled both that a UDA(A)P "may also violate other federal or state laws" and that "a transaction that is in technical compliance with other federal or state laws may nevertheless violate the prohibition against UDAAPs."[97] The agencies already use UDA(A)P to fill in gaps left by more explicit laws. For example, the Fair Debt Collection Practices Act ("FDCPA") makes it illegal for debt collectors to, among other things, engage in unfair or unconscionable practices.[98] But the FDCPA generally only applies to *third-party* debt collectors, such as collection agencies and debt purchasers, not creditors collecting their own debts.[99] The CFPB has made clear that UDAAP fills that significant gap in the FDCPA, extending FDCPA-like protections to entities collecting their own debts.[100] Similarly, the agencies commonly pursue UDA(A)P violations, even if the UDA(A)P application overlaps with other federal or state laws.[101] The unfairness-discrimination theory is no different than these historic applications of unfairness.

## Opportunities for Agency Action

**[A]gencies and states could pursue the unfairness-discrimination theory immediately through supervision or enforcement.**

In many cases, agencies and states could pursue the unfairness-discrimination theory immediately through supervision or enforcement. As discussed, most applications of the unfairness-discrimination theory flow from a straightforward interpretation of the unfairness laws. Where state law allows, private parties could enforce rights through private rights of action. Particularly in cases with strong evidence of intentional discrimination against traditionally protected classes, defenses that entities did not have sufficient notice of this application of unfairness statutes are unlikely to be persuasive.

The federal agencies with administrative authority over the unfairness laws should also pursue complementary regulatory actions. First, they could issue guidance or interpretive rules that do not require notice-and-comment rulemaking in which they formally adopt this construction and advise entities of how the agencies intend to exercise their supervisory and enforcement authorities in this area.[102] That type of announcement has the benefit of reminding entities of their non-discrimination obligations and obviating any potential fair-notice defense that an entity might attempt in future supervision or enforcement actions. This type of clarification also facilitates

enforcement of the Dodd-Frank Act by state attorneys general and enforcement agencies that might be reluctant to be first movers advancing the unfairness-discrimination application.[103] And, this guidance can play an important deterrent effect: notice of this application can prompt entities to adopt and extend policies, procedures, and compliance systems designed to mitigate risks, even if enforcement is not prioritized or widespread.

Second, the agencies—particularly the CFPB—could issue notice-and-comment rules formalizing the unfairness-discrimination application. Notice-and-comment rulemaking would make the interpretation eligible for *Chevron* deference, meaning that reviewing courts must accept the unfairness-discrimination interpretation absent holding the interpretation is unambiguously precluded by the unfairness statutes (which, as we have discussed, it is not).[104] A notice-and-comment rulemaking would also afford the agencies the opportunity to articulate substantive, detailed standards and requirements for compliance, which administrative law principles might limit them from articulating through less formal guidance. These three vehicles—immediate enforcement in strong cases, agency guidance, and notice-and-comment rulemaking—are complementary and could be pursued sequentially or simultaneously.

# Conclusion

The Biden administration and agencies like the CFPB and FTC should not shy away from legal theories that further their important goals of addressing discrimination and racial equity across markets. The unfairness-discrimination theory is an arrow in that quiver.

# Endnotes

[1] See, e.g., Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/; Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies (Jan. 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-redressing-our-nations-and-the-federal-governments-history-of-discriminatory-housing-practices-and-policies/.

[2] CFPB Blog, Dave Uejio, "The Bureau is taking much-needed action to protect consumers, particularly the most economically vulnerable" (Jan. 28, 2021), https://www.consumerfinance.gov/about-us/blog/the-bureau-is-taking-much-needed-action-to-protect-consumers-particularly-the-most-economically-vulnerable/.

[3] 12 U.S.C. § 5531 (CFPB UDAAP authority); 15 U.S.C. § 45(n) (FTC UDAP authority).

[4] Introductory Remarks of Commissioner Rohit Chopra, NFHA 2020 Conference (Oct. 6, 2020), https://www.ftc.gov/system/files/documents/public_statements/1581594/final_remarks_of_rchopra_to_nfha_v3.pdf; *see also* Statement of Commissioner Rohit Chopra, *In the Matter of Liberty Chevrolet, Inc.* (May 27, 2020), https://www.ftc.gov/system/files/documents/public_statements/1576002/bronx_honda_final_rchopra_bronx_honda_statement.pdf.

[5] Statement of Commissioner Rebecca Kelly Slaughter, *In the Matter of Liberty Chevrolet, Inc.*, at 4 (May 27, 2020) ("I also share Commissioner Chopra's view that discriminatory pricing practices that result from dealer markup are unfair under section 5 of the Federal Trade Commission Act."), https://www.ftc.gov/system/files/documents/public_statements/1576006/bronx_honda_2020-5-27_bx_honda_rks_concurrence_for_publication.pdf.

[6] *In re Facebook, Inc.*, Assurance of Discontinuance (July 24, 2018), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/2018_07_23%20AOD.pdf.

[7] *See* Chopra, *Liberty Chevrolet*, *supra* note 4, at 2 n.6 ("For example, if a rideshare app's pricing algorithm systematically charges higher prices to women requesting rides at night, compared to similar ride requests for men, this could constitute a violation of the FTC Act's prohibition on unfair acts or practices."); *see also* Elisa Jillson, *Aiming for truth, fairness, and equity in your company's use of AI*, Federal Trade Comm'n., (Apr. 20, 2021), https://www.ftc.gov/news-events/blogs/business-blog/2021/04/aiming-truth-fairness-equity-your-companys-use-ai.

[8] 15 U.S.C. § 45(a)(1).

[9] Memorandum of Understanding Between the Consumer Financial Protection Bureau and the Federal Trade Commission (Feb. 25, 2019), https://www.ftc.gov/system/files/documents/cooperation_agreements/ftc-cfpb_mou_225_0.pdf. Separate unfairness statutes exist in other regulatory schemes, and similar theories may apply there as well.  See e.g., 49 U.S.C. § 41712 (Department of Transportation, Civil Aeronautics Act and Federal Aviation Act); 7 U.S.C. § 213 (Department of Agriculture, Packers and Stockyard Act); 46 U.S.C. § 58106 (Department of Commerce, Merchant Marine Act). Commissioner Rohit Chopra commented specifically on the Department of Transportation's unfairness authority, arguing that unfairness in that statute should be interpreted more broadly than the FTC's definition. Comment of Federal Trade Commissioner Rohit Chopra, Docket No. DOT-OST-2019-0182,

https://www.ftc.gov/system/files/documents/public_statements/1576174/chopra_comment_to_us_department_of_transportations_dot-ost-2019-0182.pdf.

[10] This Article uses "UDAP" to refer to laws that prohibit unfair and deceptive acts, "UDAAP" to refer to the Dodd-Frank Act provisions that include unfair, deceptive, and abusive acts, and "UDA(A)P" to refer to these laws collectively.

[11] This Article does not address deception and abusiveness, but they too could be effective tools in certain circumstances. For example, deceptive techniques may be used to steer protected class members into inferior products or higher rates. And abusive practices may take unreasonable advantage of consumers' inability to protect themselves because differences in treatment are based on immutable protected characteristics.

[12] 12 U.S.C. § 5531(c)(1); 15 U.S.C. § 45(n).

[13] *Id.*

[14] Board, FDIC, "Unfair or Deceptive Acts or Practices by State-Chartered Banks" (Mar. 11, 2004), https://www.fdic.gov/news/financial-institution-letters/2004/fil2604a.html.

[15] The FTC Act has been interpreted as protecting business, as well as individuals from unfair practices. *See, e.g., FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 934 (N.D. Ill. 2008).

[16] The banking agencies have supervisory and enforcement authority both for the UDAP provisions of Section 5 of the FTC Act and the UDAAP provisions of the Dodd-Frank Act. Prudential UDA(A)P enforcement standards have historically been derived from historic FTC UDAP principles, are generally consistent with FTC and CFPB applications, and would need to align with an FTC or CFPB UDA(A)P rule that had the force and effect of law. *See, e.g.,* OCC Handbook, "Unfair or Deceptive Acts or Practices and Unfair, Deceptive or Abusive Acts or Practices," v.1.0 (June 2020), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/unfair-deceptive-act/index-udaap.html; Interagency Guidance Regarding Unfair or Deceptive Credit Practices (Aug. 22, 2014), https://files.consumerfinance.gov/f/201408_cfpb_guidance_ffiec_credit-card-practices.pdf; OCC Advisory Letter 2002-3, "Guidance on Unfair or Deceptive Acts or Practices," (March 22, 2002), https://www.occ.treas.gov/news-issuances/advisory-letters/2002/advisory-letter-2002-3.pdf.

[17] 12 U.S.C. § 5536; 12 U.S.C. § 5481(6), (15), & (26).

[18] *See* Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*, 32 Rev. Banking & Fin. L. 321, 329 (2013).

[19] 12 U.S.C. § 5552(a)(1).

[20] *See, e.g.*, Carolyn L. Carter, NCLC, "Consumer Protection in the States: A 50-State Report on Unfair and Deceptive Acts and Practices Statutes" (Feb. 2009) (noting "glaring" holes in state UDAP laws, explaining that "[l]egislation or court decisions in dozens of states have narrowed the scope of UDAP laws or granted sweeping exemptions to entire industries," and that "[o]ther states have placed substantial legal obstacles in the path of officials charged with UDAP enforcement," and "several states have stacked the financial deck against consumers who go to court to enforce the law themselves").

[21] *See, e.g.*, 12 C.F.R. part 1002, Supp. I, ¶ 6(a)-2 (ECOA articulation); 24 C.F.R. § 100.500(c)(1) (FHA articulation); 42 U.S.C. § 2000e-2(k) (Title VII articulation).

[22] 15 U.S.C. § 1691. Although sexual orientation and gender identity are not listed as separate classes under ECOA, they are protected. See CFPB Interpretive Rule, Equal Credit Opportunity (Regulation B): Discrimination on the Bases of Sexual Orientation and Gender Identity, 86 Fed. Reg. 14363 (Mar. 16, 2021).

24

[23] 12 C.F.R. § 1002.4(b).

[24] 12 C.F.R. part 1002.

[25] See, e.g., 12 C.F.R. § 1002.6(a) (current regulatory codification of the disparate impact "effects test"); Official Staff Commentary, 12 C.F.R. pt. 1002, Supp. I, 6(a)-2 (similar); Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18266 (Apr. 15, 1994).

[26] 42 U.S.C. § 3604; 42 U.S.C. § 3605(a).

[27] 42 U.S.C § 3604(c).

[28] Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, 576 U.S. 519, 539 (2015) (holding disparate impact claims are cognizable under the FHA).

[29] 42 U.S.C. § 1981.

[30] McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 287 (1976) (noting that § 1981 was enacted to protect persons of "every race and color"); Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987) (holding that § 1981 was "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics").

[31] 42 U.S.C. § 1982.

[32] See, e.g., Perez v. Wells Fargo & Co., No. 17-cv-00454-MMC, 2017 WL 3314797, at *3 (N.D. Cal. 2017); Daniels v. Winn Dixie Montgomery, Inc., No. CV 08-AR-0063-S, 2008 WL 11377627, at *2 (N.D. Ala. May 8, 2008); Dobson v. Cent. Carolina Bank & Tr. Co., 240 F. Supp. 2d 516, 524 (M.D.N.C. 2003); Evans v. First Fed. Sav. Bank of Ind., 669 F. Supp. 915, 918 (N.D. In. 1987); see also Nwachukwu v. Liberty Bank, 257 F. Supp. 3d 280, 307 (D. Conn. 2017).

[33] 42 U.S.C. § 2000d.

[34] 20 U.S.C. § 1681, et seq.

[35] See, e.g., Cannon v. Univ. of Chi., 441 U.S. 677, 694-98 (1979) (stating that Congress intended for Title XI to be interpreted and applied similarly to Title VI).

[36] Alexander v. Sandoval, 532 U.S. 275, 280-81 (2001).

[37] See, e.g., Nat'l Collegiate Athletic Ass'n v. Smith, 525 U.S. 459, 468 (1999).

[38] For example, a series of laws prohibit discrimination in employment. 42 U.S.C. §§ 2000e-2000e-27 ("Title VII"); 42 U.S.C. §§ 12111-17 ("ADA"); 29 U.S.C. §§ 621-623 ("ADEA"). And Title II of the Civil Rights Act of 1964 prohibits discrimination in public accommodations, such as hotels, restaurants, theatres, and stadiums. 42 U.S.C. § 2000a.

[39] Cal. Civ. Code § 51(b) (declaring that all persons are "entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever"); D.C. Code Ann. § 2-1402.31(a)(1), § 2-1401.02(24) (prohibiting discrimination by "establishments dealing with goods or services of any kind, including, but not limited to, the credit facilities thereof: banks, savings and loan associations, establishments of mortgage bankers and brokers, all other financial institutions"); Mass. Gen. Laws ch. 272 § 98, § 92A (prohibiting discrimination by "any place which is open to and accepts or solicits the patronage of the general public").

[40] *See, e.g.*, D.C. Code §§ 2-1401.3, 2-1402.68; N.Y.C. Admin. Code § 8-107.17.

[41] There have been recent allegations of discrimination related to check cashing and account opening activities. *See, e.g.,* Emily Flitter, N.Y. Times, *"Banking While Black": How Cashing a Check Can be a Minefield* (June 18, 2020), https://www.nytimes.com/2020/06/18/business/banks-black-customers-racism.html; Christine Hauser, N.Y. Times, *A Bank Wouldn't Take His Bias Settlement Money. So He's Suing.* (Jan. 23, 2020), https://www.nytimes.com/2020/01/23/us/race-discrimination-check-sauntore-thomas.html.

[42] 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.2(m).

[43] 12 C.F.R. § 1002.4(b).

[44] *See* FFIEC Interagency Fair Lending Examination Procedures, Appendix at p. 29-30, https://www.ffiec.gov/pdf/fairappx.pdf.

[45] 12 C.F.R. § 1002.2(l).

[46] Board, Final Rule, 68 Fed. Reg. 13144, 13145 (Mar. 18, 2003); *see also Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698 (5th Cir. 2017).

[47] *See, e.g., Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968) (stating § 1982 does not prohibit discriminatory advertising); *Patterson v. McLean Credit Union*, 491 U.S. 164, 190 (1989) (construing § 1981 in light of § 1982); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 35 (1990) (dismissing §§ 1981 and 1982 claims aimed at advertising).

[48] *See e.g.*, Student Borrower Protection Center, Letter to CFPB on Racial Equity and Student Debt (Feb. 8, 2021), https://protectborrowers.org/wp-content/uploads/2021/02/SBPC_Students-loans-and-racial-equity.pdf; Katherine Welbeck, *Race: Examining Legal Remedies for Disparate Student Debt Outcomes*, Consumer Finance Law Quarterly Report (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3712516; Judith Scott-Clayton, Shrinking Racial Gaps in Student Debt and Default: Recommendations to Congress (March 6, 2019), https://ccrc.tc.columbia.edu/easyblog/shrinking-racial-gaps-student-debt-default-congress.html; Ben Miller, *The Continued Student Loan Crisis for Black Borrowers*, Center for American Progress (Dec. 2, 2019), https://www.americanprogress.org/issues/education-postsecondary/reports/2019/12/02/477929/continued-student-loan-crisis-black-borrowers/.

[49] Student Borrower Protection Center, Letter to CFPB, *supra* note 48.

[50] *See generally* Stephen Hayes & Andrea Lowe, "Combating Exploitative Education" at 6-9 (Dec. 2020), https://protectborrowers.org/wp-content/uploads/2020/12/Combating-Exploitative-Education_2020.pdf; Student Borrower Protection Center, Letter to CFPB, *supra* note 48; Katherine Welbeck, *Race: Examining Legal Remedies, supra* note 48; Judith Scott-Clayton, Shrinking Racial Gaps, *supra* note 48; Ben Kaufman, *New Data Show Dramatic Disparities for Borrowers of Color with Private Student Loans*, Student Borrower Protection Center (Oct. 14, 2020), https://protectborrowers.org/new-data-show-dramatic-disparities-for-borrowers-of-color-with-private-student-loans; Student Borrower Protection Center, *The Long Legacy of Predatory Private Student Loans* (Jan. 2021), https://protectborrowers.org/wp-content/uploads/2021/01/Maryland-NCSLT.pdf.

[51] These entities might also be subject to other antidiscrimination protections, such as Title VI and Title IX, if they participate in federal student aid programs. Private parties seeking judicial enforcement of those laws must prove intentional discrimination, which can be a significant obstacle. Sandoval, 532 U.S at 280-81. Coverage of private student lenders under these theories may also be complicated if they do not directly receive federal funds. Finally, these laws are enforced by agencies responsible for extending federal financial assistance and the U.S. attorney general, but not major financial regulators like the CFPB.

[52] Hayes & Lowe, "Combating Exploitative Education," *supra* note 50, at 17.

26

[53] *Brook v. Sistema Universitario Ana G. Mendez, Inc.*, 2017 WL 1743500, at *3 (M.D. Fl. 2017).

[54] Joanna Pearl, Brian Shearer, *Credit by any Other Name*, at 4 (July 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3661989.

[55] For example, the State of California alleged that for-profit college operator Bridgepoint Education engaged in illegal debt collection practices when seeking to collect on "unexpected tuition expenses" imposed by its Ashford University chain of schools and assessed "unlawful debt collection fees." *See* Press Release, "Attorney General Xavier Becerra Sues For-Profit Ashford University For Defrauding and Deceiving Students" (Nov. 29, 2017), https://oag.ca.gov/news/press-releases/attorney-general-xavier-becerra-sues-profit-ashford-university-defrauding-and.

[56] *See, e.g.,* National Consumer Law Center, Credit Discrimination § 2.2.2.2.2 ("Disguised credit sales") (7th ed. 2018).

[57] *Consumer Financial Protection Bureau v. Global Financial Support, Inc.*, No. 15-cv-2440-GPC-AHG, 2021 WL 242939 (S.D. Cal. Jan. 25, 2021).

[58] *Id*. at *8 (quoting 12 U.S.C. § 5481(15)(A)(viii)).

[59] A similar example is *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, in which the CFPB alleged that ITT Educational Services, a for-profit school, committed UDAAP violations by inducing students to take out irresponsible private loans. The court thought ITT was not a creditor or a broker, but it agreed with the CFPB that ITT provided "financial advisory services." 219 F. Supp. 3d 878, 909-910 (S.D. Ind. 2015). If there were evidence of discrimination—for example, targeting these predatory schemes to communities of color—application of the more general UDAAP provisions would eliminate any ambiguity over coverage as a "creditor."

[60] 12 C.F.R. § 1002.2(m).

[61] *Adhvaryu v. Bank of America, N.A.*, 2019 WL 3000611, at *4 (C.D. Cal. 2019) (citing *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 706 (5th Cir. 2017)).

[62] *See* CFPB and American Express Reach Resolution to Address Discriminatory Card Terms in Puerto Rico and U.S. Territories (Aug. 23, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-and-american-express-reach-resolution-address-discriminatory-card-terms-puerto-rico-and-us-territories/; CFPB Orders GE Capital to Pay $225 Million in Consumer Relief for Deceptive and Discriminatory Credit Card Practices (June 19, 2014), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-ge-capital-to-pay-225-million-in-consumer-relief-for-deceptive-and-discriminatory-credit-card-practices/.

[63] *See* Seth Frotman and Tamara Cesaretti, "Maryland is Poised to End the Predatory Student Loan Debt Collection Machine that Barreled on Amidst COVID-19," Student Borrower Prot. Ctr. (January 15, 2021), https://protectborrowers.org/md-pslcollections/; *see also* Student Borrower Protection Center, *Dubious Debts: Ending an era of illegal private student loan debt collection practices* (March 2021), https://protectborrowers.org/ny-ncslt/.

[64] 12 U.S.C. § 5481(15)(x).

[65] Mike Pierce, "How a Data Company at the Center of the Student Loan System is Costing Borrowers Millions," Student Borrower Prot. Ctr. (Jan. 28, 2020), https://protectborrowers.org/how-a-data-company-at-the-center-of-the-student-loan-system-is-costing-borrowers-millions/.

[66] 12 U.S.C. § 5481(15)(ix).

[67] 12 U.S.C. § 5531 (CFPB UDAAP authority); 15 U.S.C. § 45(n) (FTC UDAP authority).

[68] Chopra, *Liberty Chevrolet*, *supra* note 4; Chopra, NFHA, *supra* note 4.

[69] *See, e.g., New Negro Alliance v. Sanitary Grocery, Co.*, 303 U.S. 552, 561 (1938) ("Race discrimination by an employer may reasonably be deemed more unfair and less excusable than discrimination against workers on the ground of union affiliation."); *Corning Glass Works v. Brennan*, 417 U.S. 188, 207 (1974) (describing the Equal Pay Act as representing congressional recognition "that discrimination in wages on the basis of sex constitutes an unfair method of competition." (internal quotation omitted)).

[70] Fair Housing Act, Pub. L. 90-284, 82 Stat. 73 (Jan. 15, 1968); 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limits, for fair housing throughout the United States."); 12 U.S.C. § 5493(c) (Dodd-Frank Act provision establishing within the CFPB an "Office of Fair Lending" empowered to coordinate and enforce "fair lending laws"); 12 U.S.C. § 5481(13) (Dodd-Frank Act provision defining the term "fair lending" to mean "fair, equitable, and nondiscriminatory access to credit for consumers").

[71] *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (emphasis added).

[72] *Reyes v. Waples Mobile Home Park Limited Partnership*, 903 F.3d 415, 430 (4th Cir. 2018) (emphasis added) (quoting *Mt Holly Gardens Citizens in Action, Inc. v. Twp. Of Mount Holly*, 658 F.3d 375, 383-84 (3d. Cir. 2011) (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976)))).

[73] FTC Policy Statement on Unfairness (Dec. 17, 1980), https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness; CFPB Supervision and Examination Manual, UDAAP at 2 (v.2 Oct. 2012), https://files.consumerfinance.gov/f/documents/102012_cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf.

[74] CFPB Manual, UDAAP, *supra* note 73, at 2.

[75] *Id.*

[76] FTC Policy Statement, *supra* note 73.

[77] *Id.*

[78] Disparate impact discrimination allegations fit neatly within the three elements of an unfairness claim. There also may be circumstances where one law prohibits a broader swath of conduct than the other. For example, at the second step of the traditional disparate impact test, a defendant must show that the challenged practice is necessary to achieve a legitimate interest. But under the third prong of the unfairness test, the injury must not be outweighed by benefits to the consumer or to competition. Permissible unfairness justifications may include a narrower range of interests than what is acceptable under disparate impact.

[79] FTC Policy Statement, *supra* note 73.

[80] *Id.*

[81] California's Unruh Act is an example. *See, e.g., Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 839-40 (2005) (noting various classes protected by the Unruh Act but not expressly enumerated in the statute).

[82] This application would expand upon the classes explicitly covered in certain areas, such as those enumerated by ECOA for credit. As discussed below, *see infra* notes 97-101, the expansion of existing laws is not unusual for UDA(A)P applications.

[83] Other commenters have noted that *Inclusive Communities supports this interpretation of UDA(A)P laws. See* Bethany A. Corbin, "Should I Stay or Should I Go?: The Future of Disparate Impact Liability Under the Fair Housing Act and Implications for the Financial Services Industry," 120 Penn St. L. Rev. 421, 474 (2015).

84 *Inclusive Communities*, 576 U.S. at 532.

85 Adam J. Levitin, "'Abusive' Acts and Practices: Towards a Definition?" at 17 (June 19, 2019), https://files.consumerfinance.gov/f/documents/cfpb_levitin-written-statement_symposium-abusive.pdf.

86 FTC Policy Statement, *supra* note 73 ("Unjustified consumer injury is the primary focus of the FTC Act.").

87 *Inclusive Communities*, 576 U.S. at 533.

88 15 U.S.C. § 1639b(c)(3)(C) (emphasis added). The CFPB has yet to exercise the authority granted by this provision, which governs residential mortgage loan originations.

89 12 U.S.C. § 5512(c)(2)(E).

90 *Inclusive Communities*, 576 U.S. at 524 ("[A] plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

91 As another example, imagine a third-party student loan debt collector with a policy of settling for less payment with debtors who majored in finance and greater payment with debtors who majored in sociology, on the theory that the former group would effectively negotiate for lower settlements anyway. Given existing demographic skews among college majors, such a policy could have a disproportionately negative impact on women. Again, though, it is not clear it would be unfair absent the disparate-impact concern. *See generally* Stephen Hayes & Alexa Milton, "Solving Student Debt or Compounding the Crisis: Income Share Agreements and Fair Lending Risks" (July 2020), https://protectborrowers.org/wp-content/uploads/2020/07/SBPC_Hayes_Milton_Relman_ISA.pdf.

92 CFPB Press Release, "Consumer Financial Protection Bureau and Virginia, Massachusetts, and New York Attorneys General Sue Libre for Predatory Immigrant-Services Scam" (Feb. 22, 2021), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-and-virginia-massachusetts-and-new-york-attorneys-general-sue-libre-for-predatory-immigrant-services-scam/.

93 Hayes & Lowe, "Combating Exploitative Education," *supra* note 50, at 10.

94 *See, e.g.*, NYC Department of Consumer and Worker Prot.,"Department of Consumer Affairs Files Charges Against Berkeley College For Deceptive and Predatory Practices," https://www1.nyc.gov/site/dca/media/pr101918-DCA-Berkeley-Investigation.page (last visited Apr. 21, 2021), (Berkeley lure[d] consumers – many of whom are people of color and first-generation college students with low incomes – to one-on-one sales pitches where they deceive them about potential financial obligations and say misrepresentations about other higher education institutions.); Office of the California Attorney General, "Attorney General Kamala D. Harris Files Suit in Alleged For-Profit College Predatory Scheme" (Oct. 10, 2013), https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-files-suit-alleged-profit-college-predatory (CCI's predatory marketing efforts specifically target vulnerable, low-income job seekers and single parents who have annual incomes near the federal poverty line.).

95 12 U.S.C. § 5565(c)(2).

96 12 U.S.C. § 5565(c)(3).

97 CFPB Manual, UDAAP, *supra* note 73, at 10.

98 15 U.S.C. § 1692f.

99 15 U.S.C. § 1692a(6).

[100] *See* CFPB Bulletin 2013-07, "Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts" (July 10, 2013), https://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf.

[101] For example, a failure to clearly disclose costs and terms of credit in violation of the Truth in Lending Act may also be a UDAAP. *See* CFPB Manual, UDAAP, *supra* note 73, at 10. As another example, in a recent complaint, the CFPB alleged that it was "unfair" for a nonbank to employ mortgage originators that were not licensed under state law. *See CFPB v. 1st Alliance Lending, LLC*, 3:21-cv-00055 ¶¶ 91-105 (Jan. 15, 2021), https://files.consumerfinance.gov/f/documents/cfpb_1st-alliance-lending-llc-et-al_complaint_2021-01.pdf. The CFPB's unfairness claim was not based directly on the violation of state law, but those alleged violations signaled an increased likelihood of unfairness-style injuries.

[102] *See generally* CFPB Final Rule, Role of Supervisory Guidance, 86 Fed. Reg. 9261, 9265 (Feb. 12, 2021).

[103] 12 U.S.C. § 5552(a); 12 C.F.R. part 1082.

[104] *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

30

By Stephen Hayes and Kali Schellenberg | April 22, 2021

We often assume it's clearly illegal for businesses to discriminate against people because of characteristics like race and sex. The truth, though, is more complicated. Discrimination is not expressly prohibited, and has not been regulated, in large swaths of our nation's economy. For example, federal financial regulatory agencies, like the Consumer Financial Protection Bureau ("CFPB"), have focused on *credit* discrimination, but historically have not regulated or brought enforcement actions related to discrimination in other consumer financial activities like opening checking accounts, reporting credit information, or predatory financial "advising." Moreover, while all antidiscrimination laws expressly prohibit intentional discrimination (sometimes called "disparate treatment"), not all have been interpreted to prohibit "disparate impact" discrimination. This inconsistency is critical because disparate impact enforcement has proven essential in eliminating more subtle forms of discrimination and advancing equality in areas where it clearly applies, like employment, housing, and credit.

With respect to student financial services, the need for effective discrimination enforcement is acute: there should be no room for doubt that discrimination is illegal and will be regulated with respect to predatory for-profit schools, exotic education-financing arrangements, fraudulent financial "advisory" services, student-specific consumer reporting, and third-party debt collection of student loans, just to name a few areas. Unfortunately, federal and state regulators and enforcement officials have yet to exercise their full authority to protect students and families from discrimination in this sector.

# There should be no room for doubt that discrimination is illegal and will be regulated with respect to predatory for-profit schools, exotic education-financing arrangements, fraudulent financial "advisory" services, student-specific consumer reporting, and third-party debt collection of student loans, just to name a few areas.

This report (https://protectborrowers.org/discrimination-is-unfair) offers a strategy for leveraging that authority: confirming that discrimination is a type of "unfair" act covered by "UDA(A)P" laws—laws prohibiting unfair, deceptive, (and sometimes abusive) acts and practices. Under these laws, an act is "unfair" if it is: (1) likely to cause substantial injury to consumers; (2) which is not reasonably avoidable; and (3) that is not outweighed by countervailing benefits to consumers or competition. In the words (https://www.ftc.gov/system/files/documents/public_statements/1581594/final_remarks_of_rchopra_to_nfha_v3.pdf) of FTC Commissioner Rohit Chopra—recently nominated to be the next director of the CFPB—"[d]iscriminatory practices often are three for three, causing grievous harm that cannot be avoided." This report demonstrates that Commissioner Chopra's assessment is supported by traditional canons of statutory construction and is consistent with core principles in UDA(A)P and antidiscrimination jurisprudence.

The CFPB and FTC both have unfairness authority, as do several other federal agencies. The reach of these statutes is broad, covering nearly the waterfront of consumer-business relations. States also have authority to enforce federal UDAAP law related to consumer financial products and services, in addition to their own state unfairness statutes, some of which include private rights of action.

# Leveraging UDA(A)P laws can help ensure discrimination is prohibited and regulated in areas where it has traditionally been disregarded. There is also crucial signaling and remediation value to treating civil rights violations as civil rights violations.

Leveraging UDA(A)P laws can help ensure discrimination is prohibited and regulated in areas where it has traditionally been disregarded. There is also crucial signaling and remediation value to treating civil rights violations *as* civil rights violations. Policy and enforcement actions that do not address discriminatory abuses as civil rights issues will fall short of providing historically disadvantaged consumers and communities of color adequate redress and preventing future exploitative practices. To that end:

- **First,** agencies and states should pursue the unfairness-discrimination theory immediately through supervision or enforcement, particularly in strong cases.

- **Second,** the CFPB and FTC should adopt this construction in complementary guidance or interpretive rules. This could be done reasonably quickly, without undergoing notice-and-comment rulemaking. This type of clarification would pave the way for enforcement by states that might be reluctant to be first movers. It would also further important deterrence and compliance goals: notice of this application would prompt entities to adopt policies, procedures, and compliance systems designed to address and mitigate discrimination risks.

- **Third**, agencies—particularly the CFPB—could subsequently issue notice-and-comment rules formalizing the unfairness-discrimination application. Notice-and-comment rulemaking would significantly increase the likelihood of success in litigation. A notice-and-comment rulemaking would also afford the agencies the opportunity to

articulate substantive standards and requirements for compliance, which may not be possible in less formal guidance.

The Biden administration has declared racial equity (https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/) a top priority and directed agencies to work to end discrimination and lift barriers that restrict equal opportunities. The CFPB, for its part, has recognized (https://www.consumerfinance.gov/about-us/blog/the-bureau-is-taking-much-needed-action-to-protect-consumers-particularly-the-most-economically-vulnerable/) that policies in the financial services industry have caused racial inequality and announced that it will "look more broadly, beyond fair lending, to identify and root out unlawful conduct that disproportionately impacts communities of color and other vulnerable populations." The unfairness-discrimination theory is an arrow in that quiver.

###

*Stephen Hayes is a Partner at Relman Colfax. Stephen originally joined the firm in 2011 and returned in 2018 after several years at the Consumer Financial Protection Bureau (CFPB). His work focuses on designing best-in-class practices on a range of civil rights and consumer protection issues.*

*Kali Schellenberg is an Attorney at Relman Colfax. Her civil rights litigation practice includes cases involving discrimination in housing and public accommodations.*

# PUBLICATION

## The Elaborate Guessing Game: The CFPB and Its Authority Under the UDAAP

**April 09, 2015**

Since its inception in July of 2011, the Consumer Financial Protection Bureau (CFPB), in the process of enforcing numerous laws under the Dodd-Frank Act, has focused primarily on "Unfair, Deceptive, or Abusive Acts and Practices" (UDAAP). Under the Dodd-Frank Act, it is unlawful for any covered person or service provider to "engage in any unfair, deceptive, or abusive act or practice." [1] To date, the CFPB has relied on this authority to open investigations, initiate proceedings and enter into a number of broad-ranging consent orders requiring payment of millions of dollars in damages and restitution. As proof of the CFPB's aim, out of more than 40 of the enforcement matters that the CFPB has made public, nearly half of them have allegations of violations of the UDAAP provision of the Dodd-Frank Act. These enforcement matters have garnered nearly $1.7 billion dollars in restitution for injured consumers – a staggering number worthy of creditors' and financial institutions' attention and research.

Notably, the challenge with UDAAP compliance for many institutions is that the standards are intentionally over-broad, flexible and vague.[2] That is to say, federal agencies have even brought UDAAP claims that mirror consumer financial services laws where the laws initially did not apply – effectively expanding their reach and making the UDAAP a catch-all. And if that weren't enough bad news for the financial industry, regulators have expressly stated that compliance with a consumer financial services law is not a defense to a UDAAP violation. However, the CFPB has made it crystal clear to financial institutions that complying with all of the applicable federal consumer protections is not enough to escape the UDAAP's broad reach. Accordingly, because the CFPB and other regulators have refused to issue a comprehensive guide to define prohibited activity under the UDAAP, financial institutions and firms must look to actions filed by the CFPB for guidance.

In reading between the lines, a financial institution can attempt to understand the exercise of the CFPB's authority under UDAAP based upon the allegations in enforcement actions and the statements contained in the CFPB's Examination Manual and agency guide. Other sources that have become valuable resources to financial institutions and providers are:

1. CFPB Consent Orders based on alleged UDAAP violations
2. Agency enforcement actions filed in the federal courts
3. Specific prohibited practices cited in the CFPB's Examination Manual
4. Bulletins and similar informational statements that elaborate on the CFPB's priorities under the UDAAP[3]

However, even these sources cannot provide a well-rounded guideline for compliance officers who wish to have a clear path on which to walk.

However, as mentioned previously, a financial institution can look to sources like previously filed CFPB enforcement actions to help determine what practices and tactics might be considered a violation of UDAAP. For instance, the CFPB recently filed three separate lawsuits against foreclosure relief companies regarding violations of UDAAP. The prohibited actions cited in the lawsuit concern misrepresentations of:[4]

- Consumers' eligibility for a mortgage or loan modification
- The likelihood of success and the savings that a consumer could obtain by modifying their loan

BAKER DONELSON

- Charging and collecting illegal upfront fees for promises modifications
- Provisions in agreements concerning legal representation when the consumer never spoke with an attorney or had their modification reviewed by an attorney[5]

After an analysis of enforcement actions brought by the CFPB and opinions from the industry, it is clear there are some actions that financial institutions can take to protect themselves from the vulnerability that has been created under the UDAAP:[6]

- Be sure the consumer understands absolutely everything with regard to your product or service, including disclosures and fee structures.
- Enhance scrutiny of your products and services targeted towards low income consumers and individuals who have experienced financial difficult in the past. These individuals will more likely than not be included as those with a lesser degree of financial sophistication.
- Understand the level of education, financial knowledge and vulnerability of your target audience.
- Comb through consumer complaints received by your institution. These complaints drive the regulation and rule-making of the CFPB.

While there are no hard and fast rules available to shield your company from liability under the UDAAP, the industry and institutions can take action in the form of preventative measures to ensure that their vulnerability is at the lowest level possible.  This can easily be done through monitoring CFPB enforcement actions, reviewing Consent Judgments and monitoring their own practices.

---

[1] 12 U.S.C. § 5536.

[2] "The Bureau may prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. Rules under this section may include requirements for the purpose of preventing such acts and practices." Section 1031(b) of the Dodd-Frank Act.

[3] Donald C. Lampe, *United States: The CFPB & UDAAP: A "Know It When You See It" Standard*, Mondaq.com, June 18, 2014.

[4] *See* Consumer Advisory: Don't Fall For A Foreclosure Relief Scam or Bogus Legal Help, CFPB, http://www.consumerfinance.gov/blog/consumer-advisory-dont-fall-for-a-foreclosure-relief-scam-or-bogus-legal-help/.

[5] *See Complaint, Consumer Financial Protection Bureau v. Clausen & Cobb Management Company, Inc.*, Case No. 2:14-CV-05681 (C.D. Ca., July 22, 2014), available at http://files.consumerfinance.gov/f/201407_cfpb_complaint_clausen-cobb.pdf; *Complaint, Consumer Financial Protection Bureau v. The Mortgage Law Group*, Case No. 3:14-CV-00513(W.D. WI., July 22, 2014), available at http://files.consumerfinance.gov/f/201407_cfpb_complaint_cfpb-v-tmlg-et-al.pdf; *Complaint, Consumer Financial Protection Bureau v. The Hoffman Law Group*, Case No. 14-CV-80931 (S.D. Fla., July 14, 2014), available at http://files.consumerfinance.gov/f/201407_cfpb_complaint_hoffman-law-group-et-al.pdf.

[6] "*The Coming Influence and Effects of UDAAP*, BAI Learning & Development Whitepaper, https://www.bai.org/libraries/lob-compliance-downloads/thecominginfluenceandeffectsofudaap_baiwhitepaper_oct2011_1.sflb.ashx, accessed April 3, 2015.