UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

No. 6:22-cv-00381

———

**Chamber of Commerce of the United States of America et al.,**
*Plaintiffs,*

v.

**Consumer Financial Protection Bureau et al.,**
*Defendants.*

———

## OPINION AND ORDER

Plaintiffs sue the Consumer Financial Protection Bureau and its director, Rohit Chopra, seeking relief from the agency's direction that its examiners must scrutinize companies for discrimination against unspecified protected classes and for how well companies introspect about statistical disparities in data concerning their business practices. Plaintiffs allege that the new examination directive must be vacated because the agency's funding structure violates the Appropriations Clause of the Constitution, because it exceeds the agency's statutory authority, and because it violates the Administrative Procedure Act substantively and procedurally.

Plaintiffs move for summary judgment in their favor on all claims.[1] Defendants move to dismiss the case or, alternatively, for summary judgment in their favor on the non-constitutional claims.[2] For the reasons given below, plaintiffs' motion for summary judgment is granted, and defendants' motions are denied.

### Background

**1.** On the heels of the 2008 financial crisis, Congress passed the Dodd–Frank Act.[3] It created the Consumer Financial Protection Bureau—an independent agency charged with ensuring that

---

[1] Doc. 17. In this opinion, citations to pages of docket entries are to the ECF-assigned page numbering, not the parties' assigned page numbering.
[2] Doc. 22.
[3] Pub. L. No. 111-203, 124 Stat. 1376 (2010).

consumer-debt products are safe and transparent.[4] Congress tasked the Bureau with administering 19 existing federal statutes, covering everything from credit cards to car payments to student loans.[5] Congress also banned regulated companies from engaging in "unfair, deceptive, or abusive acts or practices."[6] That conduct is commonly referred to as "UDAAP."

The Bureau has authority to name specific acts or practices in the consumer-finance sector as unfair, deceptive, or abusive.[7] The Bureau also has authority to issue "requirements for the purpose of preventing such acts or practices."[8] And the Bureau has authority to compel reports and examine companies on how their procedures guard against prohibited conduct.[9] Congress did not define what makes conduct "deceptive" but did define factors governing what makes conduct "unfair" or "abusive."[10]

**2.**   The Bureau's examination practices are spelled out in its Supervision and Examination Manual. As the agency states: "The manual describes how we supervise and examine these companies and gives our examiners direction on how to assess compliance with federal consumer financial laws."[11]

The manual first lays out the agency's general process for examining a company and its internal compliance systems.[12] That examination can be far-reaching. Agency examiners can request internal company data, interview a company's managers and employees, and observe operations at company facilities.[13]

---

[4] *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020).

[5] *Id.* at 2200.

[6] 12 U.S.C. § 5536(a)(1)(B).

[7] *Id.* § 5531(b).

[8] *Id.*

[9] *Id.* §§ 5514(b)(1), 5515(b)(1).

[10] *Id.* § 5531(c), (d).

[11]   CFPB, Supervision & Examinations, https://www.consumerfinance.gov/compliance/supervision-examinations (last visited Sept. 8, 2023).

[12] CFPB Supervision & Examination Manual, Part I.A, Supervision and Examination Process: Overview (Mar. 2017), Doc. 1-4.

[13] *Id.* at 11.

The manual next directs examiners on particular provisions of law. As relevant here, the manual directs officials on how to examine a company's compliance with, and procedures surrounding, the UDAAP prohibition.[14] Examiners are allowed to obtain and review a company's training manuals, written policies, procedure manuals, internal-audit materials, agreements with affiliates, records regarding software development and algorithms, and customer-demographics information.[15] When agency examiners believe they have found a violation—or inadequate internal monitoring to catch violations—the Bureau can pursue enforcement through administrative process, lawsuits, and referrals to other regulators.[16]

**3.**  Last year, the Bureau announced that it considers discrimination to be a UDAAP and will begin examining for discrimination itself and for whether companies are adequately "testing for" discrimination in their advertising, pricing, and other activities.[17] A press release summarized the change: examiners must now "require supervised companies to show their processes for assessing risks and discriminatory outcomes, including documentation of customer demographics and the impact of products and fees on different demographic groups."[18]

The manual now directs examination of whether a company regularly analyzes all of its decision-making processes and data for discrimination. Examiners must now determine whether:

> i. The entity has a process to prevent discrimination in relation to all aspects of consumer financial products or services the entity offers or provides, which includes the evaluation of all policies, procedures and processes for

---

[14] CFPB Supervision & Examination Manual, Part II.C, Unfair, Deceptive, or Abusive Acts or Practices (Mar. 2022), Doc. 1-2  ("UDAAP Manual").

[15] *Id.* at 11–12.

[16] CFPB Supervision & Examination Manual, Part I.A, Examinations and Targeted Reviews, at 17 (Feb. 2019), Doc. 1-5; 12 U.S.C. §§ 5515(e)(1)(C), 5563, 5564, 5565.

[17] Doc. 17-11 at 2.

[18] *Id.* at 2; *see* Doc. 1 at 12–13 ¶¶ 48–52 (reviewing the challenged manual revisions).

discrimination prior to implementation or making changes, and continued monitoring for discrimination after implementation.

j. The entity's compliance program includes an established process for periodic analysis and monitoring of all decision-making processes used in connection with consumer financial products or services, and a process to take corrective action to address any potential UDAAP concerns related to their use, including discrimination.

2. . . .

k. The entity has established policies and procedures to mitigate potential UDAAP concerns arising from the use of its decision-making processes, including discrimination.[19]

Examiners will review not only a company's internal controls but also its controls on third-party contractors and service providers.[20] Those third-party vendors, too, must not engage in practices "that lead to . . . disproportionately adverse impacts on a discriminatory basis."[21] To this end, examiners are directed to obtain companies' algorithms and customer demographics.[22] So agency examiners now have a UDAAP mandate to review for both purposeful discrimination and whether a company is sufficiently introspective about the impacts of business practices on certain groups relative to other groups.

**4.**   Plaintiffs are trade associations that object to the new examination mandate. They allege that, to come into compliance with the new directives, their members must update their internal policies and programs at significant cost.[23] The new directives are alleged to be invalid because the agency's funding violates the Appropriations Clause, because they exceed the agency's statutory

---

[19] UDAAP Manual, Doc. 1-2, at 13–14.
[20] *Id.* at 17.
[21] *Id.* at 18.
[22] *Id.* at 11–12.
[23] Doc. 1 at 15.

authority, because their substance is arbitrary and capricious, and because they issued without required notice-and-comment procedure.[24]

The parties conferred and agreed that "no discovery is needed prior to this Court's resolution of the parties' respective dispositive motions"[25] and that "judicial review is based solely on the administrative record."[26] For that reason, the parties sought to be excused from the requirement that motions for summary judgment list undisputed facts. Based on their concession, the court excused that requirement.[27] Any factual statements in this opinion are thus taken from uncontradicted representations in the briefing and the attached exhibits.

Defendants move to dismiss the case, arguing that the court lacks jurisdiction because of the sovereign's immunity from suit, that plaintiffs lack standing, and that venue has been improperly laid here. In the alternative, defendants move for summary judgment on the non-constitutional claims while stipulating that plaintiffs would prevail on the merits of their Appropriations Clause claim under Fifth Circuit precedent.[28] Plaintiffs, in turn, move for summary judgment in their favor on all claims.[29]

## Analysis

### 1. Sovereign immunity from suit

Defendants move to dismiss the case as barred by the federal government's sovereign immunity from suit. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."[30] Defendants argue that the waiver of sovereign immunity in 5 U.S.C. § 702 does not apply to any of plaintiffs'

---

[24] *Id.* at 17–20.
[25] Doc. 15 at 3.
[26] *Id.* at 3 (quoting D.D.C. Local Civ. R. 7(h)(2)).
[27] Doc. 16.
[28] Doc. 22.
[29] Doc. 17.
[30] *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

claims, whether they arise from the APA or not, because there is no "final agency action" within the meaning of 5 U.S.C. § 704.[31]

That position assumes that § 704's "final agency action" requirement limits the immunity waiver in the first place. But some tension exists in Fifth Circuit case law about precisely what language in § 702 waives sovereign immunity and whether that waiver includes limits imported from elsewhere. The circuit's 1980 decision in *Sheehan v. Army & Air Force Exchange Service* joined the Third Circuit's view that § 702's second sentence waives sovereign immunity broadly, without atextual limits such as an implied exclusion of common-law claims.[32] That apparently became the uniform circuit view by 2013.[33] In 2014, however, the Fifth Circuit in *Alabama–Coushatta Tribe of Texas v. United States* held that the "agency action" standard from § 702's first sentence and the "final agency action" standard from § 704 are "requirements for establishing a waiver of sovereign immunity."[34] For that proposition, the Fifth Circuit cited the Supreme Court's *Lujan* decision even though *Lujan* nowhere mentions sovereign immunity.[35]

It may be that, under the rule of orderliness, the circuit's earlier *Sheehan* position controls over its later *Alabama–Coushatta* position. But the parties do not brief the rule of orderliness or press the issue whether the "agency action" standard goes to jurisdiction or the merits. So the court will not rule on that issue.

---

[31] Doc. 22 at 19–27.

[32] 619 F.2d 1132, 1139 (5th Cir. 1980), *rev'd on other grounds*, 456 U.S. 728 (1982).

[33] *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013) ("we now join all of our sister circuits who have [addressed the issue] in holding that § 702's waiver of sovereign immunity extends to all non-monetary claims against federal agencies and their officers sued in their official capacity, regardless of whether plaintiff seeks review of 'agency action' or 'final agency action' as set forth in § 704").

[34] 757 F.3d 484, 486 (5th Cir. 2014).

[35] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 885 (1990). *See generally Bowen v. Massachusetts*, 487 U.S. 879, 896, 899 (1988) (reviewing the amendment that added § 702's second sentence, including an "especially convincing" summary by Judge Bork); *Amin v. Mayorkas*, 24 F.4th 383, 389 n.2 (5th Cir. 2022) (suggesting that the court's view treating the finality requirement as jurisdictional is out of step with Supreme Court rulings).

- 6 -

Plaintiffs do note that, even under *Alabama–Coushatta*'s more restrictive view of the waiver, "final" agency action within the meaning of § 704 is required only for a claim created by the APA.[36] In contrast to a claim under the APA for judicial review, courts need no statute creating a cause of action when asked to enjoin a federal official's actions as unconstitutional or beyond statutory authority.[37] That describes plaintiffs' claims seeking to enjoin Director Chopra from enforcing directives alleged to exceed his statutory authority and to be void due to unconstitutional funding. Insofar as those two claims seek an injunction and a declaratory judgment, those claims need only challenge "agency action" to fall within § 702's immunity waiver as interpreted in *Alabama–Coushatta* when brought by a qualifying plaintiff.

Defendants do not dispute that plaintiffs are adversely affected and aggrieved by the agency action here. The court agrees that they are. And the manual update qualifies as "agency action" because it meets at least the definition of a "rule"—a general agency statement of future effect, designed to prescribe law, policy, or agency procedure.[38] As the Fifth Circuit notes, "[t]he APA defines the term 'rule' broadly enough to include virtually every statement an agency may make."[39] The term includes both substantive rules, which must be issued with notice-and-comment

---

[36] *Ala.–Coushatta*, 757 F.3d at 489 (stating that, when a party seeks equitable relief from agency action "that arises completely apart from the general provisions of the APA," there is "no requirement of 'finality'"); *Apter v. HHS*, 2023 WL 5664191, at *6 (5th Cir. Sept. 1, 2023).

[37] *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (holding that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity" and does not rest upon a right of action implied from some positive text); *Bell v. Hood*, 327 U.S. 678, 684 (1946); *Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984) ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority.") (citing *Dugan v. Rank*, 372 U.S. 609, 621–23 (1963); *Malone v. Bowdoin*, 369 U.S. 643, 646–48 (1962); *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 689–91 (1949)).

[38] 5 U.S.C. § 551(4).

[39] *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983).

procedure,[40] and non-substantive rules, which concern topics such as "internal agency organization or procedures; non-binding agency policy statements; and guidance documents interpreting existing rules."[41] The challenged manual provisions here, at a minimum, specify agency policy on examination of regulated companies. They are thus a "rule" and therefore "agency action."

Defendants do not dispute that the manual update is "agency action."[42] But they do dispute the finality of that agency action. Two conditions generally must be met for action to be "final":

> First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.[43]

The agency action here meets the first condition. It is not merely a proposed or interim measure. It marks the consummation of the agency's decisionmaking process and was issued to "guide our supervision of covered financial institutions."[44] Defendants do not dispute that point. They rely only on *Bennett*'s second prong.

The manual update also meets that second prong because it obligates agency personnel to act on a particular understanding of an "unfair . . . act or practice" in examining and supervising companies. As the Fifth Circuit explained in *Texas v. EEOC*, "Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of *Bennett*."[45] Here, the agency admits that it made changes to "the

---

[40] *DOL v. Kast Metals Corp.*, 744 F.2d 1145, 1152–53 (5th Cir. 1984).

[41] *Apter*, 2023 WL 5664191, at *6 (quotation marks omitted).

[42] *See* Doc. 30 at 21 n.9.

[43] *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

[44] Doc. 17-13 at 2; *see Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (holding that guidance is final if an agency intends to bind its staff to a particular legal position).

[45] *EEOC*, 934 F.3d at 441.

way in which examiners will look for violations" of the UDAAP prohibition.[46] For example, the revised manual "instruct[s] the examiner" to examine whether a company "engages in targeted advertising or marketing in a discriminatory way."[47] So the update limits examiner discretion and interprets a legal norm, satisfying the second prong as interpreted in *EEOC*.[48]

Defendants unsuccessfully attempt to analogize this case to *Amin v. Mayorkas* which decided, not whether a policy memo was "final" agency action, but what type of "rule" it was, legislative or interpretive.[49] The policy memo there "merely clarifie[d] the order in which agency adjudicators evaluate the evidence" and did not specify "new criteria" for any agency decision.[50] In contrast, the manual update here adopts a new "legal position" on the breadth of the UDAAP prohibition, binding agency officials to that position in deciding how to examine companies. It is like the action in *EEOC*, not in *Amin*.

Because the manual updates here are final agency action, they fall within § 702's waiver of sovereign immunity from the APA claims as interpreted in *Alabama–Coushatta*. And, as explained above, plaintiffs' equitable-relief claims asserting a lack of constitutional and statutory authority need not challenge agency action that is "final" to fall within that waiver. For those reasons, the motion to dismiss for lack of subject-matter jurisdiction is denied.

**2.  Article III's case-or-controversy requirement**

Defendants next move to dismiss the case, or alternatively for summary judgment in their favor, because plaintiffs allegedly lack standing.[51] Defendants also move to dismiss the case for improper venue on the view that no plaintiff with standing resides in this

---

[46] Doc. 22 at 8.
[47] *Id.* at 14.
[48] *EEOC*, 933 F.3d at 442.
[49] 24 F.4th at 392.
[50] *Id.*
[51] Doc. 22 at 16–19.

district.[52] Plaintiffs, in turn, move for summary judgment on all of their claims, including on their proof of standing.[53]

Only plaintiff needs to have standing for the court to issue relief to all plaintiffs against same defendant on the same legal theory—what the Fifth Circuit calls the same "claim."[54] When an association sues on behalf of its members, the association inherits the standing of any single member with standing, provided the lawsuit is germane to the organization's mission and the member's participation is unnecessary.[55] The latter showings are apparent and undisputed. Standing here thus requires showing that some particular member of any plaintiff association "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[56]

Plaintiffs make that showing through declarations establishing that their members are incurring costs to comply with the manual's new UDAAP provisions.[57] Defendants do not dispute that these costs count as injury in fact, that defendants caused them, or that the relief sought would remedy them.

Instead, defendants make only one argument about standing: Relying on the Supreme Court's decision in *Summers v. Earth Island Institute*,[58] defendants argue that no plaintiff has shown that an "identified member" suffers harm because some plaintiffs have used pseudonyms or common nouns to describe those members.[59] That argument fails. To start, at least one plaintiff has publicly named its harmed members.[60] In any event, defendants

---

[52] *Id.* at 18–19.

[53] Doc. 29 at 12–18.

[54] *See R.J. Reynolds Tobacco Co. v. FDA*, 2022 WL 17489170, at *8 (E.D. Tex. 2022).

[55] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

[56] *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).

[57] Doc. 17-1 at 7–9 ¶¶ 14–22.

[58] 555 U.S. 488 (2009).

[59] Doc. 22 at 17.

[60] Doc. 17-3 at 25 (listing regulated members of the Consumer Bankers Association).

misunderstand *Summers*. It rejected the idea that an organization could show standing by a mere probability that some unidentified member would visit some unidentified small parcel of a large National Forest and be affected there by the Forest Service's decisions about the parcel.[61]

In contrast, plaintiffs here do not allege that some unidentified member of theirs might someday start offering financial services bringing it within CFPB oversight and then incur costs due to the manual provisions at issue. Rather, plaintiffs' declarations establish that multiple members of each association, right now, are regulated by the CFPB and are spending money because of the agency's new examination directives. Plaintiffs rely, not on what an unidentified member might do in the future, but on what specific members are doing right now. Nothing more is required.[62]

If defendants wanted to dispute the veracity of those declarations, defendants needed to either submit controverting evidence[63] or give specific reasons why they could not marshal such evidence in response to plaintiffs' motion for summary judgment.[64] But defendants did neither. So the evidence of plaintiffs' standing is uncontested.

If defendants had disputed the point and had served discovery requests seeking the names of plaintiffs' members who are suffering costs from the new manual provisions, the court might have compelled plaintiffs to disclose those members' names to defendants, perhaps under a protective order limiting those names to attorneys' eyes only. But the court itself does not need those members' names to find that the uncontradicted declarations credibly show that plaintiffs have identified members that are currently suffering cognizable harm from the agency action challenged here.

---

[61] *Summers*, 555 U.S. at 497–98.

[62] *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.23 (1982) (holding that a plaintiff must show "facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury").

[63] Fed. R. Civ. P. 56(c)(1)(A).

[64] Fed. R. Civ. P. 56(d).

The court thus denies defendants' motions to dismiss and for summary judgment premised on a lack of standing and holds that plaintiffs have standing. The court also denies defendants' motion to dismiss for improper venue because plaintiff Longview Chamber of Commerce is a resident of this district, plausibly alleged (and has now shown) standing, and sues a federal officer in a dispute not involving real property. In such a case, venue is proper in any district where the plaintiff resides.[65]

### 3. Appropriations Clause

Defendants concede that, if the court reaches the merits of the Appropriations Clause claim, it must enter summary judgment for plaintiffs given the binding force of the Fifth Circuit's decision in *Community Financial Services Association of America, Ltd. v. CFPB*.[66] Defendants have preserved their argument that the Fifth Circuit's decision there is wrong. But that decision controls in this court. The court thus grants summary judgment to plaintiffs on their Appropriations Clause claim.

### 4. Statutory authority

In the March 2022 manual update, the agency announced that UDAAPs "include[e] discrimination."[67] Plaintiffs challenge that update as exceeding the agency's statutory authority under the Dodd–Frank Act. The court agrees.

A few interpretive principles at the outset. First, the court interprets the Act without deference to the agency's position because defendants never request deference. As the Supreme Court has held, *Chevron* deference is forfeitable.[68] It is forfeited here.

---

[65] 28 U.S.C. § 1391(e)(1).
[66] 51 F.4th 616, 623 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) (No. 22-448).
[67] UDAAP Manual, Doc. 1-2, at 11, 13, 14, 17.
[68] *See, e.g., HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) ("[T]he government is not invoking *Chevron*. We therefore decline to consider whether any deference might be due its regulation.") (cleaned up).

Second, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[69] That inquiry is "shaped, at least in some measure, by the nature of the question presented"—here, whether Congress meant to confer the power the agency asserts.[70] Even if an agency's "regulatory assertions had a colorable textual basis," a court must consider "common sense as to the manner" in which Congress would likely delegate the power claimed in light of the law's history, the breadth of the regulatory assertion, and the economic and political significance of the assertion.[71]

Based on those principles, the Supreme Court recognizes that sweeping grants of regulatory authority are rarely accomplished through "vague terms" or "subtle device[s]."[72] Courts must "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies."[73] If that major-questions canon applies, "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims."[74]

The major-questions canon applies here. The choice whether the CFPB has authority to police the financial-services industry for discrimination against any group that the agency deems protected, or for lack of introspection about statistical disparities concerning any such group, is a question of major economic and political significance. As to economic impact, such an authority would have large implications for the financial-services industry. That is shown by the millions of dollars per year spent by companies attempting to comply with the UDAAP rule at issue here.[75]

---

[69] *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).
[70] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).
[71] *West Virginia v. EPA*, 142 S. Ct. 2587, 2608–09 (2022).
[72] *Id.* at 2609 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).
[73] *Id.* (quotation marks omitted).
[74] *Id.* (quotation marks omitted).
[75] *See* Doc. 17 at 31 (collecting citations).

And such agency authority would have significant political implications as to both state and federal power. The States can and do guard against discrimination, protect consumers, and regulate financial-services companies.[76] In doing so, the States make meaningful choices about what classes are protected or not, what conduct is prohibited or allowed, and what defenses and remedies are available or not. The broad authority staked out by the CFPB, however, would allow the agency to displace the balances struck by the States on those matters. That might be something Congress can authorize. But when the executive branch invokes authority that would "significantly alter the balance between federal and state power," Congress must grant that authority with "exceedingly clear language."[77]

The federal-powers implications of the agency's position are just as profound. Federal nondiscrimination statutes typically define what classes are protected, what outcomes or actions are prohibited, and defenses to liability.[78] Those decisions are often part of delicate negotiations requiring compromises or tradeoffs. So courts should expect a clear statement before finding that Congress assigned all of those major questions to an agency, especially one with an "anomalous," "self-actualizing," and "perpetual" funding mechanism.[79]

In addition, the CFPB's claimed authority to prohibit disparate-impact discrimination is something that Congress rarely authorizes.[80] When it does, Congress authorizes disparate-impact

---

[76] *See, e.g.*, Ariz. Rev. Stat. Ann. § 41-1491.20; Ark. Code Ann. §§ 4-87-104, 16-123-107(a)(4); Ind. Code Ann. § 24-9-3-9; Ga. Code Ann. § 7-6-1(a); La. Stat. Ann. § 51:2255; Miss. Code Ann. § 43-33-723; Ohio Rev. Code Ann. § 4112.021; S.C. Code Ann. § 31-21-60(B)(1); Tenn. Code Ann. § 47-18-802; Tex. Prop. Code Ann. § 301.026; Utah Code Ann. § 57-21-6(1)(b)(i).

[77] *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020)).

[78] *E.g.*, 15 U.S.C. § 1691(a), (b); 42 U.S.C. § 2000e-2(a)(2), (e), (k); *id.* § 3604(a), (f)(7).

[79] *Comm'y Fin.*, 51 F.3d at 638.

[80] *See* Richard A. Primus, Bolling *Alone*, 104 Colum. L. Rev. 975, 1027 n.187 (2004) ("[D]isparate impact is actionable under only a subset of federal antidiscrimination legislation.").

liability only in narrow circumstances, with limits that exist to avoid "serious constitutional questions."[81] So one would naturally expect a clear statement for Congress to authorize a version of discrimination liability that even explicit nondiscrimination statutes usually do not cover and that can raise serious constitutional questions.[82]

Given that context, the CFPB faces a high burden in arguing that Congress conferred a sweeping antidiscrimination authority without defining protected classes or defenses, without using the words "discrimination" or "disparate impact," and while separately giving the agency authority to police "discrimination" only in specific areas.

The agency cannot clear that high bar. As always, the court begins with the statute's text. And the Dodd–Frank Act treats discrimination and unfairness as distinct concepts. For instance, in setting forth its objectives for the agency, Congress directs the CFPB to exercise its authorities to ensure that, with respect to financial products and services, "consumers are protected [1] from unfair, deceptive or abusive acts and practices and [2] from discrimination."[83] Congress did not say "including discrimination" or "such as discrimination." It used the word "and" to conjoin two distinct concepts—UDAAP and discrimination. And only the agency's UDAAP authority is invoked in the manual provisions at issue here.

Similarly, Congress authorized a CFPB office to provide oversight and enforcement of federal laws "intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau."[84] As an

---

[81] *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015).

[82] *See, e.g.*, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989) (noting that without adequate safeguards, disparate-impact liability can lead to "numerical quotas in the workplace, a result that Congress and this Court have rejected repeatedly in the past").

[83] 12 U.S.C. § 5511(b)(2) (numbering added in brackets).

[84] *Id.* § 5493(c)(2)(A).

example of such a law, Congress cited the Equal Credit Opportunity Act, which explicitly prohibits "discrimination" and goes on to define protected classes, the elements of a plaintiff's case, and exclusions from liability.[85] The statutory text thus illustrates that Congress knew how to clearly add nondiscrimination to the CFPB's portfolio when it meant to do so.

But the statutory definition of "unfairness" makes no mention of discrimination.[86] The statute's "unfairness" section instead refers to whether an act or practice will cause consumers substantial injury that they cannot avoid and is not outweighed by countervailing benefits to consumers or competition.[87] Defendants' primary argument is that discrimination can cause such injury and can therefore meet the statutory definition. That argument has a certain appeal given the facial breadth of that section's language. But the court must also consider the structure of the Act. The "unfairness" section appears separately from other, explicit discrimination authorities. And the "unfairness" section forgoes any mention of discrimination, any mention of protected classes, and any mention of disparate-impact standards. The text and structure of the Act thus make its definition of "unfairness" at least vague as to the topic of discrimination.

The agency resists the conclusion that the statute is vague on this matter by noting that the Dodd–Frank Act's unfairness definition was drawn from the Federal Trade Commission Act, which uses the same language to limit the FTC's ability to police unfair or deceptive acts or practices ("UDAP").[88] The court accepts that the Dodd–Frank Act's definition can be understood with reference to the FTC Act's definition.

---

[85] 15 U.S.C. § 1691(a)–(b).

[86] 12 U.S.C. § 5531(c).

[87] *Id.*

[88] 15 U.S.C. § 45(n) (allowing the FTC to deem an act or practice unfair only based on "substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition").

But even legal views on the FTC Act's "unfairness" definition have changed over the decades, leaving it unclear that Congress meant to adopt a broad view on that major question in the Dodd–Frank Act. Former FTC official J. Howard Beales has published a useful summary of historic interpretations of that agency's UDAP authority.[89] At times, the FTC has relied on an individual-choice view, including in efforts to win congressional reapproval, stating that "the principal focus of our unfairness policy is on the maintenance of consumer choice or consumer sovereignty, an economic concept."[90]

On the other hand, FTC officials and practitioners have in recent years construed that agency's "unfairness" authority  more broadly, extending it to issues like the use of computer systems that yield "unfair" results based on endemic conditions that affect data sets.[91] Proponents of that view argue that "[t]hinking about discrimination as unfairness confers several advantages that have so far been overlooked," such as allowing the FTC to regulate "practices that existing discrimination laws are unlikely to reach."[92]

As even those proponents recognize, however, that legal position "may not be obvious because we typically think of discrimination as a separate problem from consumer protection."[93] And that is the salient feature here for purposes of the major-questions

---

[89] J. Howard Beales, *The FTC's Use of Unfairness Authority: Its Rise, Fall, and Resurrection* (May 30, 2003), https://www.ftc.gov/news-events/news/speeches/ftcs-use-unfairness-authority-its-rise-fall-resurrection.

[90] *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1061 n.47 (Dec. 21, 1984); *accord id.* at 1071, *reprinting* Wendell H. Ford, Letter to Senators Ford and Danforth (Dec. 17, 1980).

[91] FTC, *Big Data: A Tool for Inclusion or Exclusion?*, at 27–28 ( Jan. 2016), www.ftc.gov/system/files/documents/reports/big-data-tool-inclusion-or-exclusion-understanding-issues/160106big-data-rpt.pdf ("it is important to consider the digital divide and other issues of underrepresentation and overrepresentation in data inputs before launching a product or service in order to avoid skewed and potentially unfair ramifications").

[92] Andrew D. Selbst & Solon Barocas, *Unfair Artificial Intelligence: How FTC Intervention Can Overcome the Limitations of Discrimination*, 171 U. Pa. L. Rev. 1, 6 (2023).

[93] *Id.*

doctrine. Although the "unfairness" language in the Dodd–Frank Act or the FTC Act might be viewed broadly to embody protection against discrimination or disparate impact according to unspecified, immutable characteristics, that language has also been viewed as more narrowly limited to vindicating the sovereignty of individual consumer choice. The history of the legal provision at issue thus does not refute its ambiguity.

Given the statutory text, structure, and history just discussed, the Dodd–Frank Act's language authorizing the CFPB to regulate unfair acts or practices is not the sort of "exceedingly clear language" that the major-questions doctrine demands before finding a conferral of agency authority to regulate discrimination across the financial-services industry, independently of the CFPB's separately conferred antidiscrimination power in specific areas.[94] For that reason, the court grants summary judgment to plaintiffs on their statutory-authority claim.

Finally, a word on why the court reaches this claim. The Fifth Circuit recognizes a "sound judicial practice of refusing to decide or address issues whose resolution is not necessary to dispose of a case, unless there are compelling reasons to do otherwise."[95] Plaintiffs' Appropriations Clause claim would, under circuit precedent, justify the same relief granted on their statutory-authority claim. But the court sees fit to reach the latter claim because the Appropriations Clause issue is on review in the Supreme Court in *Community Financial*.[96] Indeed, one remedial issue in that case is whether to allow vacatur of challenged agency rules in other cases, such as this one, in which plaintiffs challenge the constitutionality of the CFPB's funding mechanism.[97] That review is a "compelling reason" to reach at least one alternative ground for the same relief sought on Appropriations Clause grounds. And the statutory-authority issue is logically antecedent to the issues of

---

[94] *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

[95] *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988).

[96] No. 22-448 (S. Ct.).

[97] *See* Br. of Amici Curiae the Chamber of Commerce of the United States of America et al. in Support of Respondents at 29 (July 10, 2023), *id.*

substantive and procedural propriety. So the court reaches that claim as well as the Appropriations Clause claim.

At the same time, the court does not see a "compelling reason" to reach plaintiffs' claims of substantive and procedural impropriety. A court of appeals can affirm a district court's judgment on any basis evident from the record, and those claims present purely legal questions. The parties thus agreed that this case can be resolved on the administrative record. So no judicial efficiency is gained by this court reaching those alternative grounds.

### 5.  Remedy

The Fifth Circuit's decision in *Community Financial* controls here as to both merits and remedy on the Appropriations Clause claim. As to remedy, it requires a "judgment holding unlawful, enjoining[,] and setting aside" the challenged agency action.[98] Even apart from that decision's binding force, the remedies of a declaration, an injunction, and vacatur are appropriate.

First, the Declaratory Judgment Act allows a reviewing court to "declare the rights and other legal relations of any interested party seeking such declaration."[99] Defendants offer no argument against declaratory relief and concede that "declaratory relief would be an appropriate remedy" if the court credits any of plaintiffs' claims.[100] The court finds it proper to exercise its discretion to issue such relief here.[101]

But the court disagrees with the parties' assumption that a declaratory judgment is simply a bare declaration that a disputed agency action is unauthorized or invalid. By statute, a declaratory judgment declares the rights or legal relations "of any interested party."[102] It is party-specific relief, not merely a statement of legal conclusions. So the court will issue a final judgment declaring that pursuing any examination, supervision, or enforcement action

---

[98] *Comm'y Fin.*, 51 F.4th at 643 (cleaned up).
[99] 28 U.S.C. § 2201(a).
[100] Doc. 22 at 43.
[101] *See Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 388 (5th Cir. 2003).
[102] 28 U.S.C. § 2201(a).

against any member of a plaintiff organization based on the CFPB's interpretation of its UDAAP authority announced in the March 2022 manual update would be unlawful as exceeding statutory authority and as based on unconstitutional funding.

Secondly, defendants concede that plaintiffs' showing on the well-established test for a permanent injunction "is fine as far as it goes."[103] Specifically, defendants do not controvert plaintiffs' showing that their members' harms from the challenged UDAAP revisions are irreparable (they are financial costs that the members cannot recover from the government in damages), that any harm to defendants from an injunction does not tilt the balance of the equities their way (the injunction simply governs future conduct), and that the public interest does not disfavor an injunction. The court agrees that plaintiffs make that showing.

Defendants oppose injunctive relief, however, arguing that vacatur of the agency action is a less restrictive remedy.[104] Vacatur of agency action is indeed different than an injunction. As I have explained elsewhere,[105] vacatur gives relief to even non-parties affected by agency action, whereas an injunction must "be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."[106] So the principle of minimalism can cut exactly opposite to defendants' suggestion. Enjoining an agency from acting as to only the plaintiffs, rather than vacating agency action as to even non-plaintiffs, would be the narrower path assuming all other things about the scope of relief are equal.

But that *ceteris paribus* assumption does not always hold. A court might craft an injunction that does more than simply apply to the plaintiffs in a given case the necessary effects of a vacatur of agency action. Those are the facts of the Supreme Court case

---

[103] Doc. 22 at 45.

[104] *Id.*

[105] *R.J. Reynolds*, 2022 WL 17489170, at *18–*21; *see also United States v. Texas*, 143 S. Ct. 1964, 1980–86 (2023) (Gorsuch, J., concurring) (discussion of the same topic).

[106] *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added).

on which defendants rely, *Monsanto Co. v. Geertson Seed Farms*.[107] The district court there, holding that an agency should have followed a different process before acting, vacated the agency's decision clearing a crop for planting.[108] But the district court also prohibited every farmer in the United States from almost all future plantings of the crop, even though the agency could still have partially deregulated the crop as to allow some such plantings.[109] Because a less drastic remedy—there, a vacatur that could allow some planting in future years under a partial deregulation—"was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted." In other words, the *ceteris paribus* assumption about the two remedies did not hold.

That reasoning does not apply here. This court's injunction will not restrict the ability to pursue examination or supervision of acts or practices that qualify as "unfair" independently of the position announced in the agency's March 2022 update to the manual's UDAAP provisions. In contrast to *Monsanto*, the injunction here will not restrain agency officials from anything more than conduct based on the disputed agency rule. Under those circumstances, the Fifth Circuit routinely affirms injunctions that track (and are thus no broader in scope than) vacatur of challenged agency action.[110] And the court's injunction will be limited to plaintiffs' members, who can disclose their membership to the

---

[107] 561 U.S. 139 (2010).

[108] *Id.* at 148.

[109] *Id.* at 146–48, 165.

[110] *Franciscan Alliance, Inc. v. Becerra*, 553 F. Supp. 3d 361, 377 (N.D. Tex. 2021) (rejecting the government's argument that a permanent injunction was duplicative with vacatur), *aff'd in relevant part*, 47 F.4th 368, 377–80 (5th Cir. 2022); *Texas v. United States*, 50 F.4th 498, 530–31 (5th Cir. 2022) (affirming the district court's grant of both vacatur and an injunction); *Shell Offshore, Inc. v. Babbitt*, 61 F. Supp. 2d 520, 529 (W.D. La. 1999) (both setting aside an order and enjoining the agency from enforcing it), *aff'd in relevant part*, 238 F.3d 622, 630–31 (5th Cir. 2011); *Nat'l Ass'n of Manuf. v. SEC*, 2022 WL 16727731, at *5 (W.D. Tex. Sept. 28, 2022) (following "the ordinary practice" of granting both vacatur and an injunction).

agency to stop prohibited conduct.[111] Defendants' argument against an injunction is thus unavailing.

Finally, defendants concede that vacatur of the March 2022 revisions "would be an appropriate remedy" if the court rules for plaintiffs on the merits.[112] I have previously explained my view that, under Fifth Circuit precedent independent of *Community Financial*, the APA's direction to "set aside" agency action held unlawful means vacating that agency action.[113] Defendants appear to share that reading of circuit precedent.[114] So the court's judgment will include vacatur of the agency action.

### Conclusion

Plaintiffs seek relief from the CFPB's March 2022 update to the UDAAP portion of its Supervision and Examination Manual, which directs examiners to use the agency's UDAAP authority to access companies' data, algorithms, operations, premises, and personnel for evidence of "discrimination," including "disproportionately adverse impacts on a discriminatory basis," or evidence of insufficient internal monitoring for those outcomes.[115] For the reasons given above, the court holds that the CFPB's adoption of that position in the March 2022 manual update is beyond the agency's constitutional authority based on an Appropriations Clause violation and beyond the agency's statutory authority to regulate "unfair" acts or practices under the Dodd–Frank Act. Plaintiffs' motion for summary judgment in their favor is thus granted,[116] and defendants' motion to dismiss the case or for summary judgment in their favor is denied.[117] The court will issue a final judgment forthwith.

---

[111] *See, e.g., Franciscan Alliance*, 2021 WL 6774686, at *1.

[112] Doc. 22 at 43.

[113] *R.J. Reynolds*, 2022 WL 17489170, at *18–*21.

[114] Doc. 22 at 44.

[115] Doc. 1 at 12–13 ¶¶ 48–52; UDAAP Manual, Doc. 1-2, at 13–17.

[116] *See* Doc. 17.

[117] *See* Doc. 22.

*So ordered by the court on September 8, 2023.*

J. CAMPBELL BARKER
United States District Judge